**No. 23-1972**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

—————————

PENINSULA PATHOLOGY ASSOCIATES,

*Petitioner-Appellee,*

v.

AMERICAN INTERNATIONAL INDUSTRIES,

*Respondent-Appellant.*

—————————

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 4:22-mc-00001-AWA-DEM
Hon. Arenda L. Wright Allen, U.S. District Court Judge

—————————

## OPENING BRIEF FOR APPELLANT
—————————

Robert E. Thackston
NELSON MULLINS RILEY &
SCARBOROUGH LLP
3333 Lee Parkway, Suite 740
Dallas, TX 75219
(469) 484-6100
robert.thackston@nelsonmullins.com

Benjamin L. Hatch
Sylvia Macon Kastens
MCGUIREWOODS, LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
(757) 640-3700
bhatch@mcguirewoods.com

*Counsel for Appellant American International Industries*

December 13, 2023

# CORPORATE DISCLOSURE STATEMENT

Appellant American International Industries is a family-owned California general partnership consisting of Glamour Industries, Inc., ARYZ Corp., ERX Corp., RAZY Properties, Inc., and SRYZ Corp.

American International Industries further discloses:

1. American International Industries is not a publicly held corporation.

2. American International Industries does not have any parent corporations.

3. No publicly held corporation owns 10% or more of American International Industries' stock.

4. No publicly held corporation has a direct financial interest in the outcome of the litigation.

5. No party is a trade association.

6. This case does not arise out of a bankruptcy proceeding.

7. This is not a criminal case.


Date: December 13, 2023

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Appellant American International Industries*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 5

STATEMENT OF THE ISSUE ............................................................ 6

STATEMENT OF THE CASE .............................................................. 7

    I.    Plaintiff Brian Gref Sues A-I-I Over Alleged Talc Exposure. ............................................................................ 7

    II.   Dr. Moline Publishes A Case Series Of Cosmetic Talc Plaintiffs. ......................................................................... 8

    III.  Dr. Emory, Dr. Maddox, And Dr. Kradin Publish A Copycat Article. ........................................................................ 10

    IV.  Plaintiffs' Medical Experts Originally Rely On Both The Emory Article And The Moline Article. ................ 16

    V.   Gref Withdraws Reliance On Dr. Moline's Paper After A-I-I Seeks To Identify Its Subjects. ........................... 17

    VI.  A-I-I Subpoenas PPA For The Identity Of The Article's Subjects. ................................................................ 18

    VII.  The Orders Below ................................................................ 19

STANDARD OF REVIEW .................................................................. 21

SUMMARY OF ARGUMENT ............................................................ 21

ARGUMENT ....................................................................................... 25

    I.    The Information Sought Is Critical To The *Gref* Case .............................................................................................. 28

    II.   Producing A List Of Names Imposes No Burden On PPA. ........................................................................................ 35

CONCLUSION .................................................................................... 39

LOCAL RULE 34(a) STATEMENT ................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*In re Am. Tobacco Co.,*
880 F.2d 1520 (2d Cir. 1989) ................................................................ 37

*Bell v. Am. Int'l Indus.,*
627 F. Supp. 3d 520 (M.D.N.C. 2022) ...................................... *passim*

*Deitchman v. E.R. Squibb & Sons, Inc.,*
740 F.2d 556 (7th Cir. 1984) ......................................................... 23, 34

*Hanson v. Colgate-Palmolive Co.,*
2018 WL 4686438 (S.D. Ga. Sept. 28, 2018) ................................ 15, 16

*Helsabeck v. Fabyanic,*
173 F. App'x 251 (4th Cir. 2006) ......................................................... 36

*Kellington v. Bayer Healthcare Pharms., Inc.,*
2016 WL 5349801 (W.D. Va. Sept. 23, 2016) ............................... 23, 33

*McCook Metals LLC v. Alcoa, Inc.,*
249 F.3d 330 (4th Cir. 2001) ................................................................. 5

*In re Mirena Ius Levonorgestrel-Related*
*Prod. Liab. Litig. (No. II),*
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ............................................ 33, 34

*Nicholas v. Wyndham Int'l, Inc.,*
373 F.3d 537 (4th Cir. 2004) ................................................................. 5

*Norris v. Baxter Healthcare Corp.,*
397 F.3d 878 (10th Cir. 2005) ................................................... 8, 22, 29

*Rider v. Sandoz Pharms. Corp.,*
295 F.3d 1194 (11th Cir. 2002) ................................................. 8, 22, 29

*Tarashuk v. Orangeburg County,*
2022 WL 473231 (D.S.C. Feb. 15, 2022) ............................................ 38

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.,*
    813 F.2d 1207 (Fed. Cir. 1987) ........................................................... 27

*United States v. First*
    580 F. App'x 171 (4th Cir. 2014) ........................................................ 21

*United States v. Parris,*
    639 F. App'x 923 (4th Cir. 2016) ........................................................ 21

*Va. Dep't of Corr. v. Jordan,*
    921 F.3d 180 (4th Cir. 2019) ........................................................ 25, 35

*Wall v. Rasnick,*
    42 F.4th 214 (4th Cir. 2022) ............................................................... 21

*Wolpin v. Philip Morris Inc.,*
    189 F.R.D. 418 (C.D. Cal. 1999) ................................................... 24, 34

*Wright v. Jeep Corp.,*
    547 F. Supp. 871 (E.D. Mich. 1982) ............................................ 24, 34

**Statutes**

28 U.S.C. § 1291 .................................................................................... 5

28 U.S.C. § 1332(a)(1) ........................................................................... 5

45 C.F.R. § 160.103 .............................................................................. 37

45 C.F.R. § 164.512(e)(1)(ii)(B) ........................................................... 38

Fed. R. Civ. P. 72(a) ............................................................................. 21

**Other Authorities**

Federal Judicial Center,
    *Reference Manual on Scientific Evidence* (3d ed. 2011) ...................... 7

Wright & Miller,
    *Federal Practice and Procedure* § 2463.1 (3d ed.) ........................ 21, 25

## INTRODUCTION

While on its face this appeal concerns a discovery order, its outcome will determine whether or not the underlying trial will proceed in a fundamentally unfair way.

Plaintiff Brian Gref claims that he developed the cancer mesothelioma from using appellant American International Industries' ("A-I-I") cosmetic talc products which he alleges were contaminated with trace amounts of asbestos. Gref's experts will say that asbestos is the only known occupational and/or environmental cause of mesothelioma in North America.

To support his claim that alleged asbestos in talc causes mesothelioma, Gref wants to tell the jury that 75 other plaintiffs in other cases developed mesothelioma when their *only* potential exposure to asbestos was cosmetic talc. That is a powerful and simple argument for a jury. But then Gref wants to prevent A-I-I from demonstrating to the jury that this contention is false because those other plaintiffs were exposed to asbestos from non-talc sources—what A-I-I has strong reason to believe is the case.

The 75 litigation plaintiffs appear in an article written by routine plaintiffs' experts Dr. Theresa Emory, Dr. John Maddox, and Dr. Richard Kradin. It's called *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients*. JA92 (the "Emory Article" or "Article"). The Article states that for all 75 of its litigation plaintiff subjects, their "only known exposure to asbestos was cosmetic talc." JA93. But the fundamental premise of the Article appears to be false. Although the Article's subjects are anonymized, A-I-I has strong reason to believe that many were exposed to asbestos from non-talc sources. For example, one individual in the Article appears to be a plaintiff named Illene Brick who smoked asbestos-containing cigarettes for years.

But the anonymity of the Article's subjects has served as a shield, allowing plaintiffs' attorneys to parade the Article in front of juries without concern that it would be proven false. One asked a jury in closing argument after discussing the Article: *How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'?* JA1219-1220.

This Article is particularly critical to the underlying litigation here because there are no epidemiological studies of end users of cosmetic talc

and mesothelioma. And epidemiology studies are widely recognized as the best evidence of causation in a tort case such as this one.

So A-I-I subpoenaed appellee Peninsula Pathology Associates ("PPA") for information concerning the Article, later narrowing its request to only a list of the 75 names of the Article's subjects. Dr. Emory and Dr. Maddox work at PPA, and Dr. Emory was both the primary author of the Article and the one who maintains the key that identifies the individuals in the Article.

The court below's decision to grant PPA's motion to quash was not just wrong, it was clearly erroneous. The information sought is critical to A-I-I's defense. And PPA faces no meaningful burden producing a single list of 75 names. The only "burden" the district court pointed to was vague "ethical concerns" regarding the confidentiality of the Article's subjects. But the court provided no source for those concerns other than Dr. Emory's say-so.

And Dr. Emory's say-so makes no sense. The subjects of the Article were not the authors' *patients*. To the contrary, those subjects all filed lawsuits publicly announcing that they developed mesothelioma and that they believed exposure to cosmetic talc contributed to the development of

3

that mesothelioma. So the only information A-I-I seeks is which public litigation cases the Article considered in conducting its analysis. Further, to the extent any legitimate concerns exist over confidentiality, there is a simple solution routinely used in litigation: a protective order.

PPA is a participant in the litigation with its owners and former owners having served as experts for plaintiffs for many years. PPA may not want the individuals identified because they do not want their made-for-litigation opinions to be subjected to scrutiny by a jury either in *Gref* and other cosmetic talc cases. But ultimately, this Court need not resolve PPA's motives or sort out the science of which party has the better causation argument. The issue here is not who will prevail at trial in the *Gref* case, but simply whether the information is relevant to the litigation and whether the request is unduly burdensome. This Court can reverse simply by recognizing (1) that the requested information is relevant to the underlying *Gref* litigation and (2) that A-I-I's narrowed request for PPA merely to produce a single document with 75 names is not unduly burdensome.

This Court should reverse the decision below and require PPA to produce the single document A-I-I has requested.

## JURISDICTIONAL STATEMENT

The district court's subject-matter jurisdiction over this ancillary proceeding is derivative of the court in which the underlying action is pending—here, the United States District Court for the Southern District of New York which has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). *See McCook Metals LLC v. Alcoa, Inc.*, 249 F.3d 330, 334 (4th Cir. 2001). The district court issued an order granting PPA's motion to quash on August 14, 2023. A-I-I filed a notice of appeal on September 13, 2023.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the district court's denial of discovery from a nonparty in an ancillary proceeding where the underlying lawsuit is pending in another circuit is immediately appealable as a collateral order. *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 541-42 (4th Cir. 2004) ("We adopt the uniform position of the courts of appeals and hold that an order denying discovery from a nonparty in an ancillary proceeding where the underlying lawsuit is pending in another circuit is immediately appealable as a collateral order.").

## STATEMENT OF THE ISSUE

Epidemiology is considered the best evidence of causation in a toxic tort case. But there are no epidemiology studies of end users of cosmetic talc and mesothelioma. The primary cosmetic-talc end-user study Plaintiff Brian Gref's medical experts rely on to fill that gap is the Emory Article. The Article's premise is that all 75 of its anonymous subjects developed mesothelioma that was caused by asbestos, and their only potential source of asbestos exposure was cosmetic talc. But A-I-I has strong reason to believe that the Article's fundamental premise is false because those same individuals appear to have been exposed to asbestos from other sources.

To defend against Gref's claims at trial, A-I-I seeks the production of a single document—the names of the 75 lawsuits upon which the Article is based. The plaintiffs in these lawsuits have already publicly declared that they suffered from mesothelioma. The authors of the Article used information from the lawsuits, mainly deposition transcripts, to conduct their study.

The question presented is: Did the district court clearly err in finding that the burden of producing a single nonprivileged, nonconfidential document outweighed the Emory Article's relevance?

## STATEMENT OF THE CASE

### I.    Plaintiff Brian Gref Sues A-I-I Over Alleged Talc Exposure.

The softest mineral on earth, talc has been used for centuries in countless products, including pharmaceuticals and cosmetics. A-I-I sold a brand of cosmetic talc powder called Clubman. JA551-552. Plaintiff Brian Gref sued A-I-I claiming that the Clubman talc he used was contaminated with trace amounts of asbestos. JA565-571. He claimed this exposure contributed to the development of his mesothelioma—a cancer that can be caused by asbestos. JA92. The case is pending in the Southern District of New York.

A critical question in the case is causation: Does exposure to cosmetic talc (including any alleged contaminants) cause mesothelioma? To resolve the question of causation in toxic tort cases like this one, parties often turn to epidemiology—the study of the patterns of diseases and their causes in human populations. *See* Federal Judicial Center, *Reference Manual On Scientific Evidence* 286, 551 (3d ed. 2011). Indeed, usually "epidemiology is the best evidence of general causation in a toxic

7

tort case." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005); *see also*, *e.g.*, *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002) ("[Epidemiology] is generally considered to be the best evidence of causation in toxic tort actions.").

But Gref and other plaintiffs across the country in cosmetic talc litigation had a problem. As Gref's own expert acknowledges, there are "no studies of the epidemiology of mesothelioma among cosmetic talc users." JA438. So plaintiffs' experts decided to create "studies" of their own for plaintiffs' experts around to country to rely on (including Gref's experts here).

This began with a paper by Gref's expert, Dr. Jacqueline Moline—who regularly testifies on behalf of the mass tort asbestos plaintiffs' bar—followed shortly afterward by the Emory Article.

## II. Dr. Moline Publishes A Case Series Of Cosmetic Talc Plaintiffs.

Dr. Moline published a paper entitled *Mesothelioma Associated with the Use of Cosmetic Talc*. JA99. The paper is a "case series" of 33 individuals who brought lawsuits alleging that talcum powder caused their mesothelioma in cases where Dr. Moline served as those plaintiffs' expert witness. JA99. It purports to be the "first large case series"

8

regarding "mesothelioma in cosmetic talc users." JA102. Dr. Moline claims in the paper that "[t]alcum powder usage was the *only* source of asbestos for all 33 cases." JA99. (emphasis added).

That premise is critical because Dr. Moline tells juries that "[a]sbestos exposure is the only known occupational and/or environmental cause of mesothelioma in North America." JA125. She therefore points the finger squarely at cosmetic talc powder, claiming her paper demonstrates that "[e]xposure to asbestos-contaminated talcum powders can cause mesothelioma." JA99.

But in 2022, the Middle District of North Carolina revealed in a similar cosmetic talc case against A-I-I that the fundamental premise of Dr. Moline's paper was false. *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 530-32 (M.D.N.C. 2022). Dr. Moline anonymized the individuals in her paper, making it difficult to uncover the paper's falsity and even harder to prove at trial. But in response to a subpoena, Dr. Moline's employer identified plaintiff Betty Bell as one of the individuals in Dr. Moline's paper.

As it turns out, Ms. Bell had filed a workers' compensation claim stating under criminal penalty for false statements that she had been

exposed to asbestos at her job. *Id.* at 531, 525 & n.2. After her death, her estate filed a second claim for death benefits. *Id.* at 525. The *Bell* Court excoriated Dr. Moline for her "concealment" of this information. *Id.* at 531. The court found that the inclusion of an individual with asbestos exposures apart from allegedly contaminated talc had "direct bearing on the study's credibility" as it contradicted the paper's entire foundation. *Id.* at 530. It expressed grave concern about the "groundbreaking nature" and "widespread influence" of Dr. Moline's paper "on the cosmetic talc litigation nationwide" given that this critical information had been shielded from public disclosure until the *Bell* Opinion was issued. *Id.* at 530, 532.

A-I-I has since unearthed numerous additional examples of individuals in Dr. Moline's paper who also appear to have been exposed to asbestos from non-talc sources. JA517-519.

## III. Dr. Emory, Dr. Maddox, And Dr. Kradin Publish A Copycat Article.

Shortly after Dr. Moline published her paper, Dr. Emory, Dr. Maddox, and Dr. Kradin published their own Article, reciting findings of their follow-on "study" that purported to bolster Dr. Moline's work. Their Article—which is at the center of this appeal—is entitled *Malignant*

*mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients*. JA92. It was published in the American Journal of Industrial Medicine, where Dr. Kradin is listed as a contributing editor.[1] As Dr. Emory stated in her deposition, "the whole point" of the Article was to fill the gap because there is no epidemiology connecting cosmetic talc end users to mesothelioma. JA898-899.

Like Dr. Moline, all three authors of the Article are serial plaintiffs' experts in asbestos litigation. Dr. Maddox and Dr. Emory both work at PPA, the appellee here. Dr. Maddox has been retained in approximately 100 litigation cases every year. JA44. Dr. Maddox recently retired from his role, and Dr. Emory has been taking over Dr. Maddox's litigation work. JA44. PPA earns $400,000 to $600,000 a year for its work in litigation, and that revenue is split among its partners. JA48-49. Dr. Maddox used to be a partner of PPA earning around a third of that revenue, and Dr. Emory currently is a partner. JA48-49; JA52; JA694.

Just like Dr. Moline's paper, the Emory Article is a case series of individuals (this time 75) who brought lawsuits alleging that talcum

---

[1] https://onlinelibrary.wiley.com/page/journal/10970274/homepage/editorialboard.html.

powder caused their mesothelioma and where at least one of the authors had served as a plaintiff-side expert witness. JA65.

Two-thirds of the litigation cases came from Dr. Maddox and Dr. Emory's litigation work through PPA, with the remaining litigation cases originating from Dr. Kradin's litigation work. JA55. Dr. Emory was the "central fulcrum" of the Article. JA58. She was its "primary author" and maintains the key that identifies the individuals in the Article. JA97; JA64.

The Emory Article expressly represents multiple times that its subjects' "only known exposure to asbestos was cosmetic talc." JA93; *see also* JA92 ("Methods: Seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders."); JA93 ("Seventy-five subjects, whose only known exposure to asbestos was via cosmetic talc . . ."). From this premise, the authors conclude that "cosmetic talc may be a cause of malignant mesothelioma." JA97.

A-I-I has good reason to believe that, like Dr. Moline's paper, the premise of the Emory Article is false—i.e., that many individuals in the Article were, in reality, exposed to non-talc sources of asbestos. In fact,

despite the Emory Article stating that all its subjects were "additional" to the subjects in Dr. Moline's paper, JA93, at least one appears to overlap between the two articles: Emory Case #72 and Moline Case #6:

| | Emory Case #72 | Moline Case #6 |
|---|---|---|
| **BIOGRAPHICAL DATA** | | |
| **Gender** | Male | Male |
| **Year of Diagnosis** | 2016 | 2016 |
| **Age at Diagnosis** | 44 | 43 |
| **Mesothelioma Site** | Pleural | Pleural |
| **Estimated Years Of Use** | 43 | 40 |
| **TISSUE DIGESTION DATA** | | |
| **Type** | Lymph Node | Lymph Node |
| **Concentration** | 17,250 f/g | 17,250 f/g |
| **Limit of Detection** | 3,450 f/g | 3,450 f/g |

JA95-96; JA103.

This individual appears to be Plaintiff Steven Lanzo:

| | Mr. Lanzo | Moline Case #6 |
|---|---|---|
| **Gender** | Male | Male |
| **Year of Diagnosis** | 2016 | 2016 |
| **Age at Diagnosis** | 43 | 43 |
| **Mesothelioma Site** | Pleural | Pleural |
| **Estimated Years Of Use** | 40 | 40 |
| **Factual Details** | "developed chest pain after playing hockey in 2012" | "developed chest pain after playing hockey in 2012" |

13

|  | Mr. Lanzo | Moline Case #6 |
|---|---|---|
|  | "Mr. Lanzo recalled using the talcum powder in the bathroom or his room, and that there would be powder on the floor." | "Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor." |
|  | "He applied the talcum powder to his torso, groin, legs and back, often twice a day after showering." | "He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering." |
|  | "He recalled getting mouthfuls of powder during the application." | "He recalled getting mouthfuls of powder during the application." |

JA101, JA103; JA941.

But Mr. Lanzo has documented exposure to asbestos from non-talc sources. In his case, both his expert and the defense expert found a type of asbestos in Mr. Lanzo's tissue known as crocidolite, which indisputably is not found in cosmetic talc. JA941-943; JA102. Mr. Lanzo also had 60 feet of exposed asbestos pipe in his basement, which was used as a family room with a TV and couches. JA944. And abatement records show that hundreds of bags of asbestos were removed from several elementary, middle, and high schools Mr. Lanzo attended, which would have been present while he was there. JA944.

Mr. Lanzo is uniquely identifiable because (1) he appears in both the Emory Article and Dr. Moline's paper; (2) both articles provide very particular metrics regarding an analysis of the plaintiff's tissue sample (known as a tissue digestion); and (3) Dr. Moline provided an extended description of the facts of his case in her paper.

While others are harder to identify, it appears that additional individuals in the Emory Article were exposed to asbestos from non-talc sources, which another cosmetic talc defendant has pieced together. Those include:

- **Case #8** may be plaintiff Illene Brick who for years smoked asbestos-containing cigarettes. Dr. Kradin's expert report from that case even stated that the asbestos from those cigarettes was a cause of her mesothelioma.

- **Case #33** may be plaintiff Rosalind Henry whose medical records say she had asbestos exposure through her job cleaning Navy ships.

- **Case #65** may be plaintiff Robert Blinkinsop who told his doctor that he believed he was exposed to asbestos through demolition-based construction work. A jury returned a full defense verdict in his case.

- **Case #67** may be plaintiff Pauline Citizen, who herself alleged she was exposed to asbestos fibers brought home from her parents' clothes at work.

- **Case #75** may be plaintiff Sharon Hanson who likely was exposed to asbestos fibers brought home from work on her husband's clothes. The court in the *Hanson* case granted

> summary judgment in favor of the talc defendant, concluding
> that "causation requires a showing more than what Dr.
> Kradin offers." *Hanson v. Colgate-Palmolive Co.*, 2018 WL
> 4686438, at *9 (S.D. Ga. Sept. 28, 2018).

Complaint ¶¶ 67-128, *LTL Mgm't LLC v. Emory*, No. 23-cv-03649,

(D.N.J. July 7, 2023), ECF 1.

Based on these examples, A-I-I has strong reason to believe that

many more of the 75 individuals in the Article were exposed to asbestos

from non-talc sources. But because those authors anonymized the

subjects in their Article, A-I-I has no way of identifying the individuals

to make this determination.

## IV. Plaintiffs' Medical Experts Originally Rely On Both The Emory Article And The Moline Article.

Gref disclosed two medical experts to testify that exposure to

asbestos in cosmetic talc causes mesothelioma—Dr. Moline and Dr.

Murray Finkelstein. JA112-491. Dr. Moline and Dr. Finkelstein

originally relied on both Dr. Moline's own paper and the Emory Article.

JA133; JA427; JA431.

Dr. Moline discusses her paper in her expert report: "I have recently

published a paper, along with co-authors, that describes 33 cases of

mesothelioma among individuals whose only known exposure to asbestos

was through their use of cosmetic talc (Moline et al, 2019)." JA133. And

16

she goes on to discuss the Emory Article as well: "Emory et al. (2020) has published a paper on an additional 75 individuals with mesothelioma whose source of asbestos exposure was cosmetic talc. Together, these papers show over 110 patients with mesothelioma and cosmetic talc use." JA133.

Dr. Finkelstein also discusses the Emory Article in a section discussing the "Human Health Effects of Talc Exposure." JA411; JA431. He repeats the central (false) premise that the study participants' "only known exposure to asbestos was repeated exposures to cosmetic talcum powders," and he even reproduces an image of a portion of the Article in his report. JA431.

## V.    Gref Withdraws Reliance On Dr. Moline's Paper After A-I-I Seeks To Identify Its Subjects.

A-I-I moved to compel Dr. Moline to identify the individuals in her paper in the Southern District of New York, explaining to the court that there are multiple "cases that appear to be ones Dr. Moline used that also involved additional exposures to asbestos, contrary to her claims." JA607; *see generally* JA596-615. A-I-I argued that it was unfair for Dr. Moline to "use her study offensively as reliance material then refuse to answer questions about it." JA608.

In response, Gref withdrew all reliance on Dr. Moline's paper: "Plaintiff withdraws his experts' reliance on the Moline Article in this matter . . . To be clear, neither Dr. Moline nor any of Mr. Gref's experts will use this article offensively in this matter." Letter Motion to Compel at 1, *Gref v. Am. Int'l Indus.*, No. 1:20-cv-05589 (S.D.N.Y. May 1, 2023), ECF 337. Gref contended that "[s]ince Plaintiff is withdrawing reliance on the article, there can be no argument that the identity of the subjects of the Moline Article are relevant in Mr. Gref's lawsuit." *Id.* That left the Emory Article as the only "study" of cosmetic talc end users of any significance in the litigation.[2]

## VI.  A-I-I Subpoenas PPA For The Identity Of The Article's Subjects.

A-I-I issued a subpoena to PPA (located in Newport News, Virginia) for information about the litigation files used to support the Emory

---

[2] In response to the *Bell* decision, Dr. Moline published a new similar paper in 2023 with many of the same flaws. After agreeing to withdraw reliance on Dr. Moline's 2020 paper, Gref attempted to *add* reliance on Dr. Moline's similar 2023 paper without leave of court even though it was not mentioned in any Gref's originally disclosed expert reports. Transcript at 11:7-20, *Gref*, No. 1:20-cv-05589 (S.D.N.Y. May 24, 2023), ECF No. 352; *see also* JA112-198; JA199-491. A-I-I has moved to strike this improper supplement. Letter to Court at 1, *Gref*, No. 1:20-cv-05589 (S.D.N.Y. June 30, 2023), ECF 380.

Article. JA10. PPA filed a motion to quash the subpoena in the Eastern District of Virginia. While the subpoena was initially broader, A-I-I narrowed its request to only the list identifying the 75 study participants at the hearing on the motion to quash. JA885 (noting that A-I-I "limited its demand to a list of the names of the participants in the Article's study"); JA852.

## VII. The Orders Below

The magistrate judge (Miller, J.) issued an order granting PPA's motion to quash, relying on the purportedly minimal relevance of the Emory Article and the supposed undue burden on PPA. Although the magistrate judge acknowledged that Gref's medical experts relied on the Emory Article, the judge concluded that their discussion of the Article represented a small a percentage of their overall reports. JA890.

The magistrate judge also believed that A-I-I could "attack the Article's conclusion" without identifying the individuals at issue. JA890. He did not state that A-I-I could otherwise demonstrate to a jury that, in fact, those individuals were exposed to asbestos from other sources. Rather, the magistrate judge stated that because Dr. Emory disclosed in the Article that she is a plaintiffs' expert, A-I-I could argue that the

"sample of litigation subjects is poorly reflective of the universe of people exposed to cosmetic talc." JA890. The magistrate judge therefore ultimately concluded that "the information A-I-I seeks is minimally relevant to their defense in the *Gref* litigation." JA889.

With respect to burden, although the magistrate judge acknowledged that "A-I-I limited its demand to a list of the names of the participants in the Article's study," the judge nevertheless concluded that "compliance with A-I-I's subpoena," i.e., the production of a single document, "would force Peninsula and Dr. Emory to bear heavy burdens, both financially and professionally." JA891. The magistrate judge also relied on Dr. Emory's own statement that identifying the individuals would violate medical ethics rules, though he did not identify any such rules, much less any laws requiring confidentiality in these circumstances. JA891. Nor did the magistrate judge address A-I-I's proposal that the information could be disclosed pursuant to a protective order.

A-I-I objected to the magistrate judge's order, and the district court (Allen, J.) affirmed. JA1210. The district court reasoned that "the Magistrate Judge's conclusion regarding minimal relevance of the

information sought by A-I-I to the *Gref* litigation" and "with regard to the

undue burden" was "based on a reasonable view of the evidence." JA1212.

A-I-I timely appealed.

## STANDARD OF REVIEW

"On appeal from a district court order affirming a magistrate

judge's decision, we use the same standard used by the district court."

*United States v. First*, 580 F. App'x 171, 172 (4th Cir. 2014). This Court

therefore evaluates whether the magistrate judge's decision was "clearly

erroneous or is contrary to law." *Wall v. Rasnick*, 42 F.4th 214, 217 (4th

Cir. 2022); Fed. R. Civ. P. 72(a). Reversal is appropriate if the "appellate

court has a definite and firm conviction that the court below committed

a clear error of judgment in the conclusion it reached upon a weighing of

the relevant factors." *United States v. Parris*, 639 F. App'x 923, 927 (4th

Cir. 2016).

## SUMMARY OF ARGUMENT

A court must balance the relevance of information requested

against the burden its production would impose when determining

whether discovery is warranted. "Under Rule 45(d)(3)(A)(iv) the burden

to establish that a subpoena duces tecum imposes an undue burden is on

the person who moves to have it quashed." Wright & Miller, *Federal*

*Practice and Procedure* § 2463.1 (3d ed.). The analysis does not drastically change when the information sought is from a third party, and any "special weight" non-parties would otherwise deserve is diminished here because of PPA and the Emory Article's authors' relationship to this litigation.

***Relevance***. The magistrate judge erred in finding that the identities of the individuals in the Emory Article were only "minimally relevant" on the grounds that: (1) Gref's experts did not devote a large amount of space in their reports to discussing the Emory Article; and (2) A-I-I could still adequately cross examine Gref's experts regarding the Emory Article. To the contrary, the information sought is critical to opposing Gref's causation theory.

The amount of space a study takes up in an expert's report is not an accurate proxy for the importance of the study at trial. Here, the Article is particularly critical since no epidemiological studies regarding end users of cosmetic talc and mesothelioma exist—what's generally considered the "best evidence" of general causation. *Norris*, 397 F.3d at 882; *Rider*, 295 F.3d at 1198. In a similar cosmetic talc trial's closing argument, a plaintiffs' counsel asked the jury of the 75 individuals in the

22

Emory Article: "How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'?" JA1219-1220.

And the magistrate judge's proposed cross-examination—pointing out to the jury that the Article's subjects are "poorly reflective of the universe of people exposed to cosmetic talc"—misses the point. *See* JA890. The Article claims that the *sole explanation* for 75 people's mesothelioma is cosmetic talc exposure. The only truly effective cross examination is to point out that this critical Article is based on a false premise. Contrary to the Article's claims, the subjects of the study seem to have substantial non-talc exposures to asbestos that would explain their mesotheliomas.

Overall, the court's below reasoning turns the discovery process on its head. Discovery generally provides relevant information to the parties and enables the parties themselves to assess from that information what to advance at trial and how to advance it. Other courts agree and have permitted subpoenas in similar situations. *See, e.g.*, *Kellington v. Bayer Healthcare Pharms., Inc.*, 2016 WL 5349801, at *2 (W.D. Va. Sept. 23, 2016); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 561-62 (7th

Cir. 1984); *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 429 (C.D. Cal. 1999); *Wright v. Jeep Corp.*, 547 F. Supp. 871, 874 (E.D. Mich. 1982).

***Burden***. On the other side of the scale, A-I-I seeks only a single list of 75 names. The burden on PPA could not possibly be lower. The district court identified only a single supposed "burden" on PPA: so-called "medical ethical concerns implicated by the requested disclosure." JA1212-1213. But neither the magistrate judge nor the district court provided any authority for any ethical concerns.

Every individual in the Article is a litigation plaintiff who voluntarily put his or her health information at issue in public litigation—thereby waiving any confidentiality claim. The district court did not cite any law prohibiting the release of this information because none exists. The individuals in the Article are not the authors' *patients*. And even if the district court's vague ethical concerns were warranted, an easy solution exists: using a protective order.

This Court should reverse the district court and require production of the key identifying the subjects of the Article.

24

## ARGUMENT

Determining whether discovery is warranted requires balancing the relevance of the information sought against whether its production would impose an undue burden.

"Under Rule 45(d)(3)(A)(iv) the burden to establish that a subpoena duces tecum imposes an undue burden is on the person who moves to have it quashed. That person cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance with the subpoena." Wright & Miller, *Federal Practice and Procedure* § 2463.1 (3d ed.).

The analysis does not drastically change when the information sought is from a third party. The inquiry into the relevance and burdens may be more "demanding and sensitive" when non-parties are at issue. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). But that just means courts look closely at the pertinent factors such as "the requesting party's need" for the information, "what information is available to the requesting party from other sources," "the dollars-and-

cents costs associated with a large and demanding document production," and "confidentiality interests." *Id*.

And any "special weight" non-parties deserve *generally* is diminished in the circumstances of this case. This Court reasoned that more sensitivity is warranted towards third parties because they are "strangers to the litigation," who have "no dog in the fight" and have "a different set of expectations from the parties themselves." *Id*. (internal quotation marks and brackets omitted). That rationale is attenuated here. Though non-parties to the litigation, PPA and the Emory Article's authors are no strangers to it and very much have a dog in the fight. Dr. Emory, Dr. Maddox, and Dr. Kradin earn substantial sums of money serving as experts in cosmetic talc litigation. And as repeat-player plaintiffs' experts, they have every expectation of being subjected to discovery in cosmetic talc litigation. They even authored the Article for the very purposes of bolstering the opinions they and other plaintiffs' experts offer.

Moreover, to the extent PPA's status as a third party puts a thumb on the scale in their favor, other considerations weigh heavily on the other side. A "district court whose only connection with a case is

supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder." *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211-12 (Fed. Cir. 1987) (internal quotation marks omitted). "Where relevance is in doubt, the rule indicates that the court should be permissive." *Id.*

Here, the information A-I-I seeks is critical, and the burden of producing it is negligible. The Emory Article is the primary study Gref is relying on regarding end users of cosmetic talc and mesothelioma. And A-I-I has good reason to believe that Article is based on a false premise—that individuals in Article were exposed to asbestos from non-talc sources.

At the same time, there is no burden on PPA. A-I-I seeks only a *single* document representing a list of 75 names of the plaintiffs in the Article—nothing more. Nor do any confidentiality concerns exist. That these individuals developed mesothelioma and blamed cosmetic talc use has already been made public in their litigation complaints. And, to the extent PPA has legitimate apprehensions about the individuals' confidentiality, a protective order alleviates those concerns. Neither the

27

magistrate judge nor the district judge even addressed a possible protective order, much less concluded that it would fail to resolve any potential confidentiality issues. JA885-892, JA1210-1213.

This Court should reverse the district court and require production of the key identifying the subjects of the Article.

## I. The Information Sought Is Critical To The *Gref* Case.

In no way are the identities of the plaintiffs in the Emory Article only "minimally relevant." To the contrary, that information is critical to opposing Gref's causation theory.

Imagine a trial where an expert testified that 75 other unrelated plaintiffs' mesotheliomas were caused by cosmetic talc by *falsely claiming* that those plaintiffs' only exposure to asbestos was the talc. On cross-examination, the defendant would be allowed to ask the witness, at a bare minimum, "who are those other individuals?" and "what other exposures did they have?" to demonstrate why the facts of those other cases do not support the expert's contention. The result should not change just because those plaintiffs were packaged into a publication to add a veneer of credibility to the claims.

The magistrate judge did not address any of that. Instead, he found that the information was "minimally relevant" on primarily two bases: (1) that Gref's experts did not devote a large amount of space in their reports to discussing the Emory Article; and (2) that A-I-I could still adequately cross examine Gref's experts regarding the Emory Article. Neither is correct.

The number of words attributed to a study in an expert report has zero bearing on the importance of that study at *trial*. By disclosing that they rely on the Emory Article as a basis of their opinions, Gref's experts may discuss the Emory Article at trial for as long as they want. Moreover, just because Gref's point regarding the Article does not take long to explain does not mean it is unimportant.

As the *Bell* court found, the Moline paper was groundbreaking, 627 F. Supp. 3d at 530, and the Emory Article claims to have bolstered the Moline results. JA93. Plaintiffs use the Article to fill the gap left by the complete dearth in epidemiological studies regarding end users of cosmetic talc and mesothelioma—and epidemiology is the "best evidence" of general causation. *Norris*, 397 F.3d at 882; *Rider*, 295 F.3d at 1198. Moreover, the Article will have extra emphasis here because Gref has a

rare type of mesothelioma of the lining of the abdomen known as peritoneal mesothelioma, which is more weakly associated with asbestos exposure but which some of the subjects of the Article developed. JA1048.

In fact, in a similar cosmetic talc trial where Dr. Moline was also an expert, the plaintiffs' counsel highlighted the Emory Article along with Dr. Moline's paper in stark terms. He told the jury: "Remember the Moline case series, the Emory case series. Over a hundred people exposed to cosmetic talc getting mesothelioma. *How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'*?" JA1219-1220 (emphasis added). He then told the jury that the results of the Article meant that the defendant "came into th[e] courtroom knowing that they were liable, knowing that they were guilty." JA1220. That the Article may not have taken up a lot of space in Dr. Moline's expert report is not relevant to the realities of trial.

The magistrate judge's second point is even weaker. The judge concluded that A-I-I could cross-examine Gref's experts on the Emory Article by explaining to the jury that since Dr. Emory is a plaintiff-side expert and the subjects of the study are litigation plaintiffs, the Article's

subjects are "poorly reflective of the universe of people exposed to cosmetic talc." JA890.

Put plainly: that is a weak and ineffective cross examination. No juror would be persuaded, because it entirely misses the point. It is not particularly relevant that other people used talc and did not get mesothelioma. Exposure to asbestos does not *invariably* lead to the mesothelioma. What matters is the Article's claim that the *sole explanation* for 75 people's mesothelioma is cosmetic talc exposure. The only truly effective cross examination is to point out that this critical Article—the only study Gref's experts rely on that they attempt pass off as "epidemiology"—is based on a fundamentally false premise.

Contrary to the Article's claims, the subjects of the study seem to have substantial non-talc exposures to asbestos that would explain their mesotheliomas. One of the subjects of the study may very well have even smoked asbestos-containing cigarettes, which Dr. Kradin himself acknowledged was a source of that plaintiff's asbestos exposure. *See supra* at 15. While A-I-I has strong reason to believe these non-talc exposures exist, there is no way to prove it to a jury if A-I-I does not know the identity of these individuals. Nor is there any way to understand the

31

full extent of the Article's falsity beyond just the examples discussed above without knowing who all the subjects are.

Proving the falsity of the Article to a jury without knowing the identities of its subjects is made even more difficult because the Article may contain small inaccuracies in the subjects' biographical data. For example, Dr. Moline's paper incorrectly lists the year of Ms. Bell's diagnosis (Case #9). *Compare* JA103 (stating Ms. Bell was diagnosed in 2016), *with Bell*, 627 F. Supp. 3d at 537 n.11 (explaining Ms. Bell was actually diagnosed in 2015). And while Mr. Lanzo seems to be a subject of both Dr. Moline's paper and the Emory Article, the information about his age of diagnosis and years of use differs slightly between the two.

Regardless of how effective A-I-I's trial counsel could potentially be in discrediting the Article based on other sources—an inherently speculative question—the court below's reasoning turns the discovery process on its head. Discovery, including third party discovery, generally provides relevant information to the parties, and enables the parties themselves to assess from that information what to advance at trial and how to advance it. Provided A-I-I's request was not unduly burdensome— and, as narrowed, it was not—A-I-I should have been entitled to receive

the information and evaluate for itself how best to approach cross-examination at trial.

The Western District of Virginia denied a motion to quash in a similar situation. Plaintiffs' expert Dr. Mahyar Etminan authored a scientific article describing a supposedly statistically significant greater reporting of intracranial hypertension from users of the medical device Mirena. *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 229 (S.D.N.Y. 2018). In the underlying litigation, the plaintiffs' "causation experts all rel[ied] on the Etminan Article, which [wa]s the only article published in a peer-reviewed journal on the topic." *Kellington v. Bayer Healthcare Pharms., Inc.*, 2016 WL 5349801, at *2 (W.D. Va. Sept. 23, 2016).

Dr. Etminan later "announced that he would no longer be serving as an expert witness in any of the cases related to Mirena." *Id.* at *1. Contending that "the findings and conclusions in the Etminan Article 'appear[ed] suspect,'" the defendant sought data underlying the article and a deposition of Dr. Etiminan. *Id.* The court granted the request, explaining that the "Etminan Article is important and central to the crucial and disputed issue of causation in the case." *Id.* at *2. Less than

33

a month later in response to the deposition notice, Dr. Etiminan signed a "sworn affidavit retracting many of his study's findings." *In re Mirena*, 341 F. Supp. 3d at 232.

Other courts have held similarly. The Seventh Circuit permitted a subpoena for the underlying data of an article relied on by plaintiffs' experts because the defendant was "threatened" with having the article's author effectively serve "as a potent expert witness against it without his ever taking the stand or being subject to cross-examination." *See Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 561-62 (7th Cir. 1984). The Court explained that the defendant was "entitled to cross-examine plaintiffs' experts on the data underlying their opinions" and the author was the only one with that data. *Id.; see also, e.g.*, *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 429 (C.D. Cal. 1999) ("Obtaining this information [will] assist defendant in determining the validity of the . . . study results and thereby will allow for a thorough inquiry into the underpinnings of the scientific evidence presented at trial." ); *Wright v. Jeep Corp.*, 547 F. Supp. 871, 874 (E.D. Mich. 1982) ("So if the conclusions or end product of a research effort is to be fairly tested, the underlying data must be available to others equally skilled and perceptive.").

34

The magistrate judge clearly erred by finding that a list of lawsuits was only "minimally relevant." Being able to discuss with Gref's causation experts what was really at issue in those 75 lawsuits is crucial to A-I-I's defense of Gref's claim that Clubman talcum powder contributed to the development of his peritoneal mesothelioma.

## II. Producing A List Of Names Imposes No Burden On PPA.

On the other side of the scales, A-I-I seeks only a *single* list of 75 names. The burden on PPA could not possibly be lower. Dr. Maddox stated that his "key that matches up each of the 75 cases reported in the article with the name of the plaintiff in the litigation" was "relinquished" to Dr. Emory. JA64. Sending that key to PPA to comply with the subpoena takes the burden of only a few mouse clicks. And it is information that is not "available to the requesting party from other sources." *Jordan*, 921 F.3d at 189.

The district court identified only a *single* supposed "burden" on PPA: so-called "medical ethical concerns implicated by the requested disclosure." JA1212-1213. But neither the magistrate judge nor the district court provided any authority whatsoever for any ethical concerns. That's because there are none.

35

Every individual in the Article is a litigation plaintiff who voluntarily put his or her health information at issue in public litigation. All filed public complaints announcing that they developed mesothelioma and claiming that their condition was caused by cosmetic talc. The information A-I-I seeks is exactly what has already been made public. *See Bell*, 627 F. Supp. 3d at 537 (explaining that the plaintiffs in Dr. Moline's paper "chose to publicly expose the fact of [their] mesothelioma by filing a complaint").

Dr. Emory and her co-authors received information on these cases in their role as expert witnesses in lawsuits, not as physicians. The plaintiffs in those lawsuits put their medical conditions at issue in litigation and therefore waived any confidentiality claims relating to those conditions. *See, e.g.*, *Helsabeck v. Fabyanic*, 173 F. App'x 251, 257 (4th Cir. 2006) ("Helsabeck waived the [physician-patient] privilege by putting his medical condition at issue. . . ."). Nor could the individuals have any expectation of privacy, since the authors of the Emory Article did not even seek their subjects' consent before publishing the Article. JA97.

The district court cited no law prohibiting the release of this information because none exists. HIPAA (the Health Insurance Portability and Accountability Act of 1996) does not apply. The individuals in the Article are *not the authors' patients*. HIPAA only regulates the release of "protected health information" by specific "covered entities," which include health plans, health care clearinghouses, and certain health care providers. 45 C.F.R. § 160.103. "Covered entities" do not include plaintiffs' experts in personal injury actions or their medical-legal consulting groups. And as discussed above, any HIPAA confidentiality would have been waived by anyone who put their medical condition at issue in litigation. *Bell*, 627 F. Supp. 3d at 535 (discussing the plaintiff's concession that the names of Dr. Moline's study subjects were "not HIPAA protected").

Finally, even if the district court's vague ethical concerns were warranted, an easy solution exists: a protective order. *See* JA856 (counsel for A-I-I suggesting this solution to cure any privilege concerns). Indeed, protective orders are used even in cases implicating *legitimate* claims of privilege. *In re Am. Tobacco Co.*, 880 F.2d 1520 (2d Cir. 1989) (applying a protective order to preserve physician-patient privilege concerns).

Neither the magistrate judge nor the district court even addressed this simple option.[3]

* * *

Gref wants to use the Emory Article in front of the jury to bolster his claim that exposure to cosmetic talc causes mesothelioma. But he is not willing to allow the Article to be subjected to the scrutiny of a meaningful cross examination. That is fundamentally unfair. As the *Bell* Court explained, allowing such testimony runs the risk of misleading the factfinder and court. 627 F. Supp. 3d at 530-31.

The magistrate judge got both sides of the equation wrong. On relevance, the identities of the individuals in the Article are critical. On burden, producing a single list of 75 names is effortless, and no confidentiality or ethical concerns exist. Having misapprehended each side of the scale, the magistrate judge necessarily balanced the two improperly. That balance weighs decidedly in favor of PPA producing the list of names.

---

[3] To the extent that the Court has concerns about HIPAA, there is an express exception for producing protected health information in response to a subpoena when there is "a qualified protective order." 45 C.F.R. § 164.512(e)(1)(ii)(B); *see also Tarashuk v. Orangeburg County*, 2022 WL 473231, at *4 (D.S.C. Feb. 15, 2022).

## CONCLUSION

This Court should reverse the decision of the district court and require the production of the list of the individuals in the Emory Article.

## LOCAL RULE 34(a) STATEMENT

Pursuant to Local Rule 34(a), A-I-I respectfully requests oral argument. Oral argument would assist the Court so it can consider the important questions critical to not just the *Gref* case, but to the cosmetic talc litigation nationwide.

Respectfully submitted,

*/s/ Benjamin L. Hatch*

| | |
|---|---|
| Robert E. Thackston | Benjamin L. Hatch |
| NELSON MULLINS RILEY & | Sylvia Macon Kastens |
| SCARBOROUGH LLP | MCGUIREWOODS, LLP |
| 3333 Lee Parkway, Suite 740 | 9000 World Trade Center |
| Dallas, TX 75219 | 101 West Main Street |
| (469) 484-6100 | Norfolk, VA 23510 |
| robert.thackston@nelsonmullins.com | (757) 640-3700 |
| | bhatch@mcguirewoods.com |
| | skastens@mcguirewoods.com |

*Counsel for Appellant American International Industries*

December 13, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 7,471 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 365 ProPlus.

Date: December 13, 2023

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Appellant American International Industries*

40

## CERTIFICATE OF SERVICE

This is to certify that I have this December 13, 2023, electronically

filed the foregoing with the Clerk of Court using the CM/ECF system,

which will notify all registered counsel.

/s/ Benjamin L. Hatch
Benjamin L. Hatch

*Counsel for Appellant American International Industries*