No. 23-1972

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

PENINSULA PATHOLOGY ASSOCIATES,

*Petitioner-Appellee*,

v.

AMERICAN INTERNATIONAL INDUSTRIES,

*Respondent-Appellant*.

————————

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 4:22-mc-00001-AWA-DEM
Hon. Arenda L. Wright Allen, U.S. District Court Judge

————————

JOINT APPENDIX
VOLUME I OF III: JA1 – JA588

————————

Benjamin L. Hatch
Sylvia M. Kastens
MCGUIREWOODS, LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
(757) 640-3700
bhatch@mcguirewoods.com

*Counsel for Appellant*

Kathryn M. Ali
ALI & LOCKWOOD LLP
300 New Jersey Avenue NW
Suite 900
Washington, DC 20001
(202) 651-2476
katie.ali@alilockwood.com

*Counsel for Appellee*

December 13, 2023

# TABLE OF CONTENTS

**Page**

## Volume I

Docket Report, *In re Peninsula Pathology Assocs.*,
No. 4:22-mc-00001-AWA-DEM (E.D. Va.) ...................................... JA1

R.2 Exhibits Filed (Nov. 18, 2022)

    R.2-1 - Motion to Quash Exhibit 1:
        Declaration of David M. Smith, MD ..................................... JA6

    R.2-2 - Motion to Quash Exhibit 2:
        Declaration of Theresa S. Emory, MD ............................... JA24

    R.2-3 - Motion to Quash Exhibit 3:
        Declaration of John C. Maddox, MD.................................. JA35

    R.2-4 - Motion to Quash Exhibit 4:
        Declaration of Kathryn M. Ali........................................... JA38

R.4 Exhibits Filed (Dec. 2, 2023)

    R.4-1 - Opposition to Motion to Quash Exhibit A:
        Excerpts of January 10, 2019 Deposition Transcript of
        John Maddox, MD............................................................... JA41

    R.4-2 - Opposition to Motion to Quash Exhibit B:
        Excerpts of May 13, 2020 Deposition Transcript of John
        Maddox, MD ...................................................................... JA50

    R.4-3 - Opposition to Motion to Quash Exhibit C:
        Various Deposition Transcript Cover Pages of John
        Maddox, MD ...................................................................... JA69

    R.4-4 - Opposition to Motion to Quash Exhibit D:
        Various Deposition Transcript Cover Pages of Theresa
        Swain Emory, MD.............................................................. JA88

i

# TABLE OF CONTENTS

**Page**

R.4-5 - Opposition to Motion to Quash Exhibit E:
Research Article *Malignant Mesothelioma Following
Repeated Exposures to Cosmetic Talc: A Case Series of 75
Patients* ................................................................................. JA98

R.4-6 - Opposition to Motion to Quash Exhibit F:
Research Article *Mesothelioma Associated With the Use
of Cosmetic Talc* ............................................................... JA105

R.4-7 - Opposition to Motion to Quash Exhibit G:
Excerpts of October 6, 2021 Trial Transcript,
*Johnson v. Johnson & Johnson*, No. JCCP
4676/20STCV17335 (Cal. Super. Ct.) ............................... JA116

R.4-8 - Opposition to Motion to Quash Exhibit H:
Expert Report of Jacqueline Moline, MD ......................... JA119

R.4-9 - Opposition to Motion to Quash Exhibit I:
Expert Report of Murray M. Finkelstein, PhD, MD ........ JA206

R.4-10 - Opposition to Motion to Quash Exhibit J:
American Int'l Indus. Opposition to Motion to Modify
Subpoena *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ........................................... JA499

R.4-11 - Opposition to Motion to Quash Exhibit K:
*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL
16571057 (M.D.N.C. Sept. 13, 2022) ................................ JA530

R.4-12 - Opposition to Motion to Quash Exhibit L:
Verified Complaint, *Gref v. Am. Int'l Indus.* (N.Y. July 8,
2020) .................................................................................... JA543

R.4-13 - Opposition to Motion to Quash Exhibit M:
Amended Complaint, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Feb. 2, 2021) ........................... JA554

# TABLE OF CONTENTS

**Page**

## Volume II

R.4-14 - Opposition to Motion to Quash Exhibit N:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. June 10, 2021) ............................... JA589

R.4-15 - Opposition to Motion to Quash Exhibit O:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Oct. 13, 2021) ............................... JA592

R.4-16 - Opposition to Motion to Quash Exhibit P:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Jan. 27, 2022) ............................... JA595

R.4-17 - Opposition to Motion to Quash Exhibit Q:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. May 24, 2022) ............................... JA597

R.4-18 - Opposition to Motion to Quash Exhibit R:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Aug. 1, 2022) ............................... JA599

R.4-19 - Opposition to Motion to Quash Exhibit S:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Sept. 6, 2022) ............................... JA601

R.4-20 - Opposition to Motion to Quash Exhibit T:
Letter Memorandum, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Nov. 7, 2022) ............................... JA603

R.4-21 - Opposition to Motion to Quash Exhibit U:
Third Amended Notice of Videotaped Deposition of Dr. Gregory Diette, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Nov. 22, 2022) ............................... JA624

# TABLE OF CONTENTS

**Page**

R.4-22 - Opposition to Motion to Quash Exhibit V:
Second Amended Notice of Videotaped Deposition of Dr.
Suprith Badarinath, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Jan. 7, 2022)............................ JA629

R.4-23 - Opposition to Motion to Quash Exhibit W:
Amended Notice of Videotaped Deposition of Dr. Ehsan
Shirazi, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Jan. 7, 2022) ...................................... JA634

R.4-24 - Opposition to Motion to Quash Exhibit X:
Plaintiff's Supp. Interrogatory, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y. Jan. 19, 2022)........... JA639

R.4-25 - Opposition to Motion to Quash Exhibit Y:
Defendant's Response to Plaintiff's Supp. Interrogatory,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Feb. 18, 2022) ..................................... JA648

R.4-26 - Opposition to Motion to Quash Exhibit Z:
Excerpt of Defendant's Supp. Request for Admission,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Apr. 7, 2022) ..................................... JA657

R.4-27 - Opposition to Motion to Quash Exhibit AA:
Defendant's Second Request for Production, *Gref v. Am.
Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. May 6,
2022) .................................................................... JA662

R.4-28 - Opposition to Motion to Quash Exhibit BB:
Plaintiff's Response to Defendant's Supp. Request for
Admission, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. May 9, 2022) ............................ JA669

iv

# TABLE OF CONTENTS

**Page**

R.4-29 - Opposition to Motion to Quash Exhibit CC:
Plaintiff's Response to Defendant's Second Request for
Production, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. June 6, 2022) ........................................... JA678

R.4-30 - Opposition to Motion to Quash Exhibit DD:
Subpoena to Produce, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Oct. 31, 2022) ......................... JA683

R.4-31 - Opposition to Motion to Quash Exhibit EE:
Excerpts of October 1, 2020 Deposition Transcript of
Theresa Swain Emory, MD, *Bell v. Am. Int'l Indus.*......... JA688

R.4-32 - Opposition to Motion to Quash Exhibit FF:
Excerpts of August 6, 2015 Deposition Transcript of John
C. Maddox, MD, *Archdeacon v. Ameron Int'l Corp.* ......... JA699

R.8 Exhibits Filed (Dec. 8, 2022)

R.8-1 - Reply in Support of Motion to Quash Exhibit 1:
Plaintiff's Letter Motion to Compel, *Gref v. Am. Int'l
Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Nov. 21,
2022) ................................................................................. JA705

R.8-2 – Reply in Support of Motion to Quash Exhibit 2:
Defendant's Response to Plaintiff's Letter Motion to
Compel, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ........................................... JA731

R.8-3 – Reply in Support of Motion to Quash Exhibit 3:
Excerpts of September 23, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) ................................. JA735

R.8-4 – Reply in Support of Motion to Quash Exhibit 4:
Excerpts of July 6, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) ................................. JA878

# TABLE OF CONTENTS

**Page**

R.8-5 – Reply in Support of Motion to Quash Exhibit 5:
Excerpts of June 22, 2022 Deposition Transcript of
Murray M. Finkelstein, MD, PhD, *Gref v. Am. Int'l
Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y.) .................... JA892

R.8-6 – Reply in Support of Motion to Quash Exhibit 6:
Supp. Declaration of Theresa S. Emory, MD, *In re
Subpoena for Documents Issued to Peninsula Pathology
Associates* (E.D. Va. Dec. 8, 2022) ..................................... JA902

R.8-7 – Reply in Support of Motion to Quash Exhibit 7:
Plaintiff's Letter Reply in Support of Motion to Compel,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Dec. 7, 2022) ..................................................... JA910

R.8-8 – Reply in Support of Motion to Quash Exhibit 8:
Excerpts of Corrected September 25, 2020 Motions
Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-
00111 (M.D.N.C.) .............................................................. JA914

R.8-9 – Reply in Support of Motion to Quash Exhibit 9:
Excerpts of March 11, 2020 Trial Transcript, *Johnson v.
Am. Int'l Indus.*, Nos. MID-L-006651-16ASL, MID-L-
007336-16AS (N.J. Super. Ct.) ......................................... JA922

R.8-10 – Reply in Support of Motion to Quash Exhibit 10:
Excerpts of October 13, 2022 Trial Transcript, *Fisher v.
Am. Int'l Indus.*, No. 0877 (Penn. Ct. Common Pleas)..... JA937

## Volume III

R.10 – Transcript of December 16, 2022 Proceedings
(Dec. 22, 2022)................................................................ JA954

R.11 – Order Granting Motion to Quash (Dec. 23, 2022) ............. JA1012

## TABLE OF CONTENTS

**Page**

R.18 Exhibits Filed (Jan. 11, 2023)

    R.18-1 - Motion re Objections to Magistrate Judge's Order
        Exhibit 1: Excerpts of October 1, 2020 Deposition
        Transcript of Theresa Swain Emory, MD, *Bell v. Am.
        Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.) ..................... JA1020

    R.18-2 - Motion re Objections to Magistrate Judge's Order
        Exhibit 2: Excerpts of October 13, 2022 Trial Transcript,
        *Fisher v. Am. Int'l Indus.*, No. 0877
        (Penn. Ct. Common Pleas)................................................ JA1032

    R.18-3 - Motion re Objections to Magistrate Judge's Order
        Exhibit 3: Complaint, *In re LTL Mgmt. LLC*, No. 21-
        30589 (MBK) (D.N.J. Bankr.).......................................... JA1038

    R.18-4 - Motion re Objections to Magistrate Judge's Order
        Exhibit 4: Scheduling Order, *Gref v. Am. Int'l Indus.*,
        No. 1:20-CV-05589-GBD (S.D.N.Y. Dec. 23, 2022)......... JA1093

    R.18-5 - Motion re Objections to Magistrate Judge's Order
        Exhibit 5: Order, *Burnett v. Am. Int'l Indus.* (W.D. Ark.
        July 26, 2022) .................................................................. JA1097

R.20 Exhibits Filed (Jan. 25, 2023)

    R.20-1 - Opposition to Motion re Objections to Magistrate
        Judge's Order Exhibit 1: Excerpts of December 16, 2022
        Motions Hearing Transcript, *Peninsula Pathology
        Assocs. v. Am. Int'l Indus.*, No. 4:22mc1 (E.D. Va.)........ JA1102

    R.20-2 - Opposition to Motion re Objections to Magistrate
        Judge's Order Exhibit 2: Expert Opinion Letter............ JA1161

    R.20-3 - Opposition to Motion re Objections to Magistrate
        Judge's Order Exhibit 3: Research Article: *Exposure to
        Cosmetic Talc and Mesothelioma* ................................... JA1234

# TABLE OF CONTENTS

**Page**

R.20-4 - Opposition to Motion re Objections to Magistrate Judge's Order Exhibit 4: Excerpts of October 1, 2020 Deposition Transcript of Theresa Swain Emory, MD, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1248

R.21 Exhibits Filed (Jan. 31, 2023)

R.21-1 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 1: Excerpts of October 1, 2020 Deposition Transcript of Theresa Swain Emory, MD, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1271

R.21-2 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 2: Notice of Judgment, *Pollock v. Northrop Grumman Shipbuilding, Inc.*, No. 2010-07791 (La. Civ. Dist. Ct. July 29, 2010).................................... JA1295

R.21-3 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 3: Excerpts of September 25, 2020 Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.) ............................................................. JA1304

R.21-4 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 4: Excerpts of April 12, 2021 Hearing Transcript, JCCP No. 4674 (Cal. Super. Ct.)... JA1314

R.21-5 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 5: Research Article: *Exposure to Cosmetic Talc and Mesothelioma* .................................... JA1322

R.21-6 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 6: Plaintiff's Motion to Dismiss, *In re Bell*, I.C. No. 19-732863 (N.C. Indus. Comm'n Dec. 1, 2015) ................................................................................. JA1336

R.21-7 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 7: Denial of Workers' Compensation Claim........................................................ JA1346

# TABLE OF CONTENTS

**Page**

R.21-8 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 8: Mesothelioma Claim .............. JA1355

R.21-9 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 9: Defs.' Response to Motion to Dismiss, *In re Bell*, I.C. No. 19-732863 (N.C. Indus. Comm'n Jan. 8, 2020) ...................................................... JA1361

R.24 – Order Affirming Order Granting Motion to Quash (Aug. 14, 2023) ............................................................... JA1367

R.30 – Notice of Appeal (Sept. 13, 2023) ....................................... JA1371

FRAP 10(e)(2)(A) Supplement[1]

Corrected Exhibit G to Defendant's Opposition to Motion to Quash (R.4-7): Excerpts of October 6, 2021 Trial Transcript, *Johnson v. Johnson & Johnson*, No. JCCP 4676/20STCV17335 (Cal. Super. Ct.) .................................... JA1374

---

[1] The parties stipulated to supplementing the record with this corrected exhibit pursuant to FRAP 10(e)(2)(A) as one page was inadvertently omitted from the exhibit below.

Query   Reports   Utilities   Help   Log Out

APPEAL

# U.S. District Court
## Eastern District of Virginia - (Newport News)
## CIVIL DOCKET FOR CASE #: 4:22-mc-00001-AWA-DEM

Peninsula Pathology Associates                        Date Filed: 11/18/2022
Assigned to: District Judge Arenda L. Wright Allen
Referred to: Magistrate Judge Douglas E. Miller
Case in other court:  4CCA Case Manager T. Barton, 23-01972
Cause: Civil Miscellaneous Case

**Petitioner**

**Peninsula Pathology Associates**          represented by  **Elizabeth Catherine Lockwood**
                                                           Ali & Lockwood LLP (DC-NA)
                                                           300 New Jersey Ave, NW
                                                           Washington, DC 20001
                                                           **NA**
                                                           (202) 651-2475
                                                           Email: liz.lockwood@alilockwood.com
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kathryn Marshall Ali**
                                                           Ali & Lockwood LLP
                                                           300 New Jersey Avenue NW
                                                           Suite 900
                                                           Washington, DC 20001
                                                           202-651-2476
                                                           Email: katie.ali@alilockwood.com
                                                           *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**American International Industries**       represented by  **Benjamin Lucas Hatch**
                                                           McGuireWoods LLP (Norfolk)
                                                           101 W Main St
                                                           Suite 9000
                                                           Norfolk, VA 23510-1655
                                                           757-640-3947
                                                           Email: bhatch@mcguirewoods.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Eric David Cook**
                                                           Willcox & Savage PC
                                                           Wells Fargo Center
                                                           440 Monticello Ave

**JA1**

CM/ECF - vaed

Suite 2200
Norfolk, VA 23510
(757) 628-5500
Fax: (757) 628-5566
Email: ecook@wilsav.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E. Thackston**
Lathrop GPM LLP
2101 Cedar Springs Road
Suite 1400
Dallas, TX 75201
469-983-6100
Email: robert.thackston@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvia Macon Kastens**
McGuireWoods LLP
World Trade Center
101 West Main Street
Ste 9000
Norfolk, VA 23510
757-640-3700
Email: skastens@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 | MOTION TO QUASH (Filing fee $ 49, receipt number AVAEDC-8667030.), filed by Peninsula Pathology Associates. (Attachments: # 1 Brief ISO MTQ, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Ali, Kathryn) Modified on 11/18/2022 (epri, ). (Entered: 11/18/2022) |
| 11/18/2022 | | Notice of Correction re 1 MOTION to Quash. Document number 1 contains a Brief in Support attached to the Motion which we have removed. The Motion to Quash and the Brief in Support must be filed as separate docket entries. Please refile the Brief in Support as a separate docket entry using its respective event. (epri, ) (Entered: 11/18/2022) |
| 11/18/2022 | 2 | Memorandum in Support re 1 MOTION to Quash filed by Peninsula Pathology Associates. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Ali, Kathryn) (Entered: 11/18/2022) |
| 11/18/2022 | | Initial Case Assignment to District Judge Arenda L. Wright Allen and Magistrate Judge Douglas E. Miller. (epri, ) (Entered: 11/18/2022) |
| 11/28/2022 | 3 | Motion to appear Pro Hac Vice by Elizabeth C. Lockwood and Certification of Local Counsel Kathryn M. Ali Filing fee $ 75, receipt number AVAEDC-8679206. by Peninsula Pathology Associates. (Ali, Kathryn) (Entered: 11/28/2022) |
| 12/02/2022 | 4 | Opposition to 1 MOTION to Quash filed by American International Industries. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, |

**JA2**

| | | |
|---|---|---|
| | | # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF)(Cook, Eric) (Entered: 12/02/2022) |
| 12/02/2022 | 5 | Financial Interest Disclosure Statement (Local Rule 7.1) by American International Industries. (Cook, Eric) (Entered: 12/02/2022) |
| 12/05/2022 | 6 | ORDER granting 3 a Motion to Appear Pro Hac Vice by Elizabeth C. Lockwood as certified by local counsel Kathryn M. Ali for Petitioner Pennsylvania Pathology Associates. Signed by District Judge Arenda L. Wright Allen on 12/05/2022. (Allen, Arenda) (Entered: 12/05/2022) |
| 12/05/2022 | 7 | NOTICE of Appearance by Robert E. Thackston on behalf of American International Industries (Thackston, Robert) (Entered: 12/05/2022) |
| 12/08/2022 | 8 | REPLY to Response to Motion re 1 MOTION to Quash filed by Peninsula Pathology Associates. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Ali, Kathryn) (Entered: 12/08/2022) |
| 12/13/2022 | | Set Remote Hearing (CV Magistrate)Members of the public wishing to listen to remote proceedings should call the Norfolk Division at 757-222-7222 before the hearing for instructions on how to listen to the proceedings. Recording of court proceedings of any kind is prohibited. Motion Hearing set for 12/16/2022 at 02:30 PM on Motion to Quash (#1) in Norfolk Remote w/OCR before Magistrate Judge Douglas E. Miller. (cdod, ) (Entered: 12/13/2022) |
| 12/16/2022 | 9 | Minute Entry for proceedings held before Magistrate Judge Douglas E. Miller:Motion Hearing held on 12/16/2022 re 1 MOTION to Quash filed by Peninsula Pathology Associates. Matter came on for hearing on Motion to Quash (#1). Present via zoom were Elizabeth Lockwood and Kathryn Ali on behalf of the petitioner and Eric Cook and Robert Thackston on behalf of the respondent. Mr. Thackston explained the intentions of the motion to quash. Response by Ms. Ali. Argument presented by both parties. For the reasons stated on the record the Court GRANTED the motion to quash. Petitioners have also requested sanctions. The Court heard argument regarding that request. The Court took the request for sanctions under advisement. Petitioners counsel directed to submit a sworn affidavit regarding costs and fees by January 4 And respondents may file a response by January 18. The Court will then issue an order on that matter. Hearing adjourned. (Court Reporter Paul McManus, OCR.)(cdod, ) (Entered: 12/19/2022) |
| 12/22/2022 | 10 | TRANSCRIPT of Video Conference proceedings held on 12/16/2022, before Judge Douglas E. Miller, Court Reporter/Transcriber Paul McManus, Telephone number 757-222-7077. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/23/2023. Redacted Transcript Deadline set for 2/21/2023. Release of Transcript Restriction set for 3/22/2023. (mcmanus, paul) (Entered: 12/22/2022)** |
| 12/23/2022 | 11 | ORDER re 1 Motion to Quash. The Court GRANTS Peninsula's motion to quash and ORDERS Peninsula to file a sworn statement of its costs and fees by January 4, 2023, and |

**JA3**

| | | |
|---|---|---|
| | | ORDERS responses to be filed by January 18, 2023. Signed by Magistrate Judge Douglas E. Miller on 12/23/2022. (dbra, ) (Entered: 12/23/2022) |
| 01/04/2023 | 12 | MOTION for Attorney Fees by Peninsula Pathology Associates. (Attachments: # 1 Exhibit Ali Decl., # 2 Exhibit Attach. A, # 3 Exhibit Attach. B, # 4 Exhibit Attach. C, # 5 Exhibit Attach. D)(Ali, Kathryn) (Entered: 01/04/2023) |
| 01/05/2023 | 13 | MOTION for Extension of Time to File Response/Reply as to 11 Order on Motion to Quash, by American International Industries. (Attachments: # 1 Exhibit Exh 1 - Proposed Order)(Thackston, Robert) (Entered: 01/05/2023) |
| 01/06/2023 | | MOTION REFERRED to Magistrate Judge Douglas E. Miller. 13 MOTION for Extension of Time to File Response/Reply as to 11 Order on Motion to Quash, (jhie, ) (Entered: 01/06/2023) |
| 01/06/2023 | 14 | ORDER granting 13 Motion for Extension of Time to File Objections. Respondent American International Industries shall file its Objection to the Magistrate Judge's Order on or before January 11, 2023. Signed by Magistrate Judge Douglas E. Miller on 1/6/23. (jhie, ) (Entered: 01/06/2023) |
| 01/11/2023 | 15 | NOTICE of Appearance by Benjamin Lucas Hatch on behalf of American International Industries (Hatch, Benjamin) (Entered: 01/11/2023) |
| 01/11/2023 | 16 | NOTICE of Appearance by Sylvia Macon Kastens on behalf of American International Industries (Kastens, Sylvia) (Entered: 01/11/2023) |
| 01/11/2023 | 17 | Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 11 Order on Motion to Quash, by American International Industries. (Kastens, Sylvia) (Entered: 01/11/2023) |
| 01/11/2023 | 18 | Memorandum in Support re 17 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 11 Order on Motion to Quash, filed by American International Industries. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Kastens, Sylvia) (Entered: 01/11/2023) |
| 01/18/2023 | 19 | RESPONSE to Motion re 12 MOTION for Attorney Fees filed by American International Industries. (Thackston, Robert) (Entered: 01/18/2023) |
| 01/25/2023 | 20 | Memorandum in Opposition re 17 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 11 Order on Motion to Quash, filed by Peninsula Pathology Associates. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Ali, Kathryn) (Entered: 01/25/2023) |
| 01/31/2023 | 21 | Reply to 17 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 11 Order on Motion to Quash, filed by American International Industries. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Hatch, Benjamin) (Entered: 01/31/2023) |
| 04/04/2023 | 22 | NOTICE by American International Industries (Attachments: # 1 Exhibit 1)(Hatch, Benjamin) (Entered: 04/04/2023) |
| 04/05/2023 | 23 | Response to 22 NOTICE filed by Peninsula Pathology Associates. (Ali, Kathryn) (Entered: 04/05/2023) |
| 08/14/2023 | 24 | ORDER. American International Industries' Objections (ECF No. 17 ) are OVERRULED, and the Magistrate Judge's Order (ECF No. 11 ) granting the Motion to Quash is AFFIRMED. Signed by District Judge Arenda L. Wright Allen on 8/14/23. (jhie, ) (Entered: 08/14/2023) |

JA4

| 08/16/2023 | 25 | ORDER: This court GRANTS Peninsula's motion for attorney's fees, (ECF No. 12), and awards Peninsula such fees and costs of $44,610.45. This order will fully resolve the case unless either party objects within 14 days under Federal Rule of Civil Procedure 72(a). Copies sent on 8.16.23. Signed by Magistrate Judge Douglas E. Miller and filed on 8/16/23. (epri, ) (Entered: 08/16/2023) |
|---|---|---|
| 08/30/2023 | 26 | Supplemental MOTION for Attorney Fees by Peninsula Pathology Associates. (Attachments: # 1 Affidavit)(Ali, Kathryn) (Entered: 08/30/2023) |
| 08/30/2023 | 27 | Objection to 25 Order on Motion for Attorney Fees, filed by American International Industries. (Kastens, Sylvia) (Entered: 08/30/2023) |
| 08/30/2023 | 28 | Memorandum *in Support* to 27 Objection filed by American International Industries. (Kastens, Sylvia) (Entered: 08/30/2023) |
| 09/13/2023 | 29 | RESPONSE in Opposition re 26 Supplemental MOTION for Attorney Fees filed by American International Industries. (Kastens, Sylvia) (Entered: 09/13/2023) |
| 09/13/2023 | 30 | NOTICE OF APPEAL as to 24 Order on Motion Re: Objections to Magistrate Judge's Ruling or Recommendation, 11 Order on Motion to Quash, by American International Industries. Filing fee $ 505, receipt number AVAEDC-9123189. (Kastens, Sylvia) (Entered: 09/13/2023) |
| 09/14/2023 | 31 | Transmission of Notice of Appeal to US Court of Appeals re 30 Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Attachments: # 1 Notice of Appeal)(jhie, ) (Entered: 09/14/2023) |
| 09/18/2023 | 32 | USCA Case Number 23-1972 4CCA Case Manager T. Barton for 30 Notice of Appeal, filed by American International Industries. (jhie, ) (Entered: 09/18/2023) |

**JA5**

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES

Case No. _____

Related Case: S.D.N.Y.: 1:20-cv-
5589-GBD

## DECLARATION OF DR. DAVID M. SMITH, MD

Dr. David M. Smith, MD hereby declares under penalty of perjury as follows:

1.     I am over the age of eighteen and am competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.     I am the President of Peninsula Pathology Associates PC ("Peninsula"). I submit this Declaration in support of Peninsula's Motion to Quash the subpoena issued by American International Industries ("AII") in connection with *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.), attached hereto as **Attachment A,** which Peninsula received on November 7, 2022 (the "Subpoena").

3.     Peninsula is a medical practice that has been providing pathology services to physicians throughout Eastern Virginia for more than 50 years.

4.     I am aware that one of my partners, Dr. Theresa Emory, and one part-time employee, Dr. John Maddox, co-authored an article titled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," which was published in the American Journal of Industrial Medicine on March 16, 2020 (the "Article").

**JA7**

5.      Peninsula had no involvement in researching or drafting the Article, and other than Dr. Emory and Dr. Maddox, no member of Peninsula's staff participated in researching or drafting the Article or conducting the underlying study. Peninsula did not provide Dr. Emory or Dr. Maddox with any resources, compensation, or other assistance to research or conduct the study or draft or publish the Article.

6.      Responding to the Subpoena, which contains many requests concerning the Article, Peninsula's correspondence with various individuals, Peninsula's financial records, and additional materials, would be burdensome and costly, and would divert time and resources from Peninsula's busy medical practice.

7.      Neither Peninsula nor any of its officers, directors, or employees have been engaged to provide any consultation or expert services in connection with *Gref v. American International Industries*, No. 1:20-cv-005589 (S.D.N.Y.), nor do they have any other connection to that litigation. My only awareness of the *Gref* litigation is in connection with the Subpoena served on Peninsula by American International Industries.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 18th day of November, 2022 in Newport News, VA.


                                                        _____
                                                        Dr. David M. Smith, MD
                                                        Peninsula Pathology Associates


**JA8**

**tt    h        t**

Case 4:22-mc-00001-AWA-DEM   Document 2-1   Filed 11/18/22   Page 5 of 18 PageID# 92

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| BRIAN JOSEPH GREF | )<br>) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.  1:20-CV-05589-GBD |
| American International Industries | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     Peninsula Pathology Associates, Department of Pathology, 500 J. Clyde Morris Blvd, Newport News, VA 23601

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See "Attachment A"

| Place: Gordon Rees Scully Mansukhani; 5425 Discovery Park Blvd., Suite 200, Williamsburg, VA 23188 | Date and Time:<br>11/28/2022 3:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     10/27/2022

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Alfred J. Sargente |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*

American International Industries _____ , who issues or requests this subpoena, are:
Alfred J. Sargente, Esq. (AS-3094) Hawkins Parnell & Young, LLP, 600 Lexington Ave, 8th Floor, New York, NY 10022; Telephone: (212) 897-9655

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**JA10**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-CV-05589-GBD

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows:

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**JA11**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a
person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or
regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly
transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial
expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or
tangible things at a place within 100 miles of where the person resides, is
employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney
responsible for issuing and serving a subpoena must take reasonable steps
to avoid imposing undue burden or expense on a person subject to the
subpoena. The court for the district where compliance is required must
enforce this duty and impose an appropriate sanction—which may include
lost earnings and reasonable attorney's fees—on a party or attorney who
fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce
documents, electronically stored information, or tangible things, or to
permit the inspection of premises, need not appear in person at the place of
production or inspection unless also commanded to appear for a deposition,
hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible
things or to permit inspection may serve on the party or attorney designated
in the subpoena a written objection to inspecting, copying, testing, or
sampling any or all of the materials or to inspecting the premises—or to
producing electronically stored information in the form or forms requested.
The objection must be served before the earlier of the time specified for
compliance or 14 days after the subpoena is served. If an objection is made,
the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party
may move the court for the district where compliance is required for an
order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the
order must protect a person who is neither a party nor a party's officer from
significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where
compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits
specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no
exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a
subpoena, the court for the district where compliance is required may, on
motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research,
development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does
not describe specific occurrences in dispute and results from the expert's
study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances
described in Rule 45(d)(3)(B), the court may, instead of quashing or
modifying a subpoena, order appearance or production under specified
conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be
otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These
procedures apply to producing documents or electronically stored
information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents
must produce them as they are kept in the ordinary course of business or
must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.*
If a subpoena does not specify a form for producing electronically stored
information, the person responding must produce it in a form or forms in
which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The
person responding need not produce the same electronically stored
information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person
responding need not provide discovery of electronically stored information
from sources that the person identifies as not reasonably accessible because
of undue burden or cost. On motion to compel discovery or for a protective
order, the person responding must show that the information is not
reasonably accessible because of undue burden or cost. If that showing is
made, the court may nonetheless order discovery from such sources if the
requesting party shows good cause, considering the limitations of Rule
26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information
under a claim that it is privileged or subject to protection as trial-preparation
material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or
tangible things in a manner that, without revealing information itself
privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a
subpoena is subject to a claim of privilege or of protection as
trial-preparation material, the person making the claim may notify any party
that received the information of the claim and the basis for it. After being
notified, a party must promptly return, sequester, or destroy the specified
information and any copies it has; must not use or disclose the information
until the claim is resolved; must take reasonable steps to retrieve the
information if the party disclosed it before being notified; and may promptly
present the information under seal to the court for the district where
compliance is required for a determination of the claim. The person who
produced the information must preserve the information until the claim is
resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a
motion is transferred, the issuing court—may hold in contempt a person
who, having been served, fails without adequate excuse to obey the
subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**JA12**

## ATTACHMENT A
## NOTICE FOR PRODUCTION OF DOCUMENTS:

### I.    DEFINITIONS

1. "**You**" and "**your**" mean the Deponent to whom these Requests are directed, as well
as your predecessors, successors, divisions, affiliates, parents, subsidiaries, officers,
directors, employees, agents, and anyone else acting or purporting to act on your
behalf.

2. "**Documents**" means documents within the broadest possible sense of the Federal
Rules of Civil Procedure whether fixed in tangible medium or electronically stored. The
word "**documents**" shall include writings, drawings, graphs, charts, photographs, sound
recordings, images, and other data compilations, stored in any medium from which
information can be obtained, translated, if necessary, by the respondent through
detection devices into reasonably usable form.

3. "**Person**" includes an individual, general or limited partnership, joint stock company,
unincorporated association or society, municipal or other corporation, incorporated
association, limited liability partnership, limited liability company, the State, an agency
or political subdivision of the State, a court, and any other governmental entity.

4. "**Identify**", "**identity**", or "**identification**," (1) when used in reference to a natural
person, means that person's full name, last known address, home and business
telephone numbers, and present occupation or business affiliation; (2) when used in
reference to a person other than a natural person, means that person's full name, a
description of the nature of the person (that is, whether it is a corporation, partnership,
etc. under the definition of "**person**" below), and the person's last known address,

**JA13**

telephone number, and principal place of business; (3) when used in reference to any person after the person has been properly identified previously means the person's name; and (4) when used in reference to a document, requires you to state the date, the author (or, if different, the signer or signers), the addressee, and the type of document, and to attach copy of the document.

5. The terms "**communications**" and "**discussions**" refer to any exchange of information by any means of transmission, including, but not limited to, face-to-face conversations, mail, electronic mail, telegram, overnight delivery, telephone, facsimile or telex.

6. "**Concerning**" means relating to, referring to, describing, evidencing, or constituting. Request for documents concerning any subject matter include documents concerning communications regarding that subject matter.

7. The following rules of construction shall apply to all discovery requests:
(a) All/Each. The terms "**all**" and "**each**" shall be construed as all and each;
(b) And/Or. The connectives "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope;
(c) Number. The use of the singular form of any word includes the plural and vice versa; and
(d) The use of the masculine gender shall include the feminine and neutral genders.

8. "**Deponent**" refers to Dr. Theresa S. Emory.

## II.    INSTRUCTIONS

1. These requests specifically encompass "electronically stored information" as that term is defined by the Federal Rules of Civil Procedure. Accordingly, requests for documents or communications should be construed to encompass any electronic storage medium (i.e., hard drive, USB drive, CD/DVD, "cloud" storage), and communication method (i.e., email, instant messenger, text message, etc.).

2. In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, partners, members, agents, employees, representatives, parent(s), subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their agents, employees, representatives or investigators.

3. If any requested document or thing cannot be produced in full, produce it to the extent possible, indicating which document, or portion of that document, is being withheld, and the reason that document is being withheld.

4. In producing documents, you are requested to produce each document requested together with all non-identical copies and drafts of that document. If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

5. Documents shall be produced as they are kept in the usual course of business or organized and labeled to correspond to the categories in this request.

**JA15**

6. All documents shall be produced in the file folder, envelope, or other container in which the documents are kept or maintained by you. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

7. Documents attached to each other should not be separated.

8. Documents not otherwise responsive to this request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this discovery request, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations, or similar materials.

9. If you claim the attorney-client privilege, any other privilege, or work-product protection for all or any portion of any document, that portion of the document need not be produced, but you shall provide the following information with respect to each such document:

(a) date;

(b) author(s) of the document and each and every other person who prepared or participated in the preparation of the document;

(c) a description of its subject matter and physical size;

(d) all addresses or recipients of the original or a copy thereof, together with the date or approximate date on which said recipients received said documents;

(e) all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, the means of such disclosure, the present location of the document and all copies thereof;

(f) each and every person having custody or control of the document and all copies thereof; and

**JA16**

(g) the nature of the privilege or other rule of law relied upon and any facts supporting your position.

10. Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity as possible, those portions of the document which are not being produced.

11. If a document responsive to these requests was at any time in your possession, custody, or control but now is no longer available for production, as to each such document state the following information:

(a) whether the document is missing or lost;

(b) whether it has been destroyed;

(c) whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

(d) whether the document has been otherwise disposed of;

and;

(e) a precise statement of the circumstances surrounding the disposition of the document and the date of the document's disposition.

## III.    DOCUMENTS TO BE PRODUCED

1. With regard to Dr. Emory's article, "Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc - Case Series of 75 patients" (March 6, 2020) ("EMORY ARTICLE"), please produce the following:

(a) documents relating to the alleged peer review process;

(b) all litigation files reviewed to reach conclusions referenced in the EMORY ARTICLE that the 75 subjects in these cases could have only been exposed to asbestos from cosmetic talc;

(c) all documents relating to any protocol used for the alleged study that resulted in the EMORY ARTICLE;

(d) the underlying data, notes, analysis, calculations or other documents generated in the preparation and publication of the EMORY ARTICLE;

(e) all correspondence with plaintiffs' counsel in any of the 75 cases relating to those cases and as permitted pursuant to FRCP Rule 26(b)(4)(C)(i)-(iii);

(f) any defense expert reports received as part of the 75 cases referenced in the EMORY ARTICLE;

(g) all documents related to any tissue digestions relied upon in the EMORY ARTICLE;

(h) all documents relating to the decision whether to preserve relevant bodily tissue or do tissue digestion or analysis of existing tissue for the 75 cases referred to in the EMORY ARTICLE;

(i) all documents relating to Deponent's retention and income earned for work conducted for the 140 cases reported in the EMORY ARTICLE for medico-legal evaluation;

(j) all correspondence, transmittal letters and other documents indicating when, and from where, materials were received that Deponent relied on in preparing the EMORY ARTICLE;

(k) all documents reflecting alleged review of litigation materials in the 140 cases to determine that there were no alternative exposures to asbestos other than alleged contamination of cosmetic talc, such as margin notes, checklist, outline, notes, or any other documentation of review and analysis of the product identification and exposure information;

(l) all sworn deposition testimony and sworn answers to interrogatories provided by subjects, parents and spouses to Deponent as referenced in the EMORY ARTICLE.

(m) all documentation of any protocol followed to evaluate exposure testimony including criteria for resolving factual disputes, answers to questions subject to objections or leading questions;

(n) all documentation relied upon for conclusions that environments in which plaintiffs in the 75 cases lived and worked did not contain asbestos;

(o) all documentation for any opinion deponent will express regarding background levels of exposures;

(p) all documents related to the physical location or residence of the 75 subjects during their alleged years of exposure to asbestos;

(q) all documents related to, or relied upon by Deponent, for Deponent's opinion that "Seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders..." as stated in the EMORY ARTICLE. This includes all materials provided to Deponent by plaintiffs' lawyers, that Deponent generated or received from any source that related to these specific 75 people;

(r) documentation reflecting any inquiry Deponent made regarding whether a claim for compensation was made on behalf of any of the 75 subjects as a result of exposure to any product for which there is a bankruptcy trust;

(s) all documents which show, refer to, or relate to the analysis of mineral particles used to support the conclusion in the EMORY ARTICLE that the 75 subjects were exposed to asbestos;

(t) all documents that refer to the geological source of the talcum powder products alleged to have been used by the 75 subjects identified in the EMORY ARTICLE

(u) all documents that identify the type of talcum powder used by each of the 75 subjects identified in the EMORY ARTICLE.

2. All documents and records relied upon to provide the opinions related to TABLES 1 and 2 in the EMORY ARTICLE;

3. All correspondence to and from any lawyer or law firm employee and Deponent, or any co-author and between Deponent and any of the coauthors, relating to any possible asbestos exposure of the subjects of the study. This request includes "sworn deposition testimonies and answers to interrogatories provided from the subjects, parents, and spouses" referenced in the article. EMORY ARTICLE p. 2;

4. All billing documents/invoices related conducting the study reported on in the EMORY ARTICLE or writing the article;

5. All files relating to each of the cases in which Deponent served as an expert that became subjects of the EMORY ARTICLE. (i.e. her file on each case that became a subject of the article);

6. All communications between Deponent and any other individuals where the identity of test subjects, residence of test subjects, identity of alleged talcum powder brand names, or exposure history was revealed to anyone who was not an author of the EMORY ARTICLE.

7. Financial records indicating all money that Dr. Emory, or the company of which she is an owner, have earned in connection with cosmetic talc consultation or litigation in the last 5 years;

8. All documents reflecting amounts Dr. Emory, or the company of which she is an owner, have billed Simmons Hanly Conroy LLC in the last 5 years for any kind of litigation or consultation;

9. All documents reflecting whether Plaintiff Brian Joseph Gref ("Mr. Gref") (Date of Birth: XX/XX/1982, Address: XXXX Whispering Forest Drive, Jacksonville, FL 32257) was one of the subjects of the EMORY ARTICLE.

10. All correspondence relating to the compensation paid and/or to be paid for Deponent's work related to Mr. Gref.

11. All correspondence, invoices, bills, statements, IRS Form 1099, other income tax records, and other documents relating to the compensation paid for Deponent's work or testimony done for and/or at the request of the law firm of Simmons Hanly Conroy LLC, over the last five (5) years.

12. All notes, correspondence, records, instrument tapes, slides, charts, x-rays, reports, opinions, tape recordings and every other documents of every kind or description, which the Deponent has created, seen reviewed or to which she has referred in anyway regarding Mr. Gref.

13. All photographs, calculations, worksheets, working papers, memoranda, and every other document or depiction of every sort or description, relied upon and/or generated by Deponent or at Deponent's request or direction or supervision, that relate to Mr. Gref.

14. Any materials Deponent ever possessed or reviewed that relate to any of the locations where Mr. Gref worked during his lifetime.

15. Any materials Deponent reviewed or created that relates to the calculation of dose related to Mr. Gref, if any.

16. Any materials Deponent ever possessed or reviewed that relate to Mr. Gref's potential exposure to "asbestos" from any source other than cosmetic talc.

17. All notes, records, x-rays, charts, graphs, tapes, instrument recordings, slides, tissue specimens, photographs, calculations, worksheets, working papers, memoranda, and every other document or depiction of every sort or description relied upon and/or generated by the deponent or at the deponent's request or direction or supervision relating to Mr. Gref (including but not limited to Mr. Gref's alleged use of certain cosmetic talcum powder products).

18. Any documents related to the background levels of asbestos, specifically including (i) any information related to the background levels of asbestos that are/were present in Deponent's home town, research/testing facilities, and offices, and (ii) any information relating to the background levels of asbestos that are/were present in Mr. Gref's home town, residences, and work places.

19. If you contend that any materials otherwise responsive to these requests are in any way exempt from disclosure on any basis, including but not limited to the basis of a confidentiality agreement, create a list identifying all such materials for in camera inspection by the Court.

# Exhibit

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES

Case No. _____

Related Case: S.D.N.Y.: 1:20-cv-
5589-GBD

## DECLARATION OF DR. THERESA S. EMORY, MD

Dr. Theresa S. Emory, MD hereby declares under penalty of perjury as follows:

1.      I am over the age of eighteen and am competent to make this Declaration.  I have
personal knowledge of the matters set forth below.

2.      I am an Officer at Peninsula Pathology Associates PC ("Peninsula"), and a board-
certified physician in anatomic and clinical pathology. I submit this Declaration in support of
Peninsula's Motion to Quash the subpoena issued by American International Industries ("AII") in
connection with *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.).

3.      I co-authored a peer-reviewed article entitled "Malignant mesothelioma following
repeated exposures to cosmetic talc: A case series of 75 patients," which was subsequently
published in March 2020 in the American Journal of Industrial Medicine (the "Article") and is
attached hereto as **Attachment A**.

1

**JA25**

4.    The Article was based on a review of certain records associated with 75 individuals with malignant mesothelioma who reportedly had no known asbestos exposure other than to cosmetic talcum powder.

5.    Pursuant to the Department of Health and Human Services and the Food and Drug Administration Regulations, the 75 human subjects were anonymized in the paper.

6.    I researched and drafted the Article entirely on my own personal time while I was away on vacation in February 2020. I did not use any Peninsula resources or equipment to conduct my research and/or author the Article. Peninsula did not compensate me for my efforts to conduct the study or draft or publish the Article. One of my co-authors, Dr. John Maddox, is a part-time employee of Peninsula Pathology and worked on his personal time on this article. No other Peninsula staff members assisted me with the Article. I also did not discuss the Article with any Peninsula employees, other than Dr. John Maddox, until after it was accepted for publication. As a result, the research and drafting of the Article were entirely done in my personal capacity, separate and apart from my professional affiliation with Peninsula.

7.    Neither I nor Peninsula received any compensation for my role as co-author of the Article. The Article's contents, subject matter, and findings were not discussed or shared with anyone at Peninsula (other than Dr. Maddox) or any outside party prior to its publication.

8.    In connection with my role as a testifying expert in a talc case captioned *Bell v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.), I was deposed by lawyers at Lathrop GPM representing American International Industries (also a defendant in that case) for approximately 24 hours over the course of four depositions held in October 2020, November 2020, December 2020, and April 2021.

2

**JA26**

9.    I have not been retained as an expert in connection with the litigation captioned *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.), nor do I have any other involvement in that litigation.

10.    It would be a violation of medical ethics rules to divulge the identities of anonymized human subjects. If I were required to reveal information concerning these anonymized human subjects, it could jeopardize my medical license.

11.    It is critically important that the identities of anonymized human subjects remain confidential. Researchers must adhere to good principals of ethics when performing human research. Research of pathological specimens may not require special informed consent and be subject to Institutional Review Board waiver of informed consent, but only if the researchers minimize risk of harm to the research subjects by carefully de-identifying the research materials and maintaining anonymity of the research subjects throughout the process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of November, 2022 in Newport News, VA.

Dr. Theresa S. Emory, MD
Peninsula Pathology Associates

3

**JA27**

**tt    h    t**

Received: 24 February 2020 | Revised: 5 March 2020 | Accepted: 6 March 2020

DOI: 10.1002/ajim.23106



**RESEARCH ARTICLE**

# Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients

Theresa S. Emory MD[1]  |  John C. Maddox MD[1]  |  Richard L. Kradin MD[2,3]

[1]Department of Pathology, Peninsula Pathology Associates, Newport News, Virginia

[2]Department of Medicine (Pulmonary/Critical Care), Massachusetts General Hospital, Boston, Massachusetts

[3]Department of Pathology, Massachusetts General Hospital, Boston, Massachusetts

**Correspondence**
Theresa S. Emory, MD, Department of Pathology, Peninsula Pathology Associates, 500 J Clyde Morris Blvd, Newport News, VA 23601.
Email: temorymd@gmail.com

## Abstract

**Background:** Asbestos is the primary known cause of malignant mesothelioma. Some cosmetic talc products have been shown to contain asbestos. Recently, repeated exposures to cosmetic talc have been implicated as a cause of mesothelioma.

**Methods:** Seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders, were reviewed in medical-legal consultation. Out of the 75 cases, 11 were examined for asbestiform fibers.

**Results:** All subjects had pathologically confirmed malignant mesothelioma. The mean age at diagnosis was 61 ± 17 years. The mean latency from exposure to diagnosis was 50 ± 13 years. The mean exposure duration was 33 ± 16 years. Four mesotheliomas (5%) occurred in individuals working as barbers/cosmetologists, or in a family member who swept the barber shop. Twelve (16%) occurred in individuals less than 45 years old (10 females; 2 males). Forty-eight mesotheliomas were pleural (40 females; 8 males), 23 were peritoneal (21 females; 2 males). Two presented with concomitant pleural and peritoneal disease. There was one pericardial, and one testicular mesothelioma. The majority (51) were of the epithelioid histological subtype, followed by 13 biphasic, 8 sarcomatoid, 2 lymphohistiocytoid, and 1 poorly differentiated. Of the 11 individuals whose nontumorous tissues were analyzed for the presence of asbestiform fibers, all showed the presence of anthophyllite and/or tremolite asbestos.

**Conclusions:** Mesotheliomas can develop following exposures to cosmetic talcum powders. These appear to be attributable to the presence of anthophyllite and tremolite contaminants in cosmetic talcum powder.

**KEYWORDS**
anthophyllite, females, mesothelioma, peritoneal, pleural, talc, tremolite

## 1 | INTRODUCTION

Asbestos, a generic term for naturally occurring fibrous mineral silicates, is recognized as a carcinogen by the general medical and scientific communities. In 1960, Wagner et al[1] reported a large series of malignant mesotheliomas in individuals who had been exposed to asbestos from a South African asbestos mine. It has been demonstrated that all types of asbestos and even brief and low-dose exposures are capable of causing malignant mesothelioma.[2–4] In the 1970s, several types of cosmetic talcum powder products were

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.
© 2020 The Authors. *American Journal of Industrial Medicine* published by Wiley Periodicals, Inc.

**484** | wileyonlinelibrary.com/journal/ajim                                                    *Am J Ind Med.* 2020;63:484–489.

**JA29**

EMORY ET AL.

AMERICAN JOURNAL
OF
INDUSTRIAL MEDICINE —WILEY— **485**

demonstrated to contain asbestos.[5-7] Asbestos fibers in commercial talcum powder have also been shown to become airborne upon application, and repeated exposures to cosmetic talc were implicated as a cause of mesothelioma by Gordon et al.[8] Recently, Moline et al,[9] reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc.

## 2 | METHODS

One hundred forty subjects with documented exposures to cosmetic talc were initially reviewed. Exposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses. Sixty-five subjects were excluded due to recalled occupational or paraoccupational exposures to other sources of asbestos. Seventy-five subjects, whose only known exposure to asbestos was via cosmetic talc, were included for further examination. The asbestos content of talcum products and airborne asbestos concentrations during simulations of the usage of these products was determined in previously published studies.[10,11]

Tissues from biopsies and/or debulking procedures were examined and the diagnosis of malignant mesothelioma was confirmed by a board-certified pathologist (JCM, TSE, RLK). Immunohistochemical staining results for BAP-1 were available in a few cases but was not routinely performed as a part of this study.

No efforts were made to reconstruct levels of exposure but all subjects had been repeatedly exposed over many years. Eleven cases were examined for the presence of asbestiform fibers (aspect ratio, ≥3:1) in sampled tissues. Nine subjects were examined both by analytical transmission electron microscopy (ATEM) and microprobe analysis (MA) (see Table 2), whereas two were examined by scanning electron microscopy (SEM) and MA (results not shown).

## 3 | RESULTS

The pertinent data from the 75 subjects is shown in Table 1. All had pathologically confirmed malignant mesothelioma. Sixty-four subjects were females, 11 were males. The mean age at diagnosis was 61 ± 17 years, with a range of 14 to 94 years. The mean exposure duration was 33 ± 16 years with a range of exposure from 6 to 65 years. The mean latency from time of first exposure to diagnosis was 50 ± 13 years with a range of 14 to 72 years. A total of 4 of the 75 cases (5%) occurred in barbers/cosmetologists, or in a family member who swept the barber shop. Twelve (16%) were 45 years old or younger (10 females, 2 males) at the time of diagnosis. Forty-eight mesotheliomas were pleural (40 females; 8 in males); 23 peritoneal (21 females; 2 men). Two presented with both pleural and peritoneal disease. There was one pericardial (woman), and one testicular mesothelioma. The majority, 51 (68%) were of epithelioid subtype, 13 biphasic (17%), 8 sarcomatoid (11%), 2 lymphohistiocytoid (3%),

and 1 poorly differentiated (1%). Treatment, therapeutic outcomes, and survival were not determined in this study.

For the 11 subjects whose tissues were examined by ATEM and ASEM, the analysis showed the presence of tremolite and/or anthophyllite in all 11 subjects (Table 2).

## 4 | DISCUSSION

The 75 individuals with malignant mesothelioma caused by asbestos in cosmetic talc is currently the largest series reported to date. Recently, Moline et al reported 33 cases of malignant mesothelioma attributed to exposures to cosmetic talc. Like Moline's work, most of mesotheliomas in the present series occurred in women. Several mesotheliomas occurred specifically in hairdressers/barbers. Similarly, the asbestos fiber types found by ATEM in the tissues examined were comparable to those found in laboratory testing for cosmetic talc.[10-12]

Mesothelioma is recognized as a "signal tumor" of asbestos exposure, that is, if a patient has mesothelioma, it should signal an inquiry into potential asbestos exposure. The presence of asbestos in talc deposits has been recognized since the late 1940s.[13,14] Since the 1960s, laboratory testing has identified asbestos in samples of cosmetic talc.[15,16] Studies have confirmed that the most common types of asbestos present in cosmetic talc are tremolite, anthophyllite, and chrysotile. Industrial asbestos products used in the United States generally contained chrysotile, amosite, and/or crocidolite,[17] and anthophyllite and tremolite were rarely present.[18]

While the latency between exposure and diagnosis in the present study is similar to the average latency for the development of mesothelioma (50 years) reported in surveillance epidemiology and end results program (SEER) data,[19] the average age at diagnosis in this report (61 years) is 11 years younger than that in the SEER data (72 years). In addition, fewer than 3% of mesotheliomas in the SEER data occurred in individuals less than 45 years of age, whereas 16% of mesotheliomas of the present study occurred in individuals less than 45 years of age, and 83% of these cases were in women.[20]

The present report of 75 cases, together with the 35 cases previously reported[8,9] currently brings the number of individuals with confirmed diagnoses of malignant mesothelioma following repeated exposure to cosmetic talcum powder to more than 100. The presence of anthophyllite and tremolite in the fiber analysis of tissues obtained from the 11 subjects in this series, is consistent with a source in cosmetic talc.

Unlike industrial or occupational exposure to asbestos, where materials have been regulated, exposure to asbestos in cosmetic talc has not been widely reported or recognized within the medical community or to the public. Cosmetic talc products are most frequently used by women in the United States, and while the incidence of mesothelioma in women is less than in men, the majority have previously been reported as "idiopathic," indicating no recognized source of asbestos exposure. The present study supports the contention that asbestos exposure through the use of cosmetic talc accounts may account for an uncertain percentage of these cases.

**JA30**

**486** | WILEY AMERICAN JOURNAL OF INDUSTRIAL MEDICINE                                                                EMORY ET AL.

**TABLE 1** Seventy-five mesothelioma cases exposed to talcum powder

| Case | Sex | Year of diagnosis | Age at diagnosis | Mesothelioma site | Histology | Estimated years of use | Estimated years of latency |
|------|-----|-------------------|------------------|-------------------|-----------|------------------------|----------------------------|
| 1 | F | 2017 | 72 | Pleural | Epithelioid | 20 | 57 |
| 2 | F | 2014 | 51 | Peritoneal | Epithelioid | 30 | 50 |
| 3 | F | 2017 | 50 | Pleural | Lymphohistiocytoid | 41 | 50 |
| 4 | F | 2017 | 57 | Peritoneal | Epithelioid | 30 | 52 |
| 5 | F | 2015 | 65 | Pleural | Epithelioid | 39 | 62 |
| 6 | F | 2017 | 39 | Peritoneal | Sarcomatoid | 15 | 39 |
| 7 | F | 2016 | 29 | Pericardial | Epithelioid | 29 | 29 |
| 8 | F | 2017 | 94 | Pleural | Epithelioid | 60 | 72 |
| 9 | F | 2015 | 80 | Pleural | Epithelioid | 19 | 59 |
| 10 | F | 2016 | 72 | Pleural | Sarcomatoid | 43 | 59 |
| 11 | F | 2013 | 66 | Peritoneal | Epithelioid | 20 | 52 |
| 12 | F | 2011 | 48 | Pleural | Lymphohistiocytoid | 13 | 21 |
| 13 | F | 2010 | 51 | Peritoneal | Epithelioid | 15 | 20 |
| 14 | F | 2018 | 55 | Peritoneal | Epithelioid | 40 | 42 |
| 15 | M | 2017 | 81 | Pleural | Sarcomatoid | 60 | 60 |
| 16 | F | 2018 | 56 | Pleural | Epithelioid | 48 | 52 |
| 17 | F | 2017 | 32 | Peritoneal | Epithelioid | 25 | 32 |
| 18 | F | 2017 | 89 | Pleural | Sarcomatoid | 40 | 42 |
| 19 | F | 2019 | 73 | Peritoneal | Epithelioid | 47 | 56 |
| 20 | M | 2016 | 70 | Pleural | Poorly differentiated | 50 | 55 |
| 21 | F | 2015 | 66 | Pleural | Epithelioid | 40 | 43 |
| 22 | F | 2016 | 45 | Pleural | Epithelioid | 10 | 45 |
| 23 | F | 2018 | 45 | Peritoneal | Epithelioid | 39 | 45 |
| 24 | M | 2015 | 67 | Pleural + peritoneal | Epithelioid | 35 | 60 |
| 25 | M | 2017 | 78 | Peritoneal | Biphasic | 50 | 62 |
| 26 | F | 2018 | 57 | Peritoneal | Biphasic | 25 | 57 |
| 27 | F | 2013 | 14 | Peritoneal | Epithelioid | 12 | 14 |
| 28 | F | 2016 | 67 | Peritoneal | Epithelioid | 15 | 59 |
| 29 | F | 2018 | 73 | Pleural | Epithelioid | 30 | 65 |
| 30 | F | 2018 | 76 | Pleural | Biphasic | 60 | 55 |
| 31 | M | 2017 | 39 | Testis | Epithelioid | 7 | 39 |
| 32 | F | 2018 | 57 | Pleural | Sarcomatoid | 57 | 57 |
| 33 | F | 2016 | 68 | Pleural | Epithelioid | 38 | 64 |
| 34 | F | 2017 | 80 | Pleural | Epithelioid | 50 | 60 |
| 35 | F | 2016 | 63 | Pleural | Epithelioid | 15 | 54 |
| 36 | F | 2017 | 58 | Pleural | Biphasic | 20 | 58 |
| 37 | F | 2017 | 71 | Pleural | Biphasic | 60 | 71 |
| 38 | F | 2014 | 70 | Pleural | Epithelioid | 41 | 39 |
| 39 | F | 2016 | 26 | Peritoneal | Epithelioid | 20 | 26 |

**JA31**

EMORY ET AL.    AMERICAN JOURNAL OF INDUSTRIAL MEDICINE    WILEY  |  487

**TABLE 1**  (Continued)

| Case | Sex | Year of diagnosis | Age at diagnosis | Mesothelioma site | Histology | Estimated years of use | Estimated years of latency |
|------|-----|-------------------|------------------|-------------------|-----------|------------------------|----------------------------|
| 40 | F | 2016 | 35 | Pleural | Epithelioid | 35 | 35 |
| 41 | F | 2017 | 72 | Pleural | Sarcomatoid | 23 | 60 |
| 42 | F | 2016 | 68 | Peritoneal | Epithelioid | 65 | 68 |
| 43 | F | 2018 | 77 | Pleural | Biphasic | 30 | 55 |
| 44 | M | 2015 | 58 | Plural | Biphasic | 6 | 49 |
| 45 | F | 2017 | 72 | Peritoneal | Biphasic | 30 | 42 |
| 46 | F | 2017 | 59 | Pleural + peritoneal | Epithelioid | 15 | 44 |
| 47 | F | 2016 | 80 | Pleural | Biphasic | 16 | 52 |
| 48 | M | 2019 | 71 | Pleural | Epithelioid | 40 | 57 |
| 49 | F | 2017 | 72 | Pleural | Biphasic | 58 | 58 |
| 50 | F | 2017 | 43 | Peritoneal | Epithelioid | 43 | 43 |
| 51 | F | 2017 | 75 | Peritoneal | Sarcomatoid | 55 | 59 |
| 52 | F | 2015 | 30 | Pleural | Epithelioid | 20 | 20 |
| 53 | F | 2017 | 79 | Pleural | Biphasic | 65 | 61 |
| 54 | F | 2017 | 66 | Peritoneal | Epithelioid | 20 | 60 |
| 55 | F | 2015 | 64 | Peritoneal | Epithelioid | 40 | 40 |
| 56 | F | 2017 | 24 | Pleural | Epithelioid | 12 | 24 |
| 57 | M | 2017 | 72 | Pleural | Epithelioid | 30 | 56 |
| 58 | M | 2017 | 74 | Peritoneal | Epithelioid | 30 | 52 |
| 59 | M | 2015 | 30 | Pleural | Epithelioid | 20 | 30 |
| 60 | F | 2016 | 81 | Pleural | Sarcomatoid | 52 | 52 |
| 61 | F | 2017 | 58 | Pleural | Epithelioid | 58 | 58 |
| 62 | F | 2016 | 75 | Pleural | Epithelioid | 8 | 47 |
| 63 | F | 2011 | 88 | Pleural | Epithelioid | 21 | 71 |
| 64 | F | 2016 | 73 | Peritoneal | Biphasic | 41 | 60 |
| 65[a] | M | 2017 | 64 | Pleural | Epithelioid | 18 | 40 |
| 66[a] | F | 2014 | 69 | Pleural | Epithelioid | 16 | 60 |
| 67[a] | F | 2014 | 44 | Peritoneal | Epithelioid | 30 | 39 |
| 68[a] | F | 2016 | 68 | Pleural | Epithelioid | 53 | 52 |
| 69[a] | F | 2016 | 72 | Pleural | Epithelioid | 40 | 51 |
| 70[a] | F | 2016 | 67 | Pleural | Epithelioid | 37 | 53 |
| 71[a] | F | 2017 | 58 | Pleural | Epithelioid | 41 | 46 |
| 72[a] | M | 2016 | 44 | Pleural | Epithelioid | 43 | 44 |
| 73[a] | F | 2017 | 51 | Pleural | Epithelioid | 28 | 49 |
| 74[a] | F | 2015 | 47 | Pleural | Epithelioid | 15 | 40 |
| 75[a] | F | 2014 | 62 | Pleural | Biphasic | 14 | 53 |

[a]Tissue analysis performed.

The present study has several limitations. It is both retrospective and uncontrolled, and the cases were submitted in medico-legal consultation, all of which potentially introduce bias. However, detailed deposition testimonies provide a level of detail concerning product exposure—including dates of exposure, duration, and frequency—that is rarely obtained in routine medical exposure histories, and which allowed for corroborating witness testimony in some cases. The strengths of the current series include its size, as malignant mesothelioma is a rare disease

**JA32**

**TABLE 2** Fiber detection in tissue digestion from nine cases of malignant mesothelioma

| Case | Mesothelioma site | Asbestos type | Tissues examined | Concentration (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary | Limit of detection (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary | Tissue digest weight (g) Lung, lymph node, omentum, ovary |
|---|---|---|---|---|---|---|
| 65 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 8625 | 4313 | 0.08, 0.34 |
| 66 | Pleural | Anthophyllite | Lung, lymph node | 15 333, 23 000 | 7667, 1150 | 0.06, 0.06 |
| 67 | Peritoneal | Anthophyllite, tremolite | Omentum, lymph node | 1917, 1725 | 639, 1725 | 0.54, 0.20 |
| 68 | Pleural | Anthophyllite, tremolite | Lymph node | 3044 | 1015 | 0.82, 0.34 |
| 70 | Pleural | Anthophyllite, amosite, chrysotile | Lymph node | 17 250 | 3450 | 1.06 |
| 71 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 4313, 857, 3451 | 2156, 857, 575 | 0.16 |
| 72 | Pleural | Anthophyllite, tremolite | Lymph node | 17 250 | 3450 | 0.02 |
| 74 | Pleural | Anthophyllite, tremolite | Lung | 2300 | 460 | 2 |
| 75 | Pleural | Anthophyllite | Lung, ovary | 3450, 2070 | 1150, 2070 | 0.6, 0.2 |

Note: All cases shown were examined by analytical transmission electron microscopy and structures analyzed by microprobe analysis.

JA33

EMORY ET AL.
AMERICAN JOURNAL OF INDUSTRIAL MEDICINE -WILEY 489

(1-2 cases per 100 000), and its novelty, as exposures to cosmetic talc are rarely considered by most medical practitioners when they are eliciting an exposure history to asbestos.

The findings of the present and other recent studies suggest that cosmetic talc may be a cause of malignant mesothelioma. Large-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc. Although cosmetic talcs are not currently regulated by the Food and Drug Administration, the poor prognosis of malignant mesothelioma may warrant regulation or the withdrawal of cosmetic talcs from the market, as nontoxic alternatives such as corn starch are presently available.

## CONFLICTS OF INTEREST

Drs Emory, Maddox, and Kradin have testified in asbestos litigation, primarily for plaintiffs.

## DISCLOSURE BY AJIM EDITOR OF RECORD

John D. Meyer declares that he has no conflict of interest in the review and publication decision regarding this article.

## AUTHOR CONTRIBUTIONS

JCM and RLK developed the concept and the design of the work. JCM initiated the acquisition and developed the initial data analysis. TSE reviewed the materials, performed the statistical analysis, and was the primary author of the manuscript. RLK revised and gave the final approval of the version to be published.

## ETHICS APPROVAL AND INFORMED CONSENT

As these cases were selected from medical-legal consultation practice and no identifying information was included, there was no formal institutional consent nor informed consent required.

## ORCID

Theresa S. Emory  http://orcid.org/0000-0002-8075-4480
John C. Maddox  http://orcid.org/0000-0003-1417-0337
Richard L. Kradin  http://orcid.org/0000-0002-3953-8671

## REFERENCES

1. Wagner JC, Sleggs CA, Marchand P. Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province. Occup Environ Med. 1960;17:260-271.
2. Lacourt A, Gramond C, Rolland P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. Thorax. 2014;69:532-539.
3. Rödelsperger K, Jöckel KH, Pohlabeln H, Romer W, Woitowitz HJ. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study. Am J Ind Med. 2001;39:262-275.
4. Jiang Z, Chen T, Chen J, et al. Hand spinning chrysotile exposure and risk of malignant mesothelioma: a case control study in Southeastern China. Int J Cancer. 2018;142:514-523.
5. Rohl AN, Langer AM. Identification and quantitation of asbestos in talc. Environ Health Perspect. 1974;9:95-109.
6. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. J Toxicol Environ Health. 1976;2:255-284.
7. Snider D, Pfeiffer D, Mancusco J. Asbestos form impurities in commercial talcum powders. Compass Sigma Gamma Epsilon. 1972;49:65-67.
8. Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health. 2014;20(4):318-332.
9. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc. J Occup Environ Med. 2020;62(1):11-17.
10. Steffen JE, Tran T, Yimam M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders—A case series. J Occup Environ Med. 2020;62:e65-e73. https://doi.org/10.1097/JOM.0000000000001800
11. Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. Regulatory Toxicol Pharmacol. 1984;4:222-235.
12. Roggli V, Vollmer R, Kelly J, Sporn T. Tremolite and mesothelioma. Ann Occup Hyg. 2002;46(5):447-453.
13. Millman N. Pneumoconiosis due to talc in the cosmetic industry. Occup Med. 1947;3:257-260.
14. Kleinfeld M, Messite J, Langer AM. A study of workers exposed to asbestiform minerals in commercial talc manufacture. Environ Res. 1973;6:132-143.
15. Johns-Manville Research and Engineering Center. Body Talcum Powders—Petrographic Examination, requested by J. P. Leineweber. 31 October 1968. https://cdn.toxicdocs.org/gb/gbq4wMVNy39gQpYQoRr0EpBE3/gbq4wMVNy39gQpYQoRr0EpBE3.pdf. Accessed 29 February 2020.
16. Lewin S, New York University, to Alfred Weissler, FDA, August 3, 1972, https://cdn.toxicdocs.org/85/85JyymOw7EB568x1mExoqRQVe/85JyymOw7EB568x1mExoqRQVe.pdf. Accessed 29 February 2020.
17. Churg AM, Warnock ML. Asbestos and other ferruginous bodies their formation and clinical significance. Am J Pathol. 1981;102:447-457.
18. Roggli VL, McGavran MH, Subach J, Sybers HD, Greenberg SD. Pulmonary asbestos body counts and electron probe analysis of asbestos body cores in patients with mesothelioma. Cancer. 1982;50:2423-2432.
19. American Cancer Society. Key Statistics About Malignant Mesothelioma; 2018. https://www.cancer.org/cancer/malignant-mesothelioma/about/key-statistics.html. Accessed 15 February 2020.
20. Henley SJ, Larson TC, Wu M, et al. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003–2008. Int J Occup Environ Health. 2013;19(1):1-10. https://doi.org/10.1179/2049396712Y.0000000016

How to cite this article: Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients. Am J Ind Med. 2020;63:484–489. https://doi.org/10.1002/ajim.23106

Case 4:22-mc-00001-AWA-DEM   Document 2-3   Filed 11/18/22   Page 1 of 3 PageID# 117

# Exhibit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| IN RE SUBPOENA FOR DOCUMENTS ISSUED TO PENINSULA PATHOLOGY ASSOCIATES | Case No. _____<br><br>Related Case: S.D.N.Y.: 1:20-cv-5589-GBD |

**DECLARATION OF DR. JOHN C. MADDOX, MD**

Dr. John C. Maddox, MD hereby declares under penalty of perjury as follows:

1.    I am over the age of eighteen and am competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.    I am a part-time employee of Peninsula Pathology Associates LC ("Peninsula"), and a board-certified physician in anatomic and clinical pathology as well as hematopathology. I submit this Declaration in support of Peninsula's Motion to Quash the subpoena issued by American International Industries ("AII") in connection with *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.).

3.    I co-authored a peer-reviewed article entitled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," which was subsequently published in March 2020 in the American Journal of Industrial Medicine (the "Article").

4.    I researched and drafted the Article entirely on my own personal time. I did not use any Peninsula resources or equipment to conduct my research and/or author the Article. Peninsula

**JA36**

did not compensate me for my efforts to conduct the study or draft or publish the Article. Other than my co-author, Dr. Theresa Emory, no other Peninsula staff members assisted me with the Article. I also did not discuss the Article with any Peninsula employees, other than Dr. Emory, until after it was accepted for publication. As a result, the research and drafting of the Article were entirely done in my personal capacity, separate and apart from my professional affiliation with Peninsula.

5.      I have not been engaged to provide any consultation or expert services in connection with *Gref v. American International Industries*, No. 1:20-cv-005589 (S.D.N.Y.), nor do I have any other connection to that litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of November, 2022 in Palmyra, VA.

Dr. John C. Maddox, MD
Peninsula Pathology Associates

**JA37**

# Exhibit

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN  DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES

Case No. _____

Related Case: S.D.N.Y.: 1:20-cv-
5589-GBD

### DECLARATION OF KATHRYN M. ALI

Kathryn M. Ali hereby declares under penalty of perjury as follows:

1.      I am over the age of eighteen and am competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.      I am a Partner at Ali & Lockwood LLP, which was retained by Peninsula Pathology Associates LLC ("Peninsula") in connection with Peninsula's Motion to Quash the subpoena issued by American International Industries ("AII") in connection with *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.) (the "Subpoena").

3.      On November 15, 2022, I attended a meet and confer with AII's counsel to discuss the Subpoena. During that meet and confer, I asked AII's counsel to explain their basis for issuing the Subpoena after the conclusion of fact discovery in the *Gref* litigation. I also asked AII's counsel to withdraw the Subpoena as untimely and issued in violation of the court's scheduling orders in *Gref*.

1

**JA39**

4.    AII's counsel stated its position that there was no prohibition on third-party discovery at this phase of the *Gref* litigation. They did not provide any authority for this contention, nor did they cite any court order showing that discovery remained open.

5.    As of the date of this Declaration, AII's counsel has not withdrawn the Subpoena or indicated any agreement to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of November, 2022 in Washington, D.C.

Kathryn M. Ali

2

**JA40**

# EXHIBIT A

Page 1

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                 FOR THE COUNTY OF LOS ANGELES

3

4

5    GAIL KORETOFF, by and through )
     her Guardian ad Litem, ALLEN  )
6    KORETOFF and ANNEILLIA        )
     KORETOFF, Individually,       )
7                                  )
             Plaintiffs,           )
8                                  ) Case No.
     vs.                           ) JCCP 4674 / BC656506
9                                  )
     ARKEMA, INC. f/k/a PENNWALT   )
10   CORPORATION, et al.,          )
                                   )
11           Defendants.           )
     _____)
12

13

14

15        TELEPHONIC DEPOSITION OF JOHN MADDOX, MD

16                   January 10, 2019

17

18

19

20

21

22

23

24   REPORTED BY: CARRIE LAMONTAGNE, CSR No. 13393

25   JOB NO: 153779

Page 29

1    consultations of this sort.  After I started working

2    at this hospital, I started doing my own

3    consultations of that sort in about 1983 or '84.

4         Q.   In the last year, 2018 -- and I know you

5    have your testifying list there with you -- can you

6    please tell us how many times you were retained by

7    the Simon Greenstone firm.

8              MR. MANDIA:  I'll just note my objection

9    because you are pointing him to the list.  Are you

10   talking only cases he was deposed?

11             MR. BAYMAN:  No.  I was using the list as

12   a reference.  My question's broader.

13   BY MR. BAYMAN:

14        Q.   Do you know, Doctor, how many times you've

15   been retained by Simon Greenstone in the last year?

16        A.   Let me give you a broad view of that.  The

17   most active year that I had in reviewing cases was

18   2009 at which time myself and my partner

19   Dr. Jacques Legier -- that's J-A-C-Q-U-E-S,

20   L-E-G-I-E-R -- reviewed a total of about 300 cases

21   that year.  Some of those were duplicates; in other

22   words, he'd make a report and I'd make a report on

23   the same case.

24        I think there were probably a total of about

25   200 patients involved in 300 reports.  I did

```
                                                        Page 30
 1    slightly more than half of those, maybe a hundred
 2    and ten.  He did about 90 of the patients, maybe.
 3    I'm just trying to do the estimate as best I can.
 4          Since that time the yearly number of
 5    consultations has been in the range of a hundred to
 6    slightly more than a hundred.  Last year, in 2018, I
 7    think it was 70 cases.  And this year it will
 8    probably be a total of 70 cases, maybe fewer.  I
 9    have three partners that also review
10    asbestos-related disease cases.  And one of those
11    partners, Dr. Theresa Emory, is increasing the
12    number of cases that she reviews and I'm decreasing
13    the number of cases that I'm reviewing because I'm
14    getting ready to retire fairly soon.
15          Also, two other partners, Dr. Smith and
16    Dr. Swartz, review a lesser number of cases usually
17    just for compensation type situations.
18          Q.   So of the 70 cases that you mentioned in
19    2018, were those 70 cases that you had or that your
20    firm had?
21          A.   Well, all of these cases are reported on
22    the Riverside Regional Medical Center report --
23    equipment, a software program called CoPath and the
24    revenues from all of those cases go into Peninsula
25    Pathology Associates, Incorporated, that is all the
```

Page 31

1    professional revenue.

2         There's a technical charge for the preparation

3    of slides and custodian of records and that type

4    thing that goes to the hospital.  But all of the

5    professional component billing on that goes to

6    Peninsula Pathology Associates and it would be

7    divided equally amongst all of the partners in the

8    group.

9         Q.   I understand that.  My question, though,

10   you individually, how many cases did you work on in

11   2018?

12        A.   About 70.

13        Q.   Okay.  And did you write reports in all

14   those cases?

15        A.   Yes.  That would be about 70 that I wrote

16   reports on.  Somewhere between a third and a half of

17   those cases I'd estimate went to deposition and

18   then, let's see, about six or eight, I guess eight

19   of those cases went to trial.

20        Q.   Did you have cases that you worked on in

21   which you did not write reports beyond those 70?

22             MR. MANDIA:  Andy, let me just insert an

23   objection.  Maybe we can get around it.  I don't

24   know what types of jurisdictions or all the

25   different jurisdictions that Dr. Maddox has been

Page 32

1    asked to, you know, be involved in other cases and I

2    don't know if there would be privilege rules.

3         So I'll let him answer that question.  I don't

4    know how much farther we can go because I would want

5    to make sure -- if there are any privileges in those

6    cases, I wouldn't want that to be violated.

7    BY MR. BAYMAN:

8         Q.   I don't want to reveal the details of the

9    case if you're retained as a non-testifying

10   consultant.  I'm just trying get a sense of the

11   numbers.

12        A.   I think that I wrote reports on almost a

13   hundred percent of the cases that I received to

14   review.  Now, historically over the last several

15   years there have been approximately 2 percent of

16   cases where I did not diagnose mesothelioma, but

17   generally speaking I have written a report in those

18   cases as well because I didn't want to be misquoted.

19   And also, you know, I've been talking about all the

20   cases that I have reviewed, not just Simon

21   Greenstone cases.

22        Q.   Go ahead.

23        A.   My estimate would be that the Simon

24   Greenstone cases are maybe 35 percent of the cases

25   that I see, maybe.  That's about the best that I can

JA46

Page 33

1   do on an estimate.  I also do review cases for

2   Peter Angelos' law firm and for the local law firms,

3   including Patten, Wornom, Hatten & Diamonstein.

4        Q.   Simon Greenstone, though, is the biggest

5   law firm client that you have in the last year?

6             MR. MANDIA:  Objection to form.  Biggest.

7        You can answer, Doctor.

8             THE WITNESS:  I think I probably did

9   receive more cases from the Simon Greenstone law

10  firm than from any other individual law firm.  I did

11  mention a couple others.  I also review cases for

12  Dean, Omar & Branham law firm.  Those are the major

13  contributors to the cases that I review.

14  BY MR. BAYMAN:

15       Q.   And you would have received more cases

16  from the Simon Greenstone law firm than any other

17  law firm in the past two years also, correct?

18       A.   I think that that's likely.  I can't say

19  with absolute certainty, but I think that's very

20  likely.

21       Q.   And it's also -- you receive more cases

22  from Simon Greenstone than any other law firm in the

23  past five years, correct?

24       A.   Again, that's likely.  I cannot give you

25  precise numbers off the top of my head, but I think

Page 34

1    that's likely.

2          Q.    And in 2008 you wrote more reports for the

3    Simon Greenstone firm than any other law firm that

4    retained you, correct?

5          A.    Well, that's kind of an asked and answered

6    question.  That's what I've been trying to say in my

7    answers for the last three or four questions.

8          Q.    So that's a yes?

9          A.    That is a yes.  Well, as best as I can

10   remember, that is a yes.

11         Q.    What is your hourly rate, sir?

12         A.    Well, I do not personally charge for

13   these.  As I mentioned earlier, all of the

14   professional billing goes through Peninsula

15   Pathology Associates at the rate of $500 per hour.

16   As a partner in that firm, I receive one quarter of

17   that after the cost of billing is subtracted.  So I

18   personally receive about $122 per hour for that

19   work.

20         Q.    In 2008 how much did your company earn

21   from litigation consulting?

22         A.    Well, in aggregate, including the work of

23   Drs. Emory, Swartz and Maddox it was a little bit

24   more than $600,000.

25         Q.    How about in 2017?

Page 35

1      A.    It was less than that probably.

2      Q.    Do you have an estimate?

3      A.    Just off the top of my head I'd say

4  probably more like about 500,000.  And in years

5  previous to that probably closer to 400,000.  The

6  increase during that time has largely been due to

7  the fact that Dr. Theresa Emory has ramped up her

8  practice and I have been decreasing mine.

9      Q.    You still own 25 percent of the company,

10  correct?

11      A.    That's right, yes, sir.

12      Q.    Have you ever had any of your opinions

13  excluded in the past?

14      A.    There was a case in Pittsburgh where my

15  testimony was limited by the judge.  There was a

16  case that I just learned about last year where

17  someone had presented a consult report that I had

18  prepared.  There was an objection from the defense

19  and so the plaintiffs' attorney never followed up on

20  it, and I was excluded from that case because there

21  was an unanswered objection.  And there was a case

22  in Georgia, Butler, B-U-T-L-E-R, where again my

23  testimony was limited.  I understood that there was

24  a problem with the testimony of -- the testimony

25  that established the exposure in the case of that

**JA49**

# EXHIBIT B

Page 1

1    IN THE DISTRICT COURT

2    11th JUDICIAL DISTRICT

3    HARRIS COUNTY, TEXAS

4    _____

5    CRISTINA LOPEZ and CARLOS LOPEZ,

6            Plaintiff(s),

7        v.                          Case No.

8    BRENNTAG NORTH AMERICA, INC., ET AL    2017-86022-ASB

9            Defendant(s).

10   _____

11   TELEPHONIC DEPOSITION OF JOHN MADDOX, M.D.

12   DATE:          Wednesday, May 13, 2020

13   TIME:          9:05 a.m.

14   REPORTED BY:   Latrice E. Porter, Notary Public

15   JOB No.:       4046266

16

17

18

19

20

21

22

23

24

25

JA51

Page 19

1    addendum just to account for that one additional

2    slide.  And the addendum -- you know, the addendum was

3    unchanged -- unchanged diagnosis.

4    BY MS. DIWAN:

5         Q    Okay.  Dr. Maddox, you're a partner at

6    Peninsula Pathology Associates?

7         A    No, ma'am.  I retired on December the 31st,

8    2019.  I am no longer a partner in that firm.  I was a

9    full partner, but now I am a part-time employee.

10        Q    Well, congratulations, Dr. Maddox.

11        A    Well, thank you, ma'am.  I'm now 70 years

12   old and so I'm starting to ease out of the business

13   that I've been in for the last 45 years.

14        Q    Are you still -- but as a part-time employee

15   of Peninsula, are you still reviewing pathology cases,

16   both in your clinical practice and in your litigation

17   consulting role?

18        A    I have quit doing clinical work.  Much of my

19   clinical work was hematology.  I would see patients

20   with hematologic disorders, study their blood films or

21   perform bone marrow biopsies, or aspirations of lymph

22   nodes, flow cytometry and so forth, and that has

23   entire ceased.  I also would look at samples,

24   clinically, patients with lung disorders, lung

25   cancers, mesotheliomas and so forth, that has also

JA52

```
                                          Page 21
 1    consulting in 2019?
 2         A    Again, I think it would probably be around
 3    that same amount, it might be a bit less, because like
 4    I say, in advance of my retirement, my numbers have
 5    certainly gone down.  And so far --
 6         Q    And as a part-time --
 7         A    I was going to add --
 8         Q    I'm sorry to interrupt, I thought you had
 9    completed.
10         A    Well, I thought I was finished, too, but I
11    wasn't.  Sorry.  This year my numbers have gone down
12    even more than that.  This year, I think that the
13    total number of cases that I've reviewed this year is
14    less than ten.
15         Q    And now that you're a part-time employee of
16    Peninsula Pathology, and I understand you're no longer
17    a partner in Peninsula Pathology Associates, what
18    share of, you know, litigation consulting fees do you
19    receive in your new role?
20         A    Well, previously I received 22 or 23
21    percent, because the revenue was evenly split amongst
22    four partners, after the cost of billing expenses.
23    Now, of the professional component stuff, I receive 80
24    percent.  Of the technical component stuff, I receive
25    0 percent.  And I'm limited, for expenses
```

```
                                                   Page 22
 1    reimbursement, to about $3,000 per year.  That would
 2    be for things like printer paper, toner for the
 3    printers, ink for the printers, things like that,
 4    FedEx expenses for transferring files back and forth
 5    between my current house and the hospital in Newport
 6    News, and so forth.
 7         Q    All right.  Dr. Maddox -- I'm sorry.
 8         A    I was going to just add one thing.  Eighty
 9    percent of a small amount is a lot less than 23
10    percent of a larger amount, so far this year, on
11    asbestos consulting, my revenue has probably been
12    somewhere in the neighborhood of $15,000.
13         Q    I'm sorry, Dr. Maddox, have you --
14              MS. KAGAN:  I'm sorry, can you repeat
15    that number?  I didn't hear it clearly.
16              THE WITNESS:  I was saying that so far
17    in the year 2020 my total income from doing
18    consultation work has probably been about $15,000.
19              MS. KAGAN:  Thank you.
20    BY MS. DIWAN:
21         Q    Dr. Maddox, have you spoken to Ms. Lopez?
22         A    No, ma'am, I have not spoken with the
23    patient.
24         Q    Have you spoken to any of her treating
25    physicians?
```

JA54

Page 146

1   burdens versus exposure information.

2          We tossed it back and forth and decided,

3   nah, that was not really going to be practical.  I am

4   not the one that had done the digestion studies.

5   There was a bunch of reasons why that wasn't going to

6   be feasible.  So at that point, we thought, well,

7   let's just find everybody we have seen who has a

8   history of talc exposure, whether or not fiber counts

9   were done and look at that series.

10          So he found some cases, I found some cases

11  and we started working on them.  I have never been a

12  particularly good medical writer, so late in 2019, I

13  managed to persuade Dr. Emory to help us out and do

14  some of the writing on the article.

15          In fact, I've been working on her since the

16  spring of 2019 to help us with the article.  But

17  finally, I think in December, she agreed to do it.

18  The cases, 140 cases, I think that about a third of

19  them came from Dr. Kradin, more than a third of them

20  came from me, and slightly less than a third of them

21  came from Dr. Emory.

22          Dr. Kradin generated his own data, and I

23  generated much of the data, not all of it, but much of

24  the data from the Riverside files, that is myself and

25  Dr. Emory.  And once I had compiled all the data, I

Page 147

1    turned it over to Dr. Emory and she wrote the report,

2    did some of the statistics on things like average age,

3    average length of exposure and things like that, and

4    did some drafts.

5           Dr. Kradin and I both contributed to the

6    drafts, and then we submitted it for publication,

7    sometime I think it was either late February or early

8    March, late February, I think.  That would also

9    probably be in the article itself.  Oh yeah, it says

10   here that it was received 24 of February, 2020,

11   revised and accepted on March the 6th.  So that's the

12   narrative.  I hope that was helpful to you.

13       Q    It was.  Thank you.  If you can turn to the

14   last page of your article, there's a section called

15   "All Author Contributions" that sort of gives an

16   overview of what each of you did.

17       A    Yes.

18       Q    I want to ask you first about your role on

19   this paper, where it says you "initiated the

20   acquisition and dissolved the initial data analysis."

21   What does it mean to initiate the acquisition of the

22   data?

23       A    Well, I started looking stuff up.  What I

24   did was I went to that co-path computer system in --

25   and I did natural language searches of some of the

**JA56**

Page 151

1   exposure or even probable asbestos exposure, we would

2   exclude that case.  That would then become one of the

3   65, rather than one of the 75, if you catch me.

4        Q     Okay.  And when you say we would include the

5   --

6        A     In other words -- well --

7        Q     -- 65 --

8        A     -- I would exclude it.  I'm sorry.  I guess

9   I should say I would exclude it.  I will take full

10  responsibility for excluding those 65.  If I came

11  across something where a patient had occupational

12  asbestos exposure, I would exclude that patient.  Only

13  if I was unable to exclude the patient, would I add

14  the patient to the 75.

15            And in fact, when I turned that data

16  generation work over to Dr. Emory, there was probably

17  a few more, probably closer to 80.  And then, I think

18  in her review and double checking the data, she

19  probably knocked several more out.

20        Q     Did you revise the final article?

21            MS. KAGAN:  Objection, form.

22        A     I'm not sure what you mean by the final

23  article.  I was given access to the various drafts of

24  the article that Dr. Emory had written.  And I made

25  some comments and suggestions on those, some of which

**JA57**

Page 154

1    corresponding author?

2         A    Well, she's the one that actually submits

3    the manuscript to the publisher, and handles the

4    logistics of any further review, makes sure that her

5    co-authors sign their disclosure statements.  And when

6    the article is peer reviewed, the peer review comments

7    are usually sent to her, and then she would distribute

8    them to us, Kradin and Maddox.  So she --

9         Q    And did -- sorry.

10        A    She becomes the central fulcrum of getting

11   the paper into the journal.

12        Q    Can you give me a rough estimate of when you

13   started case selection on the paper versus when

14   analysis began, and then at what point drafting began?

15        A    Well, I would say data acquisition began

16   last spring, continued through the summer and fall,

17   and I tried to write, but it was horrible.  And I

18   finally persuaded her to take over the writing in

19   December.

20        Q    Did any one of your co-authors or you review

21   all 140 cases?

22                  MS. KAGAN:  Objection, form.

23   BY MS. DIWAN:

24        A    I don't think so.  I think that Dr. Kradin

25   reviewed all the cases that he submitted.  I reviewed

**JA58**

USCA4 Appeal: 23-1972     Doc: 26-1          Filed: 12/20/2023     Pg: 69 of 599

Page 157

1              MS. DIWAN:  Dr. Maddox --

2              MS. KAGAN:  -- (inaudible) of Dr.

3    Maddox questions about the article, and that was

4    certainly not my objection.  My objection was to your

5    questioning about what Dr. Emory did or did not do,

6    which she had been deposed on by counsel for Johnson &

7    Johnson in this case, in another matter.  And so, that

8    was my only point.

9              MS. DIWAN:  I would really appreciate

10   it if I could continue asking questions so we could

11   move through this.

12   BY MS. DIWAN:

13       Q    Dr. Maddox, did you go back and review all

14   of the information in these cases at the time of

15   drafting?  Or did you rely on your existing reports in

16   this case?

17             MS. KAGAN:  Objection, form.

18   BY MS. DIWAN:

19       A    On most of them, I relied on my existing

20   report.  The review had already been done previously.

21   On a few of them, where I wasn't sure about something

22   or was -- well, when I was uncertain about something,

23   I would go back to the original file and look at the

24   primary documents.

25       Q    Did you submit this case series to any other

Page 163

1      A    Well, I'm sure that there must be.  But I

2  don't know exactly what they are.  I mean, I know that

3  they have published some articles that have had

4  physician reviewers.  But I don't know what their

5  editorial policy is.

6      Q    So if you look at the date that this was

7  received versus the revisions and the acceptance, the

8  entire process took roughly 10 days for peer review?

9               MS. KAGAN:  Objection, form.

10  BY MS. DIWAN:

11     A    Yeah, about 12 days from received until

12  accepted.  That's pretty quick, isn't it?

13     Q    Do you -- it is.  Do you know any members of

14  the Editorial Board of the American Journal of

15  Industrial Medicine?

16     A    If you were to ask me what their names are,

17  I wouldn't be able to tell you.  I certainly don't

18  know any of them personally.  In the course of things,

19  I became aware that they had a change of editor

20  sometime around the first of the year, but I can't

21  remember the name of the previous editor nor the

22  current editor.

23     Q    Before the article was accepted for

24  publication, did you communicate with any plaintiff's

25  attorneys in the talc litigation with respect to the

JA60

Page 164

1    article?

2          A    Well, there were a couple of times where I

3    had to ask for more information, a transcript or

4    something of that sort.  But the attorneys had no

5    editorial control or input for that matter on anything

6    about -- anything to do with the publication of this

7    article.  This was not something that was requested by

8    them, but they became aware of the fact that we were

9    working on something when on a few occasions, I would

10   go ask for additional documentation or transcripts or

11   something of that sort.  And also --

12         Q    Did you --

13         A    Also, let me mention that I was asked a

14   question by one of the defense attorneys last summer,

15   was I working on something?  And I -- and that was in

16   a deposition, and I answered him, yes, I am working on

17   an article on mesotheliomas.  And that -- I'll tell

18   you his name in a second.  It was Shep something, not

19   Shep the plaintiff's attorney, but the Shep, the

20   defense attorney.  I'm blocking on his name right now.

21   I'm sorry.  But it was during the summer.

22         Q    When you -- so my question is limited to

23   plaintiff's lawyers.  When you went back and asked for

24   additional materials to plaintiff's lawyers, did you

25   identify the case that you were looking for those

**JA61**

Page 165

1    additional materials on?

2        A    Well, yes, I guess I would've had to have

3    done that.

4        Q    And roughly how many cases did you do that

5    for?

6        A    Not very many.  10?  Less?

7        Q    Did you identify which materials you needed,

8    but specifically that you needed a deposition

9    transcript?

10       A    You know, it was different from case to

11   case.  But on some of those, it probably was

12   transcript.  On some of those, it would've been

13   questions on what had been proven about this or that,

14   which I don't remember the details of it.  But it was

15   variable from case to case.

16       Q    So that last statement when you said what

17   had been proven about this or that, do you mean that

18   you went back to the attorney to ask what happened in

19   this case regarding, you know, tissue digestion or

20   something, and then the plaintiff's attorney responded

21   to you?

22            MS. KAGAN:  Objection, form.

23   BY MS. DIWAN:

24       A    Well, that probably happened at least once.

25       Q    And do you recall what happened in that

JA62

Page 167

1          MS. KAGAN:  Objection, form.

2    BY MS. DIWAN:

3          A    Like what do you mean?

4          Q    Is there, you know, an internal review board

5    at Peninsula Pathology Associates?

6          A    Well, now, the hospital has IRBs,

7    Institutional Review Boards for review of studies done

8    with therapeutics.  But this was a -- pretty much a

9    retrospective type study, where institutional review

10   boards are not required.

11         Q    So did you consult anyone -- and when you

12   say the hospital, do you mean Riverside?

13         A    Well, yes, Riverside Hospital has a -- an

14   institutional review board.  I used to be on it, years

15   ago.  But as it says on the last page of this paper,

16   as these cases were selected from medical legal

17   consultation practice and no identifying information

18   was included, there was no formal institutional

19   consent nor informed consent required.  Which means

20   that it does not go through an institutional review

21   board like a paper on therapeutics would have to go.

22         Q    Is Riverside aware of your work in Talc

23   litigation?

24         MS. KAGAN:  Objection, form.

25   BY MS. DIWAN:

**JA63**

Page 178

```
 1          If there are other specific publications
 2    that address that, I'm unable to give you the citation
 3    for them.
 4        Q    The next sentence -- and the version I'm
 5    looking at -- maybe this is a typo that's been
 6    corrected -- states, "The present study supports the
 7    contention that asbestos exposure through the use of
 8    cosmetic talc accounts, may account for the uncertain
 9    percentage of these cases."  Is typo in the version
10    that you're looking at as well?
11        A    Yes, ma'am, it is.  I think --
12        Q    All right.  Do you --
13        A    "Accounts" was the first word that was
14    there.  And that was probably supposed to be redlined
15    and substitute "may account".
16        Q    Okay.  All right.  So I'm going to ask you
17    about the cases now.  Do you have a key that matches
18    up each of the 75 cases reported in the article with
19    the name of the plaintiff in the litigation?
20        A    No.  I no longer have that.  When I
21    delivered the data to Dr. Emory, I relinquished the
22    key to case number with the descriptors of the case.
23        Q    And will you answer questions about the
24    identity of those 75 cases if I pose you a series of
25    questions on the cases reported in your table?
```

**JA64**

Page 183

1    Q    Dr. Maddox, each of these 75 cases came to

2    you as an expert in litigation, is that right?

3                MS. KAGAN:   Objection, form.

4    BY MS. DIWAN:

5    A    Well, not necessarily to me.   I mean, some

6    of them came to Dr. Emory, some of them came to Dr.

7    Kradin.   But I do believe that at one time or another

8    most of these people had been involved in litigation.

9    Q    Okay.   And when you say involved in

10   litigation, they were involved in health litigation?

11               MS. KAGAN:   Objection, form.

12   BY MS. DIWAN:

13   A    I can't really answer that.   Not

14   necessarily.   Some of the excluded cases could have

15   been involved in other forms of the asbestos

16   litigation.

17   Q    Okay.   How did you determine that these 75

18   cases were unique from those reported in Dr. Moline's

19   33 cases series?

20   A    You know, that's a very interesting

21   question.   In fact, some of the cases that were

22   excluded were cases that Dr. Moline may have been

23   involved with possibly.   And at some point -- at some

24   point in our discussion, Dr. Emory and I worried

25   together about that.   And earlier I had told you that

**JA65**

Page 184

```
 1   there were a few patients that we based inquiries on
 2   regarding whether we should include them or not.  Some
 3   of those inquiries probably had to do with that.  I'm
 4   sorry if I have to sort of speak around the issue.
 5   But we try to be cognizant of that possibility, and
 6   that was one reason that we tried to exclude some of
 7   the 65 cases that we did exclude.
 8        Q    So did --
 9        A    So is it possible that we may have missed
10   something?  I suppose it's possible that we could have
11   missed one or two.  But if we did, there's very, very
12   few overlap cases here.
13        Q    Let's turn to Case 72 in your series.  If
14   you look at your table, it's a 44-year-old man.
15        A    Yes, ma'am.
16        Q    And if you look at your second table, it
17   shows that he had tissue digested from his lymph nodes
18   that showed anthophyllite and tremolite in your tables
19   one and two.
20        A    Yes, ma'am.
21        Q    And now I want to turn your attention to
22   Exhibit 12, which is Moline 2019.
23        A    Okay, let me put my hands back on it.  Yes,
24   ma'am.  I've got it right here.
25        Q    All right.  If you look at the top of page
```

**JA66**

Page 185

1    13, case number six.  Case number six is a 34-year-old

2    man.  Do you see that?

3         A    Yes, ma'am.

4         Q    All right.  Now, if you turn to your article

5    at Table one, case 72 is also listed as a 44-year-old

6    male, right?

7         A    It is.

8         Q    I'm sorry to make you jump around.  But if

9    you turn to Table 2, the details of the tissue

10   analysis on your case 72 matches up with the details

11   on Dr. Moline's Table two, case number six, correct?

12                  MS. KAGAN:  Objection, form.

13   BY MS. DIWAN:

14        A    Well, I will admit the numbers are very

15   similar.

16        Q    So it reports that that case had tissue from

17   his lymph node digested and the concentration of

18   tissue in both tables, in both articles, is 17,250.

19   And the limit of detection in both articles is 3,450.

20   And anthophyllite and tremolite were found in the

21   tissue as reported in both articles, right?

22        A    Patients with those characteristics are

23   reported in both articles.

24        Q    So what steps did you take to confirm there

25   were no other typographical or analytical errors in

JA67

Page 186

1   Dr. Moline's report that would not have led to

2   possible double counting in your case series?

3                MS. KAGAN:   Objection, form.

4   BY MS. DIWAN:

5        A    If I missed it, I missed it.  And as far as

6   your question were there any other cautions that we

7   took to avoid that, I'd have to refer you back to Dr.

8   Emory because he's the one that did the final analysis

9   of the (indiscernible) cases for the study.

10       Q    Did you intend to take any other steps to

11  verity that these are in fact unique cases from the

12  case that was reported in Dr. Moline's series?

13               MS. KAGAN:  Objection, form.

14  BY MS. DIWAN:

15       A    Well, I'd have to go to the co-authors about

16  that.  Just per se, I mean, it does not -- well, I'd

17  have to go back to the co-authors on that.

18       Q    Do you intend to revise the statement

19  currently in your article that states you and your co-

20  authors present 75 additional subjects to only 33?

21               MS. KAGAN:  Objection, form.

22  BY MS. DIWAN:

23       A    I'd have to talk to my co-authors about

24  that.

25       Q    In your article, you state anthophyllite and

JA68

# EXHIBIT C

```
 1    I N D I A N A :

 2       IN SUPERIOR COURT 2 FOR THE COUNTY OF MARION

 3

 4

 5   DARRELL PALMER and NORMA    )
     PALMER,                     )
 6                               )
             Plaintiffs,         )
 7                               )
     V.                          )  NO. 49D02-1704-MI-016728
 8                               )
     APPLETON GRP, LLC d/b/a     )
 9   APPLETON GROUP and EMERSON  )
     ELECTRIC, et al.,           )
10                               )
             Defendants.         )
11                               )

12

13

14

15           DEPOSITION UPON ORAL EXAMINATION OF

16                  JOHN C. MADDOX, MD

17         TAKEN ON BEHALF OF THE DEFENDANTS

18               Newport News, Virginia

19            Wednesday, December 27, 2017

20

21

22

23

24

25
```

**JA70**

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

LORRAINE GAMMON, an individual,

    Plaintiff,

vs                            Nos  07-C-781
                                     07-C-795

A W CHESTERTON COMPANY, et al,

    Defendants

----------------------------------------------------------------

DEPOSITION OF JOHN COULTER MADDOX, M D

Newport News, Virginia

Friday, December 28, 2007

REPORTERS.COM
125 St Paul's Boulevard, Suite 310
Norfolk, Virginia 23510
(757) 625-6695

REPORTED BY:  DEBRA-LYNN BAKER, RPR, CSR

1  IN THE CIRCUIT COURT OF KANAWHA COUNTY
2                    WEST VIRGINIA
3

4  LORRAINE JAMROM, an individual,

5     Plaintiff,

6  vs                          Nos. 07-C-781
                                  07-C-795
7  A W  CHESTERTON COMPANY, et al ,

8     Defendants

9

10

---

11
12
13
14
15          Deposition of JOHN COULTER MADDOX,
16  M D., taken on behalf of Defendants, at Riverside
17  Regional Medical Center, 500 J  Clyde Morris
18  Boulevard, Newport News, Virginia, beginning at
19  9:11 a m  and ending at 11:31 a m  on Friday,
20  December 28, 2007, before Debra-Lynn Baker, RPR,
21  CSR, a Notary Public for the Commonwealth of
22  Virginia at Large
23
24
25

```
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4       AARON J DeLUCA, PLLC
         BY:  BARRETT NAMAN
 5       Attorney at Law
         21021 Springbrook Plaza Drive, Suite 150
 6       Spring, Texas 77379
         (281) 378-5970
 7
     For A W  Chesterton, Rockwell Automation, and
 8   Reliance Electric:

 9       HAWKINS & PARNELL, LLP
         BY:  TIM JONES
10       Attorney at Law
         602 Virginia Street, Suite 200
11       Charleston, West Virginia 25301
         (304) 345-8545
12       (Telephonic appearance )

13   For A W  Chesterton Company:

14       KUROWSKI, BAILEY & SCHULTZ, LLC
         BY:  CURTIS R  BAILEY
15       Attorney at Law
         24 Bronze Pointe
16       Swansea, Illinois 62226
         (618) 277-5500
17       (Telephonic appearance )

18   For Eaton Corporation, as successor-in-interest to
     Cutler-Hammer, Inc , n/k/a Eaton Electrical, Inc :
19
         STEPTOE & JOHNSON PLLC
20       BY:  FRANK J. STANEK
         Attorney at Law
21       1085 Van Voorhis Road, Suite 400
         Morgantown, West Virginia 26507-1616
22       (Telephonic appearance )

23

24

25
```

1    APPEARANCES (Continued)

2

For Famous Supply and CBS CORP /Westinghouse
3    Electric:

4        HENDRICKSON & LONG, PLLC
         BY:  JEFFRY H. HALL
5        Attorney at Law
         214 Capitol Street
6        Charleston, West Virginia 25301
         (304) 346-5500
7        (Telephonic appearance.)

8    For FMC Corporation, on behalf of its former Stearns
     business, improperly sued as FMC Corporation;
9    Rexnord Industries, LLC, improperly sued as Rexnord
     Industries, LLC, Stearns Division; and Cooper
10   Industries, LLC:

11       ROBINSON & McELWEE, PLLC
         BY:  BETH ANN RAUER
12       Attorney at Law
         700 Virginia Street, East
13       Charleston, West Virginia 25301
         (304) 347-8357
14       (Telephonic appearance.)

15   For Garlock Sealing Technologies, LLC:

16       SEGAL McCAMBRIDGE SINGER & MAHONEY
         BY:  ROBERT T CONNOR
17       Attorney at Law
         30 South 17th Street, Suite 1700
18       Philadelphia, Pennsylvania 19103
         (215) 972-8015
19       (Telephonic appearance )

20   For General Electric:

21       FARMER CLINE & CAMPBELL, PLLC
         BY:  KIMBERLY A  MARTIN
22       Attorney at Law
         746 Myrtle Road
23       Charleston, West Virginia 25314
         (304) 346-5990
24       (Telephonic appearance )

25

1

```
 1   STATE OF SOUTH CAROLINA
                                COURT OF COMMON PLEAS
 2   COUNTY OF SPARTANBURG

 3   Beverly Dale Jolly and
     Brenda Rice Jolly,
 4
            Plaintiffs,
 5
     vs.                         Case No:  2016-CP-42-01592
 6
     General Electric Company, et al.,
 7
            Defendants.
 8

 9

10                   T E L E P H O N I C

11                   D E P O S I T I O N

12

13   WITNESS:      JOHN MADDOX, MD

14   DATE:         Tuesday, June 13, 2017

15   TIME:         10:04 a.m.

16   TAKEN BY:     Attorneys for the Defendants

17

18   REPORTED BY:   Heather M. Curlin, RPR

19   - - - - - - - - - - - - - - - - - - - - - - - - -

20                   COMPUSCRIPTS, INC.

21          Client focused.  Deadline driven.

22   CHARLESTON COLUMBIA HILTON HEAD GREENVILLE MYRTLE BEACH

23                   www.compuscripts.com

24                   1-888-988-0086

25
```

**JA75**

1       IN THE SUPERIOR COURT OF NEW JERSEY LAW DIVISION
                        MIDDLESEX COUNTY
2

3  KAYLA MARTINEZ,                    :
                                      :
4                   Plaintiff,        :
                                      :
5  v.                                 :         DOCKET NO.
                                      :      MID-L-1120-17 AS
6  AVON PRODUCTS, INC., et al.,       :
                                      :
7                   Defendants.       :

8

9

10            DEPOSITION UPON ORAL EXAMINATION OF
                    JOHN C. MADDOX, M.D.
11
       ------------------------------------
12            February 22, 2018 - 1:10 p.m.

13               Newport News, Virginia

14

15

16

17

18

19

20

21

22

23
   REPORTED BY:  Gale W. Murphy
24

25

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2                FOR THE COUNTY OF LOS ANGELES
3

   --------------------------------
4                                      :
   CAROLYN WEIRICK, et al,             :
5                                      :
            Plaintiff,                 :
6                                      :
   v.                                  :        Case No.
7                                      :   JCCP 4674 / BC656425
   BRENNTAG NORTH AMERICA, INC.        :
8  (sued individually and as a         :
   successor-in-interest to            :
9  MINERAL PIGMENT SOLUTIONS, INC.     :
   and as success-in-interest to       :
10 WHITTAKER CLARK & DANIELS,          :
   INC.), et al,                       :
11                                      :
            Defendants.                :
12                                      :
   --------------------------------
13
14          DEPOSITION OF JOHN C. MADDOX, MD
15
16             March 8, 2018 - 9:00 a.m.
17
18
19
                 Newport News, Virginia
20
21
22
23
24 Reported by:  Lisa T. Lineberry
25 Job No. 138950

JA77

1

1      IN THE UNITED STATES DISTRICT COURT

2         MIDDLE DISTRICT OF NORTH CAROLINA

3

4    IN RE: ASBESTOS PRODUCTS
     LIABILITY LITIGATION
5
     DOROTHY E. SMITH, Individually
6    and as Executrix of the Estate
     of JULIAN JACKSON SMITH,
7
              Plaintiff(s),
8
          v                C/A No. 1:16-cv-00379-LCB-LPA
9
     WEYERHAEUSER COMPANY, et al.,
10
              Defendant(s).
11

12     T E L E C O N F E R E N C E   D E P O S I T I O N

13

14   WITNESS:          JOHN C. MADDOX, M.D.

15   DATE:             Tuesday, May 8, 2018

16   TIME:             10:00 a.m.

17   LOCATION:         Riverside Regional Medical Center
                       500 J. Clyde Morris Boulevard
18                     Newport News, Virginia 23601

19   TAKEN BY:         Attorneys for the Defendant(s)

20   REPORTED BY:      DEBORAH L. DUSSELJEE, RPR, CRC
                       Realtime Systems Administrator
21   - - - - - - - - - - - - - - - - - - - - - - - - - -

22              COMPUSCRIPTS, INC.
            A South Carolina Corporation
23
         Court Reporters & Legal Videographers
24             www.compuscripts.com
                1.888.988.0086
25

**JA78**

John C. Maddox, M.D. - 7/24/2018
John Dugger, Jr. v. Union Carbide Corporation

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


JOHN DUGGER, JR., et al.,

             Plaintiffs     Civil Action No.

v                       16-cv-03912-CCB

UNION CARBIDE CORPORATION,

et al.,

             Defendants

*        *        *        *        *



TELEPHONE DEPOSITION OF JOHN C. MADDOX, M.D.

PLAINTIFF EXPERT

JULY 24, 2018


Reported by:  Denise M. Thomas



EVANS REPORTING SERVICE
The Munsey Building, Suite 705
Seven North Calvert Street
Baltimore, Maryland 21202
410.727.7100  800.256.8410

1175

1          DISTRICT COURT IN AND FOR OKLAHOMA COUNTY

2                      STATE OF OKLAHOMA

3

4

5  SHARON PIPES and spouse,     )
            Plaintiff ,         )
6                               )
                                )
7  VS.                          )    CJ-2017-3487
                                )
8                               )
   JOHNSON & JOHNSON, et al     )
9          Defendants.          )

10   --------------------------------------------------

11                      JURY TRIAL

12                      VOLUME IV

13
        Held Before the Honorable SUSAN STALLINGS
14                   District Judge

15

16                   March 18th, 2019

17   --------------------------------------------------

18

19

20

21  Reported By:

22      Sherrol L. Ledbetter, RPR, CSR
        Official Court Reporter
23      321 Park Avenue, Suite 304

JA80

Oklahoma City, OK  73102

24

25

OFFICIAL TRANSCRIPT  --  STATE OF OKLAHOMA

1176

1                   A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3

4              MR. CHRIS PANATIER
               MS. JESSICA DEAN
               302 N. Market Street, Suite 300
5              Dallas, TX  75202

6

7              MR. STEVEN T. HORTON
               114 NW 6th Street, Suite 201
8              Oklahoma City, OK  73102

9

10   FOR THE DEFENDANTS:

11

12             MR. MANUEL CACHAN
               MS. SUSAN GUTIERREZ
13             2029 Century Park East, Suite 2400
               Los Angeles, CA  90067
14

15             MR. ERIC COOK
               440 Monticello Avenue
16             Norfolk, VA  23510

17

18             MR. MICHAEL T. MALOAN
               201 Robert S. Kerr Ave, 12th Floor
19             Oklahoma City, OK  73102

20

21

22

23

24

25


OFFICIAL TRANSCRIPT  --  STATE OF OKLAHOMA

1177


1       INDEX

2

3    WITNESSES FOR THE PLAINTIFF:

4

5       ARNOLD BRODY

6          Direct Examination by MS. DEAN          196

7          Cross Examination by MS. GUTIERREZ      296

8          Redirect Examination by MS. DEAN        464

9          Recross Examination by MS. GUTIERREZ    478

10

11

12       JAMES WEBBER

13          Direct Examination by MR. PANATIER     485

14          Cross Examination by MR. COOK          630

15          Redirect Examination by MR. PANATIER   770

**JA82**

16      Recross Examination by MR. COOK         796

17

18

19      JACQUELINE MOLINE

20        Direct Examination by MR. PANATIER      891

21        Cross Examination by MR. CACHAN         991

22        Redirect Examination by MR. PANATIER    1143

23        Recross Examination by MR. CACHAN       1162

24

25

OFFICIAL TRANSCRIPT  --  STATE OF OKLAHOMA

1178

1                    INDEX (cont)

2      KRISTEN JANNEY

3        Direct Examination by MS. DEAN          1265

4        Cross Examination by MR. CACHAN         1298

5        Redirect Examination by MS. DEAN        1310

6

7

8      JOHN MADDOX

9        Direct Examination by MS. DEAN          1313

10       Cross Examination by MR. COOK           1425

11       Redirect Examination by MS. DEAN        1663

**JA83**

12        Recross Examination by MR. COOK          1698

13        Redirect Examination by MS. DEAN         1716

14

15

16     WILLIAM LONGO

17        Direct Examination by MR. PANATIER       1747

18        Cross Examination by MR. CACHAN          1871

19        Redirect Examination by MR. PANATIER     2146

20        Recross Examination by MR. CACHAN        2172

21

22

23     SHARON PIPES

24        Direct Examination by MS. DEAN           2180

25        Cross Examination by MS. GUTIERREZ       2203

           OFFICIAL TRANSCRIPT  --  STATE OF OKLAHOMA

                                                    1179

1                      INDEX (cont)

2     WITNESS FOR THE DEFENDANT

3       RICHARD ATTANOOS

4        Direct Examination by MR. COOK           2359

5        Cross Examination by MS. DEAN            2462

6        Redirect Examination by MR. COOK         2636

7        Recross Examination by MS. DEAN          2662

**JA84**

JOHN MADDOX, M.D.                                          December 11, 2020
BREWER vs AIR & LIQUID SYSTEMS CORP                                      1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF ARIZONA

 3   Lidia Brewer, as Anticipated    :      Case No.:

 4   Representative of the Estate of : 2:18-cv-3339-PHX-ROS

 5   Kenneth Brewer, Deceased, as    :

 6   surviving spouse, and on behalf :

 7   of Decedent's surviving         :

 8   statutory beneficiaries, Kenneth:

 9   Brewer, Jr. and Tina Brewer,    :

10          Plaintiffs,              :

11   v.                              :

12   Air & Liquid Systems Corporation:

13   (sued as successor-by-merger to :

14   Buffalo Pumps, Inc.),           :

15          Defendants.              :

16

17                          Friday, December 11, 2020

18   Zoom Deposition of:

19              JOHN MADDOX, M.D.

20        A witness, called for examination by counsel

21   for the defendants, pursuant to notice, via Zoom,

22   beginning at 11:14 a.m., before Cheryl K. O'Donnell, a

23   Court Reporter and Electronic Notary Public in and for

24   the Commonwealth of Virginia at Large.

25
```



800.211.DEPO (3376)
EsquireSolutions.com

JA85

```
                                                    Page 1
 1    IN THE DISTRICT COURT

 2    11th JUDICIAL DISTRICT

 3    HARRIS COUNTY, TEXAS

 4    _____

 5    CRISTINA LOPEZ and CARLOS LOPEZ,

 6            Plaintiff(s),

 7        v.                                Case No.

 8    BRENNTAG NORTH AMERICA, INC., ET AL   2017-86022-ASB

 9            Defendant(s).

10    _____

11    TELEPHONIC DEPOSITION OF JOHN MADDOX, M.D.

12    DATE:           Wednesday, May 13, 2020

13    TIME:           9:05 a.m.

14    REPORTED BY:    Latrice E. Porter, Notary Public

15    JOB No.:        4046266

16

17

18

19

20

21

22

23

24

25
```

JA86

Page 1

```
1                 COMMONWEALTH OF KENTUCKY
                  JEFFERSON CIRCUIT COURT
2                 CASE NO:  18-CI-03951
                      DIVISION 12
3    ------------------------------------------------x
     MICHAEL CLOUSE,                                 )
4                         Plaintiff                  )
                                                     )
5              -against-                             )
                                                     )
6    ASSOCIATED DRYWALL SUPPLIERS, INC., d/b/a       )
     LAGRANGE HARDWARE & BUILDING SUPPLY, INC., et al.,)
7                         Defendants.                )
     ------------------------------------------------x
8
9
10              TRANSCRIPT of the Virtual Deposition
11   of the witness, JOHN C. MADDOX, MD, taken by Defendant,
12   called for Oral Examination in the above-captioned
13   matter, said deposition being taken pursuant to Federal
14   Rules of Civil Procedure by and before, ELEANOR SEKULIC,
15   a Notary Public on Wednesday, March 17, 2021, commencing
16   at 9:58 a.m.
17
18
19
20
21            PRIORITY-ONE COURT REPORTING, INC.
22         290 West Mount Pleasant Avenue, Suite 2260
23             Livingston, New Jersey  07039
24                   (718) 983-1234
25   Job Number:  4387774
```

# EXHIBIT D

Theresa Swain Emory , M.D.                    October 1, 2020

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3                    GREENSBORO DIVISION
 4       - - - - - - - - - - - - - - - x
 5    LLOYD BELL, Individually and   :
      as Executor of the Estate of  :
 6    BETTY WHITLEY BELL, Deceased   :
                    Plaintiff        :
 7        vs.                        : Civil Action No.
      AMERICAN INTERNATIONAL         : 1:17-cv-00111
 8    INDUSTRIES, INC., et al.       :
                    Defendants       :
 9       - - - - - - - - - - - - - - - x
      AMERICAN INTERNATIONAL         :
10    INDUSTRIES, INC.               :
                    Third-Party      :
11                  Plaintiff        :
          vs.                        :
12    NESLEMUR COMPANY f/k/a, THE    :
      NESTLE-LEMUR COMPANY           :
13                  Third-Party      :
                    Defendant        :
14       - - - - - - - - - - - - - - - x
15           VIRTUAL VIDEOTAPED DEPOSITION OF
16              THERESA SWAIN EMORY, M.D.
17    DATE:       Thursday, October 1, 2020
18    TIME:       10:21 a.m.
19    LOCATION:   Remote Proceedings
20    REPORTED BY: Denise M. Brunet, RPR
21
22
```

Page 1

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
MIDDLESEX, SS.

ROBERT M. ALIOTTA AND PATRICIA )
J. DINON, AS PERSONAL           )
REPRESENTATIVES OF THE ESTATE   )
OF PATRICIA ALIOTTA, DECEASED,  )
                                )
Plaintiffs,                     )
                                )
vs.                             )   Civil Action No.
                                )   19-1101
                                )
AKZO NOBEL PAINTS, LLC, ET      )
AL.,                            )
                                )
Defendants.                     )

VIDEOCONFERENCE DEPOSITION OF THERESA EMORY, M.D.

Taken on behalf of Defendants

June 1, 2022

JULIE HUNDELT, RPR, CCR, CSR
Missouri CCR No. 829
Illinois CSR No. 084-004789

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2       COUNTY OF LOS ANGELES - COURT OF UNLIMITED JURISDICTION

3

4    Coordinated Proceedings        ) Case No. JCCP 4674
     Special Title (Rule 3.550)     )
5                                   )
     LAOSD ASBESTOS CASES           )
6    _____)
                                    )
7    LINDA ZIMMERMAN,               ) Case No. BC720153
                                    )
8                   Plaintiff,      )
                                    )
9            vs.                    )
                                    )
10   AUTOZONE, INC., et al.,        )
                                    )
11                  Defendants.     )
     _____)

12

13                        VOLUME I

14       TELEPHONIC DEPOSITION OF THERESA S. EMORY, M.D.

15                 THURSDAY, MARCH 12, 2020

16

17

18

19

20

21

22   REPORTED BY:

23   VICKI HAINES, CSR NO. 5995

24   JOB NO. 462775

25

                                1

BARKLEY
Court Reporters

JA91

Theresa S. Emory, M.D. 7/14/2017
Robert Jones v. ACandS

Page 1

```
IN RE:  BALTIMORE CITY  * IN THE CIRCUIT COURT

        ASBESTOS CASES  * FOR BALTIMORE CITY

*   *   *   *   *   *    *   *   *   *   *   *

ROBERT JONES, et al.,   * September 12, 2017

        Plaintiffs  * Mesothelioma Trial
                        Cluster
v.                      * Consolidated Case
                        No.: 24X16000497
ACandS, INC., et al.,   *
                        Law Offices of Peter
        Defendants  * G. Angelos

*   *   *   *   *   *    *   *   *   *   *   *
CASE AFFECTED:          Case No.
IOANNIS SANDALIS        * 24X16000416
*   *   *   *   *   *    *   *   *   *   *   *


  TELEPHONIC DEPOSITION OF THERESA S. EMORY, MD

        PLAINTIFF EXPERT WITNESS

        BALTIMORE, MARYLAND

        JULY 14, 2017


Reported by Kathleen E. Manes, Court Reporter


        EVANS REPORTING SERVICE
     The Munsey Building, Suite 705
     Seven North Calvert Street
     Baltimore, Maryland 21202
     410.727.7100  800.256.8410
```

Coast to coast coverage                Evans Reporting Service                Over 25 years
Unsurpassed excellence                 800-256-8410                          award-winning service

**JA92**

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

JAMES A. PETTIE and
HARRIET E. PETTIE,

        Plaintiffs,

                              No. 20-2-13224-1 SEA

vs.

BRAKE PARTS, INC., LLC, et al.,

        Defendants.

_____/


DEPOSITION OF THERESA EMORY, M.D.

        Taken by the Defendants, on the 3rd day of March, 2021,
via Zoom, before Dawn M. Houghton, CSR-3071, Certified
Shorthand Reporter, Registered Professional Reporter,
Illinois License 084.004881, Washington License 20109559,
Oregon License 20-0469, and notary public, at 9:02 a.m.
Eastern.

JA93

Page 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION


STEVE WIERSEMA and CHERYL          )
WIERSEMA,                          )
                                   )
          Plaintiffs,              )
                                   ) Case No. 2019L0011944
v.                                 )
                                   )
BASF CATALYSTS, LLC,               )
et al.,                            )
                                   )
          Defendants.              )




VIDEOTAPED ZOOM DISCOVERY DEPOSITION OF
THERESA EMORY, M.D.
Taken on Behalf of the Defendants
June 25, 2020






Susan L. Law, CCR, CSR

JA94

**Deposition of Theresa S. Emory, MD - 8/14/2019**
**Paul H. Fankhauser, et al. v. Borg Warner Morse, Tec, LLC, et al.**

Page 1

1          IN THE IOWA DISTRICT COURT FOR POLK COUNTY

2

------------------------------------

3

PAUL H. FANKHAUSER and

4    MARY  M. FANKHAUSER,

5          Plaintiff,

6    v.                          Case No.
                                 LACL140972

7    BORG WARNER MORSE, TEC, LLC, et al,

8          Defendants.

9    ------------------------------------

10

              DEPOSITION OF THERESA S. EMORY, MD

11

12           August 14, 2019 - 11:00 a.m.

13

14

                 Newport News, Virginia

15

16

17

18

19

20

21

22

23

24

25

**JA95**

```
 1      IN THE COURT OF COMMON PLEAS OF CUYAHGOA COUNTY, OHIO
                    CIVIL ACTION - ASBESTOS
 2
        BEVAN GROUP 30
 3      BARBARA MADDY, Executor for    )
        The Estate of JAMES MADDY,     )
 4                                     )
                    Plaintiffs,        )    Case No.
 5      v.                             )    CV-17-881732
                                       )
 6      HONEYWELL INTERNATIONAL INC.,  )    JUDGE HARRY HANNA
        et al.,                        )
 7                                     )
                    Defendants.        )
 8

 9


10


11
                DEPOSITION UPON ORAL EXAMINATION
12                Of THERESA S. EMORY, M.D.
             TAKEN ON BEHALF OF THE DEFENDANT
13
                  Newport News, Virginia
14                  January 21, 2019

15

16

17

18

19

20

21

22

23

24

25
```

**Network Court Reporting & Video**
866.256.1799

**JA96**

1

```
     IN THE CIRCUIT COURT FOR LAWRENCE COUNTY, TENNESSEE
------------------------------
BRIDGET B. BAILEY,

               Plaintiff,              DOCKET NO.
                                         2752-13
v.

AUTOZONE, INC., et al.

               Defendants.
------------------------------


               DEPOSITION UPON ORAL EXAMINATION
                  OF THERESA S. EMORY, M.D.,
               TAKEN ON BEHALF OF THE DEFENDANT
                HONEYWELL INTERNATIONAL, INC.


                    Newport News, Virginia

                    January 30, 2018

                       VOLUME I

Appearances:

        SHRADER & ASSOCIATES, L.L.P.
        By:  THOMAS H. HART, III, ESQUIRE
             JORDAN C. ROBERTS, ESQUIRE
             Counsel for the Plaintiff

        WILLCOX & SAVAGE, P.C.
        By:  KEVIN P. GREENE, ESQUIRE
                  and
        BAKER, O'KANE, ATKINS & THOMPSON, PLLP
        By:  MICHAEL K. ATKINS, ESQUIRE (via telephone)
                  and
        K&L GATES
        By:  MELISSA J. TEA, ESQUIRE (via telephone)
             Counsel for the Defendant Honeywell
             International, Inc.
```

ADAMS HARRIS REPORTING, INC.
(757)631-0458

**JA97**

# EXHIBIT E

Received: 24 February 2020 | Revised: 5 March 2020 | Accepted: 6 March 2020

DOI: 10.1002/ajim.23106

**RESEARCH ARTICLE**



# Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients

Theresa S. Emory MD[1] | John C. Maddox MD[1] | Richard L. Kradin MD[2,3]

[1]Department of Pathology, Peninsula Pathology Associates, Newport News, Virginia

[2]Department of Medicine (Pulmonary/Critical Care), Massachusetts General Hospital, Boston, Massachusetts

[3]Department of Pathology, Massachusetts General Hospital, Boston, Massachusetts

**Correspondence**
Theresa S. Emory, MD, Department of Pathology, Peninsula Pathology Associates, 500 J Clyde Morris Blvd, Newport News, VA 23601.
Email: temorymd@gmail.com

**Abstract**

**Background:** Asbestos is the primary known cause of malignant mesothelioma. Some cosmetic talc products have been shown to contain asbestos. Recently, repeated exposures to cosmetic talc have been implicated as a cause of mesothelioma.

**Methods:** Seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders, were reviewed in medical-legal consultation. Out of the 75 cases, 11 were examined for asbestiform fibers.

**Results:** All subjects had pathologically confirmed malignant mesothelioma. The mean age at diagnosis was 61 ± 17 years. The mean latency from exposure to diagnosis was 50 ± 13 years. The mean exposure duration was 33 ± 16 years. Four mesotheliomas (5%) occurred in individuals working as barbers/cosmetologists, or in a family member who swept the barber shop. Twelve (16%) occurred in individuals less than 45 years old (10 females; 2 males). Forty-eight mesotheliomas were pleural (40 females; 8 males), 23 were peritoneal (21 females; 2 males). Two presented with concomitant pleural and peritoneal disease. There was one pericardial, and one testicular mesothelioma. The majority (51) were of the epithelioid histological subtype, followed by 13 biphasic, 8 sarcomatoid, 2 lymphohistiocytoid, and 1 poorly differentiated. Of the 11 individuals whose nontumorous tissues were analyzed for the presence of asbestiform fibers, all showed the presence of anthophyllite and/or tremolite asbestos.

**Conclusions:** Mesotheliomas can develop following exposures to cosmetic talcum powders. These appear to be attributable to the presence of anthophyllite and tremolite contaminants in cosmetic talcum powder.

**KEYWORDS**
anthophyllite, females, mesothelioma, peritoneal, pleural, talc, tremolite

## 1 | INTRODUCTION

Asbestos, a generic term for naturally occurring fibrous mineral silicates, is recognized as a carcinogen by the general medical and scientific communities. In 1960, Wagner et al[1] reported a large series of malignant mesotheliomas in individuals who had been exposed to asbestos from a South African asbestos mine. It has been demonstrated that all types of asbestos and even brief and low-dose exposures are capable of causing malignant mesothelioma.[2-4] In the 1970s, several types of cosmetic talcum powder products were

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.

© 2020 The Authors. *American Journal of Industrial Medicine* published by Wiley Periodicals, Inc.

JA99

EMORY ET AL.

AMERICAN JOURNAL OF INDUSTRIAL MEDICINE —WILEY— | 485

demonstrated to contain asbestos.[5-7] Asbestos fibers in commercial talcum powder have also been shown to become airborne upon application, and repeated exposures to cosmetic talc were implicated as a cause of mesothelioma by Gordon et al.[8] Recently, Moline et al,[9] reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc.

## 2 | METHODS

One hundred forty subjects with documented exposures to cosmetic talc were initially reviewed. Exposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses. Sixty-five subjects were excluded due to recalled occupational or paraoccupational exposures to other sources of asbestos. Seventy-five subjects, whose only known exposure to asbestos was via cosmetic talc, were included for further examination. The asbestos content of talcum products and airborne asbestos concentrations during simulations of the usage of these products was determined in previously published studies.[10,11]

Tissues from biopsies and/or debulking procedures were examined and the diagnosis of malignant mesothelioma was confirmed by a board-certified pathologist (JCM, TSE, RLK). Immunohistochemical staining results for BAP-1 were available in a few cases but was not routinely performed as a part of this study.

No efforts were made to reconstruct levels of exposure but all subjects had been repeatedly exposed over many years. Eleven cases were examined for the presence of asbestiform fibers (aspect ratio, ≥3:1) in sampled tissues. Nine subjects were examined both by analytical transmission electron microscopy (ATEM) and microprobe analysis (MA) (see Table 2), whereas two were examined by scanning electron microscopy (SEM) and MA (results not shown).

## 3 | RESULTS

The pertinent data from the 75 subjects is shown in Table 1. All had pathologically confirmed malignant mesothelioma. Sixty-four subjects were females, 11 were males. The mean age at diagnosis was 61 ± 17 years, with a range of 14 to 94 years. The mean exposure duration was 33 ± 16 years with a range of exposure from 6 to 65 years. The mean latency from time of first exposure to diagnosis was 50 ± 13 years with a range of 14 to 72 years. A total of 4 of the 75 cases (5%) occurred in barbers/cosmetologists, or in a family member who swept the barber shop. Twelve (16%) were 45 years old or younger (10 females, 2 males) at the time of diagnosis. Forty-eight mesotheliomas were pleural (40 females; 8 in males); 23 peritoneal (21 females; 2 men). Two presented with both pleural and peritoneal disease. There was one pericardial (woman), and one testicular mesothelioma. The majority, 51 (68%) were of epithelioid subtype, 13 biphasic (17%), 8 sarcomatoid (11%), 2 lymphohistiocytoid (3%),

and 1 poorly differentiated (1%). Treatment, therapeutic outcomes, and survival were not determined in this study.

For the 11 subjects whose tissues were examined by ATEM and ASEM, the analysis showed the presence of tremolite and/or anthophyllite in all 11 subjects (Table 2).

## 4 | DISCUSSION

The 75 individuals with malignant mesothelioma caused by asbestos in cosmetic talc is currently the largest series reported to date. Recently, Moline et al reported 33 cases of malignant mesothelioma attributed to exposures to cosmetic talc. Like Moline's work, most of mesotheliomas in the present series occurred in women. Several mesotheliomas occurred specifically in hairdressers/barbers. Similarly, the asbestos fiber types found by ATEM in the tissues examined were comparable to those found in laboratory testing for cosmetic talc.[10-12]

Mesothelioma is recognized as a "signal tumor" of asbestos exposure, that is, if a patient has mesothelioma, it should signal an inquiry into potential asbestos exposure. The presence of asbestos in talc deposits has been recognized since the late 1940s.[13,14] Since the 1960s, laboratory testing has identified asbestos in samples of cosmetic talc.[15,16] Studies have confirmed that the most common types of asbestos present in cosmetic talc are tremolite, anthophyllite, and chrysotile. Industrial asbestos products used in the United States generally contained chrysotile, amosite, and/or crocidolite,[17] and anthophyllite and tremolite were rarely present.[18]

While the latency between exposure and diagnosis in the present study is similar to the average latency for the development of mesothelioma (50 years) reported in surveillance epidemiology and end results program (SEER) data,[19] the average age at diagnosis in this report (61 years) is 11 years younger than that in the SEER data (72 years). In addition, fewer than 4% of mesotheliomas in the SEER data occurred in individuals less than 45 years of age, whereas 16% of mesotheliomas of the present study occurred in individuals less than 45 years of age, and 83% of these cases were in women.[20]

The present report of 75 cases, together with the 35 cases previously reported[8,9] currently brings the number of individuals with confirmed diagnoses of malignant mesothelioma following repeated exposure to cosmetic talcum powder to more than 100. The presence of anthophyllite and tremolite in the fiber analysis of tissues obtained from the 11 subjects in this series, is consistent with a source in cosmetic talc.

Unlike industrial or occupational exposure to asbestos, where materials have been regulated, exposure to asbestos in cosmetic talc has not been widely reported or recognized within the medical community or to the public. Cosmetic talc products are most frequently used by women in the United States, and while the incidence of mesothelioma in women is less than in men, the majority have previously been reported as "idiopathic," indicating no recognized source of asbestos exposure. The present study supports the contention that asbestos exposure through the use of cosmetic talc accounts may account for an uncertain percentage of these cases.

486 | WILEY—AMERICAN JOURNAL OF INDUSTRIAL MEDICINE                                    EMORY ET AL.

**TABLE 1** Seventy-five mesothelioma cases exposed to talcum powder

| Case | Sex | Year of diagnosis | Age at diagnosis | Mesothelioma site | Histology | Estimated years of use | Estimated years of latency |
|---|---|---|---|---|---|---|---|
| 1 | F | 2017 | 72 | Pleural | Epithelioid | 20 | 57 |
| 2 | F | 2014 | 51 | Peritoneal | Epithelioid | 30 | 50 |
| 3 | F | 2017 | 50 | Pleural | Lymphohistiocytoid | 41 | 50 |
| 4 | F | 2017 | 57 | Peritoneal | Epithelioid | 30 | 52 |
| 5 | F | 2015 | 65 | Pleural | Epithelioid | 39 | 62 |
| 6 | F | 2017 | 39 | Peritoneal | Sarcomatoid | 15 | 39 |
| 7 | F | 2016 | 29 | Pericardial | Epithelioid | 29 | 29 |
| 8 | F | 2017 | 94 | Pleural | Epithelioid | 60 | 72 |
| 9 | F | 2015 | 80 | Pleural | Epithelioid | 19 | 59 |
| 10 | F | 2016 | 72 | Pleural | Sarcomatoid | 43 | 59 |
| 11 | F | 2013 | 66 | Peritoneal | Epithelioid | 20 | 52 |
| 12 | F | 2011 | 48 | Pleural | Lymphohistiocytoid | 13 | 21 |
| 13 | F | 2010 | 51 | Peritoneal | Epithelioid | 15 | 20 |
| 14 | F | 2018 | 55 | Peritoneal | Epithelioid | 40 | 42 |
| 15 | M | 2017 | 81 | Pleural | Sarcomatoid | 60 | 60 |
| 16 | F | 2018 | 56 | Pleural | Epithelioid | 48 | 52 |
| 17 | F | 2017 | 32 | Peritoneal | Epithelioid | 25 | 32 |
| 18 | F | 2017 | 89 | Pleural | Sarcomatoid | 40 | 42 |
| 19 | F | 2019 | 73 | Peritoneal | Epithelioid | 47 | 56 |
| 20 | M | 2016 | 70 | Pleural | Poorly differentiated | 50 | 55 |
| 21 | F | 2015 | 66 | Pleural | Epithelioid | 40 | 43 |
| 22 | F | 2016 | 45 | Pleural | Epithelioid | 10 | 45 |
| 23 | F | 2018 | 45 | Peritoneal | Epithelioid | 39 | 45 |
| 24 | M | 2015 | 67 | Pleural + peritoneal | Epithelioid | 35 | 60 |
| 25 | M | 2017 | 78 | Peritoneal | Biphasic | 50 | 62 |
| 26 | F | 2018 | 57 | Peritoneal | Biphasic | 25 | 57 |
| 27 | F | 2013 | 14 | Peritoneal | Epithelioid | 12 | 14 |
| 28 | F | 2016 | 67 | Peritoneal | Epithelioid | 15 | 59 |
| 29 | F | 2018 | 73 | Pleural | Epithelioid | 30 | 65 |
| 30 | F | 2018 | 76 | Pleural | Biphasic | 60 | 55 |
| 31 | M | 2017 | 39 | Testis | Epithelioid | 7 | 39 |
| 32 | F | 2018 | 57 | Pleural | Sarcomatoid | 57 | 57 |
| 33 | F | 2016 | 68 | Pleural | Epithelioid | 38 | 64 |
| 34 | F | 2017 | 80 | Pleural | Epithelioid | 50 | 60 |
| 35 | F | 2016 | 63 | Pleural | Epithelioid | 15 | 54 |
| 36 | F | 2017 | 58 | Pleural | Biphasic | 20 | 58 |
| 37 | F | 2017 | 71 | Pleural | Biphasic | 60 | 71 |
| 38 | F | 2014 | 70 | Pleural | Epithelioid | 41 | 39 |
| 39 | F | 2016 | 26 | Peritoneal | Epithelioid | 20 | 26 |

EMORY ET AL.                                    AMERICAN JOURNAL OF INDUSTRIAL MEDICINE —WILEY—| 487

**TABLE 1** (Continued)

| Case | Sex | Year of diagnosis | Age at diagnosis | Mesothelioma site | Histology | Estimated years of use | Estimated years of latency |
|------|-----|-------------------|------------------|-------------------|-----------|------------------------|----------------------------|
| 40 | F | 2016 | 35 | Pleural | Epithelioid | 35 | 35 |
| 41 | F | 2017 | 72 | Pleural | Sarcomatoid | 23 | 60 |
| 42 | F | 2016 | 68 | Peritoneal | Epithelioid | 65 | 68 |
| 43 | F | 2018 | 77 | Pleural | Biphasic | 30 | 55 |
| 44 | M | 2015 | 58 | Plural | Biphasic | 6 | 49 |
| 45 | F | 2017 | 72 | Peritoneal | Biphasic | 30 | 42 |
| 46 | F | 2017 | 59 | Pleural + peritoneal | Epithelioid | 15 | 44 |
| 47 | F | 2016 | 80 | Pleural | Biphasic | 16 | 52 |
| 48 | M | 2019 | 71 | Pleural | Epithelioid | 40 | 57 |
| 49 | F | 2017 | 72 | Pleural | Biphasic | 58 | 58 |
| 50 | F | 2017 | 43 | Peritoneal | Epithelioid | 43 | 43 |
| 51 | F | 2017 | 75 | Peritoneal | Sarcomatoid | 55 | 59 |
| 52 | F | 2015 | 30 | Pleural | Epithelioid | 20 | 20 |
| 53 | F | 2017 | 79 | Pleural | Biphasic | 65 | 61 |
| 54 | F | 2017 | 66 | Peritoneal | Epithelioid | 20 | 60 |
| 55 | F | 2015 | 64 | Peritoneal | Epithelioid | 40 | 40 |
| 56 | F | 2017 | 24 | Pleural | Epithelioid | 12 | 24 |
| 57 | M | 2017 | 72 | Pleural | Epithelioid | 30 | 56 |
| 58 | M | 2017 | 74 | Peritoneal | Epithelioid | 30 | 52 |
| 59 | M | 2015 | 30 | Pleural | Epithelioid | 20 | 30 |
| 60 | F | 2016 | 81 | Pleural | Sarcomatoid | 52 | 52 |
| 61 | F | 2017 | 58 | Pleural | Epithelioid | 58 | 58 |
| 62 | F | 2016 | 75 | Pleural | Epithelioid | 8 | 47 |
| 63 | F | 2011 | 88 | Pleural | Epithelioid | 21 | 71 |
| 64 | F | 2016 | 73 | Peritoneal | Biphasic | 41 | 60 |
| 65[a] | M | 2017 | 64 | Pleural | Epithelioid | 18 | 40 |
| 66[a] | F | 2014 | 69 | Pleural | Epithelioid | 16 | 60 |
| 67[a] | F | 2014 | 44 | Peritoneal | Epithelioid | 30 | 39 |
| 68[a] | F | 2016 | 68 | Pleural | Epithelioid | 53 | 52 |
| 69[a] | F | 2016 | 72 | Pleural | Epithelioid | 40 | 51 |
| 70[a] | F | 2016 | 67 | Pleural | Epithelioid | 37 | 53 |
| 71[a] | F | 2017 | 58 | Pleural | Epithelioid | 41 | 46 |
| 72[a] | M | 2016 | 44 | Pleural | Epithelioid | 43 | 44 |
| 73[a] | F | 2017 | 51 | Pleural | Epithelioid | 28 | 49 |
| 74[a] | F | 2015 | 47 | Pleural | Epithelioid | 15 | 40 |
| 75[a] | F | 2014 | 62 | Pleural | Biphasic | 14 | 53 |

[a]Tissue analysis performed.

The present study has several limitations. It is both retrospective and uncontrolled, and the cases were submitted in medico-legal consultation, all of which potentially introduce bias. However, detailed deposition testimonies provide a level of detail concerning product exposure—including dates of exposure, duration, and frequency—that is rarely obtained in routine medical exposure histories, and which allowed for corroborating witness testimony in some cases. The strengths of the current series include its size, as malignant mesothelioma is a rare disease

JA103

**TABLE 2** Fiber detection in tissue digestion from nine cases of malignant mesothelioma

| Case | Mesothelioma site | Asbestos type | Tissues examined | Concentration (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary | Limit of detection (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary | Tissue digest weight (g) Lung, lymph node, omentum, ovary |
|---|---|---|---|---|---|---|
| 65 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 8625 | 4313 | 0.08, 0.34 |
| 66 | Pleural | Anthophyllite | Lung, lymph node | 15 333, 23 000 | 7667, 1150 | 0.06, 0.06 |
| 67 | Peritoneal | Anthophyllite, tremolite | Omentum, lymph node | 1917, 1725 | 639, 1725 | 0.54, 0.20 |
| 68 | Pleural | Anthophyllite, tremolite | Lymph node | 3044 | 1015 | 0.82, 0.34 |
| 70 | Pleural | Anthophyllite, amosite, chrysotile | Lymph node | 17 250 | 3450 | 1.06 |
| 71 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 4313, 857, 3451 | 2156, 857, 575 | 0.16 |
| 72 | Pleural | Anthophyllite, tremolite | Lymph node | 17 250 | 3450 | 0.02 |
| 74 | Pleural | Anthophyllite, tremolite | Lung | 2300 | 460 | 2 |
| 75 | Pleural | Anthophyllite | Lung, ovary | 3450, 2070 | 1150, 2070 | 0.6, 0.2 |

Note: All cases shown were examined by analytical transmission electron microscopy and structures analyzed by microprobe analysis.

EMORY ET AL.    AMERICAN JOURNAL OF INDUSTRIAL MEDICINE —WILEY— | 489

(1-2 cases per 100 000), and its novelty, as exposures to cosmetic talc are rarely considered by most medical practitioners when they are eliciting an exposure history to asbestos.

The findings of the present and other recent studies suggest that cosmetic talc may be a cause of malignant mesothelioma. Large-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc. Although cosmetic talcs are not currently regulated by the Food and Drug Administration, the poor prognosis of malignant mesothelioma may warrant regulation or the withdrawal of cosmetic talcs from the market, as nontoxic alternatives such as corn starch are presently available.

## CONFLICTS OF INTEREST

Drs Emory, Maddox, and Kradin have testified in asbestos litigation, primarily for plaintiffs.

## DISCLOSURE BY AJIM EDITOR OF RECORD

John D. Meyer declares that he has no conflict of interest in the review and publication decision regarding this article.

## AUTHOR CONTRIBUTIONS

JCM and RLK developed the concept and the design of the work. JCM initiated the acquisition and developed the initial data analysis. TSE reviewed the materials, performed the statistical analysis, and was the primary author of the manuscript. RLK revised and gave the final approval of the version to be published.

## ETHICS APPROVAL AND INFORMED CONSENT

As these cases were selected from medical-legal consultation practice and no identifying information was included, there was no formal institutional consent nor informed consent required.

## ORCID

*Theresa S. Emory* http://orcid.org/0000-0002-8075-4480
*John C. Maddox* http://orcid.org/0000-0003-1417-0337
*Richard L. Kradin* http://orcid.org/0000-0002-3953-8671

## REFERENCES

1. Wagner JC, Sleggs CA, Marchand P. Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province. *Occup Environ Med.* 1960;17:260-271.
2. Lacourt A, Gramond C, Rolland P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. *Thorax.* 2014;69:532-539.
3. Rödelsperger K, Jöckel KH, Pohlabeln H, Romer W, Woitowitz HJ. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study. *Am J Ind Med.* 2001;39:262-275.
4. Jiang Z, Chen T, Chen J, et al. Hand spinning chrysotile exposure and risk of malignant mesothelioma: a case control study in Southeastern China. *Int J Cancer.* 2018;142:514-523.
5. Rohl AN, Langer AM. Identification and quantitation of asbestos in talc. *Environ Health Perspect.* 1974;9:95-109.
6. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. *J Toxicol Environ Health.* 1976;2:255-284.
7. Snider D, Pfeiffer D, Mancusco J. Asbestos form impurities in commercial talcum powders. *Compass Sigma Gamma Epsilon.* 1972;49:65-67.
8. Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial talcum powder as a cause of mesothelioma in women. *Int J Occup Environ Health.* 2014;20(4):318-332.
9. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc. *J Occup Environ Med.* 2020;62(1):11-17.
10. Steffen JE, Tran T, Yimam M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders—A case series. *J Occup Environ Med.* 2020;62:e65-e73. https://doi.org/10.1097/JOM.0000000000001800
11. Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. *Regulatory Toxicol Pharmacol.* 1984;4:222-235.
12. Roggli V, Vollmer R, Kelly J, Sporn T. Tremolite and mesothelioma. *Ann Occup Hyg.* 2002;46(5):447-453.
13. Millman N. Pneumoconiosis due to talc in the cosmetic industry. *Occup Med.* 1947;3:257-260.
14. Kleinfeld M, Messite J, Langer AM. A study of workers exposed to asbestiform minerals in commercial talc manufacture. *Environ Res.* 1973;6:132-143.
15. Johns-Manville Research and Engineering Center. *Body Talcum Powders—Petrographic Examination,* requested by J. P. Leineweber. 31 October 1968. https://cdn.toxicdocs.org/gb/gbq4wMVNy39gQpYQoRr0EpBE3/gbq4wMVNy39gQpYQoRr0EpBE3.pdf. Accessed 29 February 2020.
16. Lewin S, New York University, to Alfred Weissler, FDA, August 3, 1972, https://cdn.toxicdocs.org/85/85JyymOw7EB568x1mExoqRQVe/85JyymOw7EB568x1mExoqRQVe.pdf. Accessed 29 February 2020.
17. Churg AM, Warnock ML. Asbestos and other ferruginous bodies their formation and clinical significance. *Am J Pathol.* 1981;102:447-457.
18. Roggli VL, McGavran MH, Subach J, Sybers HD, Greenberg SD. Pulmonary asbestos body counts and electron probe analysis of asbestos body cores in patients with mesothelioma. *Cancer.* 1982;50:2423-2432.
19. American Cancer Society. *Key Statistics About Malignant Mesothelioma;* 2018. https://www.cancer.org/cancer/malignant-mesothelioma/about/key-statistics.html. Accessed 15 February 2020.
20. Henley SJ, Larson TC, Wu M, et al. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003–2008. *Int J Occup Environ Health.* 2013;19(1):1-10. https://doi.org/10.1179/2049396712Y.0000000016

**How to cite this article:** Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients. *Am J Ind Med.* 2020;63:484–489. https://doi.org/10.1002/ajim.23106

# EXHIBIT F

ORIGINAL ARTICLE

# Mesothelioma Associated With the Use of Cosmetic Talc

*Jacqueline Moline, MD, MSc, Kristin Bevilacqua, MPH, Maya Alexandri, JD, and Ronald E. Gordon, PhD*

**Objective:** To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder. **Methods:** Cases were referred for medico-legal evaluation, and tissue digestions were performed in some cases. Tissue digestion for the six cases described was done according to standard methodology. **Results:** Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases. **Conclusions:** Exposure to asbestos-contaminated talcum powders can cause mesothelioma. Clinicians should elicit a history of talcum powder usage in all patients presenting with mesothelioma.

## BACKGROUND

Asbestos in all forms is recognized by the International Agency for Research on Cancer (IARC) as a human carcinogen and all forms of asbestos are recognized as the primary risk factor for malignant mesothelioma.[1–9] By the mid-1950s, over 60 cases of asbestos-related lung cancer had been published in the literature. In 1955, Doll[10] published a seminal paper describing the increased risk of lung cancer among asbestos-exposed workers. In 1960, Wagner et al[2] published a study of 33 cases of malignant mesothelioma among individuals who were exposed to asbestos in and around the crocidolite mines in South Africa. By the mid-20th century, as asbestos use rose in the industrialized world, diseases associated with its use also began their upward curve.[3,8,11,12] On average between 2003 and 2008 1.05 cases per 100,000 of malignant mesothelioma (MM) was diagnosed in the United States and in 2015, 2597 deaths resulted from the disease.[13,14]

The presence of asbestos in talc and talcum powder consumer products including body powder, baby powder, facial cosmetics, and pharmaceutical talc was first discussed in the medical and scientific literature beginning in the 1940s.[15–17] Asbestos contamination of talc products is understood to occur during the mining process, in which talc deposits overlap or lie in close proximity to naturally occurring asbestos deposits.[18–22] The natural presence of asbestos within talc deposits makes selective mining or the extrication of asbestos from mined talc nearly impossible.[19] During application in its commercial talcum powder form, asbestos fibers become airborne and can be inhaled.[23,24] In 1968, Cralley et al[25] found the

presence of three different types of asbestos fibers in 22 of 22 talcum products tested (tremolite, anthophyllite, and chysotile). However, talcum powder is still widely produced and consumed with a reported 58.3 million adults using body and baby powder in the United States in 2017.[26]

While the relationship between occupational exposure to asbestos and mesothelioma is well established, multiple studies have shown that not all individuals who develop mesothelioma can pinpoint exposures to asbestos.[8,11] Among women, occupational exposure explains less than half of malignant mesothelioma cases.[27,28] Some studies have focused on conventional exposure categories that for women only reflect take home exposures from (male) family members who worked in one of the selected occupations. In one such study, data on home or personal use exposures were not collected, yet increased amounts of tremolite asbestos fibers noted in the lungs of women with MM with no identified source of asbestos contact led study authors to hypothesize that the tremolite could be related to talcum powder use.[28] The high prevalence of unexplained or, "idiopathic mesothelioma" among women necessitates further inquiry into potential non-occupational exposures, such as exposure to asbestos-contaminated talcum powder.

In light of these gaps in the existing literature, we present 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products. Of those cases, we present six in detail, where the individuals had no other known exposure to asbestos and for whom tissue studies show the presence of asbestos commonly found in talc powder (such as tremolite, and/or anthophyllite). For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder. The cases were referred to author J.M. for medico-legal evaluation as part of tort litigation, and tissue digestions were performed by author R.G. as part of this litigation. In every case, a pathology report confirmed the diagnosis of malignant mesothelioma. This study was conducted with approval from the Northwell Health Feinstein Institute for Medical Research (#18-0225 FIMR).

## MATERIALS AND METHODS

### Case Histories

Data gathered for all 33 patients were gathered from each individual's medical records and sworn testimony (deposition transcripts) of individuals. All cases were reviewed by an occupational physician with experience evaluating asbestos exposure in thousands of patients. Data abstracted included medical diagnosis, review of pathology reports confirming the diagnosis of malignant mesothelioma, and clinical course. Exposure data was obtained from sworn testimony by the cases, which included extensive questioning regarding all sources of asbestos exposure. This included family occupational histories (parents and anyone cohabitating with the patient) for all cases to assess potential asbestos exposure, hobbies that included use of products that might contain asbestos (such as ceramics), residence in an area that might have had asbestos industry leading to possible environmental exposures, known abatement of asbestos while the patient was in school, home renovations that might have used asbestos containing materials, and any other potential sources of asbestos exposure. Additional data related to family history of cancers was obtained from the sworn testimony. Any data related to potential genetic mutations such as BRCA1 associated protein-1 was collected, if present.

From the Northwell Health Department of Occupational Medicine Epidemiology and Prevention (Dr Moline, Ms Bevilacqua); Donald and Barbara Zucker School of Medicine at Hofstra/Northwell, Hempstead (Ms Alexandri); Department of Pathology, The Icahn School of Medicine at Mount Sinai (Dr Gordon), New York, New York.

Funding: No funds or external assistance were obtained by any outside source in the development, writing, analysis, or conclusions of this manuscript.

Conflicts of Interest: Authors J.M. and R.G. have served as expert witnesses in asbestos litigation, including talc litigation for plaintiffs.

Supplemental digital contents are available for this article. Direct URL citation appears in the printed text and is provided in the HTML and PDF versions of this article on the journal's Web site (www.joem.org).

Clinical Significance: This manuscript is the first to describe mesothelioma among talcum powder consumers. Our case study suggest that cosmetic talcum powder use may help explain the high prevalence of idiopathic mesothelioma cases, particularly among women, and stresses the need for improved exposure history elicitation among physicians.

Address correspondence to: Jacqueline Moline, MD, Northwell Health, Great Neck, NY (jmoline@northwell.edu).

Copyright © 2019 American College of Occupational and Environmental Medicine

DOI: 10.1097/JOM.0000000000001723

11

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

JA106

USCA4 Appeal: 23-1972     Doc: 26-1     Filed: 12/20/2023     Pg: 117 of 599

Talcum powder exposure histories were reviewed based on sworn testimony by patients and in some cases, family members with first-hand knowledge of the use of talcum powder, such as parents who recalled using talcum powder while diapering the patient. Data including type of talcum powder used (Appendix 3, http://links.lww.com/JOM/A651), age at first use of talcum powder, and duration of use was obtained to ensure adequate latency from first exposure was present.[29] In some cases, individuals were also interviewed in person, and these data were merged with the data obtained in medical records and deposition transcripts.

The six cases described below also had tissue digestions performed by author R.G. These case reports are presented in greater detail; their clinical course was similar to all 33 cases evaluated, and the same rigor with respect to obtaining information related to any asbestos exposure was applied to all 33 cases.

## Case 1

Case 1 is a 70-year-old woman who presented to a physician with shortness of breath and chest pain in January 2015. A chest x-ray revealed a small pleural effusion with left basilar atelectasis. In August 2015, a CT angiogram showed development of two sub-pleural nodules anterior to the lingula and a pleural based mass; a pleural effusion was still present. A thoracentesis was done and the cytology showed large clusters of cells suspicious for mesothelioma. A positron emission tomography (PET) scan showed pleural thickening and focal intense uptake inferiorly and posteriorly on the left side of her chest. In September 2015, she underwent thoracoscopic surgery. The pathology showed epithelial malignant mesothelioma with invasion of the visceral pleura and pulmonary parenchyma with tumor present at the stapled margin.

Case 1 applied loose face powder on a daily basis from the 1940s to the 1970s. Her mother also used the same loose face powder and Case 1 cleaned residual powder from her mother's dresser and clothing every other week from 1994 to 2012.

Electron microscopic analysis (EMA) of the lung tissue revealed anthophyllite fibers in a calculated concentrations of 3286 fibers per gram weight. There was also significant amount of fibrous and platy talc and aluminum silicates.

Case 1 was treated with four cycles of combination chemotherapy with cisplatin and pemetrexed for four cycles.

## Case 2

In August 2015, Case 2, a 65-year-old woman presented with exertional dyspnea and dry cough. A chest x-ray showed a large left pleural effusion. A chest CT scan in September 2015 showed a freely-movable, large-volume, left pleural effusion, nodularity/lobulation of the left pleura, left lower lobe atelectasis, three nodules in the left upper lobe, and no hilar or mediastinal lymphadenopathy. A thoracentesis showed carcinoma cells. A PET-CT scan on September 22, 2016 reported showed abnormal deposits of tumor in the left pleura. There was no reported disease outside the chest.

Case 2 underwent a bronchoscopy in October, 2015. Pathology showed malignant mesothelioma, biphasic mixed type (50% sarcomatoid, 50% epithelioid). A second opinion confirmed the diagnosis. She underwent two cycles of chemotherapy with doxorubricin, ifosfide, and mensa and completed treatment in November. A PET scan showed no response to the chemotherapy. In December, Case 2 underwent left radical pleurectomy/decortication, resection of left hemidiaphragm, and one lymph node dissection. Surgical pathology showed residual biphasic malignant mesothelioma with negative nodes and negative margins. In January 2016, radiation oncology recommended adjuvant radiation therapy to the left chest, which she received in February and March of 2016. As of April 2016, Case 2 had no evidence of disease recurrence.

Case 2 reported starting to use talc around age eight or nine and would apply powder after her daily shower or bath. She would also use talcum powder when visiting her grandmother because she enjoyed the scent and would apply the powder before going on a date. She continued to use powder after getting married and used baby powder with all three of her children. In the early 2000s she began to regularly apply a fragrance and its matching talcum powder in the morning and at night, describing it as her signature scent. She also sprinkled the powder in her lingerie drawer and traveled with the powder which she would rub on her suitcases and other surfaces.

EMA of the lung tissue revealed anthophyllite fibers in a calculated concentration of 8625 fibers per gram wet weight with a limit of detection of 2875 fibers per gram wet weight. A significant amount of fibrous and platy talc was seen. EMA of the lymph node tissue revealed anthophyllite and tremolite fibers in a calculated concentrations of 34,500 fibers per gram wet weight with a limit of detection of 11,500 fibers per gram wet weight. They were seen in a ratio of 2:1 anthophyllite:tremolite/actinolite. All fibers counted were 5 μm or greater in length with aspect ratios greater than 8. There was also some amount of fibrous and platy talc noted in the lymph node tissue.

## Case 3

In September 2014, Case 3, an 84-year-old woman, developed shortness of breath, a cough, and chest tightness. A chest x-ray in November 2014 showed a large left pleural effusion. A CT angiogram showed a large left pleural effusion with compressive atelectasis of the left middle and lower lobes and ground glass opacities in the left upper lobe and right lung. A thoracentesis showed carcinoma cells. Case 3 underwent a video thoracoscopy with pleural biopsy and evacuation of a pleural effusion. Pathology revealed a malignant epithelial neoplasm consistent with malignant epithelial mesothelioma. Case 3 then underwent a left pleurectomy and decortication in June 2015. The mesothelioma had spread to the lymph nodes and chest wall, and the pathology now showed malignant biphasic mesothelioma. Case 3 entered hospice care in September 2015 and died in late October 2015.

Case 3 worked as an elementary school teacher with no known occupational exposure to asbestos. Case 3 used talcum powder "before [she] was 12 and 13 years old," applying it under her arms and in her shoes daily. She shook the powder out of the can and applied it onto her body. She noted that her mother also used talcum body powder, and they shared a small bathroom. She used talcum powder beginning in the 1940s and continuing for decades, until her preferred brand was no longer available for purchase.

EMA of the lung tissue did not reveal any asbestos fibers above the limit of detection of 6900. However, there were a number of very small chrysotile asbestos fibers. Analysis of the lymph node tissue revealed tremolite asbestos fibers in calculated concentrations of 9409 fibers per gram wet weight with a limit of detection of 9409. All fibers counted were 5 μm or greater in length with aspect ratios greater than 20. There was also a significant amount of aluminum silicates, silica particles, and both fibrous and platy talc. Light microscopic analysis revealed a calculated concentration of 409 asbestos bodies per gram wet weight of lymph node tissue by phase contrast light microscopy.

## Case 4

In August 2014, Case 4, a 66-year-old woman, developed abdominal pain and had a CT scan of the abdomen and pelvis that showed omental caking, ascites, a fluid pocket in the right lower quadrant, and enlarged diaphragmatic lymph nodes. She underwent a paracentesis and an omental biopsy in August 2014. The cytology revealed atypical mesothelial cells. She then underwent a laparotomy, appendectomy, omentectomy, and left salpingo-oophorectomy. The pathology showed malignant epithelioid mesothelioma. In September 2014, a PET/CT showed increased uptake in the abdomen consistent with malignant ascites, omental metastatic disease, and cardiophrenic

*© 2019 American College of Occupational and Environmental Medicine*

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

JA107

USCA4 Appeal: 23-1972      Doc: 26-1      Filed: 12/20/2023      Pg: 118 of 599

Case 4:22-mc-00001-AWA-DEM   Document 4-6   Filed 12/02/22   Page 4 of 11 PageID# 213

nodules. A thoracoscopy showed tumor covering the right hemi-diaphragm. She was treated with multiple rounds of chemotherapy with cisplatin and pemetrexed and therapeutic paracenteses due to persistent ascites. Her tumor progressed, and she died in February 2016. She was 68 years old.

Case 4 grew up in a home where her mother used talcum powder "for as long as [she could] remember." She recalled personally using talcum powder starting around the age of 9 or 10, applying the powder to her armpits, groin, and around her body, using a powder puff. She applied talcum powder to her body for approximately 40 years. Case 4 had additional exposure to talcum powder in the 1960s while working as a licensed cosmetologist, applying talcum powder on clients' necks after a haircut. She shook the talcum powder onto the client's neck, and would wipe off the excess with a brush or blow dryer. She also used talcum powder inside the gloves that she donned prior to applying hair color.

EMA of the peritoneal tissue revealed chrysotile type asbestos fibers in a calculated concentration of 920 fibers per gram wet weight with a limit of detection of 920 fibers per gram wet weight. Fibrous and platy talc was also observed. Also seen were non-asbestiform tremolite and silica crystals.

## Case 5

Case 5 was a 76-year-old woman who developed chest pain and fatigue in September 2015 and was diagnosed with viral pericarditis. A CT scan in October 2015 showed mild pericardial thickening and mild perihepatic ascites. She was treated with steroids for viral pericarditis. In late fall 2015, Case 5 developed decreased appetite, weight loss, tenderness around the umbilicus, and abdominal pain. In December 2015 she had an abdominal ultrasound that showed a mild to moderate amount of ascites. An abdominal CT scan showed slightly bilateral pleural thickening with minimal linear atelectatic change. There was copious perihepatic ascites extending to the right and left paracolic gutter and deep pelvis, nodularity at the paracolic gutter, and a right sided deep pelvic mass. A paracentesis was done and showed atypical epithelioid cells and tissue fragments with an inflammatory background. A laparoscopy showed peritoneal carcinomatosis with a diffuse miliary excrescence, a moderate sized pelvic mass and ascites. In January 2016 she underwent an exploratory laparotomy and resection of the omentum, spleen, resection of abdominal tumor, and resection of the abdominal wall tumor. The pathology showed malignant mesothelioma involving the omentum, spleen, colon, and mesentery, as well as the fibroadipose tissue of the peritoneum. Malignant mesothelioma also involved the parietal peritoneum as well as the appendix, with fibrous obliteration of the appendiceal lumen. Case 5 died in October 2017.

Case 5 had daily personal use of talcum body powder from the 1950s to the mid-1970s. She would pour the powder onto her hands and pat it under her arms, in her genital area, between her toes, and on her legs. When she was menstruating she would apply talcum powder on her feminine napkins and her underwear. She also applied talcum powder to her shoes. Case 5's husband also used talcum powder. Both Case 5 and her husband applied the powder in the bathroom. She shook the bathroom floor mat and cleaned up residual powder from the bathroom sink.

EMA of the omental tissue did not reveal any asbestos fibers above the limit of detection of detection of 651 fibers per gram wet weight. EMA of the lymph node tissue revealed chrysotile and anthophyllite asbestos fibers in a calculated concentrations of 20,700 fibers per gram wet weight with a limit of detection of 10,350 fibers per gram wet weight. All fibers counted were 5 μm or greater in length with aspect ratios greater than 20. There was also a significant amount of fibrous and platy talc as well as fibrous and platy aluminum silicates.

## Case 6

Case 6 is a 44-year-old man who developed chest pain after playing hockey in 2012 and was evaluated in the Emergency Department. A CT scan that showed no pulmonary abnormalities. Case 6 continued to have chest pain over the next 4 years and underwent multiple cardiac evaluations. A CT scan in February 2016 showed increased pleural thickening or non-calcified pleural plaque along the right major fissure and anterior right hemithorax along the right upper lobe. A PET/CT scan in March 2016 showed unilateral hypermetabolic pleural fissural and non-fissural soft tissue abnormalities suspicious for malignancies involving the pleura. There were non-specific tiny parenchymal lung nodules. Case 6 underwent a tissue biopsy in March 2016. The pathology showed malignant epithelioid mesothelioma with invasion to the skeletal muscle.

Case 6 underwent neo-adjuvant chemotherapy with peme-trexed, cisplatin, and bevacizumab in April 2016. In May 2016, Case 6 underwent a mediastinoscopy which showed metastatic spread to the level VII lymph node. Additional chemotherapy was administered, which was not well tolerated. In July 2016, a parietal pleurectomy was done along the fissure between the upper and lower lobe. There was spread to the site of previous inferior right chest tube site. Case 6 developed acute thrombus in the right upper extremity. In September 2016, a chest x-ray showed unchanged right pleural thickening versus a small right pleural effusion. Three additional cycles of chemotherapy were recommended. A PET/CT scan in November 2017 showed a persistent hypermetabolic focus in the right anterobasal pleura and a slight increase in a right pleural effusion.

Case 6 was exposed to talcum powder beginning when he was an infant. His mother applied it to him after his bath until he was able to apply it himself, starting around the age of six. Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor. He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering. He played hockey as a youth and used powder in his hockey gear before donning the equipment. He recalled getting mouthfuls of powder during the application. He often applied talcum powder once or twice a day after showering. He had no occupational exposure to asbestos.

EMA of the lymph node tissue revealed anthophyllite and tremolite asbestos fibers in a calculated concentrations of 17,250 fibers per gram wet weight with a limit of detection of 3450 fibers per gram wet weight. They were seen in a ratio of 2:3 anthophyllite:tremolite. All fibers counted were 5 μm or greater in length with aspect ratios greater than 14.7 or greater. There was also some amount of fibrous and platy talc along with platy aluminum silicates and magnesium aluminum silicates.

## Tissue Sample Analysis

Tissue samples from six patients were analyzed: (a) lung and lymph node tissue from four of the patients diagnosed with pleural mesothelioma; and (b) lung and lymph node from two of the patients diagnosed with peritoneal mesothelioma. The tissue samples had been preserved in paraffin blocks or as formalin fixed tissues.

## Tissue Digestion Protocols

### Paraffin Blocks

The tissue was extracted from paraffin blocks was done according to the methodology described in Heller et al[30] and Wu et al.[31] The tissues were cut from the paraffin blocks and deparaffinized by melting and xylene treatment. They were brought to water, blotted and weighted. The tissues were digested with KOH and the inorganic pellet cleaned with distilled water by multiple centrifugation steps on an asbestos locator grid coated with formvar. In

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

JA108

*Moline et al*                                                                    *JOEM • Volume 62, Number 1, January 2020*

addition, 250 μL samples were prepared using a cytocentrifuge onto a standard glass slide to identify ferruginous bodies and longer fibers by phase contrast microscopy.

## Formalin Fixed Tissue

This protocol is similar to above without the deparaffinizing step as described in [23,39]. Controls for both the paraffin and formalin fixed tissues included looking at the paraffin, if from blocks, the formalin, if from fixed wet tissue, or any other materials used to process the tissue to view the remaining inorganic material on the grids.

## Asbestos Fiber Counting

The grids were analyzed two ways: (a) transmission electron microscopy (TEM) using a standard fiber-counting protocol (23,40).[23,32] on 800 grid openings; and (b) phase contrast light microscopy on two cytocentrifuge preparations per tissue type in accordance with a standard asbestos body-counting protocol (23,40).[23,32] Asbestos fibers were evaluated to determine whether they met the definition of a fiber, which includes having at a 5:1 length:width ratio and parallel sides and at least 5 μm in length. The fibers were also analyzed by Energy Dispersive Spectroscopy (EDS) to determine the ratio of elements contained in the fibers and by Selected Area Electron Diffraction (SAED) to confirm the crystalline structure of the fiber to confirm that they were asbestos. To evaluate for potential contamination, control samples were prepared from the same distilled water used to wash the samples and the paraffin surrounding the tissue. Verification techniques of fiber counting were used for quality control and quality assurance. All fibers, regardless of size, were counted in 800 grid openings.

## Calculating Asbestos Fiber Concentration

### TEM and PCM

Asbestos fiber concentration in the samples examined with transmission electron microscopy was calculated (see Appendix 1, http://links.lww.com/JOM/A649). The 250 μL samples centrifuged onto standard microscope slides were examined using phase contrast light microscopy (Appendix 2, http://links.lww.com/JOM/A650). The asbestos fiber concentration in these samples was calculated (see Appendix 2, http://links.lww.com/JOM/A650).

### Control Samples

Background control samples were obtained at autopsy or from surgical specimens from pulmonary or obstetrical and gynecologic pathologists. Samples included lung, thoracic, mesenteric and abdominal lymph nodes, abdominal tissue, ovaries, fallopian tubes, uteri and mesentery tissue. Exposure histories had been obtained by treating pulmonologists or surgeons from all individuals; all were screened for asbestos exposure from personal use, family exposure, and personal or family use of talcum powder. For those patients in whom there was any question of asbestos exposure from any source, the pathologists conferred with the treating clinician to ensure there was no known asbestos exposure. If there was potential asbestos exposure, the specimens were not included in the group. As a result, the background control specimens reflect only asbestos exposure from the overall community.

## RESULTS

The data associated with the exposure history of all 33 patients is presented in Table 1. The table identifies talcum powder as the only asbestos source these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures.

Table 2 provides the results of the fiber burden analyses for the six cases in which asbestos fibers were identified in the anatomic vicinity of the patients' mesotheliomas. Uniformly, the tissue fiber burdens reveal the presence of the following: talc, aluminum silicates, aluminum magnesium silicates, silica crystals, and asbestos fibers. The asbestos fibers are all anthophyllite, tremolite, and/or chrysotile. These three types are typical contaminants of talcum powders.[19] They have been identified as contaminants in talcum powders in repeated laboratory testing at numerous institutions.[33–37] The tissue fiber burdens contained no amosite or crocidolite, commercial amphibole asbestos fibers. Testing results of talcum powders have failed to show the presence of commercial amphiboles.

Table 3 presents the asbestos fiber burden results from background controls in tissues from autopsy and surgical population with no evidence of ovarian cancer or other malignancy, and with no known asbestos exposure. The lung and lymph nodes sampled showed only chrysotile and non-commercial amphibole asbestos in a small percentage of control samples—six of the 35 control samples, or 17%. All women with asbestos present were over 60 years of age. While asbestos is present at extremely low concentrations in the ambient air,[18] in the control samples presented in the study, there was no evidence of asbestos in women under the age of 60 years of age. Two fibers were seen in two specimens and one fiber was seen in four samples, all under 1 μm in size. The asbestos fiber burdens in the six talc exposed patients were all greater than the control population. No aluminum silicates, aluminum magnesium silicates, and silica crystals, all components of talcum powder identified in our patients, were not found in the control population that did not use talcum powder.

## DISCUSSION

This paper provides the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users. In 1960, Wagner presented 33 individuals exposed to crocidolite asbestos from occupational and environmental exposures, providing the first large case series of individuals diagnosed with mesothelioma with clearly identifiable exposure to asbestos.[2] Since then, the high prevalence of idiopathic mesothelioma cases suggested other possible exposures, including exposure to asbestos contaminated talc. Like Wagner, we present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder. This is consistent with the distribution of talcum powder usage in the United Sates, with greater numbers of women using powder than men.[26] Furthermore, the six case histories detailed years or decades of talcum powder use as well as tissue analysis that showed asbestos present in either tumor tissue or lymph nodes. In all six cases, asbestos fibers consistent with those identified as contaminants in repeated laboratory testing of talcum powder samples across several institutions were identified.[20,23,33,39] Notably, the fiber types found were consistent with the types of asbestos found in talc. Amosite and crocidolite, asbestos fibers that are encountered in cases of industrial and occupational exposure, not cosmetic talcum powder,[40] were not found in any of these cases.

This paper is also the first, to the authors' knowledge, to utilize background controls for which an extensive exposure history was elicited and for which no known asbestos exposure had occurred. Background controls are the best comparison when analyzing tissue of asbestos exposed individuals however, one of the biggest challenges is to choose a population of patients with no history of environmental or occupational exposure to asbestos apart from ambient air concentration of asbestos. Previous fiber burden studies of non-occupationally exposed individuals have compared the asbestos content in their tissue to workers in the same community where asbestos mines or asbestos containing factories were

© 2019 American College of Occupational and Environmental Medicine

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

*JOEM • Volume 62, Number 1, January 2020*                                                       *Mesothelioma and Cosmetic Talc*

**TABLE 1.** Description of 33 Mesothelioma Cases

Talcum Powder Exposure

| Case | Sex | Year of Diagnosis | Age at Diagnosis | Mesothelioma Site | Histology | Talcum Powder Brand | Estimated Years of Use | Occupation (s) |
|---|---|---|---|---|---|---|---|---|
| 1* | F | 2015 | 70† | Pleural | Epithelial | A | 30 | Medical technician |
| 2* | F | 2015 | 65 | Pleural | Biphasic | C, H, V | 50 | Homemaker |
| 3* | F | 2014 | 82† | Pleural | Biphasic | C | 70 | Teacher |
| 4* | F | 2014 | 66† | Peritoneal | Epithelial | B, C | 30 | Hairdresser |
| 5* | F | 2015 | 75† | Peritoneal | Epithelial | C | 25 | Teacher |
| 6* | M | 2016 | 43 | Pleural | Epithelial | D | 40 | Finance |
| 7 | M | 2016 | 65 | Peritoneal | Epithelial | D | 62 | None provided |
| 8 | M | 2016 | 76† | Pleural | Epithelial | U | 38 | Accountant |
| 9 | F | 2016 | 66† | Pleural | Epithelial | C, E | 35 | Hair dresser |
| 10 | F | 2015 | 80 | Pleural | Epithelial | F | 30 | Administrative assistant |
| 11 | F | 2018 | 73 | Pleural | Epithelial | C, V | 30 | Flight attendant |
| 12 | F | 2017 | 57 | Peritoneal | Epithelial | A, D, G, H, I | 40 | Medical technologist |
| 13 | M | 2016 | 56 | Peritoneal | Biphasic | D, I, S | 15 | Maintenance worker |
| 14 | M | 2017 | 56 | Peritoneal | Epithelial | D | 50 | Molding press operator |
| 15 | F | 2016 | 40 | Peritoneal | Epithelial | D, J | 12 | Retail worker |
| 16 | F | 2015 | 30 | Pleural | Epithelial | D, K, L, M | 19 | Retail worker |
| 17 | F | 2015 | 80† | Pleural | Epithelial | A, C, N | 40 | Office worker |
| 18 | F | 2015 | 64 | Pleural | Sarcomatoid | C | 40 | Real Estate agent |
| 19 | F | 2009 | 62 | Pleural | Epithelial | C | 15 | Teacher and fitness instructor |
| 20 | F | 2016 | 69 | Peritoneal | Epithelial | D, G | 30 | Hair dresser |
| 21 | F | 2013 | 34† | Peritoneal | Epithelial | C | 10 | Teacher |
| 22 | F | 2018 | 59 | Pleural | Epithelial | C, D | 42 | School custodian |
| 23 | F | 2016 | 27 | Peritoneal | Epithelial | D, O | 10 | Not provided |
| 24 | F | 2016 | 38 | Peritoneal | Epithelial | D, I | 18 | Social services |
| 25 | F | 2017 | 64 | Pleural | Epithelial | D, G, J | 27 | Mathematician |
| 26 | F | 2016 | 83 | Pleural | Epithelial | C, D, I | 60 | Not provided |
| 27 | F | 2017 | 41 | Peritoneal | Epithelial | D | 30 | Computer programmer |
| 28 | F | 2016 | 79 | Peritoneal | Epithelial | A, C, T, | 21 | Not provided |
| 29 | M | 2015 | 46 | Pleural | Epithelial | D, R, U | 15 | Informational technology |
| 30 | F | 2016 | 88† | Pleural | Epithelial | A, D, C, I | 80 | Administrative worker |
| 31 | F | 2017 | 53 | Pleural | Epithelial | D | 23 | Cleaner |
| 32 | F | 2017 | 76 | Pleural | Epithelial | D | 17 | Rehabilitation coordinator |
| 33 | F | 2017 | 46 | Peritoneal | Epithelial | D | 25 | Clerical worker |

*Tissue analysis presented done by author. Tissue analysis might have been done in some cases by other investigator, these results are not presented in this paper.
†Deceased as of writing; vital status of many individuals is currently unknown.

present.[41,42] Autopsy studies have been performed[43–45] in individuals without a specific history of workplace asbestos exposure; full exposure histories were not obtained. Langer measured asbestos fiber burdens in New York City residents with no known history of asbestos.[46] Roggli and Longo[47] measured tissue burdens for individuals who had bystander or household exposure from family members who directly worked with asbestos in their work, such as laundering clothes. However that type of exposure does not truly reflect background or "unexposed" individuals. Lee and Van Orden[32] measured background air exposure in and outside of buildings. They found short chrysotile, tremolite, and actinolite fibers, but no anthophyllite or crocidolite, and very small levels of

amosite. Lee and Van Orden's results are consistent with the background asbestos fibers found in the older women the present study.[32] While fiber burden studies are rarely undertaken in the course of clinical treatment, and are used primarily for medico-legal purposes, the findings of various fibers in the lung tissues can provide guidance as to potential prior asbestos exposure, whether from occupation, residential, or para-occupational exposure to asbestos. Attention to true background rates for fiber burdens is critical.[48]

Our findings strongly suggest that asbestos exposure through asbestos-contaminated cosmetic talc explains cases once deemed idiopathic or "spontaneous," and underline the importance of

**TABLE 2.** Tissue Digestion of Six Mesothelioma Cases

| Case | Sex | Mesothelioma Site | Asbestos Type | Site Found | Concentration (Fibers/g) (Lung, Lymph) | Limit of Detection (Lung, Lymph) | Asbestos Bodies |
|---|---|---|---|---|---|---|---|
| 1 | F | Pleural | Anthophyllite | Lung | 3,286 | 1,643 | 0 |
| 2 | F | Pleural | Anthophyllite, tremolite, actinolite | Lung, lymph node | 8,625, 34,500 | 2,875, 11,500 | 0 |
| 3 | F | Pleural | Tremolite | Lung, lymph node | 0, 9,409 | 6,900, 9,409 | 0, 409 |
| 4 | F | Peritoneal | Chrysotile | Peritoneum | 920 | 920 | 0 |
| 5 | F | Peritoneal | Anthophyllite | Lymph node | 20,700 | 10,350 | 0, 0 |
| 6 | M | Pleural | Anthophyllite, tremolite | Lymph node | 17,250 | 3,450 | 0 |

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

JA110

_Moline et al_                                                        _JOEM • Volume 62, Number 1, January 2020_

**TABLE 3.** Current Levels of Asbestos Fiber Burden Observed in Digests of Tissue From Autopsy and Surgical Population With no History of Asbestos Exposure (Controls)

| Tissue Type | N | Asbestos Type | Mean (Fibers/Gram Wet Weight)[*] | Range (Fibers/Gram Wet Weight) |
|---|---|---|---|---|
| Lung tissue | 35 | Chrysotile | 892 | 0–30,000 |
| | | Tremolite | 84 | 0–1,552 |
| | | Chrysotile and tremolite | 35 | 0–1,208 |
| | | Asbestos bodies | <1 bodies/gram wet weight | 0–6 |
| Paratracheal or parabronchial lymph node tissue | 35 | Chrysotile | 72 | 0–1,1035 |
| | | Tremolite | 29 | 0–552 |
| | | Chrysotile and tremolite | 24 | 0–828 |
| | | Asbestos bodies | <1 bodies/gram wet weight | 0–5 |
| Peritoneum + gynecological tissue | 10 | Chrysotile | 0 | 0 |
| | | Tremolite | 0 | 0 |
| | | Chrysotile and tremolite | 0 | 0 |
| | | Asbestos bodies | 0 | 0 |

[*]All fibers that were counted were always 1 μm or less in length.

collecting detailed exposure histories that incorporate these findings in patients presenting with mesothelioma. Several factors may hinder the collection of comprehensive exposure histories among individuals diagnosed with mesothelioma. Minimal training in occupational medicine and exposure taking practice among medical students may contribute to a lack of or incomplete exposure history elicitation on the part of clinicians.[49,50] Secondly, long latency periods between exposure and illness pose a challenge both to individual recall as well the ability to establishing causality. Due to the relatively short period between diagnosis and death among mesothelioma patients, patients are often too ill or are deceased before being able to provide a full history. Furthermore, though the presence of asbestos in talc and talcum powder was first discussed in the scientific literature in the 1940s, individuals may not be aware that the products they used contained asbestos. Few clinicians are aware that this is a potential exposure. Typically, patients with mesothelioma will be simply asked whether they worked with or around asbestos, rather than being providing with a listing of potential sources of the types of exposure in which one might encounter asbestos. Cases of mesothelioma among hairdressers characterized as idiopathic also underscore the contribution of an incomplete exposure history; the potential failure to identify the use of talcum powder exposure in their work would prevent the linking of occupational exposure to asbestos to their mesothelioma. In our paper, there were three female hairdressers who regularly used talcum powder in their work. It was unclear from any of the histories noted in the medical records that these women were asked if they used talcum powder as part of the hair cutting process. In a report from the National Mesothelioma Registry of Italy, staff noted a cluster of mesothelioma due to "unknown exposure" among hairdressers, but only examined hairdryer use as a potential exposure. There was no discussion of the occupational use of talcum powder.[51] However, McDonald et al,[52] noted that a barber's occupational exposure to asbestos to talc could explain the increased finding of tremolite in the individual's lung fiber burden.

The case series presented should be understood in the context of its limitations. Data were obtained from medication records and transcripts of depositions, rather than structured, in-person interviews. However, the information solicited during the course of the patients' depositions were thorough, and included exhaustive questioning about alternative sources of asbestos exposure, including household exposure, exposures from external industrial sources, occupational exposure, and potential exposure from family members. While deposition testimony is by definition self-report,

depositions were given under oath and the potential for recall bias noted would be presented whether patients completed a structured interview or were asked questions during sworn testimony. Furthermore, the utilization of medical records allowed the authors to corroborate important medical information and confirm the pathological diagnosis.

In March 2019 the Federal Drug Administration (FDA) released a statement as an update to their 2017 finding, confirming asbestos contamination of certain cosmetic products marketed and sold to young girls and outlining new steps to work with manufacturers to ensure the safety of their products.[53] While such public acknowledgment of the potential for asbestos contamination in cosmetic talc marks an important turning point, manufacturers are not legally obligated to register cosmetic products with the FDA. The results of this study coupled with the widespread use of such products[26] underline the continued risks posed to consumers through common household and cosmetic products. While these products remain unregulated and on the shelves, the use of talcum powder must be incorporated into standard exposure history practice in order to promote earlier detection of asbestos related disease among non-occupationally exposed individuals. This paper provides evidence that mesothelioma cases once considered idiopathic may be attributable to asbestos-contaminated cosmetic talcum powder usage and that the elicitation of a history of such usage is imperative to obtaining a full exposure history in all patients presenting with mesothelioma.

## REFERENCES

1. Straif K, Benbrahim-Tallaa L, Baan R, et al. A review of human carcinogens– Part C: metals, arsenic, dusts, and fibres. _Lancet Oncol._ 2009;10:453–454.
2. Wagner JC, Sleggs CA, Marchand P. Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province. _Occup Environ Med._ 1960;17:260–271.
3. Britton M. The epidemiology of mesothelioma. _Semin Oncol._ 2002;29:18–25.
4. Iwatsubo Y, Pairon JC, Boutin C, et al. Pleural mesothelioma: dose-response relation at low levels of asbestos exposure in a French population-based case-control study. _Am J Epidemiol._ 1998;148:133–142.
5. Agudo A, González CA, Bleda MJ, et al. Occupation and risk of malignant pleural mesothelioma: a case–control study in Spain. _Am J Ind Med._ 2000;37:159–168.
6. Magnani C, Agudo A, González CA, et al. Multicentric study on malignant pleural mesothelioma and non-occupational exposure to asbestos. _Br J Cancer._ 2000;83:104.
7. Rödelsperger K, Jöckel K-H, Pohlabeln H, Römer W, Woitowitz H-J. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: Results from a German hospital-based case-control study. _Am J Ind Med._ 2001;39:262–275.

© 2019 American College of Occupational and Environmental Medicine

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

JA111

*Mesothelioma and Cosmetic Talc*

8. Lacourt A, Gramond C, Rolland P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. *Thorax*. 2014;69:532–539.

9. Markowitz S. Asbestos-related lung cancer and malignant mesothelioma of the pleura: selected current issues. *Semin Respir Crit Care Med*. 2015;36:334–346.

10. Doll R. Mortality from lung cancer in asbestos workers. *Br J Ind Med*. 1955;12:81–86.

11. Marinaccio A, Corfiati M, Binazzi A, et al. The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. *Occup Environ Med*. 2017;75:254–262.

12. Lemen RA. Mesothelioma from asbestos exposures: epidemiologic patterns and impact in the United States. *J Toxicol Environ Health Part B*. 2016;19:250–265.

13. Henley SJ, Larson TC, Wu M, et al. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003-2008. *Int J Occup Environ Health*. 2013;19:1–10.

14. Mazurek JM. Malignant mesothelioma mortality—United States, 1999-2015. *MMWR Morb Mortal Wkly Rep*. 2017;66:214–218.

15. Porro F, Patton J, Hobbs A. Pneumoconiosis in the talc industry. *Am J Roentgenol*. 1942;47:507.

16. Hopkins O. A report on the asbestos, talc, and soapstone deposits of Georgia; 1948.

17. van Horn E. Talc deposits of the Murphy marble belt; 1948.

18. Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. *Regul Toxicol Pharmacol*. 1984;4:222–235.

19. Rohl AN, Langer AM. Identification and quantitation of asbestos in talc. *Environ Health Perspect*. 1974;9:95–109.

20. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. *J Toxicol Environ Health*. 1976;2:255–284.

21. Kleinfeld M, Messite J, Langer AM. A study of workers exposed to asbestiform minerals in commercial talc manufacture. *Environ Res*. 1973;6:132–143.

22. Luckewicz W. Differential thermal analysis of chrysotile asbestos in pure talc and talc containing other minerals. *J Soc Cosmet Chem*. 1975;26:431–437.

23. Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. *Int J Occup Environ Health*. 2014;20:318–332.

24. Camiade E, Gramond C, Jutand M-A, et al. Characterization of a French series of female cases of mesothelioma. *Am J Ind Med*. 2013;56:1307–1316.

25. Panou V, Vyberg M, Meristoudis C, et al. Malignant mesothelioma in 91 danish women: the occupational asbestos exposure. *J Clin Oncol*. 2017;35:8560–18560.

26. Lanphear BP, Buncher CR. Latent period for malignant mesothelioma of occupational origin. *JOM*. 1992;34:718–721.

27. Longo DL, Young RC. Cosmetic talc and ovarian cancer. *Lancet*. 1979;314:349–351.

28. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. *Am Ind Hyg Assoc J*. 1968;29:350–354.

29. Simmons. U.S. Brands of body and baby powder used 2017 | Statistic. Statista. Available at: https://www.statista.com/statistics/275421/us-house-holds-brands-of-body-and-baby-powder-used/. Accessed February 21, 2018.

30. Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. *Am J Ind Med*. 1996;29:435–439.

31. Wu M, Gordon R, Herbert R. Lung disease in World Trade Center responders exposed to dust and smoke-carbon nanotubes found in the lungs of WTC patients and dust samples. *Environ Health Perspect*. 2010;118:499–504.

32. Lee RJ, Van Orden DR. Airborne asbestos in buildings. *Regul Toxicol Pharmacol*. 2008;50:218–225.

33. Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. *Environ Health Perspect*. 1991;94:225–230.

34. Snider D, Pfeiffer D, Mancuso J. Asbestos form impurities in commercial talcum powders. *Compass Sigma Gamma Epsil*. 1972;49:65–67.

35. Longo W, Rigler M. Supplemental Expert Report & Analysis of Johnson & Johnson Baby Powder and Valeant Shower to Shower Talc Products for Amphibole Asbestos; 2018.

36. Compton S. Investigation of Italian Talc Samples for Asbestos; 2017.

37. Longo W. Analysis of Johnson & Johnson's Historical Baby Powder & Shower to Shower Products from the 1960's to the Early 1990's for Amphibole Asbestos; 2018.

38. Ahelmann A, Glynn ME, Pierce JS, Scott PK, Serrano S, Paustenbach DJ. Historical ambient airborne asbestos concentrations in the United States—an analysis of published and unpublished literature (1960s–2000s). *Inhal Toxicol*. 2015;27:754–766.

39. Investigation of Possible Asbestos Contamination in Talc Samples; 1972.

40. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Carbon Black, Titanium Dioxide, and Talc. Lyon, France: World Health Organization International Agency for Research on Cancer; 2010.

41. Dodson RF, Huang J, Bruce JR. Asbestos content in the lymph nodes of nonoccupationally exposed individuals. *Am J Ind Med*. 2000;37:169–174.

42. Dodson RF, Williams MG, Huang J, Bruce JR. Tissue burden of asbestos in nonoccupationally exposed individuals from east Texas. *Am J Ind Med*. 1999;35:281–286.

43. Churg A. Asbestos fibers and pleural plaques in a general autopsy population. *Am J Pathol*. 1982;109:88–96.

44. Warnock ML, Churg AM. Asbestos bodies. *Chest*. 1980;77:129–130.

45. Srebro SH, Roggli VL, Samsa GP. Malignant mesothelioma associated with low pulmonary tissue asbestos burdens: a light and scanning electron microscopic analysis of 18 cases. *Mod Pathol*. 1995;8:614–621.

46. Langer AM, Selikoff IJ, Sastre A. Chrysotile asbestos in the lungs of persons in New York City. *Arch Environ Health*. 1971;22:348–361.

47. Roggli VL, Longo WE. Mineral fiber content of lung tissue in patients with environmental exposures: household contacts vs. building occupants. *Ann N Y Acad Sci*. 1991;643:511–518.

48. Gordon RE. Analytic Analyses of Human Tissues for the Presence of Asbestos and Talc. In: Electron Microscopy-Novel Microscopy Trends. IntechOpen; 2018.

49. Papali A, Hines SE. Evaluation of the patient with an exposure-related disease: the occupational and environmental history. *Curr Opin Pulm Med*. 2015;21:155–162.

50. Politi BJ, Arena VC, Schwerha J, Sussman N. Occupational medical history taking: how are today's physicians doing? A cross-sectional investigation of the frequency of occupational history taking by physicians in a major US teaching center. *J Occup Environ Med*. 2004;46:550–555.

51. Carugno M, Mensi C, Sieno C, Consonni D, Riboldi L. Asbestos exposure among hairdressers. *Med Lav*. 2012;103:70–71.

52. McDonald AD, Case BW, Churg A, et al. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. *Ann Occup Hyg*. 1997;41:707–719.

53. Gottlieb S, Mayne S. Statement from FDA Commissioner Scott Gottlieb, M.D., and Susan Mayne, Ph.D., Director of the Center for Food Safety and Applied Nutrition, on Tests Confirming a 2017 Finding of Asbestos Contamination in Certain Cosmetic Products and New Steps That FDA Is Pursuing to Improve Cosmetics Safety; 2019. Available at: https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm632736.htm. Accessed May 30, 2019.

© 2019 American College of Occupational and Environmental Medicine

Copyright © 2019 American College of Occupational and Environmental Medicine. Unauthorized reproduction of this article is prohibited

17

JA112

**Appendix 1.** Asbestos fiber concentration in the samples examined with transmission electron microscopy

$$\frac{552^{a} \times \frac{total\ fluid\ volume}{10\ \mu L} \times \frac{average\ \#\ of\ fibers}{grid\ space}}{weight\ of\ tissue}$$

a. total number of square micrometers of a grid opening in the total area of the grid.

**Appendix 2.** Equation for asbestos fiber concentration in samples examined with phase contrast light microscopy

$$\frac{abestos\ bodies\ on\ 2\ slides\ \times\ 2\ \times\ \#mL\ of\ total\ digest}{weight\ of\ digested\ tissue}$$

**Appendix 2.** Cosmetic Talcum Powder Companies

a.  Coty Airspun face powder
b.  Mennen
c.  Cashmere Bouquet
d.  Johnson's
e.  Clubman
f.  Chantilly
g.  White Shoulders
h.  Jean Nate
i.  Shower to Shower
j.  Avon
k.  Maybelline
l.  Cover Girl
m.  Mary Kay
n.  Helena Rubinstein
o.  Spring Fresh
p.  Desert Flower
q.  Giorgio Dustin
r.  Goldbond
s.  Air Mist
t.  Lily of the Valley
u.  Old Spice
v.  Chanel

# EXHIBIT G

```
1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
2                 FOR THE COUNTY OF LOS ANGELES
3     DEPARTMENT 4            HON. STEPHEN M. MOLONEY, JUDGE
4
      COORDINATED PROCEEDING SPECIAL TITLE   )
5     (RULE 3.550)                           )
                                             )
6     LAOSD ASBESTOS CASES                   )
      _____  )
7                                            )
                                             ) CASE NO.:
8     SHAWN JOHNSON, AN INDIVIDUAL; HOLLY    )
      JOHNSON, AN INDIVIDUAL,                ) JCCP 4674/20STCV17335
9                                            )
                                             )
10                   PLAINTIFFS,             )
                                             )
11       VS.                                 )
                                             )
12    JOHNSON & JOHNSON; JOHNSON & JOHNSON   )
      CONSUMER INC., A SUBSIDIARY OF         )
13    JOHNSON & JOHNSON; ALBERTSONS          )
      COMPANIES, INC., INDIVIDUALLY AND AS   )
14    SUCCESSOR IN INTEREST TO SAV-ON DRUG   )
      STORES, INC.; COSTCO WHOLESALE         )
15    CORPORATION; RALPHS GROCERY COMPANY;   )
      THRIFTY PAYLESS, INC., DBA RITE AID    )
16    PHARMACY; WALMART, INC. AND DOES 1     )
      THROUGH 400, INCLUSIVE,                )
17                                           )
                     DEFENDANTS.             )
18    _____  )
19
20            REPORTER'S TRANSCRIPT OF PROCEEDINGS
21               WEDNESDAY, OCTOBER 6, 2021
22                        DAY 36
23              (PAGES 10801 TO 11014)
24
25      (APPEARANCES ON NEXT PAGE)
26
27
      REPORTED BY:   DAYNA HESTER, C.S.R. 9970
28               OFFICIAL REPORTER PRO TEMPORE
```

10866

1   TALC GETTING MESOTHELIOMA.

2          HOW MANY PEOPLE HAVE TO DIE OF MESOTHELIOMA

3   BEFORE THIS COMPANY WILL SAY, "OKAY.  ENOUGH'S ENOUGH.

4   WE ADMIT IT WE DID IT"?

5          THE CRAZY THING IN OUR SOCIETY, EVEN IF YOU'RE

6   GUILTY, YOU CAN COME INTO COURT AND REQUIRE THE OTHER

7   SIDE TO PROVE IT.

8          THAT'S WHAT JOHNSON & JOHNSON DID.  THEY CAME

9   INTO THIS COURTROOM KNOWING THAT THEY WERE LIABLE,

10  KNOWING THAT THEY WERE GUILTY, AND THEY SAID, "HEY,

11  PLAINTIFF PROVE IT."

12         AND THAT'S WHAT WE'VE DONE OVER THE LAST

13  36 DAYS.  AND I KNOW IT'S BEEN EXHAUSTING.  IT'S BEEN

14  EXHAUSTING FOR ME AND MY TEAM.

15         I KNOW AT TIMES IT'S BEEN FRUSTRATING FOR YOU

16  AS JURORS.  I KNOW IT'S BEEN HARD TO GET HERE EVERY

17  DAY.  I KNOW SOMETIMES IT'S HARD TO PAY ATTENTION.

18         BUT IT'S THAT IMPORTANT.

19         THE LAST 36 DAYS, WE SAID TO THEM, "ALL RIGHT.

20  YOU WANT US TO PROVE IT?  THAT'S EXACTLY WHAT WE'RE

21  GOING TO DO."

22         AND THAT'S EXACTLY WHAT WE DID, LADIES AND

23  GENTLEMEN.

24         AND DR. MOLINE TELLS YOU HIS EXPOSURES FROM

25  1964 TO 1978.  THOSE EXPOSURES ALONE CAUSED HIS

26  DISEASE, INCREASED HIS RISK OF MESOTHELIOMA.

27         SHE TELLS YOU, "ALL RIGHT.  IF YOU JUST LOOK

28  AT 1985 THROUGH 2019, THAT EXPOSURE PERIOD ALONE

JA118

# EXHIBIT H



**Northwell**
Health™

Occupational Medicine, Epidemiology and Prevention

October 28, 2021

Simmons, Hanly, Conroy
One Court Street
Alton, IL 62002
Attention: Melissa Schopfer, Esq.

Re: Brian Gref

Dear Ms. Schopfer:

    I am writing to report the results of my evaluation of the materials listed below pertaining to Mr. Brian Gref. I have reviewed these materials in the context of my pre-existing knowledge, training, and experience in the field of occupational medicine. These materials are of the type I and other specialists in occupational medicine normally rely upon and are sufficient to form a reliable basis for my opinions contained within this report. All of the opinions stated in this report are given within a reasonable degree of medical certainty.

    This report and the opinions stated in the report are based on the listed materials and my 30 years of training, education, and experience in the area of asbestos-related occupational medicine. Over the past 30 plus years, I have had the opportunity to evaluate and treat hundreds of patients with asbestos exposure, many of whom have asbestos related diseases.

**Qualifications:**

    I am a physician licensed in the State of New York, specializing in the field of occupational and environmental disease. I have been a practicing physician since I graduated from medical school in 1988.

    I attended the University of Chicago and received a Bachelor of Arts degree with Honors, with a major of History, Philosophy, and Social Studies of Science and Medicine. I then continued at the University of Chicago – Pritzker School of Medicine, where I obtained my medical degree in 1988. I was elected to the Alpha Omega Alpha Honor

EXHIBIT

3

**JA120**

Society, and was also awarded an American Medical Women's Association Award. Following medical school graduation, I was an intern and resident in Internal Medicine at Yale University – Yale New Haven Hospital from 1988 – 1991. Upon completion of my Internal Medicine Residency program, I completed a second residency at the Mount Sinai School of Medicine in Occupational Medicine, from 1991 – 1993. During my Occupational Medicine Residency Program, I obtained my Master of Science Degree in Community Medicine (equivalent degree to a Masters of Public Health) in 1993. I began to evaluate dozens of patients with asbestos exposure during my residency program at Mount Sinai. I am board certified in Occupational Medicine and in Internal Medicine. I have become recertified in Internal Medicine two times.

Following completion of my residency training in Occupational Medicine, I was awarded a Fellowship in Occupational Medicine from the Foundation for Occupational Health and Research. I continued at Mount Sinai, where I joined the faculty, and continued to evaluate patients with asbestos exposure. I became Vice Chair of the Department of Preventive Medicine in 2001. I was Director of the New York/New Jersey Education and Research Center from 2006 – 2010, and had been Director of the Residency Program in Occupational Medicine from 1998-2006. I was also the Director of the Mount Sinai World Trade Center Medical Monitoring and Treatment Program from 2006 – 2010, although my involvement with the World Trade Center medical programs started in 2001, when I began to evaluate patients with exposure to the World Trade Center disaster, and was initially Medical Core Director of the World Trade Center Worker and Volunteer Medical Screening Program (2002-2004), and Co-Director of the World Trade Center Medical Monitoring and Treatment Program (2004-2006). I have published over fifty articles in the peer-reviewed literature.

In 2010, I left the Mount Sinai School of Medicine to become the Founding Chair of the Department of Population Health at Northwell Health and Hofstra Northwell School of Medicine (formerly known as North Shore University Health System). The Department changed its name in 2014 to Occupational Medicine, Epidemiology and Prevention.

I have evaluated hundreds of patients with asbestos exposure in my career in occupational medicine, spanning over 30 years. I currently direct the Occupational and Environmental Medicine Center of Long Island, providing occupational health services to patients in the metropolitan New York area. Over the past year alone, I have supervised the examination of or directly examined nearly 700 patients with asbestos exposure, as we have greatly expanded our clinical services. Over the course of the past 30 years, I have evaluated dozens of patients with malignant mesothelioma and lung cancer due to asbestos exposure. I have kept abreast of the scientific and medical literature regarding the diagnosis and causation of mesothelioma. I have personally evaluated cases of mesothelioma where the exposure was brief, and have also seen cases of mesothelioma in individuals whose only exposure to asbestos was from family members who worked with asbestos and brought their asbestos contaminated clothes home.

My current rate for deposition and trial testimony is $750 per hour. My *curriculum vitae* is attached hereto as **Exhibit A**. A list of my former testimony is attached hereto as

**Exhibit B**. In addition to the documents referenced herein, I may also rely on the documents and literature referenced in my reference and reliance list for this case, attached hereto as **Exhibit C**.

**Materials Reviewed:**

I have had the opportunity to review the medical records of Mr. Gref and reviewed deposition transcripts from Mr. Gref and his parents. I was provided with the following information:

1. Dr. Zhang report
2. Advent Health medical records
3. Baptist Medical Center medical records
4. Cancer Specialists of North Florida medical records
5. Dr. Elizabeth Worsham medical records
6. Mayo Clinic medical records
7. VA Jacksonville medical records
8. Dr. Mark Krekler reports
9. Social Security records
10. Plaintiff's Answers to Interrogatories
11. Deposition of Brian Gref
12. Deposition of Roger Gref
13. Deposition of Jeneane Bennett
14. Article-Asbestos Found in Ten Powders, dated 3/10/76
15. Memo from Environmental Science Laboratory dated 3/22/76

**Mr. Gref's Medical and Exposure History:**

*Clinical History:* Mr. Gref is a 38 year old who presented to the Emergency Department (ED) on August 17, 2017 with right flank pain. A CT scan showed a right ureteral calculus. He returned to the ED on December 4, 2017 with left upper quadrant abdominal pain, fever, chills, nausea and vomiting for four days. A CT scan of the abdomen and pelvis on December 4, 2017 showed moderate induration of the omentum in the left upper quadrant and a small amount of free fluid in the pelvis. These findings were new compared with the CT scan in August 2017. There was a concern for ischemia to the omentum, and suspected omental torsion. Mr. Gref underwent surgery on December 6, 2017 and an exploratory laparotomy with omenectomy was done, with an area of congestion noted in the omentum. The pathology showing acute inflammation, reactive mesothelial hyperplasia and vascular congestion. There was no evidence of malignancy. He was discharged home on December 7, 2017. Mr. Gref had another episode of abdominal pain in late October 2018. A CT scan of the abdomen and pelvis showed a very small area of omentum to the right of the midline just above the umbilicus that showed hazy edema. There was a hazy density in the left upper quadrant mesentery near the spleen. A loop of small bowel was mildly dilated with slight thickening as well. There was "a swirling of the deep mesentery without vascular occlusion." The radiologist's impression was mesenteritis. He was admitted to the hospital and treated with intravenous fluids, antibiotics, and pain medication. He underwent an

*Dr. J. Moline-Gref report*                                              *Page 3 of 23*

**JA122**

endoscopy on October 30th, 2018 that was normal. His pain resolved and he was discharged home.

   Mr. Gref developed abdominal pain again on December 17, 2018, and went to the ED, where a CT angiogram showed no evidence of an acute vascular abnormality. There was circumferential mucosal thickening of the small bowel loops within the left mid abdomen and left upper quadrant, most suggestive of small bowel enteritis. There was redemonstration of inflammatory stranding/edema throughout the mesenteric fat especially within the left upper quadrant. There was significant interval progression compared to the previous examination, and the radiologist noted that while the findings were non-specific, they did raise the possibility of peritoneal carcinomatosis. He was admitted to the hospital and given fluids and antibiotics. A significant fluid collection was noted in his abdomen, and a paracentesis was done on December 19, 2018. Around 1700 cubic centimeters of fluid was removed and the cytology was negative for malignant cells. There were some reactive mesothelial cells, along with neutrophils and lymphocytes. A video capsule endoscopy showed slow gastric transit, gastric ulcerations and gastritis and a normal small bowel otherwise with delayed transit. The endoscopy biopsies showed findings suggestive of peptic duodenitis and gastritis. No abnormalities were noted in the colon. He was discharged home on December 23, 2018.

   Mr. Gref's abdominal pain returned in June/July 2019 and he developed nausea and difficulty taking a deep breath due to left upper quadrant pain. The pain gradually worsened over three to four weeks and he returned to the ED for evaluation on July 20, 2019. He had a CT scan of the abdomen that showed a moderate amount of ascites throughout the abdomen. Small bowel thickening was seen within several loops of small bowel within the abdomen. He was placed on antibiotics for presumed mesenteritis. An endoscopy was done that showed gastritis, and the gastric antrum showed no significant findings. He had a paracentesis done with 1600 cubic centimeters of fluid removed, and the fluid cytology showed acute inflammation and mesothelial cells. No malignant cells were seen. He was discharged home on July 22, 2019. A repeat CT scan was done on August 18, 2019. There was a moderate amount of intra-abdominal ascites. Mild splenomegaly was seen. There were a few mildly enlarged epicardial lymph nodes. Mr. Gref was admitted to the hospital with five days of abdominal pain and vomiting. Dr. Bradford Joseph, a gastroenterologist, saw Mr. Gref in the hospital. He recommended an MRI of the abdomen and Doppler ultrasound of the liver. If the tests were abnormal, he recommended a surgical evaluation. A repeat paracentesis was done with 1,400 cubic centimeters of fluid removed. Dr. Benjamin Piperno, a surgeon, saw Mr. Gref in consultation. He did not feel he required surgery at that time. An MRI of the abdomen was done on August 20, 2019. There was a moderate volume of ascites of uncertain etiology. Borderline enlarged epicardiac lymph nodes were again seen. There was a tiny splenic lesion, likely benign, and mild splenomegaly. A less than one centimeter pulmonary nodule was seen at the right lung base. An abdominal ultrasound showed mild splenomegaly and small volume ascites. Normal blood flow in the portal vein was seen on Doppler. A paracentesis was done and the fluid showed reactive mesothelial cells and acute inflammation. No malignant cells were seen. He was discharged home on August 25, 2019, and a recommendation was made to seek care at Mayo Clinic for a second opinion.

*Dr. J. Moline-Gref report*                                          *Page 4 of 23*

Mr. Gref was admitted to the Mayo Clinic in Florida on Novembe 24, 2019 with worsening abdominal pain and distention along with nausea. He also had non-tender cervical lymphadenopathy. A CT scan on November 24, 2019 showed a large volume of ascites with heterogenous stranding and nodularity of the omentum, omental caking with a soft tissue mass anterior to the level of the umbilicus. Mr. Gref had a CT-guided paracentesis and biopsy. Around 2.15 liters of fluid was removed from the abdomen. The fluid showed neutrophils and he was treated with antibiotics and given albumin to treat spontaneous bacterial peritonitis. The fluid cytology and the biopsy pathology showed malignant mesothelioma, epithelial cell type. Dr. Zhang reviewed the pathology and noted that the histological features and immunohistochemical staining pattern supported the diagnosis of malignant mesothelioma, epithelioid cell type. Mr. Gref was switched to oral antibiotics and plans were made for an outpatient chest CT, PET/CT and consultation, along with surgical consultation regarding possible HIPEC. He was discharged home on November 28, 2019. Mr. Gref returned on November 29, 2019 with a panic attack. He was treated with anxiolytics.

Dr. Thomas Davis, a medical oncologist, saw Mr. Gref on December 15, 2019. A PET scan was done on December 17, 2019 and showed hypermetabolic omental soft tissue infiltration throughout the upper abdomen consistent with known mesothelioma with a mass in the right upper quadrant measuring 3.2 x 2.5 centimeters. There was moderate ascites with low-level FDG. There was no abnormal uptake within the neck or chest. Dr. Marcelo DaSilva, a surgical oncologist, saw Mr. Gref on January 8, 2020. He discussed treatment options with Mr. Gref including cytoreductive surgery. Mr. Gref went to the ED at Mayo Clinic on January 21, 2020 with two weeks of abdominal pain and nausea. A bedside ultrasound showed no ascites. He was given pain medication. Dr. DaSilva recommended induction chemotherapy with Cisplatin and Pemetrexed, and Dr. Davis planned to administer the chemotherapy and rescan after two cycles. Mr. Gref went to the ED on February 8, 2020 with chest pain, shortness of breath and generalized weakness. He had started chemotherapy on February 4, 2020. A CT angiogram of the chest showed no evidence of a pulmonary embolism. There was no acute abnormality noted in the chest. His chest pain was relieved by nitroglycerin. He was admitted for monitoring to see if he had a cardiac event. He continued to have abdominal pain and nausea. A stress echocardiogram showed normal clinical response to exercise stress with no chest pain during the procedure. There was a normal electrocardiographic response during exercise stress and perfusion imaging was normal. The overall left ventricular systolic function was normal with no wall motion abnormalities. He was discharged home on February 10, 2020.

Dr. Davis saw Mr. Gref on February 18th, 2020. He had some nausea, headache and diarrhea, and was getting a bit dehydrated. He had less abdominal distension. Dr. Davis arranged for hydration and planned a second cycle for the following week. Mr. Gref saw Dr. Davis on March 10th. He had daily nausea and a poor appetite with occasional diarrhea. He received intravenous fluids and anti-emetics. He received his third cycle on March 17th, 2020. Dr. Davis saw Mr. Gref on March 31st. His nausea and appetite were improved but he still had nausea and bloating for a week after treatment. A PET scan was done on March 31, 2020. There was an interval decrease in the volume and FDG intensity within the

mesothelioma in the omental fat, consistent with a response to interval therapy. There were persistent areas of fine omental nodularity in the left upper quadrant with low-level FDG activity. Persistent but improved intra-abdominal ascites was noted. Dr. Davis saw Mr. Gref on April 7th. Mr. Gref was doing better on treatment and his pain had decreased. He was using Varubi and Protonix with relief of his symptoms. Dr. DaSilva saw Mr. Gref via telehealth on April 22, 2020 and discussed the plan for surgery. Dr. DaSilva planned a radical peritonectomy with possible cholecystectomy, splenectomy, bowel resection and omentectomy with HIPEC. Dr. Davis saw Mr. Gref on April 28, 2020. He planned to see him in June following his surgery.

Mr. Gref underwent cytoreductive surgery with HIPEC on May 20, 2020. Dr. DaSilva performed a radical omentectomy and administered intraoperative heated Cisplatin. [full records of the surgery and hospitalization were not available for my review]. The pathology showed multiple miscroscopic foci of malignant mesothelioma in the peritoneum soft tissue. There was extensive malignant mesothelioma involving an area up to 30.3 centimeters and excision of the mesentery showed malignant mesothelioma. Dr. DaSilva saw Mr. Gref on July 8, 2020. He was able to walk around ½ of a mile a day and had very mild incisional pain. A PET scan on July 28, 2020 showed no PET evidence of active malignancy. There was interval resolution of the previously seen fine nodularity that was infiltrating the omental fat in the left upper quadrant. No intraperitoneal ascites was seen and no focal abnormality was seen in the neck or chest. Dr. Davis saw Mr. Gref on July 29, 2020. Dr. Davis noted that there was no evidence of disease on his PET scan. He started him on lisinopril for an elevated blood pressure. Mr. Gref returned to Dr. Davis on March 10, 2021. Mr. Gref continued to require pain medication and Dr. Davis noted he had no evidence of disease on his recent scan [not available for my review]. He planned to see Mr. Gref in 12 months for follow-up with a repeat scan.

No other records were available for my review.

*Past Medical History:* Mr. Gref has a history of kidney stones, chronic sinusitis and sinus surgery, migraines, low back pain, bipolar disease, alcohol use disorder, depression and anxiety.

*Cigarette Smoking History:* Mr. Gref smoked cigarettes regularly from 2004 – 2019. He smoked between several cigarettes a day to up to one-half pack of cigarettes a day, although there is notation that he smoked around one pack a day.

*Environmental and Occupational History:* When Mr. Gref was young, his parents served in the US Navy. He recalled his mother worked in an office and as a detailer and his father was a drug and alcohol counselor and worked on aircraft, working on ejection seats and doing supervisory work. His mother had ship duty, but she did not go into the mechanical areas, and performed administrative duties onboard. His father was unaware of any asbestos exposure during his service. His parents separated when he was young and he and his mother moved to Virginia from Florida when he was around 9. Mr. Gref worked as a security guard from 2001 – 2004. He worked at a front desk for an office building for two years from 2003 – 2005. He worked as a service technician for North Florida Lube

from 2005 – 2007. He worked as a call center operator from 2007 – 2013, and served in the US Army from 2014 – 2015. He worked as a website builder from 2015 – 2019, and has been a blood technician since 2019.

Mr. Gref recalled that his parents bathed him when he was young and dried him off and applied powder to his body. He recalled that a lot of powders were in the house, particularly Old Spice and Clubman, which were used a lot. He also remembered English Leather, Johnson & Johnson, Shower to Shower, and Mennen. He stated that the powder was applied "in healthy doses, dust getting all up in the air." His parents either applied the powder directly onto him from the bottle or put the powder on their hand and applied it over his body and rubbed it in. Mr. Gref stated that his family no longer used Mennen after 1993 or 1994. When Mr. Gref moved with his mom to Virginia in 1991, he stopped using powder daily, and used it weekly until he was 12 years old. He used the same brands of powder in Virginia. When he was around 12 he began using powder daily. He applied it to his groin region, under his arms, behind his knees, and to his neck. Mr. Gref used a container of powder every two to three weeks. Mr. Gref graduated from high school in 2001 and continued to use the powders, including Johnson and Johnson, Shower to Shower, Clubman and Old Spice, on a daily basis. After he moved to Florida in 2004 Mr. Gref continued to use powders by English Leather, Clubman, Johnson and Johnson and Shower to Shower. He used these powders until he was diagnosed with mesothelioma in 2019. Mr. Gref stated that he used the various powders interchangeably. He estimated he would go through around 6 containers of Clubman talcum powder a year. He had to clean up the bathroom after he used the powder, around two to three times a month. He estimated over his lifetime he used dozens of bottles of Clubman talc over the years he used powder. He used several dozen bottles of English Leather talc, and ten to twelve bottles of Old Spice (during the period of 1994-1999/2000)]. He also mentioned using Imperial Talc.

Mr. Gref's father, Roger Gref, noted that he used Johnson's Baby Powder or Mennen when he changed his son's diapers. He also applied talcum powder after Mr. Gref was bathed. His mother, Karen Nappi recalled using Mennen, Clubman, Shower to Shower, Old Spice, Johnson and Johnson's Baby Powder, and English Leather on her son. When she and Mr. Roger Gref were stationed in Cuba, her father would send packages that included talcum powder for her to use on Mr. Gref, who was age 3 months to 3 years. She used various powders when she was changing his diaper, and then after his bath. Ms. Nappi used powder on Mr. Gref until he was around 7-8 years old, when Mr. Gref began bathing independently. In Cuba she used three to four containers once a month for 30-36 months. Over the years from 1982-1987, Ms. Nappi estimated that she used 5-7 bottles each of the various talcum powders on her son. She estimated that she bought around 5-7 bottles of Mennen and the other powders when Brian was 7-11 years old. He used more after he was around 11. Similarly, she bought additional bottles of the various talcum powders for him more frequently after he reached puberty, around 11 or 12, and he continued to use a variety of powders.

*Conclusion:* Mr. Gref has malignant mesothelioma of the peritoneum as a result of his cumulative exposure to asbestos. His parents noted that they used talcum powders on Mr. Gref from birth, including Mennen, Clubman, Shower to Shower, Old Spice, Johnson's

Baby Powder and English Leather. Mr. Gref continued to use talcum powders until 2019, for a total of 36 years. Mr. Gref has undergone chemotherapy and cytoreductive surgery.

The methodology and basis for my opinions follows standard methods of the medical and scientific community and have been described in the peer reviewed literature including by Bradford-Hill, Lemen, and Welch. Asbestos is the most well known cause of mesothelioma, and the causation of mesothelioma has been established by the quantitative history of exposure to asbestos. Thousands of individuals, from myriad professions and exposure situations have developed mesothelioma as a result of either direct or indirect exposure to asbestos. The reliance on the history of exposure to asbestos was used by seminal studies by Newhouse, Wagner and Selikoff in the 1960s, who attributed mesothelioma to asbestos exposure based solely on the history of exposure. The increased risks for mesothelioma exist for individuals who both directly handled asbestos products and for those who worked adjacent to or were in the vicinity of others who were using asbestos products, which is known as "bystander" exposure.

_Asbestos and Malignant Mesothelioma General Opinions:_ Occupational Medicine is the field of medicine that deals with exposures to substances, toxins, conditions and agents in the workplace that are associated with increased risks of diseases. It exists as a subspecialty of Preventive Medicine that deals with identifying ways to prevent people from becoming ill. This includes identifying the sources, agents or catalysts that increase the likelihood of someone developing a disease, illness, or detrimental condition, and educating people on how to eliminate, avoid, and/or mitigate those risks. To put it simply, Occupational Medicine and Preventive Medicine involves searching for and identifying causes of diseases. This knowledge is important for those who are already ill: elimination of the catalysts can eliminate or mitigate the illness. It is also important from a public health point of view: to a large extent, the higher purpose of Occupational Medicine and Preventive Medicine is to educate and warn the public on how to eliminate, avoid, or mitigate the risks of diseases at the workplace, and to provide guidance to governments and businesses on appropriate regulations and standards concerning workplace health and safety.

One of the essential tasks of a physician of Occupational Medicine, when dealing with an individual patient, is the taking of a proper occupational history. Standard medical histories usually involve the patient explaining their reason for seeking medical attention; a listing of current symptoms, conditions, allergies, medications and other relevant medical problems; and providing some family and social history. Occasionally, a standard medical history may-but doesn't always-include identifying the patient's occupation.

A full occupational history, on the other hand, will go into details of a patient's entire work history, including details concerning their tasks and duties and their working conditions and environment. The history will also routinely make inquiries into the patient's home or hobbies. It would also reveal what kinds of substances or agents the patient was exposed to in his or her working environment that might have occurred decades earlier. It remains the standard tool for determining exposure and has not been supplanted by quantitative measurements, which are rarely obtained, and would not, unless continuously performed on an individual (which is not feasible), fully address all exposures

*Dr. J. Moline-Gref report*                                                          *Page 8 of 23*

an individual might have had. At times, it is not possible to directly obtain an occupational history from an individual, and information concerning work and environmental experiences contained in deposition transcripts by plaintiffs, co-workers and family members can provide detailed information of that type that can be elicited from an occupational physician-obtained history.

The hallmark of occupational medicine is to connect an exposure to a hazardous substance to a disease, and identify whether there is a causal relationship. This is a critical differentiation in the field of occupational medicine; not only do we treat patients for disease, but we emphasize what hazardous substance might be causing the disease. In occupational medicine training, there are core areas of training, including epidemiology, biostatistics, toxicology, and industrial hygiene.

_Asbestos and Disease:_ Asbestos is a naturally occurring mineral that has been used commercially for a variety of purposes for over 100 years. Asbestos is mined in the form of microscopic fibers released from the surrounding earth. Asbestos was extremely useful from an industrial perspective: it is highly resistant to heat and therefore serves as an excellent insulator and friction surface. It is also very durable, and as a fiber it can be molded into shapes and products that serve a variety of functions. However, asbestos is also highly toxic and carcinogenic when the fibers are inhaled or ingested.

While there are many "fiber types" of asbestos, as well as different sizes of the fibers, there exists consensus among scientists that exposure to _any_ asbestos fiber type or size increases the likelihood of lung cancer, mesothelioma, as well as nonmalignant lung and pleural disorders. Asbestos fibers are generally divided into two categories: amphiboles and serpentine (or chrysotile). There are several varieties of amphiboles, including both commercial and non-commercial types. The three major asbestos types used in industry have been chrysotile, amosite and crocidolite. Of these three fiber types, over 95% of all asbestos used in the United States has been chrysotile. Much of the chrysotile asbestos that was used in the US was mined in Canada, where there was contamination with small amounts of tremolite, another type of amphibole asbestos. The mainstream scientific community has also long recognized, and continues to recognize today, that there is no "safe" level of exposure to asbestos regardless of fiber type or size. This position is shared by numerous United States government agencies, including the Occupational Safety and Health Administration ("OSHA", which has regulatory authority over workplaces), the Environmental Protection Agency ("EPA" which has regulatory authority over non-occupational settings), the National Institute for Occupational Safety and Health ("NIOSH", which is responsible for conducting research and making recommendations for the prevention of work-related injuries and illnesses), the World Trade Organization ("WTO"), and the national academies of science of every major industrialized nation. The World Health Organization recently reviewed the existing literature and concluded (in 2014) that all fiber types are capable of causing asbestos related disease, including mesothelioma, and reiterated the statement that there is no safe level for exposure to asbestos.

Due to the ubiquitous use of asbestos and its presence in naturally occurring formations, there is asbestos in the ambient air in the United States, albeit at minute levels. The ambient air concentration or "background level" has been reported to be approximately 0.00001 f/cc. These levels are thousands of times less than the current OSHA permissible exposure level of 0.1 f/cc. While it is theoretically possible to develop mesothelioma from ambient air concentrations, it has not been proven to occur at levels at or below ambient air concentrations. Given that there is no truly "unexposed" population, it would be impossible to reasonably perform such a study to determine if this were the case.

**State of the Art (Brief)**:

In 1898, Montague Murray described interstitial fibrosis in an individual exposed to asbestos. Pancoast described radiographic changes of interstitial fibrosis in asbestos workers in 1917. Cooke described two cases of asbestosis in the 1920s, and actually used the term "asbestosis" to describe the interstitial fibrosis among asbestos workers, and also noted pleural plaques (fibrosis) in these workers.

In 1930, Merewether and Price, in their *Report on the Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry,* noted that inhaling dust containing asbestos fibers could lead to disabling and fatal lung disease. They studied asbestos workers in the textile mills in Great Britain, and noted that asbestosis could occur in large numbers of exposed individuals. Moreover, they found that the textile workers with the highest exposures had more asbestosis than workers in areas where asbestos exposure was lower. Merewether and Price noted that asbestos was a potential hazard to health in any industry where dry asbestos products were abraded or otherwise manipulated to generate dust, such as thermal insulating. They recommended warning, education and training of all those individuals who were exposed to asbestos.

Lynch and Smith noted a case of lung cancer in an asbestos worker from South Carolina in 1935. Textbooks in the 1930s, such as A.J. Lanza's textbook on dust disease, included asbestosis as a disease of concern. In 1943, the first case of mesothelioma was associated with asbestos exposure and was published by Wedler in Germany. Also in 1943, Hueper from the United States Public Health Service stated that he believed asbestos caused lung cancer. He published an editorial stating this association in the Journal of the American Medical Association in 1949.

In 1955, Doll published a seminal article that described the increased risk of lung cancer among asbestos exposed workers. By the time of Doll's epidemiology study, there had been over 60 cases of asbestos-related lung cancer published in the literature. In 1960, Wagner et.al. published a study of 33 cases of malignant mesothelioma among individuals who were exposed to asbestos in and around the crocidolite mines in South Africa. Not only were miners developing disease, but family members, individuals on the wagon routes in which the asbestos was carried and people who had played with mine tailings as children developed mesothelioma. In the early 1960s, numerous studies in several countries, under different exposure scenarios, were published that showed mesothelioma in association with

*Dr. J. Moline-Gref report*                                                    *Page 10 of 23*

asbestos exposure. In fact, by the end of 1964, over 700 scientific articles had been published that showed the adverse health effects of asbestos.

**Asbestos Related Disease:**

*The Development of Diseases:* When asbestos is inhaled, some proportion of the fibers can be deposited upon any component of the respiratory tract, including the nose, pharynx, conducting airways and the alveolar or gas exchanging regions of the lung. Fibers that land initially on the airways and above are cleared rapidly from the lung. The primary defense mechanism that mediated this clearance is known as the mucociliary escalator. The escalator is comprised of collated and mucous producing epithelial cells that propel inhaled fibers up to the mouth where they can be swallowed or expectorated. These epithelial lining cells are the "target cells" for cancers. Fibers that evade the mucociliary escalator can penetrate into the lower airways and lung tissue, where they can be transported through the body. Amphibole fibers tend to clear from the lung less rapidly than chrysotile fibers. Asbestos is cleared through the pulmonary lymphatics to lymph nodes and to the pleura, the target organ for pleural mesothelioma. Of the different fiber types, Suzuki, Sebastien and LeBouffant have all shown that chrysotile fibers preferentially translocate to the pleural space.

*Asbestosis:* The fibers that are inhaled and deposited past the escalator can cause asbestosis. These fibers deposit initially on the Type 1 and Type 2 alveolar epithelial cells. On the epithelial surfaces, some asbestos fibers activate the 5th complement which attracts inflammatory cells, including foreign particles, like asbestos, from the lung. About 20% of the fibers deposited on the alveolar surfaces are enveloped by the Type 1 cells and are translocated to the underlying connective tissue (interstitial) compartment. There, the fibers can interact with interstitial fibroblasts, myofibroblasts and macrophages. Fibroblasts and myofibroblasts are the target cells for asbestos because these are the cells that synthesize and release the scar tissue matrix. (See Y. Suzuki & N. Kohyama, *Translocation of Inhaled Asbestos Fibers from the Lung to Other Tissues.,*19 Am J. Indus, Med. 701 (1990); Y. Suzuki & N. Kohyama, *Translocation of Inhaled Asbestos Fibers from the Lung to Other Tissues., 19* Am J. Indus, Med. 701 (1991)). They produce scar tissue when the epithelial cells are injured and when the macrophages are activated. Alveolar cells and macrophages release a number of protein growth factors that stimulate the fibroblasts to multiply and produce scar tissue and the fibroblasts and myofibroblasts also synthesize a similar array of factors that induce their own cell growth and matrix production that we recognize as asbestosis. Like *all* of the asbestos-related diseases, asbestosis is dose dependent. An individual typically needs long-term occupational exposure to develop clinical asbestosis.

The scarring process described above begins as soon as inhaled fibers are deposited on the alveolar surfaces, and microscopic asbestosis is ongoing in the lungs of afflicted individuals for many years before any clinical signs or symptoms are presented. The initial physiological symptom of asbestosis is shortness of breath. This is caused by the scar tissue which replaces normal elastic connective tissue, this producing a stiff lung that restricts the individual from taking a deep breath. Shortness of breath also results when scar tissue

thickens the alveolar-capillary membrane, the barrier across which oxygen and carbon dioxide gases are exchanged.

_Pleural Plaques and Fibrosis:_ This is scar tissue formation in an identical manner to that described above, under asbestosis. The difference is that there is little direct deposition of asbestos fibers in the pleura. While some fibers can be inhaled through the alveolar ducts and reach the pleura directly, most fibers that land on alveolar surfaces and reach the interstitial compartment have direct access to the pleura do so by way of pulmonary lymphatic flow. The inhaled fibers that land on alveolar surfaces and reach the interstitial compartment have direct access to lymphatic fluids which flow through these regions on the way to the pleura. The lymphatic flow carries fibers to the pleura where they interact with the sub-mesothelial fibroblasts that produce a scar tissue matrix, as described above. If the scarring is in a circumscribed pattern, the scarring is called "plaque". Investigators have shown that this injury can result in a restrictive lung disease in some individuals.

_Lung Cancer:_ These tumors caused by asbestos typically arise in cigarette smokers, although some epidemiologic studies on asbestos-exposed non-smokers show an increased risk of developing the disease. When an individual is exposed to the cancer-causing agents (carcinogens) of both cigarettes and asbestos, the risk of getting lung cancer is increased well beyond the risk presented by exposure to either agent alone or by simply adding the risks of the two carcinogens. Epidemiologists multiply the risks of the two carcinogens since there is a clear synergy in the way asbestos and cigarette smoke combine to cause lung cancer.

Cancer is the loss of control of cell growth. Every cell in the bodies of humans and animals is under strict genetic control of the rate at which a given cell replaces itself by dividing. Cancer is caused when the specific genes that control cell division and other aspects of the cell cycle develop errors or mutations. Carcinogens induce such errors, and complete carcinogens can produce the errors with no other agent required. Cigarette smoke has a number of complete carcinogens, and all of the asbestos varieties have been shown to act as complete carcinogens. Thus, as the airway epithelial cells of the mucociliary escalator are assaulted daily by cigarette smoke and asbestos fibers, a number of cells are injured, and many exhibit genetic errors through the lifespan of the individual. In those who are susceptible to developing a cancer, one of those injured cells accumulates a sufficient number of genetic errors in genes that control cell growth to finally, after decades of exposure, lose the normal growth pattern and grow into a malignant tumor. (See Frost G, Darton A, Harding AH. _The effect of smoking on the risk of lung cancer mortality for asbestos workers in Great Britain (1971-2005)_ Ann Occup Hyg 55:239-24 (2011)).

_Mesothelioma:_ This cancer occurs when mesothelial cells of the pleural or peritoneal surfaces develops a sufficient number of genetic errors in a set of genes that control cell growth, as described above. Cigarette smoking has no influence on the development of mesothelioma. (See N.S. Offermans, et. al., _Occupational Asbestos Exposure and Risk of Pleural Mesothelioma, Lung Cancer, and Laryngeal Cancer in the Prospective Netherland Cohort Study,_ 56 J. Occupational Envt'l Med. 1 (2014); Robinson BM. _Malignant pleural_

*mesothelioma: an epidemiological perspective,* 1 Annals Cardiothoracic Surgery 491 (2012)).

Asbestos exposure is the only known occupational and/or environmental cause of mesothelioma in North America, and all of the asbestos varieties induce the genetic errors described above and cause this cancer. The fibers that cause mesothelioma reach the pleural surfaces through the lymphatic pathways, as explained earlier, and they interact with the target cells of the mesothelial surfaces. When a sufficient number of genetic errors have accumulated in a single mesothelial cell, this cell can undergo neoplastic transformation and grow into a deadly tumor. It typically takes many decades for a sufficient number of mutations to occur in a single mesothelial cell because of the numerous effective defense mechanisms that destroy genetically defective cells, thus explaining the long latencies known for this cancer. However, shorter latency periods have been reported in the literature, and latency period is measured as the time from first exposure; all additional exposures to asbestos are cumulative.

All of the asbestos varieties have been shown to cause genetic errors and fibers less than five microns can bind DNA and this contributes to the development of genetic damage. Short fibers have been found to accumulate in the pleural regions of the lung as well as in mesenteric lymph nodes of the peritoneal cavity. Longer fibers may be comparatively more dangerous than short fibers (on a fiber per fiber basis), but all size ranges are capable of causing and contributing to the development of mesothelioma or any of the asbestos-related diseases. Exposure to asbestos fibers of all types and lengths are toxic, and short fibers more readily reach the mesothelial target cells of the pleura. (See Y. Suzuki & S. R. Yeun, *Asbestos Fibers Contributing to the Induction of Human malignant mesothelioma.,* 982 Annals N.Y. Acad. Sci. (2002); Y. Suzuki, et al. *Short thin asbestos fibers contribute to the development of human malignant mesothelioma: pathological evidence.,* 208 Int'l. J. Hygiene Env. Health 201 (2005)). Some have suggested that geological nomenclature – calling the anthophyllite and tremolite in the talc either "non-asbestiform" or "cleavage fragments" – has biological significance. This notion has been rejected by the EPA, US Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry USGS (United States Geological Survey), and American Thoracic Society, and most recently by the FDA Working Group, and is not a distinction that is considered medically important. The Finnish Institute of Occupational Medicine (2019) provided a definition of asbestos that states that "asbestos fibers with a thickness of 3 micrometers or less and a length of 5 micrometers or more cause a risk of cancer and pulmonary diseases when inhaled, regardless of whether they have been formed as a result of a geological process metamorphism or in an industrial process, such as in mining operations." In fact, mesotheliomas have been documented among New York State miners and millers of talc containing approximately 50% "non-asbestiform" anthophyllite and tremolite. Asbestos related diseases have also been found at the Italian and Vermont talc mines and mills. The absence of documented cases of mesothelioma among one cohort of miners and millers of talc containing less than 1% the tremolite and anthophyllite (such as the Rubino, Coggiole, and Pira Italian studies of talc miners and millers) is most likely due to an inadequate sample size, selection criteria, and the manner in which the data has been reported. (US EPA Region 9 Response to the 2005 National Stone, Sand and Gravel

*Dr. J. Moline-Gref report*                                                                 *Page 13 of 23*

Association Report, April 20, 2006; RT Vanderbilt Co., MSDS, May 1, 1975; Roggli, et.al. *Tremolite and Mesothelioma.* Ann Occ Hyg 46(5):447-453 (2002); Lamm, *Similarities in Lung Cancer and Respiratory Disease Mortality of Vermont and New York State Talc Workers;* Epidemiology-Fibers, 1576-1581 (1988), Mirabelli, *Letter on "Cosmetic Talc as a Risk Factor for Pleural Mesothelioma: a Weight of Evidence Evaluation of the Epidemiology;* Inhal Toxicol 29(8):341 (2017)). Mirabelli noted a case of mesothelioma in a 79 year old man who was a maintenance worker who worked at the Italian talc mill from 1947-1957 (Mirabelli D, Letter on: "Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology, Inhal Toxicol 29(8):341 (2017). A mesothelioma in Johnson & Johnson's consumer product division worker population has been reported. This individual's exposure in the consumer product division would be more analogous to what a consumer of talcum powder products would experience than a miner or miller's exposure. Johnson & Johnson's own internal records document many dozen mesotheliomas with Johnson & Johnson associating the possible cause to be exposure to its talcum powder products.

Fibers of all lengths can bind to DNA and cause genetic errors that are required in the causation of cancer such as mesothelioma. Fiber burden studies of mesothelioma patients show a preponderance of chrysotile asbestos within the tumor tissue. Since the target location of mesothelioma is the pleura, the lung burden of asbestos does not reflect the fact that asbestos has moved from the lung to the pleura, where it can cause the mesothelioma to develop. (See Ronald F. Dodson, *Analysis and Relevance of Asbestos Burden in Tissue, in Asbestos: Risk Assessment, Epidemiology and Health Effects.* Risk Assessment, Epidemiology and Health Effects 78 (2d, ed. 2011); M. Silverstein, et al., *Developments in Asbestos Cancer Risk Assessment.* Am J. of Indus. Med. (2009)).

Moreover, there is ample evidence to support the conclusion that exposure to the asbestos fibers typically used in brake linings-chrysotile fibers-can and does cause mesothelioma. This conclusion is supported by, among others, the American Conference of Governmental Industrial Hygienists, the American Thoracic Society, the Environmental Protection Agency, the International Agency for Research on Cancer, the National Toxicology Program, OSHA, the Consumer Products Safety Commission, the World Health Organization, and the World Trade Organization. The scientific consensus that all fiber types and sizes can cause mesothelioma is also reflected in the Consensus Report of the 1997 Helsinki Conference (discussed below) and publications from the American Cancer Society and the National Cancer Institute of the National Institutes of Health.

In essence, there exists a consensus among the overwhelming majority of medical and scientific professionals and organizations that asbestos fibers of any type or size can cause mesothelioma, including chrysotile fibers. (See Dodson, Ronald F. et al., *Asbestos Fiber Length as Related to Potential Pathogenicity: A Critical Review,* 44 Am J. Indus. Med. 291 (2003); D. Egilman, et al., *Exposing the "Myth" of ABC, "Anything But Chrysotile: A Critique of the Canadian Asbestos Mining Industry and McGill University Chrysotile Studies.* 44 Am J. Indus. Med. 540 (2003); David S. Egilman & Marion Billings: *Abuse of Epidemiology: Automobile Manufacturers Manufacture a Defense to Asbestos Liability,* 11 Int. J. Occupational Envtl Health 360 (2005). 11:360-371; Egilman D. *Fiber*

*Dr. J. Moline-Gref report*                                                      *Page 14 of 23*

**JA133**

*Types, Asbestos Potency, and Environmental Causation.* 15 Int. J. Occupational Envtl. Health (2009); Finkelstein, M. *Asbestos Fiber Concentrations in the Lungs of Brake Workers: Another Look,* 52 Annals Occupational Hygiene 455 (2008); M.M. Finkelstein & C. Meisenkothen, *Malignant Mesothelioma among Employees of a Connecticut Factory that Manufactured Friction Materials Using Chrysotile Asbestos.* 54 Annals Occupational Hygiene 692 (2010); P.J. Landrigan, et al., *The Hazards of Chrysotile Asbestos, a Critical Review.* 37 Indus. Health 271 (1999); W.J. Nicholson, *The Carcinogenicity of Chrysotile Asbestos-A Review.* 39 Indus. Health 57 (2001); R.A. Lemen, *Chrysotile Asbestos as a Cause of Mesothelioma: Application of the Hill Causation Model.* 10 (2) Int. J. Occupational Envtl. Health (2004); *see also* R. Lemen, *Asbestos in Brakes: Exposure and Risk of Disease.* 45 Am. J. Indus. Med 229 (2004); EPA: *Guidance For Preventing Asbestos Disease Among Auto Mechanics.* (1986); A.H. Smith & C.C. Wright, *Chrysotile Asbestos is the Main Cause of Pleural Mesothelioma.* 30 Am. J. Indus. Med. 252 (1996); U.S. Dept. of Labor: *Working Safely with Asbestos in Clutch and Brake Linings.* (posting); U.S. Dept. of Labor, OSHA Directorate of Science, Technology and Medicine, Office of Science and Technology Assessment. *Asbestos-Automotive Brake and Clutch Repair Work*; World Health Organization, *Environmental Health Criteria 203: Chrysotile Asbestos.* International Programme on Chemical Safety (1998 Geneva)).

Asbestos fibers are very small; so small, in fact, that millions of fibers could fill the air in a room without anyone being able to perceive it with the naked eye. The fibers are odorless, cannot be seen with the naked eye, and are aerodynamic. Consequently, someone can inhale asbestos fibers without even being aware of it. The fibers are also small enough to pass through the normal respiratory defense mechanisms that the human body uses to keep out toxins and debris.

The Scientific community has even concluded that small amount of asbestos exposure can cause cancer. The Rodelsperger study indicates that exposure to asbestos below the Occupational Safety and Health Administration (OSHA) Permissible Exposure Level (PEL) of 0.1 fibers per cubic centimeter can cause disease. However, visible asbestos-laden dust that is released into the air from the manipulation of gaskets or packing, or that is reintroduced into the respirable zone from the process of sweeping the floor, is between 2.0 and 10.0 fibers per cubic centimeter. These levels far exceed the OSHA PEL. Some of these levels even exceed the OSHA PEL issued in 1972.

Government agencies and international organizations universally recognize asbestos as a carcinogen in low levels. These agencies include the International Agency for Research on Cancer, Environmental Protection Agency, OSHA, National Institute for Occupational Safety and Health, and World Health Organization. The inhalation of asbestos fibers also does not trigger any immediate physiological reactions: the victim doesn't experience any immediate irritation, asthmatic problems, or allergic reactions. Moreover, the latency, or development period, for mesothelioma is very long: the minimum latency period is usually considered to be around 10 years with a maximal latency period well over 60 years after the last exposure. There are some case reports of shorter latency periods; the idea of latency starts with the first exposure to asbestos, with additional exposures also contributing. Consequently, it could be decades before someone is aware

that he or she was exposed to asbestos, or it might have occurred so remotely that they do not realize they had asbestos exposure. Moreover, they may not realize that a product they used contained asbestos and thus are unaware they had exposure.

*The Helsinki Criteria for Attribution*: In January 1997, a conference called "Asbestos, Asbestosis and Cancer" was held in Helsinki, Finland. The conference was convened to establish criteria for diagnosis and attribution of disorders of the lungs and pleura, including mesothelioma. This was a multidisciplinary group of internationally recognized experts, consisting of pathologists, radiologists, occupational and pulmonary physicians, epidemiologists, toxicologists, industrial hygienists, and clinical and laboratory scientists specializing in tissue fiber analysis. Collectively, the members had published over 1,000 articles on asbestos and associated disorders. The conclusions of the conference were developed into a peer-reviewed Consensus Report that established the "Helsinki Criterion". Among the conclusions of the Helsinki Criterion are:

    a.  That, in general, reliable work histories provide the most practical and useful measures of occupational asbestos exposure; and

    b.  That even in the absence of other independent evidence of disease (e.g. lung fiber counts exceeding the background range for the lab in question; the presence of radiographic or pathological evidence of asbestos-related tissue injury; histopathologic evidence of abnormal asbestos content), a history of significant occupational, domestic or environmental exposure to asbestos will suffice for attribution of the disease with asbestos exposure.

    Moreover, with reference to determining an occupational etiology of mesothelioma, the Helsinki Criterion Consensus Report concluded that:

    a.  The great majority of mesotheliomas are due to asbestos exposure;

    b.  Mesothelioma can occur in cases with low asbestos exposures. However, very low background environmental exposures carry only an extremely low risk;

    c.  About 80% of mesothelioma patients have had some sort of occupational exposure to asbestos (necessitating a carefully obtained and detailed occupational history for proper diagnosis);

    d.  An occupational history of brief or low-level exposure should be considered sufficient for mesothelioma to be designated as occupationally related;

    e.  A minimum of 10 years from the first exposure is required to attribute mesothelioma to asbestos exposure (though in most cases, the latency interval is longer);

    f.  Smoking has no influence on the risk of mesothelioma.

    The conclusions of the Helsinki Criterion have since been adopted by, and form the general consensus of, the medical community's positions vis-à-vis mesothelioma and asbestos. (See *Consensus Report, Asbestos, asbestosis and cancer: the Helsinki criteria for diagnosis and attribution,* 23 Scandinavian J. Work Environ Health 311 (1997)). And, given the fact that about 80% of patients with mesothelioma have had some sort of

*Dr. J. Moline-Gref report*                                       *Page 16 of 23*

occupational exposure to asbestos,[1] asbestos exposure in the workplace is a prime focus of Occupational Medicine when dealing with mesothelioma patients.

*Mesothelioma is a dose responsive disease:* It is my opinion that Mesothelioma and asbestos related lung cancer are dose responsive diseases in which more substantial exposures directly increases the risk for the development of these cancers. This linear dose-response relationship presented in *Asbestiform Fibers: Non-occupational Health Risks,* published by the National Research Council National Academy of Sciences in 1984, discussed herein, is neither new nor novel and generally accepted in the medical and scientific communities. As per the aforementioned Helsinki criteria, the first question usually asked of a patient diagnosed with mesothelioma, concerns how, when, and where the patient was exposed to asbestos. (*See Consensus Report, Asbestos asbestosis and cancer: The Helsinki criteria for diagnosis and attribution.* 23 Scandinavian J. Work Environ Health 311 (1997)). Because of the proven association between asbestos fibers and mesothelioma, proof of significant exposure to asbestos dust is considered to be proof of specific causation. (*See* P. Boffetta, et al., *Health Effects of Asbestos Exposure in Humans: A Quantitative Assessment.* 89 (6) Medicina Del Lavoro, 471 (1998). This causal relationship between exposure to asbestos dust and the development of mesothelioma is so firmly established in the scientific literature that it is accepted as a scientific "fact".

Malignant mesothelioma is, in general, a dose response disease where all significant exposure to asbestos-containing dust has been shown to contribute to cause diffuse malignant mesothelioma including pleural mesothelioma (*See also* Newman, et al., *Malignant Mesothelioma Register 1987-1999.* 74 Int'l Arch Env. Health 383 (2001), (concluding that "higher cumulative asbestos-fiber dose leads to the earlier development of mesothelioma)). As each exposure to asbestos contributes to the total amount of asbestos that is inhaled, and, in doing so, reduces the necessary period for asbestos disease to develop. As a result, all non-trivial exposure to asbestos should be considered a contributing factor in the development of the malignant mesothelioma or lung cancer. More recently, the BAP-1 gene mutation has been found to confer increased susceptibility in individuals who have both the mutation and have asbestos exposure. There is no evidence that the genetic mutation of this tumor suppressor gene without asbestos exposure causes mesothelioma.

*Exposure to Asbestos contaminated talc and disease:* Asbestos fibers have been reported in cosmetic talcum powder for decades, in company documents, the media, FDA communications, and the published medical and scientific literature. In 1935 asbestos was identified as a source of exposure in talc miners and millers by Dreesen. By 1968 Cralley had described asbestos in consumer cosmetic talc products. By 1972, the cosmetic industry was looking for asbestos free alternatives to cosmetic talc. Cosmetic talc has been analyzed by researchers in various countries, and has routinely been shown to be contaminated with asbestos. In 1957, researchers at Battelle Memorial reported finding tremolite in Italian talc used by Johnson & Johnson. In 1968, Johns-Manville documented fibrous tremolite asbestos in consumer cosmetic talcum powder products. In 1972, Snider, et al., reported

---

[1] The remaining 20% of mesothelioma patients likely had asbestos exposures that were para-occupational or are simply unidentified.

*Dr. J. Moline-Gref report*                                          *Page 17 of 23*

finding asbestos in several consumer cosmetic talcum powder products, including Johnson's Baby Powder. That same year, Lewin of New York University reported finding asbestos in numerous talcum powder products including Johnson's Baby Powder purchased off the shelf. The University of Minnesota also found asbestos in Lewin's sample of Johnson's Baby Powder. In 1973, Lewin reported asbestos in Clubman talc. That same year, talc industry Round Robin testing reported asbestos in Italian, Montana, Alabama, and North Carolina talc sources. In 1974 Rohl, and in 1976, Rohl and Langer tested 20 consumer products that had been labeled as talc or talcum powder, including body powders. Of the 20 products that were tested, ten were found to contain tremolite and anthophyllite, principally asbestiform. Of note, the product that had the highest asbestos content in the Rohl and Langer study was the same product later tested by Gordon, et.al. Pooley, while consulting for Johnson & Johnson, also found anthophyllite in the Cashmere Bouquet Rohl and Langer studied. In 1979, Berg reported the presence of asbestos in the Montana talc mine deposits, the source of talc used to manufacture Clubman and included in Mennen talc. In 1991, Blount reported amphibole asbestos in talc from Vermont used to manufacture Johnson's Baby Powder. Mattenklott et. al. in 2007 found that low or trace levels of asbestos by weight in talcum powder (0.1 percent) released millions of asbestos fibers upon use. In 2015, Ilgren, et al. attributed the increased rate of mesothelioma in the chrysotile miners in Italy to the tremolite asbestos in the talc in the adjacent mining region. Recently, Saldivar under contract for FDA reported chrysotile asbestos in Johnson's Baby Powder.

Exposure to asbestos-containing talc has been shown to cause asbestos related diseases, including mesothelioma. A paper by Gordon, et.al., Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women, evaluated the mineralogical constituents of Cashmere Bouquet and its ability to release asbestos fibers into the breathing zone of the direct user and bystanders. In their paper Gordon et.al. noted that the talc that was used in Cashmere Bouquet was derived from three distinct regions, where anthophyllite and tremolite asbestos were found, regions from which the talc used in Johnson's Baby Powder was also sourced. Gordon et.al. measured 18 million anthophyllite asbestos fibers per gram in the talcum powder. Air measurements were done by both phase contrast microscopy (PCM) and transmission electron microscopy (TEM), and significant levels of asbestos fibers were noted (anthophyllite, tremolite and some chrysotile) in the breathing zone of the individual applying the powder as well as a bystander. Results taken from the experiment in the paper show that personal measurements from the shaker container test showed a measurement by PCM of 4.8 f/cc, with an actual asbestos fiber measurement of 1.8 f/cc. Bystander measurements showed a lower, but still significant exposure of 1.35 f/cc by PCM for the bystander, and 0.5 f/cc of actual asbestos fibers. Similar measurements were done with the puff application method. Personal measurements after using a puff were 23.6 f/cc and 16.5 f/cc for the user, with actual asbestos fiber measurements of 5 f/cc and 3.5 f/cc. A short term sample showed even higher measurements, of 60 f/cc with the use of a puff and actual asbestos fiber measurements of 13 f/cc. Bystander exposures to asbestos from the puff application were elevated, with a short term sample by PCM of 13.7 f/cc and 9.7 f/cc, and an actual asbestos fiber measurement of 4.9 f/cc and 3.5 f/cc. Gordon et.al. also noted that the TEM measurements were far more sensitive than x-ray diffraction detection, since there was a

much lower detection limit with TEM. In addition, the Mine Safety and Health Administration (MSHA) monitored personnel in the mill where Italian talc was ground (this talc was used in consumer products) in 1984. The filters form the personal measurements from these workers contained 5.8% anthophyllite. The MSHA scientist determined that this equated to anthophyllite comprising 0.6% of the bulk Italian talc. Dr. Steven Compton found asbestos (anthophyllite, tremolite, actinolite, and chrysotile) in 11 samples collected from the Italian mining region from which the talc originated that was then used in consumer products, including Cashmere Bouquet and Johnson's Baby Powder and others. Dr. Compton further found asbestos in 6 of 7 Argonaut Vermont talc mine samples and 4 additional samples collected on the mining property, as well as in samples of Montana talc provided to him by the manufacturer of Clubman.

Both historic and recent analyses (published in the medical and scientific literature as well as industry, government and private laboratory testing) of the talc from the source mines used in Johnson's Baby Powder and Clubman finished powder products, have shown significant amounts of chrysotile, anthophyllite and tremolite asbestos. Studies done recently from products using ore taken from the same source mines as those used in the manufacture of the Johnson's Baby Powder and Clubman, showed significant amounts of chrysotile, anthophyllite, and tremolite asbestos. The asbestos found in the ores is also found in the finished consumer products. Dr. William Longo from MAS found tremolite and anthophyllite, as well as chrysotile, in his analysis of historic and current Johnson's Baby Powder and Shower to Shower powder products, the same fiber types found in the historic testing records of Italian and Vermont talc ores and in historic testing records of Johnson's Baby Powder. Dr. Longo analyzed and reported on approximately 146 Johnson's Baby Powder and Shower to Shower products that were manufactured from the 1940s through the 2000s and provided to his laboratory from mesothelioma plaintiffs, off-the-shelf purchases, from collectors, and from Johnson & Johnson's own historic collection (72 obtained directly from Johnson & Johnson). Dr. Longo report regulated asbestos in 116 of the 146 (79%) containers of Johnson & Johnson talcum powder products. For Johnson & Johnson talcum powder products manufactured in the United States, Dr. Longo reported regulated asbestos in 88 of 112 containers (79%). For containers manufactured in the United States after 2003, Dr. Longo report asbestos in 37 of 40 (93%) of containers. Subsequent analyses have shown chrysotile present in Johnson's Baby Powder sourced from Chinese talc as well. MAS and MVA (Dr. Compton's laboratory) have analyzed and identified asbestos in hundreds of containers of talcum powder products and ore samples from varying vintages and sources.

Dr. Longo's laboratory has performed additional analysis to determine whether exposure from use of talcum powder below the waist (using Italian talc-sourced Johnson's Baby Powder), led to respirable levels of asbestos. Samples taken in the breathing zone of an individual during use of Johnson's Baby Powder below the waist, resulted in a mean tremolite fiber exposure of 2.57 fibers/cc. Area samples taken resulted in a mean tremolite fiber exposure of 0.2 fibers/cc. Dr. Longo's results were published in 2020 (Steffen, 2020). The cosmetic talc testing done by Dr. Longo and Dr. Compton, combined with published air measurements in the medical literature (Gordon 2014, Anderson 2016, Steffen 2020) all show measurements of asbestos that are orders of magnitude above the ATSDR

background level of 0.00005 f/cc. At the levels measured by these authors, the literature shows a substantially increased risk for disease at the cumulative levels of exposure (Iwatsubo, Rodelsberger, LaCourt).

Exposure data from talcum powder usage as compared to background is identified on the graph below:



# Asbestos Exposure From Cosmetic Talc

In addition to looking at bulk and air samples, Gordon et.al analyzed the lung tissue and lymph node tissue of a woman who had been exposed to contaminated talcum powder (Cashmere Bouquet). The authors found that there were 3150 and 4150 fibers per gram wet weight, respectively, with a detection limit of 690 fibers per gram wet weight. All fibers were 5 micrometers or greater in length, and had an aspect ratio of 20:1 or greater. The fibers were identified as anthophyllite or tremolite. In addition to the fibers counted above, there were many anthophyllite and tremolite fibers that were less than 5 micrometers in length, with a predominance of anthophyllite. In the lymph node, amphibole asbestos fibers were also noted, measuring 12,738 fibers per gram wet weight (detection limit 2123 fibers per gram wet weight). Again, the fibers noted were anthophyllite and tremolite. In addition to the asbestos found in the lungs, the authors noted fibrous and platy talc and small asbestos bodies.

The issue of asbestos and talc has been studied for decades. Millman in 1947 noted pneumoconiosis in a man exposed to cosmetic talc. Lung scarring was seen in miners from New York State in the 1950s, and there are elevated rates of mesothelioma and lung cancer in miners at the asbestos contaminated talc mines. Moskowitz 1970 reported a talc pneumoconiosis in a woman exposed to cosmetic talc while working as a quality control inspector on the production floor at Revlon for 11 years. The International Agency for Research on Cancer has noted that talc contaminated with asbestos is carcinogenic. Case

*Dr. J. Moline-Gref report*                                                          *Page 20 of 23*

reports published out of Italy have involved patients with mesothelioma and exposure only to cosmetic talcum powder (Andrione, 1994, Musti, 2009). In the fall of 2019, the FDA found asbestos contamination in Johnson's Baby Powder, leading to a recall of thousands of bottles of cosmetic talc. In 2018, OSHA found tremolite asbestos contamination in make-up products that contained cosmetic talc. I have recently published a paper, along with co-authors, that describes 33 cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc (Moline et al, 2019). Emory et al. (2020) has published a paper on an additional 75 individuals with mesothelioma whose source of asbestos exposure was cosmetic talc. Together, these papers show over 110 patients with mesothelioma and cosmetic talc use.

_Applying an Accepted Method for Evaluating Disease Causation in an Individual:_
In deciding whether Mr. Gref's mesothelioma was caused by his exposure to asbestos, I applied the methodology that was described by Welch, et.al. in her paper _Asbestos Exposure Causes Mesothelioma, but Not This Asbestos Exposure: An Amicus Brief to the Michigan Supreme Court_, published in 2007 in the International Journal of Occupational and Environmental Health. This method mirrors the Hill criteria, but is specific for asbestos (see also Lemen). Similar methodology for assessing causation for individuals exposed to asbestos who developed asbestos-related diseases was also outlined by Freeman. In this paper, Dr. Welch identifies four questions that should be examined in the causation of disease in an individual:

  1. Was the individual exposed to a toxic agent?
  2. Does the agent cause the disease present in the individual?
  3. Was the individual exposed to this substance at a level where the disease has occurred in other settings?
  4. Have other competing explanations for the disease been excluded?

For question #2, there is ample literature that asbestos causes mesothelioma and no dispute in the medical literature. With respect to question #1, Mr. Gref was exposed to asbestos from talcum powder for approximately 36 years, from birth continuing until around 2018, fulfilling this criterion. Clubman talcum powder, Mennen, Johnson's Baby Powder, Old Spice, and other talcum powders using talc from the same ore sources have been shown to contain asbestos, and Mr. Gref would have had asbestos exposure based on his family's descriptions of their use on him as well as his own descriptions of his powder use. For criteria #4, Mr. Gref had no known alternate exposures to asbestos. The remaining criterion, #3 is whether there is an analogous exposure scenario in which others also developed mesothelioma. As described above, and recently referenced by the Center for Disease Control, as well as published in the peer-reviewed literature, there are numerous other individuals with exposure to asbestos-containing talc products who have developed malignant mesothelioma.[2]

---

[2] Andrion, Alberto, et al. _Malignant Peritoneal Mesothelioma in a 17-Year-Old Boy with Evidence of Previous Exposure to Chrysotile and Tremolite Asbestos_, Human Pathology, Volume 25, No. 6 (June 1994); Bulbulyan, M.A., et al., _Cancer Mortality Among Women in the Russian Printing Industry_, AM J Ind Med, 36:166-171(1999); Finkelstein, M., _Malignant Mesothelioma Incidence Among Talc Miners and Millers in New York State_, Am J Indust Med 55, 863-868 (2012); Ghio, A, Roggli, V, _Talc Should Not Be Used for Pleurodesis in Patients with Nonmalignant Pleural Effusions_, Am J Respir Crit Care Med, Vol 164, No. 9,

_Dr. J. Moline-Gref report_                                            _Page 21 of 23_

**Summary and Specific Causation in Mr. Gref's Case**

Based on the information that was provided to me and the diagnosis of mesothelioma as outlined by his treating physicians, and applying both my understanding of the medical and scientific literature and the facts of this case, it is my opinion to a reasonable degree of medical certainty that the exposures to the dust from asbestos-contaminated cosmetic talc products that Mr. Gref used or were used on him, beginning approximately 36 years prior to his diagnosis, were above normal background levels. Both historic and recent analyses (published in the medical and scientific literature as well as industry, government and private laboratory testing) of the talc from the source mines used in Johnson's and Johnsons' Baby Powder, Old Spice, Mennen, Clubman talc have shown significant amounts of asbestos, including chrysotile, anthophyllite and tremolite asbestos.

Studies done recently on both Clubman talc products and on products using ore taken from the same source mines as those used in the manufacture of Clubman Talc showed significant amounts of chrysotile, anthophyllite, and tremolite asbestos. Dr. Compton found asbestos (primarily anthophyllite) in 6 different containers of Clubman talc manufactured with Montana talc. Recent testing of two Clubman samples showed tremolite/actinolite asbestos, ranging from 11.8 million fibers per gram in one container to 2.3 million fibers/gram in the other (although the latter measure is likely an underestimate due to a higher concentration of fibers initially noted on direct examination). Dr. Compton also identified asbestos in a Clubman container from a vintage prior to the use of Montana talc. Dr. Compton analyzed and identified asbestos in samples of Montana talc produced by the manufacturer of Clubman.

Studies by Dr. Longo have also identified asbestos in an Avon Night Magic container manufactured with Montana talc. While Mr. Gref did not use Avon products, the talc used came from the same region. Similarly, both Drs. Longo and Compton have identified asbestos in Cashmere Bouquet manufactured with Italian and Montana talc. These findings are consistent with both current and historic product testing of talcum powder products containing the same talcs (Cashmere Bouquet – 5/5 Montana talc from Beaverhead; Avon Night Magic – Montana; Clubman – 6/6 Montana talc from Barretts Minerals and Whittaker Clark & Daniels). Testing of Old Spice powders by Dr. Longo has shown asbestos in virtually every container evaluated as well. Similarly, Dr. Mark Kreleker has done a comprehensive review of testing of the ore and talcum samples over decades,

---

pp 1741 (2001); Fujiwara, Hiroshi, et al. *An Autopsy Case of Primary Pericardial Mesothelioma in Arc Cutter Exposed to Asbestos through Talc Pencils*, 43 Industrial Health 346-350 (2005); Ilgren E, et al., *Critical reappraisal of Balangero chrysotile and mesothelioma risk*, Epidemiology Biostatistics and Public Health, Vol. 12, No. 1 (2015); Lamm, S.H., et al., *Similarities in Lung Cancer and Respiratory Disease Mortality of Vermont and New York State Talc Workers*, Epidemiology-Fibers, 1576-1581, (1988); Mirabelli D, *Letter on: "Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology"*, Inhalation Toxicology, 29:8, 341 (2017); Musti, et al., *Exposure to Asbestos and Mesothelioma Risk of Onset of Primary Ovarian, Description of Two Cases*, (2009); Moline, Jacqueline, et al., *Mesothelioma Associated with the Use of Cosmetic Talc*, Journal of Occupational and Environmental Medicine, (2020); Emory, Theresa, et al., *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients*, Am J Ind Med, (2020).

*Dr. J. Moline-Gref report*                                              *Page 22 of 23*

documenting testing results showing that asbestos was repeatedly found, including in the Italian, Montana, Chinese and North Carolina sources.

Fiber release studies done recently by MVA Scientific Consultants and others from products using ore taken from the same source mines as those used in the manufacture of Johnson's Baby Powder and Mennen (which used the same talc as that used in Cashmere Bouquet) showed significant amounts of chrysotile, anthophyllite, and tremolite asbestos. MSHA found anthophyllite in the mills that processed the Italian talc. Similarly, Dr. Compton found anthophyllite in 11 of the 13 samples of talc ore from the Italian mines, from which the talc originated that, was then used in consumer products. As outlined above, MAS performed an additional analysis to determine whether exposure of talcum powder below the waist led to respirable levels of asbestos (using Johnson and Johnson Baby Powder). Their report stated that there was a mean tremolite fiber exposure of 2.57 fibers/cc during this activity. Dr. Longo has done extensive testing on Chinese talc, which was used in both Johnson's Baby Powder, and has found chrysotile asbestos in every sample he has evaluated. Dr. Longo has evaluated 91 containers of Cashmere Bouquet, and found asbestos in 79 of 91 containers.

Alternative powders not containing talc were available since the early 20th century. The opinions related to Mr. Gref's case are based on my review of the evidence of exposure in this case, the medical and scientific literature as described above regarding asbestos exposure and disease, available studies concerning fiber release, epidemiological studies of exposure to asbestos exposure and the development of disease, and my knowledge, skill, experience, and training as a physician specializing in occupational medicine with a clinical focus on evaluating individuals with asbestos exposure.

In conclusion, Mr. Gref's exposure to asbestos-contaminated talcum powder led to his diagnosis of peritoneal mesothelioma. He has undergone chemotherapy and cytoreductive surgery. There is no cure for mesothelioma, and his prognosis is poor.

Sincerely,

Jacqueline Moline, MD, MSc, FACP, FACOEM

# CURRICULUM VITAE

| | |
|---|---|
| **Date Prepared:** | 05/03/2021 |
| **Name:** | Jacqueline Moline, MD, MSc, FACP, FACOEM |
| **Office Address:** | 175 Community Drive, 2nd Floor, Suite 206, Great Neck, NY 11021 |
| **Work Phone:** | (516) 465-2639 |
| **Work Email:** | JMoline@northwell.edu |
| **Work FAX:** | (516) 465-2699 |

## Education

| 1984 | BA | History, Sci/Bio | University of Chicago |
|------|-----|------------------|-----------------------|
| 1988 | MD | Medicine | University of Chicago-Pritzker School of Medicine |
| 1993 | MSc | Community Medicine | Mount Sinai School of Medicine |

## Postdoctoral Training

| 07/1988 – 06/1991 | Resident | Internal Medicine | Yale University / Yale New Haven Hospital |
|-------------------|----------|-------------------|------------------------------------------|
| 07/1991 – 06/1993 | Resident | Occupational and Environmental Medicine | Mount Sinai School of Medicine / Mount Sinai Medical Center |
| 07/1993 – 06/1995 | Fellowship | Occupational Health and Research | Mount Sinai School of Medicine / Mount Sinai Medical Center |

## Faculty Academic Appointments

| 01/1993 – 12/1995 | Instructor | Community Medicine and Internal Medicine | Mount Sinai School of Medicine |
|-------------------|------------|------------------------------------------|--------------------------------|
| 01/1996 – 12/2004 | Assistant Professor | Community and Preventive Medicine, and Internal Medicine | Mount Sinai School of Medicine |
| 01/2005 – 04/2010 | Associate Professor | Community and Preventive Medicine, and Internal Medicine | Mount Sinai School of Medicine |
| 04/2010 – 11/2014 | Associate Professor | Population Health and Internal Medicine | Hofstra Northwell School of Medicine |
| 04/2010 – Present | Clinical Associate Professor (Adjunct) | Preventive Medicine | Mount Sinai School of Medicine |
| 11/2014 – 04/2015 | Associate Professor | Occupational Medicine, Epidemiology & Prevention, and Internal Medicine | Hofstra Northwell School of Medicine |
| 04/2015 – Present | Professor | Occupational Medicine, Epidemiology & Prevention, and Internal Medicine | Donald & Barbara Zucker School of Medicine at Hofstra/Northwell |

## Appointments at Hospitals/Affiliated Institutions

| 01/1994 – 04/2010 | Assistant Attending | Internal Medicine | Mount Sinai Medical Center |
|-------------------|---------------------|-------------------|----------------------------|
| 04/2002 – 06/2004 | Medical Core Director | World Trade Center Worker & Volunteer Program | Mount Sinai School of Medicine |
| 01/2002 – 04/2010 | Vice Chair | Community and Preventive Medicine | Mount Sinai Medical Center |

Page 1 of **32**

JA143

| 07/2004 – 06/2006 | Clinical Services Director and Co-Principal Investigator | World Trade Center Medical Monitoring Program | Mount Sinai School of Medicine |
|---|---|---|---|
| 07/2006 – 04/2010 | Principal Investigator | World Trade Center Medical Monitoring & Treatment Program | Mount Sinai School of Medicine |
| 05/2010 – 11/2014 | Chair | Population Health | Hofstra Northwell School of Medicine, North Shore University Hospital, and Long Island Jewish Medical Center |
| 05/2010 – Present | Member | Long Island Jewish Medical Center Medical Board | Long Island Jewish Medical Center |
| 05/2010 – Present | Member | North Shore University Hospital Medical Board | North Shore University Hospital |
| 07/2011 – Present | Director | World Trade Center Clinical Center of Excellence at Long Island Jewish Medical Center | Northwell Health |
| 01/2012 – Present | Clinical Investigator | Patient Oriented Research | Feinstein Institute for Medical Research, Northwell Health |
| 04/2013 – Present | Director | Occupational & Environmental Medicine of Long Island (OEMLI) | Northwell Health |
| 11/2014 – Present | Chair | Occupational Medicine, Epidemiology & Prevention | Donald & Barbara School of Medicine at Hofstra/Northwell, North Shore University Hospital, and Long Island Jewish Medical Center |
| 09/2020 – Present | Head | The Center for Occupational Medicine & Epidemiology | The Feinstein Institutes for Medical Research, Northwell Health |

## Other Professional Positions

| 1992 – Present | Consultant | United Federation of Teachers |
|---|---|---|
| 1995 – 2010 | Member | Faculty Practice Associates Assembly, MSSM |
| 1998 | Co-Chair | Hazardous Substances and Male Reproductive Health – An International Conference, New York, NY |
| 1998 – 2010 | Coordinator | Occupational Medicine Training for Primary Care Residents, North General Hospital |
| 1999 – 2010 | Assistant Director | Pediatric Environmental Health Specialty Unit |
| 2000 – 2004 | Physician Panel | Department of Energy (appointed by the National Institute for Occupational Safety and Health) |
| 2007 - 2010 | Member | Medical Board, Mount Sinai Hospital |
| 2010 – 2012 | Member | Safety & Occupational Health Study Section, NIOSH, CDC, DHHS |
| 2010 – Present | Member | NY/NJ Education and Research Center Advisory Board |
| 2013 – 2017 | Ad hoc Reviewer/ Chair | Occupational Health & Training Study Sections, NIOSH, CDC, DHHS |
| 2012 – Present | Member | Hofstra University Bioethics Center |
| 2015 – Present | Chair | Health & Wellness Committee, Fireman's Association of the State of New York (FASNY) |
| 2016 – 2017 | Member | Health and Wellness Committee for Suffolk County Employees |
| 2017 – Present | Advisory Council Member | New York State Workers' Compensation Board |

**Major Administrative Leadership Positions**

**Local**

| | | |
|---|---|---|
| 1993 - 1994 | Coordinator<br>Occupational Medicine Residency Program | Mount Sinai School of Medicine<br>Division of Environmental and Occupational Medicine |
| 1993 – 1997 | Co-Director<br>Environmental Health Research Training Summer Program<br>Medical Students | Mount Sinai School of Medicine<br>Funded by National Institute of Environmental Health Sciences |
| 1994 - 1998 | Co-Director<br>Occupational Medicine Residency Program | Mount Sinai School of Medicine<br>Division of Environmental and Occupational Medicine |
| 1997 – 2010 | Director<br>Environmental Health Research Training Summer Program<br>Medical Students | Mount Sinai School of Medicine |
| 1998 – 2006 | Director<br>Occupational Medicine Residency Program | Mount Sinai School of Medicine<br>Division of Environmental and Occupational Medicine |
| 2005 – 2010 | Track Director | Mount Sinai School of Medicine<br>Master of Public Health Program<br>Occupational and Environmental Medicine |

**Regional**

| | | |
|---|---|---|
| 2005 – 2010 | Director | NY/NJ Education and Research Center |
| 2002 – 2010, &<br>2011 – Present | Member | World Trade Center Health Program Steering Committee |

**Committee Service**

**Local**

| | | |
|---|---|---|
| 1996 – 2010 | Residency Advisory Committee | New York Hospital-Cornell Medical Center Preventive Medicine Residency |
| 2001 – 2002 | Member | Chancellor's Committee on Environmental Safety<br>New York City Department of Education |
| 2002 – 2004 | President | Occupational Medicine Residency Directors Association |
| 2004 - 2010 | Chair | Teaching Committee<br>Department of Community and Preventive Medicine<br>Mount Sinai School of Medicine |
| 2005 – 2010 | Member | Biosafety Committee, Mount Sinai School of Medicine |
| 2006 – 2010 | Clinical Advisor | The New York City Department of Health and Mental Hygiene |
| 2006 – 2010 | Member | Academic Advisory Committee - Masters of Public Health, Mount Sinai School of Medicine |
| 2006 – 2010 | Member | Admissions Committee - Masters of Public Health, Mount Sinai School of Medicine |
| 2008 – 2010 | Chair | Student Promotions Committee<br>Mount Sinai School of Medicine |
| 2008 – 2010 | Member | Executive Admissions Committee<br>Mount Sinai School of Medicine |
| 2008 – 2010 | Member | Office for Women's Careers Advisory Committee<br>Mount Sinai School of Medicine |
| 2010 – Present | Member | Mount Sinai Occupational Medicine Residency Advisory Committee |
| 2011 – Present | Member | Admissions Committee<br>Hofstra Northwell School of Medicine |
| 2011 – Present | Member | Master of Public Health (MPH) Advisory Committee<br>Hofstra University |

Page **3** of **32**

| 2012 – Present | Member | Physician Partners Chairs Affairs Committee<br>Northwell Health |
| 2012 – Present | Member | ECRIP Review Committee<br>Northwell Health |
| 2013 | Chair | Internal Review Committee, 1199-NBF Wellness Projects |
| 2013 – Present | Member | Diversity, Inclusion & Health Literacy Physician Council<br>Northwell Health |
| 2014 | Member | Liaison Subcommittee on Medical Education<br>Donald & Barbara Zucker School of Medicine at<br>Hofstra/Northwell |
| 2014 | Member | Clinical Research Executive Committee<br>Feinstein Institute for Medical Research<br>Northwell Health |
| 2014 – Present | Member | Cancer Center-NCORP Steering Committee<br>Donald & Barbara Zucker School of Medicine at<br>Hofstra/Northwell |
| 2014 – Present | Member | Wellness Advisory Committee<br>Northwell Health |
| 2015 – Present | Member | Lung Cancer Research Group<br>Northwell Health |
| 2016 – Present | Member | Workers' Compensation Steering Committee<br>Northwell Health |
| 2016 – Present | Member | Physician Partners Board of Governors<br>Northwell Health |
| 2017 – Present | Medical Advisor | Food and Nutrition Transformation<br>Northwell Health |
| 2018 – Present | Chair | Physician Wellbeing Committee<br>Northwell Health Physician Partners |
| 2020 – Present | Member | Clinical Advisory Council<br>Northwell Health |

**Regional**

| 2001 – 2006 | Member | Johns Hopkins Occupational Medicine Resident Advisory<br>Committee |
| 2002 – 2008 | Member | Workers' Compensation and Occupational Health, Injury<br>Prevention and Control, and Physical Medicine and<br>Rehabilitation (WCOH, IP&C, and PM&R) Committee, The<br>Medical Society of New York |
| 2012 – 2013 | Member | New York State Workers' Compensation Board Medical<br>Advisory Committee |
| 2012 – Present | Member      Member | Long Island Federation of Labor's Health & Safety Committee |
| 2016 – 2020 | Member | Mid-Atlantic Regional Committee in Occupational &<br>Environmental Medicine (MARCOEM) Scientific Committee |
| 2020 – Present | Executive Board Member | Mid-Atlantic Regional Committee in Occupational &<br>Environmental Medicine (MARCOEM) |

**National and International**

| 2000 – 2002 | Secretary/Pres-Elect | Occupational Medicine Residency Directors<br>Association |
| 2007 - 2008 | Planning Committee Member | AOHC Annual Conference 2008 Planning Committee, New<br>York, NY |
| 2013 – 2018 | Co-Chair | Partnership for Quality Care (PQC), Immunization of<br>Healthcare Workers Against Influenza |
| 2014 – 2017 | Committee Member | National Quality Forum (NQF)<br>Health and Well-Being Steering Committee |

| 2021 – Present | Committee Member | Central Department of Energy Institutional Review Board (CDOEIRB) |

**Professional Societies**

| 1988 – Present | Member | Alpha Omega Alpha Honor Society |
| 1991 – Present | Fellow | American College of Physicians |
| 1991 – Present | Member | American Public Health Association |
| 1992 – Present | Fellow | American College of Occupational and Environmental Medicine |
| 1993 – Present | Member | Medical Society of the State of New York Environmental Committee |
| 1994 – Present | Member | New York Academy of Medicine |
| 1995 – Present | Member | American Medical Women's Association |
| 2012 – 2016 | Executive Board Member | New York Occupational & Environmental Medical Association (NYOEMA) |
| 2016 – 2017 | Treasurer | New York Occupational & Environmental Medicine Association (NYOEMA) |
| 2017 – 2018 | Secretary | New York Occupational & Environmental Medicine Association (NYOEMA) |
| 2018 – 2019 | Vice President | New York Occupational & Environmental Medicine Association (NYOEMA) |
| 2019 – 2020 | President | New York Occupational & Environmental Medicine Association (NYOEMA) |
| 2020 – Present | Executive Board Member | New York Occupational & Environmental Medicine Association (NYOEMA) |

**Editorial Activities**

| 1993 – Present | Reviewer | American Journal of Industrial Medicine |
| 1993 – Present | Reviewer | Environmental Research |
| 1994 – Present | Reviewer | Journal of Occupational & Environmental Medicine |
| 1999 – Present | Contributing Editor | American Journal of Industrial Medicine |
| 2012 – Present | Reviewer | Journal of the American Medical Association (JAMA) |
| 2012 – Present | Editor | Conference Papers in Medicine |
| 2013 – 2016 | Editorial Board | Advances in Epidemiology |
| 2013 – 2016 | Editorial Board | Advances in Medicine |
| 2014 – Present | Peer Reviewer | Arthritis & Rheumatology |
| 2017 – 2018 | Deputy Editor-In-Chief | Archives of Environmental & Occupational Health |
| 2019 – Present | Editor-In-Chief | Archives of Environmental & Occupational Health |

**Other Editorial Roles**

| 1999 | Book Review | **Moline J.** "Insights on asthma at work". *The Lancet*, 354:1217, October 2, 1999. |

**Honors and Prizes**

| 1984 | General Honors in the College and Honors | Division of Social Sciences, University of Chicago | General Honors |
| 1988 | American Medical Women's Association Award | American Medical Women's Association | Excellence in Academics |
| 1988 | Beta Chapter | Alpha Omega Alpha Honor Society, University of Chicago | Excellence in Academics |

| 1999 | New Jersey-New York Laborers' Research Foundation Award | New Jersey-New York Laborers' Research Foundation | Potential Leadership in Occupational Medicine |
| 2004 | Mount Sinai Faculty Council Junior Faculty Award | Mount Sinai Faculty Council | Research and Clinical Excellence |
| 2004 | Nomination, IME Teaching Award | Mount Sinai School of Medicine | Teaching Achievement |
| 2006 | Fellow | The New York Academy of Medicine | Fellow |
| 2009 | Fellow | American College of Physicians | Fellow |
| 2010 | Fellow | American College of Occupational and Environmental Medicine | Fellow |
| 2010 | Kehoe Award of Merit | American College of Occupational and Environmental Medicine | Outstanding Contributions in Occupational Medicine |
| 2010 | Honorary Member | New York Police Department Honor Legion | Service to Law Enforcement |
| 2010 | Humanitarian Award | New York City Detective Investigators' Association | Humanitarian Award |
| 2012 | Sharon Joyce Schlanger Award for Outstanding Community Service | Northwell Health | Outstanding Community Service |
| 2014 | VIP Woman of the Year | National Association of Professional Women | 2014-2015 Woman of the Year |
| 2020 | Annual Leadership Award | 9/11 Health Watch | Annual Leadership Award |
| 2020 | Lifetime Achievement Award | Asbestos Disease Awareness Association (ADAO) | Lifetime Achievement Award |

**Local Invited Presentations**

| 03/1999 | "Hepatitis - Occupational Issues"<br>American Liver Foundation Seminar, Waldorf Astoria, New York, NY |
| 03/30/1999 | "Sick Building Syndrome"<br>Mount Sinai, Department of Allergy and Immunology, New York, NY |
| 04/06/1999 | "Lead Poisoning"<br>The New York Flushing Hospital Medical Center, Dept. of Medicine Grand Rounds, Flushing, NY |
| 04/28/2000 | Conference on Occupational Medicine for the Primary Care Physicians<br>Staten Island University Hospital, New York, NY |
| 02/27/2001 | "Introduction to Occupational Medicine"<br>Staten Island University Hospital, Department of Medicine, New York, NY |
| 10/18/2001 | "Occupational Health Risks Related to the World Trade Center Disaster"<br>New York University, World Trade Center Forum, New York, NY |
| 10/23/2001 | "Case Studies in Occupational Medicine"<br>Columbia University Primary Care Residency Program, New York, NY |
| 01/10/2002 | "Occupational Medicine for the Primary Care Physicians"<br>Staten Island University Hospital, Grand Rounds, New York, NY |
| 11/06/2002 | "World Trade Center Health Effects"<br>New York Occupational Medical Association Annual Meeting, New York, NY |
| 11/14/2002 | "Occupational Medicine for the Primary Care Physicians"<br>Staten Island University Hospital, Grand Rounds, New York, NY |
| 11/17/2002 | "World Trade Center Health Effects"<br>North General Hospital, Grand Rounds, New York, NY |
| 09/11/2003 | "WTC Aftermath – Health Effects Related to Exposure"<br>Elmhurst Hospital Grand Rounds, Elmhurst, NY |

| Date | Description |
|---|---|
| 03/24/2004 | "Emerging Threats in Health and Medicine Conference, New York: World Trade Center Disease" New York, NY |
| 09/12/2004 | "Medical Examination of WTC Responders at Mount Sinai" NYU Medical Center, The September 11th World Trade Center Dust Health Effects Conference, New York, NY |
| 09/13/2005 | "Health Effects from the World Trade Center Disaster" Mount Sinai School of Medicine Grand Rounds, Department of Medicine, New York, NY |
| 09/27/2005 | "Lessons Learned from the WTC Worker and Volunteer Medical Screening Program" University of Medicine and Dentistry of New Jersey (UMDNJ), Protecting the Protectors Conference, Newark, NJ |
| 11/15/2006 | "The World Trade Center Disaster: A 5 Year Assessment" North General Hospital Grand Rounds, Department of Medicine, New York, NY |
| 09/12/2007 | "The World Trade Center Medical Monitoring & Treatment Program" Saint Vincent's Hospital, Emergency Department Architecture and Disaster Preparedness Symposium, New York, NY |
| 09/19/2007 | "The World Trade Center Medical Monitoring & Treatment Program" NY Allergy and Asthma Society, New York, NY |
| 10/31/2007 | "Health Policy Implications of Studying the World Trade Center Disaster" New York Weill Cornell Medical Center, David Rogers Health Policy Colloquium, New York, NY |
| 02/13/2009 | "The World Trade Center Collapse: Impact of an Unprecedented Manmade Disaster" Mount Sinai School of Medicine, Allergy and Immunology Grand Rounds, New York, NY |
| 02/26/2009 | "The World Trade Center Collapse: Impact of an Unprecedented Manmade Disaster on Health" Office of the NYC Chief Medical Examiner, Grand Rounds, New York, NY |
| 05/30/2009 | "Controversies from the Fallout of 9/11" New York Chapter American College of Physician's Scientific Meeting, New York, NY |
| 06/04/2009 | Recent Findings from the World Trade Center Medical Monitoring and Treatment Program Mount Sinai School of Medicine, Department of Medicine, New York, NY |
| 2010 | Occupational Medicine Weekly Seminar Series Mount Sinai School of Medicine, New York, NY |
| 06/03/2010 | "The World Trade Center Collapse: Impact of an Unprecedented Manmade Environmental Health Disaster on Health" WTC Symposium on the Intrepid, New York, NY |
| 11/05/2010 | "The Department of Population Health: How Can We Impact Overall Health" Public Health Challenges and Achievements Conference, Hofstra University, Hempstead, NY |
| 01/02/2011 | "Multiple Myeloma in World Trade Center Responders: A Case Series" World Trade Center Health Conditions: A Scientific Update, New York, NY |
| 02/04/2011 | "It's Not Just Plastics" Breakers Mini Medical School, Northwell Health, Great Neck, NY |
| 02/17/2011 | "Health Foods and Tobacco Free Policy" Executive Directors Meeting, North Shore-LIJ Health System, Great Neck, NY |
| 03/02/2011 | "Wellness and Population Health" Trustee Meeting, North Shore-LIJ Health System, Great Neck, NY |
| 04/04/2011 | "Medical Mysteries: Occupational and Environmental Medicine for the Practitioner" ProHealth, New Hyde Park, NY |
| 04/06/2011 | "Medical Expert Host" The Million Women's Heart Summit, New Hyde Park, NY |
| 07/19/2011 | "WTC Health Program" Trustee Meeting, North Shore-LIJ Health System, Great Neck, NY |
| 08/04/2011 | "Department of Population Health" Strategic Retreat Meeting, North Shore-LIJ Health System, Great Neck, NY |
| 08/10/2011 | "Wellness Prevention and Population Health" Professional Evaluation Medical Group, Mineola, NY |
| 08/22/2011 | "Introduction to Environmental Health" Hofstra Northwell School of Medicine, Hempstead, NY |
| 09/15/2011 | "The Impact of the World Trade Center Disaster: Reflections on the 10 Year Anniversary" |

| | |
|---|---|
| 10/27/2011 | Department of Medicine Grand Rounds, Long Island Jewish Medical Center, Queens, NY<br>"Medical Mysteries: Occupational and Environmental Medicine for the Practitioner"<br>Department of Medicine Grand Rounds, Huntington Hospital, Huntington, NY |
| 03/13/2012 | "Patient Access"<br>Chairs Affairs Subcommittee, North Shore-LIJ Health System, Great Neck, NY |
| 04/25/2012 | "Wellness Update"<br>Nursing Leadership Meeting, Franklin Hospital, Valley Stream, NY |
| 10/11/2012 | Joint Benefit and Pension Funds Annual Meeting, CEOs Against Cancer, New York Chapter<br>Executive Liaison Meeting, New York, NY |
| 2012 | "Update on Wellness Initiatives"<br>Board Meeting, North Shore-LIJ Health System, Great Neck, NY |
| 02/08/2013 | "Medical Monitoring & Treatment of 9/11 Responders"<br>North Shore University Hospital Transplant Center, Manhasset, NY |
| 09/10/2014 | "Voices of September 11th, Healing Families & Communities after Tragedy"<br>13th Annual Day of Remembrance Information Forum, New York, NY |
| 03/24/2015 | "The Impact of the Older Worker on Businesses"<br>Cardinus LLC, British Consulate, New York, NY |
| 09/11/2015 | "History of the WTC Health Program, Current Updates and Future of the Program"<br>Voices of September 11th, Healing Families & Communities after Tragedy, New York, NY |
| 09/28/2015 | Occupational and Environmental Medicine Presentation<br>Chinese Delegation, New York Occupational & Environmental Medicine Association<br>(NYOEMA), New York, NY |
| 01/20/2016 | "Occupational Exposures & Gynecologic Oncology"<br>Grand Rounds, North Shore University Hospital, Manhasset, NY |
| 03/23/2016 | "Air Pollution"<br>Estee Lauder Panel Discussion, New York, NY |
| 05/02/2016 | Keynote Speaker<br>Eta Sigma Gamma Honorary Ceremony, Hofstra University, Hempstead, NY |
| 05/06/2016 | Cancer Roundtable<br>National Volunteer Fire Council, Albany, NY |
| 06/27/2016 | "Cardiac Issues Facing First Responders"<br>Central Park Medical Unit, Lenox Hill Hospital, New York, NY |
| 09/08/2016 | The Future of 9/11 Health 15 Year Commemorative Conference<br>United Federation of Teachers (UFT), New York, NY |
| 09/10/2016 | "Update on the World Trade Center Health Program"<br>Voices of September 11th, 15th Annual Day of Remembrance, New York, NY |
| 05/19/2017 | "Translating Medical Surveillance into Research"<br>Feinstein Institute for Medical Research, Northwell Health<br>Centricity Series, Health Outcomes Research: Research that Changes Healthcare Today, Manhasset, NY |
| 09/09/2017 | "Knowledge to Practice: Pathways to Long-Term Healing, A Victim-Centered Approach"<br>Voices of September 11th, 16th Annual Day of Remembrance, New York, NY |
| 10/27/2017 | "Enhancing the Wellness of People with Disabilities"<br>Project Accessible Oral Health, The Viscardi Center & New York University, Albertson, NY |
| 09/05/2018 | "Do No Harm"<br>Screening and Panel Discussion, North Shore University Hospital, Manhasset, NY |
| 11/14/2018 | "How the Environment Impacts Your Health"<br>Katz Institute for Women's Health, Uniondale, NY |
| 09/10/2019 | "Reflections of a Program after 18 Years"<br>Voices of September 11th, 18th Annual Day of Remembrance, New York, NY |
| 09/16/2019 | "WTC Health Programs & the Victim's Compensation Fund"<br>Borough of Manhattan Community College, New York, NY |
| 09/12/2020 | "Teaching in the Time of COVID-19: Keeping Students Safe, Well and Engaged"<br>American Federation of Teachers (AFT), Webinar |
| 03/12/2021 | "Maximizing Professional Fulfillment Through Connectivity and Self Knowledge" |

Department of Cardiology, North Shore University Hospital and Long Island Jewish Medical Center, Northwell Health, Virtual Grand Rounds

**Report of Regional, National and International Invited Teaching Courses and Presentations**

**Regional**

| | |
|---|---|
| 06/1999 | "Lead Mobilization" |
| | American Industrial Hygiene Association (New York Chapter), Annual Meeting, Mineola, NY |
| 2000 | Lead Mobilization / Lead Exposure |
| | Visiting Scholar |
| | Johns Hopkins School of Medicine, Baltimore, MD |
| | Division of Environmental and Occupational Medicine, December 4, 2000 |
| 04/01/2002 | "Endocrine Disruption" |
| | Hudson River PCBs and the Health of River Communities Symposium, Albany, NY |
| 12/10/2002 | "World Trade Center Health Effects" |
| | New Jersey OMA Annual Meeting, East Brunswick, NJ |
| 02/28/2003 | "Occupational Health Issues in the Schools" |
| | New York State United Teachers Health and Safety Conference, Albany, NY |
| 04/15/2003 | "World Trade Center Health Effects" |
| | Yale School of Public Health, Department of Occupational Medicine Seminar, New Haven, CT |
| 04/24/2003 | "Lead Exposure and Its Consequences" |
| | Yale School of Public Health, Department of Occupational Medicine Seminar, New Haven, CT |
| 12/07/2007 | "The World Trade Center Collapse: Worker Health in the Wake of an Unprecedented Man-made Environmental Disaster" |
| | 27th NE Regional Industrial Hygiene Conference & Exposition: Here's to your Health! Boston, MA |
| 05/14/2008 | "World Trade Center Health Effects" |
| | Colloquia, Occupational Medicine Department University of Connecticut Health Center, Farmington, CT |
| 12/13/2010 | "Implementing a Smoke-Free Hospital Campus" |
| | Greater New York Hospital Association, New York, NY |
| 07/15/2014 | "Employee Claims – 9/11: How the Workers' Compensation Board Responded and Where We Stand Today," Panel Discussion |
| | NYS Workers' Compensation Centennial Conference, Albany, NY |
| 03/23/2016 | "Effects of Air Pollution on Your Skin" |
| | Estee Lauder Panel Discussion, New York, NY |
| 03/24/2016 | "The Aging Workforce" |
| | The British Embassy, New York, NY |
| 05/02/2016 | "Occupational Medicine as a Career" |
| | Eta Sigma Gamma Honorary Ceremony, New York, NY |
| 05/06/2016 | "Cancer among Fire Fighters" |
| | National Fire Fighter Volunteer Roundtable, Alexandria, VA |
| 10/29/2016 | "Emerging Topics in Environmental Medicine" |
| | New York Occupational & Environmental Medicine Association (NYOEMA) Regional Board Meeting, New York, NY |
| 11/10/2016 | "Ovarian Cancer & Asbestos" |
| | Annual Current Concepts & Controversies in Asbestos-Related Disease Course |
| | Massachusetts General Hospital, Boston, MA |
| 05/12/2017 | "Aftermath of a Tragedy: The WTC Disaster & Its Impact" |
| | Anna Baetjer Lecture, Department of Environmental Health & Engineering |
| | Johns Hopkins School of Public Health, Baltimore, MD |
| 05/19/2017 | "Influence of the World Trade Center Programs on Research" |
| | Feinstein Institute for Medical Research Centricity Series |
| | Northwell Health, Manhasset, NY |
| 10/17/2017 | "Occupational Medicine Perspective and Workers' Compensation" |

**JA151**

| | New York State Workers' Compensation Board |
|---|---|
| | Schenectady, NY |
| 10/27/2017 | "Oral Health & Internal Health" |
| | Project Accessible Oral Health, Panel: Working Together for Successful Collaborations |
| | New York University School of Dentistry |
| 10/11/2020 | "World Trade Center Updates" |
| | Mid-Atlantic Regional Conference in Occupational & Environmental Medicine |
| | Virtual Presentation, hosted by Lenox Hill Hospital, Northwell Health, New York, NY |
| 12/15/2020 | "New Solutions for Burnout and Substance Abuse in Healthcare Professionals" |
| | Webinar |
| | Veritus, Freedom Institute, New York, NY |

**National**

| | |
|---|---|
| 06/2000 | Moderator for Heavy Metals Session |
| | American College of Occupational and Environmental Medicine, 85th Annual American Occupational |
| | Health Conference, Philadelphia, PA |
| 10/2000 | "Establishing Causation" |
| | National College of Advocacy, ATLA. Napa, CA |
| 10/25/2000 | "An Overview of Occupational and Environmental Medicine" |
| | SVCMC, Family Practice Residency |
| 07/17/2001 | American College of Preventive Medicine Leadership Forum |
| | Invited Participant |
| 10/27/2002 | "World Trade Center Health Effects" |
| | The American College of Occupational Medicine, SOTAC Conference, Baltimore, MD |
| 10/21/2006 | "Disaster Medicine: From Shock to Public Health Response" |
| | The American College of Occupational Medicine, SOTAC Conference |
| 04/27/2007 | "The World Trade Center Collapse: Worker Health in the Wake of an Unprecedented Man-Made |
| | Environmental Disaster" |
| | Cleveland State University, Fourth Annual Bioterrorism Conference, Cleveland, OH |
| 02/15/2008 | "The World Trade Center Medical Monitoring & Treatment Program" |
| | Dartmouth Medical School, Medical Grand Rounds, Hanover, NH |
| 04/15/2008 | "Update on the World Trade Center" |
| | AOHC Annual Conference, Speaker & Moderator Session #307. New York, NY |
| 02/08/2012 | "Collection of Data on Race, Ethnicity and Language: Development and Implementation of a Strategic |
| | Plan for a 15 Hospital Health System" |
| | Disparities Leadership Program, Santa Monica, CA |
| 03/14/2013 | Population Health Colloquium |
| | Moderator |
| | Philadelphia, PA |
| 10/09-10/2013 | The World Congress 4th Annual Executive Forum on Creating a Culture of Health & Wellness |
| | Chicago, IL |
| 10/08/2014 | "The Impact of the World Trade Center Disaster" |
| | 15th Annual 2014 Pilot Research Project Symposium, Education & Research Center (ERC) National |
| | Institute for Occupational Safety & Health (NIOSH), Keynote Speaker |
| | University of Cincinnati, Cincinnati, OH |
| 05/06/2016 | "Cancer among Firefighters" |
| | National Firefighter Roundtable |
| | This event was live-streamed over the radio to thousands of listeners. |
| | Alexandria, VA |
| 04/26/2017 | "The Influence of the WTC Programs on Research" |
| | American Occupational Health Conference (AOHC) Annual Conference |
| | Denver, CO |
| 03/05/2018 | "Tell Congress: 'Remember 9/11' Should Be More Than a Bumper Sticker" |
| | Citizens for the Extension of the James Zadroga Act |

| | |
|---|---|
| 06/11/2019 | Washington, DC<br>"The Need to Reauthorize the September 11[th] Victim Compensation Fund"<br>House Judiciary Committee Hearings, https://youtu.be/NLKWRsDPUlk and<br>https://judiciary.house.gov/legislation/hearings/need-reauthorize-september-11th-victim-compensation-fund |
| 12/10/2019 | Washington, DC<br>"Examining Carcinogens in Talc and Best Methods for Asbestos Detection"<br>House Oversight & Reform Committee Hearings,<br>https://oversight.house.gov/legislation/hearings/examining-carcinogens-in-talc-and-the-best-methods-for-asbestos-detection<br>And<br>https://www.youtube.com/watch?v=ZL8o-1o4WZM |
| 03/14/2020 | Washington, DC<br>"Assessing Long-Term Respiratory Consequences and Management of the World Trade Center Collapse to Inform Current/Future Events"<br>American Academy of Allergy, Asthma & Immunology (AAAAI) Annual Meeting, Virtual Event |
| 05/13/2020 | "Asbestos, Talc, Prevention, and Policy"<br>The Asbestos Disease Awareness Organization (ADAO)<br>National Zoom Meeting |

**International**

| | |
|---|---|
| 02/1998 | "Lead Mobilization during Pregnancy"<br>Instituto Nacional de Salud Publica, International Conference on Occupational and Environmental Health, Cuernavaca, Mexico |
| 12/1998 | "Lead and Pregnancy"<br>1st International Meeting on Environmental and Occupational Health, Rio de Janeiro, Brazil |
| 08/30/2000 | Environmental Influences on Children Brain Development and Behavior<br>Invited Speaker<br>26th International Congress on Occupational Health, Singapore |
| 06/23/2003 | "Evaluating the Physiological and Psychological Impacts to Rescue and Recovery Personnel at the WTC Site"<br>World Congress on Risk, Brussels, Belgium |
| 03/25/2004 | Occupational Medicine Training in the US<br>Convocatoria Reunion Nal Invest Mexico, Mexico City, Mexico |
| 01/19/2009 | The World Trade Center Collapse: Impact of an Unprecedented Manmade Disaster on Health<br>JNIOSH, Tokyo, Japan |
| 01/20-26/2011 | "Introduction to Occupational and Environmental Medicine"<br>Chulabhorn Research Institute, Bangkok, Thailand |

**Report of Clinical Activities and Innovations**

**Current Licensure and Certification**

| | |
|---|---|
| 1988 | National Board of Medical Examiners |
| 1990 | New York State (License 184671) |
| 1991, 2001, & 2011 | American Board of Internal Medicine: Internal Medicine |
| 1995 | American Board of Preventive Medicine: Occupational Medicine |

**Practice Activities**

| | | |
|---|---|---|
| 1993 – 2010 | Attending Physician | Selikoff Center for Occupational Medicine<br>Mount Sinai School of Medicine, New York, NY |
| 2004 – 2010 | Attending Physician & Director | WTC Medical Monitoring and Treatment Program<br>Mount Sinai School of Medicine, New York, NY |
| 2011 – Present | Director | Northwell Health Queens World Trade Center Health Program |

Page **11** of **32**

| | | Queens, NY |
|---|---|---|
| 2013 – Present | Attending Physician & Director | Occupational & Environmental Medicine of Long Island Northwell Health, New Hyde Park & Islandia, NY |

**Report of Education of Patients and Service to the Community**

**Activities**

| | |
|---|---|
| 03/2003 | "Health Effects of Creosote" United Brotherhood of Carpenters (Dockbuilders and Piledrivers), Palm Springs, CA |
| 11/03/2010 | "Women and Their Environment: How Does it Affect Health" Action Long Island, Hempstead, NY |
| 11/16/2010 | "North Shore-LIJ and the Borough of Queens: A Population-Based Health Care Partnership" Queens Borough Cabinet Meeting, New York, NY |
| 01/13/2011 | "Health Effects of PCBs Exposure" United Federation of Teachers, PS36, Staten Island, NY |
| 08/23/2011 | "Health Effects of Trichloroethylene Exposure" United Federation of Teachers, PS51x, Bronx, NY |
| 10/25/2011 | "Wellness in the Workplace, The Employer's Advantage" Commerce & Industry Council, New Hyde Park, NY |
| 05/09/2012 | "Employee Wellness Collaboration Initiative" NSLIJ/1199 SEIU Delegates, New York, NY |
| 07/11/2012 | "Employee Wellness Collaboration Initiative" Joint Benefit and Pension Funds Annual Meeting, New York, NY |
| 10/11/2012 | "CEO Cancer Gold Standard Accreditation; Process & Implementation" Eastern Division, Inc. American Cancer Society "Employee Wellness Collaboration Initiative" |
| 04/17/2013 | "Occupational Health & Safety in Schools" United Federation of Teachers |
| 08/21/2013 | "Aging in Place in Suburbia; Living Better with Technology" Town of North Hempstead Department of Services for the Aging, Conference and Expo, Roslyn Heights, NY |
| 10/02/2014 | "Occupational Health" Ethical Humanist Society of Long Island (EHSLI), Community Health Care Seminar Garden City, NY |
| 02/27/2014 | "Federal Motor Carrier Safety Administration (FMSCA) Changes to the Commercial Driver's License Exam" Utility Workers Union of America |
| 04/24/2014 | "Health Hazards to Volunteer Firefighters" Brookhaven Fire District, Terryville, NY |
| 05/15/2014 | Q&A about Asbestos Dumping at Roberto Clemente Park Suffolk County Legislature, Brentwood Library, Brentwood, NY |
| 06/11/2014 | "What's Next?...", Follow-up on Asbestos Dumping in Brentwood Brentwood Library, Brentwood, NY |
| 08/28/2014 | "Health Hazards to Volunteer Firefighters" Terryville Fire District, Terryville, NY |
| 09/10/2014 | "Voices of September 11th, Healing Families & Communities after Tragedy" 13th Annual Day of Remembrance Information Forum, New York, NY |
| 10/02/2014 | "Health Hazards to Volunteer Firefighters" Smithtown Firefighter Chiefs Council Meeting, Nesconset, NY |
| 11/01/2014 | "Health Challenges to Firefighters" Association of Fire Districts of the State of New York 43rd Annual Mid-Year "Fall" Workshop, Ellenville, NY |
| 11/04/2014 | "Health Challenges to Firefighters" Nissequogue Fire Department, Nissequogue, NY |
| 02/13/2015 | "Wellness of Firefighters" |

| | Bellerose Terrace Fire Department, Bellerose Terrace, NY |
|---|---|
| 02/19/2015 | "Health of Firefighters" |
| | Firemen's Association of New York (FASNY), Mastic Fire Department, Mastic, NY |
| 03/14/2015 | "Exposure to Chemicals and Occupational Asthma" |
| | Teamsters 237, New York, NY |
| 05/29/2015 | "Firefighter Health" |
| | Freeport Fire District, Freeport, NY |
| 07/30/2015 | "Occupational Health and Exposures on the Job" |
| | Uniformed Sanitationmen's Association, New York, NY |
| 10/13/2015 | "Health Challenges to Firefighters" |
| | Local 3 Retiree Meeting, Seaford, NY |
| 10/15/2015 | "Health Hazards for Fire Fighters" |
| | Nassau County Fire Chief's General Meeting, Valley Stream, NY |
| 10/21/2015 | "Asbestos Exposure in the Home" |
| | Union 237, Brooklyn, NY |
| 12/10/2015 | "Health Hazards to Plumbers" |
| | Plumbers Local Union 1, Queens, NY |
| 02/12/2016 | "Asbestos Exposure in the Home" |
| | New York City Department of Environmental Protection (NYC DEP), New York, NY |
| 06/29/2016 | "Occupational Health of National Grid Workers" |
| | National Grid Medical Unit, Great Neck, NY |
| 07/20/2016 | "Occupational Health" |
| | Hauppauge Industrial Association, Hauppauge, NY |
| 08/09/2016 | "Occupational Health of Fire Fighters" |
| | Fireman's Association of the State of New York (FASNY) Annual Conference |
| | Albany, NY |
| 09/09/2016 | "The Future of 9/11 Health 15 Year Commemorative Conference" |
| | United Federation of Teachers, NY, NY |
| 09/24/2016 | "Occupational Asbestos Exposure among Plumbers" |
| | Plumbers Local 1, New York, NY |
| 09/24/2016 | "Occupational Asbestos Exposure among Plumbers and Pipefitters" |
| | Plumbers Local 24, West Caldwell, NJ |
| 09/29/2016 | "Occupational Health of Fire Fighters" |
| | Centereach Fire Department, Centereach, NY |
| 10/21/2016 | Q&A Regarding Environmental Contaminants at West Hills County Park |
| | Suffolk County Department of Health, Great River, NY |
| 10/27/2016 | "Occupational Health Exposure to Sanitation Workers" |
| | New York, NY |
| 01/30/2017 | "Careers in Occupational Medicine" |
| | Donald & Barbara Zucker School of Medicine at Hofstra/Northwell Faculty Council |
| | Career Night, Hempstead, NY |
| 04/06/2017 | "Health Effects of Meningitis" |
| | United Federation of Teachers, PS36Q, Queens, NY |
| 07/25/2017 | "Occupational Exposures to Fire Fighters" |
| | Nassau County Fire Commission Meeting, Westbury, NY |
| 08/09/2017 | "Cancer among Volunteer Firefighters" |
| | Fireman's Association of the State of New York (FASNY) Annual Convention |
| | Syracuse, NY |
| 01/09/2017 | "Exposure to Asbestos in the Workplace" |
| | Electricians, Seaford, NY |
| 01/18/2018 | "Health Hazards to Fire Fighters" |
| | Rockland County Fire Chiefs Association, Rockland, NY |
| 02/08/2018 | "WTC Exposures and Programs Available to Teachers" |
| | United Federation of Teachers, New York, NY |
| 03/06/2018 | "Occupational Exposures to Fire Fighters" |

| | | | |
|---|---|---|---|
| | Port Jefferson Fire District, Port Jefferson, NY | | |
| 03/21/2018 | National Volunteer Fire Council's Lavender Ribbon Report & 11 Best Practices for Preventing Firefighter Cancer | | |
| 09/16/2019 | "9/11 Victim Compensation Fund Permanently Extended" | | |
| | Borough of Manhattan Community College, New York, NY | | |
| 10/16/2019 | "Occupational & Environmental Medicine of Long Island" | | |
| | Long Island Health Collaborative, Hauppauge, NY | | |
| 01/27/2021 | "Virtual Covid Panel" | | |
| | Zoom Panel Discussion, Oceanside Library, Oceanside, NY | | |
| 01/27/2021 | "Reopening Clinic I: Expanding Access to Testing and Vaccines" | | |
| | Zoom Webinar, American Federation of Teachers | | |

**Educational Material for Patients and the Lay Community**

**Books, monographs, articles and presentations in other media**

| Date | Title | Role | Source |
|---|---|---|---|
| 12/30/2010 | Vivo Health Fitness | Speaker | Manhasset Press http://www.northshorelij.com/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1247153404286&ssbinary=true |
| 03/03/2011 | 9/11 Firefighter Dies of Cancer Linked to TR | Interviewee | CNN http://www.cnn.com/2011/HEALTH/03/02/new.york.firefighter/index.html |
| 07/21/2011 | LIJ, Queens College in WTC Monitoring Plan | Interviewee | Queens Chronicle http://www.qchron.com/editions/queenswide/article_a3cab83e-a0c8-5394-a1dc-b13496e07148.html |
| 07/28/2011 | Further Research Needed to Draw Conclusive Connection between Cancer and Ground Zero | Interviewee | CNN Morning http://am.blogs.cnn.com/category/911-responders/ |
| 08/03/2011 | Study on Cancer and 9/11 Alarms Many | Interviewee | Downtown Express http://www.downtownexpress.com/2011/08/03/study-on-cancer-and-911-alarms-many/ |
| 09/02/2011 | Firefighters Responding to 9/11 at Increased Cancer Risk | Interviewee | CNN http://www.cnn.com/2011/HEALTH/09/01/911.firefighters.cancer/index.html |
| 09/05/2011 | A Legacy of Illnesses from 9/11 | Interviewee | Los Angeles Times https://www.latimes.com/nation/la-xpm-2011-sep-05-la-he-911-wtc-cough-20110905-story.html |
| 09/08/2011 | First Responders Get Help in Queens | Interviewee | Queens Chronicle http://www.qchron.com/editions/queenswide/first-responders-get-help-in-queens/article_46bf1cf8-ebb0-5a60-9c6e-6e774557c3bf.html?mode=story |
| 09/11/2011 | 9/11 Costs | Interviewee | LA Times |
| 09/2011 | Lancet Study on Cancer Rates in Fire Departments | Interviewee | Doctor Radio, SiriusXM Satellite Radio |
| 2011 | 9/11 World Trade Center Workers | Interviewee | Inter Channel, Ukraine TV |
| 02/2012 | World Trade Center Health Program's Scientific/Technical Advisory Committee (STAC) added cancer as a covered condition | Interviewee | ABC Radio |

| Date | Title | Role | Source |
|---|---|---|---|
| 02/2012 | WTC's program STAC added cancer as a covered condition | Interviewee | CBS New York http://newyork.cbslocal.com/2012/02/16/govt-panel-wants-aid-for-wtc-victims-who-are-cancer-patients/ |
| 03/2012 | Opening of Cold Spring Harbor | Interviewee | Crain's New York Business |
| 04/09/2012 | Health Workers "Walk to Paris" and Fitness | Interviewee | Long Island Newsday http://www.newsday.com/news/health/health-workers-walk-to-paris-and-fitness-1.3651502 |
| 05/22/2012 | Study: 911 WTC Dust Sickened Residents Years Later | Interviewee | CNN Health http://thechart.blogs.cnn.com/2012/05/22/study-911-wtc-dust-sickened-residents-years-later/ |
| 09/07/2012 | Why Organic is Better (Never Mind the Study) | Author, Letter to the Editor | New York Times http://www.nytimes.com/2012/09/07/opinion/why-organic-is-better-never-mind-the-study.html |
| 09/13/2012 | 9/11 First Responders | Interviewee | Reuters http://www.reuters.com/article/2012/09/13/life-idUSRTR37ULP |
| 11/30/2012 | Comptroller Liu Proposes Innovative "Green Apple Bonds" to Make Public Schools Environmentally Safe & Efficient | Interviewee | Press Release, New York City Comptroller John C. Liu http://comptroller.nyc.gov/newsroom/comptroller-liu-proposes-innovative-green-apple-bonds-to-make-public-schools-environmentally-safe-energy-efficient/ |
| 12/19/2012 | 911 – Terror in the Dust Increased Risk for Three Cancers | Interviewee | CNN Health http://thechart.blogs.cnn.com/2012/12/18/911-terror-in-the-dust-increased-risk-for-three-cancers/ |
| 2012 | 911 Responders | Interviewee | CNN online |
| 01/04/2013 | A Physician's Perspective on the Zadroga Act | Author | 9/11 Health Watch 911Healthwatch.org/blog/physicians-perspective |
| 01/09/2013 | Americans Sicker Compared to Other Wealthy Nations | Interviewee | *Web*MD http://www.webmd.com/news/20130104/americans-sicker-other-nations |
| 01/17/2013 | Americans Sicker Compared to Other Wealthy Nations | Interviewee | CBS New York http://newyork.cbslocal.com/2013/01/17/americans-sicker-compared-to-other-wealthy-nations/ |
| 02/07/2013 | After the Towers Fell: The Long-Term Public Health Impact & Lessons of 9/11 | Presenter | Webinar |
| 03/11/2013 | North Shore-LIJ Unveils World Trade Center Clinical Center | Interviewee | FiOs 1 News, Television http://fios1news.com/longisland/node/29150#.UqdfhdJDuSo |
| 03/11/2013 | Queens Gets Upgrade Medical Facility for 9/11 Responders | Interviewee | New York Daily News http://www.nydailynews.com/life-style/health/queens-upgraded-medical-facility-9-11-responders-article-1.1285551 |
| 03/16/2013 | New Center to Treat 9/11 First Responders | Interviewee | The Queens Courier http://queenscourier.com/2013/new-center-to-treat-first-911-first-responders/ |
| 04/12/2013 | North Shore-LIJ Awarded $3.8M Grant to Open Clinics | Interviewee | New Hyde Park Patch http://newhydepark.patch.com/groups/editors-picks/p/north-shore-lij-awarded-3-8m-grant-to-open-clinics |
| 04/22/2013 | Cancer Rate 15% Higher than Normal for 9/11 Responders | Interviewee | NY Daily News http://www.nydailynews.com/new-york/9-11-responders-higher-cancer-rate-study-article-1.1324613 |

| 04/23/2013 | 9/11 First Responders See 15% Increased Cancer Risk, Study Says | Interviewee | Huffington Post http://www.huffingtonpost.com/2013/04/23/911-first-responders-cancer-study_n_3136672.html |
| 06/04/2013 | Large Handbags are Causing Undue Strain, Experts Warn | Interviewee | CBSNews.com http://www.cbsnews.com/news/large-handbags-are-causing-undue-strain-experts-warn/ |
| 08/01/2013 | PQC Partnership for Quality Care, Immunization of Healthcare Workers Against Influenza | Presenter | Webinar |
| 09/06/2013 | FDA: Low Levels of Arsenic in Rice | Interviewee | US News & World Report http://health.usnews.com/health-news/news/articles/2013/09/06/fda-low-levels-of-arsenic-in-rice |
| 09/06/2013 | FDA: Low Levels of Arsenic in Rice | Interviewee | HealthDay http://consumer.healthday.com/environmental-health-information-12/environment-health-news-233/fda-rice-contains-low-levels-of-arsenic-in-rice-679979.html |
| 09/06/2013 | FDA: Low Levels of Arsenic in Rice | Interviewee | Yahoo! Health |
| 09/10/2013 | Illnesses Mount for Sept. 11 Survivors, but Help is Available | Author (Op-Ed) | LiveScience http://www.livescience.com/39549-illnesses-still-plague-wtc-survivors.html |
| 09/11/2013 | Is the Air Quality in Beijing Worse than Ground Zero's After 9/11? | Interviewee | The Atlantic https://www.theatlantic.com/china/archive/2013/09/is-the-air-quality-in-beijing-worse-than-ground-zeros-after-9-11/279589/ |
| 10/16/2013 | Shellfish Toxin Spreading to Eastern U.S. | Interviewee | HealthDay News http://consumer.healthday.com/public-health-information-30/safety-and-public-health-news-585/shellfish-toxin-spreading-to-eastern-u-s-europe-report-says-681180.html |
| 12/01/2013 | Asbestos Health Fears | Interviewee | Long Island Newsday http://www.newsday.com/911-anniversary/9-11-asbestos-crews-share-fear-of-health-coverage-running-out-1.6519945 |
| 02/18/2014 | Workplace Injuries & Illnesses | Interviewee | Labor Lines (radio show) |
| 02/24/2014 | WTC Health or Lung Disease among 9/11 Responders | Interviewee | AFP Wire |
| 03/02/2014 | Unions Save Bankrupt Company – Occupational Asthma | Interviewee | Labor Lines (radio show) http://laborlines.com/Blog/2014/03/03/unions-save-bankrupt-company-occupational-asthma/ |
| 03/12/2014 | Dust, Health Effects of Building Collapses and Fires | Interviewee | CNN |
| 03/14/2014 | Living in a World Without Nature | Interviewee | The Weather Channel http://www.weather.com/health/living-world-without-nature-20140312 |
| 06/26/2014 | Pesticides Could Lead to Autism | Interviewee | Great Neck Patch http://patch.com/new-york/greatneck/pesticides-could-lead-to-autism_97d11a84 |

**JA158**

| Date | Title | Role | Source |
|------|-------|------|--------|
| 07/14/2014 | M&M Glass Recall Raises Lead Concerns | Interviewee | Great Neck Patch http://patch.com/new-york/greatneck/mm-glass-recall-raises-lead-concerns |
| 08/20/2014 | PQC Partnership for Quality Care, Immunization of Healthcare Workers Against Influenza | Presenter | Webinar |
| 09/02/2014 | Occupational Health Relief for World Trade Center Responders and Survivors | Interviewee | Labor Lines |
| 09/08/2014 | | Interviewee | Labor Lines http://laborlines.com/2014/09/08/relief-world-trade-center-responders-survivors/ |
| 09/11/2014 | Extending 9/11 Health Act for Survivors | Interviewee | MSNBC Reid Report http://www.msnbc.com/the-reid-report/watch/extending-9-11-health-act-for-survivors-328139331955 |
| 09/26/2014 | The Zadroga Act, Ground Zero and Justice | Interviewee | North Shore-LIJ News https://www.northshorelij.com/about/news/zadroga-act-ground-zero-and-justice?dm_i=1Y9P,2UER9,FTWG6I,ABFY1,1 |
| 10/07/2014 | 29 Mind-Boggling Outdoor Yoga Poses | Interviewee | Weather.com http://www.weather.com/health/news/mind-boggling-outdoor-yoga-poses-20141007 |
| 04/02/2015 | Could Household Bleach Raise Your Risk for Flu, Other Infections? | Interviewee | Health Day http://consumer.healthday.com/respiratory-and-allergy-information-2/asthma-news-47/could-household-bleach-raise-kids-risk-for-flu-other-infections-698036.html |
| 04/17/2015 | More Evidence of Long-Term Illness in 911 Responders | Interviewee | US News & World Report – Health, HealthDay http://health.usnews.com/health-news/articles/2015/04/16/more-evidence-of-long-term-illness-in-9-11-responders |
| 04/17/2015 | PTSD Rampant among 9/11 Responders | Interviewee | Newsmax Health http://www.newsmax.com/Health/Health-News/PTSD-emergency-rescue- workers/2015/04/17/id/639228/ |
| 04/25/2015 | Retired Firefighter, Who Toiled for Eight Months at Ground Zero after 9/11 and in Battling Stage-Four Cancer, Says FDNY is Still the Best Job in the World | Interviewee | Daily News http://www.nydailynews.com/new-york/ex-firefighter-battling-cancer-calls-fdny-best-job-world-article-1.2198061 |
| 06/24/2015 | Occupational Medicine and 9/11 | Interviewee | Medscape Video Lecture |
| 08/07/2015 | Firefighters Fighting Cancer | Interviewee | FASNY Website http://www.fasny.com/fightcancer/ |
| 09/04/2015 | Follow up to Firefighters Fighting Cancer | Interviewee | DKC News Interview by Carolyn Stone to discuss the Firefighters Fighting Cancer video that was published on the FASNY website (on August 7th) |
| 09/10/2015 | World Trade Center Health Program and Medscape Launch Education Initiative to Help Healthcare Professionals Understand the Eligibility, Screening | Presenter | PR Newswire http://www.prnewswire.com/news-releases/world-trade-center-health-program-and-medscape-launch-education-initiative-to-help-healthcare-professionals-understand-the-eligibility-screening-and-treatment-benefits-for-911-responders-and-survivors- |

| | and Treatment Benefits for 9/11 Responders and Survivors | | 300140417.html?dm_i=1Y9P,3NY24,FTWG6I,D7CAF,1 |
|---|---|---|---|
| 09/11/2015 | Federal Program for Ground Zero Workers Set to Expire | Interviewee | CBS News http://www.cbsnews.com/news/health-effects-of-911-linger-for-ground-zero-workers/ |
| 09/12/2015 | Doctor Pushes for Zadroga Act Renewal | Interviewee | NY 1 News http://www.ny1.com/nyc/queens/news/2015/09/12/-doctor-pushes-for-zadroga-act-renewal.html |
| 09/16/2015 | Firefighters More Likely to Develop Cancer than Public at Large, Experts Say in Calling for Volunteers' Insurance | Interviewee | Newsday, Health News http://www.newsday.com/news/health/firefighters-more-likely-to-develop-cancer-than-public-at-large-call-is-for-volunteers-insurance-1.10853464 |
| 09/17/2015 | Firefighters More Likely to Develop Cancer than Public at Large, Experts Say in Calling for Volunteers' Insurance | Interviewee | EmergencyManagement.com http://www.emergencymgmt.com/health/Firefighters-More-Llikely-to-Develop-Cancer-Than-Public-at-Large-Experts-Say-in-Calling-for-Volunteers-Insurance.html |
| 09/23/2015 | Doctor Radio | Interviewee | Sirius XM Radio |
| 10/02/2015 | Loud Noise Exposure Linked to Heart Disease Risk | Interviewee | Reuters http://www.reuters.com/article/us-health-heartdisease-noise-exposure-idUSKCN0RW27Y20151002 |
| 10/04/2015 | A Lot of Loud Noise May Raise Your Risk of Heart Disease | Interviewee | Youth Health Magazine http://www.youthhealthmag.com/articles/24520/201510 04/noise-heart-disease-workplace-environment-loud-noise.htm |
| 10/06/2015 | Heart Disease Risk Linked with Loud Noise Exposure | Interviewee | Press Examiner http://www.pressexaminer.com/heart-disease-risk-linked-with-loud-noise-exposure/75927 |
| 01/08/2016 | Firemen's Association of NY Forms Health, Wellness Committee | Interviewee | Firehouse.com http://www.firehouse.com/product/12156548/firemens-association-of-the-state-of-new-york-fasny-firemens-association-of-the-state-of-new-york-forms-health-and-wellness-committee |
| 01/12/2016 | LI Doctor to Advise State Firefighters | Interviewee | Newsday http://images.burrellesluce.com/image/23337A/23337A_16023?utm_campaign=6653123_In%20The%20News%201%2F14%2F16&utm_medium=email&utm_source=Northwell%20Health%20Internal%20Communications&dm_i=1Y9P,3YLKZ,M5CIHK,EAMA1,1 |
| 02/08/2016 | Honor Roll | Interviewee | The Buffalo News http://images.burrellesluce.com/image/23337A/23337A_16176 |
| 02/16/2016 | US Military Burn Pit Built on Chemical Weapons Facilities Tied to Soldiers' Illness | Interviewee | The Guardian http://www.theguardian.com/us-news/2016/feb/16/us-military-burn-pits-chemical-weapons-cancer-illness-iraq-afghanistan-veterans |
| 02/24/2016 | Paid to Live Near Work | Interviewee | CBS News New York http://newyork.cbslocal.com/show/cbs-new-york-videos/video-3364909-paid-to-live-near-work/?utm_campaign=6832990_In%20the%20News%203%2F3%2F16&utm_medium=email&utm_source=Northwell%20Health%20Internal%20Communications&dm_i=1Y9P,42GDA,FTWG6I,EQI20,1 |

| | | | |
|---|---|---|---|
| 02/26/2016 | FASNY Press Conference | Interviewee | WCBS-TV 6pm |
| 02/26/2016 | Cancer in Volunteer Firefighters | Interviewee | Rochester Radio |
| March 2016 | Things Worth Celebrating | Interviewee | Environmental, Occupational and Population Health (EOPH) Newsletter, American Thoracic Society |
| 03/01/2016 | Proposed Bill Calls for Coverage of Volunteer Firefighters with Cancer | Interviewee | Register-Star http://www.registerstar.com/news/article_8fc017fe-df50-11e5-bd87-67b899457f4f.html |
| 03/03/2016 | Talcum Verdict Another Sign to Use Cornstarch | Interviewee | Northwell Health News https://blog.northwell.edu/2016/03/03/talcum-verdict-another-sign-use-cornstarch?utm_campaign=6843774_E-News%20Bulletin%20-%203%2F4%2F16&utm_medium=email&utm_source=Northwell%20Health%20Internal%20Communications&dm_i=1Y9P,42OOU,M5CIHK,ERXBG,1 |
| 05/05/2016 | Long Island School to Reopen after Asbestos Scare | Interviewee | NBC New York http://www.nbcnewyork.com/news/local/Long-Island-School-Closed-After-Asbestos-Scare-378285111.html |
| 05/19/2016 | Airway Injury from 9/11 Dust Persists | Interviewee | MedPage Today http://www.medpagetoday.com/MeetingCoverage/ATS/58019?xid=nl_mpt_DHE_2016-05-20&eun=g309450d0r |
| 05/25/2016 | Health Effects of WTC Responders | Interviewee | Blue Collar Buzz Radio |
| 06/26/2016 | Is *Pollution* Keeping You From Great Skin? *Fix That Now!* | Interviewee | Origins http://www.origins.com/is-pollution-keeping-you-from-great-skin#menu-section |
| 07/22/2016 | Local Schools Fear Lead in Water | Interviewee | Fox 5 https://www.northwell.edu/about/news/video/local-schools-fear-lead-water |
| Summer 2016 | After the Attacks | Interviewee | The University of Chicago Magazine https://mag.uchicago.edu/science-medicine/after-attacks |
| 08/29/2016 | 9/11 First Responders Show Memory Problems, Researchers Find | Interviewee | Newsday https://www.northwell.edu/about/news/11-first-responders-show-memory-problems-researchers-find?utm_campaign=7477311_In%20the%20News%209%2F1%2F16&utm_medium=email&utm_source=Northwell%20Health%20Internal%20Communications&dm_i=1Y9P,4G9J3,M5CIHK,GETM7,1 |
| 08/30/2016 | Report: 9/11 First Responders Show Early Memory Problems | Interviewee | EMS1.com http://www.ems1.com/health-and-wellness/articles/121485048-Report-9-11-first-responders-show-early-memory-problems/ |
| 09/01/2016 | Study Identifies Cognitive Impairment among 9/11 Responders | Interviewee | Public Health Watchdog https://www.publichealthwatchdog.com/study-identifies-cognitive-impairment-among-911-responders/ |
| 09/08/2016 | Northwell Health Remembers 9/11…15 Years Later | Interviewee | Northwell Health Public Relations https://www.northwell.edu/about/news/northwell-health-remembers-911%E2%80%A615-years-later |
| 09/08/2016 | 9/11 First Responders Share Their Stories at New Hyde Park Remembrance Event | Interviewee | News 12 https://www.northwell.edu/about/news/video/danny-rodriguez-9-11-news-12 |

| Date | Title | Role | Source |
|---|---|---|---|
| 09/11/2016 | Responders Recount Ground Zero Illnesses | Interviewee | Officer.com<br>http://www.officer.com/news/12255509/responders-recount-ground-zero-illnesses |
| 11/14/2016 | WTC Dust Caused First Responders' Nerve Damage, Study Finds | Interviewee | Newsday<br>http://www.newsday.com/news/health/li-hospital-study-links-nerve-damage-to-wtc-first-responders-1.12616924 |
| 01/13/2017 | Possible Carcinogen Found in Long Island Water Supply, EPA Says | Interviewee | FiOS1<br>http://www.fios1news.com/longisland/possible-carcinogen-found-li-water-supply#.WIvHlNIrJQJ |
| 03/01/2017 | The Hidden Mesothelioma Risk for Dentists | Author | Surviving Mesothelioma<br>https://survivingmesothelioma.com/the-hidden-mesothelioma-risk-for-dentists/ |
| 09/08/2017 | WTC Clinic Q&A / Dr. Jacqueline Moline | Interviewee | The Chief-Leader<br>www.Thechiefleader.com |
| 10/22/2017 | Governor Cuomo Signs Legislation to Deliver Health Benefits to Volunteer Firefighters Across New York | Interviewee | New York State, Press Release<br>http://www.governor.ny.gov/news/governor-cuomo-signs-legislation-deliver-health-benefits-volunteer-firefighters-across-new-york |
| 10/23/2017 | Volunteer Firefighters to Get Cancer Coverage | Interviewee | Poughkeepsie Journal<br>https://www.poughkeepsiejournal.com/story/news/local/new-york/2017/10/23/volunteer-firefighters-get-cancer-coverage/106933874/ |
| 12/22/2017 | How Safe is That Painted Drinking Glass? | Interviewee | Consumer Reports<br>https://www.consumerreports.org/product-safety/how-safe-is-that-painted-drinking-glass/ |
| January 2018 | Now Hear This: The Link between Loud Noises, Heart Disease | Interviewee | Chicago Tribune Heart Monitor |
| 03/05/2018 | New York Congressmen, First Responders Want to Block 9/11 Health Care Program Changes | Interviewee | WNYC News<br>https://www.wnyc.org/story/new-york-congressmen-and-first-responders-want-block-changes-911-health-care-program/ |
| 05/24/2018 | Still Counting: 9/11's Toxic Legacy Haunts First Responders | Interviewee | Long Island Business News<br>https://www.northwell.edu/about/news/media-coverage/still-counting-911s-toxic-legacy-haunts-first-responders |
| Summer 2018 | Lavender Ribbon Report: Best Practices for Preventing Firefighter Cancer | Panelist | National Volunteer Fire Council<br>https://www.nvfc.org/wp-content/uploads/2018/08/Lavendar-Ribbon-Report-Cancer.pdf |
| 06/18/2018 | FBI Official, Dead of 9/11-Related Cancer, Remembered as Number of Cases Grows | Interviewee | CNN<br>https://www.cnn.com/2018/06/18/health/9-11-fbi-cancer/index.html?dm_i=1Y9P,5PBLQ,M5CVVL,M8FHL,1 |
| 09/06/2018 | Hero FBI Agents and First Responders Sick and Dying from 9/11 Exposure | Interviewee | American Legal News<br>https://americanlegalnews.com/hero-fbi-agents-and-first-responders-sick-and-dying-from-9-11-exposure/ |
| 09/26/2018 | Household Chemicals Harming Your Cat's Thyroid? | Interviewee | WebMD<br>https://pets.webmd.com/cats/news/20180926/household-chemicals-harming-your-cats-thyroid#1 |
| 09/27/2018 | Cancer Study Looks at New York's Volunteer Firefighters, but Needs Local Participants | Interviewee | Lohud<br>https://www.lohud.com/story/opinion/perspective/2018/09/27/cancer-study-seeks-input-new-york-volunteer-firefighters/1434090002/ |

| 10/10/2018 | Smoggy Air Tied to Higher Odds for Mouth Cancers | Interviewee | HealthDay https://consumer.healthday.com/cancer-information-5/mouth-cancer-news-103/smoggy-air-tied-to-higher-odds-for-mouth-cancers-738476.html |
|---|---|---|---|
| 10/11/2018 | Smog Linked to Higher Risk for Mouth Cancers | Interviewee | UPI https://www.upi.com/Health_News/2018/10/11/Smog-linked-to-higher-risk-for-mouth-cancers/9611539289063/ |
| 10/22/2018 | Eating More Organic Food May Help Prevent Cancer, Study Says | Interviewee | Everyday Health https://www.everydayhealth.com/diet-nutrition/diet/organic-food-tied-lower-cancer-risk-study-finds/ |
| 10/23/2018 | New Law Will Provide Improved Disability Benefits for Volunteer Firefighters | Interviewee | Press-Republican https://www.pressrepublican.com/news/local_news/new-law-will-provide-improved-disability-benefits-for-volunteer-firefighters/article_6bc60e60-4887-59fa-a1cf-3cb843f5c491.html |
| 10/25/2018 | Report: Weed Killer Found in More Breakfast Cereals, Snack Bars | Interviewee | Fox 5 http://www.fox5ny.com/news/report-weed-killer-found-in-more-breakfast-cereals-snack-bars |
| 10/26/2018 | Eating More Organic Food May Help Prevent Cancer | Interviewee | Everyday Health https://www.everydayhealth.com/diet-nutrition/diet/organic-food-tied-lower-cancer-risk-study-finds/?dm_t=0,0,0,0,0&dm_i=1Y9P,5XLRY,M5CIHK,N8JY6,1 |
| 11/13/2018 | Why the FDA is Banning Lead from Hair Dye after 40 Years | Interviewee | Healthline https://www.healthline.com/health-news/fda-banning-lead-from-hair-dye-after-40-years |
| 11/15/2018 | Chemicals Used in E-Cig Flavors Are Toxic and We've Known for Decades | Interviewee | Healthline https://www.healthline.com/health-news/vaping-may-be-worse-for-your-lungs-than-you-think |
| 11/17/2018 | California's Fires Wrecked Its Air Quality: Here's How to Protect Yourself | Interviewee | The New York Times https://www.nytimes.com/2018/11/17/health/air-quality.html?login=email&auth=login-email |
| 11/21/2018 | Here's How Smoke from California Wildfires Affects the Human Body | Interviewee | Live Science https://www.livescience.com/64144-wildfire-smoke-health-effects.html |
| 12/29/2018 | New Laws Deal with Minimum Wage, Tax Workaround, Lawmakers' Pay | Interviewee | Newsday https://www.newsday.com/news/region-state/new-york-new-laws-jan-1-1.25073844 |
| 03/19/2019 | Plaintiff's Expert Witness Faces Questions from J&J in N.J Talc-Asbestos Trial | Interviewee | Legal Newsline https://legalnewsline.com/stories/512299464-plaintiff-s-expert-witness-faces-questions-from-j-j-in-n-j-talc-asbestos-trial |
| 05/26/2019 | Up Close: Hammering out the New York City budget | Interviewee | ABC 7 https://abc7ny.com/politics/up-close-hammering-out-the-nyc-budget/5317748/ |

JA163

| | | | |
|---|---|---|---|
| 05/26/2019 | EMS Memorial Opens at 9/11 Memorial and Museum | Interviewee | WABC – Channel 7 https://www.northwell.edu/news/in-the-news/-up-close-hammering-out-the-new-york-city-budget |
| 06/11/2019 | Jon Stewart Lashes Out at House Hearing on 9/11 Responders Bill: "You Should Be Ashamed of Yourselves" | Interviewee | CBS News https://www.cbsnews.com/news/victim-compensation-fund-jon-stewart-lashes-out-at-house-hearing-on-911-responders-bill-you-should-be-ashamed-of/ |
| 06/11/2019 | Jon Stewart Excoriates Congress for 'Shameful' Support for 9/11 Victim Compensation Fund | Interviewee | New York Daily News https://www.nydailynews.com/news/politics/ny-911-victim-compensation-fund-jon-stewart-terrorism-luis-alvarez-20190611-d4dtysboifb6rc4oi7xztb6tva-story.html |
| 06/11/2019 | Jon Stewart Breaks Down at Hearing on 9/11 Responder Bill: 'You Should Be Ashamed of Yourselves' | Interviewee | Entertainment Tonight https://www.etonline.com/jon-stewart-breaks-down-at-hearing-on-911-responders-bill-you-should-be-ashamed-of-yourselves |
| 06/11/2019 | Congress Blasted for Inaction on Benefits Funding to 9/11 First Responders | Interviewee | Efficient Gov https://efficientgov.com/blog/2019/06/11/congress-blasted-for-inaction-on-benefits-funding-to-9-11-first-responders/ |
| 06/14/2019 | WTC Health Program Director: Half of 9/11 Firefighters Have Lung Issues | Interviewee | The Chief Leader https://thechiefleader.com/news/news_of_the_week/wtc-health-program-director-half-of-firefighters-have-lung-issues/article_ecaf7ab6-8d4b-11e9-afa7-b3f064a3d105.html |
| 06/16/2019 | Jon Stewart Says Mitch McConnell Has Only Supported 9/11 Victims Fund After Lobbying and Public Shaming | Interviewee | Newsweek https://www.newsweek.com/jon-stewart-says-mitch-mcconnell-has-only-supported-9/11-first-responders-fund-after-lobbying-1444244 |
| 06/16/2019 | Why 9/11 Fund is Facing a Crisis | Interviewee | Sunday Star Ledger |
| 07/03/2019 | The Full Story: 9/11 Victim Compensation Fund | Interviewee | WSHU https://www.wshu.org/post/update-911-victim-compensation-fund#stream/0 |
| 07/18/2019 | 9/11 VCF Renewal Passes House with Bipartisan Support | Interviewee | The Chief Leader https://thechiefleader.com/news/news_of_the_week/vcf-renewal-passes-house-with-bipartisan-support/article_a76017fa-a4ec-11e9-9dc1-671d32a22492.html |
| 07/23/2019 | Why It's So Hard to Predict How Much Funding 9/11 First Responders Need | Interviewee | PBS https://www.pbs.org/newshour/health/why-its-so-hard-to-predict-how-much-funding-9-11-first-responders-need |
| 07/25/2019 | Tough to Predict How Much Funding Sept. 11 First Responders Will Need | Interviewee | Tribune News Service https://pdffiles.s3.amazonaws.com/live/pdf/20190725/1920661206595123311_19019.pdf?dm_i=1Y9P,6EMM6,M5CIHK,PDCR6,1 |
| 07/30/2019 | Are There Toxins in Your Coffee? | Interviewee | The Well https://thewell.northwell.edu/dear-doctor/are-there-toxins-in-your-coffee |

**JA164**

| 08/01/2019 | New Wave of 9/11 Illnesses Emerging | Interviewee | WCBS Radio 880 https://wcbs880.radio.com/articles/new-wave-911-illnesses-emerging?dm_i=1Y9P,6F22L,M5CIHK,PFV73,1 |
|---|---|---|---|
| 08/05/2019 | Executive Profile: Dr. Jacqueline Moline | Interviewee | Long Island Business News https://libn.com/2019/08/05/executive-profile-dr-jacqueline-moline/?utm_term=Executive%20Profile%3A%20Dr.%20Jacqueline%20Moline&utm)campaign=afternoon&utm_content=email&utm_source=ealert&utm_medium=email&= |
| 09/10/2019 | The Wound that Won't Heal | Interviewee | City and State NY https://www.cityandstateny.com/articles/politics/new-york-city/911-the-wound-that-wont-heal.html |
| 09/11/2019 | 18 Years after 9/11, Former Students are Feeling Health Effects, but Full Consequences Remain Unknown | Interviewee | ABC News https://abcnews.go.com/US/18-years-911-students-feeling-health-effects-full/story?id=65484454 |
| 09/11/2019 | She Fled the 68th Floor. She's Finally Dealing with 9/11 Trauma | Interviewee | The New York Times https://www.nytimes.com/2019/09/11/nyregion/911-survivors-ptsd.html |
| 09/17/2019 | Jon Stewart, Kirsten Gillibrand health spread word on 9/11 healthcare | Interviewee | The Villager https://www.thevillager.com/2019/09/jon-stewart-kirsten-gillibrand-help-spread-word-on-9-11-healthcare/ |
| 09/30/2019 | Occupational Medicine and Its Many Application | Interviewee | Medical School Headquarters https://medicalschoolhq.net/ss-114-occupational-medicine-and-its-many-applications/ |
| 10/07/2019 | Uterine Cancer Rejected as Related to WTC Time | Interviewee | The Chief Leader https://thechiefleader.com/news/news_of_the_week/uterine-cancer-rejected-as-related-to-wtc-time/article_b5ab32d2-e6c7-11e9-9028-ebc0cd739e27.html |
| 10/09/2019 | NYC Schools Begin Contracting 9/11 Survivors about Health Risks | Interviewee | City & State New York https://www.cityandstateny.com/articles/policy/health-care/nyc-schools-begin-contacting-911-survivors-about-health-risks.html |
| 10/15/2019 | A New Study Suggests Tainted Talcum Powder Can Cause a Rare Cancer. Here's How that Could Play Out in the Courtroom | Interviewee | Time https://time.com/5692129/talcum-powder-mesothelioma/ |
| 10/16/2019 | Occupational Medicine Expert Publishes Study Linking Talc Powder to Mesothelioma | Interviewee | Mesothelioma.net https://mesothelioma.net/mesothelioma-news/occupational-medicine-expert-publishes-study-linking-talc-powder-to-mesothelioma/ |
| 10/16/2019 | Contaminated Baby Powders May be Linked to Rare Form of Cancer, Study Suggests | Interviewee | Romper https://www.romper.com/p/contaminated-baby-powders-may-be-linked-to-rare-form-of-cancer-study-suggests-19221063 |
| 10/17/2019 | Talc Powder Exposure Linked to Mesothelioma | Interviewee | PR Newswire https://www.prnewswire.com/news-releases/talc-powder-exposure-linked-to-mesothelioma-300940545.html |

**JA165**

| Date | Title | Role | Source |
|---|---|---|---|
| 10/18/2019 | Case Study Shows Asbestos in Talc Causes Mesothelioma | Interviewee | Asbestos.com https://www.asbestos.com/news/2019/10/18/talc-mesothelioma-case-study/ |
| 10/21/2019 | Study Links Asbestos in Talcum Powder to Deadly Cancer | Interviewee | Health Day https://consumer.healthday.com/cancer-information-5/lung-cancer-news-100/study-links-asbestos-in-talcum-powder-to-deadly-cancer-751430.html |
| 10/22/2019 | Mesothelioma Due to Asbestos in Talcum Powder | Interviewee | Doctor Radio, Sirus XM |
| 01/14/2020 | National Report: Elevated amount of 9/11 First Responders Diagnosed with Leukemia | Interviewee | News 12 Long Island http://longisland.news12.com/story/41563714/national-report-elevated-amount-of-911-first-responders-diagnosed-with-leukemia |
| 02/06/2020 | 9/11 Study Shows PTSD Tied to Earlier Death | Interviewee | Health Day https://consumer.healthday.com/mental-health-information-25/post-traumatic-stress-disorder-news-773/9-11-study-shows-ptsd-tied-to-earlier-death-754664.html |
| 06/30/2020 | NY's Indoor Malls will Need Air Filtration Systems Installed in Order to Reopen | Interviewee | News 12 Long Island https://longisland.news12.com/nys-indoor-malls-will-need-air-filtration-systems-installed-in-order-to-reopen-42311349 |
| 07/03/2020 | Attorney from Locust Valley Advocates for 9/11 Survivors during the Pandemic | Interviewee | Long Island Herald https://www.liherald.com/glenhead/stories/attorney-from-locust-valley-advocates-for-911-survivors-during-the-pandemic,126355?dm_i=1Y9P,6XSS5,M5CIHK,RY6UH,1 |
| 07/30/2020 | Researchers Conclude 9/11 WTC Exposure Can Cause Dementia | Interviewee | The Chief Leader https://thechiefleader.com/news/news_of_the_week/researchers-conclude-9-11-wtc-exposure-can-cause-dementia/article_ecab7c14-d29f-11ea-bfd9-6fb120a28e35.html?dm_i=1Y9P,6Z9NE,M5CIHK,S4U1C,1 |
| 08/19/2020 | UFT President: All Students, Adults Must Have Evidence They Don't Have COVID-19 Before Being Allowed Back in School | Interviewee | CBS New York https://newyork.cbslocal.com/2020/08/19/new-york-city-public-schools-coronavirus-covid-19-united-federation-of-teachers/ |
| 08/21/2020 | UFT Leader Threatens to Strike if Schools Reopen Unsafely Sept. 10 | Interviewee | The Chief Leader https://thechiefleader.com/news/news_of_the_week/uft-leader-threatens-to-strike-if-schools-reopen-unsafely-sept-10/article_a1d742be-e3ec-11ea-a01d-df770ff271a6.html |
| 08/23/2020 | UFT President: All Students Must have Evidence they don't have COVID-19 before Being Allowed Back in School | Interviewee | Jewish Voice https://thejewishvoice.com/2020/08/union-demand-test-every-nyc-student-teacher-for-covid-19-before-school-resumes/ |
| 02/06/2021 | In the Midst of our COVID Crisis, We Must Learn to Take Care of Ourselves. And Each Other. | Interviewee | KevinMD.com https://www.kevinmd.com/blog/2021/02/in-the-midst-of-our-covid-crisis-we-must-learn-to-take-care-of-ourselves-and-each-other.html |

**JA166**

## Report of Scholarship

### Publications

#### Book Chapters

**Moline** J, Levy S. Plumbers and Pipefitters. In: Greenberg MI, Hamilton RJ, Phillips SD, eds. *Occupational, Industrial, and Environmental, Toxicology, 2nd Edition*, 2001.

**Moline** J, Landrigan P. Lead. In: Rosenstock, L, Cullen M, Brodkin D, Redlich C, eds, *Textbook of Occupational and Environmental Medicine, 2nd Edition*, 2003

Spaeth KR, **Moline JM**. Outdoor Air Pollution. First Consult. Elsevier Online Publishing, 2013.

**Moline** J, Wilson L, Smith FR. The Influence of the WTC Programs on Research. In: Szema AM, ed. *World Trade Center Pulmonary Diseases and Multi-Organ System Manifestations*, 2017.

Crane M, Flynn K, Lucchini R, Mejia G, **Moline J**, Prezant D, Reibman J, Siegel de Hernandez M, Onea C, Opotow S. Health Impacts of September 11th. In: Opotow S, Shemtob ZB, eds. *New York after 9/11*, 2018.

#### Peer reviewed publications in print or other media

**Moline JM**, Markowitz SB. Medical surveillance for workers exposed to tuberculosis. *Occup Med*. 1994;9(4):695-721. PMID: 7878496. PMCID: None.

Todd AC, Wetmur JG, **Moline JM**, Godbold JH, Levin SM, Landrigan PJ. Unravelling the chronic toxicity of lead: an essential priority for environmental health. *Environ Health Perspect*. 1996;104 Suppl. 1:141-6. DOI: 10.1289/ehp.96104s1141. PMID: 872218. PMCID: PMC1469569.

Gunderson E, **Moline J**, Catalano P. Risk of developing noise-induced hearing loss in employees of urban music clubs. *Am J Ind Med*. 1997;31(1):75-9. DOI: 10.1002/(sici)1097-0274(199701)

Hatch M, **Moline J**. Women, work and health. *Am J Ind. Med*. 1997;32(3):303-8. DOI: 10.1002/(sici)1097-0274(199709)32:3<303::aid-ajim18>3.0co;2-z. PMID: None. PMCID: None.

Szeinuk J, de la Hoz R, **Moline J**. Lead Intoxication. *Can J of Med*. 1999;6(2):2-8. DOI: None. PMID: None. PMCID: None.

**Moline JM**, Golden AL, Todd AC, Godbold JH, Berkowitz GS. Lead exposure among young urban women. *Salud Publica Mex*. 1999;41 Suppl. 2:S82-S87. DOI: 10.1590/s0036-36341999000800003. PMID: 10850129. PMCID: None.

Berkowitz GS, **Moline JM**, Todd AC. Methodological issues related to studies of lead mobilization during menopause. *Salud Publica Mex*. 1999;41 Suppl. 2:S88-S92. DOI: 10.1590/s0036-36341999000800004. PMID: 10850130. PMCID: None.

Golden AL, **Moline J**, Bar-Chama N. Male reproduction and environmental and occupational exposures: a review of epidemiologic methods. *Salud Publica Mex*. 1999;41 Suppl. 2:S93-S105. DOI: 10.1590/s0036-3641999000800005. PMID: 10850131. PMCID: None.

Forman J, **Moline J**, Cernichiari E, Sayegh S, Torres JC, Landrigan MM, et al. A cluster of pediatric metallic mercury exposure cases treated with Meso 2,3-Dimercaptosuccinic acid (DMSA). *Environ Health Perspect*. 2000;108(6):575-7. DOI: 10.1289/ehp.00108575. PMID: 10856034. PMCID: None.

**Moline** J, Bukharovich IF, Wolff MS, Phillips R. Dietary flavonoids and hypertension: is there a link? *Med Hypotheses*. 2000;55(4):306-9. DOI: 10.1054/mehy.2000.1057. PMID: 11000057. PMCID: None.

**Moline JM**, Golden AL, Bar-Chama N, Smith E, Rauch ME, Chapin RE, et al. Exposure to hazardous substances and male reproductive health: a research framework. *Environ Health Perspect*. 2000;108(9):803-13. DOI: 10.1289/ehp.00108803. PMID: 11017884. PMCID: PMC2556920.

**Moline** J, Lopez Carrillo L, Torres Sanchez L, Godbold J, Todd A. Lactation and lead body burden turnover: a pilot study in Mexico. *J Occup Environ Med*. 2000;42(11):1070-5. DOI: 10.1097/00043764-200011000-00007. PMID: 11094785. PMCID: None.

Lopez-Carillo L, Torres-Sanchez L, **Moline** J, Ireland K, Wolff MS. Breast-feeding and serum DDT Levels among Mexican women of childbearing age. *Environ Res*. 2001;87(3):131-5. DOI: 10.1006/enrs.2001.4296. PMID: 11771926. PMCID: None.

Mitchell C, **Moline** J, Avery NA, Baker D, Blessman JE, Carson AI, et. al. Letters to the Editor:  In response to the 2002, Vol 22, No. 4 article entitled "The Rise and Fall of Occupational Medicine in the United States." *Am J of Prev Med*. 2002;23(4):307-9. DOI: 10.1016/s0749-3797(02)00521-4. PMID: 12406486. PMCID: None.

Levin S, Herbert R, Skloot G, Szeinuk J, Teirstein A, Fischler D, Milek D, Piligian G, Wilk-Rivard E, **Moline J**. Health effects of World Trade Center site workers. *Am J of Ind Med*. 2002;42:545-7. DOI: 10.1002/ajim.10154. PMID: 12439881. PMCID: None.

Osinubi OY, **Moline J**, Rovner, E, Sinha S, Perez-Lugo M, Demissee K, et al.   A pilot study of telephone-based smoking cessation intervention in asbestos workers. *J Occup Environ Med*. 2003;45:569-74. DOI: 10.1097/01.jom.0000063618.37065.ab. PMID: 12762083. PMCID: None.

de la Hoz RE, Afilaka AA, Bienenfeld LA, **Moline J**, Szeinuk J, Levin S, et al. Health status of the World Trade Center rescue, recovery and restoration workers. *Am J Respir Crit Care Med*. 2004;169:A646. DOI: None. PMID: None. PMCID: None.

Centers for Disease Control and Prevention. Physical Health Status of World Trade Center Rescue and Recovery Workers and Volunteers - New York City, July 2002-August 2004. *MMWR*. 2004;53(35):807-15. DOI: None. PMID: 15356455. PMCID: None.

Liu Z, Wolff MS, **Moline JM**. Analysis of environmental biomarkers in urine using an electrochemical detector. *J Chromatogr B Analyt Technol Biomed Life Sci*. 2005;819(1):155-9. DOI: 10.1016/j.jchromb.2005.02.005. PMID: 15797533. PMCID: None.

Piligian G, Szeinuk J, Levin S, **Moline J**, Milek D, Afilaka A, et al. Nonspecific triggers also provoke occupational asthma. *Am J Respir Crit Care Med*. 2006;173(3):357. DOI: 10.1164/ajrccm.173.3.357. PMID: 16436368. PMCID: None.

**Moline J**, Herbert R, Nguyen N. Health consequences of the September 11th World Trade Center attacks: A review. *Cancer Invest*. 2006;24(3):294-301. DOI: 10.1080/07357900600633965. PMID: 16809158. PMCID: None.

Trasande L, Boscarino J, Graber N, Falk R, Schechter C, Galvez M, Dunkel G, Geslani J, **Moline J,** et al. The environment in pediatric practice: A study of New York pediatricians' attitudes, beliefs, and practices towards children's environmental health. *J Urban Health*. 2006;83(4):760-72. DOI: 10.1007/s11524-006-9071-4. PMID: 16736113. PMCID: PMC2430476.

Herbert R, **Moline J**, Skloot G, Metzger K, Baron S, Luft B, et al. The World Trade Center disaster and the health of workers: Five-year assessment of a unique medical screening program. *Environ Health Perspect*. 2006;114(12):1853-8. DOI: 10.1289/ehp.9592. PMID: 17185275. PMCID: PMC1764159.

Mitchell C, Gochfeld M, Shubert J, Kipen H, **Moline J**, Langlieb A, et al. Surveillance of workers responding under the National Response Plan. *J Occup Environ Med*. 2007;49(8):922-7. DOI: 10.1097/JOM0b013e318145b2b0. PMD: 17693791. PMCID: None.

**Moline J**, Herbert R, Levin S, Stein D, Luft B, Landrigan P. The World Trade Center Medical Monitoring and Treatment Program: Comprehensive healthcare response in the aftermath of disaster. *Mt Sinai J Med*. 2008;75:67-75. DOI: 10.1002/msj.20022. PMID: 18500718. PMCID: None.

Savitz D, Oxman R, Metzger K, Wallenstein S, Stein D, **Moline J**, et al. Epidemiologic research on man-made disasters: Strategies and implications of definition for the World Trade Center worker and volunteer surveillance programs. *Mt Sinai J Med*. 2008;75:77-87. DOI: 10.1002/msj.20023. PMID: 18500719; PMCID: None.

Bills C, Nancy S, Sharma V, Charney D, Herbert R, **Moline J,** et al. The mental health of workers and volunteers responding to the events of 9/11: a review of the literature. *Mt Sinai J Med*. 2008;75:115-7. DOI: 10.1002/msj.20026. PMID: 18500712. PMCID: None.

Stellman JM, Smith RP, Katz CL, Sharma V, Charney DS, Herbert R, **Moline J**, et al. Enduring mental health morbidity and social function impairment in World Trade Center rescue, recovery and cleanup workers: The psychological dimension of an environmental health disaster. *Environ Health Perspect*. 2008;116(9):1248-53. DOI: 10.1289/ehp.11164. PMID: 18795171. PMCID: PMC2535630.

Skloot G, Schecter B, Herbert R, **Moline J,** Levin S, Crowley L, et al. Longitudinal assessment of spirometry in the World Trade Center medical monitoring program. *Chest*. 2009;135(2):492-8. DOI: 10.1378/chest.08-1391. PMID: 19141527. PMCID: None.

Bills CB, Dodson N, Stellman JM, Southwick S, Sharma V, Herbert R, **Moline JM,** et al. Stories behind the symptoms: a qualitative analysis of the narratives of 9/11 rescue and recovery workers. *Psychiatr Q*. 2009;80(3):173-89. DOI: 10.1007/s11126-009-9105-7. PMID: 19585238. PMCID: None

**Moline J**, Herbert R, Crowley L, Troy K, Hodgman E, Shukla G, et al. Multiple Myeloma in World Trade Center responders: a case series. *J Occup Environ Med*. 2009;51(8):896-902. DOI: 10.1097/JOM.0b013e3181ad49c8. PMID: 19620891. PMCID: None.

Wu M, Gordon RE, Herbert R, Padilla M, **Moline J**, Mendelson D, et al. Case report: Lung disease in World Trade Center responders exposed to dust and smoke: carbon nanotubes found in the lungs of World Trade Center patients and

dust samples. *Environ Health Perspect*. 2010;118(4):499-504. DOI: 10.1289/ehp.0901159. PMID: 20368128. PMCID: PMC2854726.

Dalton PH, Opiekun RE, Gould M, McDermott R, Wilson T, Maute C, Ozdener MH, Zhao K, Emmett E, Lees PS, Herbert R, **Moline J.** Chemosensory loss: functional consequences of the World Trade Center disaster. *Environ Health Perspect*. 118(9):1251-6, 2010. DOI: 10.1289/ehp.1001924. PMID: 20478761. PMCID: PMC2944085.

Patel SJ, McLaughlin MA, Berookhim B, Iyengar R, Sawit S, Platt D, **Moline J.** Relationship between erectile dysfunction and coronary artery calcification in a population of middle aged men in the World Trade Center Medical Monitoring and Treatment Program. *J Am Coll Cardiol*. 2010;55(10 Supplement);A128.E1196. DOI: 10.1016/S0735-1097(10)61197-7. PMID: None. PMCID: None.

Altman K, Desai S, **Moline J,** de la Hoz R, Herbert R, Gannon P, et al. Odor identification ability and self-reported upper respiratory symptoms in workers at the post-9/11 World Trade Center site. *Int Arch Occup Environ Health*. 2011;84:131-7. DOI: 10.1007/s00420-010-0556-9. PMID: 20589388. PMCID: None.

Udasin I, Schecter C, Crowley L, Sotolongo A, Gochfeld M, Luft B, **Moline J,** et al. Respiratory symptoms were associated with lower spirometry results during the first examination of WTC responders. *J Occup Environ Med*. 2011;53(1):49-54. DOI: 10.1097/JOM.0b013e3182028e5c. PMID: 21187790. PMCID: None.

Crowley L, Herbert R, **Moline J,** Wallenstein S, Shukla G, Schechter C, et al. "Sarcoid like" granulomatous pulmonary disease in World Trade Center disaster responders. *Am J Ind Med*. 2011;54(3):175-84. DOI: 10.1002/ajim.20924. PMID: 21298693. PMCID: None.

Wisnivesky J, Teitelbaum S, Todd A, Boffetta P, Crane M, Crowley L, de la Hoz R, Dellenbaugh C, Harrison Denise, Herbert Robin, Kim Hyun, Jeon Yunho, Kaplan Julia, Katz Craig, Levin Stephen, Luft Ben, Markowitz S, **Moline J,** et al. Persistence of multiple illnesses in World Trade Center rescue and recovery workers: a cohort study. *The Lancet*. 2011;378(9794):888-97. DOI: 10.1026/S0140-6736(11)61180-X. PMID: 21890053. PMCID: None.

Perritt KR, Herbert R, Levin SM, **Moline J.** Work-related injuries and illnesses reported by World Trade Center response workers and volunteers. *Prehosp Disaster Med*. 2011;26(6):401-7. DOI: 10.1017/S1049023X12000143. PMID: 22559304. PMCID: PMC4680838.

Crowley LE, Herbert R, **Moline JM,** Wallenstein S, Shukla G, Schechter C, et al. Response to Dr. Reich's letter: "Sarcoid-like granulomatous pulmonary disease in World Trade Center disaster responders: influence of incidence computation methodology in inferring airborne dust causation": "Sarcoid-like" granulomatous pulmonary disease in World Trade Center disaster responders. *Am J Ind Med*. 2011;54(11):894-5. DOI: 10.1002/ajim.20995. PMID: 22006593. PMCID: None.

Kim H, Herbert R, Landrigan P, Markowitz SB, **Moline JM,** Savitz DA, et al. Increased rates of asthma among World Trade Center disaster responders. *Am J Ind Med*. 2012;55(1):44-53. DOI: 10.1002/ajim.21025. PMID: 22068920. PMCID: None.

Pietrzak RH, Schechter CB, Bromet EJ, Katz CL, Reissman DB, Ozbay F, Sharma V, Crane M, Harrison D, Herbert R, Levin SM, Luft BJ, **Moline JM,** et al. The burden of full and partial posttraumatic stress disorder among police involved in the World Trade Center rescue and recovery effort. *J Psychiatr Res*. 2012;46:835-42. DOI: 10.1016/j.jpsychires.2012.03.011. PMID: 22464942. PMCID: None.

Luft B, Schechter C, Kotov R, Broihier J, Reissman D, Guerrera K, Udasin I, **Moline J,** et al. Exposure, probable PTSD and lower respiratory illness among World Trade Center rescue, recovery and clean-up workers. *Psychol Med*. 2012;42:1069-79. DOI: 10.1017/S003329117100256X. PMID: 22459506. PMCID: PMC3315774.

Kim H, Dropkin J, Spaeth K, Smith F, **Moline J.** Patient handling and musculoskeletal disorders among hospital workers: analysis of 7 years of institutional workers' compensation claims data. *Am J Ind Med*. 2012;55(8):683-90. DOI: 10.1002/ajim.22006. PMID: 22237853. PMCID: None.

Kim H, **Moline J,** Dropkin J. Aging, sex, and cost of medical treatment. 2013; *J Occup Environ Med*. 55(5):572-8. DOI: 10.1097/JOM.0b013e318289eeda. PMID: 23618892. PMCID: None.

Mani V, Wing SK, Sawit ST, Calcagno C, Maceda C, Ramachandran S, Fayad ZA, **Moline J,** et al. Relationship between particulate matter exposure and atherogenic profile in "Ground Zero" workers as shown by dynamic contrast enhanced MR imaging. *Int J Cardiovasc Imaging*. 2013;29(4):827-33. DOI: 10.1007/s10554-012-0154-x. PMID: 23179748. PMCID: PMC3647018.

Pietrzak RH, Feder A, Schechter CB, Singh R, Cancelmo L, Bromet EJ, Katz CL, Reissman DB, Ozbay F, Sharma V, Crane M, Harrison D, Herbert R, Levin SM, Luft BJ, **Moline JM,** et al. Dimensional structure and course of posttraumatic stress symptomatology in World Trade Center responders. *Psychol Med*. 2014;44(10):2085-98. DOI: 10.1017/S0033291713002924. PMID: 24289878. PMCID: None.

Pietrzak RH, Feder A, Singh R, Schechter CB, Bromet EJ, Katz CL, Reissman DB, Ozbay F, Sharma V, Crane M, Harrison D, Herbert R, Levin SM, Luft BJ, **Moline JM,** et al. Trajectories of PTSD risk and resilience in World Trade

Center responders: An 8-year prospective cohort study. *Psychol Med.* 2014;44(1):205-19. DOI: 10.1017/S0033291713000597. PMID: 23551932. PMCID: None.

Zvolensky MJ, Kotov R, Schechter CB, Gonzalez A, Vujanovic A, Pietrzak R, Crane M, Kaplan J, **Moline J,** et al. Post-disaster stressful life events and WTC-related posttraumatic stress, depressive symptoms, and overall functioning among responders to the World Trade Center disaster. *J Psychiatr Res.* 2015;61:97-105. DOI: 10.1016/j.jpsychires.2014.11.010. PMID: 25499737. PMCID: None.

Kotov R, Bromet EJ, Schechter C, Broihier J, Feder A, Friedman-Jimenez G, Gonzalez A, Guerrera K, Kaplan J, **Moline J,** et al. Posttraumatic stress disorder and the risk of respiratory problems in the World Trade Center responders: Longitudinal test of a pathway. *Psychosom Med.* 2015;77(4):438-48. DOI: 10.1097/PSY.0000000000000179. PMID: 25919367. PMCID: None.

Zvolensky MJ, Farris SG, Kotov R, Schechter CB, Bromet E, Gonzalez A, Vuganovic A, Pietrzak R, Crane M, Kaplan J, **Moline J,** et al. World Trade Center disaster and sensitization to subsequent life stress: A longitudinal study of disaster responders. *Preventive Medicine.* 2015;75:70-4. DOI: 10.1016/j.ypmed.2015.03.017. PMID: 25840022. PMCID: None.

Taioli E, Wolf AS, **Moline JM,** Camacho-Rivera M, Flores RM. Frequency of surgery in black patients with malignant pleural mesothelioma. *Dis Markers.* 2015:282145. DOI: 10.1155/2015/282145. PMID: 26063951. PMCID: PMC4430630.

Dasaro CR, Holden WL, Berman KD, Crane MA, Kaplan JR, Lucchini RG, Luft BJ, **Moline JM,** et al. Cohort profile: World Trade Center Health Program general responder cohort. *Int J Epidemiol.* 2017:46(2):e9. DOI: 10.1093/ije/dyv099. PMID: 26094072. PMCID: PMC6074831.

Gan W, **Moline J,** Kim H, Mannino DM. Exposure to loud noise, bilateral high-frequency hearing loss and coronary heart disease. *Occup Environ Med.* 2015;73(1):34-41. DOI: 10.1136//oemed-2014-102778. PMID: 26374778. PMCID: None.

Dropkin J, **Moline J,** Power PM, Kim H. A qualitative study of health problems, risk factors, and prevention among Emergency Medical Service workers. *Work.* 2015;52:935-51. DOI: 10.3233/WOR-1521393. PMID: 26409382. PMCID: None.

Stein C, Wallenstein S, Shapiro M, Hashim D,  **Moline J,** Udasin I, et al. Mortality among World Trade Center rescue and recovery workers, 2002-2011. *Am J Ind Med.* 2015;59(2):87-95. DOI: 10.1002/ajim.22558. PMID: 26727695. PMCID: PMC4715601.

Jiang J, Icitovic N, Crane MA, Dasaro CR, Kaplan JR, Lucchini RG, Luft BJ, **Moline JM.** Sex differences in asthma and gastroesophageal reflux disease incidence among the World Trade Center Health Program general responder cohort. *Am J Ind Med.* 2016;59(9),815-22. DOI: 10.1002//ajim.22634. PMID: 27424876. PMCID: None.

Feder A, Mota N, Salim R, Rodriguez J, Singh R, Schaffer J, Schechter C, Cancelmo L, Bromet EJ, Katz CL, Reissman DB, Ozbay F, Kotov R, Crane M, Harrison DJ, Levin SM, Luft BJ, **Moline JM,** et al. Risk, coping and PTSD symptom trajectories in World Trade Center responders. *J Psychiatr Res.* 2016;82:68-79. DOI: 10.1016/j.psychires.2016.07.003. PMID: 27468166. PMCID: None.

**Moline JM,** McLaughlin MA, Sawit ST, Maceda C, Croft LB, Goldman ME, et al. The prevalence of metabolic syndrome among law enforcement officers who responded to the 9/11 World Trade Center attacks. *Am J Ind Med.* 2016;59(9):752-60. DOI: 10.1002/ajim.22649. PMID: 27582477. PMCID: None.

Icitovic N, Onyebeke LC, Wallenstein S, Dasaro CR, Harrison D, Jiang J, Kaplan JR, Lucchini RG, Luft BJ, **Moline JM,** et al. The association between body mass index and gastroesophageal reflux disease in the World Trade Center Health Program General Responder Cohort. *Am J Ind Med.* 2016;59(9):761-6. DOI: 10.1002/ajim.22637. PMID: 27582478. PMCID: None.

Dropkin J, **Moline J,** Kim H, Gold J. Blended work as a bridge between traditional workplace employment and retirement. *Work Aging Retire.* 2016;2(4)373-83. DOI: 10.1093//workar/waw017. PMID: None. PMCID: None.

Luchhini RG, Hashim D, Acquilla S, Basanets A, Bertazzi PA, Bushmanov, A, Crane M, Harrison DJ, Holden W, Landrigan PJ, Luft BJ, Mocarelli P, Mazitova N, Melius J, **Moline JM,** et al. A comparative assessment of major international disasters: the need for exposure assessment, systematic emergency preparedness, and lifetime health care, *BMC Public Health.* 2017;17(1):46. DOI: 10.1186/s12889-016-3939-3. PMIC: 28061835. PMCID: PMC5219808.

Markowitz SM, **Moline JM.** Malignant mesothelioma due to exposure to asbestos in dental tape. *Am J Ind Med.* 2017;60(5):437-42. DOI: 10.1002/ajim.22696. PMID: 28244608. PMCID: None.

Kim H, Baron S, Baidwan NK, Schwartz A, **Moline J.** New onset of asthma and job status change among World Trade Center responders and workers, *Am J Ind Med.* 2017;60(12):1039-48. DOI: 10.1002/ajim.22774. PMCID. None.

Kim H, Kriebel D, Liu B, Baron S, Mongin SJ, **Moline J**. Standardized morbidity ratios of four chronic health conditions among World Trade Center responders: Comparison to National Health Interview Survey, *Am J Ind Med*. 2018;61(5):413-21. DOI: 10.1002/ajim.22825. PMID: 29508426. PMCID: None.

Uchida M, Feng H, Feder A, Mota N, Schechter CB, Woodworth HD, Kelberman CG, Crane M, Landrigan P, **Moline J,** et al. Parental posttraumatic stress and child behavioral problems in World Trade Center responders, *Am J Ind Med*. 2018;61(6):504-14. DOI: 10.1002/ajim.22838. PMID: 29574927. PMCID: None.

Hashim D, **Moline J**, Udasin I, Lucchini R, Galsky M, et al. Prostate characteristics in the WTC population, *Eur J of Cancer Prev*. 2018;27(4):347-54. DOI: 10.1097/CEJ.0000000000000315. PMIC: 27898584. PMCID: PMC5443704.

Bellehsen M, **Moline J**, Rasul R, Bevilacqua K, Schneider S, et al. A quality improvement assessment of the delivery of medical health services among WTC responders treated in the community, *Int J Environ Res Public Health*. 2019;16(9):1536. DOI: 10.3390/ijerph16091536. PMIC: 31052246. PMCID: PMC6540212.

Dropkin J, Power P, Rasul R, **Moline J**, Kim H. Effect of resiliency and age on musculoskeletal injuries and lost workdays in emergency medical service personnel, *Int J Ind Ergon*. 2019;69:184-93. DOI: 10.1016/j.ergon.2018.11.008. PMID: None. PMCID: None.

Graber JM, Harris G, Black K, Lucchini RG, Giuliano AR, Dasaro CR, Shapiro M, Steinberg MB, Crane MA, **Moline JM,** et al. Excess HPV-related head and neck cancer in the World Trade Center Health Program general responder cohort, *Int J Cancer*. 2019;145(6):1504-9. DOI: 10.1002/ijc.32070. PMID: 30556136. PMCID: None.

Manderski B, Black K, Udasin IG, Giuliano AR, Steinberg MB, Strickland PO, Black TM, Dasaro CR, Crane M, Harrison D, **Moline J,** et al. Risk factors for head and neck cancer in the World Trade Center Health Program General Responder Cohort: Results from a nested case-control study, *Occ Environ Med*. 2019;76(11):854-60. DOI: 10.1136/oemed-2019-105890. PMID: 31515248. PMCID: None.

Diab O, DePierro J, Cancelmo L, Schaffer J, Schechter C, Dasaro C, Todd A, Crane M, Udasin I, Harrison D, **Moline J,** et al. Mental healthcare needs in World Trade Center responders: Results from a large, population-based health monitoring cohort, *Adm Policy Ment Health*. 2019;47(3):427-34. DOI: 10.1007/s10488-019-00998-z. PMID: 31776767. PMCID: PMC7159995.

Shapiro MZ, Wallenstein SR, Dasaro CR, Lucchini RG, Sacks HS, Teitelbaum SL, Thanik ES, Crane MA, Harrison DJ, Luft BJ, **Moline JM,** et al. Cancer in general responders participating in World Trade Center Health Programs, 2003-2013. *JNCI Cancer Spectr*, 2019:4(1):pkz090. DOI: 10.1093/jncics/pkz090. PMID: 32337498. PMCID: PMC7050150.

**Moline J**, Bevilacqua K, Gordon RE. Authors' response to "Evidence does not support exposure to cosmetic talc as a cause of malignant mesothelioma," *J Occup Environ Med*, 2019:62(2):e85-6. DOI: 10.1097/JOM.0000000000001790. PMID: 31815813. PMCID: None.

**Moline J**, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc, *J Occup Environ Med*. 2020:62(1):11-7. DOI: 10.1097/JOM.0000000000001723. PMID: 31609780. PMCID: None.

Chen C, Salim R, Rodriguez J, Singh R, Schechter C, Dasaro CR, Todd A, Crane M, **Moline JM**, et al. The burden of subthreshold PTSD in World Trade Center responders in the second decade after 9/11. *J Clin Psychiatry*. 2020;81(1):19m12881. DOI: 10.4088/JCP.19m12881. PMID: 31967749. PMCID: None.

DePierro J, Lowe SM, Haugen PT, Cancelmo L, Schaffer J, Schecter CB, Dasaro CR, Todd AC, Crame M, Luft BJ, **Moline JM,** et al. Mental health stigma and barriers to care in World Trade Center responders: Results from a large, population-based health monitoring cohort. *Am J Ind Med*, 2020 Nov 25, online ahead of print. DOI: 10.1002/ajim.23204. PMID: 33241583. PMCID: None.

Sloan N, Teitelbaum S, Shapiro M, Sabra A, Dasaro C, Crane M, Harrison D, **Moline J,** et al. Cardiovascular disease in the World Trade Center Health Program General Responder Cohort. *Am J Ind Med*, 2020 Dec 14, online ahead of print. DOI: 10.1002/ajim.23207. PMID: 33315266. PMCID: None.

Manderski MTB, Black K, Udasin IG, Black TM, Steinberg MB, Giuliano A, Luft BJ, Harrison D, Crane MA, **Moline J,** et al. Retrospective assessment of risk factors for head and neck cancer among World Trade Center General Responders. *Front Public Health*. eCollection 2020;8:488057. DOI: 10.3389/fpubh.2020.488057. PMID: 33330296. PMCID: PMC7734028.

Whealan J, Ciro D, Dasaro C, Udasin I, Crane M, **Moline J**, et al. Race/ethnic differences in prevalence and correlates of posttraumatic stress disorder in the World Trade Center responders: Results from a population-based, health monitoring cohort. *Psychol Trauma*. In press.

**Non-peer reviewed scientific or medical publications/materials in print or other media**

**Moline JM,** Golden AL, Highland JH, Kao AS. Health effects evaluation of theatrical smoke, haze, and pyrotechnics. Prepared for: Equity-League Pension and Health Trust Funds (2000) and at

**JA171**

http://www.actorsequity.org/TheatreNews/smokefog_0501.html, Theatre News: Landmark Theatrical "Smoke and Fog" Study (2001).

**Professional educational materials or reports, in print or other media**

**Clinical Guidelines and Reports**

New York State (NYS) Workers' Compensation Medical Guidelines for Chronic Pain Management
Advances in Screening and Treatment for WTC Responders and Survivors, CME Presentation, Medscape, August 28, 2015.

**Thesis**

Utility of General Medical Screening Tests in Asbestos Exposed Individuals
Mount Sinai School of Medicine, New York, NY. 1993.

**Abstracts, Poster Presentations and Exhibits Presented at Professional Meetings**

Sokas RK, **Moline JM**, Ryan M, Manyak MJ, Bar-Chama N, Landrigan PJ. Depressed testosterone levels among five cadmium-exposed workers. American Public Health Association Annual Meeting, San Diego, CA, October 29 – November 2, 1995.
**Moline J**, Todd A, Golden A, Godbold J, Brown Y, Ginde N, Berkowitz G. Lead Mobilization During Pregnancy and Lactation in Urban Women. Presented at Superfund Basic Research Program: A Decade of Improving Health Through Multi-Disciplinary Research. Chapel Hill, NC, February 1997.
Woo P, Ostrowski R, **Moline J**, Schaefer-Mojica J, Minasian A. Perceptual/Acoustic Qualities of the Broadway Voice Before and After Performance: Pennsylvania. The Voice Foundation's 29th Annual Symposium, Presented, June 2000.
**Moline JM**, Golden AL, Todd AC. Disparities in Environmental Lead Exposure in the United States. American Public Health Association Conference, Boston, MA, November 2000.
**Moline J**, Golden A, Kao A, Highland. Health Effects Evaluation of Theatrical Smoke, Haze, and Pyrotechnics. American Occupational Health Conference, Atlanta, GA, May 2003.
Stern P, Chan K, **Moline J**. Health Effects of the World Trade Center Disaster: A Chart Review. American Occupational Health Conference, Atlanta, GA, May 2003.
Herbert R, Levin S, **Moline J**, Todd AC, Fang S, Skloot G, Katz C, Landsbergis P. The World Trade Center Worker and Volunteer Medical Screening Program: Preliminary Findings. American Occupational Health Conference, Atlanta, GA, May 2003.
Garapati A, Skloot G, Grundfast S, Schechter C, Goldman M, Levin S, Herbert R, **Moline J,** Teirstein A. Forced Oscillation Testing in Symptomatic and Asymptomatic Individuals Exposed at the World Trade Center Disaster Site. ATS International Conference, Seattle, WA, May 2003.
Wu M, Padilla M, **Moline JM,** Herbert R, Mendelson D, Litle V, Travis W, Gil J. Bronchiolitis and Peribronchiolar Interstitial Disease in 4 Patients Exposed to WTC Smoke and Dust. Pulmonary Pathology Society Biennial Meeting, June 20-22, 2007.
Desai S, Doty R, de la Hoz R, **Moline JM**, Herbert R, Gannon P, Altman K. Prevalence and Severity of Anosmia in Workers Exposed to the World Trade Center Site. Rhinology World, American Rhinologic Society, Philadelphia, PA, April 15-19, 2009.
DCE-MRI for the Evaluation of Atherosclerosis in Patients with Exposure to Particulate Matter. Mani V, Sawit S, Calcagno C, Maceda C, Moncrieff C, Fayad Z, **Moline J**, McLaughlin MA. International Society for Magnetic Resonance in Medicine. Stockholm, Sweden, May 4, 2010.
Croft L, McLaughlin MA, Bander J, Goldberg A, Krasner A, Duvall W, Goldman ME, **Moline J**. First Documentation of Cardiac Dysfunction Following Exposure to the World Trade Center Disaster. JACC, 55:A86.E810, 2010.
Sawit S, McLaughlin MA, Garcia-Alvarez A, Fahima DK, Maceda C, **Moline J**. Evidence of Impaired Vascular Reactivity Following Dust Exposure in Participants of the World Trade Center Medical Monitoring and treatment Program. American Heart Association QCOR, Scientific Sessions, Washington DC, May 12, 2011.

McLaughlin MA, Tamler R, Woodward M, **Moline JM**, Sawit St, O'Boyle J, Berookhim B, Lu K, Bar-Chama N. Hypogonadism is Independently Associated with Obstructive Sleep Apnea in Middle-aged Men. American Heart Association QCOR, Scientific Sessions, Washington, DC, May 12, 2011.

Berookhim B, McLaughlin MA, Woodward M, Iyengar R, Sawit S, Maceda C, **Moline J**, Bar-Chama N. Erectile Dysfunction is Independently Associated with Sleep Apnea in a Large Population of Middle-Aged Men. American Urological Association Annual Meeting, Washington DC, May 16, 2011.

Kim H, Dropkin J, Spaeth K, Smith F, **Moline J**. Patient handling and musculoskeletal disorders among hospital workers: Analysis of 7 years of institutional Workers' Compensation claims data. EPICOH, The Scientific Committee of Epidemiology in the International Commission of Occupational Health, Oxford, UK, September 7 – 9, 2011.

Kim H, Dropkin J, Spaeth K, Smith F, **Moline J**. Occupational Injuries among EMS Workers in a large Healthcare System in North America: 7 Years of Workers' Compensation Claims. XIX World Congress on Safety and Health at Work, Istanbul, Turkey, September 11 – 15, 2011.

Escolin N, Sawit S, Iyengar R, Maceda C, O'Boyle J, Noorani F, Kurtis S, Berookhim B, **Moline J**, Tamler R, Bar-Chama N, McLaughlin MA. Erectile Dysfunction is Significantly Associated with Sleep Apnea Independent of Metabolic Syndrome and CRP. Sexual Medicine Society of North America, Las Vegas, NV, November 10-13, 2011.

Kurtis S, Berookhim B, Iyengar R, Escolin N, O'Boyle J, Noorani F, Sawit S, Maceda C, Tamler R, **Moline J**, McLaughlin MA, Bar–Chama N. Erectile Dysfunction Is Associated With Abnormal Coronary Artery Calcium Scores Independent Of Framingham Risk Score. Sexual Medicine Society of North America, Las Vegas, NV, November 10-13, 2011.

Noorani F, McLaughlin MA, Maceda C, Tamler R, Iyengar R, Sawit S, Escolin N, O'Boyle J, Kurtis S, **Moline J**, Berookhim B, Bar–Chama N. Middle-Aged Men with Hypogonadism are at High Risk for Obstructive Sleep Apnea, Independent of Body Mass Index and Framingham Risk Score. Sexual Medicine Society of North America, Las Vegas, NV, November 10-13, 2011.

O'Boyle J, Iyengar R , Tamler R, Sawit S, Maceda C, Escolin N, Noorani F, Kurtis S, Berookhim B, **Moline J**, Bar–Chama N, McLaughlin MA. Hypogonadism, Metabolic Syndrome, and 10 Year Cardiovascular Disease Risk in Middle-Aged Men. Sexual Medicine Society of North America, Las Vegas, NV, November 10-13, 2011.

Iyengar RL, Sawit ST, Messeh HA, Escolin N, Maceda C, **Moline J**, McLaughlin MA. Low Total Testosterone is Associated with Inflammation and Dyslipidemia in a Large Population of Asymptomatic Middle Aged Men. American Heart Association, Scientific Sessions, Orlando, FL, November 13, 2011.

Mani V, Sawit ST, Maceda C, Calcagno C, Wong S, Fayad ZA, **Moline J**, McLaughlin MA. Particulate Matter Exposure Worsens Atherogenic Profile in "Ground Zero" Workers. American Heart Association, Scientific Sessions, Orlando, FL, November 15, 2011.

Fishman ML, Iyengar RL, Sawit ST, Maceda C, O'Boyle J, Dweck J, Mount Sinai Sch of Med, New York, NY; **Moline JM**, Hofstra North Shore-LIJ School of Med, Hempstead, NY; McLaughlin MA, Mount Sinai Sch of Med, New York, NY. C-Reactive Protein and Sleep Apnea Symptoms in World Center Responders. American Heart Association, Scientific Sessions, Orlando, FL, November 15, 2011.

Kim H, Dropkin J, **Moline JM**. Inequality of Determinants between MSD Occurrence and Cost of MSD Treatment among Hospital Workers. International Commission on Occupational Health, Cancun, Mexico, March 18-23, 2012.

Eberhart T, **Moline J**. Employee Wellness – Know Your Numbers: Employee Wellness Initiatives are Critical to Helping Employees Determine their Risks for Serious Illness, such as Heart Disease, Diabetes, and Stroke. American Association of Occupational Health Nurses, Inc., Nashville, TN, April 2012.

Liu B, Tak S, Silverman R, **Moline J**, Dropkin J, Kim H. The Role of Syndromic Surveillance in Assessing Sandy's Health Impact: Safe and Effective Flood and Mold Remediation – after Super Storm Sandy and Other National Disasters. International Conference and Training Meeting, Bethesda, MD, March 13-15, 2013.

Pfeffer MA, Iyengar RL, Croft LB, Mena PV, Sawit ST, Maceda C, Beckford BJ, **Moline J**, McLaughlin MA. High Risk for Obstructive Sleep Apnea is Associated with Left Ventricular Diastolic Dysfunction in a Large Population of Middle-Aged Men without Overt Cardiac Symptoms. American Heart Association, Epidemiology and Prevention/Nutrition, Physical Activity and Metabolism, Scientific Sessions, New Orleans, LA, March 20, 2013.

Mena PV, Croft LB, Iyengar RL, Pfeffer MA, Sawit ST, Maceda C, Beckford BJ, Escolin N, **Moline J**, McLaughlin MA. Low Total Testosterone is Associated with Left Ventricular Diastolic Dysfunction in a Cohort of Asymptomatic Middle-Aged Men. American Heart Association, Epidemiology and Prevention/Nutrition, Physical Activity and Metabolism, Scientific Sessions, New Orleans, LA, March 22, 2013.

Kim H, **Moline J**, Dropkin J. Aging, Cost of Medical Treatment, and Effect Modification by Gender. American Occupational Health Conference, Orlando, FL, April 28-May 1, 2013.

Page 31 of 32

**JA173**

O'Boyle J, Iyengar R, Maceda C, Sawit ST, Beebe H, **Moline JM**, Bar–Cham N, McLaughlin MA. <u>Severity of Erectile Dysfunction and Depression in Healthy Middle-Aged Men</u>. Sexual Medicine Society of North America (SMSNA) Fall Scientific Meeting, New Orleans, LA, November 21-24, 2013.

O'Boyle J, Iyengar R, Maceda C, Sawit ST, Beebe H, **Moline JM**, Bar–Chama N, McLaughlin MA. <u>Association between Depression and Hypogonadism in Middle-Aged Men</u>. Sexual Medicine Society of North America (SMSNA) Fall Scientific Meeting, New Orleans, LA, November 21-24, 2013.

**Moline J.** <u>Employee Claims – 9/11: How the Workers' Compensation Board Responded and Where We Stand Today</u>, Panel Discussion, New York State Workers' Compensation Centennial Conference, Albany, NY, July 15, 2014.

**Moline J,** Smith F, Teitelbaum S, Kim H. <u>Medical Surveillance of Fire Fighters Post-Katrina</u>. American Public Health Association Annual Meeting, New Orleans, LA, November 17, 2014.

Kim H, Camacho-Rivera M, Smith F, Kriebel D, **Moline J.** <u>Job status change and asthma among WTC responders</u>. World Trade Center Research Principal Investigator Autumn/Winter Meeting, New York, NY, November 19, 2014.

Kim H, Camacho M, Kriebel D, Baron S, **Moline J.** <u>Socioeconomic Status and Asthma among WTC Responders</u>. Society for Epidemiologic Research, Denver, CO, May 2015.

Kim H, Liu B, Smith F, Baron S, **Moline J.** <u>Health Effect of the WTC Disaster among Responders: 10 Year Assessment</u>. International Congress on Occupational Health, Seoul, South Korea, June 2015.

Patal B, Pak T, Cohen S, **Moline J**, Szeinuk J, Shah A, Rahmani N, Shah R. <u>Breathing It All In: A Health System's Approach to Asbestos Screening Presentation Format</u>. RSNA 102nd Scientific Assembly and Annual Meeting, Chicago, IL, November 27-December 2, 2016.

Dropkin J, **Moline J,** Golden A. <u>Workers' Compensation Barriers to Physical Therapy among Broadway Actors: A Qualitative Pilot Study</u>. Feinstein Institute for Medical Research Northwell Health, 3rd Annual Clinical Research Poster Presentation Session, Hofstra Northwell School of Medicine, Hempstead, NY, September 14, 2016.

**Moline J,** Golden A, Arena G, Caruso V, Purcell C. <u>Northwell Health – FASNY Study of Cancer in Volunteer Firefighters in New York State: Work in Progress</u>. Summer Student Intern Poster Session, Feinstein Institute for Medical Research, Manhasset, NY, August 16, 2017.

Black T, Bover Manderski MT, Black K, Malik P, Udasin IG, Giuliano A, Steinberg M, Davis C, Todd A, Lucchini R, Crane M, **Moline JM,** Harrison D, Luft B, Graber, JM. <u>Head and Neck Cancer among World Trade Center General Responders: A sensitivity analysis using WTC Health Program monitoring data to assess risk factors</u>. American Society of Preventive Oncology (ASPO) 42nd Annual Meeting, New York, NY, March 10-13, 2018.

Black T, Bover Manderski MT, Black K, Malik P, Udasin IG, Todd A, Lucchini R, Giuliano A, Steinberg M, Davis C, Malik P, Crane M, **Moline JM,** Harrison D, Luft B, Graber, JM. <u>Exploring the Utility of World Trade Center Health Program Monitoring Data for Cancer Risk Factor Analysis: Preliminary findings for head and neck cancer</u>. ISES-ISEE Joint Annual Meeting, Ottawa, Canada, August 26-30, 2018.

Arena G, Caruso V, Purcell C, Golden A, **Moline J.** <u>Northwell Health – FASNY Study of Cancer in Volunteer Firefighters in New York State: Work in Progress</u>. 5th Annual Clinical Research Poster Session, Donald and Barbara Zucker School of Medicine at Hofstra/Northwell, Hempstead, NY, September 26, 2018.

Alexandri M, Longo W, **Moline J.** <u>Case Report: Occupational Asbestos Exposure from Pizza Ovens Linked to Malignant Mesothelioma</u>. Donald and Barbara Zucker School of Medicine at Hofstra/Northwell Scholarship Day, Hempstead, NY, November 7, 2018.

Elangovan M, Golden A, Arena G, Rasul R, **Moline J,** Cohen S. <u>A Comparison of Coronary Artery Calcifications among Groups of Asbestos-Exposed Union Workers</u>. Donald and Barbara Zucker School of Medicine at Hofstra/Northwell Scholarship Day, Hempstead, NY, November 7, 2018.

Cohen SL, Rasul R, Arena G, Golden A, Szeinuk J, **Moline J.** <u>Screening for cardiovascular disease in asbestos-exposed workers</u>. NY/NJ Occupational Safety and Health Center Annual Scientific Meeting, New York, NY, November 20, 2018.

**Moline J,** Golden A, Arena G, Caruso V, Hobbie B, Purcell C, McQueen B. <u>FASNY-Northwell Health Study of Cancer in Volunteer Fire Fighters in New York State: Research in Progress</u>. State of the Science National Firefighter Cancer Symposium, Miami, FL, June 9, 2019.

Rasul R, Schwartz R, Bellehsen M, Schneider S, **Moline J,** Kornrich J. <u>A Quality Improvement Assessment of the Delivery of Mental Health Services among WTC Responders Treated in the Community</u>. Annual Meeting of the International Society of Traumatic Stress Studies, Boston, MA, November 14, 2019.

# REFERENCE LIST
Jacqueline Moline, M.D.

1. Acheson E, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up, British J Ind Med, 1982;39:344-8.
2. Agudo A, González CA, Bleda MJ, et al. Occupation and risk of malignant pleural mesothelioma: A case–control study in Spain. Am J Ind Med. 2000;37(2):159-168.
3. American Thoracic Society. Diagnosis and initial management of nonmalignant diseases related to asbestos. American journal of respiratory and critical care medicine. 2004 Sep 15;170(6):691.
4. Ampleford EJ, Ohar J. Mesothelioma: you do not have to work for it. Diagn Cytopathol. 2007 Dec;35(12):774-7.
5. Anderson HA, Lilis R, Daum SM, Fischbein AS, Selikoff IJ. Household-contact asbestos neoplastic risk. Ann N Y Acad Sci. 1976;271:311-23.
6. Anderson HA, Lilis R, Daum SM, Selikoff IJ. Asbestosis among household contacts of asbestos factory workers. Ann N Y Acad Sci. 1979;330:387-99.
7. Anderson PH, Farino WJ. Analysis of fiber release from certain asbestos products. US. Environmental Protection Agency, Office of Toxic Substances. 1982(68-01):5960.
8. Anderson A, Barlow L, Engeland A, Kjaerheim K, Lynge K, Pukkala E. Work-related cancer in the Nordic countries, Scand J Work Environ Health, 1999;25 suppl 2:1-116.
9. Andrion, Alberto, et al. Malignant Peritoneal Mesothelioma in a 17-Year-Old Boy with Evidence of Previous Exposure to Chrysotile and Tremolite Asbestos, Human Pathology, Volume 25, No. 6 (June 1994).
10. Arul KJ, Holt PF, Mesothelioma Possibly Due to Environmental Exposure to Asbestos in Childhood, Int. Arch. Occup. Environ. Hlth 40, 141-143 (1977).
11. Asbestos, Asbestosis, and Cancer: Helsinki Criteria for Diagnosis and Attribution 2014, Finnish Institute of Occupational Health (2014).
12. Asbestos. OSHA Fact Sheet, (2014).
13. Asbestos Dust Called a Hazard To at Least One-Fourth of U.S., The New York Times (March 2, 1966)
14. Asbestos exposures during the cutting and machining of asbestos cement pipe. Equitable Environmental Health, Inc., report to A/C Pipe Producers Association, Arlington, Va. 1977.
15. Asbestos Fibers Found in Baby Powder, The Washington Post, March 8, 1976.
16. Asbestos Found in Ten Powders, The New York Times, March 10, 1976.
17. Asbestos: You'll Be All Right if You Just Stop Breathing, New York Times (July 18, 1971)
18. Asbestos Safety and Eradication Agency. Chrysotile Key Facts. Fact Sheet, Australian Government; 2019
19. Ascoli V, Scalzo CC, Facciolo F, Martelli M, Manente L, Comba P, Bruno C, Nardi F. Malignant mesothelioma in Rome, Italy 1980-1995. A retrospective study of 79 patients. Tumori. 1996 Nov-Dec;82(6):526-32.
20. Ascoli V, Calisti R, Carnovale-Scalzo C, Nardi F. Malignant pleural mesothelioma in bakers and pastry cooks. Am J Ind Med. 2001 Oct;40(4):371-3.

1

**JA175**

21.    Ascoli V, Cavone D, Merler E, Barbieri PG, Romeo L, Nardi F, Musti M. Mesothelioma in blood related subjects: report of 11 clusters among 1954 Italy cases and review of the literature. Am J Ind Med. 2007 May;50(5):357-69.

22.    Atkinson MA, O'Sullivan M, Zuber S, Dodson RF. Evaluation of the size and type of free particulates collected from unused asbestos-containing brake components as related to potential for respirability. American journal of industrial medicine. 2004 Dec;46(6):545-53.

23.    Azuma K, Ochiyama I, Chiba Y, Okumura J. Mesothelioma Risk and Environmental Exposure to Asbestos: Past and Future Trends in Japan. Int. J. Occup. Environ. Health 15:166-72 (2009).

24.    Balzer JL, Cooper WC. The work environment of insulating workers. Am Ind Hyg Assoc J. 1968 May-Jun;29 (3):222-7.

25.    Bamber HA, Butterworth R. Asbestos hazard from protective clothing. Ann Occup Hygi 1970, 13:77-79.

26.    Barton H, et al., Assessing Susceptibility from Early-Life Exposure to Carcinogens, Environmental Health Perspectives 2005; 113 (9); 1125-1133.

27.    Baur X, Frank AL, Soskolne CL, Oliver LC, Magnani C. Malignant mesothelioma: Ongoing controversies about its etiology in females. American Journal of Industrial Medicine. 2021 May 25.

28.    Bearer C, How Are Children Different from Adults?, Environmental Health Perspectives, 103(Suppl 6):7-12 (1995).

29.    Berg R, Talc and Chlorite Deposits in Montana, Montana Bureau of Mines and Geology, A Department of Montana College of Mineral Science and Technology (1979).

30.    Berge W, Mundt K, Luu H, Boffetta P, Genital use of talc and risk of ovarian cancer: a meta-analysis; Euopean Journal of Cancer Prevention 2017, Vol 00 No 00.

31.    Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-1980, Occup Environ Med, 2000;57:782-5.

32.    Bianchi C, et al., Latency periods in asbestos-related mesothelioma of the pleura, European J. Cancer Prevention 1997; 6, 162-166.

33.    Bianchi C, Bianchi T. Malignant pleural mesothelioma in Italy. Indian journal of occupational and environmental medicine. 2009 Aug;13(2):80.

34.    Bird T, Steffen JE, Tran TH, Egilman DS. A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards for Asbestos in Talc. NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy 0(0) 1-18 (2021)

35.    Bird T, Steffen JE, Tran TH, Egilman DS. Supplement – A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards for Asbestos in Talc. (2021)

36.    Birnbaum L, Fenton S, Cancer and Developmental Exposure to Endocrine Disruptors, Environmental Health Perspectives 2003; 111 (4); 389-394.

37.    Bitchatchi E., et al., Mesothelioma and asbestosis in a young woman following occupational asbestos exposure: Short latency and long survival: Case Report, Diagnostic Pathology, 5:81 (2010).

38.    Block, L., et al., Modernization of Asbestos Testing in USP Talc, U.S. Pharmaceopeial Convention, Stimuli to the Revision Process, http://www.usppf.com/pf/pub/data/v404/GEN_STIMULI_404_s201184.html (2014).

39.    Blount, A.M., Amphibole Content of Cosmetic and Pharmaceutical Talcs, Environmental Health Perspectives, Vol. 94, pp. 225-230 (1991).

2

**JA176**

40.   Boffetta, P., et al.  Cancer Risks Related to Electricity Production.  European Journal of Cancer.  1991; 7 (11); 1504-1519.

41.   Boffetta, P., Epidemiology of Peritoneal Mesothelioma: A Review, Annals of Oncology 18, 985-990 (2007).

42.   Boffetta P. Health Effects of Asbestos Exposure in Humans: A Quantitative Assessment. Med Lav 1998; 89,6:471-480.

43.   Bonneville R., et al., Landscape of Microsatellite Instability Across 39 Cancer Types, Am. Society of Clinical Oncol. (2017).

44.   Bourdes V, Boffetta P, Pisani P. Environmental exposure to asbestos and risk of pleural mesothelioma: review and meta-analysis. Eur J Epidemiol. 2000 May;16(5):411-7.

45.   British Thoracic Society Standards of Care Committee. Statement on malignant mesothelioma in the United Kingdom. Thorax 2001; 56:250-265.

46.   Brody AR. How Inhaled Asbestos Causes Scarring and Cancer. Current Respiratory Medicine Reviews. 2018 Dec 1;14(4):204-17.

47.   Brown, D., et al., Mortality Patterns Among Miners and Millers Occupationally Exposed to Asbestiform Talc, Dusts and Diseases, 317-324 (1979).

48.   Browne K. Asbestos-related mesothelioma: epidemiological evidence for asbestos as a promoter. Arch Environ Health. 1983 Sep-Oct;38(5):261-6.

49.   Burdorf A, Swuste P. An expert system for the evaluation of historical asbestos exposure as diagnostic criterion in asbestos-related diseases. Ann Occup Hyg. 1999 Jan;43(1):57-66.

50.   Bulbulyan, M.A., et al., Cancer Mortality Among Women in the Russian Printing Industry, AM J Ind Med, 36:166-171(1999).

51.   Burt LM, Ying J, Poppe MM, Suneja G, Gaffney DK. Risk of secondary malignancies after radiation therapy for breast cancer: Comprehensive results. Breast. 2017 Oct;35:122-129. doi: 10.1016/j.breast.2017.07.004.

52.   Cai SX, Zhang CH, Zhang X, Morinaga K. Epidemiology of occupational asbestos-related diseases in China. Ind Health. 2001 Apr;39(2):75-83. Review.

53.   Camargo MC, Stayner LT, Straif K, Reina M, Al-Alem U, Demers PA, Landrigan PJ. Occupational exposure to asbestos and ovarian cancer: a meta-analysis, Environ Health Perspect, 2011;119:1211-7.

54.   Camiade E, Gramond C, Jutand M-A, et al. Characterization of a French series of female cases of mesothelioma. Am J Ind Med. 2013;56(11):1307-1316.

55.   Camus M, Siemiatycki J, Meek B. Nonoccupational exposure to chrysotile asbestos and the risk of lung cancer. N Engl J Med. 1998 May 28;338(22):1565-71.

56.   Cancer Facts & Figures 2018-Special Section: Ovarian Cancer. Cancer.org. https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2018/cancer-facts-and-figures-special-section-ovarian-cancer-2018.pdf. Published 2018.

57.   Cantor KP, Sontag JM, Heid MF. Patterns of mortality among plumbers and pipefitters. Am J Ind Med. 1986;10(1):73-89.

58.   The Carcinogenicity of Chrysotile Asbestos - A Review, 39 Industrial Health, 57, 63 (2001).

59.   Carugno M, Mensi C, Sieno C, Consonni D, Riboldi L. Asbestos exposure among hairdressers. Med Lav. 2012;103(1):70-71.

3

**JA177**

60.    Casali M, Carugno M, Cattaneo A, Consonni D, Mensi C, Genovese U, Cavallo DM, Somigliana A, Pesatori AC. Asbestos lung burden in necroscopic samples from the general population of Milan, Italy. Annals Of Occupational Hygiene. 2015 Aug 1;59(7):909-21.

61.    CDC – Centers for Disease Control and Prevention, PMR Query System for Occupation (1999, 2003-2004, 2007-2013). Printed January 1, 2019 from https://wwwn.cdc.gov/niosh-noms/occupation2.aspx

62.    Cely-García MF, Sánchez M, Breysse PN, Ramos-Bonilla JP. Personal exposures to asbestos fibers during brake maintenance of passenger vehicles. Ann Occup Hyg. 2012 Nov;56(9):985-99.

63.    Chahinian AP, Pajak TF, Holland JF, Norton L, Ambinder RM, Mandel EM. Diffuse malignant mesothelioma. Prospective evaluation of 69 patients. Ann Intern Med. 1982 Jun;96(6 Pt 1):746-55.

64.    Chang CJ, Tu YK, Chen PC, Yang HY. Talc exposure and risk of stomach cancer: Systematic review and meta-analysis of occupational cohort studies. Journal of the Formosan Medical Association. 2020 Apr 1;119(4):781-92.

65.    Cherrie JW, Tindall M, Cowie H. Exposure and risks from wearing asbestos mitts. Part Fibre Toxicol 2005, 2:5.

66.    Cheng RT, McDermott HJ. Exposure to asbestos from asbestos gaskets. Applied Occupational and Environmental Hygiene. 1991 Jul 1;6(7):588-91.

67.    Cheung, et al., Further evidence for germline BAP1 mutations predisposing to melanoma and malignant mesothelioma, Cancer Genetics 206 (2013) 206-210.

68.    Cheung, et al., Germline BAP1 mutation in a family with high incidence of multiple primary cancers and a potential gene-environmental interaction, Cancer Letters 369 (2015) 261-265.

69.    Churg, Biological Effects of Asbestos, National Institutes of Health (2/1/1973)

70.    Churg, A. Warnock ML. Asbestos and other ferruginous bodies. Am J Pathol 1981; 102:447-56.

71.    Churg A. Asbestos fibers and pleural plaques in a general autopsy population. Am J Pathol. 1982;109(1):88-96.

72.    Chrysotile Asbestos. World Health Organization (2014).

73.    Coggiola, et al., An Update of a Mortality Study of Talc Miners and Millers in Italy, Am. J. Indus. Med. 44:63-69 (2003).

74.    Committee on Carcinogenicity of Chemicals in Food, Consumer Products and the Environment, Statement on the Relative Vulnerability of Children to Asbestos Compared to Adults. (May 2013)

75.    Committee on Nonoccupational Health Risks of Asbestiform Fibers, Board on Toxicology and Environmental Health Hazards and Commission on Life Sciences and National Research Council. Asbestiform Fibers, Nonoccupational Health Risks (1984)

76.    Consensus Report. Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution.  Scand J Work Environ Health 1997;23:311 – 6.

77.    Consumer Patching Compounds And Artificial Emberizing Materials (Embers and Ash) Containing Respirable Free-Form Asbestos, Federal Register, Vol. 42, No. 241 (December 13, 1977).

78.    Cooke, W.E., Pulmonary Asbestosis, The British Medical Journal, pp. 1024-25. (December 3, 1927)

4

79.    Cottrell, A, Schwartz, E, et al., Surveillance of Sentinel Occupational Mortality in the District of Columbia: 1980 to 1987, Am J Public Health, Vol. 82, No. 1 (January 1992).

80.    Cralley, J., Fibrous and Mineral Content of Cosmetic Talcum Products, Amer. Ind. Hyg. Assoc. J 1968: July-August: 350-354.

81.    Cramer DW, Welch WR, et al., Ovarian Cancer and Talc, Cancer 50, 372-376 (1982).

82.    Crane DT, Report of Evaluation of Cosmetics and Cosmetic Talc for FDA, U.S. Dept. Labor, Occupational Safety and Health, Salt Lake Technical Center (February 23, 2019).

83.    Dahlgren J, Peckham T. Mesothelioma Associated With Use of Drywall Joint Compound: A Case Series and Review of Literature, International Journal of Occupational and Environmental Health, 2012, V.18, No. 4, 337-343.

84.    D'Agostin F, de Michieli P, Negro C. Pleural mesothelioma in household members of asbestos-exposed workers in Friuli Venezia Giulia, Italy. Int J Occup Med Environ Health. 2017 May 8;30(3):419-31.

85.    Davis J, et al., Variations in the Carcinogenicity of Tremolite Dust Samples of Differing Morphology, The Third Wave of Asbestos Disease: Exposure to Asbestos in Place, The New York Academy of Sciences, Vol 643 (1991).

86.    Dement, et al., Fiber Exposure During Use of Baby Powders, NIOSH (1972)

87.    Dement J, Pompeii L, Lipkus IM, Samsa GP. Cancer Incidence Among Union Carpenters in New Jersey, JOEM, Volume 45, Number 10 (October 2003).

88.    Dodoli D, Del Nevo M, Fiumalbi C, Iaia TE, Cristaudo A, Comba P, Viti C, Battista G. Environmental household exposures to asbestos and occurrence of pleural mesothelioma. Am J Ind Med. 1992;21(5):681-7.

89.    Dodson RF, Williams MG, Huang J, Bruce JR. Tissue burden of asbestos in nonoccupationally exposed individuals from east Texas. Am J Ind Med. 1999;35(3):281-286.

90.    Dodson RF, Huang J, Bruce JR. Asbestos content in the lymph nodes of nonoccupationally exposed individuals. Am J Ind Med. 2000;37(2):169-174.

91.    Dodson, Ronald F., et al., Asbestos content of omentum and mesentery in nonoccupationally exposed individuals, Toxicology and Industrial Health, 17:138-143 (2001).

92.    Dodson, Ronald F., et al., Asbestos Fiber Length as Related to Potential Pathogenicity: A Critical Review, 44 American Journal of Industrial Medicine, 291 (2003).

93.    Dodson RF, O'Sullivan M, Brooks DR, Hammar SP. Quantitative analysis of asbestos burden in women with mesothelioma. American journal of industrial medicine. 2003 Feb;43(2):188-95.

94.    Dodson, Ronald F., et al, Asbestos Burden in Cases of Mesothelioma from Individuals from Various Regions of the United States, Ultrastructural Pathology, 29:5, 415-433 (2005).

95.    Dodson RF, Hammar SP. Asbestos: risk assessment, epidemiology and health effects. Asbestos: risk assessment, epidemiology and health effects. 2005.

96.    Dodson, Ronald F., Analysis and Relevance of Asbestos Burden in Tissue, in Asbestos: Risk Assessment, Epidemiology and Health Effects. 39,78-79 (Ronald F. Dodson and Samuel P. Hammar ed),  2006.

97.    Dodson, Ronald F. and Hammar, S. Asbestos, Risk Assessment, Epidemiology, and Health Effects, Second Edition. (2011).

5

JA179

98.  Dodson RF, Poye LW. Tissue burden evaluation of elongated mineral particles in two individuals with mesothelioma and whose work history included manufacturing tile. Ultrastruct Pathol. 2020 Jan 9:1-15.

99.  Doll R. Mortality from lung cancer in asbestos workers. Br J Ind Med. 1955 Apr;12(2):81-6.

100. Dresler CM, León ME, Straif K, Baan R, Secretan B. Reversal of risk upon quitting smoking. Lancet. 2006 Jul 29;368(9533):348-9.

101. Dressen W, Dalla Valle JM, The Effects of Exposure to Dust in Two Georgia Talc Mills and Mines, Public Health Reports, Vol. 50, No. 5 (February 1, 1935).

102. Drevinskaite M, Patasius A, Kevlicius L, Mickys U, Smailyte G. Malignant mesothelioma of the tunica vaginalis testis: a rare case and review of literature. BMC cancer. 2020 Dec;20(1):1-6.

103. Dunning, et al., Mesothelioma Associated With Commercial Use of Vermiculite Containing Libby Amphibole, 00 J. Envtl. Med. 00 (March 2012).

104. Dust exposures during the cutting and machining of asbestos-cement pipes, Additional studies. Equitable Environmental Health, Inc., report to A/C Pipe Producers Association, Arlington, VA. 1977.

105. Dyer, Owen, Johnson & Johnson recalls its Baby Powder after FDA finds asbestos in sample, BMJ (October 21, 2019).

106. Egli GE, Newton M. The transport of carbon particles in the human female reproductive tract, Fertil Steril, 1961;12:151-5.

107. Egilman D, Fehnel C, Rankin Bohme S. Exposing the "Myth" of ABC, "Anything But Chrysotile": A Critique of the Canadian Asbestos Mining Industry and McGill University Chrysotile Studies.  Am Journal Indus Med 44:540-557 (2003).

108. Egilman and Billings: Abuse of Epidemiology: Automobile Manufacturers Manufacture a Defense to Asbestos Liability, Int J Occup Environ Health 2005; 11:360-371.

109. Egilman D. Fiber Types, Asbestos Potency, and Environmental Causation. . Int J Occup Environ Health, Vol 15/No. 2, April/June 2009.

110. Egilman DS, Druar NM. Commentary on 'evaluation of take home (para-occupational) exposure to asbestos and disease: a review of the literature', Donovan et al.1. Int J Occup Environ Health. 2013 Jul-Sep;19(3):163-8.

111. Egilman D, Steffen J, Commentary on "Assessment of Health Risk From Historical Use of Cosmetic Talcum Powder," New Solutions: A Journal of Environmental and Occupational Health Policy, 0(0)1-10 (2018).

112. Egilman D, Steffen J, Tran T, Clancy K, Rigler M, Longo. Health Effects of Censored Elongated Mineral Particles: A Critical Review. ASTM International (2019).

113. Egilman, D., Madigan, D., Yimam, M., and Tran, T. (2019). Letter to the Editor: Response to Vermont Talc-Miners Cohort Study Update. *Journal of Occupational and Environmental Medicine*, PMID: 31790061. DOI: 10.1097/JOM.0000000000001783.

114. Egilman D, Madigan D, Yimam M, Tran T.  Evidence that cosmetic talc is a cause of ovarian cancer. Gynecol Pelvic Med 2021;4:2 | http://dx.doi.org/10.21037/gpm-20-28

115. Elimination of asbestos-related diseases. Fact sheet 4. WHO 2017.

116. Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients. American journal of industrial medicine. 2020 Mar 16.

6

117. Emory TS, Maddox JC, Kradin RL. Authors' response to" malignant mesothelioma following exposure to cosmetic talc: Association, not causation". American journal of industrial medicine. 2020 Apr 16.

118. Environmental Protection Agency. Airborne asbestos health assessment update. Washington, DC: U.S. EPA (EPA/600/8-84/003F), 1986.

119. Environmental Protection Agency. Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions. 40 CFR Part 763; 1989.

120. Englund A. Cancer incidence among painters and some allied trades. J Toxicol Environ Health. 1980 Sep-Nov;6(5-6):1267-73.

121. EPA: Guidance for Preventing Asbestos Disease Among Auto Mechanics.  June 1986.

122. EPA: Health Assessment for Talc (March 1992)

123. EPA: National Inventory of Sources and Emissions: Asbestos – 1968. February 1970.

124. EPA: Current best practices for preventing asbestos exposure among brake and clutch repair workers. March 2007.

125. Epler GR, Fitz Gerald MX, Gaensler EA, Carrington CB. Asbestos-related disease from household exposure. Respiration. 1980;39(4):229-40.

126. Erren TC, Jacobsen M, Piekarski C. Synergy between asbestos and smoking on lung cancer risks. Epidemiology. 1999 Jul;10(4):405-11.

127. Faig J, Howard S, Levine EA, Casselman G, Hesdorffer M, Ohar JA. Changing pattern in malignant mesothelioma survival. Transl Oncol. 2015 Feb;8(1):35-9.

128. Fenner EM. Documents from Manville Corporation's Environmental Control Department re: Asbestos dust levels during Transite pipe field operations. 1972.

129. Feng Y, Liu J, Zhang T, Pan G. Asbestos in China: country report. Proceedings of the Asbestos Symposium for Asian Countries. 2002.

130. Ferrante D, Bertolotti M, Todesco A, Mirabelli D, Terracini B, Magnani C. Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato, Italy. Environ Health Perspect. 2007 Oct;115(10):1401-5.

131. Ferrante D, Mirabelli D, Silvestri S, Azzolina D, Giovannini A, Tribaudino P, Magnani C. Mortality and Mesothelioma incidence among chrysotile asbestos miners in Balangero, Italy: A cohort study. Am J Ind Med 1-11 (2019).

132. Finkelstein MM. Lung cancer among steelworkers in Ontario. American journal of industrial medicine. 1994 Oct;26(4):549-57.

133. Finkelstein MM. Asbestos fibre concentrations in the lungs of brake workers: another look. Annals of occupational hygiene. 2008 Aug 1;52(6):455-61.

134. Finkelstein MM, Meisenkothen C. Malignant mesothelioma among employees of a Connecticut factory that manufactured friction materials using chrysotile asbestos. Annals of occupational hygiene. 2010 Aug 1;54(6):692-6.

135. Finkelstein MM. Malignant mesothelioma incidence among talc miners and millers in New York State. American journal of industrial medicine. 2012 Oct;55(10):863-8.

136. Finkelstein MM. Pneumoconiosis and malignant mesothelioma in a family operated metal casting business that used industrial talc from New York state. American journal of industrial medicine. 2013 May;56(5):550-5.

137. Finkelstein MM. Letter Concerning: Glynn ME, Keeton KA, Gaffney SH, Sahmel J. Ambient Asbestos Fiber Concentrations and Long-Term Trends in Pleural Mesothelioma Incidence Between Urban and Rural Areas in the United States (1973-2012). Risk

7

JA181

Analysis 2018; 38 (3): 454-471. Risk analysis: an official publication of the Society for Risk Analysis. 2018 Aug 1;38(8):1521-3.

138.   Finkelstein, M, To the Editor (Attanoos et al) re. 'Malignant Mesothelioma and Its Nonasbestos Causes,' Arch Pathol Lab Med, Vol 143, June 2019.

139.   Finley BL, Benson SM, Marsh GM, Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology, Inhalation Toxicolocy (2017).

140.   Fordyce TA, Leonhard M, Mowat FS, Moolgavkar SH. A 37-year Update on Mortality Patterns in an Expanded Cohort of Vermont Talc Miners and Millers. J Occup Environ Med. 2019 Sep 5.

141.   Freeman M., Kohles S. Assessing specific causation of mesothelioma following exposure to chrysotile asbestos-containing brake dust, International Journal of Occupational and Environmental Health Vol 18, No. 4, 329 (2012).

142.   French Agency for Food, Environmental and Occupational Health & Safety, Opinion on "Health Effects and the identification of cleavage fragments of amphiboles from quarried minerals," December 4, 2015.

143.   Frost G, Darnton A, Harding AH. The effect of smoking on the risk of lung cancer mortality for asbestos workers in Great Britain (1971-2005). Ann Occup Hyg. 2011 Apr;55(3):239-47.

144.   Fujiwara, Hiroshi, et al. An Autopsy Case of Primary Pericardial Mesothelioma in Arc Cutter Exposed to Asbestos through Talc Pencils, 43 Industrial Health 346-350 (2005).

145.   Gamble, et al., An Epidemiological-Industrial Hygiene Study of Talc Workers, British Occupational Hygiene Society, 26:1-4 841-85 (1982).

146.   Gao Z, Hiroshima K, Wu X, et al., Asbestos textile production linked to malignant peritoneal and pleural mesothelioma in women: Analysis of 28 cases in Southeast China. Am J Ind Med. 2015 Oct;58(10):1040-9.

147.   Gao Z, Carbone M, Zhang X, et al. Improving the accuracy of mesothelioma diagnosis in China. J Thorac Oncol. 2017 Apr;12(4):714-723.

148.   Gemba K, Fujimoto N, Kato K, Aoe K, Takeshima Y, Inai K, Kishimoto T. National survey of malignant mesothelioma and asbestos exposure in Japan. Cancer science. 2012 Mar;103(3):483-90.

149.   Germani D, Belli S, Bruno C, Grignoli M, Nesti M, et al. Cohort mortality study of women compensated for asbestosis in Italy, Am J Ind Med, 1999;36:129-34.

150.   Ghio, A, Roggli, V, Talc Should Not Be Used for Pleurodesis in Patients with Nonmalignant Pleural Effusions, Am J Respir Crit Care Med, Vol 164, No. 9, pp 1741 (2001).

151.   Gibbs GW. Fibre release from asbestos garments. Ann Occup Hyg 1975, 18: 143-149.

152.   Godwin MC, Jagatic G. Asbestos and Mesothelioma. JAMA. 1968;204(11):1009.

153.   Gordon, Fertilizer Linked to Worker Death, Spokesman-Review, June 20, 2001, at 85.

154.   Gordon, et al., Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women, 20 International Journal of Occupational and Environmental Health 4, 318-332 (2014).

155.   Gordon, RE, Cosmetic Talcum Powder as a Causative Factor in the Development of Diseases of the Pleura," Intech Open (2019).

156.   Gordon RE. Analytic Analyses of Human Tissues for the Presence of Asbestos and Talc. In: Electron Microscopy-Novel Microscopy Trends. IntechOpen; 2019.

8

**JA182**

157. Gorini, G., et al., Mesothelioma of the tunica vaginalis testis: report of two cases with asbestos occupational exposure, Int J Surg Pathol, 13(2):211-4 (Apr 2005).

158. Graham J, Graham R. Ovarian cancer and asbestos, Environ Research, 1967;1:115-8.

159. Grandjean P, Bach E. Indirect exposures: the significance of bystanders at work and at home. Am Ind Hyg Assoc J. 1986 Dec;47(12):819-24.

160. Greenberg M. The Art of Perpetuating a Public Health Hazard. JOEM Vol 47, No. 2, February 2005.

161. Grogg JB, Fronzaroli JN, Oliveira P, Bode PK, Lorch A, Issa A, Beyer J, Eberli D, Sangar V, Hermanns T, Clarke NW. Clinicopathological characteristics and outcomes in men with mesothelioma of the tunica vaginalis testis: analysis of published case-series data. Journal of Cancer Research and Clinical Oncology. 2021 Feb 9:1-9.

162. Gunter MR, Belluso E, Mottana A, Amphiboles: Environmental and Health Concerns, Reviews in Mineralogy & Geochemistry, Vol. 67, pp. 453-516 (2007).

163. Guo Z, Carbone M, Zhang X, Su D, Sun W, Lou J, Gao Z, Shao D, Chen J, Zhang G, Hu J, Chen K, Wang F, Pass HI, Yu H, Napolitano A, Yang H, Mao W. Improving the accuracy of mesothelioma diagnosis in China. J Thorac Oncol. 2017 Apr;12(4):714-723.

164. Gupta, NP, et al., Malignant mesothelioma of the tunica vaginalis testis: a report of two cases and review of literature, J. Surg. Oncol., 70:251-254 (1999).

165. Haque A, et al., Is There Transplacental Transfer of Asbestos? A Study of 40 Stillborn Infants, Pediatric Pathology & Laboratory Medicine, 16:877-897, 1996.

166. Harries PG. Asbestos Hazards in Naval Dockyards. Annals of Occ Hygiene, 11(2); 135-145: 1968.

167. Harries PG. Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in the Naval Dockyards. Annals of Occ Hygiene, 14; 241-254: 1971.

168. Hart, et al., Evaluation of Asbestos Exposures During Firewood-Harvesting Simulations in Libby, MT, USA – Preliminary Data, Ann. Occup. Hyg., Vol. 51, No. 8, pp. 1-7 (2007).

169. Hatfield RL, Mount MD, Longo WE. Cutting of Johns-Manville Asbestos Containing Cement Pipe. Materials Analytic Services, Inc. 2003.

170. Health Canada, Talc – Potential Risk of Lung Effects and Ovarian Cancer, Recalls and safety alerts, New safety information report, No. RA-68320 (December 5, 2018).

171. Heller DS, et al., Asbestos exposure and ovarian fiber burden, Am J Ind Med, 1996;29:435-9.

172. Helm JH, Miura JT, Glenn JA, Marcus RK, Larrieux G, Jayakrishnan TT, Donahue AE, Gamblin TC, Turaga KK, Johnston FM. Cytoreductive surgery and hyperthermic intraperitoneal chemotherapy for malignant peritoneal mesothelioma: a systematic review and meta-analysis. Annals of surgical oncology. 2015 May 1;22(5):1686-93.

173. Henderson WJ, Joslin CA, Turnbull AC, Griffiths K, Talc and carcinoma of the ovary and cervix, J Obstet Gynaecol Br Commonw, 1971;78(3):299-72.

174. Henley SJ, Larson TC, Wu M, et al. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003-2008. Int J Occup Environ Health. 2013;19(1):1-10.

175. High Levels of Asbestos Found In 3 Paints and 2 Talcums Here, New York Times (June 16, 1972).

176. Hill AB. The environment and disease: association or causation? Proc R Soc Med. 1965 May;58:295-300.

9

177. Hillerdal G. Mesothelioma: cases associated with non-occupational and low dose exposures. Occup Environ Med 1999, 56:505-513.

178. Howard, Thomas, Pneumoconiosis in a Vermiculite End-Product User, Am. J. Indus. Med. 44:214-217 (2003).

179. Huang, Q., et al., Triple primary malignancies in a patient with colorectal adenocarcinoma: A case report, Int. J Surgery Case Reports, 42 (2018) 34-37.

180. Huang, ZW. The geology of industrial minerals and rocks in China. Ontario Geol. Survey Misc. Paper 114. P. 175-179.

181. Hueper WC. Cancer in Its Relation to Occupation and Environnement. Jonnard; 1943 Jun.

182. Hueper, Occupational & Non-occupational Exposures to Asbestos, Annals of the New York Academy of Sciences (1965)

183. Hull, M., el al., Mesothelioma Among Workers in Asbestiform Fiber-bearing Talc Mines in New York State, Ann. Occup. Hyg., Vol. 46, Supplement 1, 132-135 (2002).

184. Huncharek M, Capotorto JV, Muscat J. Domestic asbestos exposure, lung fibre burden, and pleural mesothelioma in a housewife. Br J Ind Med. 1989 May;46(5):354-5.

185. Huncharek M. Changing risk groups for malignant mesothelioma. Cancer. 1992 Jun 1;69(11):2704-11.

186. Hunn J, Rodriguez G.C. Ovarian Cancer: Etiology, Risk Factors, and Epidemiology. Clinical Obstetrics and Gynecology. 012; 55(1): 3-23.

187. IARC Monographs on Evaluation of the Carcinogenic Risk of Chemicals to Humans, Silica and Some Silicates, Vol. 42 (1987).

188. IARC 2012, Arsenic, metals, fibres, and dusts, Volume 100C.

189. Ilgren E, et al., Critical reappraisal of Balangero chrysotile and mesothelioma risk, Epidemiology Biostatistics and Public Health, Vol. 12, No. 1 (2015).

190. Ilgren E, et al., Supplemental Data; Critical reappraisal of Balangero chrysotile and mesothelioma risk, Epidemiology Biostatistics and Public Health, Vol. 12, No. 1 (2015).

191. Imbernon E, Marcharnd JL, Garras L, Goldberg M. Evaluation quatitative du risqué de cancer du poumon et de mesotheliome pleural chez les mecaniciens de vehicules automobiles.  Quantitative assessment of lung cancer and pleural mesothelioma among automobile mechanics.  Rev Epidemiol Sante Publique. 2005, 53:491-500.

192. Interagency Working Group on Asbestos in Consumer Products (IWGACP) publishes "Executive Summary, Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc," January 6, 2020.

193. International Agency for Research on Cancer. Asbestos (actinolite, amosite, anthophylite, chrysotile, crocidolite, tremolite). World Health Organization. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. 1998.

194. International Agency for Research on Cancer. Asbestos (chrysotile, amosite, crocidolite, tremolite, actinolite, and anthophyllite). IARC Monogr Eval Carcinog Risks Hum. 2012; 1 OOC:219-309.

195. International Agency for Research on Cancer. Asbestos: Monograph on the Evaluation of Carcinogenic Risk to Man. Lyon, France: IARC, 1988.

196. International Conference on Monitoring and Surveillance of Asbestos-Related Diseases. The Helsinki Declaration on Management and Elimination of Asbestos-Related Diseases. Espoo, Finland: Finnish institute of Occupational Health; 2014.

10

**JA184**

197. Iwatsubo, Y., et al., Pleural Mesothelioma: Dose-Response Relation at Low Levels of Asbestos Exposure in a French Population-Based Case-Control Study, 148(2) Am. J. Epidemiology, 133, 136, 141 (1998).

198. JAMA, Asbestosis & Cancer of the Lung (1949).

199. Jemal A, Murray T, Samuels A, Ghafoor A, Ward E, et al. Cancer statistics, CA Cancer J Clin, 2003;53(1):5-26.

200. Jiang Z, Chen T, Chen J, Ying S, Gao Z, He X, Miao C, Yu M, Feng L, Xia H, Wu W, Chen R, Morinaga K, Lou J, Zhang X. Hand-spinning chrysotile exposure and risk of malignant mesothelioma: A case-control study in Southeastern China. Int J Cancer. 2018 Feb 1;142(3):514-523.

201. Joint Policy Committee, Societies of Epidemiology, Position Statement on Asbestos from the Joint Policy Committee of the Societies of Epidemiology (JPC-SE), June 4, 2012.

202. Joubert L, Seidman H, Selikoff IJ. Mortality experience of family contacts of asbestos factory workers. Ann N Y Acad Sci. 1991 Dec 31;643:416-8.

203. Kadariya, Y., et al., BAP1 is a bona fide tumor suppressor: genetic evidence from mouse models carrying heterozygous germline BAP1 mutations, Cancer Res. 2016 Mat 1; 76(9):2836-2844.

204. Kadry Taher M, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA, Krishnan K, Mattison D, Wen SW, Krewski D. Critical review of the association between perineal use of talc powder and risk of ovarian cancer. Reprod Toxicol. 2019 Aug 28;90:88-101.

205. Kähkönen, H., Lallukka, H., Linnainmaa, M., et al. Asbestos Risk Management Guidelines for Mines, Finnish Institute of Occupational Health. Helsinki 2019.

206. Kakooei H, Sameti M, Kakooei AA. Asbestos exposure during routine brake lining manufacture. Industrial health. 2007;45(6):787-92.

207. Kaminski R, Geissert KS, Dacey E. Mortality analysis of plumbers and pipefitters. J Occup Med. 1980 Mar;22(3):183-9.

208. Kanarek MS. Mesothelioma from chrysotile asbestos: update. Ann Epidemiol. 2011 Sep;21(9):688-97. doi: 10.1016/j.annepidem.2011.05.010. Review. Erratum in: Ann Epidemiol. 2012 May;22(5):377

209. Kanarek MS, Mandich MK. Peritoneal Mesothelioma and Asbestos: Clarifying the Relationship by Epidemiology. Epidemiology Open Access Journal. 2016;6:2.

210. Kanarek MS, Anderson HA, Mesothelioma from Asbestos Exposure in Brake Mechanics: Epidemiology in Context, Epidemiology Open Access Journal. 2018;8:2.

211. Kanarek MS, Liegel JC. Asbestos in Talc and Mesothelioma: Review of the Causality Using Epidemiology. Medical Research Archives. 2020 May 25;8(5).

212. Kane M, Chahinian A, Holland J. Malignant mesothelioma in young adults. Cancer. 1990;65(6):1449-55.

213. Karamurzin, Y., et al., Unusual DNA mismatch repair-deficient tumors in Lynch syndrome: a report of new cases and review of the literature, Human Pathology, 43, 1677-1687 (2012).

214. Karjalainen, Meurman, & Pukkala, Four Cases of mesothelioma among Finish anthophyllite miners, Occupational and Environmental Medicine, 51:212-215 (1994).

215. Keyes D.L., et al., Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling, Am. Ind. Hyg. Assoc. J. 52 (November 1991).

216. Khaliullin TO, Kisin ER, Guppi S, Yanamala N, Zhernovkov V, Shvedova AA. Differential responses of murine alveolar macrophages to elongate mineral particles of

11

asbestiform and non-asbestiform varieties: Cytotoxicity, cytokine secretion and transcriptional changes. Toxicology and Applied Pharmacology 409 (2020) 115302

217. Kilburn KH, Lilis R, Anderson HA, Boylen CT, Einstein HE, Johnson SJ, Warshaw R. Asbestos disease in family contacts of shipyard workers. American journal of public health. 1985 Jun;75(6):615-7.

218. Kim, Hyoung Ryoul, Overview of Asbestos Issues in Korea, 24 J Korean Med Sci 363-7 (2009).

219. Kim, et al., Lung Cancer Probably Related to Talc Exposure: a Case Report, Industrial Health, 51:228-231 (2013).

220. Kleinfeld, M., et al., A Study of Workers Exposed to Asbestiform Minerals in Commercial Talc Manufacture, Environ Research 6, 132-143 (1973).

221. Kleinfeld, M., Mortality Among Talc Miners and Millers in New York State, Arch Environ. Health, 14:663-667 (1967).

222. Kleinfeld, M., et al., Talc Pneumoconiosis, AMA Archives of Industrial Health, Vol. 12, pp 66-72 (1955).

223. Kradin RL, Eng G, Christiani DC. Diffuse peritoneal mesothelioma: A case series of 62 patients including paraoccupational exposures to chrysotile asbestos. American journal of industrial medicine. 2017 Nov;60(11):963-7.

224. Kronenberg RS, Levin JL, Dodson RF, Garcia JG, Griffith DE. Asbestos-related disease in employees of a steel mill and a glass bottle manufacturing plant. Toxicology and industrial health. 1991 Jan;7(1-2):73-9.

225. Kumagai S, Nakachi S, Kurumatani N, Nakagiri S, Kataoka A. Estimation of asbestos exposure among workers repairing asbestos cement pipes used for conduits. Sangyo igaku. Japanese journal of industrial health. 1993 May;35(3):178-87.

226. Lacourt A, et al. Attributable risk in men in two French case-control studies on mesothelioma and asbestos. Eur. J. Epidemiol (2010) 25:799-806.

227. Lacourt A, Gramond C, Audignon S, et al. Pleural mesothelioma and occupational coexposure to asbestos, mineral wool, and silica. Am J Respir Crit Care Med 2013;187(9):977-982.

228. Lacourt A, Gramond C, Rolland P, Ducamp S, Audignon S, Astoul P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. Thorax. 2014;69:532-9.

229. Lamm, S.H., et al., Similarities in Lung Cancer and Respiratory Disease Mortality of Vermont and New York State Talc Workers, Epidemiology-Fibers, 1576-1581, (1988).

230. Landrigan PJ, Nicholson WJ, Suzuki Y, Ladou J. The Hazards of Chrysotile Asbestos: A Critical Review. Industrial Health 1999, 37, 271-280.

231. Landrigan PJ, A Population of Children at Risk of Exposure to Asbestos in Place, Annals New York Academy of Sciences, 283-286.

232. Landrigan PJ, Collegium Ramazzini, Comments on the Causation of Malignant Mesothelioma: Rebutting the False Concept That Recent Exposures to Asbestos Do Not Contribute to Causation of Mesothelioma, Annals of Global Health (2016).

233. Landrigan PJ. Asbestos--still a carcinogen. N Engl J Med. 1998 May 28;338(22):1618-9.

234. Langer AM, McCaughey WT. Mesothelioma in a brake repair worker. The Lancet. 1982 Nov 13;320(8307):1101-3.

12

235. Langhoff MD, Kragh-Thomsen MB, Stanislaus S, Weinreich UM. Almost half of women with malignant mesothelioma were exposed to asbestos at home through their husbands or sons. Dan Med J. 2014 Sep;61(9):A4902.

236. Langseth H & Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. Scand J Work Environ Health. 2004; 30: 356-361.

237. Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer, J Epidemiol Community Health, 2008;62:358-60.

238. Latham A, et al., Microsatellite Instability Is Associated With the Presence of Lynch Syndrome Pan-Cancer, J Clin Oncol 36 (2018).

239. Lee M, Alexander HR, Burke A. Diffuse mesothelioma of the peritoneum: a pathological study of 64 tumours treated with cytoreductive therapy. Pathology. 2013 Aug;45(5):464-73.

240. Lehman EJ, Hein MJ, Estill CF. Proportionate mortality study of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry. Am J Ind Med. 2008 Dec;51(12):950-63

241. Leigh J, Davidson P, Leigh H, Berry D. Malignant Mesothelioma in Australia, 1945 – 2000.  Am Journal Indus Med, 41:188-201 (2002).

242. Lemen, et al., Dusts and Disease (1979).

243. Lemen RA. Chrysotile asbestos as a cause of mesothelioma: application of the Hill causation model. Int J Occup Environ Health 2004; 10(2):233-239

244. Lemen R: Asbestos in Brakes: Exposure and Risk of Disease.  American Journal of Industrial Medicine, 45:229-237 (2004).

245. Lemen RA. Mesothelioma from asbestos exposures: Epidemiologic patterns and impact in the United States. J Toxicol Environ Health Part B. 2016;19(5-6):250-265.

246. Levin JL, O'Sullivan MF, Corn CJ, Williams MG, Dodson RF. Asbestosis and small cell lung cancer in a clutch refabricator. Occupational and environmental medicine. 1999 Sep 1;56(9):602

247. Levin JL, O'Sullivan M, Dodson RF. Environmental sample correlation with clinical and historical data in a friction product exposure. Inhalation toxicology. 2003 Jan 1;15(7):639-47.

248. Li FP, Lokich J, Lapey J, Neptune WB, Wilkins EW Jr. Familial mesothelioma after intense asbestos exposure at home. JAMA. 1978 Aug 4;240(5):467.

249. Li L, Sun T, Zhang X, Lai R, Li X, Fan X, Morinaga K. Cohort Studies on Cancer Mortality Among Workers Exposed Only to Chrysotile Asbetsos: a Meta-analysis. Biomedical and Environmental Sciences 17, 459-468 (2004).

250. Lieben J, Pistawka H. Mesothelioma and asbestos exposure. Arch Environ Health. 1967;14(4):559-63.

251. Lightfoot, Kingston, Pooley, An Examination of Italian Mine Samples and Relevant Powders, Department of Mineral Exploitation. (September 8, 1972)

252. Lillington GA, Jamplis RW, Differding JR. Letter: Conjugal malignant mesothelioma. N Engl J Med. 1974 Sept 12;291(11):583-4.

253. Lin RT, Takahashi K, Karjalainen A, et al. Ecological association between asbestos-related diseases and historical asbestos consumption: an international analysis. Lancet. 2007;369(9564): 844-9.

254. Lin S, et al. Cause-Specific Mortality in Relation to Chrysotile Asbestos Exposure in a Chinese Cohort. Journal of Thoracic Oncology, Volume XX, Number XX, XXX (2012).

13

**JA187**

255. Linton A, Vardy J, Clarke S, van Zandwijk N. The ticking time-bomb of asbestos: its insidious role in the development of malignant mesothelioma. Crit Rev Oncol Hematol. 2012 Nov;84(2):200-12.

256. Lockey, et al., Pulmonary Changes After Exposure to Vermiculite Contaminated with Fibrous Tremolite, Am. Rev. Respir. Dis. (1984).

257. Longo DK, Young RS. Cosmetic Talc and Ovarian Cancer. The Lancet, pp 349-351 (Aug 18, 1979).

258. Longo WE, Egeland WB, Hatfield RL, Newton LR. Fiber release during the removal of asbestos-containing gaskets: a work practice simulation. Appl Occup Environ Hyg. 2002 Jan;17(1):55-62.

259. Longo WE, Hatfield RL and Mount M. Gasket Fabrication: A Work Practice Study. Materials Analytic Services, Inc. (March 2006).

260. Longo WE. Exposure to airborne chrysotile and amphibole fibers during the removal of flange and bonnet gaskets: A work practice study. (2010).

261. Longo WE, Egeland WB. Scraping and wire brushing of asbestos containing stone in a commerical pizza oven. Supplemental Report. Materials Analytic Services, Inc. (January 2018).

262. Loomis D, Dement JM, Wolf SH, Richardson DB. Lung Cancer Mortality and Fiber Exposures among North Carolina Asbestos Textile Workers.  Occup. Environ. Med. published online 11 Mar 2009; doi:10.1136/oem.2008.044362.

263. Lorimer WV, Rohl AN, Miller A, Nicholson WJ, Selikoff IJ. Asbestos exposure of brake repair workers in the United States. Mt. Sinai J Med 1976;43:207-18.

264. Lumley KP. Asbestos dust levels inside firefighting helmets with chrysotile asbestos covers. Ann Occup Hyg 1971, 14 (3); 285-286.

265. Lynch and Smith, Carcinoma of Lung in Asbestos- Silicosis (1935)

266. Madigan, D., Egilman, D., Finkelstein, M., Yimam, M., and Tran, T. (2019). Response to Marsh, G. M., Ierardi, A. M., Benson, S. M., & Finley, B. L. (2019). Occupational exposures to cosmetic talc and risk of mesothelioma: an updated pooled cohort and statistical power analysis with consideration of latency period. *Inhalation Toxicology*, 31(6), 213–223.

267. Madkour, Environmental Exposure to Asbestos and the Exposure-Response Relationship with Mesothelioma, E.Med.Health J. 15:25-38 (2009).

268. Magnani C, Terracini B, Ivaldi C, Botta M, Budel P, Mancini A, Zanetti R. A cohort study on mortality among wives of workers in the asbestos cement industry in Casale Monferrato, Italy. Br J Ind Med. 1993 Sep;50(9):779-84.

269. Magnani C, Dalmasso P, Biggeri A, Invaldi C, Mirabelli D, Terracini B. Increased risk of malignant mesothelioma of the pleura after residential or domestic exposure to asbestos: A case-control study in Casale Monferrato, Italy. Environ Health Perspect. 2001 Sep;109(9):915-9.

270. Magnani C, Agudo A, González CA, Andrion A, Calleja A, Chellini E, Dalmasso P, Escolar A, Hernandez S, Ivaldi C, Mirabelli D, Ramirez J, Turuguet D, Usel M, Terracini B. Multicentric study on malignant pleural mesothelioma and non-occupational exposure to asbestos. Br J Cancer. 2000 Jul;83(1):104-11.

271. Magnani C, Ferrante D, Barone-Adesi F, Bertolitti M, Todesco A, et al. Cancer risk after cessation of asbestos exposure, Occup Environ Med, 2008;65(3):164-70.

14

JA188

272.   Mangold C, Clark K, Madl A, Paustenbach D. An exposure study of bystanders and workers during the installation and removal of asbestos gaskets and packing. J Occup Environ Hyg. 2006 Feb;3(2):87-98.

273.   Mao W, Zhang X, Guo Z, Gao Z, Pass HI, Yang H, Carbone M. Association of asbestos exposure with malignant mesothelioma incidence in Eastern China. JAMA Oncol. 2017 Apr 1;3(4):562-564.

274.   Marinaccio A, Binazzi A, Di Marzio D, Scarselli A, Verardo M, Mirabelli D, Gennaro V, Mensi C, Merler E, De Zotti R, Mangone L. Incidence of extrapleural malignant mesothelioma and asbestos exposure, from the Italian national register. Occupational and environmental medicine. 2010 Nov 1;67(11):760-5.

275.   Marinaccio A, Belli S, Binazzi A, Scarselli A, Massari S, Bruni A, Conversano M, Crosignani P, Minerba A, Zona A, Comba P. Residential proximity to industrial sites in the area of Taranto (Southern Italy): a case-control cancer incidence study. Annali dell'Istituto superiore di Sanità. 2011;47:192-9.

276.   Marinaccio A, et al. The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Environ Med 2018; 75:254-262.

277.   Marinaccio, A, et al. Letter concerning: 'Response to: 'The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure' by Marinaccio et al'. Occup Environ Med November 2018, Vol 75, No. 11.

278.   Marinaccio A, Consonni D, Mensi C, Mirabelli D, Migliore E, Magnani C, Di Marzio D, Gennaro V, Mazzoleni G, Girardi P, Negro C. Association between asbestos exposure and pericardial and tunica vaginalis testis malignant mesothelioma: a case–control study and epidemiological remarks. Scandinavian Journal of Work, Environment & Health. 2020 Apr 7.

279.   Marinaccio A, Consonni D, Mensi C, Mirabelli D, Migliore E, Magnani C, Di Marzio D, Gennaro V, Mazzoleni G, Girardi P, Negro C. Authors' response: Mezei et al's "Comments on a recent case-control study of malignant mesothelioma of the pericardium and the tunica vaginalis testis". Scandinavian Journal of Work, Environment & Health. 2021 Jan 1;47(1):87.

280.   Markowitz SB, Moline JM. Malignant mesothelioma due to asbestos exposure in dental tape. Am J Ind Med. 2017 May;60(5):437-442.

281.   Markowitz SB, Levin SM, Miller A, Morabia A. Asbestos, asbestosis, smoking, and lung cancer. New findings from the North American insulator cohort. Am J Respir Crit Care Med. 2013 Jul 1;188(1):90-6.

282.   Markowitz S, Asbestos-Related Lung Cancer and Malignant Mesothelioma of the Pleura: Selected Current Issues, Semin Respir Crit Care Med, 36:334-346 (2015).

283.   Mattenklott, M., TRANSLATION OF: "Asbestos in talc powders and soapstone – the present state" --- Asbest in Talkumpudern und Speckstein – heutige Situation. Gefahrstoffe – Reinhalt. Luft 67 (2007) no. 7/8 p. 287-291. (by courtesy of Springer-VDI-Verlag, Düsseldorf).

284.   Mazurek, et al., Malignant Mesothelioma Mortality – United States, 1999-2015, Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report, 66(8);214-218 (March 3, 2017).

285.   McCrone, W., Brown, J., Stewart, I., The Particle Atlas, Edition Two, Vol VI, Electron Optical Atlas and Techniques, Ann Arbor Science Publishers (1980s)

15

JA189

286. McDonald, et al., Malignant Mesothelioma in North America, 46 Cancer 7 (Oct. 1, 1980).

287. McDonald, et al., Mesothelioma and Asbestos Fiber Type: Evidence from Lung Tissue Analysis, Cancer, Vol. 63, No. 8, 1544-1547 (1989).

288. McDonald AD, Case BW, Churg A, Dufresne A, Gibbs GW, Sebastien P, McDonald JC. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. The Annals of occupational hygiene. 1997 Dec 1;41(6):707-19.

289. McKinnery WM and Moore RW. Evaluation of Airborne Asbestos Fibers Levels during Removal and Installation of Valve Gaskets and Packing. American Industrial Hygiene Association, (August 1992).

290. Merewether & Price,  Report on Effects of Asbestos Dust on Lung & Dust Suppression in Asbestos Industry (1930)

291. Meurman, Kiviluoto, & Hakama, Mortality and morbidity among the working population of anthophyllite asbestos miners in Finland, British Journal of Industrial Medicine, 31:105-112 (1974).

292. Meurman, Pukkala, Hakama, Incidence of Cancer among Anthophyllite asbestos miners in Finland, Occupational and Environmental Medicine, 51:421-425 (1994).

293. Miller R., How Environmental Hazards in Childhood Have Been Discovered: Carcinogens, Teratogens, Neurotoxicants, and Others, Pediatrics 2004;113;945.

294. Miller A. Mesothelioma in household members of asbestos-exposed workers: 32 United States cases since 1990. American journal of industrial medicine. 2005 May;47(5):458-62.

295. Millette JR and Mount MD. A Study Determining Asbestos Fiber Release during the Removal of Valve Packing. Applied Occ Environ Hygiene, September 1993.

296. Millette JR. Asbestos Containing Sheet Gaskets and Packing. Chapter 6, Asbestos Health Risks: Sourcebook on Asbestos Diseases, (Volume 12), Michie Publishes, 1996.

297. Millette JR. Cutting CertainTeed Asbestos Cement Pipe: Report of Results-MVA7946. 2009.

298. Millette JR, Compton S, DePasquale, C. Microscopical Analysis of Asbestos-Cement Pipe and Board. The Microscope 66 (1), pp 3 – 20. 2018.

299. Millman N, Pneumoconiosis Due To Talc In The Cosmetic Industry, Occup. Med., 4:391 (1947).

300. Mirabelli D, Letter on: "Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology", Inhalation Toxicology, 29:8, 341 (2017).

301. Mirabelli D, Cavone D, Merler E, Gennaro V, Romanelli A, Mensi C, Chellini E,  Nicita C, Marinaccio A, Magnani C, Musti M. Non-occupational exposure to asbestos and malignant mesothelioma in the Italian National Registry of Mesotheliomas. Occup Environ Med 2010;67:792e794. doi:10.1136/oem.2009.047019.

302. Mirabelli D, Cadum E, Mortality among patients with pleural and peritoneal tumors in Alta Valle di Susa, Epidemiol Prev., 26(6):284-6 (Nov-Dec 2002).

303. Mirabelli D, Calisti R, Barone-Adesi F, Fornero E, Merletti F, Magnani C. Excess of mesotheliomas after exposure to chrysotile in Balangero, Italy. Occup Environ Med 2008;65(12):815-819.

304. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma Associated with the Use of Cosmetic Talc. J Occup Environ Med. 2019 Oct 10. doi: 10.1097/JOM.0000000000001723. [Epub ahead of print] PubMed PMID: 31609780.

16

JA190

305. Moline J, Bevilacqua K, Gordon RE. Authors' response to "Evidence does not support exposure to cosmetic talc as a cause of malignant mesothelioma," *JOEM*, 2019.

306. Moskowitz R, Talc Pneumoconiosis: A Treated Case, Chest, Vol 58, No. 1, (July 1970).

307. Muscat JE, Wynder EL. Cigarette smoking, asbestos exposure, and malignant mesothelioma. Cancer research. 1991 May 1;51(9):2263-7.

308. Musti, et al., Exposure to Asbestos and Mesothelioma Risk of Onset of Primary Ovarian, Description of Two Cases, 2009.

309. Nam K, Gracey DR. Pulmonary talcosis from cosmetic talcum powder. JAMA. 1972 Jul 31;221(5):492-3.

310. National Cancer Institute. Asbestos Exposure and Cancer Risk. Bethesda, MD: National Institutes of Health, 2009.

311. Nazemi A, Nassiri N, Pearce S, Daneshmand S. Testicular mesothelioma: an analysis of epidemiology, patient outcomes, and prognostic factors. Urology. 2019 Apr 1;126:140-4.

312. Ness R, Cottreau C. Possible Role of Ovarian Epithelial Inflammation in Ovarian Cancer. JNCI: Journal of the National Cancer Institute. 1999; 91(17): 1459–1467.

313. Neumann V, Günther S, Müller KM, Fischer M. Malignant mesothelioma–German mesothelioma register 1987–1999. International archives of occupational and environmental health. 2001 Aug 1;74(6):383-95.

314. Newhouse ML, G Berry, Wagner JC, Turok ME. A study of the mortality of female asbestos workers, Brit J Indusr Med, 1972;29:134-41.

315. Newhouse M, Thompson H. Mesothelioma of pleura and peritoneum following exposure to asbestos in the London area. Br J Ind Med. 1965;22(4):261-9.

316. New York Industrial Code Rule No. 12, adopted TLV. 1958

317. Nicholson WJ, Rohl A, Fischbein A, Selikoff IJ. Occupational and Community Asbestos Exposure from Wallboard Finishing Compounds. Bull. N.Y. Acad. Med., Vol. 51, No. 10, November 1975.

318. Nicholson WJ, Rohl AN, Weisman I, Selikoff IJ. Environmental asbestos concentrations in the United States. IARC scientific publications. 1980(30):823-7.

319. Nicholson WJ, Landrigan PJ. Asbestos: A Status Report. Current Issues in Public Health 1996, 2:118-123.

320. Nicholson WJ. The Carcinogenicity of Chrysotile Asbestos – A Review. Industial Health 2001, 39, 57-64.

321. NIOSH: Control of Asbestos Exposure During Brake Drum Service. August 1989.

322. NIOSH (1972): Criteria for a Recommended Standard...Occupational Exposure to Asbestos. DHEW (NIOSH) Publication No. 72-10267.

323. NIOSH (1976). Revised recommended asbestos standard. Cincinnati, OH: U.S. Department of Health, Education, and Welfare, Center for Dis- ease Control, National Institute for Occupational Safety and Health, DHEW (NIOSH) Publication No. 77-169.

324. NIOSH (1980). Workplace Exposure to Asbestos: Review and Recommendations: NIOSH/OSHA Asbestos Work Group Recommendations. Department of Health and Human Services, 1980: 81-103.

325. NIOSH (2011): Current Intelligence Bulletin 62: Asbestos fibers and other elongate mineral particles: state of the science and roadmap for research. Cincinnati (OH): Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health; 2011 Apr. DHHS (NIOSH) Publication No. 2011-159.

17

**JA191**

326. Noonan CW, Conway K, Landguth EL, McNew T, Linker L, Pfau J, Black B, Szeinuk J, Flores R. Multiple pathway asbestos exposure assessment for a Superfund community. J Expo Sci Environ Epidemiol. 2015 Jan;25(1):18-25.

327. Noonan CW. Environmental asbestos exposure and risk of mesothelioma. Annals of translational medicine. 2017 Jun;5(11).

328. NTP (2011 ): Report on Carcinogens. 1ih Edition. 2011. U.S. department of Health and Human Services. Public Health Service. National Toxicology Program.

329. Occupational Safety and Health Administration, Dept of Labor, Part 1910 Occupational Safety and Health Standards, Standard for Exposure to Asbestos Dust, Federal Register, Vol. 37, No. 110 (June 7, 1972).

330. Occupational Safety and Health Administration, Dept of Labor, 29 CFR Parts 1910 and 1926, Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite; Final Rules, Federal Register, Vol. 51, No. 119 (June 20, 1986).

331. Occupational Safety and Health Administration, Dept of Labor, Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite, Section 3 – III. Regulatory History. 57 FR 24310 (June 8, 1992).

332. Occupational Safety and Health Administration. Occupational exposure to asbestos; final rule. Fed Reg. 1994;59:40964-41162.

333. Offermans N., et al., Occupational Asbestos Exposure and Risk of Pleural Mesothelioma, Lung Cancer, and Laryngeal Cancer in the Prospective Netherlands Cohort Study, J. Occ. Environ. Medicine, Vol. 56:1 (Jan. 2014).

334. Ohar, J., et al., Germline BAP1 mutation landscape of asbestos-exposed malignant mesothelioma patients with family history of cancer, Cancer Res. 2016 January 15; 76(2): 206-215.

335. Olsen, NJ, et al. Increasing Incidence of Malignant Mesothelioma After Exposure to Asbestos During Home Maintenance and Renovation. Med J Aust 2011; 195 (5): pp. 271-274.

336. Olsson AC, Vermeulen R, Schüz J, Kromhout H, Pesch B, Peters S, Behrens T, Portengen L, Mirabelli D, Gustavsson P, Kendzia B, Almansa J, Luzon V, Vlaanderen J, Stücker I, Guida F, Consonni D, Caporaso N, Landi MT, Field J, Brüske I, Wichmann HE, Siemiatycki J, Parent ME, Richiardi L, Merletti F, Jöckel KH, Ahrens W, Pohlabeln H, Plato N, Tardón A, Zaridze D, McLaughlin J, Demers P, Szeszenia-Dabrowska N, Lissowska J, Rudnai P, Fabianova E, Stanescu Dumitru R, Bencko V, Foretova L, Janout V, Boffetta P, Bueno-de-Mesquita B, Forastiere F, Brüning T, Straif K. Exposure-Response Analyses of Asbestos and Lung Cancer Subtypes in a Pooled Analysis of Case-Control Studies. Epidemiology. 2017 Mar;28(2):288-299.

337. Oury, T., Sporn, T., and Roggli, V, Pathology of Asbestos-Associated Diseases, Third Ed. Copyright 2014 – Chapters 3 and 8.

338. Ovarian cancer, Estimated incidence, mortality & prevalence, 2012, EUCAN.

339. Oyarzun, et al., Restrictive Definition of Asbestos and the Assessment of Potential Health Hazards: Insights from Northern Chile, International Geology Review, 52:955-963 (Sept. 2010).

340. Panou V, Vyberg M, Meristoudis C, et al. Malignant mesothelioma in 91 danish women: The environmental asbestos exposure. J Clin Oncol. 2017;35(15_suppl):8560-8560.

18

**JA192**

341. Paoletti, L., Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic and Pharmaceutical Talcs, Regulatory Toxicology and Pharmacology, 4:222-235 (1984).

342. Papali A, Hines SE. Evaluation of the patient with an exposure-related disease: the occupational and environmental history. Curr Opin Pulm Med. 2015;21(2):155-162.

343. Park S, Park J, Lee E, et al. Ovarian cancer in a former asbestos textile factory worker: a case report. Ann Occup Environ Med. 2018;30:65 (Nov. 2018).

344. Patel AV, Bogner PN, Klippenstein D, Ramnath N. Malignant pleural mesothelioma after household exposure to asbestos. J Clin Oncol. 2008 Nov 20;26(33):5480-3.

345. Pearce N, Checkoway H, Kriebel D: Bias in Occupational Epidemiology Studies, Occup Environ Med 2007;64:562-568. doi: 10.1136/aem.2006.026690.

346. Peretti, Luigi, Bulletin of the Subalpine Mining Association - Year III No. 3-4, "Geology and Genesis of the Talc Deposits in the Pinerolese," September - December 1966.

347. Peretz A, Van Hee VC, Kramer MR, Pitlik S, Keifer MC. Pleural plaques related to "take-home" exposure to asbestos: An international case series. International journal of general medicine. 2008;1:15.

348. Phillips, Murray, Malignant Mesothelioma in a Patient with Anthophyllite Asbestos Fibres in the Lungs, Oxford University Press, 54:412-416 (2010).

349. Piolatto, Giorgio, et al. An Update of cancer mortality among chrysotile asbestos miners in Balangero, northern Italy, 47 British Journal of Industrial Medicine 810-814 (1990).

350. Pira E, Pelucchi C, Buffoni L, Palmas A, Turbiglio M, et al. Cancer mortality in a cohort of asbestos textile workers, Br J Cancer, 2005;92(3):580-6.

351. Pira, et al., Mortality of Talc Miners and Millers from Val Chisone, Northern Italy, An Updated Cohort Study, Journal of Occupational and Environmental Medicine, Volume 59, Number 7 (July 2017).

352. Pira E, Pelucchi C, Piolatto PG, Negri E, Bilei T, La Vecchia C. Mortality from cancer and other causes in the Balangero cohort of chrysotile asbestos miners. Occup Environ Med. 2009 Dec;66(12):805-9.

353. Plas, E., et al., Malignant mesothelioma of the tunica vaginalis testis: review of the literature and assessment of prognostic parameters, Cancer, 83(12):2437-46 (Dec 1998).

354. Politi BJ, Arena VC, Schwerha J, Sussman N. Occupational medical history taking: how are today's physicians doing? A cross-sectional investigation of the frequency of occupational history taking by physicians in a major US teaching center. J Occup Environ Med. 2004;46(6):550-555.

355. Pooley, F., et al., Chemical and Physical Properties of British Talc Powders, Inhaled Particles, 639-646 (1975).

356. Porro FW, et al., Pneumoconiosis in the Talc Industry, Am. J. Roentgenology and Radium Therapy, Vol. 47, No. 4 (April 1942).

357. Price, B., Industrial-Grade Talc Exposure and the Risk of Mesothelioma, Crit Rev Toxicol 40(6), 513-530 (July 2010).

358. Pukkala E, Auvinen A, Wahlberg G. Incidence of cancer among Finnish airline cabin attendants, 1967-92, Brit Med J, 1995;311:649-52.

359. Rajapakse P. Disorders of the pleura, Trends in mesothelioma incidence among females in the United States. CHEST 2021 Annual Meeting October 17-20. https://doi.org/10.1016/j.chest.2021.07.1255

19

JA193

360. Rake C, Gilham C, Hatch J, Darnton A, Hodgson J, Peto J. Occupational, domestic and environmental mesothelioma risks in the British population: a case–control study. Br J Cancer. 2009 Apr 7;100(7):1175-83.

361. Ramazzini, Collegium, Asbestos is Still With Us: Repeat Call for A Universal Ban, 16 Int. J. Occup. Environ. Health, 351, 351-352 (2010).

362. Reid A, Heyworth J, de Klerk N, Musk AW. The mortality of women exposed environmentally and domestically to blue asbestos at Wittenoom, Western Australia. Occup Environ Med. 2008 Nov;65(11):743-9.

363. Reid A, Segal A, Hayworth JS, de Klerk NH, Musk AW. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. Cancer Epidemiol Biomarkers Prev. 2009;18(1):140-7.

364. Reid A, Klerk N, Musk A.W. Does Exposure to Asbestos Cause Ovarian Cancer? A Systematic Literature Review and Meta-analysis. Cancer Epidemiol Biomarkers Prev. 2011; 20(7): 1287-1295.

365. Reid A, et al., Mesothelioma risk after 40 years since first exposure to asbestos: a pooled analysis, Thorax (2014).

366. Robinson BM. Malignant pleural mesothelioma: an epidemiological perspective. Ann Cardiothorac Surg. 2012 Nov;1(4):491-6.

367. Robinson CF, Walker JT, Sweeney MH, Shen R, Calvert GM, Schumacher PK, Ju J, Nowlin S. Overview of the National Occupational Mortality Surveillance (NOMS) System: Leukemia and Acute Myocardial Infarction Risk by Industry and Occupation in 30 US States 1985-1999, 2003-2004, and 2007. Am J Ind Med, 2015 February; 58(2): 123-137.

368. Rödelsperger K, Jockel KH, Pohlabein H, Romer W, Woitowitz HJ. Asbestos and Man-Made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma: Results From a German Hospital-Based Case-Control Study. Am Journal of Ind Med, 39:262-275 (2001).

369. Roelofs, Cora, et al., Mesothelioma and employment in Massachusetts: Analysis of cancer registry data 1988 – 2003, American Journal of Industrial Medicine (2013)

370. Roggli, Victor, et al., Pulmonary Asbestos Body Counts and Electron Probe Analysis of Asbestos Body Cores in Patients with Mesothelioma, A Study of 25 Cases, Cancer 50:2423-2432 (1982).

371. Roggli, Victor, Pathology of Human Asbestosis: A Critical Review, Adv Pathol 2:31-60 (1989).

372. Roggli VL, Longo WE. Mineral fiber content of lung tissue in patients with environmental exposures: household contacts vs. building occupants. Ann N Y Acad Sci. 1991 Dec 31;643:511-8.

373. Roggli VL, Oury TD, Moffatt EJ. Malignant mesothelioma in women. Anatomic pathology (Chicago, Ill.: annual). 1997;2:147-63.

374. Roggli, Victor, et al., Tremolite and Mesothelioma, Ann. Occup. Hyg., Vol. 46, No. 5, pp. 447-453 (2002).

375. Roggli VL, Sharma A, Butnor KJ, Sporn T, Vollmer RT. Malignant mesothelioma and occupational exposure to asbestos: a clinicopathological correlation of 1445 cases. Ultrastructural pathology. 2002 Jan 1;26(2):55-65.

376. Rohl AN, Langer AM, Wolff MS, Weisman I. Asbestos exposure during brake lining maintenance and repair. Environmental research. 1976 Aug 1;12(1):110-28.

20

JA194

377. Rohl, AN, Asbestos in Talc, Enviro Health Persp, Vol 9, pp 129-132 (1974).

378. Rohl AN, Langer AM, Selikoff IJ, Nicholson WJ. Exposure to Asbestos in the Use of Consumer Spackling, Patching, and Taping Compounds. Science, 15 August 1975, Volume 189, pp. 551-553.

379. Rohl AN, Langer A, Fibrous Mineral Content of Consumer Talc-Containing Products, pp 394-403 (1979).

380. Rohl AN, Langer A, Identification and Quantitation of Asbestos in Talc, Enviro Health Persp, Vol 9, pp 95-109 (1974).

381. Rohl, A., et al. Asbestos Content of Dust Encountered in Brake Maintenance and Repair, 70 Proceedings of the Royal Society of Medicine, 32(1977).

382. Rohl, A., Langer, A., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, Journal of Toxicology and Environmental Health, 2:255-284 (1976).

383. Rohs, et al., Low-Level Fiber-induced Radiographic Changes Caused by Libby Vermiculite, A 25-Year Follow-up Study, 177 Am. J. Respir. Crit. Care. Med. 630 (2008).

384. Rolland, P., et al, "Risk of Pleural Mesothelioma: A French Population-Based Case-Control Study (1998-2006)." October 20, 2006/ Oral Session: Epidemiology II.

385. Rom, et al., Malignant Mesothelioma From Neighborhood Exposure to Anthophyllite Asbestos, American Journal Of Industrial Medicine, 40:211-214 (2001).

386. Rosner, D., et al., "Nondetected": The Politics of Measurement of Asbestos in Talc, 1971-1976, Public Health Then and Now, AJPH, Vol. 109, No. 7 (July 2019).

387. Rubino, G.F., et al. Mortality Study of Talc Miners and Millers, Department of Occupational Medicine University of Torino Italy, presented at American Industrial Health Conference, San Francisco, California (April 14, 1975).

388. Rubino, G.F., et al. Mortality Study of Talc Miners and Millers (March 1976).

389. Rubino, G.F., et al. Mortality and Morbidity among Talc Miners and Millers in Italy, 357-363.

390. Rubino, G.F., et al. Mortality of chrysotile asbestos workers at the Balangero Mine, Northern Italy, 36 British Journal of Industrial Medicine 187-194 (1979).

391. Saba R, Aronu GN, Bhatti RP, Mirrakhimov AE, Anusim N, Barbaryan A, Kwatra SG, Iroegbu N. Malignant mesothelioma after household exposure to asbestos. Case Rep Oncol Med. 2013;2013(570487):1-4.

392. Saitoh, Muto, Hachiya, Takizawa, Asbestos Body and Fiber Concentrations in Pathological Autopsy Tissues of Patients with Malignant Peritoneal Mesothelioma, Bull. Environ. Contam. Toxicol. 50:325-332 (1993).

393. Sakai K, Hisanaga N, Shibata E, Ono Y, Takeuchi Y. Asbestos exposures during reprocessing of automobile brakes and clutches. International journal of occupational and environmental health. 2006 Apr 1;12(2):95-105.

394. Samimi BS, Williams AM. Occupational exposure to asbestos fibres resulting from use of asbestos gloves. Am Ind Hyg Assoc J 1981, 42:870-875.

395. Sawyer RN. Asbestos exposure in a Yale building. Analysis and resolution. Environ Res. 1977 Feb;13(1):146-69.

396. Sawyer RN. Indoor asbestos pollution: application of hazard criteria. Ann N Y Acad Sci. 1979;330:579-86.

397. Scancarello G, Romero R, Respiratory Disease as a Result of Talc Inhalation, J Occup Environ Med 38(6), 610-614 (June 1996).

21

**JA195**

398.  Schepers, GW H and Durkan, TM, An Experimental Study of the Effects of Talc Dust on Animal Tissue, American Medical Association's Archives of Industrial Health, Vol. 12, Number 6. (December 1955)
399.  Schiller, JE, Payne, SL, Surface Charge Measurements of Amphibole Cleavage Fragments and Fibers, Bureau of Mines Report of Investigations, RI 8483, U.S. Dept. of Interior (1980).
400.  Schneider J, Straif K, Woitowitz HJ. Pleural mesothelioma and household asbestos exposure. Rev Environ Health. 1996 Jan-Jun;11(1-2):65-70.
401.  Schneider J, Woitowitz HJ. Tumours linked to para-occupational exposure to airborne asbestos. Indoor Built Environ. 1996 Mar;5(2):67-75.
402.  Schulz RZ, Williams CR, Commercial Talc Animal and Mineralogical Studies, J Ind Hygiene and Toxicology, Vol. 24, No. 4 (1942).
403.  Schüz J, Bukhtiyarov I, Olsson A, Moissonnier M, Ostroumova E, Feletto E, Schonfeld SJ, Byrnes G, Tskhomariia I, McCormack V, Straif K. Occupational cohort study of current and former workers exposed to chrysotile in mine and processing facilities in Asbest, the Russian Federation: Cohort profile of the Asbest Chrysotile Cohort study. Plos one. 2020 Jul 29;15(7):e0236475.
404.  Sebastien, Janson, Gaudichet, Hirsch and Bignon, Asbestos retention in Human Respiratory Tissues: Comparative Measurements in Lung Parenchyma and in Parietal Pleura, 30 IARC Sci. Pub., 237-246 (1980).
405.  Selevan SG, Dement JM, Mortality Patterns Among Miners and Millers of Non-Asbestiform Talc: Preliminary Report, Journal of Environmental Pathology and Toxicology, Vol. 2, No. 5 (May-June 1979).
406.  Selikoff IJ, Churg J, Hammond EC. Asbestos Exposure and Neoplasia. JAMA. 1964 Apr 6; 188:22-6.
407.  Selikoff IJ, Hammond EC, Seidman H. Cancer risk of insulation workers in the United States. Mount Sinai School of Medicine, New York, NY (USA); 1972 Oct 4.
408.  Selikoff IJ, Hammond EC, Seidman H. Mortality experience of insulation workers in the United States and Canada, 1943--1976. Ann N Y Acad Sci. 1979;330:91-116.
409.  Silverstein, M., Welch, L., Lemen, R. Developments in Asbestos Cancer Risk Assessment. Am Journal of Ind Med, 2009.
410.  Sjosten A.C.E, Ellis H, Edelstam G.A.B. Retrograde migration of glove powder in the human female genital tract. Human Reproduction. 2004; 19(4): 991-995.
411.  Smith AH, Wright CC. Chrysotile Asbestos is the Main Cause of Pleural Mesothelioma. Am J Indus Med 30:252-266 (1996).
412.  Smith, D., Women and Mesothelioma, Chest, 122/6 1885-1886 (2002).
413.  Snider, D., et al., Asbestosform Impurities In Commercial Talcum Powders, The Compass of Sigma Gamma Epsilon, Vol. 49, No. 2 (1972).
414.  Sprince NL, Oliver LC, McLoud TC. Asbestos-related disease in plumbers and pipefitters employed in building construction. J Occup Med. 1985 Oct;27(10):771-5.
415.  Srebo S, Roggli, V, Asbestos-Related Disease Associated with Exposure to Asbestiform Tremolite, Am J Int Med 26, 809-819 (1994).
416.  Srebro SH, Roggli VL, Samsa GP. Malignant mesothelioma associated with low pulmonary tissue asbestos burdens: a light and scanning electron microscopic analysis of 18 cases. Modern pathology: an official journal of the United States and Canadian Academy of Pathology, Inc. 1995 Aug;8(6):614-21.

22

JA196

417.  Statement from Acting Surgeon General Boris Lushniak about National Asbestos Week, April 1-7, 2014. U.S Surgeon General. 2014

418.  Stayner LT. Canada's Asbestos International Expert Panel Report. J Occup Environ Med, 22.12.2008.

419.  Steffen JE, Tran T, Yimam M, Clancy KM, Bird TB, Rigler M, Longo W, Egilman DS. Serous Ovarian Cancer Caused by Exposure to Asbestos in Cosmetic Talc Powders – A Case Series. JOEM (Publish Ahead of Print) DOI: 10.1097/JOM.0000000000001800. (2019).

420.  Straif K, Benbrahim-Tallaa L, Baan R, et al. A review of human carcinogens--Part C: metals, arsenic, dusts, and fibres. Lancet Oncol. 2009;10(5):453-454.

421.  Summary of Published Measurement of Asbestos Levels in Ambient Air. Prepared for USEPA by SRC, Inc. 2013.

422.  Suzuki Y, Yuen SR, Ashley R. Short thin asbestos fibers contribute to the development of human malignant mesothelioma: pathological evidence. Int J Hyg Environ-Health 208 (2005) 201-210.

423.  Suzuki Y, Yuen SR. Asbestos Fibers Contributing to the Induction of Human Malignant Mesothelioma. Annals of the New York Academy of Science, Volume 982, December 2002.

424.  Suzuki Y, Kohyama N. Translocation of inhaled asbestos fibers from the lung to other tissues. Am J Ind Med. 1991;19(6):701-4.

425.  Talcum Study Clarified by N.Y. Hospital, Washington Post, March 26, 1976.

426.  Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ, et al. (2013). Genital powder use and risk of ovarian cancer: a pooled analysis of 8525 cases and 9859 controls. Cancer Prev Res 6:811-821.

427.  Teschke K, Morgan MS, Checkoway H, Franklin G, Spinelli JJ, van Belle G, Weiss NS. Mesothelioma surveillance to locate sources of exposure to asbestos. Can J Public Health. 1997 May-Jun;88(3):163-8.

428.  Testa, J., et al., Germline BAP1 mutations predispose to malignant mesothelioma, Nature Genetics, 43:10 (2011).

429.  The British Thoracic Society, Statement on malignant mesothelioma in the United Kingdom. Thorax 56:250-265; 2001.

430.  Thomas, Lung Cancer Mortality among pottery workers in the United States, Lyon International Agency for Research on Cancer (1990).

431.  Thomas & Stewart, Mortality From Lung Cancer and Respiratory Among Pottery Workers Exposed To Silica, American Journal of Epidemiology, (1987).

432.  Tlotleng N, Sidwell Wilson K, Naicker N, Koegelenberg CF, Rees D, Phillips JI. The significance of non-occupational asbestos exposure in women with mesothelioma. Respirol Case Rep. 2018 Nov 20;7(1):e00386.

433.  Torre L.A, Trabert B, DeSantis C.E, et al. Ovarian cancer statistics, 2018. CA: A cancer journal for clinicians. 2018; 68(4): 284-296.

434.  Tran T, Egilman D, Rigler M, Emory T. A Critique of Helsinki Criteria for Using Lung Fiber Levels to Determine Causation in Mesothelioma Cases. Annals of Global Health. 2021; 87(1): 73, 1-13. DOI: https://doi.org/10.5334/aogh.3135

435.  Transactions – National Safety Council (NSC 3) (1934)

436.  US Environmental Protection Agency – Region IX, Response to the November 2005 National Stone, Sand & Gravel Association Report Prepared by the R.J. Lee Group, Inc.

23

JA197

"Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project," April 20, 2006.

437. US Dept. of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, NIOSH. Control of Asbestos Exposure During Brake Drum Service. August 1989.

438. US Dept. of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, NIOSH. Report to Congress on Workers' Home Contamination Study Conducted Under the Workers' Family Protection Act (29 U.S.C. 671a). September 1995.

439. US Public Health Service, US Department of Health and Human Services. Toxicological profile for asbestos. Atlanta, GA: Agency for Toxic Substances and Disease Registry, 2001 Sep.

440. US Dept. of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, NIOSH. Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research Revised Edition, 1-174 (2011).

441. US Dept. of Interior, U.S. Geological Survey, Mineralogy and Morphology of Amphiboles Observed in Soils and Rocks in El Dorado Hills, California (2006).

442. US Dept. of Labor: Working Safely with Asbestos in Clutch and Brake Linings. (posting).

443. US Dept. of Labor, OSHA Directorate of Science, Technology and Medicine, Office of Science and Technology Assessment. Asbestos – Automotive Brake and Clutch Repair Work (bulletin).

444. Van Gosen, Bradley, The Geology of Asbestos in the United States and Its Practical Applications, Environmental & Engineering Geoscience, Vol. XIII, No. 1, February 2007. pp. 55-63.

445. Van Gosen, Bradley, et al., Using the geologic setting of talc deposits as an indicator of amphibole asbestos content, 45 Environmental Geology 920-939 (2004).

446. Van Horn, Earl C. Talc Deposits of the Murphy Marble Belt," NC Dept of Conservation and Development, Bulletin Number 56 (1948).

447. Varela K, Harvey RR, Cummings KJ, Harrison R, Blackley DJ, Fechter-Leggett E, Zhang J, Sipin-Baliwas A, Deapen D. Epidemiologic Comparison of Malignant Mesothelioma Reported in California During 1988-2016. InB50. ASBESTOS, BERYLLIUM, AND OTHER UNIQUE INHALED TOXICANTS 2020 May (pp. A3635-A3635). American Thoracic Society.

448. Vasama-Neuvonen K, Pukkala E, Paakkulainen H, Mutanen P, Weiderpass E, et al. Ovarian cancer and occupational exposures in Finland, Am J Ind Med, 1999;36:83-9.

449. Venter PF, Iturralde M. Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. S Afr Med J. 1979 Jun 2;55(23):917-9.

450. Vianna NJ, Polan AK. Non-occupational exposure to asbestos and malignant mesothelioma in females. Lancet. 1978;1(8073):1061-3.

451. Vimercati L, Cavone D, Delfino MC, Bruni B, De Maria L, Caputi A, Sponselli S, Rossi R, Resta L, Fortarezza F, Pezzuto F, Serio G. Primary Ovarian Mesothelioma: A Case Series with Electron Microscopy Examination and Review of the Literature. Cancers. 2021; 13(9):2278. https://doi.org/10.3390/cancers13092278

452. Vimercati L, Cavone D, Delfino MC, De Maria L, Caputi A, Ferri GM, Serio G. Asbestos exposure and malignant mesothelioma of the tunica vaginalis testis: a

24

**JA198**

systematic review and the experience of the Apulia (southern Italy) mesothelioma register. Environmental Health. 2019 Dec;18(1):1-24.

453. Vimercati L, Cavone D, Delfino MC, De Maria L, Caputi A, Ferri GM, Serio G. Response to the "Letter to the Editor" by Gabor Mezei et al., Comments on Vimercati et al., 2019,"Asbestos exposure and malignant mesothelioma of the tunica vaginalis testis: a systematic review and the experience of the Apulia (Southern Italy) mesothelioma register". Environmental Health. 2019 Dec;18(1):1-3.

454. Vinikoor, et al., Exposure to Asbestos-Containing Vermiculite Ore and Respiratory Symptoms Among Individuals Who Were Children While the Mine Was Active in Libby, Montana, 118 Envtl. Health Perspectives 7 (July 2010).

455. Visonà SD, Capella S, Bodini S, Borrelli P, Villani S, Crespi E, Colosio C, Previderè C, Belluso E. Evaluation of deposition and clearance of asbestos (detected by SEM-EDS) in lungs of deceased subjects environmentally and/or occupationally exposed in Broni (Pavia, Northern Italy). Frontiers in Public Health. 2021;9:980.

456. Wagner, Diffuse Pleural Mesothelioma & Asbestos Exposure in the Northwestern Cape Province (1960)

457. Wagner, J.C., et al., Biological Effects of Tremolite, 45 Br. J. Cancer 352 (1982).

458. Wagner JC, Berry G, Skidmore JW, Timbrell V. The effects of the inhalation of asbestos in rats. Br J Cancer. 1974 Mar;29(3):252-69.

459. Wagner JC, Sleggs CA, Marchand P. Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province. Br J lnd Med. 1960;17:260-71.

460. Wang X, Yano E, Qiu H, Yu I, Courtice MN, Tse LA, Lin S, Wang M. A 37-year observation of mortality in Chinese chrysotile asbestos workers. Thorax. 2012 Feb;67(2):106-10.

461. Wang XR, Yu IT, Qiu H, et al., Cancer mortality among Chinese chrysotile asbestos textile workers. Lung Cancer. 2012 Feb;75(2):151-5.

462. Wang X, Lin S, Yu I, Qiu H, Lan Y, Yano E. Cause-specific mortality in a Chinese chrysotile textile worker cohort. Cancer Sci. 2013 Feb;104(2):245-9.

463. Ward, et al., Trees as reservoirs for amphibole fibers in Libby, Montana, Science of the Total Environment 367, pp. 460-465 (2006).

464. Warnock ML, Churg AM. Asbestos bodies. Chest. 1980;77(2):129-130.

465. Webber, et al., Separation and Characterization of Respirable Amphibole Fibers from Libby, Montana, Inhalation Toxicology, 20:733-740 (2008).

466. Wedler HW. Asbestosis and Pulmonary Carcinoma. Deutsche Medizinische Wochenschrift. 1943;69(31/32):575-6.

467. Weill, H, et al., Health Effects of Tremolite, Am Rev Respir Dis 142, 1453-1458 (1990).

468. Weir FW, Tolar G, Meraz LB. Characterization of vehicular brake service personnel exposure to airborne asbestos and particulate. Appl Occup Environ Hyg. 2001 Dec;16(12):1139-46.

469. Welch, Laura, et al. Asbestos and Peritoneal Mesothelioma among College-educated Men, 11 International Journal of Occupational Environmental Health 254-258 (2005).

470. Welch, et al, Asbestos Exposure Causes Mesothelioma, But Not This Asbestos Exposure: An Amicus Brief to the Michigan Supreme Court, Int J Occup Environ Health 2007; 13:318-327.

471. Whitehouse, et al., Environmental Exposure to Libby Asbestos and Mesotheliomas, Am. J. Indus. Med. 50:877-880 (2008).

25

**JA199**

472. Whittemore AS, Wu ML, Paffenbarger RS Jr, Sarles DL, Kampert JB, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee, Am J Epidemiol, 1988;126(6):1228-40.

473. Whitwell F, Scott J, Grimshaw M. Relationship between occupations and asbestos-fibre content of the lungs in patients with pleural mesothelioma, lung cancer, and other diseases. Thorax. 1977 Aug;32(4):377-86.

474. Wignall BK, Fox AJ. Mortality of female gas mask assemblers, Brit J Ind Med, 1982;39:34-8.

475. Wild C, Kleinjans J, Children and Increased Susceptibility to Environmental Carcinogens: Evidence or Empathy?, Cancer Epidemiology, Biomarkers & Prevention, 2003, Vol. 12; 1389-1394.

476. Wong JY, Rice C, Blair A, Silverman DT. Mesothelioma risk among those exposed to chrysotile asbestos only and mixtures that include amphibole: a case-control study in the USA, 1975-1980. Occup Environ Med 2020;0:1–4. doi:10.1136/oemed-2020-106665.

477. World Health Organization. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 93, Carbon Black, Titanium Dioxide, and Talc, Lyon, France (2010).

478. World Health Organization. Elimination of Asbestos-related diseases. Geneva, Switzerland: World Health Organization; Report No.: WHO/SDE/OEH/6.03 (2006).

479. World Health Organization. Environmental Health Criteria 53: Asbestos and Other Natural Mineral Fibres. Geneva, Switzerland: WHO, 1986.

480. World Health Organization. Environmental Health Criteria 203: Chyrsotile Asbestos. Geneva, Switzerland: WHO, 1998.

481. World Trade Organization. European Communities-Measures Affecting Asbestos and Asbestos-containing Products. WT/DS135/R. 2000

482. Wright, GW. Asbestos and Health in 1969, American Review of Respiratory Disease, Oct 1969, Vol 100, No. 4.

483. Wu M, Gordon R, Herbert R. Lung disease in World Trade Center responders exposed to dust and smoke-carbon nanotubes found in the lungs of WTC patients and dust samples. Env Health Perspect. 2010;118:499-504.

484. Xu, J, et al., Germline Mutation of BAP1 Accelerates Development of Asbestos-Induced Malignant Mesothelioma, Cancer Res; 74(16) August 15, 2014.

485. Yano, Wang, Wang, Wang, Lan, Cancer Mortality Among Workers Exposed to Amphibole-Free Chrysotile Asbestos, American J. Epid. 15, 154(6):538-43 (Sept. 2001).

486. Yano E, Wang ZM, Wang XR, Wang MZ, Takata A, Kohyama N, Suzuki Y. Mesothelioma in a worker who spun chrysotile asbestos at home during childhood. Am J Ind Med. 2009 Apr;52(4):282-7.

487. Yuxin, L, et al., Metachronous Uterine Endometrioid Adenocarcinoma and Peritoneal Mesothelioma in Lynch Syndrome: A Case Report, Int J Surg Path, Vol. 25(3) 253-257 (2017).

488. Zahm SH, Blair A, 2003, Occupational cancer among women: where have we been and where are we going? Am J Ind Med, 44:565-75.

489. Zhai Z, Ruan J, Zheng Y, et al. Assessment of global trends in the diagnosis of mesothelioma From 1990 to 2017. JAMA Netw Open. 2021;4(8):e2120360. doi:10.1001/jamanetworkopen.2021.20360

26

490.    Zhao J, Zuo T, Zheng R, Zhang S, Zeng H, Xia C, Yang Z, Chen W. Epidemiology and trend analysis on malignant mesothelioma in China. Chin J Cancer Res. 2017 Aug;29(4):361-368.

491.    Zhu H, Wang Z. Study of occupational lung cancer in asbestos factories in China. Br J Ind Med. 1993 Nov;50(11):1039-42.

492.    Zielinski, J., et al., Decreases in Occupational Exposure to Ionizing Radiation among Canadian Dental Workers, Journal of the Canadian Dental Association, Vol. 71, No. 1 (January 2005).

**JA201**

**JA202**

| Jacqueline Moline, MD, MSc, FACP, FACOEM | | | Depositions and Testimony 2017-2021 | | *deposition/trial continued | | |
|---|---|---|---|---|---|---|---|
| Case | Date | Law Firm | Deposition / Trial | Docket # | Judge | County | State |
| McManus | 2/28/17 | Coady Law Firm | Deposition | | | | |
| Yates | 3/22/17 | Klamann Law Firm | Deposition | | | | |
| Nemeth | 3/24/17 | Levy Konigsberg | Trial | 190138/2014 | Shulman | New York | NY |
| Caine | 3/30/17 | Simon Greenstone Panatier | Trial | | | | NJ |
| Hopkins | 4/6/17 | Klamann Law Firm | Deposition | | | | NY |
| Goodman | 4/7/17 | Klamann Law Firm | Deposition | | | | |
| Brown | 5/26/17 | Levy Konigsberg | Deposition | | | | |
| Anisansel | 6/5/17 | Weitz & Luxenberg | Trial | | | | |
| Hanson | 6/6/17 | Simon Greenstone Panatier | Deposition | 2:16-CV-34-LGW-RSB | | Southern District of | GA |
| Bartlow | 6/28/17 | Simon Greenstone Panatier | Deposition | | | | |
| Schoeniger | 6/28/17 | Simon Greenstone Panatier | Deposition | | | | |
| Bartlow* | 6/29/17 | Simon Greenstone Panatier | Deposition | | | | |
| Schoeniger* | 6/29/17 | Simon Greenstone Panatier | Deposition | | | | |
| McGlynn | 8/7/17 | Simmons Hanley Conroy | Trial | | | New York | NY |
| Herford | 9/5/17 | Simon Greenstone Panatier | Deposition | BC646315 | | Los Angelos | CA |
| Lanzo | 9/5/17 | Levy Konigsberg | Deposition | | | | |
| Jenkins | 9/7/17 | Simon Greenstone Panatier | Deposition | 37-2016-00025572-CU-AS- | | Los Angelos | CA |
| Snowdale | 9/8/17 | Belluck & Fox | Trial | | | New York | NY |
| Herford* | 9/14/17 | Simon Greenstone Panatier | Deposition | BC646315 | | Los Angelos | CA |
| Lanzo* | 9/14/17 | Levy Konigsberg | Deposition | | | | |
| Boucher | 9/15/17 | Law Office of Michael P. Joyce | Deposition | | | | |
| Barbosa | 9/29/17 | Law Office of Michael P. Joyce | Deposition | MA 16-1939 | | | |
| Northrup | 10/11/17 | Belluck and Fox | Trial | | | Riverhead | NY |
| Herford | 10/26/17 | Simon Greenstone Panatier | Trial | BC646315 | | Los Angelos | CA |
| Kohr | 11/6/17 | Levy Konigsberg | Deposition | | | New York | NY |
| Chapp | 11/28/17 | Simon Greenstone Panatier | Deposition | | | New York | NY |
| Teuscher | 2/21/18 | Simon Greenstone Panatier | Deposition | | | Great Neck | NY |
| Lanzo | 2/22/18 | Levy Konigsberg | Trial | MID-L-7385-16AS | | New Brunswick | NJ |
| Barber | 3/1/18 | Belluck and Fox | Trial | 190112/2016 | Barbara Jaffe | New York | NY |
| Ingham | 3/15/18 | Lanier Law Firm | Deposition | | | Great Neck | NY |
| Anderson | 3/28/18 | Simon Greenstone Panatier | Deposition | BC666513 | | Los Angelos | CA |
| Lyons | 4/18/18 | Simon Greenstone Panatier | Deposition | CGC-16-276495 | | San Francisco | CA |
| Berry | 4/20/18 | Simmons Hanley Conroy | Deposition | 15-005737 | | Fort Lauderdale | FL |
| Brick | 4/25/18 | Simon Greenstone Panatier | Deposition | BC674595 | | Los Angelos | CA |
| Anderson | 5/7/18 | Simon Greenstone Panatier | Trial | BC666513 | | Los Angelos | CA |
| Morris | 6/22/18 | Law Office of Peter G. Angelos | Deposition | 1:16-cv-00118-CCB | | Maryland | |
| Ingham | 6/25/18 | Lanier Law Firm | Trial | 1522-CC10417-01 | | St. Louis | MO |
| Pipes | 6/27/18 | Dean Omar Branham Law Firm | Deposition | CJ-2017-3487 | | Oklahoma | OK |
| Von Salzen | 7/12/18 | Simon Greenstone Panatier | Deposition | BC680576 | | Los Angelos | CA |
| Von Salzen | 8/3/18 | Simon Greenstone Panatier | Trial | BC680576 | | Los Angelos | CA |
| Stock | 8/30/18 | Belluck & Fox | Trial | 807846/2017 | | | |
| Allen | 9/14/18 | Simon Greenstone Panatier | Deposition | DR180132 | | Humboldt County | CA |
| Rimondi | 9/17/18 | Lanier Law Firm | Deposition | MID- L-2912-17AS | | | |
| Ruman | 9/17/18 | Lanier Law Firm | Deposition | MID-L-2919-17AS | | | |
| Hayes | 9/27/18 | Levy Konigsberg | Deposition | | | | |
| Kerkhof | 10/1/18 | Simon Greenstone Panatier | Deposition | 439392-V | | Montgomery County | MD |

**JA203**

| Jacqueline Moline, MD, MSc, FACP, FACOEM | | Depositions and Testimony 2017-2021 | | | *deposition/trial continued | | |
|---|---|---|---|---|---|---|---|
| Case | Date | Law Firm | Deposition / Trial | Docket # | Judge | County | State |
| Chapman | 10/4/18 | Lanier Law Firm | Deposition | MID-L-02911-17 | | Middlesex County | NJ |
| Allen | 10/9/18 | Simon Greenstone Panatier | Trial | DR180132 | | Humboldt County | CA |
| Leavitt | 11/8/18 | Levy Konigsberg | Deposition | RG17882401 | | Alameda County | NY |
| Rice | 11/27/18 | Simon Greenstone Panatier | Deposition | ASB-FBT-15-6053658-S | | | |
| Edenfield | 12/6/18 | Levy Konigsberg | Trial | MID-L-4820-11AS | | Middlesex County | NJ |
| Stepanek | 12/12/18 | Levy Konigsberg | Deposition | 17 L 008994 | | Cook County | IL |
| Blinkinsop | 12/20/18 | Weitz & Luxenberg | Deposition | | | Los Angeles | CA |
| Forgie | 1/7/19 | Simon Greenstone Panatier | Deposition | 17CV01032 | Pauline Maxwell | Santa Barbara | CA |
| Fong | 1/8/19 | Levy Konigsberg | Deposition | | | | |
| Donovan | 1/16/19 | Phillips & Paolicelli | Deposition | | | | |
| Koretoff | 2/4/19 | Simon Greenstone Panatier | Deposition | JCCP4674 | David Cunningham | Los Angeles | CA |
| Ripley | 2/27/19 | Simon Greenstone Panatier | Deposition | MID-L-00562-18AS | Ana Viscomi | New Brunswick | NJ |
| Olson | 3/4/19 | Maune Raichle Hartley French & Mudd | Trial | | | | |
| Lefrak | 3/7/19 | Weitz & Luxenberg | Trial | 190033/14 | | New York | NY |
| Blinkinsop | 3/13/19 | Weitz & Luxenberg | Trial | | | | CA |
| Pipes | 3/15/19 | Simon Greenstone Panatier | Trial | CJ-2017-3487 | Susan Stallings | Oklahoma City | OK |
| Rimondi | 3/18/19 | Lanier Law Firm | Trial | | | | |
| Schmitz | 3/26/19 | Levy Konigsberg | Deposition | | | | |
| Carrera | 3/27/19 | Simon Greenstone Panatier | Deposition | 17CV02331 | Paul Burdick | Santa Cruz | CA |
| Jefferson | 3/27/19 | Simon Greenstone Panatier | Deposition | 15C-05-158ASB | | Wilmington | DE |
| Stepanek | 5/3/19 | Levy Konigsberg | Deposition | | | Chicago | IL |
| Fredericks | 5/6/19 | Simmons Hanley Conroy | Trial | | | Philadelphia | PA |
| Souza | 5/9/19 | Simon Greenstone Panatier | Deposition | 1-15-CV-13109 | Maryann Bowler | Boston | MA |
| Strain | 5/15/19 | Lanier Law Firm | Deposition | | | | |
| Babich | 5/22/19 | Levy Konigsberg | Deposition | | | | |
| Crudge | 5/29/19 | Simon Greenstone Panatier | Deposition | BC685901 | Steven Kleifield | Los Angeles | CA |
| Citizen | 6/19/19 | Simon Greenstone Panatier | Deposition | 20142920 | Clayton Davis | Calhoun | LA |
| Mason | 6/24/19 | Simon Greenstone Panatier | Deposition | BC687010 | David Cunningham | Los Angeles | CA |
| Cabibi | 7/1/19 | Simon Greenstone Panatier | Deposition | BC665257 | David Cunningham | Los Angeles | CA |
| Weirick | 7/1/19 | Simon Greenstone Panatier | Deposition | BC656425 | Steven Kleifield | Los Angeles | CA |
| Barden | 7/3/19 | Levy Konigsberg | Deposition | | | New Brunswick | NJ |
| Etheridge | 7/3/19 | Simon Greenstone Panatier | Deposition | | | New Brunswick | NJ |
| McNeil | 7/3/19 | Maune Raichle Hartley French & Mudd | Deposition | | | New Brunswick | NJ |
| McNeil | 7/3/19 | Simon Greenstone Panatier | Trial | | | New Brunswick | NJ |
| Ronning | 7/3/19 | Levy Konigsberg | Deposition | | | New Brunswick | NJ |
| Citizen* | 7/17/19 | Simon Greenstone Panatier | Deposition | 20142920 | | | |
| Delacruz | 7/18/19 | Simon Greenstone Panatier | Deposition | BC658576 | Brian Currey | Los Angeles | CA |
| Nemec | 7/25/19 | Peter Angelos Firm | Deposition | | | | |
| Barden | 7/29/19 | Levy Konigsberg | Trial | | | New Brunswick | NJ |
| Etheridge | 7/29/19 | Simon Greenstone Panatier | Trial | MID-L-932-17AS | | New Brunswick | NJ |
| McNeil* | 7/29/19 | Maune Raichle Hartley French & Mudd | Deposition | | | New Brunswick | NJ |
| Ronning | 7/29/19 | Levy Konigsberg | Trial | | | New Brunswick | NJ |
| Stewart S. | 8/26/19 | Law Office of Michael P. Joyce | Deposition | | | | |
| Cabibi | 8/28/19 | Simon Greenstone Panatier | Trial | BC665257 | David Greenstone | Los Angeles | CA |
| Weirick | 9/23/19 | Simon Greenstone Panatier | Trial | | | Los Angeles | CA |
| Wille | 9/26/19 | Klamann Law Firm | Deposition | | | | |

| Case | Date | Law Firm | Deposition / Trial | Docket # | Judge | County | State |
|---|---|---|---|---|---|---|---|
| Crudge | 9/27/19 | Simon Greenstone Panatier | Trial | | | Los Angeles | CA |
| McAllister | 10/8/19 | Simmons Hanley Conroy | Deposition | 18-361 | Shelly D. Dick | New Orleans | LA |
| Fong | 10/28/19 | Levy Konigsberg | Trial | | | | CA |
| Stumbo/Hall | 11/18/19 | Freidman Rubin | Deposition | | | | |
| Breakell | 12/18/19 | Lanier law Firm | Deposition | | | | CT |
| DuQuette | 12/23/19 | Simon Greenstone Panatier | Deposition | | | | |
| Evans | 1/10/20 | Cheely Law Firm | Deposition | | | | |
| Johnson | 1/15/20 | Simon Greenstone Panatier | Deposition | | | | |
| Lashley | 1/15/20 | Simon Greenstone Panatier | Deposition | | | | |
| Birch | 2/10/20 | Phillips & Paolicelli | Deposition | | | | |
| Biermann | 2/18/20 | Cheek Law Firm | Deposition | | | New Orleans | LA |
| San Nicholas | 2/20/20 | Simon Greenstone Panatier | Deposition | 2017-CP-4005764 | Jean Hoesertoal | Richland | SC |
| Zimmerman | 2/26/20 | Simon Greenstone Panatier | Deposition | | | | |
| Johnson* | 2/27/20 | Siomon Greenstone Panatier | Deposition | | | | |
| King | 3/3/20 | Simmons Hanley Conroy | Deposition | | | | |
| Johnson | 3/9/20 | Simon Greenstone Panatier | Trial | | | | NJ |
| Lashley | 3/9/20 | Simon Greenstone Panatier | Trial | | | | NJ |
| Barry, J | 5/14/20 | Law Office of Michael P. Joyce | Deposition | | | | |
| Lopez | 6/11/20 | Simon Greenstone Panatier | Deposition | 201786022 | Mark Davidson | Zavala | TX |
| McNeal | 6/29/20 | Simon Greenstone Panatier | Deposition | | | Los Angeles | CA |
| Armstrong | 7/13/20 | Simmons Hanley Conroy | Deposition | | | | |
| Carroll | 7/31/20 | Karste & Von Oiste | Deposition | | | | |
| O'Riordan | 9/21/20 | Thorton Law Firm | Deposition | | | | |
| Dickens | 10/16/20 | Simon Greenstone Panatier | Deposition | 1:18-cv-00162 | Louis Girola | Mississippi | |
| Lefton | 10/28/20 | Phillips & Paolicelli | Deposition | | | | |
| Terantino | 11/19/20 | Maune Raichle Hartley French & Mudd | Deposition | | | | |
| Hamilton | 1/7/21 | Phillips & Paolicelli | Deposition | | | | |
| Johnson, Shawn | 1/15/21 | Weitz & Luxenberg | Deposition | | | | |
| Whetsel | 1/19/21 | Karste & Von Oiste | Deposition | | | | |
| Castro | 1/25/21 | Belluck & Fox | Deposition | | | | |
| Chenet | 3/4/21 | Cheek Law Firm | Deposition | | | | |
| Whelan | 3/5/21 | Lanier Law Firm | Deposition | | | | |
| Archer | 3/24/21 | Cheely Law Firm | Deposition | | | | |
| McNeal | 4/1/21 | Simon Greenstone Panatier | Trial | | | | CA |
| Casaretto | 4/6/21 | Levin Papantonio Rafferty | Deposition | | | | FL |
| Miller, Joyce | 4/15/21 | Law Office of Michael P. Joyce | Deposition | | | | |
| Harpster | 4/30/21 | Simmons Hanley Conroy | Deposition | | | | |
| Pritchard | 5/27/21 | Phillips & Paolicelli | Deposition | | | | |
| Moran | 6/21/21 | Belluck & Fox | Deposition | | | | |
| Wheeler | 7/2/21 | Simmons Hanley Conroy | Deposition | | | | |
| Corcoran | 7/2/21 | Simmons Hanley Conroy | Deposition | | | | |
| Manz | 7/9/21 | Weitz & Luxenberg | Deposition | | | | |
| Dobson | 7/14/21 | Phillips & Paolicelli | Deposition | | | | |
| Sandoval | 7/26/21 | Weitz & Luxenberg | Deposition | | | | |
| Petas | 8/4/21 | Simon Greenstone Panatier | Deposition | | | | |
| Hamilton | 8/13/21 | Phillips & Paolicelli | Deposition | | | | |

**JA205**

| Jacqueline Moline, MD, MSc, FACP, FACOEM | | Depositions and Testimony 2017-2021 | | | *deposition/trial continued | | |
|---|---|---|---|---|---|---|---|
| **Case** | **Date** | **Law Firm** | **Deposition / Trial** | **Docket #** | **Judge** | **County** | **State** |
| Myers | 9/13/21 | Simon Greenstone Panatier | Deposition | BC701665 | David Cunningham, III | Los Angeles | CA |
| Johnson, Shawn | 9/15/21 | Weitz & Luxenberg | Trial | | | Los Angeles | CA |
| Hattenburgh | 9/21/21 | Law Office of Peter Angeloes | Deposition | | | Baltimore | MD |
| Evans | 9/23/21 | Cheely Law Firm | Trial | | | | GA |
| Gutierrez | 10/7/21 | Weitz & Luxenberg | Deposition | | | | |
| Welch | 10/8/21 | Simon Greenstone Panatier | Deposition | MID-L-3376-AS | | Middlesex | NJ |

# EXHIBIT I

**Murray M. Finkelstein PhD MD**

Occupational Medicine
Environmental Medicine
Epidemiology
Biostatistics

336 Spadina Road
Suite 902
Toronto
Ontario, Canada
M5R 2V8

Phone: 416-886-6448

E-Mail:
murray.finkelstein@
utoronto.ca

September 7, 2021

Lauren Brady, Paralegal
Simmons, Hanly, Conroy
New York, NY.

Dear Ms. Brady:

**Re: Brian Gref (DOB: ▮▮ /82)**

At your request I have reviewed medical records and other materials concerning Brian Gref in
order to express an opinion about whether the development of Mr. Gref's malignant
mesothelioma was related to exposures to asbestos.

I am a physician-epidemiologist. My education is in physical science and medicine. In 1972, I
was awarded a PhD in physics from Case-Western Reserve University in Cleveland, Ohio. I
graduated from the Faculty of Medicine at McGill University in Montreal, Canada in 1976. In
1978, I completed my residency training at the University of Toronto and obtained my
certification in Family Medicine. In July 1978 I began employment as a Medical Consultant with
the Ontario Ministry of Labour, a position I held until retirement in September 2008.
My first assignments at the Ministry of Labour were to prepare the background health-effects
documentation for the proposed asbestos regulation (R.R.O. 1990, Reg. 837) and to undertake an
epidemiologic study of the health of workers at the Johns-Manville asbestos-cement plant in
Scarborough, Ontario. I have subsequently published numerous studies, in the peer-reviewed
literature, of the relations between asbestos exposure and health. In 2008 I was appointed as a
member of the United States Environmental Protection Agency Science Advisory Board
Asbestos Panel. In 2013, I was invited by the Finnish Institute of Occupational Safety and Health
to be a member of the Working Group to Update the Helsinki Criteria for Asbestos and Disease.
In 2017, I was invited to participate in the Elongate Mineral Particles Conference in
Charlottesville,Virginia.

During the course of my career I have designed numerous epidemiologic studies, collected study
data, performed the statistical analyses, prepared the study reports and published the findings. As
a result of this work, I have developed expertise in the analysis of data and databases.

The following items have been reviewed:

1. Medical records;
2. Deposition Transcripts of Brian Gref (Vols 1-2);
3. Deposition Transcript of Roger Gref;

Page -1-

4. Deposition Transcript of Jeneane Bennett;
5. Deposition Transcripts of Karen Nappi (Vols 1-2);
6. Answers to Interrogatories.

**Clinical Information**

Mr. Gref had a several year history of abdominal pain and was diagnosed with peritoneal mesothelioma in May 2020.

**History of Present Illness**
This is a 37 y/o male with peritoneal mesothelioma.
He had a history of several years of severe abdominal pain and some ascites who is sent for a diagnosis of mesothelioma which was found only after 2 years of problems and operations. He had been told he has mesenteritis by Baptist. He has been through multiple surgeries including a partial colon resection and omental biopsy in 2017. He has pathology reports from Baptist and Baptist South that fail to demonstrate any malignancy. Apparently he had a new biopsy done at Mayo and this shows clea evidence of mesothelioma. He reports that pain has been going of for over 2 years. He reported ascites reaccumulation and need for 2 liter paracentesis ever few weeks.

**Social History**
father was a navy mechanic, so may have had asbestos exposure that he brought home

There was no family history of cancer.

**Exposure History (from the Interrogatories)**

Plaintiff used asbestos containing cosmetic talc products on a regular and frequent basis from approximately 1982 until 2019. Plaintiff used the following brands of asbestos containing talc powder between 1982 and 2019: "Johnson and Johnson," "Shower to Shower," "Old Spice," "Mennen," "Clubman," and "English Leather." This information was provided by Plaintiff, and his parents, Roger Gref, and Karen Nappi.

**Exposure History (from the Deposition of Brian Gref)**

Mr. Gref was born in 1982. His parents divorced about 1990 and he continued to live with his mother. His parents were both in the Navy. His father was an aircraft mechanic and then a drug and alcohol counsellor. His mother held administrative positions. His parents were posted to Guantanamo Bay (1982-85) and then they moved to Jacksonville, Florida.

Page -2-

Use of Powders

Q. Okay. And do you have a
3 recollection as to the brand or brands of
4 powder that your parents applied to you when
5 you lived on Travertine Trail?
6 A. I know that we had a lot of it.
*7 There was -- there was Clubman. There was Old*
*8 Spice. There was English Leather. There was*
*9 Johnson & Johnson. There was Shower to Shower,*
*10 and there was some Mennen -- ad there was*
*11 Mennen as well.*

22 Q. Okay. And were one of these --
23 you mentioned a whole list of brands here.
24 Were one of these brands more popular than the
25 others?
1 A. I don't think so. I don't think
2 we had any kind of -- we weren't really -- we
3 weren't really brand myopic, so I think it was
4 just whatever was available at the time.


## Mennen

Q. Sitting here today, do you have an
6 actual memory of the Mennen powder being
7 applied to you?
8 A. I do for a little while at least
9 anyway. I recall we stopped getting Mennen for
10 one reason or another maybe around '93 or '94
11 and that was about the extent of the Mennen.

## Johnson and Johnson

Q. Okay. And do you have a memory of
25 the Johnson & Johnson powder also being used on
you in that home?
2 A. Yes.
3 Q. And is that true also for the
4 Shower to Shower?
5 A. Yes.

Q. And do you recall how the powder
1 would be applied to your body?
2 A. Usually, in healthy doses, dust
3 getting all up in the air. Can you still hear
4 me?
5 Q. Yeah, sorry. It froze on my end
6 for a second.
7 A. Okay. I remember there being a
8 lot of dust. Again, I don't want to speculate

Page -3-

Gref.B-FIN01-000003

JA209

9 here, but I do remember there just being a lot
10 of dust in the air.

A. It was either applied directly
16 from bottle to the area or was put on their
17 hands and then they would rub it in for me.
18 Q. Okay. And why would one method be
19 used versus another, if you know?
20 A. I wouldn't know why they would use
21 one method over another. Maybe because of the
22 area in which it was contained in that they
23 were applying it to.

Were there certain times of the
8 year where powder was not used because of
9 either the specific season or something like
10 that?
11 A. No. It was pretty much a staple
12 of my daily hygiene ritual at that point.

Q. That's okay. And would you have a
20 memory as to the specific body parts where the
21 powder was being applied?
22 A. It was -- a lot of it was in my
23 groin region, the derriere, my armpit areas and
24 my neck as well.

4 Q. What brand or brands of powder do
5 you recall applying to yourself when you were
6 living on Enochs Drive?
7 A. I remember the Old Spice. I
8 remember the Clubman. There was an English
9 Leather in there as well, Johnson & Johnson,
10 the Shower to Shower and the Mennen.

Q. Okay. Now, I think you told me,
12 and certainly correct me if I'm wrong, sir,
13 that Mennen phased out sometime in about 1992.
14 Am I accurately summarizing your testimony?
15 A. Yes. I stopped -- I didn't have
16 any more Mennen around '92 or '93. That's when
17 I stopped seeing it.

23 Q. Now, did you use these powders --
24 when you used powders about once a week, did
25 you use them in the same way or would it depend
1 on the brand that you were using?
2 A. It was all the same way.

Gref.B-FIN01-000004

3 Q. Now, putting Mennen aside, because
4 you said that you stopped using it in about
5 1992 or 1993. Did you use the other brands
6 equally?
7 A. Yeah, pretty equally. I didn't
8 have any brand loyalty. It was just whatever
9 my mom was getting at that time.

**Application**

16 Q. After you would take a shower,
17 what would you do next?
18 A. I would take a shower. I would
19 leave the bathroom, let the steam settle or do
20 what it's going to do, make sure that I was
21 completely dry. The drying process kind of
22 takes a little bit longer with me. I had to
23 make sure I was completely dry first, and then
24 I would go back into the bathroom, and that's
25 where I would apply my powder. You know, just
1 shake out a nice mound of it in my hand, and
2 pat it in, rub it down and get it into those
3 places that I had my irritation

Q. And how often would you say that
14 you recall applying powder to yourself after
15 your showers when you lived on Waterflow Place?
16 A. It was every time.
17 Q. And do you have a recollection as
18 to what brand or brands of powder you were
19 using during this time?
20 A. The ones that I've already
21 mentioned, the Clubman, the Old Spice, the
22 English Leather, and maybe a little -- and
23 there was some Mennen in there. Like I said, I
24 know we couldn't find that for a while.
25 Q. Okay. You told me earlier that

Q. So when's the last year that you
21 recall using Mennen?
22 A. It was either '93 or '94.

**Own Purchases**

17 Q. And when you started purchasing
18 them on your own, were you purchasing -- well,
19 what brands were you purchasing yourself?
20 A. I was purchasing the Johnson &
21 Johnson, and I was purchasing the Old Spice,
22 the Mennen, excuse me, not the Mennen, excuse
23 me, the Clubman, English Leather. It just
24 depended what I saw first, what was on sale.

Page -5-

Gref.B-FIN01-000005

**JA211**

Q. Okay. Do you know how long it
2 would take you to use one full container of
3 powder?
4 A. Religiously. It could be a couple
5 of weeks. We could be looking about three
6 weeks maybe to go through a container, three to
7 four weeks to go through a container.
8 Q. You mentioned using several brands
9 of powder. Are you saying that you would get
10 through each brand's container every three
11 weeks?
12 A. I would say -- I would go through
13 the equivalent of one container about every
14 three weeks.
15 Q. Okay. So you weren't buying one
16 particular brand every three weeks?
17 A. No.


A. From there we moved to Parkstone
9 Crossing Drive in Jacksonville, Florida.
10 Q. What kind of home is that?
11 A. That is a town home.
12 Q. How many bedrooms?
13 A. That has three bedrooms.
14 Q. And how many bathrooms?
15 A. Two and-a-half.
16 Q. And how long did you live there
17 for?
18 A. Until 2013 or 2014.

Q. I was going to ask you, what brand
8 or brands of powders were you using at this
9 time?
10 A. That would be the Clubman, the Old
11 Spice, English Leather, Johnson & Johnson,
12 Shower to Shower.
13 Q. And how often were you using
14 powder during this time?
15 A. Daily


Q. Okay. What brand of powders were
16 you using when you were in Texas?
17 A. The Clubman, Old Spice, Johnson &
18 Johnson, Shower to Shower, English Leather,
19 Clubman.
20 Q. And why were you using powder
21 during this time?
22 A. With Texas and the heat. We PT'd
23 in the morning. You get super hot. There's a

Page -6-

Gref.B-FIN01-000006

**JA212**

24 lot of sweat going on. And with those uniforms
25 they're not built for comfort.

A. Then I moved to 12700 Bartram Park
18 Boulevard in Jacksonville, Florida.
19 Q. And how long did you live there
20 for?
21 A. From 2016 to 2020.
22 Q. And who did you live there with?
23 A. I was by myself.

Q. Were you using any other products
22 on your body other than soap in connection with
23 your shower routine?
24 A. The Old Spice, Clubman, English
25 Leather, Johnson & Johnson, Shower to Shower.
Page 120
1 Q. Did there come a point in time
2 when living at this residence that you stopped
3 using one or more of these brands of powder?
4 A. I was pretty much using everything
5 all the way up until I was diagnosed in 2019
6 with cancer.

Q. Did you have any other brands of
18 powder in your possession at the time that you
19 were diagnosed with mesothelioma?
20 A. The only one that I remember
21 specifically having was the Clubman. I believe
22 I had Old Spice as well, but I don't recall
23 specifically if I had it or not.

ENGLISH LEATHER

Q. Now I'm going to move on to a few
12 questions about English Leather. You mentioned
13 English Leather a little bit yesterday. Can
14 you tell me the first time you recall seeing
15 English Leather?
16 A. I remember hearing and seeing it
17 around six years old.
18 Q. Okay. And, I'm sorry, which
19 residence would that be at again?
20 A. That would be at Travertine Trail

Q. Okay. To the extent you did use
4 any English Leather powder product, would you
5 apply the product in the same manner you
6 previously described your application of
7 Clubman earlier today?
8 A. Yes, ma'am.

Page -7-

Gref.B-FIN01-000007

JA213

9 Q. And you described it taking a few
10 seconds for each step of the process. Would
11 you agree that that's -- you would you say
12 that that's the same manner in which you would
13 have applied this English Leather product?
14 A. Yes, ma'am.

**Estimated Usage**

Q. Can you estimate how many bottles
9 of Clubman talc you used over the course of
10 your lifetime?
11 A. Dozens, several.
12 Q. Can you estimate how many bottles
13 of Old Spice talc you used over the course of
14 your lifetime?
15 A. Ten, maybe 12.
16 Q. Can you estimate how many bottles
17 of English Leather talc you used over the
18 course of your lifetime?
19 A. Again, several dozens.

A. I believe so. And would actually
13 like to make a correction if that's possible.
14 Q. A correction regarding what?
15 A. The use of Old Spice.
16 Q. What correction would you like to
17 make?
18 A. With my usage of the Old Spice. I
19 may have gotten that actually confused with
20 Imperial when I was talking about my usage with
21 it.
22 Q. All right. Let's see if we can
23 un-pack that.
24 Did you use Old Spice talc?
25 A. I did.
1 Q. Okay. When did you use Old Spice
2 talc?
3 A. During when I was going through
4 puberty, so '94 to '99, 2000 time frame.
5 Q. And are you saying you were
6 confused -- for all of the other times you
7 mentioned using Old Spice beyond puberty, are
8 you saying that you confused Old Spice with
9 Imperial?
10 A. I did, yes.
11 Q. Does that change your estimation
12 as to how many bottles of Old Spice talc that
13 you used?
14 A. About a dozen or so of the Old
15 Spice would be about what I do with the Old
16 Spice, yeah.

Page -8-

Gref.B-FIN01-000008

JA214

**From the Deposition of Karen Nappi (Mother)**

She powdered Brian when he was a baby.

14 A. And -- and -- and if I may go back to what
15 brand of -- of powders I used on Brian, I -- I could
16 tell you what -- what brand of powders I used on Brian,
17 but -- I used a variety of -- of powders on Brian, but
18 any one in particular, I didn't use any one in
19 particular at any particular time. I just -- when I'd
20 go shopping, I'd grab what they had and I used it.
21 Q. And as you're sitting here today, can you tell
22 me what brand you used when you lived at this Chartwell
23 Drive apartment?
24 A. I used several. As I said, I didn't
25 specifically hone on any one particular brand. When I'd
1 go shopping, whatever caught my eye, I'd take it --
2 Q. And --
3 A. -- or I'd purchase it.
4 Q. And as you're sitting here now, can you tell
5 me which brand or brands you used at this apartment?
**6 A. We're going back to -- I used Mennen. I used**
**7 Clubman. I used Shower to Shower. I used Old Spice. I**
**8 used English Leather. I'm sure I used another brand, as**
**9 well.**


Q. -- is it your testimony that you used all
4 these brands at this apartment during that three-month
5 period of time?
6 A. Yes.
7 Q. Okay. When Brian was born and you first
8 brought him home, what was the first powder you bought?
9 A. I don't remember.
10 Q. How did you make your selection?
11 A. I don't remember. Whatever jumped out at me.
12 Q. Did you buy all these brands at one particular
13 commissary or different commissaries?
14 A. Different commissaries.

**Guantanamo**

Her father shipped supplies to them from the mainland.

Q. And what about the powder that you received
22 from your father?
**23 A. Mennen, the Shower to Shower, the Clubman, the**
**24 Old Spice, and the English Leather.**
**25 Q. Any others?**
**1 A. No.**
2 Q. No? Never bought Johnson -- never sent you
3 Johnson & Johnson?
4 A. Not that I recall.

22 Q. Did the package that your father sent to
23 Guantanamo ever include Johnson's Baby Powder?

Page -9-

Gref.B-FIN01-000009

JA215

24 MR. FULLER: Objection.
25 A. Quite possibly.

## Jacksonville

Q. When you were living at this home in
12 Travertine Trail while you were stationed at fleet
13 training center in Florida, do you recall what brand of
14 powder you used for Brian?
15 A. I used several brands. Again, I -- I used --
16 I used Mennen. I used Old Spice. I used Clubman. I
17 used English Leather. There was just -- I used them
18 all.

## Old Spice

Q. Just focusing on the Old Spice talcum powder
24 product that you had used to treat Brian's rashes as a
25 child, when was the last time you recall purchasing that
1 specific Old Spice product?
2 A. The late '90s, maybe.
3 Q. And why would you have purchased an Old Spice
4 powder product in the late '90s?
5 A. Well, he was still living with me at the time
6 and we were living in Virginia. He was still using the
7 products.

## Clubman

17 Q. (BY MR. THACKSTON) What did a -- what did a
18 container of Clubman look like in 1982 when Brian was
19 born?
20 A. To the best of my recollection, green.

## From the Deposition of Roger Gref (Father)

## Naval aircraft Mechanic

20 A. I studied the systems that I would
21 be working with within my rating, which is
22 ejection seats, air-conditioning and aircraft
23 environmental systems and oxygen systems

Q. All right. Before we talk about
12 your time at Norfolk generally when you were at
13 Cecil Field, were you assigned to ships?
14 A. Yes. The squadron would be
15 assigned to a specific ship.
16 Q. Do you recall the ships that you
17 were assigned to during your time with VA 44?
18 A. Okay. VA 44 was a land-based
19 thing. That was a training squadron. VA 83
20 was assigned to the USS Forrestal and VS 28 was

Page -10-

Gref.B-FIN01-000010

JA216

21 assigned to the USS America.
22 Q. And VA 174, because that was
23 training, that was land-based as well?
24 A. That's correct.
25 Q. And what type of a ship was the
1 Forrestal?
2 A. Aircraft carrier.

Q. What was your assignment when
2 Brian was born?
3 A. I said when Brian was born I was
4 attending equal opportunity program specialist
5 school at Patrick Air Force Base in preparation
6 for my assignment to Guantanamo Bay.
7 Q. All right. So after VF 143, what
8 did you do next?
9 A. Okay. I went to that school. I
10 was assigned to that school first, before --
11 Q. I apologize. Could you please
12 repeat for me the school?
13 A. Oh, yes. It is equal opportunity
14 program specialist, oh, I'm sorry, equal
15 opportunity management institute, I'm sorry.
16 Q. And where was that located?
17 A. That was at Patrick Air Force
18 base, Cocoa Beach, Florida.

Q. What was your rank at Gitmo?
10 A. I was an E6.
11 Q. And the -- what were your duties
12 during the 7:30 to 4:30 Monday through Friday
13 time frame?
14 A. Okay. As an equal opportunity
15 program specialist, my basic function was to
16 assure that the directives concerning equal
17 opportunity were met. I did that through
18 interviews and gathering statistics for the
19 different commands.

**Diaper Changes**

Q. As you're sitting here now, do you
8 recall the process that you used in changing
9 Brian's diapers that once or twice before you
10 came to Gitmo?
11 A. Yes. I would -- he would
12 basically -- he would be in his crib. I would
13 put a towel down, lay him on the towel. I
14 would have wet wipes beside me here. I would
15 take the diaper off, clean him up real good,
16 use another towel to dry him and then I would

Page -11-

Gref.B-FIN01-000011

JA217

17 use baby powder or talc.
18 Q. And what brand of baby powder did
19 you use?
20 A. I remember using either Johnson &
21 Johnson Baby Powder or Mennen talc.

you saw Johnson's Baby Powder there?
2 A. I saw it there, the only thing I
3 could say, a lot of times.
4 Q. Do you recall any other brands of
5 powder that you recall being on that
6 nightstand?
7 A. Yes. I do recall the Mennen talc.

*Let me answer it this way,*
*18 Johnson & Johnson and Mennen were the ones we*
*19 used the most. Every once in a while something*
*20 else might come in on occasion, but that would*
*21 be very rare that something like that would*
*22 happen*

Q. And when you talk about powdering
10 him down, did you use Johnson's Baby Powder on
11 Brian on these bathing occasions?
12 A. That was -- that would be one of
13 the powders that I would have used.
14 Q. Do you recall using any other baby
15 powder than Johnson's?
16 A. I recall using Mennen one time and
17 the reason for that is I had started using it
18 myself at that time because of my feet. So I
19 remember a lot of times I would powder, you
20 know, I would powder him, and then when I
21 finished I would give myself a little powder
22 too.

**From the Deposition of Jeneane Bennett (Sister)**

Ms. Bennett confirmed the use of cosmetic talc, but was mostly unable to recall which brands were used.

1 Q. Do you recall what brands you used?
2 A. There were several. Like I said, my
3 mom would buy what was on sale, what was
4 available. I think the only one that I could
5 probably remember by name only is Shower to
6 Shower. And that doesn't mean that I used it
7 any more than any other one, or that it was
8 in the house any more. It's just that's the
9 one I remember.

Page -12-

Gref.B-FIN01-000012

Q. How about powders? Any cosmetic talc
20 products that he used or you saw in the house
21 when you went to Arlington?
22 A. He's always used powder products. I
23 could not nail down a specific brand or a
24 name. He's used products. Powder products.
25 Talc products throughout his life.

**Summary of Exposures**

1. Johnson and Johnson: Shower to Shower and Baby Powder: 1982 - 2000s
2. Old Spice : 1982 - 2000s
3. Mennen: 1982 - 1992
4. Clubman: 1982 - 2000s
5. English Leather: 1982 - 2000s

**Opinions and basis for opinions**

**1. Diagnosis: a) Malignant peritoneal mesothelioma**

Malignant peritoneal mesothelioma was diagnosed on biopsy tissue on the basis of pathologic appearance and immunostaining.

**2. Causation of Mr. Gref's Malignant Mesothelioma**

I conclude, to a reasonable degree of medical certainty, that Mr. Gref's exposures to asbestos fibers originating in cosmetic talcs were substantial contributing causes of his malignant mesothelioma.

**Basis for Conclusion**

From the 1980s through the 2000s, cosmetic talcs were contaminated with asbestos fibers.

In order to assess the cancer risk associated with the use of cosmetic talcs, it is helpful to review the geology and mineralogy of talc and asbestos and then to assess asbestos contamination of commercial cosmetic talcs.

# Geology

*Continental rocks* are dominated by the elements silicon (Si) and aluminum (Al), and *ocean or basalt* is relatively silica poor while being magnesium (Mg) and Iron (Fe) rich. Ocean crustal rocks are therefore called "mafic" or "ultramafic", and mostly occur on land when they are split or planed from the ocean floor and then faulted through the silica-rich continental "country" rock,

Page -13-

Gref.B-FIN01-000013

JA219

normally in tectonic mountain-building processes. Therefore, the occurrence of ultramafic rock is most often coincidental with the ocean side of mountain ridges, folded in and among the foothills (piedmont regions). As the intermixing of these elements are subjected to the metamorphic forces of heat, pressure, and water that are conducive to the formation of asbestos minerals, they are also the conditions that form talc. Indeed, the occurrences of talc and asbestos in the Earth occur in bands and belts in these regions, as the presence of one is often a good indicator of the other.

Talc is a natural mineral, hydrous magnesium silicate, with the general formula $(OH)_2Mg_3Si_4O_{10}$. Talc mineral is formed by the hydrothermal alteration of serpentine and tremolite or directly from unserpentinized ultrabasic rocks. Talc may also be formed by the thermal metamorphism of silicous dolomites. The characteristics of the mineral deposits vary widely from the pure talc formula and from each other according to the mineralogy involved. Some deposits may contain varying amounts of tremolite, chrysotile, pyrophylite, or serpentine, or other basic material from which the talc may be derived. The deposits may also contain varying amounts of metals such as iron, nickel, cobalt, chromium, and manganese as associated minerals, as well as silica (Cralley et al. 1968).

According to Rohl and Langer 'Talc rocks occur fairly commonly in nature, and are formed as the result of two important geological processes, i.e., the hydrothermal alteration of ultramafic rocks and the low grade thermal metamorphism of silica-rich dolomite, $CaMg(CO_3)_2$. These metamorphic processes frequently result in the formation of an assemblage of co-existing minerals, principally hydrous magnesium silicates, but also hydrous calcium-magnesium-iron silicates. Some of these are the magnesium and calcium amphibole minerals, which include anthophyllite and tremolite; and the serpentine minerals, including chrysotile asbestos. Depending on the nature of the parent rock, varying amounts of mica minerals (e.g., chlorite), quartz and carbonates may also be found. Although pure talc deposits exist, very frequently the mineralogically complex deposits are used to provide "talc" for both industrial and consumer products.' (Rohl and Langer 1974).

According to Rohl, 'The mineral talc is a hydrous magnesium sheet silicate that occurs in both platy and fibrous crystal forms. Talc tends to occur in rock masses coexisting with a number of other hydrous magnesium silicate minerals. Typically, talc deposits consists of fine-grained, intergrown mixtures of minerals which may contain considerable amounts of asbestos. In addition, talc deposits often show complex mineral zonation, which adds to the difficulty of selective mining. For example, in the talc deposits of the Gouveneur District of New York State, talc occurs with the asbestos minerals chrysotile, tremolite, and anthophyllite in addition to other silicate minerals. Since the mining of talc rock almost invariably includes the mining of asbestos as well, the asbestos contaminant may be carried over into the consumer product and thus introduce the risk of asbestos disease. This possibility leads to an important public health question: is asbestos present in consumer talcs, and if present, which mineral fibers and in what concentrations?' (Rohl 1974).

Gref.B-FIN01-000014

**Analytical Techniques for Identification and Quantification of Fibrous Minerals in Talc**
(Rohl and Langer. Published in Dusts and Diseases, 1979)

Techniques which have been successfully used for the analysis of mineral fibers in talc products include optical microscopy, x-ray diffractometry and electron beam instrumentation.
The use of polarized light optics has long been a standard technique for the identification of minerals. By using immersion oils of known refractive indices, for example, the optical properties of unknown crystalline particles can be determined. However, there are a number of conditions which limit the usefulness of optical microscopy. The accurate determination of refractive indices is extremely difficult when applied to particles less than 1 μ in diameter. The optical properties of fibrous minerals frequently obviates full characterization of their optical constants. In consumer talc products, most of which are finely pulverized powders, the particle dimensions are at, or below, the resolution capability of optical microscopy, making identification very difficult, if not impossible. Large numbers of fibers may go undetected when this technique is used exclusively. However, it may be useful in some cases, at least as a screening or preliminary technique.

X-ray powder diffraction has been used in both the continuous scan and step-scan modes of operation for the identification and quantitation of fibrous minerals in talc. This can be achieved by comparison of dilutions of known minerals in a talc matrix with unknowns. Quantitative analysis using this technique requires (1) a talc standard or matrix completely free of contaminating minerals and pure standards of fibrous minerals for preparing talc-fiber dilution standards; (2) a preparation method which is both sensitive and reproducible; and (3) selection of diagnostic x-ray reflections for quantitative analysis of specific minerals. X-ray diffraction in the step-scan mode is used for quantitative determination of tremolite, chrysotile and anthophyllite in talc at levels as low as *0.1%, 0.25% and 2.0%, by weight*, respectively. These minerals are often found as fine-grained and intimate components of talc rock, and they are of particular concern as constituents of consumer talc products because of their biological potential. The major limitation of x-ray diffraction analysis is its inability to distinguish between different morphological habits of the same mineral. For example, short tremolite fragments and long fibers of asbestiform tremolite give virtually identical x-ray patterns. To distinguish between different habits or shapes of the same mineral, including asbestos minerals, requires microscopic techniques.

Transmission electron microscopy, used in conjunction with selected area electron diffraction (SAED), provides the resolution capability to visualize all particles and, in many cases, to identify them. For example, at magnifications of about 25,000x, or greater, chrysotile fibers may be identified on the basis of their unique morphology. In some instances, the morphological similarities between fibrous talc and amphibole fibers may be close enough to preclude the unequivocal identification of the latter on the basis of such characteristics as cleavage, diffraction contrast figures and aspect ratios. However, talc fibers can be easily distinguished from amphibole fibers on the basis of SAED patterns.

Page -15-

Gref.B-FIN01-000015

**JA221**

## A1. Analysis of Ores from Mines Supplying Talc to Manufacturers of Cosmetic Talcs

Johnson and Johnson imported talc from the Val Chisone region of the Italian Piedmont and also sourced their talc from mines in Vermont. After the year 2000, talc was imported from China. From 1968-2003 the ore was mostly Windsor Vermont – but also Val Chisone, Italy (exclusive supply during a six month strike of Vermont workers in 1979-80). According to the Answers to Interrogatories (Superior Court of New Jersey Law Division: Middlesex County. Docket No: MID-L-4726-17 AS) the suppliers of cosmetic talc used to manufacture JBP from 1971 to 2017 were Windsor Minerals, Cyprus Minerals, and Luzenac/Rio Tinto/Imerys. Defendants state the suppliers of cosmetic talc used to manufacture STS from 1971 to 2012 were Charles Mathieu, Windsor Minerals, Cyprus Minerals, and Luzenac/Rio Tinto/Imerys. Defendants state that between 1971 and 2017 cosmetic talc used for JBP was sourced from the Hammondsville, Argonaut, Rainbow, and Hamm (Windham) mines in Vermont, mines in Val Chisone, Italy, and Zhizhua, Guping, Huamei Shang Lang, and Tongzi quarries in China. Defendants state that between 1971 and 2012 cosmetic talc used for STS was sourced from the Hammondsville, Argonaut, Rainbow, and Hamm (Windham) mines in Vermont, mines in Val Chisone, Italy, and Zhizhua, Guping, Huamei Shang Lang, and Tongzi quarries in China.

J&J VERMONT ORE SOURCES - A BRIEF REVIEW

1968- H'Ville was producing 90,000 tons (45,000 FF & 45,000 dry ground industrial).  Production was from the 3rd level by traditional drill and blast.
1973- Argonaut was started using mechanical full face boring machines (continuous miners).
1975- Rainbow was started as an open pit with continuous miners.
1978- H'Ville 4th level being developed.
1979- Argonaut open pit was phased in above the UG workings.
1982- First continuous miners used in H'Ville for development 1986- Fed up to 30% Argonaut to float feed.  Continuous miners phased out of production.
    1989- Started assay program & ore coding for ore control.
1990- Started using Hamm as primary source of float feed.
1991- H'Ville phased out and closed.
1994- Expanded Argonaut open pit over the undergroud workings
1995- First float feed production from exposed ore body.

Gref.B-FIN01-000016

JA222

Mennen

# THE MENNEN COMPANY
### STANDARD PRACTICE BULLETIN

Sheet____1____of____1____

Issued to:  President                        Copies to:
            Vice President (Research & Development)
            Vice President (Domestic & Export)
            Plant Manager
            Production Manager (2)
            Controller
            Control Chemist
            Research Chemist

Subject: Bath Powder for Men
         Formula

Bulletin No._____

Date____February 3, 1953____

BATH POWDER FOR MEN

Batch Size – 2000 lb.

PERCENT BY WEIGHT

Talc – Italian #1600 – M.C.D.
(17 x 110 lb. bags)          1870 lbs.          93.5 %

---

## THE MENNEN COMPANY
### RAW MATERIAL SPECIFICATIONS

Pg. 2 of 2

SUBJECT:  TALC, SUPRA BC

Code Number  10,628

Date:    July 8, 1983

Supersedes  November 18,

Reason for Revision:  Change Microbiological Limit

Page -17-

Gref.B-FIN01-000017

**JA223**

# THE MENNEN COMPANY

### RAW MATERIAL SPECIFICATIONS

Pg 1 of 1

SUBJECT: Talc

Code Number 11,316

Date: January 11, 1989

Supersedes _____

Reason for Revision: Original

SUPPLIER: Whittaker, Clark & Daniels (5141 Talc Lo Micron BC)

# THE MENNEN COMPANY

### RAW MATERIAL SPECIFICATIONS

Pg 1 of 2

SUBJECT: TALC

Code Number 10,628

Date : May 16, 1989

Supersedes 12/13/88

Reason for Revision: Revise Color, Screen Analysis, Arsenic and Microbiological specificat:

SUPPLIER: Cyprus Industrial Minerals Co. (Supra A Talc)

DEFINITION: Hydrous, magnesium silicate sometimes containing
a small portion of aluminum silicate.
50% Italian/50% Australian Talc

Page -18-

Gref.B-FIN01-000018

JA224

# THE MENNEN COMPANY

### RAW MATERIAL SPECIFICATIONS

Pg __1__ of __1__

SUBJECT:   Talc                                         Code Number __11,316__

Date:   January 11, 1989                                Supersedes _____

Reason for Revision:   Original

SUPPLIER:                    Whittaker, Clark & Daniels (5141 Talc Lo Micron BC)

. Excerpts from the deposition of Keith Lehman (Cyprus employee):

Q Did you ever hear of the Supra talc?
4 A Supra, yes.
5 Q What does that mean to you?
6 A Supra is a Cyprus name for the
7 Italian talc that's milled in New Jersey at the
8 South Plainfield mill, through the roller mill
9 at a 200 mesh screen size.
10 Q And what is the source of the Supra
11 talc?
12 A The source is the Val Chisone Italy
13 mill.

A Every product had a name.
2 Q What were they? Any names that you
3 recall.
4 A Okay, we had Supra, which was Italian
5 200 mesh. We had Suprafino, which was Italian
6 finer mesh 325. There was Supra Extra Fine,
7 which is just what it says, it's finer, also
8 made on the roller mill. We had Monoblend,
9 which is a blend of Italian and Beaverhead.
10 There was Mistron. Mistron Vapor,
11 actually, is the full name. And that was
12 straight Yellowstone crude from the Yellowstone

Page -19-

Gref.B-FIN01-000019

JA225

13 mine. There was Steawhite 200. Steawhite.

**Clubman Talc**

I have Customer Sales Sheets from Whitaker, Clark, and Daniels.



CUSTOMER SPECIFICATION SHEET

Invoice copies _____                    Ship to: Charles of the Ritz
                                                               Fairlawn, NJ

Bill of Lading _____

29 So. Plainfield              OR      Accounts Payable Dept.      FOB  Plant
Bill  Charles of the Ritz Group, Ltd., PO Box 711,     Holmdel NJ 07733
to:         Name              Street Address              City & State

        Charles of the Ritz Group. Ltd.,
Ship  c/o B.H. Krueger,                17-9 Zinc Place, Fairlawn, NJ 07412
to:         Name              Street Address              City & State

        Partial pick-up may be required.

PRODUCT (S)

Name  24 tons SUPRA/"S" bag pal                    Ton Price  Book

Date:  4/14/83  rt

and

Date:  10/27/82

Page -20-

Gref.B-FIN01-000020

**JA226**

PRODUCT (S)

Name 20 tons SUPRA/ bag pal                                     Ton Price  Book

Charles of the Ritz (manufacturer of Clubman talc) was thus supplied Supra talc by WKD.

## OLD SPICE

### Shulton Products Including Old Spice Body Powder

According to the Deposition of Whittaker Clark and Daniels corporate representative Theodor Hubbard (Los Angeles Superior Court BC607192; Aug 8, 2016) Italian ore from the Metropolitan Talc Company was used from 1977 to 1983. In 1976, the ore was from the Hitchcock mine in North Carolina. Ore from Alpine, Alabama was also used.  Old Spice Talcum Powder products were manufactured into the early to mid-1990s.

Lewin, in his 1973 report to the FDA, reported 1% tremolite in Old Spice Body Powder.

According to the February, 2020 report of the geologist Sean Fitzgerald, 'Whittaker, Clark & Daniels was the primary supplier of talc (99%) to the Shulton Company for use in the talc-containing products manufactured in the Clifton and Mays Landing, NJ plants, including Old Spice®, Desert Flower® , and Friendship Garden® talcum powders.

The talc supplied to Shulton came from the mining of three talc formations. The first was known as American Ground Italian (AGI), which was talc from the Val Chisone talc mines in the Piedmont region of northwest Italy. Grade 1615 was such an AGI talc. Whittaker, Clark & Daniels also supplied Shulton with talc grade 2450 (a.k.a., 643), from a mine located in Cherokee County, North Carolina. This talc came from a geologic belt known as the Murphy marble belt, specifically from the Hitchcock mine, approximately 1.5miles southwest from Murphy, NC. Thirdly, grade 141 was supplied from Alpine Alabama, from the talc mined in Talladega (and nearby Tallapoosa; Dadeville) County. This talc was mined in a zone of metamorphic rocks that contains both asbestos and talc deposits, and includes areas rich in amphiboles, specifically, anthophyllite.

All three of these talc formations sourced for use in the subject products have been shown to contain asbestos, both in the geologic investigations of their formations and in the laboratory analysis of talc ore and products sourced from these mines.'

Gref.B-FIN01-000021

JA227

With respect to North Carolina Talc, Fitzgerald wrote " I have personally visited this area, collected samples, and confirmed tremolite presence in the talc mines of the Murphy, NC marble and talc belt. I confirmed asbestos presence including in the Hitchcock talc mine. In both hand samples of bedrock and collected samples of milled talc taken from the mine I confirmed asbestos presence in the laboratory, including chrysotile, winchite, richterite, and asbestiform tremolite.'

With respect to Alabama talc: 'I have personally tested grade 141 in a manner consistent with and in fact parallel to my testing of AGI 1615 (see Italian talc section, to follow), and confirmed that grade 141 talc contained releasable fibers of chrysotile and anthophyllite asbestos.'

And for Italian talc: 'Further, in 2013, I personally tested samples of talc ore (AGI 1615) given to me for testing from Dr. Arthur Langer and Dr. Robert Nolan, experts retained by the companies involved in this case, including Colgate. ("TEM Images, EDS Spectra, and SAED of Asbestos Released from Source Talc Grade 1615".) The samples were confirmed as originating from the Val Chisone/Val Germanesca region and of a 1970s vintage. In my testing of the Italian ore, I found both asbestiform anthophyllite and asbestiform tremolite, and occasional chrysotile asbestos.'

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | Chamber, cc | fibers | Talc grade grams used |
|--------|----------|-------|--------|-----|---------|---------|----------|-----|-----|-----|-------|------|-------------|--------|-----------------------|
| 1615 | Anthopyllite & Tremolite | 7 | 100 | 1320 | 200 | 50 | 0.25 | 10 | 0.0128 | 0.4125 | 54.69 | 2.8875 | 245,150 | 707,872 | 0.2544 |

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | Chamber, cc | fibers | Talc grade grams used |
|--------|----------|-------|--------|-----|---------|---------|----------|-----|-----|-----|-------|------|-------------|--------|-----------------------|
| 141 | Anthopyllite & Chrysotile | 6 | 100 | 1320 | 130 | 30 | 0.23077 | 10 | 0.0128 | 0.4469 | 46.88 | 2.6813 | 245,150 | 657,310 | 0.1015 |

*Table 1: Calculated concentrations of asbestos released from Talc Grades 1615 and 141.*

Fitzgerald also measured release of asbestos from containers of Old Spice and Desert Flower talcs.

Gref.B-FIN01-000022

JA228



He also measured tremolite in the Dustfall.

Mr. Fitzgerald's summary stated:

"In summary, the talc sources for the historic Shulton talcum powders supplied by Whittaker, Clark & Daniels were formed in geologic formations that can and do have asbestos minerals associated with them, and asbestos has been confirmed by geologists and associated with those talc ores. Repeated testing of both the grade 1615 Italian talc from Val Chisone and the grade 141 talc from the Hitchcock mine in North Carolina have been found to contain asbestos, including anthophyllite, tremolite, and chrysotile asbestos. Finally, my own releasability tests of Old Spice® and Desert Flower® found significant concentrations of airborne asbestos, including the same three mineral species historically identified, namely chrysotile, anthophyllite, and tremolite asbestos."

Gref.B-FIN01-000023

**JA229**

## A2. Italian Talc

**Val Chisone**

1. The American geologist and mineralogist Sean Fitzgerald analysed a sample of Grade 1615 American Ground Italian (AGI) talc from Val Chisone on behalf of an American law firm (Fitzgerald, S. AGI Talc Powder Testing. Report prepared for the Law Offices of Peter G. Angelos. May, 2014). He reported that 'Anthophyllite, tremolite, and chrysotile asbestos were all identified in a TEM preparation of this sample. Chrysotile fibers exhibited their characteristic "soda straw" morphology, highly characteristic electron diffraction pattern (SAED), and a chemistry commensurate with serpentine. Anthophyllite fibers were found with characteristic asbestiform morphology, amphibole crystalline structure by SAED, and appropriate ratio of silica to magnesium as determined by EDS. Tremolite fibrous structures demonstrated pronounced asbestiform morphology as well, and also had distinct amphibole structure demonstrated by diffraction.' Mr Fitzgerald reported 70 million asbestos structures per gram of talc in each of 2 subsamples. Both subsamples were found to contain multiple asbestos structures both greater and lesser than 5 μ in length.



Gref.B-FIN01-000024

JA230



4/23/2014
HT: 100KV
TEM Magnification: 2,500x

AGI Anthophyllite

*3564) Chemistry determined by EDS demonstrates appropriate ratios of magnesium, silicon,*

Gref.B-FIN01-000025

The International Agency for Research on Cancer (IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, No. 100C. IARC Working Group on the Evaluation of Carcinogenic Risk to Humans. Lyon (FR): International Agency for Research on Cancer; 2012) has written about these talc sources:

"Talc deposits formed from the alteration of magnesian carbonate and sandy carbonate such as dolomite and limestone are the most important in terms of world production. Two types are recognized:

   1)  those derived from hydrothermal alteration of unmetamorphosed or minimally metamorphosed dolomite such as found in Australia (Mount Seabrook and Three Springs); USA (Wintersboro, Alabama; Yellowstone, Montana; Talc City, California; Metaline Falls, Washington; and West Texas); the Republic of Korea; the People's Republic of China; India; the Russian Federation (Onot); and, northern Spain (Respina); and,

   2)  those derived from hydrothermal alteration (including retrograde metamorphism) of *regionally metamorphosed* siliceous dolomites and other magnesium-rich rocks such as in the USA (Murphy Marble belt, North Carolina; Death Valley-Kingston Range, California; Gouverneur District, New York; Chatsworth, Georgia); Canada (Madoc); **Italy (Chisone Valley)**; the Russian Federation (Krasnoyarsk); Germany (Wunsiedel); Austria (Leoben); Slovakia (Gemerska); Spain; France (Trimouns); and Brazil (Brumado) (IARC, 2010).

In a study to examine the amphibole asbestos content of commercial talc deposits in the USA, Van Gosen et al. (2004) found that the talc-forming environment (e.g. regional metamorphism, contact metamorphism, or hydrothermal processes) directly influenced the amphibole and amphibole-asbestos content of the talc deposit. Specifically, the study found that hydrothermal talcs consistently lack amphiboles as accessory minerals, but *that contact metamorphic talcs show a strong tendency to contain amphiboles, and regional metamorphic talc bodies consistently contain amphiboles, which display a variety of compositions and habits (including asbestiform). Death Valley, California is an example of a contact metamorphic talc deposit that contains accessory amphibole-asbestos (namely talc-tremolite).*

Gref.B-FIN01-000026

2: Dr. Steven Compton analysed Italian Talc samples on behalf of a plaintiff's law firm (Report of Results: MVA11730. Investigation of Italian Talc Samples for Asbestos. Prepared for: Simon Greenstone Panatier Bartlett. August 1, 2017)

This report presented the results of an investigation of several talc/mineral samples for asbestos. The fifteen samples were initially collected onsite from the Imerys mining facility (Fontane) in Rodoretto, Italy by Alan Segrave with Bureau Veritas of Kennesaw, Georgia. It was requested that MVA investigate the bulk talc samples for the presence of asbestos fibers. The MVA report provides the analytical results of the thirteen samples corresponding to Italian talc sources.

## Compton's Methods

After visual examination and labeling with an MVA sample number, each sample received was photographed using a Nikon D60 DSLR camera. Mineral particulate was extracted both directly via forceps and also after breaking up a portion of the sample with a mortar and pestle. A representative portion of each sample was weighed, suspended in filtered deionized water, and a known aliquot was extracted and filtered through a 0.2 micrometer pore size membrane filter. Each filter was dried and grids prepared following standard direct preparation procedures for analysis by transmission electron microscopy (TEM). The grids were examined using either a Philips CM120 transmission electron microscope (TEM) equipped with an Oxford INCA energy dispersive spectrometry (EDS) x-ray analysis system or a Philips EM 420 TEM equipped with a Thermo Scientific Noran System 7 EDS x-ray analysis system. Both microscopes are capable of selected area electron diffraction (SAED).

Talc fibers were not counted, but were discounted after confirming their identity by elemental composition and observation of a pseudohexagonal diffraction pattern, consistent with the reported literature. Anthophyllite, tremolite, and actinolite fibers were designated as such based on their elemental composition and linear repeating diffraction patterns. When possible, a zone axis pattern was indexed to confirm the mineral identity. For each prepared sample, a laboratory blank sample was prepared following all of the same procedures except for the addition of test material. The TEM results for asbestos are given in terms of percent by weight and structures per gram.

Dr. Compton concluded 'Amphibole fibers were detected in eleven of the thirteen samples analyzed for this report. Aside from the talc itself, the primary fibrous contaminants in the sample set are anthophyllite and tremolite/actinolite. The asbestos content of samples found to contain amphibole and chrysotile fibers range from approximately 1.7 to 660 million fibers per gram. After estimating the mass of the fibers, this corresponds to a quantity ranging from 0.00002% to 0.68% by weight.'

Gref.B-FIN01-000027

JA233

Dr. Compton's measurements of the Val Chisone sample, containing 9 million fibers of anthophyllite per gram of powder are shown below.

## Table 6.  Fibers Detected During Examination of Bulk Sample AB1535

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 1.9 | 0.10 | 19 | Anthophyllite |
| 2 | 3.9 | 0.52 | 8 | Anthophyllite |
| 4 | 18.8 | 0.14 | 134 | Anthophyllite |
| 5 | 2.4 | 0.38 | 6 | Anthophyllite |
| 6 | 2.2 | 0.26 | 8 | Anthophyllite |
| 7 | 2.9 | 0.29 | 10 | Anthophyllite |
| 8 | 3.2 | 0.19 | 17 | Anthophyllite |
| 9 | 2.5 | 0.21 | 12 | Anthophyllite |
| 10 | 3.9 | 0.14 | 28 | Anthophyllite |
| 11 | 2.9 | 0.57 | 5 | Anthophyllite |

NA - Not Analyzed

Finkelstein: All 4 of the Fontana samples contained anthophyllite (Sample AB1532 also contained tremolite), as did Sample AB1535 from Val Chisone, Sample AB1537 (Milled Italian), AB1540 (Paulo Rimonta 5), AB1542 Gianna, and AB1543 (Gianna at Fault). The average concentration of anthophyllite was 9 million fibers per gram.

**Analysis by Mr. Alan Segrave of Bureau Veritas**

Mr. Alan Segrave had collected the Italian samples and he also analysed them. He reported finding no asbestos in the samples.

Mr. Segrave described his method:

Page -28-

Gref.B-FIN01-000028

JA234

| CLIENT: | ALSTON & BIRD, LLP |
| Project: | Italy |
| Work Order No: | A1512004 |

In addition to the analysis outlined above, an additional 100 grid openings were counted to derive a lower sensitivity. If present, asbestos structures which met a >3:1 length:width aspect ratio and a minimum length of 0.5 μm were identified using morphology, selected area electron diffraction, and energy- dispersive x-ray spectroscopy. Fibers are classified by structure type, sized (length and width), and identified as chrysotile and the identified regulated amphibole. Several grids are placed consecutively in the TEM for examination so that 100 grid openings, or 100 fibers, are counted, whichever occurs first. A magnification of 15,000X or higher was used for the analysis.

Consistent with the EPA method, asbestos is defined as having high aspect ratios of at least 20:1 or greater. Using a counting protocol of >3:1 as defined above provided a means to determine if any population of asbestos in any dimension existed in the sample(s). Even if fibers of >3:1 criteria were observed meeting the morphology, chemistry and crystalline structure of asbestos, a population of fibers 20:1 or greater would also have to exist for the sample to contain asbestos. Since no asbestos in any of these dimensions were observed, no asbestos was identified in any of the samples.

Segrave referenced the EPA method: United States Environmental Protection Agency. Method for the Determination of Asbestos in Bulk Building Materials. EPA-600/R-93/116, July 1993 **(PLM)**.

The materials scientist Dr. James Millette published 'Procedure for the Analysis of Talc for Asbestos' in Microscope, the journal of the American Society for the Testing of Materials, (THE MICROSCOPE • Vol. 63:1, pp 11–20 (2015)). Millette wrote: 'A transmission electron microscope equipped with EDS X-ray analysis system and capable of SAED is used to analyze the talc and asbestos fibers in the sample including tilting of talc/anthophyllite fibers. The TEM asbestos fiber counting criteria of fibers greater than 0.5 micrometer in length with at least a 5:1 aspect ratio as described in the Asbestos Hazard Emergency Response Act (AHERA) (15) and ASTM methods: D6281 (16), D5755 (17), D5756 (18) and D6480 (19) as well as in ISO 10312 (20) and 13794 (21) are used.'

Millette also wrote: 'Differentiation of Asbestos Fibers from Non-asbestos Fibers. In 1990, Wylie published some suggested characteristics of a population of particles with the asbestiform mineral habit. These included a mean aspect ratio of 20:1 or greater for fibers longer than 5 μm. Asbestos was characterized by very thin fibrils, usually less than 0.5 μm in width, and two or more of the following:
• Parallel fibers occurring in bundles
• Fiber bundles displaying splayed ends
• Fibers in the form of thin needles

Gref.B-FIN01-000029

**JA235**

• Matted masses of individual fibers
• Fibers showing curvature

Subsequently, the draft EPA R-93 (14) repeated most of the characteristics in a glossary providing a definition of a population of asbestos fibers as observed with light microscopy in a bulk sample. The EPA draft deleted the characteristic of fibers in the form of thin needles as being indicative of asbestiform.

Research by Wylie reported in 1985 showed that 50% of the fibers in a known amosite (grunerite) asbestos sample would not be counted if a 20:1 aspect ratio were used as a criterion. Comparison of the aspect ratio plots in the 1977 Bureau of Mines Circular (26) shows that a criterion of about 5:1 aspect ratio appears to be the best aspect ratio discriminator for asbestos versus non-asbestos fibers. The 5:1 aspect ratio is used in AHERA; ASTM methods D6281, D5755, D5756 and D6480; and ISO 10312 and 13794. The width of the fiber was found in inter-laboratory testing by Harper (27) to be the best discriminator for asbestos fibers, and that using a criterion of width that is less than or equal to one micrometer provides the least number of false negatives when dealing with asbestos and non-asbestos fibers.'

Segrave thus applied the EPA method for *light microscopy* to his measurements by TEM. He did not use the method suggested by Millette and published in the Journal of the ASTM. (THE MICROSCOPE · Vol. 63:1, pp 11–20 (2015).

A transmission electron microscope equipped with EDS X-ray analysis system and capable of SAED is used to analyze the talc and asbestos fibers in the sample including tilting of talc/anthophyllite fibers. The TEM asbestos fiber counting criteria of fibers greater than 0.5 micrometer in length with at least a 5:1 aspect ratio as described in the Asbestos Hazard Emergency Response Act (AHERA) (15) and ASTM methods: D6281 (16), D5755 (17), D5756 (18) and D6480 (19) as well as in ISO 10312 (20) and 13794 (21) are used. The d-spacing/interfacial angle tables of Shu-Chun Su (22) are used when the option to index zone-axis patterns of amphibole minerals obtained by SAED in the TEM is chosen. The results of the TEM analysis are recorded using the procedures described in ASTM D6281.
interfacial angle tables of Shu-Chun Su (22) are used when the option to index zone-axis patterns of amphibole minerals obtained by SAED in the TEM is chosen. The results of the TEM analysis are recorded using the procedures described in ASTM D6281.

**Fibers and Cleavage Fragments**

It has become a matter of controversy, in the regulatory and legal settings, whether the amphibole particles measured in samples such as AB1535 should be called fibers or cleavage fragments. A number of authors and Agencies have considered this issue. I will examine these considerations from a data analytic perspective.

Gref.B-FIN01-000030

**JA236**

The most recent publication to address this issue was published in 2019 by Roggli and Green
( Roggli VL, Green CL. Dimensions of elongated mineral particles: a study of more than 570
fibers from more than 90 cases with implications for pathogenicity and classification as
asbestiform vs. cleavage fragments. Ultrastructural Pathology:
https://doi.org/10.1080/01913123.2019.1566298).  In this publication they reported their study of
more than 570 fibers extracted from more than 90 cases examined in their laboratory, and have
drawn conclusions for pathogenicity of Elongated Mineral Particles and their classification as
asbestiform vs. cleavage fragments.  There are aspects of their methodology and discussion that
would benefit from examination (Finkelstein MM: Comments on "Dimensions of elongated
mineral particles with implications for pathogenicity and classification as asbestiform versus
cleavage fragments", Ultrastructural Pathology, 2019: 43:326-329.)

Dr. Roggli's laboratory has been performing fiber analyses of lung tissue samples since 1980,
counting only those fibers that are 5μ or greater in length with aspect ratios of at least 3:1 and
roughly parallel sides. Roggli and Green reference Harper and colleagues (Harper M, Lee EG,
Doorn SS, Hammond O. Differentiating non-asbestiform amphibole and amphibole asbestos by
size characteristics. J Occup Environ Hyg. 2008;5:761. doi:10.1080/15459620802462290) for
the proposition that the best morphologic criteria for distinguishing cleavage fragments from true
asbestos fibers is a length of at least 10μ and a diameter of less than 1.0μ.  I have reviewed the
paper by Harper et al and find that, concerning length and diameter, Harper and colleagues write
that 'Commercially exploited asbestos normally occurs in veins, and the width of the vein
determines the fiber length, generally between 0.5 and 20 mm but with fibers up to 250 mm long
being common. Asbestos ore is processed after mining to remove impurities and to produce a
consistent product. This processing shortens the length of fibers, but the majority of the
commercial product is still of the order of millimeters in length. However, as a result of this or
subsequent processing, fibers small enough to remain airborne are formed, and these are
generally <100μ in length and <3μ in width.' Decades earlier than the Harper paper,  the British
physicist, Vernon Timbrell, working at the MRC Pneumoconiosis Unit, wrote: 'Unlike fibre
diameter fibre length is dependent on milling history and does not provide an identification
method.' (Timbrell V. 1982. Deposition and retention of fibres in the human lung. Ann Occup
Hyg 26:347-369). Both of these authorities thus agree that milling history is an important factor
in determining the length of the particles a microscopist might subsequently detect and measure
in lung tissue. The degree of milling is likely to vary by fiber type, with commercial amphiboles,
largely used for construction applications, likely to be less heavily milled than chrysotile and talc.

Harper and colleagues write about the size distributions of airborne amphibole "fibers".
'Disturbing asbestos by extraction or processing leads to airborne fibers, which may be individual
fibrils or fibrillar bundles. Due to comminuting, these fibers are not as long as those found in the
ore bodies. In general, airborne asbestos particle length distributions can be modeled as a
log-normal distribution, with the majority below 100μ and more than 50% below 10μ in length.'
The size distribution of fibers in the air is, of course, a determinant of the size distribution of the
fibers inhaled and retained in the human lung. With respect to "cleavage fragments" Harper and
colleagues write 'Disturbance of coarsely crystalline amphiboles can result in the release of

Page -31-

Gref.B-FIN01-000031

prismatic single crystals or cleavage fragments, which may resemble asbestos fibers. Although there has been less work considering the size distributions of airborne prismatic crystals and cleavage fragments, the general opinion is that they are shorter and thicker than airborne asbestos fibers. In general, the widths of airborne cleavage fragments are greater than those of airborne asbestos fibers, although there is some overlap in the case of very fine cleavage fragments or *thick fibrillar bundles of asbestos*. However, the difference in lengths may be exaggerated. There appears to be substantial overlap in the distributions of cleavage fragment and asbestos fiber length.'

Harper and colleagues write about the use of Phase Contract Optical Microscopy (PCM) and Transmission Electron Microscopy (TEM) in detecting asbestos fibers and cleavage fragments. 'The greater resolution of TEM causes more individual fibrils to be seen than are visible under PCM. Thus PCM is considered an index of asbestos fiber exposure. Under standard PCM there may be very little difference in appearance between a cleavage fragment or prismatic crystal and an individual fibril or bundle of fibrils, and so, by default, all objects meeting certain dimensional criteria as described above may be assumed to be potentially asbestos. These dimensional criteria do not separate asbestos fibers from non-asbestiform particles well. The NIOSH (National Institute for Occupational Safety and Health) method does not attempt to differentiate because NIOSH does not recognize there is currently sufficient evidence for a different toxicity for non-asbestiform amphibole particles that meet the morphological criteria for a fiber. The EPA has a similar position. Various laboratories have devised their own criteria for determining whether a particle under PCM is asbestos or a non-asbestiform analog and this leads to variability in analysis. *These criteria may also be subjective and may require skill to apply, which leads to variation even in the application of the same procedure. Thus the OSHA method for counting fibers under PCM declares that "differential counting" should be discouraged unless absolutely necessary.'*

Harper and colleagues pointed out that the American Society for Testing of Materials (ASTM) International Subcommittee D22.04 had ballotted a revision to the standard for assuming that a particle is a potential asbestiform fiber. The proposed revision was to become: Length >10µ and width <1µ (these are the criteria used by Roggli and Green). However, the ASTM ballot to change the definition of asbestiform returned some negative votes that were considered persuasive, and the revision was rejected. Thus, the existing version in D7200-06 remains in effect. Under the ASTM D7200-06 method, any particle meeting the definition of a fiber, that is, curved, has split ends, or has any other morphology suggesting that it is a bundle of fibrils, is automatically assigned to a class of particles (Class 1), defined as potentially asbestiform, whatever its actual dimensions.

The Harper paper describes the results of an interlaboratory study to test the ASTM D7200-06 method. It was first necessary to obtain asbestiform and non-asbestiform amphibole mineral specimens. The minerals were crushed in a sequential operation using first a hydraulic press to create cm-sized particles. These large chunks were screened through 1mm, 360µ, and 250µ sieves, and in each case, larger material was returned for recrushing. The screened material was

Gref.B-FIN01-000032

ground by hand in a mortar and pestle using little or no hand pressure for 1-min intervals. After each minute interval, a glass slide mount was prepared and was then inspected by polarized light microscopy to observe the range of particle sizes present. When a sufficiently large portion of the particles appeared to meet acceptable size criteria (>5 μ long,<3 μ wide, aspect ratio >= 3:1), the material was suspended in water and allowed to settle. In addition, alternative actinolite asbestos and tremolite asbestos specimens were sourced from the U.K. Health and Safety Executive (HSE). Samples of these materials were treated in a similar fashion as the non-asbestiform amphiboles, except that the initial crush in the hydraulic press was not necessary. The cleavage fragments generated from the non-asbestiform amphibole specimens and the fibers generated from the asbestos reference materials were transferred to filters and examined under PCM and TEM and measured. This procedure allowed the binning into different size categories to see the effect of using different size criteria to differentiate asbestos from cleavage fragments. PCM and TEM analyses were carried out.

Approximately 300 particles from each material were examined under PCM to determine the percentage of particles meeting NIOSH rules for definition of a fiber. Approximately 300 particles from each material were examined under TEM to determine the total size distribution.

Table 1 of Harper et al shows the classification of crushed non-asbestiform amphibole particles under several classification criteria, and Table 2 of their paper shows the same for crushed amphibole asbestos particles. The results are summarized in the Table below.

| Table. Results of Classification Criteria for non-asbestiform and asbestiform mineral particles. 300 Particles counted in each cell. | | | |
|---|---|---|---|
| Particle Type | Percentage classified as Fibers by PCM counted under (NIOSH rules: (>5 μ long,<3 μ wide, aspect ratio >= 3:1 | Percentage >10 μ long and <1 μ wide (counted by TEM) | Width Only Classification – Percentage <1 μ wide (counted by TEM) |
| Tremolite (Non-asbestiform) | 62.3% | 4.9 % | 24.4% |
| Tremolite (asbestiform) | 65.3 | 2.7% | 27.2% |
| Anthophyllite (Non-asbestiform) | 91.3 | 6.8% | 50.4% |
| Anthophyllite (asbestiform) | 74.3 | 3.7% | 37.5% |

Gref.B-FIN01-000033

JA239

Harper and colleagues write that if the morphologic criteria for distinguishing cleavage fragments from true asbestos fibers (a length of at least 10$\mu$ and a diameter of less than 1.0$\mu$) adopted by Roggli and Green are utilized, then the majority of particles of actinolite asbestos and tremolite asbestos would be considered as unlikely to be asbestos.

Harper and colleagues concluded that 'On microscopic examination, the degree of overlap in length distributions for the asbestos fibers and for the non-asbestiform cleavage fragments was unexpected. However, the size distributions appear to be relevant to airborne particles as well as to particles used as surrogates for airborne materials. Based on the size distributions observed in this study, an alternative size-selection criterion can be suggested. For crocidolite and amosite asbestos and for actinolite asbestos and tremolite asbestos, it has been shown that most fibers are likely to be <1$\mu$ wide, but also <10$\mu$ long, and this is also true of actual airborne fibers. For most of the non-asbestiform amphiboles, the processing gave rise to particles where a proportion were >10$\mu$ long but where, typically, only around 25% of particles meeting the NIOSH definition of a fiber were <1$\mu$ wide.'  'The current ASTM D7200, which *is based on the appearance of the fiber, is rather subjective and may not be very useful for distinguishing amphibole asbestos*.'

The ultimate conclusion of Harper and colleagues with respect to criteria for differentiating asbestos from cleavage fragments is based upon the following width criterion: 'A width criterion of <1 $\mu$ may adequately include asbestos (although, for example, missing 5% of crocidolite and 18% of amosite) while minimizing the amount of cleavage fragments also included. It would also exclude any prismatic or acicular crystals >1 $\mu$ in width. Thus, it is relatively conservative, and since it depends on measurement alone, it is verifiable.' The final sentence in the paper by Harper and colleagues is: 'However, it should be clearly recognized that a 1$\mu$ width criteria is not being proposed here as a dividing line between safe and unsafe.'

Returning to the analysis of Roggli and Green, it is clear from the above that they have misinterpreted the work of Harper and colleagues. Roggli and Green wrote that 'It has been reported (by Harper and colleagues) that the best morphologic criteria for distinguishing cleavage fragments from true asbestos fibers is a length of at least 10$\mu$ and a diameter of less than 1.0$\mu$. This distinction is important since there is no convincing evidence for the pathogenicity of cleavage fragments.' As seen above, however, the ASTM and Harper and colleagues rejected the morphologic criteria adopted by Roggli and Green, but instead adopt a width criterion of <1$\mu$. They further state that 'a 1$\mu$ width criteria is not being proposed here as a dividing line between safe and unsafe.'

Roggli and Green write 'It has been our impression that this distinction (between fibers and cleavage fragments) has little effect on the identification of amosite or crocidolite as asbestos but might have a considerable effect on the identification of non-commercial amphiboles, including tremolite, actinolite, and anthophyllite.' As described above, length differences between the commercial and non-commercial amphiboles are likely due, in large part, to the handling and milling after mining. Amosite and crocidolite were largely used in construction applications and were not heavily milled. Tremolite, actinolite, and anthophyllite in the United States mostly

Page -34-

occurred as contaminants of Talc and Canadian asbestos. These minerals were usually heavily milled for many of their commercial applications.

Roggli and Green reported that only 1% of crocidolite fibers and none of the amosite fibers analyzed met the criteria of both length less than 10μ and diameter greater than 1.0μ. This might be compared with 69% of crocidolite fibers and 85% of the amosite fibers measured by Harper and colleagues. These differences might be due to the relatively small number of fibers counted by Roggli, the fact that he used SEM rather than TEM, and the fact that his particles were extracted from lung tissue, rather than coming straight from the mill. Roggli and Green reported that 10% percent of tremolite and 14% of actinolite fibers met the criteria of both length less than 10μ and diameter greater than 1.0μ and thus were likely cleavage fragments. Harper and colleagues crushed amphibole asbestos particles and measured their dimensions. They reported that 97% percent of tremolite and 89% of actinolite asbestos fibers met the criteria of both length less than 10μ and diameter greater than 1.0μ. The conclusion of Roggli and Green that the particles they measured were likely cleavage fragments is thus not supported by the measurements reported in their primary reference.

Roggli and Green conclude that 'Our findings demonstrate the lack of pathogenicity of fibers less than 10μ long or likelihood of cleavage fragments for fibers less than 10μ long and greater than 1.0μ in diameter has little or no effect on the classification of commercial amphibole fibers using our analytical methodology. On the other hand, both lack of pathogenicity and likelihood of cleavage fragments apply to a significant proportion of noncommercial amphiboles identified using our counting scheme.' This is not true. The study of Roggli and Green was a simple fiber counting study with no control population. The design of such a study does not allow the investigator to draw any conclusions about pathogenicity, or lack thereof.

**Particle Width**

Some geologists believe that particle width is a more fundamental parameter of asbestos fibers than the Aspect Ratio. Dr. Ann Wylie, Professor of Geology at the University of Maryland has noted that, while there are differences in the distribution of aspect ratios when one looks at populations of asbestos fibers and nonasbestiform cleavage fragments, aspect ratio is a dimensionless parameter and lacks information about the size particles; it only describes shape. Rather than aspect ratio, Dr. Wylie stressed that "width is a much more fundamental parameter of asbestos fibers, and perhaps will shed some light on how we tell particles that are elongated, whether they are cleavage fragments, or whether they are asbestos" (Federal Register / Vol. 57, No. 110 / Monday, June 8, 1992). To illustrate this point Dr. Wylie presented data, in her testimony to the OSHA hearings, on the widths of various populations of asbestos fibers and nonasbestiform cleavage fragments from both bulk and airborne data. These data showed that in the populations of asbestos fibers she studied, the majority of fibers had widths less than one micrometer. In tremolite asbestos samples, 85- 95% of the fibers had widths less than one micrometer and 75% had widths less than 0.5 micrometers. Wylie stated that when looking at these fiber populations it generally doesn't make any difference whether you look at particles

Gref.B-FIN01-000035

longer than five micrometers, or all particles in a population, when you look at width. Dr. Wylie acknowledged, however, that *asbestos fiber bundles may have widths greater than one micrometer*, but she added that even in these cases the majority of particles are less than one micrometer (Federal Register / Vol. 57, No. 110 / Monday, June 8, 1992). A critical dimensional distinction between asbestiform fibers and cleavage fragments thus appears to be their widths. Thus, Dr. Wylie stated that her analyses of width show that about *80 percent of the amphibole cleavage fragments longer than five micrometers, have widths greater than one micron, and none have widths less than 0.25.* Dr. Wylie also pointed out how the width of asbestos fibers will influence their aspect ratio. She states that the mean width of asbestos fibers is less than half a micron, and if you have five micrometer particles, you have to have an aspect ratio of at least 10 to 1. Moreover, she states that while low aspect ratio fibers (or fiber bundles) are present in asbestos populations, they are characteristic of short asbestos fibers. Since the mean width of asbestos fibers is less than 0.5 micrometers, the mean aspect ratio of a 5 micrometer fiber is about 10:1.

Dr. R.J. Lee, a microscopist and mineralogist with R.J. Lee and Associates, also noted the importance of width in distinguishing asbestos fibers from nonasbestiform cleavage fragments. *Dr. Lee testified to the following: First airborne asbestos is less than one micrometer in diameter, unless it's present as bundles or clusters, which exhibit the characteristic fibrillar structure of asbestos, or as Dr. Wylie indicated, the hallmark of asbestos. Asbestos larger than a half a micron is a bundle.* Second, nonasbestos particles longer than five micrometers in length are generally more than one micrometer in diameter, and only rarely less than half a micrometer in diameter. (Federal Register / Vol. 57, No. 110 / Monday, June 8, 1992).

Harper and colleagues, Dr. Wylie and Dr. Lee thus generally agree that the width of amphibole asbestos particles is less than the width of amphibole cleavage fragments (Harper et al. 2008). Wylie published the size distribution of a sample of crushed Swedish prismatic amphibole (Wylie 2016). Fifty-two precent of particles were less than 5 µ in length and these had a mean width (SD) of 0.71 +/- 0.29 µ. Nine of the 10 particles in Compton's sample were less than 5 µ in length, and the mean width (SD) was 0.30 +/- 0.16 µ. The widths of these 2 samples of amphibole particles (one, crushed Swedish prismatic amphibole, the other crushed Italian talc ore) were significantly different

Page -36-

Gref.B-FIN01-000036

JA242

```
Two-sample t test with unequal variances
------------------------------------------------------------------------------
         |    Obs       Mean    Std. Err.    Std. Dev.    [95% Conf. Interval]
---------+--------------------------------------------------------------------
       x |     81        .71    .0322222          .29     .6458757    .7741243
       y |      9         .3    .0533333          .16     .1770131    .4229869
---------+--------------------------------------------------------------------
combined |     90       .669    .0321793    .3052796     .6050604    .7329396
---------+--------------------------------------------------------------------
    diff |                .41    .0623114                  .276958     .543042
------------------------------------------------------------------------------
    diff = mean(x) - mean(y)                                    t =   6.5799
Ho: diff = 0                    Satterthwaite's degrees of freedom =  14.7102

     Ha: diff < 0                 Ha: diff != 0                 Ha: diff > 0
Pr(T < t) = 1.0000         Pr(|T| > |t|) = 0.0000         Pr(T > t) = 0.0000
```



The widths of the Val Chisone particles
were essentially normally distributed

```
                Shapiro-Wilk W test for normal data
    Variable |      Obs         W          V          z       Prob>z
-------------+-------------------------------------------------------
       Width |        9    0.92161      1.152      0.238      0.40577
```

In Wylie's sample of Swedish crushed anthophyllite, 4% of particles were > 15μ in length. Their mean width was 2.70 +/- 1.89 μ and the minimum width was 0.72 μ. In the Compton sample, the anthophyllite particle > 15μ in length was 0.14 μ wide.

Based on their length and width distribution, the anthophyllite particles measured in Italian talc by Dr. Compton were significantly different from the cleavage fragments obtained from crushing prismatic anthophyllite.

Gref.B-FIN01-000037

JA243

The topic of fibers and cleavage fragments was also addressed in a Bureau of Mines Report in 1977. These geologists concentrated on the Aspect Ratio distribution of a population of particles as the measure to distinguish fibers from cleavage fragments. Like Harper and Timbrell, they noted the shortening of fibers by milling.





Dr Campbell was the Program coordinator, Particulate Mineralogy Unit, College Park Metallurgy Research Center, College Park, Md. The authors of the Report wrote that 'Various legislative actions and public concerns within the past decade have had, and will continue to have, an impact upon the mineral industry. As a result, control of mineral particulates is becoming increasingly important, with much recent attention focused on asbestiform particulates in both air and water. Figure 1, from an Environmental Protection Agency report, shows the widespread occurrence of common amphibole and serpentine minerals that, according to existing regulatory definitions, may be classified as asbestiform minerals

Gref.B-FIN01-000038

JA244



'With such possibly overwhelming implications to both mineral producer and mineral consumer, it is essential that existing ambiguities regarding silicate minerals and their asbestiform varieties be resolved. Until recently, adverse health effects associated with asbestos were focused on occupational exposure in asbestos-related industries. Now there is international concern regarding the effect on health from long-term low-level, or short-term high-level, exposure to mineral particulates by the general public. These particulates may include both the common and the asbestiform varieties of certain silicate minerals. In many instances, cleavage fragments of common amphibole minerals have been mistakenly identified as microscopic fibers of the related asbestiform variety. Such lack of precision in identifying these particulates is a handicap to scientific decision making by regulatory agencies and medical researchers. *The Particulate Mineralogy Unit was created to work on problems such as this. The unit is to assist local, State, and Federal agencies in establishing precise and workable mineral definitions and to improve or develop methods of particulate identification and quantitative measurement.*

This Bureau of Mines report is intended to clarify some of the terminology used in identification and characterization of asbestiform minerals, and to sharpen the distinction between common rock minerals and their asbestiform varieties. It defines certain mineral terms related to asbestiform minerals and discusses mineral-characterization techniques on a strictly mineralogical basis. *The report then discusses the identification of silicate particulates and suggests how to apply this information to asbestos-related problems.*'

'Many macroscopic samples of interest to the occupational and environmental health personnel may contain low percentages of asbestiform minerals (for example, chrysotile in serpentine and tremolite asbestos in talc). As a supplement to optical microscopy, the presence or absence of

Page -39-

Gref.B-FIN01-000039

JA245

serpentine or amphibole minerals can be determined in 10- to 100-mg samples by instrumental techniques such as X-ray diffraction, differential thermal analysis, or infrared spectrophotometry. In general, the sensitivity of these instrumental methods is approximately 1.0 weight-percent. It is important to note that these methods usually only distinguish between mineral groups; *light optical or electron optical microscopy is required to obtain morphological characteristics necessary to identify varieties of the same material.*

Amphiboles in acicular habit may appear to grade into the asbestiform varieties. The characteristic features of this habit may still be seen by **electron microscopy**. Terms such as "acicular" or "prismatic" may still be applied when seen, but **the term "asbestiform" begins to lose its usefulness.** For example, how may flexibility be demonstrated in a 2-um bundle of fibers? As particle size decreases, the inability to manipulate the mineral grains restricts the use of the term "asbestiform" without altering the original sense of the word. ***High magnification necessitates the use of strictly dimensional terms such as size and aspect ratios to accurately describe the morphology of the amphiboles and serpentines.' (Emphasis by Finkelstein)***

'For the purpose of this discussion, **assume that a hand specimen meeting these requirements is correctly identified as an asbestiform mineral**. If this sample is crushed and its fragments examined at various magnifications, its fibrous nature would be apparent These elongated fragments would be termed "fibers" and "bundles of fibers," and with the other available information would be called asbestiform. As these asbestiform particles are examined at increasing magnification, smaller particles become visible, while the image of large fibers and fiber bundles may exceed the field of the microscope. **At increasingly smaller sizes, while fibers or bundles of fibers are still the predominant shape, a few of the fibers are observed to have broken into shorter and shorter segments. These very short fiber segments are no longer described as fibers, but would be classified as fragments of fibers, or cleavage fragments if one or more cleavage planes govern their shape. Therefore, a known asbestiform sample would show an increase in the ratio of fiber fragments to fibers with a decrease in particle size.**

'If the hand specimen discussed previously does not separate into flexible fibers or bundles of fibers, the mineral would not be considered asbestiform. If crushed fragments of this known nonasbestiform mineral are examined at various magnifications, the particles would be primarily cleavage fragments, or irregularly broken fragments if cleavage does not govern breakage. However, a few elongated particles may resemble a fiber in appearance to the degree that they may be indistinguishable morphologically from fibers derived from an asbestiform mineral sample. **What can be stated morphologically about particles derived from crushing a known nonasbestiform mineral is that most of the particles are cleavage fragments with nonasbestiform texture; a few are fibrous in appearance, *particularly at low magnification*; and all of the particles are known to be derived from a nonasbestiform source.**'

Page -40-

Gref.B-FIN01-000040

JA246

## ASPECT RATIO

'Existing regulatory standards are based on counting specific mineral particulates with aspect ratios of 3 to 1 or greater. This report emphasizes that *the aspect ratio has little mineralogical significance for individual particulates but is applicable to a large number of particles. A few relatively long thin particles are produced as cleavage fragments from the crushing and grinding of many nonasbestiform minerals. Conversely, similar milling treatment will result in a few short segments of true fibers from the asbestiform varieties. However, statistically, the length-to-width characteristics of the milled amphiboles and serpentine and their asbestiform varieties are significantly distinct,* as shown by the data in figures 41-42. Figures 41 and 42 show the frequency polygons of the aspect ratio distribution for milled samples of the normal nonasbestiform variety of anthophyllite and tremolite. Note that in both examples, approximately 70 percent of the particles have an aspect ratio of less than 3 to 1, and 95 percent of the particles have a length-to-width ratio of less than 10 to 1. **The frequency distribution maximums of the aspect ratios for milled anthophyllite asbestos and tremolite asbestos are significantly higher than those for the normal, nonasbestiform variety.** Thirty to forty percent of the asbestiform particulates are in the 10-to-l-or-longer class, with a significant number of particles having an aspect ratio greater than 20 to 1.'

'Based on these data, *one test for distinguishing the presence or absence of the asbestiform variety of a mineral could be an examination of the frequency distribution of the aspect ratio for that mineral.* Assuming positive identification of the mineral type, then the designation of variety would be based both on particle morphology and the frequency maximum of the aspect ratio. *Cleavage fragments will generally have a frequency maximum less than 3 to 1*, whereas *the asbestiform varieties will fall between 10 to 1 and 20 to 1 or higher, depending on the characteristics of the mineral and the history of the sample, particularly the type and degree of milling.*



FIGURE 42. - Frequency polygons for the aspect ratios of tremolite and tremolite asbestos.

Gref.B-FIN01-000041

JA247



FIGURE 41. - Frequency polygons for the aspect ratios of anthophyllite and anthophyllite asbestos.

So, to quote the US Bureau of Mines document once more:

'Based on these data, *one test for distinguishing the presence or absence of the asbestiform variety of a mineral could be an examination of the frequency distribution of the aspect ratio for that mineral.* Assuming positive identification of the mineral type, then the designation of variety would be based both on particle morphology and the frequency maximum of the aspect ratio. *Cleavage fragments will generally have a frequency maximum less than 3 to 1*, whereas *the asbestiform varieties will fall between 10 to 1 and 20 to 1 or higher, depending on the characteristics of the mineral and the history of the sample, particularly the type and degree of milling*.

Harper and colleagues also measured the distribution of Aspect Ratios in their 2008 paper.

Page -42-

Gref.B-FIN01-000042

JA248

Firstly they considered crushed *non-asbestiform amphibole* mineral particles:

## TABLE IV. Aspect Ratios of Crushed Non-Asbestiform Amphibole Particles

| Non-Asbestiform Amphibole Type | Percentage Fibers[A] | Percentage Fibers Under TEM[B] with: | |
|---|---|---|---|
| | | Aspect Ratio >5:1 | Aspect Ratio >10:1 |
| Riebeckite | 62.0 | 31.1 | 3.3 |
| Cummingtonite | 71.3 | 59.6 | 8.6 |
| Grunerite | 64.7 | 48.6 | 5.3 |
| Actinolite | 58.3 | 41.2 | 2.9 |
| Tremolite | 62.3 | 53.7 | 9.8 |
| Anthophyllite[C] | 91.3 | 83.8 | 35.0 |

[A] Percentage meeting the NIOSH 7400 method "A" counting rules definition of a fiber out of 300 particles observed under PCM. From Table I.

[B] For greater accuracy, measurements were made under TEM. 300 total particles were measured and the number of PCM-equivalent (PCMe) fibers counted. Percentage is the number meeting the stated classification out of the 300 PCMe fibers measured under TEM.

[C] Anthophyllite contains talc, probably fibrous.

Then they tabulated crushed asbestiform amphibole mineral particles.

Gref.B-FIN01-000043

## TABLE V. Aspect Ratios of Crushed Amphibole Asbestos Particles

| Asbestos Type | Percentage Fibers[A] (%) | Percentage Fibers Under TEM[B] with | |
| --- | --- | --- | --- |
| | | Aspect ratio >5:1 (%) | Aspect ratio >10:1 (%) |
| Crocidolite | 77.3 | 99.7 | 94.3 |
| Amosite | 59.0 | 98.0 | 66.8 |
| Actinolite asbestos | 64.0 | 84.0 | 36.7 |
| Tremolite asbestos | 65.3 | 58.1 | 14.8 |
| Anthophyllite asbestos | 74.3 | 67.2 | 17.4 |

[A] Percentage meeting the NIOSH 7400 method "A" counting rules definition of a fiber out of 300 particles observed under PCM. From Table II.

[B] For greater accuracy, measurements were made under TEM. Percentage is the number meeting the stated classification out of the 300 PCMe fibers measured under TEM.

Gref.B-FIN01-000044

With these measurements in mind, the histogram below shows the distribution of the Aspect Ratios of the anthophyllite particles in the Val Chisone sample measured by Dr. Compton.



There are clearly particles with Aspect Ratios of 10:1 and 20:1 and higher, including one with an Aspect Ratio of 134:1, which did not fit on the graph.

Now Dr Compton counted only those particles with an Aspect Ratio of 5:1 or greater. In the Bureau of Mines graph, 88% of cleavage particles had aspect ratios less than 5:1, as did 50% of asbestos fibers. Of the 12% of particles with aspect ratios >5:1, 10 of 12% (ie 83%) were in the Aspect Ratio range 5:1 - 10:1; and about 2 of 12% (ie 16%) were in the Aspect Ratio range 10:1 - 20:1. Of the 50% of fibers with Aspect Ratios of 5:1 or more, 27 of 50% (ie 54%) were in the Aspect Ratio range 5:1 - 10:1; and about 15 of 50% (ie 30%) were in the Aspect Ratio range 10:1 - 20:1. About 16% of anthophyllite fibers had Aspect Ratios of more than 20:1. The aspect Ratio distributions of the Bureau of Mines cleavage fragments and fibers, and the Anthophyllite measurements made by Dr. Compton on the Val Chisone sample, are shown in the Table below.

Gref.B-FIN01-000045

| Comparison of Aspect Ratios for Bureau of Mines Anthophyllite Cleavage Fragments, Bureau of Mines Anthophyllite Fibers, and the Val Chisone Anthophyllite Particles Measured By Dr Compton | | | |
|---|---|---|---|
| Aspect Ratio | Bureau of Mines Cleavage Fragments | Bureau of Mines Fibers | Val Chisone Particles |
| 5:1 - 10:1 | 83% | 54% | 40% |
| 10:1 - 20:1 | 16% | 30% | 40% |
| >20:1 | 1% | 16% | 20% |

The population of Val Chisone anthophyllite particles more closely resembles the Bureau of Mines anthophyllite asbestos than the Bureau of Mines anthophyllite cleavage fragments and would support calling these amphibole particles "fibers".


**The Effect of Milling on the Particle Size Distribution**

In their 1976 paper, Rohl and Langer wrote: 'By comparing the results of optical microscopy with those of quantitative X-ray diffraction and electron microscopy, we observed that large numbers of fibers go undetected. In addition to the restraints of resolution imposed by light microscopy, another major drawback relates to the strong tendency of asbestiform minerals to cleave or break along planes of weakness when they are crushed, producing large numbers of small fibers. For example, light microscopic examination of a talc sample which contains over 7% tremolite demonstrates the presence of mineral fragments that are primarily not asbestiform. *However, electron microscopic examination of the same sample demonstrates that many of the submicroscopic tremolite particles are fibrous. Basically, the large fibers are broken during milling yielding a new size distribution in the submicroscopic range.'*

The same point was made in 1982 by the British physicist, Vernon Timbrell, working at the MRC Pneumoconiosis Unit (Timbrell V. 1982. Deposition and retention of fibres in the human lung. Ann Occup Hyg 26:347-369.) Dr Timbrell wrote: 'Unlike fibre diameter fibre length is dependent on milling history and does not provide an identification method.' Referring to the UICC anthophyllite sample he reported that the count median fibre diameter was 0.5 µ in the UICC reference sample of anthophyllite. The count median fibre length was 3 µ.

The count median fibre width in Compton's Val Chisone sample was about 0.24 µ and the count median fibre length was about 3µ.

Gref.B-FIN01-000046

It is of interest to compare the concentration of anthophyllite in the Val Chisone Bulk Sample to the concentration of anthophyllite in a commercial talc product, Colgate Palmolive's Cashmere Bouquet, that was manufactured using talc from Val Chisone. Gordon and colleagues were hired by a plaintiff's law form to analyse samples of Cashmere Bouquet Cosmetic Talc (Gordon et al. 2014). In the Shaker Container Test, this particular talcum powder contained approximately 0.1% by weight and approximately 18 million anthophyllite asbestos fibers per gram. In the Puff applicator Test, this particular talcum powder contained approximately 0.05% anthophyllite asbestos, approximately 70 million asbestos fibers per gram. It can thus be seen that the bulk sample contained anthophyllite fibers in somewhat lower concentrations than the refined commercial products measured by Gordon and colleagues.

**The Bureau of Mines has written about the identification of cleavage fragments and fibers in TALC.**

Asbestos-related health regulations are having a significant impact on the *domestic talc industry* from occupational exposure at the mines and mills and at various manufacturing plants that use talcs in their operations. Certification that the talc does or does not contain asbestiform minerals is important because the occupational health requirements are much more restrictive if the talc is designated as containing asbestiform serpentine or amphibole minerals. Talc is both the name of a specific mineral and a commercial term for a mixture of minerals ranging from essentially 100 percent talc to blends where the mineral talc is a minor constituent. Semiquantitative estimation of the serpentine and/or amphibole mineral concentration, if present, can be obtained by X-ray diffraction and differential thermal analysis. Several talc deposits contain a variable amount of tremolite. Therefore, the essential question faced by the analyst is whether or not the tremolite is fibrous. Figure 52 illustrates the type of particles obtained from a mixture of tremolite and platy talc. The cleavage fragments of tremolite are typical of the nonasbestiform variety. Better judgment is required of the analyst with the type of sample illustrated in figure 53. This sample consists of platy talc, cleavage fragments of tremolite, and minor to trace amounts of fibrous tremolite. For this latter sample, the 3-to-1 aspect-ratio criteria would greatly overestimate the number of fibrous tremolite particles collected on air filters or other monitors.

Gref.B-FIN01-000047

Note the Width of the Cleavage Fragment



FIGURE 52. - Platy talc (A) and tremolite cleavage
fragment (B) (X 640)0



FIGURE 53. - Platy talc, tremolite cleavage fragments,
and a fibrous tremolite particle (A)
(X 400).

Page -48-

Gref.B-FIN01-000048

JA254

**The Preliminary Recommendations of the Interagency Working Group on Asbestos in Consumer Products (IWGACP) (January 6, 2020)**

In the fall of 2018, the United States Food and Drug Administration (US FDA) formed the Interagency Working Group on Asbestos in Consumer Products (IWGACP), with representatives from eight federal agencies (Food and Drug Administration (FDA), National Institutes for Occupational Safety and Health (NIOSH), National Institute of Health (NIH)/ National Institute of Environmental Health Sciences (NIEHS), Occupational Safety and Health Administration (OSHA), Environmental Protection Agency (EPA), Consumer Product Safety Commission (CPSC), the National Institute of Standards & Technology (NIST), and the Department of Interior's U.S. Geological Survey (USGS). The participating federal agencies have expertise in asbestos-testing and/or asbestos-related issues (e.g., from a health perspective), or because they regulate some of the consumer products that contain talc as an ingredient), to support the development of standardized testing methods for asbestos and other mineral particles of health concern in talc that could potentially affect consumer product safety. The IWGACP was formed in response to reports of the presence of asbestos in talc-containing cosmetic products, with talc being the presumptive source of asbestos.

'The health hazards associated with asbestos are well documented. There is general agreement among US federal agencies, most developed nations, and the World Health Organization (WHO) that there is no known safe level of asbestos exposure. **Concern about the purity of talc used as a raw material was heightened in the early 1970s when numerous cosmetic products tested positive for asbestos. However, at that time the development of asbestos testing methods was still in its infancy. In 1976, the cosmetics industry implemented voluntary asbestos testing of talc raw materials using the Cosmetic, Toiletry, and Fragrance Association (CTFA) J4-1 method. Talc suppliers to the pharmaceutical industry use a similar method to certify that talc meets the United States Pharmacopeia's (USP's) requirement for "Absence of Asbestos." To date, both methods rely on the use of X-ray diffraction (XRD) or infrared (IR) spectroscopy followed by polarized light microscopy (PLM) only if XRD or IR is positive for amphibole or serpentine minerals in talc. The CTFA J4-1 and USP methods remain standard test methods despite long-recognized shortcomings in specificity and sensitivity compared with electron microscopy-based methods.**

In 2010, FDA asked the USP to consider revising the current tests for asbestos in talc to ensure adequate specificity, and in 2014 the Talc USP expert panel recommended an update of the Talc USP monograph to require an electron microscopy method for the measurement of asbestos in talc. Recent reports from testing of cosmetic products indicate that because of shortcomings in sensitivity, light microscopy (polarized light microscopy; PLM) sometimes fails to detect finely-sized particles of asbestos and similar minerals even when they are present in talc. Moreover, modern laboratories with expertise in asbestos testing, when asked to test talc-containing consumer products, routinely perform electron microscopy and do not rely solely on PLM. These findings provide support to recommendations from many scientific experts,

Page -49-

Gref.B-FIN01-000049

including those on this Working Group, that transmission electron microscopy (TEM) should be used for asbestos-testing of talc, even if the findings of PLM are negative.

Asbestos regulations and standard methods for analysis contain a wide variety of "counting rules" designating how to quantify asbestos in occupational or environmental settings using various microscopic methods. Rules were tailored to simplify counting, to improve statistical analysis, and to provide a threshold for mitigating risk when asbestos is known to be present. To date, counting rules have not specifically considered biological activity, overt toxicity, or epidemiology of the kinds of chrysotile and amphibole particles being detected and counted. That is, all mineral particles meeting specified criteria for mineral type and dimensions are expected to be reported and counted.

Importantly, testing methods pertaining to asbestos in articles of commerce were developed for analyzing "bulk materials" containing at least 1% asbestos as an intentional ingredient by weight or in settings where asbestos was known to be present (e.g. mines, mills, factories, schools, and other settings). *Published methods for analysis of bulk materials were not intended to determine the presence of asbestos in products at less than 1% concentration. In contrast, the likely amount present when asbestos is a contaminant or impurity in talc or talc-containing consumer products might be orders of magnitude below 1%.*

The difficulty of identifying and quantifying individual asbestos or other mineral particles present at low concentrations in talc is compounded by the presence of non-asbestiform analogs with the same elemental composition and crystal structure, but different growth habit. Using TEM, differentiation of chrysotile from non-asbestiform serpentine analogs is relatively straightforward; however, each of the non-asbestiform amphiboles can disaggregate into particles resembling asbestiform fibers, giving rise to disputes between laboratories over whether elongate amphibole particles are truly asbestos, or are particles resulting from attrition of larger particles of a non-asbestiform analog. ***Because both types of elongate minerals are suspected of having biological activity with similar pathological outcomes, the distinction is irrelevant***. Lack of consensus concerning what should be called "asbestos" has persisted since the first reports indicating that asbestos might be present in talc used in cosmetics and has inhibited thorough toxicological and epidemiological investigations of disease attributable to talc that contains asbestos.

**In light of this lack of consensus, the IWGACP considered applicable published asbestos test methods and other published documents in developing recommendations for terminology, analytical techniques, and criteria for qualitative and quantitative measurement of asbestos in talc and talc-containing consumer products. Based on its review, the IWGACP agrees with the recommendations and rationale provided in the peer reviewed NIOSH Bulletin 6210 regarding adopting the term "elongate mineral particle" or "EMP" that is defined as "any mineral particle with a minimum aspect ratio [i.e., length: width ratio] of 3:1."**

Gref.B-FIN01-000050

Countable EMPs have an aspect ratio (AR) of >3:1 and a length of > 0.5 μm using the most inclusive criteria for length and AR from among the "asbestos" counting rules in established testing protocols. The specified minimum length of 0.5 μm is consistent with the counting rules for fibers established by the global standard for TEM sampling and analysis, ISO 10312:2019 and is supported by studies that indicate asbestos particles and EMPs of these dimensions could pose a health concern.'

Gref.B-FIN01-000051

JA257

**A3: Vermont Talc**

Johnson & Johnson used Vermont talc for their Baby Powder and Shower to Shower products.

The Mine Safety and Health Administration sampled workers for asbestos exposure at Luzenac's Ludlow Vermont Mill.



**Metal/Nonmetal**
**Personal Health Sampling Results**

**Current Mine Information**

| | |
|---|---|
| Mine ID: | 4300276 |
| Operator: | Luzenac America, Inc. |
| Opr. Begin Date: | 7/1/1992 |
| Mine Name: | LUDLOW MILL |
| Current Controller: | Imerys 5 A |
| Mine Status: | Abandoned |
| Status Date: | 3/2/1998 |
| Mined Material: | Talc |
| Type of Mine: | Facility |
| Location: | Windsor County, VT |
| State: | VT |

**Operator History for Mine ID: 4300276**

| Operator Name | Begin Date | End Date |
|---|---|---|
| Luzenac America, Inc. | 7/1/1992 | |
| Cyprus Windsor Minerals Corp | 6/5/1989 | 6/30/1992 |
| Windsor Minerals Inc | Unknown | 6/4/1989 |

How do I use this information? *Click Here*

Asbestos fibers were detected in personal sampling of mill employees.

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/17/1979 | M - Bagging | Bagging Operator | Talc, nonfibrous, <1% Qtz | 6.65 | 20.00 | Y |
| ✱ 10/17/1979 | M - Bagging | Bagging Operator | Asbestos 2.0f/ml | 0.18 | 2.00 | Y |
| 10/17/1979 | M - General | Mechanic | Talc, nonfibrous, <1% Qtz | 6.80 | 20.00 | Y |
| ✱ 10/17/1979 | M - General | Mechanic | Asbestos 2.0f/ml | 0.09 | 2.00 | Y |
| 6/1/1978 | M - Bagging | Bagging Operator | Talc, nonfibrous, <1% Qtz | 9.50 | 20.00 | Y |
| 6/1/1978 | M - Bagging | Bagging Operator | Talc, nonfibrous, <1% Qtz | 9.30 | 20.00 | Y |

Gref.B-FIN01-000052

JA258

There is evidence from Johnson and Johnson documents that Vermont ores were contaminated with tremolite, in amounts less than 1%. This is comparable to the tremolitic contamination of the chrysotile ores mined to the north of Vermont in Quebec.

*The concentrations were low, and scientists eventually realized that concentration techniques were required to enable reliable detection of the tremolite contamination.*

Dr. Alice Blount wrote: 'Unfortunately, asbestos and amphiboles cannot be measured using currently developed methods to the level of 0.1% in the presence of talc. Some investigators have suggested that tremolite can be measured to that level by X-ray diffraction. But others have shown that the peak intensities vary between nonfibrous and fibrous tremolite so that the 0.1% level of detection and measurement is doubtful except in cases where the sample has been spiked so that the exact nature of the tremolite is known. For anthophyllite there is little argument about the fact that detection cannot be made to 0.1% However, the main problem with using X-ray diffraction for detection of amphibole minerals is that it gives no information about the shape of the particles, and shape is important in view of the uncertainty in the outcome of the asbestos regulation pertaining to nonfibrous amphiboles.' She went on to describe a heavy-liquid concentration method for tremolite and concluded:

'Finally, even in those cases where one may wish to use the standard 100 FOV count, the centrifuge method offers a way to screen samples between those times when a more lengthy count is made, and it permits a double check of values so determined. In addition, the tendency to bring down a disproportional number of larger particles has the advantage that ***with true asbestiform amphiboles one generally sees some particles showing bundles of fibrils which removes any doubt about the nature of the amphibole.***

Gref.B-FIN01-000053

COLORADO SCHOOL OF MINES RESEARCH INSTITUTE
P.O. Box 112
GOLDEN, COLORADO 80401

June 30, 1971

Mr. Wm. H. Ashton                              390517
Johnson & Johnson
Research Center
Research and Development
New Brunswick, New Jersey 08901

Dear Mr. Ashton:

Based upon x-ray diffraction and microscopical analyses of
the Vermont finished product plant run sample, 344-L, and
six monthly Vermont finished product samples only very trace
amounts of tremolite-actinolite were identified.

No other forms of nontalc minerals approaching asbestos
types were identified.

Sincerely,

M. G. Pattengill
Project Engineer

Page -54-

Gref.B-FIN01-000054

JA260



COLORADO SCHOOL OF MINES RESEARCH INSTITUTE
P.O. Box 112
Golden, Colorado 80401

July 7, 1971

Mr. Wm. H. Ashton                                                    390517
Johnson & Johnson
Research Center
Research and Development
New Brunswick, NJ 08901

Dear Mr. Ashton:

Following are the results of the x-ray analyses on the 344-L Vermont talc product and the six monthly Vermont talc product samples.

Summary and Conclusions

Semiquantitative x-ray diffraction analyses of the Vermont products and standard mineral samples indicate that essentially no anthophyllite and only minor amounts (below 1%), of tremolite and actinolite were detected. Other nontalc phases noted in the Vermont talc samples were small amounts of mica, chlorite, magnesite, dolomite, and minor to trace amounts of quartz.

**Finkelstein: Minor amounts of tremolite and actinolite means below 1%.**

Johnson&Johnson

New Brunswick, N.J.
July 29, 1971

Subject:  Talc/Asbestos

Mr. L. Foster

Please refer to your memo of July 26, 1971.

The talc used in JOHNSON'S Baby Powder is obtained from a selected mine in Vermont where the ore consists mainly of platy talc with only trace amounts of fibrous minerals (tremolite/actinolite). It is free of chrysotile fibers which may be called "pure asbestos" by the layman.

The ore undergoes a careful purifying process which includes a 36-step washing process to maximize its content of high lubricity platy talc and to remove or substantially reduce any traces of fibrous minerals which may be present in the unrefined ore. The resulting talc has been shown by three independent consulting laboratories* to contain negligible traces of fibrous minerals and no chrysotile fibers.

We will be receiving sometime next week a report from our consultant, Professor F. D. Pooley of the University College of Wales, Mineral Exploitation Section, Cardiff, Great Britain. He has completed an exhaustive examination of a sample of baby powder by electron microscopy and other sophisticated techniques. His oral report is that it contains no asbestos.

**1971**

**Finkelstein: The Vermont ore used for Johnson's Baby Powder contained trace amounts (<1%) of fibrous tremolite and actinolite.**

Page -55-

Gref.B-FIN01-000055

# JA261

**Memo (1973) : Re Pooley analysis and use of *concentration techniques*, which are 'much more sensitive'. Shows traces of tremolite.**

June 4, 1973

Talc

Mr. W. A. Ashton
Dr. R. A. Fuller
Dr. A. Goudie to Dr. E. Eolle
Dr. G. Hildick-Smith
Dr. J. Lord
Dr. W. Nashed
Dr. R. Petterson

Dr. Hildick-Smith and I met with our English cohorts to discuss the talc program. Much of the discussion is outlined in the attached report.

One important point which was covered was that the British Toilet Preparations Federation is drafting specifications for the analysis of 'asbestos' in talc. Their methods involve concentration techniques, and will therefore be much more sensitive than our propose specifications.

Apparently the Italian 00000 talc passes this test, and of course Vermont talc does too, for chrysotile. However, I expressed my concern that Vermont talc may occasionally show traces of tremolite by this procedure. I pointed out to Bob Dean that there was no specific evidence that traces of tremolite in talc posed any hazard, rather that the evidence indicated no toxic problem. Bob

**Finkelstein: Vermont talc shows traces of tremolite by concentration technique.**

New Brunswick, N.J.
May 16, 1973

**Subject:**

Dr. F. R. Rolle

I am going to England Friday, May 25.   I have been asked to
bring along our proposed specs for analyzing talc for "asbestos."

Please get me copies of all reports, correspondence, etc., that
are pertinent,   plus a cover memo outlining our recommendations.

England is considering method of preconcentrating the asbestos
so as to be able to analyze by X-ray.   They find no "asbestos"
by doing this with Italian talc.   They find (Pooley) 0.05% of a
tremolite-type in Vermont.

**Finkelstein: Using a concentration technique, Pooley finds 0.05% of tremolite asbestos in
Vermont talc.**

Gref.B-FIN01-000057

JA263

Memo (1992) concerning Cyprus Talc Deposits in Vermont

*R J Kentetter*

MAR 2 5 1992

## INTEROFFICE CORRESPONDENCE
### LOS ANGELES

TO            SEE DISTRIBUTION                    DATE   March 25, 1992

ATTENTION                                          L.A. FILE

FROM          R. C. MUNRO                          YOUR FILE

SUBJECT                                            COPIES TO

## CYPRUS ORE RESERVES - ARSENIC & TREMOLITE

*Excerpts from Cyprus Talc Reserve Report by R.C. Munro*

### Geology & Environment

There are some important environmental issues related to the geology and mineralogy of the Cyprus talc deposits, particularly in Vermont.

*Tremolite*

The other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of the amphibole minerals, tremolite and actinolite (hydrous calcium iron-magnesium silicates) which have been classified as asbestiform minerals by OSHA and EPA. OSHA was expected to de-classify non-fibrous (blocky) tremolite on February 29, but has not as yet announced their decision.

As a result, all tremolite, the fibrous varieties of all amphiboles and chrysotile asbestos in talc ores are a source of great concern to all talc producers and especially to marketers of cosmetic products.

Cyprus claims that there are no fibres in their cosmetic talc products and they work rigorously to ensure this. However, a recent paper published by Rutgers University worker, Alice Blount, suggests the presence of fibre in several cosmetic talcs, some of which might have been from Cyprus West Windsor material, which is a source of great concern to Cyprus management and potentially to their principal customer, Johnson & Johnson. Talc de Luzenac personnel are well aware of the situation and Phillipe Moreau is currently quietly working to identify the reality and the magnitude of the problem.

**This 1992 memo refers to the work of Alice Blount**

Page -58-

Gref.B-FIN01-000058

JA264

Blount (Blount 1991) identified asbestiform tremolite in Johnson Baby Powder *using a tremolite concentration technique* (see further on in my report).

*The Cyprus geologist saw tremolite in the deposits.*

Vermont talcs are derived from altered serpentine - a natural host for asbestiform minerals. There is certainly visible tremolite and actinolite in specific zones of the Vermont deposits - fibrous tremolite was identified by the writer in exposures and cores at the East Argonaut and Black Bear mines. Cyprus staff report past tremolite from the Hammondsvile and Clifton deposits.

Tremolite in these deposits is encountered in the contact zones between the talc and the surrounding schist; in "grey talcs" in the vicinity of the contacts; and associated with the chlorite/amphibole waste zones within the talc ores that are locally termed "cinders". Cyprus maintains a selective mining program in Vermont that is directed toward exclusion of all of these potentially fibre-bearing zones from the ores sent to the mills, and those suspect tonnages, including the associated talc, are left in the pit walls or sent to waste piles.

Gref.B-FIN01-000059

JA265

McCrone Analysis of Vermont Ore 1975

 walter c. mc crone associates, inc.

CONSULTING: ULTRAMICROANALYSIS · MICROSCOPY · SMALL PARTICLE PROBLEMS · SOLID-STATE CHEMISTRY

5 November 1975

Mr. Vernon Zeitz
Windsor Minerals Company
P. O. Box 680
Windsor, Vermont      05089

Dear Mr. Zeitz:

This letter will supplement our report of 1 July 1975 on a series of talc ore samples which we have analyzed for you. Table 1 shows the actual fiber counts and the approximate equivalent concentration in parts per million of the amphibole particles which we found in these samples. Some of them seemed rather high, one had 10 and one had 9 amphiboles. Most of these come in bundles of 1, 2 or 3 fibers with anywhere from 2-5 amphiboles in a bundle.

Table 1 follows on the next page. Note that "HC" designation is for ore for cosmetic production.

Page -60-

Gref.B-FIN01-000060

JA266

Table 1

| Sample Number | Date | | | Fibers of Asbestos | Fines PPM | SEDIMENT Number of Fibers | PPM |
|---|---|---|---|---|---|---|---|
| D-HC | 7/22/74 | – | 7/26/74 | | | 2 | 0.2 |
| D-GI | 7/15 | – | 7/29 | | | 0 | 0.0 |
| F-HC | 9/13 | – | 9/7 | | | 0 | 0.0 |
| H-WI | 9/16 | – | 9/23 | | | | |
| I-WI | 9/23 | – | 9/28 | | | 0 | 0.0 |
| P-GI | 10/28 | – | 11/1 | | | 4 amph. | 0.4 |
| Q-HC | 11/4 | – | 11/8 | | | | |
| U-HC | 12/2 | – | 12/6 | | | | |
| U-GI | 12/2 | – | 12/6 | 0 | 0.0 | 0 | 0.0 |
| V-WI | 12/9 | – | 12/20 | 0 | 0.0 | 0 | 0.0 |
| V-HC | 12/9 | – | 12/13 | 0 | 0.0 | 0 | 0.0 |
| V-GI | 12/9 | – | 12/16 | 2 amph. | 0.3 | | |
| W-HC | 12/16 | – | 12/20 | 0 | 0.0 | 0 | 0.0 |
| W-GI | 12/16 | – | 12/20 | 0 | 0.0 | 0 | 0.0 |
| X-HC | 12/26 | – | 12/28 | 2 amph. | 0.2 | 0 | 0.0 |
| Y-HC | 12/30 | – | 1/3/75 | 0 | 0.0 | 0 | 0.0 |
| Y-GI | 12/30 | – | 1/6/75 | 0 | 0.0 | 0 | 0.0 |
| Z-HC | 1/6/75 | – | 1/10/75 | 9 amph. | 2.0 | 4 amph. | 0.4 |
| Z-GI | 1/6 | – | 1/13 | 0 | 0.0 | 0 | 0.0 |
| A1-HC | 1/13 | – | 1/17 | 0 | 0.0 | | |
| B1-HC | 2/24 | – | 2/28 | 5 amph. | 1.5 | 0 | 0.0 |
| B1-WI | 2/24 | – | 3/7 | 0 | 0.0 | | |
| B1-GI | 2/24 | – | 3/3 | 0 | 0.0 | | |
| C1-HC | 3/3 | – | 3/7 | 0 | 0.0 | 0 | 0.0 |
| C1-GI | 3/3 | – | 3/10 | 6 amph. | 1.5 | | |
| D1-HC | 3/10 | – | 3/14 | 0 | 0.0 | 0 | 0.0 |
| D1-WI | 3/10 | – | 3/14 | 0 | 0.0 | | |
| D1-GI | 3/10 | – | 3/17 | 0 | 0.0 | 0 | 0.0 |
| E1-HC | 3/17 | – | 3/21 | 2 amph. | 0.2 | | |
| E1-WI | 3/14 | – | 3/21 | 0 | 0.0 | 2 amph. | 0.2 |
| E1-GI | 3/17 | – | 3/24 | 0 | 0.0 | 1 amph. | 0.1 |
| F1-HC | 3/24 | – | 3/29 | 10 amph. | 2.0 | | |
| F1-WI | 3/24 | – | 3/29 | 1 amph. / 1 antigorite | 0.1 / 0.1 | 0 | 0.0 |
| G1-HC | 3/31 | – | 4/4 | 0 | 0.0 | 0 | 0.0 |
| G1-WI | 3/31 | – | 4/4 | 1 amph. | 0.1 | | |
| H1-HC | 4/7 | – | 4/11 | 0 | 0.0 | | |
| H1-WI | 4/7 | – | 4/11 | 0 | 0.0 | 0 | 0.0 |

Page -61-

Gref.B-FIN01-000061

JA267

D: McCrone Analysis of Cyprus Windsor
      This plant processed Vermont talc

EPA LEVEL II TEM ANALYSIS

ME # 90009-1        McCRONE ID# _____

PROJECT      Cyprus Windsor
CLIENT ID    ICWA 90-28

| OBS | G/S | STRUCT | TYPE | LENGTH | WIDTH | # FIBERS | REP LENGTH | REP WIDTH | SAED | EDS | NOTES | |
|-----|-----|--------|------|--------|-------|----------|------------|-----------|------|-----|-------|---|
| 61 | S1 | | | | | | | | | | | 29,540 |
| | S2 | | | | | | | | | | | |
| | S3 | | | | | | | | | | | |
| | S4 | | | | | | | | | | | 5,400 |
| | S5 | | | | | | | | | | | |
| | S6 | 20.0 | AH/1.5 | 20.0 | 1.5 | | | | ✓ | ✓ | ANTHYPHyll/R2 | |
| | S7 | | | | | | | | | | | |

Finkelstein: The Vermont ore milled at Cyprus Windsor contained anthophyllite asbestos.
The anthophyllite fiber observed was 20 microns in length with an aspect ratio of 13.3.

Gref.B-FIN01-000062

JA268

**E: Measurement's by the Rutgers University Geologist Alice Blount (Blount, 1991)**

**E1: Letter from Alice Blount April 23, 1998**

"Although my papers report an improved method for analysis, the determinations for the sample labeled I (Johnson & Johnson's Vermont talc) have been done by the traditional methods as well (see Table 2, page 567 in the 1990 paper). As I told you, *I believe that Johnson & Johnson's Vermont talc contains trace amounts of asbestos which are well below those specified by OSHA*. It should be noted that the proposed FDA regulation. which was never finalized, also specified the same 0.1% limit for amphibole asbestos as OSHA."

Gref.B-FIN01-000063

JA269

Alice M. Blount, Ph.D.

Mineralogist

*GMW*

April 23, 1998

M. Raymond Hatcher
MEHAFFY & WEBER
2615 Calder Avenue
P.O. Box 16
Beaumont, Texas 77704

RECEIVED

APR 2 7 1998

MEHAFFY & WEBER
BEAUMONT, TEXAS

Dear Mr. Hatcher:

According to your letter of March 31, 1998, I have written and enclosed a report on the occurrence, regulation and up-to-date scientific view of asbestos, amphiboles and "intermediate" fibers. I have also enclosed copies of my 1990 and 1991 papers, one of which I am sure that you already have. The 1991 paper was written because I became aware that it was a common opinion among industrial hygienists that industrial talcs were better than pharmaceutical and cosmetic talcs because there was a regulation for the former and not for the latter. I knew that this was not the case and wanted to set the record straight.

Although my papers report an improved method for analysis, the determinations for the sample labeled *I* (Johnson & Johnson's Vermont talc) have been done by the traditional methods as well (see Table 2, page 567 in the 1990 paper). As I told you, I believe that Johnson & Johnson's Vermont talc contains trace amounts of asbestos which are well below those specified by OSHA. It should be noted that the proposed FDA regulation, which was never finalized, also specified the same 0.1% limit for amphibole asbestos as OSHA.

I may be away for short periods during the coming weeks, but I do check for messages on my work phone at the number you have been using.

Sincerely yours,

*Alice M. Blount*

Alice M. Blount, Ph.D.

Box 3437
Rutland, VT 05701
Phone: 802-747-4857

e-mail: amblount@together.net

Page -64-

Gref.B-FIN01-000064

JA270

**Table 1. Counts of regulatory fibers in processed talcs.**

| Sample | Counts, particles/mg | SD | Particle shapes | Particles/FOV[a] |
|--------|--------------------|-----|-----------------|------------------|
| A | 38 | 25 | Cleavages | 3/100 |
| B | ND[b] | | | 0/20 |
| C | ND | | | 0/20 |
| D | < 25[c] | | Cleavages | 0/20 |
| E | ND | | | 0/20 |
| F | ND | | | 0/20 |
| G | ND | | | 0/20 |
| H | 17 | 17 | Cleavages and needles | 2/20 |
| I | 226 | 59 | Needles and fibers | 17/20[d] |
| | 283 | 100 | Needles and fibers | 8/20 |
| | 291 | 98 | Needles and fibers | 9/20 |
| | 341 | 108 | Needles and fibers | 10/20 |
| | 102 | 51 | Needles and fibers | 3/20 |
| J | 25 | 14 | Cleavages | 1/20 |
| | 27 | 27 | Cleavages | 3/20 |
| K | 25 | 25 | Cleavages | 1/20 |
| L | < 10[c] | | Needles | 0/20 |
| M | 39 | 21 | Cleavages and fibers | 4/20 |
| N | 25 | 17 | Prismatic pieces | 3/20 |
| O | ND | | | 0/20 |

[a]FOV, fields of view.
[b]ND, none detected.
[c]No particles seen during a 20 FOV count, but some particles could be seen during a random scan of the filter. Value shown is the lower limit of detection.
[d]Large sample used for this analysis (305 mg).

Johnson Baby Powder was analyzed in 100 microscopic fields, in 5 groups. The counts ranged from 102-341 particles/mg, averaging 250 particles/mg. Blount wrote that 'The FDA has equated 0.1% with 1000 particles per milligram.' 250 particles/mg is thus equivalent to 0.025%. This might be compared with Millette's finding of Tremolite in the Canadian chrysotile from Black Lake, Quebec at a weight percent level of 0.0094%. As will be seen below, Longo measured 445,000 tremolite fibers per gram in a 1993 sample of Johnson's Baby Powder. The FDA has equated 0.1% with 1000 particles per milligram.' 450,000 fibers / gm = 450 particles/mg is thus equivalent to 0.045%.

Gref.B-FIN01-000065

JA271



FIGURE 5.   Particle of amphibole in centrifuged sample *I*. Width of view 0.07 mm and 1.584 refractive index liquid. Particle is on a membrane filter.

Gref.B-FIN01-000066

JA272



FIGURE 6.  Percent amphiboles in each aspect ratio group for talc sample *I* (left) and *M* (right) compared with tremolite asbestos (*7*) and tremolite (nonasbestiform) (*7*).



FIGURE 42. - Frequency polygons for the aspect ratios of tremolite and tremolite asbestos. Page -67-

Figure 6 shows distribution of aspect ratios for asbestiform (left) versus non-asbestiform tremolite.

As a reminder, here is the figure from the Bureau of Mines.

The similarity of Blount's analysis of the Aspect Ratios of Talc I to the Bureau of Mines Aspect Ratio distribution for tremolite asbestos is striking.

I

Gref.B-FIN01-000067

JA273

**Summary concerning Vermont Ore:  The MSHA measured asbestos in personal sampling of Luzenac mill workers. Pooley and Blount detected fibrous tremolite using concentration techniques. Without using a concentration technique, McCrone reported amphibole fibers in Vermont ore.**

**Comparison with the Detection of Tremolite in Canadian Chrysotile Asbestos**

Millette conducted an analysis for tremolite as a contaminant of Quebec chrysotile (Millette et al. 2009). Millette wrote 'The analysis for low levels of amphibole fibers in chrysotile-containing samples *requires that samples be prepared in a way that concentrates the amphibole fibers so they may be detected among the more voluminous chrysotile fibers.*\* For example, a sample in which tremolite is present at the 0.01% level in the overall sample where chrysotile is nearly 100%, there will be over 10,000 chrysotile fibers for every tremolite fiber. Eliminating the chrysotile fibers will result in the concentration and detection of very small amounts of tremolite.' This is the same problem faced by analysts examining talc for the presence of tremolite. Millette used an acid digestion technique to eliminate the chrysotile; Pooley and Blount used tremolite concentration methods.

The Canadian chrysotile asbestos sample was collected from a bag of asbestos labeled "5R-4 Asbestos, Black Lake, Quebec, Canada." Tremolite was found in the Canadian chrysotile from Black Lake, Quebec at a weight percent level of 0.0094%. The single fiber analytical sensitivity was 0.0000003%. No amphibole fibers were found in the laboratory blank.  Pooley (above) found 0.05% tremolite asbestos in the Vermont sample.

*\* Finkelstein: The analogous situation with talc concerns detection of the amphibole fibers among the more voluminous talc particles and fibers.*



**Example of TEM micrograph of a talc sample.**

Page -68-

Gref.B-FIN01-000068

JA274

**F. Recent Analyses of Bulk Samples from the Argonaut Mine**

**1. Investigation of Vermont Talc Samples for Asbestos: MVA 12588 April 23/18**

Dr. Stephen Compton analyzed samples from the Argonaut Mine collected by Dr. Mickey Gunter.

"This report presents the results of an investigation of fifteen talc/mineral samples for asbestos. The fifteen samples were initially collected by Mickey Gunter from the Argonaut mine in Vermont. The samples were transferred to R.J. Lee Group (RJLG) before they were received onsite at the RJLG facility by Matthew Underwood of MVA. It was requested that we investigate the bulk mineral samples for the presence of asbestos fibers. The analyses of the fifteen mineral samples were performed during the period of 30 March to 20 April 2018."

**Dr. Compton's Methodology**

After visual examination and labeling with an MVA sample number, each sample received was photographed using a Nikon D60 DSLR camera (Figures 1 through 15). Mineral particulate was extracted from powdered samples (AD0534 and AD0535) directly via a stainless steel laboratory spatula. Mineral particulate was extracted from aggregate samples (AD0536 through AD0548) using a new stainless steel razor blade to shave representative particulate from each aggregate. A representative portion of each sample was weighed, suspended in filtered deioniser water, and a known aliquot was extracted and filtered through a 0.4 micrometer pore size membrane filter. Each filter was dried and grids prepared following standard direct preparation procedures for analysis by transmission electron microscopy (TEM). The grids were examined using a Philips EM 420 TEM equipped with a Therm Scientific Noran System 7 energy dispersive spectroscopy (EDS) x-ray analysis system capable of selected area electron diffraction (SAED).

Talc fibers were not counted, but were discounted after confirming their identity by elemental composition and observation of a pseudohexagonal diffraction pattern, consistent with the reported literature. Anthophyllite, tremolite, and actinolite fibers were designated as such based on their elemental composition and linear repeating diffraction patterns. When possible, a zone axis pattern was indexed to confirm the mineral identity for anthophyllite. For each prepared sample, a laboratory blank sample was prepared following all of the same procedures except for the addition of test material. The TEM results for asbestos are given in terms of percent by weight and structures per gram.

**Results and Discussion**

"During the TEM examination, numerous platy and fibrous talc particles were observed. In addition to talc, several samples contained one or more fibers of anthophyllite. One sample,

Page -69-

Gref.B-FIN01-000069

USCA4 Appeal: 23-1972    Doc: 26-1    Filed: 12/20/2023    Pg: 286 of 599

Case 4:22-mc-00001-AWA-DEM   Document 4-9   Filed 12/02/22   Page 71 of 293 PageID# 381

AD0548, also contained a great number of tremolite and actinolite fibers. In five samples, no asbestos was detected. Analytical sensitivities for these five samples range from approximately 5 to 7 million fibers per gram. Additional material may be analyzed for increased sensitivity, if desired."

**Conclusions**

"Amphibole fibers were detected in ten of the fifteen samples analyzed for this report. Aside from the talc itself, the primary fibrous contaminants in the sample set are anthophyllite and, in one sample, tremolite/actinolite. The asbestos content of samples found to contain amphibole fibers range from approximately 1.2 to 2,600 million fibers per gram. After estimating the mass of the fibers, this corresponds to a quantity ranging from 0.00009% to 4.5% by weight.

Fiber release studies of consumer talc products within this range documented elevated concentrations of airborne asbestos fibers during use of those products. It is expected that aerosolization of these samples or any powder consumer product containing these samples as a constituent ingredient would likewise result in elevated concentrations of airborne asbestos fibers."

Page -70-

Gref.B-FIN01-000070

JA276

Table 1.  Summary of **TEM** Bulk Sample Analytical Results

| MVA Sample ID | Client Sample ID/Description | TEM Analysis Results | | |
|---|---|---|---|---|
| | | Fibers Confirmed | % Wt Asbestos | [Million Fibers Per Gram] |
| AD0534 | USA VT Argonaut BB (From Buzon) | 2 | 0.0124 | 15.3 |
| AD0535 | USA VT Argonaut Underflow (From Buzon) | 1 | 0.00077 | 1.35 |
| AD0536 | USA VT Argonaut LG (From Buzon) | 1 | 0.00009 | 1.16 |
| AD0537 | USA VT Argonaut XST (From Buzon) | NAD | $(3 \times 10^{-7})$ | (4.64) |
| AD0538 | USA VT Argonaut R (From Buzon) | 3 | 0.0040 | 3.80 |
| AD0539 | USA VT Argonaut G (From Buzon) | 3 | 0.0001 | 3.96 |
| AD0540 | USA VT Argonaut HG (From Buzon) | 1 | 0.00002 | 6.07 |
| AD0541 | USA VT Argonaut Serp | 2 | 0.00023 | 12.0 |
| AD0542 | USA VT Argonaut CRX | NAD | $(4 \times 10^{-7})$ | (5.03) |
| AD0543 | USA VT Argonaut Drill | NAD | $(5 \times 10^{-7})$ | (7.34) |
| AD0544 | USA VT Argonaut (Talc Bench Rust) | 1 | 0.00028 | 1.46 |
| AD0545 | USA VT Argonaut BW | NAD | $(5 \times 10^{-7})$ | (7.27) |
| AD0546 | USA VT Argonaut MG | NAD | $(4 \times 10^{-7})$ | (4.82) |
| AD0547 | USA VT Argonaut (Talc Bench Gray) | 3 | 0.00046 | 4.38 |
| AD0548 | USA VT Argonaut Amp | 104 | 4.46 | 2,585 |

NAD - No Asbestos (Structures) Detected (Analytical Sensitivity)

Gref.B-FIN01-000071

The Tables of the report present the dimensions of the fibers counted by Dr Compton.

## Table 2.  Fibers Detected During Examination of Bulk Sample AD0534

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 1 | 15.1 | 0.67 | 23 | Anthophyllite |
| 2 | 1.7 | 0.14 | 12 | Anthophyllite |

## Table 3.  Fibers Detected During Examination of Bulk Sample AD0535

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 1 | 7.3 | 0.58 | 13 | Anthophyllite |

## Table 4.  Fibers Detected During Examination of Bulk Sample AD0536

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 1 | 4.6 | 0.26 | 18 | Anthophyllite |

## Table 5.  Fibers Detected During Examination of Bulk Sample AD0538

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 1 | 4.2 | 0.38 | 11 | Anthophyllite |
| 2 | 10.4 | 1.11 | 9 | Anthophyllite |
| 3 | 1.2 | 0.14 | 9 | Anthophyllite |

Gref.B-FIN01-000072

JA278

**Table 6.  Fibers Detected During Examination of Bulk Sample AD0539**

| Str. # | Length µm | Width µm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 4.4 | 0.14 | 31 | Anthophyllite |
| 2 | 4.2 | 0.19 | 22 | Anthophyllite |
| 3 | 5.0 | 0.14 | 36 | Anthophyllite |

**Table 7.  Fibers Detected During Examination of Bulk Sample AD0540**

| Str. # | Length µm | Width µm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 1.3 | 0.10 | 13 | Anthophyllite |

Gref.B-FIN01-000073

JA279

Table 8.  Fibers Detected During Examination of Bulk Sample AD0541

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 2.0 | 0.14 | 14 | Anthophyllite |
| 2 | 2.2 | 0.24 | 9 | Anthophyllite |

Table 9.  Fibers Detected During Examination of Bulk Sample AD0544

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 14.3 | 0.24 | 60 | Anthophyllite |

Table 10.  Fibers Detected During Examination of Bulk Sample AD0547

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|--------|-----------|----------|--------------|------|
| 1 | 11.6 | 0.29 | 40 | Anthophyllite |
| 2 | 4.1 | 0.14 | 29 | Anthophyllite |
| 3 | 5.1 | 0.24 | 21 | Anthophyllite |

Gref.B-FIN01-000074

JA280

Table 11.  Fibers Detected During Examination of Bulk Sample AD0548

| Str. # | Length µm | Width µm | Aspect Ratio | Type |
|---|---|---|---|---|
| 1 | 2.2 | 0.10 | 22 | Tremolite |
| 2 | 1.6 | 0.29 | 6 | Tremolite |
| 3 | 1.5 | 0.24 | 6 | Tremolite |
| 4 | 2.0 | 0.24 | 8 | Tremolite |
| 5 | 2.1 | 0.10 | 21 | Tremolite |
| 6 | 1.5 | 0.24 | 6 | Tremolite |
| 7 | 2.5 | 0.34 | 7 | Tremolite |
| 8 | 2.6 | 0.29 | 9 | Tremolite |
| 9 | 1.3 | 0.05 | 26 | Tremolite |
| 10 | 1.0 | 0.05 | 20 | Tremolite |
| 11 | 2.3 | 0.14 | 16 | Tremolite |
| 12 | 1.5 | 0.29 | 5 | Tremolite |
| 13 | 1.3 | 0.24 | 5 | Tremolite |
| 14 | 4.0 | 0.24 | 17 | Tremolite |
| 15 | 1.4 | 0.19 | 7 | Actinolite |
| 16 | 2.5 | 0.24 | 10 | Tremolite |
| 17 | 2.5 | 0.48 | 5 | Tremolite |
| 18 | 1.5 | 0.24 | 6 | Tremolite |
| 19 | 1.5 | 0.10 | 15 | Tremolite |
| 20 | 2.1 | 0.34 | 6 | Tremolite |
| 21 | 1.3 | 0.05 | 26 | Tremolite |
| 22 | 3.7 | 0.29 | 13 | Tremolite |
| 23 | 1.4 | 0.10 | 14 | Anthophyllite |
| 24 | 2.2 | 0.24 | 9 | Tremolite |
| 25 | 1.7 | 0.14 | 12 | Tremolite |
| 26 | 1.2 | 0.10 | 12 | Tremolite |
| 27 | 4.1 | 0.19 | 22 | Tremolite |
| 28 | 1.1 | 0.10 | 11 | Tremolite |
| 29 | 2.7 | 0.10 | 27 | Actinolite |
| 30 | 6.6 | 1.01 | 7 | Tremolite |
| 31 | 2.5 | 0.29 | 9 | Tremolite |
| 32 | 1.8 | 0.19 | 9 | Tremolite |
| 33 | 1.9 | 0.19 | 10 | Actinolite |
| 34 | 2.0 | 0.38 | 5 | Tremolite |
| 35 | 1.4 | 0.05 | 28 | Tremolite |
| 36 | 2.6 | 0.19 | 14 | Tremolite |
| 37 | 1.9 | 0.19 | 10 | Tremolite |
| 38 | 2.5 | 0.34 | 7 | Tremolite |
| 39 | 1.3 | 0.24 | 5 | Tremolite |
| 40 | 1.1 | 0.10 | 11 | Tremolite |

Gref.B-FIN01-000075

JA281

Table 11 (cont'd). Fibers Detected During Examination of Bulk Sam

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 41 | 2.6 | 0.34 | 8 | Tremolite |
| 42 | 1.9 | 0.19 | 10 | Actinolite |
| 43 | 1.6 | 0.29 | 6 | Tremolite |
| 44 | 2.5 | 0.38 | 7 | Tremolite |
| 45 | 1.4 | 0.24 | 6 | Tremolite |
| 46 | 27.9 | 1.35 | 21 | Tremolite |
| 47 | 4.4 | 0.43 | 10 | Tremolite |
| 48 | 2.0 | 0.29 | 7 | Tremolite |
| 49 | 2.1 | 0.10 | 21 | Tremolite |
| 50 | 0.5 | 0.10 | 5 | Tremolite |
| 51 | 1.4 | 0.19 | 7 | Actinolite |
| 52 | 1.3 | 0.14 | 9 | Tremolite |
| 53 | 3.4 | 0.38 | 9 | Tremolite |
| 54 | 24.7 | 4.33 | 6 | Tremolite |
| 55 | 2.1 | 0.24 | 9 | Actinolite |
| 56 | 1.4 | 0.24 | 6 | Tremolite |
| 57 | 1.1 | 0.10 | 11 | Tremolite |
| 58 | 1.0 | 0.10 | 10 | Tremolite |
| 59 | 3.4 | 0.48 | 7 | Actinolite |
| 60 | 2.8 | 0.10 | 28 | Tremolite |
| 61 | 0.9 | 0.10 | 9 | Tremolite |
| 62 | 2.8 | 0.38 | 7 | Tremolite |
| 63 | 0.9 | 0.14 | 6 | Tremolite |
| 64 | 1.0 | 0.19 | 5 | Tremolite |
| 65 | 1.2 | 0.24 | 5 | Tremolite |
| 66 | 1.5 | 0.24 | 6 | Tremolite |
| 67 | 3.6 | 0.58 | 6 | Tremolite |
| 68 | 4.4 | 0.87 | 5 | Actinolite |
| 69 | 0.9 | 0.14 | 6 | Tremolite |
| 70 | 33.7 | 2.21 | 15 | Tremolite |
| 71 | 1.0 | 0.19 | 5 | Tremolite |
| 72 | 7.8 | 1.11 | 7 | Tremolite |
| 73 | 0.9 | 0.14 | 6 | Tremolite |
| 74 | 1.0 | 0.10 | 10 | Tremolite |
| 75 | 0.8 | 0.14 | 6 | Actinolite |
| 76 | 1.3 | 0.10 | 13 | Tremolite |
| 77 | 1.3 | 0.24 | 5 | Tremolite |
| 78 | 8.3 | 0.91 | 9 | Tremolite |
| 79 | 1.3 | 0.17 | 8 | Actinolite |
| 80 | 1.4 | 0.10 | 14 | Tremolite |

Page -76-

Gref.B-FIN01-000076

JA282

Table 11 (cont'd).  Fibers Detected During Examination of Bulk Sample AD0548

| Str. # | Length μm | Width μm | Aspect Ratio | Type |
|---|---|---|---|---|
| 81 | 0.7 | 0.10 | 7 | Tremolite |
| 82 | 1.4 | 0.14 | 10 | Tremolite |
| 83 | 1.2 | 0.14 | 9 | Tremolite |
| 84 | 1.0 | 0.19 | 5 | Actinolite |
| 85 | 9.1 | 1.39 | 7 | Tremolite |
| 86 | 1.4 | 0.24 | 6 | Actinolite |
| 87 | 1.5 | 0.24 | 6 | Tremolite |
| 88 | 0.6 | 0.10 | 6 | Tremolite |
| 89 | 3.5 | 0.19 | 18 | Tremolite |
| 90 | 8.7 | 1.49 | 6 | Tremolite |
| 91 | 8.3 | 1.01 | 8 | Tremolite |
| 92 | 2.5 | 0.29 | 9 | Tremolite |
| 93 | 1.3 | 0.14 | 9 | Tremolite |
| 94 | 0.8 | 0.14 | 6 | Tremolite |
| 95 | 2.6 | 0.43 | 6 | Tremolite |
| 96 | 3.9 | 0.24 | 16 | Actinolite |
| 97 | 2.0 | 0.24 | 8 | Tremolite |
| 98 | 1.8 | 0.14 | 13 | Tremolite |
| 99 | 0.7 | 0.10 | 7 | Tremolite |
| 100 | 1.4 | 0.14 | 10 | Actinolite |
| 101 | 3.5 | 0.58 | 6 | Tremolite |
| 102 | 1.1 | 0.10 | 11 | Tremolite |
| 103 | 2.3 | 0.19 | 12 | Tremolite |
| 104 | 1.8 | 0.19 | 9 | Tremolite |

Figure 16, below, shows representative images of the anthophyllite fibers and bundles detected by Dr Compton.

Gref.B-FIN01-000077

JA283



**Figure 16.** TEM images of representative anthophyllite fibers and bundles detected during examination of the Vermont talc sample set.

As shown on the next page, the wider particles were often identified as bundles.

Page -78-

Gref.B-FIN01-000078

**MVA SCIENTIFIC CONSULTANTS**
**Bulk Sample Analysis Sheet**

MVA Project# 12588    Amount Collected(g): 0.04366g    Analyst: MRU

MVA Sample# AD0547    Grid Opening (mm2): 0.01    Date: 4/5/2018 – 4/19/2018

Client I.D.: 3149113    Filter Area (mm2): 1256    Page: 1 of 2

Instrument: Philips EM420    Filter Type: PC    Comments: 5ml aliquot 003G18

Magnification: 20,800    Openings Analyzed: 40    Method: ISO 10312   X

Acc. Voltage: 100kV    Level of Analysis: N/A   (C)    or   ASTM D6281

Level of Analysis: AZZQ   (A)

| Grid | Opening | Number of Structures Primary | Total | Class | Structure Type | Length* (cm) | Width* (cm) | Comments | Length** (µm) | Width** (µm) |
|------|---------|---------|-------|-------|-----------|--------|-------|----------|--------|-------|
| A5 | C3-3 | NSD | | | | | | | | |
| | E4-3 | NSD | | | | | | | | |
| | F5-1 | NSD | | | | | | | | |
| | G6-1 | 1 | 1 | AZZQ | B | 24.1 | 0.60 | Anthophyllite | 11.6 | 0.29 |
| | H5-6 | NSD | | | | | | | | |
| | K4-3 | NSD | | | | | | | | |
| | H3-6 | NSD | | | | | | | | |
| | G2-3 | NSD | | | | | | | | |
| | F3-3 | NSD | | | | | | | | |
| | E2-6 | NSD | | | | | | | | |
| B5 | B4-6 | NSD | | | | | | | | |
| | C3-3 | NSD | | | | | | | | |
| | E4-6 | NSD | | | | | | | | |
| | F5-6 | 2 | 2 | AZQ | F | 8.6 | 0.30 | Anthophyllite | 4.1 | 0.14 |
| | G6-6 | NSD | | | | | | | | |
| | H5-1 | NSD | | | | | | | | |
| | K4-3 | NSD | | | | | | | | |
| | H3-4 | NSD | | | | | | | | |
| | G2-3 | NSD | | | | | | | | |
| | F3-1 | NSD | | | | | | | | |
| | | ~~ Began analyzing additional 20 GO's on 4/19/18 ~~ | | | | | | | | |
| A5 | K5-1 | NSD | | | | | | | | |
| | H4-4 | NSD | | | | | | | | |
| | G5-6 | 3 | 3 | ADQ | B | 10.6 | 0.50 | Anthophyllite | 5.1 | 0.24 |
| | F4-3 | NSD | | | | | | | | |

Page -79-

Gref.B-FIN01-000079

JA285

The chart below shows the distribution of lengths and widths of the anthophyllite particles.





Gref.B-FIN01-000080

JA286

and, the distribution of Aspect Ratios.



and, finally, the relation between width and Aspect Ratio.



Page -81-

Gref.B-FIN01-000081

JA287

We see that both by Harper's, Wylie's, and Lee's size criteria, and those of the Bureau of Mines, these anthophyllite particles would be classified as asbestos.

**Analyses of the Vermont Ore Samples by the RJ Lee Group.**

These samples were also analysed by the RJ Lee Group (Project Number: LLH802394). They reported that they detected no asbestiform amphiboles.

"RJ Lee Group (RJLG) has completed our analysis of the fifteen (15) samples collected by Professor Mickey Gunter from the Argonaut Mine. No asbestos was observed in any of the talc samples. In two non-talc samples composed of primarily serpentine group minerals a trace quantity of chrysotile was observed by TEM. No asbestiform amphiboles were observed in any sample. Non-asbestiform tremolite-actinolite amphibole was the primary component of sample 3149114 which is also not a talc sample."

"A portion of each sample was first examined then ground into a powder. The remainder of the samples were then sealed and placed in storage. The samples were examined using three analytical procedures, X-ray powder diffraction (XRD), polarized light microscopy (PLM), and transmission electron microscopy (TEM)."

"Finally, TEM was conducted in accordance with the EPA Level III protocol (Method for the Measurement of Airborne Asbestos by Electron Microscopy, Contract No. 68-02-3266) and the analytical portions of ASTM D5756 (Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Mass Loading)."

Analytical Results

The XRD scans are summarized in Table 1 and the individual scans with results are attached in the XRD Analytical Report in Appendix B. Four samples contained serpentine group minerals and subsequent PLM analyses determined the serpentine to be consistent with lizardite/antigorite. Two of these samples represent ore grade material (3149100 and 3149101). The final two samples were serpentinite (non-talc ore) and contained trace quantities of chrysotile by TEM.

"The PLM results are summarized in Table 2 as well as the attached analytical report with bench sheets (Appendix C). Table 3 provides the optical properties of the observed non-asbestiform amphibole identified as actinolite by optical properties. Four samples contained serpentine group minerals, these are 3149100, 3149101, 3149107, and 3149109. In each sample massive serpentine was observed by PLM. Images of the serpentine in these samples are provided in Figure 2. Sample 3149114 contained non-asbestiform amphibole with some talc replacement of the original amphibole phase. Select grains were also mounted and the optical properties were measured using

Page -82-

Gref.B-FIN01-000082

**JA288**

spindle stage techniques. Images of mounted grains are shown in Figure 3 illustrating the non-asbestiform nature of these amphiboles. Figure 4 is a grain mount overview of sample 3149114, note the presence of talc fiber as replacement of the original nonasbestiform amphibole. None of the ore or talc samples contained any chrysotile or amphibole minerals."

**3) Luzenac Analyses of the Argonaut Mine**

Analysts at Luzenac America analyzed samples of waste rock from the Argonaut Mine and reported fibrous tremolite.

**Request:**

A sample of fibrous material from the waste rock on the west side of the south end of the Argonaut mine was submitted to the Technical Center for identification.  The waste rock was being considered for road paving applications.

**Results:**

**The fibrous material is tremolite.**

The material was first examined by polarizing light microscopy, using the dispersion staining technique. Tremolite was preliminarily identified by this method.

From:    **Julie Pier**
         **Analytical and Technical Support**

Copy:    **J. M. Godla**
         **S. S. Mauney**
         **R. J. Zazenski**

Subject:    **ANALYSIS OF FIBROUS MATERIAL FROM ARGONAUT**
            **WASTE ROCK**

Gref.B-FIN01-000083

**JA289**

**Request:**

A sample of fibrous material from the waste rock on the west side of the south end of the Argonaut mine was submitted to the Technical Center for identification. The waste rock was being considered for road paving applications.

**Results:**

**The fibrous material is tremolite.**

The material was first examined by polarizing light microscopy, using the dispersion staining technique. Tremolite was preliminarily identified by this method.

Subsequent analysis by scanning electron microscopy (SEM) and transmission electron microscopy (TEM) confirmed the tremolite identification. SEM micrographs and chemical analysis by energy dispersive X-ray spectroscopy (EDS) are included in Plate 1.



**ANALYSIS OF FIBROUS MATERIAL**
**FROM ARGONAUT WASTE ROCK**
Project No.  A01709

Plate 1

**LUZENAC AMERICA TECHNICAL CENTER**
23-May-02
J.W. Pier



*SEM IMAGE*
Fibrous material found in Argonaut waste rock identified as tremolite. The material clearly has an extremely high aspect ratio.

Page -84-

Gref.B-FIN01-000084

JA290

**Finkelstein Conclusions About Amphibole Contamination of the Source Mines**

Amphibole particles have been found in ores from Italian and Vermont mines.

The MSHA measured asbestos in personal sampling of Luzenac Vermont mill workers. Pooley and Blount detected fibrous tremolite using concentration techniques. Without using a concentration technique, McCrone reported amphibole fibers in Vermont ore. Compton detected amphibole fibers in ten of the fifteen samples analysed for his report. Aside from the talc itself, the primary fibrous contaminants in the sample set are anthophyllite and, in one sample, tremolite/actinolite. The RJ Lee Group identified no fibrous amphiboles in samples of the same ores analysed by Compton. Analysts at Luzenac America analysed samples of waste rock from the Argonaut Mine and reported fibrous tremolite.

The RJ Lee group used a method for the evaluation of asbestos in airborne samples. As Yamate wrote:

**APPLICATION TO NONAIRBORNE SOURCES**

```
    Although the methodology has been developed for airborne asbestos, other
types of samples from different sources can be analyzed if the samples are
finely divided and placed with proper loading and uniform distribution either
on a polycarbonate membrane filter or on a carbon-coated EM grid. Of course,
the limitations of the collection and preparation steps must be known and
accounted for to prevent inaccuracies in comparing results.
```

Gref.B-FIN01-000085

## ORDER OF ANALYSIS

The order of analysis is (1) field blanks, (2) laboratory blanks (if needed), and (3) field samples.

## COLLECTION AND REPORTING

The counting rule, "minimum 100 fibrous structures per known area (complete grid opening) or 10 grid openings, whichever is first," is a minimum rule for cost limitation. For very low asbestos presence, or for asbestos contamination studies, where particulate loading is high and asbestos presence very low, counting 20 grid openings from each of 2 grids (10 per grid) is recommended.

The EM magnification factor is very high or, conversely, the area of deposit examined is very small. Therefore, although the electron microscopist may report a zero count, the notation "Below Detectable Level" is more appropriate in the sample report. Along the same lines, the electron microscopist

The RJ Lee group counted 10 or 25 grid openings.

Note Yamate's comment: Below Detection Limit more appropriate than a zero count.

(7) Since asbestos fibers are found isolated as well as with each other or with other particles in varying arrangements, the fibrous particulates are characterized as asbestos structures:

Fiber (F) is a particle with an aspect ratio of 3:1 or greater, with substantially parallel sides.

Bundle (B) is a particulate composed of fibers in a parallel arrangement, with each fiber closer than the diameter of one fiber.

Cluster (Cl) is a particulate with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group.

Compton measured fibers and bundles.

Page -86-

Gref.B-FIN01-000086

JA292

1. The MSHA measured asbestos in personal sampling of Luzenac Vermont mill workers.

2. Pooley and Blount detected fibrous tremolite using concentration techniques.

3. Without using a concentration technique, McCrone reported amphibole fibers in Vermont ore.

4. Compton detected amphibole fibers in ten of the fifteen samples analysed for his report. Aside from the talc itself, the primary fibrous contaminants in the sample set are anthophyllite and, in one sample, tremolite/actinolite.

5. Luzenac analysts identified fibrous tremolite in Argonaut rock.

6. The RJ Lee Group identified no fibrous amphiboles in samples of the same ores analyzed by Compton and Luzenac analysts.

RJ Lee is thus an outlier. I am unable to account for the discrepancies among the analysts.

Page -87-

Gref.B-FIN01-000087

JA293

### III: Studies of Asbestos Content of Consumer Talcum Products

#### 1. (Rohl and Langer: in Dusts and Diseases 1979)

#### Consumer Talcums and Powders

'In a paper published in 1976, we reported a mineral and chemical characterization of 20 consumer talcums and powders obtained in New York city during the period 1971-1975 (Rohl et al., 1976). Where known, all were formulated prior to 1973. Of the twenty products, 10 contained either tremolite or anthophyllite or both. The proportions, determined by step-scan x-ray diffraction ranged from 0.1% to over 14%, by weight. No attempt was made to distinguish proportions of fibrous and non-fibrous morphological phases, although every sample contained fiber. Two contained detectable amounts of chrysotile. The presence of these minerals in fibrous form was verified by electron beam techniques.



FIGURE 1. Electron photomicrograph of amphibole fibers in cosmetic talcum powder. x25,000

Gref.B-FIN01-000088



FIGURE 2. Electron photomicrograph of amphibole fibers in cosmetic talcum powder, x52,000 magnification.

Gref.B-FIN01-000089

JA295

### 2. The Study of Consumer Talcum and Powders by Rohl, Langer and Colleagues (1976)

J Toxicol Environ Health. 1976 Nov;2(2):255-84.

Consumer talcums and powders: mineral and chemical characterization.

Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R, Bowes DR, Skinner DL.

Abstract

Representative consumer talcums and powders, including 20 body powders, baby powders, facial talcums, and also one pharmaceutical talc, were analyzed to determine their mineralogical and chemical composition. Where known, all were formulated prior to 1973. Of the 20 products 10 contained detectable amounts of tremolite and anthophyllite, principally asbestiform, while some also contained fragmented forms of these minerals. The amounts ranged from tenths of a percent to over 14% by weight; two contained detectable amounts of chrysotile asbestos fiber. Eight contained quartz, seven ranging from 2 to 5%, with one as high as 35%. The analyses showed that the consumer products examined were rarely the pure mineral talc, but rather were mixtures of various minerals; some samples consisted of three to five minerals, only one of which was talc. Other common mineral phases included chlorite, platy serpentine, pyrophyllitem mica, and carbonate minerals. Kaolin additive was identified in two products. The single pharmaceutical talc examined contained only a trace amount of quartz. The chemical composition of these products, including both major oxide and trace element content, correlated with their mineral components. Four samples contained substantial concentrations of nickel, cobalt, and chromium, suggesting latice substitution or the presence of trace mineral phases. Geological provenance of the talcs may be ascertained on the basis of chemistry. Possible adverse health effects from intermittent use of these products, especially those that contain asbestiform and fragmented anthophyllite and tremolite, chrysotile, quartz, and trace metals, are presently unknown and warrant evaluation.

### A. Methodology and Results of Mineral and Chemical Characterization

The analytical techniques employed for mineral identification and quantification included optical microscopy, transmission electron microscopy with selected area electron diffraction, X-ray diffraction, and scanning electron microscopy with X-ray analysis capabilities.

### A1. Optical Microscopy

Optical microscopy is a conventional technique for the identification of minerals and for the study of mineral relationships. A microscope equipped with bright field illumination and polarized light optics was used to analyze the cosmetic powders. Approximately 0.5 mg of powder was placed on

Gref.B-FIN01-000090

JA296

a precleaned glass slide and immersed in index oils of known refractive indices. These were checked on a refractometer. The information obtained on particles with this method included most of the measurable optical properties, including indices of refraction, extinction angles of fibers, general morphology, and size characteristics of mineral phases. In coarse-grained powders, fibers could be identified {tremolite, anthophyllite, talc}. Two samples contained cornstarch, easily recognized by morphological and optical characteristics. One product consisted entirely of cornstarch.

In most samples, however, the powders were too fine grained, with particle dimensions significantly less than 1.0 µm, for the technique to be useful. The limiting factor for determination of optical constants, and hence for identification of particles, is the resolving power of the microscope. The presence of talc fibers, which may have indices of refraction similar to amphibole (tremolite, anthophyllite) fibers, also confounds analysis. Therefore, although this technique is an excellent diagnostic instrument in some instances these restrictions limited its usefulness. Optical microscopy while it works well on pure samples of fairly massive fiber length from 3 to 5 microns, our observations by transmission electron microscopy have shown that naturally occurring asbestiform minerals often lie below the working resolution capabilities of the light microscope and furthermore while massive fiber bundles can often be observed by either light or electron microscopy the observation of individual fibers smaller than 0.5 by 0.2 micrometers often will require the high resolution capability of the transmission electron microscope

*By comparing the results of optical microscopy with those of quantitative X-ray diffraction and electron microscopy, we observed that large numbers of fibers go undetected.* In addition to the restraints of resolution imposed by light microscopy, another major drawback relates to the strong tendency of asbestiform minerals to cleave or break along planes of weakness when they are crushed, producing large numbers of small fibers. For example, light microscopic examination of a talc sample which contains over 7% tremolite demonstrates the presence of mineral fragments that are primarily not asbestiform.  However, electron microscopic examination of the same sample demonstrates that many of the submicroscopic tremolite particles are fibrous. Basically, the large fibers are broken during milling yielding a new size distribution in the submicroscopic range.

Gref.B-FIN01-000091

JA297



**FIGURE 3.** Transmission electron micrographs showing range in morphological characteristics of asbestiform tremolite and anthophyllite in talc. The entire range of morphological variations observed for these minerals is observed in the asbestos standards: rectilinear fibers with parallel ends and edges (A); step-cleavage ends (B); unit fibrils protruding from fiber body, (C); curvilinear fiber with amphibole cleavage end (D); high length-to-width ratio fibers (E); fibers protruding from interiors of talc plates (F). All of these morphological variations and forms (A-E) have been described in anthophyllite and tremolite asbestos samples. The amphibole structure was confirmed in all cases by selected area electron diffraction characterization. Scale as marked. Micrographs obtained on a JEOL JEM 120 U with an accelerating voltage at 120 kV.

Page -92-

Gref.B-FIN01-000092

JA298

**A2. X-ray Diffraction**

The application of X-ray diffraction analysis in step-scan mode for quantitative determination of asbestos in talc has been described in detail (Rohl and Langer, 1974), including the selection of talc and asbestos reference materials, the preparation of standard dilutions of asbestos minerals in talc to ensure sensitivity and reproducibility, the selection of characteristic X-ray reflections to be scanned, and instrumental technique.

**A3. Electron Microscopy and Electron Diffraction**

The transmission electron microscope has been shown to possess the sensitivity required for fiber identification and for determination of particle size distribution of submicroscopic particles.

Accordingly, aliquots of talcum samples were prepared for electron microscopic analysis by a technique that disperses particles in a drop of nitrocellulose solution on a glass slide. A second glass slide is placed on the first and the two are drawn lightly apart, leaving a film. This technique is intended to minimize the alteration of particle size distribution. The film is mounted on electron microscope grids and scanned at magnifications of X20,000.

Morphologically, amphibole minerals are generally quite dissimilar from other silicate minerals. Both anthophyllite and tremolite are rectilinear, often with amphibole-type step cleavage or, infrequently, with prismatic terminations. Tremolite fibers tend to be electron dense and shorter than anthophyllite, while the latter has a tendency to be electron translucent and to show diffraction contrast figures. *Electron microscopy, in combination with selected area diffraction was used to verify the presence of amphibole in the 10 samples shown to be positive by X-ray diffraction.* Electron microscopy, while not quantitative, also showed that amphibole fibers were present in relative amounts that corresponded to their percentages as shown by X-ray diffraction.

The presence of traces of chrysotile, rather than platy serpentine, in samples 12 and 15 was verified by electron microscopy. By comparison with known dilution levels of chrysotile in talc observed by electron microscopy, the levels of contamination of chrysotile in the two samples correspond to about 0.25-0.5% chrysotile, which was suggested by the X-ray diffraction results. The chrysotile fibers were all shorter than 2 μm and the diameters less than 0.2 μm, explaining why they were not visible by optical microscopy.

**A4. DISCUSSION AND CONCLUSIONS by Rohl, Langer, and Colleagues**

Talc used in the United States represents a wide range of mineralogical substances. Industrial grade talcs are obtained from different rock types of highly variable mineral composition with the result that the mineral talc may actually be a minor constituent. However, it has been stated that

Page -93-

Gref.B-FIN01-000093

JA299

consumer talcum products should contain at least 90% of the mineral of the same name and no asbestos fiber. Review of the literature suggests that at least until 1968, materials that were marketed as cosmetic talcum products did not necessarily conform to these criteria.

Talc mineral may occur in a platy form or in a fibrous form. Talc fiber may occur as a small proportion of the mineral desposit or as a major constituent. Intergrowths of talc with other mineral phases are common. These phases may be simply macroscopic zones adjoining talc mineral or may occur as microscopic intergrowths within the talc. Of the many minerals that may coexist with talc, a number of asbestiform phases commonly occur: tremolite, anthophyllite, and chrysotile have been identified in these deposits.

Methodology has been developed for quantitative X-ray diffraction determination of anthophyllite, tremolite, serpentine, and quartz in consumer talcums and powders. Important factors in the calibration standard development include selection of talc and reference minerals and the selection of diagnostic X-ray reflections. The sample preparation technique is sensitive and reproducible. Dilution standards are step scanned over diagnostic reflection areas, peak areas are measured, and a set of standard calibration curves is developed by regression analysis. Samples of consumer talcums and powders are prepared and analyzed under identical conditions and compared with the calibration curves, permitting quantitative analysis of these minerals. *X-ray diffraction alone cannot distinguish between asbestiform and fragmented forms of anthophyllite and tremolite nor between asbestiform and platy serpentine varieties. Electron microscopic analysis was used to distinguish between these forms.*

*Mineralogical characterization of 21 consumer talcums and powders showed that 10 contained measurable concentrations of asbestiform tremolite and anthophyllite, and some also contained fragmented forms of these minerals.* Two samples contained trace quantities of chrysotile (0.25-0.5%). These observations were confirmed by transmission electron microscopy. *The amphibole phases present in these talcum products ranged in amounts from several tenths of a percent to over 14% by weight.*

Examination of the same consumer talcum products by both optical and transmission electron microscopy indicates that not all of the materials fall within the definition of fiber or asbestiform. For example, one consumer talcum product that contained more than 7% tremolite was observed to contain both fragmented tremolite grains by optical microscopy and asbestiform fiber with 3:1 or greater length-to-width ratio by transmission electron microscopy. Optical microscopy may provide useful information. However, more complete characterization can be obtained by electron microscopy and selected area electron diffraction. Using electron microscopy, for example, several samples of consumer talcum products exhibited both free amphibole fiber, discrete from talc grains, and, in addition, numerous small amphibole fibers were visible, apparently inter-layered between talc or chlorite plates. Preliminary examination of the asbestiform amphiboles by an

Gref.B-FIN01-000094

**JA300**

electron microprobe technique has demonstrated that individual fiber chemistry is identical to those fibers encountered in the IARC Asbestos Standards.

On the basis of the mineralogical and chemical characterization of these products, all formulated prior to June 1973, we conclude that cosmetic grade talc was not used exclusively. The presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. This standard should be cognizant of talc complexities, mineralogical and chemical in nature, and should provide for adequate analytical protocols to ensure monitoring. We also recommend that evaluation be made to determine possible health hazards associated with the use of these products.

Rohl and Langer did not identify asbestos in Johnson's Baby Powder. It should be noted that they first screened their samples with XRD before undertaking electron microscopic analysis. The limit of detection for XRD is 0.1% contamination.

Rohl and Langer reported asbestos contamination of Mennen Shave Talc and English Leather After Shave Talc. They did not detect asbestos in Mennen Bath Talc.

## The New York Times    Wednesday March 10, 1976

# Asbestos Found In Ten Powders

**Ten out of 19 body and baby powders tested at Mount Sinai Hospital here were contaminated with asbestos fibers capable of causing a rare form of chest and abdominal cancer, researchers have reported.**

Page -95-

Gref.B-FIN01-000095

Bauer & Black Baby Talc, which is no longer on the market, had a 15 percent concentration. Other powders containing less than 5 percent asbestos were Fabergé Brut Talc, Yardley Invisible Talc, Yardley Black Label Baby Powder, Mennen Shave Talc and English Leather After Shave Talc.

The manufacturers that could be reached for comment said that they were convinced that their products were safe and that their own tests had shown no asbestos. Only the manufacturer of Rosemary could not be reached.

The products that the researchers found uncontaminated with asbestos fibers were Ammen's Medicated Powder, Avon Bird of Paradise Beauty Dust, Diaperene Medicated Body Powder, two Johnson's Baby Powders (one made here and one in Britain), Johnson's Medicated Powder, Mennen Bath Talc, Yardley After Shave Powder and Yardley Original Body Powder.

Gref.B-FIN01-000096

JA302

In 1976, Johnson and Johnson submitted over the counter talc samples to Dr Fred Pooley, the English analyst, for testing.

J&J-0086512

JNJNL61_000069017

Dr. P. Finkelstein
Mr. A. J. Goudie
Dr. G. Hildick-Smith
Mr. G. Lee
Dr. W. Nashed
Dr. D. Petterson
Dr. B. Semple
Dr. J. Schelz to Ms. R. Gallagher
Dr. T. H. Shelley

*Johnson & Johnson*

*New Brunswick, N.J.*
May 4, 1976

**Subject:**

        Talc Advisory Group

        I have just received and passed onto Mr. G. Lee, a 20
page report entitled "Report of the Examination of
American Consumer Talc Samples" by our prolific con-
sultant Dr. F. D. Pooley. This report provides detailed
quantitative analysis by x-ray diffraction, TEM/SAD and
bulk chemistry (Prof. Bowes) of the five OTC talc samples
that were mentioned by Langer in the Washington Post. A
summary of this report is as follows:

Tremolite was present in 12% by weight. Dr Pooley identified these tremolite particles as fibrous.

        From an examination of the traces, six of the samples
appear to contain amphibole type material; these are
Samples Nos. 1, 8, 11, 16, 21 and 24. There is no indic-
ation from the scans to suggest amphibole material in any
of the other specimens. The six samples listed above
have also been examined using the analytical electron
microscope and in Samples Nos. 1, 11, 16, 21 and 24, the
amphibole type detected was anthophyllite. Sample No. 8
is a rather peculiar sample which contains very minor
quantities of talc and has yet to be fully investigated.

Page -97-

Gref.B-FIN01-000097

**JA303**

J&J-0086513
JNJNL61_000069018

Dr Pooley identified amphibole, which he identified as anthophyllite, in:

Sample 1: Cashmere Bouquet Body Powder (Yellow Can)

*Dr. Pooley thus found Cashmere Bouquet, sourced from the Italian mines, to contain 4% fibrous anthophyllite by weight.*

Page -98-

Gref.B-FIN01-000098

JA304

APPENDIX A: DEFINITIONS OF TERMS USED by Rohl, Langer, and Colleagues

ASBESTOS:

**Asbestos** implies current or possible exploitation, based on the presence of special physical and chemical properties, determined on the bulk sample level. For example, high fiber tensile strength, flexibility, low heat conductivity, high electrical resistance, and chemical inertness are properties of asbestos. Noncommercial varieties of the same mineral may not possess the same qualities on the bulk level.

Amosite may be considered as an aggregate of unoriented, discrete, grunerite crystals with only the c axis in common alignment. Comminution of such aggregates produces fibers with characteristics identical to those of single crystals of grunerite that have been similarly pulverized. Some workers have suggested that mechanical size reduction of amosite yields fibers with crystal growth surfaces rather than cleavage surfaces. Since amphibole cleavage tends to parallel prominent crystal face planes, such distinctions on the submicroscopic level may disappear. This appears to be the case for tremolite and anthophyllite as well. However, because no methods exist to distinguish between possible differences in fiber surface, we do not refer to anthophyllite and tremolite fibers in these talcums as asbestos. Instead they are referred to as asbestiform. It should be stressed, however, that evidence does not exist that would indicate that fibers with crystal growth surfaces or cleavage surfaces possess lesser or greater biological potential than fibers from commercial asbestos deposits.

**Asbestiform** "Formed like or resembling asbestos; fibrous; .... (Bureau of Mines, 1968). The term is used herein for amphiboles (anthophyllite and tremolite) seen on both light and submicroscopic examination, which resemble comminuted asbestos varieties, on the basis of morphology. Essentially, when these fibers are derived from commercial deposits we term them "asbestos" and when analytically identical fibers are found as noncommercial intrusions with the mineral talc, we term them "asbestiform." The use of two terms does not imply differences that can be analytically determined.

**Fiber** "The smallest single strand of asbestos or other fibrous materials" (Bureau of Mines, 1968). We use this term in a broader sense. For example, chrysotile fibers are called fibrils, possessing unit diameters of about 200-400 A. Coherent bundles of fibrils are also called fibers. Fiber in the present text is used to denote any elongated single mineral unit visible on the light or electron microscopic level. The Occupational Safety and Health Administration has applied a 3:1 length-to-width ratio to distinguish fiber from mineral fragment.

Page -99-

Gref.B-FIN01-000099

JA305

III: Studies of Asbestos Content of Consumer Talcum Products

## Measurement of Italian Talcs

**1. Paoletti and colleagues measured tremolite fibers in Italian cosmetic talcs (Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. Regul Toxicol Pharmacol. 1984;4:222-235.)**

TABLE 9

PERCENTAGE OF FIBROUS PARTICLES AND OF ASBESTOS FIBERS IN SOME COSMETIC TALCS

|   | % Fibers in the particulate | % Fibers > 5 $\mu$m in the particulate | % Asbestos fibers versus total fibers | % Asbestos fibers in the particulate | Variety of asbestos |
|---|---|---|---|---|---|
| A | 6.1 ± 0.9 | 1.6 ± 0.5 | <2 | <0.1 | — |
| B | 21.6 ± 1.6 | 5.0 ± 0.9 | <2 | <0.4 | — |
| C | 11.1 ± 1.1 | 3.2 ± 0.6 | <2 | <0.2 | — |
| D | 4.9 ± 0.5 | 0.7 ± 0.2 | 32 ± 4.7 | 1.6 ± 0.3 | Tremolite |
| E | 10.3 ± 0.7 | 3.2 ± 0.4 | <2 | <0.2 | — |
| F | 5.1 ± 0.6 | 1.8 ± 0.4 | 10 ± 3 | 0.5 ± 0.2 | Tremolite |

**2. Ilgren reported finding tremolite in a historic sample of Italian Cosmetic Talc (Ilgren, I et al. Analysis of an Authentic Historical Italian Cosmetic Talc Sample – Further Evidence for the Lack of Cancer Risk. Environment and Pollution; Vol. 6, No. 2; 2017)**

He reported 3.7 million fibers per gram of talc.

Gref.B-FIN01-000100

JA306

Table 1. Results of Analysis of Talc Sample

| Sample | Initial Weight of Sub-Sample (g) | Dispersal Volume (mL) | Volume Filtered (mL) | Area of Analytical Filter (mm$^2$) | Mean Grid Opening Area (mm$^2$) | Number of Grid Openings Examined | Number of Tremolite Fibres Detected | Numerical Concentration of Tremolite Fibres In Original Sample (Fibres/gram) | Weight Percent Tremolite Fibres In Original Sample |
|---|---|---|---|---|---|---|---|---|---|
| ROBERTS BOROTALCO TALC 100 g Bottle Dated 3.71 GTIN 8001 8735 Received 2015-11-23 | 0.1045 | 100 | 0.1 | 199 | 0.01033 | 100 | 2 | 3.687 x 10$^6$ | 0.0000722 |

| Grid Opening | Grid/ID | Structure Number | Class | Structure Type | Length (μm) | Width (μm) |
|---|---|---|---|---|---|---|
| 61 | B-C4-3 | | NSD | | | |
| 62 | B-C3-3 | | NSD | | | |
| 63 | B-C3-6 | 1 | ADQ | F | 3.4 | 0.23 |
| 64 | B-E3-3 | | NSD | | | |
| 65 | B-E3-6 | | NSD | | | |
| 66 | B-F3-3 | | NSD | | | |
| 67 | B-F3-6 | | NSD | | | |
| 68 | C-C3-1 | | NSD | | | |
| 69 | C-C3-4 | 2 | ADQ | F | 2.1 | 0.19 |
| 70 | C-E3-1 | | NSD | | | |

Page -101-

Gref.B-FIN01-000101

JA307

## IV: More Recent Measurements of the Asbestos Content of Consumer Talc Products (Johnson & Johnson)

### A: Measurements by Dr. Alice Blount.

In addition to her analysis of Vermont ore, Dr. Blount also detected tremolite in retail samples of Johnson's Baby Powder (Deposition of Dr. Alice Blount, Case Number: 1522-CC10417-01. April 13, 2018. ).

### B. Measurements of the asbestos content of Johnson and Johnson's Talc Products

1: On behalf of plaintiffs' attorneys, Longo and Rigler analysed Johnson & Johnson Baby Powder And Valiant Shower to Shower Talc Products for Amphibole (Tremolite) Asbestos (Longo and Rigler, Materials Analytic Services, August 2, 2017).

The authors analyzed 30 separate containers of talc containing Johnson & Johnson (J&J) Baby Powder (BP) and Valiant Shower to Shower (SS) talc products for the presence of amphibole asbestos fibers. The 30 J&J/SS talc products that were analysed for this report were sent to MAS, LLC by three different law firms. These were The Lanier Law Firm, Kazan McClain Satterley & Greenwood, and Simon Greenstone Panatier Bartlett. Dr. Longo described the containers in his deposition dated August 23, 2017 ( SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, MIDDLESEX COUNTY, Docket MID-L-7385-16AS).

| Sample ID | Description | Year | Tremolite fibers/g |
|---|---|---|---|
| **KAZAN** | | | |
| M65205-001 | **Tin** | **Pre 1964** | **15100000** |
| M65208-001 | **Hospital-Metal Can** | **Pre 1964** | **376000** |
| M65228-001 | Plastic | 1993 | 445000 |
| | | | |
| **LANIER** | | | |
| M65329-041 | **Metal Can** | **Late 1940s, 1950s** | **1310000** |

Page -102-

Gref.B-FIN01-000102

| M65329-043 | **Metal Can** | **Late 1940s, 1950s** | **938000** |
| M66173-001 | **Metal Can** | **1960** | **None Detected** |
| M66173-002 | **Metal Can** | **Pre 1964** | **301000** |
| M66173-003 | **Metal Can** | **Pre 1964** | **4120000** |
| M66203-001 | **Metal Can** | **Pre 1964** | **18700** |
| M66203-002 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-003 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-004 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-006 | **Metal Can** | **Pre 1964** | **9120** |
| M66203-007 | **Metal Can** | **Pre 1964** | **9030** |
| M66309-002 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66309-003 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66352-001 | Plastic Container | 2012 | None Detected |
| M66352-002 | Plastic Container | 2014 | 17200 |
| M66405-001 | **Metal Can** | **Pre 1964** | **45200** |
| M66405-002 | **Metal Can** | **Pre 1964** | **None Detected** |
| | | | |

Page -103-

Gref.B-FIN01-000103

**JA309**

| Simon-Greenstone | Collected from Clients | | |
|---|---|---|---|

Dear Dr. Longo,

Enclosed please find the following cosmetic talc sample(s) for analysis:

SGPB 11-28-16(1); Johnson's Baby Powder, 1.5 oz (from client Gail Koretoff)
SGPB 1-28-17(1); Johnson's Baby Powder, 1.5 oz (purchased by SGPB 1/2017)
SGPB 1-28-17(2); Johnson's Baby Powder, 22 oz (purchased by SGPB 1/2017)
SGPB 2-27-17(3); Valeant Shower to Shower Powder 13 oz, blue plastic bottle (from client John Currie)
SGPB 3-7-17(1); Valeant Shower to Shower Powder 13 oz, blue plastic bottle (purchased by SGPB 2/2017)
SGPB 3-21-17(2); Valeant Shower to Shower Powder 13 oz, blue plastic bottle (2013) (from client Earl Wheeler)
SGPB 3-21-17(4); Johnson's Baby Powder, 1.5 oz (2010) (from client Earl Wheeler)
SGPB 4-7-17(1); Johnson's Baby Powder, 9 oz (from client Carolyn Weirick)
SGPB 4-19-17(6); Johnson's Baby Powder, 4 oz (from client Pauline Citizen)
SGPB 4-19-17(7); Johnson's Baby Powder, 1.5oz (from client Pauline Citizen)

| M66507-001 | Plastic Bottle | 2004 | None Detected |
|---|---|---|---|
| M66508-001 | Plastic Bottle | 2017 | None Detected |
| M66509-001 | Plastic Bottle | 2017 | None Detected |
| M66510-001 | *Shower to Shower* | 2013 | 18200 |
| M66511-001 | *Shower to Shower* | 2017 | None Detected |
| M66512-001 | *Shower to Shower* | 2013 | 8800 |
| M66513-001 | Plastic Bottle | 2010 | None Detected |
| M66514-001 | Plastic Bottle | ? | 24700 |
| M66515-001 | Plastic Bottle | 2012 | 8740 |
| M66516-001 | Plastic Bottle | 2012 | 8690 |

Gref.B-FIN01-000104

JA310

Longo and Rigler wrote:'Since the amount of possible amphibole content of the J&J BP/Valiant SS talc product samples was expected to be at trace levels (0.1% or less), it was recognized that this analysis would require the use of an analytical transmission electron microscope (ATEM). ATEM is the only analytical method with the appropriate sensitivity for this type of trace mineral analysis as it can positively identify potential fibrous amphibole structures by energy dispersive x-ray analysis (EDXA) for mineral fiber chemistry and crystalline structure information by selective area electron diffraction (SAED). Additionally, the ATEM provides good fibrous morphology information that can eliminate obvious non-asbestiform particulates. ***The authors used the Blount method of talc-to-amphibole separation through the use of heavy liquid density separation during the sample preparation stage.***'

The authors report that 'using the Blount talc density heavy liquid preparation method for these J&J BP/Valiant SS samples, our ATEM analysis showed that of the 30 J&J BP/Valiant SS product samples analyzed for this report, 17 samples were found to contain detectable amounts of amphibole asbestos (tremolite series and ferro-anthophyllite). The amphibole concentration range for the 17 J&J BP/Valiant SS samples that were positive for fibrous amphibole asbestos ranged from between 8,690 fibers/gram to 15,100,000 fibers/gram.

Among the 17 talc container samples that were positive, four different amphibole asbestos types were found including tremolite, ferro-anthophyllite, richterite and actinolite. The percentage for each of the fibrous amphibole asbestos types found in our analysis were approximately 92.8% tremolite, 4.4% ferro-anthophyllite, 2.4% richterite and 0.4% actinolite. No anthophyllite or chrysotile fibers/bundles were found in any of the 30 J&J talc samples we analyzed.'

## Counting Rules

A minimum of 20 grid openings to a maximum of 100 grid openings were analyzed for these J&J Baby Powder samples. The 20 to 100 grid opening counts were split evenly between two grids. If the amount of amphibole fibers/bundles exceeded 100 structures before 20 grid openings were analyzed, then the analysis was stopped as long as a minimum of 4 grid openings from 2 different grids were analyzed. If there were less than three amphibole structures found in the first 20 grid openings, then 100 grid openings were analyzed. If 3 or more amphiboles were found in the first 20 grid openings, then the analysis was stopped at 20 grid openings.

The detection limit was 9000 fibers per gram.

## Table 1 of the Report gives the sample-specific results.

Page -105-

Gref.B-FIN01-000105

# JA311

**3 Kazan McClain Satterley Greenwood J&J Samples**

| MAS Sample Number | Sample Description | Date Samples Received at MAS |
|---|---|---|
| M65205-001 | Johnson's Baby Powder | 9/22/2016 |
| M65208-001 | Johnson's Baby Powder (Hospital Dispensing Only) | 9/22/2016 |
| M65228-001 | Johnson's Baby Powder | 9/22/2016 |

(Summary)

Samples Received From: Kazan McClain Satterly and Greenwood

| Sample ID | Sample Description | Tremolite Concentration Fibers/g | Fibrous Talc |
|---|---|---|---|
| M65205-001 | White – fine grained homogeneous powder | 15,100,000 | Trace |
| M65208-001 | White – fine grained homogeneous powder | 376,000 | Trace |
| M65228-001 | White – fine grained homogeneous powder | 445,000 | NSD |

Page -106-

Gref.B-FIN01-000106

JA312

## 17 The Lanier Law Firm J&J Samples

| MAS Sample Number | Sample Description | Date Sample Received at MAS |
|---|---|---|
| M65329-041 | Johnson's Baby Powder | 9/1/2016 |
| M65329-043 | Johnson's Baby Powder | 11/14/2016 |
| M66173-001, 002 & 003 | Johnson's Baby Powder Containers | 3/3/2017 |
| M66203-001, 002, 003, 004, 006 & 007 | Johnson's Baby Powder Containers | 3/8/2017 |
| M66309-002 & 003 | Johnson's Baby Powder Containers | 3/23/2017 |
| M66352-001 & 002 | Johnson's Baby Powder Containers | 3/28/2017 |
| M66405-001 & 002 | Johnson's Baby Powder Containers | 4/5/2017 |

Samples Received From: The Lanier Law Firm

| Sample ID | Sample Description | Tremolite Concentration Fibers/g | Fibrous Talc |
|---|---|---|---|
| M65329-041 | White – fine grained homogeneous powder | 1,310,000 | NSD |
| M65329-043 | White – fine grained homogeneous powder | 938,000 | Common |
| M66173-001 | White – fine grained homogeneous powder | NSD | Trace |
| M66173-002 | White – fine grained homogeneous powder | 301,000 | Trace |
| M66173-003 | White – fine grained homogeneous powder | 4,120,000 | Trace |
| M66203-001 | White – fine grained homogeneous powder | 18,700 | Common |
| M66203-002 | White – fine grained homogeneous powder | NSD | Trace |
| M66203-003 | White – fine grained homogeneous powder | NSD | Trace |
| M66203-004 | White – fine grained homogeneous powder | NSD | NSD |
| M66203-006 | White – fine grained homogeneous powder | 9,120 | Trace |
| M66203-007 | White – fine grained homogeneous powder | 9,030 | NSD |
| M66309-002 | White – fine grained homogeneous powder | NSD | Trace |
| M66309-003 | White – fine grained homogeneous powder | NSD | Trace |

Gref.B-FIN01-000107

JA313

| | homogeneous powder | | |
|---|---|---|---|
| M66352-001 | White – fine grained homogeneous powder | NSD | NSD |
| M66352-002 | White – fine grained homogeneous powder | 17,200 | NSD |

Samples Received From: The Lanier Law Firm Continued

| M66405-001 | White – fine grained homogeneous powder | 45,200 | Trace |
|---|---|---|---|
| M66405-002 | White – fine grained homogeneous powder | NSD | Common |

Page -108-

Gref.B-FIN01-000108

JA314

**10 Simon Greenstone Panatier Bartlett J&J and Shower to Shower Samples**

| MAS Sample Number | Sample Description | Date Sample Received at MAS |
|---|---|---|
| M66507-001 | SGPB 11-28-16(1) Johnson's Baby Powder 1.5 oz. | 4/21/2017 |
| M66508-001 | SGPB 1-28-17 (1) Johnson's Baby Powder 1.5 oz. | 4/21/2017 |
| M66509-001 | SGPB 1-28-17 (2) Johnson's Baby Powder 22 oz. | 4/21/2017 |
| M66510-001 | SGPB 2-27-17 (3) Valiant Shower to Shower Powder 13 oz. | 4/21/2017 |
| M66511-001 | SGPB 3-7-17 (1) Valiant Shower to Shower Powder 13 oz. | 4/21/2017 |
| M66512-001 | SGPB 3-21-17 (2) Valiant Shower to Shower Powder 13 oz. | 4/21/2017 |
| M66513-001 | SGPB 3-21-17 (4) Johnson's Baby Powder, 1.5 oz. | 4/21/2017 |
| M66514-001 | SGPB 4-7-17 (1) Johnson's Baby Powder, 9 oz. | 4/21/2017 |
| M66515-001 | SGPB 4-19-17 (6) Johnson's Baby Powder, 4 oz. | 4/21/2017 |
| M66516-001 | SGPB 4-19-17 (7) Johnson's Baby Powder, 1.5 oz. | 4/21/2017 |

Gref.B-FIN01-000109

JA315

Samples Received From: Simon Greenstone Panatier Bartlett

| Sample ID | Sample Description | Tremolite Concentration Fibers/g | Fibrous Talc |
|---|---|---|---|
| M66507-001 | White – fine grained homogeneous powder | NSD | Trace |
| M66508-001 | White – fine grained homogeneous powder | NSD | NSD |
| M66509-001 | White – fine grained homogeneous powder | NSD | NSD |
| M66510-001 | White – fine grained homogeneous powder | 18,200 | NSD |
| M66511-001 | White – fine grained homogeneous powder | NSD | NSD |
| M66512-001 | White – fine grained homogeneous powder | 8,800 | NSD |
| M66513-001 | White – fine grained homogeneous powder | NSD | NSD |
| M66514-001 | White – fine grained homogeneous powder | 24,700 | NSD |
| M66515-001 | White – fine grained homogeneous powder | 8,740 | NSD |
| M66516-001 | White – fine grained homogeneous powder | 8,690 | NSD |

**The authors' summary:**

'Using the Blount heavy liquid sample preparation method, we were able to detect fibrous amphiboles in 17 of the 30 J&J samples we analyzed. The majority of the fibrous amphiboles were of the tremolite series (95.6%) and the remaining 4.4% of the fibrous amphiboles found were of the ferro-anthophyllite type. As anticipated and discussed below, neither chrysotile nor anthophyllite were found in any of the J&J talc samples.

Of the 17 positive amphibole samples, 5 samples had only one tremolite fiber detected in a hundred grid openings which represents the limit of detection for this analysis. The finding of one tremolite fiber or bundle is not considered background by this method. This result is significant and can be relied on to quantify the amount of tremolite asbestos contained in these five J&J talc samples. Tremolite is a non-commercial amphibole in a mineral (talc) that is known to have the potential for varying amounts of amphibole asbestos such as tremolite.

Page -110-

Gref.B-FIN01-000110

JA316

For the 13 J&J talc samples, the TEM results were less than the limit of detection of approximately 9,000 amphibole fibers per gram. This result cannot be characterized to mean the samples do not contain amphibole fibers. Rather it can only be said that if there are any amphiboles present, they are at less than the detection limit for the TEM analysis. The maximum grid openings analyzed by this method was 100. By increasing the number of grid openings from 100 to either 500 or 1000, the detection limit would decrease to either 1,800 fibers per gram or 900 fibers per gram. Due to time constraints, these analyses have not performed at this time. Additionally, the 13 J&J talc samples analysis at less than the limit of detection, are further evidence of no laboratory cross-contamination.'

'This heavy liquid method is specific to the asbestos tremolite series, and as anticipated neither anthophyllite or chrysotile was detected. The reason for this is that the heavy liquid solutions (LMT & LST) used for talc separation process had a density of 2.84 to 2.85 g/cm3. Therefore, any minerals with a similar density or lower would not be separated by this method such as chrysotile that has a density of between 2.5 to 2.6 g/cc. The density of anthophyllite ranges from 2.85 to 3.2 g/cm3. This range of densities is primarily due to the addition of iron (Fe) to the chemical structure. For example, anthophyllite is part of a solid solution series with a chemical formula of $Mg_7Si_8O_{22}(OH)_2$ to approximately $Fe_2Mg_5Si_8O_{22}(OH)_2$. Without Fe being present, the density would be at the lower end of the density gradient of 2.85 g/cm3. Again, since anthophyllite is a solid solution series, the amount of iron atoms that can be substituted into the molecular formula of anthophyllite depends on the iron content of the surrounding rock. This iron atom substituted could be 0, 1, 2 or higher which accounts for the range of anthophyllite densities described here. With an anthophyllite density of approximately 2.85 g/cm3, which is the same as the heavy liquid used, one would not expect separation of this type of anthophyllite from the talc particles using the Blount method and they would not be detected by our analysis. Therefore, by using the Blount talc separation method, the lack of detection for anthophyllite and chrysotile in the J&J samples we analyzed was anticipated, but not taken as a negative result for either anthophyllite or chrysotile. Anthophyllite was never identified in any of the heavy liquid separation analyses reported in the Blount papers either, as only tremolite was described. Since tremolite has a density of between 3.0 to 3.2 g/cm3, it would be separated using the Blount method as was consistent with our analysis in this report.

As discussed above, fibrous ferro-anthophyllite was found in one J&J sample (M66514-001) that had a much higher iron content than is typically seen at our laboratory for iron-containing anthophyllite. This higher iron content would increase the density to the degree necessary for heavy liquid separation as compared to no iron or low iron anthophyllite as shown by our analysis. This ferro-anthophyllite, depending on the mine location of the J&J talc used for the product we tested, could also be called chesterite (polymorph of anthophyllite) as described by D.R. Veblen for talc samples he analyzed from Chester, Vermont.'

Gref.B-FIN01-000111

*'Based on the results of our analysis, it can be stated, that individuals who used Johnson & Johnson's Baby Powder or Valiant Shower to Shower talc products would have, more likely than not, been exposed to fibrous amphibole asbestos.'*

**For samples manufactured from Italian talc:**

| Sample ID | Description | Year | Tremolite fibers/g |
|---|---|---|---|
| **KAZAN** | | | |
| M65205-001 | **Tin** | **Pre 1964** | **15100000** |
| M65208-001 | **Hospital-Metal Can** | **Pre 1964** | **376000** |
| | | | |
| **LANIER** | | | |
| M65329-041 | **Metal Can** | **Late 1940s, 1950s** | **1310000** |
| M65329-043 | **Metal Can** | **Late 1940s, 1950s** | **938000** |
| M66173-001 | **Metal Can** | **1960** | **None Detected** |
| M66173-002 | **Metal Can** | **Pre 1964** | **301000** |
| M66173-003 | **Metal Can** | **Pre 1964** | **4120000** |
| M66203-001 | **Metal Can** | **Pre 1964** | **18700** |
| M66203-002 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-003 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-004 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66203-006 | **Metal Can** | **Pre 1964** | **9120** |
| M66203-007 | **Metal Can** | **Pre 1964** | **9030** |
| M66309-002 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66309-003 | **Metal Can** | **Pre 1964** | **None Detected** |
| M66405-001 | **Metal Can** | **Pre 1964** | **45200** |
| M66405-002 | **Metal Can** | **Pre 1964** | **None Detected** |

Gref.B-FIN01-000112

JA318

The observed counts were logarithmically normally distributed.



**3. Longo and Rigler (February 16, 2018) performed a TEM Analysis of an Historical 1978 Johnson's Baby Powder sample.**

Two samples from a historical 1978 Johnson's Baby Powder (JBP) container, that was provided to MAS from The Lanier Law Firm were examined for the presence of amphibole asbestos fibers or bundles. According to the information supplied with these two samples, they were collected from a 2/8/1978 historical JPB container that was supplied by Johnson & Johnson, lot number 113J and bottle/container identification number JBP084.

Using the Blount talc density heavy liquid preparation method for these samples, the TEM analysis showed that for the two 1978 JPB product samples analyzed for this report were found to contain detectable amounts of amphibole asbestos (ferroanthophyllite). The two samples had an amphibole asbestos concentration range of between 7,240 fibers/gram to 22,100 fibers/gram.

Gref.B-FIN01-000113

**JA319**

**New Analysis of Johnson's Historical Baby Powder (October 2018)**

LEVY KONIGSBERG LLP
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(212) 605-6200
FAX: (212) 605-6290
WWW.LEVYLAW.COM

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE CENTER
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

ALBANY OFFICE
90 STATE STREET
ALBANY, NEW YORK 12207
TELEPHONE: (518) 286-5068

July 16, 2018

Via FedEx
Dr. William Longo
MAS, LLC
3945 Lakefield Ct.
Suwanee, GA 30024

                    Re:     Teresa Leavitt case – J&J samples

Dear Dr. Longo,

        Enclosed please find the following samples of talcum powder produced by Johnson & Johnson in the Leavitt case:

1. Sample numbered 20180056-02D, taken from bottle with sample number JBP 209;
2. Sample numbered 20180056-06D, taken from bottle with sample number JBP 213;
3. Sample numbered 20180056-31D, taken from bottle with sample number JBP 238;
4. Sample numbered 20180056-34D, taken from bottle with sample number JBP 241;
5. Sample numbered 20180060-25D, taken from bottle with sample number JBP 188;
6. Sample numbered 20180060-49D, taken from bottle with sample number JBP 092;
7. Sample numbered 20180060-50D, taken from bottle with sample number JBP 093;
8. Sample numbered 20180060-67D, taken from bottle with sample number JBP 110;
9. Sample numbered 20180060-68D, taken from bottle with sample number JBP 111; and
10. Sample numbered 20180070-86D, taken from container with sample number 2014.001.5102.

        Also enclosed please the following materials:

        Exhibit 1 to this letter is a series of Chain of Custody Forms for these samples; at your convenience, please complete the form and send a copy to me (you can scan the signed form and email it to jdischinger@levylaw.com).

        Exhibit 2 to this letter is a set of photographs produced by Johnson & Johnson to Plaintiff prior to the sample split.

Page -114-

Gref.B-FIN01-000114

JA320

In October 2018, Longo and Rigler prepared a new analysis of Johnson's Historical Baby Powder (M69042). They used both a Polarized Light Microscopy (PLM) analysis and an analysis by Analytical Transmission Electron Microscopy (ATEM). *In the PLM method they used the Blount heavy liquid concentration method.*

**ATEM Amphibole Analysis Procedure**

JEOL 1200EX ATEMs equipped with either a Noran or an Advanced Analysis Technologies (light element) energy dispersive x-ray analyzer (EDXA) were employed for this analysis. ATEM samples were analyzed at a screen magnification of Amphibole fibers or bundles only with substantially parallel sides and an aspect ratio of 5:1 or greater, and at least 0.5µm in length  were counted as regulated asbestos fibers and bundles per standard TEM counting rules as described by ASTM D5755, ASTM D5756, ISO 10312, ISO 13794, AHERA (TEM section only) and  D7712-11. 1, 2, 3, 4,

Positive identification of amphibole asbestos requires EDXA for mineral chemistry confirmation and selected area electron diffraction (SAED) for each amphibole type. At times, amphibole bundles may have a diameter that is too thick to acquire a SAED pattern, then only the mineral chemistry can be used. For Anthophyllite series asbestos, two zero angle SAEDs. One hundred grid openings were analyzed for each of the 10 Johnson's Baby Powder samples. Six of the 10 samples had detectable amphibole particles, primarily anthophyllite. The particles were a mixture of fibers and bundles.

| MAS Sample Number | Client Sample ID | Year of Mnfr. |
|---|---|---|
| M69042-001 | JJTP JBP309 20180056-02D | 1973-1975 |
| M69042-002 | JJTP JBP213 20180056-06D | 1978 |
| M69042-003 | JJTP JBP238 20180056-31D | 1967 |
| M69042-004 | JJTP JBP241 20180056-34D | 1978 |
| M69042-005 | JJTP JBP188 20180060-25D | 1967 |

| MAS Sample Number | Client Sample ID | Year of Mnfr. |
|---|---|---|
| M69042-006 | JJTP JBP092 20180060-49D | 1967 |
| M69042-007 | JJTP JBP093 20180060-50D | 1966-1967 |
| M69042-008 | JJTP JBP110 20180060-67D | 1978 |
| M69042-009 | JJTP JBP111 20180060-68D | 1970 |
| M69042-010 | JJTP 2014.001.5102 20180070-86D | 1985 |

Page -115-

Gref.B-FIN01-000115

**JA321**

The results of the TEM analyses are presented below:

**TEM Structure Data for M69042-001**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 14.4 | 0.4 | 36.0 | Fiber | Anthophyllite |
| 2 | 2.3 | 0.4 | 5.8 | Fiber | Anthophyllite |
| 3 | 15.7 | 2.0 | 7.9 | Bundle | Anthophyllite |
| 4 | 10 | 0.2 | 50.0 | Fiber | Anthophyllite |
| 5 | 22.5 | 2.5 | 9.0 | Bundle | Anthophyllite |

**Average Aspect Ratio: 21.7**

**TEM Structure Data for M69042-002**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 35.4 | 1.8 | 19.7 | Bundle | Anthophyllite |
| 2 | 12.4 | 1.1 | 11.3 | Bundle | Anthophyllite |
| 3 | 6.4 | 1.1 | 5.8 | Bundle | Anthophyllite |
| 4 | 6.0 | 0.7 | 8.6 | Bundle | Anthophyllite |
| 5 | 34.5 | 1.1 | 31.4 | Bundle | Anthophyllite |
| 6 | 11.5 | 1.2 | 9.6 | Bundle | Anthophyllite |
| 7 | 11.5 | 1.0 | 11.5 | Bundle | Anthophyllite |

**TEM Structure Data for M69042-003**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 4.52 | 0.44 | 10.3 | Bundle | Tremolite |
| 2 | 3.4 | 0.42 | 8.1 | Bundle | Anthophyllite |

**Average Aspect Ratio: 9.2**

**TEM Structure Data for M69042-004**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 13.4 | 0.4 | 33.5 | Fiber | Anthophyllite |
| 2 | 4.2 | 0.38 | 11.1 | Bundle | Anthophyllite |
| 3 | 13.4 | 0.63 | 21.3 | Bundle | Anthophyllite |

Page -116-

Gref.B-FIN01-000116

JA322

**TEM Structure Data for M69042-008**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 3.9 | 0.5 | 7.8 | Bundle | Anthophyllite |
| 2 | 7.8 | 1.5 | 5.2 | Bundle | Anthophyllite |
| 3 | 5.3 | 0.5 | 10.6 | Bundle | Anthophyllite |

**Average Aspect Ratio: 7.9**

**TEM Structure Data for M69042-010**

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| 1 | 9.2 | 1.5 | 6.1 | Bundle | Anthophyllite |
| 2 | 8.9 | 0.42 | 21.2 | Bundle | Anthophyllite |

**Average Aspect Ratio: 13.7**

| Blank Sample No. | Date Prepped | Date Analyzed | For Sample Set | Asbestos Detected | Fibrous Talc Detected |
|------------------|--------------|---------------|----------------|-------------------|-----------------------|
| M69042-000 | 7/26/2018 | 9/17/2018 | M69042 | None | None |

Four of the 21 anthophyllite objects were fibers. The remainder were bundles.

| The Anthophyllite Fibers | | |
|--------------------------|---|---|
| Length | Width | Aspect Ratio |
| 14 | 0.4 | 36 |
| 2.3 | 0.4 | 5.8 |
| 10 | 0.2 | 50 |
| 13.4 | 0.4 | 33.5 |

These particles are fibers by both the width and aspect ratio criteria. In the containers among which the amphiboles were detected, the concentrations exceeded 10,000 fibers/gm. The weight-percent was less than 0.1%.

Gref.B-FIN01-000117

**JA323**

We thus have the following results for measurements of Johnson's Baby Powder. Some were made with talc-amphibole separation methods.

| Analyst | Asbestiform Tremolite Concentration | Source |
|---|---|---|
| Pooley | 0.05% | Vermont Ore |
| Blount | 0.025% | Johnson's Baby Powder (~1990) |
| Longo (Vermont) | 0.045% | Johnson's Baby Powder (1993) |
| Longo (Chinese) | 0.001% | Concentration in 3 of 6 positive samples from 2004 to 2014 |
| Rohl and Langer | None detected | 4 samples of J and J talc Preliminary screening by Xray diffraction <br><br> No concentration technique to measure tremolite |
| Compare with | | |
| Millette | 0.0094% | Tremolite in Quebec Chrysotile |

Page -118-

The Table below compares the Aspect Ratios of the Tremolite particles measured by Longo in Johnson's Baby Powder, in Metal Cans from before 1964 (samples 66205-001 and 66173-003), with those measured by the Bureau of Mines.



FIGURE 42. - Frequency polygons for the aspect ratios of tremolite and tremolite asbestos.

Page -119-

Gref.B-FIN01-000119

| Comparison of Aspect Ratios for Bureau of Mines Tremolite Cleavage Fragments, Bureau of Mines Tremolite Fibers, and the Tremolite Particles Counted by Dr. Longo | | | |
|---|---|---|---|
| Aspect Ratio | Bureau of Mines Cleavage Fragments | Bureau of Mines Fibers | Longo Tremolite Particles |
| 5:1 - 10:1 | 80% | 39% | 44% |
| 10:1 - 20:1 | 20% | 32% | 42% |
| 20:1 - 50:1 | 0% | 22% | 13% |
| 50:1 - 100:1 | 0% | 5% | 0% |

The Tremolite particles measured by Longo more closely resemble the Tremolite fibers measured by the Bureau of Mines than the Tremolite fragments measured by the Bureau of Mines.

In summary, Pooley used a concentration technique and identified 0.05% asbestiform tremolite contamination of Vermont ore. Two analysts used a concentration technique on powder from J & J retail containers. Blount found a concentration of 0.025% and Longo a concentration of 0.045% in talcs from Vermont and a concentration of 0.001% in 3 of 6 positive samples from 2004 to 2014. Rohl and Langer did not use a concentration technique, and, using X-ray diffraction, they did not find tremolite in the 4 retail samples they examined.

These tremolite contamination levels in consumer talcs may be compared with the level of 0.0094% in Quebec chrysotile.

Page -120-

## Additional Analyses by Dr. Longo

**Longo Declaration of January 25, 2019**

Dr. Longo wrote:

'3.    My lab, MAS, has now tested approximately *91 containers of Johnson & Johnson talc products (primarily Johnson's Baby Powder) that cover a span of decades*. This number will continue to increase as I obtain and test additional containers. Of the 91 containers, approximately 34 of them were obtained from lawyers representing plaintiffs in lawsuits against Johnson & Johnson. Those 34 containers included Johnson & Johnson talc products purchased off the shelf or from the attorneys' clients themselves, while others came from collectors. The other 57 containers were obtained directly from the Johnson & Johnson archive. The results of the initial 30 containers are contained in my report dated August 2, 2017 and later updated with additional containers in reports from February 2018 (a 1978 J&J archive sample) and March 11, 2018. The results for the remaining 56 J&J archive containers are contained in my report dated November 14, 2018 and updated report dated January 15, 2019.


4. My lab has also analyzed 15 samples of Imerys Vermont talc produced from its archive. (January 15, 2019 report) These Imerys samples represent Vermont ores that would have been shipped to Johnson & Johnson for use in its talcum powder products.'


**Statistical Analysis of Longo and Rigler's Johnson Talcum Data**


The analysis of consumer talcums for asbestos contamination, using sufficiently sensitive analytical techniques, has been going on sporadically for the past 40 years. X-ray diffraction, a technique with a detection limit of 0.1% or more, was widely used in the 1970s. In 1979,  Rohl and Langer wrote: "The major limitation of x-ray diffraction analysis is its inability to distinguish between different morphological habits of the same mineral. For example, short tremolite fragments and long fibers of asbestiform tremolite give virtually identical x-ray patterns. To distinguish between different habits or shapes of the same mineral, including asbestos minerals, requires microscopic techniques. Transmission electron microscopy, used in conjunction with selected area electron diffraction (SAED), provides the resolution capability to visualize all particles and, in many cases, to identify them. In a paper published in 1976, we reported a mineral and chemical characterization of 20 consumer talcums and powders obtained in New York city during the period 1971-1975 (Rohl et al., 1976). Of the twenty products, 10 contained either tremolite or anthophyllite or both. The proportions, determined by step-scan x-ray diffraction ranged from 0.1% to over 14%, by weight. No attempt was made to distinguish proportions of fibrous and non-fibrous morphological phases, although every sample contained fiber. The presence of these minerals in fibrous form was verified by electron beam techniques."


Page -121-


Gref.B-FIN01-000121


**JA327**

A seminal contribution was published in 1984 by Paoletti and colleagues who discussed the statistical basis for drawing inferences about the asbestos contamination of pharmaceutical and cosmetic talcs. The authors utilized electron microscopy (EM) and associated analytical techniques such as electron diffraction and X-ray microanalysis which allowed the morphological and structural characterization, as well as elemental analysis of particles, at high levels of resolution. A binomial distribution was expected for the values of the fibrous fraction of a given number of particles and for the percentage of asbestos fibers in a given number of fibers. This allowed calculation of the number of particles to be observed in order to obtain the required accuracy of measurement. They found that, in order to evaluate the fiber concentration with a relative standard deviation of less than 10-15%, the number of particles counted must be about 1000, even for concentrations between 5 and 30%, and must increase by at least of a factor 10 for lower concentrations. They wrote that 'since some talc specimens may contain very few asbestos fibers, and therefore are barely detectable, it is necessary to define an upper limit for the pollution level, in case that no asbestos fibers should be detected in a given specimen. *Even in such a case we cannot infer that the talc specimen is completely asbestos free.*' They found that, for very small concentrations (Concentration $\ll 10^{-4}$), the probability of observing one asbestos fiber is very close to zero for samples containing 100-1000 fibrous particles.

The consequence of these considerations is that, for low asbestos concentrations and for the counting of a limited number of particles, some samples will reported to be "Below the Detection Limit, or Non-Detects."

(It should be noted that the Blount and Pooley concentration techniques are intended to increase detectability by decreasing the background concentration of talc fibers.)

I have been involved in researching statistical methods for dealing with non-detects for several decades (Finkelstein MM, Verma D: Exposure Estimation in the Presence of Nondetectable Values: Another Look. Am Ind Hyg Assoc J 2001; 62:195-198.). According to Google Scholar (December 2019) this paper has been cited by other researchers 123 times. In 2013, I published additional statistical methods in the context of asbestos concentrations in the lungs of brake workers (Finkelstein MM: Commentary: The Analysis of Asbestos Count Data With "Nondetects": The Example of Asbestos Fiber Concentrations in the Lungs of Brake Workers. Am J Ind Med 2013;56:1482–1489). Dr. Dennis Helsel, an American statistician, discussed my statistical methodology in the introduction to his textbook (Helsel D. Statistics for Censored Environmental Data Using Minitab and R. Hoboken, N.J.: Wiley; 2012.) Dr. Helsel wrote:

Gref.B-FIN01-000122

Finkelstein (2008) re-examined a study that compared asbestos in the lungs of automobile brake mechanics to a control group. The original study decided that no difference in tremolite asbestos was evident between the two groups, based on visually comparing group medians. The study was faced with many censored observations in the two groups, and was not sure how to best incorporate them into a statistical test. Finkelstein used censored maximum likelihood (see Chapter 9) to test for differences, finding that concentrations of tremolite asbestos were indeed elevated in the mechanics' lungs. The message of his paper is clear—ignoring methods that incorporate censored data leads to wrong decisions both economically and for human or ecosystem health. In the introduction to the first edition, I used the flawed decision to launch the Challenger shuttle as the example. Finkelstein's example of missing the elevated levels of asbestos in the lungs of brake mechanics is equally compelling. Simple, cheap, easy but ineffective methods today can often lead to expensive, heart-breaking, difficult consequences later.

In this discussion, I apply the methods of statistical analysis for non-detects to measurements of Johnson's Baby Powder made by Drs. Longo and Rigler, and reported in 2019 (The Analysis of Johnson & Johnson's Historical Product Containers and Imerys' Historical Railroad Car Samples from the 1960's to the Early 2000's for Amphibole Asbestos: February 1, 2019, 2nd Supplemental Report) *and* the Declaration of Dr. Longo from January, 2019.

**Methods of Statistical Analysis**

The statistical methods used were presented in my paper "The Analysis of Asbestos Count Data With "Nondetects", published in AJIM in 2013.

'Measurement of asbestos contamination in substances is a fundamental procedure in the field of asbestos toxicology. Contamination "level" is calculated by counting the number of asbestos fibers in a sample of microscope fields, and by then dividing the number of fibers counted by an appropriate denominator to produce a "density". Typically, the number of fibers counted is divided by the weight of substance analyzed to produce the number of fibers per gram of substance. When the number of fibers counted is reasonably large the distribution of counts may be well approximated by a normal distribution, and the usual normal distribution statistics may be used to estimae mean concentrations. When the number of fibers counted is small, then it is found that the distribution of counts is not normally distributed; that is the number of counts is not symmetrically distributed about the mean with variability independent of the magnitude of the counts. There is

Page -123-

Gref.B-FIN01-000123

JA329

often a tail to the right of the mean and the variance increases with the mean of the distribution (Hilbe 2011). There are a variety of methods for dealing with the non-normality associated with the statistics pertinent to small counts of fibers. One approach is to transform the "density" data to make the distribution more normal, and the logarithmic normal (lognormal) transformation is a popular and useful choice. A complication frequently arises in the comparison of populations, however, because it is not unusual to have some measurements reported to be below the analytical detection limit (nondetects). Lognormal transformation may be used straightforwardly in the absence of nondetects. When nondetects are present, and one is analyzing density data, then one might consider a maximum likelihood method, and Finkelstein and Verma (Finkelstein and Verma 2001) have published a method implemented in spreadsheet software which utilizes the presumption of a lognormal distribution of the underlying data to maximize the likelihood of the observed data.

Methods for dealing with nondetects have been discussed in the hygiene literature (Helsel 2010;Ogden 2010) and Helsel has written a text on the topic (Helsel 2012). It is the purpose of this paper to present an alternative method for handling nondetects in the analysis of asbestos fiber count data. This method involves acknowledging the integer properties of the underlying data and applying statistical models for integer data. These methods take account of the non-normal distribution of the count data.

## Statistical Methods

The basic model for count data is the Poisson distribution. In the Poisson distribution, if $\mu$ is the mean, or expected, count, then the relation between $\mu$ and the probability of observing any observed count, y, is given by:

$$\Pr(y|\mu) = e^{-\mu}\mu^y/y!$$

A unique feature of the Poisson distribution is the relationship of the mean to its variance. Recall that in the Normal distribution the variance is independent of the mean and is a constant. In the Poisson model the variance is equal to the mean, ie $V = \mu$.

In data obtained in "real world circumstances" it is often found that the variance exceeds the mean (Hilbe 2011). It would not be surprising, for example, that in a convenience sample of talcum powders the variation in asbestos concentrations would be greater than that predicted from a simple Poisson model. The negative binomial regression model (NBRM) addresses the failure of the Poisson model by adding a parameter, $\alpha$, that reflects unobserved heterogeneity among the containers. The NBRM is a model for discrete data in which the variance, $V(\mu) = \mu + \alpha\mu2$, is greater than that of the Poisson (Cameron and Trivedi 1998).'

Gref.B-FIN01-000124

JA330

**The Data Analyzed**

I used the measurements of Johnson's powders made by Longo and Rigler. In their earlier work on the Italian samples the analysts used the Blount method of talc-to-amphibole separation through the use of heavy liquid density separation during the sample preparation stage. '*This heavy liquid method is specific to the asbestos tremolite series, and as anticipated neither anthophyllite or chrysotile was detected.* **The reason for this is that the heavy liquid solutions (LMT & LST) used for talc separation process had a density of 2.84 to 2.85 g/cm3.** Therefore, any minerals with a similar density or lower would not be separated by this method such as chrysotile that has a density of between 2.5 to 2.6 g/cc. **The density of anthophyllite ranges from 2.85 to 3.2 g/cm3.** This range of densities is primarily due to the addition of iron (Fe) to the chemical structure. For example, anthophyllite is part of a solid solution series with a chemical formula of $Mg_7Si_8O_{22}(OH)_2$ to approximately $Fe_2Mg_5Si_8O_{22}(OH)_2$. Without Fe being present, the density would be at the lower end of the density gradient of 2.85 g/cm3. Again, since anthophyllite is a solid solution series, the amount of iron atoms that can be substituted into the molecular formula of anthophyllite depends on the iron content of the surrounding rock. This iron atom substituted could be 0, 1, 2 or higher which accounts for the range of anthophyllite densities described here. With an anthophyllite density of approximately 2.85 g/cm3, which is the same as the heavy liquid used, one would not expect separation of this type of anthophyllite from the talc particles using the Blount method and they would not be detected by our analysis.' In their more recent work on Vermont talc, Longo and Rigler used a different heavy liquid. 'Approximately 1.2 ml of Heavy Liquid (Lithium heteropolytungstates solution, GeoLiquids, Inc., Cat. No. LSTO1O **density 2.25 g/cc**) was added to the tube containing the talc samples and mixed with a disposable mixing rod for approximately 10 to 20 seconds.' The use of this heavy liquid permitted the detection of anthophyllite.

Longo and Rigler used ATEM because it is the only analytical method with the appropriate sensitivity for this type of trace mineral analysis as it can positively identify potential fibrous amphibole structures by energy dispersive x-ray analysis (EDXA) for mineral fiber chemistry and crystalline structure information by selective area electron diffraction (SAED). Additionally, the ATEM provides good fibrous morphology information that can eliminate obvious non-asbestiform particulates.

I extracted the measurement results from the various reports. Johnson and Johnson sourced their talc from mines in the Val Chisone region of the Italian Piedmont (until the late 1960s), and then from Vermont (about 1968 to 2000s) and subsequently from China.

Gref.B-FIN01-000125

Here are Longo's measurements for the Italian talcs (from the Declaration)

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 13 |  | M65205-001 | Kazan | JBP – Collector | 1950s | 15,100,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 12.0<br>Below Waist Personal Application: 1.81 – 4.51 f/cc | N/A |
| 14 |  | M65208-001 | Kazan | JBP – Collector | 1957 | 376,000 s/g<br><br>Tremolite Richterite<br><br>Average Aspect Ratio: 10.5 | N/A |
| 16 |  | M65329-041 | Lanier | JBP | 1940-42 | 1,310,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 11.1 | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 17 |  | M65329-043 | Lanier | JBP | 1927-39 | 938,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.0 | N/A |
| 18 |  | M66173-001 | Lanier | JBP | 1960 | NAD<br><br>Fibrous Talc | N/A |

Page -126-

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 19 |  | M66173-002 | Lanier | JBP | 1927-39 | 301,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 8.1 | N/A |
| 20 |  | M66173-003 | Lanier | JBP | 1945 | 4,120,000 s/g<br><br>Tremolite Richterite<br><br>Average Aspect Ratio: 11.7 | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 21 |  | M66203-001 | Lanier | JBP | 1953-58 | 18,700 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.2 | N/A |
| 22 |  | M66203-002 | Lanier | JBP | 1960 | NAD<br><br>Fibrous Talc | N/A |
| 23 |  | M66203-003 | Lanier | JBP | 1960 37c | NAD<br><br>Fibrous Talc | N/A |

Page -127-

Gref.B-FIN01-000127

JA333

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 24 |  | M66203-004 | Lanier | JBP | 1953 or prior | NAD | N/A |
| 25 |  | M66203-006 | Lanier | JBP | 1953-58 | 9,120 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 5.9 | N/A |
| 26 |  | M66203-007 | Lanier | JBP | 1953-58 | 9,030 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.8 | N/A |
| 27 |  | M66309-002 | Lanier | JBP | 1953 or prior | NAD<br><br>Fibrous Talc | N/A |
| 28 |  | M66309-003 | Lanier | JBP | 1950s 53c | NAD<br><br>Fibrous Talc | N/A |

Page -128-

Gref.B-FIN01-000128

JA334

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 31 |  | M66405-001 | Lanier | JBP | 1953 or prior | 45,200 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 18.6 | N/A |
| 32 |  | M66405-002 | Lanier | JBP | 1953 or prior | NAD<br><br>Fibrous Talc | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 33 |  | M66203-005 | Lanier | JBP | 1953 or prior | 37,000 s/g<br>Tremolite<br><br>Average Aspect Ratio: 13.7 | N/A |

Page -129-

Gref.B-FIN01-000129

JA335

and in Tabular Format

| Sample | Year | Concentration |
|--------|------|---------------|
| M65205-001 | 1950s | 15100000 |
| M65208-001 | 1957 | 376000 |
| M65329-041 | 1940-42 | 1310000 |
| M65329-043 | 1927-39 | 938000 |
| M66173-002 | 1927-39 | 301000 |
| M66173-003 | 1945 | 4120000 |
|  |  |  |
| M66203-001 | 1953-58 | 18700 |
| M66173-001 | 1960 | Non-Detect |
| M66203-002 | 1960 | Non-Detect |
| M66203-003 | 1960 | Non-Detect |
| M66203-004 | 1953 | Non-Detect |
| M66203-006 | 1953-58 | 9120 |
| M66203-007 | 1953-58 | 9030 |
| M66309-002 | 1953 | Non-Detect |
| M66309-003 | 1953 | Non-Detect |
| M66405-001 | 1953 | 45200 |
| M66405-002 | 1953 | Non-Detect |
| M66203-005 | 1953 | 37000 |

The graph below shows that the "OBSERVED DATA" are logarithmically normally distributed.

$P = 0.39$ for the Shapiro-Wilk Test for normal data

Page -130-

Gref.B-FIN01-000130

JA336



The lowest observed point is at the detection limit of 9030 fibers/cc. *The dashed line shows that the distribution continues below the detection limit, and that samples with concentrations below the detection limit would be recorded as Non-Detects.*

The mean concentration was 1.1 million fibers/gm. As noted above, Ilgren reported 3.7 million fibers/gm in a container of Italian talc.

Gref.B-FIN01-000131

JA337

Here are Longo's measurements for the **Vermont talcs** (from the Declaration)

Longo 1970s

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 14 | | 2018-0061-08 STS 042 | M68503-026 | MDL | 1969 | 268,000 s/g Tremolite Average Aspect Ratio: 8.7 | ISO: <0.1 Trem/Act<br>Blount: <0.1 Trem/Act |
| 15 | | 2018-0056-30 JBP 237 | M68503-005 | MDL | 1970 | NAD | NAD |
| 16 | | 2018-0060-68 JBP 111 | M69042-009 | Levy (MDL) | 1970 | NAD | ISO: <0.1 Trem/Act<br>Blount: NAD |
| 17 | | 2018-0061-17 STS 051 | M68503-029 | MDL | 1971 | NAD | NAD |

Page -132-

Gref.B-FIN01-000132

JA338

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 18 | | 2018-0060-54 JBP 097 | M68503-021 | MDL | 1972 | NAD | NAD |
| 19 | | 2018-0060-64 JBP 107 | M68503-023 | MDL | 1973 | 8,760 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 10.7 | ISO: <0.1 Anth<br><br>Blount: <0.1 Anth |
| 20 | | 2018-0061-12 STS 046 | M68503-028 | MDL | 1974 | 17,500 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 10.5 | ISO: NAD<br><br>Blount: <0.1 Anth |
| 21 | | 2018-0061-02D STS 1611A (STS 36) | 02D | J3 (MDL) | 1975 | NAD | ISO: NAD (J3)<br><br>Blount: NAD |

Page -133-

Gref.B-FIN01-000133

JA339

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 22 |  | 2018-0056-02D JBP 209 | M69042-001 | Levy (MDL) | 1975 | 22,400 s/g  Anthophyllite  Average Aspect Ratio: 21.7 | ISO: <0.1 Trem/Act  Blount: <0.1 Trem/Act |
| 23 |  | 2018-0061-57 STS 021 | M68503-046 | MDL | 1975 | NAD | NAD |
| 24 |  | 2018-0061-49 STS 013 | M68503-042 | MDL | 1976 | 23,600 s/g  Anthophyllite  Average Aspect Ratio: 9.8 | ISO: <0.1 Trem/Act <0.1 Anth  Blount: <0.1 Trem/Act |

Page -134-

Gref.B-FIN01-000134

JA340

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 25 |  | 2018-0015-01A1 JBP 084 | M68233-001 | MDL (Lanier) | 1978 | 7,240 s/g Anthophyllite Average Aspect Ratio: 7.6 | ISO: <0.1 Trem/Act Blount: <0.1 Trem/Act |
| | | 2018-0015-01A2 JBP 084 | M68233-002 | | | 22,130 s/g Anthophyllite Average Aspect Ratio: 19.4 | ISO: <0.1 Trem/Act Blount: <0.1 Anth |
| 26 |  | 2018-0070-10 2014-001-0612 JBP | M68503-057 | MDL | 1977 | 8,360 s/g Tremolite Average Aspect Ratio: 5.3 | ISO: <0.1 Trem/Act <0.1 Anth Blount: NAD |
| 27 |  | 2018-0060-53 JBP 096 | M68503-020 | MDL | 1978 | 34,800 s/g Anthophyllite Tremolite Average Aspect Ratio: 13.8 | ISO: <0.1 Trem/Act <0.1 Anth Blount: <0.1 Trem/Act |

Page -135-

Gref.B-FIN01-000135

JA341

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 28 |  | 2018-0056-06 JBP 213 | M69042-002 | Levy (MDL) | 1978 | 63,800 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 14.0 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act<br><0.1 Anth |
| 29 |  | 2018-0056-34 JBP 241 | M69042-004 | Levy (MDL) | 1978 | 18,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 21.9 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act<br><0.1 Anth |
| 30 |  | 2018-0060-67 JBP 110 | M69042-008 | Levy (MDL) | 1978 | 18,100 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 7.9 | ISO:<br><0.1 Anth<br><br>Blount:<br><0.1 Anth |
| 31 |  | 2018-0070-07D 2014-001-0397 STS | 07D | J3 (MDL) | 1978 | 82,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.5 | ISO:<br>NAD (J3)<br><br>Blount:<br>0.2 Trem/Act<br>0.5 Anth |

Gref.B-FIN01-000136

JA342

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 32 |  | 2018-0061-15D STS 049 | 15D | J3 (MDL) | 1978 | 61,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 20.0 | ISO: NAD (J3)<br><br>Blount: 0.3 Anth |
| 33 |  | 2018-0061-50D STS 1605A STS 014 | 50D | J3 (MDL) | 1978 | NAD | ISO: NAD (J3)<br><br>Blount: <0.1 Anth |
| 34 |  | 2018-0070-162-14.001-1363 JBP | M68503-059 | MDL | 1979 | 17,100 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.4 | ISO: <0.1 Trem/Act <0.1 Anth<br><br>Blount: <0.1 Trem/Act <0.1 Anth |
| 35 |  | 2018-0061-10D STS 044 | 10D | J3 (MDL) | 1980 | N/A | ISO: NAD (J3)<br><br>Blount: 0.2 Trem/Act <0.1 Anth |

Page -137-

Gref.B-FIN01-000137

JA343

**1980s and Later**

| M66514-001 | SGPB 4-7-17(1) | JBP – Client Carolyn Weirick | Circa 1980 | 24,700 s/g<br><br>Ferro Anthophyllite<br><br>Average Aspect Ratio: 14.8 | N/A |
|---|---|---|---|---|---|

| Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|
| M65228-001 | Kazan | JBP – Collector | 1994 | 445,000 s/g<br><br>Tremolite Richterite<br><br>Average Aspect Ratio: 7.9 | N/A |

Gref.B-FIN01-000138

JA344

| | | | | | |
|---|---|---|---|---|---|
| 2018-0061-10D STS 044 | 10D | J3 (MDL) | 1980 | N/A | ISO: NAD (J3)<br><br>Blount: 0.2 Trem/Act <0.1 Anth |

| Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|
| 2018-0061-38D STS 002 | 38D | J3 (MDL) | 1980 | 53,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 9.6 | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.2 Anth |
| 2018-0061-63D STS 027D | 63D | J3 (MDL) | 1980 | N/A | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.2 Anth |

Gref.B-FIN01-000139

JA345

| 2018-0061-52D STS 016 | 52D | J3 (MDL) | 1981 | 70,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 22.4 | ISO:<br>NAD (J3)<br><br>Blount:<br>0.2 Tre/Act<br>0.5 Anth |
| 2018-0061-65D STS 029 | 65D | J3 (MDL) | 1981 | 95,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.4 | ISO:<br>NAD (J3)<br><br>Blount:<br>0.2 Tre/Act<br>0.2 Anth |

| Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|
| 2018-0061-37D STS 001 | 37D | J3 (MDL) | 1982 | 9,300 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 6.1 | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act<br><0.1 Anth |
| 2018-0061-45D STS 009 | 45D | J3 (MDL) | 1982 | 9,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 8.0 | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act |
| 2018-0061-51D STS 1606A STS 015 | 51D | J3 (MDL) | 1982 | NAD | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act |

Gref.B-FIN01-000140

JA346

| 2018-0061-66D STS 1610A STS 030 | 66D | J3 (MDL) | 1982 | NAD | ISO: NAD (J3) Blount: 0.1 Tre/Act |

| Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|
| 2018-0061-21D STS 1614A STS 055 | 21D | J3 (MDL) | 1983 | NAD | ISO: NAD (J3) Blount: <0.1 Tre/Act <0.1 Anth |

Gref.B-FIN01-000141

JA347

| | | | | | |
|---|---|---|---|---|---|
| 2018-0051-34 JBP 294 *Twin pack. Only 1 bottle selected for sampling by MDL. (See note on COC from MDL split) | M68503-001 | MDL | 1984 | 18,700 s/g<br><br>Anthophyllite Tremolite<br><br>Average Aspect Ratio: 11.5 | ISO:<br><0.1 Tre/Act<br>Blount:<br><0.1 Tre/Act |
| 2018-0070-86 2014.001.5102 JBP | M69042-010 | Levy (MDL) | 1985 | 12,500 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.5 | ISO:<br><0.1 Tre/Act<br>Blount:<br><0.1 Anth |
| 2018-0061-31F STS 065 "Regular" (Left) | 31F | J3 (MDL) | 1986 | 22,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 16.6 | ISO:<br>NAD (J3)<br>Blount:<br>0.3 Tre/Act<br><0.1 Anth |

Page -142-

Gref.B-FIN01-000142

JA348

| Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|
| 2018-0061-31G STS 065 "Spice" (Right) | 31G | J3 (MDL) | 1986 | 30,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 21.8 | ISO: NAD (J3)<br><br>Blount: <0.7 Tre/Act |
| 2018-0060-33 JBP 001 | M68503-016 | MDL | 1994 | NAD | NAD |
| 2018-0060-38 JBP 006 | M68503-017 | MDL | 1996 | NAD | NAD |

TABLE III – IMERYS MDL SAMPLES

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 | West Windsor Grade 66 | 2018-0314-03 Imerys | M69751-037 | Beasley (MDL) | 1989 | 59,000 s/g | ISO: <0.1 Tre/Act<br>Blount: <0.7 Tre/Act |
| 2 | | 2018-0343-03A Imerys | M69757-005 | Beasley (MDL) | 1990 | 27.000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.1 | ISO: <0.1 Tre/Act <0.1 Anth<br>Blount: <0.1 Tre/Act <0.1 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 3 | | 2018-0358-01A Imerys | M69757-007 | Beasley (MDL) | 1990 | 39,000 s/g<br><br>Anthophyllite Actinolite<br><br>Average Aspect Ratio: 11.1 | ISO: <0.1 Tre/Act<br>Blount: <0.1 Tre/Act <0.1 Anth |

Page -143-

Gref.B-FIN01-000143

**JA349**

|  | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 11.1 |  |
| 4 | West Windsor Grade 66 | 2018-0320-01A Imerys | M69751-039 | Beasley (MDL) | 1991 | NAD | NAD |
| 5 | West Windsor Grade 96 | 2018-0320-13A Imerys | M69751-040 | Beasley (MDL) | 1991-1992 | 13.000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.1 | ISO: NAD<br><br>Blount: <0.1 Tre/Act |
| 6 |  | 2018-0339-05 Imerys | M69757-004 | Beasley (MDL) | 1994 | NAD | NAD |
| 7 | West Windsor Grade 66 | 2018-0313-02A Imerys | M69751-036 | Beasley (MDL) | 1995 | 4,400 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 35.0 | NAD |
| 8 |  | 2018-0344-04A Imerys | M69757-006 | Beasley (MDL) | 1996 | NAD | NAD |
| 9 | Railcar & Bag Sample Grade 66 | 2018-0315-021A Imerys | M69751-002 | Beasley (MDL) | 1999 | NAD | NAD |
| 10 | Railcar & Bag Sample West Windsor Grade 66 | 2018-0315-01A Imerys | M69751-001 | Beasley (MDL) | 2001-2002 | 4,400 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 8.8 | NAD |

|  | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 11 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-020A Imerys | M69751-006 | Beasley (MDL) | Dec 2000 | 4,600 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 35.0 | ISO: NAD<br><br>Blount: <0.1 Tre/Act |
| 12 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-021A Imerys | M69751-007 | Beasley (MDL) | Feb 2000 | 8,700 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 12.2 | NAD |
| 13 | West Windsor Grade 66 | 2018-0317-04A Imerys | M69751-038 | Beasley (MDL) | 2000 | NAD | NAD |
| 14 | Railcar & Bag Sample Silo Grade 66 | 2018-0315-040A Imerys | M69751-004 | Beasley (MDL) | 2001 | NAD | NAD |
| 15 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-022A Imerys | M69751-008 | Beasley (MDL) | Jan 2003 | NAD | NAD |

and next, a Table of these data with the fiber counts inserted.

Gref.B-FIN01-000144

JA350

| Results of TEM Analysis of Talcum Powders | | | | | |
|---|---|---|---|---|---|
| Sample Number | Source | Year | Concentration (Structures per gm) | Structures* Counted | Detection Limit (Structures per gm) |
| M685003-005 | JBP | 1970 | . | 0 | 8780 |
| M69042-009 | JBP | 1970 | . | 0 | 6370 |
| M678503-029 | STS | 1971 | . | 0 | 8400 |
| M68503-021 | JBP | 1972 | . | 0 | 5920 |
| M68503-023 | JBP | 1973 | 8760 | 1 | 8730 |
| M68503-028 | STS | 1974 | 17500 | 3 | 5800 |
| 02D | STS | 1975 | . | 0 | 9400 |
| M69042-001 | JBP | 1975 | 22400 | 5 | 4470 |
| M68503-046 | STS | 1975 | . | 0 | 5900 |
| M68503-042 | STS | 1976 | 23600 | 4 | 5890 |
| M68233-001 | JBP | 1978 | 7240 | 1 | 7240 |
| M68233-002 | JBP | 1978 | 22130 | 3 | 7400 |
| M68503-057 | JBP | 1977 | 8360 | 1 | 8360 |
| M68503-020 | JBP | 1978 | 34800 | 4 | 8690 |
| M69042-002 | JBP | 1978 | 63800 | 7 | 9120 |
| M69042-004 | JBP | 1978 | 18000 | 3 | 6020 |
| M69042-008 | JBP | 1978 | 18100 | 3 | 6020 |
| 07D | STS | 1978 | 82000 | 9 | 9100 |
| 15D | STS | 1978 | 61000 | 7 | 8700 |
| 50D | STS | 1978 | . | 0 | 9300 |
| M68503-059 | JBP | 1979 | 17100 | 2 | 8560 |
| 38D | STS | 1980 | 53000 | 8 | 7600 |
| 52D | STS | 1981 | 70000 | 8 | 7800 |
| 65D | STS | 1981 | 95000 | 13 | 7300 |
| 37D | STS | 1982 | 9300 | 1 | 9300 |
| 45D | STS | 1982 | 9000 | 1 | 9000 |
| 51D | STS | 1982 | . | 0 | 9400 |
| 66D | STS | 1982 | . | 0 | 9400 |
| 21D | STS | 1983 | . | 0 | 8300 |
| M68503-001 | JBP | 1984 | 18700 | 3 | 6240 |
| M69042-010 | JBP | 1985 | 12500 | 2 | 6200 |
| 31F | STS | 1986 | 22000 | 1 | 7300 |
| 31G | STS | 1986 | 30000 | 4 | 7500 |
| M69751-037 | Imerys | 1989 | 59000 | 13 | 4500 |

Gref.B-FIN01-000145

JA351

| M69757-005 | Imerys | 1990 | 27000 | 6 | 4500 |
|---|---|---|---|---|---|
| M69757-007 | Imerys | 1990 | 39000 | 8 | 4300 |
| M69751-039 | Imerys | 1991 | . | 0 | 4400 |
| M69751-040 | Imerys | 1991 | 13000 | 3 | 4500 |
| M68503-016 | JBP | 1994 | . | 0 | 9000 |
| M69757-004 | Imerys | 1994 | . | 0 | 4400 |
| M69751-036 | Imerys | 1995 | 4400 | 1 | 4400 |
| M68503-017 | JBP | 1996 | . | 0 | 9000 |
| M69757-006 | Imerys | 1996 | . | 0 | 4400 |
| M69751-002 | Imerys | 1999 | . | 0 | 4400 |

Source: JBP = Johnson's Baby Powder; STS = Johnson's Shower to Shower Powder.
*Structure = A bundle of asbestos fibers or a single fiber

Gref.B-FIN01-000146

# Analysis Results

The graph below shows that the "OBSERVED CONCENTRATION DATA" (that is the concentrations measured in samples with concentrations above the detection limit) were logarithmically normally distributed.



P = 0.58 for the Shapiro-Wilk Test for normal data
Shapiro-Wilk W test for normal data

| Variable | Obs | W | V | z | Prob>z |
|----------|-----|--------|-------|--------|---------|
| logConc | 28 | 0.96996 | 0.907 | -0.200 | 0.57941 |

The lowest observed point is at the detection limit of 4400 structures/gm. *The dashed line shows that the distribution continues below the detection limit, and that samples with concentrations below the detection limit would be recorded as Non-Detects.*

Gref.B-FIN01-000147

**JA353**

**Statistical Analysis**

In this analysis of the parameters of the lognormal distribution of concentration data I used the method, Maximum Likelihood Estimation, that I published in the Journal of the American Industrial Hygiene Association in 2001 (Finkelstein MM, Verma D: Exposure Estimation in the Presence of Nondetectable Values: Another Look. Am Ind Hyg Assoc J 2001; 62:195-198). I used the Spreadsheet method, described in that paper, to maximize the Likelihood of Longo's measurements.

The spreadsheet and the observations are shown on the next page.

Gref.B-FIN01-000148

JA354

Spreadsheet for Maximum Likelihood Calculations of Johnson Vermont Data

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | | | | | Solver Cells |
| | DATA* | Log Likelihood of Observation, given estimate of Mean & SD | Starter | Mean | 9.293862800 |
| | 8760 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A6)-E$5)/E$6)^2)) | Starter | SD | 1.245340356 |
| | 17500 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A7)-E$5)/E$6)^2)) | | | |
| | 22400 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A8)-E$5)/E$6)^2)) | | | |
| | 23600 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A9)-E$5)/E$6)^2)) | | | |
| | 7240 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A10)-E$5)/E$6)^2)) | | | |
| | 22130 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A11)-E$5)/E$6)^2)) | | | |
| | 8360 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A12)-E$5)/E$6)^2)) | | | |
| | 34800 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A13)-E$5)/E$6)^2)) | | | |
| | 63800 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A14)-E$5)/E$6)^2)) | | | |
| | 18000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A15)-E$5)/E$6)^2)) | | | |
| | 18100 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A16)-E$5)/E$6)^2)) | | | |
| | 82000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A17)-E$5)/E$6)^2)) | | | |
| | 61000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A18)-E$5)/E$6)^2)) | | | |
| | 53000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A19)-E$5)/E$6)^2)) | | | |
| | 17100 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A20)-E$5)/E$6)^2)) | | | |
| | 70000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A21)-E$5)/E$6)^2)) | | | |
| | 95000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A22)-E$5)/E$6)^2)) | | | |
| | 9300 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A23)-E$5)/E$6)^2)) | | | |
| | 9000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A24)-E$5)/E$6)^2)) | | | |
| | 18700 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A25)-E$5)/E$6)^2)) | | | |
| | 12500 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A26)-E$5)/E$6)^2)) | | | |
| | 22000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A27)-E$5)/E$6)^2)) | | | |
| | 30000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A28)-E$5)/E$6)^2)) | | | |
| | 59000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A29)-E$5)/E$6)^2)) | | | |
| | 27000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A30)-E$5)/E$6)^2)) | | | |
| | 39000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A31)-E$5)/E$6)^2)) | | | |
| | 13000 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A32)-E$5)/E$6)^2)) | | | |
| | 4400 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A33)-E$5)/E$6)^2)) | | | |
| | <8780 | =LN(NORMDIST(LN(8780),E$5,E$6,TRUE)) | | | |
| | <6370 | =LN(NORMDIST(LN(6370),E$5,E$6,TRUE)) | | | |
| | <8400 | =LN(NORMDIST(LN(8400),E$5,E$6,TRUE)) | | | |
| | <5920 | =LN(NORMDIST(LN(5920),E$5,E$6,TRUE)) | | | |
| | <9400 | =LN(NORMDIST(LN(9400),E$5,E$6,TRUE)) | | | |
| | <5900 | =LN(NORMDIST(LN(5900),E$5,E$6,TRUE)) | | | |
| | <9300 | =LN(NORMDIST(LN(9300),E$5,E$6,TRUE)) | | | |
| | <9400 | =LN(NORMDIST(LN(9400),E$5,E$6,TRUE)) | | | |
| | <9400 | =LN(NORMDIST(LN(9400),E$5,E$6,TRUE)) | | | |
| | <8300 | =LN(NORMDIST(LN(8300),E$5,E$6,TRUE)) | | | |
| | <4400 | =LN(NORMDIST(LN(4400),E$5,E$6,TRUE)) | | | |
| | <9000 | =LN(NORMDIST(LN(9000),E$5,E$6,TRUE)) | | | |
| | <4400 | =LN(NORMDIST(LN(4400),E$5,E$6,TRUE)) | | | |
| | <9000 | =LN(NORMDIST(LN(9000),E$5,E$6,TRUE)) | | | |
| | <4400 | =LN(NORMDIST(LN(4400),E$5,E$6,TRUE)) | | | |
| | <4400 | =LN(NORMDIST(LN(4400),E$5,E$6,TRUE)) | | | |
| | | Total LogLikelihood | | | |
| | | =SUM(B6:B49) | | | |

Page -149-

I used the formulae for the arithmetic mean and standard deviation described in the Perkins textbook (Perkins JL. Modern Industrial Hygiene. Volume I: Recognition and Evaluation of Chemical Agents. New York: Van Nostrand Reinhold; 1997).

| | | |
|---|---|---|
| $\mu_L, \sigma_L$ | $\mu_c =$ | $\exp[\mu_L + (\tfrac{1}{2})\sigma_L^2]$ |
| $\mu_g, \sigma_L$ | $\mu_c =$ | $\mu_g \exp[(\tfrac{1}{2})\sigma_L^2]$ |
| $\mu_L, \sigma_L$ | $\sigma_c =$ | $\sqrt{[\exp(2\mu_L + \sigma_L^2)][\exp(\sigma_L^2)-1]}$ |
| $\mu_g, \sigma_L$ | $\sigma_c =$ | $\sqrt{\mu_g^2[\exp(\sigma_L^2)][\exp(\sigma_L^2)-1]}$ |

So Mean =  di exp(9.29 + 0.5*(1.25)^2)
23653.113

and SD
. di (exp((2*9.29) + 1.25^2)*exp((1.25*1.25) - 1))^0.5
31335.283

The arithmetic mean concentration was about 23,700 structures / gm and the standard deviation was about 31,000.

To calculate the Confidence Intervals for the Arithmetic Mean, I used the methods described in: Ulf Olsson (2005) Confidence Intervals for the Mean of a Log-Normal Distribution, Journal of Statistics Education, 13:1, , DOI: 10.1080/10691898.2005.11910638.

The Confidence Intervals for log(Mean) are:

$$\overline{Y} + \frac{S^2}{2} \pm z\sqrt{\frac{S^2}{n} + \frac{S^4}{2(n-1)}}$$

Page -150-

Gref.B-FIN01-000150

JA356

This gives the 95% Confidence Interval on the arithmetic mean concentration to be (14,500-38,950) structures gram.

We thus have that the mean concentration of amphibole structures in the powders manufactured from Vermont talc was 23,700 (14,500 - 39,000)  structures / gm of powder.

These data were also analyzed with a negative binomial count model using Stata Statistical Software.

The mean *fiber count* in the Vermont samples was 2.8 amphibole structures per 100 grids examined.

To illustrate how it is common to have "nondetects" when the mean count is 2.8 fibers per sample, the following graph shows the distribution of counts measured by Dr. Longo with those predicted by the negative binomial distribution with a mean of 2.8.

Page -151-

Gref.B-FIN01-000151

JA357

**The fit of the Negative Binomial Model to Longo's Vermont data**



The bars show the Longo fiber counts; the Curve is the negative binomial model fitted to the data.

Some 35% of samples would be expected to be below the detection limit, in agreement with what was measured.

Gref.B-FIN01-000152

**JA358**

**Fibers of Cleavage Fragments? Comparison with Wylie's Measurements of Crushed Rock**

**This analysis addresses the question: Are the amphibole particles best characterized as crushed rock (cleavage fragments) or fibers?**

Here are Longo's measurement results for powders from the 1970's, 1980's and 1990's.

B or F means Bundle or Fiber; Mineral = Anthophylite or Tremolite

| | Sample | Length | Width | AspectR | B or F | Mineral |
|---|---|---|---|---|---|---|
| 1. | M68503-023 | 12 | .8 | 15 | B | A |
| 2. | M68503-028 | 18.8 | 1.8 | 10.4 | B | A |
| 3. | M68503-028 | 5.7 | .4 | 14.3 | B | A |
| 4. | M68503-028 | 6 | .9 | 6.7 | B | A |
| 5. | M69042-001 | 14.4 | .4 | 36 | F | A |
| 6. | M69042-001 | 2.3 | .4 | 5.8 | F | A |
| 7. | M69042-001 | 15.7 | 2 | 7.9 | B | A |
| 8. | M69042-001 | 10 | .2 | 50 | F | A |
| 9. | M69042-001 | 22.5 | 2.5 | 9 | B | A |
| 10. | M68503-042 | 19 | 2 | 9.5 | B | A |
| 11. | M68503-042 | 29 | 2 | 14.5 | B | A |
| 12. | M68503-042 | 6.7 | .08 | 804 | B | A |
| 13. | M68503-042 | 40 | 6 | 6.7 | B | A |
| 14. | M68223-001 | 6.8 | .9 | 7.6 | F | A |
| 15. | M68233-002 | 27.7 | .7 | 36.7 | B | A |
| 16. | M68233-002 | 16.4 | 2.6 | 6.3 | B | A |
| 17. | M68233-002 | 7.6 | .5 | 15.2 | F | A |
| 18. | M68503-057 | 8 | 1.5 | 6.3 | B | T |
| 19. | M68503-020 | 8.5 | .42 | 20.2 | B | A |
| 20. | M68503-020 | 2.7 | .44 | 6.1 | B | T |
| 21. | M68503-020 | 4.62 | .62 | 705 | B | A |
| 22. | M68503-020 | 21.1 | .98 | 21.5 | B | A |
| 23. | M69042-002 | 35.4 | 1.8 | 19.7 | B | A |
| 24. | M69042-002 | 12.4 | 1.1 | 11.3 | B | A |
| 25. | M69042-002 | 6.4 | 1.1 | 5.8 | B | A |
| 26. | M69042-002 | 6 | .7 | 8.6 | B | A |
| 27. | M69042-002 | 34.5 | 1.1 | 31.4 | B | A |
| 28. | M69042-002 | 11.5 | 1.2 | 9.6 | B | A |
| 29. | M69042-002 | 11.5 | 1 | 11.5 | B | A |
| 30. | M69042-004 | 13.4 | .4 | 33.5 | F | A |
| 31. | M69042-004 | 4.2 | .38 | 11.1 | B | A |
| 32. | M69042-004 | 13.4 | 1.63 | 21.3 | B | A |
| 33. | m69042-008 | 3.9 | .5 | 7.8 | B | A |

Page -153-

Gref.B-FIN01-000153

JA359

| 34. | m69042-008 | 7.8 | 1.5 | 5.2 | B | A |
| 35. | m69042-008 | 5.3 | .5 | 10.6 | B | A |
| 36. | 07D | 3.5 | .25 | 14 | F | A |
| 37. | 07D | 6 | .4 | 15 | B | A |
| 38. | 07D | 7.5 | .2 | 37.5 | B | A |
| 39. | 07D | 11 | .6 | 18.3 | B | A |
| 40. | 07D | 4 | .25 | 16 | B | A |
| 41. | 07D | 14 | 1.1 | 12.7 | B | A |
| 42. | 07D | 8.5 | .4 | 21.3 | B | A |
| 43. | 07D | 9 | .7 | 12.9 | B | A |
| 44. | 15D | 6.6 | .7 | 9.4 | B | A |
| 45. | 15D | 5.2 | .22 | 23.6 | B | A |
| 46. | 15D | 20.3 | .92 | 22.1 | B | A |
| 47. | 15D | 27 | 1.5 | 18 | B | A |
| 48. | 15D | 5.9 | .22 | 26.8 | F | A |
| 49. | m68503-059 | 12 | .4 | 30 | B | A |
| 50. | m68503-059 | 17 | 2.5 | 6.8 | B | A |
| **1980S** | . | . | . | | | |
| 53. | 38D | 3.2 | .6 | 5.3 | B | A |
| 54. | 38D | 3.6 | .7 | 5.1 | B | A |
| 55. | 38D | 18.9 | 1.5 | 12.6 | B | A |
| 56. | 38D | 6 | .9 | 6.7 | B | A |
| 57. | 38D | 6.2 | 1.1 | 5.6 | B | A |
| 58. | 38D | 3.5 | .4 | 8.9 | F | A |
| 59. | 38D | 6 | .3 | 20 | B | A |
| 60. | 38D | 3.1 | .25 | 12.4 | B | A |
| 62. | 52D | 46.5 | 1.5 | 31 | B | A |
| 63. | 52D | 29.2 | 1.5 | 19.5 | B | A |
| 64. | 52D | 10 | .5 | 20 | B | A |
| 65. | 52D | 22.5 | 1.3 | 17.3 | B | A |
| 66. | 52D | 11.7 | 1 | 11.7 | B | A |
| 67. | 52D | 31 | 1 | 31 | B | A |
| 68. | 52D | 9 | .25 | 36 | F | A |
| 69. | 52D | 3.8 | .3 | 12.7 | B | A |
| 71. | 65D | 18 | 1.5 | 12 | B | A |
| 72. | 65D | 14.3 | 1.5 | 9.5 | B | A |
| 73. | 65D | 20.2 | 1.3 | 15.5 | B | A |
| 74. | 65D | 11.2 | .7 | 16 | B | A |
| 75. | 65D | 6.8 | .7 | 9.7 | B | A |
| 76. | 65D | 13.3 | .7 | 19 | B | A |
| 77. | 65D | 22.3 | 14.5 | 14.9 | B | A |
| 78. | 65D | 17 | .22 | 77.3 | F | A |
| 79. | 65D | 28 | 2.5 | 11.2 | B | A |
| 80. | 65D | 9.5 | 1.3 | 7.3 | B | A |

Gref.B-FIN01-000154

JA360

| | | | | | | |
|---|---|---|---|---|---|---|
| 81. | 65D | 12 | .8 | 15 | B | A |
| 82. | 65D | 10.2 | .4 | 25.5 | B | A |
| 83. | 65D | 23 | 3.5 | 6.6 | B | A |
| 85. | 37D | 15.8 | 2.6 | 6.1 | B | A |
| 87. | 45D | 17.5 | 2.2 | 8 | B | A |
| 89. | M68503-001 | 9.9 | .46 | 21.5 | B | A |
| 90. | M68503-001 | 3.2 | .59 | 5.4 | B | T |
| 91. | M68503-001 | 10.4 | 1.38 | 7.5 | B | T |
| 93. | M69042-010 | 9.2 | 1.5 | 6.1 | B | A |
| 94. | M69042-010 | 8.9 | .42 | 21.2 | B | A |
| 96. | 31f | 21.6 | 1.3 | 16.6 | B | A |
| 98. | 31G | 30.1 | .7 | 43 | B | A |
| 99. | 31G | 13.5 | .7 | 19.3 | B | A |
| 100. | 31G | 7 | .7 | 10 | B | A |
| 101. | 31G | 22.5 | 1.5 | 15 | B | A |
| **1990S** | . | . | | | | |
| 104. | M69757-005 | 2.32 | .21 | 11 | B | A |
| 105. | M69757-005 | 6.1 | .41 | 14.5 | B | A |
| 106. | M69757-005 | 4.4 | .84 | 5.2 | B | A |
| 107. | M69757-005 | 2.72 | .42 | 6.5 | B | A |
| 108. | M69757-005 | 8.7 | .38 | 22.9 | B | A |
| 109. | M69757-005 | 4.82 | .76 | 6.3 | B | A |
| 111. | M69757-007 | 5.6 | 1.1 | 5.1 | B | A |
| 112. | M69757-007 | 4.6 | .64 | 7.2 | B | A |
| 113. | M69757-007 | 9.9 | .36 | 27.5 | F | A |
| 114. | M69757-007 | 10.9 | .35 | 31.1 | B | A |
| 115. | M69757-007 | 11.7 | 1.4 | 8.4 | B | A |
| 116. | M69757-007 | 11.6 | 1.1 | 10.5 | B | ACT |
| 117. | M69757-007 | 11.8 | 1.6 | 7.4 | B | A |
| 118. | M69757-007 | 8 | 1.3 | 6.2 | B | A |
| 119. | M69757-007 | 49.4 | 2.1 | 23.5 | B | T-A |
| 121. | M69751-040 | 7.4 | .62 | 11.9 | B | A |
| 122. | M69751-040 | 14.9 | .74 | 20.1 | B | A |
| 123. | M69751-040 | 6.72 | .62 | 10.8 | B | A |
| 125. | M69751-036 | 6.3 | .18 | 35 | B | T |

Most of the Structures were identified as bundles

Here are the structures that were identified as Fibers

Page -155-

Gref.B-FIN01-000155

JA361

|      | Sample     | Length | Width | AspectR | Bundle | Mineral |
|------|------------|--------|-------|---------|--------|---------|
| 5.   | M69042-001 | 14.4   | .4    | 36      | F      | A       |
| 6.   | M69042-001 | 2.3    | .4    | 5.8     | F      | A       |
| 8.   | M69042-001 | 10     | .2    | 50      | F      | A       |
| 14.  | M68223-001 | 6.8    | .9    | 7.6     | F      | A       |
| 17.  | M68233-002 | 7.6    | .5    | 15.2    | F      | A       |
| 30.  | M69042-004 | 13.4   | .4    | 33.5    | F      | A       |
| 36.  | 07D        | 3.5    | .25   | 14      | F      | A       |
| 48.  | 15D        | 5.9    | .22   | 26.8    | F      | A       |
| 58.  | 38D        | 3.5    | .4    | 8.9     | F      | A       |
| 68.  | 52D        | 9      | .25   | 36      | F      | A       |
| 78.  | 65D        | 17     | .22   | 77.3    | F      | A       |
| .13. | M69757-007 | 9.9    | .36   | 27.5    | F      | A       |

I next look at the experimental data reported by Dr Ann Wylie in which prismatic (non-asbestiform) anthophyllite was crushed and the size distribution of the resulting cleavage fragments was characterized.

Page -156-

Gref.B-FIN01-000156

JA362

Wylie published on the Dimensions of particles found after the crushing of **non-fibrous** tremolite and anthophyllite (Wylie AG. Amphibole Dusts: Fibers, Fragments, and Mesothelioma. Canadian Mineralogist. 2016;54:1403-1435.).

Here is a Table from her publication:

TABLE 7B. AMPHIBOLE CLEAVAGE FRAGMENT EMPS DERIVED FROM CRUSHED

| | Q tremolite NIEHS | R tremolite NIEHS | A riebeckite CA | B riebeckite CO | H grunerite SD | I grunerite Portugal | II anthophyllite Sweden |
|---|---|---|---|---|---|---|---|
| **1 ≤ L ≤ 5 μm** | | | | | | | |
| % all EMPs | 59 | 74 | 37 | 69 | 69 | 80 | 52 |
| width mode (μm) | 0.83 ± 0.17 | 0.18 ± 0.12 | 0.44 ± 0.06 | 0.63 ± 0.06 | 0.64 ± 0.07 | 0.36 ± 0.06 | 0.72 0.06 |
| mean width ± SD (μm) | 0.77 ± 0.28 | 0.40 ± 0.29 | 0.63 ± 0.30 | 0.59 ± 0.31 | 0.59 ± 0.31 | 0.54 ± 0.31 | 0.71 ± 0.29 |
| range (μm) | 0.33–1.76 | 0.06–1.45 | 0.17–1.76 | 0.06–1.27 | 0.01–1.27 | 0.06–1.45 | 0.24–1.44 |
| **5 < L ≤ 10 μm** | | | | | | | |
| % all EMPs | 21 | 11 | 20 | 25 | 23 | 13 | 40 |
| width mode (μm) | 1.93 ± 0.17 | undefined | 0.66 ± 0.06 | 0.66 ± 0.06 | 0.89 ± 0.07 | 1.21 ± 0.06 | 1.80 0.12 |
| mean width ± SD (μm) | 1.70 ± 0.49 | 1.14 ± 0.59 | 1.09 ± 0.56 | 1.56 ± 0.63 | 1.33 ± 0.62 | 1.30 ± 0.53 | 1.40 ± 0.50 |
| range (μm) | 0.77–3.08 | 0.06–2.72 | 0.11–3.08 | 0.51–2.92 | 0.51–2.79 | 0.48–2.72 | 0.48–2.40 |
| **10 < L ≤ 15 μm** | | | | | | | |
| % all EMPs | 10 | 5 | 9 | 4 | 2 | 3 | 5 |
| width mode (μm) | 3.3 ± 0.10 | undefined | 0.66 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (μm) | 2.76 ± 0.95 | 2.17 ± 0.94 | 1.66 ± 1.01 | 2.57 ± 1.01 | 2.88 ± 0.66 | 2.45 ± 1.03 | 2.76 ± 0.78 |
| range (μm) | 0.99–4.4 | 0.48–3.33 | 0.33–3.96 | 1.52–4.44 | 2.22–3.81 | 0.97–3.93 | 1.44–3.60 |
| **L > 15 μm** | | | | | | | |
| % all EMPs | 11 | 2 | 33 | 2 | 1 | < 1 | 4 |
| width mode (μm) | 3.85 ± 0.08 | undefined | 0.77 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (μm) | 4.47 ± 3.10 | 3.95 ± 2.29 | 3.82 ± 3.30 | 3.77 ± 0.97 | 3.81 ± 2.29 | undefined | 2.70 ± 1.89 |
| range (μm) | 0.55–13.75 | 2.18–7.26 | 0.33–15.4 | 2.92–4.83 | 1.91–6.35 | undefined | 0.72–5.40 |
| Number of EMPs | 157 | 233 | 651 | 195 | 210 | 209 | 155 |
| minimum length (μm) | 1.1 | 0.6 | 0.44 | 0.64 | 0.8 | 0.5 | 1.2 |
| maximum length (μm) | 165 | 30 | 160 | 18.4 | 22 | 21 | 23.4 |

Column II is crushed prismatic anthophyllite.

Three of Longo's anthophyllite fibers were less than 5 microns in length. Their widths were 0.4, 0.25, and 0.4 microns. From Wylie's table we see that the mean width of crushed prismatic anthophyllite in this size range was 0.71 microns (range: 0.24 - 1.44).

Five of Longo's anthophyllite fibers were 5 - <10 microns in length. Their widths were: 0.9, 0.5, 0.22, 0.25, and 0.36 microns. From Wylie's table we see that the mean width of crushed prismatic anthophyllite was 1.40 microns (range: 0.48 - 2.40).

Page -157-

Gref.B-FIN01-000157

JA363

Three of Longo's anthophyllite fibers were 10-15 microns in length. Their widths were: 0.4, 0.2, and 0.4 microns. From Wylie's table we see that the mean width of crushed prismatic anthophyllite was 2.76 microns (range: 1.44 - 3.60).

One of Longo's anthophyllite fibers was >15 microns in length. The width was 0.22 microns. From Wylie's table we see that the mean width of crushed prismatic anthophyllite was 2.70 microns (range: 0.72 - 5.40).

**I conclude that the anthophyllite fibers counted in talcums produced from Vermont talc did not arise from crushed prismatic anthophyllite and are correctly characterized as fibers.**

Gref.B-FIN01-000158

JA364

On February 24, 2020 I received from Sam Iola, of Waters and Kraus, a copy of the RJ Lee report on the analysis of splits from the data of Dr. Longo.



April 23, 2018

Mr. Kevin Hynes
Orrick
51 West 52nd Street
New York, New York 10019-6142

Re: Preliminary Analytical Test Report of thirty-seven MAS Split Samples

Dear Mr. Hynes,

RJ Lee Group (RJLG) has completed our analysis of thirty-one (31) of thirty-seven (37) samples that we in the possession of Dr. William Longo.  Tremolite asbestos was detected in only one (1) of the 31 samples analyzed, the asbestiform phase was observed in 3149796.

RJ Lee thus reported that, with one exception, all of the tremolite particles that they observed were cleavage fragments.

The results of their analyses are presented below:

Page -159-

Gref.B-FIN01-000159

JA365

| | Report | SampleID | Mineral~e | Classificati~G | Length | Width | Aspect~o |
|---|---|---|---|---|---|---|---|
| 1. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.1 | .3 | 10 |
| 2. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.57 | .35 | 7 |
| 3. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.72 | .25 | 15 |
| 4. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.66 | .15 | 18 |
| 5. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.92 | .5 | 8 |
| 6. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 6.06 | .37 | 16 |
| 7. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 4.2 | .9 | 4 |
| 8. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.55 | .45 | 6 |
| 9. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .15 | 14 |
| 10. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.53 | .3 | 8 |
| 11. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 16.6 | .57 | 29 |
| 12. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.33 | .2 | 12 |
| 13. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .32 | 10 |
| 14. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 4.31 | .35 | 12 |
| 15. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.66 | .15 | 18 |
| 16. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 7.45 | .96 | 7 |
| 17. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.33 | .35 | 7 |
| 18. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .58 | 6 |
| 19. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.55 | .2 | 13 |
| 20. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .2 | 10 |
| 21. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .2 | 10 |
| 22. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.8 | .3 | 9 |
| 23. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.12 | .84 | 6 |
| 24. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.45 | .4 | 9 |
| 25. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.1 | .35 | 15 |
| 26. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .47 | 7 |
| 27. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 10.4 | .63 | 17 |
| 28. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 8.29 | .63 | 13 |
| 29. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.99 | .46 | 13 |
| 30. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 16.6 | .99 | 17 |
| 31. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 6.02 | .95 | 6 |
| 32. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 11.1 | .92 | 12 |
| 33. | Longo Splits- JJBP | 3149790 | Tremolite | Cleavage | 6.9 | .8 | 9 |
| 35. | Longo Splits- JJBP | 3149790 | Tremolite | Cleavage | 9.6 | .8 | 12 |
| 36. | Longo Splits- JJBP | 3149795 | Tremolite | Cleavage | 7.81 | .61 | 13 |
| 37. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.13 | .35 | 15 |

Page -160-

Gref.B-FIN01-000160

JA366

| 37. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.13 | .35 | 15 |
| 38. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.1 | .25 | 16 |
| 39. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.6 | .25 | 22 |
| 40. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 2.13 | .2 | 10 |
| 41. | Longo Splits- JJBP | 3149796 | Tremolite | Asbestos Fiber | 7.65 | .2 | 38 |
| 42. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.46 | .3 | 15 |
| 43. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.46 | .3 | 15 |
| 44. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.53 | .1 | 55 |
| 45. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 6.92 | .46 | 15 |

Dr Ann Wylie, of the University of Maryland, has published on the Dimensions of particles found after the crushing of **non-fibrous** tremolite and anthophyllite (Wylie AG. Amphibole Dusts: Fibers, Fragments, and Mesothelioma. Canadian Mineralogist. 2016;54:1403-1435.).

Here is a Table from her publication:

TABLE 7B. AMPHIBOLE CLEAVAGE FRAGMENT EMPS DERIVED FROM CRUSHED

|  | Q tremolite NIEHS | R tremolite NIEHS | A riebeckite CA | B riebeckite CO | H grunerite SD | I grunerite Portugal | II anthophyllite Sweden |
|---|---|---|---|---|---|---|---|
| **$1 \leq L \leq 5$ µm** | | | | | | | |
| % all EMPs | 59 | 74 | 37 | 69 | 69 | 80 | 52 |
| width mode (µm) | 0.83 ± 0.17 | 0.18 ± 0.12 | 0.44 ± 0.06 | 0.63 ± 0.06 | 0.64 ± 0.07 | 0.36 ± 0.06 | 0.72 0.06 |
| mean width ± SD (µm) | 0.77 ± 0.28 | 0.40 ± 0.29 | 0.63 ± 0.30 | 0.59 ± 0.31 | 0.59 ± 0.31 | 0.54 ± 0.31 | 0.71 ± 0.29 |
| range (µm) | 0.33–1.76 | 0.06–1.45 | 0.17–1.76 | 0.06–1.27 | 0.01–1.27 | 0.06–1.45 | 0.24–1.44 |
| **$5 < L \leq 10$ µm** | | | | | | | |
| % all EMPs | 21 | 11 | 20 | 25 | 23 | 13 | 40 |
| width mode (µm) | 1.93 ± 0.17 | undefined | 0.66 ± 0.06 | 0.66 ± 0.06 | 0.89 ± 0.07 | 1.21 ± 0.06 | 1.80 0.12 |
| mean width ± SD (µm) | 1.70 ± 0.49 | 1.14 ± 0.59 | 1.09 ± 0.56 | 1.56 ± 0.63 | 1.33 ± 0.62 | 1.30 ± 0.53 | 1.40 ± 0.50 |
| range (µm) | 0.77–3.08 | 0.06–2.72 | 0.11–3.08 | 0.51–2.92 | 0.51–2.79 | 0.48–2.72 | 0.48–2.40 |
| **$10 < L \leq 15$ µm** | | | | | | | |
| % all EMPs | 10 | 5 | 9 | 4 | 2 | 3 | 5 |
| width mode (µm) | 3.3 ± 0.10 | undefined | 0.66 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (µm) | 2.76 ± 0.95 | 2.17 ± 0.94 | 1.66 ± 1.01 | 2.57 ± 1.01 | 2.88 ± 0.66 | 2.45 ± 1.03 | 2.76 ± 0.78 |
| range (µm) | 0.99–4.4 | 0.48–3.33 | 0.33–3.96 | 1.52–4.44 | 2.22–3.81 | 0.97–3.93 | 1.44–3.60 |
| **$L > 15$ µm** | | | | | | | |
| % all EMPs | 11 | 2 | 33 | 2 | 1 | < 1 | 4 |
| width mode (µm) | 3.85 ± 0.08 | undefined | 0.77 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (µm) | 4.47 ± 3.10 | 3.95 ± 2.29 | 3.82 ± 3.30 | 3.77 ± 0.97 | 3.81 ± 2.29 | undefined | 2.70 ± 1.89 |
| range (µm) | 0.55–13.75 | 2.18–7.26 | 0.33–15.4 | 2.92–4.83 | 1.91–6.35 | undefined | 0.72–5.40 |
| Number of EMPs | 157 | 233 | 651 | 195 | 210 | 209 | 155 |
| minimum length (µm) | 1.1 | 0.6 | 0.44 | 0.64 | 0.8 | 0.5 | 1.2 |
| maximum length (µm) | 165 | 30 | 160 | 18.4 | 22 | 21 | 23.4 |

Page -161-

Gref.B-FIN01-000161

JA367

Dr. Wylie has provided to me a copy of the NIEHS TEM analysis data set (Sample R in the Table).

In the following analysis, I compare the size distributions of the tremolite particles measured by RJ Lee in the Longo samples to those measured in crushed prismatic tremolite (cleavage fragments) by NIEHS.

Wylie categorized the NIEHS data by Particle Length.

Here is the RJ Lee data for L < 5

and For L < 5

|  | Report | SampleID | Mineral~e | Classi~G | Length | Width | Aspect~o |
|---|---|---|---|---|---|---|---|
| 1. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.1 | .3 | 10 |
| 2. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.57 | .35 | 7 |
| 3. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.72 | .25 | 15 |
| 4. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.66 | .15 | 18 |
| 5. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.92 | .5 | 8 |
| 7. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 4.2 | .9 | 4 |
| 8. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.55 | .45 | 6 |
| 9. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .15 | 14 |
| 10. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.53 | .3 | 8 |
| 12. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.33 | .2 | 12 |
| 13. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .32 | 10 |
| 14. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 4.31 | .35 | 12 |
| 15. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.66 | .15 | 18 |
| 17. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.33 | .35 | 7 |
| 18. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .58 | 6 |
| 19. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.55 | .2 | 13 |
| 20. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .2 | 10 |
| 21. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.1 | .2 | 10 |
| 22. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 2.8 | .3 | 9 |
| 24. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.45 | .4 | 9 |
| 26. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 3.26 | .47 | 7 |
| 38. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.1 | .25 | 16 |
| 40. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 2.13 | .2 | 10 |
| 42. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.46 | .3 | 15 |
| 43. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 4.46 | .3 | 15 |

Page -162-

and a histogram of the data



and the NIEHS Width Distribution for Cleavage Fragments



Page -163-

Gref.B-FIN01-000163

**JA369**

and the RJ Lee data for L > 5 and L < 10

. list if M =="Tremolite" & L > 5 & L<10

|     | Report | SampleID | Mineral~e | Classificati~G | Length | Width | Aspect~o |
|-----|--------|----------|-----------|----------------|--------|-------|----------|
| 6.  | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 6.06 | .37 | 16 |
| 16. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 7.45 | .96 | 7 |
| 23. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.12 | .84 | 6 |
| 25. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.1 | .35 | 15 |
| 28. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 8.29 | .63 | 13 |
| 29. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 5.99 | .46 | 13 |
| 31. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 6.02 | .95 | 6 |
| 33. | Longo Splits- JJBP | 3149790 | Tremolite | Cleavage | 6.9 | .8 | 9 |
| 35. | Longo Splits- JJBP | 3149790 | Tremolite | Cleavage | 9.6 | .8 | 12 |
| 36. | Longo Splits- JJBP | 3149795 | Tremolite | Cleavage | 7.81 | .61 | 13 |
| 37. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.13 | .35 | 15 |
| 39. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.6 | .25 | 22 |
| 41. | Longo Splits- JJBP | 3149796 | Tremolite | Asbestos Fiber | 7.65 | .2 | 38 |
| 44. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 5.53 | .1 | 55 |
| 45. | Longo Splits- JJBP | 3149796 | Tremolite | Cleavage | 6.92 | .46 | 15 |

The comparative histograms are shown below.

Page -164-

Gref.B-FIN01-000164

JA370

Here are the tremolite data measured by RJ Lee



and the tremolite cleavage fragment data measured by NIEHS



Page -165-

Gref.B-FIN01-000165

JA371

and finally, particles > 10 microns in Length

Firstly, RJ Lee

```
list if M =="Tremolite" & L >10
```

|  | Report | SampleID | Mineral-e | Classi-G | Length | Width | Aspect-o |
|---|---|---|---|---|---|---|---|
| 11. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 16.6 | .57 | 29 |
| 27. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 10.4 | .63 | 17 |
| 30. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 16.6 | .99 | 17 |
| 32. | Longo Splits- JJBP | 3149785 | Tremolite | Cleavage | 11.1 | .92 | 12 |



and then                                                     NIEHS



Page -166-

Gref.B-FIN01-000166

JA372

Dr. R.J. Lee has testified about the width distributions of fibers and cleavage fragments.

Dr. R.J. Lee, a microscopist and mineralogist with R.J. Lee and Associates, also noted the importance of width in distinguishing asbestos fibers from nonasbestiform cleavage fragments. *Dr. Lee testified to the following:* First airborne asbestos is less than one micrometer in diameter, unless it's present as bundles or clusters, which exhibit the characteristic fibrillar structure of asbestos, or as Dr. Wylie indicated, the hallmark of asbestos. Asbestos larger than a half a micron is a bundle. *Second, nonasbestos particles longer than five micrometers in length are generally more than one micrometer in diameter, and only rarely less than half a micrometer in diameter.* (Federal Register / Vol. 57, No. 110 / Monday, June 8, 1992).

Here are the "Cleavage Fragments" greater than 5 microns in length measured in Johnson's Baby Powder by RJ. Lee.



As stated by Dr. Lee: *"Nonasbestos particles longer than five micrometers in length are generally more than one micrometer in diameter, and only rarely less than half a micrometer in diameter."*

One may conclude, based upon the comparative measurements between RJ Lee and NIEHS, and by Dr. Lee's criteria, that the Tremolite particles measured in Johnson's Baby Powder by RJ Lee are not cleavage fragments but fibers.

Gref.B-FIN01-000167

JA373

---

## Chinese Talc

---

Longo and Rigler analyzed samples of talc from Chinese sources for amphibole fibers.

# Analysis of Johnson & Johnson Baby Powder and Valeant Shower to Shower Talc Products for Amphibole Asbestos
# Chinese
**February 2019**

### Analysis of J&J Johnson Baby Powder and Valeant Shower to Shower Off the Shelf or Client Samples:
### Source of the Cosmetic Talcum Powder is the Guangxi Mine in China

"The Lanier Law Firm requested that we analyze Johnson and Johnson & Johnson (J&J) and Johnson's Baby Powder (JBP) and one J&J Shower to Shower (STS) container where the source of the talcum powder was shown to be from the Guangxi mine in China. We have also segregated our previous analyses of 13 containers of Johnson & Johnson's Baby Powder (JBP) and Valeant Shower to Shower (STS) where the source of the cosmetic talc used in these products was also the Guangxi mine in China.

These JBP /STS and Valeant STS talcum powder sample containers were either purchased off the shelf or provided by clients in either mesothelioma or ovarian cancer cases. These 18 JBP and STS containers were purchased between and 2017 and therefore, the cosmetic talc was supplied by Imerys Talc America, Inc. or Luzenac to J&J and Valeant Pharmaceuticals. It is recognized by us that the Valeant STS products were not sold by J&J during this time frame. However, the Valeant STS talcum powder products used the same source of talc (China) as did J&J. Therefore, the data from the Valeant STS products is relevant to out testing of the J&J talcum powder products.

#### Analysis for Regulated Amphibole Asbestos
-
#### China
This report contains the results for our analysis of 18 J&J/Valeant talcum powder containers where the source of the cosmetic talc was Guangxi, China. Out of the 18 containers, seven were positive for regulated amphibole asbestos. For the positive containers, the amphibole asbestos structures of talc concentration range from 7,160 fiber/bundles per gram to 18,800 fiber/bundles per gram of talc. The analytical sensitivity for the analysis ranged from 6,970 to 16,597 fiber/bundles per gram. Of the 18 samples tested, 11 were below our analytical

Page -168-

Gref.B-FIN01-000168

sensitivity or non-detects.

For these analysis, the type regulated asbestos amphiboles was of the tremolite solid solution series (tremolite, winchite, richterite & actinolite) and anthophyllite solid solution series (anthophyllite, iron-rich anthophyllite, cummingtonite & grunerite).

**ATEM Amphibole Analysis Procedure**

JEOL 1200EX ATEMs equipped with either a Noran or an Advanced Analysis Technologies (light element) energy dispersive x-ray analyzer (EDXA) were employed for this analysis. ATEM samples were analyzed at a screen magnification of 20,000X. Amphibole fibers or bundles with substantially parallel sides and an aspect ratio of 5:1 or greater, and at least 0.5μm in length  were counted as regulated asbestos fibers and bundles per standard TEM counting rules as  described by ASTM D5755, ASTM D5756, ISO 10312, ISO 13794, AHERA (TEM section only) and Positive identification of amphibole asbestos requires EDXA for mineral chemistry confirmation and selected area electron diffraction (SAED) for each amphibole type. For anthophyllite series asbestos, two separate angle SAED were acquired.

**Counting Rules**

100 grid openings were analyzed for each of the JBP/STS and Imerys talcum powder samples. The 100 grid opening counts were split evenly between two grids. All amphibole fibers/bundles that meet the above-stated size criteria were recorded on the MAS TEM structure count bench sheets for each sample. Length and width of each amphibole fiber/bundle was recorded and identified. Every amphibole structure identified and counted by the analyst required observation of an EDXA spectra matching the mineral chemistry for that particular amphibole and a SAED amphibole pattern. EDXA spectra and SAED patterns are recorded/saved for every asbestos amphibole structure found in the samples. Photomicrographs were taken of the amphibole fibers/bundles found from each of the samples that were positive for amphibole asbestos. Results were reported as either amphibole asbestos fibers/bundles (structures) per gram of talc or in weight percent. Analytical sensitivity/detection limits were reported as structures per gram.

**Analysis Results**

The results of Dr. Longo's analysis are shown in the Table below.

The column entitled "Calculated Average Fibers/ Bundles per gram of talc is a calculation in which values below the Detection Limit are replaced by ½ Detection Limit. As noted previously, this is not necessary when Maximum Likelihood Methods are used to compute averages over the collection of samples.

The Spreadsheet for the Maximum Likelihood analysis is shown on the page following the photographs of fibers observed in the powders.

Page -169-

Gref.B-FIN01-000169

**JA375**

Table 1

| MAS Sample Number | Client Sample Number | Date of Mfg | ATEM Analysis Fiber/bundles Per gram of Talc | Calculated Average Fiber/Bundles Per gram of Talc | Approximate Fiber/Bundles Per cc of Air (from f/g vs f/cc Graph) | Product |
|---|---|---|---|---|---|---|
| M66507-001 CA* | SGPB 11-28-16(1) Gail Koretoff | 2006 | <9,120 | 4,569 | 0.0035 | JBP |
| M66508-001 CA | SGPB 1-28-17(1) Off-shelf | 2016 | <8,050 | 4,025 | 0.0035 | JBP |
| M66509-001 CA | SGPB 1-28-17(2) Off-shelf | 2016 | <9,143 | 4,872 | 0.0035 | JBP |
| M66510-001 CA | SGPB 2-27-17(3) John Currie | 2016 | 18,200 | 18,200 | 0.0100 | STS Valeant |
| M66511-001 CA | SGPB 3-1-17(1) Off-shelf | 2017 | <8,800 | 4,400 | 0.0035 | STS Valeant |
| M66512-001 CA | SGPB 3-21-17 (2) Earl Wheeler | 2013 | 8,800 | 8,800 | 0.0060 | STS Valeant |
| M66513-001 CA | SGPB 3-21-17 (4) Earl Wheeler | 2011 | <8,560 | 4,280 | 0.01 | JBP |
| M66515-001 CA | SGPB 4-19-17(6) Pauline Citizen | 2012 | 8,740 | 8,740 | 0.0060 | JBP |
| M66516-001 CA | SGPB 4-19-17(7) Pauline Citizen | 2012 | 8,690 | 8,690 | 0.0035 | JBP |
| M68379-001 | SGPB 11-22-17(1) Joanne Anderson | 2004 | <6970 | 3,845 | 0.0030 | JBP |
| M68379-002 CA | SGPB 11-22-17(2) Joanne Anderson | 2004 | 7,160 | 7,160 | 0.006 | JBP |
| M66352-001 | #1 Lanier Krystal Kim | 2014 | <16,597 | 8,298 | 0.0060 | JBP |
| M66352-002 | #2 Lanier Krystal Kim | 2014 | 17,200 | 17,200 | 0.0035 | JBP |
| M67420-001 CA** | #1 Lanier | 2017 | <8,367 | 4,283 | 0.0035 | JBP** |
| M67420-002 CA** | #2 Lanier | 2017 | <9,407 | 4,703 | 0.006 | JBP** |
| M67420-003 CA** | #3 Lanier | 2017 | 18,800 | 18,800 | 0.0100 | J&J STS ** |
| M67420-004 CA** | #4 Lanier | 2017 | <9540 | 4,770 | 0.006 | JBP** |
| M67420-005 CA | #5 Lanier | 2017 | <8,859 | 4,429 | 0.0035 | JBP** |

CA - purchased in California     **Purchased in California in 2017

Gref.B-FIN01-000170

JA376

The fibers detected were:

| Str. # | Grid Opening | Str./Asb. Type | Length | Width | Ratio | SAED | EDS |
|---|---|---|---|---|---|---|---|
| | B10 A4 | NSD | | | | | |
| 1 | B5 | B/Actinolite | 2.3 | 0.22 | 10.5 | Observed | ☑ |
| | H2 | NSD | | | | | |
| 2 | H3 | F/Richterite | 11.2 | 0.2 | 56.0 | Observed | ☑ |
| | H4 | NSD | | | | | |
| 1 | I6 | B/Richterite | 20 | 2 | 10.0 | Observed | ☑ |
| | I7 | NSD | | | | | |
| 1 | A2 | B/Tremolite | 20 | 0.7 | 28.6 | Observed | ☑ |
| | A3 | NSD | | | | | |
| 1 | C6 | Fiber | Tremolite | 3.7 | 0.4 | 9.3 | Observed | ☑ |
| NSD | A5 | NSD | | | | | |
| 1 | A6 | B/Tremolite | 2.3 | 0.46 | 5.0 | X | X |
| | A7 | NSD | | | | | |
| NSD | B8 | | | | | | |
| 1 | B9 | Bundle | Tremolite | 11.5 | 1.3 | 8.8 | Observed | ☑ |
| NSD | B10 | | | | | | |
| | H3 | | | | | | |
| 1 | H4 | Bundle | Anthophyllite | 4.1 | 0.45 | 9.1 | X | X |
| | H5 | | | | | | |
| | G2 | | | | | | |
| 2 | G3 | Fiber | Anthophyllite | 7 | 0.2 | 35.0 | X | X |
| | G4 | | | | | | |

Gref.B-FIN01-000171





Page -172-

Gref.B-FIN01-000172

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | Spreadsheet for Maximum Likelihood Calculations of Amphibole Concentrations in Chinese Talc | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | Solver Cells |
| 5 | DATA* | Log Likelihood of Observation, given estimate of Mean & SD | Starter | Mean | 8.8853144399 |
| 6 | 18200 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A6)-E\$5)/E\$6)^2)) | Starter | SD | 0.5389010343 |
| 7 | 8800 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A7)-E\$5)/E\$6)^2)) | | | |
| 8 | 8740 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A8)-E\$5)/E\$6)^2)) | | | |
| 9 | 8690 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A9)-E\$5)/E\$6)^2)) | | | |
| 10 | 7160 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A10)-E\$5)/E\$6)^2)) | | | |
| 11 | 17200 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A11)-E\$5)/E\$6)^2)) | | | |
| 12 | 18800 | =LN((1/((2*PI())^0.5*E\$6))*EXP(-(1/2)*((LN(A12)-E\$5)/E\$6)^2)) | | | |
| 13 | <9120 | =LN(NORMDIST(LN(9120),E\$5,E\$6,TRUE)) | | | |
| 14 | <8050 | =LN(NORMDIST(LN(8050),E\$5,E\$6,TRUE)) | | | |
| 15 | <9143 | =LN(NORMDIST(LN(9143),E\$5,E\$6,TRUE)) | | | |
| 16 | <8800 | =LN(NORMDIST(LN(8800),E\$5,E\$6,TRUE)) | | | |
| 17 | <8560 | =LN(NORMDIST(LN(8560),E\$5,E\$6,TRUE)) | | | |
| 18 | <6970 | =LN(NORMDIST(LN(6970),E\$5,E\$6,TRUE)) | | | |
| 19 | <16597 | =LN(NORMDIST(LN(16597),E\$5,E\$6,TRUE)) | | | |
| 20 | <8367 | =LN(NORMDIST(LN(8367),E\$5,E\$6,TRUE)) | | | |
| 21 | <9407 | =LN(NORMDIST(LN(9407),E\$5,E\$6,TRUE)) | | | |
| 22 | <9540 | =LN(NORMDIST(LN(9540),E\$5,E\$6,TRUE)) | | | |
| 23 | <8859 | =LN(NORMDIST(LN(8859),E\$5,E\$6,TRUE)) | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | Total LogLikelihood | | | |
| 27 | | =SUM(B6:B23) | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | Estimated Mean of | Observed data =EXP(E5 + 0.5*E6^2) | | | |
| 36 | Estimated Standar | (EXP(2*E5+E6^2)*((EXP(E6^2) - 1))^0.5 | | | |
| 37 | | | | | |
| 38 | Mean | di exp(8.89+ 0.5*(0.54)^2) | | | |
| 39 | | 8338.4235 | | | |
| 40 | | | | | |
| 41 | SD | . di ((exp((2*8.89) + ((0.54)^2)))*exp(0.54*0.54 – 1))^0.5 | | | |
| 42 | | 5893.4686 | | | |
| 43 | | | | | |

Page -173-

Gref.B-FIN01-000173

JA379

I used the formulae for the arithmetic mean and standard deviation described in the Perkins textbook (Perkins JL. Modern Industrial Hygiene. Volume I: Recognition and Evaluation of Chemical Agents. New York: Van Nostrand Reinhold; 1997).

The arithmetic mean concentration was about 8400 structures / gm and the standard deviation was about 5900.

To calculate the Confidence Intervals for the Arithmetic Mean, I used the methods described in: Ulf Olsson (2005) Confidence Intervals for the Mean of a Log-Normal Distribution, Journal of Statistics Education, 13:1, , DOI: 10.1080/10691898.2005.11910638.

The Confidence Intervals for log(Mean) are:

$$\bar{Y} + \frac{S^2}{2} \pm z \sqrt{\frac{S^2}{n} + \frac{S^4}{2(n-1)}}$$

This gives the 95% Confidence Interval on the arithmetic mean concentration to be (6500-11,000) structures gram.

We thus have that the mean concentration of amphibole structures in the powders manufactured from Chinese talc was 8400 (6500 - 11,000)  structures / gm of powder.

Recall that for Vermont talc the mean concentration of amphibole structures in the powders manufactured from Vermont talc was 23,700 (14,500 - 39,000)  structures / gm of powder.

So, the concentration of Amphibole fibers in Vermont talc was nominally higher than that of amphibole fibers in Chinese talc. I used a t-test to analyze whether this difference was statistically significant.

Page -174-

Gref.B-FIN01-000174

**JA380**

t-Test result:

1. t-Score:                                        1.696

2. Standard Error of Difference:                   0.2359

3. Degrees of Freedom:                             30.3727

4. Two-tailed p-Value:                             0.1798

Pick a confidence interval:

○ 80%　○ 85%　○ 40%　○ 94%　○ 90%　◉ 95%
○ 98%　○ 99%　○ 99.8%　○ 99.9%　○ 99.9%

Confidence range:

1. Mean Difference:                                -0.4

2. Confidence Range:              -0.8816              0.0816

The result was that the difference between the concentration of fibers in the powders from the 2 sources failed to achieve statistical significance. However, regression analysis of the count data using Negative Binomial Regression showed that the concentrations of amphibole fibers were significantly higher in the Vermont than in the Chinese powders.

**Chrysotile Asbestos in Chinese Talc**

Longo has used a concentration method and reported chrysotile fibers in Chinese talc.



Page -175-

Gref.B-FIN01-000175

'This report provides the analytical results for the testing of three 1.5 oz. JBP talcum powder containers that were purchased off-the-shelf in 2020 at CVS and Walgreens located in Suwanee and Johns-Creek, Georgia. The talcum powder in the three JBP 1.5 oz. containers were analyzed for chrysotile asbestos and fibrous talc using the ISO-22262-1 PLM method without heavy liquid separation (HLS), and the Colorado School of Mines (CSM) PLM method for chrysotile with HLS at 2.72 g/cc. The CSM-PLM method was implemented at MAS in January of this year. JBP container samples were also analyzed by the Blount-PLM method for amphibole asbestos, with HLS at a density of 2.81 g/cc.'

**Overview of Results**

The ISO 22262-1 (w/o HLS) method for chrysotile showed that all three JBP container samples analyzed were positive for chrysotile asbestos at an estimated volume weight concentration range of between 0.008 to 0.01%.

The Blount-PLM amphibole asbestos method showed that all three off-the-shelf JBP samples were found to be non-detects for amphibole asbestos.

For the PLM-CSM method for chrysotile, all three JBP samples were found to be positive for chrysotile asbestos. The estimated chrysotile weight percent (recovery weight corrected) for the three JBP container samples was between 0.0012 to 0.0030 % by volume weight estimation.

### Table 2
### Overall Summary of Off-The-Shelf JBP 1.5 oz. Container Sample Analysis Results

| MAS Sample # | JBP Container Codes | ISO-PLM w/o HLS Chrysotile % | Blount-PLM with HLS trem/act | Weight Recovery CSM | CSM-PLM with HLS chrysotile % |
|---|---|---|---|---|---|
| M71166-001 | 08719RA | 0.006-0.008 | NDA* | 17.0% | **0.0015-0.0017 |
| M71166-002 | 24219RA | 0.009-0.010 | NAD | 14.6% | 0.0013-0.0030 |
| M71166-003 | 24119RA | 0.009-0.010 | NAD | 13.4% | 0.0012-0.0026 |

And the concentration of Chrysotile bundles:

Gref.B-FIN01-000176

**JA382**

Table 8
Summary of Estimated Chrysotile Bundles per gram Calculations
For the JBP ISO & CSM PLM Results

| MAS Sample # | ISO PLM w/o HLS Chrysotile % | Chrysotile Bundles/gram | | CSM-PLM with HLS Chrysotile% | Chrysotile Bundles/gram |
|---|---|---|---|---|---|
| M71166 -001 | 0.006-0.008 | 822,000 | | 0.0015-0.0017 | 1,263,576 |
| M71166 -002 | 0.009-0.010 | 1,311,000 | | 0.0013-0.0030 | 1,466,000 |
| M71166 -003 | 0.009-0.010 | 1,347,000 | | 0.0012-0.0026 | 1,490,000 |

**Total ISO-PLM Average = 1,160,000    Total CSM-PLM Average = 1,406,000**

Dr. Longo commented:
'For the 1.5 oz. JBP containers we analyzed, each contained 42 grams of talcum powder, using the average number of chrysotile bundles for both methods, 1,283,000 chrysotile bundles per gram would equate to approximately 61,000,000 PLM size chrysotile bundles. Assuming that the average amount of talcum powder dispersed during the typical application of a 1.5 oz. JBP container is 4 grams by an adult user of this product, then for each application, approximately 4,000,000 chrysotile bundles would be potentially dispersed into the breathing environment of that user.'

**Johnson Recall**

In 2019, Johnson recalled a batch of Baby Powder after FDA testing found chrysotile asbestos.

Gref.B-FIN01-000177

JA383

# Johnson & Johnson Consumer Inc. to Voluntarily Recall A Single Lot of Johnson's Baby Powder in The United States

*Company is Acting Out of an Abundance of Caution*

*Recall Limited to One Lot of Bottles Produced and Shipped in the U.S. in 2018*

NEW BRUNSWICK, NJ, October 18, 2019 – Out of an abundance of caution, Johnson & Johnson Consumer Inc. (JJCI) announced that it is initiating a voluntary recall in the United States of a single lot of its Johnson's Baby Powder in response to a U.S. Food and Drug Administration (FDA) test indicating the presence of sub-trace levels of chrysotile asbestos contamination (no greater than 0.00002%) in samples from a single bottle purchased from an online retailer. Despite the low levels reported and in full cooperation and collaboration with the FDA, JJCI is initiating this voluntary recall of Lot #22318RB of Johnson's Baby Powder, from which the tested sample was taken.

In parallel, JJCI has immediately initiated a rigorous, thorough investigation into this matter, and is working with the FDA to determine the integrity of the tested sample, and the validity of the test results. At this early stage of the investigation, JJCI:

- Cannot confirm if cross-contamination of the sample caused a false positive.
- Cannot confirm whether the sample was taken from a bottle with an intact seal or whether the sample was prepared in a controlled environment.
- Cannot confirm whether the tested product is authentic or counterfeit.

Page -178-

Gref.B-FIN01-000178

JA384

 **AMA Analytical Services, Inc.**
*Focused On Results.* **CERTIFICATE OF ANALYSIS**

Chain of Custody: 308006
Client: US Food & Drug Administration
Address: Office of Cosmetics & Colors
4300 River Road
College Park, MD 20740
Attention: John Gasper

Job Name: Task 3 - Analysis of Official Samples
Job Location: 4th Group - 15 Samples
Job Number: C1N 1 - Task 3
PO Number: HHSF223201810337P

Date Submitted: 7/24/2019
Date Analyzed: 8/20/2019-9/18/2019
Report Date: 10/3/2019
Date Sampled: Not Provided
Person Submitting: Gevan Peritz
Revised: 10/11/2019 [Revision #2]

**SUMMARY OF ANALYSIS**

| AMA Sample ID | Client Sample ID | TEM LOD Using ASTM D5756 Mass Calculation | TEM LOQ Using ASTM D5756 Mass Calculation | % Tremolite by TEM Using ASTM D5756 Mass Calculation | % Chrysotile by TEM Using ASTM D5756 Mass Calculation | % Total Tremolite & Chrysotile by TEM Using ASTM D5756 Mass Calculation | % Asbestos by PLM | % Organics | % Acid Soluable | % Other | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 308006-6 | D-58 | 0.00000169% | 0.0000675% | ND | ND | ND | ND | 0.3% | 6.7% | 93.1% | Gravimetric Loss from PLM Prep: Organics = 0.9%; Acid Soluable = 7.1%; Other = 93.0% |
| 308006-6A | D-58 | 0.00000133% | 0.0000485% | < 0.00001% | < 0.00001% | ND | ND | 0.2% | 19.5% | 80.2% | Gravimetric Loss from PLM Prep: Organics = 0.3%; Acid Soluable = 8.5%; Other = 91.3% |
| 308006-6B | D-58 | 0.00000135% | 0.0000540% | ND | 0.00002% | 0.00002% | ND | 0.2% | 11.2% | 88.6% | Gravimetric Loss from PLM Prep: Organics = 0.3%; Acid Soluable = 5.5%; Other = 94.2% |

LOD = Limit of Detection        LOQ = Limit of Quantification        ND = Not Detected        PLM = Polarized Light Microscopy        TEM = Transmission Electron Microscopy

Analytical Method(s):   PLM by Modified NY ELAP 198.6
TEM by Modified NY ELAP 198.4/ASTM D5756

Analyst(s):  PLM 
TEM

Technical Director: Andreas Saldivar

All results are to be considered preliminary and subject to change unless signed by the Technical Director or Deputy

**FDA Statement**

The U.S. Food and Drug Administration is alerting consumers of a voluntary recall by Johnson & Johnson of Johnson's Baby Powder after FDA testing has found that a sample from one lot of the product contains chrysotile fibers, a type of asbestos. Consumers who have Johnson's Baby Powder lot #22318RB should stop using it immediately and contact Johnson & Johnson for a refund. The FDA stands by the quality of its testing and results and is not aware of any adverse events relating to exposure to the lot of affected products.

During talc mining, if talc mining sites are not selected carefully and steps are not taken to purify the talc ore sufficiently, the talc may be contaminated with asbestos. Asbestos is a known carcinogen. It is important to note that the FDA has been conducting testing of talc-containing cosmetic products for asbestos. Not all talc contains asbestos and the majority of product samples tested by the FDA did not contain asbestos.

Since 2018, the FDA has been conducting an ongoing survey of cosmetic products for asbestos and to date has tested approximately 50 cosmetic products. As part of this testing, two samples of Johnson's Baby Powder were tested: one sample from lot #22318RB was found to be positive for asbestos; a second Johnson's Baby Powder sample, lot #00918RA, tested negative for asbestos. The FDA expects to issue the full results from this survey, including all tested products having both positive and negative results, by the end of the year. Since undertaking the testing, the agency has warned consumers when products tested positive for asbestos, advising them to stop using affected products, including not to use certain products from Claire's and Beauty Plus Global. The FDA will continue to update its safety alert with new information as it becomes available.

Page -179-

Gref.B-FIN01-000179

**JA385**

**Measurements of Shulton Products Including Old Spice Body Powder**

According to the Deposition of Whittaker Clark and Daniels corporate representative Theodor Hubbard (Los Angeles Superior Court BC607192; Aug 8, 2016) Italian ore from the Metropolitan Talc Company was used from 1977 to 1983. In 1976, the ore was from the Hitchcock mine in North Carolina.Ore from Alpine, Alabama was also used.  Old Spice Talcum Powder products were manufactured into the early to mid-1990s.

Lewin, in his 1973 report to the FDA, reported 1% tremolite in Old Spice Body Powder.

According to the February, 2020 report of the geologist Sean Fitzgerald, 'Whittaker, Clark & Daniels was the primary supplier of talc (99%) to the Shulton Company for use in the talc-containing products manufactured in the Clifton and Mays Landing, NJ plants, including Old Spice®, Desert Flower® , and Friendship Garden® talcum powders.

The talc supplied to Shulton came from the mining of three talc formations. The first was known as American Ground Italian (AGI), which was talc from the Val Chisone talc mines in the Piedmont region of northwest Italy. Grade 1615 was such an AGI talc. Whittaker, Clark & Daniels also supplied Shulton with talc grade 2450 (a.k.a., 643), from a mine located in Cherokee County, North Carolina. This talc came from a geologic belt known as the Murphy marble belt, specifically from the Hitchcock mine, approximately 1.5miles southwest from Murphy, NC. Thirdly, grade 141 was supplied from Alpine Alabama, from the talc mined in Talladega (and nearby Tallapoosa; Dadeville) County. This talc was mined in a zone of metamorphic rocks that contains both asbestos and talc deposits, and includes areas rich in amphiboles, specifically, anthophyllite.

All three of these talc formations sourced for use in the subject products have been shown to contain asbestos, both in the geologic investigations of their formations and in the laboratory analysis of talc ore and products sourced from these mines.'

With respect to North Carolina Talc, Fitzgerald wrote " I have personally visited this area, collected samples, and confirmed tremolite presence in the talc mines of the Murphy, NC marble and talc belt. I confirmed asbestos presence including in the Hitchcock talc mine. In both hand samples of bedrock and collected samples of milled talc taken from the mine I confirmed asbestos presence in the laboratory, including chrysotile, winchite, richterite, and asbestiform tremolite.'

With respect to Alabama talc: 'I have personally tested grade 141 in a manner consistent with and in fact parallel to my testing of AGI 1615 (see Italian talc section, to follow), and confirmed that grade 141 talc contained releasable fibers of chrysotile and anthophyllite asbestos.'

And for Italian talc: 'Further, in 2013, I personally tested samples of talc ore (AGI 1615) given to me for testing from Dr. Arthur Langer and Dr. Robert Nolan, experts retained by the companies involved in this case, including Colgate. ("TEM Images, EDS Spectra, and SAED of Asbestos Released from Source Talc Grade 1615".) The samples were confirmed as originating from the Val

Gref.B-FIN01-000180

Chisone/Val Germanesca region and of a 1970s vintage. In my testing of the Italian ore, I found both asbestiform anthophyllite and asbestiform tremolite, and occasional chrysotile asbestos.'

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | Chamber, cc | fibers | Talc grade grams used |
|--------|----------|-------|--------|-----|---------|---------|----------|----|-----|-----|-------|------|-------------|--------|------------------------|
| 1615 | Anthopyllite & Tremolite | 7 | 100 | 1320 | 200 | 50 | 0.25 | 10 | 0.0128 | 0.4125 | 54.69 | 2.8875 | 245,150 | 707,872 | 0.2544 |

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | Chamber, cc | fibers | Talc grade grams used |
|--------|----------|-------|--------|-----|---------|---------|----------|----|-----|-----|-------|------|-------------|--------|------------------------|
| 141 | Anthopyllite & Chrysotile | 6 | 100 | 1320 | 130 | 30 | 0.23077 | 10 | 0.0128 | 0.4469 | 46.88 | 2.6813 | 245,150 | 657,310 | 0.1015 |

*Table 1: Calculated concentrations of asbestos released from Talc Grades 1615 and 141.*

Fitzgerald also measured release of asbestos from containers of Old Spice and Desert Flower talcs.

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | | | |
|--------|----------|-------|--------|-----|---------|---------|----------|----|-----|-----|-------|------|---|---|---|
| 2-Left | Chrysotile | 2 | 100 | 1320 | 400 | 30 | 0.075 | 15 | 0.0128 | 0.9167 | 10.42 | 1.8333 | | | |
| 2-Left | Anthophyllite | 3 | 100 | 1320 | 400 | 30 | 0.075 | 15 | 0.0120 | 0.9167 | 15.63 | 2.7500 | | | |
| 2-Left | ALL | 5 | 100 | 1320 | 400 | 30 | 0.075 | 15 | 0.0128 | 0.9167 | 26.04 | 4.5833 | | | |
| 2-right | ALL (chry) | 5 | 100 | 1320 | 400 | 30 | 0.075 | 10 | 0.0128 | 1.3750 | 39.06 | 0.8750 | | | |
| 2-center | Anthophyllite | 1 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 7.81 | 1.6500 | | | |
| 2-center | Chrysotile | 3 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 23.44 | 4.9500 | | | |
| 2-center | ALL | 4 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 31.25 | 6.6000 | | | |
| | | | | | | | | | | | Chamber, cc | fibers | | | Talc Product grams used |
| | | | | | | Old Spice for Men average: | | | | 6.0194 | 245,150 | 1,475,659 | mostly chrysotile | | 1.06 |

| Sample | Asbestos | count | Volume | EFA | suspens | aliquot | dilution | GO | GOA | as | s/mm2 | s/cc | | | |
|--------|----------|-------|--------|-----|---------|---------|----------|----|-----|-----|-------|------|---|---|---|
| 3-Left | Anthophyllite | 2 | 100 | 1320 | 400 | 10 | 0.025 | 10 | 0.0128 | 4.1250 | 15.63 | 8.2500 | | | |
| 3-Left | Tremolite | 3 | 100 | 1320 | 400 | 10 | 0.025 | 10 | 0.0128 | 4.1250 | 23.44 | 12.3750 | | | |
| 3-Left | ALL | 5 | 100 | 1320 | 400 | 10 | 0.025 | 10 | 0.0128 | 4.1250 | 39.06 | 20.6250 | | | |
| 3-right | Anthophyllite | 1 | 100 | 1320 | 400 | 20 | 0.05 | 10 | 0.0128 | 2.0625 | 7.81 | 2.0625 | | | |
| 3-right | Tremolite | 3 | 100 | 1320 | 400 | 20 | 0.05 | 10 | 0.0128 | 2.0625 | 23.44 | 6.1875 | | | |
| 3-right | ALL | 4 | 100 | 1320 | 400 | 20 | 0.05 | 10 | 0.0128 | 2.0625 | 31.25 | 8.2500 | | | |
| 3-center | Anthophyllite | 2 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 15.63 | 3.3000 | | | |
| 3-center | Tremolite | 1 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 7.81 | 1.6500 | | | |
| 3-center | ALL | 3 | 25 | 1320 | 400 | 100 | 0.25 | 10 | 0.0128 | 1.6500 | 23.44 | 4.9500 | | | |
| | | | | | | | | | | | Chamber, cc | fibers | | | Talc Product grams used |
| | | | | | | Desert Flower average: | | | | 11.2750 | 245,150 | 2,764,072 | mostly tremolite | | 4.37 |

He also measured tremolite in the Dustfall.

Mr. Fitzgerald's summary stated:

"In summary, the talc sources for the historic Shulton talcum powders supplied by Whittaker, Clark & Daniels were formed in geologic formations that can and do have asbestos minerals associated with them, and asbestos has been confirmed by geologists and associated with those talc ores. Repeated testing of both the grade 1615 Italian talc from Val Chisone and the grade 141 talc from the Hitchcock mine in North Carolina have been found to contain asbestos, including anthophyllite,

Page -181-

Gref.B-FIN01-000181

JA387

tremolite, and chrysotile asbestos. Finally, my own releasability tests of Old Spice® and Desert Flower® found significant concentrations of airborne asbestos, including the same three mineral species historically identified, namely chrysotile, anthophyllite, and tremolite asbestos."

Dr. William Longo tested samples of Old Spice. Powdered samples were obtained, but the containers were not identified, nor the year of manufacture.

**ANALYSIS REPORT**
**MAS Project # M70594**
**Old Spice Talc Powder Products**
**01/15/2020**

"This report includes the results of analyses for sixteen of seventeen containers of Old Spice Body Powder (OSBP) samples. The samples were supplied to Materials Analytical Services, LLC by J3 Laboratories on behalf of Phillips & Paolicelli on June 10, 2019 and were then assigned MAS laboratory project identification number M70594 and sample numbers 001-017, respectively. The container labeled OS-028C was found to be empty so therefore, only 16 Old Spice aliquots were analyzed for the possible presence of amphibole asbestos.

The 16 OSBP samples were analyzed for the possible presence of amphibole asbestos by both PLM (ISO & Blount method) as well as ATEM with heavy liquid separation (HLS). Also, a semiquantitative analysis for amount of fibrous talc in the 16 samples was also done by both ATEM and PLM during the analysis.

Each of the 16 OS-C containers were examined by polarizing light microscopy by both the ISO 22262-1 PLM (w/o HLS) and the Blount PLM method with HLS. For the analytical transmission electron microscopy (ATEM); the samples were first prepared by the ISO-22262-2 heavy liquid (HLS) cosmetic talc analysis method. For the ATEM analysis, suspected amphibole asbestos structures were analyzed by the three-step method: 1) morphology, 2) energy dispersive x-ray spectroscopy (EDXA) and 3) selected area electron diffraction (SAED), for the verification of fibrous amphibole asbestos.

*The overall results showed that 8 of the 16 (50%) OSBP samples were positive for the tremolite asbestos solid solution series.*

**ATEM**

For the ATEM analysis, six of the 16 (**38%**) OS-C samples were positive for amphibole asbestos at a concentration range of 6,950 to 48,500 asbestos fiber/bundles per gram of talcum powder,

Page -182-

Gref.B-FIN01-000182

**JA388**

with an average asbestos ratio of 12.5 to 1. For the 13 fibrous tremolite asbestos structures found by ATEM, *all 13 were classified as bundles.*

**Blount PLM**
For the Blount PLM method (with) HLS there were 5 out of 16 (**31%**) positive for tremolite/actinolite asbestos. *The aspect ratio for all of the amphibole asbestos bundles found was all greater than 20:1.* Also, 14 out of 16 samples were found to contained tremolite/actinolite cleavage fragments cleavage (nonfibrous).

**ATEM Analysis**
For the ATEM analysis, 100 grid openings were analyzed between two grids (50 openings per grid). JEOL 1200EX ATEMs equipped with either a Noran or an Advanced Analysis Technologies (light element) energy dispersive x-ray analyzer (EDXA) were employed for this analysis. The sample was analyzed at a screen magnification of 20,000X. Verification of regulated asbestos structures is done in the ATEM by the following three steps:

**Morphology (Step 1)**
For the determination of the fibrous morphology (step 1) for any potential regulated amphibole asbestos structures in the sample was done by the standard ATEM methodology. For morphology, fibers and bundles, *the potential asbestos structures must have substantially parallel sides with an aspect ratio of 5:1 or greater, and at least 0.5 μm in length.*

**Amphibole Asbestos Verification (Steps 2 & 3)**
For potential fibrous asbestos structures that fit the above morphology criteria, they are analyzed in the ATEM by EDXA for the fiber/bundle chemistry (step 2) and selected area electron diffraction (SAED) for the appropriate crystalline lattice measurements for regulated amphibole asbestos.The detection limit for this method, as specified by the ISO 22262-1, is the findings of either 1 fiber or 1 bundle in the analysis.

**ATEM Analysis**
For the ATEM analysis, six of the 16 (**38%**) OS-C samples were positive for amphibole asbestos at a concentration range of 6,950 to 48,500 asbestos fiber/bundles per gram of talcum powder, with an average asbestos ratio of 12.5 to 1. For the 13 fibrous tremolite asbestos structures found by ATEM 13 or 100% were classified as bundles.

Gref.B-FIN01-000183

## Table 1. Sample Analysis Results

| Sample Number | Client Sample Number | ATEM TEM strs /gram | PLM w/o HLS | Blount-PLM | Fibrous Talc Amount (ISO-PLM) |
|---|---|---|---|---|---|
| M70594-001 | OS-002C | <7,070 | NDA* | NDA* | Abundant |
| M70594-002 | OS-003C | <7,100 | NDA* | <0.1%Trem/Act | Abundant |
| M70594-003 | OS-007C | <7,210 | NDA* | NDA* | Abundant |
| M70594-004 | OS-008C | <6,960 | NDA* | NDA* | Abundant |
| M70594-005 | OS-012C | <6,950 | NDA* | NDA* | Abundant |
| M70594-006 | OS-013C | 7,240 | NDA* | NDA* | Abundant |
| M70594-007 | OS-018C | <7,010 | NDA* | NDA* | Abundant |
| M70594-008 | OS-020C | 7,210 | NDA* | <0.1%Trem/Act | Abundant |
| M70594-009 | OS-021C | 7,110 | NDA* | <0.1%Trem/Act | Abundant |
| M70594-010 | OS-023C | <7,100 | NDA* | <0.2%Trem/Act | Moderate |
| M70594-011 | OS-024C | <7,090 | NDA* | NDA* | Moderate |
| M70594-012 | OS-027C | 7,290 | NDA* | NDA* | Moderate |
| M70594-013 | OS-028C | N/A** | N/A* | N/A* | N/A* |
| M70594-014 | OS-029C | <7,180 | NDA* | NDA* | Moderate |
| M70594-015 | OS-030C | 48,500 | NDA* | <0.2Trem/Act | Moderate |
| M70594-016 | OS-031C | 14,200 | NDA* | NDA* | Abundant |
| M70594-017 | OS-032C | <7,130 | NDA* | NDA* | Abundant |

*NDA: No fibrous Amphibole structures detected with aspect ratios $\geq$5:1
**N/A: Not applicable, no sample in the OS-028C container

Page -184-

Gref.B-FIN01-000184

JA390

# SUPPLEMENT ANALYSIS REPORT
# MAS Project # 70092
# Old Spice Talcum Powder

May 15, 2020

## OVERVIEW

The 17 Old Spice talcum powder split samples were analyzed by MAS for the possible presence chrysotile asbestos using the PLM HLS method developed by the Colorado School of Mines (CSM), and provided in late 1972 to early 1973.[1,2]

The CSM-PLM results showed that 16 of 17 (94%) OS-B sample splits were found to be positive for chrysotile asbestos.   The estimated chrysotile volume weight percent for the positive 16 OS-B sample splits was an estimated range 0.2 to 1.4 wt. percent. (20 % recovery corrected).  The one sample that was not positive for chrysotile was OS-028, M70092-013.

Additionally, fibrous talc, at a trace estimated concentration, was detected in all 17 OS-B samples analyzed by the CSM-PLM method.

Gref.B-FIN01-000185

### Table 1. Sample Analysis Results

| MAS Sample # | OS Sample # | ATEM f-b/gram With HLS (2.85) Amphibole asbestos | PLM with-out HLS Amphiboles asbestos | Blount-PLM with HLS (2.81) Amphibole asbestos | PLM-CSM with HLS (2.70) Chrysotile |
|---|---|---|---|---|---|
| M70092-001 | OS-002B | 11,700 | NDA* | NDA | 0.6 to 1.0%** |
| M70092-002 | OS-003B | 12,100 | NDA | 0.02% Trem/Act | 0.4 to 0.8% |
| M70092-003 | OS-007B | <5,690 | NDA | NDA | 0.4 to 0.8% |
| M70092-004 | OS-008B | <4,310 | NDA | NDA | 0.8 to 1.4% |
| M70092-005 | OS-012B | <6,030 | NDA | NDA | 0.8 to 1.4% |
| M70092-006 | OS-013B | 22,200 | <0.1%Trem/Act | NDA | 0.4 to 0.8% |
| M70092-007 | OS-018B | <5,930 | NDA | NDA | 0.8 to 1.4% |
| M70092-008 | OS-020B | 12,100 | NDA | 0.02%Trem/Act | 0.2 to 0.6% |
| M70092-009 | OS-021B | <5,720 | NDA | 0.02%Trem/Act | 0.2 to 0.6% |
| M70092-010 | OS-023B | <6,060 | <0.1%Trem/Act | 0.02%Trem/Act | 0.4 to 0.8% |
| M70092-011 | OS-024B | <4,470 | NDA | NDA | 0.4 to 0.8% |
| M70092-012 | OS-027B | 18,200 | NDA | 0.02%Trem/Act | 0.4 to 0.8% |
| M70092-013 | OS-028B | 61,800 | <0.1%Trem/Act <0.1%Anth | 0.4% Trem/Act 0.2% Anth | NDA* |
| M70092-014 | OS-029B | <6,010 | NDA | NDA | 0.6 to 1.0% |
| M70092-015 | OS-030B | 17,700 | NDA | 0.02%Trem/Act | 0.2 to 0.6% |
| M70092-016 | OS-031B | 4,590 | NDA | NDA | 0.4 to 0.8% |
| M70092-017 | OS-032B | <6,130 | NDA | NDA | 0.4 to 0.8% |

*NDA: No Fibrous Amphibole Structures Detected.
**CSM-PLM results weight corrected for HLS 20% recovery

Gref.B-FIN01-000186

JA392

# ANALYSIS REPORT
# MAS Project # M71045
# Old Spice Retains

May 15, 2020

## PROJECT SUMMARY

This report includes the results of analyses for the three Old Spice talcum powder containers were submitted to MAS by Lee Poye, on behalf of the law firm of Simon, Greenstone & Panatier, and received by MAS on 1/3/2020.  The three Old Spice talcum powder containers were assigned MAS laboratory project identification number M71045-001, 002 and 003 and were labeled OS-006A, OS-016A and OS-033A   Photographs of the three Old Spice sample split containers can be found in Section 7 to this report.

Gref.B-FIN01-000187

## OVERVIEW

The three Old Spice talcum powder samples were analyzed by MAS for the possible presence of amphibole asbestos (tremolite series & anthophyllite series) by the Blount/PLM and ATEM, with heavy liquid separation (HLS), and the ISO-PLM method without HLS sample preparation.

Also, the three Old Spice talcum powder samples were analyzed for the presence of chrysotile asbestos using the PLM HLS method developed by the Colorado School of Mines (CSM), and provided in late 1972 to early 1973.[1,2]

For the three OS-A container samples, all were found to be below the detection limit for both the ISO-PLM and ISO-ATEM methods.

For the Blount-PLM method, OS-001A sample was positive for tremolite/actinolite, while the other two OS-A samples (OS-016A and OS-033A were both found to be below the detection limit for amphibole asbestos by the Blount-PLM method.

The CSM-PLM results showed that all three OS-A sample splits were found to be positive for chrysotile asbestos.   The estimated chrysotile volume weight percent for the OS-A container sample M71095-001 was a range of between 0.60 to 01.6 wt. percent. (20 % recovery corrected).

Gref.B-FIN01-000188

JA394

## Table 1. Asbestos Analysis Results

| Sample Number | Client Sample Number | Year of Manufacture | ATEM Amphibole Asbestos F-B /gram | ISO-PLM with/out HLS Amphibole wt. percent | Blount-PLM with HLS Amphibole wt. percent | CMS-PLM with HLS Chrysotile wt. percent |
|---|---|---|---|---|---|---|
| M71045-001 | OS-006A | unknown | <5,580 | *NDA | <0.01% | 0.60 to 1.60** |
| M71045-002 | OS-016A | unknown | <6.980 | NDA | NDA | 0.01 to 0.02 |
| M71045-003 | OS-033A | unknown | <7,130 | NAD | NAD | 0.01 to 0.02 |

*NDA: No Fibrous Amphibole Asbestos Structures Detected
**CSM-PLM results weight corrected for HLS 20 % recovery

Page -189-

Gref.B-FIN01-000189

JA395

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | Spreadsheet for Maximum Likelihood Calculations of Longo Old Spice Data | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | Solver Cells |
| 5 | DATA* | Log Likelihood of Observation, given estimate of Mean & SD | Starter | Mean | 8.3115286512 |
| 6 | 7240 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A6)-E$5)/E$6)^2)) | Starter | SD | 1.2195856516 |
| 7 | 7210 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A7)-E$5)/E$6)^2)) | | | |
| 8 | 7110 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A8)-E$5)/E$6)^2)) | | | |
| 9 | 7290 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A9)-E$5)/E$6)^2)) | | | |
| 10 | 48500 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A10)-E$5)/E$6)^2)) | | | |
| 11 | 14200 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A11)-E$5)/E$6)^2)) | | | |
| 12 | 11700 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A12)-E$5)/E$6)^2)) | | | |
| 13 | 12100 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A13)-E$5)/E$6)^2)) | | | |
| 14 | 22200 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A14)-E$5)/E$6)^2)) | | | |
| 15 | 18200 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A15)-E$5)/E$6)^2)) | | | |
| 16 | 61800 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A16)-E$5)/E$6)^2)) | | | |
| 17 | 17700 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A17)-E$5)/E$6)^2)) | | | |
| 18 | 4590 | =LN((1/((2*PI())^0.5*E$6))*EXP(-(1/2)*((LN(A18)-E$5)/E$6)^2)) | | | |
| 19 | <7070 | =LN(NORMDIST(LN(7070),E$5,E$6,TRUE)) | | | |
| 20 | <7100 | =LN(NORMDIST(LN(7100),E$5,E$6,TRUE)) | | | |
| 21 | <7210 | =LN(NORMDIST(LN(7210),E$5,E$6,TRUE)) | | | |
| 22 | <6960 | =LN(NORMDIST(LN(6960),E$5,E$6,TRUE)) | | | |
| 23 | <6950 | =LN(NORMDIST(LN(6950),E$5,E$6,TRUE)) | | | |
| 24 | <7010 | =LN(NORMDIST(LN(7010),E$5,E$6,TRUE)) | | | |
| 25 | <7100 | =LN(NORMDIST(LN(7100),E$5,E$6,TRUE)) | | | |
| 26 | <7090 | =LN(NORMDIST(LN(7090),E$5,E$6,TRUE)) | | | |
| 27 | <7180 | =LN(NORMDIST(LN(7180),E$5,E$6,TRUE)) | | | |
| 28 | <7130 | =LN(NORMDIST(LN(7130),E$5,E$6,TRUE)) | | | |
| 29 | <5690 | =LN(NORMDIST(LN(5690),E$5,E$6,TRUE)) | | | |
| 30 | <4310 | =LN(NORMDIST(LN(4310),E$5,E$6,TRUE)) | | | |
| 31 | <6030 | =LN(NORMDIST(LN(6030),E$5,E$6,TRUE)) | | | |
| 32 | <5930 | =LN(NORMDIST(LN(5930),E$5,E$6,TRUE)) | | | |
| 33 | <5720 | =LN(NORMDIST(LN(5720),E$5,E$6,TRUE)) | | | |
| 34 | <6060 | =LN(NORMDIST(LN(6060),E$5,E$6,TRUE)) | | | |
| 35 | <4470 | =LN(NORMDIST(LN(4470),E$5,E$6,TRUE)) | | | |
| 36 | <6010 | =LN(NORMDIST(LN(6010),E$5,E$6,TRUE)) | | | |
| 37 | <6130 | =LN(NORMDIST(LN(6130),E$5,E$6,TRUE)) | | | |
| 38 | <5580 | =LN(NORMDIST(LN(5580),E$5,E$6,TRUE)) | | | |
| 39 | <6980 | =LN(NORMDIST(LN(6980),E$5,E$6,TRUE)) | | | |
| 40 | <7130 | =LN(NORMDIST(LN(7130),E$5,E$6,TRUE)) | | | |
| 41 | | Total LogLikelihood | | | |
| 42 | | =SUM(B6:B40) | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |

I used the formulae for the arithmetic mean and standard deviation described in the Perkins textbook (Perkins JL. Modern Industrial Hygiene. Volume I: Recognition and Evaluation of Chemical Agents. New York: Van Nostrand Reinhold; 1997).

Gref.B-FIN01-000190

JA396

| $\mu_L, \sigma_L$ | $\mu_c =$ | $\exp[\mu_L + (\tfrac{1}{2})\sigma_L^2]$ |
|---|---|---|
| $\mu_g, \sigma_L$ | $\mu_c =$ | $\mu_g \exp[(\tfrac{1}{2})\sigma_L^2]$ |
| $\mu_L, \sigma_L$ | $\sigma_c =$ | $\sqrt{[\exp(2\mu_L + \sigma_L^2)][\exp(\sigma_L^2)-1]}$ |
| $\mu_g, \sigma_L$ | $\sigma_c =$ | $\sqrt{\mu_g^2[\exp(\sigma_L^2)][\exp(\sigma_L^2)-1]}$ |

So Mean =  di exp(8.31 + 0.5*(1.22)^2)
8560

and SD
. di (exp((2*8.31) + 1.22^2)*exp((1.22*1.22) - 1))^0.5
10,900

The arithmetic mean concentration was about 8560 structures / gm and the standard deviation was about 10900.

To calculate the Confidence Intervals for the Arithmetic Mean, I used the methods described in: Ulf Olsson (2005) Confidence Intervals for the Mean of a Log-Normal Distribution, Journal of Statistics Education, 13:1, , DOI: 10.1080/10691898.2005.11910638.

The Confidence Intervals for log(Mean) are:

$$\overline{Y} + \frac{S^2}{2} \pm z\sqrt{\frac{S^2}{n} + \frac{S^4}{2(n-1)}}$$

This gives the 95% Confidence Interval on the arithmetic mean concentration to be (5000-14,500) structures gram.

Page -191-

Gref.B-FIN01-000191

JA397

We thus have that the mean concentration of amphibole structures in the Old Spice powders measured by Dr. Longo was 8560 (5000 - 14,500) structures / gm of powder.

It should be noted that neither the manufacture dates nor mine sources of the powder samples were available. It is thus possible that these samples represent a mixture of sources.

**Measurements of Clubman Talc**

FDA Memo

EMORANDUM          DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
                        PUBLIC HEALTH SERVICE            F-620
                     FOOD AND DRUG ADMINISTRATION

: Dr. Robert M. Schaffner, Director        DATE: July 31, 1973
  Office of Technology (BF-400)                7/31/73

OM : Dr. Alfred Weissler, Acting Director
     Division of Color Technology (BF-430)

UJECT: Summary and Comments on Prof. Lewin's Analytical Results for Asbestos
       in Talc

## 163      Pinaud Clubman Talc

| SAMPLE NO. | N.Y.U. (X-RAY DIFFRACTION) | RESULTS FDA[a] (OPTICAL MICROSCOPY) | PFIZER[b] (X-RAY DIFFRACTION) |
|---|---|---|---|
| 163 | 10% | large amount | 3.8% |

Dr. Steven Compton analyzed 4 samples of Clubman Talc on behalf of a plaintiff's attorney (MVA 12113, September 2017). Three samples were from Pinaud Clubman containers and one sample was recovered from an application brush. All three containers had barcodes suggesting they were manufactured in the mid 1970s or later. The sample retrieved from the application brush is alleged to be a sample of Pinaud Clubman talcum powder used by the plaintiff.

After visual examination and labeling with an MVA sample number, each sample received was photographed and a representative portion of each sample was weighed, suspended in filtered deionized water, and a known aliquot was extracted and filtered through a 0.4 micrometer pore size membrane filter. Each filter was dried and grids prepared following standard direct preparation procedures for analysis by transmission electron microscopy (TEM). The grids were examined using a Philips EM 420 transmission electron microscope (TEM) equipped with a Thermo

Page -192-

Gref.B-FIN01-000192

**JA398**

Scientific Noran System 7 energy dispersive x-ray spectrometry (EDS) analysis system and capable of selected area electron diffraction (SAED).

Talc fibers were not counted, but were discounted after confirming their identity by elemental composition and observation of a pseudohexagonal diffraction pattern, consistent with the reported literature. Anthophyllite, tremolite, and actinolite fibers were designated as such based on their elemental composition and linear repeating diffraction patterns. When possible, a zone axis pattern was indexed to confirm the mineral identity. For each prepared sample, a laboratory blank sample was prepared following all of the same procedures except for the addition of test material.

During the TEM examination, numerous platy and fibrous talc particles were observed. In addition to talc, anthophyllite fibers (one or more) were detected in all samples. The anthophyllite fiber concentration for all four samples ranges from approximately 11 to 51 million fibers per gram. After estimating the mass of the fibers counted, this corresponds to a quantity ranging from 0.00005% to 0.002% by weight. No asbestos or talc fibers were detected in the analyzed blank samples.



**Figure 9.** TEM image (above) and EDS spectrum (below) of an anthophyllite fiber

**Table 1. Summary of TEM Bulk Sample Analytical Results**

| MVA Sample ID | Sample Description | TEM Analysis Results | | |
|---|---|---|---|---|
| | | Fibers Confirmed | % Wt Asbestos | [Fibers Per Gram] |
| AC0764 | Pinaud Clubman Talc in tin (11 oz) | 1 | 0.00053 | 11,000,000 |
| AC0765 | Pinaud Clubman Talc in tin (11 oz) | 4 | 0.0010 | 51,000,000 |
| AC0766 | Pinaud Clubman Talc in plastic bottle (255g) | 2 | 0.0020 | 20,000,000 |
| AC0767 | Duster brush filled with Pinaud Clubman talc powder | 1 | 0.00005 | 12,000,000 |

Gref.B-FIN01-000193

**JA399**

The length, width, and Aspect Ratios of the anthophyllite fibers measured by Dr. Compton are shown below.

| | Length | width | AspectRatio |
|---|---|---|---|
| 1 | 1.9 | .33 | 6 |
| 2 | .5 | .1 | 5 |
| 3 | 1.5 | .05 | 30 |
| 4 | 2.5 | .33 | 8 |
| 5 | 1.5 | .19 | 8 |
| 6 | 2.5 | .1 | 25 |
| 7 | 3 | .52 | 6 |
| 8 | 2.1 | .1 | 21 |

The mean width was 0.215 microns +\- 0.163 microns.

There is some controversy whether the anthophyllite particles measured by Dr. Compton are best described as asbestiform fibers or cleavage fragments. According to Dr. Ann Wylie, Professor of Geology at the University of Maryland, "Rather than aspect ratio, width is a much more fundamental parameter of asbestos fibers, and perhaps will shed some light on how we tell particles that are elongated, whether they are cleavage fragments, or whether they are asbestos." A critical dimensional distinction between asbestiform fibers and cleavage fragments appears to be their widths. Thus, Dr. Wylie stated that her analyses of width show that about 80 percent of the amphibole cleavage fragments longer than five micrometers, have widths greater than one micron, and none have widths less than 0.25. Dr. Wylie also pointed out how the width of asbestos fibers will influence their aspect ratio. She stated that the mean width of asbestos fibers is less than half a micron, and if you have five micrometer particles, you have to have an aspect ratio of at least 10 to 1. Moreover in her comments she stated that while low aspect ratio fiber (or fiber bundles) are present in asbestos populations, they are characteristic of short asbestos fibers. Since the mean width of asbestos fibers is less than 0.5 micrometers, the mean aspect ratio of a 5 micrometer fiber is about 10:1. (Federal Register / V o l. 57, No. 110 / Monday] June 8, 1992).

Dr. R.J. Lee, a microscopist and mineralogist with R.J. Lee and Associates, noted the importance of width in distinguishing asbestos fibers from nonasbestiform cleavage fragments. Dr. Lee testified to the following: First airborne asbestos is less than one micrometer in diameter, unless it's present as bundles or clusters, which exhibit the characteristic fibrillar structure of asbestos. Asbestos larger than a half a micron is a bundle. Second, nonasbestos particles longer than five micrometers in length are generally more than one micrometer in diameter, and only rarely less than half a micrometer in diameter. (Federal Register / Vol. 57, No. 110 / Monday, June 8, 1992).

Now, Dr. Wylie has published data on anthophyllite clevage fragments in the Canadian Mineralogist (Wylie 2016).

Page -194-

Gref.B-FIN01-000194

JA400

## TABLE 7B. AMPHIBOLE CLEAVAGE FRAGMENT EMPS DERIVED FROM CRUSHED SAMPLES

| | II anthophyllite Sweden |
|---|---|
| 1 ≤ L ≤ 5 μm | |
| % all EMPs | 52 |
| width mode (μm) | 0.72 0.06 |
| mean width ± SD (μm) | 0.71 ± 0.29 |
| range (μm) | 0.24–1.44 |

So, for cleavage fragments less than 5 microns in length, the mean width was 0.71 +/- 0.29 microns.

We can thus compare the width distribution of the amphibole particles measured by Dr. Compton with the mean widths of a population of anthophyllite cleavage fragments.

```
Two-sample t test with unequal variances
------------------------------------------------------------------------------
         |    Obs       Mean    Std. Err.   Std. Dev.   [95% Conf. Interval]
---------+--------------------------------------------------------------------
       x |      8       .215   .0576292        .163    .0787286    .3512714
       y |     81        .71   .0322222         .29    .6458757    .7741243
---------+--------------------------------------------------------------------
combined |     89   .6655056   .0333252    .3143895    .5992788    .7317325
---------+--------------------------------------------------------------------
    diff |             -.495   .0660257                -.6389129   -.3510871
------------------------------------------------------------------------------
    diff = mean(x) - mean(y)                                  t =  -7.4971
Ho: diff = 0                           Satterthwaite's degrees of freedom =  11.9586

    Ha: diff < 0                 Ha: diff != 0                     Ha: diff > 0
 Pr(T < t) = 0.0000          Pr(|T| > |t|) = 0.0000          Pr(T > t) = 1.0000
```

The null hypothesis that there is no difference in the mean widths between the anthophyllite particles measured by Dr. Compton and the anthophyllite cleavage fragments published by Dr. Wylie is rejected (P = 0.0000). This is consistent with the particles measured by Dr. Compton being asbestiform and not cleavage fragments.

Gref.B-FIN01-000195

**JA401**

Reference List

Wylie AG. 2016. Amphibole Dusts: Fibers, Fragments, and Mesothelioma. Canadian Mineralogist 54:1403-1435.

**English Leather**

Dr. Seymour Lewin did not detect asbestos fibers in English Leather talc by the use of X-ray diffraction.

EMORANDUM             DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
                                      PUBLIC HEALTH SERVICE
                              FOOD AND DRUG ADMINISTRATION          F - 6 ̄

      :  Dr. Robert M. Schaffner, Director          DATE: July 31, 1973
         Office of Technology (BF-400)        RM
                                                      7/31/73

  )M  :  Dr. Alfred Weissler, Acting Director
         Division of Color Technology (BF-430)

 JECT:  Summary and Comments on Prof. Lewin's Analytical Results for Asbestos
         in Talc

Page -196-

# Measurements of Baby Powder Air Concentrations

**A: Longo: Measurement of Fibers in the Breathing Zone of a Subject applying Baby Powder below the Waist (MAS Project 14-1852, September 2017).**

Approximately 4 grams of baby powder were applied to the lower body of an investigator. The NIOSH 7400 PCM and 7402 TEM methods were performed to determine if any detectable amphibole asbestos fibers from the Johnson's Baby Powder were released into the Breathing zone of the investigator. Four personal samples were collected and fibers were detected by PCM and TEM.



### Overview

This report describes the procedures and methodology used to analyze for airborne asbestos amphibole fiber exposure during the application of talc-containing Johnson's Baby Powder metal container M65205-001. Previous bulk ATEM analysis of the Johnson's Baby Powder from this can showed a tremolite concentration of 15,100,000 tremolite fibers.

Approximately 4 grams of baby powder were applied to the lower body of an investigator to determine the potential exposure levels of an individual to asbestos amphibole fibers while applying Johnson's Baby Powder. Both the NIOSH 7400 PCM method and the NIOSH 7402 TEM method were performed to determine if any detectable amphibole asbestos fibers from the Johnson's Baby Powder were released into the breathing zone of the investigator and immediate surrounding area in the ECL. The Johnson's Baby Powder application procedure used in this study was based on the testimony of the plaintiff, Jody Ratcliff.

The NIOSH 7400 PCM analysis found that the four personal sample results ranged from 3.85 f/cc to 5.86 f/cc with an average mean of 4.52 f/cc. Area air sample results were 0.28 f/cc to 0.58 f/cc with an average mean of 0.41 f/cc.

Four of the personal PCM filters were analyzed by the NIOSH 7402 TEM method and the percent tremolite asbestos fiber concentration ranged from 42.9% to 76.9% resulting in a PCM equivalent range of 1.81 f/cc to 4.51 f/cc.

Gref.B-FIN01-000197

JA403

Results

The results of both the PCM 7400 and TEM 7402 analyses for the study are shown in Table 1 and fully summarized in Section 3. Specific results for both the PCM and TEM analyses can be found in Sections 5 and 6 of this report.

Table 1
Johnson's Baby Powder
PCM & TEM Airborne Tremolite & Talc Fiber Exposure Levels

| Sample ID | No. of Air Samples Analyzed | PCM Range & Mean F/cc | 7402 TEM Tremolite Percent | PCME Range & Mean Tremolite F/cc | 7402 TEM Range & Mean Talc F/cc |
|---|---|---|---|---|---|
| Background (BG-1-A,B,C,D) | 4 | <0.002 Mean <0.002 | --- | --- | --- |
| Worker (P-1-A,B,C,D) | 4 | 3.85 to 5.86 4.52 | 43% to 77% | 1.81 to 4.51 2.57 | 0.60 to 1.86 1.51 |
| Area (A-1-A,B,C,D) | 4 | 0.28 to 0.58 0.41 | --- | --- | --- |

**B. Johnson's Baby Powder Application to Baby During Diaper Change: A Work Practice Study. Longo, Rigler, Egeland, Bennett. Materials Analytic Services. January 2019.**

A. The study was performed in the MAS, LLC Suwanee, GA exposure characterization lab (ECL) constructed using negative airflow asbestos abatement technology. The internal volume of the ECL is approximately 15 ft. wide x 20 ft. long x 8 ft. high that simulates the approximate size of a typical room. The ECL was thoroughly decontaminated before the study.

B. A 10 oz. container of Johnson's Baby Powder **(M66173-003)** was placed on a changing table situated in the center of the ECL. Also located on the changing table was a 20" long clothed and diapered vinyl/silicone based baby doll. The doll was placed on top of a vinyl contoured changing pad. The baby powder and a spare disposable diaper was placed above the head of the doll. At the doll's feet was a wipe used for cleaning the baby's bottom prior to re-diapering. The investigator donned typical type clothes consisting of a flannel shirt and a pair of blue jean pants on top of a pair of protective polypropylene based coveralls. The baby doll was donned with a cotton and polyester jump suit, a disposable diaper, crocheted bootees and head cover. The investigator entered the work area standing to the side of the changing table containing the baby doll and started the air sampling pump placed near the baby. The investigator re-diapered the baby performing the following procedural steps: 1). Unbuttoning the dolls jump suit, 2). Removing and disposing of the original diaper, 3). Cleaning the doll's bottom with a wipe, 4). Applying talc to the doll's bottom with *approximately 3 shakes of the can*, 5). Rubbing the talcum powder on the diaper area of the baby, 6). Placing the new diaper on the doll, adjusting it as needed and re-buttoning the jump suit, and; 7). Lastly, standing next to the doll for a period of approximately 2 minutes before turning the

Page -198-

Gref.B-FIN01-000198

JA404

baby's air sampling pumps off and exiting the work area. The study was concluded and the area air sampling pumps were turned off.

Total air sampling time for area and personal samples was 5 & 6 minutes.

All air samples were analyzed by the NIOSH 7400 PCM method using "A" counting rules. After a portion of the filter had been removed for the PCM analysis, selected air filter samples were analyzed by the NIOSH 7402 method using ATEM. Additionally, air samples were analyzed by the typical TEM counting protocols (asbestos fibers/bundles >0.5μm in length, with parallel sides and aspect ratio > 5.0 to 1.)

**Results**

The Baby Powder can had been analyzed previously, and was found to contain 4,120,000 tremolite fibers and bundles/gm.

<u>**PERSONAL SAMPLES**</u>

| Sample # | Sample Description | PCM Fibers/cc | TEM (7402) % Asbestos | PCME Fibers/cc | TEM (ALL) Fibers/cc Asbestos |
|---|---|---|---|---|---|
| M68705-005 **P-1-A** | Personal (Right Shoulder) | 0.82 | 0 | <0.50 | 0.32 |
| M68705-006 **P-1-B** | Personal (Right Shoulder) | 0.73 | 83.3 | 0.61 | In progress |
| M68705-007 **P-1-C** | Personal (Left Shoulder) | 1.3 | 60.0 | 0.78 | 2.10 |
| M68705-008 **P-1-D** | Personal (Left Shoulder) | 0.64 | 100.0 | 0.64 | In progress |
| M68705-009 **P-1-E** | Personal (Right Shoulder) | 2.8 | 57.1 | 1.6 | In progress |
| M68705-010 **P-1 -F** | Personal (Left Shoulder) | 3.5 | 85.7 | 3.0 | 1.16 |

Gref.B-FIN01-000199

The PCME (TEM corrected fiber count) ranged from 0.6 - 3 f/cc.

The concentration of fibers measured by PCM is given in the 3rd column, and the percentage of asbestos, by TEM is given in the 4th column, the PCM concentration, corrected for the concentration of non-asbestos fibers, is given in the 5th column. Non-asbestos fibers would include fibrous talc and other fibers, such as cloth dust. Assuming that all of the non-asbestos fibers were fibrous talc, then the concentration of talc fibers is the difference between PCMe and PCM. This is given in the Table below.

| Sample | Concentration of Talc Fibers (f/cc) |
|---|---|
| P1A | 0.5 |
| P1B | 0.12 |
| P1C | 0.52 |
| P1D | 0 |
| P1E | 1.2 |
| P1F | 0.5 |
| Average (Excluding 0 count) | 0.6 f/cc |

Page -200-

Gref.B-FIN01-000200

JA406

C. **Measurements of Baby Powder Air Concentrations by Other Investigators**

Measurements of air concentrations during the use of Johnson's Baby Powder had been made earlier.

1. In 1972 Dement and colleagues at the National Institute of Occupational Safety and Health performed a study of the fiber concentrations associated with the use of Baby Powders (J. Dement et al. Fibers Exposure During Use of Baby Powders. NIOSH 1972).

In 1968, the U.S. Public Health Service examined 22 talcum products for the presence of fibrous materials and found a range of 8% and 22% by particle count.[2]  No attempt was made to determine fiber exposure during the use of these products.  In the present study nine commercially available baby powders were investigated for fiber and free $SiO_2$ content and a test conducted on each of these products to determine fiber exposure to both mother and baby during dusting.  It was found that fiber concentrations reached a maximum during the first thirty seconds of powder use and diminished rapidly with time.  Concentrations were found to range between 0-18 fibers greater than five microns in length per milliliter of air in the first thirty seconds of powder use.  The percentage of free $SiO_2$ in the powders was found to range from 0.05% to 2.03% by weight.  Further analysis of these powders will be necessary in order to properly identify the fibers which were observed.

A **total of nine (9)** baby powders were purchased from Walgreen Drugs on March 28, 1972 for these experiments.  These powders are listed in Table 1.

Gref.B-FIN01-000201

JA407

| | | | | | |
|---|---|---|---|---|---|
| 4 | Johnson & Johnson Medicated Powder | Johnson & Johnson New Brunswick, N.J. 08903 | Hexachlorophene, Talc | 5.5 oz | .78 |
| 5 | Diaparene | Breon Laboratories, Inc. New York, New York 10016 Subs. of Sterling Drug | Methylbenzethonium chloride, Cornstarch & Magnesium carbonate | 9 oz | .94 |
| 6 | Johnson Baby Powder | Johnson & Johnson New Brunswick, N.J. 08903 | Talc | 9 oz | .76 |

### FIBER EXPOSURE
### TO BOTH
#### MOTHER AND BABY DURING 15 SECOND DUSTING
#### (SECOND TALCUM POWDER EXPERIMENT)

| Powder | Subject | Sample Time (Min) | FIBERS >5μm IN LENGTH Average Fibers/Field | Conc. Fibers/cc |
|---|---|---|---|---|
| #1, Vaseline Intensive Care | Mother | 2.0 | .06 | 2.7 |
| | Baby | 2.0 | .05 | 2.2 |
| #2, Crib Age Powder | Mother | 2.0 | .10 | 4.5 |
| | Baby | 2.0 | .12 | 5.4 |
| #4, Johnson & Johnson Medicated | Mother | 2.0 | .04 | 1.8 |
| | Baby | 2.0 | .02 | 0.9 |
| #6, Johnson Baby Powder | Mother | 2.0 | .05 | 2.2 |
| | Baby | 2.0 | .04 | 1.8 |

The PCM counts were similar to those measured by Longo using a sample of Johnson's Baby Powder from Italy. The Baby Powder purchased by NIOSH was likely manufactured from Vermont talc.

If we assume that the talc component was similar to that measured by Longo, namely 0.6 f/cc, the asbestos concentrations (PCM) were 1 - 1.5 f/cc.

Gref.B-FIN01-000202

JA408

**2. Johnson and Johnson Measured Fiber Concentrations in 1977**

*Johnson-Johnson*
BABY PRODUCTS COMPANY

RARITAN, N.J. 08869

CC:  W. H. Ashton
     B. Semple
     W. Sherman                June 6, 1977
     W. Waggoner

SUBJECT:  USPHS/NIOSH Membrane Filter Method
          for Evaluating Airborne Asbestos Fibers

          Method Applied to JBP for Determination of Talc
          Fibers in Airborne Respirable Fraction - 0503.01

TO:  Mr. G. Lee

          In a previous memo (Jan. 25, 1977) under this title, we
     reported the results of applying this NIOSH method for
     measuring fibrous dust particles in an airborne JBP
     dust cloud.  The cloud was created during shake dis-
     pensing of JBP 118-D from the regular 9 oz. container.
     We found that 4% of the particles in the dust cloud
     were fibrous by NIOSH definition, e.g., any particle
     having an aspect ratio of 3:1 or greater and which is
     5 microns or longer is classed as a fiber.

Gref.B-FIN01-000203

**JA409**

In this present experiment, the same thing was done, however, only the respirable sized particles (10 microns and below) were collected from the dust cloud and measured.

Results
-------

Total concentration - Respirable particles/cc = 244
Fibrous concentration - Respirable fibers/cc = 4.4

These data indicate the fiber concentration at approximately 2% of the total airborne respirable size particle concentration.

Discussion
----------

The fiber content of the total airborne talc cloud was found to be about 4% (from the 1/25/77 study), and the fiber content of the respirable fraction only, of the cloud, was found to be 2% by the present experiment.

Experimentally, these results are in the same range, and we conclude that "NIOSH definition" fibrous particles are about evenly distributed through the particle size range present in airborne JBP.

/by                                            R. S. Russell
                                               R. S. Russell

**The concentration of respirable fibers was 4.4 f/cc. This would have been a mixture of fibrous talc, asbestos, and possibly other fibers as well.** If we assume that the talc component was similar to that measured by Longo, namely 0.6 f/cc, the asbestos concentration (PCM) was about 3 f/cc.

**3. In another Study, Johnson measured the concentration of fibers in a dust cloud of Baby Powder.**

Page -204-

Gref.B-FIN01-000204

*Johnson & Johnson*

## BABY PRODUCTS COMPANY

RARITAN, N.J. 08869

### Special Talc Study

### Project No. 0503.01

### Report for December 1976, January 1977

OBJECTIVE:

Evaluate biological responses to talc.

SUMMARY:

Respirable Particle Measurements

Adult After Shower Exposure Study:

This study has been completed.  Ten adult females and ten adult males were asked to shower, towel dry and apply JBP in their normal manner.  During the powdering process we measured the average and peak concentrations of respirable sized particles in the area of the subjects nose and mouth.

The subjects for this study were chosen by questionnaire as being regular users of JBP for after shower body powdering.

The results of this study show that adult users of JBP for after shower body powdering were exposed to airborne respirable particle concentrations about 8 times higher than babies during powdering and diapering.  Also, the adult users were exposed to these higher concentrations for a longer period of time.

Page -205-

Gref.B-FIN01-000205

JA411

Because of the possibility that both agencies may adopt the
NIOSH Membrane Filter Method as official, it was deemed
expedient to gain some prior data on the application of this
method to JBP.  By NIOSH definition any particle having an
aspect ratio of 3:1 or greater and which is 5 microns or longer
is classed as a fiber.

By this NIOSH method, airborne particles are sampled and deposited
on a membrane filter where they are counted and shape aspect
determined microscopically.

Results:

Two determinations were made:

| | 1 | 2 |
|---|---|---|
| Total concentration-particles/cc | 177 | 224 |
| 3:1 Fiber Concentration-fibers/cc | 8 | 8 |

These data indicate the 3:1 aspect ratio particles (fibers) as
determined by the NIOSH Membrane Filter Method, would be approxi-
mately 4% of the total concentration of airborne particles in
the talc cloud caused by dispensing JBP from its container.

**The Johnson investigators noted that the concentration during adult use was about 8 times
the concentration when the powder was applied to babies.**

**4.** Anderson and colleagues (Anderson EL, Sheehan PJ, Kalmes RM, Griffin JR. Assessment of
Health Risk from Historical Use of Cosmetic Talcum Powder. Risk Anal. 2017;37:918-929.)
measured the concentration of fibers in the breathing zone of volunteers who applied *Colgate's
Cashmere Bouquet talcum powder manufactured from Italian talc.* Each simulation run lasted a
total of 48 minutes, with eight application events of approximately equal duration, at six-minute
intervals per application event. Since there were 6 minutes between application, and since the
concentrations decline following application, the 48-minute concentration would underestimate the
peak concentrations during application. Here are the concentrations as measured by polarized light
microscopy.

Page -206-

Gref.B-FIN01-000206

**JA412**

**Table IV.** Total Fiber and Asbestos Fiber Concentrations

| Sample Number | Sample Description | Sample ID | Sample Duration (Min) | Sample Volume (Liters) | Total PCM Fiber Concentration[a] (f/cm$^3$) | Fraction Asbestos I TEM[b] ( |
|---|---|---|---|---|---|---|
| S1-2-ML | Subject 1, Left | 61-33/33MNJ-5 | 48 | 200.6 | 0.139 | 0% |
| S1-3-MR | Subject 1, Right | 61-33/33MNJ-5 | 48 | 204.5 | 0.172 | 0% |
| S1-6-ML | Subject 1, Left | 61-32/32MNJ-4 | 48 | 203.0 | 0.093 | 0% |
| S1-7-MR | Subject 1, Right | 61-32/32MNJ-4 | 48 | 201.1 | 0.123 | 0% |
| S2-2-ML | Subject 2, Left | 61-33/33MNJ-5 | 48 | 201.6 | 0.277 | 0% |
| S2-3-MR[f] | Subject 2, Right | 61-33/33MNJ-5 | 48 | 201.6 | 0.295 | NA |
| S2-6-ML | Subject 2, Left | 61-32/32MNJ-4 | 48 | 203.0 | 0.227 | 0% |
| S2-7-MR[f] | Subject 2, Right | 61-32/32MNJ-4 | 48 | 201.1 | 0.229 | NA |
| S3-2-ML | Subject 3, Left | 61-12/12L | 48 | 209.3 | 0.246 | 0% |
| S3-3-MR | Subject 3, Right | 61-12/12L | 48 | 204.0 | 0.234 | 0%[*] |
| S3-6-ML | Subject 3, Left | 61-6/6F | 48 | 201.6 | 0.235 | 0% |
| S3-7-MR | Subject 3, Right | 61-6/6F | 48 | 204.5 | 0.279 | 0% |
| S4-2-ML | Subject 4, Left | 61-32/32MNJ-4 | 48 | 205.9 | 0.215 | 0% |
| S4-3-MR | Subject 4, Right | 61-32/32MNJ-4 | 48 | 203.0 | 0.203 | 0%[*] |
| S4-6-ML | Subject 4, Left | 61-11/11K | 48 | 202.6 | 0.540 | *0.73%* |
| S4-7-MR | Subject 4, Right | 61-11/11K | 48 | 202.1 | 0.384 | 0% |
| S5-2-ML | Subject 5, Left | 61-6/6F | 49 | 207.8 | 0.184 | 0% |
| S5-3-MR | Subject 5, Right | 61-6/6F | 49 | 204.8 | 0.180 | 0% |
| P16-MCE37 | Subject 5, Left | 61-33/33MNJ-5 | 48 | 202.1 | 0.144 | 0% |
| P17-MCE37 | Subject 5, Right | 61-33/33MNJ-5 | 48 | 203.0 | 0.118 | 0% |

NA = not analyzed; ND = not detected because the fraction of asbestos fibers was zero.
[a]Concentration of total fibers as measured by PCM.

These results are consistent with a talc fiber concentration of less than 1 f/cc.

Page -207-

Gref.B-FIN01-000207

JA413

**Summary of Asbestos Fiber Concentrations During Use of Johnson's Baby Powder**

**1. Longo 2019**

PERSONAL SAMPLES

| Sample # | Sample Description | PCM Fibers/cc | TEM (7402) % Asbestos | PCME Fibers/cc | TEM (ALL) Fibers/cc Asbestos |
|---|---|---|---|---|---|
| M68705-005 P-1-A | Personal (Right Shoulder) | **0.82** | **0** | **<0.50** | 0.32 |
| M68705-006 **P-1-B** | Personal (Right Shoulder) | 0.73 | 83.3 | **0.61** | In progress |
| M68705-007 **P-1-C** | Personal (Left Shoulder) | 1.3 | 60.0 | **0.78** | 2.10 |
| M68705-008 **P-1-D** | Personal (Left Shoulder) | 0.64 | 100.0 | **0.64** | In progress |
| M68705-009 **P-1-E** | Personal (Right Shoulder) | 2.8 | 57.1 | **1.6** | In progress |
| M68705-010 **P-1-F** | Personal (Left Shoulder) | 3.5 | 85.7 | **3.0** | 1.16 |

Gref.B-FIN01-000208

JA414

**2. NIOSH 1972**

In this present experiment, the same thing was done, however, only the respirable sized particles (10 microns and below) were collected from the dust cloud and measured.

<u>Results</u>

Total concentration – Respirable particles/cc = 244
Fibrous concentration – Respirable fibers/cc = 4.4

These data indicate the fiber concentration at approximately 2% of the total airborne respirable size particle concentration.

<u>Discussion</u>

The fiber content of the total airborne talc cloud was found to be about 4% (from the 1/25/77 study), and the fiber content of the respirable fraction only, of the cloud, was found to be 2% by the present experiment.

Experimentally, these results are in the same range, and we conclude that "NIOSH definition" fibrous particles are about evenly distributed through the particle size range present in airborne JBP.

/by                                    R. S. Russell

**Johnson 1977**

**Johnson Project 0503.01 1977**          **Adult after Shower Exposure Study**

|                                  | <u>1</u> | <u>2</u> |
|----------------------------------|-----|-----|
| Total concentration-particles/cc | 177 | 224 |
| 3:1 Fiber Concentration-fibers/cc | 8   | 8   |

Page -209-

Gref.B-FIN01-000209

## CONCLUSIONS:

Assuming that the concentration of talc fibers in the dust is about 1 f/cc, then we have

| Study | Amphibole Air Concentration (f/cc) |
|---|---|
| NIOSH 1972 | 2 f/cc Total ~ 1 f/cc |
| Longo 2019 | ~ 2 f/cc |
| Johnson 1977 | 4 f/cc Total ~ 3 f/cc |
| Johnson Project 0503.01 1976-77 | 8 f/cc Total ~ 7 f/cc |

### 4. MAS Project 14-1852: Below the Waist Application of Johnson & Johnson Baby Powder

Longo and colleagues described the procedures and methodology used to analyze for airborne asbestos amphibole fiber exposure during the application of talc-containing Johnson's Baby Powder metal container M65205-001. Previous bulk ATEM analysis of the Johnson's Baby Powder from this can showed a tremolite concentration of 15,100,000 tremolite fibers.

"Approximately 4 grams of baby powder were applied to the lower body of an investigator to determine the potential exposure levels of an individual to asbestos amphibole fibers while applying Johnson's Baby Powder. Both the NIOSH 7400 PCM method and the NIOSH 7402 TEM method were performed to determine if any detectable amphibole asbestos fibers from the Johnson's Baby Powder were released into the Breathing zone of the investigator and  immediate surrounding area in. The Johnson's Baby Powder application procedure used in this study was based on the testimony of the plaintiff, Jody Ratcliff.

The NIOSH 7400 PCM analysis found that the four personal sample results ranged from 3.85 f/cc to 5.86 f/cc with an average mean of 4.52 f/cc. AREA air sample results were 0.28 f/cc to 0.58 f/cc with an average mean of 0.41 f/cc. Four of the personal PCM filters were analyzed by the NIOSH 7402 TEM method and the percent tremolite asbestos fiber concentration ranged from 42.9% to 76.9% resulting in a PCM equivalent range of 1.81 f/cc to 4.51 f/cc."

**Finkelstein**: This study found respirable fibers in the Breathing zone of an individual applying cosmetic talc.

Gref.B-FIN01-000210

**JA416**

**Fiber Deposition in the Lungs of Babies**

Moon has computed fiber deposition in the lungs of babies exposed to baby powder (Moon MC, Park JD, Choi BS, et al. Risk Assessment of Baby Powder Exposure through Inhalation. Toxicol Res. 2011;27:137-141.)  He wrote: 'the airborne concentration of asbestos in a workplace using below 0.1% asbestos-containing talcum powder has been estimated as 0.01 fibers/cc (Mattenklott, 2007).  If the breathing frequency of a baby is assumed to be 40 times/min (range 20~40 times/min) and the tidal volume for a baby is 123 ml/min, the minute volume would be approximately 5 liters/min, 7200 liters/day, and 5,256,000 liters/2 years. The lung weight of a baby is approximately 300 g, and if it contains 60% water, the dry lung weight becomes 120 g. Thus, if the inhalation exposure of a baby to asbestos-containing baby powder is 24 hrs, 1 hr, or 10 min over 2 years, the inhaled asbestos fibers would be 438,000 fibers/g of dry lung, 18,250 fibers/g of dry lung, or 3,040 fibers/g of dry lung, respectively. Plus when applying a deposition fraction maximum of 20%, as suggested by Asgharian et al. (2004), the lung contents of asbestos in the case of inhalation exposure to baby powder for 24 hr, 1 hr, or 10 minutes over 2 years would be 87,600 fibers/g of dry lung, 3,650 fibers/g of dry lung, or 608 fibers/g of dry lung, respectively.

Gref.B-FIN01-000211

# Human Health Effects of Talc Exposure

Talc powder is a complex mixture of platy talc, asbestos fibers, and other minerals. The major asbestiform contaminants are tremolite and anthophyllite. Tremolite is an established cause of mesothelioma in humans (Luce et al. 1994;Luce et al. 2000). Anthophyllite fibers have caused mesothelioma in Finnish miners (Nynas et al. 2017).

**A: Cosmetic Talc Epidemiology**

# How Many Americans Use Baby Powder?

## A1. The Use of Consumer Talcs in the United States

**Statista, a company that performs analysis of consumer purchasing patterns, has reported that some 100 million Americans used body and baby powders in the years 2011 to 2017 (https://www.statista.com/statistics/285799/brands-of-body-and-baby-powder-in-the-us-trend /). They reported that 53 million Americans used Johnson and Johnson's Baby Powder in 2017.**



Gref.B-FIN01-000212

**JA418**

A2. Johnson performed Internal Surveys to estimate Baby Powder Usage in the United States.

## 1. February 1973: 75% of teen girls and 80% of women use a talc

*Johnson & Johnson*
BABY PRODUCTS COMPANY

February 13, 1973

JOHNSON'S Baby Powder
Review of Consumer Research

Mr. H. R. Callum

This document reviews past market research in an effort to isolate those product benefits and uses which are most important to consumers.

Conclusions:

Teen and Female Market--

- 75% of teen girls and 80% of women use a talc. Therefore, the primary growth for JBP in this market will have to be taken from other brands (Avon, Cashmere Bouquet, etc).

Page -213-

Gref.B-FIN01-000213

JA419

2 September 1982. Perineal Usage of Talc by Women

RECEIVED

SEP 7 1982

GEORGE LEE

*Johnson & Johnson*

BABY PRODUCTS COMPANY

September 3, 1982

SKILLMAN, N. J. 08558

SUBJECT:   JOHNSON'S Baby Powder
           Talc Usage In the Crotch Area
           Project 7321.45

TO:  Bruce Semple, M.D.

| Response | Number of Women | Percent | Cumulative % |
|---|---|---|---|
| Use Frequently | 1110 | 50.1 | 50.1 |
| Use Occasionally | 437 | 19.7 | 69.8 |
| Seldom Use | 128 | 5.8 | 75.6 |
| Never Use | 179 | 8.1 | 83.7 |
| No Response | 103 | 4.7 | 88.4 |
| No talc use in past 12 months | 257 | 11.6 | 100.0 |
| Total | 2214 | 100.0 | |

Although the questionnaire does not define "frequent" or
"occasional," the results clearly show a much higher incidence
of perineal talc usage than found by Dr. Cramer.

Page -214-

Gref.B-FIN01-000214

JA420

A3. May 2004. Adult Use of Powder

Powder Consumer Learning Survey - Internet Survey Analysis (Tag-On to RDG #117-03)

<u>General Survey Population</u>    n=1073 survey participants (18+ in age):
- 34% reported current baby/body powder use on themselves.
- Slight overall difference in powder use among age categories:
  Powder users: 38% of (120) 18-24 year olds surveyed / 35% of (379) 25-39 year olds / 35% of (283) 40-49 year olds surveyed / 31% of (291) 50+

<u>Gender Breakouts:</u>
- Greater percentage of females indicate powder use on themselves:
  42% of the 418 females surveyed / 29% of the 655 males surveyed
- Slightly higher percentage of powder use among males in the 18 to 24 age category
  Powder use among males surveyed: 35% of 69 male, 18-24 year olds / 28% of 194 male, 25-39 year olds / 28% of 172 male, 40-49 year olds / 29% of 220 male 50+ year olds
- Little significant difference in female powder use among age categories:
  Powder use among females surveyed: 41% of 51 female, 18-24 year olds / 42% of 185 female, 25-39 year olds / 45% of 111 female, 40-49 year olds / 37% of 71 female 50+

Gref.B-FIN01-000215

JA421

A4. Powdering of Babies. December 1991.

**Johnson & Johnson**
CONSUMER PRODUCTS, INC.
SKILLMAN, NJ 08558-9418

December 19, 1991

SUBJECT:    JOHNSON'S BABY POWDER USE

TO:         J. LEEBAW
            B. SEMPLE

You asked me for an idea of how many baby bottoms have been powdered with
JOHNSON'S Baby Powder since we introduced it about 100 years ago.

From 1930 to 1990, total U.S. births were 235,295,000. They estimate 1991 at 3.7 million
giving us a total of 238,995,000 baby bottoms. The U.S. Census Bureau records go back
only to 1920. Numbers prior to 1920 would not be significant anyway.

Assuming 70% of babies born were powdered and that 50% were powdered with J&J
powder, it comes down to a little over 100,000,000 J&J powdered bottoms here in the

If the question had been - "How many times has JOHNSON'S Baby Powder been
applied to baby bottoms?", the answer would be astronomical!

If you want an astronomical number for publicity reasons, I suggest you check with Mr.
Bigelow's office and ask him how many times an infant is powdered during its diaper life
and multiply by 200 million.

*W. Ashton*
W. Ashton

Page -216-

Gref.B-FIN01-000216

**JA422**

**Comment:** Many millions of Americans used, or were exposed to, Johnson's Baby Powder during the 20th century.

**How is the use of Cosmetic talcs by Americans reflected in analyses of their Biological Tissues?**

**Tremolite and Anthophyllite Lung Fiber Burden in Victor Roggli's studies**

A. Srebro and Roggli measured talc, tremolite, and anthophyllite concentrations in the lungs of individuals referred for fiber burden analysis (Srebro SH, Roggli VL. Asbestos-related disease associated with exposure to asbestiform tremolite. Am J Ind Med. 1994;26:809-819.).

Here are their subjects:

**TABLE I. Demographic, Pathologic, and Occupational Information for Seven Patients With Asbestos-Related Diseases***

| Case[1] | Age/Sex | Diagnosis | Occupation | Exposure duration | Smoking history |
|---|---|---|---|---|---|
| 1 | 74/M | Asbestosis | Manufactured asbestos blankets/gaskets | 7 yr | Smoker (PY unknown) |
| 2 | 44/M | Asbestosis/Lung adenocarcinoma | Lived near vermiculite plant during childhood | 20 yr | Ex-smoker, (1-2 PY), (quit 20 years) |
| 3 | 56/M | BPL | Painter/spackler | 38 yr | Smoker (70 PY) |
| 4 | 62/M | EPL | Engineer at power plant; insulator | N/A | Smoker (6 PY) |
| 5 | 44/F | EPL | Assembler at dry cleaner | N/A | N/A |
| 6 | 57/F | EPL | Housewife of shipyard worker | 1-2 yr | Smoker (40 PY) |
| 7 | 58/F | DPL | Teacher's aide in building with tremolite in tiles | 18 yr | Nonsmoker |

Subjects 5, 6, and 7 were females.

The talc concentrations in the lungs of these subjects were:

Page -217-

816        Srebro and Roggli

TABLE III. Uncoated NAMF From Seve

| Case[a] | Talc |
|---|---|
| 1 | 21,300 |
| 2 | <8,200 |
| 3 | 60,800 |
| 4 | <1,190 |
| 5 | 680 |
| 6 | <4,860 |
| 7 | 6,930 |
| Controls | <80–10,200 |

and the tremolite and anthophyllite concentrations in the lungs of these subjects were

TABLE II. Results of LM and SEM Analyses in Seven Patients With Asbestos-related Diseases*

| LM data | | SEM data (uncoated fibers/g)[b] | | | | | |
|---|---|---|---|---|---|---|---|
| Case[a] | AB/g | Total | Trem-olite | Antho-phyllite | Actin-olite | Chry-sotile | NAMF |
| 1 | 6,200 | 554,000 | 405,000 | 63,800 | <21,300 | 63,800 | 21,300 |
| 2 | 2,900 | 140,000 | 124,000 | <8,200 | 16,500 | <8,200 | <8,200 |
| 3 | <15.0 | 101,000 | 8,100 | 8,100 | <4060 | <4060 | 85,200 |
| 4 | 42 | 10,700 | 5,940 | <1200 | <1200 | 1,200 | 3,570 |
| 5 | 64 | 6,800 | 5,440 | <680 | <680 | <680 | 1,360 |
| 6 | 2 | 24,300 | 4,860 | <4860 | 4,860 | <4,860 | 14,600 |
| 7 | 2.8 | 13,000 | 4,330 | <870 | <870 | <870 | 8,670 |
| Controls | 0.2–22.0 | 420–12,700 | <160–2,540 | <2,540 | <80–1,310 | <80–1,000 | 210–10,160 |

Gref.B-FIN01-000218

JA424

For the 3 women, the concentrations were about 5,000 Fibers of Tremolite per gram of Wet Lung.

Srebro and Roggli wrote:

Women represent 43% (3/7) of the cases in this study vs. only 8% of the 153 mesotheliomas cases, with tissue asbestos analyses, in one of the authors' (V.L.R.) consultation files. A potential source of exposure for these three cases was cosmetic talc, which may be contaminated with tremolite asbestos. The 19 control cases used

Our study confirms the relationship between tremolite exposure and the development of asbestos-associated diseases and suggests that certain types of exposure are likely to be associated with elevated tissue levels of tremolite asbestos. Furthermore, the finding of relatively modest elevations of tremolite content in some of our mesothelioma cases suggests to us, that at least for some susceptible individuals, moderate exposures to tremolite-contaminated dust can produce malignant pleural mesothelioma.

Page -219-

Gref.B-FIN01-000219

**B: The Studies of Dr. Victor Roggli and colleagues on Tremolite in Subjects with mesothelioma (Roggli et al. 2002).**

Dr. Roggli's laboratory performed lung fiber burden analysis on a large number of mesothelioma patients. Fiber analysis was performed on lung tissue samples obtained either at time of surgery (lobectomy or pneumonectomy) or at autopsy. Scanning electron microscopy was performed with a JEOL JSM 6400 scanning electron microscope. Both coated (asbestos body) and uncoated fibers ≥5μ in length were counted, with a fiber defined as a mineral particle with an aspect (length to width) ratio of at least 3:1 and roughly parallel sides. A total of 100 fields or 200 fibers, whichever occurred first, were counted for each sample. Blank filters were also examined and all reagents were pre-filtered to avoid contamination with fibers. The elemental composition of individual mineral fibers was determined by means of energy dispersive X-ray analysis (EDXA). Asbestos fibers were classified as amosite, crocidolite, tremolite, anthophyllite, actinolite, chrysotile or talc based on their morphology and X-ray spectra.

**Talc was identified in 193 cases (62%),** and chrysotile was identified in only 32 cases (10%). **Tremolite was detected in 166 of 312 cases (53%). The levels of tremolite were strongly associated with concentrations of fibrous talc.** Mesotheliomas associated with non-commercial amphibole fibers alone accounted for 3.5% of the cases (11 of 312). These included six men and five women ranging in age from 44 to 73 yr (median age 58 yr). The exposure duration ranged from 8 days to 34 yr. In 1994, Srebro and Roggli discussed 3 of these women (Srebro and Roggli 1994). They stated that 'A potential source of exposure for these three cases was cosmetic talc which may be contaminated with tremolite asbestos.' Roggli and colleagues concluded *'evidence from our series indicates that tremolite and other non-commercial amphibole fibers are present in the lungs of a substantial proportion of patients with mesothelioma. In some patients these fibers appear to be the likely cause of the disease. The data are consistent with a derivation of the pulmonary tremolite burden from both talc and chrysotile asbestos.'*

**Additional Analysis of the Roggli Database**

The Roggli database has continued to accumulate new cases. I examined the database of asbestos fiber lung burden measurements from December 1978 through March 2015. Fiber burden measurements were made on 566 subjects with pleural mesothelioma; 75 (13%) were female. Lung burdens of talc, along with its amphibole contaminants, are markers of exposure to talc-containing dusts. There has been occupational exposure to industrial talc in the United States. American-mined talc was used in the production of ceramics, paint, paper, plastics, roofing, rubber, cosmetics, flooring, caulking, and agricultural applications. The talc is used as a "filler" in most of these applications, and there is unlikely to be any substantial exposure among users of most of these products. The number of persons with occupational or para-occupational exposures to industrial talc is tiny compared to the 100 million users of baby and body powders.

Table 1, below, shows the proportion of subjects diagnosed with pleural mesothelioma, lung cancer, or neither of these, in the Roggli database. The finding of talc *and* tremolite in the tissues of

Gref.B-FIN01-000220

**JA426**

subjects with mesothelioma, and other conditions, was common reflecting the widespread use of body and baby powders in the United States.

| Table 1: The proportions of subjects who had fibers of the stated minerals in their lung tissues. | | | | | | |
|---|---|---|---|---|---|---|
| | Pleural Mesothelioma | | Lung Cancer | | All Other Diagnoses | |
| **Mineral Fiber** | **Men** N = 491 | **Women** N =75 | **Men** N=450 | **Women** (N =14) | **Men** N=355 | **Women** (N =26) |
| Talc | 332/491 (68%) | 62/75 (83%) | 244/450 (54%) | 11/14 (78%) | 199/355 (56%) | 11/26 (42%) |
| Talc and Tremolite | 205 / 491 (42%) | 46 / 75 (61%) | 118/450 26% | 7/14 50% | 118/355 (33%) | 7/26 (27%) |
| Talc and Anthophyllite | 77 /491 (16%) | 11 / 75 (15%) | 47/450 10% | 3/14 21% | 47/355 (13%) | 5/26 (19%) |

Given the millions of users of baby and body powders, it is not surprising that the prevalence of talc fibers in the lung tissues of subjects with mesothelioma was very common, being present in more than 61% of men and women. The detection of tremolite was also common, being present in 43% of subjects. Thirty-six percent of subjects had *both talc and tremolite* in their lung tissues. Tremolite is a contaminant of Canadian chrysotile in addition to being a contaminant of talc, but detection of tremolite was significantly associated with the presence of talc ($p < 0.001$); only 5 women and 49 men had tremolite, but not talc, in their lungs.

In a logistic regression analysis, talc was twice as likely to be found in the lungs of subjects with pleural mesothelioma than among subjects with other diagnoses (excluding lung cancer).

```
--------------------------------------------------------------------------
PleuralvsOther | Odds Ratio   Std. Err.      z    P>|z|     [95% Conf. Interval]
---------------+----------------------------------------------------------
          Talc | 1.996096    .2915159     4.73   0.000     1.499233    2.657623
           Age | 1.007703    .0057461     1.35   0.178     .9965038    1.019028
--------------------------------------------------------------------------
```

Gref.B-FIN01-000221

JA427

I have obtained a copy of Dr. Roggli's lung burden database (2015 version). 86 of 120 (72%) women had talc fibers in their lungs. (I previously mentioned the Johnson survey of 1973 in which it was found that 80% of women use a talc) Here are the talc and amphibole concentrations for female subjects with talc in their lungs.

| Age | Diagnosis | Talc | TremPlusAnth | (Fibers per gm Wet Lung) |
|-----|-----------|------|--------------|---------------------------|
| 68 | Malignant pleural mesothelioma | 660 | 1980 | |
| 62 | Malignant pleural mesothelioma | 4070 | 5420 | |
| 32 | Malignant pleural mesothelioma | 6680 | 2430 | |
| 49 | Malignant peritoneal mesothelioma | 9680 | 740 | |
| 62 | Malignant peritoneal mesothelioma | 1190 | 0 | |
| 56 | Malignant pleural mesothelioma | 510 | 510 | |
| | Metastatic adenocarcinoma | 5360 | 0 | |
| 77 | Squamous cell carcinoma | 5650 | 1420 | |
| 55 | Nonspecific pleural, subpleural, and peribronchiolar fibrosis | 1810 | 600 | |
| 50 | Malignant pleural mesothelioma | 1450 | 480 | |
| 54 | Malignant pleural mesothelioma | 550 | 1640 | |
| 72 | Mucinous adenocarcinoma | 1390 | 2090 | |
| 63 | Malignant pleural mesothelioma | 1230 | 1230 | |
| 81 | Malignant pleural mesothelioma | 8640 | 3600 | |
| 53 | Malignant pleural mesothelioma | 5640 | 700 | |
| 38 | Malignant pleural mesothelioma | 940 | 0 | |
| 73 | Bronchioloalveolar cell carcinoma (BAC) | 1250 | 0 | |
| 61 | Malignant pleural mesothelioma | 1920 | 1280 | |
| 68 | Malignant pleural mesothelioma | 15900 | 11340 | |
| 59 | Malignant pleural mesothelioma | 11700 | 1670 | |
| 59 | Malignant peritoneal mesothelioma | 8790 | 0 | |
| 67 | Benign asbestos-related pleural disease | 6040 | 0 | |
| 64 | Monophasic synovial sarcoma | 33000 | 2060 | |
| 65 | Malignant pleural mesothelioma | 3910 | 490 | |

Page -222-

Gref.B-FIN01-000222

JA428

USCA4 Appeal: 23-1972    Doc: 26-1    Filed: 12/20/2023    Pg: 439 of 599

| 66 | Malignant pleural mesothelioma | 22500 | 0 |
|----|--------------------------------|-------|---|
| 49 | Idiopathic pulmonary fibrosis (U.I.P.) | 30600 | 0 |
| 47 | Squamous cell carcinoma | 16000 | 2290 |
| 34 | Malignant pleural mesothelioma | 20100 | 2510 |
| 72 | Large cell carcinoma | 3140 | 0 |
| 44 | Malignant pleural mesothelioma | 680 | 5440 |
| 81 | Malignant pleural mesothelioma | 2610 | 4170 |
| 71 | Malignant pleural mesothelioma | 650 | 0 |
| 61 | Malignant pleural mesothelioma | 11500 | 0 |
| 67 | Malignant pleural mesothelioma | 3400 | 570 |
| 34 | Malignant pleural mesothelioma | 1460 | 0 |
| 70 | Adenocarcinoma | 490 | 0 |
| 79 | Malignant pleural mesothelioma | 37200 | 17200 |
| 55 | Malignant pleural mesothelioma | 3630 | 610 |
| 62 | Malignant pleural mesothelioma | 20000 | 14520 |
| 55 | Malignant pleural mesothelioma | 2080 | 0 |
| 56 | Malignant pleural mesothelioma | 3700 | 0 |
| 80 | Malignant pleural mesothelioma | 13400 | 0 |
| 66 | Nonspecific interstitial pneumonia | 4380 | 0 |
| 60 | Malignant pleural mesothelioma | 3320 | 0 |
| 41 | Malignant peritoneal mesothelioma | 7970 | 1990 |
| 68 | Carcinoma | 13400 | 1120 |
| 53 | Malignant pleural mesothelioma | 5220 | 0 |
| 62 | Malignant pleural mesothelioma | 2160 | 3780 |
| 59 | Malignant pleural mesothelioma | 3250 | 5200 |
| 31 | Malignant pleural mesothelioma | 5310 | 0 |
| 75 | Malignant pleural mesothelioma | 17100 | 3420 |
| 76 | Malignant pleural mesothelioma | 11900 | 9920 |

Gref.B-FIN01-000223

JA429

| 84 | Malignant pleural mesothelioma | 5780 | 640 |
|---|---|---|---|
| 35 | Malignant pleural mesothelioma | 1970 | 0 |
| 66 | Malignant peritoneal mesothelioma | 500 | 0 |
| 55 | Malignant pleural mesothelioma | 5340 | 480 |
| 75 | Malignant pleural mesothelioma | 28000 | 16800 |
| 74 | Malignant pleural mesothelioma | 2000 | 4000 |
| 60 | Small cell carcinoma | 15800 | 9500 |
| 49 | Malignant pleural mesothelioma | 21700 | 1550 |
| 47 | Malignant pleural mesothelioma | 2760 | 1230 |
| 42 | Malignant pleural mesothelioma | 2180 | 1450 |
| 34 | Malignant pleural mesothelioma | 1570 | 0 |
| 63 | AODM, ASCVD, pulmonary edema | 5610 | 4670 |
| 54 | Malignant pleural mesothelioma | 1160 | 0 |
| 65 | Malignant peritoneal mesothelioma | 12000 | 7170 |
| 74 | Idiopathic pulmonary fibrosis (U.I.P.) | 2540 | 2540 |
| 66 | Malignant pleural mesothelioma | 1460 | 490 |
| 77 | Malignant pleural mesothelioma | 4380 | 490 |
| 45 | Malignant pleural mesothelioma | 1460 | 490 |
| 74 | Malignant pleural mesothelioma | 2080 | 520 |
| 58 | Malignant pleural mesothelioma | 6930 | 4330 |
| 62 | Malignant pleural mesothelioma | 1260 | 3150 |
| 73 | Malignant pleural mesothelioma | 46100 | 5010 |
| 79 | Malignant pleural mesothelioma | 970 | 970 |
| 68 | Malignant pleural mesothelioma | 29900 | 3520 |
| 63 | Small cell/large cell carcinoma | 40000 | 8000 |
| 74 | Nonspecific interstitial pneumonia | 19000 | 2540 |
| 76 | Malignant pleural mesothelioma | 1960 | 1470 |
| 75 | Adenocarcinoma | 12200 | 6070 |

Gref.B-FIN01-000224

JA430

| 43 | Malignant pleural mesothelioma | 3900 | 1950 |
| 82 | Malignant pleural mesothelioma | 70200 | 9360 |
| 72 | Malignant pleural mesothelioma | 7200 | 3600 |
| 73 | Malignant pleural mesothelioma | 3850 | 0 |
| 78 | Malignant pleural mesothelioma | 7350 | 4200 |
| 80 | Malignant pleural mesothelioma | 57200 | 21450 |

The mean concentration of talc fibers was 9000 f/gm wet lung

The mean concentration of tremolite fibers was 2300 f/gm wet lung among those women with talc in their lungs (some of whom may not have had detectable amphibole).

The mean concentration of tremolite/anthophyllite fibers was 2700 f/gm wet lung among those women with talc in their lungs (some of whom may not have had detectable amphibole) and was 2800 f/gm wet lung among those women with both talc and tremolite/anthophyllite fibers in their lungs.

**The level of amphibole fibers in women's lungs was significantly associated with the level of Talc fibers ($p < 0.001$).**

*Among the 86 women with talc in their lungs the mean amphibole/talc ratio was **0.54.** Among the 61 women with both Talc and Anthophyllite/Tremolite in their lungs, the mean amphibole/talc ratio was **0.76.** That is, there were 2-3 anthophyllite/tremolite fibers for every 4 talc fibers.*

The graph below shows the amphibole/talc ratio for women with both Talc and Anthophyllite/Tremolite in their lungs. **Amphibole deposition and retention was of the same order of magnitude as talc deposition and retention.**



Page -225-

Gref.B-FIN01-000225

**C: Dr. Roggli's 2020 Publication on Mesothelioma in Women (Pavlisko EN, Liu B, Green C, Sporn TA, Roggli VL. Malignant Diffuse Mesothelioma in Women: A Study of 354 Cases. Am J Surg Pathol. 2020;44:293-304.)**

The authors wrote:

**Fiber Analysis**

Fiber analysis data were available for 67 of the 354 cases of mesothelioma in women (Tables 5–10). There are 3 distinct groups that stand out following analysis: (1) asbestos fiber burden elevated above background range, (2), borderline asbestos fiber burden, and (3) background range asbestos fiber burden. **Overall, tremolite/actinolite/ anthophyllite (TAA) were the most common fiber type detected (82%) with tremolite predominating,** and amosite and crocidolite (AC) were present in slightly less than half of all cases (48%), with amosite predominating. Chrysotile was detected in 9% of cases and was never the lone fiber type.

**Nonasbestos Mineral Fiber—Talc**

Talc is a nonasbestos mineral fiber that is considered elevated above background range at 10,000 fibers per gram. In our 65 cases with SEM fiber analysis data, talc was elevated in 23%. Looking further at the distribution of talc in the 3 categories of elevated, borderline and background tissue asbestos content shows that talc was predominantly detected elevated in cases with elevated amphibole asbestos. Of our 38 cases with elevated tissue asbestos content, talc was detected in 32 of 36 with SEM data and elevated in 13 of those cases. In these 13 cases, talc was accompanied by elevated AC and TAA, which were elevated above background in nearly equal numbers at 9 and 10 cases, respectively. Six of the 13 had elevated levels of both AC and TAA. Only 1 of these 13 had elevated chrysotile, which was also in the presence of elevated AC.

Of the 32 cases with talc detected in the setting of elevated tissue asbestos content, there were 6 cases where TAA was the only asbestos fiber type detected (elevated TAA in all 6). Two of the 6 TAA-only cases had elevated talc above background. Interestingly, in 4 of the 6 TAA only cases, the asbestos fiber type was isolated to tremolite (also elevated in these 4 cases) and only 1 tremolite-only case had elevated talc above background.

Noncommercial amphiboles were detected in 82% and elevated in 34% of all cases with fiber analysis. Overall, the most common fiber type was tremolite by SEM, detected in 74% and elevated in 34% of all cases with fiber analysis data. Tremolite is also the most common fiber type found in our unexposed background population (Finkelstein comment: The unexposed background population consisted of 20 men).

Page -226-

Gref.B-FIN01-000226

JA432

The nonasbestos mineral fiber talc was uncommonly elevated (23%) in our 65 cases with SEM fiber analysis data. Of cases with elevated talc, commercial and noncommercial amphiboles were elevated above background in a nearly equal number of cases. Rare cases (6 in our series) with only elevated noncommercial amphiboles had talc detected and even more infrequently (2 cases in our series) was talc elevated in the presence of isolated and elevated noncommercial amphibole asbestos.

Overall, 44% of our women with peritoneal mesothelioma had objective markers of asbestos exposure (4/9 cases). Overall, 20% (1/5 cases) had elevated tissue asbestos content in comparison to 62% of men from our cohort.27 The single woman with peritoneal mesothelioma and above background levels of asbestos had elevated levels of both commercial and noncommercial amphibole asbestos with no chrysotile detected. The remaining 4 cases had background levels with no chrysotile detected, and 2 having background levels of TAA.

MM in younger women was more often located in the peritoneum. Survival after a diagnosis of mesothelioma was greatest for tumors of epithelioid type, and this was magnified in the peritoneal location. HHC was the most common exposure reported and is a significant source of asbestos exposure with objective markers present in 57% of our cases. Tremolite was the most common type of asbestos detected in women, although commercial and noncommercial amphiboles were elevated in nearly equal numbers of cases. Of cases with elevated tissue asbestos content, talc is rarely a source. There are some cases of mesothelioma in women which cannot be attributed to asbestos exposure; peritoneal mesotheliomas in women, in general, are not likely to be caused by exposure to asbestos.

Gref.B-FIN01-000227

JA433

D: Moline and colleagues measured the tissue burden of **amphibole fibers in subjects whose only asbestos exposure was to cosmetic talc (Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma Associated with the Use of Cosmetic Talc. J Occup Environ Med. 2019.)**

Tissue digestion was performed in 6 of 33 subjects.

Case 1 applied loose face powder on a daily basis from the 1940's to the 1970's Her mother also used the same loose face powder and Case 1 cleaned residual powder from her mother's dresser and clothing every other week from 1994-2012. Electron microscopic analysis **(EMA) of the lung tissue revealed anthophyllite fibers in a calculated concentrations of 3,286 fibers per gram weight**. There was also significant amount of fibrous and platy talc and aluminum silicates.

Case 2 reported starting to use talc around age eight or nine and would apply powder after her daily shower or bath. She would also use talcum powder when visiting her grandmother because she enjoyed the scent and would apply the powder before going on a date. She continued to use powder after getting married and used baby powder with all three of her children. In the early 2000's she began to regularly apply a fragrance and its matching talcum powder in the morning and at night, describing it as her signature scent. She also sprinkled the powder in her lingerie drawer and traveled with the powder which she would rub on her suitcases and other surfaces.

**EMA of the lung tissue revealed anthophyllite fibers in a calculated concentration of 8,625** fibers per gram wet weight with a limit of detection of 2,875 fibers per gram wet weight. A significant amount of fibrous and platy talc was seen. **EMA of the lymph node tissue revealed anthophyllite and tremolite fibers** in a calculated concentrations of 34,500 fibers per gram weight with a limit of detection of 11,500 fibers per gram wet weight. They were seen in a ratio of 2:1 anthophyllite:tremolite/actinolite. All fibers counted were 5 micrometers or greater in length with aspect ratios greater than 8. There was also some amount of fibrous and platy talc noted in the lymph node tissue.

Case 3 worked as an elementary school teacher with no known occupational exposure to asbestos. Case 3 used talcum powder "before [she] was 12 and 13 years old," applying it under her arms and in her shoes daily. She shook the powder out of the can and apply it onto her body. She noted that her mother also used talcum body powder, and they shared a small bathroom. She used talcum powder beginning in the 1940s and continuing for decades, until her preferred brand was no longer available for purchase.

**EMA of the lung tissue did not reveal any asbestos fibers above the limit of detection of 6,900.** However, there were a number of very small chrysotile asbestos fibers. **Analysis of the lymph node tissue revealed tremolite asbestos fibers in calculated concentrations of 9,409 fibers per gram wet weight with a limit of detection of 9,409**. All fibers counted were 5 micrometers or greater in length with aspect ratios greater than 20. There was also a significant amount of aluminum silicates, silica particles and both fibrous and platy talc. Light microscopic analysis

Gref.B-FIN01-000228

**JA434**

revealed a calculated concentration of 409 asbestos bodies per gram wet weight of lymph node tissue by phase contrast light microscopy.

Case 4 grew up in a home where her mother used talcum powder "for as long as [she could] remember." She recalled personally using talcum powder starting around the age of nine or ten, applying the powder to her armpits, groin, and around her body, using a powder puff. She applied talcum powder to her body for approximately 40 years. Case 4 had additional exposure to talcum powder in the 1960's while working as a licensed cosmetologist, applying talcum powder on clients' necks after a haircut. She shook the talcum powder onto the client's neck, and would wipe off the excess with a brush or blow dryer. She also used talcum powder inside the gloves that she donned prior to applying hair color.

**EMA of the peritoneal tissue** revealed chrysotile type asbestos fibers in a calculated concentration of 920 fibers per gram wet weight with a limit of detection of 920 fibers per gram wet weight. Fibrous and platy talc was also observed. Also seen were non-asbestiform tremolite and silica crystals.

Case 5 had daily personal use of talcum body powder from the 1950s to the mid-1970s. She would pour the powder onto her hands and pat it under her arms, in her genital area, between her toes, and on her legs. When she was menstruating she would apply talcum powder on her feminine napkins and her underwear. She also applied talcum powder to her shoes. Case 5's husband also used talcum powder. Both Case 5 and her husband applied the powder in the bathroom. She shook the bathroom floor mat and cleaned up residual powder from the bathroom sink.

**EMA of the omental tissue did not reveal any asbestos fibers above the limit of detection of detection of 651 fibers per gram wet weight.** EMA of the lymph node tissue revealed chrysotile and anthophyllite asbestos fibers in a calculated concentrations of 20,700 fibers per gram wet weight with a limit of detection of 10,350 fibers per gram wet weight. All fibers counted were 5 micrometers or greater in length with aspect ratios greater than 20. There was also a significant amount of fibrous and platy talc as well as fibrous and platy aluminum silicates.

Case 6 was exposed to talcum powder beginning when he was an infant. His mother applied it to him after his bath until he was able to apply it himself, starting around the age of six. Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor. He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering. He played hockey as a youth and used powder in his hockey gear before donning the equipment. He recalled getting mouthfuls of powder during the application. He often applied talcum powder once or twice a day after showering. He had no occupational exposure to asbestos.

**EMA of the lymph node tissue revealed anthophyllite and tremolite asbestos fibers in a calculated concentrations of 17,250 fibers per gram wet weight with a limit of detection of 3,450 fibers per gram wet weight. They were seen in a ratio of 2:3 anthophyllite:tremolite.** All fibers counted were 5 micrometers or greater in length with aspect ratios greater than 14.7 or

Page -229-

Gref.B-FIN01-000229

greater. There was also some amount of fibrous and platy talc along with platy aluminum silicates and magnesium aluminum silicates.

**E. 2020 Publication on Asbestos Fibers in the Abdominal Tissues of Subjects with Gynecologic Cancer (Steffen JE, Tran T, Yimam M, et al. Serous Ovarian Cancer Caused by Exposure to Asbestos and Fibrous Talc in Cosmetic Talc Powders-A Case Series. J Occup Environ Med. 2020;62:e65-e77.**

The authors wrote:

**Tissue Analysis for Asbestos and Talc**

Samples from a combination of the left and right ovaries, left and right fallopian tubes, and left and right pelvic lymph nodes were obtained from the hospital for each of the 10 patients. Tissues were analyzed to identify and quantify talc and asbestos content in the tissue. For tissue analysis, a small portion of the tissue in each block was removed with a clean razor blade and placed in a pre-weighed 20 to 30mL borosilicate glass vial. The vial was filled with 10mL of filtered extraction solvent (hexane) and placed in a 60 8C water bath. The filtered extraction solvent was replaced every 20 minutes for a total of three changes. After the last extraction solvent change, two changes of filtered ethanol (10 mL, each) 10 minutes each were performed, then the tissue piece(s) were dried at 110 to 120 8C.

For TEM analysis, 100 to 300 grid openings were analyzed for all asbestos and talc structures at a magnification of between 4000 and 20,000 . As per standard TEM analysis protocols, asbestos fiber/bundle identification was done by morphology (substantially parallel sides and length to width ratio of at least 5:1), length (greater than 0.5mm in length), selected area electron diffraction (SAED), and energy dispersive X-ray spectroscopy (EDS). Talc structures (platy and fibrous) were identified morphologically, by selected area diffraction (SAED), and energy dispersive spectroscopy (EDS).

**Talcum Powder Use**

All cases reported perineal talc application; the frequency of perineal powdering with talc ranged from once per day to 10 times per day and the duration ranged from 24 years to 47 years. Nine of 10 cases reported upper body powdering with talc ranging from 1 to 5 times per day and lasting from 20 to 47 years. Seven of 10 cases reported that their parents used talc powder on them during diaper changes and eight of 10 cases used talc powder during diapering.

Gref.B-FIN01-000230

JA436

**Tissue Burden**

Talc and/or asbestos was identified in the tissue from all cases. Platy talc was found in 9/10 cases (90%) with an average concentration of 264,487 structures per gram (s/g) (range, 0 to 2,057,640 s/g). Fibrous talc was found in 8/10 cases (80%) with an average concentration of 5878 s/g (range, 0 to 21,545 s/g). Tremolite asbestos was found in 6/10 cases (60%) with an average concentration of 6488 s/g (range, 0 to 22,000 s/g). Anthophyllite asbestos was found in 4/10 cases (40%) with an average concentration of 2393 s/g (range: 0 to 12,000 s/g). Ferro-anthophyllite asbestos was also identified in two cases (20%), winchite and richterite asbestos were identified in one case (10%), and crocidolite asbestos was identified in one case (10%). Two tremolite structures with aspect ratios less than 5:1 were observed in one case, but were not counted as asbestos.

The most common structures identified by tissue analysis (platy talc, fibrous talc, tremolite and anthophyllite asbestos) strongly indicate talc powder as the source of asbestos exposure in these cases. Tremolite asbestos has had minor commercial production in India and Italy and is mainly found as an accessory mineral in talc, vermiculite, and chrysotile. Anthophyllite asbestos, which occurs as an accessory mineral in talc and chrysotile, has also had limited commercial use. Anthophyllite and tremolite together account for less than 1% of asbestos production and consumption worldwide.None of the cases reported in this series had any known history of alternative asbestos or vermiculite exposure and no chrysotile or vermiculite was found in any of the tissue samples.

The combination of talc with tremolite and/or anthophyllite asbestos, as identified by Finkelstein and the 10 cases reported here, are a fingerprint for exposure to asbestos-containing talc. These results indicate that perineal use can result in important inhalation exposure to asbestos, which is an accepted route of transmigration to the peritoneum and ovary.



**FIGURE 3.** TEM images of a tremolite asbestos fibers in Case No. 3 right pelvic lymph node tissue (left) and in sample of JBP purchased by Case No. 3 in 2014 (right).

Gref.B-FIN01-000231

JA437

F: **Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients. Am J Ind Med. 2020.**

Emory and colleagues presented a case series of seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders, and who were reviewed in medical-legal consultation. Out of the 75 cases, 11 were examined for asbestiform fibers. For the 11 subjects whose tissues were examined by ATEM and ASEM, the analysis showed the presence of tremolite and/or anthophyllite in all 11 subjects. The findings in 9 subjects are shown in the Table below.

**TABLE 2**  Fiber detection in tissue digestion from nine cases of malignant mesothelioma

| Case | Mesothelioma site | Asbestos type | Tissues examined | Concentration (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary | Limit of detection (fibers per gram of wet tissue) Lung, lymph node, omentum, ovary |
|------|-------------------|---------------|------------------|--------------------------------------------------------------------------------|-------------------------------------------------------------------------------------|
| 65 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 8625 | 4313 |
| 66 | Pleural | Anthophyllite | Lung, lymph node | 15 333, 23 000 | 7667, 1150 |
| 67 | Peritoneal | Anthophyllite, tremolite | Omentum, lymph node | 1917, 1725 | 639, 1725 |
| 68 | Pleural | Anthophyllite, tremolite | Lymph node | 3044 | 1015 |
| 70 | Pleural | Anthophyllite, amosite, chrysotile | Lymph node | 17 250 | 3450 |
| 71 | Pleural | Anthophyllite, tremolite | Lung, lymph node | 4313, 857, 3451 | 2156, 857, 575 |
| 72 | Pleural | Anthophyllite, tremolite | Lymph node | 17 250 | 3450 |
| 74 | Pleural | Anthophyllite, tremolite | Lung | 2300 | 460 |
| 75 | Pleural | Anthophyllite | Lung, ovary | 3450, 2070 | 1150, 2070 |

*Note:* All cases shown were examined by analytical transmission electron microscopy and structures analyzed by microprobe analysis.

Gref.B-FIN01-000232

JA438

### G: Fiber Burden Analysis of the Johnson Baby Powder User Kathleen Stepanek

I have consulted on, and been deposed on, the case of Johnson and Johnson user Kathleen Stepanek.

MTE/al                                                                                          Firm #90200

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| KATHLEEN STEPANEK, | ) | IN RE: ASBESTOS LITIGATION |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | NO. 17 L 008994 |
| | ) | |
| BRENNTAG NORTH AMERICA, INC., | ) | |
| INDIVIDUALLY, AND AS | ) | |
| SUCCESSOR-IN-INTEREST TO MINERAL | ) | |
| PIGMENT SOLUTIONS INC., AS | ) | |
| SUCCESSOR TO WHITTAKER, CLARK & | ) | |
| DANIELS, INC., ET. AL. , | ) | |
| | | |
| Defendant(s). | | |

Dr. Stepanek was born in 1929, and used Johnson's Baby powder on herself and on her children. She also had take-home exposure to amosite fibers on her husband's work clothing and there was vermiculite insulation in their attic.

Dr. Ronald Dodson performed tissue burden analysis of Dr. Stepanek's lung and tissues.

### Fiber Burden Analysis by Dr. Ronald Dodson

Dr. Dodson was provided with autopsy tissue (45 grams) for analysis of lung fiber burden. There were 3 pieces each from the left and right lungs. Samples from each lung were pooled and analysed by TEM at high magnification (15,000X) and also at low magnification (2,000x).

Six asbestos structures (Tremolite:4; Amosite:1; and Anthophyllite: 1) were counted in left lung tissue at high magnification. In addition, one fiber of "Libby Amphibole" was observed.

Page -233-

Gref.B-FIN01-000233

**JA439**

## Asbestos – By TEM – Tissue Fiber Burden
### LAB WORKSHEET

Customer: ERI Consulting
J3 Order #: JH1899962

Sample Number: 1805333A
Prep: F1

### High Magnification Scan at 15,000X

| Grid | G.O. # | Non-Asbestos | Asbestos Tally | L x W (µm) | TYPE | EDS | Morphology | SAED | Comments |
|------|--------|--------------|----------------|-----------|------|-----|------------|------|----------|
| A | | | | | | | | | |
| | 1 | ✓ | NA | 14 x 0.3 | Libby Amphibole | Yes | 01 | 02 | |
| | 9 | | NSD | | | | | | |
| | 10 | | 1 | 11 x 0.25 | Amosite | Yes | 03 | 04 | |
| | | | 2 | 16 x 5 | Anthophyllite | Yes | 05 | 06 | |
| | 16 | | NSD | | | | | | |
| | 17 | | 3 | 9 x 0.5 | Tremolite | Yes | 11 | 12 | |
| | 18 | | 4 | 8 x 0.5 | Tremolite | Yes | | | |
| | 19 | | NSD | | | | | | |
| | 21 | | NSD | | | | | | |
| | 22 | | 5 | 12 x 0.8 | Tremolite | Yes | | | |
| | 23 | | NSD | | | | | | |
| | 24 | | NSD | | | | | | |
| | 25 | | NSD | | | | | | |
| | 26 | | NSD | | | | | | |
| | 27 | | NSD | | | | | | |
| | 28 | | NSD | | | | | | |
| | 29 | | 6 | 15 x 0.6 | Tremolite | Yes | | | |

## Asbestos – By TEM – Tissue Fiber Burden
### LAB WORKSHEET

Customer: ERI Consulting
J3 Order #: JH1899962

Sample Number:
Prep:

### Low Magnification Scan at 2,000X

| Grid | G.O. # | Non-Asbestos | Asbestos Tally | L x W (µm) | TYPE | EDS | Morphology | SAED |
|------|--------|--------------|----------------|-----------|------|-----|------------|------|
| A | | | | | | | | |
| | 1-14 | | NSD | | | | | |
| | 15 | | 1 | 7.5 x 0.3 | Tremolite | Yes | 07 | |
| | | | 2 | 5 x 0.3 | Tremolite | Yes | | |
| | 16-19 | | NSD | | | | | |
| | 20 | | 3 | 8 x 0.25 | Anthophyllite | Yes | 08/09 | 10 |
| B | | | | | | | | |
| | 1-7 | | NSD | | | | | |
| | 8 | | 4 | 8 x 0.3 | Tremolite | Yes | | |
| | 9-16 | | NSD | | | | | |
| | 17 | | 5 | 11 x 0.35 | Tremolite | Yes | | |
| | 18-20 | | NSD | | | | | |

Five asbestos structures (Tremolite:4; and, Anthophyllite: 1) were counted in left lung tissue at low magnification.

Two asbestos structures

Page -234-

Gref.B-FIN01-000234

**JA440**

(Amosite:1; and Anthophyllite: 1) were counted in right lung tissue at high magnification. In addition, a tremolite cleavage fragment and a talc fiber were observed.

| Customer: | ERI Consulting | | | | | Sample Number: | 1805333B | | |
| J3 Order #: | JH1899962 | | | | | | Prep: | F1 | |

| | | | | **High Magnification Scan at 15,000X** | | | | | |
| Grid | G.O. # | Non-Asbestos | Asbestos Tally | L x W (µm) | TYPE | EDS | Images Morphology | SAED | Comments |
|---|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | | |
| | 1 | ✓ | NA | 12 x 1.3 | Tremolite | Yes | 01 | | Cleavage Fragment |
| | 2 | | NSD | | | | | | |
| | 3 | | 1 | 15 x 0.25 | Amosite | Yes | 02 | 03 | |
| | 4 | | NSD | | | | | | |

| | 24 | | NSD | | | | | | |
| | 25 | | 2 | 11.5 x 0.25 | Anthophyllite | Yes | | | |
| | 26 | | NSD | | | | | | |
| | 27 | | NSD | | | | | | |
| | 28 | | NSD | | | | | | |
| | 29 | ✓ | NA | 24 x 2 | Talc | Yes | | | Fiber |
| | 30 | | NSD | | | | | | |

Five asbestos structures (Anthophyllite: 3; and, Tremolite: 2) were counted in right lung tissue at low magnification. There was one Talc fiber counted.

## Asbestos - By TEM - Tissue Fiber Burden
### LAB WORKSHEET

| Customer: | ERI Consulting | | | | | Sample Number: | | | |
| J3 Order #: | JH1899962 | | | | | | Prep: | | |

| | | | | **Low Magnification Scan at 2,000X** | | | | | |
| Grid | G.O. # | Non-Asbestos | Asbestos Tally | L x W (µm) | TYPE | EDS | Images Morphology | SAED | |
|---|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | | |
| | 1-7 | | NSD | | | | | | |
| | 8 | | 1 | 7.5 x 0.8 | Tremolite | Yes | | | |
| | 9-10 | | NSD | | | | | | |
| | 11 | | 2 | 5.5 x 0.4 | Tremolite | Yes | | | |
| | | | | | | | | | |
| B | | | | | | | | | |
| | 1-14 | | NSD | | | | | | |
| | 15 | | 3 | 45 x 2 | Anthophyllite | Yes | 04/05 | 06 | |
| | | | 4 | 2.5 x 0.3 | Anthophyllite | Yes | | | |
| | 16-20 | | NSD | | | | | | |
| | | | | | | | | | |
| C | | | | | | | | | |
| | 1-3 | | NSD | | | | | | |
| | 4 | | 5 | 17 x 0.25 | Anthophyllite | Yes | | | |
| | | | NSD | | | | | | |

Page -235-

Gref.B-FIN01-000235

**JA441**

Tremolite



Cleavage Fragment



Anthophyllite Fiber Bundle

Page -236-

Gref.B-FIN01-000236

JA442

**Summary of Asbestos Structures Observed**

| Structure | Magnification | Length (μ) | Width (μ) | Aspect Ratio |
|---|---|---|---|---|
| Libby Amphibole | H | 14 | 0.3 | 47 |
| Amosite | H | 11 | 0.25 | 44 |
| Amosite | H | 15 | 0.25 | 60 |
| Anthophyllite | H | 16 | 5 | 3.2 |
| Anthophyllite | L | 8 | 0.25 | 32 |
| Anthophyllite | H | 11.5 | 0.25 | 46 |
| Anthophyllite | L | 45 | 2 | 23 |
| Anthophyllite | L | 2.5 | 0.3 | 8.3 |
| Anthophyllite | L | 17 | 0.25 | 68 |
| Tremolite | H | 9 | 0.5 | 18 |
| Tremolite | H | 8 | 0.5 | 16 |
| Tremolite | H | 12 | 0.8 | 15 |
| Tremolite | H | 15 | 0.6 | 25 |
| Tremolite | L | 7.5 | 0.3 | 25 |
| Tremolite | L | 5 | 0.3 | 17 |
| Tremolite | L | 8 | 0.3 | 27 |
| Tremolite | L | 11 | 0.35 | 31 |
| Tremolite | H | 15 | 0.25 | 60 |
| Tremolite | L | 7.5 | 0.8 | 9.4 |
| Tremolite | L | 5.5 | 0.4 | 14 |

**Discussion:** A mixed population of fibers was observed in Dr. Stepanek's lungs. These included Libby Amphibole (1 fiber), Amosite (2 fibers), Anthophyllite (6 fibers), Tremolite (12 fibers), and Talc (1 fiber). The anthophyllite and tremolite likely were derived from inhalation of cosmetic talc, although the dust from brakes (husband and son performed shade tree mechanic work) would also have contained tremolite fibers.

Page -237-

Gref.B-FIN01-000237

I now reproduce Wylie's Table to show the dimensions of crushed prismatic tremolite.

TABLE 7B. AMPHIBOLE CLEAVAGE FRAGMENT EMPS DERIVED FROM CRUSHED

| | Q tremolite NIEHS | R tremolite NIEHS | A riebeckite CA | B riebeckite CO | H grunerite SD | I grunerite Portugal | II anthophyllite Sweden |
|---|---|---|---|---|---|---|---|
| $1 \leq L \leq 5$ μm | | | | | | | |
| % all EMPs | 59 | 74 | 37 | 69 | 69 | 80 | 52 |
| width mode (μm) | 0.83 ± 0.17 | 0.18 ± 0.12 | 0.44 ± 0.06 | 0.63 ± 0.06 | 0.64 ± 0.07 | 0.36 ± 0.06 | 0.72 0.06 |
| mean width ± SD (μm) | 0.77 ± 0.28 | 0.40 ± 0.29 | 0.63 ± 0.30 | 0.59 ± 0.31 | 0.59 ± 0.31 | 0.54 ± 0.31 | 0.71 ± 0.29 |
| range (μm) | 0.33–1.76 | 0.06–1.45 | 0.17–1.76 | 0.06–1.27 | 0.01–1.27 | 0.06–1.45 | 0.24–1.44 |
| $5 < L \leq 10$ μm | | | | | | | |
| % all EMPs | 21 | 11 | 20 | 25 | 23 | 13 | 40 |
| width mode (μm) | 1.93 ± 0.17 | undefined | 0.66 ± 0.06 | 0.66 ± 0.06 | 0.89 ± 0.07 | 1.21 ± 0.06 | 1.80 0.12 |
| mean width ± SD (μm) | 1.70 ± 0.49 | 1.14 ± 0.59 | 1.09 ± 0.56 | 1.56 ± 0.63 | 1.33 ± 0.62 | 1.30 ± 0.53 | 1.40 ± 0.50 |
| range (μm) | 0.77–3.08 | 0.06–2.72 | 0.11–3.08 | 0.51–2.92 | 0.51–2.79 | 0.48–2.72 | 0.48–2.40 |
| $10 < L \leq 15$ μm | | | | | | | |
| % all EMPs | 10 | 5 | 9 | 4 | 2 | 3 | 5 |
| width mode (μm) | 3.3 ± 0.10 | undefined | 0.66 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (μm) | 2.76 ± 0.95 | 2.17 ± 0.94 | 1.66 ± 1.01 | 2.57 ± 1.01 | 2.88 ± 0.66 | 2.45 ± 1.03 | 2.76 ± 0.78 |
| range (μm) | 0.99–4.4 | 0.48–3.33 | 0.33–3.96 | 1.52–4.44 | 2.22–3.81 | 0.97–3.93 | 1.44–3.60 |
| $L > 15$ μm | | | | | | | |
| % all EMPs | 11 | 2 | 33 | 2 | 1 | < 1 | 4 |
| width mode (μm) | 3.85 ± 0.08 | undefined | 0.77 ± 0.06 | undefined | undefined | undefined | undefined |
| mean width ± SD (μm) | 4.47 ± 3.10 | 3.95 ± 2.29 | 3.82 ± 3.30 | 3.77 ± 0.97 | 3.81 ± 2.29 | undefined | 2.70 ± 1.89 |
| range (μm) | 0.55–13.75 | 2.18–7.26 | 0.33–15.4 | 2.92–4.83 | 1.91–6.35 | undefined | 0.72–5.40 |
| Number of EMPs | 157 | 233 | 651 | 195 | 210 | 209 | 155 |
| minimum length (μm) | 1.1 | 0.6 | 0.44 | 0.64 | 0.8 | 0.5 | 1.2 |
| maximum length (μm) | 165 | 30 | 160 | 18.4 | 22 | 21 | 23.4 |

| | | Length | Width | |
|---|---|---|---|---|
| Tremolite | H | 9 | 0.5 | 18 |
| Tremolite | H | 8 | 0.5 | 16 |
| Tremolite | H | 12 | 0.8 | 15 |
| Tremolite | H | 15 | 0.6 | 25 |
| Tremolite | L | 7.5 | 0.3 | 25 |
| Tremolite | L | 5 | 0.3 | 17 |
| Tremolite | L | 8 | 0.3 | 27 |
| Tremolite | L | 11 | 0.35 | 31 |
| Tremolite | H | 15 | 0.25 | 60 |
| Tremolite | L | 7.5 | 0.8 | 9.4 |
| Tremolite | L | 5.5 | 0.4 | 14 |

Page -238-

Gref.B-FIN01-000238

JA444

**I conclude that the Tremolite fibers measured by Dr. Dodson did not arise from crushed prismatic tremolite.**

This analysis confirms the deposition and retention of talc, tremolite and anthophyllite fibers in the lungs of a Johnson Baby Powder user and is consistent with the previously mentioned findings of Roggli and of Churg.

H: **The Analysis of Cores of Asbestos Bodies in Human Lung Tissue**

Warnock and Churg analyzed the cores of asbestos bodies from members of the general population ((Asbestos and Other Ferruginous Bodies: Their Formation and Clinical Significance. Am J Pathol 1981, 102:447-456). They found that certain differences in fiber types at the core of the asbestos bodies between men and women became apparent. Although cores of amosite and crocidolite predominated in men (12 of 14, 86 per cent), *anthophyllite and tremolite comprised 57 per cent (12 of 21) of the cores found in women, a statistically significant difference.* These differences suggested to Warnock and Churg that the major commerical varieties of amphibole asbestos (amosite and crocidolite) are the source of the fibers in men, 'whereas in women a major source may be cosmetic talc, which is often contaminated with anthophyllite and tremolite.'

I have a copy of the lung tissue fiber burden database of Dr. Victor Roggli of Duke University. There are analyses of the fiber burden of 530 individuals with pleural mesothelioma. Dr. Roggli counted tremolite and anthophyllite cored asbestos bodies among these subjects. There were 3 anthophyllite-cored asbestos bodies among the 73 women (4.1%) and 11 anthophyllite-cored asbestos bodies among the 457 men (2.4%). There were 4 tremolite-cored asbestos bodies among the 73 women (5.5%) and 13 tremolite-cored asbestos bodies among the 457 men (2.8%).

As with Dr. Churg's analysis, the tremolite and anthophyllite cored asbestos bodies were more common among the women.

**Comment: The finding of fibers, and asbestos bodies, of talc, tremolite, and anthophyllite in the lung tissues of men and women is consistent with the widespread use of talcum products in the United States, and, the contamination of these products with fibers of tremolite and anthophyllite.**

I: **The Epidemiology of Mesothelioma among Cosmetic Talc Users**

There are, as of the present, no studies of the epidemiology of mesothelioma among cosmetic talc users. In 2018, I urged researchers performing epidemiologic studies of mesothelioma to collect informtion on cosmetic talc use that would make such studies possible (Finkelstein MM: Re: The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Env Med 2018. http://dx.doi.org/10.1136/oemed-2018-105129.) Marinaccio and colleagues replied and indicated that they would begin collecting such data for their studies of the

Gref.B-FIN01-000239

JA445

Italian mesothelioma register ( Marinaccio A, Corfiati M, Binazzi A, et al. Occup Environ Med 2018;75:844–845.)

## Letter concerning: 'Response to: 'The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure' by Marinaccio *et al*'

Finkelstein[1] invited physicians and researchers interested in mesothelioma to investigate on past usage of talcum powders by affected people. In Italy, asbestos contamination in talc for industrial use has been documented,[2] and, as he underlines tremolite contamination at low levels of cosmetic and pharmaceutical talc has been reported in USA by Blount[3] and Gordon and colleagues.[4]

Gref.B-FIN01-000240

JA446

Registry data such as those provided by ReNaM cannot provide estimates of the mesothelioma risk associated with any particular exposure circumstance. We plan to include talc exposure at work and cosmetic talc usage in the analyses of a case–control study on pleural mesothelioma currently under way. A specific survey to compare and discuss how the modalities of exposure to talc have been evaluated in patients with mesothelioma in countries where epidemiological surveillance systems are active could improve knowledge and support prevention policies.

Gref.B-FIN01-000241

JA447

**J: The Epidemiology of Mesothelioma among Talc Miners and Millers**

**1. Miners and end-users of commercial talc from New York State** are at increased risk of mesothelioma (Finkelstein 2012;Finkelstein 2013), attributable to the contamination with tremolite and anthophyllite, but the talc used in cosmetic talc was not sourced from this heavily contaminated deposit.

*Vanderbilt Minerals Corporation states that their products did not contain asbestiform minerals.*



R.T. Vanderbilt Company, Inc.                            MINERAL PRODUCT SAFETY DATA SHEET

NOTE: Exposure to all airborne mineral dusts is subject to OSHA regulations in accordance with Section 1910.93 of the Occupational Health and Safety Administration Standards as published in the Federal Register of October 18, 1972, starting on page 72139

| SECTION I | |
|---|---|
| TRADE NAME AND SYNONYMS | NYTAL 200, NYTAL 300, NYTAL 400    Industrial Talc |
| MINERAL FAMILY | Hydrous silicates |
| CHEMICAL COMPOSITION | Complex hydrous calcium magnesium silicates |

| SECTION II INGREDIENTS | % RANGE |
|---|---|
| Talc | 20 - 40 |
| Non-asbestiform tremolite and/or anthophyllite | 40 - 60 |
| Serpentine | 20 - 30 |
| Quartz | 1 - 5 |

Nolan, Gamble, and Gibbs have written, in the American Journal of Industrial Medicine, that 'tremolite and anthophyllite particles in NYS tremolitic talc are by definition non-asbestiform' (Nolan et al. 2013).

Kelse, of Vanderbilt Minerals, refers to the amphibole particles as Non-asbestos Elongate Mineral Particulate in a paper published in 2017 (Kelse et al. 2017).

Gref.B-FIN01-000242

JA448

**We thus have an increased risk of mesothelioma among individuals exposed to Elongate Mineral Particles. This is in agreement with The Recent Preliminary Recommendations of the Interagency Working Group on Asbestos in Consumer Products (IWGACP) (January 6, 2020) who wrote:**

'The difficulty of identifying and quantifying individual asbestos or other mineral particles present at low concentrations in talc is compounded by the presence of non-asbestiform analogs with the same elemental composition and crystal structure, but different growth habit. Using TEM, differentiation of chrysotile from non-asbestiform serpentine analogs is relatively straightforward; however, each of the non-asbestiform amphiboles can disaggregate into particles resembling asbestiform fibers, giving rise to disputes between laboratories over whether elongate amphibole particles are truly asbestos, or are particles resulting from attrition of larger particles of a non-asbestiform analog. ***Because both types of elongate minerals are suspected of having biological activity with similar pathological outcomes, the distinction is irrelevant***. Lack of consensus concerning what should be called "asbestos" has persisted since the first reports indicating that asbestos might be present in talc used in cosmetics and has inhibited thorough toxicological and epidemiological investigations of disease attributable to talc that contains asbestos. Based on its review, the IWGACP agrees with the recommendations and rationale provided in the peer reviewed NIOSH Bulletin 6210 regarding adopting the term "elongate mineral particle" or "EMP" that is defined as "any mineral particle with a minimum aspect ratio [i.e., length: width ratio] of 3:1. Countable EMPs have an aspect ratio (AR) of >3:1 and a length of > 0.5 μm using the most inclusive criteria for length and AR from among the "asbestos" counting rules in established testing protocols. The specified minimum length of 0.5 μm is consistent with the counting rules for fibers established by the global standard for TEM sampling and analysis, ISO 10312:2019 and is supported by studies that indicate asbestos particles and EMPs of these dimensions could pose a health concern.'

**Mesothelioma Incidence Among New York State Talc Miners Exposed to Amphibole Particles**

Mining operations began in 1948. In 2002, Honda and colleagues (Honda et al. 2002) reported 2 cases of mesothelioma among 782 men who were followed from 1960 to the end of 1989. In 2012, I described an additional 6 cases from this cohort. Making conservative assumptions about overall mortality in the cohort, I computed that:

"The Incidence Rate Ratios (with 95% confidence limits) in a comparison of the RTV incidence rates with those of American males are then:
(a) 5 (1.6–11.7) assuming Subject 6 did not have mesothelioma; and,
(b) 6 (2.2–13.0) assuming Subject 6 did have mesothelioma. In both situations, the Rate Ratios are significantly above unity."

I wrote: "There has been concern that these individuals may have had asbestos exposure outside of their mining employment. Indeed, Several of the subjects with mesothelioma may have had

Gref.B-FIN01-000243

exposure to asbestos from other sources. Subject 3 had worked as a radar man in the US Navy. It is possible that, although not working in an asbestos-exposed trade, he may have had exposure to asbestos onboard naval vessels. Subject 4 had worked in a Navy Yard for 1 year. A description of his job tasks was not available, but asbestos exposure was certainly possible in that environment. Subject 5 had done mechanical work, including brake adjustments, at an automotive service station. It is possible that he had asbestos exposure from automotive friction products, but that exposure alone is unlikely to have produced pneumoconiosis, a morbidity with which he had been diagnosed. Asbestos exposure is thus possible among three subjects prior to the start of their employment in the talc industry; the extent of exposure cannot be quantified, but is likely to be low with the possible exception of the man who worked in the Navy Yard."

Since my 2012 report, I have reviewed the cases of 2 additional Vanderbilt Talc employees who developed mesothelioma. Neither of these career miners had any history of asbestos exposure outside of their mining employment.

There are thus at least 10 cases of mesothelioma among the 800 men in the Gouverneur talc cohort. The rate of mesothelioma is thus about 1 per 80. This might be compared to the average of 1.05 mesothelioma cases per 100,000 persons diagnosed annually in the United States during 2003–2008 (Henley et al. 2013). Men in the mining cohort had exposure to tremolite and anthophyllite **asbestos fibers** (in the opinions of NIOSH, Hull and Abraham and Case (2002)) or to **non-asbestiform particles** of tremolite and anthophyllite (in the opinions of Vanderbilt Minerals, Nolan et al., Kelse et al.)

**Conclusion:** Workers at a New York State Talc Mine and Mill who inhaled Amphibole Particles have had a markedly increased risk of developing mesothelioma. These particles were classified as Fibers by NIOSH and by Research Pathologists. They were classified as non-asbestiform by the Company and its consultants.

## 2. NIOSH and Exponent Mortality Studies of Vermont Talc Miners

Selevan and colleagues conducted a mortality study of 392 Vermont talc workers who had been under radiographic surveillance by the Vermont Health Department (Selevan et al. 1979). Death certificates were obtained and coded according to the 7th revision of the ICD. The 7th revision did not have a separate rubric for mesothelioma, and any deaths from mesothelioma would have been coded under the rubric for lung cancer. NIOSH observed a total of 90 deaths, including 6 coded to respiratory cancer (3.7 expected). There was a substantial excess of mortality from non-malignant respiratory disease.

Lamm compared lung cancer and respiratory disease mortality between the Vermont and New York State talc workers (Lamm and Starr 1990). He concluded that the mortality patterns were similar. He stated "although New York talc has been described as asbestiform and Vermont talc as non-asbestiform, the mortality patterns of the workers appear to be inconsistent with that classification."

Page -244-

Gref.B-FIN01-000244

Lamm stated that "mesothelioma caused the death of one Vermont talc man". No further details of the diagnosis or exposure history were given.

In 2019, Fordyce and colleagues confirmed the occurrence of 1 case of mesothelioma in a 37-year update on mortality patterns in an expanded cohort of Vermont talc miners and millers. (Fordyce et al. Journal of Occupational and Environmental Medicine, DOI : 10.1097/JOM.0000000000001700).

Fordyce and colleagues made a special effort to find any deaths due to mesothelioma in this cohort. There was no specific code for mesothelioma before implementation of ICD-10 in 1999; therefore, mesothelioma deaths were assigned ICD codes at the discretion of the nosologist. These ICD codes were not specific to mesothelioma and included other malignant, and possibly benign, conditions. Furthermore, these codes did not necessarily represent tumors of the pleura or peritoneum, the anatomic sites at which most mesotheliomas arise. To identify any mesothelioma deaths in this cohort of workers, all death certificates with the codes listed in Table 2 were sent back to the nosologist for a second review to identify any deaths due to mesothelioma.

In their preliminary analyses using the methodology in Selevan et al. (1979), no deaths were attributed to malignant neoplasms of either the pleura or the peritoneum; therefore, applying the methodology employed by Selevan et al. (1979) to the updated cohort would not have resulted in the identification of any possible deaths due to mesothelioma. Because mesotheliomas are not necessarily coded as either pleural or peritoneal tumors, they created two subsets of ICD codes, as described above, each of which could have been used to code mesothelioma deaths. Death certificates coded to these ICD codes were sent to the nosologist for a second evaluation. *After evaluation by the nosologist, only one of these deaths was determined to be due to mesothelioma and was explicitly noted on the death certificate. In this talc worker, death occurred 30 or more years following employment and the death certificate indicated that the individual had been exposed to asbestos.* This worker was employed in the talc industry for less than five years and death occurred 30 years following employment.

The SMR for lung cancer was also elevated in this small cohort (Bronchus, Trachea, Lung (SMR = 143.9, 95% CI: 98.4–203.1)

There are no other studies of American talc miners, but there are a number of studies of European cohorts, and several have recently been updated.

3. Wergeland and colleagues (Wergeland et al. 2017) updated information on mortality and cancer morbidity in a cohort of Norwegian talc workers exposed to talc not containing asbestiform fibers, although the authors state that National Institute of Occupational Health (NIOH) in Norway had identified tremolite and anthophyllite (asbestiform fibers) in bulk samples from the mine. Repeated exposure measurements after 1981 showed only trace amounts of fibrous tremolite and anthophyllite together with trace amounts of quartz. The updated cohort comprised 390 men, 94 miners, and 296 millers. They were observed from January 1, 1953 through December 31, 2011 or date of death or emigration, whichever date came first. Mean age by end of follow-up was 74.9

Gref.B-FIN01-000245

years (median 75.9 years, range 31.3-95.9). Mean duration of employment was 15 years (miners 8 years, range 1-49 years, millers 17 years, range 3-46 years.) Person-years were 3 956 for miners and 11 731 for millers. The cohort included all employees from the mine 1944-1972 with at least 1 year employment, and all employees from the mill with at least 2 years employment. They were considered at risk from 1 year (miners) and 2 years (millers) after first employment. Standardized mortality and incidence ratios were based on 5-year age-specific and period-specific rates in the general male population. No cases of mesothelioma were observed and the authors reported that the probability of detecting increased incidence of mesothelioma was about 80% for a true RR = 7.5 and 54% for RR = 5.

4. **Pira and colleagues** have published an updated analysis of the mortality experience of a cohort of talc miners and millers in Northern Italy (Pira et al. 2017). The authors concluded 'We confirmed the lack of association between exposure to asbestos-free talc, lung cancer, and mesothelioma.' With respect to mesothelioma, the authors found no cases among their cohort of 1722 miners and millers. They reported that 2.0 cases would have been expected based upon national and regional mesothelioma mortality rates. Unfortunately, the authors' conclusion about a lack of association between asbestos-free talc and mesothelioma is blunted by their failure to discuss the power of their study to detect an excess risk.

**A Recent Review of Talc Miner Epidemiology by Marsh and Colleagues:** Occupational exposures to cosmetic talc and risk of mesothelioma: an updated pooled cohort and statistical power analysis with consideration of latency period by Gary M. Marsh et al. (Inhal Toxicol. 2019 Aug 5:1-11. doi: 10.1080/08958378.2019.1645768.)

Marsh and colleagues have recently updated their pooled cohort analysis of mesothelioma incidence in Italian, Norwegian, Austrian, and French cosmetic talc miner and miller cohorts and concluded that the epidemiological evidence from these cohort studies does not support the hypothesis that exposure to cosmetic talc is associated with the development of pleural cancer/mesothelioma. Unfortunately, there are a number of errors in the paper and some statements made by the authors are worthy of further discussion.

In the Introduction to their paper the authors state that "in the mid-1970s, researchers at Mt. Sinai claimed to have measured elevated levels of asbestos mineral in numerous cosmetic talc products (Rohl et al. 1976). Following the publication of their initial study, Rohl et al. (1976) acknowledged that the method employed in their 1976 study (i.e. X-ray diffraction [XRD]) was not capable of distinguishing between asbestiform and non-asbestiform minerals (Rohl and Langer 1979)." This statement by Marsh and colleagues in misleading and incomplete. In their 1979 paper Rohl and Langer do write: "The major limitation of x-ray diffraction analysis is its inability to distinguish between different morphological habits of the same mineral. For example, short tremolite fragments and long fibers of asbestiform tremolite give virtually identical x-ray patterns." Marsh and colleagues fail to mention the next sentences and paragraph written by Rohl and Langer: "To distinguish between different habits or shapes of the same mineral, including asbestos minerals, requires microscopic techniques. Transmission electron microscopy, used in conjunction with selected area electron diffraction (SAED), provides the resolution capability to visualize all

Page -246-

Gref.B-FIN01-000246

**JA452**

particles and, in many cases, to identify them." "In a paper published in 1976, we reported a mineral and chemical characterization of 20 consumer talcums and powders obtained in New York city during the e period 1971-1975 (Rohl et al., 1976). Of the twenty products, 10 contained either tremolite or anthophyllite or both. The proportions, determined by step-scan x-ray diffraction ranged from 0.1% to over 14%, by weight. No attempt was made to *distinguish proportions* of fibrous and non-fibrous morphological phases, although every sample contained fiber. The presence of these minerals in fibrous form was verified by electron beam techniques (Figures 1,2)." The next pages of Rohl and Langer (1979) show electron micrographs of amphibole fibers in commercial cosmetic talcs. Marsh and colleagues are thus in error in suggesting that Rohl and Langer did not find amphibole asbestos fibers in the samples of commercial cosmetic talcs that they analysed.

Marsh and colleagues go on to say "Nonetheless, there continues to be some debate on this issue. For example, Gordon et al. (2014) recently claimed to have measured 0.004–0.9% by weight asbestos fiber in bulk samples of cosmetic talc. Using different analytical methods, Anderson et al. (2017) analysed the same product and concluded there was no detectable asbestos fiber." Marsh and colleagues fail to mention that Anderson and colleagues hired Dr. Mark Floyd of Forensic Analytical Laboratories to perform the microscopic analysis, and that he identified and classified fibers of anthophyllite in his initial report on the bulk samples. One of the Anderson et al. authors, Patrick Sheehan, who is not a microscopist, directed Floyd to alter the report and add the qualification that "…this classification was inconclusive due to the small number counted. (Deposition Testimony of Mark Floyd, Supreme Court of the State of New York, County of New York, New York City Asbestos Litigation: Dec. 4, 2012).

Further on in their report Marsh and colleagues discuss specific issues related to the Italian cohort and comment on deaths attributed to pneumoconiosis. They write: "It is worth noting that Pira et al. (2017) reported that the number of observed deaths in their cohort attributed to pneumoconiosis was significantly higher than expected, yielding an SMR for pneumoconiosis of 26.62. Notably, the number of expected deaths in the Pira et al. (2017) cohort due to pneumoconiosis (n =2.6) was similar to that of mesothelioma (n =2.0), yet the authors observed 69 deaths due to pneumoconiosis and 0 deaths due to mesothelioma." This statement with respect to expected deaths due to pneumoconiosis and to mesothelioma illustrates a problem with the use of the regional reference population in the Italian study. Pneumoconiosis is an occupational lung disease caused by inhaling large amounts of fibrosis-inducing dusts such as silica or asbestos. Individuals do not develop these diseases without inhaling these dusts. Therefore the expected number of cases of pneumoconiosis in a general population without industrial exposures should be 0. Indeed, Marsh and colleagues write that "Pira et al. (2017) used regional (Piedmont) mesothelioma rates to estimate the expected number of mesothelioma deaths in the Italian cohort. Because there were several active asbestos industries in Piedmont, it has been claimed that the use of regional mesothelioma rates may lead to an overestimate of expected deaths for the Italian cohort (Finkelstein 2017; Mirabelli 2017). Marinaccio et al. (2018) specifically reported that among women in the Piedmont region, 'both environmental and familial exposures contribute to the female mesothelioma clusters, attributable to large asbestos cement plants'. In using regional rates to compute their expected number of cases of mesothelioma in the talc mining cohort, Marsh and colleagues have essentially asked the

Page -247-

Gref.B-FIN01-000247

question: How do mesothelioma rates in the mining cohort compare to the average rate in a region where many cases of mesothelioma are caused by exposures arising from the asbestos cement and other industries in Piedmont? In order to address the important question of how many cases of mesothelioma one might expect in a population without these known asbestos exposures, one would need rates in an unexposed reference population. Unfortunately these are not available because the reference population cannot be divided among exposed and unexposed individuals.

With respect to pneumoconiosis, Marsh and colleagues go on to write: "As we previously noted (Finley et al. 2017), the excess risk of pneumoconiosis in the Italian cohort is important because it indicates that these workers were exposed to very high levels of cosmetic talc, levels well beyond those ever encountered by cosmetic talc consumers." This statement is false. The occurrence of pneumoconiosis *does not* indicate that the workers were exposed to very high levels of cosmetic talc; rather it indicates that they were exposed to very high levels of silica. The 1976 study of Rubino et al tabulated 65 deaths from silicosis (62 in miners and 3 in millers) and there was a dose-response relationship with cumulative dust exposure. Rubino writes: "Table 13 shows a remarkable difference of free silica amount in air dust respectively in the mines and in the mills and within the mines jobs between drilling and other operations. This is due to the high content of quartz in footwall rocks and inclusions as opposed to the absence of free silica in talc minerals. The small amount of free silica in mills operations is due, as above mentioned, to the actual incomplete screening of talc inclusions."

Concerning the presence of asbestos in the Italian mines, Marsh and colleagues write "Regarding the alleged presence of asbestos in the Italian cosmetic talc mines, Mirabelli (2017) stated that 'low-level exposure to airborne asbestos fibers was indeed reported by Rubino et al. (1976)'. However, Rubino et al. (1976) did not report the presence of airborne asbestos fibers at the mine, nor did they claim there was any 'exposure' to such fibers." *This is false.* Rubino et al wrote: "Table 13 shows a remarkable difference of free silica amount in air dust respectively in the mines and in the mills and within the mines jobs between drilling and other operations. This is due to the high content of quartz in footwall rocks and inclusions as opposed to the absence of free silica in talc minerals. The small amount of free silica in mills operations is due, as above mentioned, to the actual incomplete screening of talc inclusions. *The same explanation could be given for the very small number of fibers in air, caused by possible microinclusions of rock containing little amount of tremolite.*"

Marsh and colleagues comment on a case of mesothelioma in the Vermont talc cohort studied by Selevan et al. They computed 7682 person-years at risk and an expectation of 0.16 based upon US national and state-specific rates. Calculation of an SMR has the same caveats as discussed concerning reference rates in the Italian study.

Marsh and colleagues concluded that "The epidemiological evidence from the cosmetic talc miner/miller cohort studies does not support the hypothesis that exposure to cosmetic talc is associated with the development of pleural cancer/mesothelioma. In a previous analysis (Finkelstein 2017), I commented that it is not possible to find a reference population purged of subjects with occupational exposures and I proposed a 'thought experiment' in which the cosmetic

Gref.B-FIN01-000248

talc miners are compared to the chrysotile miners of Quebec, Canada. McDonald and colleagues (McDonald et al. 1997) reported on mesothelioma mortality in Quebec miners and millers. They found 33 deaths from mesothelioma in a cohort of 9072 men (132,000 person-years). The mesothelioma mortality rates were 33.7 per 100,000 person-years among miners and millers in the Thetford Region and were 13.2 per 100,000 in the Asbestos Region. The average across the 2 regions was 25 deaths per 100,000 person-years. The pooled cohorts of the updated Marsh study comprised 113,344 person-years of observation.

Now, for the purposes of analysis, let us make two assumptions about the asbestos dust concentrations experienced by the cosmetic talc miners. Assumption (a) is that asbestos dust exposures in talc mining were 10% of the levels in Quebec chrysotile mining (high assumption), or, assumption (b) that asbestos dust exposures in talc mining were 1% of the asbestos dust exposures experienced by the Quebec miners and millers. How many mesothelioma deaths would be expected in the pooled cohort under these exposure conditions? In situation (a) we would expect the rate to be 10% of the Quebec rate of 25 per 100,000. In situation (b) we would expect the rate to be 1% of 25 per 100,000. Given that there were 113,000 person-years in the pooled cohort, we would then expect to see 2.5 cases of mesothelioma for situation (a) in which *asbestos exposure levels* were 10% of those in Quebec, and to see 0.25 cases in situation (b) where exposure levels were 1% of those in Quebec.

Now, there were no cases of mesothelioma observed in the three pooled cohorts. According to the Poisson distribution, used to compute confidence intervals for count data:

1) there is an *8% chance of observing no cases* when 2.5 were expected (situation A where the cosmetic talc miners asbestos exposure was 10% of the Quebec chrysotile miners exposure); and, 2) there is a *78% probability of observing no cases* when 0.25 were expected (situation B where the cosmetic talc miners asbestos exposure was 1% of the Quebec chrysotile miners exposure).

The exposure at which there is a 50/50 chance of observing either no case, or, of observing one or more cases of mesothelioma, corresponds to an asbestos exposure of about 3% of that experienced by the chrysotile miners and millers in Quebec.

I conclude that, given the size of the pooled cosmetic talc cohort, even at risk levels corresponding to asbestos exposures as high as 3% of those of the Quebec miners and millers, one is as likely to observe no cases of mesothelioma as one in likely to see one or more cases. Thus, despite the pooling of 4 cohorts and the accumulation of 113,000 person-years of observation the epidemiologic evidence is too weak to draw conclusions about the risk associated with the low levels of asbestos exposure experienced by talc miners. Observation of a much larger cohort would be required to have confidence in a conclusion that there is no risk associated with these exposures. In the meantime, the best evidence concerning risk is derived from analyses of the mineral content of samples of cosmetic talc and of the analyses of the lung content of cosmetic talc users.

Gref.B-FIN01-000249

**JA455**

**Recent Analysis of the Val Chisone cohort by Ciocan and colleagues** (Ciocan C, Pira E, Coggiola M, Franco N, Godono A, La VC, Negri E, Boffetta P. 2021. Mortality in the cohort of talc miners and millers from Val Chisone, Northern Italy: 74 years of follow-up. Environ Res 203:111865.)

Ciocan and collagues have recently updated follow-up of the Val Chisone cohort (n = 1749) through 2020. There were 64, 349 person-years of observation. No cases of mesothelioma were observed. Talc product (massive material) was collected by the contractor from the raw material, directly extracted from the mine, before any cleaning and processing technique. Samples arrived in the laboratory of the University of Turin with the request for the qualitative analysis (presence or absence of asbestos fibers) for fibrous content and not for quantitative analysis. The overall weight of the product brought each time to the laboratory was 500 g. Analyses were conducted with an Electron Microscope (SEM). No fibers were detected by SEM analysis.

In the previous analysis of the pooled cosmetic talc cohorts I proposed a 'thought experiment' in which the cosmetic talc miners are compared to the chrysotile miners of Quebec, Canada. McDonald and colleagues (McDonald et al. 1997) reported on mesothelioma mortality in Quebec miners and millers. They found 33 deaths from mesothelioma in a cohort of 9072 men (132,000 person-years). The mesothelioma mortality rates were 33.7 per 100,000 person-years among miners and millers in the Thetford Region and were 13.2 per 100,000 in the Asbestos Region. The average across the 2 regions was 25 deaths per 100,000 person-years. The cohort of the updated Italian study comprised 64, 349 person-years of observation.

Now, for the purposes of analysis, let us make two assumptions about the asbestos dust concentrations experienced by the cosmetic talc miners. Assumption (a) is that asbestos dust exposures in talc mining were 10% of the levels in Quebec chrysotile mining (high assumption), or, assumption (b) that asbestos dust exposures in talc mining were 1% of the asbestos dust exposures experienced by the Quebec miners and millers. How many mesothelioma deaths would be expected in the pooled cohort under these exposure conditions? In situation (a) we would expect the rate to be 10% of the Quebec rate of 25 per 100,000. In situation (b) we would expect the rate to be 1% of 25 per 100,000. Given that there were 64,349 person-years in the pooled cohort, we would then expect to see 1.4 cases of mesothelioma for situation (a) in which *asbestos exposure levels* were 10% of those in Quebec, and to see 0.14 cases in situation (b) where exposure levels were 1% of those in Quebec.

Now, there were no cases of mesothelioma observed in the three pooled cohorts. According to the Poisson distribution, used to compute confidence intervals for count data:

1) there is a *20% chance of observing no cases* when 1.4 cases were expected (situation A where the cosmetic talc miners asbestos exposure was 10% of the Quebec chrysotile miners exposure); and, 2) there is a *85% probability of observing no cases* when 0.14 were expected (situation B where the cosmetic talc miners asbestos exposure was 1% of the Quebec chrysotile miners exposure).

Gref.B-FIN01-000250

**JA456**

I conclude that, given the size of the Val Chisone cosmetic talc cohort, even at risk levels corresponding to asbestos exposures as high as 1% of those of the Quebec miners and millers, one is more likely than not to observe no cases of mesothelioma. Thus the epidemiologic evidence is too weak to draw conclusions about the risk associated with the low levels of asbestos exposure experienced by talc miners. Observation of a much larger cohort would be required to have confidence in a conclusion that there is no risk associated with these exposures. In the meantime, the best evidence concerning risk is derived from analyses of the mineral content of samples of cosmetic talc and of the analyses of the lung content of cosmetic talc users.

Reference List

Anderson EL, Sheehan PJ, Kalmes RM, Griffin JR. 2017. Assessment of health risk from historical use of cosmetic talcum powder. Risk Anal. 37:918–929.

Ciocan C, Pira E, Coggiola M, Franco N, Godono A, La VC, Negri E, Boffetta P. 2021. Mortality in the cohort of talc miners and millers from Val Chisone, Northern Italy: 74 years of follow-up. Environ Res 203:111865.

Finkelstein MM. 2017. "Letter on: cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology." Inhal Toxicol. 29:387–388.

Gordon RE, Fitzgerald S, Millette J. 2014. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health. 20:318–332.

Marinaccio A, Corfiati M, Binazzi A, Di Marzio D, Scarselli A, Ferrante P, Bonafede M, Verardo M, Mirabelli D, Gennaro V, et al. 2018. The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Env Med. 75:254–262.

Mirabelli D. 2017. Letter on: "cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology". Inhal Toxicol. 29:341.

Pira E, Coggiola M, Ciocan C, Romano C, La Vecchia C, Pelucchi C, Boffetta P. 2017. Mortality of talc miners and millers from Val Chisone, Northern Italy: an updated cohort study. J Occup Environ Med. 59:659–664.

Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R, Bowes DR, Skinner DL. 1976. Consumer talcums and powders: mineral and chemical characterization. J Toxicol Environ Health. 2:255–284.

Rohl AN, Langer AM. 1979. Fibrous mineral content of consumer talc containing products. In: Lemen R, Dement JM, editors. Dusts and disease. Park Forest South (IL): Pathotox Publishers; p. 393–403.

Gref.B-FIN01-000251

JA457

Rubino GF, Scansetti G, Piolatto G, Romano CA. 1976. Mortality study of talc miners and millers. J Occup Med. 18:186–193.

Selevan SG, Dement JM, Wagoner JK, Froines JR. 1979. Mortality patterns among miners and

**J: Health Risk Assessment:**

As discussed above, there is some controversy whether the amphibole particles in cosmetic talc (and industrial talc)  are best described as asbestos fibers or cleavage fragments. The pathologist, Dr. Bruce Case of McGill University, has commented upon the health implications of this controversy. In 1991, he published a letter in the British Journal of Industrial Medicine entitled "On talc, tremolite, and tergiver-sation (Ter-gi-ver-sate: To use subterfuges)" (Case 1991). Dr Case wrote: "Reger and Morgan attempt to get "non-asbestiform" tremolite off the hook. Three vital questions need to be answered if some fibrous tremolite is to be declared "safe" in the working and general environments. Firstly, can "non-asbestiform" fibres, by mineralogical definition, be unambiguously identified to the satisfaction of experts and regulators? Secondly, if they can be identified, are they present to the exclusion of "asbestiform" fibres in the same mix? Thirdly, if both of the previous conditions can be satisfied, do they inform as to the biological effects of long, thin, durable fibres that do not meet the crystallographic growth characteristics for asbestiform nature required by some experts? The answer to all three questions-without ter-giversation-is no.

"Non-asbestiform" tremolite has a variable content of high aspect ratio ( > 3:1 for regulatory purposes, but often > 10:1), long ( > 5 μm, and many > 10 μm), and thin ( < 3 μm, and many less than 0.25 μm) "fibres". The lack of mineralogical consensus as to what exactly the term means is such that the American Thoracic Society's statement on the health effects of tremolite observes that: "It became apparent both from our review of the literature and from submissions made to this Committee by experienced mineralogists, that the distinction between cleavage fragments and asbestiform fibres, although theoretically clear, is in practice extremely murky. Some mineralogists believe that these two types of particles are always distinct, whereas others believe they shade off one into the other . . . these same submissions were at odds with one another in identifying particular samples used in various experiments.The US Occupational Safety and  Health Administration (OSHA) has observed that the primary proponent for use of a  "mineralogically correct" definition of asbestos was a company mining and producing tremolitic talc. The OSHA also notes that ". . . many (biological) studies did not use carefully crafted definitions such as those currently submitted by the comentors from affected industries." The major flaw in the substitution of mineralogical definitions for microscopical characteristics is a reliance of the first on gross morphology. *For regulatory and health assessment purposes, it is microscopical morphology that counts: there is no evidence that potentially affected cells can distinguish between "asbestiform" and "non-asbestiform" fibres having equivalent dimensions.* The lack of agreement as to what is and what is not "asbestiform" tremolite would be less critical if those who advocate such a definition could show that a clear line exists between the two forms when they present "fibrous" morphology. Unfortunately, this is not the case. Pooley has noted that the differences in structure

Gref.B-FIN01-000252

between massive, acicular, and fibrous morphology are not "sharply defined" but rather represent points on a continuum." So called cleavage fragments may, in a strict morphological sense, be fibrous in their appearance in microscopical fields, and there is no convincing evidence that these "fibres" are of no public health concern. The probability that clearly amorphous, non-fibrous massive particles are individually of less concern is irrelevant for regulatory purposes. Regulatory fibres (those greater than 5 µm in length and having aspect ratio > 3:1) are present in both asbestiform and non-asbestiform habit.

Even if there were agreement on a definition of non-asbestiform fibres, and even if it were possible consistently to observe real world samples for regulation in which one form or the other, but not both, were present, the most important question would remain unanswered. That is, do non-asbestiform fibres lack biological effects? Reger and Morgan correctly cite inconclusive epidemiological studies of lung cancer among talc miners, but omit convincing evidence that tremolite-actinolite (a mixture of mineralogical types) causes lung cancer, mesothelioma, and interstitial fibrosis in vermiculite miners.

In discussing animal studies, studies flawed by improper sample preparation/characterisation and unacceptable animal survival figures are discussed as if they were valid, whereas the important work by Stanton et al is misinterpreted. Tremolite, which was most carcinogenic in Stanton's paper, did not fit the usually cited dimensional range (diameter < 0.25 µm, length > 8µm) but was composed largely of thicker and shorter fibres. Conversely, six of the seven talc preparations injected contained no fibres in the Stanton range at all. The exact make up, sources, and preparation methods for these samples are unknown. Reference to important recent work by Addison and Davis and Davis et al neglects to point out that one tremolite characterised before the experiment as fibrous (spicules) but not asbestiform ultimately produced mesothelioma in 70% of animals.

It is certainly true that more work is needed in the investigation of any role for mineralogical characteristics in the production of health effects by tremolite "fibres". Until there is actual evidence that "non-asbestiform" fibres are easily defined, clearly separated from tremolite asbestos in real world work environments, and not productive of lung fibrosis or other health effects, it seems folly to declare them exempt from regulation.''

In 2017, Dr. Case wrote 'distinction between mineralogical groups collectively known as 'asbestos' is important when considering the aetiology of asbestos-related diseases because it demonstrates that the potential of asbestos to produce disease is not confined to one crystalline mineral or chemical grouping. The biological potential of asbestos is most likely related directly to the ability of the minerals to form fibrous dust or 'elongated mineral particles' (EMP) in the parlance of the NIOSH Roadmap'. 'Imprecise terminology and mineralogical complexity have affected progress in research. 'Asbestos' and 'asbestiform' are two commonly used terms that lack mineralogical precision. 'Asbestos' is a term used for certain minerals that have crystallized in a particular macroscopic habit with certain commercially useful properties. These properties are less obvious on microscopic scales, and so a different definition of asbestos may be necessary at the scale of the light microscope or electron microscope, involving characteristics such as chemical composition and crystallography. The lack of precision in these terms and the difficulty in translating

Page -253-

Gref.B-FIN01-000253

macroscopic properties to microscopically identifiable characteristics contribute to miscommunication and uncertainty in identifying toxicity associated with various form of minerals. Comparably sized (by length , width, aspect ratio etc) amphibole particles which are considered 'asbestos' or 'not asbestos' including but not limited to 'cleavage fragments' 'transitional fibers' and the like have not been tested adequately for toxic potential , and in many real world situations - tremolite associated with chrysotile mining being one-  many health scientists believe that such asbestos analogues need to be treated with similar caution as long as they meet minimum requirements for fiber length. For regulatory and health-assessment purposes there is no evidence that potentially affected cells can distinguish between 'asbestiform' and 'nonasbestiform' fibers having equivalent dimensions (Case and Marinaccio 2017).


There are several recently published papers written by attendees at the Elongated Mineral Particles (EMP) Conference (October, 2017) in Charlottesville, Virginia that have bearing upon questions of interest concerning the toxicity of particles in cosmetic talc.

Page -254-

Gref.B-FIN01-000254

JA460

The English mineralogist, Dr. Fred Pooley, a long-time consultant to Johnson & Johnson has written a paper entitled Characterization of lung burden E.M.P.S.

Accepted Manuscript



Characterization of lung burden E.M.P.S

F.D. Pooley

PII:                    S0041-008X(18)30483-6
DOI:                    doi:10.1016/j.taap.2018.10.019
Reference:              YTAAP 14442

To appear in:           *Toxicology and Applied Pharmacology*

Received date:          7 May 2018
Revised date:           17 October 2018
Accepted date:          22 October 2018

Please cite this article as: F.D. Pooley , Characterization of lung burden E.M.P.S. Ytaap (2018), doi:10.1016/j.taap.2018.10.019

Dr. Pooley concludes that "the toxicity of exposure to airborne elongated mineral particles can be related almost entirely to their dimensions i.e.: length and diameter distributions and durability."

Dr. Bruce Case, a pathologist and epidemiologist has written about tremolite.

Gref.B-FIN01-000255

JA461

Toxicology and Applied Pharmacology xxx (xxxx) xxx–xxx



Contents lists available at ScienceDirect

## Toxicology and Applied Pharmacology

journal homepage: www.elsevier.com/locate/taap



Does qualitative examination of Elongated Mineral Particles (EMP) recovered from human and animal lungs provide reliable information on their carcinogenic and other effects?

Bruce W. Case[+]

Department of Epidemiology, Biostatistics and Occupational Health, and Associate Member, McGill School of Environment, McGill University, Montreal, Canada

## 2. Tremolite: the EMP for all reasons

As with anthophyllite and actinolite, much has been made of whether or not "tremolite" is or is not "asbestos" (or, asbestiform; or, cleavage fragment/acicular fragment/etc.). In our published work no such distinction is made, for rationale described many times, although it is recognized that some "tremolite EMP" will be more "hazardous" than other tremolite EMP. Two examples are given. First, a high burden of tremolite EMP was found associated with talc structures by Dr. Ronald Dodson in a mesothelioma case who worked in NY Talc mines early in life, later alleged to have his disease caused by friction product chrysotile exposure. Second, demonstration of high concentrations of

Gref.B-FIN01-000256

**The Recent Health Risk Assessment by Burns and Colleagues: Burns AM, Barlow CA, Banducci AM, Unice KM, Sahmel J. Potential Airborne Asbestos Exposure and Risk Associated with the Historical Use of Cosmetic Talcum Powder Products. Risk Anal 2019 Apr 12. doi: 10.1111/risa.13312**

Burns and colleagues [1] have recently reported on potential airborne asbestos exposures and the risk associated with the historical use of cosmetic talcum powder products. Burns and colleagues are consultants to defendants in talc litigation. They declare that: Three of the authors (Burns, Barlow, and Sahmel) have served as experts in talc and/or asbestos-related litigation. It is likely that this work will be relied upon in occupational health and exposure assessment research and litigation.

Their aim was to update a previous Food and Drug Administration (FDA) assessment by incorporating the current published exposure literature associated with consumer use of talcum powder and to use the current U.S. Environmental Protection Agency's (EPA) nonoccupational asbestos risk assessment approach to estimate potential cumulative asbestos exposure and risk for four use scenarios: (1) infant exposure during diapering; (2) adult exposure from infant diapering; (3) adult exposure from face powdering; and (4) adult exposure from body powdering. Unfortunately, the authors made a serious error in the method they used to compute asbestos fiber levels observed in experimental studies and have thus underestimated asbestos exposures by a least 2 orders of magnitude. This has substantial implications for the reliability of their conclusions.

In Table 1 of their paper, the authors list measurements of airborne dust concentrations, or of airborne fiber concentrations, published in 7 studies of infant or adult application of cosmetic talcum powder. In order to establish a common metric, they converted dust concentrations (in millions of particles per cubic foot or mg/m$^3$) to a fiber concentration in fibers/cc. In Table II, they presented Infant and Adult Cumulative Asbestos Exposure Estimates Associated with Four Consumer Application Scenarios. As they explained in the footnote to Table II, "fiber concentrations were converted from dust concentrations to fiber concentrations using the 1.72:1 fiber to dust conversion factor *and the application of the 0.1% asbestos factor to the airborne fiber concentration*, based on the FDA 1985 approach. In other words, they assumed that the asbestos component of the measurements of the fiber concentration was only 0.1% of the total fiber concentration. This is clearly wrong, as can be seen in the case of the measurements reported by Gordon et al[2], where Transmission Electron Microscopy (TEM) was used to measure the asbestos fiber concentration directly.

The authors' use of the 0.1% asbestos factor followed from a misinterpretation of the FDA method. The method used by the FDA to assess asbestos concentrations was explained by the geologist, Alice Blount, in her 1991 paper on the amphibole content of cosmetic and pharmaceutical talcs[3]. Blount wrote "The FDA has equated 0.1% with 1000 particles per milligram. It should be borne in mind that the 0.1% indicated is percent by count and not percent by weight or volume. The question of the validity of this relation has been considered. Briefly, the relation implies (1000 amphibole particles)/(1,000,000 total particles). Counts of total particles per milligram of talc have shown that 1 million particles per milligram of talc is a low value. Most show at least 2 to 3 times this number. The only exception was a baby powder with very large

Gref.B-FIN01-000257

flakes which showed 0.4 to 0.8 million particles per milligram. It was not clear, however, whether this was a true value or due to the problem of counting where large, flakey particles could potentially hide other particles even in the most carefully prepared samples. Using 1000 particles/mg = 0.1% would, in most samples, give a percentage value on the high side and in this sense be a conservative answer." So, the error made by Burns and colleagues was to equate *particles* in talc with *fibers* in talc. The great majority of particles in cosmetic talc are not fibers, but are platey talc.

There are several studies which have directly measured the airborne concentrations of asbestos fibers during the use of cosmetic talc and which do not require any conversion. Burns and colleagues cited the 2014 paper by Gordon et al [2]. Page 323 of that paper states that in the Shaker Container Test "For the talc user, the average Phase Contrast Microscopy (PCM) fiber concentration in his breathing zone during application was 4.8 F/cc. *The asbestos to total fiber percentage as determined by TEM was 40%.* Therefore, the asbestos concentration in the breathing zone of the talc user during application was 1.9 F/cc. For the bystander the PCM fiber concentration was 1.35 F/cc and *the TEM derived percentage of asbestos was 35%.*" For measurements made of powder application using a puff, "PCM fiber concentration in his breathing zone during the 5-minute sampling period was 20 F/cc. The asbestos to total fiber percentage as determined by TEM was 21%. Therefore, the asbestos concentrations in the breathing zone of the talcum powder user were 5 and 3.5 F/cc. The short term sample in the breathing zone of the applier had a PCM value of 60 F/cc. Using the TEM-derived percentage of asbestos of 10%, the result for the short term sample was an asbestos concentration of 13 F/ cc. For the bystander, the PCM fiber concentration was 11.7 F/cc. Using the minimum TEM-derived percentage of asbestos of 36% results in a bystander asbestos concentration of 4.9 and 3.5 F/cc. No asbestos fibers were found in the sample collected in the chamber before the testing or in the blank filters." So, the original investigators reported that the fiber concentrations during application were 4.8, 20, and 60 fibers/cc. Burns and colleagues have divided these concentrations by a factor of 1000, and report them in their Table II to be 0.0048, 0.020, and 0.060 fibers/cc.

Longo, Rigler, and Egeland measured the asbestos concentration of an individual applying Johnson's Baby Powder [5]. Approximately 4 grams of baby powder were applied to the lower body of an investigator to determine the potential exposure levels of an individual to asbestos amphibole fibers. Both the NIOSH 7400 PCM method and the NIOSH 7402 TEM method were performed to determine if any detectable amphibole asbestos fibers from the Johnson's Baby Powder were released into the breathing zone of the investigator and the immediate surrounding area. The NIOSH 7400 PCM analysis found that the four personal sample results ranged from 3.85 f/cc to 5.86 f/cc with an average mean of 4.52 f/cc. Area air sample results were 0.28 f/cc to 0.58 f/cc with an average mean of 0.41 f/cc. Four of the personal PCM filters were analyzed by the NIOSH 7402 TEM method and *the percent tremolite asbestos fiber concentration ranged from 42.9% to 76.9%* resulting in a PCM equivalent range of 1.81 f/cc to 4.51 f/cc. The investigators also measured the concentration of fibrous talc and reported that the NIOSH 7402 TEM method was used to quantitate the airborne fibrous talc concentrations in each of the four personal air samples. The airborne fibrous talc concentrations ranged from 0.45 f/cc to 1.86 f/cc with an average mean of 1.23 f/cc.

Page -258-

JA464

The results of these two investigations show that rather than the 0.1% proportion assumed by Burns et al to be the proportion of asbestos in the fibers released during application of cosmetic talc, the measured proportion is actually in the range 10% -75%. Burns and colleagues have thus underestimated the asbestos fiber concentration by at least 2 orders of magnitude.

I have recalculated the airborne asbestos concentrations and cumulative exposures tabulated by Burns et al in Table II of their paper by multiplying by 100, to more closely reflect the concentration of asbestos measured in the studies performed by Gordon and by Longo. For adult exposures during face powdering and body powdering, concentrations range from 0.02 to 6 f/cc and cumulative exposures from 0.1 to 0.9 f/cc-yr.

Burns and colleagues have compared these exposures to cumulative lifetime exposures to ambient air (0.002-0.4 f/cc - yr) and concluded that "Our analysis also confirmed the original finding of the FDA that the risks associated with cosmetic talc use were below the corresponding cumulative upper-bound lifetime risk of background asbestos exposures to the general population. The results also indicate that using the FDA's upper-bound assumption of asbestos content (i.e., 0.1%) in cosmetic talc products, many typical consumer use scenarios are unlikely to pose a cumulative asbestos exposure risk using conservative regulatory approaches to risk assessment." After correction of the serious underestimate (by at least 2 orders of magnitude) in the asbestos exposure concentrations, I conclude that the risks associated with cosmetic talc use exceed the corresponding cumulative upper-bound lifetime risk of background asbestos exposures to the general population. Given the millions of cosmetic talc users in the United States, it is not surprising that cases of mesothelioma have developed in some users.

Here are the data relied upon by Burns and colleagues. Note that the airborne fiber concentrations and cumulative exposure estimates have been under estimated by 2-3 orders of magnitude.

Page -259-

Gref.B-FIN01-000259

Table II. Infant and Adult Cumulative Exposure Estimates Associated with Four Consumer Application Scenarios

| Application Description | Exposure Time ($E_T$) (Min/Use)[a] | Exposure Frequency ($E_F$) (Uses/Year)[b,c] | Exposure Duration ($E_D$) (Years) | Airborne Concentration (f/cc)[d] | Cumulative Exposure (f/cc-yr)[e] | Reference |
|---|---|---|---|---|---|---|
| **Scenario 1: Infant exposure—diapering** | | | | | | |
| Application of powder in "normal way," container with sprinkler closure | 5 | 1,825 | 2 | 0.0024 | 8.4E-05 | Aylott et al., 1979 |
| Application around diaper area followed by spreading the powder | 2 | 1,825 | 2 | 0.0024 | 3.3E-05 | Dement et al., 1972 |
| Application around diaper area followed by spreading the powder | 3 | 1,825 | 2 | 0.00053 | 1.1E-05 | Dement et al., 1972 |
| Application around diaper area followed by spreading the powder | 3 | 1,825 | 2 | 0.0016 | 3.4E-05 | Dement et al., 1972 |
| Application of powder around arm pit area | 5 | 1,825 | 2 | 0.00025 | 8.8E-06 | Moon et al., 2011 |
| Application of powder around diaper area, twist-top container | 0.69 | 1,825 | 2 | 0.0022 | 1.0E-05 | Russell et al., 1979 |
| **Scenario 2: Adult exposure—diapering** | | | | | | |
| Application around diaper area followed by spreading the powder | 2 | 1,825 | 2 | 0.0027 | 3.8E-05 | Dement et al., 1972 |
| Application around diaper area followed by spreading the powder | 3 | 1,825 | 2 | 0.00085 | 1.8E-05 | Dement et al., 1972 |
| Application around diaper area followed by spreading the powder | 3 | 1,825 | 2 | 0.0012 | 2.6E-05 | Dement et al., 1972 |
| Simulated application of powder, product dusting into shallow tray | 1.25 | 1,825 | 2 | 0.00024 | 2.1E-06 | Hildick-Smith, 1976 |
| Application of powder around arm pit area | 5 | 1,825 | 2 | 0.000060 | 2.1E-06 | Moon et al., 2011 |
| **Scenario 3: Adult exposure—face powdering** | | | | | | |
| Application of loose face powder, puff applicator | 5 | 365 | 70 | 0.0055 | 1.3E-03 | Aylott et al., 1979 |
| **Scenario 4: Adult exposure—body powdering** | | | | | | |
| Application of powder in a typical fashion[f] | 6 | 365 | 70 | 0.00023 | 6.6E-05 | Anderson et al., 2017 |
| Application of powder in "normal way," container with sprinkler closure | 5 | 365 | 70 | 0.013 | 3.1E-03 | Aylott et al., 1979 |
| Application to upper body, shaker container[f] | 5 | 365 | 70 | 0.0048 | 1.2E-03 | Gordon et al., 2014 |
| Application to upper body, puff applicator[f] | 4 | 365 | 70 | 0.020 | 3.9E-03 | Gordon et al., 2014 |
| Application to upper body, puff applicator[f] | 3.3 | 365 | 70 | 0.060 | 9.6E-03 | Gordon et al., 2014 |
| Application of powder in a "normal manner," twist-top container | 1.78 | 365 | 70 | 0.023 | 2.0E-03 | Russell et al., 1979 |

[a]When available, the sample duration reported for each application scenario was used for exposure time ($E_T$). Anderson et al. (2017) reported that each simulation lasted 48 minutes, including eight applications each lasting 6 minutes; therefore, 6 minutes was used as the $E_T$ for this study. Russell et al. (1979) did not report a sample duration; therefore, the maximum reported powdering time was used.

[b]Daily exposure frequency of five uses per day, based on diapering frequency data presented in Hildick-Smith (1976) and EPA's *Exposure Factors Handbook* (2011).

[c]Daily exposure frequency of one use per day, based on adult use presented in Zazenski et al. (1995) and EPA's *Exposure Factors Handbook* (2011).

[d]Fiber concentrations in italics were converted from dust concentrations to fiber concentrations using the 1.72:1 fiber to dust conversion factor and the application of the 0.1% asbestos factor to the airborne fiber concentration, based on the FDA 1985 approach.

[e]Cumulative asbestos exposure over time on an environmental basis (f/cc-Year) = $C_{f(cc)} \times E_T \times E_F \times E_D \times C_F$; where $C_F$: (Year/Min), or 1.9E-06 (1 year / [365 days/year] × [24 hours/day] × [60 minutes/hour]).

[f]Reported PCM (f/cc) concentrations used for analysis.

As discussed above, for example, Gordon and colleagues reported fiber concentrations, measured directly by TEM of 4.8, 20, and 60 f/cc and Burns and colleagues have under-reported by a factor of 1000. The cumulative exposures for body powdering should thus be 1.2, 3.9, and 9.6 f/cc-years.

**Risk Estimation in the United States Population**

Burns and colleagues used the EPA Risk assessment Methodology (EPA. 2008. Framework for Investigating Asbestos-Contaminated Sites. Report prepared by the Asbestos Committee of the Technical Review Workgroup of the Office of Solid Waste and Emergency Response, U.S. Environmental Protection Agency. OSWER Directive #9200.0-68.)

Gref.B-FIN01-000260

JA466

The EPA writes: "Inhalation exposure to asbestos increases the risk of cancer (lung cancer and mesothelioma) in exposed humans. The U.S. Environmental Protection Agency (EPA) has developed a method for estimating the risk of cancer as a function of the concentration of asbestos in inhaled air and the exposure conditions (EPA, 2008). The basic equation is:

$$Risk = EPC \cdot TWF \cdot IURa,d$$

where:

Risk = Lifetime excess risk of dying from cancer (lung cancer or mesothelioma) as a consequence of the site-related asbestos exposure.

EPC = Exposure point concentration of asbestos in air (PCM or PCMe s/cc). The EPC is an estimate of the long-term average concentration of asbestos in inhaled air.

TWF = Time weighting factor. The value of the TWF term ranges from zero to one, and describes the average fraction of full time that exposure occurs in the time interval being evaluated.

Burns and colleagues calculated a less-than-lifetime IUR of 0.22 f/cc$^{-1}$ for the adult use over a 70-year lifetime (with an age at start of exposure of 0 years; Scenarios 3 and 4). The cancer risk estimates they calculated for the consumer application of facial talcum powder (Scenario 3: adult exposure over the course of 70 years) resulted in less than $10^{-5}$ added theoretical risk. Similarly, the cancer risk estimates calculated for consumer application of body powder (Scenario 4: adult exposure over the course of 70 years) resulted in less than $10^{-4}$ added theoretical risk. Now, if we assume that they underestimated fiber exposures by a factor of only 100, the lifetime cancer risks become $10^{-3}$ added theoretical risk for the consumer application of facial talcum powder (1/1000) and $10^{-2}$ (1/100) added theoretical risk for consumer application of body powder.

As shown above, there are about 100,000,000 users of cosmetic talc in the United States. Application of these risk estimates would suggest the occurrence of many thousands of cases of asbestos-related cancers (lung cancer and mesothelioma) in the United States attributable to the use of cosmetic talcs.

Gref.B-FIN01-000261

JA467

Reference List

(1)   Burns AM, Barlow CA,  Banducci AM, Unice KM, Sahmel J. Potential Airborne Asbestos
Exposure and Risk Associated with the Historical Use of Cosmetic Talcum Powder Products. Risk
Anal 2019 Apr 12. doi: 10.1111/risa.13312

(2)   Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a
cause of mesothelioma in women.  Int J Occup Environ Health 2014;20(4):318-332.

(3)   Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. Environ Health
Perspect 1991 ;94:225-230.

(4)   Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a
cause of mesothelioma in women.  Int J Occup Environ Health 2014;20(4):318-332.

(5)   Longo WE, Rigler MW, Egeland WB. Below the Waist Application of Johnson & Johnson
Baby Powder. MAS Project 14-1852. Materials Analytical Services. Suwanee, Georgia. 2017.

(6)   Lee RJ, Van Orden DR. 2008. Airborne asbestos in buildings. Regul Toxicol Pharmacol
50:218-225.

Gref.B-FIN01-000262

JA468

## K: COMPARISONS of COSMETIC TALC with NEW YORK TALC

As discussed above, there are, as of the present, no studies of the epidemiology of mesothelioma among cosmetic talc users. Miners and end-users of commercial talc from New York State are at increased risk of mesothelioma (Finkelstein 2012;Finkelstein 2013), attributable to the contamination with tremolite and anthophyllite, *but the talc used in cosmetic talc was not sourced from this heavily contaminated deposit. **Vanderbilt Minerals Corporation, and their consultants, state that their products did not contain asbestiform minerals.*** The effect of amphibole contaminants on mesothelioma risk among the New York talc miners and millers nevertheless assists with risk assessment for cosmetic talc users. Although the concentrations of amphibole particles are higher in New York talc than in samples of cosmetic talc (and 1 in 80 miners in the Vanderbilt cohort developed mesothelioma), it is possible to derive inferences about the health effects of the contamination of cosmetic talcs from the experience of humans exposed to the dusts of New York talc. It is therefore of interest to compare the amphibole particles measured in cosmetic talc with those measured in New York industrial talc.

Millette has analyzed samples of New York Talc and reported on the size distribution of the tremolite particles that he observed.

The results of analyses of samples of NYTAL 100, 100HR, 200, 300, and 400 are shown in the Table below.

| Measurement of **Tremolite** in NYTAL Talcs by MVA Scientific Consultants | | |
|---|---|---|
| Length | Width | AR |
| **NYTAL 100** | *Report MVA 8237* | |
| 8.2 | 0.58 | 14 |
| 3.1 | 0.38 | 8 |
| 4.3 | 0.77 | 6 |
| 2.6 | 0.48 | 5 |
| | | |
| **NYTAL 100HR** | *Report MVA 8237* | |
| 12.6 | 2.8 | 5 |
| 16.9 | 3.7 | 5 |
| 4.3 | 0.96 | 5 |
| 2.9 | 0.38 | 8 |

Page -263-

Gref.B-FIN01-000263

| | | |
|---|---|---|
| 2.4 | 0.24 | 10 |
| 2.9 | 0.24 | 12 |
| | | |
| **NYTAL 200** | *Report MVA 10331* | |
| 1.7 | 0.29 | 6 |
| 1.7 | 0.29 | 6 |
| 5.4 | 0.15 | 36 |
| 2.9 | 0.24 | 12 |
| | | |
| **NYTAL 300** | *Report MVA 10331* | |
| 9.3 | 1.7 | 5 |
| 3.4 | 0.39 | 8 |
| 5.4 | 0.73 | 7 |
| 3.9 | 0.49 | 8 |
| 3.3 | 0.21 | 16 |
| 1.7 | 0.29 | 6 |
| 6 | 1.04 | 6 |
| 4.2 | 0.5 | 8 |
| 12.5 | 1.33 | 9 |
| 1.8 | 0.29 | 6 |
| 2.3 | 0.25 | 9 |
| 0.8 | 0.08 | 10 |
| 1.9 | 0.29 | 9 |
| | | |
| **NYTAL 400** | ***Report MVA 10331*** | |
| 13.7 | 1.46 | 9 |

Page -264-

Gref.B-FIN01-000264

JA470

| | | |
|---|---|---|
| 3.9 | 0.39 | 10 |
| 5.4 | 0.98 | 6 |
| 4.6 | 0.59 | 8 |
| 2.7 | 0.49 | 6 |
| 2.4 | 0.29 | 8 |
| | | |

Millette has analyzed samples of New York Talc and also reported on the size distribution of the anthophyllite particles that he observed.

The results of analyses of samples of NYTAL 100, 100HR, 200, 300, and 400 are shown in the Table below.

| Measurement of **Anthophyllite** in NYTAL Talcs by MVA Scientific Consultants | | |
|---|---|---|
| Length | Width | AR |
| **NYTAL 100** | *Report MVA 8237* | |
| 5.3 | 0.96 | 6 |
| 1.4 | 0.01 | 14 |
| 7.2 | 0.58 | 12 |
| 4.3 | 0.87 | 5 |
| 8.2 | 1.11 | 7 |
| 4.8 | 0.48 | 10 |
| 12 | 0.38 | 32 |
| 3.1 | 0.05 | 62 |
| | | |
| **NYTAL 100HR** | *Report MVA 8237* | |
| 7.2 | 0.29 | 25 |
| 2.9 | 0.24 | 12 |
| 3.1 | 0.38 | 8 |

Gref.B-FIN01-000265

**JA471**

| | | |
|---|---|---|
| 1.4 | 0.14 | 10 |
| 3.1 | 0.38 | 8 |
| 6.7 | 1.44 | 5 |
| 11.5 | 0.58 | 20 |
| 2.9 | 0.19 | 15 |
| 2.2 | 0.14 | 15 |
| 3.4 | 0.1 | 35 |
| 12 | 0.48 | 25 |
| 2.2 | 0.1 | 23 |
| 29.8 | 1.44 | 21 |
| | | |
| **NYTAL 200** | *Report MVA 10331* | |
| 9.3 | 0.73 | 13 |
| 2.9 | 0.49 | 6 |
| 8.5 | 1.22 | 7 |
| 38.5 | 0.39 | 99 |
| 8.3 | 0.49 | 17 |
| | | |
| **NYTAL 300** | *Report MVA 10331* | |
| 4.9 | 0.39 | 13 |
| 26.8 | 0.49 | 55 |
| 4.6 | 0.39 | 12 |
| 22.4 | 0.39 | 57 |
| 2.9 | 0.39 | 7 |
| 3.9 | 0.49 | 8 |
| 16.6 | 0.49 | 34 |
| | | |

Page -266-

Gref.B-FIN01-000266

JA472

| NYTAL 400 | MVA 10331 | |
|---|---|---|
| 5.4 | 0.24 | 23 |
| 3.4 | 0.49 | 7 |
| 5.4 | 0.98 | 6 |
| 6.3 | 0.24 | 26 |
| 7.8 | 1.46 | 5 |
| 4.4 | 0.24 | 18 |
| 4.4 | 0.39 | 11 |
| 8.8 | 0.49 | 18 |
| 7.8 | 0.73 | 11 |
| 7.3 | 0.49 | 15 |
| 7.8 | 0.39 | 20 |
| 9.3 | 0.39 | 24 |
| 28.8 | 0.73 | 39 |
| 8.3 | 0.73 | 11 |
| 8.3 | 0.39 | 21 |
| 10.7 | 0.59 | 18 |
| 5.4 | 0.49 | 11 |
| 12.2 | 0.49 | 25 |
| 6.3 | 0.49 | 13 |
| 7.8 | 0.24 | 33 |
| 3.4 | 0.39 | 9 |
| 26.8 | 0.59 | 45 |
| 3.9 | 0.29 | 13 |
| 3.9 | 0.59 | 7 |
| 3.9 | 0.24 | 16 |

Page -267-

Gref.B-FIN01-000267

JA473

| | | |
|---|---|---|
| 2.4 | 0.2 | 12 |
| 1.5 | 0.24 | 6 |
| 3.7 | 0.34 | 11 |
| 42.9 | 0.59 | 73 |
| 8 | 0.44 | 18 |
| 5.9 | 0.29 | 20 |
| 2.9 | 0.24 | 12 |
| 7.3 | 0.49 | 15 |
| 22.4 | 0.59 | 38 |

**I now make comparisons of the particle size distributions in New York talcs with those in cosmetic talcs.**

# Johnson's Baby Powder

This analysis compares Longo's measurements of tremolite in Baby Powder and his 2018 measurements of anthophyllite in Johnson's Baby Powder with Millette's measurements of NYTAL.

Firstly, histograms for width. The Baby Powder particles tended to be wider; however, Longo identified most of these as bundles rather than fibers.

Page -268-

Gref.B-FIN01-000268

JA474



and a statistical test for differences in particle width between Johnson's Baby Powder and New York Talc:

Gref.B-FIN01-000269

JA475



Comparison of Particle Width: New York Talc and Baby Powder

p = 0.18 (No Significant Difference)

Gref.B-FIN01-000270

JA476

and for anthophyllite:





Gref.B-FIN01-000271

JA477

and for the Aspect Ratios



Graphs by NYTAL

Page -272-



I conclude that there is substantial overlap between the size distributions of anthophyllite particles between cosmetic talcs and New York industrial talcs. Miners and end-users of commercial talc from New York State are at increased risk of mesothelioma (Finkelstein 2012;Finkelstein 2013), attributable to the contamination with tremolite and anthophyllite.

Gref.B-FIN01-000273

## Trace Amphibole Contamination of Asbestos Ore or Products and Human Body Burden

Retail talc products contained trace amounts of amphibole particles. Blount found a concentration of 0.025% and Longo a concentration of 0.045%. Rohl and Langer did not use a concentration technique, and, using Xray diffraction, they did not find tremolite in the 4 retail samples they examined. These tremolite contamination levels in consumer talcs may be compared with the level of 0.0094% in Quebec chrysotile. Higher levels of contamination were found in Cashmere Bouquet and Coty powders.

It is well known that, because of their lengthy biopersistence, amphibole fibers accumulate in human tissues. Dr Andre Dufresne and I analyzed the fiber burden in the lungs of chrysotile miners and millers in the Province of Quebec, Canada (Finkelstein and Dufresne 1999). The chrysotile ores of Quebec are contaminated with trace amounts of tremolite and other fibrous amphiboles (McDonald et al. 1997). The figure below shows the accumulation of long and short fiber chrysotile and tremolite in miners' lungs in relation to the length of occupational exposure. The Table below shows that, despite its presence in trace quantities in the ore, there was as much tremolite measured in the lung tissue of chrysotile miners and millers as there was chrysotile.

The accumulation of amphibole particles in the lungs of cosmetic talc users is thus not surprising.

Gref.B-FIN01-000274

JA480





Page -275-

Gref.B-FIN01-000275

JA481

TABLE II. Results of Multiple Linear Regression Analyses for the Logarithm of Fiber Concentration in Relation to Years of Exposure and Time Since Last Exposure

| Fiber | Intercept | Years of exposure[a] | Years since last exposure[a] | Clearance half-time (years) |
|---|---|---|---|---|
| Asbestos bodies | 1.76 (0.50–3.02) | 0.073[c] (0.039–0.108) | −0.025 (−0.065 to 0.016) | 12.04 (4.63 to ∞) |
| Chrysotile <5 microns | 2.54 (1.29–3.79) | 0.052[c] (0.018–0.087) | −0.079[c] (−0.119 to −0.039) | 3.81 (2.53 to 7.72) |
| Chrysotile 5–10 microns | 1.10 (−0.212–2.42) | 0.064[c] (0.028–0.100) | −0.053[b] (−0.095 to −0.010) | 5.67 (3.17 to 30.1) |
| Chrysotile >10 microns | 1.07 (−0.106–2.24) | 0.051[c] (0.019–0.083) | −0.038[b] (−0.076 to −0.0002) | 7.92 (3.96 to 1500) |
| Tremolite <5 microns | 1.72 (0.50–2.94) | 0.065[c] (0.032–0.099) | −0.021 (−0.061 to 0.018) | 14.33 (4.93 to ∞) |
| Tremolite 5–10 microns | 1.15 (0.28–2.02) | 0.067[c] (0.043–0.090) | −0.019 (−0.047 to 0.009) | 15.84 (6.40 to ∞) |
| Tremolite >10 microns | 1.07 (0.19–1.95) | 0.046[c] (0.022–0.070) | −0.002 (−0.030 to 0.0266) | 150 (11 to ∞) |

[a]The coefficients are the change in log (concentration) per year.
[b]$P < 0.05$.
[c]$P < 0.01$.
The parentheses contain the 95% confidence intervals. The clearance half-time is derived from the coefficient for the "years since last exposure" term in the model. Quebec chrysotile miners autopsied 1973–1992.

McDonald, Case and colleagues (McDonald et al. 1997) attribute much of the mesothelioma risk in Quebec to the contamination of chrysotile with tremolite. 'Its pathogenicity and carcinogenicity have been amply demonstrated and lung burden analyses suggest that its geographical distribution in the mining region is closely related to the pattern of mesothelioma risk.'

Gref.B-FIN01-000276

JA482

**In relation to Mr. Gref's asbestos exposure we have the following:**

1. Mr. Gref had long term usage of a variety of cosmetic talcs:

1. Johnson and Johnson: Shower to Shower and Baby Powder: 1982 - 2000s
2. Old Spice : 1982 - 2000s
3. Mennen: 1982 - 1992
4. Clubman: 1982 - 2000s
5. English Leather: 1982 - 2000s

His earliest exposures were as an infant and continued to the time of his diagnosis of meaothelioma.

2. The powders that he used were sourced from Italian, Vermont, other American and Chinese sources. These cosmetic talcs were contaminated with asbestiform minerals including the amphibole minerals tremolite and anthophyllite. From 1968, Johnson's Powders were sourced from Vermont ore. These cosmetic talcs were contaminated with asbestiform minerals including the amphibole minerals tremolite and anthophyllite. From the early 2000s, Johnson's Baby Powder was sourced from Chinese ore. These cosmetic talcs were contaminated with asbestiform minerals including chrysotile and the amphibole minerals tremolite and anthophyllite.

2. Exposure to fibers of tremolite and anthophyllite increases the risk of mesothelioma.

3. There is transport of asbestos fibers from the lungs to the abdominal cavity via the lymphatic system. Tremolite and anthophyllite fibers are found in the abdominal cavity and omentum of individuals with mesothelioma.

Dodson reported finding tremolite and anthophyllite fibers in the mesentery and omentum of individuals with mesothelioma (Dodson et al. 2000). The chart showing the comparison between the lung and abdominal burdens is shown below.

Page -277-

Gref.B-FIN01-000277

**JA483**



Steffen et al reported the measurement of Asbestos Fibers in the Abdominal Tissues of Subjects with Gynecologic Cancer who had been users of Johnson's Baby Powder.

Gref.B-FIN01-000278

JA484

4. Low Level Asbestos Exposure is a recognized cause of mesothelioma

As stated in the Helsinki Criteria for diagnosis and attribution (Wolff et al. 2015):

"The following points need to be considered in the assessment of occupational aetiology:
• "The great majority of mesotheliomas are due to asbestos exposure;
• "Mesotheliomas can occur in cases with low asbestos exposure. However, very low background
environmental exposures carry only an extremely low risk;
• "About 80% of mesothelioma patients have had some occupational exposure to asbestos, and
therefore a careful occupational and environmental history should be taken;
• "Even a brief or low-level exposure should be considered sufficient for mesothelioma to be
designated as occupationally related;
• "A minimum of 10 years from the first exposure is required to attribute the mesothelioma to
asbestos exposure, though in most cases the latency interval is longer (e.g., in the order of 30–40
years); and
• "Smoking has no influence on the risk of mesothelioma."

Mr. Gref's exposures were domestic and not occupational, but the same criteria apply.


**5. Asbestos is the only relevant known cause of mesothelioma**

Mesothelioma is a rare tumor. Apart from therapeutic radiation and inhalation of erionite, fluoro-
edenite, and Libby amphibole inhalation of asbestos is the only known cause of mesothelioma.
Inhalation of asbestos is the only relevant cause in Mr. Gref's case.

**6. Mr Gref had exposures to asbestos dusts from a variety of products**

As outlined above, Mr Gref had exposures to asbestos fibers originating in a variety of cosmetic
talcs. Because of the multi-stage process for the initiation of mesothelioma (Hanahan and Weinberg
2011;National Cancer Institute 2009), all exposures must be considered to have increased his risk of
mesothelioma (Appendix).

National Cancer Institute. Understanding Cancer.
http://www.cancer.gov/cancertopics/understandingcancer/cancer . 2009.
Hanahan D, Weinberg RA. 2011. Hallmarks of cancer: the next generation. Cell 144:646-674.


In summary, for the reasons stated above, I conclude, to a reasonable degree of medical certainty,
that Mr. Gref's exposures to asbestos fibers in cosmetic talcs were substantial contributing causes of
his malignant peritoneal mesothelioma.

I reserve the right to supplement my report should additional information become available.


Page -279-


Gref.B-FIN01-000279


**JA485**

**Reference List**

Anderson EL, Sheehan PJ, Kalmes RM, Griffin JR. 2016. Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder. Risk Anal.

Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. 1968. Fibrous and mineral content of cosmetic talcum products. Am Ind Hyg Assoc J 29:350-354.

Finkelstein MM. 2012. Malignant mesothelioma incidence among talc miners and millers in New York State. Am J Ind Med 55:863-868.

Finkelstein MM. 2013. Pneumoconiosis and malignant mesothelioma in a family operated metal casting business that used industrial talc from New York State. Am J Ind Med.

Gordon RE, Fitzgerald S, Millette J. 2014. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health 20:318-332.

Hanahan D, Weinberg RA. 2011. Hallmarks of cancer: the next generation. Cell 144:646-674.

Lee R, Van OD. 2015. RE: Gordon R, Fitzgerald S, and Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health. 2014;20(4):318-332. Int J Occup Environ Health.

Luce D, Brochard P, Quenel P, Salomon-Nekiriai C, Goldberg P, Billon-Galland MA, Goldberg M. 1994. Malignant pleural mesothelioma associated with exposure to tremolite. Lancet 344:1777.

Luce D, Bugel I, Goldberg P, Goldberg M, Salomon C, Billon-Galland MA, Nicolau J, Quenel P, Fevotte J, Brochard P. 2000. Environmental exposure to tremolite and respiratory cancer in New Caledonia: a case-control study. Am J Epidemiol 151:259-265.

McDonald AD, Case BW, Churg A, Dufresne A, Gibbs GW, Sebastien P, McDonald JC. 1997. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. Ann Occup Hyg 41:707-719.

Millette JR. 2015. Procedure for the Analysis of Talc for Asbestos. The Microscope 63:11-20.

National Cancer Institute. Understanding Cancer. http://www.cancer.gov/cancertopics/understandingcancer/cancer . 2009.

Nynas P, Pukkala E, Vainio H, Oksa P. 2017. Cancer Incidence in Asbestos-Exposed Workers: An Update on Four Finnish Cohorts. Saf Health Work 8:169-174.

Gref.B-FIN01-000280

**JA486**

Pira E, Coggiola M, Ciocan C, Romano C, La VC, Pelucchi C, Boffetta P. 2017. Mortality of Talc Miners and Millers From Val Chisone, Northern Italy: An Updated Cohort Study. J Occup Environ Med 59:659-664.

Rohl AN. 1974. Asbestos in talc. Environ Health Perspect 9:129-132.

Rohl AN, Langer AM. 1974. Identification and quantitation of asbestos in talc. Environ Health Perspect 9:95-109.

Tossavainen A. 1997. Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution. Scand J Work Environ Health 23:311-316.

Van Gosen BS, Lowers HA, Sutley SJ, Gent CA. 2004. Using the geologic setting of talc deposits as an indicator of amphibole asbestos content. Environmental Geology 45:920-939.

Wergeland E, Gjertsen F, Vos L, Grimsrud TK. 2017. Cause-specific mortality and cancer morbidity in 390 male workers exposed to high purity talc, a six-decade follow-up. Am J Ind Med 60:821-830.

Wolf H et al. 2014. Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution 2014: recommendations. Scand J Work Environ Health doi:10.5271/sjweh.3462

Gref.B-FIN01-000281

JA487

# APPENDIX

**Slide 4 | Loss of Normal Growth Control**

Cancer arises from a loss of normal growth control. In normal tissues, the rates of new cell growth and old cell death are kept in balance. In cancer, this balance is disrupted. This disruption can result from uncontrolled cell growth or loss of a cell's ability to undergo cell suicide by a process called "apoptosis." Apoptosis, or "cell suicide," is the mechanism by which old or damaged cells normally self-destruct.



National Cancer Institute. Understanding Cancer. National Cancer Institute . 2009.
http://www.cancer.gov/cancertopics/understandingcancer/cancer

Gref.B-FIN01-000282

JA488

**Dr. Finkelstein's Qualifications**

I am a physician-epidemiologist. My education is in physical science and medicine. In 1972, I was awarded a PhD in physics from Case-Western Reserve University in Cleveland, Ohio. I graduated from the Faculty of Medicine at McGill University in Montreal, Canada in 1976. In 1978, I completed my residency training at the University of Toronto and obtained my certification in Family Medicine. In July 1978 I began employment as a Medical Consultant with the Ontario Ministry of Labour, a position I held until retirement in September 2008.

My first assignments at the Ministry of Labour were to prepare the background health-effects documentation for the proposed asbestos regulation (R.R.O. 1990, Reg. 837) and to undertake an epidemiologic study of the health of workers at the Johns-Manville asbestos-cement plant in Scarborough, Ontario. I have subsequently published numerous studies, in the peer-reviewed literature, of the relations between asbestos exposure and health. In addition, in 2007 my research team and I won a "Request for Proposals" competition sponsored by WorkSafeBC, the workers' compensation authority of British Columbia, to prepare a systematic review entitled: "Bronchogenic Carcinoma in Asbestos Exposed Workers: A Systematic Review". In 2008 I was appointed as an epidemiologist to the United States Environmental Protection Agency Science Advisory Board Asbestos Panel. In 2013, I was invited by the Finnish Institute of Occupational Health to participate in the 2014 revision of the Helsinki Criteria for the diagnosis and attribution of asbestos, asbestosis, and cancer. In November 2014, my colleagues and I won a "Request for Proposals" competition sponsored by WorkSafeBC, the workers' compensation authority of British Columbia, to prepare a systematic review entitled: "Asbestos-related Lung Disease and Chronic Obstructive Pulmonary Disease".

In June, 2015 I retired from my part-time medical practice in the Department of Family and Community Medicine at Mt Sinai Hospital in Toronto, and from my appointment as a Research Scholar in the Department of Family and Community Medicine at the University of Toronto. I continue to hold Faculty Appointments in the Departments of Family Medicine at the University of Toronto and at McMaster University.

Dr Finkelstein's Publications 2010 - 2021

108. Finkelstein MM. Depression Severity and Effect of Antidepressant Medications (letter). JAMA. 2010;303(16):1596-1597

109. Finkelstein MM. Lung Cancer in the Melt Shops of Ontario Steelmakers (Letter). American Journal of Industrial Medicine 2010; 53(7):762.

110. Finkelstein MM, Meisenkothen C. Malignant Mesothelioma Among Employees of a Connecticut Factory that Manufactured Friction Materials Using Chrysotile Asbestos. Ann Occup Hyg 2010 54: 692-696

Gref.B-FIN01-000283

**JA489**

111. Jason G. Su, Michael Jerrett, Bernardo Beckerman, Dave Verma, Altaf Arain, Pavlos Kanaroglou, Dave Stieb, Murray Finkelstein, Jeffery Brook. A land use regression model for predicting ambient volatile organic compound concentrations in Toronto, Canada. Atmospheric Environment 2010;44:3529-3537.

112. Finkelstein MM. Absence of Radiographic Asbestosis and the Risk of Lung Cancer Among Asbestos-Cement Workers: Extended Follow-up of a Cohort. 2010. Am J Ind Med. 2010 Nov;53(11):1065-9.

113. Verma D, Demers C, Shaw D, Verma P, Kurtz L, Finkelstein M, des Tombe K and Welton T. Occupational Health and Safety Issues in Ontario Saw Mills and Veneer/Plywood Plants: A Pilot Study. Journal of Environmental and Public Health. 2010. doi:10.1155/2010/526487.

114. Finkelstein MM. Reply to Ross (Invited Letter to the Editor). Am J Ind Med 2011;54:497-498.

115. Verma DK, Hacek PM, des Tombe K, Finkelstein M, Branch B, Gibbs GW, Graham WG. Silica Exposure Assessment in a Mortality Study of Vermont Granite Workers. Journal of Occupational and Environmental Hygiene 2011;8: 71–79.

116. Finkelstein MM, Chapman KR, McIvor RA, Sears MR. Mortality Among Subjects With Chronic Obstructive Pulmonary Disease or Asthma at Two Respiratory Disease Clinics in Ontario, Canada. Canadian Respiratory Journal 2011 18:327-332

117. Finkelstein MM. Reply to Teta (Letter). Ann Occ Hyg 2011 55: 820-822.

118. Finkelstein MM. Asbestos fibers in brake repair workers: Letter re March et al. Inhalation Toxicology 2012;24(2):139-40

119. Beckerman B, Jerrett M, Finkelstein M, Kanaroglou J, Brook R, Arain A, Sears M, Stieb D, Balmes J, Chapman K: The association between chronic exposure to traffic-related air pollution and ischemic heart disease. J Toxicol Environ Health A. 2012;75(7):402-11.

120. Finkelstein MM: Malignant Mesothelioma Incidence Among Talc Miners and Millers in New York State. Am J Ind Med. 2012; 55:863-868

121. Finkelstein MM: Malignant Pleural Mesothelioma in U.S. Automotive Mechanics: Reported vs Expected Number of Cases. Regulatory Toxicology and Pharmacology. 2013;65: 178-179

122. Finkelstein MM: Pneumoconiosis and Malignant Mesothelioma In a Family Operated Metal Casting Business That Used Industrial Talc From New York State. Am J Ind Med 2013;56:550–555

Gref.B-FIN01-000284

JA490

123.  Meisenkothen C, Finkelstein MM. Asbestos exposure and malignant mesothelioma of the tunica vaginalis testis: Case series and review of the literature. OA Case Reports 2013 Feb 28;2(2):17

124.  Finkelstein MM: Reply to Letter by Nolan and Colleagues—Re: The Carcinogenicity of New York State Talc Dusts in Humans. Am J Ind Med  2013;56:1119–1124

125.  Finkelstein MM: Letter to the Editor re Bernstein at al: Health risk of chrysotile revisited. Critical Reviews in Toxicology 2013; 43(8): 707–708

126.  Finkelstein MM: Commentary: The Analysis of Asbestos Count Data With "Nondetects": The Example of Asbestos Fiber Concentrations in the Lungs of Brake Workers. Am J Ind Med 2013;56:1482–1489

127.  Finkelstein MM: Statins and musculoskeletal adverse events. JAMA Intern Med. 2014 Feb 1;174(2):302 (Letter)

128.  Finkelstein MM:  Asbestos fibres in the lungs of an American mechanic who drilled, riveted, and ground brake linings: A case report and discussion. Ann Occ Hyg 2015;59:525-527.

129.  Finkelstein MM:  Historical Ambient Airborne Asbestos Concentrations in the United States. Inhalation Toxicology 2016. DOI:10.1080/08958378.2016.1203045.

130.  Finkelstein MM: Asbestos exposure and laryngeal cancer mortality. Laryngoscope  2017 Mar;127(3).

131.  Finkelstein MM: On the Mortality of Talc Miners and Millers from Val Chisone, Northern Italy. Journal of Occupational and Environmental Medicine 2017; 59:e194.

132.  Finkelstein MM: On cosmetic talc as a risk factor for pleural mesothelioma. Inhalation Toxicology 2017: DOI: 10.1080/08958378.2017.1336187.

133.  Finkelstein MM: A re-analysis of non-occupational exposure to asbestos and risk of pleural mesothelioma. Occupational and Environmental Medicine. 2018;75:472-3.

134.  Finkelstein M: Relationship between income and mortality in a Canadian family practice cohort. Can Fam Physician 2018; 64:e181-e189

135.  Finkelstein MM: "Re: Glynn ME, Keeton KA, Gaffney SH, Sahmel J. Ambient Asbestos Fiber Concentrations and Long-Term Trends in Pleural Mesothelioma Incidence between Urban and Rural Areas in the United States (1973-2012). Risk Anal 2018 Mar;38(3):454-71". Risk Analysis, Vol. 38, No. 8, 2018  DOI: 10.1111/risa.13124.

Gref.B-FIN01-000285

JA491

136: Finkelstein MM: Re: The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Env Med 2018. http://dx.doi.org/10.1136/oemed-2018-105129.

137: Chatfield EJ, Finkelstein M, Roggli V: Elongated Mineral Fibers Conference: Session II: Effects and Mechanisms. Toxicology and Applied Pharmacology: 2018; 361: 99

138: Finkelstein MM: Malignant Mesothelioma and Its Non-Asbestos Causes. Archives of Pathology & Laboratory Medicine: June 2019, Vol. 143, No. 6, pp. 659-660.

139: Finkelstein MM: A comparison of asbestos fiber potency and elongate mineral particle (EMP) potency for mesothelioma in humans. Toxicology and Applied Pharmacology. 2019; 371:1-2.

140: Finkelstein MM:  Potential Airborne Asbestos Exposure and Risk Associated with the Historical Use of Cosmetic Talcum Powder Products. Risk Analysis 2019. doi: 10.1111/risa.13401

141: Finkelstein MM: Comments on "Dimensions of elongated mineral particles with implications for pathogenicity and classification as asbestiform versus cleavage fragments", Ultrastructural Pathology, 2019: 43:326-329.
DOI: 10.1080/01913123.2019.1693457

142: Finkelstein MM: Letter concerning: Occupational exposures to cosmetic talc and risk of mesothelioma: an updated pooled cohort and statistical power analysis with consideration of latency period by Gary M. Marsh et al. (Inhal Toxicol. 2019 Aug 5:1–11. doi:10.1080/08958378.2019.1645768). DOI: 10.1080/08958378.2019.1705940

143: David Madigan, David Egilman, Murray M. Finkelstein, Triet Tran & MunaYimam (2019): Response to Marsh, G. M., Ierardi, A. M., Benson, S. M., & Finley, B. L. (2019).Occupational exposures to cosmetic talc and risk of mesothelioma: an updated pooled cohort and statistical power analysis with consideration of latency period. Inhalation toxicology, 31(6), 213–223,Inhalation Toxicology, DOI: 10.1080/08958378.2019.1702743

144: Finkelstein MM, Meisenkothen C: Malignant Mesothelioma Among Employees of a Connecticut Factory that Manufactured Friction Materials  Using Chrysotile Asbestos: An Update. Annals of Work Exposures and Health, Volume 64, Issue 1, January 2020, Pages 106–109, https://doi.org/10.1093/annweh/wxz082

145: Finkelstein MM: Letter to the Editor: Re Fordyce et al. (2019) Vermont Talc Miners and Millers Cohort Study Update. J. Occup Env Med 2020 (In Press).

Gref.B-FIN01-000286

JA492

Dr. Finkelstein's Appearances at Deposition or Trial 2015 - 2021

| Name | Date | Attorney | Jurisdiction | |
|---|---|---|---|---|
| Bullington | January 6/15 | McMullen | Florida | Deposition |
| Bunting | January 6/15 | Vinocur | Florida | Deposition |
| Pudleiner | January 30/15 | Weitzel | D.C. | Deposition |
| Stockton | Feb 3/15 | Ruckdeschel | Tennessee | Deposition |
| Schwartz | Feb 10/15 | Kelly-Ferraro | Ohio | Deposition |
| Hayes | Feb 24/15 | Hoffman | Louisiana | Deposition |
| Schultz | Mar 2/15 | Smith | Maryland | Deposition |
| Matteoni | Mar 5/15 | Lanier | Illinois | Deposition |
| May | Mar 23/15 | French & Mudd | Illinois | Deposition |
| Bodnarchuk | Mar 27/15 | Ignatowski | Maryland | Deposition |
| Ridenour | April 17/15 | French & Mudd | California | Deposition |
| Pejic | April 28/15 | Bullock | Missouri | Deposition |
| Gonzalez | May 8/15 | Ferraro | Florida | Deposition |
| Castello | May 14/15 | Ferraro | Massachusetts | Deposition |
| Schultz | May 21/15 | Angelos | Maryland | Trial |
| Bowers | May 26/15 | French & Mudd | Illinois | Deposition |
| Pavlick | June 18/15 | Ruckdeschel | Delaware | Trial |
| Supanich | June 23/15 | Vinocur | Florida | Deposition |
| Shrum | June 25/15 | French & Mudd | Illinois | Deposition |
| David | July 1/15 | French & Mudd | Illinois | Deposition |
| Seiber | July 2/15 | Karst | Texas | Deposition |
| Maxwell | July 6/15 | Ferraro | Florida | Deposition |
| Bean | July 6/15 | Ferraro | Florida | Deposition |
| Graubart | July 7/15 | French & Mudd | California | Deposition |
| Gonzalez | July 29/15 | Ferraro | Florida | Trial |
| Kelly | Aug 4/15 | Ferraro | Florida | Deposition |
| Levn | Aug 5/15 | Ferraro | Florida | Deposition |
| Mosko | Aug 6/15 | Angelos | Maryland | Deposition |
| Stockton | Aug 12/15 | Ruckdeschel | Tennessee | Trial |
| Gomez | Sept 2/15 | Ferraro | Florida | Deposition |
| Higgins | Sept 3/15 | Vinocur | Florida | Deposition |
| Lewis | Sept 9/15 | DiMuzio | Virginia | Deposition |
| Russell | Sept 10/15 | Lanier | Florida | Deposition |
| Herndon | Sept 11/15 | Lanier | Florida | Deposition |
| English | Sept 17/15 | Maune Raichle | Pennsylvania | Trial |
| Seiber | Oct 29/15 | Karst & VonOiste | Texas | Trial |
| Ellis | Nov 25/15 | Shepard | Massachusetts | Deposition |
| Guthrie | Nov 30/15 | Maune Raichle | MADCO | Deposition |
| Hoskins | Nov 30/15 | Maune Raichle | MADCO | Deposition |
| Foskett | Dec 2/15 | Maune Raichle | MADCO | Deposition |
| Saldana | Dec 10/15 | Kunen | Florida | Deposition |
| Hickey | Dec 18/15 | Karst & VonOiste | Washington | Deposiiton |
| Mitchem | Jan 28/16 | Maune Raichle | California | Deposition |
| Lemberger | Jan 29/16 | Maune Raichle | California | Deposition |

Gref.B-FIN01-000287

JA493

| Name | Date | Firm | State | Type |
|---|---|---|---|---|
| Rauen | Feb 1/16 | Maune Raichle | Illinois | Deposition |
| Yanez | Feb 4/16 | Maune Raichle | California | Deposition |
| Cataldo | Feb 18/16 | Waters & Krauss | Massachusetts | Deposition |
| Velasco | Mar 3/16 | Vinocur | Florida | Deposition |
| Bordelone | Mar 10/16 | Baron & Budd | Louisiana | Deposition |
| Mead | Mar 11/16 | Maune Raichle | California | Deposition |
| Vega | Mar 16/16 | Maune Raichle | California | Trial |
| Goodson | Mar 21/16 | Ferraro | Florida | Deposition |
| Garcia | Mar 22/16 | Ferraro | Florida | Deposition |
| Parrott | Mar 29/16 | Maune Raichle | South Carolina | Deposition |
| Tracy | April 21/16 | Levy-Konigsberg | Georgia | Deposition |
| Beene | May 2/16 | Vinocur | Florida | Deposition |
| Smith | May 3/16 | Waters & Krauss | Virginia | Deposition |
| Rodriguez | May 25/16 | Waters & Krauss | California | Deposition |
| Hubbard | June 3/16 | Maune Raichle | MADCO | Deposition |
| Lasich | June 29/16 | Karst and Von Oiste | Washington | Deposition |
| Weis | July 7/16 | Baron & Budd | Louisiana | Deposition |
| Ludlow | July 19/16 | Morgan and Morgan | Maryland | Deposition |
| Lasich | July 21/16 | Karst | Washington | Trial |
| Batchelor | July 25/16 | Ferraro | Florida | Deposition |
| Dominguez | July 30/16 | Heubeck | California | Deposition |
| Soto | Aug 12/16 | Maune Raichle | California | Depositiion |
| Raines | Aug 19/16 | Vinocur | Florida | Deposition |
| Oster | Aug 23/16 | Kunen | Florida | Deposition |
| Batchelor | Aug 25/16 | Ferraro | Florida | Trial |
| Levine | Aug 26/16 | Ferraro | Florida | Deposition |
| Britt | Aug 26/16 | Ferraro | Florida | Deposition |
| Trigueros | Aug 29/16 | Baron & Budd | Louisiana | Deposition |
| Coates | Aug 30/16 | Angelos | Maryland | Deposition |
| Theriault | Sept 1/16 | Ferraro | Massachusetts | Deposition |
| Reid | Sept 6/16 | Baron & Budd | Texas | Deposition |
| Cumbest | Sept 16/16 | Angelos | Maryland/Texas | Deposition |
| Britt | Sept 21,22/16 | Ferraro | Florida | Trial |
| Colletti | Oct 5/16 | Landry, Swarr | Louisiana | Deposition |
| Wagoner | Oct 13/16 | Karst | California | Deposition |
| Bourke | Oct 19/16 | Baron & Budd | Louisiana | Deposition |
| Garcia | Oct 25/16 | Baron & Budd | Texas | Deposition |
| LeBlanc | Oct 28/16 | Ferraro | Massachusetts | Deposition |
| Angelos Steel Cases | Nov 1/16 | Angelos | Maryland | Deposition |
| McGrew | Nov 2/16 | Baron & Budd | Louisiana | Deposition |
| Giovanni | Nov 9/16 | Robins Cloud | Missouri | Deposition |
| Coates | Nov 21/16 | Angelos | Maryland | Trial |
| Clarke | Nov 23/16 | Ferraro | Florida | Deposition |
| Graham | Nov 29/16 | Vinocur | Florida | Deposition |
| Angelos Steel Cases | Dec 8/16 | Angelos | Maryland | Trial |
| Parbury | Dec 21/16 | French & Mudd | California | Deposition |

Gref.B-FIN01-000288

JA494

| | | | | |
|---|---|---|---|---|
| Schmidt | January 9/17 | Robins Cloud | Florida | Deposition |
| Rodrigues | Jan 13/17 | Waters & Krauss | California | Deposition |
| Muscarello | Jan 27/17 | Baron & Budd | Louisiana | Deposition |
| Olsen | Feb 10/17 | Ferraro | Florida | Deposition |
| Wallace | Feb 14/17 | Angelos | Maryland | Deposition |
| Westerman | Feb 17/17 | Morgan and Morgan | Florida | Deposition |
| Lennon | Feb 21/17 | Maune Raichle | California | Deposition |
| LeBlanc | Feb 24/17 | Ferraro | Massachusetts | Trial |
| Olsen | Feb 28/17 | Ferraro | Florida | Deposition |
| Tracy | Mar 2/17 | Levy-Konigsberg | Georgia | Daubert Hearing |
| Kindred | Mar 13/17 | Angelos | Maryland | Deposition |
| Greene | Mar 16/17 | Angelos | Maryland | Deposition |
| Foster | Mar 20/17 | French & Mudd | California | Deposition |
| Hardaway | April 19/17 | SWMK Law | Missouri | Deposition |
| Garcia | April 20/17 | Baron & Budd | Texas | Trial |
| Shaw | May 2/17 | French & Mudd | California | Deposition |
| Brooks | May 23/17 | Angelos | Maryland | Deposition |
| Herold | May 26/17 | French & Mudd | MADCO | Deposition |
| Hart | June 6/17 | French & Mudd | California | Deposition |
| Moore | June 21/17 | Ferraro | Florida | Deposition |
| Moore | June 27/17 | Ferraro | Florida | Trial |
| Hart | June 29/17 | Maune Raichle | California | Trial |
| Hlotsclaw | July 3/17 | Maune Raichle | California | Deposition |
| DeFiore | July 10.17 | Baron & Budd | Louisiana | Deposition |
| Smith | Aug 4/17 | Ferraro | Florida | Deposition |
| Foucha | Aug 10/17 | SMKW Law | Louisiana | Deposition |
| Jasmin | Aug 14/17 | Baron & Budd | Louisiana | Deposition |
| O'Neill | Aug 18/17 | Ferraro | Florida | Deposition |
| Pisz | Aug 21/17 | Ferraro | Florida | Deposition |
| Lefebvre | Sept 5/17 | Ferraro | Massachusetts | Deposition |
| Morgan | Sept 7/17 | Baron & Budd | Louisiana | Deposition |
| Gokey | Sept 14/17 | Ferraro | Massachusetts | Deposition |
| Nichols | Sept 18/17 | Gori Julian | Florida | Deposition |
| Lanzo | Sept 29/17 | Levy-Konigsberg | New Jersey | Deposition |
| Jaslovec | Oct 2/17 | Ferraro | Florida | Deposition |
| Torres | Oct 13/17 | Ferraro | Florida | Deposition |
| Gafford | Oct 30/17 | McMullen | Louisiana | Deposition |
| Kohr | Oct 31/17 | Levy-Konigsberg | Illinois | Deposition |
| Torres | Nov 9/17 | Ferraro | Florida | Trial |
| Lanzo | Nov 13/17 | Levy-Konigsberg | New Jersey | Deposition |
| Miller | Dec 12/17 | Flint | Illinois | Deposition |
| Henry | Dec 22/17 | Motley Rice | New Jersey | Deposition |
| Lord | Jan 12/18 | Waters & Krauss | Florida | Deposition |
| Henry | Jan 23/18 | Motley Rice | New Jersey | Deposition |
| Henry | Jan 30/18 | Motley Rice | New Jersey | Deposition |
| Michel | Feb 21/18 | Gori Julian | Louisiana | Deposition |
| Minecci | Feb 26/18 | Ferraro | Florida | Deposition |
| Lord | March 1/18 | Waters & Krauss | Florida | Trial |

Page -289-

Gref.B-FIN01-000289

**JA495**

| | | | | |
|---|---|---|---|---|
| Boyd-Bostic | Mar 16/18 | Motley Rice | South Carolina | Deposition |
| Wills | Mar 16/18 | Motley Rice | South Carolina | Deposition |
| Sontag | April 10/18 | French & Mudd | California | Deposition |
| Blake | April 11/18 | Angelos | Maryland | Deposition |
| Alexander | April 26/18 | Kelly-Ferraro | Ohio | Deposition |
| Boyd-Bostic | May 17/18 | Motley Rice | South Carolina | Trial |
| McKnight | May 23/18 | Hoffman | Louisiana | Deposition |
| Strong | May 24/18 | Ferraro | Wisconsin | Deposition |
| Long | June 7/16 | Zinns | Georgia | Deposition |
| Windsor | June 8/16 | Cooney Conway | Illinois | Deposition |
| Huff/McIntosh | June 12/18 | Schmickle | Missouri | Deposition |
| Blake | July 17/18 | Angelos | Maryland | Trial |
| O'Daniel | July 19/18 | McMullen | Illinois | Deposition |
| Dugger | July 20/18 | Angelos | Maryland | Deposition |
| Meek | Aug 24/18 | Baron & Budd | Indiana | Deposition |
| Green | Aug 27/18 | Ferraro | Florida | Deposition |
| Cook | Aug 27/18 | Ferraro | Florida | Deposition |
| Barr | Aug 29/18 | French & Mudd | California | Deposition |
| Hare | Sept 7/18 | SWMW Law | Missouri | Deposition |
| Henry | Sept 25/18 | Motley Rice | New Jersey | Trial |
| Alexander | Oct 3/18 | Kelly-Ferraro | Ohio | Trial |
| Berry | Oct 10/18 | Baron & Budd | Louisiana | Deposition |
| Startley | Oct 19/18 | Baron & Budd | Illinois | Deposition |
| Barr | Oct 22/18 | French & Mudd | California | Trial |
| Colatorti | Oct 29/18 | Cooney Conway | Illinois | Deposition |
| Startley | Dec 11/18 | Baron & Budd | Illinois | Trial |
| Henson | Dec 13/18 | Waters & Krauss | California | Deposition |
| Scheurman | Dec 28/18 | Vinocur | Florida | Deposition |
| Henson | Jan 11/19 | Waters & Krauss | California | Trial |
| Various | Feb 6/19 | SWMW Law | Missouri | Trial |
| Hogue | Feb 6/19 | Maune Raichle | California | Deposition |
| Simpson | Feb 8/19 | Maune Raichle | West Virginia | Deposition |
| Coates | Feb 13/19 | Angelos | Maryland | Trial |
| Gutuierrez | Feb 21/19 | Baron & Budd | New Mexico | Deposition |
| Martin | Feb 22/19 | Baron & Budd | Louisiana | Deposition |
| Olson | Mar 11/19 | French & Mudd | New York | Trial |
| Hare | April 4/19 | SWMW Law | Missouri | Trial |
| Stepanek | May 23/19 | Levy-Konigsberg | Illinois | Deposition |
| Fibish | May 24/19 | Maune Raichle | Illinois | Deposition |
| Elizarraras | June 3/19 | Maune Raichle | California | Deposition |
| Thornton | June 5/19 | Ferraro | Florida | Trial |
| Bennett | June 10/19 | Gori Julian | Missouri | Deposition |
| Lavender | June 17/19 | Eley | Colorado | Deposition |
| Foushee | June 26/19 | Levy-Konigsberg | N. Carolina | Deposition |
| Scott | June 27/19 | Baron & Budd | Louisiana | Deposition |
| Morgan | July 8/10 | Baron & Budd | Louisiana | Deposition |
| Bell | July 9/19 | Angelos | Maryland | Deposition |

Page -290-

Gref.B-FIN01-000290

JA496

| | | | | |
|---|---|---|---|---|
| Hernandez | July 10/19 | Ferraro | Florida | Deposition |
| Gutierrez | July 18/19 | Baron & Budd | New Mexico | Trial |
| Hewatt | July 29/19 | French & Mudd | Georgia | Deposition |
| Pelltier | Aug 1/19 | Gori Julian | Louisiana | Deposition |
| Cole | Aug 2/19 | Baron & Budd | Missouri | Deposition |
| Melcher | Aug 5/19 | Maune Raichle | Illinois | Deposition |
| Hernandez | Aug 14/19 | Ferraro | Florida | Trial |
| Sutter | Aug 19/19 | SMKW Law | Missouri | Deposition |
| Bennett | Aug 21/19 | Gori Julian | Missouri | Trial |
| Bergeman | Sept 9/19 | SMKW Law | Missouri | Deposition |
| Fankhauser | Sept 12/19 | Waters & Krauss | Iowa | Deposition |
| Vazquez | Sept 19/19 | Ferraro | Florida | Deposition |
| Woodard | Sept 20/19 | Cooney Conway | Illinois | Deposition |
| Hudak | Sept 27/19 | Kelly-Ferraro | Ohio | Trial |
| Bell | Oct 3/19 | Angelos | Maryland | Trial |
| Roy | Oct 7/19 | Maune Raichle | California | Deposition |
| McLeod | Oct 8/19 | Gori Julian | Louisiana | Deposition |
| Berkman | Oct 11/19 | Maune Raichle | Indiana | Deposition |
| DeLaCruz | Oct 28/19 | Meisenkothen | Connecticut | Deposition |
| Doolittle | Oct 30/19 | Cooney Conway | Illinois | Deposition |
| Foushee | Nov 5/19 | Simmons | N. Carolina | Deposition |
| Todd | Nov 6/19 | Baron & Budd | Louisiana | Deposition |
| Scott | Dec 4/19 | Baron & Budd | Louisiana | Trial |
| Long | Dec 16/19 | Zinns | Georgia | Daubert Hearing |
| Lebrecht | January 10/20 | Waters & Krauss | California | Deposition |
| Mourre-Cabrerra | Jan 14/20 | Ferraro | Florida | Deposition |
| Chapman | Jan 17/20 | Ruckdeschel | Florida | Deposition |
| Moure-cabrerra | Feb 6/20 | Ferraro | Florida | Daubert Hearing |
| Moure-cabrerra | Feb 10/20 | Ferraro | Florida | Trial |
| Doolittle | Feb 20/20 | Cooney Conway | Illinois | Trial |
| Terek | Feb 21/20 | Baron & Budd | Wisconsin | Deposition |
| Daily | Feb 21/20 | Maune Raichle | California | Deposition |
| Roy | Feb 25/20 | Maune Raichle | California | Deposition |
| Wilson | Feb 27/20 | Baron & Budd | Louisiana | Deposition |
| Slann | Mar 3/20 | Baron & Budd | Louisiana | Deposition |
| Biermann | Mar 13/20 | Unglesby | Louisiana | Deposition |
| Wagner | Mar 26/20 | Maune Raichle | California | Deposition |
| Kyler | April 24/20 | Waters & Krauss | California | Deposition |
| Butler | April 29/20 | Ferraro | Florida | Deposition |
| Arditto | May 8/20 | Maune Raichle | California | Deposition |
| Ford | July 13/20 | Gori Julian | Florida | Deposition |
| Chambers | July 15/20 | Baron & Budd | Louisiana | Deposition |
| Broussard | Aug 7/20 | Baron & Budd | Louisiana | Deposition |
| Joros | Aug 24/20 | Maune Raichle | Indiana | Deposition |
| Williams | Sept 2/20 | Maune Raichle | California | Deposition |
| Parsons | Sept 4/20 | Kelly-Ferraro | Ohio | Deposition |
| Montgomery | Sept 18/20 | Ferraro | Florida | Deposition |
| Sarkis | Oct 2/20 | Shepard | Massachusetts | Deposition |

Gref.B-FIN01-000291

JA497

| | | | | |
|---|---|---|---|---|
| Sawmiller | Oct 5/20 | Waters & Krauss | Ohio | Deposition |
| Matacena | Oct 9/20 | Ferraro | Florida | Deposition |
| | | | | |
| Jennings | Nov 9/20 | Kelly-Ferraro | Ohio | Deposition |
| West | Nov 25/20 | Maune Raichle | California | Deposition |
| Patterson | Dec 2/20 | Maune Raichle | Missouri | Deposition |
| Williams | Dec 17/20 | Maune Raichle | California | Trial |
| Williams | Dec 29/20 | Maune Raichle | California | Deposition |
| Williams | Jan 12/21 | Maune Raichle | California | Trial |
| Castro | Jan 15/21 | Belluck Fox | New York | Deposition |
| Whetsel | Jan 21/21 | Karst &Von Oiste | Missouri | Deposition |
| Weatherman | Feb 22/21 | Ferraro | Florida | Deposition |
| Losner | Feb 23/21 | Ferraro | Florida | Deposition |
| Chenet | Feb 24/21 | Unglesby | Louisiana | Deposition |
| Eggers | Mar 1/21 | Dean Omar Branham | Oklahoma | Deposition |
| Ramirez | Mar 8/21 | Maune Raichle | California | Deposition |
| Walls | April 5/21 | Dean Omar Branham | North Carolina | Deposition |
| Torres | April 15/21 | Ferraro | Florida | Trial |
| Harpster | April 19/21 | Simmons | New Jersey | Deposition |
| Fouts | April 21/21 | Angelos | Maryland | Deposition |
| Corcoran | May 4/21 | Simmons | Florida | Deposition |
| Wheeler | May 4/21 | Simmons | Florida | Deposition |
| Walls | June 28/21 | Dean Omar Branham | North Carolina | Deposition |
| Horner | July 12/21 | Lanier | North Dakota | Deposition |
| Jennings | July 19/21 | Kelly Ferraro | Ohio | Trial |
| Masters | Aug 6/21 | Boling | Louisiana | Deposition |
| Pylar | Aug 20/21 | Ferraro | Florida | Deposition |
| Chavis | Aug 23/21 | Maune Raichle | Indiana | Deposition |
| Bonnem | Sept 3/21 | Cooney Conway | Illinois | Deposition |

**Dr Finkelstein's Compensation**

Dr Finkelstein will be paid $550 per hour for office work, $825 per hour for deposition testimony, and $5000 / day for trial testimony.

Please let me know if you have any questions.

Sincerely,

*Murray Finkelstein*

Murray Finkelstein PhD MD

Page -292-

Gref.B-FIN01-000292

**JA498**

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN JOSEPH GREF, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 1:20-CV-05589-GBD |
| v. | § | |
| | § | |
| AMERICAN INTERNATIONAL | § | |
| INDUSTRIES, et al. | § | |
| | § | |
| Defendants. | § | |
| | § | |

**AMERICAN INTERNATIONAL INDUSTRIES' OPPOSITION TO
NORTHWELL HEALTH, INC.'S MOTION TO MODIFY SUBPOENA
SERVED BY DEFENDANT AND CROSS-MOTION TO ENFORCE
A-I-I'S SUBPOENA**

Defendant American International Industries (sued individually and erroneously as *"successor-in-interest for the* CLUBMAN BRAND, to THE NESLEMUR COMPANY and PINAUD COMPANY") ("A-I-I"), by counsel, requests this Court deny Northwell Health, Incorporated's ("Northwell") Motion to Modify Subpoena served by Defendant A-I-I ("Motion to Modify") and grant A-I-I's Cross Motion to Enforce its Subpoena for the following reasons:

**BACKGROUND** – In 2020, Dr. Jacqueline Moline, who is a well-known causation expert for plaintiffs in talc and asbestos litigation published an article about certain plaintiffs who claimed to have used cosmetic talc products. ("Mesothelioma Associated With the Use of Cosmetic Talc," Journal of Occupational and Environmental Medicine, Vol. 62, No. 1, Jan. 2020, ("**Exhibit C**") ("Moline Article"). The twin assertions of the Article are: (i) that all 33 mesotheliomas were caused by asbestos, and (ii) their only possible source of asbestos exposure was contaminated cosmetic talc. To the contrary, it was discovered in the *Betty Bell* case that Mrs. Bell was one of the Article subjects and that she, and later her estate, filed two workers' compensation cases alleging occupational exposure to asbestos from a textile mill where she

1

**JA500**

worked. When subsequently confronted with that fact, Dr. Moline made the false statement under oath that those claims were "adjudicated" to be without merit. Neither she nor Northwell has ever provided any documentation to support such a claim. When this information was disclosed in a similar motion filed by Northwell in *Bell*, the United States District Court for the Middle District of North Carolina ("M.D.N.C.") twice found it troubling that Dr. Moline might mislead factfinders by testifying that the Article's subjects had no alleged exposures to asbestos, knowing there were workers' compensation claims in one of them, while being shielded from cross-examination by claiming that her reliance materials were privileged medical information. (*See* **Ex. A** at p. 20-22).

**REASON #1** – Northwell's Motion to Modify raises the exact same arguments recently rejected by the M.D.N.C. (*See, e.g.*, Memorandum Opinion and Order dated September 13, 2022, *Bell et al. v. American International Industries, et al.*, 1:17-cv-00111-WO-JEP, M.D.N.C. **"Exhibit A"** at p. 36 ("*Bell* Order"); Northwell's Memorandum of Law in support of Motion to Intervene and Extend Protective Order, *Bell et al. v. American International Industries, et al.*, 1:17-cv-00111, ECF 259 **"Exhibit B"** ("Northwell's *Bell* Motion")). Both Northwell and plaintiff's counsel in *Bell* repeatedly raised these arguments. They were fully briefed and decided against Northwell in a detailed 41-page opinion. The *Bell* Court also ordered unsealed 37 pleadings discussing the fact that Mrs. Bell was a subject of the Moline Article despite her and her Estate's belief that she had occupational exposure to asbestos. Thus, Northwell must be estopped from making the same arguments to this Court, seeking a contrary result.

**REASON #2** – If this Court finds not all conditions for collateral estoppel are present, Northwell's Motion to Modify should be denied because the claim that its "interests" in the information about the identities of the 33 subjects is privileged is factually and legally wrong. The 33 subjects of the Moline Article were never patients of the doctor or in any Northwell facility. Instead, they were plaintiffs in talc litigation in which their lawyers hired Dr. Moline as an expert. The only information Dr. Moline received about the cases was litigation materials chosen for her by the lawyers who hired her, such as deposition transcripts and discovery responses. These were public materials for those cases to which defense counsel and courts in those cases also had access. The defendants in this matter are simply asking for those very same public litigation materials and a key that corresponds with the subject numbers assigned in the Moline Article.

/ / /

/ / /

48304334v.1

## ARGUMENT

**I.    Principles of Collateral Estoppel Bar Northwell's Motion to Modify A-I-I's Subpoena.**

Collateral estoppel "will bar relitigation of an issue that is identical to an issue which has necessarily been decided in the prior action." *Application of Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989). This principle "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979), *citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329 (1971). "Collateral estoppel saves parties and the courts from the waste and burden of relitigating stale issues, and, by discouraging inconsistent results, forwards public policy favoring the establishment of certainty in legal relations." *Bounkhoun v. Barnes*, No. 15-CV-631A, 2020 WL 1526917, at *4 (W.D.N.Y. Mar. 30, 2020).

Collateral estoppel applies if:

(1) the issues in both proceedings are identical,

(2) the issue in the prior proceeding was actually litigated and actually decided,

(3) there was a full and fair opportunity for litigation in the prior proceeding, and

(4) the issues previously litigated were necessary to support a valid and final judgment on the merits.

*Lord v. Int'l Marine Ins. Servs.*, 420 F. App'x 40, 41 (2d Cir. 2011).

48304334v.1

3

**JA502**

Here, Northwell's Motion to Modify meets all criteria for the application of collateral estoppel: (1) the Motion to Modify attempts to hide the identity of the participants of Dr. Moline's Article using the exact arguments Northwell used in *Bell et al. v. American International Industries, et al.* ("*Bell* case"); (2) A-I-I expended great expense to fully litigate these same arguments in the *Bell* case; (3) Northwell intervened in *Bell* and fully briefed and argued these same issues in the *Bell* case over the course of nearly two years; and (4) all issues raised by Northwell here were fully litigated and decided by the M.D.N.C in a valid and final judgment. (*See* Ex. A ("*Bell* Order"). Plus, Northwell was given an opportunity to appeal the *Bell* court's ruling and did not. Now, it seeks to consume the resources of this Court to try to get a different result.

In *Bell*, counsel for plaintiff and Northwell made confidentiality and privilege arguments, including concerns about HIPAA and "human research" confidentiality, to shield Moline's Article from full and fair cross-examination. The *Bell* court rejected those arguments and ordered unsealed all information relating to Mrs. Bell as a subject of the study. The *Bell* court unsealed 37 pleadings initially protected based on claims of confidentiality and privilege. (Ex. A). The existence of 37 pleadings on that topic indicate how thoroughly this issue has been litigated.

Northwell intervened in the *Bell* case making the same argument it makes in its Motion to Modify. (Ex. B at p.2). In *Bell*, Northwell requested the court not require Dr. Moline to disclose "the identity of any subjects of her research study," claiming such disclosures "would be contrary to":

48304334v.1

**JA503**

1. The Federal Policy for the Protection of Human Subjects, 45 C.F.R. Part 46, Subpart A (or, "The Common Rule");

2. Bedrock Institutional Review Board ("IRB") standards of privacy and confidentiality covering research subjects;

3. The specific IRB approvals that Dr. Moline secured in advance of writing and publishing the Article;

4. Well-established standards and universally accepted norms in the medical research community related to research subjects and anonymity; and

5. Relevant case law affirming privacy and confidentiality requirements for research subjects.

(*Id.*; compare with Northwell's Motion to Modify, ECF 266 at p. 3). Apart from minor wording changes in argument three (3), these are *verbatim* the same arguments Northwell makes in its Motion to Modify in this matter where Northwell requests the Court enjoin A-I-I from compelling Northwell to "identify any research subjects" that were part of Dr. Moline's 2020 article at-issue before the Court. (*See* Ex. C, Moline Article).

As the *Bell* court found, Dr. Moline is using her article offensively to assert a connection between mesothelioma and cosmetic talc. (Ex A). This creates a new chapter in asbestos litigation from which Dr. Moline handsomely profits as an expert – for the last 25 years. She also volunteered to testify before a congressional committee and used one of the cases from her Article as an example of someone with mesothelioma who had no known exposure to asbestos. (Hearing before the Subcommittee on Economic and Consumer Policy of the committee on Oversight and Reform (Dec. 10, 2019), "**Exhibit D**"). There, she repeated the claim from her Article

**JA504**

that, "[n]o individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." (Ex. C).

Dr. Moline's congressional testimony was nearly verbatim from her (non-confidential) litigation report issued in the *Bell* case. (*See* Report from Dr. Moline dated May 5, 2016 (*Bell*), attached hereto as "**Exhibit H**"). Counsel from that case knew Mrs. Bell had filed workers' compensation cases. (Ex. A). When confronted with that inconsistency, Dr. Moline claimed she could not confirm the *Bell* case was one in her study nor answer any questions about it. Thus, she was in the enviable position, for an expert witness, of being able to make what she claimed were "groundbreaking" claims of causation but not having to answer questions about the grounds for those claims. (Ex. A).

Both the *Bell* plaintiffs and Northwell moved to seal the identities of the subjects of Moline's Article, including Mrs. Bell's identity, claiming various privileges and privacy concerns. (*See, e.g.,* Ex. B). The M.D.N.C. Magistrate Judge relied on their representations that confidential medical information was at issue and tentatively sealed all pleadings relating to Mrs. Bell's identity as a subject of the study. After A-I-I won the case on summary judgment, it moved to unseal those pleadings. United States District Judge William Osteen, Jr. extensively considered Northwell's arguments in light of the facts and issued a detailed 41-page Opinion solely dedicated to this issue, including:

> Mrs. Bell nonetheless made statements to the Industrial Commission, while represented by counsel, that she had sustained an occupational disease caused by exposure to asbestos during employment with Hoechst Celanese Corporation and

48304334v.1

6

**JA505**

Pillowtex Corporation. The alleged occupational disease was mesothelioma. As Mrs. Bell's counsel explained, "[s]he made a [workers' compensation] claim because she thought she might have been exposed." **Mrs. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the "33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder." The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility.** This court expressed concern about this seeming contradiction before, and does so again.

This court's concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide. For example, Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial. The plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos: "Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this." **Dr. Moline has given testimony in many other cosmetic talc cases. Moreover, other expert witnesses have begun relying on the article for the basis of their opinions. [O]ne [expert] describe[ed] it as "the only peer-reviewed paper that [he] know[s]" to support the conclusion that cosmetic talc use by hairdressers releases material amounts of asbestos into the air.** When entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller specifically discussed the article's integral role in supporting the plaintiffs' claims.

This court finds that with the protective order in place defense counsel in cosmetic talc cases across the country are stymied from effectively cross-examining plaintiff expert witnesses on the article's foundation. The following exchange from Dr. Moline's cross-examination in the California state trial is illustrative:

7

**JA506**

Q . . . Other than cosmetic talc, you eliminated anybody
from your study who might have had other asbestos
exposures; is that correct?

A To the best of my knowledge, yes.

Q Okay. And after you published the paper and testified in
Congress about the paper, did you come to learn that some
of the information regarding one or more of the people in
your study was incorrect as published?

A There was a question about one particular individual
that I was presented with information about, but I -- based
on the information that I had, there was -- it wasn't
determined that they had the -- any additional exposure.
I'm not sure of any others.
[****]
Q Did you publish an errata with regard to your paper after
you found out that this one plaintiff that was provided to
you had other alleged exposures?

A As I said just a minute ago, there was an allegation or
there was a -- a comment, but it was shown to be without
evidence, so I did not publish an errata based on that one
individual.

Dr. Moline offered no basis for her statement that an errata was
unnecessary because the allegation of alternative exposure "was
shown to be without evidence." Indeed, she did not have to
because the protective order effectively shielded the assertion
from cross-examination. If the order was not in place, then
defense counsel in that case—and defense counsel in similar
cosmetic talc cases—would be able to establish that Mrs. Bell was
one of the individuals the article studied and then challenge Dr.
Moline with Mrs. Bell and Plaintiff's workers' compensation
claims asserting, under criminal penalty for false statements,
that Mrs. Bell was exposed to asbestos at textile job sites. Defense
counsel could show that those workers' compensation claims were
not adjudicated on the merits, rather they were dismissed
without prejudice, weakening the credibility of Dr. Moline's
statement that the allegation of alternative exposure "was shown
to be without evidence."

**JA507**

**Perhaps more significant than this example of a hamstrung cross-examination is the <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) issue created by concealment of Mrs. Bell's possible exposure.** Dr. Moline testified that "based on the information . . . it wasn't determined that [the research subjects] had . . . any additional exposure." Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, Daubert imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594 (internal citations omitted). **Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.**

From this court's perspective, inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." Daubert, 509 U.S. at 594–95. Even if reliability is examined by a court and deemed sufficient to support admissibility, relevant cross-examination of an expert includes "factual underpinnings [which] . . . affect the weight and credibility of the witness' assessment." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation mark omitted) (quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)). [...]
In this case, a principal factual underpinning of the article is that in all thirty-three cases studied "no identified source apart from the talcum powder" was identified. (Doc. 274-1 at 2.) **The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the**

48304334v.1

> **factual underpinning of no known exposure to asbestos other than talcum powder.**

(Ex. A at p. 16-22) (emphasis added) (internal citations omitted).

For Northwell's specific arguments, the *Bell* court explicitly rejected that "The Common Rule" applied to the Moline Article. The judge noted:

> As an initial matter, Northwell appears to concede that because Dr. Moline's study was not conducted by or on behalf of the federal government these protections for human subjects do not inherently apply. (Northwell's Resp. (Doc. 392) at 14–15.) Rather, Northwell insists the protections apply because it has voluntarily elected, as part of its "Federalwide Assurance" to the government, to have these protections apply to all its human subject research—regardless of the source of support or funding for that research. (Id.) Northwell's concession that these protections only apply because it has chosen to apply them (and has told the government about that choice), suggests to this court that these protections are not requirements imposed on Northwell by the government, but rather requirements it has imposed upon itself. Thus, nonenforcement of these protections would not seem to violate any federal requirements the government itself has imposed on Northwell.

(Ex. A at p. 31, fn. 8; *see also* Northwell's Response in Opposition to Defendant *American International Industries*' Motion to Vacate the Preliminary Protective Order of September 25, 2020, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111, ECF 392 "**Exhibit E**").

The *Bell* court also rejected the notion that the IRB approval conferred privacy or confidentiality on the subjects of Moline's Article given the IRB "waived the requirement that Dr. Moline and her coauthors acquire informed consent from the individuals to be studied." (Ex. A at p. 33, fn. 10). Northwell admitted this waiver was granted "because the IRB found Dr. Moline's research subjects faced no more than 'a

48304334v.1

minimal risk of harm resulting from a breach of confidentiality.'" (*Id.*, quoting Ex. E at 14). "That finding undercuts Northwell and Plaintiff's argument that research subjects would suffer great harm if their identities were disclosed." (*Id.*).

> While being part of a larger study that qualified as human subject research may have facially and incidentally granted Mrs. Bell greater confidentiality protections, this court is hesitant to give much weight to those protections that were not crafted with the goal of protecting the privacy of deceased individuals like Mrs. Bell.

(Ex A at p. 33).

The *Bell* court also rejected Northwell's argument that disclosing the identities of the subjects of Moline's Article would have a "chilling effect" that "would significantly dissuade individuals from agreeing to participate in human subject research" because the individuals involved in Moline's Article "never agreed to participate in Dr. Moline's research because the study was not required to obtain informed consent from any of the individuals studied." (Ex. A at p. 34-35)(*see also* Northwell's Motion to Modify, ECF 266 at p. 1 ("preserving the anonymity of research subjects' identities is essential to avoid the chilling effect that disclosure of those subjects' identities would inevitably have have….")).

The court ruled that deceased individuals are not considered "human subjects" for purposes of confidentiality protections. It also found that all individuals (living or deceased) in Moline's Article were afforded less confidentiality protections because they consented to put their medical information in the legal domain by filing lawsuits:

11

**JA510**

"all the information in the Northwell Document[1]—and indeed much more sensitive medical information—is already contained in this case's publicly available filings." (Ex. A at p. 35).

The *Bell* Order also rejected Northwell's HIPAA concerns. In *Bell*, plaintiff's attorney admitted HIPAA did not apply to documentation containing Mrs. Bell's identity. (Ex. A at p. 36; Plaintiff's Response in Opposition to *Defendant American International Industries'* Motion to Vacate the Preliminary Protective Order of September 25, 2020, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111, ECF 377 "**Exhibit F**"). Yet, now, Northwell seeks to resurrect even that claim. Dr. Moline did not treat the medical information of the 33 as protected by HIPAA when she wrote and disseminated litigation reports about their detailed medical history. Northwell's position on HIPAA is, in essence, that Dr. Moline was free to disregard those protections when she used the information but can invoke it when convenient to avoid cross-examination. Ignoring her supposed confidentiality concerns, Dr. Moline even identified Mrs. Bell (for the purpose of making the false claim that her workers' compensation claims were dismissed as meritless) while refusing to identify Mrs. Bell during cross-examination by defense.

The *Bell* court concluded Northwell did not have "any remaining privacy interest" in Mrs. Bell's identity being disclosed from Moline's Article "because in a medical research study, **the interest in confidentiality belongs primarily to the**

---

[1] The "Northwell Document" referred to by the court was a 5-page document produced by Northwell containing Mrs. Bell's name, brands of talc she used, the law firm representing her, her occupation, and her mesothelioma diagnosis.

48304334v.1

**JA511**

**study participant, not the researcher or sponsoring facility**." (Ex. A at pp. 36-37). Specifically, the court found "the study participant chose to publicly expose the fact of her mesothelioma by filing a complaint in this case, and the workers' compensation claim she chose to file, alleging she was exposed to asbestos in the textile industry, is publicly available." (*Id.* at p. 37)(internal citations omitted). Here, the identity of <u>every</u> subject of Dr. Moline's study chose to publicly expose the fact of their mesothelioma diagnoses by filing complaints, verifying discovery, and giving testimony in their respective cases.

There are several analogous cases where federal courts have applied the principles of collateral estoppel in cases involving the issuances of subpoenas. First, in *Sreter v. Hynes,* plaintiffs operating nursing homes sought to enjoin enforcement of a subpoena for records in United States District Court for the Eastern District of New York. 419 F. Supp. 546, 547–48 (E.D.N.Y. 1976). Plaintiffs initially attempted to quash the same subpoena in New York state court, though the New York Supreme Court denied their application. *Id.* at 548. The District Court held that plaintiffs' claim attempting to quash the subpoena was barred by *res judicata* given it involved "identical parties and the same basic claim (invalidity of the subpoena)" previously ruled on by the state court decision. *Id.*

In another case, a plaintiff comic book media group sued various entities about the ownership of characters used in other forms of media, suing Disney in the District Court of Colorado, Marvel Enterprises in the Southern District in New York, and Stan Lee in the Central District of California. *Stan Lee Media, Inc. v. Walt Disney*

13

**JA512**

*Co.,* 774 F.3d 1292, 1294–95 (10th Cir. 2014). The California District Court initially denied the plaintiff media group's claim on *res judicata* grounds related to a decision in the Southern District of New York, though the Ninth Circuit affirmed the denial on other grounds (sufficiency of the pleadings due to lack of plausibility). *Id.* at 1296. Following the Ninth Circuit's decision, the Tenth Circuit found the issues in its case "substantively identical" despite the differences in defendants, noting collateral estoppel precludes relitigation of the issues "even if the issue arises when the party is pursuing or defending against a different claim." *Id.* at 1297. While the plaintiff argued it was allowed to "fully litigate" the claims or amend its claims, the Tenth Circuit held it fully briefed the issues of pleading sufficiency to the Ninth Circuit and these substantively similar claims were denied. *Id.* at 1298-99; *see also Kwolek v. United States,* No. 11-MC-53, 2011 WL 2940984, at *1 (W.D. Pa. July 21, 2011) (finding collateral estoppel applied to deny motion to quash subpoena in Western District of Pennsylvania case because an evidentiary hearing was not required to determine if issue "fully litigated" in Northern District of California).

Finally, in *Edwards v. Maxwell,* a non-party filed a motion to quash a subpoena in the Southern District of Florida issued by the defendant in the underlying action, *Giuffre v. Maxwell,* in the Southern District of New York. No. 15CV07433RWSSDNY, 2016 WL 7413505, at *1 (S.D. Fla. Dec. 22, 2016) (unreported). The defendant in the underlying action previously subpoenaed another non-party who had subsequently moved to quash the subpoena in the District of Utah, which transferred the motion back to the Southern District of New York. *Id.* Because the court in the underlying

14

**JA513**

case had previously ruled on identical requests for the other non-party, the Southern District of Florida transferred the motion to quash to the Southern District of New York on *res judicata* grounds, among others, citing the "great risk of inconsistent rulings" and "the interests of fairness, consistency, judicial economy, and speed of resolution." *Id*. at \*2-3. The court highlighted the importance of "[u]niformity of discovery rulings in a case of this complexity is critical to achieving fairness to the parties and non-parties." *Id*. at \*3.

Here, Northwell should be barred from raising its arguments in its Motion to Modify given that every argument was fully litigated in the *Bell* case. As demonstrated above, United States District Courts in New York have already rejected the attempts of parties to stop subpoenas by making the same arguments in a new court after an adverse ruling in another. *See Sreter v. Hynes,* 419 F. Supp. 546, 547–48 (E.D.N.Y. 1976). As with the *Kwolek* and *Stan Lee Media* cases noted above, Northwell's Motion to Modify and its previously filed motion in *Bell* are "substantively identical" or "nearly identical" to each other. Beyond the final judgment of the *Bell* Order – which Northwell did not appeal – Northwell's Motion to Modify is nearly unchanged for large sections of its argument. (*Compare* Motion to Modify, ECF 266 at p. 1 to Ex. B at 2; Motion to Modify, ECF 266, III(A) at 7-11 to Ex. B at 7-10; Motion to Modify, ECF 266, III(B) at 11 to Ex. B III(B) at 10-11). Northwell essentially admits the facts in its Motion to Modify are unchanged from those litigated in *Bell* as Northwell relies on an affidavit of Dr. Moline used in the *Bell* case, stating "Northwell notes that Dr. Moline's affidavit was provided in another

15

**JA514**

case (and reflects the caption of that case). <u>Because Northwell relies on the same facts and testimony provided therein</u>, Northwell does not believe a new, identical affidavit is necessary here." (Motion to Modify, ECF 266 at p. 2, fn. 1) (emphasis added).

The District Court in *Bell* already rejected Northwell's privacy concerns raised in its Motion to Modify. Just as Northwell argues here, the *Bell* court considered whether the "Common Rule" applied to the subjects in Moline's article and held that it did not. Just as Northwell argues here, the *Bell* court considered whether the IRB conferred privacy rights over the subjects in Moline's article and held that it did not. As is argued here, the *Bell* court considered whether Northwell had a privacy interest in the identity of the subjects and held that it did not. Finally, the *Bell* court considered whether not identifying the subjects of Moline's article would prejudice A-I-I and found that it would.

Given the arguments Northwell makes here are substantively identical to those made in *Bell*, not precluding these arguments creates a "great risk of inconsistent rulings." Because "uniformity of discovery rulings… is critical to achieving fairness to the parties and non-parties," this Court should preclude Northwell from making the same argument rejected by the *Bell* Court and deny its Motion to Modify. *See Edwards v. Maxwell,* No. 15CV07433RWSSDNY, 2016 WL 7413505 (S.D. Fla. Dec. 22, 2016).

Additionally, none of the arguments raised by Northwell fall under the exceptions to the collateral estoppel principle. There have been no changes to the legal rules at issue; there have been no changes to the factual predicates essential to

48304334v.1

the *Bell* Order (i.e., the disclosure of the subjects' identities of the Moline Article); there are no pure questions of law at issue; and the interests of finality and judicial economy are not outweighed by "other substantive policies." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718–19 (2d Cir. 1993).

Given Northwell's arguments were previously litigated, barring Northwell from relitigating these issues here would protect A-I-I from the burden of relitigating these same issues and promote judicial economy. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Therefore, A-I-I requests this Court bar Northwell from re-litigating previously adjudicated issues in its Motion to Modify.

## II.   In the Alternative to Precluding Northwell's Motion By Collateral Estoppel, This Court Should Deny Its Motion Because There Is No Privilege Protecting the Identities of the 33 Subjects in Moline's Article As All Information Sought Is from the Subjects' Own Lawsuits.

Assuming, *arguendo*, this Court does not find all conditions for Collateral Estoppel are met, this Court should deny Northwell's Motion to Modify given the privileges it espouses do not apply. Northwell's efforts to enjoin A-I-I from compelling Northwell to identify any research subjects of Moline's Article is based on a fundamental misunderstanding of the law and facts. Not only is the information not privileged, it is highly relevant. And precluding inquiry regarding the subjects' inclusion in the study will significantly prejudice A-I-I.

The facts against Northwell's Motion to Modify are straightforward: the 33 subjects are not (and were never) patients of Dr. Moline. None sought health treatment at Northwell. Dr. Moline did not obtain their health information used in

17

48304334v.1

her Article in the course of treatment, nor did she obtain this health information in the course of research. Rather, all information sought by A-I-I was obtained by Dr. Moline – and subsequently Northwell – through Dr. Moline's work in litigation. All information sought was provided by these 33 subjects after they disclosed their medical condition publicly by filing their respective lawsuits. Dr. Moline admitted the background information she relied on to draft her Article was provided to her by counsel for those subjects, and she even assumed all this health information was made available to defense counsel during the course of the subjects' litigation. Finally, not only did Northwell waive a requirement that Dr. Moline obtain informed consent from any of the subjects or their counsel, Dr. Moline never informed any of the subjects' counsel that she was drafting her Article based on the information.

    **A.**    **There is no privilege with respect to any of the study subjects in Moline's Article when their information was obtained through Dr. Moline's capacity as an expert witness in the subjects' own lawsuits.**

Moline's Article does not involve research where a physician used medical records from her employer to conduct research and publish a paper in a scientific journal. Dr. Moline did not have a physician-patient relationship with any of the subjects, and none of the subjects were seen by any doctor at Northwell. (Ex. C at 11). The personal health information for all 33 subjects Northwell claims it seeks to protect was obtained from lawyers representing the plaintiffs and was contained in Dr. Moline's litigation reports that she issued as part of her work as an expert in those cases. (Ex. A; Ex. C at 11 ("The [33] cases were referred to author J.M. for medicolegal evaluation as part of tort litigation."); Relevant Portions of Deposition of

48304334v.1

Jacqueline Moline, M.D. (*Lashley*), taken January 15, 2020, "**Exhibit G**", at pp. 30:24-34:12). Dr. Moline already provided detailed histories of these individuals in her expert reports produced for purposes of litigation without claiming confidentiality or HIPAA rights were at-issue. (*See, e.g.,* Ex. H).

Likewise, all 33 subjects publicly put their medical condition at issue by filing lawsuits for mesothelioma. (Ex. A). Indeed, Dr. Moline admitted she assumed "all information" she relied on for her article was already "in the possession of defense lawyers" during the course of litigation. (Ex. G at p. 172:17-22).

As such, none of the information Northwell seeks to protect was confidential when disclosed in those underlying lawsuits. Plaintiffs in personal injury litigation execute a release for medical information relating to their claims, and they waive the patient-physician relationship as it relates to the medical conditions that are at issue in the case. Hence, there is no privilege that applies. And, there is certainly no privilege as it relates to questioning Dr. Moline about the subjects' inclusion in her Article on which she bases her opinions.

Likewise, Northwell's "concerns" that "potential research subjects might well be disinclined to consent to participating in research at all" are disingenuous. As noted, <u>none</u> of the 33 subjects knowingly participated in medical research conducted by Dr. Moline. All 33 subjects filed lawsuits and waived privacy of their respective medical information. Tellingly, the IRB "waived the requirement that Dr. Moline and her coauthors acquire informed consent from the individuals to be studied." (Ex. A at p. 33, fn. 10). Moreover, Dr. Moline did not inform counsel for any of these subjects

19

48304334v.1

**JA518**

that she was drafting her purported "research" based on the subjects' health information until <u>after</u> her Article was accepted for publication. (Ex. G at pp. 167:14-168:20).

There is no privilege that attaches to materials produced by plaintiffs in litigation when they are received by a retained expert who happens to be a physician. Northwell tries to argue that the approval of the study by the IRB at Northwell somehow confers a privilege or confidentiality to the information. This is false. Dr. Moline received the information in her capacity as an expert witness in litigation. Hence, the information was no longer privileged at the time she included it in her 33 litigation reports and then used the "same" information to write her "study." That the IRB later approved her use of the non-privileged information for a study does not confer any privilege on material where the underlying physician-patient privilege was already waived by filing 33 lawsuits and turning the information over to an expert witness.

Northwell attempts to misuse confidentiality and privilege claims intended to protect patients in medical studies in a context wholly unlike Dr. Moline's use of depositions and litigation materials to write an article that supports her expert witness work in those and future cases. Northwell cites no law that says funneling litigation materials through a retained medical expert gives those litigation materials confidentiality protections intended for real subjects of human studies sharing their confidential medical information with medical researchers.

48304334v.1

Northwell also claims privacy concerns stop it from complying, so it requests this Court enjoin A-I-I from compelling Northwell to "produce documentation from which the identities of research subjects can be ascertained." (Motion to Modify, ECF 266). This ignores the fact that both Dr. Moline and Northwell previously produced such individually identifiable health information or confirming documentation about the identity of individual subjects. For example, Northwell previously disclosed documentation containing Mrs. Bell's information to A-I-I containing her name, diagnosis, date of diagnosis, and alleged exposure information. (Ex. A at 6). As the court noted in the *Bell* Order, all information contained in this document "is already contained in this [Bell] case's publicly available filings." (*Id.* at 36).

Dr. Moline claimed "no patient identifiers would be included in research-related summaries." (Ex. F para. 16 to Decl. of Nathanial Huff).[2] However, she provided substantial information in her Article and her testimony before Congress about individual subjects, which allowed A-I-I to correctly identify Mrs. Bell. (Ex. D). In her Congressional testimony, Dr. Moline willingly provided the following details about Mrs. Bell (whom she referred to as "Ms. D"): her age, her medical diagnosis, her symptoms, her medications, her treatments, her smoking history, her employment and occupation history, and the timing of her death following her diagnosis. (*Id.*). This is similar to the identifying information provided in her Article:

_____

[2] Other defendants in this litigation have been able to determine the identity of at least four other subjects of Dr. Moline's Article based on the information she included in her reports. All four of these subjects had additional exposures to asbestos, contrary to Dr. Moline's claims. However, the identities of these subjects is yet to be confirmed due to Dr. Moline's refusal to provide confirmation. *See infra.*

21

48304334v.1

**JA520**

she identified six subjects' ages, genders, symptoms, diagnoses, date of diagnoses, treatments, date of treatments, and alleged exposures. (Ex. C). Beyond this information that Dr. Moline willingly disclosed without regard to HIPAA or other privacy concerns, counsel for plaintiff in the *Bell* case admitted her information was not "protected by HIPAA" given the authorized release produced in that case. (Ex. F at 19; *see also* Ex. G at p. 172:17-22 (Dr. Moline acknowledging defendants in the subjects' underlying lawsuits would have access to the same medical information she relied on)).

Finally, none of the authorities cited by Northwell support the proposition that information obtained by an expert through litigation somehow gains confidential protection when that same expert uses that litigation information to publish a paper that supports her litigation activities. (Motion to Modify, ECF 266 at p. 10-11).

A prime example from the authority cited by Northwell is *In re Am. Tobacco Co.*, 880 F.2d 1520, 1522–23 (2d Cir. 1989). While Northwell cites this case as an example of a court "allowing non-party recipients of subpoenas to redact the names and other identifying information of participants in research studies and enjoining defendants from determining the identities of research participants from the information provided," the differences between the research studies in that case compared to the 33 litigation subjects in Moline's Article are widely apparent. In *In re Am. Tobacco Co.*, neither Dr. Selikoff nor any of his employers' staffs were being called as paid expert witnesses in litigation. *Id.* at 1522–23. The information sought in that case was <u>not</u> obtained through the course of litigation, and Dr. Selikoff

22

**JA521**

obtained the sought-after information through his own research and <u>assured his subjects</u> that the information they provided would remain confidential. *Id.*

As noted, *supra*, Dr. Moline is offering her opinion in Plaintiff's case as an expert witness, and her opinion relies on her Article. She obtained all sought-after information through the course of her work in litigation from her subjects' lawsuits. The individuals in the Moline Article did not explicitly agree to participate in her research, and Dr. Moline did not obtain informed consent from any of the 33 individuals. (Ex. A at 34-35). Finally, all information sought by Defendants here is already contained in publicly available litigation reports, transcripts, and filings. (*Id.*).

The remaining cases on which Northwell relies are no better. *See, e.g., Cusumano v. Microsoft Corp.,* 162 F.3d 708, 714 (1st Cir. 1998) ("Whether the creator of the materials is a member of the media or of the academy, the courts will make a measure of protection available to him as long as he intended 'at the inception of the newsgathering process' to use the fruits of his research 'to disseminate information to the public.'")(citing *von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir. 1987). It can hardly be said that Dr. Moline intended "at the inception" of her research to use the information on her Article's subjects to disseminate it to the public for the betterment of society. On the contrary, at the inception, she obtained that information <u>in her capacity as an expert witness</u> for the "betterment" of her work as an expert witness. *See also, e.g., In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.,* 249 F.R.D. 8, 11 (D. Mass. 2008) (this involved a subpoena to the New England

48304334v.1

23

**JA522**

Journal of Medicine (a third-party with no relationship to the underlying litigation) for all documents regarding any studies submitted to the Journal involving Celebrex or Bextra untethered to whether that information was obtained in litigation); *Andrews v. Eli Lilly & Co., Inc.,* 97 F.R.D. 494 (N.D. Ill. 1983), *vacated sub nom. Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556 (7th Cir. 1984) (finding the lower court abused its discretion in denying Squibb discovery into a third-party researcher's registry on patients with clear cell adenocarcinoma); *Lampshire v. Procter & Gamble Co.,* 94 F.R.D. 58, 59 (N.D. Ga. 1982) (granting discovery into the CDC's study on tampons and toxic shock but requiring names be redacted when the underlying patients had no connection to the litigation).

Clearly, Dr. Moline's Article was not drafted with the privacy of the 33 subjects secured or in mind, and, as such, should not be afforded the subsequent privacy protections requested by Northwell.

**B.    Allowing Northwell to Modify A-I-I's Subpoena Would Significantly Prejudice A-I-I's Defense.**

Northwell argues that modifying A-I-I's subpoena to cover "all" subjects in Moline's Article "will not prejudice or delay Defendant A-I-I in any way." (ECF No. 266 at 11). This is plainly false. The only reason that Northwell wants to modify A-I-I's subpoena is to prevent A-I-I from questioning Dr. Moline about the participants in the study as doing so will destroy Dr. Moline's credibility and the central claim in her paper. The central premise of her Article is that cosmetic talc must have caused mesothelioma in all 33 study subjects (*i.e.,* plaintiffs) because those study subjects had no other exposures to asbestos. (Ex. C at 11; Ex. A) ("For all 33 cases, other

24

48304334v.1

**JA523**

potential exposures to asbestos were considered, with no identified source apart from the talcum powder."). A-I-I has proof that this premise is false as the plaintiffs representing the one confirmed subject, Mrs. Bell, filed two workers' compensation claims alleging exposure to asbestos during her work at Fiber Industries in the 1970s. (Ex. A at 16). As the court in *Bell* explained,

> The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's [Moline Article's] credibility.

(Ex. A at 16-17).

In addition to the *Bell* case, there are at least three other cases that appear to be ones Dr. Moline used that also involved additional exposures to asbestos, contrary to the express claims of her Article. Thus far, defendants have determined that at least four of the subjects in Moline's Article match plaintiffs for whom there is significant evidence of exposure to asbestos that is not from purportedly contaminated talc.

What Dr. Moline refers to as "Case 3" in her 2020 article aligns with the facts of the *Doris Jackson* case, a school teacher. (Ex. C; Dr. Moline's Expert Report (*Jackson*), attached hereto as "**Exhibit I**" at 3; Ronald Gordon, Ph.D.'s Tissue Digestion (Jackson), attached hereto as "**Exhibit J**" at 2) The U.S.D.C. for the District of Columbia granted a talcum powder defendant's *Daubert* motion to exclude the testimony of Ms. Jackson's expert, Dr. Ronald Gordon, because he failed to follow

**JA524**

the Helsinki Criteria in disregarding Ms. Jackson's exposure to "ceiling pipes with degrading insulation" during her more than 30 year career as a public school teacher. (*Jackson* Daubert Decision, "**Exhibit K**" at 18 (emphasis added)). The court excluded the opinion finding, "Dr. Gordon's specific causation opinion is unreliable under *Daubert.*" *Id*. Like Dr. Gordon, Dr. Moline reviewed and noted evidence of alternative exposure in her litigation report, yet she represented that "Case 3"/Doris Jackson had no asbestos exposure other than talcum powder. (Ex. I at 5).

"Case 4" aligns with *Valerie Jo Dalis* who filed a $450,000 asbestos bankruptcy trust claim based on her husband's automotive work. She received $28,000 from the Manville Personal Injury Settlement Trust related to known commercial asbestos exposure—separate and apart from her alleged talcum powder exposure. (Ex. C; Dr. Moline's Expert Report (*Dalis*), attached hereto as "**Exhibit L**" at 4; *see also* Ronald Gordon, Ph.D.'s Tissue Digestion Analysis (*Dalis*), attached hereto as "**Exhibit M**" at 2; Bankruptcy Trust claim, Claim Detail Report and Claim Information Report (*Valerie Dalis*), attached hereto as "**Exhibit N**"). Dr. Moline was aware of the asbestos bankruptcy trust claim, having received the transcripts of the depositions of both Mr. and Mrs. Dalis in preparation of or drafting her litigation report in 2016. (Ex. L). Despite this review and knowledge, Dr. Moline again misrepresented "Case 4"/Mrs. Dalis as having no exposures to asbestos other than talcum powder in her 2020 article. (Ex. C).

Case 17's facts align with *Helene Kohr*. (Ex. C; Dr. Moline's Expert Report *(Kohr)*, attached hereto as "**Exhibit O**" at 3). In her case-specific litigation report for

48304334v.1

**JA525**

Ms. Kohr, Dr. Moline acknowledged Ms. Kohr's 50 to 60 pack year smoking history, which included smoking Kent cigarettes with crocidolite asbestos-containing filters. (Ex. O). However, Dr. Moline did not include this fact in her 2020 article. (Ex. C). Thus, based on Dr. Moline's own causation opinion, "Case 17"/Helene Kohr had alternative exposures and should have been excluded from the study due to Dr. Moline's description of the scope of the study. (*Id.*).

Northwell asks this Court to aid it in continuing to mislead the medical community, judges, and jurors into believing that this Article shows a link between cosmetic talc and mesothelioma, when the underlying facts show this to be false. Because the information on these subjects' inclusion in Dr. Moline's study is critical to A-I-I's defense, modifying A-I-I's subpoena such that Northwell would not have to produce identifying information about these subjects would significantly prejudice A-I-I. As noted by the *Bell* court, concealing the identities of these subjects and their alternative exposures significantly hamstrings A-I-I's cross-examination of Dr. Moline, and it creates an obvious *Daubert* issue in that A-I-I cannot determine whether her opinions are based on "sufficient facts or data" and "reliable principles and methods" as required by Federal Rule of Evidence 702. (Ex. A at 19-29, *citing Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). For this reason, and those discussed above, the Court should deny Northwell's Motion to Modify.

## CROSS MOTION TO ENFORCE A-I-I'S SUBPOENA

A-I-I served its subpoena, dated September 27, 2022, to Northwell and, to date, Northwell has not produced the requested documents or information. As discussed

48304334v.1

**JA526**

*supra*, the items requested are highly relevant and non-production significantly prejudices A-I-I. To ensure Northwell complies with this subpoena, pursuant to Federal Rules of Civil Procedure 45, A-I-I respectfully requests that this Court grant A-I-I's Cross Motion To Enforce its Subpoena compelling Northwell to comply with the subpoena and further relief as the Court deems appropriate.

<u>CONCLUSION</u>

In light of the foregoing, A-I-I respectfully requests that this Court (i) deny Northwell's Motion to Modify Subpoena, and (ii) grant A-I-I's Cross Motion to Enforce its Subpoena pursuant to Fed. R. Civ. P. 45.

This 21st day of November 2022.

/s/ *Robert E. Thackston*
Robert E. Thackston (*pro hac vice*)
NY Bar No. 5448428
**LATHROP GPM LLP**
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Robert.thackston@lathropgpm.com

/s/ *Alfred J. Sargente*
Alfred J. Sargente, Esq.
New York Bar No. 2651750
**HAWKINS PARNELL & YOUNG LLP**
600 Lexington Avenue, 8th Floor
New York, NY 10022-7678
Telephone: (212) 897-9655
Facsimile: (646) 589-8700
asargente@hpylaw.com
***Attorneys for Defendant***
***American International Industries***

28

48304334v.1

**JA527**

## CERTIFICATE OF SERVICE

I hereby certify that, on November 21, 2022, a true and correct copy of the foregoing American International Industries' OPPOSITION TO NORTHWELL HEALTH, INC.'S MOTION TO MODIFY SUBPOENA SERVED BY DEFENDANT AND CROSS-MOTION TO ENFORCE A-I-I'S SUBPOENA was served to all registered parties and non-parties pursuant to the Federal Rules of Civil Procedure via CM/ECF NextGen.

*/s/ Robert E. Thackston*
Robert E. Thackston

48304334v.1

29

**JA528**

# EXHIBIT K

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

2022 WL 16571057
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

Lloyd BELL, individually and as
Executor of the Estate of Betty
Whitley Bell, Deceased, Plaintiff,

v.

AMERICAN INTERNATIONAL
INDUSTRIES, et al., Defendants.

1:17CV111
|
Signed September 13, 2022

**Attorneys and Law Firms**

Kevin W. Paul, Dean Omar & Branham LLP, Dallas, TX, Eric Przybysz, Frank J. Wathen, Leah C. Kagan, Simon Greenstone Panatier Bartlett, Dallas, TX, William Marc Graham, Wallace and Graham, P.A., Salisbury, NC, Joseph J. Mandia, Simon Greenstone Panatier, PC, New York, NY, for Plaintiff.

Robert E. Thackston, Kurt W. Greve, Lanita S. Morgan, Samuel Garcia, Lathrop GPM LLP, Dallas, TX, Timothy Peck, Richard A. Coughlin, Fox Rothschild LLP, Greensboro, NC, Eric A. Swan, Lathrop GPM LLP, Kansas City, MO, Nilofar Karbassi, Lathrop GPM LLP, Los Angeles, CA, for Defendant American International Industries.

**MEMORANDUM OPINION AND ORDER**

OSTEEN, JR., District Judge

  **\*1**  Before this court is Northwell Health, Inc.'s ("Northwell") Motion for Reconsideration of its Motion to Intervene and Extend Protective Order. (Doc. 388.) Also before this court is a Motion to Vacate the Preliminary Protective Order of September 25, 2020, (Doc. 368), filed by Defendant American International Industries ("AII") and joined by Defendant Whittaker, Clark & Daniels, Inc. ("WCD"), (Doc. 373). Lastly before this court are motions to seal the motion to vacate and related briefing. (Docs. 370, 375, 378, 381.) The motion for reconsideration and motion to vacate will be granted; the motions to seal will be denied.

**I. BACKGROUND**

Betty Whitley Bell ("Mrs. Bell") worked most of her career as a hairdresser and used Clubman brand talc powder for over thirty years, beginning in the 1970s, (Doc. 294-9 at 6–8),[1] and continuing through 2009, (id. at 7-8). AII purchased the Clubman brand in the late 1980s. (Doc. 294-3 ¶ 8.) Mrs. Bell was diagnosed with mesothelioma in July 2015. (Doc. 322-2 at 2; Doc. 205-11 at 5–6.)

In September 2015, Mrs. Bell filed workers' compensation claims with the North Carolina Industrial Commission, asserting that she was exposed to asbestos during prior employment with two textile employers—Hoechst Celanese Corporation and Pillowtex Corporation. (Doc. 322-2.) Mrs. Bell's claims were eventually dismissed without prejudice. (Doc. 333-3.)

Mrs. Bell filed this case in February 2017, arguing that exposure to asbestos in Clubman talc powder caused her mesothelioma. (Doc. 1.) Mrs. Bell passed away in June 2017. (Doc. 39-2 at 2.) The executor of her estate, Lloyd Bell, was substituted as Plaintiff in this action after Mrs. Bell passed. (Doc. 40.)

In April 2019, Plaintiff filed a new workers' compensation claim against Mrs. Bell's two former textile employers seeking death benefits.[2] (Doc. 322-5.) The claims were again dismissed without prejudice. (Doc. 333-11.)

In January 2020, the peer-reviewed Journal of Occupational and Environmental Medicine published an article titled "Mesothelioma Associated With the Use of Cosmetic Talc." (Doc. 274-1 at 2.) Dr. Jacqueline Moline was the article's lead author. (Id.) The article analyzed medical records and deposition transcripts for thirty-three anonymous individuals diagnosed with mesothelioma for whom Dr. Moline had conducted a "medico-legal evaluation as part of tort litigation." (Id.) The article stated that each of the thirty-three individuals had no known asbestos exposure other than talcum powder. (Id.) The article claimed to be "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users." (Id. at 5.) Prior to drafting the article, Dr. Moline received Institutional Review Board ("IRB") approval from her employer, Northwell. (Doc. 2652-1 at 2; Doc. 392-1 at 2–4.) That approval referenced federal regulations governing human subject research and waived the

**JA531**

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

requirement that Dr. Moline obtain informed consent from the individuals whose cases she planned to study. (Doc. 392-1 at 2–3.)

**\*2** Dr. Moline's work has been influential. For example, after her article had been published online, she testified to Congress about her findings. (Doc. 331-11.) In her congressional testimony she used a pseudonym—"Ms. D"—to discuss one of the thirty-three individuals analyzed for her article. (Id. at 5–6.)

Dr. Moline had been retained as an expert in this case. (See, e.g., Doc. 188-8.) Because the facts of Mrs. Bell's case paralleled the description of Ms. D in Dr. Moline's congressional testimony, AII suspected that Mrs. Bell was one of the thirty-three anonymous individuals that the article had studied. (Doc. 188 at 6-7.) If so, AII believed that would undermine the article's express premise and the related expert testimony that none of the individuals had any known exposure to asbestos other than talcum powder because Mrs. Bell and her estate filed workers' compensation claims alleging occupational exposure to asbestos from textile workplaces. (Id. at 3.) In a deposition for a different <u>mesothelioma</u> case, AII asked Dr. Moline for specifics about the thirty-three individuals. (See Doc. 188-1 at 6.) Dr. Moline declined to answer due to confidentiality concerns. (Id.) The plaintiff's counsel, who also represents Plaintiff in this case, advised AII that if it sought information regarding the thirty-three individuals, then it would have to subpoena Northwell. (Id. at 6–7.) AII did so, (Doc. 168-1), and Plaintiff moved to quash the subpoena, (Doc. 168).

After AII provided Northwell with a HIPAA authorization form signed by Plaintiff, (Doc. 179-6), Northwell produced a single five-page document (the "Northwell Document"), (Doc. 182-5). The document is a spreadsheet containing information on all thirty-three individuals the article studied, but importantly the entire document is redacted except for the row headings and the column listing Mrs. Bell's information. (Id. at 4–8.) Upon learning that this document had been disclosed, Plaintiff filed an emergency motion for a protective order pursuant to <u>Federal Rule of Civil Procedure 26(c)</u> to preclude discovery and inquiry into the identities of the thirty-three individuals. (Doc. 182 at 5–9, 12.) The motion also sought for all copies of the Northwell Document to be destroyed and not disseminated in this case or any other forum. (Id. at 12.) The motion was set for hearing. (Text Entry 09/18/2020.)

On September 25, 2020, the Magistrate Judge held that the Northwell Document could be used in this case but that it, and the information therein confirming Mrs. Bell was one of the thirty-three individuals the article studied, was "confidential and limited solely to this case." (Doc. 206 at 94, 96.) The Magistrate Judge explicitly stated that this limited protective order could potentially be reconsidered as the case progressed. (Id. at 96.) In December 2020, Northwell filed a Motion to Intervene and Extend Protective Order, seeking to prevent defense counsel from questioning Dr. Moline about any link between Mrs. Bell and the article. (Doc. 258.)

Before Northwell's motion was adjudicated, Plaintiff effectively withdrew Dr. Moline as an expert by not presenting her for deposition by the court-ordered January 7, 2021 deadline. (Order ("MJ's Order") (Doc. 309) at 3.) Accordingly, in February 2021, the Magistrate Judge denied Northwell's intervention motion as procedurally moot and untimely, as well as substantively meritless. (Id. at 3–8.) Northwell filed an objection, (Doc. 316), but this court affirmed the Magistrate Judge's decision, (Doc. 350 at 8).

**\*3** In July 2021, this court granted AII's motion for summary judgment, and judgment was entered the following month. (Doc. 361 at 12–13; See Doc. 366.) The case was closed.

On September 29, 2021, AII filed the instant motion requesting this court vacate the order protecting the identification of Mrs. Bell as one of the individuals in the article from disclosure outside this case. (Doc. 368.) AII filed a brief in support of its motion. (Def. AII's Br. in Supp. of Mot. to Vacate Prelim. Protective Order of Sept. 25, 2020 ("AII's Br.") (Doc. 369).) Codefendant WCD filed a notice that it joins in AII's motion. (Doc. 373.) Plaintiff responded in opposition to the motion, (Pl.'s Resp. in Opp'n to AII's Mot. to Vacate Prelim. Protective Order of Sept. 25, 2020 & WCD's Notice of Joinder ("Pl.'s Resp.") (Doc. 377)), and AII replied, (Def. AII's Reply in Supp. of Mot. to Vacate Prelim. Protective Order of Sept. 25, 2020 ("AII's Reply") (Doc. 380)). In June 2022, Northwell filed a motion for reconsideration of its intervention motion, (Doc. 388), accompanied by a brief, (Northwell's Suppl. Mem. of Law in Supp. of Mot. for Recons. of Mot. to Intervene and Extend Protective Order ("Northwell's Recons. Br.") (Doc. 391)). That motion is unopposed. Northwell also filed a response in opposition to AII's motion to vacate the protective order, (Northwell's Resp. in Opp'n to AII's Mot. to Vacate Prelim. Protective Order of Sept. 25, 2020 & WCD's Notice of Joinder

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

("Northwell's Resp.") (Doc. 392)), to which AII replied, (Doc. 394).

The motion to vacate and related briefing, as well as Northwell's brief supporting its reconsideration motion, have all been filed under temporary seal and are accompanied by corresponding motions to seal. (Docs. 370, 375, 378, 381, 390, 395.) AII and WCD state in their motions to seal that they do not believe the filings need to be sealed and have only filed motions to seal because Plaintiff and Northwell claim confidentiality. (Doc. 370 at 1–2; Doc. 375 at 1; Doc. 381 at 1–2; Doc. 395 at 1–2.)

## II. ANALYSIS

The motion for reconsideration, motion to vacate the protective order, and the motions to seal are all ripe for review. This court will address the motions in that order.

### A. Motion for Reconsideration

Northwell seeks reconsideration of its intervention motion so it can become an intervening party, allowing it to "adequately defend its continuing interests in this case." (Northwell's Recons. Br. (Doc. 391) at 6.) The reconsideration motion is unopposed.

After carefully reviewing Northwell's reconsideration motion and supporting brief, (Doc. 388; Northwell's Recons. Br. (Doc. 391)), this court will grant the motion to the extent necessary to admit Northwell as a formal intervening party in this case.[3] Accordingly, this court has fully considered and herein addressed the relevant arguments contained in Northwell's response to AII's motion to vacate the protective order, (Northwell's Resp. (Doc. 392)).

### B. Motion to Vacate Protective Order

**\*4** As a threshold matter, the parties disagree what standard this court should apply in adjudicating the motion to vacate the protective order. AII[4] insists that the Northwell Document is a judicial record. (AII's Br. (Doc. 369) at 12.) AII maintains that because the Northwell Document is a judicial record there is a presumption of public access that "can be rebutted only if 'countervailing interests heavily outweigh the public interests in access.' " (Id. at 13 (quoting BASF Agro B.V. v. Makhteshim Agan of N. Am., Inc., 1:10cv276, 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013)).) Plaintiff and Northwell disagree that the Northwell Document qualifies as a judicial record and contend that the motion to vacate must

be justified by "good cause" pursuant to Federal Rule of Civil Procedure 26(c). (Pl.'s Resp. (Doc. 377) at 12; Northwell's Resp. (Doc. 392) at 7–8.)

"The type of documents or information which will be revealed by the modification to the protective order directly bears on the decision to modify.... [If] the documents are so-called 'judicial documents,' any presumption in favor of maintaining confidentiality must now contend with a presumption in favor of public access." SmithKline Beecham Corp. v. Synthon Pharms., Ltd., 210 F.R.D. 163, 167 (M.D.N.C. 2002). That right of public access "derives from two independent sources: the common law and the First Amendment." Va. Dep't of State Police v. Wash. Post, 386 F.3d 567, 575 (4th Cir. 2004). But "the mere filing of a document with a court does not render the document judicial." Hatch v. Demayo, No. 1:16cv925, 2020 WL 6161533, at *5 (M.D.N.C. Oct. 21, 2020) (internal quotation marks omitted) (quoting In re Policy Mgmt. Sys. Corp., 67 F.3d 296 (table), Nos. 94–2254 & 94-2341, 1995 WL 541623, *4 (4th Cir. 1995)).

Rather, "documents filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." In re. U.S. for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 290 (4th Cir. 2013). Applying that definition, court filings may be judicial records if "they were filed with the objective of obtaining judicial action or relief." Id. at 291. Crucially, however, "courts in this circuit have found that documents filed to facilitate protective orders and other discovery motions do not qualify as judicial records." United States ex rel. Thomas v. Duke Univ., No. 1:17cv276, 2018 WL 4211375, at *4 (M.D.N.C. Sept. 4, 2018) (collecting cases). Fourth Circuit courts have ruled similarly regarding documents filed to facilitate motions to seal. E.g., id. (concluding that "motions to seal concern procedural issues similar to those requesting protective orders [and thus] ... do not qualify as 'judicial documents' ").

Here, AII argues that the Northwell Document is a judicial record because it was attached to AII's Opposition to Northwell Health's Objections and Appeal and "has also been the subject of numerous motions." (AII's Br. (Doc. 369) at 12.) But that Opposition to Northwell's Objections and Appeal and each of those motions were filed in relation to the protective order, discovery, or sealing requests. (See e.g., Docs. 168, 179, 331.) Therefore, the Northwell Document does not qualify as a judicial record, and no presumptive right

JA533

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

of public access attaches. See United States ex rel. Thomas, 2018 WL 4211375, at *4.

Because no public right of access has presumptively attached, AII's motion is not governed by the First Amendment or common law but rather the "good cause" standard from Federal Rule of Civil Procedure 26(c), the rule providing for protective orders. While the rule itself does not address modification of protective orders, "[a] district court has discretionary authority to modify a protective order it has previously entered 'for what it deems good cause shown.' " Schaefer v. Fam. Med. Ctrs. of S.C., LLC, C/A No. 3:18-cv-02775-MBS, 2019 WL 2135675, at *12 (D.S.C. May 16, 2019) (quoting United States v. (Under Seal), 794 F.2d 920, 928 n.6 (4th Cir. 1986)); accord In re Kolon Indus. Inc., 479 F. App'x 483, 485–86 (4th Cir. 2012). As in this case, "[a] final judgment ... does not diminish the district court judge's right to lift or to modify [protective] orders." Factory Mut. Ins. v. Insteel Indus., Inc., 212 F.R.D. 301, 303 (M.D.N.C. 2002). Because the parties did not stipulate to a protective order, and instead Plaintiff moved for a protective order during discovery and that motion was granted—the finding of that good cause for the protective order was necessarily established, see Longman v. Food Lion, Inc., 186 F.R.D. 331, 333 (M.D.N.C. 1999)—"[t]he party seeking to modify a protective order bears the burden of showing good cause for the modification." SmithKline Beecham, 210 F.R.D. at 166.

   *5 In determining whether that party has shown good cause, courts consider four factors: "[1] the reason and purpose for a modification, [2] whether a party has alternative means available to acquire the information, [3] the type of protective order which is at issue, and [4] the type of materials or documents which are sought." Id.; accord Am. Heartland Port, Inc. v. Am. Port Holdings, Inc., 53 F. Supp. 3d 871, 880–81 (N.D.W. Va. 2014); Schaefer, 2019 WL 2135675, at *12. As will be discussed, the first factor weighs in AII's favor, the second in Plaintiff's favor, the third is neutral, and the fourth in AII's favor. This court finds that because more factors weigh in favor of vacating the protective order than preserving it, AII has met its burden to show good cause, and the protective order will be vacated. Each factor will now be addressed in turn.

## 1. Reason for Modification

AII seeks to vacate the protective order to allow for "public access to data that undermines claims that plaintiffs' experts and counsel continue to present to courts and factfinders." (AII's Br. (Doc. 369) at 13.) AII explains that the purpose of its motion is "to prevent Moline and others from misrepresenting to courts, juries, and the public the truth about a study supposedly showing that cosmetic talc causes mesothelioma." (Id. at 14.) AII argues that if the order protecting the Northwell Document is lifted, then it will be able to debunk "the false narrative that only plausible asbestos exposures in the 33 cases were from contaminated cosmetic talc" because it will be able to show that at least one of the individuals the article studied, Mrs. Bell, "had alternative exposures to asbestos at her job sites." (Id. at 14, 16.) AII explains that it "and other defendants continue to be confronted with Moline's [a]rticle in litigation, and other plaintiffs' experts rely on it as support for their opinions." (Id. at 17.) AII asserts that plaintiffs in these other cases are using the protective order from this case "as a shield against cross-examination" to prevent the discrediting of the article. (Id. at 16.)

Plaintiff disagrees that the Northwell Document undermines the article's claims. (See Pl.'s Resp. (Doc. 377) at 15–16.) Plaintiff insists that the workers' compensation claims do not establish that Mrs. Bell in fact had alternative exposure to asbestos at the textile workplaces; rather, those claims are merely unsupported allegations. (Id.) Moreover, Plaintiff and Northwell argue that "Defendants may effectively cross-examine Dr. Moline on the exact issue they have with the Moline Study without disclosing ... Mrs. Bell's identity." (Id. at 16; see also Northwell's Resp. (Doc. 392) at 11.) Plaintiff points to trial testimony in a California state court case as an example. (Id.)

In essence, AII seeks to vacate the protective order so the Northwell Document can be used in other litigation. This is "the most forceful" grounds for modifying a protective order and "builds on a long line of cases recognizing the propriety of access to the fruits of one litigation to facilitate the preparation of other cases." 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2044.1 (3d ed. Apr. 2022 update) But nevertheless "[a] court should be hesitant to modify protective orders for matters unrelated to the litigation in front of it because ... modifying protective orders for other litigation involves re-litigation over issues that that have nothing to do with the lawsuit in front of the court ... [and can] burden[ ] both the court and the parties." SmithKline Beecham, 210 F.R.D. at 166 (internal citation omitted). Moreover, "[s]uch modifications [risk] involv[ing] the court in a controversy with which it is not familiar and over which it lacks control." Id.

JA534

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

**\*6** AII's reason for seeking to vacate the protective order seems to outweigh those concerns. While this court is hesitant to justify a modification of its own protective order solely in light of collateral cases, it also recognizes that the issues and controversies in those collateral cases intimately intersect with those litigated in this case. Further, although this court agrees with Plaintiff that the mere existence of the unsuccessful workers' compensation claims does not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces, Mrs. Bell nonetheless made statements to the Industrial Commission, while represented by counsel, that she had sustained an occupational disease caused by exposure to asbestos during employment with Hoechst Celanese Corporation and Pillowtex Corporation. (Doc. 322-2 at 2.) The alleged occupational disease was mesothelioma. (Doc. 322-3 at 2.) As Mrs. Bell's counsel explained, "[s]he made a [workers' compensation] claim because she thought she might have been exposed." (Doc. 322-7 at 6.) Mrs. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the "33 cases ... had no known exposure to asbestos other than prolonged use of talcum powder." (Doc. 274-1 at 5.) The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility. This court expressed concern about this seeming contradiction before, (Doc. 350 at 7 n.2), and does so again.

This court's concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide. For example, Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial. (See Doc. 369-1.) The plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos: "Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this." (Doc. 369-2 at 6–7.) Dr. Moline has given testimony in many other cosmetic talc cases. (See Doc. 197-1 at 19.) Moreover, other expert witnesses have begun relying on the article for the basis of their opinions. (see, e.g., Doc. 331-13 at 4; Doc. 331-14 at 3; Doc. 331-15 at 3.) [O]ne [expert] describe[ed] it as "the only peer-reviewed paper that [he]

know[s]" to support the conclusion that cosmetic talc use by hairdressers releases material amounts of asbestos into the air. (Doc. 188-14 at 6–7.)[5] When entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller specifically discussed the article's integral role in supporting the plaintiffs' claims. (Doc. 380-1 at 98–99.)

This court finds that with the protective order in place defense counsel in cosmetic talc cases across the country are stymied from effectively cross-examining plaintiff expert witnesses on the article's foundation. The following exchange from Dr. Moline's cross-examination in the California state trial is illustrative:

Q ... Other than cosmetic talc, you eliminated anybody from your study who might have had other asbestos exposures; is that correct?

A To the best of my knowledge, yes.

Q Okay. And after you published the paper and testified in Congress about the paper, did you come to learn that some of the information regarding one or more of the people in your study was incorrect as published?

A There was a question about one particular individual that I was presented with information about, but I — based on the information that I had, there was — it wasn't determined that they had the — any additional exposure. I'm not sure of any others.

....

Q Did you publish an errata with regard to your paper after you found out that this one plaintiff that was provided to you had other alleged exposures?

A As I said just a minute ago, there was an allegation or there was a — a comment, but it was shown to be without evidence, so I did not publish an errata based on that one individual.
(Doc. 377-1 at 6.)

Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure "was shown to be without evidence." (Id.) Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. (See id.) If the order was not in place, then defense counsel in that case— and defense counsel in similar cosmetic talc cases—would be able to establish that Mrs. Bell was one of the individuals

JA535

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

the article studied and then challenge Dr. Moline with Mrs. Bell and Plaintiff's workers' compensation claims asserting, under criminal penalty for false statements, that Mrs. Bell was exposed to asbestos at textile job sites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits, rather they were dismissed without prejudice, (Docs. 333-3, 333-11), weakening the credibility of Dr. Moline's statement that the allegation of alternative exposure "was shown to be without evidence."

   *7 Perhaps more significant than this example of a hamstrung cross-examination is the Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) issue created by concealment of Mrs. Bell's possible exposure. Dr. Moline testified that "based on the information ... it wasn't determined that [the research subjects] had ... any additional exposure." (Doc. 377-1 at 6.) Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, Daubert imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594, 113 S.Ct. 2786 (internal citations omitted). Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.

Plaintiff quotes Mrs. Bell's diagnosing pathologist who asserted "these requests go far beyond ... appropriate investigation into scientific merit or arguments that are made in the scientific literature." (Pl.'s Resp. (Doc. 377) at 14 (quoting Doc. 179-8 at 11).) But Plaintiff fails to recite what this doctor considers "appropriate investigation into scientific merit." (Id.)

From this court's perspective, inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is ... a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." Daubert, 509

U.S. at 594–95, 113 S.Ct. 2786. Even if reliability is examined by a court and deemed sufficient to support admissibility, relevant cross-examination of an expert includes "factual underpinnings [which] ... affect the weight and credibility of the witness' assessment." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation mark omitted) (quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)).

In this case, a principal factual underpinning of the article is that in all thirty-three cases studied "no identified source apart from the talcum powder" was identified. (Doc. 274-1 at 2.) The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the factual underpinning of no known exposure to asbestos other than talcum powder.

This is the reason why AII seeks to vacate the protective order: to be able to challenge the article's fundamental premise that none of the thirty-three individuals had any known alternative asbestos exposures. This is a valid purpose, especially given the groundbreaking nature and widespread influence of the article. Mrs. Bell's workers' compensation claims, and her employment at the textile facilities, is clearly relevant to the article's findings. If presented with Mrs. Bell's workers' compensation claims, Dr. Moline and other expert witnesses for cosmetic talc plaintiffs may be able to persuasively explain that they do not constitute known alternative exposures because the claims never amounted to more than unproven allegations. But at a minimum, defendants in cosmetic talc cases deserve a fair opportunity to explore the weight to be assigned to Dr. Moline's facts and conclusions—an opportunity not previously available due to the absence of information stemming from the previous cloak of anonymity. Simply because Dr. Moline and her colleagues may have a good answer as to why the workers' compensation claims do not undermine the article's credibility does not foreclose an otherwise relevant inquiry. Therefore, the first factor—reason for modification of the protective order—weighs heavily in favor of vacating the order.

2. **Alternative Means to Acquire the Information**

   *8 AII quotes language from the Magistrate Judge suggesting that it would be inappropriate in other cases to seek the release of Mrs. Bell's inclusion in the article. (AII's Br. (Doc. 369) at 24 (quoting Doc. 220-2 at 8).) AII argues that if it cannot disclose Mrs. Bell's inclusion in the article in future

**JA536**

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

cases, then "Plaintiff's counsel is essentially given free rein to commit fraud—provided they never disclose as an expert in any of the 32 remaining cases that were included in her study." (Id. at 24–25; see also AII's Reply (Doc. 380) at 13.)

In evaluating whether to modify a protective order, courts must assess whether the movant can "obtain the information in ways other than requesting a modification of the protective order" because "a motion to modify a protective order in order to use material in other litigation should, in most cases, be the last resort of a party, not the first." SmithKline Beecham, 210 F.R.D. at 168–69. For example, prior to seeking a protective order's modification, a party in the other litigation should seek to obtain the information via a third-party subpoena. See id. "The third-party subpoena route has the added benefit of allowing the court in which the main litigation is pending to make the ruling. This may be particularly appropriate when relevancy of the discovery is a significant issue" because "[t]he court in which the litigation is pending will be in a better position to decide relevancy issues." Id. at 169 n.7. Additionally, "where the material sought would not be discoverable in the collateral litigation ... the court should be inclined to deny modification" of a protective order. Wright & Miller, supra, § 2044.1.

Here, AII has not alleged that it is devoid of alternative means to acquire the information it seeks. While AII recites the Magistrate Judge's statement that it may be inappropriate in other cases to seek the Northwell Document identifying Mrs. Bell, (AII's Br. (Doc. 369) at 24 (quoting Doc. 220-2 at 8)), AII never states that it has actually tried and failed to get that document in any other case through the use of a third-party subpoena or any other mechanism. Because "a motion to modify a protective order in order to use material in other litigation should, in most cases, be the last resort of a party, not the first," SmithKline Beecham, 210 F.R.D. at 169, this court is wary of vacating the protective order without any allegation that AII has exhausted alternative means. And even if AII had actually tried and failed in another case to get the Northwell Document identifying Mrs. Bell, this court would not be disposed to undercut that ruling by modifying the protective order because "where the material sought would not be discoverable in the collateral litigation" courts "should be inclined to deny modification." Wright & Miller, supra, § 2044.1.

Finally, this court notes that even with the protective order in place, defense counsel in other cosmetic talc cases have

ascertained that Mrs. Bell was one of the anonymous thirty-three individuals. (E.g., Doc. 340-2 at 5–8.) To do this, they cross-referenced Dr. Moline's congressional testimony, Examining Carcinogens in Talc and the Best Methods for Asbestos Detection: Hearing Before the Subcomm. on Econ. & Consumer Pol'y of the H. Comm. on Oversight & Reform, 116th Cong. 8–9 (2019) (statement of Dr. Jacqueline Moline, Professor, Feinstein Institutes for Medical Research at Northwell Health), with her unsealed expert report evaluating Mrs. Bell, (Doc. 205-11). (E.g., Doc. 340-2 at 5–8.) This demonstrates that defendants in other cosmetic talc cases have alternative means of acquiring the information that Mrs. Bell was one of the individuals the article studied, undermining AII's insistence that the Northwell Document is needed to establish this fact.[6]

**\*9** For these reasons, the second factor—alternative means to acquire the information—weighs against vacating the protective order.

### 3. Type of Protective Order

AII notes that unlike cases where the parties "enter into a protective order prior to a document production to 'facilitate discovery,' " here "the parties did not stipulate to a protective order." (AII's Reply (Doc. 380) at 3–4 (quoting Factory Mut. Ins., 212 F.R.D. at 305).) AII stresses that the document was produced by a third party, and AII has consistently opposed protecting it. (See id.) AII also insists that the protective order shielding the Northwell Document was always intended to be a preliminary ruling as evidenced by the fact that the Magistrate Judge "more than once ... reminded the parties that the protective order was tentative and subject to reconsideration." (Id. at 4.)

Different types of protective orders are granted varying degrees of deference when deciding whether an order should be vacated. See SmithKline Beecham, 210 F.R.D. at 167.

If the protective order has been entered upon an actual finding that the information falls within Rule 26(c) protection, great care should be exercised before modifying a protective order for use outside of the litigation and the court's control. A blanket protective order, on the other hand, often is nothing more than a Fed. R. Civ. P. 29 stipulation between the parties to keep discovery confidential. A party's claimed reliance on such orders to protect confidentiality is, consequently, less than if the

JA537

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

party had to make an actual or particular showing of confidentiality in order to obtain the protective order. Id. (internal citation omitted). Additionally, less "credence may be given to reliance on ... temporary pretrial [protective orders]." Id.

The protective order at issue is not a blanket protective order that was stipulated to by the parties. Rather, it was entered by the Magistrate Judge in response to an opposed Rule 26(c) motion. (Docs. 179, 197; Oral Order 09/25/2020.) That the order was issued upon an actual, particularized finding of good cause entitles the order to more deference. See SmithKline Beecham, 210 F.R.D. at 167.

On the other hand, Plaintiff cannot claim to have reasonably relied on the protective order because the order was pretrial and explicitly temporary. See id. In issuing the order, the Magistrate Judge stated that "[i]f there is any reason to revisit that further ... then those are matters that the Court can take up once they are briefed and presented." (Doc. 206 at 96.) AII understandably concluded from this and similar statements, (see, e.g., Doc. 360 at 3 ("[T]he Court has only made preliminary determinations regarding confidentiality....")), that the protective order was preliminary and "not intended to be a final order," (AII's Br. (Doc. 369) at 4). Further discrediting any reliance interest Plaintiff may claim in the protective order is that the Northwell Document was not produced in reliance on the order's protection, rather it was produced before the order was issued.

In sum, this third factor—type of protective order at issue —cuts in both directions. Some aspects weigh in favor of Plaintiff: that the order is not a stipulated blanket order but instead a particularized order supported by a good cause finding of confidentiality. Other aspects weigh in favor of AII: that the order was pretrial, expressly preliminary, and Plaintiff cannot claim that the Northwell Document was produced in reliance on the protective order since the order issued after the document was produced. Therefore, on balance, this court finds this factor to be neutral.

### 4. Type of Document Sought[7]

**\*10**  AII insists that the information contained in the Northwell Document is not sensitive enough to warrant the protective order. (AII's Br. (Doc. 369) at 18–22.) AII argues that the article cannot be classified as human subject research, Mrs. Bell had no reasonable expectation of privacy since she

placed her health at issue by commencing this lawsuit, and the information contained in the Northwell Document is not HIPPA protected. (Id.) Plaintiff concedes that the Northwell Document is not HIPAA protected but insists that Mrs. Bell qualifies as a human research subject, and thus her identity is entitled to confidentiality protections to prevent "a chilling effect on further research." (Pl.'s Resp. (Doc. 377) at 14, 18–19.) Northwell shares the chilling effect concern and adds that even if Mrs. Bell herself is not a human research subject, the article as a whole still qualified as human subject research because of the other individuals studied. (Northwell's Resp. (Doc. 392) at 15–16.)

When the documents under protective order are highly confidential, "[t]he court may demand greater need for modification and act with more reluctance" when faced with a modification motion. SmithKline Beecham, 210 F.R.D. at 168. In contrast, "when the documents at issue do not likely involve highly confidential information ... opposition to modification carries less weight." Id. at 167. In determining what information qualifies as "highly confidential," "some documents or information will, at initial apprehension, intuitively appear to be more confidential." Id. at 167–68.

United States Department of Health and Human Services regulations confer upon "human subject" research confidentiality protections enforced by an IRB.[8] See, e.g., 45 C.F.R. § 46.111(a)(7) (2020). "Human subject" is defined as "a living individual about whom an investigator ... conducting research ... [o]btains information ... through intervention or interaction with the individual, and uses, studies, or analyzes the information or ... [o]btains, uses, studies, analyzes, or generates identifiable private information." Id. § 46.102(e)(1) (emphasis added).

Mrs. Bell does not qualify as a human subject under that regulation because by the time Dr. Moline and her coauthors "obtain[ed]," "use[d]," "studie[d]" "analyze[d]," or "generate[d]," Mrs. Bell's information for purposes of drafting the article, Mrs. Bell was no longer a "living individual." Id. Mrs. Bell died in June 2017. (Doc. 39-2 at 2.) Dr. Moline and her coauthors did not receive IRB approval for their study until March 2018. (Doc. 265-1 ¶ 17; Doc. 392-1.) However, it seems likely that some of the other individuals the article studied were living when IRB approval was granted—thus qualifying them as human subjects. Indeed, Northwell claims at least twenty-three individuals studied were still living when the study was conducted.[9] (Northwell's Resp. (Doc. 392) at 15.) Irrespective of the exact number

JA538

of living individuals, the fact that at least some of the individuals studied were alive when the IRB reviewed the article's application is corroborated by the IRB approval's statement that the "research must be conducted in accordance with ... Department of Health and Human Services regulations CFR 46," which provides protection for human research subjects.[10] (Doc. 392-1 at 3; accord Doc. 265-1 ¶ 20.)

*11 Thus, although the article as a whole likely qualified as human subject research, Mrs. Bell herself was never a human subject because she was deceased by the time the study began. While being part of a larger study that qualified as human subject research may have facially and incidentally granted Mrs. Bell greater confidentiality protections, this court is hesitant to give much weight to those protections that were not crafted with the goal of protecting the privacy of deceased individuals like Mrs. Bell. This is consistent with caselaw that indicates Mrs. Bell's privacy interest in her study participation was always, and remains presently, diminished because she was deceased. (MJ's Order (Doc. 309) at 7 n.2 (citing Wessler v. DOJ, 381 F. Supp. 3d 253, 259 (S.D.N.Y. 2019)). That Mrs. Bell was not a human subject also renders inapposite the caselaw Plaintiff has marshalled, as well as much of the regulatory scheme that Northwell exhaustively recites. (See Pl.'s Resp. (Doc. 377) at 14 (citing Lampshire v. Procter & Gamble Co., 94 F.R.D. 58 (N.D. Ga. 1982); Doe v. Am. Red Cross Blood Servs., 125 F.R.D. 646 (D.S.C. 1989)); see Northwell's Resp. (Doc. 392) at 9–18.)

Moreover, since Mrs. Bell was not a human subject, that invalidates Plaintiff and Northwell's argument that the disclosure of human subjects would have a chilling effect on academic research. (See Pl.'s Resp. (Doc. 377) at 14; Northwell's Resp. (Doc. 392) at 12–13.) Here, no human subject's identity is being disclosed. Additionally, as to Plaintiff and Northwell's chilling effect concern, this court remains ever "cognizant that 'the ability to conduct probing scientific and social research supported by a population willing to submit to in-depth questioning' depends on the guarantee that the researcher will take steps to ensure confidentiality." (MJ's Order (Doc. 309) at 5 (quoting Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985)).) But Northwell's argument that "[f]orcing the disclosure of the identities of research subjects ... would significantly dissuade individuals from agreeing to participate in human subject research," neglects the fact that Mrs. Bell never agreed to participate in Dr. Moline's research because the study was not required to obtain informed consent from any of the individuals studied. (See Doc. 392-1 at 2.)

Critically, the Northwell Document redacts all information on other individuals, (see Doc. 331-17), some of whom likely qualify as human subjects thus entitling them to greater confidentiality protections than Mrs. Bell. Additionally, the information the Northwell Document contains is not sensitive; all that is listed is Mrs. Bell's name, the brands of talc she used, the name of the law firm representing her, her occupation, and her mesothelioma diagnosis date.[11] (Id.) Given Mrs. Bell put all that information at issue by filing this lawsuit, that information is a far cry from the sort of document or information that "at initial apprehension, intuitively appear[s] to be more confidential." SmithKline Beecham, 210 F.R.D. at 168. In fact, all the information in the Northwell Document—and indeed much more sensitive medical information—is already contained in this case's publicly available filings. (See, e.g., Doc. 205-11.) Consequently, this court finds that Mrs. Bell's privacy interests do not justify keeping the Northwell Document confidential.

Moreover, AII and Plaintiff agree that none of the information in the Northwell Document is HIPAA protected. (Compare AII's Br. (Doc. 369) at 21, with Pl.'s Resp. (Doc. 377) at 19.) Plaintiff's concession that no HIPPA-protected information is at risk of disclosure nullifies Northwell's argument that "vacating the protective order would violate the purpose of HIPPA." (Northwell's Resp. (Doc. 392) at 17 (capitalization removed).) As Northwell acknowledges, the relevant purpose of HIPPA is to benefit patients by providing privacy protections for certain types of health information. (See id. at 17 (citing 45 C.F.R. §§ 160.103, 164.502, 164.508 (2020)).) Here, the patient's representative, Plaintiff, concedes no HIPPA-protected information is at risk of disclosure. In light of this concession—not to mention the HIPPA waiver Plaintiff executed, (Doc. 179-6)—HIPPA does not seem to apply nor is its purpose violated.

*12 In that vein, this court reminds Northwell that despite its claimed "significant interest in protecting the anonymity of research participants," (Northwell's Resp. (Doc. 392) at 12), it "does not appear to have any remaining privacy interest in the fact of Ms. Bell's participation in Dr. Moline's study," (MJ's Order (Doc. 309) at 7). That is because "[i]n a medical research study, the interest in confidentiality belongs primarily to the study participant, not the researcher or sponsoring facility." (Id.) Here, that study participant chose to publicly expose the fact of her mesothelioma by filing a complaint in this case, (Doc. 1), and the workers'

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

compensation claim she chose to file, alleging she was exposed to asbestos in the textile industry, is publicly available, (See Doc. 322-2).

Finally, this court notes that AII seeks to vacate the protective order to un-shield a single document. This matters because it can "make a difference if the proposed modification involves one or many documents." SmithKline Beecham, 210 F.R.D. at 168. While courts may be inclined to reject motions to vacate protective orders when a large number of documents would be "wholesale release[d]," "request[s] for modification not involv[ing] a limited set of documents" are more palatable. Id.

For these reasons, this court concludes that the final factor —type of document sought—weighs in AII's favor. Because the first factor weighed in AII's favor, the second in Plaintiff's favor, and the third was neutral, this last factor tips the scales decisively and establishes that AII has discharged its burden of showing good cause to vacate the protective order.[12] Accordingly, this court will grant AII's Motion to Vacate the Preliminary Protective Order of September 25, 2020. (Doc. 368.)

At this time, this court will not unseal any filings as AII's motion has not sought such action. If any party seeks to unseal any filings pursuant to this decision vacating the protective order, they should file the appropriate motion with this court.

**C. Motions to Seal**

AII's motion to vacate and the related briefing are all accompanied by corresponding motions to seal. (Docs. 370, 375, 378, 381, 390, 395.) AII and WCD explicitly state that they do not believe the motion or briefing should be sealed but have filed the motions because "Plaintiff and Northwell have claimed confidentiality with regard to certain information." (Doc. 370 at 1; see also Doc. 375.) Plaintiff effectively acknowledges that if the motion to vacate the

protective order is granted, then the motions to seal should be denied. (See Doc. 382 at 1 (recognizing that the motions to seal are contingent on "the Court's decision as to whether the protective order should be vacated"); see also Doc. 374 at 1–2.)

Because this court has decided that the Northwell Document is not entitled to confidentiality protections and thus will grant the motion to vacate the protective order, supra Section II.B., the motions to seal will all be denied. This court will seal and stay this order for 7 days to allow Plaintiff and Intervenor to review this order and determine how they wish to proceed.

**III. CONCLUSION**

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Northwell's Motion for Reconsideration of its Motion to Intervene and Extend Protective Order, (Doc. 388), is **GRANTED** insofar as Northwell is hereby admitted to the case as an intervening party.

**\*13 IT IS FURTHER ORDERED** that AII's Motion to Vacate the Preliminary Protective Order of September 25, 2020, (Doc. 368), is **GRANTED.**

**IT IS FURTHER ORDERED** that the motions to seal the motion to vacate and the related briefing, (Docs. 370, 375, 378, 381, 390, 395), are all **DENIED.**

This order is hereby **SEALED** and **STAYED** for 7 days. At the conclusion of the 7 days, this order shall be **UNSEALED** by the Clerk unless a further order is entered.

**All Citations**

--- F.Supp.3d ----, 2022 WL 16571057

Footnotes

1    All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2    Both this and the prior workers' compensation filings were subject to a state statute that criminalizes the making of false statements to obtain benefits. N.C. Gen. Stat. § 97-88.2(a).

3    Northwell's reconsideration motion was made pursuant to Federal Rule of Civil Procedure 54(b). (Doc. 388 at 1; see also Northwell's Recons. Br. (Doc. 391) at 4.) That is not the appropriate vehicle because Rule 54(b) reconsideration motions

**JA540**

Bell v. American International Industries, --- F.Supp.3d ---- (2022)

must be made "before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Here, such a judgment adjudicating all the parties' claims and liabilities has been entered. (Doc. 366.)

The appropriate vehicle for Northwell's reconsideration motion is Rule 60(b)(6), which allows this court to relieve a party from an order for any "reason that justifies relief." This court has carefully reviewed Northwell's motion and supporting brief pursuant to that Rule and finds that they provide sufficient grounds to justify relief from this court's prior order denying Northwell's intervention motion.

4    Although WCD has filed a notice that it joins AII's motion to vacate, (Doc. 373), for ease of reference this court will refer to AII as the party making the arguments in favor of vacating the protective order.

5    Evidently, at least one similar peer-review paper was published in the months after the Moline article was released. (See Doc. 282-5.)

6    Further evidence that the Northwell Document is not required to establish this information is that Plaintiff failed to redact a portion of an unsealed filing in this case that directly identifies Mrs. Bell as an article "subject." (Doc. 179 at 5 ("The Court Should Enter a Protective Order ... Requiring All Copies of Documents Identifying Betty Bell as a Subject Be Destroyed.").)

7    Some cases have examined whether a document is a "judicial document" under this fourth factor. E.g., SmithKline Beecham, 210 F.R.D. at 167–68. This court found it analytically more logical to address that as a threshold question prior to discussing the four factors. Thus, this court has already concluded that the Northwell Document is not a judicial document and will examine other concerns within the confines of the fourth factor.

8    As an initial matter, Northwell appears to concede that because Dr. Moline's study was not conducted by or on behalf of the federal government these protections for human subjects do not inherently apply. (Northwell's Resp. (Doc. 392) at 14–15.) Rather, Northwell insists the protections apply because it has voluntarily elected, as part of its "Federalwide Assurance" to the government, to have these protections apply to all its human subject research—regardless of the source of support or funding for that research. (Id.) Northwell's concession that these protections only apply because it has chosen to apply them (and has told the government about that choice), suggests to this court that these protections are not requirements imposed on Northwell by the government, but rather requirements it has imposed upon itself. Thus, nonenforcement of these protections would not seem to violate any federal requirements the government itself has imposed on Northwell.

9    Northwell has not provided any evidence to substantiate this number, preventing this court from independently corroborating Northwell's claim.

10    The IRB approval also waived the requirement that Dr. Moline and her coauthors acquire informed consent from the individuals to be studied. (See Doc. 392-1 at 2.) Northwell explains this informed consent waiver was granted because the IRB found Dr. Moline's research subjects faced no more than "a minimal risk of harm resulting from a breach of confidentiality." (Northwell's Resp. (Doc. 392) at 14 (citing 45 C.F.R. § 46.117(c)(1)(ii) (2020)).) That finding undercuts Northwell and Plaintiff's argument that research subjects would suffer great harm if their identities were disclosed.

11    The Northwell Document appears to have made a clerical error as to Mrs. Bell's diagnosis date. It states she was diagnosed with mesothelioma on "7/20/2016." (Doc. 331-17 at 6.) She was actually diagnosed a year earlier. (Doc. 322-2 at 2; Doc. 205-11 at 4–5.)

12    Alternatively, this court further finds the first factor weighs substantially in AII's favor. This court goes so far as to find the reason and purpose for the modification establish an extraordinary circumstance and a related compelling need. See S.E.C. v. TheStreet.com, 273 F.3d 222, 229 (2nd Cir. 2001). As a result, even if the third factor weighed in Plaintiff's favor, this court would reach the same result.

---

End of Document                                 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

YSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/202

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
                                                          :
BRIAN JOSEPH GREF,                                        :    Index No.:
                                                          :    Date Filed:
                                                          :
                              Plaintiff,                  :    Plaintiff designates
                                                          :    New York County
             -against-                                    :    as the place of trial
                                                          :
                                                          :    The basis of the venue is
AMERICAN INTERNATIONAL INDUSTRIES,                        :    **Defendant's Place of Business**
*individually and as successor-in-interest for the*       :
CLUBMAN BRAND, and to THE NESLEMUR                        :    **SUMMONS**
COMPANY and PINAUD COMPANY, et al.                        :
                                                          :
                              Defendants.                 :
                                                          :
See Attached Rider – FULL CAPTION                         :
------------------------------------------------------------------X

**TO THE ABOVE NAMED DEFENDANTS:**

          **You are hereby summoned** to answer the Complaint in this action and to serve a
copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of
Appearance, on the Plaintiffs' Attorney within 20 days after the service of this Summons,
exclusive of the day of service (or within 30 days after the service is complete if this Summons is
not personally delivered to you within the State of New York). In the case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Date:  New York, New York
          July 8, 2020

                                        **SIMMONS HANLY CONROY**
                                        Attorneys for Plaintiffs
                                        112 Madison Avenue
                                        New York, NY 10016
                                        Tel.: (212)784-6400

                                        James M. Kramer, Esq

                                        1

YSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/202

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X

BRIAN JOSEPH GREF,                              :

                                    Plaintiff,  :

                    -against-                    :

AMERICAN INTERNATIONAL INDUSTRIES,              :
    *individually and as successor-in-interest for the*   :
    CLUBMAN BRAND, and to THE NESLEMUR          :
    COMPANY and PINAUD COMPANY,                 :
BRENNTAG NORTH AMERICA,                         :
BRENNTAG SPECIALTIES, INC., *as successor-in-*  :
    *interest to* MINERAL PIGMENT SOLUTIONS, INC.,  :
    *as successor-in-interest to* WHITAKER CLARK :
    & DANIELS, INC.,                            :
CYPRUS AMAX MINERALS COMPANY, sued             :
    individually, doing business as, and as successor to  :
    AMERICAN TALC COMPANY, METROPOLITAN :
    TALC CO. INC., and CHARLES MATHIEU, INC and :
    SIERRA TALC COMPANY and UNITED TALC        :
    COMPANY,                                    :
CYPRUS MINES CORPORATION *individually,*       :
    *doing business as, and as successor-in-interest to*  :
    AMERICAN TALC COMPANY,                      :
    METROPOLITAN TALC CO. INC., CHARLES        :
    MATHIEU INC., CYPRUS INDUSTRIAL            :
    MINERALS COMPANY, WINDSOR                   :
    MINERALS INC., and VERMONT TALC            :
DANA CLASSIC FRAGRANCES, INC.,                  :
IMG HOLDINGS INC.,                              :
JOHNSON & JOHNSON,                              :
JOHNSON & JOHNSON CONSUMER,                     :
    COMPANIES, INC.,                            :
KOLMAR LABORATORIES, INC.,                      :
LUZENAC AMERICA INC.,                           :
PATRIARCH PARTNERS, LLC                         :
JOHN DOE 1 through JOHN DOE 75 (fictitious),    :
                                                :
                                    Defendants.  :
--------------------------------------------------------------------X

**FULL CAPTION RIDER**

2

2 of 9

**JA545**

YSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/08/202

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X
                                                    :
BRIAN JOSEPH GREF,                                  :        Index No.:
                                                    :
                                Plaintiff,          :        COMPLAINT FILED:
                                                    :
            -against-                               :        **VERIFIED COMPLAINT**
                                                    :
AMERICAN INTERNATIONAL INDUSTRIES,                  :
    *individually and as successor-in-interest for the* :
    CLUBMAN BRAND, and to THE NESLEMUR              :
    COMPANY and PINAUD COMPANY,                     :
BRENNTAG NORTH AMERICA,                             :
BRENNTAG SPECIALTIES, INC*., as successor-in-*     :
    *interest to* MINERAL PIGMENT SOLUTIONS, INC., :
    *as successor-in-interest to* WHITAKER CLARK    :
    & DANIELS, INC.,                                :
CYPRUS AMAX MINERALS COMPANY, sued                  :
    individually, doing business as, and as successor to :
    AMERICAN TALC COMPANY, METROPOLITAN             :
    TALC CO. INC., and CHARLES MATHIEU, INC and     :
    SIERRA TALC COMPANY and UNITED TALC             :
    COMPANY,                                        :
CYPRUS MINES CORPORATION *individually,*            :
    *doing business as, and as successor-in-interest to* :
    AMERICAN TALC COMPANY,                          :
    METROPOLITAN TALC CO. INC., CHARLES             :
    MATHIEU INC., CYPRUS INDUSTRIAL                 :
    MINERALS COMPANY, WINDSOR                       :
    MINERALS INC., and VERMONT TALC                 :
DANA CLASSIC FRAGRANCES, INC.,                      :
IMG HOLDINGS INC.,                                  :
JOHNSON & JOHNSON,                                  :
JOHNSON & JOHNSON CONSUMER,                         :
    COMPANIES, INC.,                                :
KOLMAR LABORATORIES, INC.,                          :
LUZENAC AMERICA INC.,                               :
PATRIARCH PARTNERS, LLC                             :
JOHN DOE 1 through JOHN DOE 75 (fictitious),        :
                                                    :
                                Defendants.         :
-----------------------------------------------------------------X

3

3 of 9

**JA546**

YSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/202

Plaintiff's complaint of the Defendants, by SIMMONS HANLY CONROY, his attorneys, respectfully alleges, upon information and belief, at all times hereinafter mentioned, as follows:

## PARTIES – PLAINTIFF

1.      Plaintiff Brian Joseph Gref resides at 10263 Whispering Forest Drive, Apartment 716, Jacksonville, FL 32257. Plaintiff Brian Gref was previously employed as, *inter alia,* a security guard, desk clerk, service technician, call center operator, medical combat technician, and presently employed as a blood technician. During his personal use of talc products, Plaintiff Brian Gref was exposed to and came in contact with Defendants' asbestos products and was also exposed to dust from Defendants' asbestos, asbestos-containing, and asbestos-contaminated products.  As a direct and proximate result of his inhalation and ingestion of asbestos dust particles and fibers from Defendants' asbestos and asbestos-contaminated products, Plaintiff Brian Gref developed mesothelioma on or about November 27, 2019.  Said injury meets the criteria for placement on the New York City Asbestos Litigation ("NYCAL") active docket as set forth in the NYCAL Case management order.

2.      Plaintiff respectfully repeats, realleges, and incorporates as set forth more fully herein all allegations contained in Simmons Hanly Conroy Standard Complaint for New York City Asbestos Litigation filed with the Court under Index No. 40,000 on June 16, 2015 as it pertains to the Defendants in the aforementioned caption.

3.      Reference herein to plaintiff and/or plaintiff's decedents is reference to all the persons set forth above as is syntactically and contextually correct.

4

4 of 9

**JA547**

YSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/08/202

## PARTIES - DEFENDANTS.

4.    Defendant AMERICAN INTERNATIONAL INDUSTRIES, individually and as successor-in-interest for the CLUBMAN BRAND, and to THE NESLEMUR COMPANY and PINAUD COMPANY is a corporation and was doing business in the State of New York.

5.    Defendant BRENNTAG NORTH AMERICA is a corporation and was doing business in the State of New York.

6.    Defendant BRENNTAG SPECIALTIES, INC., as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC., as successor-in-interest to WHITAKER CLARK & DANIELS, INC., is a corporation and was doing business in the State of New York.

7.    Defendant CYPRUS AMAX MINERALS COMPANY, sued individually, doing business as, and as successor to AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC and CHARLES MATHIEU, INC and SIERRA TALC COMPANY and UNITED TALC COMPANY is a corporation and was doing business in the State of New York.

8.    Defendant CYPRUS MINES CORPORATION individually, doing business as, and as successor-in-interest to AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., CHARLES MATHIEU INC., CYPRUS INDUSTRIAL MINERALS COMPANY, WINDSOR MINERALS INC., and VERMONT TALC is a corporation and was doing business in the State of New York.

9.    Defendant DANA CLASSIC FRAGRANCES, INC. is a corporation and was doing business in the State of New York.

10.   Defendant IMG HOLDINGS INC. is a corporation and was doing business in the State of New York.

5

YSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 07/08/202

11.     Defendant JOHNSON & JOHNSON is a corporation and was doing business in the State of New York.

12.     Defendant JOHNSON & JOHNSON CONSUMER COMPANIES, INC. is a corporation and was doing business in the State of New York.

13.     Defendant KOLMAR LABORATORIES, INC. is a corporation and was doing business in the State of New York.

14.     Defendant LUZENAC AMERICA INC. is a corporation and was doing business in the State of New York.

15.     Defendant PATRIARCH PARTNERS, LLC is a corporation and was doing business in the State of New York.

16.     John Doe 1 through John Doe 50 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who mined, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

17.     John Doe 51 through John Doe 75 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who are the alter ego of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

18.     The term "Defendant" is used hereafter to refer to all of the entities named above.

19.     At all relevant times the Defendants have done business in this state, have transacted business in this state, have committed one or more tortuous acts within this state, and

6

JA549

YSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/202

otherwise have performed acts within or without the state which have given rise to the injuries and losses hereafter described, and which subjects them to jurisdiction of the courts of this state.

20.      Plaintiff hereby incorporates by reference all allegations set forth in the Standard Verified Complaint filed with the Court under Index No. 40,000 on June 16, 2015 in accordance with the Case Management Order entered by Justice Freedman respecting asbestos litigation. Copies of the Standard Complaint are available upon written request.

## PUNITIVE DAMAGES

21.      Defendants and each of them had a duty to refrain from willful, reckless and wanton acts, omissions and/or misconduct which would foreseeably harm Plaintiff Brian Gref and/or expose Plaintiff Brian Gref to harm.

22.      Defendants and each of them breached said duties in that one or more of the above-described acts and/or omissions constitute willful, reckless, and wanton misconduct and manifests an intentionally and reckless disregard for the health, safety, and well-being of Plaintiff Brian Gref and others similarly situated.

23.      As a direct and proximate result of such willful, reckless, and wanton acts and/or omissions on the part of the Defendants and each of them, Plaintiff Brian Gref was exposed to asbestos as described, causing Plaintiff Brian Gref to develop mesothelioma and thereby sustain damages as outlined above as against each Defendant.

24.      In addition to compensatory damages, an award of punitive damages is necessary and appropriate to punish Defendants and each of them for their willful, wanton and intentional misconduct and reckless disregard for the health, safety and well-being of Plaintiff Brian Gref, and to deter Defendants and others from engaging in like misconduct in the future.

25.      WHEREFORE, Plaintiff demands and prays judgment against Defendants and each of them, jointly, severally or in the alternative, as follows:

<div align="center">7</div>

<div align="center">**JA550**</div>

YSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/202

 

    a.  Compensatory damages on each cause of action in an amount to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

    b.  Punitive damages in amounts to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

    c.  An award of interest (pre- and post- judgment), costs and disbursements incurred in this action; and,

    d.  Such other and further relief as this Court deems appropriate.

26.    In accordance with the Case Management Order entered on June 20, 2017, a copy of Plaintiff's Social Security records were ordered on January 8, 2020 and will be made available to Defendants.

Dated: New York, New York            **SIMMONS HANLY CONROY**
       July 8, 2020

                                              James Kramer, Esq.
                                            112 Madison Avenue, 7th Floor
                                            New York, New York 10016-7416
                                            Attorneys for Plaintiff

**OF COUNSEL**
SIMMONS HANLY CONROY
Drew Sealey (IL Id. No. 6294584)
One Court Street
Alton, Illinois 62002
Tele: (618) 259-2222
Fax: (618) 259-2251

YSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/08/202

STATE OF NEW YORK        )

                         )

COUNTY OF NEW YORK  )

      The undersigned, an attorney admitted to practice in the Courts of New York State, shows:

      Deponent is a member of the firm SIMMONS HANLY CONROY, Trial Counsel for the Plaintiff in the within action; deponent has read the foregoing Summons and Verified Complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true. This Verification is made by deponent and not by Plaintiff because Plaintiff resides outside of the County of New York where the deponent maintains his office.

Dated: July 8, 2020

James M. Kramer, Esq.

9

9 of 9

JA553

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                         :

BRIAN JOSEPH GREF,                           :      Docket No.: 1:20-cv-05589
                                               :
                          Plaintiff,     :      AMENDED COMPLAINT
               -against-                  :
                                               :

AMERICAN INTERNATIONAL INDUSTRIES,
   *individually and as successor-in-interest for the*
   CLUBMAN BRAND, and to THE NESLEMUR
   COMPANY and PINAUD COMPANY;
BRENNTAG NORTH AMERICA;
BRENNTAG SPECIALTIES, INC., *as successor-in-*
   *interest to* MINERAL PIGMENT SOLUTIONS, INC.,
   *as successor-in-interest to* WHITTAKER CLARK
   & DANIELS, INC.;
COLGATE-PALMOLIVE COMPANY *as successor-in*
   *Interest to* THE MENNEN COMPANY;
CYPRUS AMAX MINERALS COMPANY, *sued*
   *individually, doing business as, and as successor to*
   AMERICAN TALC COMPANY, METROPOLITAN
   TALC CO. INC., and CHARLES MATHIEU, INC and
   SIERRA TALC COMPANY and UNITED TALC
   COMPANY;
CYPRUS MINES CORPORATION *individually,*
   *doing business as, and as successor-in-interest to*
   AMERICAN TALC COMPANY,
   METROPOLITAN TALC CO. INC., CHARLES
   MATHIEU INC., CYPRUS INDUSTRIAL
   MINERALS COMPANY, WINDSOR
   MINERALS INC., and VERMONT TALC;
DANA CLASSIC FRAGRANCES, INC.;
IMG HOLDINGS INC.;
JOHNSON & JOHNSON;
JOHNSON & JOHNSON CONSUMER COMPANIES,
   INC.;
KOLMAR LABORATORIES, INC.;
LUZENAC AMERICA INC.,;
PATRIARCH PARTNERS, LLC;
SHULTON, INC.
THE PROCTER & GAMBLE MANUFACTURING
   COMPANY *as successor-in-interest to* SHULTON INC.;
WHITTAKER CLARK & DANIELS, INC.;

1

WHITTAKER CLARK & DANIELS, INC.                         :
   *Individually and as successor to* CHARLES MATHIEU, :
   INC. and METROPOLITAN TALC CO.;                  :
JOHN DOE 1 through JOHN DOE 75 (fictitious),            :
                                        :
                         Defendants.   :
------------------------------------------------------------------------X

     Plaintiff's complaint of the Defendants, by SIMMONS HANLY CONROY, his attorneys,

respectfully alleges, upon information and belief, at all times hereinafter mentioned, as follows:

### NATURE OF THE ACTION

     1.    Plaintiff BRIAN JOSEPH GREF resides at 10263 Whispering Forest Drive,

Apartment 716, Jacksonville, FL 32257. Plaintiff Brian Gref was previously employed as, *inter*

*alia,* a security guard, desk clerk, service technician, call center operator, medical combat

technician, and presently employed as a blood technician. During his daily use of cosmetic talc

products, Plaintiff Brian Gref was exposed to and came in contact with Defendants' asbestos-

containing talc products from approximately 1982 until 2019. Plaintiff purchased, used, and was

exposed to asbestos from the use of Defendants' talcum powder in the United States, including in

but not limited to, New York where he stayed for an extended period of time during the relevant

time period. Plaintiff Brian Gref would apply and/or be exposed to the Defendants' Asbestos

Contaminated Products at least once and often twice per day during the relevant time period as he

used Defendants Asbestos Contaminated Products as part of his daily hygiene routine. As a direct

and proximate result of his inhalation and ingestion of asbestos dust particles and fibers from

Defendants' asbestos and asbestos-contaminated products, Plaintiff Brian Gref developed

mesothelioma on or about November 27, 2019.

     2.    This is a product liability action arising out of Defendants' negligent design,

manufacture and sale of talc and talcum powder-based products which were contaminated

**JA556**

with asbestos. Plaintiff alleges that BRIAN GREF used and was exposed to AMERICAN INTERNATIONAL INDUSTRIES, *individually and as successor-in-interest for the* CLUBMAN BRAND, and to THE NESLEMUR COMPANY and PINAUD COMPANY (hereinafter "CLUBMAN"), DANA CLASSIC FRAGRANCES, INC. (hereinafter "ENGLISH LEATHER"), COLGATE-PALMOLIVE COMPANY *as successor-in-interest to* THE MENNEN COMPANY (hereinafter "MENNEN"), THE PROCTER & GAMBLE MANUFACTURING COMPANY *as successor-in-interest to* SHULTON INC. (hereinafter "OLD SPICE"), and SHULTON INC. (hereinafter "OLD SPICE II") talcum powder products in the United States, which were contaminated with asbestos for decades.

3.    As a result of his exposure to asbestos-contaminated talc and/or talcum powder products that Defendants designed, mined, milled, managed, manufactured, supplied, sold and/or distributed, Plaintiff developed mesothelioma. In addition, Plaintiff alleges that Defendants defectively manufactured, designed, tested, marketed and produced their talcum powder products, when they knew or should have known of an alternative design, manufacturing process and testing process which would eliminated the potential for asbestos contamination of their products.

4.    Defendants CLUBMAN, ENGLISH LEATHER, MENNEN, OLD SPICE I and II, KOLMAR LABORATORIES, INC. (hereinafter "KOLMAR"), BRENNTAG NORTH AMERICA, Defendant BRENNTAG SPECIALTIES, INC., *as successor-in-interest to* MINERAL PIGMENT SOLUTIONS, INC., *as successor-in-interest to* WHITAKER CLARK & DANIELS, INC. (hereinafter "BRENNTAG"), CYPRUS AMAX MINERALS COMPANY, *sued individually, doing business as, and as successor to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., and CHARLES MATHIEU, INC and SIERRA TALC

3

**JA557**

COMPANY and UNITED TALC COMPANY (hereinafter "CAMC"), CYPRUS MINES CORPORATION *individually, doing business as, and as successor-in-interest to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., CHARLES MATHIEU INC., CYPRUS INDUSTRIAL MINERALS COMPANY, WINDSOR MINERALS INC., and VERMONT TALC (hereinafter "CMC"), DANA CLASSIC FRAGRANCES, INC. (hereinafter "DANA" or "ENGLISH LEATHER"), LUZENAC AMERICA INC. (hereinafter "LUZENAC"), WHITTAKER CLARK & DANIELS, INC. (hereinafter "WCD I"), and WHITTAKER CLARK & DANIELS, INC., *Individually and as successor to* CHARLES MATHIEU, INC. and METROPOLITAN TALC CO. (hereinafter "WCD II") were engaged in mining, milling, producing, processing, bagging, designing, manufacturing, marketing, supplying, delivering, distributing, using, purchasing, importing, exporting, compounding, selling and/or otherwise placing into the stream of commerce: (i) raw talc and/or talc ore contaminated with asbestos fibers of various kinds and grades; and/or (ii) asbestos- contaminated talcum powder products, specifically CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II talc powder (hereinafter referred to by name or as "Asbestos Contaminated Products").

5.    Upon information belief, Defendants IMG HOLDINGS INC. (hereinafter "IMG") and PATRIARCH PARTNERS, LLC (hereinafter "PATRIARCH") engaged in the management, supply, capitalization, distribution, and/or otherwise placing in the stream of commerce asbestos-containing talcum powder manufactured by ENGLISH LEATHER.

6.    Brian Gref personally used CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II talcum powder as part of his daily hygiene routine from approximately 1995 until 2019. In addition, Plaintiff's parents applied, as designed and intended, CLUBMAN and ENGLISH LEATHER talcum powder to Brian Gref from the time of his birth in 1982 until

4

**JA558**

approximately 1987. Plaintiff's parents applied Defendants' talcum powder multiple times per day after they changed his diapers and bathed him, and for several years after Plaintiff stopped wearing diapers to prevent rashes and general skin irritation.

7.    As a result of the above activities, Plaintiff was exposed to asbestos dust and asbestos fibers through the normal and anticipated use of said Asbestos Contaminated Products.

8.    During the relevant time period, Plaintiff was exposed – directly and/or indirectly- on numerous occasions to talcum powder products which were mined, produced, processed, designed, manufactured, marketed, supplied, delivered, distributed, used, purchased, tested, specified, controlled, imported, exported, compounded, sold or otherwise placed in the stream of commerce by Defendants.

9.    Plaintiff was unavoidably exposed to, inhaled and ingested asbestos fibers contained within and emanating from the Defendants' Asbestos Contaminated Products and/or as a result of Defendants' actions, omissions and/or failures to act.

10.    At all relevant times, Defendants knew or should have known of the health hazards associated with exposure to asbestos.

11.    At all relevant times, Defendants knew or should have known that the Asbestos Contaminated Products that they mined, milled, designed, manufactured, supplied, sold and/or distributed were and are contaminated with asbestos fibers.

12.    As a direct and proximate result of Plaintiff's exposure to-and consequential inhalation and ingestion of asbestos fibers and dust, as contained within and emanating from the Defendants' Asbestos Contaminated Products or otherwise as a result of Defendants' actions or failures to act, Plaintiff developed a progressive, debilitating asbestos-related disease, specifically

5

**JA559**

mesothelioma, and consequential damages, including, without limitation, pain and suffering, mental anguish, and medical expenses.

13.    Plaintiff alleges that Plaintiff's exposure to Defendants' Asbestos Contaminated Products caused or substantially contributed to his asbestos-related injuries such that the Defendants are jointly and severally liable to him for same.

## PARTIES - DEFENDANTS

14.    Plaintiff Brian Gref resides at 13221 Pecky Cypress Drive, Jacksonville, FL 32223

15.    Defendant AMERICAN INTERNATIONAL INDUSTRIES, *individually and as successor-in-interest for the* CLUBMAN BRAND, and to THE NESLEMUR COMPANY and PINAUD COMPANY is a California corporation duly organized and existing under and by virtue of the laws of the State of California

16.    Defendant AMERICAN INTERNATIONAL INDUSTRIES, *individually and as successor-in-interest for the* CLUBMAN BRAND, and to THE NESLEMUR COMPANY and PINAUD COMPANY maintained its principal place of business and corporate headquarters in California.

17.    Defendant BRENNTAG NORTH AMERICA is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

18.    Defendant BRENNTAG NORTH AMERICA maintained its principal place of business and corporate headquarters in Pennsylvania.

19.    Defendant BRENNTAG SPECIALTIES, INC., *as successor-in-interest to* MINERAL PIGMENT SOLUTIONS, INC., *as successor-in-interest to* WHITTAKER CLARK & DANIELS, INC., is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

6

**JA560**

20.    Defendant BRENNTAG SPECIALTIES, INC., *as successor-in-interest to* MINERAL PIGMENT SOLUTIONS, INC., *as successor-in-interest to* WHITTAKER CLARK & DANIELS, INC., maintained its principal place of business and corporate headquarters in New Jersey.

21.    Defendant COLGATE-PALMOLIVE COMPANY *as successor-in-interest to* THE MENNEN COMPANY is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

22.    Defendant COLGATE-PALMOLIVE COMPANY *as successor-in-interest to* THE MENNEN COMPANY maintained its principal place of business and corporate headquarters in New York.

23.    Defendant CYPRUS AMAX MINERALS COMPANY, *sued individually, doing business as, and as successor to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC and CHARLES MATHIEU, INC and SIERRA TALC COMPANY and UNITED TALC COMPANY is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

24.    Defendant CYPRUS AMAX MINERALS COMPANY, *sued individually, doing business as, and as successor to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC and CHARLES MATHIEU, INC and SIERRA TALC COMPANY and UNITED TALC COMPANY maintained its principal place of business and corporate headquarters in Colorado.

25.    Defendant CYPRUS MINES CORPORATION *individually, doing business as, and as successor-in-interest to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., CHARLES MATHIEU INC., CYPRUS INDUSTRIAL MINERALS COMPANY,

WINDSOR MINERALS INC., and VERMONT TALC is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

26.     Defendant CYPRUS MINES CORPORATION *individually, doing business as, and as successor-in-interest to* AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., CHARLES MATHIEU INC., CYPRUS INDUSTRIAL MINERALS COMPANY, WINDSOR MINERALS INC., and VERMONT TALC maintained its principal place of business and corporate headquarters in Arizona.

27.     Defendant DANA CLASSIC FRAGRANCES, INC. is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

28.     Defendant DANA CLASSIC FRAGRANCES, INC. maintained its principal place of business and corporate headquarters in New Jersey.

29.     Defendant IMG HOLDINGS INC. is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

30.     Defendant IMG HOLDINGS INC. maintained its principal place of business and corporate headquarters in Florida.

31.     Defendant KOLMAR LABORATORIES, INC. is, a Delaware corporation, duly organized and existing under and by virtue of the laws of the State of Delaware.

32.     Defendant KOLMAR LABORATORIES, INC. maintained its principal place of business in New York.

33.     Defendant LUZENAC AMERICA, INC. is a Georgia corporation duly organized and existing under and by virtue of the laws of the State of Georgia.

34.     Defendant LUZENAC AMERICA, INC. maintained its principal place of business and corporate headquarters in Georgia.

8

**JA562**

35.    Defendant PATRIARCH PARTNERS, LLC is a Delaware corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

36.    Defendant PATRIARCH PARTNERS, LLC maintained its principal place of business and corporate headquarters in New York.

37.    Defendant THE PROCTER & GAMBLE MANUFACTURING COMPANY *as successor-in-interest to* SHULTON INC. is an Ohio corporation duly organized and existing under and by virtue of the laws of the State of Ohio.

38.    Defendant THE PROCTER & GAMBLE MANUFACTURING COMPANY *as successor-in-interest to* SHULTON INC. maintained its principal place of business and corporate headquarters in Ohio.

39.     Defendant SHULTON INC. is a New Jersey corporation duly organized and existing under and by virtue of the laws of the State of New Jersey.

40.    Defendant SHULTON INC. maintained its principal place of business and corporate headquarters in Ohio.

41.    Defendant WHITTAKER CLARK & DANIELS, INC., is a New Jersey corporation duly organized and existing under and by virtue of the laws of the State of New Jersey.

42.    Defendant WHITTAKER CLARK & DANIELS, INC. maintained its principal place of business and corporate headquarters in New Jersey.

43.    Defendant WHITTAKER CLARK & DANIELS, INC., *Individually and as successor to* CHARLES MATHIEU, INC. and METROPOLITAN TALC CO., is a New Jersey corporation duly organized and existing under and by virtue of the laws of the State of Jersey.

9

**JA563**

44.     Defendant WHITTAKER CLARK & DANIELS, INC., *Individually and as successor to* CHARLES MATHIEU, INC. and METROPOLITAN TALC CO., maintained its principal place of business and corporate headquarters in New Jersey.

45.     John Doe 1 through John Doe 50 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who mined, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

46.     John Doe 51 through John Doe 75 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who are the alter ego of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

47.     The term "Defendant" is used hereafter to refer to all of the entities named above.

48.     At all relevant times the Defendants have done business in this state, have transacted business in this state, have committed one or more tortuous acts within this state, and otherwise have performed acts within or without the state which have given rise to the injuries and losses hereafter described, and which subjects them to jurisdiction of the courts of this state.

### JURISDICTION AND VENUE

49.     On July 8, 2020, Plaintiff filed an asbestos-related lawsuit in New York State Supreme Court, County of New York, Index No. 190178/2020 naming the above captioned Defendants.

10

**JA564**

50.     On July 20, 2020, Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. by counsel and pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, filed a Notice of Removal to the United States District Court for the Southern District of New York.

51.     The Court has jurisdiction over each Defendant because each Defendant is either a resident and citizen of New York and/or has continuing minimum contacts with the State of New York, or is doing business and is engaged in substantial activity within New York, or has committed torts or breached warranties and committed acts or omissions in New York, at a time when solicitations or services were carried on within New York, by or on behalf of these Defendants and products, materials or things processed, serviced, managed, or manufactured by these corporate Defendants which resulted in personal injuries in locations inside and outside of the State, when they were used or consumed, in the ordinary course of trade.

52.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has in personal jurisdiction over each of the Defendants, because Defendant KOLMAR maintains their principal place of business in New York and Defendants are routinely present and conduct regular business in the State of New York such that requiring an appearance does not offend traditional notions of fair play and substantial justice.

53.     This Court has personal jurisdiction over the Defendants, pursuant to, and consistent with, the Constitutional requirements of Due Process in that the Defendants acting through agents or apparent agents, committed one or more of the following:

   a.   Defendants transacted business in the State of New York; and

   b.   Defendants made or performed a contract or promise substantially connected within the State of New York.

11

**JA565**

54.     At all times hereinafter mentioned, the the Defendants systematically, continuously, and regularly did business in the State of New York in that it places its products in the stream of commerce with actual knowledge that its products, including the above are distributed, sold and used from and in the State of New York.

55.     At all times hereinafter mentioned the Defendants were in the business, investment, and management of, milling, designing, manufacturing, supplying, selling and/or distributing products, including the Asbestos Contaminated Products to which Plaintiff was exposed, and received substantial compensation and revenue from the sale of its Asbestos Contaminated Products in the State of New York.

56.     At all times hereinafter mentioned, the Defendants had and continue to have significant sales of, as well as marketing promotion for their talcum powder products within the State of New York, including the Asbestos Contaminated Products to which Plaintiff was exposed, and are thereby subject to the jurisdiction of this State and Court.

57.     At all times relevant, the products at issue in this case, specifically talc powders, were sold, managed, designed, specified, distributed, marketed, and directed to New York.

58.     At all times herein mentioned, the Defendants, jointly and individually, were engaged in the business of, or were successors in interest to, entities engaged in the business of designing, mining, milling, manufacturing, researching, formulating, testing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising for sale, and selling the Asbestos Contaminated Products to which Plaintiff was exposed in New York. These products were for use by consumers such as Plaintiff and were used and/or applied in the same condition as when the Asbestos Contaminated products left the

12

**JA566**

Defendants' control and in the anticipated manner. As such, each of the Defendants are individually, as well as jointly and severally, liable to the Plaintiff for his damages.

59.    Venue is properly laid in this judicial district pursuant to 28 U.S.C. 1391(b)(2) as substantial parts of the events or omissions giving rise to the claim, namely, Defendants designed, manufactured, supplied, sold and/or distributed the Asbestos Contaminated Products, specifically talcum powders in this district.

60.    Venue also is proper under 28 U.S.C. §§ 1391(a), 1391(b)(1), 1391(b)(2), 1391(c)(1) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claim are in this judicial district.

## FACTUAL ALLEGATIONS

61.    Upon information and belief, at all times pertinent hereto, Defendants CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II manufactured talcum powders to which Plaintiff was exposed.

62.    Upon information and belief, at all times pertinent hereto, Defendants CLUBMAN, ENGLISH LEATHER, MENNEN, OLD SPICE I and II, BRENNTAG, CAMC, CMC, KOLMAR, LUZENAC, WCD I, and WCD II, were engaged in mining, milling, producing, processing, bagging, designing, manufacturing, marketing, supplying, delivering, distributing, using, purchasing, importing, exporting, compounding, selling and/or otherwise placing into the stream of commerce: (i) raw talc and/or talc ore contaminated with asbestos fibers of various kinds and grades; and/or (ii) asbestos- contaminated talcum powder products.

63.    Upon information and belief, at all times pertinent hereto, Defendants IMG and PATRIARCH engaged in the management, supply, capitalization, distribution, and/or otherwise

13

**JA567**

placing in the stream of commerce asbestos-containing talcum powder manufactured by DANA under the brand, trade, or manufacturer's name "ENGLISH LEATHER."

64.    Defendants committed misconduct in New York by concealing asbestos contamination, failing to warn, and marketing and selling a known dangerous product globally through its many subsidiaries.

65.    At all times relevant, Defendants developed, over-saw, controlled and performed all testing for asbestos on its finished baby powder products that were sold in New York and throughout the United States.

66.    Upon information and belief, at all times herein mentioned, Defendants CLUBMAN, ENGLISH LEATHER, MENNEN, OLD SPICE I and II, selected third party labs in the U.S. to test talcum powder that was sold throughout the United States and controlled the testing methodology, materials, and was sole recipient of the results.

67.    Upon information and belief, at all times relevant, Defendants controlled and directed all messaging and public communication, on the issue of asbestos contamination in talc from the United States.

68.    Upon information and belief, at all times herein mentioned, Plaintiff was exposed to CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II, talcum powder in the United States, including in but not limited to, New York, between approximately 1982 until 2019.

69.    At all times herein mentioned, the Defendants' talcum powder products as set forth above were contaminated with asbestos and asbestos fibers.

70.    Between approximately 1995 until 2019, Plaintiff personally used and applied CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II talcum powder,

14

**JA568**

manufactured by Defendants, as part of his daily hygiene routine. In addition, Plaintiff's parents applied, as designed and intended, CLUBMAN and ENGLISH LEATHER talcum powder to Plaintiff Brian Gref from the time of his birth in 1982 until approximately 1987. Plaintiff's parents applied Defendants' talcum powder to Plaintiff multiple times per day after they changed his diapers and bathed him. Plaintiff's parents continued to apply Defendants' powder to Plaintiff Brian Gref for several years after he stopped wearing diapers to prevent rashes and general skin irritation.

71.     The Defendants incorporated raw talc and talc ore during the manufacturing and blending of their Asbestos Contaminated Products.

72.     The talc ore used as an ingredient in Defendants' talcum powder and sold by the Defendants was contaminated with asbestos fibers due to the location and manner in which it was mined.

73.     The normal and anticipated use and application of Defendants' Asbestos-Contaminated Products produced dangerous levels of airborne asbestos fibers which Plaintiff breathed in.

74.     As a result of his exposure to the Asbestos-Contaminated Products mined, milled, designed, manufactured, supplied, sold and/or distributed by Defendants, Plaintiff was diagnosed with mesothelioma, an aggressive, incurable and terminal cancer caused exclusively by exposure to asbestos fibers, in November of 2019.

75.     The dangers of talc and the understanding that mined talc was contaminated with asbestos can be traced back to the 1930's where a number of clinical reports indicated that talc workers were suffering from pneumoconiosis, a disease which causes symptoms similar to

15

**JA569**

asbestosis. By the 1960's talc miners had been identified as having an increased risk of lung cancer. Additionally, in the 1960's, tremolite asbestos fibers were identified in cosmetic talc products.

76.     During the 1970's, the FDA became concerned about the possibility of asbestos contamination of cosmetic talc products, and called upon the cosmetic talc industry, including the Defendants, to discuss the analytical methods they were employing to test for the presence of asbestos fibers. In 1972, Dr. Seymour Lewin of New York University, under contract with the FDA, tested 102 samples of commercial talc products, including Defendants' products, and found over 40 percent to contain asbestos fibers. These results were published in major newspapers, including the New York Times, and disseminated amongst those in the cosmetic industry, including the Defendants.

77.     In response to these findings, the FDA announced a proposed rule in the Federal Register which would require that cosmetic talc products to be at least 99.9% free of amphibole and/or chrysotile asbestos fibers, to be considered safe.

78.     In 1971 the FDA expressed concerns regarding asbestos in consumer talc products to those in the cosmetics industry, including Defendants. In response, Defendants should have: (a) directly informed consumers of these risks by including a warning label on their talc and talcum powder products; (b) instructed consumers on the safe handling, application and use of their products in order to minimize or eliminate exposure to respirable asbestos fibers; (c) utilized testing methods for their products that were precise enough to detect asbestos fibers; (d) changed talc source in their products; (e) removed talc as an ingredient and incorporated a reasonable alternative design, such as corn starch or mica (f) removed their talc products from the stream of commerce as they were defective and could

16

cause consumers to be exposed to asbestos fibers, which would subject patients to unreasonable risk, including risk of death.

79.    Defendants knew or should have known about the presence of asbestos in their products based on their own internal testing results.

80.    Upon information and belief, testing of CLUBMAN, ENGLISH LEATHER, MENNEN, and OLD SPICE I and II talcum powder has shown that it has been consistently and pervasively contaminated with asbestos for decades.

81.    Defendants failed to include warnings with their Asbestos Contaminated Products regarding the presence of asbestos fibers, or the health hazards associated with asbestos exposure.

82.    Defendants failed to include instructions with their products regarding the safe handling and use of the products, which could minimize or eliminate exposure to asbestos fibers. If Defendants had timely and adequately warned Plaintiff of this risk, Plaintiff's injuries would have been avoided.

83.    Upon information and belief, not only did Defendants fail to warn about the presence of asbestos fibers in their products, they actively concealed the fact that these products could be contaminated with asbestos fibers through misrepresentation regarding the purity of their talc and by employing less stringent analytical methodologies to certify that asbestos was not detected in their products, thus misleading consumers into believing that these products were safe and free of asbestos fibers.

84.    Defendants knew or should have known and notified consumers that their consumer talc products were defectively and improperly designed in that the raw talc and/or talc ore used as the main ingredient in these products was contaminated with asbestos fibers,

17

**JA571**

the inhalation of which could put consumers at risk for developing several asbestos-related diseases, including mesothelioma.

## COUNT I
## NEGLIGENCE AS AGAINST ALL DEFENDANTS

85.    Plaintiff repeats, reiterates and incorporates herein the prior and subsequent allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

86.    Plaintiff Brian Gref frequently and regularly was exposed to the Asbestos Contaminated Products mined, milled, produced, processed, designed, manufactured, marketed, supplied, delivered, distributed, purchased, imported, exported, converted, compounded, removed, sold, or otherwise placed in the stream of commerce by Defendants. Said exposure directly and proximately caused him to develop an asbestos-related disease, specifically mesothelioma.

87.    At all times pertinent hereto, Defendants acted through their duly authorized agents, servants and employees who were then and there acting in the course and scope of their employment and in furtherance of Defendants' business.

88.    Plaintiff Brian Gref was necessarily and unavoidably exposed to and did inhale and ingest asbestos fibers from Defendants' Asbestos Contaminated Products.

89.    As a proximate result of the exposure to asbestos from Defendants' Asbestos Products and/or Asbestos Contaminated Products, Plaintiff Brian Gref developed an asbestos-related disease, specifically mesothelioma.

90.    At all relevant times, Defendants knew or should have known that the products they designed, milled, mined, manufactured, supplied, sold and/or distributed were consistently and pervasively contaminated with asbestos.

91.    At all relevant times, Defendants knew or with reasonable diligence should have known and/or ascertained that their Asbestos Contaminated Products were inherently dangerous

18

and hazardous to the health and well-being of persons using, exposed to or otherwise coming in contact with Defendants' Asbestos Contaminated Products.

92.    At all relevant times, Defendants knew or with reasonable diligence should have known and/or ascertained that the inherent dangers posed by their Asbestos Contaminated Products were beyond the expectations of the ordinary user or handler who would come into contact with said Asbestos Contaminated Products.

93.    Defendants knew or with reasonable diligence should have known and/or ascertained that the reasonable and anticipated use of, exposure to or contact with their Asbestos Contaminated Products would cause the release of asbestos fibers and dust, creating a danger and unreasonable risk of injury and harm to those in the vicinity of such Asbestos Contaminated products.

94.    Defendants knew or with reasonable diligence should have known and/or ascertained that Plaintiff would use or come into contact with Defendants' Asbestos Contaminated Products, and in so doing, would become exposed to, inhale and ingest the asbestos fibers as they were discharged and released from said Asbestos Contaminated Products in the course of ordinary and foreseeable contact, application and use thereof.

95.    Defendants knew or with reasonable diligence should have known and/or ascertained that Plaintiff used, came into contact with and was exposed to asbestos fibers emanating and released from Defendants' Asbestos Contaminated Products without any knowledge of the dangers and potential risk of harm to which he was thereby being subjected.

96.    Despite knowledge of the unsafe and dangerous nature and properties of asbestos, Defendants willfully, recklessly and negligently:

        a.    failed to warn the public at large, and specifically Plaintiff Brian Gref, of the dangers and hazards associated with or caused by the use of,

exposure to or contact with Defendants' Asbestos Contaminated Products resulting from the ordinary, anticipated and foreseeable use thereof;

b.   failed to study, investigate and/or properly test their Asbestos Contaminated Products for both potential and actual hazards associated with the use of, exposure to and contact with said products when said products were used in a reasonably foreseeable and anticipated manner;

c.   failed to communicate or convey their suspicions and knowledge with respect to potential or actual dangers and health hazards associated with the use of, exposure to or contact with their Asbestos Contaminated Products resulting in inhalation and ingestion of asbestos fibers by the users and consumers of said Asbestos Contaminated Products;

d.   failed to design or redesign their Asbestos Contaminated Products to prevent, impede or minimize the release of airborne inhalable and ingestible asbestos fibers;

e.   failed to design their Asbestos Contaminated Products to prevent, impede or minimize the asbestos contamination of their product and/or its component parts or ingredients.

f.   failed to properly design and manufacture their Asbestos Contaminated Products to insure safe use and handling by users and consumers under conditions that were reasonably anticipated and foreseeable;

g.   failed to advise the public at large, and specifically Plaintiff Brian Gref of the necessity for protective garments, safety equipment and appliances to protect the user/consumer from harm caused by inhalation and ingestion of asbestos fibers released by, and associated with the ordinary and foreseeable use of and contact with Defendants' Asbestos Contaminated Products;

h.   failed to institute, adopt or enforce appropriate safety protocols for handling and use of their Asbestos Contaminated Products and to communicate same to individuals, including Plaintiff, working with, utilizing, handling or otherwise coming into contact with said products;

i.   failed to adequately package and/or design the packaging of their

20

respective Asbestos Contaminated Products in a manner which would ensure safe handling and use by those individuals, including Plaintiff, who Defendants knew or should have reasonably anticipated would be exposed to asbestos fibers and dust released by and associated with the ordinary and foreseeable use of Defendants' Asbestos Products and/or Asbestos Contaminated Products;

j.   failed to remove their Asbestos Contaminated Products from the stream of commerce, despite knowledge of the unsafe and dangerous nature and condition of said Asbestos Products and/or Asbestos Contaminated Products;

k.   continued to mine, produce, process, design, manufacture, market, supply, deliver, distribute, use, purchase, import, export, convert, compound, and/or sell Asbestos Contaminated Products for general application and purposes without any alteration or change, despite the potential and known health hazards and dangers posed to the foreseeable and anticipated users and consumers of said Asbestos Contaminated Products;

l.   failed to timely develop and utilize substitute materials for use in their Asbestos Contaminated Products and/or develop non-hazardous substitutes that could have been used for the same purposes as their Asbestos Contaminated Products;

m.   failed to design or redesign their Asbestos Contaminated Products to prevent, impede or minimize the release of inhalable and/or ingestible asbestos fibers and dust;

n.   failed to recall and/or issue a post-sale warning for their Asbestos Contaminated Products;

o.   failed to provide warnings, advice, instructions or information to Plaintiff so that he may have made an adequate and informed judgment as to the use of Defendants' Asbestos Contaminated Products; and

p.   failed to develop, make available and/or provide non-hazardous materials which could have been used for the same purpose as their Asbestos Contaminated Products.

97.   Defendants, individually and as a group, since the early 1900s possessed medical and scientific data which clearly indicated that asbestos and, consequently, Asbestos Contaminated Products were hazardous. Further, since at least as early as 1971, Defendants possessed knowledge

21

regarding the potential for the talc and/or talc ore used in their products was contaminated with asbestos fibers. However, in pursuit of pecuniary motives, Defendants, individually and collectively, suppressed, ignored and/or failed to act upon said knowledge and medical and scientific data and conspired to deprive the public, and particularly users of their Asbestos Contaminated Products, including Plaintiff, of said knowledge and medical and scientific data. Therefore, Defendants deprived the public at large, including Plaintiff, of the opportunity of free choice regarding whether or not to expose themselves to Defendants' Asbestos Contaminated Products. Defendants further willfully, intentionally and wantonly failed to warn Plaintiff of the serious bodily harm which would result from the inhalation and ingestion of asbestos fibers from their Asbestos Contaminated Products.

98.     Defendants' continued mining, production, processing, design, manufacture, marketing, supply, delivery, distribution, installation, use, purchase, importation, exportation, conversion, compounding, and/or sale of their respective Asbestos Contaminated Products under the circumstances and conditions enumerated above demonstrates a callous, reckless, willful, depraved and wanton indifference to and disregard of the health, safety and welfare of the public at large, including Plaintiff

99.     As a result of the Defendants' negligence and recklessness, Plaintiff unwittingly and unavoidably inhaled and ingested asbestos fibers, which resulted in the development of his asbestos-related disease and injuries. Plaintiff has been caused to endure severe physical pain and suffering and mental anguish and has been placed at increased risk for developing other serious bodily injuries. Plaintiff had expended sums of money for medical care, treatment and monitoring related to his exposure to asbestos and his asbestos related disease and sequelae. Plaintiff was prevented from pursuing his normal activities and employment, was deprived of his ordinary

22

**JA576**

pursuits and enjoyment of life as a result of his mesothelioma. Plaintiff has suffered pecuniary losses as a result of his asbestos-related injuries.

100.   Plaintiff's injuries are a direct and proximate result of the negligence and carelessness of Defendants and their demonstrated wanton and reckless disregard for Plaintiff's safety and well-being.

101.   Defendants' utter failure to use reasonable care under all the circumstances is the proximate cause of Plaintiff's asbestos-related disease and injuries.

102.   By reason of the foregoing Plaintiff suffered and continues to suffer great pain, personal injuries, agony, mental anguish, emotional distress, surgeries, hospitalization, physical impairment, and economic losses.

103.   That no negligence on the part of the Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

104.   As a direct and proximate cause of the Defendants' negligence, breach of warranties, both expressed and implied, and strict liability in tort, Plaintiff contracted mesothelioma and suffers from various diverse injuries and attendant complications related to his mesothelioma diagnosis, endured great pain and suffering, and mental anguish.

105.   It was foreseeable to the Defendants that Plaintiff and others similarly situated, would be injured as a result of their actions, inactions and misconduct.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally for:

    a.   Compensatory damages;

    b.   Punitive damages;

    c.   Pre-judgment and post judgment interest;

**JA577**

    d.  Costs;

    e.  Attorney fees and litigation expenses; and

    f.  Such other relief as the Court may deem just and proper.

## COUNT II
## BREACH OF WARRANTY AS AGAINST ALL DEFENDANTS

106.    Plaintiff repeats, reiterates and incorporates herein the prior and subsequent allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

107.    The Defendants conduct and/or have conducted business in New York at all times relevant herein, including but not limited to, the sale, management, distribution, marketing, design formulation, processing and/or manufacturing of their talc/talcum powder, including asbestos contaminated talc/talcum and other finished and unfinished asbestos containing and/or asbestos contaminated products to which Plaintiff was exposed.

108.    The Defendants breached their warranties, both express and implied, for fitness of purpose and merchantability.

109.    In reliance on Defendants' warranties, Plaintiff Brian Gref used, came into contact with and/or was otherwise exposed to Defendants' Asbestos Contaminated Products, causing him to unknowingly and unwittingly inhale and ingest asbestos fibers resulting from the ordinary and foreseeable use of said products.

110.    The Defendants are strictly liable in tort

111.    As a direct and proximate cause of the Defendants' negligence, breach of warranties, both expressed and implied, and strict liability in tort, Plaintiff contracted mesothelioma and suffers from various diverse injuries and attendant complications related to his mesothelioma diagnosis, endured great pain and suffering, and mental anguish.

24

**JA578**

112.   It was foreseeable to the Defendants that Plaintiff and others similarly situated would be injured as a result of their actions, inactions and misconduct.

113.   That no negligence on the part of the Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

114.   That by reason of the foregoing, the Plaintiff has been damaged in an amount to be established at trial, but the damages of the Plaintiff exceed $75,000.00.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally for:

      a.   Compensatory damages;

      b.   Punitive damages;

      c.   Pre-judgment and post judgment interest;

      d.   Costs;

      e.   Attorney fees and litigation expenses; and

      f.   Such other relief as the Court may deem just and proper.

**COUNT III**
**STRICT LIABILITY AS AGAINST ALL DEFENDANTS**

115.   Plaintiff repeats, reiterates and incorporates herein the prior and subsequent allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

116.   Defendants mined, produced, processed, designed, manufactured, marketed, supplied, delivered, distributed, installed, used, purchased, imported, exported, converted, compounded, removed, sold or otherwise placed into the stream of commerce Asbestos Contaminated Products in a defective, unsafe and unreasonably dangers condition, and said

25

products were expected to and did reach users, handlers and other persons coming into contact therewith without substantial change in the condition in which they left Defendants' possession.

117.    Defendants Asbestos Contaminated Products were defective in their design, manufacture, and in its failure to provide adequate warnings, and said defect existed at the time the Products left the Defendants' possession and control.

118.    Defendants' Asbestos Contaminated Products did not contain a warning and/or information concerning the asbestos-related dangers posed to persons using, handling or otherwise coming into contact therewith.

119.    Defendants' Asbestos Contaminated Products were defectively designed and during the relevant time period, Defendants were aware of a reasonable alternative design that would have altered the dangerous and defective condition.

120.    Defendants' Asbestos Contaminated Products did not contain adequate and correct warnings or instructions regarding safety precautions to be observed by users, handlers and persons who would foreseeably use or otherwise come into contact with said products.

121.    At all relevant times, Defendants' Asbestos Contaminated Products were being employed for the purpose and in the manner that was intended and foreseeable. The defects of Defendants' Asbestos Contaminated Products were not discoverable by Plaintiff through the exercise of reasonable care, the dangers of said products were not perceivable by Plaintiff, and Plaintiff would not have otherwise averted his injuries by the exercise of reasonable care.

122.    Defendants' Asbestos Contaminated Products were defective and dangerous at the time they left Defendants' possession, as they contained a latent defect and were harmful, poisonous and deleterious when inhaled and/or ingested.

123.    Defendants knew or otherwise expected that their Asbestos Contaminated Products would reach the ultimate users, including Plaintiff, without substantial change from, or alteration of, the condition in which said products were originally mined, produced, processed, designed, manufactured, marketed, supplied, delivered, distributed, installed, used, purchased, imported, exported, converted, compounded, removed or sold.

124.    Defendants knew or in the exercise of reasonable diligence should have ascertained that Plaintiff and others similarly situated would be the ultimate users or consumers of Defendants' Asbestos Contaminated Products and would be exposed to asbestos dust and fibers therefrom.

125.    Defendants knew that their Asbestos Contaminated Products would be used without inspection for defects and, by placing them in the marketplace, represented to the public at large, including Plaintiff that said products could be utilized safely in the manner and for the purpose for which they were intended.

126.    Defendants knew that their Asbestos Contaminated Products were defective and were incapable of being made safe for their ordinary, intended and foreseeable uses and purposes and that these defects were not discoverable by Plaintiff, or others similarly situated, in the exercise of reasonable care. The dangers and hazards of said products were not perceivable to Plaintiff such that he might otherwise have averted his injuries by the exercise of reasonable care. In light of the foregoing, the ordinary and foreseeable use of Defendants' Asbestos Contaminated Products constituted a dangerous and hazardous activity and placed the ultimate users, including Plaintiff, at an unreasonable risk of harm and injury. The risks and dangers created by the use of Defendants' Asbestos Contaminated Products outweighed their utility.

27

**JA581**

127.    The Defendants failed to implement or use the reasonable alternative design that was easily available at the time of manufacture, and would have prevented the injury causal defect and made the product safe for its intended purpose.

128.    The Defendants, jointly and severally, marketed an ultra-hazardous product and placed that product in the stream of commerce.

129.    Defendants breached their non-delegable duty to warn and negligently supplied defective materials and products without ensuring that Plaintiff, was warned about the dangers of asbestos exposure.

130.    The Defendants aforesaid were willful, by intentionally withholding from the Plaintiff, and his family, the known dangers associated with the use of asbestos compounds, second hand exposure, household exposure and intentionally withholding from the Plaintiff and his family, knowledge that breathing in respirable asbestos fiber dust generated from asbestos-contaminated talc powder products can be fatal. Defendants issued information, which they knew to be false concerning their product safety, and did willfully, wantonly and intentionally prevent the dissemination of information known to them concerning the products' hazards and dangers, and willfully, wantonly and intentionally failed to take the appropriate steps to minimize the risks of asbestos exposure, and otherwise acted willfully, wantonly and intentionally with reference to their products

131.    As a consequence of the warning, manufacturing and design defects of Defendants' Asbestos Contaminated Products and Plaintiff's resultant inhalation and/or ingestions of asbestos fibers and dust resulting from the ordinary and foreseeable use of said products, Plaintiff has sustained serious and permanent injuries and damages as more fully described herein.

28

**JA582**

132.    Plaintiff's injuries are the direct and proximate result of Defendants' placement into the stream of commerce of defective and unreasonably dangerous Asbestos Contaminated Products.

133.    The Defendants, by virtue of the foregoing, are strictly liable to Plaintiff for injuries and illnesses resulting from the defects and dangerous propensities of their Asbestos Contaminated Products.

134.    By reason of the foregoing, Plaintiff suffered great pain, personal injuries, agony, mental anguish, emotional distress, surgeries, hospitalization, physical impairment, and economic losses.

135.    That no negligence on the part of the Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

136.    It was foreseeable to the Defendants that Plaintiff and others similarly situated, would be injured as a result of their actions, inactions and misconduct.

137.    That by reason of the foregoing, the Plaintiff has been damaged in an amount to be established at trial, but the damages of the Plaintiff exceed $75,000.00

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally for:

a.   Compensatory damages;

b.   Punitive damages;

c.   Pre-judgment and post judgment interest;

d.   Costs;

e.   Attorney fees and litigation expenses; and

f.   Such other relief as the Court may deem just and proper.

29

**JA583**

**COUNT IV**
**NEGLIGENT FAILURE TO WARN AS AGAINST ALL DEFENDANTS**

138.    Plaintiff repeats, reiterates and incorporates herein the prior and subsequent allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

139.    Defendants breached their non-delegable duty to warn and negligently marketed, sold, manufactured, designed, formulated, distributed and/or supplied defective materials and products without ensuring that Plaintiff was warned about the dangers of asbestos exposure.

140.    Plaintiff was exposed to asbestos fibers from Asbestos Contaminated Products mined, produced, processed, designed, manufactured, marketed, supplied, delivered, distributed, installed, used, purchased, imported, converted, compounded, removed, sold, or otherwise placed into the stream of commerce by Defendants.

141.    During the course of his lifetime, Plaintiff was exposed to and inhaled and/or ingested asbestos dust and fibers from Defendants' Asbestos Contaminated Products and such exposure directly and proximately caused him to develop an asbestos-related disease

142.    At all relevant times, Defendants knew or should have known that their Asbestos Contaminated Products were inherently dangerous and that such dangerous qualities were beyond the expectations and knowledge of the ordinary user or handler who would come into contact with said Asbestos Contaminated Products.

143.    Defendants negligently failed to provide adequate and proper warnings regarding the health hazards posed by their products.

144.    Defendants negligently failed to warn and failed to provide adequate instructions of safe handling methods, if any, which could have been utilized by reasonably foreseeable users, handlers and other persons came into contact with Defendants' Asbestos Containing Products.

30

**JA584**

145.    Defendants negligently failed to render warnings or advice or give instructions and information to Plaintiff so that he may have made an adequate and informed judgment as to the use of Defendants' Asbestos Contaminated Products.

146.    Defendants negligently failed to investigate and/or test for the hazards of asbestos.

147.    To the extent that a Defendant inquired as to the hazards of asbestos, Defendant negligently failed to convey to the users and consumers of its Asbestos Contaminated Products, including Plaintiff, whatever knowledge of dangers, health hazards or necessary safety precautions it discovered.

148.    Defendants, individually and as a group, since the early 1900s possessed medical and scientific data which clearly indicated that asbestos and, consequently, Asbestos Contaminated Products were hazardous. Further, since at least as early as 1971, Defendants possessed knowledge regarding the potential for the talc and/or talc ore used in their products was contaminated with asbestos fibers. However, in pursuit of pecuniary motives, Defendants, individually and collectively, suppressed, ignored and/or failed to act upon said knowledge and medical and scientific data and conspired to deprive their salesmen, and those who directly communicated with the salesmen, and the public, and particularly users of their Asbestos Contaminated Products, including Plaintiff, of said knowledge and medical and scientific data. Therefore, Defendants deprived the public at large, including Plaintiff, of the opportunity of free choice regarding whether or not to expose themselves to Defendants' Asbestos Contaminated Products. Defendants further willfully, intentionally and wantonly failed to warn Plaintiff of the serious bodily harm which would result from the inhalation and ingestion of asbestos fibers from their Asbestos Contaminated Products.

31

**JA585**

149.    Defendants' negligent and reckless failure to use reasonable care in providing adequate warnings under all of the circumstances was the direct and proximate cause of Plaintiff's injuries.

150.    As a direct and proximate result of, using or otherwise being present near Defendants' Asbestos Contaminated Products and the consequent and unavoidable inhalation and ingestion of asbestos fibers therefrom, Plaintiff developed asbestos-related injuries and endured great physical pain and suffering, mental anguish, and loss of enjoyment of his life.

151.    By reason of the foregoing, Plaintiff suffered great pain, personal injuries, agony, mental anguish, emotional distress, surgeries, hospitalization, physical impairment, and economic losses.

152.    That no negligence on the part of the Plaintiff contributed to the occurrence alleged herein in any manner whatsoever

153.    It was foreseeable to the Defendants that Plaintiff and others similarly situated, would be injured as a result of their actions, inactions and misconduct

154.    That by reason of the foregoing, the Plaintiff has been damaged in an amount to be established at trial, but the damages of the Plaintiff exceed $75,000.00.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally for:

   a.   Compensatory damages;

   b.   Punitive damages;

   c.   Pre-judgment and post judgment interest;

   d.   Costs;

   e.   Attorney fees and litigation expenses; and

   f.   Such other relief as the Court may deem just and proper.

32

**JA586**

## **PUNITIVE DAMAGES**

155.    Defendants and each of them had a duty to refrain from willful, reckless and wanton acts, omissions and/or misconduct which would foreseeably harm Plaintiff Brian Gref and/or expose Plaintiff Brian Gref to harm.

156.    Defendants and each of them breached said duties in that one or more of the above-described acts and/or omissions constitute willful, reckless, and wanton misconduct and manifests an intentionally and reckless disregard for the health, safety, and well-being of Plaintiff Brian Gref and others similarly situated.

157.    As a direct and proximate result of such willful, reckless, and wanton acts and/or omissions on the part of the Defendants and each of them, Plaintiff Brian Gref was exposed to asbestos as described, causing Plaintiff Brian Gref to develop mesothelioma and thereby sustain damages as outlined above as against each Defendant.

158.    In addition to compensatory damages, an award of punitive damages is necessary and appropriate to punish Defendants and each of them for their willful, wanton and intentional misconduct and reckless disregard for the health, safety and well-being of Plaintiff Brian Gref, and to deter Defendants and others from engaging in like misconduct in the future.

**WHEREFORE**, Plaintiff demands and prays judgment against Defendants and each of them, jointly, severally or in the alternative, as follows:

   a.  Compensatory damages on each cause of action in an amount to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

   b.  Punitive damages in amounts to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

   c.  An award of interest (pre- and post- judgment), costs and disbursements incurred in this action; and,

33

**JA587**

d.   Such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby invokes his right to a trial by jury as to all counts and issues pled against the Defendants in this case.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, on the First, Second, Third, and Fourth Counts in an amount to be determined at trial of this matter, which exceeds $75,000.00 on each Cause of Action, together with the costs and disbursements of this action, and for such other and further relief as the Court herein deems just and proper.

Dated: New York, New York
      January 29, 2021

SIMMONS HANLY CONROY

_____
James M. Kramer, Esq.
112 Madison Avenue, 7th Floor
New York, New York 10016-7416
Attorneys for Plaintiff

**OF COUNSEL**
SIMMONS HANLY CONROY
Drew Sealey (IL Id. No. 6294584)
One Court Street
Alton, Illinois 62002
Tele: (618) 259-2222
Fax: (618) 259-2251

34

**JA588**

## CERTIFICATE OF SERVICE

This is to certify that I have this December 20, 2023, electronically

filed the foregoing with the Clerk of Court using the CM/ECF system,

which will notify all registered counsel.

/S/ *Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Appellant American*
*International Industries*