No. 23-1972

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

PENINSULA PATHOLOGY ASSOCIATES,

*Petitioner-Appellee*,

v.

AMERICAN INTERNATIONAL INDUSTRIES,

*Respondent-Appellant*.

————————

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 4:22-mc-00001-AWA-DEM
Hon. Arenda L. Wright Allen, U.S. District Court Judge

————————

JOINT APPENDIX
VOLUME II OF III: JA589 – JA953

————————

Benjamin L. Hatch
Sylvia M. Kastens
MCGUIREWOODS, LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
(757) 640-3700
bhatch@mcguirewoods.com

*Counsel for Appellant*

Kathryn M. Ali
ALI & LOCKWOOD LLP
300 New Jersey Avenue NW
Suite 900
Washington, DC 20001
(202) 651-2476
katie.ali@alilockwood.com

*Counsel for Appellee*

December 13, 2023

# TABLE OF CONTENTS

**Page**

## Volume I

Docket Report, *In re Peninsula Pathology Assocs.*,
No. 4:22-mc-00001-AWA-DEM (E.D. Va.) ..................................... JA1

R.2 Exhibits Filed (Nov. 18, 2022)

R.2-1 - Motion to Quash Exhibit 1:
Declaration of David M. Smith, MD .................................... JA6

R.2-2 - Motion to Quash Exhibit 2:
Declaration of Theresa S. Emory, MD ............................... JA24

R.2-3 - Motion to Quash Exhibit 3:
Declaration of John C. Maddox, MD.................................. JA35

R.2-4 - Motion to Quash Exhibit 4:
Declaration of Kathryn M. Ali............................................ JA38

R.4 Exhibits Filed (Dec. 2, 2023)

R.4-1 - Opposition to Motion to Quash Exhibit A:
Excerpts of January 10, 2019 Deposition Transcript of
John Maddox, MD................................................................ JA41

R.4-2 - Opposition to Motion to Quash Exhibit B:
Excerpts of May 13, 2020 Deposition Transcript of John
Maddox, MD ........................................................................ JA50

R.4-3 - Opposition to Motion to Quash Exhibit C:
Various Deposition Transcript Cover Pages of John
Maddox, MD ........................................................................ JA69

R.4-4 - Opposition to Motion to Quash Exhibit D:
Various Deposition Transcript Cover Pages of Theresa
Swain Emory, MD................................................................ JA88

i

# TABLE OF CONTENTS

**Page**

R.4-5 - Opposition to Motion to Quash Exhibit E:
Research Article *Malignant Mesothelioma Following
Repeated Exposures to Cosmetic Talc: A Case Series of 75
Patients* .................................................................................. JA98

R.4-6 - Opposition to Motion to Quash Exhibit F:
Research Article *Mesothelioma Associated With the Use
of Cosmetic Talc* ............................................................... JA105

R.4-7 - Opposition to Motion to Quash Exhibit G:
Excerpts of October 6, 2021 Trial Transcript,
*Johnson v. Johnson & Johnson*, No. JCCP
4676/20STCV17335 (Cal. Super. Ct.)................................ JA116

R.4-8 - Opposition to Motion to Quash Exhibit H:
Expert Report of Jacqueline Moline, MD ......................... JA119

R.4-9 - Opposition to Motion to Quash Exhibit I:
Expert Report of Murray M. Finkelstein, PhD, MD ........ JA206

R.4-10 - Opposition to Motion to Quash Exhibit J:
American Int'l Indus. Opposition to Motion to Modify
Subpoena *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ............................................ JA499

R.4-11 - Opposition to Motion to Quash Exhibit K:
*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL
16571057 (M.D.N.C. Sept. 13, 2022)................................ JA530

R.4-12 - Opposition to Motion to Quash Exhibit L:
Verified Complaint, *Gref v. Am. Int'l Indus.* (N.Y. July 8,
2020) .................................................................................... JA543

R.4-13 - Opposition to Motion to Quash Exhibit M:
Amended Complaint, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Feb. 2, 2021)........................... JA554

# TABLE OF CONTENTS

**Page**

## Volume II

R.4-14 - Opposition to Motion to Quash Exhibit N:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. June 10, 2021) ................................ JA589

R.4-15 - Opposition to Motion to Quash Exhibit O:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Oct. 13, 2021) ................................ JA592

R.4-16 - Opposition to Motion to Quash Exhibit P:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Jan. 27, 2022) ................................ JA595

R.4-17 - Opposition to Motion to Quash Exhibit Q:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. May 24, 2022) ................................ JA597

R.4-18 - Opposition to Motion to Quash Exhibit R:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Aug. 1, 2022) ................................ JA599

R.4-19 - Opposition to Motion to Quash Exhibit S:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Sept. 6, 2022) ................................ JA601

R.4-20 - Opposition to Motion to Quash Exhibit T:
Letter Memorandum, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Nov. 7, 2022) ........................... JA603

R.4-21 - Opposition to Motion to Quash Exhibit U:
Third Amended Notice of Videotaped Deposition of Dr.
Gregory Diette, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Nov. 22, 2022) ................................ JA624

# TABLE OF CONTENTS

**Page**

R.4-22 - Opposition to Motion to Quash Exhibit V:
Second Amended Notice of Videotaped Deposition of Dr.
Suprith Badarinath, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Jan. 7, 2022)............................ JA629

R.4-23 - Opposition to Motion to Quash Exhibit W:
Amended Notice of Videotaped Deposition of Dr. Ehsan
Shirazi, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Jan. 7, 2022) ...................................................... JA634

R.4-24 - Opposition to Motion to Quash Exhibit X:
Plaintiff's Supp. Interrogatory, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y. Jan. 19, 2022)........... JA639

R.4-25 - Opposition to Motion to Quash Exhibit Y:
Defendant's Response to Plaintiff's Supp. Interrogatory,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Feb. 18, 2022) ................................................... JA648

R.4-26 - Opposition to Motion to Quash Exhibit Z:
Excerpt of Defendant's Supp. Request for Admission,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Apr. 7, 2022) ...................................................... JA657

R.4-27 - Opposition to Motion to Quash Exhibit AA:
Defendant's Second Request for Production, *Gref v. Am.
Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. May 6,
2022) .................................................................................. JA662

R.4-28 - Opposition to Motion to Quash Exhibit BB:
Plaintiff's Response to Defendant's Supp. Request for
Admission, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. May 9, 2022) ............................................. JA669

iv

# TABLE OF CONTENTS

**Page**

R.4-29 - Opposition to Motion to Quash Exhibit CC:
Plaintiff's Response to Defendant's Second Request for
Production, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. June 6, 2022) .......................................... JA678

R.4-30 - Opposition to Motion to Quash Exhibit DD:
Subpoena to Produce, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Oct. 31, 2022) ......................... JA683

R.4-31 - Opposition to Motion to Quash Exhibit EE:
Excerpts of October 1, 2020 Deposition Transcript of
Theresa Swain Emory, MD, *Bell v. Am. Int'l Indus.* ........ JA688

R.4-32 - Opposition to Motion to Quash Exhibit FF:
Excerpts of August 6, 2015 Deposition Transcript of John
C. Maddox, MD, *Archdeacon v. Ameron Int'l Corp.* ......... JA699

R.8 Exhibits Filed (Dec. 8, 2022)

R.8-1 - Reply in Support of Motion to Quash Exhibit 1:
Plaintiff's Letter Motion to Compel, *Gref v. Am. Int'l
Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Nov. 21,
2022) ................................................................................ JA705

R.8-2 – Reply in Support of Motion to Quash Exhibit 2:
Defendant's Response to Plaintiff's Letter Motion to
Compel, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ........................................... JA731

R.8-3 – Reply in Support of Motion to Quash Exhibit 3:
Excerpts of September 23, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) ................................. JA735

R.8-4 – Reply in Support of Motion to Quash Exhibit 4:
Excerpts of July 6, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) ................................. JA878

# TABLE OF CONTENTS

**Page**

R.8-5 – Reply in Support of Motion to Quash Exhibit 5: Excerpts of June 22, 2022 Deposition Transcript of Murray M. Finkelstein, MD, PhD, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y.) ..................... JA892

R.8-6 – Reply in Support of Motion to Quash Exhibit 6: Supp. Declaration of Theresa S. Emory, MD, *In re Subpoena for Documents Issued to Peninsula Pathology Associates* (E.D. Va. Dec. 8, 2022) ..................................... JA902

R.8-7 – Reply in Support of Motion to Quash Exhibit 7: Plaintiff's Letter Reply in Support of Motion to Compel, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Dec. 7, 2022) ..................................................... JA910

R.8-8 – Reply in Support of Motion to Quash Exhibit 8: Excerpts of Corrected September 25, 2020 Motions Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.) ............................................................... JA914

R.8-9 – Reply in Support of Motion to Quash Exhibit 9: Excerpts of March 11, 2020 Trial Transcript, *Johnson v. Am. Int'l Indus.*, Nos. MID-L-006651-16ASL, MID-L-007336-16AS (N.J. Super. Ct.) ........................................ JA922

R.8-10 – Reply in Support of Motion to Quash Exhibit 10: Excerpts of October 13, 2022 Trial Transcript, *Fisher v. Am. Int'l Indus.*, No. 0877 (Penn. Ct. Common Pleas)..... JA937

## Volume III

R.10 – Transcript of December 16, 2022 Proceedings (Dec. 22, 2022) ................................................................ JA954

R.11 – Order Granting Motion to Quash (Dec. 23, 2022) .............. JA1012

# TABLE OF CONTENTS

**Page**

R.18 Exhibits Filed (Jan. 11, 2023)

R.18-1 - Motion re Objections to Magistrate Judge's Order
Exhibit 1: Excerpts of October 1, 2020 Deposition
Transcript of Theresa Swain Emory, MD, *Bell v. Am.
Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.) ..................... JA1020

R.18-2 - Motion re Objections to Magistrate Judge's Order
Exhibit 2: Excerpts of October 13, 2022 Trial Transcript,
*Fisher v. Am. Int'l Indus.*, No. 0877
(Penn. Ct. Common Pleas)............................................... JA1032

R.18-3 - Motion re Objections to Magistrate Judge's Order
Exhibit 3: Complaint, *In re LTL Mgmt. LLC*, No. 21-
30589 (MBK) (D.N.J. Bankr.)........................................ JA1038

R.18-4 - Motion re Objections to Magistrate Judge's Order
Exhibit 4: Scheduling Order, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y. Dec. 23, 2022)......... JA1093

R.18-5 - Motion re Objections to Magistrate Judge's Order
Exhibit 5: Order, *Burnett v. Am. Int'l Indus.* (W.D. Ark.
July 26, 2022) ................................................................ JA1097

R.20 Exhibits Filed (Jan. 25, 2023)

R.20-1 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 1: Excerpts of December 16, 2022
Motions Hearing Transcript, *Peninsula Pathology
Assocs. v. Am. Int'l Indus.*, No. 4:22mc1 (E.D. Va.)........ JA1102

R.20-2 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 2: Expert Opinion Letter............ JA1161

R.20-3 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 3: Research Article: *Exposure to
Cosmetic Talc and Mesothelioma* ................................... JA1234

vii

# TABLE OF CONTENTS

**Page**

R.20-4 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 4: Excerpts of October 1, 2020
Deposition Transcript of Theresa Swain Emory, MD, *Bell
v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1248

R.21 Exhibits Filed (Jan. 31, 2023)

R.21-1 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 1: Excerpts of October 1, 2020
Deposition Transcript of Theresa Swain Emory, MD, *Bell
v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1271

R.21-2 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 2: Notice of Judgment, *Pollock v.
Northrop Grumman Shipbuilding, Inc.*, No. 2010-07791
(La. Civ. Dist. Ct. July 29, 2010)..................................... JA1295

R.21-3 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 3: Excerpts of September 25, 2020
Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-
00111 (M.D.N.C.) ............................................................. JA1304

R.21-4 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 4: Excerpts of April 12, 2021
Hearing Transcript, JCCP No. 4674 (Cal. Super. Ct.)... JA1314

R.21-5 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 5: Research Article: *Exposure to
Cosmetic Talc and Mesothelioma* ................................... JA1322

R.21-6 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 6: Plaintiff's Motion to Dismiss, *In
re Bell*, I.C. No. 19-732863 (N.C. Indus. Comm'n Dec. 1,
2015) ................................................................................. JA1336

R.21-7 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 7: Denial of Workers'
Compensation Claim........................................................ JA1346

# TABLE OF CONTENTS

**Page**

R.21-8 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 8: Mesothelioma Claim .............. JA1355

R.21-9 - Reply in Support of Motion re Objections to Magistrate Judge's Order Exhibit 9: Defs.' Response to Motion to Dismiss, *In re Bell*, I.C. No. 19-732863 (N.C. Indus. Comm'n Jan. 8, 2020) ...................................................... JA1361

R.24 – Order Affirming Order Granting Motion to Quash (Aug. 14, 2023) ............................................................ JA1367

R.30 – Notice of Appeal (Sept. 13, 2023) ...................................... JA1371

FRAP 10(e)(2)(A) Supplement[1]

Corrected Exhibit G to Defendant's Opposition to Motion to Quash (R.4-7): Excerpts of October 6, 2021 Trial Transcript, *Johnson v. Johnson & Johnson*, No. JCCP 4676/20STCV17335 (Cal. Super. Ct.) .................................. JA1374

---

[1] The parties stipulated to supplementing the record with this corrected exhibit pursuant to FRAP 10(e)(2)(A) as one page was inadvertently omitted from the exhibit below.

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN JOSEPH GREF,<br><br>                              Plaintiff,<br><br>        -against-<br><br>AMERICAN INTERNATIONAL<br>INDUSTRIES, et al.,<br><br>                              Defendants. | 20cv05589 (GBD) (DF)<br><br>**SCHEDULING ORDER** |

**DEBRA FREEMAN, United States Magistrate Judge:**

This Court having held a telephonic initial pretrial conference on June 9, 2021, with counsel for all parties; and counsel having informed this Court that the parties had already commenced discovery, and had, *inter alia*, completed their initial disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure; it is hereby ORDERED, as stated at the conference, that:

1.      To the extent they have not already done so, the parties shall serve their initial document requests and interrogatories no later than June 25, 2021.  In their initial interrogatories, the parties may, as reasonable, seek information outside the scope of Local Civil Rule 33.3(a).

2.      Any motions to amend the pleadings or to join any additional parties shall be filed no later than August 28, 2021.

3.      All fact discovery shall be completed no later than September 30, 2021.

4.      Expert discovery shall be conducted on the following schedule:

    a.      Plaintiff's medical expert report(s) shall be produced no later than September 17, 2021;

**JA590**

     b.    Plaintiff's non-medical expert report(s), as well as Defendants' medical expert report(s), shall be produced no later than October 15, 2021;

     c.    Defendants' non-medical expert report(s) shall be produced no later than November 12, 2021;

     d.    Any rebuttal reports shall be produced no later than December 17, 2021; and

     e.    Expert depositions shall be completed no later than February 4, 2022.

5.    All discovery shall be completed no later than February 18, 2022.

6.    The parties may stipulate to modify interim deadlines in this Scheduling Order, without seeking prior leave of Court.

7.    No later than August 9, 2021, the parties shall submit a joint status letter to the Court regarding the progress of discovery and settlement discussions.

Dated: New York, New York
      June 10, 2021

                     SO ORDERED

                     _____
                     DEBRA FREEMAN
                     United States Magistrate Judge

Copies to:

All counsel (via ECF)

2

**JA591**

# EXHIBIT O



**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

*From the desk of:*
*James M. Kramer, Esq.*

**VIA ECF**
Hon. Debra C. Freeman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

October 12, 2021

> The proposed modified schedule is adopted.
> SO ORDERED
>
> _udha Fmr_
> DEBRA FREEMAN
> United States Magistrate Judge
> Dated: 10/13/2021

    Re:    *Gref v. Am. Int'l Indus.*, et al., 20-cv-05589

Dear Judge Freeman,

    Plaintiff in the above-captioned case writes to apprise the Court of the parties' progress in negotiating a mutually agreeable discovery schedule. Pursuant to the Court's directive at our most recent conference, the parties have reached an agreement that discovery should proceed according to the following modified schedule:

- All fact discovery must be completed by November 30, 2021;
- Plaintiff's medical expert reports must be served upon Defendants by December 15, 2021;
- Plaintiff's non-expert reports must be served upon Defendants by January 15, 2022;
- Defendants' medical expert reports must be served upon Plaintiff by January 15, 2022;
- Defendants' non-expert reports must be served upon Plaintiff by February 15, 2022;
- Any rebuttal reports must be served by March 15, 2022;
- Expert depositions must be completed by April 29, 2022; and
- All discovery must be completed by May 13, 2022.

    Plaintiff and the remaining Defendants request that the Case Management Order and Scheduling Order be amended to reflect the aforementioned schedule. Plaintiff's counsel stands ready should the Court have any questions.

Respectfully Submitted,

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 1350 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-5986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |



**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

cc:    All Counsel of Record (via ECF and electronic mail)

*We stand for our clients.*

HEADQUARTERS
One Court Street
Alton, IL 62002
TEL: (618) 259-2222
FAX: (618) 259-2251

NEW YORK
112 Madison Avenue
New York, NY 10016
TEL: (212) 784-6400
FAX: (212) 213-5949

CHICAGO
230 W. Monroe
Suite 2221
Chicago, IL 60606
TEL: (312) 759-7500
FAX: (312) 759-7516

SAN FRANCISCO
455 Market
Suite 1150
San Francisco, CA 94105
TEL: (415) 536-3986
FAX: (415) 537-4120

LOS ANGELES
100 N. Sepulveda Blvd.
Suite 1350
El Segundo, CA 90245
TEL: (310) 322-3555
FAX: (310) 322-3655

ST. LOUIS
231 S. Bemiston
Suite 525
St. Louis, MO 63105
TEL: (800) 479-9533

# EXHIBIT P

Case 1:20-cv-05589-GBD-DCF    Document 218    Filed 01/27/22    Page 1 of 1

 **SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

*From the desk of:*
*James M. Kramer, Esq.*

January 26, 2022

**VIA CM/ECF**
Hon. Debra C. Freeman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> The proposed modification of the discovery schedule is approved.
>
> SO ORDERED
>
> _____
> DEBRA FREEMAN
> United States Magistrate Judge
> Dated: 1/27/2022

     **Re:** *Gref v. Am. Int'l Indus.,* et al., 20-cv-05589

Dear Judge Freeman,

     The parties have conferred and are in agreement that the following discovery deadlines be amended as follows:

(i)    Plaintiff's non-medical expert reports are to be provided by March 31, 2022;

(ii)   Defendants' medical and non-medical expert reports are to be provided by April 29, 2022;

(iii)  Rebuttal reports are to be provided by May 31, 2022;

(iv)  Expert depositions are to be completed by July 15, 2022; and

(v)   All discovery is to be completed by July 29, 2022.

     If this joint request meets with Your Honor's approval, the parties respectfully request that the Court so-order the Scheduling Order amended as set forth above.

     As always, we are available at the Court's convenience if you have any questions or would like additional information.

Respectfully,

cc: All Counsel of Record via CM/ECF

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 1350 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-3986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |

**JA596**

# EXHIBIT Q

Case 1:20-cv-05589-GBD-VF   Document 232   Filed 05/24/22   Page 1 of 1

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

*From the desk of:*
*James M. Kramer, Esq.*

May 23, 2022

**VIA ECF**
Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Application Granted

Valerie Figueredo, U.S.M.J.
DATED:  5-24-2022

 **Re.** *Gref v. Am. Int'l Indus.*, et al., 20-cv-05589

Dear Judge Figueredo,

  Plaintiff writes in accord with Your Honor's request for a joint status update in the referenced matter.  The case remains on schedule and the parties are moving forward diligently according to the current deadlines.  The one exception to this is completion of expert depositions, the deadline for which currently falls on July 15, 2022.  Plaintiff and Defendants have conferred and believe that extending this deadline to July 29, 2022 will allow the parties to better coordinate coverage and logistics. Along these lines, it is respectfully requested that the parties be afforded through July 29, 2022 to complete expert depositions.

  As always, we stand ready to provide additional information or answer any questions the Court may have.

       Respectfully yours,

       James M. Kramer

cc: All Counsel of Record (via ECF)

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 3850 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-3986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |

**JA598**

# EXHIBIT R

Case 1:20-cv-05589-GBD-VF   Document 250   Filed 07/29/22   Page 1 of 1

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

*From the desk of:*
*James M. Kramer, Esq.*

July 29, 2022

**VIA ECF**
Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Application Granted

Valerie Figueredo, U.S.M.J.
DATED: 8-1-2022

    Re.    *Gref v. Am. Int'l Indus.*, et al., **20-cv-05589**

Dear Judge Figueredo,

        I write on behalf of both Plaintiff and Defendants with a joint request for an extension by which to complete expert depositions.

        The parties continue to move forward diligently according to the current deadlines but are in need of additional time to coordinate coverage and the logistics presented by the multitude of expert depositions that are proceeding in this case. Along these lines, it is respectfully requested that the parties be afforded through October 7, 2022 to complete expert depositions.

        As always, we stand ready to provide additional information or answer any questions the Court may have.

Respectfully yours,

James M. Kramer

cc:    All Counsel of Record (via ECF)

*We stand for our clients.*

HEADQUARTERS
One Court Street
Alton, IL 62002
TEL: (618) 259-2222
FAX: (618) 259-2251

NEW YORK
112 Madison Avenue
New York, NY 10016
TEL: (212) 784-6400
FAX: (212) 213-5949

CHICAGO
230 W. Monroe
Suite 2221
Chicago, IL 60606
TEL: (312) 759-7500
FAX: (312) 759-7516

SAN FRANCISCO
455 Market
Suite 1150
San Francisco, CA 94105
TEL: (415) 536-3986
FAX: (415) 537-4120

LOS ANGELES
100 N. Sepulveda Blvd.
Suite 1350
El Segundo, CA 90245
TEL: (310) 322-3555
FAX: (310) 322-3655

ST. LOUIS
231 S. Bemiston
Suite 525
St. Louis, MO 63105
TEL: (800) 479-9533

**JA600**

# EXHIBIT S

Case 1:20-cv-05589-GBD-VF   Document 252   Filed 09/06/22   Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BRIAN JOSEPH GREF,                                       :

                        Plaintiff,                       :

            -against-                                    :               ORDER

                                                         :         20 Civ. 5589 (GBD)
AMERICAN INTERNATIONAL INDUSTRIES,                       :
et al.                                                   :

                        Defendants.                      :

                                                         :

                                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

         The September 7, 2022 pretrial conference is adjourned until discovery is complete in

this case.   Once discovery is complete, the parties are to notify the Court.

Dated:   September 6, 2022
         New York, New York

                                               SO ORDERED.

                                               _George B. Daniels_
                                               GEORGE B. DANIELS
                                               UNITED STATES DISTRICT JUDGE

**JA602**

# EXHIBIT T



2101 Cedar Springs Road
Suite 1400
Dallas, TX  75201
Main: 469.983.6100

MEMO ENDORSED

HON. VALERIE FIGUEREDO
UNITED STATES MAGISTRATE JUDGE

Dated:  11-7-2022

Plaintiff is directed to file its response by November 21,
2022. A discovery conference is scheduled for
December 12, 2022 at 2:00 p.m. Counsel for the parties
are directed to call Judge Figueredo's AT&T conference
line at the scheduled time.  Please dial (888) 808-6929,
access code 9781335.

November 4, 2022

**VIA ECF**

Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

RE:   ***Brian Joseph Gref v. American International Industries, et al.***
      ***Case No.: 1:20-cv-05589-GBD-DCF***

Dear Justice Figueredo:

Defendant American International Industries (sued individually and erroneously as "*successor-in-interest for the* CLUBMAN BRAND, to THE NESLEMUR COMPANY and PINAUD COMPANY") (hereinafter "A-I-I"); Colgate-Palmolive Company, as a successor-in-interest to The Mennen Company (hereinafter "Mennen"): Shulton, Inc.; and Whittaker Clark & Daniels, Inc.; (hereinafter "Defendants") by counsel and pursuant to Fed. R. Civ. P. 26(b)(1) and (2), 30(d), and 37, collectively move to Compel the Continuation of the deposition of Plaintiff's Expert Jacqueline Moline.

I.    **INTRODUCTION**

Defendants bring this motion to compel the continuation of the deposition of Plaintiff's expert Jacqueline Moline to complete her deposition. The parties have met and conferred prior to seeking relief. Plaintiff has unilaterally attempted to limit the deposition to one additional hour. As more fully set forth below, there are compelling reasons, that are not the fault of the defendants, that additional time is needed to complete Dr. Moline's deposition.  Specifically:

(1) Dr. Moline authored an article that serves as a basis for her opinions in this case "Mesothelioma Associated With the Use of Cosmetic Talc," Journal of Occupational and Environmental Medicine, Vol. 62, No. 1, Jan. 2020, ("**Exhibit A**") ("Moline Article") which relies on false premises;

(2) Dr. Moline's Article states she examined 33 mesothelioma litigation cases—which she refuses to identify—that she claims the only possible exposure to asbestos was through contaminated cosmetic talc despite likely alternative exposures;

November 4, 2022
Page 2

(3) although Dr. Moline refuses to identify the cases, A-I-I proved one of these 33 cases was the *Betty Bell* case in North Carolina where the plaintiffs filed two workers' compensation claims for alleged occupational exposures to asbestos, with Dr. Moline being aware of both claims;

(4) Dr. Moline relies on her Article in reports and testifies about it on direct examination, but then claims various privileges to refuse to answer questions on cross examination;

(5) when A-I-I discovered the *Bell* case contradicted the foundations of her Article, Dr. Moline claimed, with no factual basis, that the workers' compensation claims were determined to be without merit;

(6) counsel for Plaintiff in this case has elicited this same false testimony from Dr. Moline at trial in the last month (the *Holly Fisher* trial in Philadelphia);

(7) initially, Dr. Moline provided a reliance list with 492 articles for her opinion in this case, though reliance and reference materials changed between the issuance of her case report, her first volume of her deposition, and her second day of deposition, so Defendants require additional time to determine the actual bases of her opinions;

(8) during her deposition, Dr. Moline brought more than half dozen additional expert reports with her that she now relies on that were not mentioned in her report;

(9) during her deposition, Dr. Moline reached new opinions based on a 17-page "Exposure Testimony Summary" sent to her by Plaintiff's counsel nine months after her initial report was produced to Defendants, these new opinions based on that summary were not disclosed until her deposition, and Plaintiff's counsel only produced this "Exposure Testimony Summary" to defense counsel the day before her deposition;

(10) throughout her deposition thus far in this case, Dr. Moline has consumed undue time with filibustering and insulting counsel; and

(11) technical issues inherent in remote depositions, plus Dr Moline finding fault with every document displayed, contributed to the time consumed thus far.

## II.   DEFENDANTS REQUIRE ADDITIONAL TIME TO EXAMINE DR. MOLINE ON HER METHODOLOGIES THAT FORMED THE BASIS FOR HER OPINIONS IN THIS MATTER

### A. There is no epidemiological link between peritoneal mesothelioma and cosmetic talc, so Defendants need additional time to examine Dr. Moline on her methodologies and reliance materials used to reach her conclusions.

Plaintiff Brian Gref is 40 years old and was diagnosed with a cancer of the lining of the abdominal cavity known as peritoneal mesothelioma. (Expert Report of Jacqueline Moline, MD,

November 4, 2022
Page 3

dated October 28, 2021, "**Exhibit B**" at pp. 6-7). This type of cancer has a weak link to asbestos (only 8% of individuals with peritoneal mesothelioma reported asbestos exposures) and, when there is a link to asbestos, the link is only associated with heavy occupational exposures. (Carbone, Michele, et al., "Mesothelioma: Scientific Clues for Prevention, Diagnosis, and Therapy" 2019; 69:402-429, "**Exhibit C**" at 421). Plaintiff has no such known exposures to asbestos. (Ex. B).

Due to this lack of known asbestos exposures, Plaintiff alleges his cancer was causes by asbestos from trace contaminants in cosmetic talcs used on him and by him. (*Id.*; Doc. 37-1). Plaintiff's mother testified she used various men's shaving powders equally to change Plaintiff's diapers. (Relevant Portions of Deposition Testimony of Karen Nappi, dated June 16, 2021, "**Exhibit D**" at 55:20-57:15, 62:23-63:2; Ex. B at 7).[1] These men's shaving powders included English Leather, Mennen, Old Spice, and Clubman. (*Id.*). They continued using these shave talcs to change Plaintiff's diaper, in equal amounts, until he was out of diapers, even having these shave talcs shipped to their home in Guantanamo Bay specifically for Plaintiff's diaper changes. (Ex. B at 7; Ex. D at 92:21-94:4). Plaintiff alleges he also personally used these same shave talcs on his groin, arms, knees, and neck. (Ex. B at p. 7).

There is no epidemiology study supporting the claim that cosmetic talc increases the risk of any kind of mesothelioma, not the kind that occurs around the lungs (pleural), and certainly not the type that occurs in abdominal cavity (peritoneal) like Plaintiff's. (Report of Dr. Tim D. Oury, PhD (*Gref*), dated May 11, 2022, "**Exhibit E**" at p. 4-5).

> "In contrast to pleural mesothelioma, MpeM [malignant peritoneal mesothelioma] is rarely associated with asbestos exposure; in a large series, only 8% of patients reported exposure, and MpeM afflicts men and women equally—as anticipated when mesothelioma is not caused by occupational exposure. However, when MpeM occurs in individuals exposed to asbestos, they usually have a higher lung fiber burden than those with pleural mesotheliomas, possibly because a higher burden is required for asbestos fibers to bypass the lung filter and reach the peritoneum in sufficient amounts to cause mesothelioma."

(Ex. C at p. 421).

Dr. Moline was deposed in this matter for one and a half days on July 6, 2022, and September 23, 2022. (Relevant Portions from Transcripts of Virtual Videotaped Deposition of Jacqueline Moline, MD, volumes 1 and 2, "**Exhibit F**" and "**Exhibit G**"). Despite the unique qualities of peritoneal mesothelioma compared to pleural mesothelioma described above, Dr. Moline testified she did not separate peritoneal and pleural mesotheliomas when utilizing her methodology in formulating her opinions. (Ex. G at p. 234:16-235:2; Ex. B at p. 21). She has not published any work on the percentage of peritoneal mesotheliomas that are related to asbestos. (Ex.

---

[1] Depositions of Plaintiff, his father, and his mother took place <u>after</u> Plaintiff settled with and dismissed Johnson & Johnson and Johnson & Johnson Consumer Inc. (Doc. 44).

**JA606**

G at p. 224:10-14). Dr. Moline's report in this case does not have any sections specific to peritoneal mesothelioma. (Ex. B; Ex. G at p. 225:9-21). She has never evaluated scientific literature supporting the conclusion that contaminated cosmetic talc can be linked to peritoneal mesothelioma. (Ex. G at pp. 239:23-240:9).

Because of the lack of epidemiology between cosmetic talc and mesothelioma (including peritoneal mesothelioma), Dr. Moline wrote an article to rely on for her testimony (and other's) that purports to find a link between talcum powder and mesothelioma. As discussed below, the claims in the article appear to be false and she refuses to answer questions about them. (*e.g.*, Ex. H, Ex. I, and Ex. V). Due to its importance to Plaintiff's case (as well as in other litigation), and because of the false basis for its conclusions, Dr. Moline must be compelled to answer questions about the litigation cases she claims to have studied which form the basis of her options in this case.

Because her opinions are unsupported by scientific literature and the lack of epidemiology, Dr. Moline developed and subsequently relied on her own article to develop a causation opinion that Plaintiff's use of cosmetic talcum powder caused his peritoneal mesothelioma. (Ex. B; Ex. C).

**B.** **Because there is no epidemiology linking cosmetic talc to mesothelioma Dr. Moline wrote an article while serving as an expert witness purporting to find such a link.**

Dr. Moline is a prolific expert for plaintiffs, first in asbestos litigation and now in the effort to make talcum powder the "next asbestos." Her opinion in this case relies on her Article where Dr. Moline assumes the mesotheliomas found the 33 individuals referenced were caused by asbestos. (Ex. B, p. 20-21; Ex. A at 11). In her article, Dr. Moline claims they had no possible source of exposure other than presumed asbestos contamination of cosmetic talc. (Ex. A at 11) Each of the 33 individual came to Dr. Moline as part of her consultation work in asbestos litigation. (Ex. A; *see also* Deposition of Jacqueline Moline, M.D. (*Lashley*), taken January 15, 2020, "**Exhibit H**", at pp. 30:24-32:6). She was not a treating physician in any of the 33 cases. (Ex. 1 at p. 31:8-11). All 33 individuals publicly put their medical condition at issue by filing lawsuits for mesothelioma. (*see, e.g.,* Ex. A; Memorandum Opinion and Order dated September 13, 2022, *Bell et al. v. American International Industries, et al.*, 1:17-cv-00111-WO-JEP, US District Court, Middle District of North Carolina "**Exhibit I**" at p. 36 ("*Bell* Order")). These individuals presumably signed releases pertaining to their medical records for use in their respective lawsuits. (Ex. 1 at 168:21-172:22 (Dr. Moline assumed the information used to write her article was in possession of defense lawyers involved in the underlying cases of the 33 individuals)). Also, Dr. Moline provided detailed medical histories of these individuals in her reports produced for purposes of litigation without claiming confidentiality or HIPAA rights were at-issue. (*see, e.g.,* Report from Dr. Moline dated May 5, 2016 (*Bell*), attached hereto as "**Exhibit J**"). Dr. Moline also provided details of individual plaintiffs' medical history (albeit without explicitly naming them) to Congress when she provided testimony at a hearing on "Examining Carcinogens in Talc and the Best Methods for Asbestos Detection." (Hearing before the Subcommittee on Economic and Consumer Policy of the committee on Oversight and Reform (Dec. 10, 2019), "**Exhibit K**").

November 4, 2022
Page 5

     Dr. Moline relies heavily on her article for her causation testimony in cosmetic talc cases. Yet, she refuses to answer any questions about the underlying litigation files on which her article is allegedly based. She claims all such information is confidential based on a variety of privileges. Dr. Moline is of course free to keep all such information private if she does not choose to serve as an expert witness or rely on her Article and testify about the cases on direct. This creates a tangled web where Dr. Moline funnels litigation files into a research article, then relies on her own Article to develop new litigation opinions, but refuses to answer questions about her article because she claims the information if privileged. (*see, e.g.,* Ex. H and Ex. I). Her positions have been fully litigated and rejected by another federal court.

### C.  Dr. Moline's Claims of Privilege Have been Adjudicated and Rejected.

     Dr. Moline's refusal to answer questions about these underlying cases is the sole subject of a 40 page opinion in *Bell v. A-I-I* from the United States District Court for the Middle District of North Carolina. (Ex. I). After a momentous effort, it was discovered that the *Bell* case was one of the litigation files Dr. Moline used in her study. Based on the known details of Mrs. Bell's case, A-I-I determined Dr. Moline's Article was based on a faulty premise: namely, that Mrs. Bell had alleged occupational exposures to asbestos from her lengthy employment at textile mills. (Ex. I). Mrs. Bell's allegations were obviously contrary to Dr. Moline's assertion in her article that "[n]o individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." (Ex. A).

     Plaintiff moved to seal all pleadings mentioning the facts of Mrs. Bell's identity, again claiming various privileges. Extensive time and effort went into plaintiff, Moline and her employer, Northwell Health, trying to keep sealed the fact that *Bell* was part of the study. After A-I-I won the case on summary judgment, it moved to unseal the *Bell* pleadings. Judge Osteen United States District Court extensively analyzed the facts and balanced privilege claims against the need for discovery of expert opinions, holding:

> Mrs. Bell nonetheless made statements to the Industrial Commission, while represented by counsel, that she had sustained an occupational disease caused by exposure to asbestos during employment with Hoechst Celanese Corporation and Pillowtex Corporation. The alleged occupational disease was mesothelioma. As Mrs. Bell's counsel explained, "[s]he made a [workers' compensation] claim because she thought she might have been exposed." **Mrs. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the "33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder." The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the**

**fact that one of the individuals claimed otherwise has direct bearing on the study's credibility.** This court expressed concern about this seeming contradiction before, and does so again.

This court's concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide. For example, Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial. The plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos: "Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this." **Dr. Moline has given testimony in many other cosmetic talc cases. Moreover, other expert witnesses have begun relying on the article for the basis of their opinions. [O]ne [expert] describe[ed] it as "the only peer-reviewed paper that [he] know[s]" to support the conclusion that cosmetic talc use by hairdressers releases material amounts of asbestos into the air.** When entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller specifically discussed the article's integral role in supporting the plaintiffs' claims.

This court finds that with the protective order in place defense counsel in cosmetic talc cases across the country are stymied from effectively cross-examining plaintiff expert witnesses on the article's foundation. The following exchange from Dr. Moline's cross-examination in the California state trial is illustrative:

> Q . . . Other than cosmetic talc, you eliminated anybody from your study who might have had other asbestos exposures; is that correct?
>
> A To the best of my knowledge, yes.
>
> Q Okay. And after you published the paper and testified in Congress about the paper, did you come to learn that some of the information regarding one or more of the people in your study was incorrect as published?
>
> A There was a question about one particular individual that I was presented with information about, but I -- based on the information that I had, there was -- it wasn't determined that they had the -- any additional exposure. I'm not sure of any others.
> [****]
> Q Did you publish an errata with regard to your paper after you found out that this one plaintiff that was provided to you had other alleged exposures?

November 4, 2022
Page 7

A   As I said just a minute ago, there was an allegation or there was a -- a comment, but it was shown to be without evidence, so I did not publish an errata based on that one individual.

Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure "was shown to be without evidence." Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case—and defense counsel in similar cosmetic talc cases—would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Mrs. Bell and Plaintiff's workers' compensation claims asserting, under criminal penalty for false statements, that Mrs. Bell was exposed to asbestos at textile job sites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits, rather they were dismissed without prejudice, weakening the credibility of Dr. Moline's statement that the allegation of alternative exposure "was shown to be without evidence."

**Perhaps more significant than this example of a hamstrung cross-examination is the Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) issue created by concealment of Mrs. Bell's possible exposure.** Dr. Moline testified that "based on the information . . . it wasn't determined that [the research subjects] had . . . any additional exposure." Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, Daubert imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594 (internal citations omitted). **Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.**

From this court's perspective, inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the

**JA610**

principles that underlie a proposed submission." Daubert, 509 U.S. at 594–
95. Even if reliability is examined by a court and deemed sufficient to
support admissibility, relevant cross-examination of an expert includes
"factual underpinnings [which] . . . affect the weight and credibility of the
witness' assessment." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195
(4th Cir. 2017) (internal quotation mark omitted) (quoting Structural
Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)).
[…]
In this case, a principal factual underpinning of the article is that in all thirty-
three cases studied "no identified source apart from the talcum powder" was
identified. (Doc. 274-1 at 2.) **The absence of any specific information on
the identities of the individuals studied precludes inquiry into the basis
of the factual underpinning of no known exposure to asbestos other
than talcum powder.**

(Ex. I at p. 16-22) (emphasis added) (internal citations omitted).

The *Bell* order was dated September 13, 2022. (*Id.*). Northwell was a party to the case at
that point and given notice of the order. (*Id.*). Northwell was also given seven days to appeal but
did not. (*Id.* at 39).

In a deposition two weeks after the *Bell* order was entered, Dr. Moline continued refusing
to answer questions about the study. (Relevant portions of Deposition of Jacqueline Moline, M.D.
(*Daigle*), taken Sept. 30, 2021, attached hereto as "**Exhibit L**", at 129:17-148:25). Dr. Moline also
repeated the false claim that Mrs. Bell's workers compensation cases were "dismissed for lack of
information or lack of evidence." (*Id.* at 133:9-15). She claimed to be unaware of the Bell order
in which Judge Osteen specifically spelled out that the Bell workers compensation claims were
not adjudicated as she has been testifying. (*Id.* at 137:7-138:8, 139:13-140:17). The pertinent
portion of the *Bell* order was even read to Dr. Moline on the record:

MR. THACKSTON: […]
Page 19 of Judge Osteen's order, which we're attaching as Exhibit No.
15, says, quote Dr. Moline offered no basis for her statement that an
errata was unnecessary because the allegation of alternative exposure
was, quote, shown to be without evidence, end of quote. Indeed, she did
not have to because the protective order effectively shielded the
assertion from cross-examination. If the order was not in place, then
defense counsel in that case and defense counsel in similar cosmetic talc
cases would be able to establish that Mrs. Bell was one of the individuals
the article studied and then challenge Dr. Moline with Ms. Bell and
plaintiff's workers' compensation claims asserting under criminal
penalty for false statements that Mrs. Bell was exposed to asbestos at
textile jobsites. **Defense counsel could show that those workers'
compensation claims were not adjudicated on the merits.** Rather,

**JA611**

November 4, 2022
Page 9


they were dismissed without prejudice weakening the credibility of the Dr. Moline's statements that the allegation of alternative exposure was, quote, shown to be without evidence, end of quote.

Ex. L at 137:10-138:8[2] (emphasis added).

_____

[2] The full context of Dr. Moline's deposition testimony in the *Daigle* matter are illuminating as to her evasiveness when being examined about the bases of her study's findings:

Q.   And it was brought to your attention that in the Betty Bell case, she had filed not one, but two workers' compensation claims for occupational exposure to asbestos having nothing to do with cosmetic talc; right?
A.   That were dismissed by the court as having no evidence, yes, I was aware of that.
Q.   And so you're giving kind of a legal opinion now about the mechanism by which it was dismissed. Do you know whether Judge Osteen specifically addressed that argument?
A.   I was speaking about the other within the worker's comp claims that she made. My understanding is that they were dismissed for lack of information or lack of evidence. I don't know what Osteen said. I haven't read the report. And I'm not going to answer questions related to this without counsel present from Northwell Health. So I will not be answering any questions that have to do with this order without counsel present.
Q.   Let me turn the page.
A.   I'm not answering questions related to this document without my counsel present.
Q.   Where did you get the understanding that the Bell workers' comp claim was dismissed or how it was dismissed?
A.   I believe I was provided with documents years ago with respect to that particular case and... I mean, I'm not going to discuss another case without their counsel present and my counsel present.
Q.   Let's look at page 19. You're saying here today that the Bell workers' compensation claim was found to be without evidence; right?
A.   I'm not discussing this case any further without Mrs. Bell's counsel present and without Northwell Health's counsel present.
Q.   But you already had discussed it. You made the statement –
A.   I'm not making any further comments.
[...]
MR. THACKSTON: I'm going to read into the record the question I would ask by way of a bill.
        Page 19 of Judge Osteen's order, which we're attaching as Exhibit No. 15, says, quote Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure was, quote, shown to be without evidence, end of quote. Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case and defense counsel in similar cosmetic talc cases would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Ms. Bell and plaintiff's workers' compensation claims asserting under criminal penalty for false statements that Mrs. Bell was exposed to asbestos at textile jobsites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits. Rather, they were dismissed without prejudice weakening the credibility of the Dr. Moline's statements that the allegation of alternative exposure was, quote, shown to be without evidence, end of quote.
[...]
Q.   I'm going to back to your statement that the Bell workers' compensation case was dismissed and I'm asking you about what your training –
A.   I told you I'm not discussing this case without counsel present and I am not -- or Bell's counsel present. So I'm not discussing it.
Q.   Let's go back to your report. Your report in the Daigle case at page 19 states, quote, I have recently published a paper along with co-authors that describes 33 cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc, end of quote. Correct?
A.   That's what I wrote.
Q.   And I would like to ask you about those cases because there were allegations in those cases of exposure to asbestos other than from cosmetic talc, weren't there?
MS. RATCLIFFE: Objection. This is just borderline harassment at this point.
THE WITNESS: I don't hear a question pending. You told me what you'd like to do, but that's not a question.
BY MR. THACKSTON:
Q.   In those 33 cases, there were allegations of exposure to asbestos other than from cosmetic talc, weren't there?
A.   I'm not discussing the cases in the paper. I'm not discussing the specifics or the names of the individuals in the paper.

Approximately <u>two weeks after</u> being specifically apprised that a federal court had rejected her testimony about dispositions of the *Bell* workers compensation claims, Dr. Moline repeated the same false claim in testimony to a jury in Philadelphia on October 13, 2022, this time even purporting to be an authority on the workers' compensation process. (Relevant Portions of *Fisher v. A-I-I*, Trial Tr. Morning Session, October 13, 2022, "**Exhibit M**"; *Fisher v. A-I-I*, Trial Tr. P.M. Session, October 13, 2022, "**Exhibit N**"). On direct examination, the same counsel who represents Mr. Gref asked Dr. Moline the following:

Q   Are you familiar with the process of workers' compensation?

A   I am. I've been dealing with workers' compensation patients since I started at Mount Sinai.

Q   Could you explain in what way you're involved with that process?

A   Sure. It's a process where a patient may feel that they have an exposure at a workplace that's making them sick. They have to do some paperwork, then they have to provide medical evidence that their exposures are related – that their workplace exposures have caused the disease, and then the workplace has to provide information saying whether there is exposure at the workplace that could cause the disease and it's -- part of it is an insurance process, but it also can involve if there's a dispute that there may not be such an exposure or the exposure didn't cause the disease, and then you have hearings, and there's workers' comp judges that make decisions.

Q   **What significance is there, if any, to a workers' compensation judge denying a worker's application or claim?**

[objection omitted]

THE WITNESS: **That a worker's compensation is going to look at the information provided to them by the employer and by the claimant or the patient, as well as if there's medical information, look to see if there's a connection, look to see if there's an exposure in the workplace and make a decision if there's sufficient evidence for there to be a claim to go forward.**

(Ex. M at 27:23-29:10). And again, only last month in October 2022 Dr. Moline claimed to a jury that she could not testify about the cases on which she relied on in her 2019 article due to "standard medical practice":

─────────────────

*Id.* at 133:9-134:24, 137:7-138:8, 139:13-140:17.

November 4, 2022
Page 11

> Q. After you testified about your article to juries, if somebody who's cross-examining you wants to make sure that that's right, that in those 33 cases there was no other exposure – alleged exposure to asbestos, you take the position that you won't disclose the names of any of those cases, right?
>
> A. I take that position regardless of what situation I'm in. **I do not disclose the names of individuals. That is standard medical practice.** That is standard research practice…

(Ex. N at 30:17-40:4).

It is false and misleading for her to suggest that she had any medical relationship with the 33 litigation cases discussed in her article where she was not any of their treating physicians and the cases came to her through the course of litigation. Dr. Moline's continuing reliance on her Article, misrepresentations in the article and about events that came to light after it was published provide a compelling basis for a complete deposition in this case.

### D. Although Dr. Moline Refuses to Identify the Underlying Cases, Facts Described in the Article Resemble Other Cases That Also Had Allegations of Asbestos Exposure

In addition to the *Bell* case, described above, there are at least four other cases that appear to be ones Dr. Moline used that also involved additional exposures to asbestos, contrary to her claims. Defendants have determined at least four of the plaintiff-cases in Dr. Moline's 2019 study match plaintiffs in other cases involving the Defendants for whom there is significant evidence of exposure to asbestos that is not alleged to be in talc.

What Dr. Moline refers to as "Case 3" in her 2019 article aligns with the facts of the *Doris Jackson* case, a school teacher. (Ex. A; Dr. Moline's Expert Report (Jackson), attached hereto as "**Exhibit O**" at 3; Ronald Gordon, Ph.D.'s Tissue Digestion (Jackson), attached hereto as "**Exhibit P**" at 2) The United States District Court for the District of Columbia granted a talcum powder defendant's *Daubert* motion to exclude the testimony of Ms. Jackson's expert, Dr. Ronald Gordon because he failed to follow the Helsinki Criteria in disregarding Ms. Jackson's exposure to *"ceiling pipes with degrading insulation" during her more than 30 year career as a public school teacher.* (*Jackson* Daubert Decision, "**Exhibit Q**" at 18 (emphasis added)). The Court excluded the opinion finding "Dr. Gordon's specific causation opinion is unreliable under *Daubert.*" *Id.* Like Dr. Gordon, Dr. Moline reviewed and noted evidence of alternative exposure in her expert report, yet represented that Plaintiff 3/Doris Jackson had no asbestos exposure other than talcum powder. (Ex. O at 5)

Case 4 aligns with *Valerie Jo Dalis*, who filed a $450,000 bankruptcy trust claim based on her husband's automotive work, receiving $28,000 from the Manville Personal Injury Settlement Trust related to known commercial asbestos exposure separate and apart from her alleged talcum powder exposure. (Ex. A; Dr. Moline's Expert Report (Dalis), attached hereto as "**Exhibit R**" at

4; *see also* Ronald Gordon, Ph.D.'s Tissue Digestion Analysis (*Dalis*), attached hereto as "**Exhibit S**" at 2; Bankruptcy Trust claim, Claim Detail Report and claim Information Report (*Valerie Dalis*), attached hereto as "**Exhibit T**"). Dr. Moline was aware of the bankruptcy trust claim, having received the transcripts of the depositions of both Mr. and Mrs. Dalis in preparation of drafting her expert report in 2016. (Ex. R). Despite this review, Dr. Moline again misrepresented "Case 4"/Mrs. Dalis as having no exposures to asbestos other than talcum powder in her 2019 article. (Ex. A).

Case 17's facts align with *Helene Kohr*. (Ex. A; Dr. Moline's Expert Report *(Kohr)*, attached hereto as "**Exhibit U**" at 3). In her case specific report for Ms. Kohr, Dr. Moline acknowledged Ms. Kohr's 50-60 pack year smoking history, which included smoking Kent cigarettes with crocidolite asbestos-containing filters. (Ex. U). However, Dr. Moline did not include this fact in her 2019 article. (Ex. A). Thus, based on Dr. Moline's own causation opinion, Plaintiff 17/Helene Kohr had alternative exposures and should have been excluded from the study based on Dr. Moline's description of the scope of the study. (*Id.*).

Despite having served as an expert to plaintiff-participants in their cases, when asked recently about her 2016 expert reports from the *Betty Bell* and *Doris Jackson* cases, Dr. Moline refused to answer questions before any questions were even asked. (Relevant Portions of Deposition of Jacqueline Moline, M.D. (*Chenet*)(Mar. 25, 2021), "**Exhibit V**" at pp. 151:5-153:19; 154:12-155:19; *see also* Ex. 1).

### E. **Dr Moline Cannot use her study offensively as reliance material then refuse to answer questions about it based on alleged privileges**

Dr. Moline's claims that the litigation information on which she based her article is confidential in the context of her work as an expert witness has been exhaustively litigated and resolved against her and her employer. (Ex. I). In *Bell*, Plaintiff's counsel and Northwell made confidentiality and privilege arguments, including concerns about HIPAA and human research confidentiality, to shield Dr Moline's 2019 article from examination. The Bell court rejected those arguments and ordered unsealed all information relating to the Bell case being a subject of the study. The *Bell* court unsealed 36 pleadings initially protected based on claims of confidentiality and privilege. (Ex. I). The fact that there were 36 pleadings on that topic indicate how thoroughly this issue has been litigated.

In *Bell*, counsel for the plaintiff even conceded that HIPAA does not apply to the information Moline received as an expert witness and used in her study. As to HIPPA claims, the court found:

> Moreover, **AII and Plaintiff agree that none of the information in the Northwell Document is HIPAA protected**. (Compare AII's Br. (Doc. 369) at 21, with Pl.'s Resp. (Doc. 377) at 19.) Plaintiff's concession that no HIPAA-protected information is at risk of disclosure nullifies Northwell's argument that 'vacation the protective order would violate the purpose of

November 4, 2022
Page 13

HIPAA." (Northwell's Resp. (Doc. 392) at 17 (capitalization removed).) As Northwell acknowledges, the relevant purpose of HIPAA is to benefit patients by providing privacy protections for certain types of health information. (See id. at 17 (citing 45 C.F.R. §§ 160.103, 164.502, 164.508 (2020)).) Here, the patient's representatives, Plaintiff, concedes no HIPAA-protected is at risk of disclosure. In light of this concession-not to mention the HIPAA waiver Plaintiff executed, (Doc. 179-6) – **HIPAA does not seem to apply nor is its purpose violated**.

(Ex. I at 36 (emphasis added)).

The Court also noted that many of the 33 cases do not qualify for privacy protections granted to "human test subjects" given the cases involved deceased individuals at the time the study began. (*Id.* at 29-34).

As noted, Northwell intervened in the *Bell* case to make these same arguments. The Court subsequently rejected them. Northwell was then given the opportunity to appeal the Court's decision and did not. In this case, pursuant to a subpoena, Northwell is producing documents related to the Moline article. Other Courts have also rejected arguments related to "privacy" in relation to questioning the individuals involved in Dr. Moline's study. (No. 2019-7989 Div. "E", SEC. 7, Civil District Court Parish of Orleans, State of Louisiana, Judgment dated July 16, 2021, attached hereto as "**Exhibit W**").

**F.   Additional Time is Needed to Fairly Examine Dr. Moline Due given the Nature of her Opinions and the History of Obstruction.**

Although a party may terminate or limit a deposition that is "being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses" their expert, the Rules provide that "[t]he court **must allow additional time** consistent with Rule 26(b)(1) and (2) **if needed to fairly examine the deponent....**" Fed. R. Civ. P. 30(d)(3)(A) and 30(d)(1). "[T]**here may often be a need for additional time [...] for full exploration of the theories upon which the [expert] witness relies**." Fed. R. Civ. P. 30(d), 2000 Advisory Committee Notes. The Rules also demonstrate a preference for "broadening of discovery against experts in the cases [] where expert testimony [is] central to the case," as this will make for more efficient and better cross-examination and rebuttal at trial. Fed. R. Civ. P. 26(b)(4), 1970 Advisory Committee Notes.

The Rules of Evidence state an "expert may be required to disclose [the underlying] facts or data [of her opinion] on cross-examination. Fed. R. Evid. 705. Rule 26(b)(4) governing protections of expert discovery is not meant to impede any discovery efforts about an expert's opinion or the "development, foundation, or basis of those opinions." Fed. R. Civ. P. 26(b)(4), 2010 Advisory Committee Notes.

For example, the expert's testing of material involved in litigation, and notes of any such testing, would not be exempted from discovery by this

rule. **Counsel are also free to question expert witnesses about alternative analyses, testing methods, or approaches to the issues on which they are testifying, whether or not the expert considered them in forming the opinions expressed.** These discovery changes therefore do not affect the gatekeeping functions called for by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and related cases.

*Id.* (emphasis added).

Defendants are allowed to examine Plaintiff's expert about any source whose information pertained to her opinions for this case. *Cnty. of Suffolk v. Long Island Lighting Co.,* 122 F.R.D. 120, 124 (E.D.N.Y. 1988). Examination of Dr. Moline's methodology used in her 2019 article is required to determine whether her opinion in this case is based on reliable analysis. *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Finally, "**[t]he need to provide the parties with an adequate opportunity to develop the record and present their strongest arguments**" trumps any interest the Court may have in expediency. *In re Gen. Motors LLC Ignition Switch Litig.,* No. 14-MD-2543 (JMF), 2017 WL 9771806, at *2 n.1 (S.D.N.Y. May 4, 2017).

Here, Defendants must be allowed additional time to explore the theories on which Dr. Moline's opinion is based, including on her article she explicitly cited in her Report as a basis for her opinions in this case. (Ex. A). Questioning how Dr. Moline developed her methodologies cannot be considered "bad faith," let alone unreasonably annoying, harassing, or oppressive. Indeed, Defendants are permitted to fully exposure "the theories upon which [Dr. Moline] relies." The Defendants cannot develop a complete record Dr. Moline without the adequate opportunity to "vigorous[ly] cross-examin[e]" on the development, foundation, or basis of her opinions found in her 2019 article, as Dr. Moline's opinion in this case relies on the thesis of her 2019 article.

Federal Rule of Evidence 705 is clear: Plaintiff's expert is required to disclose the facts or data underlying her opinion. Each of the 33 plaintiff-participants who were hand-picked by Dr. Moline for her study were those who had already filed his or her own personal injury action and for whom Dr. Moline had been designated as an expert witness to testify regarding their disease and the alleged cause(s) of the plaintiffs' disease. The Defendants would be unduly prejudiced if they are prevented from having a full and complete opportunity to cross-examine Dr. Moline about her unsound methodologies to properly challenge, and exclude, the testing results and her expert opinions under *Daubert.*

Notably, *Daubert* imposes multiple factors for courts to consider in assessing the reliability of an expert. *Daubert v. Merrell Dow Phrams., Inc.,* 409 U.S. 579, 594 (1993). This includes determining "the known or potential rate of error and existence and maintenance of standards controlling the technique's operation." (*Id.*). Given at least one of the individuals listed in her 2019 article is known to not meet the alleged premises of her study, and there are likely at least three

**JA617**

more, full cross-examination on the basis of her study, including the full backgrounds of the individuals in the 2019 article is required to determine the reliability of or "potential rate of error" in her study given its false claim that all 33 individuals had "no identified source [of asbestos exposures] apart from the talcum powder." (*see* Ex. I at pp. 20-21, 23).

Finally, public policy supports allowing Defendants to fully question Dr. Moline. Dr. Moline's misleading 2 article has had influence "on cosmetic talc litigation nationwide." (*Id.* at p. 17). Not only does Dr. Moline rely on and cite her article, other expert witnesses in this litigation have relied on it for their opinions. (*Id.* at pp. 17-18). Dr. Moline gave testimony to Congress about the "findings" in her 2019 article, which has the potential to influence policy nationwide. (Ex. K). Given its reach and influence, Defendants must have the ability to challenge the basis of her testimony given its reliability is in question based on the information Dr. Moline omitted about the individual's known asbestos exposures.

Following informal requests to continue Dr. Moline's deposition based on the foregoing, Plaintiff only offered one hour of additional time to depose Dr. Moline. Given she not only wrote the  article on which this litigation is built, but she also managed to avoid answering <u>any</u> <u>substantive</u> questions about it using various dilatory tactics for two years, Dr. Moline must be examined fully on her article or withdraw as an expert.

As the *Bell* Court found, the potential issue created by concealment of the individuals in her 2019 article "goes directly to the issue of standards controlling her study's operation." Respectfully, this Court should find the same. Therefore, Defendants need additional time to depose Dr. Moline to examine her on her flawed methodologies, and Dr. Moline should be compelled to answer questions on the names and backgrounds of the individuals in her 2019 article pursuant to Federal Rules 26, 30, and 37.

## III.    **DEFENDANTS NEED ADDITIONAL TIME TO DEPOSE DR. MOLINE DUE TO UNDUE DELAYS AND EXCESSIVE AND UNTIMELY DISCLOSURES OF OPINIONS.**

### A. **Defendants need additional time to question Dr. Moline to determine which materials she actually relies on to determine her opinion.**

Defendants cannot be expected to fully examine a witness on the basis of her opinions when they have no way of ascertaining where her opinions came from. Dr. Moline's purposefully obfuscates which materials she relies on to develop her case-specific opinions, prolonging her examination.  She purports to rely on a "reference" list of articles or documents containing 492 references to develop her opinions. (Ex. B). However, throughout her report she make assertions without citations to specific articles or studies, pointing to the 492 references as the basis for her assertion. (*e.g.*, Ex. G at p. 241:10-21). Likewise, during her second day of deposition she claimed her reference list actually contained "about 505" items as the basis for her assertions. (*Id.* at pp. 241:22-242:2).

Beyond the 492 reference materials listed, Dr. Moline presented at the deposition with multiple expert reports and additional testimony and opinions not disclosed in her original report. (Ex. F at pp. 14:18-17:11). This included a 17-page "Exposure Testimony Summary", which she did not draft, which was not provided to Defendants until the day prior the deposition and which she relied on for her opinions in the deposition. (Id. at pp. 13:9-25, 135:16-136:2, 170:15-21). Despite receiving this "Exposure Testimony Summary" nine months after her report was produced, she relied on this for new opinions in this case.

Another example of Dr. Moline's obfuscation came during defense examination related to her alleged methodology in formulating her opinion. She alleged there was an "analogous exposure scenario" referenced by the Center for Disease Control ("CDC"), although she offered no citation to any specific article. . (Ex. B at 21). Dr. Moline testified that someone would have to "go and find" the CDC article from her list of 505 articles in her report's reference list. (Ex. G at pp. 241:10-242:9). She also testified that the article did involve linking peritoneal mesothelioma to asbestos exposures, and she claimed it stated "that cosmetic talc may be a cause." (Ex. G at pp. 242:25-243:16).

Likewise, after the first day of deposition, Dr. Moline made dose estimates/dose applications for various products allegedly at-issue in this matter. (Ex. G at pp. 273:17-274:17). She did not provide these estimates to counsel, but she relied on these estimates for her opinions expressed for the first time on direct at the end of her deposition. (Id.).

Similarly, she reviewed a report from Dr. William Longo produced after her October 28, 2021, report which she reviewed and considered for her opinions in this case. (Ex. G at pp. 275:20-277:14). Despite considering this report for her opinions in this case, she never supplemented her report to reflect her updated opinions. (Id.)

During examination by plaintiff's counsel near the very end of the second day of deposition, Dr. Moline again developed new dose estimates and "cumulative exposure" estimates, including dose estimates for individual defendant's products. (Ex. G at 295:2-296:14). Again, these estimates were not provided by Dr. Moline prior to her deposition. (Id.).

When given the opportunity to briefly examine Dr. Moline on these estimates, she was asked whether she knew of any studies, whether in her over 500 listed references or not, that examined individuals within the range she alleged Plaintiff Gref was exposed to from cosmetic powders contracted mesothelioma and she was unable. (Id. at pp. 307:7-311:25). She mentioned one study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos, and the examination was terminated before Defendants were finished examining her on this study or her new dose estimate opinions. (Id.).

In addition and specific to Mennen, Mennen's counsel asked Dr. Moline about the bases for her opinions on Day 1, and Dr. Moline testified she did not rely on the late-produced reports from Dr. Longo on purported asbestos content of Mennen products. Indeed, Dr. Moline confirmed

November 4, 2022
Page 17

she reviewed three reports from MAS/ Dr. Longo on Mennen products after her 8/28/21 report and never supplemented her report or opinions.  Ex. F at 14:18-15:4, 16:8-16, 166:12-169:3.

     With regard to the 17-page "Exposure Testimony Summary" that was not provided to Defendants until the day before the deposition, Dr. Moline testified she "didn't have anything to do with the preparation of it."  Ex. F at pp. 170:7-21.  She further testified that she did not perform a dose estimate or "any quantification" in terms of fiber release for Mennen products. (*Id.* at pp. 171:7- 172:9).  Nevertheless, after the second day of her deposition when her own counsel did his direct examination, Dr. Moline offered new opinions beyond her report for the first time and after more than 6 hours of deposition.  Specifically, Dr. Moline testified she developed new dose estimates and "cumulative exposure" estimates, including a fiber release and dose estimate specific to Mennen. (Ex. G at 295:2-296:14).  Counsel for Mennen was unable to ask follow up questions as to the basis for this brand new opinion before Plaintiff's counsel called time on the deposition.

     As shown, Dr. Moline essentially aims to "hide the ball" from examining counsel as to the foundations for her opinions. Not only does her reference list change mid-deposition without notice to defendants, but she does not cite to specific articles to make her assertions and she modifies her opinions without notice to defendants or supplementing her opinion report. As noted in Section II, studies demonstrate that only 8% of peritoneal mesotheliomas like Plaintiff Gref's have known relation to asbestos. If Dr. Moline's is allowed to point to "about 505" references for the "foundation" of her opinion, determining the actual grounds for her opinion is impossible.

     Questioning how Dr. Moline developed her methodologies cannot be considered "bad faith," let alone unreasonably annoying, harassing, or oppressive. Indeed, Dr. Moline cannot claim to be oppressed while charging $750 per hour to give her testimony. (Ex. F at p. 20:23-25).

     Defendants are permitted to fully expose "the theories upon which [Dr. Moline] relies." Likewise, simply reviewing this "Reference List" does not satisfy Defendants' right to examine and depose Dr. Moline. (*Harris v. United States*, 132 F. App'x 183, 185 (9th Cir. 2005) ("The opportunity to review the opposing party's expert witness's report does not satisfy a party's right to depose that expert.")). This is even more relevant here, where, as noted, Dr. Moline brought additional reports she relied on to her deposition that Defendants had minimal or no opportunity to review prior to the deposition.

     Here, there is no basis for terminating Dr. Moline's deposition before defense has adequate time to examine her, and there is no basis for limiting its continuation to one hour. Given Defendants did not have adequate opportunity to fairly examine Dr. Moline on the materials she relied on for her opinions – both those disclosed in her initial report as well as those disclosed the day of her deposition.

### B. Undue Delays Caused by Dr. Moline's Unresponsive Answers And Technical Issues Justify Additional Time For Examination.

During her deposition, Dr. Moline consumed undue time to insult the questioning attorneys or make snide remarks, which unduly wasted time on at least seventeen occasions. (*Id.* at 50:9-13, 59:15-22, 80:9-24, 80:25-81:11, 81:12-25, 89:3-13, 95:3-19, 102:2-3, 106:17-24, 116:11-18, 118:10-119:7, 131:14-21, 132:24-133:10, 297:12-16, 196:14-197:22, 281:2-16, 297:24-298:5). These unprofessional remarks causing delays occurred while counsel questioned Dr. Moline's about her reliance materials (outside of her 2019 article) forming the bases for her opinion, including questions about dose levels, methodologies she claimed to follow, Mr. Gref's non-talc, alternative exposures to asbestos, and testing done on cosmetic talc, among other topics. (*Id.*)

In addition to delays caused by Dr. Moline, technical issues caused by virtual nature of the deposition also caused delays in the deposition while on the record. These issues included hearing issues, screen sharing issues (for exhibits), and camera positioning, none of which were the sole fault of any one party present at the deposition. (*e.g., id.* at 10:14-20, 26:11-15, 29:2-3, 85:13-24, 117:5-19, 121:20-25, 193:2-7, 214:20-23, 240:16-17, 244:9-18, 267:13-25, 297:12-19).

Despite these delays, and despite defendants stating they had additional questions on the reliance materials through which Dr. Moline formed her opinion, Plaintiff's counsel ended the deposition. (Ex. G at p. 291:25-292:24, 297:5-9, 311:21-312:16).

As noted *supra*, the Rules provide that "[t]he court **must allow additional time** consistent with Rule 26(b)(1) and (2) **if needed to fairly examine the deponent or if the deponent […] or any other circumstance impedes or delays the examination.**" Fed. R. Civ. P. 30(d)(3)(A) and 30(d)(1). "Other circumstances" allowing for additional examination time include circumstances outside the control of the parties, including "a power outage, a health emergency, or other event." Fed. R. Civ. P. 30(d), 2000 Advisory Committee Notes.

Dr. Moline's deposition was repeatedly delayed by her personal insults on examining attorneys and mocking non-responsive remarks aimed at the questioning attorneys. Similarly, the deposition experienced multiple technical issues while on the record which further delayed her examination. These are exactly the situations covered under Rule 30(d)(1) – not only did Dr. Moline delay her own examination through her remarks, but "other circumstances" caused by technical failures impeded her deposition. As such, this Court "must allow additional time" to allow Defendants "to fairly examine" Dr. Moline.

Given the combative, nonresponsive nature of Dr. Moline's testimony, time limits are unfair to the defendant. They allow the witness, and counsel with long improper objections, to "run out the clock" without actually providing answers during Defendant's examination. Therefore, pursuant to Federal Rules 26, 30, and 37, A-I-I moves this Court to grant additional time to fairly examine Dr. Moline on all bases of her opinion.

*///*

November 4, 2022
Page 19


IV.   **<u>CONCLUSION & PRAYER</u>**

    For the foregoing reasons, Defendants seek an order compelling the continuation of Dr. Moline's deposition until Defendants are given reasonable opportunity to explore fully the bases for Dr. Moline's opinions, and Defendants seek an order compelling Dr. Moline to answer questions regarding her article. The Defendants also seek such other relief the Court may consider appropriate.

                    Respectfully Submitted,

                    **Lathrop GPM LLP**

                    Robert E. Thackston
                    Partner

cc:     All parties of records (via ECF)


**JA622**

JA623

# EXHIBIT U

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
:
BRIAN JOSEPH GREF,                                                     :        Docket No.: 1:20-cv-05589
                                                                      :
                                        Plaintiff,                    :        **THIRD AMENDED NOTICE**
                                                                      :        **OF VIDEO DEPOSITION OF**
        -against-                                                     :        **DR. GREGORY DIETTE**
                                                                      :
                                                                      :
AMERICAN INTERNATIONAL INDUSTRIES,                                    :
*individually and as successor-in-interest for the*                   :
CLUBMAN BRAND, and to THE NESLEMUR                                    :
COMPANY and PINAUD COMPANY, *et. al.,*                                :
                                                                      :
                                        Defendants.                   :
-----------------------------------------------------------------------X

## THIRD AMENDED NOTICE OF VIDEOTAPED DEPOSITION OF
## DR. GREGORY DIETTE

TO/DEPONENT:                    Dr. Gregory Diette

FROM:                          Plaintiff, Brian Joseph Gref

DATE AND TIME:                 December 22, 2022 at 11:00 a.m. ET

PLACE DEPOSITION TO BE TAKEN:  Via **Zoom Conferencing** accessible at VeritextLink:

        https://proceedings.veritext.com/?token=7615a1b99f064a898d22b4c9f1e78451

        PLEASE TAKE NOTICE that Plaintiff BRIAN JOSEPH GREF, by and through his

undersigned counsel, and pursuant to Fed. R. Civ. P. 26(b)(4) and Fed. R. Civ. P. 30, the Local

Rules of this Court and other applicable rules and statutes, will take the videotaped deposition

upon oral examination of Dr. Gregory Diette. before a certified court reporter and notary

public who is not an attorney, or employee of an attorney, for any party or prospective party

herein and is not a person who would be disqualified to act as a jury because of interest or

because of consanguinity or affinity to any party herein.   The deposition will be recorded by

**JA625**

stenograph by a certified court reporter that is authorized to administer oaths, and also videotaped.

PLEASE TAKE FURTHER NOTICE that the Deponent is also required to produce any and all documents s/he relies upon for his/her opinions in the above-captioned matter, including those items enumerated in the attached "Schedule A," and it is requested that such production take place at least three days in advance of the deposition.

All Defendants wishing to attend the deposition are invited to participate.

Respectfully submitted,

Dated: November 22, 2022, 2022

SIMMONS HANLY CONROY

James Kramer, Esq.
112 Madison Avenue, 7th Floor
New York, New York 10016-7416
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I do hereby certify that on this 22 November 2022, I served a copy of the foregoing on all counsel of record via electronic mail per the parties' agreement.

James Kramer, Esq.

**JA626**

**SCHEDULE A**

**DOCUMENTS TO BE
PRODUCED**

1.     Deponent's complete file(s) concerning this case;

2.     All documents or other materials deponent has reviewed, prepared, discussed, considered, relied upon or referred to in preparation of his/her expert report and/or in preparation for his/her deposition in this case;

3.     All articles, publications, reports, tests, or studies that form the basis for deponent's opinions in this case;

4.     All summaries, impressions, reports and evaluations relating to this case, including but not limited to, any testing deponent performed or any tests conducted at deponent 's request and/or upon request;

5.     All documents that constitute deponent reliance materials, including all documents which deponent will rely upon to support each and every opinion to which s/he will testify in this case;

6.     All documents or other materials that deponent considered and rejected in forming and providing his/her opinions in this case;

7.     All correspondence, reports, and documents deponent has ever shared or exchanged with or received from, any other witness testifying for Plaintiffs in this case;

8.     Any and all materials prepared by deponent, or at his/her direction, pertaining to this case;

9.     All documents constituting or evidencing a communication between deponent and any law firm representing any defendant in this action, or anyone assisting any of those firms in this case in relation to deponent 's services as a witness in this case, including, without limitation, any communication of factual, expert or legal information about the litigation, any retention letter, contract, fee schedule, billing from deponent, payment to deponent, and all materials provided to deponent by any law firm representing any defendant in this action, or anyone assisting any of those firms in this case.

10.     All documents constituting or evidencing a communication between deponent and any Defendant in this case that has retained deponent concerning 's services as an expert, including, without limitation all billing from deponent, payment to deponent, and all materials provided to deponent or received from deponent.

11.     All invoices for any fees billed to date in this case.

12.     All notes, drawings, charts, exhibits, photographs, videotapes, and power points or other presentations made by deponent or on his/her behalf, or considered by deponent with regard to this case;

13.     Any and all written reports rendered by deponent, reviewed by deponent or prepared at deponent direction setting forth any findings and/or factual observations, including drafts of such reports, and any notes, computations and/or calculations and/or writings of any description concerning this case, or the facts underlying this case;

14.     All documents constituting or evidencing a communication between deponent, or anyone acting on deponent's behalf, concerning Plaintiffs and/or this case;

15.     All exhibits to be used by deponent as a summary of or in support of his/her opinions or conclusions in this case;

16.     Any and all presentation materials, including but not limited to PowerPoint slides, lecture handouts, or lecture notes, related to all presentations deponent has given or intends to give on asbestos-related cases; and

17.     Deponent's most current curriculum vitae.

**JA628**

# EXHIBIT V

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X

BRIAN JOSEPH GREF,                                    Docket No.: 1:20-cv-05589-GBD-DCF

                Plaintiff,       **DEFENDANT AMERICAN**
                                   **INTERNATIONAL INDUSTRIES'**
    -against-        **SECOND AMENDED NOTICE**
                                   **FOR VIDEOTAPED DISCOVERY**
AMERICAN INTERNATIONAL INDUSTRIES,   **DEPOSITION OF DR. SUPRITH**
*individually and as successor-in-interest for the*   **BADARINATH, M.D.**
CLUBMAN BRAND, and to THE NESLEMUR
COMPANY and PINAUD COMPANY, et al.,

                                  **CHANGE OF TIME**

                Defendants.
--------------------------------------------------------------X

**TO:**   **Dr. Suprith Badarinath, M.D.**
       **Cancer Specialists of North Florida - Riverside**
       **2 Shircliff Way, Suite 800**
       **Jacksonville, Florida 32204**

      **PLEASE TAKE NOTICE** that Defendant AMERICAN INTERNATIONAL

INDUSTRIES, by and through their undersigned counsel and pursuant to Fed. R. Civ. P.

30(b)(3)(A) and Local Rules of this Court, will take the videotaped and stenographic discovery

deposition upon oral examination of **DR. SUPRITH BADARINATH, M.D.,** before a Notary

Public who is not an attorney, or employee of an attorney, for any party or prospective party herein

and is not a person who would be disqualified to act as a jury because of interest or because of

consanguinity or affinity to any party herein, on **Tuesday, January 11, 2022 beginning at 3:30**

**P.M. (EST) via Veritext Virtual Zoom Conferencing or telephone**. The videographer will also

be provided by Veritext. The deposition will continue day-to-day until completed.

      **PLEASE TAKE FURTHER NOTICE** that the deponent is required to produce at the

deposition, all documents within his possession, custody or control, by also those reasonably

available to him, including those in the possession, custody or control of Plaintiff's attorneys,

**JA630**

agents or any other person or entity acting on the behalf which are responsive to the requests, below:

1) A copy of your current CV;

2) A copy of your complete file pertaining to Plaintiff, Brian Joseph Gref (i.e., medical records, test reports, intake forms, patient questionnaires, etc.);

3) A copy of all communications between Plaintiff, Brian Joseph Gref and yourself, including by not limited to, call notes, emails, or any and all communications via any "patient portal", etc.; *and*

4) A copy of all communications between Simmons Hanly Conroy LLC and Plaintiff, Brian Joseph Gref or anyone authorized to discuss Plaintiff, Brian Joseph Gref's medical condition in deponent's file.

DATED: New York, New York
            January 7, 2022

Respectfully Submitted,

**HAWKINS PARNELL & YOUNG, LLP**

By: _____
Alfred J. Sargente, Esq. (AS-3094)
275 Madison Avenue, 10th Floor
New York, New York 10016
Tel: (646) 589-8714
Fax: (646) 589-8700
*Attorneys for Defendant*
*American International Industries*

**JA631**

TO:    James M. Kramer, Esq.
SIMMONS HANLY CONROY LLC
112 Madison Avenue, 7th Floor
New York, New York 10016
Tel: (212) 257-8482
*Attorneys for Plaintiff (via e-mail)*

All Defense Counsel of Record *(via e-mail)*

cc:    Priority One/Veritext *(via email)*

**JA632**

## CERTIFICATE OF SERVICE

I, Alfred J. Sargente, Esq., do hereby certify that on January 7, 2022, the foregoing

Defendant American International Industries' Second Amended Notice for Videotaped

Discovery Deposition of Dr. Suprith Badarinath, M.D. was e-mailed to all counsel of record.

Dated: New York, New York
        January 7, 2022

                                    **HAWKINS PARNELL & YOUNG, LLP**

                            By: _____
                                    Alfred J. Sargente, Esq. (AS-3094)
                                    275 Madison Avenue, 10th Floor
                                    New York, New York 10016
                                    Tel: (646) 589-8714
                                    Fax: (646) 589-8700
                                    Email: asargente@hpylaw.com
                                    *Attorneys for Defendant*
                                    *American International Industries*

**JA633**

# EXHIBIT W

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
BRIAN JOSEPH GREF,                                        Docket No.: 1:20-cv-05589-GBD-DCF

                                     Plaintiff,          **DEFENDANT AMERICAN**
                                                         **INTERNATIONAL INDUSTRIES'**
                -against-                                 **AMENDED NOTICE FOR**
                                                         **VIDEOTAPED DISCOVERY OF**
AMERICAN INTERNATIONAL INDUSTRIES,                       **DR. EHSAN SHIRAZI, M.D.**
*individually and as successor-in-interest for the*
CLUBMAN BRAND, and to THE NESLEMUR
COMPANY and PINAUD COMPANY, et al.,

                                     Defendants.
--------------------------------------------------------------X

**TO:   Dr. Ehsan Shirazi, M.D.**
**Mayo Clinic – Jacksonville**
**4500 San Pablo Rd. South**
**Jacksonville, Florida 32224**

        **PLEASE TAKE NOTICE** that Defendant AMERICAN INTERNATIONAL

INDUSTRIES, by and through their undersigned counsel and pursuant to Fed. R. Civ. P.

30(b)(3)(A) and Local Rules of this Court, will take the videotaped and stenographic discovery

deposition upon oral examination of **DR. EHSAN SHIRAZI, M.D.,** before a Notary Public who

is not an attorney, or employee of an attorney, for any party or prospective party herein and is not

a person who would be disqualified to act as a jury because of interest or because of consanguinity

or affinity to any party herein, on **Wednesday, January 12, 2022 beginning at 10:00 A.M. (EST)**

**via Veritext Virtual Zoom Conferencing or telephone**. The videographer will also be provided

by Veritext. The deposition will continue day-to-day until completed.

        **PLEASE TAKE FURTHER NOTICE** that the deponent is required to produce at the

deposition, all documents within his possession, custody or control, but also those reasonably

available to him, including those in the possession, custody or control of Plaintiff's attorneys,

**JA635**

agents or any other person or entity acting on his behalf which are responsive to the requests, below:

1) A copy of your current CV;

2) A copy of your complete file pertaining to Plaintiff, Brian Joseph Gref (i.e., medical records, test reports, intake forms, patient questionnaires, etc.);

3) A copy of all communications between Plaintiff, Brian Joseph Gref and yourself, including but not limited to, call notes, emails, or any and all communications via any "patient portal", etc.; *and*

4) A copy of all communications between Simmons Hanly Conroy LLC and Plaintiff, Brian Joseph Gref or anyone authorized to discuss Plaintiff, Brian Joseph Gref's medical condition in deponent's file.

DATED: New York, New York
             January 7, 2022

                                          Respectfully Submitted,

                              **HAWKINS PARNELL & YOUNG, LLP**

                              _____
                              Alfred J. Sargente, Esq. (AS-3094)
                              275 Madison Avenue, 10th Floor
                              New York, New York 10016
                              Tel: (646) 589-8714
                              Fax: (646) 589-8700
                              *Attorneys for Defendant*
                              *American International Industries*

**JA636**

TO:    James M. Kramer, Esq.
         SIMMONS HANLY CONROY LLC
         112 Madison Avenue, 7th Floor
         New York, New York 10016
         Tel: (212) 257-8482
         Attorneys for Plaintiff *(via e-mail)*

         All Defense Counsel of Record *(via e-mail)*

cc:    Priority One/Veritext

**JA637**

## CERTIFICATE OF SERVICE

I, Alfred J. Sargente, Esq., do hereby certify that on January 7, 2022, the foregoing

Defendant American International Industries' Amended Notice for Videotaped Discovery

Deposition of Dr. Ehsan Shirazi, M.D. was e-mailed to all counsel of record.

Dated: New York, New York
January 7, 2022

**HAWKINS PARNELL & YOUNG, LLP**

By: _____
Alfred J. Sargente, Esq. (AS-3094)
275 Madison Avenue, 10th Floor
New York, New York 10016
Tel: (646) 589-8714
Fax: (646) 589-8700
Email: asargente@hpylaw.com
*Attorneys for Defendant*
*American International Industries*

**JA638**

# EXHIBIT X



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
:
BRIAN JOSEPH GREF,                                          :        Docket No.: 1:20-cv-05589
:
                                         Plaintiff,          :
:
                -against-                                    :
:
:
AMERICAN INTERNATIONAL INDUSTRIES,      :
*individually and as successor-in-interest for the*          :
CLUBMAN BRAND, and to THE NESLEMUR         :
COMPANY and PINAUD COMPANY, *et. al.*,          :
:
                                         Defendants.        :
-------------------------------------------------------------------X

### PLAINTIFF'S SUPPLEMENTAL INTERROGATORY TO DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST FOR THE CLUBMAN BRAND, AND TO THE NESLEMUR COMPANY AND PINAUD COMPANY

Pursuant to Fed. R. Civ. P. 33, Plaintiff, by his undersigned attorneys, propounds this Interrogatory, which Defendant American International Industries individually and as successor-in-interest for the Clubman Brand, and to The Neslemur Company and Pinaud Company shall respond fully to within the time prescribed by the Federal Rules of Civil Procedure, in accordance with the Instructions and Definitions set forth hereinafter.

### INSTRUCTIONS

1.      These instructions and definitions should be construed to require responses based upon the knowledge of, and information available to, the responding party as well as its agents, representatives, and, unless privileged, attorneys. If, when responding, any information is withheld on the basis of privilege or other claimed protection, a privilege log is to be provided. Such log shall provide information sufficient for the propounding party (and the court) to discern

**JA640**

the propriety of any claimed protection for disclosure.  *See* below at paragraph 6 for further instructions.

2.      These requests are continuing in character, so as to require that supplemental responses be filed seasonally if further or different information is obtained with respect to any request.

3.      No part of an interrogatory should be left unanswered merely because an objection is interposed to another part of the interrogatory.  If a partial or incomplete answer is provided, the responding party shall state that the answer is partial or incomplete.  All objections must be stated with specificity.

4.      Likewise, pursuant to Rule 34(b)(2)(B), if you object to a request, the grounds for each objection must be stated with specificity.  Also pursuant to that Rule, if you intended to produce copies of documents or of ESI instead of permitting inspection, you must so state.

5.      Pursuant to Rule 34(b)(2)(C), an objection must state whether any responsive materials are being withheld on the basis of that objection.

6.      In accordance with Fed. R. Civ. P. 26(b)(5), where a claim of privilege is asserted in objecting to any response to a discovery request or part thereof, and information is not provided on the basis of such assertion:

A.      In asserting the privilege, the responding party shall, in the objection to the interrogatory, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed.

B.      The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information:

**JA641**

    (1)    For oral communications:

        a.    the name of the person making the communication and the names of persons present while the communication was made, and, where not apparent, the relationship of the persons present to the person making the communication;

        b.    the date and place of the communication; and

        c.    the general subject matter of the communication.

(2)    For documents:

    a.    the type of document,

    b.    the general subject matter of the document,

    c.    the date of the document, and

    d.    such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document and, where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

7.    If the responding party elects to specify and produce business records in answer to any interrogatory, the specification shall be in sufficient detail to permit the interrogating party to locate and identify, as readily as the responding party can, the business records from which the answer may be ascertained or, if produced electronically, produced in a manner consistent with Guideline 2.04 of the ESI Principles.

8.    Further, whenever you are asked to identify or produce a document which is deemed by you to be properly withheld from production for inspection or copying:

A.     If you are withholding information under claim of privilege (including, but not limited to, the work product doctrine), please provide the information set forth in Fed. R. Civ. P. 26(b)(5).  For electronically stored information, a privilege log (in searchable and sortable form, such as a spreadsheet, matrix, or table) generated by litigation review software, containing metadata fields that generally correspond to the above paragraph is permissible, provided that it also discloses whether transmitting, attached or subsidiary ("parent-child") documents exist and whether those documents have been produced or withheld.*

B.     If you are withholding information for any reason other than an objection that it is beyond the scope of discovery, identify in addition to the information requested in paragraph 8.A, above, the reason for withholding the information. If you are withholding information on the basis that electronically stored information ("ESI") is not reasonably accessible because of undue burden or cost, you must so state with specificity.

9.     When information requested contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.  If a privilege is asserted with regard to part of the information sought, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.

11.     If, in answering these requests, the responding party encounters any ambiguities when construing a question, instruction, or definition, the responding party's answer shall set forth the matter deemed ambiguous and the construction used in answering.

**JA643**

## DEFINITIONS

Notwithstanding any definition below, each word, term, or phrase used in these Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

1. *Concerning:* The term "concerning" means relating to, referring to, pertaining to, describing, evidencing, or constituting.

2. *Communication:* The term "communication" means the transmittal of information by any means.

3. *Document:* The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the term "items" in Fed. R. Civ. P. 34(a)(1) and include(s), but is not limited to, electronically stored information. The terms "writings," "recordings," and "photographs" are defined to be synonymous in meaning and equal in scope to the usage of those terms in Fed. R. Evid. 1001. A draft or non-identical copy is a separate document within the meaning of the term "document."

4. *Identify (with respect to persons):* When referring to a person, to "identify" means to state the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment and said person's title/job description. If the business and home telephone numbers are known to the answering party, and if the person is not a party or present employee of a party, said telephone numbers shall be provided. Once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that person.

5. *Identify (with respect to documents, records or other materials):* When referring to documents, to "identify" means to state the: (i) type of document; (ii) general subject matter; (iii) date of the document (iv) author(s), addressee(s), and recipient(s) and the date the document, record or other material was located by you (defined below).

6. *Occurrence/Transaction:* The terms "occurrence" and "transaction" mean the events described in the Complaint and other pleadings, as the word "pleadings" is defined in Fed. R. Civ. P. 7(a).

7. *Parties:* The terms "plaintiff" and "defendant" (including, without limitation, third-party plaintiff, third-party defendant, counter claimant, cross-claimant, counter-defendant, and cross-defendant), as well as a party's full or abbreviated name or a pronoun referring to a party, mean that party and, where applicable, its officers, directors, and employees. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation or to limit the Court's jurisdiction to enter any appropriate order.

**JA644**

8.    *Person:* The term "person" is defined as any natural person or any business, legal or governmental entity or association.

9.    *You/Your:*  The terms "you" or "your" include the Defendant to which these requests are addressed and its agents, representatives and attorney, as well as all of Defendant's predecessors.

10.    *Representative*: The term "representative" shall be liberally construed and shall include all agents, employees, officials, officers, executives, directors, consultants, and any others who directly or indirectly represent in any manner the Defendant.

11.    *Professional capacity*: The term "professional capacity" means duties, work and/or activities undertaken or performed for a fee or other valuable consideration.

12.    *Role*: The term "role" includes job title, job description and/or position and the responsibilities, tasks, and duties of each particular job title, job description and/or position.

11.    *Describing with particularity*: The term "describing with particularity" means identifying with specificity each source of information, whether it be a document, individual or other source, including but not limited to the documents/sources reviewed and/or information obtained from persons by AII and/or its counsel when it represented to Plaintiff and the Court the bulleted statements provided on page two of AII's January 3, 2022 correspondence to the Hon. Debra Freeman, attached here as Exhibit 1.

12.    The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all;" "any" means "any and all." "Including" means "including but not limited to."  "And" and "or" encompass both "and" and "or." Words in the masculine, feminine, or neuter form shall include each of the other genders.

## SUPPLEMENTAL INTERROGATORY

**Interrogatory No. 1**: Set forth the dates David Woolf was associated with AII in a *professional capacity*, to include specifying within those dates of association David Woolf's precise *role*, including providing information for any personal injury case involving AII's talcum powder products, and *describing with particularity* all sources from which the information provided in response to this interrogatory was derived.

ANSWER:

Dated: New York, New York                    **SIMMONS HANLY CONROY**
       January 19, 2022

**JA645**

James Kramer, Esq.
112 Madison Avenue, 7th Floor
New York, New York 10016-7416
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I do hereby certify that on this <u>19 January 2022</u>, I served a copy of the foregoing on all counsel of record via electronic mail per the parties' agreement.

James Kramer, Esq.

JA646

# EXHIBIT Y

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN JOSEPH GREF,<br><br>          Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL<br>INDUSTRIES, et al.<br><br>          Defendants. | Case No. 1:20-CV-05589-GBD |

**DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' RESPONSE TO PLAINTIFF'S**
**SUPPLEMENTAL INTERROGATORY**

Pursuant to Fed. R. Civ. P. 26 and 33, Defendant AMERICAN INTERNATIONAL INDUSTRIES, sued individually and erroneously as "successor-in-interest for the Clubman Brand, and to The Neslemur Company and Pinaud Company" (hereinafter "responding party" or "AII"), responds to Plaintiff's Supplemental Interrogatory ("Request") as follows:

I.     **PRELIMINARY STATEMENT**

This response, while based on diligent inquiry and investigation by responding party, reflects only the current state of responding party's knowledge, understanding, and belief, based upon the information reasonably available to it at this time. As this action proceeds, and further investigation and discovery is conducted, additional or different facts and information could be revealed to responding party. Moreover, responding party anticipates that propounding party may make legal or factual contentions presently unknown to and unforeseen by responding party that may require responding party to adduce further facts in rebuttal to such contentions. Consequently, responding party may not yet have knowledge and may not fully understand the significance of information potentially pertinent to this response. Accordingly, this response is provided without prejudice to responding party's right to rely upon and use any information that it

1

**JA649**

subsequently discovers, or that was omitted from these responses as a result of mistake, inadvertence, surprise, or excusable neglect. Without in any way obligating itself to do so, responding party reserves the right to supplement or amend this response in light of the information that responding party may subsequently obtain or discover.

## GENERAL OBJECTIONS

AII incorporates the following General Objections in its response as set forth below:

1.     AII objects that this Request is inapplicable, irrelevant and not reasonable calculated to lead to the discovery of admissible evidence, and unduly burdensome and oppressive as no formulation of any AII product used or uses asbestos as an ingredient.

2.     AII objects to this Request that the extent it relates to periods of time, geographical areas, or activities outside the scope of the allegations of the complaint as overbroad, irrelevant, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Any Request that is not limited in time and scope to the particular facts of this case, by definition, calls for irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence. It would also impose an unreasonable burden on AII to search out, review, organize and produce information and documents not related to any issue in this case. Further, requiring AII to produce information without limitation to the particular facts of this case improperly shifts Plaintiff's burden of proof to AII.

3.     AII objects to this Request to the extent it seeks information from AII about any entity other than AII. AII objects to Plaintiff's attempt to enlarge the scope of this litigation beyond this Defendant by requesting information concerning purported "predecessors" or the like, or by seeking any information from any entity other than this Defendant. AII shall respond solely on its behalf.

4.     AII objects to this Request to the extent it purports to create and/or impose obligations upon it beyond those contemplated by the Federal Rules of Civil Procedure,

---

{ 2 }

**JA650**

the Federal Rules of Evidence, the Southern District Local Rules, common law, and any other applicable statutes, rules, or orders.

5.    AII objects to this Request to the extent it calls for information and documents individually or collectively constituting a trade secret, proprietary information, customer information, confidential financial data, confidential research, development, or commercial business information, and personal privacy information of a person not party to this litigation without the protection of an appropriate protective order and/or for which proper authorizations have not been obtained.

6.    AII objects to any Request that seeks confidential or privileged health information without the proper HIPAA-compliant authorization forms or protection of an appropriate protective order.

7.    AII objects to any Request that calls for information that is protected by the attorney-client privilege, work product doctrine, joint defense privilege, common interest doctrine, consulting expert privilege, or any other available privileges or protections.

8.    AII objects to any Request that seeks information that does not exist or no longer exists, whether due to the passage of time, document retention policies, or otherwise, and/or is not currently in the possession, custody, and/or control of AII. AII was recently the victim of a ransomware attack.

9.    AII objects to each Request to the extent it is so broad, uncertain, and unintelligible that AII cannot determine the nature of the information sought, and to which AII is, therefore, unable to respond.

10.    AII objects to any Request that is vague, unintelligible, or fails to set forth with reasonable particularity the precise information sought.

11.    AII objects to any Request to the extent Plaintiff has failed to identify a particular AII product at issue as irrelevant, unfair, unreasonable, and as an improper attempt to shift Plaintiff's burden of proof to AII.

12.    AII objects to each Request to the extent the required good cause or

{ 3 }

**JA651**

substantial need, as dictated by applicable statutes, court rules and case law, has not been shown for the information requested.

13.     AII objects to the extent the Request seeks information that is duplicative or cumulative of earlier discovery to AII.

14.     AII objects to any Request that calls for the premature disclosure of experts or expert opinions, which is outside the scope of discovery.

15.     Disclosure of information pursuant to this Request does not constitute an admission by AII that such information is admissible at trial. AII reserves all such objections to the time of trial.

16.     Plaintiff's Request has been interpreted and answered in accordance with all applicable statutes and rules of court, plain English usage, and, to the extent not specifically challenged by objection, the definitions and instructions, if the same were included. To the extent Plaintiff intended a meaning other than those set out above, AII objects because such Requests are vague and ambiguous and cannot be understood in context.

17.     Further, although AII has made a good faith effort to respond to this Request, in making such response, AII does not purport to have adopted or applied any definitions set forth at the outset of, or at places in, Plaintiff's Request. Nor has AII assumed the improper, unproved, and hypothetical facts proffered by Plaintiff. Additionally, AII has not accepted the terminology or substance of Plaintiff's claims incorporated in, implied in, or alluded to within Plaintiff's Request.

18.     AII objects to this Request to the extent it contain sub-parts, is compound, conjunctive or disjunctive, are not full and complete in and of itself, contains unauthorized definitions and instructions, or otherwise violate the Federal Rules of Civil Procedure.

19.     AII's response is subject to continuing investigation and discovery, and AII reserves the right to supplement or amend its response at any time during the course of this litigation.

Without waiving any of its objections, and subject thereto, AII responds to Plaintiff's Request as follows:

## RESPONSE TO SUPPLEMENTAL INTERROGATORY

**INTERROGATORY NO. 1**: Set forth the dates David Woolf was associated with AII in a *professional capacity*, to include specifying within those dates of association David Woolf's precise *role*, including providing information for any personal injury case involving AII's talcum powder products, and *describing with particularity* all sources from which the information provided in response to this interrogatory was derived.

ANSWER:

AII incorporates its Preliminary Statement and General Objections herein. AII objects to this Interrogatory as vague, compound, and overly broad in time and scope. AII specifically objects that "including providing information for any personal injury case involving AII's talcum powder products" is vague, ambiguous, and unintelligible. AII further objects to the extent this Interrogatory assumes facts, calls for speculation, and seeks information that, due to the passage of time, document retention policies, ransomware attack, or otherwise, is not currently in the possession, custody, and/or control of AII. AII also objects to the extent this Interrogatory seeks information that is neither relevant nor proportional to the needs of the case. AII further objects to the extent this Interrogatory seeks privileged, confidential, and/or proprietary information, including information protected from disclosure by the attorney-client privilege, work product doctrine, right to privacy, and any other applicable privileges and protections. Subject to and without waiver of the foregoing objections, AII states that, to the best of its knowledge, Mr. David Woolf began working for AII in or around November of 1984. His employment with AII ceased in or around June of 2015. During the time he was employed by AII, Mr. Woolf held the titles of "Executive Vice President - Sales" at least until January of 2002, "Manager" at least until March of 2012, and "Consultant – Sales/Marketing" at least until December of 2014. Mr. Woolf performed tasks including due diligence for product/brand acquisitions, approval of certain employee timecards, and handling of certain employee vacation requests. The sources reviewed for this information and the information in AII's January 3, 2022, correspondence were Mr. Woolf's confidential HR file (personnel and medical records) and the depositions of Mr. Zvi Ryzman in this matter and *Colpitts v. American International Industries, Inc., et al.* (Superior Court of the State of California, County of Los Angeles, Case No. BC600850). Mr. Loveless, the verifying party, was also consulted. AII reserves the right to supplement or amend this response at any time during the course of this litigation.

{ 5 }

**JA653**

Dated: February 18, 2022

**HAWKINS PARNELL & YOUNG LLP**

*/s/ Alfred J. Sargente*

Alfred J. Sargente, Esq. (AS-3094)
New York Bar No. 2651750
600 Lexington Avenue, 8th Floor
New York, NY 10022-7678
Telephone: (646) 589-8714
Facsimile: (646) 589-8700
Email: asargente@hpylaw.com
*Attorneys for Defendant American
International Industries*

TO: James M. Kramer, Esq.
   SIMMONS HANLY CONROY LLC
   112 Madison Avenue, 7th Floor
   New York, New York 10016
   Tel: (212) 257-8482
   *Attorneys for Plaintiff*

CC: All Defense Counsel of Record (*via email*)

{ 6 }

**JA654**

## VERIFICATION OF CHARLES LOVELESS

I, Charles Loveless, hereby declare:

I am the Executive Vice President and authorized representative of Defendant American International Industries in this case. I am the agent of American International Industries for the purpose of answering PLAINTIFF'S SUPPLEMENTAL INTERROGATORY. The facts stated in the attached response have been assembled by authorized employees, representatives, and counsel for American International Industries, and I am informed and believe, after reasonable inquiry, that the facts stated in the attached response are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___17___ day of February, 2022, in Los Angeles, CA.

CHARLES LOVELESS

1

**JA655**

# EXHIBIT Z



275 Madison Avenue, 10th Floor
New York, NY, 10016

Direct: 646-589-8714
Email: asargente@hpylaw.com

April 7, 2022

**VIA ELECTRONIC MAIL**

James M. Kramer, Esq.
Simmons Hanly Conroy LLC
112 Madison Avenue, 7th Floor
New York, NY 10016

> RE:  **Brian Joseph Gref v. American International Industries, et al.**
>       **Case No.: 1:20-cv-05589-GBD-DCF**

Dear Mr. Kramer:

Attached please find Defendant American International Industries'(hereinafter "AII") Supplemental Request for Admissions to Plaintiff Brian Joseph Gref in the above-referenced matter. Plaintiff's responses to AII's Request for Admission are due within thirty (30) days from the date of service.

Thank you for your assistance in this matter.

Very truly yours,

Alfred J. Sargente

AJS/tl

Attachment

cc:  All co-defendants (via e-mail)

**hpylaw.com**

**JA658**

or individuals acting on his or their behalf.

    c.    The terms "Exposure" or "Exposed" shall mean Your (or others in Your presence) use, application, installation, removal, disturbance, or manipulation in any way of asbestos-containing materials, which released asbestos fibers that became airborne, traveled to Your breathing zone, which You breathed, which escaped Your body's defense mechanisms, and after a reasonable latency period, caused Your alleged injury.

    d.    "Asbestos-Containing Material(s)" means a material or product which consists of or contains the mineral Asbestos.

## REQUEST FOR ADMISSIONS

    64.    Admit that You saw health care providers prior to 2019 for routine health care that was unrelated to your current diagnosis on which this lawsuit is based.

**ANSWER:**

    65.    Admit that from Your birth until 1988 Your father was on active duty in the United States Navy.

**ANSWER:**

    66.    Admit that from Your birth until approximately 1999 Your mother was on active duty in the United States Navy.

**ANSWER:**

    67.    Admit that You have received medical care from military health care providers during Your lifetime.

**ANSWER:**

    68.    Admit that You have no medical records evidencing that You have ever reported a skin condition to any health care provider.

**ANSWER:**

77. Admit that You have never reported having a heat- related rash to any healthcare provider?

**ANSWER:**

78. Admit that Old Spice Talcum Powder was a fragranced talcum powder.

**ANSWER:**

79. Admit that Clubman Talcum Powder was a fragranced talcum powder.

**ANSWER:**

80. Admit that English Leather Talcum Powder was a fragranced talcum powder.

**ANSWER:**

81. Admit that Johnson & Johnson Baby Powder was a fragranced talcum powder.

**ANSWER:**

82. Admit that Johnson & Johnson Shower to Shower was a fragranced talcum powder.

**ANSWER:**

83. Admit that Mennen Powder was a fragranced talcum powder.

**ANSWER:**

84. Admit that you produced to AII the medical records from Mayo Clinic attached hereto as Bates Nos. MR-MayoClinicHospitalin(29248)-Gref.Brian-000001-000047.

**ANSWER:**

85. Admit that you saw Dr. Ehsan Shirazi at the Mayo Clinic on January 21, 2020.

**ANSWER:**

86. Admit that Dr. Shirazi's medical records (Bates Nos. MR-MayoClinicHospitalin(29248)-Gref.Brian-000001-000047) are authentic.



JA660

94.    Admit that the medial records from Cancer Specialists of North Florida (Bates Nos. MR-CancerSpecialistsofN(62382)-Gref.Brian-000001-000087) are authentic.

**ANSWER:**

95.    Admit that you saw Dr. Suprith Badarinath on March 31, 2020.

**ANSWER:**

96.    Admit that you saw Dr. Suprith Badarinath on April 28, 2020.

**ANSWER:**

97.    Admit that Dr. Suprith Badarinath's medical record of March 31, 2020 (Bates No. MR-CancerSpecialistsofN(62382)-Gref.Brian-000008) contains the following statement: "father was a navy mechanic, so may have had asbestos exposure that he brought home".

**ANSWER:**

98.    Admit that Dr. Suprith Badarinath's medical record of April 28, 2020 (Bates No. MR-CancerSpecialistsofN(62382)-Gref.Brian-000002) says "father was a navy mechanic, so may have had asbestos exposure that he brought home".

**ANSWER:**

99.    Admit that you never used talcum powder products from 2011 until August of 2015.

**ANSWER:**

Dated: April 7, 2022

HAWKINS PARNELL & YOUNG LLP

By:_____

Alfred J. Sargente, Esq. (AS-3094)
275 Madison Avenue, 10th Floor
New York, NY, 10016
212.897.9655
*Attorneys for Defendant*
*American International Industries*

6

JA661

# EXHIBIT AA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN JOSEPH GREF,<br><br>    Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL INDUSTRIES, et al.<br><br>    Defendants. | Case No. 1:20-CV-05589-GBD |

**DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' SECOND
REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO PLAINTIFF**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and Local Rule 26.1, Defendant American International Industries requests that Plaintiff responds to this Request within the time prescribed by the Federal Rules of Civil Procedure, and produce or make available for inspection and copying the following documents and electronically stored information at such time and place as may be agreed upon by all counsel.

**DEFINITIONS**

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in this Request, the following terms are to be interpreted in accordance with these definitions:

a) "All" means and includes any, each and every one.

b) "And" means and includes "or."

c) "Asbestos" is a collective mineralogic term that describes a variety of certain silicates belonging to the serpentine and amphibole mineral groups, which have naturally crystallized in the fibrous habit causing them to be easily separated into long, thin, flexible, strong fibers when crushed or processed. Included in the definition are chrysotile, crocidolite, fibrous grunerite (amosite), fibrous anthophyllite, fibrous tremolite, and fibrous actinolite.

1

**JA663**

d) "Asbestos-containing" or "asbestos containing" means a product, material, or substance that consists or consisted of, in whole or in part, or contains or contained, one or more of the following: chrysotile, amosite, crocidolite, fibrous tremolite, fibrous anthophyllite, and/or fibrous actinolite. "Asbestos-containing" or "asbestos containing" also means a product, material, or substance that Plaintiff alleges and/or contends consists or consisted of, in whole or in part, or contains or contained, one or more of the following: chrysotile, amosite, crocidolite, fibrous tremolite, fibrous anthophyllite, and/or fibrous actinolite.

e) "AII" or "Defendant" means Defendant American International Industries.

f) "Asbestos Bankruptcy Trust" means any trust, qualified settlement fund or similar entity administering the assets of a manufacturer, distributor or supplier of asbestos or asbestos-containing products, including but not limited to: A.P. Green, A-Best, Amatex Corporation, American Shipbuilding, API Industries, Armstrong Contracting & Supply, Armstrong World Industries (including Nitram and Desseaux), ARTRA (Synkoloid), ASARCO (including Lake Asbestos of Quebec, CAPCO Pipe Company and Cement Asbestos Products Company), Asbestec, Atlas Corporation, Babcock & Wilcox, Bethlehem Steel, Brunswick Fabrications, Burns & Roe Enterprises, Carey-Canada, Cassiar Mines, CE Thurston, Celotex, Chemetron, Combustion Engineering, Congoleum, Delaware Insulations, E.J. Bartells, Eagle Piche Industries, Eastco Industrial Safety Corporation, Federal Mogul (including Gasket Holdings and T&N), Flintkote, Forty-Eight Insulations, Fuller-Austin Insulation, Gatke Corp., G-1 Holdings (successor to GAF), H & A Construction, H.K. Porter Co., Harbison Walker, Harnischfeger Industries, Hillsborough Holdings (successor to Jim Walters and Celotex), Johns-Mansville, JT Thorpe, Kaiser Aluminum and Chemical, Keene Corp. (successor to Baldwin Ehret-Hill), Kellogg Brown &Root/DII, Kentile Floors, Lone Star Steel, Lykes Brothers Steamship, M.H. Detrick, Muralo, National Gypsum, Nicolet, North American Asbestos Corporation, North American Refractories (NARCO)/RHI, Owens Corning Fiberglas (including Fibreboard and CDC Corp.), Pacor, Pfizer/Quigley, Pittsburgh Corning, Plibrico, Porter Hayden, Prudential Lines, Raytech Corporation (successor to Raymark), Rock Wool Manufacturing, Rutland Fie & Clay, Shook & Fletcher, Skinner Engine Company, Standard Insulations Inc., Stone and Webster, Swan Transportation, Todd Shipyards, U.S. Gypsum (including L&W Supply), U.S. Mineral, United States Lines, UNR Industries, Utex Industries, W.R. Grace, Wallace & Gale, Washington Group International, Waterman Steamship Corp., and Western MacArthur.

g) "Communication" means the transmittal of information by any means.

h) "Complaint" means the complaint filed in the United States District Court for the Southern District of New York bearing case number 1:20-cv-05589 and any amendments thereto.

i) "Document" or "Documents" are defined to be synonymous in meaning and equal in scope to the usage of the term "items" in Fed. R. Civ. P. 34(a)(1) and include(s), but is not limited to electronically stored information. The terms "writings," "recordings," and "photographs" are defined to be synonymous in meaning and equal in scope to the usage of those terms in Fed. R. Evid. 1001. A draft or non-identical copy is a separate document

2

**JA664**

within the meaning of the term "document." "Document" or "Documents" also means anything in writing or electronic form, and includes the original or identical copy of such in handwriting, printing, photostating, photographing, computer printout, computer copy, and every other means of recording upon any tangible thing or form of communication or representation including letters, words, pictures, sounds, or symbols or combinations of them.

j)  "Fiber" means the smallest elongated crystalline unit that can be separated from a bundle or appears to have grown individually in that shape, and that exhibits a resemblance to organic fibers.

k)  "Fibrous" means a mineral habit where crystals form naturally as long thin hair-like crystals.

l)  "Identify" with respect to a "Document" means that you shall provide the full title of the Document, the date the Document was generated, the author/authors of the Document, and a description of the Document (e.g., letter, memorandum, report, book, photograph, etc.).

m)  "Occurrence" and "transaction" mean the events described in the Complaint and other pleadings, as the word "pleadings" is defined in Fed. R. Civ. P. 7(a).

n)  "Or" means and includes "and."

o)  "Plaintiff," "You," or "Your" means Plaintiff Brian Gref and/or any agents, attorneys, or individuals acting on his or their behalf.

p)  "Relate to" or "relates to" means constituting, defining, concerning, embodying, reflecting, identifying, stating, referring to, dealing with or in any way pertaining to.

q)  "Regarding" shall mean regarding, evidencing, establishing, concerning, reflecting, referencing, referring to, pertaining to, relating to, and about.

r)   "Talc" is a powdered, selected, natural, hydrated magnesium silicate.  Pure talc has the formula $Mg_3Si_4O_{10}(OH)_2$.  It may contain variable amounts of associated minerals among which chlorites (hydrated aluminum and magnesium silicates), magnesite (magnesium carbonate), calcite (calcium carbonate), and dolomite (calcium and magnesium carbonate) are predominant.[1]

s)  "Talc-containing product" as used herein refers to any product, matter, substance, or material containing the mineral talc, including all grades and morphologic forms (e.g. platy, fibrous, cosmetic, industrial, food grade). This includes talcum powder. It also includes components and/or ingredients designed, manufactured, and/or supplied by a third party.

t)  A "testifying expert" is an expert who may be called by Plaintiff to testify as an expert

---

[1] U.S. Pharmacopeia Talc, Revision Bulletin

3

witness at trial, either live or by deposition.

u) A "consulting expert" is an expert who has been consulted, retained, or specially employed by Plaintiff in anticipation of litigation or in preparation for trial, but who is not a "testifying expert" and whose mental impressions or opinions have been reviewed by a "testifying expert."

## GENERAL INSTRUCTIONS:

1. You are to produce all responsive documents within your possession, custody or control, and also all documents within the possession, custody or control of your attorneys, agents, servants, or employees or otherwise available to you, wherever the documents may be located.

2. If the original of any document responsive to these demands was in your possession or control in the past, but is no longer in your possession or control, then (1) state whether it is missing, lost, destroyed, transferred voluntarily or involuntarily to others, or was otherwise disposed of and (2) describe in detail the date and circumstances under which it left your possession or control and (3) state the current location of the original and identify each person having possession or control of the original.

3. For each document, you are to indicate each request to which it is responsive.

4. Pursuant to Rule 34(b)(2)(B), if you object to a request, the grounds for each objection must be stated with specificity. Also pursuant to that Rule, if you intend to produce copies of documents or of electronically saved information instead of permitting inspection, you must so state.

5. If you object to any request on any basis, then designate the documents you are withholding and describe in detail the basis for your objection, both with sufficient specificity to allow an application to the Court to determine the propriety of your objection. You shall produce responsive documents to the extent not objected to.

6. If, in responding to this Request for Production, the responding party encounters any ambiguities when construing a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

7. Pursuant to Rule 34(b)(2)(C), an objection must state whether any responsive materials are being withheld on the basis of that objection.

8. When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of

4

**JA666**

the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

10. It is intended that this Request will not solicit any material protected either by the attorney/client privilege or by the work product doctrine which was created by, or developed by, counsel for the responding party after the date on which this litigation was commenced. If any Request is susceptible of a construction which calls for the production of such material, that material need not be provided and no privilege log pursuant to Fed. R. Civ. P. 26(b)(5) or Discovery Guideline 9(a) will be required as to such material.

11. If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

## REQUESTS

1. All medical records relating to any skin condition You may have reported to any health care provider.

2. All medical records relating to any rash You may have reported to any health care provider.

3. All medical records relating to any heat-related rash You may have reported to any health care provider.

4. All medical records relating to any skin condition that either of Your parents may have reported to any health care provider.

5. All medical records relating to any rash that either of Your parents may have reported to any health care provider.

6. All medical records relating to any heat-related rash that either of Your parents may have reported to any health care provider.

Dated: May 6, 2022

**HAWKINS PARNELL & YOUNG LLP**

By:_____
   Alfred J. Sargente, Esq. (AS-3094)
   275 Madison Avenue, 10th Floor
   New York, NY, 10016
   212.897.9655
   *Attorneys for Defendant*
   *American International Industries*

5

**JA667**

## CERTIFICATE OF SERVICE

I, Tanya L. Logan, do hereby certify that I served a true and correct copy of the foregoing:

**DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' SECOND REQUEST FOR PRODCUTION OF DOCUMENTS DIRECTED TO PLAINTIFF** upon all counsel/parties by e-mail on May 6, 2022.

_____
TANYA L. LOGAN

# EXHIBIT BB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                          :
BRIAN JOSEPH GREF,                                        :        Docket No.: 1:20-cv-05589
                                                          :
                    Plaintiff,                            :        PLAINTIFF'S RESPONSES
                                                          :        TO AMERICAN
                                                          :        INTERNATIONAL
                                                          :        INDUSTRIES
               -against-                                  :        SUPPLEMENTAL
                                                          :        REQUESTS FOR
                                                          :        ADMISSIONS
                                                          :
                                                          :
                                                          :
AMERICAN INTERNATIONAL INDUSTRIES,                        :
*individually and as successor-in-interest for the*      :
   CLUBMAN BRAND, et al.,                                 :
                                                          :
                    Defendants.                           :
                                                          :
-------------------------------------------------------------------X

### PLAINTIFF'S RESPONSES TO DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' SUPPLEMENTAL REQUEST FOR ADMISSIONS TO PLAINTIFF BRIAN JOSEPH GREF

NOW COMES Plaintiff herein, by and through their counsel of record, respectfully submit the following responses to Defendant American International Industries' ("Defendant") Supplemental Request for Admissions Directed to Plaintiff.

### PRELIMINARY STATEMENT

Plaintiff expressly reserves the right to amend, add to, delete from, or otherwise modify or supplement each and every response to this and any other discovery requests propounded upon him throughout the discovery process and to make such claims and contentions as may be appropriate when Plaintiff has concluded all discovery and has ascertained all relevant facts. To the extent that these Requests calls for information prepared in anticipation of litigation or for trial, or which is



1

**JA670**

otherwise protected from disclosure by the work product doctrine, the attorney client privilege, or any other privilege, Plaintiff will not supply or render information protected from discovery by virtue of such doctrine or privileges. No response herein is, or should be construed to be, a waiver of the protection by such doctrine or privilege.

## REQUEST FOR ADMISSIONS

64. Admit that You saw health care providers prior to 2019 for routine health care that was unrelated to your current diagnosis on which this lawsuit is based.

**ANSWER:** Admitted.

65. Admit that from Your birth until 1988 Your father was on active duty in the United States Navy.

**ANSWER:** This request has been withdrawn by Defendant.

66. Admit that from Your birth until approximately 1999 Your mother was on active duty in the United States Navy.

**ANSWER:** This request has been withdrawn by Defendant.

67. Admit that You have received medical care from military health care providers during Your lifetime.

**ANSWER:** Admitted.

68. Admit that You have no medical records evidencing that You have ever reported a skin condition to any health care provider.

**ANSWER:** This request has been withdrawn by Defendant.

69. Admit that You have no medical records evidencing that You have ever reported having a rash to any health care provider.

**ANSWER:** This request has been withdrawn by Defendant.

70.     Admit that You have no medical records evidencing that You have ever reported having a heat-related rash to any health care provider

**ANSWER:** This request has been withdrawn by Defendant.

71.     Admit that You have no medical records evidencing that either of Your parents reported your having a skin condition to any health care provider

**ANSWER:** This request has been withdrawn by Defendant.

72.     Admit that You have no medical records evidencing that either of Your parents reported your having a rash to any health care provider

**ANSWER:** This request has been withdrawn by Defendant.

73.     Admit that You have no medical records evidencing that either of your parents reported your having a heat- related rash to any health care provider.

**ANSWER:** This request has been withdrawn by Defendant.

74.     Admit that You have never sought medical treatment from any health care provider for any skin related conditions.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous, overbroad and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

75.     Admit that You have never reported having a skin condition to any healthcare provider.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous, overbroad and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

76.     Admit that You have never reported having a rash to any healthcare provider.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous, overbroad and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

JA672

77.    Admit that You have never reported having a heat- related rash to any healthcare

provider?

**ANSWER:** Plaintiff objects to this request as vague, ambiguous, overbroad and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

78.    Admit that Old Spice Talcum Powder was a fragranced talcum powder.

**ANSWER:**  Plaintiff objects to this request as vague, ambiguous and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

79.    Admit that Clubman Talcum Powder was a fragranced talcum powder.

**ANSWER:**  Plaintiff objects to this request as vague, ambiguous and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

80.    Admit that English Leather Talcum Powder was a fragranced talcum powder.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

81.    Admit that Johnson & Johnson Baby Powder was a fragranced talcum powder.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

82.    Admit that Johnson & Johnson Shower to Shower was a fragranced talcum powder.

**ANSWER:** Plaintiff objects to this request as vague, ambiguous and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

83.    Admit that Mennen Powder was a fragranced talcum powder.

**ANSWER:** Plaintiff objects to this request as vague and incapable of being admitted/denied as drafted in view of its use of undefined term(s).

84.    Admit that you produced to All the medical records from Mayo Clinic attached

hereto as Bates Nos. MR-MayoClinicHospitalin(29248)-Gref.Brian-000001-000047.

**ANSWER:**    Admitted.

85.    Admit that you saw Dr. Ehsan Shirazi at the Mayo Clinic on January 21, 2020.

( 4 )

**JA673**

**ANSWER:** Plaintiff does not at this time specifically recall whether he saw Dr. Shirazi on January 21, 2020 and therefore is unable to admit or deny this request at this time.

86.    Admit that    Dr.    Shirazi's    medical    records    (Bates Nos. MR- MayoClinicHospitalin(29248)-Gref.Brian-000001-000047) are authentic.

**ANSWER:** This request has been withdrawn by Defendant.

87.    Admit that a male family member attended your visit with Dr. Shirazi on January 21, 2020.

**ANSWER:** Plaintiff does not at this time specifically recall whether he saw Dr. Shirazi on January 21, 2020, or who, if anyone, may have been with him at any such appointment, and therefore is unable to admit or deny this request at this time.

88.    Admit that the male family that attended your visit with Dr. Shirazi on January 21, 2020, was Your father, Roger Gref.

**ANSWER:** Plaintiff does not at this time specifically recall whether he saw Dr. Shirazi on January 21, 2020, or who, if anyone, may have been with him at any such appointment, and therefore is unable to admit or deny this request at this time.

89.    Admit that Dr. Shirazi's medical record of January 21, 2020 (Bates No. MRMayoClinicHospitalin(29248)-Gref.Brian-000013), contains the following statement: "He states he believes his mesothelioma was due to asbestos exposure from his biological father who worked in the Navy in a shipyard with aerosolized asbestos".

**ANSWER:** This request has been withdrawn by Defendant.

90.    Admit that the "he" in the statement in Request No. 80 was You, Brian Gref.

**ANSWER:** Objection. This request is unintelligible and Plaintiff is unable to admit or deny this request.

91.    Admit that the "he" in the statement in Request No. 80 was your father, Roger Gref.

**JA674**

**ANSWER:** Objection. This request is unintelligible and Plaintiff is unable to admit or deny this request.

92.    Admit that you have seen Dr. Suprith Badarinath of Cancer Specialist of North Florida.

**ANSWER:** Admitted.

93.    Admit that you produced to All the medical records from Cancer Specialists of North Florida attached hereto as Bates Nos. MR-CancerSpecialistsofN(62382)-Gref.Brian-000001-000087.

**ANSWER:** Admitted.

94.    Admit that the medial records from Cancer Specialists of North Florida (Bates Nos. MR-CancerSpecialistsofN(62382)-Gref.Brian-000001-000087) are authentic.

**ANSWER:** This request has been withdrawn by Defendant.

95.    Admit that you saw Dr. Suprith Badarinath on March 31, 2020.

**ANSWER:** Plaintiff does not at this time specifically recall whether he saw Dr. Badarinath on March 31, 2020 and therefore is unable to admit or deny this request at this time.

96.    Admit that you saw Dr. Suprith Badarinath on April 28, 2020.

**ANSWER:** Plaintiff does not at this time specifically recall whether he saw Dr. Badarinath on April 28, 2020 and therefore is unable to admit or deny this request at this time.

97.    Admit that Dr. Suprith Badarinath's medical record of March 31, 2020 (Bates No. MR-CancerSpecialistsofN(62382)-Gref.Brian-000008) contains the following statement: "father was a navy mechanic, so may have had asbestos exposure that he brought home".

**ANSWER:** This request has been withdrawn by Defendant.

**JA675**

98.    Admit that Dr. Suprith Badarinath's medical record of April 28, 2020 (Bates No. MR-CancerSpecialistsofN(62382)-Gref.Brian-000002) says "father was a navy mechanic, so may have had asbestos exposure that he brought home".

**ANSWER:** This request has been withdrawn by Defendant.

99.    Admit that you never used talcum powder products from 2011 until August of 2015.

**ANSWER:**  Plaintiff objects to this Request as improperly seeking information as to a fundamental disagreement at the heart of the lawsuit.  Without waiving this objection, denied.

Date:   May 9, 2022                           Respectfully Submitted,

                                        */s/ Brett Fuller*
                                        Brett F. Fuller, *pro hac vice*
                                        Simmons Hanly Conroy
                                        112 Madison Avenue
                                        New York, NY 10016
                                        Phone: (212) 784-6400
                                        Email: bfuller@simmonsfirm.com

**Certificate of Service**

I hereby certify that on this 9th day of May, 2022, I served a copy of the foregoing on all counsel of record via electronic mail per the parties' agreement.

                                        */s/ Brett Fuller*
                                        Brett F. Fuller

JA676

# EXHIBIT CC

JA678

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
BRIAN JOSEPH GREF,                                  :         Docket No.: 1:20-cv-05589
                                                    :
                               Plaintiff,           :         PLAINTIFF'S RESPONSES
              -against-                             :         TO AMERICAN
                                                    :         INTERNATIONAL
                                                    :         INDUSTRIES' SECOND
                                                    :         REQUEST FOR
                                                    :         PRODUCTION OF
                                                    :         DOCUMENTS DIRECTED
                                                    :         TO PLAINTIFF
                                                    :
                                                    :
AMERICAN INTERNATIONAL INDUSTRIES,                  :
*individually and as successor-in-interest for the*  :
CLUBMAN BRAND, et al.                               :
                                                    :
------------------------------------------------------------------X

### PLAINTIFF'S RESPONSES TO AMERICAN INTERNATIONAL INDUSTRIES' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO PLAINTIFF

NOW COMES Plaintiff herein, by and through his counsel of record, and respectfully submits the following responses to Defendant American International Industries' ("Defendant") Second Request for Production of Documents Directed to Plaintiff.

### PRELIMINARY STATEMENT

Plaintiff expressly reserves the right to amend, add to, delete from, or otherwise modify or supplement each and every response to this and any other discovery requests propounded upon him throughout the discovery process and to make such claims and contentions as may be appropriate when Plaintiff has concluded all discovery and has ascertained all relevant facts. To the extent that these Requests calls for information prepared in anticipation of litigation or for trial, or which is otherwise protected from disclosure by the work product doctrine, the attorney client

privilege, or any other privilege, Plaintiff will not supply or render information protected from discovery by virtue of such doctrine or privileges. No response herein is, or should be construed to be, a waiver of the protection by such doctrine or privilege.

## **RESPONSES**

1.    All medical records relating to any skin condition You may have reported to any health care provider.

   **RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through the use of undefined terms. Plaintiff further objects on the basis that the request, as drafted, necessarily seeks irrelevant information and also exceeds the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. Plaintiff maintains these objections and states, subject to and without waiver of them, that Plaintiff's counsel has produced, and will continue to produce by way of supplementation, medical records that are received in response to Plaintiff's HIPAA requests.

   Investigation continues and Plaintiff reserves to supplement and/or amend this response.

2.    All medical records relating to any rash You may have reported to any health care provider.

   **RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through the use of undefined terms. Plaintiff further objects on the basis that the request, as drafted, necessarily seeks irrelevant information and also exceeds the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. Plaintiff maintains these objections and states, subject to and without waiver of them, that Plaintiff's counsel has produced, and will continue to produce by way of supplementation, medical records that are received in response to Plaintiff's HIPAA requests.

   Investigation continues and Plaintiff reserves to supplement and/or amend this response.

3.    All medical records relating to any heat-related rash You may have reported to any health care provider.

   **RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through the use of undefined terms. Plaintiff further objects on the basis that the request, as drafted, necessarily seeks irrelevant information and also exceeds the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. Plaintiff maintains these objections and states, subject to and without waiver of them, that Plaintiff's counsel has produced, and will continue to produce by way of supplementation, medical records that are received in response to Plaintiff's HIPAA requests.

   Investigation continues and Plaintiff reserves to supplement and/or amend this response.

4.    All medical records relating to any skin condition that either of Your parents may have reported to any health care provider.

**RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through, by example, the use of undefined terms, seeking irrelevant information, and exceeding the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. The request as drafted also seeks to violate Plaintiff's parents' federal and state rights to privacy and confidentiality protecting from disclosure their medical/health-related information, which further renders the request objectionable.

Investigation continues and Plaintiff reserves to supplement and/or amend this response.

5.    All medical records relating to any rash that either of Your parents may have reported to any health care provider.

**RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through, by example, the use of undefined terms, seeking irrelevant information, and exceeding the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. The request as drafted also seeks to violate Plaintiff's parents' federal and state rights to privacy and confidentiality protecting from disclosure their medical/health-related information, which further renders the request objectionable.

Investigation continues and Plaintiff reserves to supplement and/or amend this response.

6.    All medical records relating to any heat-related rash that either of Your parents may have reported to any health care provider.

**RESPONSE:** Plaintiff objects to this request as vague, ambiguous and overbroad through, by example, the use of undefined terms, seeking irrelevant information, and exceeding the permissible scope of discovery, which is confined to relevant matters proportional to the needs of the case. The request as drafted also seeks to violate Plaintiff's parents' federal and state rights to privacy and confidentiality protecting from disclosure their medical/health-related information, which further renders the request objectionable.

Investigation continues and Plaintiff reserves to supplement and/or amend this response.

Date:  June 6, 2022                                          Respectfully submitted,

                                                            _/s/ Brett Fuller_____
                                                            Brett F. Fuller, *pro hac vice*
                                                            Simmons Hanly Conroy
                                                            112 Madison Avenue

New York, NY 10016
Phone: (212) 784-6400
Email: bfuller@simmonsfirm.com

**<u>Certificate of Service</u>**

I hereby certify that on this 6th day of June, 2022, I served a copy of the foregoing

on all counsel of record via electronic mail per the parties' agreement.


*/s/ Brett Fuller*
Brett F. Fuller

**JA682**

# EXHIBIT DD

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Brian Joseph Gref, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:20-cv-05589-GBD-VF |
| American International Industries, et al., | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    NAVY PERSONNEL COMMAND, PERS 312D1, 5720 INTEGRITY DRIVE, MILLINGTON, TN 38055-3120

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Refer to Schedule A

| Place: Hawkins Parnell & Young, LLP | Date and Time: |
|---|---|
| 275 Madison Avenue, 10th Floor New York, NY 10016 | 11/21/2022 12:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   October 31, 2022

| *Magistrate Judge* | | |
|---|---|---|
| *Magistrate Judge Hon. Valerie Figueredo* | OR | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendant
American International Industries , who issues or requests this subpoena, are:

Alfred J. Sargente, Esq., 275 Madison Avenue, 10th Fl, New York, NY 1001, (646) 589-8714, asargente@hpylaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Case 1:20-cv-05589-GBD-VF   Document 259   Filed 10/31/22   Page 2 of 4

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:20-cv-05589-GBD-DCF

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Defendant American International Industries

on *(date)*                          .

☑ I served the subpoena by delivering a copy to the named person as follows:   Director, National Personnel

NAVY PERSONNEL COMMAND, PERS 312D1, 5720 INTEGRITY DRIVE, MILLINGTON, TN 38055-3120

                                            on *(date)*                     ; or

☐ I returned the subpoena unexecuted because:                                        

                                                                       .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$                        .

My fees are $                    for travel and $                    for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date:                    

                                    _____
                                              *Server's signature*

                                    _____
                                              *Printed name and title*

                                    _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

**JA685**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## JA686

## SCHEDULE A

Any and all Military Personnel Records in the possession of the Navy Personnel Command, ERS 312D1, 5720 Integrity Drive, Millington, TN 38055-3120, from 07/25/1982-07/25/2000 relating to Karen Linda Nappi, f/k/a Gref (Maiden Name: Conna), DOB: 12/21/1951; USN, UIC 04639, which relate to: (1) Ms. Nappi's duty stations and assignments; (2) Ms. Nappi's son, Brian Gref (DOB: (07/25/1982; SSN XX-XX-3163) ; and/or (3) Ms. Nappi's potential exposure to asbestos, or use of asbestos or asbestos-containing products, at locations which she served.

# EXHIBIT EE



Deposition of:

**Theresa Swain Emory , M.D.**

*October 1, 2020*

In the Matter of:

**Bell, Lloyd et al v. American International Industries et al**

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

**JA689**

Theresa Swain Emory , M.D.                    October 1, 2020

Page 153

1          So -- and that's true.  Again, with a

2     rare disease, to prove a negative is -- you've got

3     to have statistical power.

4          Q    Okay.  Exhibit 15, we marked, is the

5     paper published this year that you authored with

6     Dr. Maddox and Dr. Kradin.  Let me know when

7     you're able to pull up that document.

8          A    I'm there.

9          MR. SCHROLL:  And it's loaded for

10    everybody?  Okay.

11    BY MR. SCHROLL:

12         Q    Now, this case series that you published,

13    it has information about the 75 cases --

14         A    I'm sorry?

15         Q    I had a phone interruption here.  I'm

16    sorry, hold on.  My phone was ringing.  Okay.

17         Can you hear me now?

18         A    I can.

19         Q    And table 1 of your paper contains

20    information about the 75 cases, correct?

21         A    Yes.

22         Q    Okay.  And if I understand from a prior

Theresa Swain Emory , M.D.                    October 1, 2020

Page 154

1    deposition, that if I asked you for the names of

2    the 75 individuals, you will not provide that

3    information, correct?

4        A    That is correct.  And that is what's

5    called ethics.  Right?  So there's a lot of

6    reasons why, but one of them is I am a doctor of

7    medicine.  I am ethical.  And in ethics, you

8    don't -- once you anonymize a patient in a

9    study -- for example, the study of the over a

10   thousand that I did for gastrointestinal GI

11   tumors -- you anonymize them -- that's an ethical

12   standard that has been forever about how you do

13   that.  You don't de-anonymize people or subjects,

14   human subjects.  That is the basis.

15            And so this paper has nothing in it that

16   is -- identifies any patient.  They're anonymous.

17   And there is no company listed or any supplier or

18   anything else in this paper.

19            So the paper stands for what it is.  And

20   the only thing I'm going to talk to you about is

21   what is in that paper, because I don't know -- I

22   think the bar association probably has ethical

Theresa Swain Emory , M.D.                    October 1, 2020

Page 155

1    standards, and your state bar that you have to

2    live by and that you could be sanctioned and that

3    you could lose your law license -- and the same

4    thing with medicine.  I have an ethical obligation

5    to keep human subjects that are anonymized

6    anonymized.  And I would think that, as an

7    attorney, that you also have ethical standards

8    that you have to live by.

9            So in addition to HIPAA and all of that,

10   anonymization of human subjects for medical

11   research is a standard that has been practiced

12   forever, at least, you know, a hundred years.  All

13   the studies we look at.  And to ask for that type

14   of information is, at the least, unethical, it's

15   illegal from -- to get that kind of information,

16   and would jeopardize, I think, anyone that was

17   pressuring that to occur.

18           So, yes, I am not going to define who

19   these people are, what human subjects they are.

20   The paper stands as it is.  Whether someone

21   accepts the paper, doesn't think that it does

22   anything to add to the literature or it does add

Theresa Swain Emory , M.D.                    October 1, 2020

Page 156

1    to the literature, that's fine.  This paper was

2    peer reviewed and, therefore, I will not disclose.

3          And I would be remiss to say that I'm not

4    certain that even the state bar would have a

5    problem with somebody breaching that ethics

6    standard of human subjects for medical research.

7          MR. TOMLIN:  Objection.  Non-responsive.

8    BY MR. SCHROLL:

9      Q    Okay.  Thank you for that, Doctor.  And

10   with that understanding, the way this works is

11   that -- I understand what your position is and the

12   answer you're going to give me, but I have to make

13   a record for the judge to review.  So I'm going to

14   ask you some questions about the identifying

15   information.  And I understand your position and

16   you can simply say -- you know, reiterize your

17   point that you will not tell me the information,

18   and that is sufficient for my purposes here today.

19   Okay?

20     A    Yes.

21     Q    Okay.  In the data provided in the

22   article, it does not note the brand of talcum

Theresa Swain Emory , M.D.                    October 1, 2020

Page 158

1    one issue.  The other one is there's no basis for

2    anyone in a particular litigation to be asking for

3    information that is anonymized and doesn't claim

4    any particular product or anything here.  So there

5    is no basis for it and, no, I won't.

6        Q    Okay.  And will you tell me the

7    identities of the individual law firms that

8    referred the 75 cases?

9        A    The paper does not implicate or talk

10   about any law firm, any specific product.  And the

11   human subjects have been anonymized.  So I will

12   not do any more than what is in this paper.  This

13   paper stands as this paper.  And it was peer

14   reviewed.  And it is -- that's all the information

15   I will provide is what's published in the

16   literature.

17       Q    And I understand that, Doctor.  It sounds

18   like, again, the answer is no.  So I'll accept

19   that.  But I just need to have an answer on the

20   record.

21            So when it comes to the identities of the

22   law firms that referred these 75 cases, will you

Theresa Swain Emory , M.D.                October 1, 2020

Page 159

1    tell me those law firm names for the individual 75

2    cases, yes or no?

3         A    No.

4              MS. KAGAN:  Asked and answered.

5              THE REPORTER:  I'm sorry?

6              MS. KAGAN:  The objection was asked and

7    answered.

8              THE WITNESS:  I answered the question.

9    BY MR. SCHROLL:

10        Q    Would you reveal any information about

11   the manner on how the individual 75 used the

12   talcum powder products?

13        A    The paper stands for itself.  So no

14   additional information will be provided.

15        Q    Will you tell me the age that any of the

16   75 individuals first started using talcum powder

17   products?

18        A    I will not add anything that's in the --

19   that isn't in the paper.  And you can look for

20   yourself the estimated years of use and estimated

21   years of latency and you can look at the age and

22   you could figure that out.

Theresa Swain Emory , M.D.                October 1, 2020

Page 180

1    case, correct?

2        A    I think so.

3        Q    Okay.  Would you tell the brand of talcum

4    powder that any of the individuals used to

5    Dr. Moline?

6        A    I think I've made it very clear that I

7    won't tell any additional information with regard

8    to these 75 human subjects than what was published

9    in the peer-reviewed literature.

10       Q    Okay.  Hold on.  I'm trying to load the

11   next exhibit.  Okay.  Let's pull up Exhibit 17.

12            (Deposition Exhibit Number 17 was marked

13   for identification.)

14   BY MR. SCHROLL:

15       Q    Let me know when you can view it.

16            Are you able to see it, Doctor?

17       A    Yes.

18       Q    And this is an e-mail exchange that you

19   had with Dr. David Egilman, correct?

20       A    Yes.

21       Q    And he's asking you a question about case

22   number 75, correct?

Theresa Swain Emory , M.D.                    October 1, 2020

Page 181

1      A     Yes.

2      Q     And you reply to him and you give

3    information about case number 75, correct?

4      A     Number 75 -- yes.

5      Q     Okay.  And you tell Dr. Egilman that she

6    used one product, Cashmere Bouquet, correct?

7      A     Yes.

8      Q     Okay.  And you would not tell me today

9    the brand of talcum powder used by any of these 75

10   individuals in your case series, correct?

11     A     That's correct.

12     Q     And why is it that you're able to tell

13   Dr. Egilman the brand of talcum powder?

14     A     Because he wasn't trying to de-anonymize

15   anyone.  He asked a question for his medical

16   research, I'm sure, but there was no attempt of

17   de-anonymizing anyone, which is what you're here

18   to do today.  So information between people with

19   regard to de-anonymization can occur, but that's

20   not something that somebody is trying to do.

21     Q     How do you know he's not trying to

22   de-anonymize anyone?

# EXHIBIT FF

**JA699**

**In The Matter Of:**

*Archdeacon v.*
*Ameron International Corp., et al.*

*John C. Maddox, MD*
*Vol. I*
*August 06, 2015*



**ZAHN**
COURT REPORTING

208 E. Plume Street, Suite 214
Norfolk, Virginia 23510
*tel:* 757 627 6554  *fax:* 757 625 7077
*email:* info@zahncourtreporting.com

*Original File 080615kzjm.txt*
Min-U-Script® with Word Index

41

1    documents that I've printed out.  And, as I said a

2    minute ago, I estimated 25 to 30 pages perhaps.  That's

3    an estimate, not a count.

4            Next I have what's called an asbestos

5    case worksheet.  It's kind of torn, unfortunately.  But

6    this is what my secretary has recorded as having been

7    received by us and then returned to the law firm.

8            Next I have a -- a FedEx airbill that was

9    created when the material was returned to the law firm

10   on March the 13th.

11           Next I have what's called a Riverside

12   pathology request slip, which is an internal document

13   used by the secretaries to assign an accession number

14   and listing the materials received.

15           So that's -- that's Exhibit Number 31.

16       Q    I did not notice any financial or billing

17   information between you or your facility and the

18   plaintiff's law firm in that summary.  Is there one in

19   there that I missed?

20       A    I don't think so.

21       Q    Where are the billing records regarding

22   this matter or how does that work?

23       A    Now, if you're referring to Peninsula

24   Pathology Associates, of which I am a member, billing

25   Simon Greenstone Panatier and Bartlett, we do not keep

080615kzjm

42

1    records of that sort here.  We use a bookkeeper.  That

2    would be J. Moore & Associates located in Roanoke,

3    Virginia.

4                    Now, I can estimate for you that we

5    probably bill for about three or three and a half hours

6    of review and photography, and so forth, for that.

7    That's -- that's the usual amount.

8                    Now, the billing is done by the company

9    and the -- the payments come in to the company.  I am a

10   partner in that professional corporation and I

11   personally would receive approximately 30 percent of

12   what was billed out; 10 -- 10 percent for the cost of

13   billing and then three partners 30 percent each.

14        Q    So is your estimate for all of the work

15   involved leading to the point of preparing and issuing

16   your report for three and a half hours of labor?

17        A    Yes.  Yes, sir, that would be correct.

18        Q    And any other materials or laboratory

19   costs?

20        A    I don't think so.  I don't see -- I don't

21   see -- let me just check something.

22                    I had said that there was no unstained,

23   recuts or paraffin blocks, so no additional

24   immunostains can be prepared.

25                    Therefore, we did not have to prepare any

**JA702**

080615kzjm

43

1  stains or slides in our lab.  We looked at the slides

2  that were already available and rendered a diagnosis

3  based on them, on those slides, as well as the medical

4  records, the pathology reports that perhaps listed a

5  few other stains as well.

6         Q     For three and a half hours, what was the

7  billing rate?

8         A     These were billed at a rate of five

9  hundred dollars per hour.

10        Q     And is that a standard rate for all of

11 the activities that you engage in in dealing with

12 asbestos litigation or do you have different rates for

13 different things?

14        A     The -- the rate was four hundred dollars

15 an hour until very early in 2014 and then it was

16 increased to five hundred dollars an hour.

17              There's some discussion about a special

18 increase for depositions that go longer than four

19 hours; we're thinking about doubling the rate for

20 those.  But, other than that, I think it will stay at

21 the five hundred dollars per hour for the foreseeable

22 future.

23        Q     You understand you're under oath.

24        A     Yes, sir, I am under oath.

25        Q     Can you describe to me the -- the billing

**JA703**

080615kzjm

44

1   and distribution arrangement again?

2              Five hundred dollars per hour goes to

3   several partners and a portion goes to bookkeeping?

4   Did I get that right?  Who -- who are the partners?

5   Can you summarize that for me?

6         A    Okay, sure.

7              The company in question is Peninsula

8   Pathology Associates, Incorporated, which is a

9   professional service corporation.  There are three

10  partners, which would be myself, I guess you'd say I'm

11  the senior partner because I'm the oldest, the managing

12  partner is Dr. David Smith, and the other partner is

13  Dr. Michael Schwartz.

14             This corporation has been around for

15  several decades.  I can't tell you when it was first

16  incorporated, but, at any rate, we -- we bill for

17  services and the payments come back into the

18  corporation after the -- the cost of billing is

19  deducted by the company, J. Moore & Associates, the

20  accounting and bookkeeping firm, then the remaining

21  90 percent is equally split against the three partners.

22        Q    Have the other two partners, Doctors

23  Smith and Schwartz, done anything with regard to the

24  Archdeacon matter?

25        A    No, sir, they have not.

ZAHN COURT REPORTING
info@zahncourtreporting.com

**JA704**

# Exhibit 1

November 21, 2021

<u>VIA ECF</u>
Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

     **Re:**    *Gref v. Am. Int'l Indus.,* **et al., 20-cv-05589**

Dear Judge Figueredo:

Plaintiff Brian Gref hereby opposes the Motion to Compel the Continuation of the deposition of Plaintiff's Expert Dr. Jacqueline Moline, filed collectively by Defendant American International Industries ("AII"), Colgate-Palmolive Company ("Colgate"), Shulton, Inc. ("Shulton), and Whittaker Clark & Daniels, Inc. ("WCD"), and hereby cross-moves for a protective order pursuant to Federal Rule of Civil Procedure 26(c). Given the numerous procedural and substantive deficiencies of Defendants' motion discussed herein, including Defendants' failure to adhere to Your Honor's Part Rules in both form and substance, Defendants' motion should be denied in its entirety. Additionally, because, as set forth below, Defendants' motion seeks clearly confidential and protected testimony regarding human subjects of scientific studies, the Court should enter a protective order precluding Defendants from asking Dr. Moline questions regarding the same.

<u>**INTRODUCTION**</u>

Dr. Jacqueline Moline is an exceptionally qualified and experienced expert in occupational and environmental medicine who has been deposed and cross-examined by defendants in asbestos and cosmetic talcum powder litigation ***hundreds*** of times. *See e.g.* Dr. Moline Testimony List (Updated Aug. 31, 2022), attached as **Exhibit 1**. In all cases in which she has been retained as an expert, she applies essentially the same generally-accepted methodology to determine the medical causation of a plaintiff or decedent's asbestos-related disease. As she has repeatedly explained in countless depositions – including many attended by the defendants in the instant case – this methodology involves reviewing the individual's clinical history, past medical history, and environmental and occupational history in order to determine if he or she was exposed to asbestos, and whether, based on case-specific evidence and relevant peer-reviewed scientific literature, the exposure was at a level at which disease has occurred in others. Dr. Moline's reliance materials, which firmly support the methodology she applies, are published, peer-reviewed scientific literature that is generally-accepted within the scientific and medical communities. Insofar as all Defendants in this case are entities that are frequently involved in cosmetic talc cases, they are all familiar with Dr. Moline, the methodology she applies and literature she relies upon.

**JA706**

Despite having deposed Dr. Moline on dozens of prior occasions and completed a seven-and-a-half hour deposition in this case during which the full scope of Dr. Moline's opinion and reliance materials were explored, Defendants move this Court to permit an open-ended continued deposition of Dr. Moline claiming further questioning is needed to understand Dr. Moline's methodology and opinions. In addition to numerous procedural flaws, Defendants' motion makes significant misrepresentations about cited case law, the honesty and integrity of Plaintiff's counsel, Dr. Moline, and the good faith that Plaintiff exercised in attempting to resolve this discovery dispute with Defendants prior to their seeking judicial intervention. Disturbingly, Defendants go so far as to accuse Dr. Moline of giving false testimony and Plaintiff's counsel of suborning perjury. These false accusations, casually levied against Plaintiff and his expert without any evidence, should not be given any credence by the Court, and should be viewed instead as generally undermining the credibility of Defendants' motion as more a vehicle for *ad hominem* attacks than a genuine request for discovery.

As set forth in detail herein, each of the grounds on which Defendants claim additional time is needed to depose Dr. Moline is without merit. Significantly, almost none of these issues were raised with Plaintiff in meet and confer negotiations before Defendants filed the instant motion. Under Your Honor's Part Rules, this alone warrants denial of Defendants' motion.

To the extent Defendants make "Mesothelioma Associated With the Use of Cosmetic Talc" (hereinafter "the Moline Study"), the peer-reviewed Study that Dr. Moline co-authored in 2019, the primary focus of its motion, this, in all events, is an improper basis for further questioning. Indeed, having known about the Study for over two years, Defendants have previously examined Dr. Moline about the Study and the methodology she and the co-authors applied (AII as recently as last month in the *Fisher* trial), and had ample opportunity to question Dr. Moline about it at the two-day deposition in this case. Except for a few questions raised on the first day of Dr. Moline's deposition, **Defendants never returned to the topic**, not even during meet-and-confer discussions after the deposition was completed in accordance with Federal Rule 30(d)(1). Defendants now seek to reopen Dr. Moline's deposition by arguing that they are entitled to inquire as to the identity of the Study's human research subjects. As argued by Northwell Health, Dr. Moline's employer, who is the exclusive owner of that information and the target of a subpoena by AII and WCD for records regarding the subjects of Dr. Moline's Study, this information is, as other courts have found, privileged and confidential.[1] Despite Defendants' argument to the contrary, the recent decision by Chief Judge Osteen in *Bell v. American Int'l. Indust.*, which focuses on a sole issue pertinent to that particular case and has no bearing on the instant matter, does not provide otherwise. Indeed, though it does not inform the Court of this, the *Bell* decision explicitly precluded AII from discovering the identities of the very human subjects Defendant now attempts to have this Court compel. *See* Opinion and Order, dated Sept. 13, 2022, attached as **Exhibit 2**. Plaintiff submits that, just as the *Bell* Court, among many others, recognized that the identifying information

---

[1] In this case, Defendants misleadingly argue that "pursuant to a subpoena, Northwell is producing documents related to the Moline article." *See* Defendants' Motion at 13. What Defendants fail to mention is that Northwell filed objections to the subpoena served by the Defendants and further moved to limit the subpoenas. *See* Northwell's Non-Party Objections To Subpoena, **Exhibit 3**. Pursuant to the briefing schedule ordered by the Court, Defendants' responses to Northwell's motions are due today.

which Defendants seek is clearly confidential and protected information, this Court should too preclude Defendants from attempting to question Dr. Moline regarding the same. As such, Plaintiff submits that the Court should enter a protective order, pursuant to Federal Rule of Civil Procedure 26(c), prohibiting Defendants from attempting to depose Dr. Moline regarding the identity of the Study's human research subjects.

The remaining issues raised by Defendants' motion are plagued by various misrepresentations and half-truths about the record and rely on insignificant quibbles with Dr. Moline to feign a need for additional time. All in all, Defendants fail to demonstrate that they used the time afforded by the Federal Rules to depose Dr. Moline efficiently, and they fail to demonstrate that good cause exists to warrant the Court granting them any additional time to continue deposing Dr. Moline. Without these showings, Defendants' interest in questioning Dr. Moline further about any of the topics that they list in their motion is not in good faith. Accordingly, Defendants' motion must be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

I.      **Ignoring the Deeply-Rooted Scientific Foundation Supporting Dr. Moline's Opinion and Extensive Testimony She Has Provided Regarding The Generally-Accepted Methodologies Applied to Reach a Causation Opinion in this Case, Defendants' Claimed Need for Additional Time to Examine Dr. Moline on These Topics Is Both Procedurally Improper and Meritless**

   A.      **Defendants Improperly Base Their Motion to Depose Dr. Moline Far Beyond the 7-Hour Limit on Areas of Inquiry That Were Not Discussed During Required Meet-and-Confer Negotiations And, In All Events, Are Not Discoverable And/Or Have Already Been Asked of Dr. Moline in this Case or Past Depositions That Defendants Agreed to Rely Upon**

In accordance with the then-governing case scheduling order and in response to Defendants' Notice of Deposition, Plaintiff produced his medical causation expert, Dr. Jacqueline Moline, for a deposition on July 6, 2022, and September 23, 2022. Notably, at AII's request, Plaintiff agreed that Defendants could use Dr. Moline's prior testimony from other similar cases (*Crudge*, *Lashley*, and *Bell*) so that questions already asked of Dr. Moline as to issues in common with this case would not have to be repeated, thereby eliminating the need to spend time on matters previously addressed. *See* Dep. of Dr. Moline, dated July 6, 2022, attached as **Exhibit 4**, at 6:14-17, 194:12-23. Notwithstanding having the benefit of these multiple transcripts, Defendants proceeded to question Dr. Moline over the course of two days for 7 hours and 35 minutes (exclusive of breaks), during which large portions of Defendants' examination re-visited matters addressed in Dr. Moline's prior testimony. Revealingly, towards the end of the second day of the deposition (defense was still permitted to cross Dr. Moline further), counsel for AII opposed ending the deposition 35 minutes after the 7-hour mark, claiming, without any support: "*I'm entitled to cross not subject to any time limitation, which will basically [be] going back through all the studies that [Dr. Moline] claims to rely on, et cetera.*" *See* Dep. of Dr. Moline, dated Sept. 23, 2022, attached as **Exhibit 5** at 297:5-9 (emphasis added).

**JA708**

As the deposition transcripts reveal, Defendants explored the full scope of Dr. Moline's opinions and the studies on which she relies, the vast majority of which Defendants are already familiar with. Specifically, Defendants asked Dr. Moline about general, non-case-specific topics that defendants in the talc litigation have already exhaustively explored. Such topics include the scientific literature that supports Dr. Moline's opinion that repeated exposure to asbestos-contaminated cosmetic talcum powder products increases the risk of developing mesothelioma (*see e.g.* **Exhibit 4**, at 87:2-88:3, 93:18-105:24, 150:15-25; **Exhibit 5**, at 239:23-241:9), that the causative link between exposure to asbestos and mesothelioma is supported by epidemiological studies (*see e.g.* **Exhibit 4** 137:2-160:19), and that there is no safe threshold to exposures above background that has been established by generally-accepted medical literature (*see e.g. id.* at 60:7-61:13, 74:18-77:7, 78:7-80:19).

Regarding the article entitled "Mesothelioma Associated With the Use of Cosmetic Talc" (hereinafter "the Moline Study") (attached as **Exhibit 6**), co-authored by Dr. Moline and published in a peer-reviewed journal, Defendants asked Dr. Moline (yet again) about the "cumulative doses" that the subjects studied in that article experienced and the data regarding their asbestos exposures "from all sources." *Id.* at 143:12-145:3. In addition to re-hashing these topics, Defendants also explored Dr. Moline's opinions regarding Plaintiff's specific exposures in this case, her review of his diagnosis, medical and occupational history (*see e.g.* **Exhibit 4** at 13:9-14:9, 116:8-119:18, 134:24-136:25, 161:12-162:7), and the methodology she employed to assign causation of Plaintiff's disease to his use and exposure to Defendants' cosmetic talcum powder products (*see e.g. id.* at 137:2-160:19; **Exhibit 5** at 212:24-213:6, 224:15-239:22, 241:10-261:2).

Following the completion of Dr. Moline's deposition in accordance with Federal Rule 30(d)(1), Plaintiff met via telephone conference with counsel for Defendant Colgate-Palmolive Company, who was acting as liaison for all Defendants, regarding the Defendants' request for a continuation of Dr. Moline's deposition. During the meet and confer, Defendants proposed a "not-to-exceed" four-hour time period to further examine Dr. Moline, explaining that the focus and majority of the estimated four-hour timeframe was necessitated by Defendants' lack of clarity regarding how Dr. Moline arrived at her exposure calculations in this case.

In response, and despite Defendants having already received the benefit of additional time beyond the seven hours provided for under the Federal Rules, Plaintiff nonetheless offered Defendants an additional one hour of time within which to depose Dr. Moline on her dose estimations. From Plaintiff's perspective, this offer was reasonable and in-line with Defendants' own estimation of the additional time they needed now that Plaintiff had confirmed for Defendants the manner and method by which Dr. Moline performed her calculations in this case. Defendants rejected Plaintiff's counter proposal and advised that they would be seeking the Court's intervention to resolve the dispute. This exchange encompassed the totality of the subjects discussed in the parties' good-faith meet-and-confer sessions.

On November 4, 2022, AII, on behalf of all Defendants, moved to compel the continued deposition of Dr. Moline. In direct violation of this Court's Part Rules, AII (i) failed to state any of the specifics of the meet-and-confer negotiations that took place between Plaintiff and Colgate's counsel, (ii) mischaracterized the subject and scope of those negotiations and Plaintiff's position

regarding the one-hour counter proposal, and (iii) filed a brief more than six times longer than the Court's three-page limit. In its improper, non-compliant brief, AII further departed from the proposed four-hour limitation Defendants initially proposed and argued that Dr. Moline's deposition should be continued for an unspecified length of time so that Defendants could inquire as to various subjects that are either facially improper or have already been explored *ad nauseum* with Dr. Moline in this and/or past cases. Tellingly, in listing the subjects on which they seek to further question Dr. Moline, AII fails to advise the Court that the Moline Study and the identity of the human subjects of the study – the very topic on which AII focuses in urging the Court to grant its request for additional time within which to depose Dr. Moline – was neither raised nor the subject of any discussion during the multiple meet and confers.[2] AII's motion also fails to demonstrate that Defendants used the time they had efficiently, or that their questions are not otherwise covered by the testimony they incorporated by reference during the deposition.

**B.     It is Well Established in the Scientific Community That Exposure to Asbestos (As Found In Contaminated Cosmetic Talcum Powder) Causes All Forms of Mesothelioma**

AII sets the stage for its misleading arguments regarding Dr. Moline's Article by repeating the fallacy often raised by defendants in cosmetic talc litigation that there is a lack of epidemiology to support a causal link between Plaintiff's mesothelioma and cosmetic talc use. This argument, which is routinely rejected by courts across the country in the context of decisions on summary judgment motions and *Daubert* motions, ignores that it is the *asbestos* in Defendants' cosmetic talcum powder products that caused Plaintiff's disease. Based on peer-reviewed scientific literature from a range of disciplines, including epidemiology, toxicology, medical research, and industrial hygiene, there is overwhelming consensus that exposure to all forms of asbestos cause cancer, including peritoneal mesothelioma. *See e.g.* Excerpts of WHO, International Agency Research on Cancer ("IARC"), *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, A Review of Human Carcinogens, Part C: Arsenic, Metals, Fibres, and Dusts* Vol. 100C (2012), attached as **Exhibit 7** at 294; Joint Policy Committee of the Societies of Epidemiology*, Position Statement on Asbestos from the Joint Policy Committee of the Societies of Epidemiology (JPC-SE)* (June 4, 2012), attached as **Exhibit 8**. Similarly, it is a widely-accepted scientific fact that talc containing asbestos is a human carcinogen. **Exhibit 7** at 38, 219, 291-294. Numerous experts, including Dr. Moline, have testified to the scientific literature that forms the foundation on which a medical expert may, based upon a case-specific review of an individuals' medical and occupational history, assign causation to the individual's exposure to asbestos-contaminated cosmetic talcum powder product(s) in accordance with generally-accepted methodology.

Importantly, a cosmetic talcum powder product-specific epidemiological study is not required to establish (either legally or scientifically) that there is a link between asbestos-

---

[2] As discussed below, AII not only improperly asks this Court to compel Dr. Moline to disclose the identity of human subjects of medical research and studies in violation of federal, state, and local laws, but also neglects to inform the Court that its attempts have been expressly rejected by multiple other courts. In arguing that the Middle District of North Carolina's decision supports it request, AII misrepresents the scope and impact of that decision, as discussed, *infra*.

contaminated talc and disease. Indeed, "there are about 3,000 products," but "not 3,000 separate studies of every product that contained asbestos." *See* Dr. Moline AM Trial Testimony in *Fisher*, dated Oct. 13, 2022, attached as **Exhibit 9** at 54:7-17. Epidemiologically, it is beyond dispute that asbestos causes disease. The issue in answering whether a product caused an asbestos-related disease is not "the product *per se*. It's whether there was asbestos in the product." *Id.* Altogether, as in past cases involving the same Defendants as here, Dr. Moline[3], with the support of the peer-reviewed literature cited in her reference list, will explain at trial that, breathing asbestos as a result of using cosmetic talcum powder is capable of causing disease just as it is in connection with any other product.

Despite Defendants' claims to the contrary, there is no meaningful difference between pleural and peritoneal mesothelioma. It is the same disease in different locations of the body – the lining of the pleura (in the lung) versus the peritoneum (in the abdomen). **Exhibit 5** at 238:19-239:17. It is beyond credible scientific dispute that both locations of this disease are caused via exposure to asbestos fibers. *See Consensus Report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution*, 23 SCAND. J. WORK ENVIRON. HEALTH 4, 311-316 (1997) cited *infra*.[4] As reflected in Dr. Moline's report and deposition, this distinction does not change the scientific foundation for concluding that asbestos exposure from cosmetic talcum powder products causes each disease. **Exhibit 4** at 84:12-85:2 (explaining that low levels of asbestos exposure are capable of causing peritoneal mesothelioma, undermining earlier notions that higher levels of exposure were required to trigger the disease); **Exhibit 5** at 237:22-243:16 (reiterating the consensus within medical literature that asbestos causes mesothelioma in all locations). Mesothelioma is a "signal" tumor for asbestos exposure. *See* Dr. Moline's Trial Testimony, dated March 9, 2020 in *Lashley*, attached as **Exhibit 11** at 48:12-13. As relevant to this case, based on Plaintiff's exposure history, he suffered an exposure to asbestos through cosmetic talc use that is associated with the very cancer he has and that supports Defendants' products contributed to the development of his disease. **Exhibit 4** at 112:18-24.

In challenging the epidemiology of peritoneal mesothelioma in relation to asbestos and asbestos-contaminated cosmetic talc, Defendants generally ignore the consensus of the objective scientific community that *all forms of mesothelioma* are causally linked to asbestos exposure. *See Consensus Report: Asbestos, asbestosis, and Cancer, the Helsinki Criteria for Diagnosis and Attribution 2014: Recommendations*, 41 SCAND. J. WORK ENVIRON. HEALTH 1, 5-15 (2015), attached as **Exhibit 12**; *Consensus Report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution*, 23 SCAND. J. WORK ENVIRON. HEALTH 4, 311-316 (1997), attached as **Exhibit 13**; **Exhibit 7**. Such consensus is based on the full body of scientific evidence, including

---

[3] As indicated in her *Curriculum Vitae*, Dr. Moline has training and experience in the field of epidemiology. *See* **Exhibit 10**.

[4] AII argues, incredibly, that only 8% of peritoneal mesothelioma victims "report" asbestos exposure, and thus there is a "weak link" between asbestos and peritoneal mesothelioma. Putting to one side that this is not surprising as many mesothelioma victims, including the instant Plaintiff, were unaware that products they were exposed to decades ago contained asbestos, whether a patient "reports" asbestos exposure or not is irrelevant when determining general causation. The fact remains that the credible medical literature is unanimous in concluding that asbestos causes all forms of mesothelioma.

epidemiological studies, human fiber burden testing, animal studies, *in vitro* studies, as well as case series and case-control studies showing that all types of asbestos cause cellular changes that lead to mesothelioma, including peritoneal. *See* Kanarek and Mandich, *Peritoneal Mesothelioma and Asbestos: Clarifying the Relationship by Epidemiology*, Epidemiology Open Access Journal (2016), attached as **Exhibit 14**.

As in past cases, Dr. Moline testified at her deposition in this case about the extensive body of scientific literature supporting her causation opinion and the methodology she applied to reach her opinion. The reference list attached to the report Dr. Moline prepared for this case, which, at the time of disclosure, contained 492 items, is a "living document" to which she adds sources as they become available. *See* Dr. Moline's Dep., dated July 8, 2022 in *Lashley*, attached as **Exhibit 15**, at 83:11-18; *see also* Dr. Moline's Expert Report, **Exhibit 16**. Curiously, Defendants attack Dr. Moline for purportedly lacking a scientific foundation for her opinion, but then complain that her reference list with hundreds of scientific articles supporting her opinion is too large. Ultimately, as Dr. Moline has testified repeatedly, the list demonstrates the overwhelming consensus that exists in the medical and scientific communities that exposure to all forms of asbestos fibers cause mesothelioma.

Notably, each of the above-cited sources is included on Dr. Moline's list. As discussed in further detail below, because Dr. Moline has been deposed hundreds of times in this litigation and the scientific foundation for her opinions is a subject universally explored by defendants, it is beyond disingenuous for Defendants to now claim that they cannot ascertain the bases for Dr. Moline's opinions. Indeed, Defendants were already familiar with the majority of Dr. Moline's reference list before her deposition. On issues that Defendants asked for more specific information about Dr. Moline's reliance materials, Dr. Moline responsively summarized the available literature and/or pointed Defendants to specific sources on her reference list. *See e.g.* **Exhibit 4** at 141:6-145:11 (narrowing sources cited for purposes of reflecting "analogous exposure scenarios" to those specific to peritoneal mesothelioma) **Exhibit 5** at 239:23-240:9 (explaining that literature linking asbestos-contaminated talc and peritoneal mesothelioma are case series and case reports), 241:10-242:24 (clarifying the author, title, and year of Center for Disease Control article cited in report).

## C. Dr. Moline's Peer-Reviewed Article Provides Additional Support for Connecting the Causal Link Between Exposure to Asbestos-Contaminated Cosmetic Talc and Mesothelioma

In their efforts to discredit Dr. Moline and her article, Defendants completely ignore the peer-review process that the article had to go through in order to be published, which gives the article significant indicia of reliability. *See In re Fosamax Products Liability Litig.*, 645 F.Supp.2d 164, 183 (S.D.N.Y. 2009) ("That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, *i.e.*, that it meets at least the minimal criteria of good science," citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("Daubert II"), 43 F.3d 1311, 1318 (9th Cir. 1995). Viewed appropriately in context and substance, Dr. Moline's peer-reviewed, published article is a meaningful addition to the already well-developed lexicon of medical literature that

physicians and scientists may rely upon in treating patients and developing opinions regarding mesothelioma, asbestos, and cosmetic talc.

In January 2020, the Moline Study, which Dr. Moline authored with Dr. Kristin Bevilacqua, Dr. Maya Alexandri, and Dr. Ronald Gordon, was published in the Journal of Occupational and Environmental Medicine. **Exhibit 6**. The Study examined data for 33 human subjects with malignant mesothelioma and no *confirmed* asbestos exposure other than cosmetic talcum powder.[5] *Id.* at 11. The cases were obtained through referrals for medico-legal evaluation, and tissue digestions were performed in six cases.[6] *Id.* The Study concludes that exposure to asbestos-contaminated cosmetic talc can cause mesothelioma and urges clinicians to elicit a history of talcum powder usage in all patients presenting with mesothelioma. **Exhibit 6** at 11.

Notably, the limitations of the Study and methodology employed are disclosed:

> The case series presented should be understood in the context of its limitations. Data were obtained from medical records and transcripts of depositions, rather than structured, in-person interviews. However, the information solicited during the course of the patients' depositions were thorough, and included exhaustive questioning about alternative sources of asbestos exposure, including household exposure, exposures from external industrial sources, occupational exposure, and potential exposure from family members. While deposition testimony is by definition self-report, depositions were given under oath and the potential for recall bias noted would be presented whether patients completed a structured interview or were asked questions during sworn testimony. Furthermore, the utilization of medical records allowed the authors to corroborate important medical information and confirm the pathological diagnosis.

**Exhibit 6** at 16.

Given the enormous body of scientific literature establishing that exposure to asbestos, regardless of the product in which it is contained, is capable of causing mesothelioma, Defendants' claim that Dr. Moline drafted an article *because* there is no epidemiology linking cosmetic talc to mesothelioma is an egregious misstatement. As reflected in Point II(2), *supra*, a scientific foundation to support a medical expert's opinion that exposure to asbestos-contaminated cosmetic talc exists without the Moline's Study. The Study is now merely one of numerous peer-reviewed scientific publications discussing the presence of asbestos in talcum powder and asbestos-related

---

[5] As discussed fully, *infra*, this is includes the *Bell* plaintiff who, despite a full opportunity to do so by AII and other defendants, has never been proven to have experienced a confirmed asbestos exposure other than to cosmetic talc.

[6] Generally speaking, tissue digestions involve removing biological material from a sample of tissue so that the inorganic materials contained therein can be examined on a filter under a microscope. Tissue digestions are significant because they allow for the examination of various fibers in the lung tissues through fiber burden studies, which can provide guidance as to potential prior asbestos exposure, whether from occupational, residential, or para-occupational exposure to asbestos. *See* **Exhibit 6**; *see also Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women*, Gordon, et al., **Exhibit 17**.

disease that is relied upon by Plaintiff's experts when, based on the facts of a case, causation is attributed to a cosmetic talcum powder product. As with any other item of scientific literature, Dr. Moline's Study is not used as, nor is it intended to be, proof that, because the 33 patients were exposed to asbestos from cosmetic talc and diagnosed with mesothelioma, any particular Plaintiff contracted mesothelioma from his or her exposure to cosmetic talc. The Study is merely additional support in the foundation of scientific literature that experts rely on to form their medical causation opinions in a case involving cosmetic talcum powder products.

Moreover, the Study was not written for any litigation purpose. It was borne out of the observation that, historically, there has been a "high prevalence of unexplained or, 'idiopathic mesothelioma' among women," that, a growing body of scientific data, indicates that millions of men and women were unwittingly exposed to asbestos from cosmetic talc products (mostly women as they are the more likely users of these powders), and that these exposures were generally not considered by medical practitioners when examining a mesothelioma patient's exposure history. **Exhibit 6**. Based on the data examined by Dr. Moline and her colleagues, the Study alerts the medical community to cosmetic talc as a potential source of asbestos exposure that should be considered when examining a patient's history. *Id*.; *See* **Exhibit 9** at 67:13-68:8; Dr. Moline PM Trial Testimony in *Fisher*, dated Oct. 13, 2022, attached as **Exhibit 18** at 39:12-16.

Pursuant to the Department of Health and Human Services and the Food and Drug Administration Regulations, the 33 human subjects of Dr. Moline's Study were anonymized in the paper. *Id*; *see* 45 C.F.R. 46.111(a)(7); 21 C.F.R. 56.111(a)(7). As discussed in further detail below, based on these federal regulations as well as the terms of the directive which granted Dr. Moline and her colleagues permission to conduct the Study, the identities of the subjects and their personal medical data are privileged and confidential. Accordingly, requests for disclosure of this information have been repeatedly denied. Nevertheless, as discussed below, even without this information, Defendants have conducted meaningful cross-examinations of Dr. Moline regarding the Study, the methodology applied, the potential alternative exposures that the subjects experienced, and the ultimate conclusions drawn.

### D. The Identity of the Subjects of Peer-Reviewed Medical Literature is Confidential, Protected Information, That is Not Subject to Discovery

For more than two years in litigation across the country, Defendants, led by AII, have been improperly (and unsuccessfully) attempting to discover the protected identities of the human subjects involved in Dr. Moline's Study, either through cross-examining Dr. Moline or filing discovery requests directed at plaintiffs. Because this information is owned exclusively by Northwell Health, Dr. Moline's employer, who gave approval to Dr. Moline and her co-authors to conduct the Study and prepare the peer-reviewed article, but nothing more, neither Plaintiff nor Dr. Moline are in a position to provide Defendants with the information they seek. In any event, as Courts have repeatedly found, this information is protected and confidential and, thus, not discoverable. Contrary to Defendants' contention, the recent decision issued by the Middle District of North Carolina in *Bell v. American Int'l. Indus.*, does not provide otherwise. As discussed below, although Chief Judge Osteen decided to lift a protective order maintaining the anonymity of the decedent in that case as a subject of Dr. Moline's Study, this decision is clearly limited to

the facts and circumstances of that case and does not apply to any of the other 32 subjects, whose identities Judge Osteen *explicitly recognized remain protected*. *See* **Exhibit 2** at 35.

As confirmed by the motions to quash filed by Northwell in response to defense subpoenas seeking, *inter alia*, "information relating to any publication authored or co-authored by Dr. Moline while employed by Northwell, including her article entitled, 'Mesothelioma Associated With the Use of Cosmetic Talc,'" "all Reports written by Dr. Moline on Northwell letterhead/stationary with respect to each of the 33 individuals included in the study," and "the subjects' first and last names, brand(s) of talc they used, law firm representation, occupation(s), and date of diagnosis and/or date of birth," (*see* Dkt. Nos. 264-269), the personal information and medical data of the subjects involved in Dr. Moline's Study is privileged and confidential, such that Dr. Moline is not permitted to divulge the identities of the subjects or provide other revealing details. Dkt. Nos. 264-269. As explained in Northwell's memorandum of law, the disclosure of such information would violate (1) The Federal Policy for the Protection of Human Subjects, 45 C.F.R. Part 46, Subpart A ("The Common Rule"); (2) Bedrock Institutional Review Board ("IRB") standards of privacy and confidentiality covering research subjects; (3) The specific IRB approvals that Dr. Moline secured in advance of writing and publishing her peer-reviewed article; (4) well-established standards and universally accepted norms in the medical research community related to research subjects and anonymity; and (5) relevant case law affirming privacy and confidentiality requirements for research subjects. Doc. Nos. 266 and 269.

Northwell's position is supported by the decisions of multiple courts that have confronted Defendants' requests for the disclosure of the subjects' identities in litigation. For instance, in 2020, at a trial in the New Jersey Superior Court, Middlesex County, Judge Ana C. Viscomi, who presides over all asbestos matters filed in the State, prohibited AII from attempting to elicit the identity of human subjects involved in Dr. Moline's study during cross-examination, rightly recognizing that the information was protected and not necessary to exploring the Study's methodology. *See* Excerpts of Dr. Moline's Testimony in *Johnson/Lashley*, dated Mar. 11, 2020, attached as **Exhibit 19** at 205:3-208:5, 217:2-221:2. The court permitted AII to question Dr. Moline about "all of the different reports that [AII had] or that [Dr. Moline] may have referenced in that paper," but held that identifying any of the Study's subjects would be inappropriate, even where AII was attempting to match the identity of a subject to a plaintiff in a case in which AII was a named defendant. *Id.* (*Lashley/Johnson*) at 218:24-221:2. AII went on to inquire what impact, if any, a worker's compensation claim filed by a Study's subject alleging an alternative asbestos exposure would have on the Study's findings. *Id.* at 222:23-223:2. Dr. Moline explained that to be relevant, there would have to have been actual exposure and not just an allegation of exposure. *Id.* at 223:1-2. And, in any event, "an additional exposure" would not change the Study's conclusion that asbestos in cosmetic talc leads to mesothelioma because it does not "negate the fact that all 33 [subjects] had this exposure to asbestos from the cosmetic talc." *Id.* at 230:9-12.

In 2021, Chanel, Inc., a defendant in another New Jersey cosmetic talcum powder case, filed a motion to compel seeking the identities of the 33 human subjects of Dr. Moline's Study. The request was denied based on Judge Viscomi's ruling in *Lashley/Johnson* that the identity of

the subjects was not discoverable. *See* Order Denying Request for Discovery in *Harpster v. Chanel, Inc.*, dated Aug. 19, 2021, attached as **Exhibit 20**.

In 2022, at the trial of *Fisher v. American Int'l. Indus.*, Judge Sierra Thomas-Street of the Pennsylvania Court of Common Pleas, Philadelphia County, granted Plaintiff's motion to preclude AII from improperly attempting to elicit the identity of the human subjects involved in Dr. Moline's study during cross-examination. **Exhibit 9** at 75:9-14. Based on the recent ruling in *Bell v. AII*, which, as discussed below, is far more limited than AII argued either at *Fisher* or in the instant motion, Judge Thomas-Street permitted AII to reference the "Bell" case in connection with Dr. Moline's Study and ask Dr. Moline as to the significance, if any, of that plaintiff's filing of a workers' compensation claim in the Study's analysis. *Id*. at 81:17-83:19; **Exhibit 18** at 32:6-17, 33:12-34:18, 35:20-40:4, 42:24-43:17. Nevertheless, the Court refused to compel Dr. Moline to disclose the identities or underlying personal data about the subjects of the Study. **Exhibit 9** at 79:6-9.

Additionally, multiple Courts have rejected motions *in limine* seeking to preclude Dr. Moline's Study from being used at trial based on the fact that it is based, in part, on confidential information obtained from human subjects. *See* 3/18/22 Order in *Stanley v. Avon Products, Inc., et al.*, **Exhibit 21**; 3/17/20 Order in *Zimmerman v. Autozone, Inc., et al.*, **Exhibit 22**.

Disregarding the rulings that have rejected their requests for the subjects' identities, Defendants point to *Bell v. AII*, as having "litigated and rejected" Dr. Moline's position that this information is privileged and confidential. *See* Defs. Motion at 5-8. An honest and complete reading of Chief Judge Osteen's 40-page opinion and order belies Defendants' argument and, in fact, confirms that, as maintained by Plaintiff, Dr. Moline, and Northwell Health, the identities of all subjects except for Ms. Bell are not discoverable in this case.

In *Bell*, AII subpoenaed Northwell for information to discover whether Ms. Bell, the decedent, was a subject of Dr. Moline's Study. **Exhibit 2** at 4. According to AII, confirming Ms. Bell was a subject of Dr. Moline's Study was critical because Ms. Bell filed a workers' compensation claim asserting that she may have been exposed to asbestos while employed by two textile mills and, although the claims were denied by the employers and ultimately dismissed, AII believes the allegation is sufficient to undermine the Study's representation that its subjects were women with mesothelioma and no known source of asbestos exposure other than cosmetic talc. Upon receipt of the subpoena and a "HIPAA-authorization" authorizing the disclosure of certain protected medical information, Northwell produced a single document (the "Northwell Document") containing a list of all human subjects of Dr. Moline's Study with all information redacted except relating to Ms. Bell. *Id*. at 5. Shortly thereafter, the plaintiff filed an emergency motion for a protective order to preclude discovery and inquiry into the identities of the thirty-three individuals, and to prevent the use of the Northwell Document in that case as well as any other. *Id*.

In September 2020, a Magistrate Judge issued a temporary order holding that the Northwell Document could be used in that case, but that it, and the information therein confirming that Ms. Bell was one of the thirty-three individuals studied, was "confidential and limited solely to this

**JA716**

case." **Exhibit 2**, at 6. In reaching this decision, the Magistrate Judge Joi E. Peake was clear that because Ms. Bell was the decedent in the case and Dr. Moline was that plaintiff's retained expert, "Ms. Bell's information and her relationship to Dr. Moline's Study should have been provided in expert discovery as to Dr. Moline," but that disclosure of the other individuals included in the study presented a "very different issue." *See* Transcript of Telephonic Motions Hearing, dated Sept. 25, 2020, attached as **Exhibit 23** at 5:23-6:21. Indeed, Magistrate Judge Peake remarked that she "completely agree[d]" with Judge Viscomi's ruling in *Lashley/Johnson* that it would be improper for defense to attempt to identify a subject or question Dr. Moline whether one of the subjects of the Study was a plaintiff in another case in which AII was involved. *Id*. at 59:8-14, 82:2-21. Defendants could not utilize a HIPAA-authorization form from another case for use *Bell* case to obtain the release of that individual's information or connection to Dr. Moline's study. *Id*. at 6:15-17, 82:2-21. Magistrate Judge Peake recognized: "There are important confidentiality and privacy issues as to the other individuals in the study." *Id*. at 6:17-21.

Once the *Bell* case was resolved, AII filed a motion seeking to vacate the order protecting the identification of Ms. Bell as one of the individuals in the Study from disclosure outside of that case. **Exhibit 2**, at 6-7. In deciding to grant AII's motion, Chief Judge Osteen considered four factors and the facts specific to *Bell* and, although the factors were mixed, that the order should be vacated. *Id*. Notably, the seven pages of Judge Osteen's order that AII block quotes across four pages of its motion represents only the first part of the analysis. Although it is here that Judge Osteen agrees with AII that there is value in making public that Ms. Bell was a subject of Dr. Moline's Study and filed worker's compensation claims, AII fails to highlight to this Court that Judge Osteen "agrees with Plaintiff that the mere existence of the unsuccessful workers' compensation claims does not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces." *Id*. at 16. Indeed, Judge Osteen acknowledges that other than stating "she thought she might have been exposed," Ms. Bell's claim never substantiated an alternative source of asbestos exposure. *Id*. at 16-17. Although there was not a formal adjudication on the merits involving an examination of competing evidence, there is no indication evidence supporting the claim was ever presented, nor does AII supply any such evidence for this Court to consider. Indeed, none exists.

It is likewise misleading for AII to suggest that Judge Osteen's decision to lift the protective order over the Northwell Document based upon a balancing of "privacy claims against the need for discovery of expert opinions" supports the disclosure of information regarding any other Study subject in any other case. It is clear that the *Bell* decision hinged largely on the fact that the Northwell Document was redacted so that "all information on other individuals," *i.e.* the 32 other research subjects other than Ms. Bell, remained protected. **Exhibit 2** at 35. Like Magistrate Judge Peake, Judge Osteen was less protective of Ms. Bell's identity and connection to Dr. Moline's study than of other participants because her information was disclosed in a case that was brought on her behalf and in which Dr. Moline was retained. *Id*. Judge Osteen also recognized that, even though Ms. Bell was not a "human subject" as defined by federal regulations because she was deceased at the time that Dr. Moline's Study received IRB approval, Dr. Moline's "article as a whole likely qualified as human subject research" as defined by 45 C.F.R. Part 46 and specific

IRB approvals. *Id.* at 32-33. Accordingly, Judge Osteen observed that other study subjects were "likely" entitled to "greater confidentiality protections than Mrs. Bell." *Id.* at 35.

Clearly, far from demonstrating that AII is entitled to depose Dr. Moline longer than the seven-and-a-half-hours that Defendants already had, the *Bell* opinion and order undermines Defendants' claim that they are entitled to question Dr. Moline about the Study's subjects (other than Ms. Bell) or obtain information that may help in their impermissible fishing expedition to match other plaintiffs to cases described therein. Even under the most liberal reading of Judge Osteen's order from a separate jurisdiction involving a separate plaintiff, Defendants are only entitled to discover information specific to the plaintiff involved in a particular case. Insofar as there is no possibility that Mr. Gref was a subject of Dr. Moline's Study, there are no valid questions Defendants could present to Dr. Moline other than what has already been explored.

Given the holding of Judge Osteen's decision, Defendants' citation to a deposition taken of Dr. Moline on September 30, 2022, in *Daigle v. Anco Insulations, Inc.*, a Louisiana state case,[7] to suggest that Dr. Moline acted improperly two weeks after the *Bell* order was issued by refusing to discuss "the specifics" of cases in the Study "or the names of the individuals in the paper" is unavailing.[8] *See* Defs. Motion at 8-9. As the above discussion reflects, under *Bell* as well as federal regulations, the Bedrock and Northwell IRBs, and relevant state and federal law (as argued in Northwell's motion to quash), the identities of the human research subjects are privileged and confidential, and Dr. Moline was well within her rights to maintain these protections.

Relatedly, contrary to Defendants' contentions, it is not "false" for Dr. Moline, in explaining her understanding as to how Ms. Bell's workers' compensation claims were resolved, to state that they were "dismissed for lack of information or lack of evidence." Defs. Motion at 8. As Judge Osteen's order reflects, the only "evidence" that Ms. Bell experienced an alternative exposure to asbestos separate from cosmetic talcum powder is the allegation she made based solely on personal belief in the context of workers' compensation claims. **Exhibit 2** at 16. It is well-

---

[7] Defendants' reliance on an unpublished decision from another Louisiana state case, *Biermann v. Colgate-Palmolive Co.*, July 16, 2021, is likewise unavailing. There, the court did not order that the identities of the human subjects were discoverable or exclude the study; it *denied* the defendants' motion to exclude Dr. Moline's expert testimony with the caveat that defendants could cross-examine Dr. Moline about the subjects' identities if she referenced them on direct examination. *See* Exhibit W to Defs. Motion; *see also* Transcript of Motion Hearing in *Biermann v. Colgate-Palmolive Co.*, dated May 18, 2021, attached as **Exhibit 24**, at 72:7-14. In addition, the *Biermann* plaintiff failed to notify the court of information that would have necessitated a different ruling (*id.* at 44:16-58:3), as there was no mention of, *inter alia*, any federal statute or regulation. Insofar as *Biermann* stands in contradiction to other courts who have considered the issue, including Magistrate Judge Peake who expressed agreement with Judge Viscomi's ruling, this Court should not be swayed by this outlier.

[8] Defendants do not explain why they asked Dr. Moline about Study, the identities of the subjects, and other information they believed they were entitled to at the deposition in *Daigle*, but not at day two of the deposition in *this* case that took place three days before, on September 27, 2022. In fact, AII failed to question Dr. Moline on either day of her deposition on these topics. Other than a few questions by WCD's counsel on the first day of the deposition, Defendants did not ask Dr. Moline about the Study at all, undermining their claim that the Study and its subjects is a basis justifying a need for any further inquiry at all.

settled that "unproven, nonadjudicated allegations are not evidence." *Bernstein v. Village of Wesley Hills*, 95 FSupp.3d 547, 569 (S.D.N.Y. March 27, 2015). In any event, Judge Osteen found that claims based on the belief of possible exposure was appropriate fodder for cross-examination to challenge the representation in Dr. Moline's Study that none of the 33 subjects had "known exposure to asbestos other than prolonged used of talcum powder." However, Judge Osteen also acknowledged that the claims were dismissed without prejudice and that "the mere existence of the unsuccessful workers' compensation claims does not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces." *Id.* at 16. Altogether, Dr. Moline's testimony indicating that it is her understanding the claims were dismissed because they were not substantiated with evidence of actual exposure is generally consistent with how Ms. Bell's workers' compensation claims were resolved. Nothing Defendants cite requires Dr. Moline to accept Defendants' interpretation of the record in *Bell*, nor does Judge Osteen require Dr. Moline to somehow concede (unjustifiably) that Ms. Bell's workers' compensation claims compromise the results of the Study. All Judge Osteen's decision permits Defendants to do is make specific reference to Ms. Bell as a subject of the Study, and ask Dr. Moline about the impact, if any, the unsuccessful workers' compensation claims had on her interpretation of data and conclusions – something Dr. Moline has already done now in depositions and trial.

For essentially the same reasons, Defendants' claims that Dr. Moline gave "false testimony" about Ms. Bell's workers' compensation claims during trial in *Fisher v. AII* is incorrect. *See* Defs. Motion at 10-11. At that trial, AII's counsel asked numerous questions about Dr. Moline's knowledge of the *Bell* case, whether Ms. Bell's worker's compensation claim was ever adjudicated, and if Dr. Moline's Study considered all of the subjects' possible sources of alternative asbestos exposures. Despite Defendants' claim to the contrary, Dr. Moline did not hold herself out as an "authority on the workers' compensation process" (Defs. Motion at 10), but merely testified about her knowledge of the process based on her decades of experience working with workers' compensation patients. **Exhibit 9** at 27:23-29:10. She did not apply any of this knowledge specifically to Ms. Bell's claim. Specifically, regarding Ms. Bell's worker's compensation claim, Dr. Moline reasonably explained, yet again:

> "My understanding was that there was a dispute and then either the case was withdrawn or there was a decision. I may be misremembering, but I know it did not go any further than that. That there was a dispute that there was any exposure. I thought it went and either a judge made that determination or the case was withdrawn at that point. And no further action was taken. So that's my recollection. I don't know."

**Exhibit 18** at 43:8-17. Based on what was known about Ms. Bell's exposures and that the worker's compensation claim was dismissed (even if it was just because the employers denied the claim, there was no evidence presented to substantiate Ms. Bell's allegation of exposure), Dr. Moline's testimony is appropriate.

Defendants take issue with Dr. Moline's citing "standard medical practice" as a basis for refusing to identify the subjects of her Study, claiming that she did not have a doctor-patient relationship with the subjects to justify invoking these standards. This argument relies on a myopic

understanding of the medical practice research standards and ethics at play. As argued by Northwell Health in its motions to quash, the information Defendants seek is protected by federal regulations, the Bedrock IRB, and the Northwell IRB through which approval for the Study was specifically granted, as well as generally-accepted standards in the medical research community.

Even experts retained by Defendants *in this case* recognize the legitimacy of Dr. Moline's position. For instance, Defendant Colgate-Palmolive's medical expert Dr. Gregory Diette has testified in another matter as to the importance of protecting the identity of the 33 subjects whose medical data is featured in the 2020 peer-reviewed article. *See* Excerpt of Dep. of G. Diette, M.D., dated 6/19/20, **Exhibit 25**, at 118:10-119:16. Similarly, Dr. Victor Roggli, M.D., a well-known pathologist who has testified as a medical expert on behalf of asbestos defendants in hundreds of cases and has published numerous articles involving case studies of human subjects (including studies on which Defendants' experts rely), testified as to his concerns regarding the disclosure of case files. *See* Excerpt of Dep. of V. Roggli, M.D., dated Feb. 3, 2011, **Exhibit 26**, at 42:9-45:21. He also remarked:

> "I also have objection to it because in – personally, because in the 25 years that I've been testifying as an expert in federal and state courts these requests go far beyond anything that have been requested of myself or my colleagues that I'm aware of, and I don't think that they are appropriate investigation into scientific merit or arguments that are made in the scientific literature…"

*Id*. at 44:25-45:7.

Ultimately, the importance of protecting the identity of human research subjects is well supported by numerous sources, including legal, medical, and ethical authorities. *See In re Fosamax Prod. Liab. Litig.*, No. 1:06-MD-1789, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009) (granting motion to quash subpoena issued to third-party researcher, because it created a "serious danger" of threatening the "ardor and fearlessness of scholars," qualities that are "indispensable for fruitful academic labor). Although Defendants clearly disagree with these sources, they fail to provide any persuasive counter-authority to justify the relief they seek. Even the case law from *Bell*, which Defendants argue champions their cause, recognizes that the identities of all human research subjects other than Ms. Bell constitute protected, confidential information that cannot be disclosed.

## II.   Ignoring Dr. Moline's Deposition Transcript Makes Clear That Defendants Have Feigned A Need To Question Her Further Based On Nonexistent "Undue Delays And Excessive And Untimely Disclosures Of Opinions."

### A.   At Every Turn, Dr. Moline Specifically Pointed Defendants To Her The Materials She Relied Upon In Forming Her Opinion.

Defendants go to great lengths to create the false impression that Dr. Moline's deposition testimony left them with more questions than answers because she was evasive and ambiguous about her opinions and the bases thereof. To that end, Defendants argue that they had "no way of ascertaining where [Dr. Moline's] opinions came from" at the deposition because she "purposefully obfuscate[d] the materials she relied on to develop her case-specific opinions,"

attempted to "hide the ball" by failing to cite to specific articles to support her assertions, and "modifie[d] her opinions without notice to defendants or supplementing her opinion report." *See* Defs. Motion at 15-17. As set forth below, Defendants' arguments rely upon unsupported assumptions, not facts, and completely ignore the long history they have of deposing Dr. Moline in previous cases in which she applied the same generally-accepted methodologies and relied on many of the same reliance materials. Even without the benefit of past experience with Dr. Moline, a full review of Dr. Moline's pre-trial expert disclosure and deposition testimony in this case, and not the conveniently cherry-picked narrative presented by the Defendants, makes clear that, at every turn, Dr. Moline fully apprised Defendants of the opinions that she will offer at trial, such that Defendants have no legitimate basis for further questioning.

As Defendants are well aware, Federal Rule of Civil Procedure 26(B) required Dr. Moline to produce a written report containing (i) a complete statement of all the opinions she will express at trial and the bases and reasons for them; (ii) the facts or data considered by Dr. Moline in forming her opinions; (iii) any exhibits that will be used to summarize or support Dr. Moline's opinions; (iv) Dr. Moline's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, Dr. Moline testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for her testimony in the case. Just a cursory review of Dr. Moline's report reveals that she faithfully complied with this requirement by producing an exhaustive report – 86 pages, not including her reliance materials – setting forth all the requirements of Federal Rule of Civil Procedure 26(B). Although Defendants would have this Court believe otherwise, Dr. Moline's report repeatedly cited to the published literature and studies which support the various aspects of her testimony, thereby allowing any litigant to prepare for her deposition by reviewing the scientific foundation of her causation opinion. Instead of acknowledging this fact, Defendants repeatedly bemoan the length of Dr. Moline's reference list and materials, an assertion which says far more about the sound basis supporting her opinion than Dr. Moline's desire to "hide the ball," as Defendants put it.

Importantly, Dr. Moline's deposition transcript demonstrates that Defendants were permitted to fully explore the opinions expressed in her report for longer than the presumptive 7-hour limit, which suggests that their current motion is simply an attempt to make her needlessly sit for additional repetitive questioning. That Defendants have manufactured claims that Dr. Moline somehow obfuscated or shielded her opinion is best exemplified by their incomplete and misleading assertion that Dr. Moline testified that an "analogous exposure scenario" to Mr. Gref's could be found in CDC literature, but that Dr. Moline "offered no citation to any specific article," instead testifying that defense counsel would have to "go and find" the CDC article from her list of reliance materials. *See* Defs. Motion at 15.

During Dr. Moline's deposition, Defendant AII asked her about a reference to a CDC report in her own expert report, to which Dr. Moline responded that it was a morbidity and mortality weekly report for which she initially could not recall the specific citation. What Defendants fail to mention is that a mere moments later, Dr. Moline specifically identified the article as Mazurek, et al., *Malignant Mesothelioma Mortality – United States, 1999-2015*, Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report, 66, Volume 8, Pages 214-218, March 3rd, 2017. *See* **Exhibit 5**, at 242:10-24. Dr. Moline's specific citation allowed counsel for Defendant AII to present Dr. Moline with the article and question her extensively regarding the same. *Id.* at 242:10-243:1-16, 244:3-255:17, 258:20-260:4. Dr. Moline's testimony regarding the

Mazurek article undercuts Defendants' claims that they are in the dark as to which CDC publication Dr. Moline was referring to.

Equally without merit are Defendants' misleading suggestions that Dr. Moline somehow withheld new "dose estimates/dose applications" until the second day of her deposition, or that Plaintiff deprived Defendants of questioning Dr. Moline regarding her dose estimate. As plainly reflected in the transcripts, Dr. Moline did not belatedly disclose new dose estimate opinions, but rather, merely prepared an informal dose estimate for Mr. Gref to address repetitive questioning from Defendants regarding the same. Unsurprisingly, Defendants neglected to mention that, as set forth below, during the first day of Dr. Moline's deposition, they squandered their time by repeatedly asking Dr. Moline whether she had performed a dose estimate for Mr. Gref, an answer which Dr. Moline consistently answered in the negative. *See, e.g.* **Exhibit 4**, at 154:4-12, 157:14-21. As Dr. Moline clearly explained, a formal dose estimate was scientifically and legally unnecessary for determining the causation of Mr. Gref's disease because his exposures were significantly above a hypothetical baseline exposure a person may experience from the background air. *See* **Exhibit 4**, at 135:16-25, 136:1-23; **Exhibit 5**, at 294:7-15.

Although Defendants would have this Court believe otherwise, Dr. Moline did not wait until the second day of her deposition to reveal a new dose estimate opinion that is somehow critical to her trial testimony. To the contrary, Dr. Moline explained that she merely "scribbled notes" the week of her continued deposition to arrive at what is essentially a back-of-the-envelope dose estimate in the event that Defendants insisted asking her about it again. *See* **Exhibit 5**, at 273:17-24, 274:4-24. Importantly, Dr. Moline re-affirmed that a dose estimate was not necessary for her to render a causation opinion at trial. *See* **Exhibit 5**, at 294:7-15. To the contrary, the dose calculation which Defendants claim is so critical that her deposition must be re-opened was nothing more than an "absolute estimate" that she did not even bother providing to Plaintiff's counsel. *Id.* at 294:7-17. Despite this, Dr. Moline proceeded to answer pages of questions on the subject, explaining her methodology, the calculations for each Defendants' products, and how her exposure estimate relates to the published literature. *See* **Exhibit 5**, at 282:13-21, 290:5-16, 293:7-296:19, 297:24-311:20. Critically, Dr. Moline explained that she arrived at her calculation by relying on three studies – the Gordon paper, the Stefan Paper, and the Anderson paper – which Defendants asked Dr. Moline about during the first day of her deposition. **Exhibit 4**, at 86:23-88:3, 93:18-105:23; **Exhibit 5**, at 305:11-307:6.[9]

Unable to establish that Dr. Moline belatedly disclosed a new "dose estimate" opinion or failed to answer questions regarding her opinion, Defendants claim that "[w]hen given the opportunity to briefly examine Dr. Moline on these estimates, she was asked whether she knew of any studies, whether in her over 500 listed references or not, that examined individuals within the range she alleged Plaintiff Gref was exposed to from cosmetic powders contracted mesothelioma and she was unable." *See* Defs. Motion at 16. Rather, according to Defendants, Dr. Moline vaguely mentioned "one study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos." *Id.* Once again, Defendants' misleading argument demonstrates their lack of fidelity to

---

[9] During post-deposition meet-and-confer discussions at which Defendants indicated a need to continue Dr. Moline's deposition on the limited issue of her "dose" calculations, Plaintiff advised that Dr. Moline applied the same methodology as in *Woods*, a case in which Dr. Moline had prepared a detailed declaration that Defendants were provided copies of.

the record, as Dr. Moline did not merely refer Defendants to a "study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos." Rather, Dr. Moline specifically cited to Rodelsperger (incorrectly recorded as "Roethlisberger" by the stenographer in the first transcript), a study which Dr. Moline discussed during the first day of her deposition, as well as Jiang, et al.'s article "Hand-spinning chrysotile exposure and risk of malignant mesothelioma: a case-control study Southeastern China." *See* **Exhibit 4**, at 150:12-24, 153:14-154:3, 157:22-160:19; **Exhibit 5**, at 307:7-308:24. That Dr. Moline sufficiently identified the Jiang study is evidenced by the fact that counsel for AII marked the Jiang article as an exhibit and questioned Dr. Moline regarding it. 309:10-312:5. Despite Dr. Moline having fully answered Defendants' questions regarding the dose estimate that she prepared merely to assuage their concerns, Plaintiffs, as set forth above, offered Defendants an additional hour – nearly 15% the length of the original deposition – to address any outstanding questions regarding this estimate.[10] Defendants' failure to fully disclose this fact in their motion underscores that they have no real specific need for the carte blanche extension of time that they now seek.

Next, Defendants take issue with the fact that Dr. Moline presented at the deposition with an "Exposure Testimony Summary" which she herself did not prepare. Defendants' arguments on this point require little of the Court's attention, as the Exposure Testimony Summary is not an undisclosed report or reliance material. As its title suggests, it is merely a summary of the exposure testimony as reflected in the depositions of Plaintiff and his parents, which are the ***exact same*** sources of the exposure summary provided by Dr. Moline in her disclosed expert report. The summary and notes that Dr. Moline writes during a deposition regarding Mr. Gref's exposures are simply calculations based on the information already set forth in the reports, which were timely produced to Defendants. Thus, Defendants' argument is meritless.

Lastly, consistent with its practice of relying upon half-truths, Defendants argue that Dr. Moline presented at the deposition with "multiple expert reports" that were not disclosed in her original report or the subject of a supplemental report. *See* Defs. Motion at 16. In this regard, Defendants refer to certain expert reports prepared by Plaintiff's expert in materials science and industrial hygiene, Dr. William Longo. What Defendants' motion fails to mention is that, based on when she received them, Dr. Moline could not have included these reports as her reliance material, nor could they have been the subject of a supplemental report. Dr. Moline wrote her report in 2021, but Dr. Longo's testing was not done until 2022, and the results were not provided to her until August 2022 – after her deposition had already started. *See* **Exhibit 5**, at 275:20-276:17. Similarly, Defendants argue that Dr. Moline reviewed three reports from Dr. Longo pertaining to testing of Mennen products, yet "never supplemented her report or opinions." *See* Defs. Motion at 17. Defendants similarly fail to mention that Dr. Moline did not even receive the Mennen reports until the week of her deposition after returning from being out of the office, thus leaving her no real time to issue a supplemental report. *See* **Exhibit 4**, at 14:17-16:16. Ultimately, as set forth below, Dr. Moline is free to rely on these reports and was not required to supplement her report to include any of Dr. Longo's test results as "reliance materials" to comply with the discovery rules.

---

[10] As indicated *supra*, Defendants' claimed need to depose Dr. Moline regarding her dose estimate was the only reason proffered by Defendants during the meet-and-confer process.

**B.**   **Dr. Moline's Deposition Was Prolonged By Counsel's Needlessly Repetitive Questioning And Interruptions**

In an obvious attempt to malign Dr. Moline's character, Defendants self-servingly cite portions of the deposition transcript to create the impression that Dr. Moline obstructed the deposition with a series of unwarranted snide or insulting remarks. Putting aside that the "seventeen occasions" Defendants cite as constituting "undue" consumption of time aggregates to, at most, a mere handful of minutes of deposition testimony, and therefore, could not reasonably be construed as a justification for an indefinitely-continued deposition, Defendants' strategy is clearly an attempt to distract the Court from the fact that it was their counsel's repetitive and interruptive questioning, and not Dr. Moline's testimony, which wasted large swaths of the seven hours afforded under the Federal Rules. This conclusion is best exemplified by a citation to a portion of the transcript which Defendants incredibly – and incorrectly – argue supports the notion that Dr. Moline's conduct wasted time during her deposition. Midway through the first day of Dr. Moline's testimony, Dr. Moline expressed frustration with a question posed by Defendant for WCD and responded:

> You know, I've been asked these questions so many times. I'm really at a loss why I'm being asked the same questions that I've been asked for the past ten years. And it's just that there's volumes of transcripts that you could be referring to rather than wasting all of our time. But I just, I just don't understand this.

*See* **Exhibit 4**, at 80:2-18.

Without a doubt, Dr. Moline's frustration with Defendants' questioning is entirely justified and exemplifies the complete lack of need for a continued deposition. Dating back to 2004, Dr. Moline has testified in hundreds of cases involving asbestos exposure, often regarding the exact same or substantially similar questions of diagnosis, medical causation, and disease attribution.[11] Importantly, a significant portion of these prior occasions involves questioning from the ***exact same*** Defendants and defense counsel. Case in point is Defendants' request that they be permitted to rely on Dr. Moline's past testimony in the *Crudge*, *Lashley*, and *Bell* cases in order to avoid asking her the same questions. **Exhibit 4** at 6:14-17, 194:12-23. It does not appear that Defendants have ever followed through with their intent to rely on Dr. Moline's past testimony, despite instigating an agreement with Plaintiff to allow them to do so. This would have been the most efficient and considerate use of time for all involved with Dr. Moline's deposition, including the Court, which now has to consider these lengthy motion papers. Dr. Moline has already thoroughly explained, under oath, her methodology and reliance materials to the same litigants and attorneys for hours on end. Defendants are well aware that instead of asking Dr. Moline to step away from her medical practice and sit for yet another deposition to answer the same questions that have already been answered *ad nauseum*, they could simply refer to Dr. Moline's past transcripts to review her sworn testimony.

---

[11] By way of example, talc defendants have already questioned Dr. Moline regarding her Study, and further attempted to question her regarding the identities of the human subjects of her Study, on multiple occasions. *See, e.g.* Relevant Excerpts of Dr. Moline's Testimony in *Harpster*, **Exhibit 27**; Relevant Excerpts of Dr. Moline's Testimony in *Zimmerman*, **Exhibit 28**; Relevant Excerpts of Dr. Moline's Testimony in *Dolan*, **Exhibit 29**.

Despite this, Defendants – whether intentionally or unintentionally – act as though Dr. Moline has never testified before, and instead, attempt to rehash the same questions, often within the same deposition. For example, WCD, a party which has appeared at Dr. Moline's depositions numerous times, asked Dr. Moline iterations of essentially the same question within a matter of minutes pertaining to a well-trodden subject: the well-accepted notion in the peer-reviewed Helsinki Criteria that very low doses of asbestos exposure, without a minimum threshold, have been associated with the development of mesothelioma. *See* **Exhibit 4**, at 60:7-61:13, 77:8-19, 80:2-24, 81:11-19, 81:20-82:6. In light of this questioning, Dr. Moline understandably expressed her frustration, as anyone would. Unfortunately, this was not the only instance in which Defendants squandered their time by subjecting Dr. Moline to repetitive questioning. WCD asked Dr. Moline more than once whether she performed a dose estimate or comparison for Mr. Gref, even though she clearly and unequivocally answered the first time that she did not (*see* **Exhibit 4**, at 135:16-25, 136:14-23, 154:4-12, 155:2-16, 157:14-21), and asked Dr. Moline more than once whether it was possible to calculate an individual's lifetime dose to asbestos. **See Exhibit** 4 at 63:23-25, 64:1-66:2.[12] WCD compounded this error by repeatedly interrupting Dr. Moline's testimony and not allowing her to finish her answer. **Exhibit 4**, at 77:8-24, 80:25-81:10, 89:6-12. Simply stated, Defendants' argument that Dr. Moline "insulted" the questioning attorneys or made "snide remarks" overlooks that Defendants have clearly made it their mission to either goad Dr. Moline or obtain a different answer to the same types of questions by asking them persistently. In either case, Defendants should not be rewarded for their conduct, which is at best, an inefficient and improper use of time or, at worst, deliberate harassment of Plaintiff's expert which on its own qualifies as a valid cause to halt the deposition under F.R.C.P. 30.

Defendants' argument that "technical issues caused by the virtual nature of the deposition also caused delays in the deposition" extends beyond absurdity and into frivolity. Defendants did not cite to a single portion of the transcript where they encountered any real technical difficulty based on the virtual nature of the deposition, nor can any Defendants point to a real time request that the deposition be extended based upon technical difficulties – a request that Plaintiff would have entertained had it been made at the deposition. Instead, Defendants string cite to a handful of lines of the deposition which cannot be reasonably characterized as "technical issues" even under the most charitable interpretation. For example, Defendants cite to several portions, totaling mere seconds, in which Dr. Moline asked that displayed documents be enlarged so as to make the easier to read. **Exhibit 4**, at 29:2-3, 121:20-25, 193:1-5, 214:17-23. Additionally, Defendants cite to quick requests from Dr. Moline that the questioner adjust his seating so that his face could be seen, a simple courtesy which is not a "technical issue," and is no different than asking a questioner to speak up or move their hand away from their face during a live deposition. **Exhibit 4**, at 10:10-20, 85:13-15. That Defendants seek to re-open Dr. Moline's deposition for an indefinite period of time by mischaracterizing routine, promptly-addressed issues that can arise during any deposition as "technical issues" underscores that Defendants' have no real need for the relief they seek, and are unnecessarily burdening the Court with excessive and inappropriate motion practice.

---

[12] As Plaintiff did dozens of times throughout the deposition, Plaintiff's counsel objected to repetitive questioning as asked and answered.

## ARGUMENT

**I.    Defendants' Motion Should Be Summarily Denied Due to Defendants' Violation of Your Honor's Part Rules**

As a threshold matter, Defendants' motion should be denied because, in violation of Part Rules II(c)(2), Defendants filed a letter motion 16 pages over the limit and failed to certify with the requisite specificity that the parties met and conferred regarding this discovery dispute prior to Defendants filing the motion. As per Your Honor's rules, it is not enough for Defendants to merely mention that the "parties have met and conferred prior to seeking relief," as they did here. *See* Def. Motion at 1. The moving party must state: (1) the date and time of such conference; (2) the approximate duration of the conference; (3) the names of the attorneys who participated in the conference; (4) the adversary's position as to each issue being raised (as stated by the adversary during the in-person or telephone conference); and (5) that the moving party informed the adversary during the conference that the moving party believed the parties to be at an impasse and that the moving party would be requesting a conference with the Court. Other than stating that "Plaintiff has unilaterally attempted to limit the deposition to one additional hour," which grossly understates the Plaintiff's position and the scope of discussions with which Plaintiff's counsel engaged with Defendant Colgate-Palmolive Company's counsel, Defendants fail to make any showing with respect to the pre-requisites for seeking discovery relief from the Court as per Your Honor's Part Rules. Defendants likely made no attempt to make this showing because the substantial majority of issues they now raise in their motion were never mentioned during the meet and confer process. Had any of these issues actually been raised by Defendants, the parties would have, at the very least, been given the opportunity to resolve some of the issues without requiring the Court's intervention. In short, because Defendants plainly failed to comply with this requirement, their motion should be summarily denied in its entirety.

**II.    Defendants' Motion Should Be Denied Because They Fail to Demonstrate Good Cause Justifying a Continued Deposition of Dr. Moline Beyond the Seven Hours Afforded by the Federal Rules**

"Rule 30 of the Federal Rules of Civil Procedure governs the conduct of parties, deponents, and attorneys at depositions. Rule 30(d)(2) governs that, '[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day or seven hours." *Pierre v. City of New York*, 2022 WL 2384150, *1 (S.D.N.Y. July 1, 2022), quoting Fed. R. Civ. P. 30(d)(2). "Nevertheless, a Court 'must allow additional time, consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent." *Id.* "A party seeking a court order to extend the time for examination or otherwise alter the limitations is expected to show good cause to justify an order." *Id.,* citing *Robinson v. De Niro*, 2022 WL 274677, *2 (S.D.N.Y. Jan. 26, 2022). "Whether good cause exists to extend a deposition beyond the presumptive time limit of seven hours is a fact-specific determination." *Pierre*, 2022 WL 2384150 at *1. "A district court has broad discretion to set the length of depositions appropriate to the circumstances of the case." *Arista Records LLC v. Lime Group LLC*, 2008 WL 1752254 (S.D.N.Y. Apr. 16, 2008).

As demonstrated in detail above, there is no question that Defendants failed to establish good cause justifying the Court to compel Dr. Moline to sit for an indefinite continued deposition. Rather than make the requisite procedural or substantive showing with respect to any requested area of inquiry, Defendants use their motion to misrepresent the scientific foundation underlying Plaintiff's claims and assert *ad hominem* attacks against the character and integrity of Plaintiff's counsel and Dr. Moline rather than seek genuinely-needed discovery.

Indeed, without even mentioning that they initially sought to conduct a limited four-hour deposition of Dr. Moline about her exposure calculations for Mr. Gref, Defendants request an open-ended deposition to explore a broad range of other topics, including the identities of the human research subjects involved with Dr. Moline's Study, which courts, including Magistrate Judge Peake and Chief Judge Osteen in *Bell*, have consistently recognized are protected from disclosure. Putting aside that Defendants inexplicably changed the position they took during the meet-and-confer process, Defendants fail to demonstrate good cause for any individual topic. In fact, Defendants failed to make even the threshold showing that, in the seven-and-a-half hours that they already exhausted, their time was used efficiently. *See Margel v. E.G.L. Gem Lab Ltd.*, 2008 WL 2224288, at *7-8 (S.D.N.Y. May 29, 2008) (defendants failed to make appropriate showing that they used the time previously afforded efficiently and that there are additional relevant areas of inquiry); *Bender v. Del Volle*, 2007 WL 1827839, at *3 (S.D.N.Y. June 25, 2007) ("While it is understandable that the Bivens defendants may wish to inquire as to a variety of other topics, such thorough questioning on all potential subjects is not envisioned under the rules"). Instead, Defendants seek to re-tread ground that has already been covered, or wade into subjects that are prohibited by law. This is not a permissible basis on which additional time beyond that afforded by Federal Rule 30(d) should be granted.

To the extent Defendants reference *Daubert* as a justification for further questioning, Defendants' argument is without merit. As discussed, before Dr. Moline's deposition in this case even started, Defendants were familiar with Dr. Moline's opinion, the methodology she applied to determined that Mr. Gref's mesothelioma was caused by asbestos-contaminated cosmetic talcum powder, and the scientific literature she relies on. Defendants have previously deposed Dr. Moline on numerous occasions in other talc cases involving similar allegations of liability. Notwithstanding the benefit of this experience, Defendants deposed Dr. Moline in this case for over seven hours (exclusive of breaks), exploring the full scope of her opinion, confirming the sources on which she relies for various aspects of her opinion, and the methodologies she applies. Given the extensive testimony Dr. Moline has provided regarding the bases of her opinion, Defendants have all the discovery they need to raise a *Daubert* challenge, should they choose to do so.

Without a legitimate basis to request further discovery to explore a potential *Daubert* challenge, Defendants attempt to invoke *Daubert* as grounds for questioning Dr. Moline further about her Study. Under the guise of exploring the Study's methodology, Defendants seek to identify the human research subjects so as to match them to the plaintiffs in other cases that Defendants believe had alternative exposures that will undercut the Study's representation that the subjects only asbestos exposure was through cosmetic talcum powder use. This convoluted use of

*Daubert* is improper and does not support any additional questioning of Dr. Moline. Obviously, the *Daubert* factors apply to determine the admissibility of expert testimony. They cannot be used against reliance materials or scholarship.

Nor can *Daubert* be used to override the clear federal standards which protect the identity of the Study's subjects. As discussed, despite Defendants' claims to the contrary, the identities of all the subjects except for Ms. Bell remain protected, even under Chief Judge Osteen's decision in *Bell*. Indeed, although Ms. Bell was not a "human subject" as defined by federal regulations, Judge Osteen recognized that Dr. Moline's "article as a whole likely qualified as human subject research" as defined by 45 C.F.R. Part 46 and specific IRB approvals. **Exhibit 2** at 32-33. Accordingly, all 32 other study subjects were "likely" entitled to "greater confidentiality protections than Mrs. Bell." *Id*. at 35. This view is consistent with that argued by Northwell Health in opposition to the subpoenas filed by AII and WCD to discover records concerning the Moline Study and its subjects. Ultimately, *Bell* does not support any further disclosure of information regarding the Moline Study in this case than was already provided by Dr. Moline in response to the small number of questions Defendants presented during the first day of her deposition. In general, under *Bell* and all other relevant case law, Defendants are entitled, as they were during both days of Dr. Moline's deposition, to ask Dr. Moline about the Study, challenge the reliability of the Study through questions regarding the methodology and the types of information considered (or not considered). Defendants are not permitted to discover the identities of the Study's subjects. Because this information is not discoverable, good cause does not exist to require Dr. Moline to sit for an additional deposition on this topic.

Defendants likewise failed to establish good cause to require Dr. Moline to sit for a continued examination through their citation to a litany of complaints and non-existent "technical issues" which the record makes clear are entirely unfounded. As set forth above, Dr. Moline sat for seven-and-a-half hours and fairly answered each question posed by the Defendants. Far from "hiding the ball," as Defendants put it, Dr. Moline fully explained her methodology for attributing causation, oriented the Defendants to the materials and literature upon which her opinions are based, and even sat for additional questioning beyond the federal limit to answer questions regarding a dose estimate that she created merely to assuage Defendant's persistent questioning on the subject. Simply stated, Defendants have not identified a single area that Dr. Moline failed to testify to, nor did Defendants come close to establishing that their legal rights were infringed by the manner in which she testified. The closest Defendants come to identifying a legal objection to Dr. Moline's testimony is their argument that, at the deposition, she testified that she relied on new reports from Dr. Longo which required her to issue a supplemental report. However, Defendant's argument is meritless, as there is no dispute that Dr. Moline was not required to supplement her initial report to indicate that she considered Dr. Longo's reports, and as such, any further time to question her regarding her reliance on the same would be unwarranted.

Indeed, as Federal Rule of Civil Procedure 26(e) makes clear, a party who has made an initial disclosure must only supplement or correct his or her disclosure or response (1) as ordered by the Court, or (2) if the party learns that in some material respect the disclosure or response is incomplete or incorrect and "[t]he additional or corrective information has not otherwise been

known to the other parties during the discovery process or in writing." Here, Defendants cannot establish that supplementation was required by either prong, as this Court did not direct Dr. Moline to supplement her initial disclosure, nor was supplementation required, given that the additional information – Dr. Longo's reports – were otherwise disclosed to the Defendants before Dr. Moline's deposition took place.[13] For this reason alone, Defendants' argument must be rejected. Although Defendants may argue that Dr. Moline should have alerted them to the fact that she would consider Dr. Longo's reports as additional support for her opinion, any such contention would be meritless. Defendants cannot dispute that Dr. Moline's initial report already references product testing which Dr. Longo's laboratory has conducted throughout the years. As such, it should have been readily apparent to Defendants that Dr. Moline may consider additional materials prepared by Dr. Longo which were not in existence or made available to her when she prepared her initial report. To the extent Defendants disagree with the methodology or conclusions expressed in Dr. Longo's reports, they had the opportunity to depose Dr. Longo regarding the same at his deposition in this case.

Lastly, Defendants' motion makes clear that, despite the unequivocal authority cited *supra* establishing that Dr. Moline is not permitted to reveal identifying information concerning her Study's human research subjects, Defendants will continue their improper campaign to elicit such information at any continued deposition, arguing that "Dr. Moline should be compelled to answer questions on the names and backgrounds of the individuals in her 2019 article pursuant to Federal Rules 26, 30, and 37." *See* Defs. Mot. At 15. In order to prevent Defendants from attempting to wade into these clearly protected areas of inquiry, should Dr. Moline's deposition be extended, the Court should enter a protective order. Indeed, pursuant to Federal Rule of Civil Procedure 26(c), a District Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including forbidding disclosure or discovery, or forbidding inquiry into certain matters. Plaintiff submits that good cause exists for the issuance of a protective order in this case, given that, as stated above, the personal information and medical data of the subjects involved in Dr. Moline's Study is privileged and confidential, such that Dr. Moline is not permitted to divulge the identities of the subjects or provide other revealing details. For this reason, the Court should not merely deny Defendants' motion; rather, it should also grant Plaintiff's cross-motion for a protective order.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel the Continuation of the Deposition of Plaintiff's Expert, Dr. Jacqueline Moline, should be denied in its entirety.

---

[13] As of the filing of this opposition, Dr. Longo has already been deposed on these reports, among many other subjects.

Respectfully submitted,

James M. Kramer

# Exhibit

275 Madison Avenue, 10th Floor
New York, NY, 10016

Direct: 646-598-8714
Email: asargente@hpylaw.com

December 2, 2022

BY E-File
The Honorable Valerie Figueredo
Magistrate Judge
U.S. District Court
Southern District of New York
500 Pearl Street
New York, NY 1007

**Re: Brian Joseph Gref v. American International Industries, et al.**
**Case No. 1:20-CV-05589-GBD**

Dear Judge Figueredo,

On November 21, 2022, Plaintiff requested that this Court intervene in a subpoena dispute pending in the United States District for the Eastern District of Virginia ("EDVa"). (ECF 283). A-I-I submits this letter in response. In essence, Plaintiff is seeking to quash A-I-I's third-party subpoena to Peninsula Pathology Associates and to Theresa Swain Emory, MD. Such a request is improper. Not only does Plaintiff lack standing, but discovery has not concluded.

Plaintiff Has No Standing to Quash A-I-I's Subpoena

As a preliminary matter, Plaintiff has no standing to make his motion. "[T]he weight of authority in this Circuit dictates that a party must claim a personal right or privilege in the subpoenaed documents in order to have standing to challenge a subpoena served on a third party." *Somaxon Pharms., Inc. v. Actavis Elizabeth LLC*, No. 22 MISC. 162 (KPF), 2022 WL 3577904, at \*2 (S.D.N.Y. Aug. 18, 2022); *citing Est. of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009); *Sali v. Zwanger & Pesiri Radiology Grp., LLP*, No. 19 CV 275 (FB) (CLP), 2022 WL 1085508, at \*17 (E.D.N.Y. Jan. 10, 2022), *report and recommendation adopted*, No. 2:19-CV-00275-FB-CLP, 2022 WL 819178 (E.D.N.Y. Mar. 18, 2022). Plaintiff does not have any personal right or privilege to the requested documents in A-I-I's subpoena. He is not claiming to have been treated by Peninsula Pathology or Dr. Emory. He does not represent the facility or the individual. He has not even retained Dr. Emory as an expert witness in this case. As such, he has no standing to quash A-I-I's third-party subpoena.

Fact Discovery Continued After November 30, 2021

**JA732**

Similarly, A-I-I's subpoena cannot be considered "untimely" when discovery in this matter has not concluded. Despite his reliance on the claimed fact discovery closure date of November 20, 2021, Plaintiff is well aware that the discovery deadline was continued multiple times and even acknowledges that the subpoenas were served within the discovery period. Additionally, Plaintiff ignores that he both engaged and participated in fact discovery well into 2022.

The depositions of Plaintiff's treating physicians took place on January 11 and 12, 2022. (*See* **Exhibit 1**, Deposition Notice of Dr. Suprith Badarinath for January 11, 2022; **Exhibit 2**, Deposition Notice of Dr. Ehsan Shirazi for January 12, 2022).

Likewise, A-I-I and Plaintiff were actively engaged in fact discovery into 2022. A-I-I informed the Court of ongoing fact discovery issues on January 3, 2022, and Plaintiff responded to A-I-I's letter on January 6, 2022. (ECF 202, ECF 208). Continuing, Plaintiff served supplemental interrogatories to A-I-I on January 19, 2022, to which A-I-I responded on February 18, 2022. (*See* **Exhibit 3**, Plaintiff's Supplemental Interrogatory to A-I-I; **Exhibit 4**, Defendant A-I-I's Response to Supplemental Interrogatory). A-I-I also served supplemental discovery to Plaintiff on 4/7/2022 and 5/6/2022, to which Plaintiff responded on 5/9/2022 and 6/6/2022, respectively. (*See* **Exhibit 5**, A-I-I's Request for Admissions to Plaintiff; **Exhibit 6**, A-I-I's Second Request for Production of Documents; **Exhibit 7**, Plaintiff's Responses to A-I-I's Supplemental Request for Admissions; **Exhibit 8**, Plaintiff's Responses to A-I-I's Second Request for Production of Documents). The November 30, 2021, "deadline" referenced by Plaintiff in his November 21, 2022, letter was not asserted in response to any of the fact discovery outlined above.

Similarly, as Your Honor is aware, parties are still in the process of collecting military records from the National Personnel Records Center. A-I-I subpoenaed the NPRC on March 22, 2022, to which the NPRC did not respond until October 20, 2022. A-I-I requested the subpoena be updated on October 27, 2022, and Your Honor signed this updated subpoena for military records on October 31, 2022. (ECF 258 and 259). Plaintiff did not object to either subpoena. Nor has the NPRC responded to date (the parties are still awaiting a production).

<u>Expert Discovery Is Ongoing, and Plaintiff's Experts Rely on Dr. Emory's Study</u>

Importantly, expert discovery is ongoing. Plaintiff and defendants jointly requested an extension to complete expert depositions on July 29,2022. (ECF 250). Following this request, the Court adjourned a scheduled pretrial conference "until discovery is completed in this case." (ECF 252). The Court requested the parties notify the Court "[o]nce discovery is complete." (ECF 252). As of the writing of this letter, several expert depositions are to be completed, and defendants have attempted to compel the continuation of several others.[1]

---

[1] The following depositions have not yet been completed: Dr. Mossman, R. Adams, Dr. Oury, Dr. Gunter, A. Segrave, Dr. Poye, Dr. Feingold (started on 11/17), Dr. Attanoos (started on 12/1), Dr. Carder (started on 12/2) and Dr. Diette. Further, the depositions of Drs. Longo and Moline were adjourned by Plaintiff prior to completion of examination by defense. The Court has scheduled a discovery conference for December 12, 2022, regarding A-I-I's motion to compel the continuation of Dr. Moline's deposition. Defendants will also be moving to compel the continuation of Dr. Longo's deposition.

No party has notified the Court discovery is complete. Indeed, it is not.

Likewise, several of Plaintiff's experts have testified this year to relying on Dr. Emory's 2020 article in formulating their case-specific opinions. Dr. Moline relies on Dr. Emory's 2020 study as well, citing the study in her October 2021 report and offering testimony about the study during her deposition taken on July 6 and September 23, 2022.

Specifically, Dr. Moline testified this year that she could not "speak to Emory" regarding whether the subjects of Emory's study could be compared or contrasted to Plaintiff's alleged exposure history. (*See* **Exhibit 9**, Deposition of Dr. Jacqueline Moline, July 6, 2022 at pp. 143:12-145:3, *pertinent pages*).

Dr. Finkelstein also offered testimony about Emory this year and relied on her study to formulate his case-specific opinions. (*See* **Exhibit 10**, Deposition of Dr. Murray Finkelstein, June 22, 2022, at pp. 67:22-68:16, *pertinent pages attached hereto*).

As both Moline and Emory's studies use litigation files, A-I-I needs to know if they overlap or if one rejected a plaintiff that the other included in their respective studies. Similarly, given Plaintiff's experts' reliance on Dr. Emory's study, A-I-I also needs to determine if any of the subjects of her study are actually comparable to Plaintiff to fully explore this "theory upon which [Plaintiff's] witness[es] rel[y]." 30(d), 2000 Advisory Committee Notes.

If Your Honor requires any additional information, A-I-I will expeditiously provide it.


Respectfully submitted,


Alfred Sargente
Hawkins Parnell & Young, LLP
275 Madison Avenue, 10th Floor
New York, NY 10016
T: (212) 897-9655
F: (646) 589-8700
Attorneys for Defendant
American International Industries, LLP


**JA734**

# Exhibit 3

Page 206

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     -------------------------------------------------X
 4     BRIAN JOSEPH GREF
                                        Plaintiff,
 5
                                ZOOM VIDEOCONFERENCE
 6                              VIDEOTAPED DEPOSITION
                                    UNDER ORAL
 7                               EXAMINATION OF
                                JACQUELINE MOLINE, M.D.
 8
                        against
 9
10     AMERICAN INTERNATIONAL INDUSTRIES, individually and
       as successor-in-interest for the CLUBMAN BRAND, and
11     to THE NESLEMUR COMPANY and PINAUD COMPANY, et al.,
12                                        Defendants.
13     Civil Action No: 1:20-cv-05589-GBD-DCF
       -------------------------------------------------X
14
15     Volume II
16
                    Transcript of the Zoom Videoconference
17     Videotaped Deposition of the witness, called for Oral
       Examination in the above-captioned matter, said
18     deposition taken by and before BRENDA FITZGERALD, a
       Notary Public and Shorthand Reporter, on Friday,
19     September 23, 2022, commencing at 10:05 in the
       forenoon.
20
21
            PRIORITY-ONE COURT REPORTING SERVICES, INC.
22               290 West Mt. Pleasant Avenue
                 Livingston, New Jersey 07039
23                    (718) 983-1234
24
25     Job No.: 5418333
```

Page 207

STIPULATIONS

1

2

3

4      IT IS HEREBY STIPULATED AND AGREED by and among

5  the attorneys for the respective parties herein that

6  the sealing, filing and certification of the within

7  deposition be waived; that such deposition may be

8  signed and sworn to before any officer authorized to

9  administer an oath with the same force and effect as

10 if signed and sworn to before a judge.

11     IT IS FURTHER STIPULATED AND AGREED that all

12 objections, except as to form, are reserved to the

13 time of trial.

14

15                        - oOo -

16

17

18

19

20

21

22

23

24

25

Page 208

1

2                        I N D E X

3

4    WITNESS                    EXAMINATION BY          PAGE

5    Jacqueline Moline, M.D.    Mr. Thackston      211, 304

6                               Mr. Kramer              293

7                               Mr. Kozak               297

8

9                          EXHIBITS

10   MOLINE              DESCRIPTION              FOR IDENT

11     18     2019 article by Michele Carbone         213

12     19     Morbidity and Mortality Weekly Report   244

13     20     2022 CDC Morbidity and Mortality Weekly

                 Report                               267

14

       22     Photograph of MAS Project M71373,

15              Pinaud Clubman container              277

16     23     2018 article by Jiang                   311

17

18   (There is no Exhibit 21.  Exhibits retained by

     counsel.)

19

                        - oOo -

20

21

22

23

24

25

```
 1
 2    A P P E A R A N C E S:
          SIMMONS, HANLY, CONROY, LLC
 3                Attorneys for the Plaintiff(s)
                  112 Madison Avenue
 4                New York, New York 10016
          BY:   JAMES KRAMER, ESQ.
 5
 6
          NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
 7                Attorneys for the Defendant(s)
                  Colgate-Palmolive Company, as
 8                successor-in-interest to the Mennen Co.
                  105 S. Charles Street, Suite 1600
 9                Baltimore, Maryland 21201
          BY:   KATHERINE A. LAWLER, ESQ.
10
11
          CLYDE & CO US, LLP
12                Attorneys For Defendant(s)
                  Kolmar Laboratories, Inc.
13                The Chrysler Building
                  405 Lexington Avenue, 16th Floor
14                New York, New York 10174
          BY:   KEVIN C. McCAFFREY, ESQ.
15
16        LATHROP GPM LLP
                  Attorneys for Defendant(s)
17                American International Industries
                  2101 Cedar Springs Road, Suite 1400
18                Dallas, Texas 75201-2134
          BY:   ROBERT THACKSTON, ESQ.
19                DAVID ASHDOWN, ESQ.
                  KURT GREVE, ESQ.
20
21
          GOLDBERG SEGALLA, LLP
22                Attorneys for Defendant(s)
                  The Procter & Gamble Company, Shulton Inc.
23                1037 Raymond Boulevard, Suite 1010
                  Newark, New Jersey 07102-5423
24        BY:   DAVID E. RUTKOWSKI, ESQ.
25
```

Page 210

1

2    A P P E A R A N C E S: (Cont'd)

3

        LANDMAN, CORSI, BALLAINE & FORD, P.C.

4            Attorneys for Defendant(s)
             Whittaker Clark & Daniels
5            One Gateway Center, 22nd Floor
             Newark, New Jersey, 07102
6    BY:    CHRISTOPHER S. KOZAK, ESQ.

7

8    Also Present:

9            Bob Jorissen, videographer

10
                    - oOo -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 211

1

2               VIDEOGRAPHER:  Good morning.  We are

3      going on the record at 10:05 a.m. Eastern Daylight

4      Time on Friday, September 23rd, 2022.

5               This is media unit one of the remote

6      video recorded deposition of Dr. Jacqueline Moline in

7      the matter of Brian Joseph Gref versus asbestos,

8      filed in the United States District Court, Southern

9      District of New York, docket number 120-cv-05589.

10              The court reporter is Brenda Fitzgerald.

11     My name is Bob Jorissen, certified legal video

12     specialist.  We are both here today representing the

13     firm Priority-One, a Veritext company.

14              Appearances will be noted on the

15     stenographic record.  As all parties to this

16     proceeding do stipulate as to their acceptance of

17     this remote video arrangement and the court reporter

18     swearing in the witness remotely, would the court

19     reporter please swear the witness.

20     J A C Q U E L I N E   M O L I N E, having been first

21     duly sworn by a Notary Public of the State of New

22     York, was examined and testified as follows:

23     EXAMINATION BY

24     MR. THACKSTON:

25              VIDEOGRAPHER:  Go ahead, Counselor.

1            Jacqueline Moline, M.D.

2       Q.     Good morning, Dr. Moline.  Can you hear

3  me okay?

4       A.     You got my name right, yes.  Good

5  morning.

6       Q.     Dr. Moline, this is a continuation of

7  your deposition in the Gref case.  Have you received

8  some additional materials in this case since the

9  beginning of your deposition on July 6th?

10       A.     I don't believe so.

11       Q.     Some materials have been produced to us

12  in the last couple of days, one was an exposure

13  testimony summary for Brian Gref.

14            Do you know when you first received the

15  exposure testimony summary?

16       A.     I don't know -- I'm sorry, there's so

17  much paper.  Yes, I received it, I honestly do not

18  recall, but it was before the first deposition.

19            MR. KRAMER:  Yes, I'll just put on the

20  record, this is James Kramer, that that exposure

21  summary I believe was the subject of some questioning

22  on day one and was produced prior to the first

23  volume.

24       Q.     Doctor, do you have the opinion that

25  Mr. Gref suffers from peritoneal mesothelioma?

1              Jacqueline Moline, M.D.

2        A.      Based on the medical records, yes.

3        Q.      And you have the opinion that his

4   peritoneal mesothelioma was caused by exposure to

5   asbestos?

6        A.      Correct.

7        Q.      Are you familiar with what we marked as

8   number 18, the Carbone article in the journal of

9   Cancer titled, quote, Mesothelioma:  Scientific Clues

10  For Prevention, Diagnosis and Therapy?

11       A.      You know, Dr. Carbone is a prolific

12  author.  If you would like me to know if I'm familiar

13  with the article, you will have to show it to me.

14  Just off the top of my head I can't answer the

15  question.

16       Q.      We're about to show it to you and mark

17  it as Exhibit 18.

18              (Whereupon, 2019 article by Michele

19  Carbone and others was received and marked Moline

20  Exhibit 18, for identification, as of this date.)

21              MR. THACKSTON:  Please allow screen

22  share.

23              VIDEOGRAPHER:  Yes, I will.

24       Q.      Doctor, we are displaying on the screen

25  an article that I believe you've been shown before

Page 214

1                    Jacqueline Moline, M.D.

2    titled Mesothelioma:  Scientific Clues for

3    Prevention, Diagnosis and Therapy in the journal of

4    Cancer, published in 2019.

5                    Have you seen that before?

6         A.    If I did it was three years ago.  I have

7    not read it recently and I can't comment on its

8    content.

9         Q.    You don't recall being shown that in a

10   deposition within the last several months and

11   portions of it being pointed out to you?

12        A.    With all respect, Mr. Thackston, I have

13   a lot of things going on and I don't remember what

14   happened several months ago in a particular day at a

15   particular time in a particular case in a particular

16   deposition, so, no, I do not recall.

17        Q.    Let me direct your attention to page 421

18   of that article.  On page 421 of the article it has a

19   heading on it --

20        A.    I apologize for interrupting you, but

21   the print is way too small for me to be able to read

22   anything on the page.  I can't even see the page

23   number.  There's the page number so thank you.

24        Q.    We're displaying a view that shows at

25   the bottom of the page that it is 421, volume 69,

Page 215

```
 1                  Jacqueline Moline, M.D.
 2    number five, September/October 2019.
 3                  You can see all of that, right?
 4         A.       Correct.
 5         Q.       If we move up on the page a little bit,
 6    there's a heading that's larger bold print that says
 7    Unique Characteristics of Peritoneal Mesothelioma.
 8                  Do you see that?
 9         A.       Yes.
10         Q.       This says -- I want to ask you if you
11    agree with this statement.  It says first, "diffuse
12    malignant peritoneal mesothelioma (MPeM) represents
13    approximately 15 to 20 percent of all mesothelioma
14    diagnoses."  Do you agree with that?
15                  MR. KRAMER:  Counsel, before the answer
16    comes, can I just have a running objection to an
17    article that she doesn't recall and is not relying on
18    or hasn't been asked about that?
19                  MR. THACKSTON:  Yes.
20                  MR. KRAMER:  Thanks.
21         A.       I think the numbers vary in terms of the
22    percentages of peritoneal mesotheliomas.  Some places
23    it's quoted as less than that.  It's probably around
24    ten to 15 percent, but I think it varies depending on
25    the population that's being evaluated and the time
```

1                    Jacqueline Moline, M.D.

2       frame and on a variety of other factors.

3            Q.    Have you ever published anything on the

4       percentages of mesotheliomas that are peritoneal

5       versus pleural?

6            A.    Not specifically.

7            Q.    The article also states, quote, although

8       it shares many similarities with the pleural form of

9       mesothelioma, it has many unique features, end of

10      quote.  Do you agree with that statement?

11           A.    That's sort of a very generic statement.

12      I don't know -- I'm assuming that they're going to

13      expound on what they feel the unique features are,

14      but it rises in a different area, it's often more

15      diffuse, as they say in the next line, but I don't

16      know how I would consider it purely unique.

17           Q.    Would you agree, I'm not referring

18      specifically to the article now, but would you agree

19      that peritoneal mesothelioma occurs in the abdominal

20      cavity and pleural mesothelioma occurs in the chest

21      cavity?

22           A.    You're asking me for a factual answer.

23      It's not an opinion.  It is a fact, yes, that is by

24      definition where those occur.  The pleura is the

25      chest, the peritoneum is the abdomen.

1                   Jacqueline Moline, M.D.

2          Q.      Back to the article.  It states, quote,

3     in contrast to pleural mesothelioma, MPeM is rarely

4     associated with asbestos exposure; in a large series,

5     only eight percent of patients reported exposure, and

6     MPeM afflicts men and women equally, as anticipated

7     when mesothelioma is not caused by occupational

8     exposure (see above) 193, 194, end of quote.

9                   That's what Dr. Carbone and a number of

10    other authors wrote in 2019, correct?

11                  MR. KRAMER:  Objection to form.

12         A.      They wrote in the referencing articles

13    193, 194, which I don't know what they are.  It's

14    basing that opinion that they're stating on one

15    article.  There are certainly others that have

16    different percentages.

17         Q.      Let's look at 193 and 194.  They are on

18    page 429.  Footnote 193 is Lee M, Alexander HR, Burke

19    AP.  Diffuse mesothelioma of the peritoneum:  A

20    pathological study of 64 tumors treated with

21    cytoreductive therapy in Pathology 2013, volume 45,

22    pages 464 to 473.

23                  Are you familiar with that article?

24         A.      I have read some of Dr. Alexander's

25    work.  I don't know if I've read that specific

Page 218

1                    Jacqueline Moline, M.D.

2     article.  These were published about nine years ago,

3     so I've certainly seen some of them.  I couldn't

4     quote what is in a particular article or reference

5     what percentages.  So, I'm vaguely familiar with

6     them.  I have read some of Dr. Alexander's work in

7     the past.  I don't know if it's that specific

8     article.  I would have to see the article and read

9     through it again to refresh my recollection.

10          Q.     Article 194, footnote 194 is an article

11    by Liu, L-i-u, S; Staats, S-t-a-a-t-s, P; Lee M;

12    Alexander HR; Burke AP.  Diffuse mesothelioma of the

13    peritoneum: Correlation between histological and

14    clinical parameters and survival in 73 patients in

15    the journal Pathology 2014, volume 46, pages 604 to

16    609.  Are you familiar with that article?

17          A.     The same answer I gave you before, which

18    is I have read some of Dr. Alexander's work, and I'm

19    picking Dr. Alexander because that's the name that I

20    recognize as opposed to the first author of 193 is

21    Lee, of 194 is Liu.  I don't recall if I've read one

22    or both of them and if I did, it was several years

23    ago and I don't have a specific recollection of the

24    contents of these articles.

25          Q.     Can we go back to page 421 of the

1              Jacqueline Moline, M.D.

2    Carbone article.  It says, however, when MPeM -- I'm

3    just going to say peritoneal mesothelioma.  When

4    peritoneal mesothelioma occurs in individuals exposed

5    to asbestos, they usually have a higher lung fiber

6    burden than those with pleural mesotheliomas,

7    possibly because a higher burden is required for

8    asbestos fibers to bypass the lung filter and reach

9    the peritoneum in sufficient amounts to cause

10   mesothelioma, end of quote.

11              First of all, do you agree that patients

12   with peritoneal mesothelioma usually have a higher

13   lung burden, lung fiber burden than those with

14   pleural mesothelioma?

15              MR. KRAMER:  Objection to form,

16   overbroad.

17        A.     I think that when they looked

18   historically that might have been the case.  I think

19   that there are ample articles that do not have that

20   distinction now.  I don't know, again, what they're

21   referencing.  We can look at those references and see

22   if they are related to what they found in the

23   insulators from the 1960s in reference 24 or 196 or

24   196.  I think they often don't have a fiber burden

25   analyses in folks with peritoneal mesothelioma now

Page 220

1                    Jacqueline Moline, M.D.

2      since they're not obtaining lung tissue just for the

3      sake of obtaining tissue.

4           Q.     Let's look at those footnote articles on

5      page 423.  If you look at page 423, there's a heading

6      that says References, reference number 24 is Dodson

7      RF, O'Sullivan M, Corn CJ, McLarty, JW, Hammar, SP.

8      Analysis of asbestos fiber burden in lung tissue from

9      mesothelioma patients in the Journal Ultrastructural

10     Pathology, 1997, volume 21 at 321 - 336.

11                 Are you familiar with that article?

12          A.     I've read several of Dr. Dodson's

13     articles.  In all likelihood, I read this article

14     15 years ago, but, again, I need the article to

15     refresh my recollection.

16          Q.     Do you consider -- that's Dr. Ron

17     Dodson, you consider him to be an expert on issues

18     relating to lung pathology and asbestos, don't you?

19                 MR. KRAMER:  Objection to form.

20          A.     Dr. Dodson is -- with respect to fiber

21     burden, he's written a number of articles.  I think

22     he's one of the researchers who's looked at the

23     migration of asbestos throughout the body more so

24     than anyone else, and I definitely think he's a

25     clinician who is well versed in what he does.

Page 221

1          Jacqueline Moline, M.D.

2          Q.      When you say clinician, he's not a

3    medical doctor, is he?

4          A.      I think he's -- I don't believe he's an

5    M.D., I think he's a Ph.D., and he's a microscopist.

6          Q.      You're familiar with the last author

7    there Hammar SP, is that Dr. Sam Hammar?

8          A.      Familiar by name.  I've never met the

9    man or if I did, it was 30 years ago, but I don't

10   have a specific recollection of meeting him.

11         Q.      Do you know if he was a co-author on a

12   textbook on pulmonary pathology?

13         A.      The name, I believe so, yes.

14         Q.      The other article cited or other

15   references were 195 and 196.  195, Reid A, Berry,

16   B-e-r-r-y, G, de Klerk, d-e K-l-e-r-k, N, et al.  Age

17   and sex differences in malignant mesothelioma after

18   residential exposure to blue asbestos (crocidolite)

19   in the journal Chest 2007, volume 131, pages 376 to

20   382.  Are you familiar with that article?

21         A.      Again, I've read Dr. Reid's work.  I

22   don't know if I probably saw this article many years

23   ago.  And, Mr. Thackston, if I could ask that you

24   speak off a little off, you're trailing off at the

25   end and it's difficult to hear you.

1              Jacqueline Moline, M.D.

2         Q.    Sure.   Reference 196, Reid A, de Klerk

3    N, Ambrosini, A-m-b-r-o-s-i-n-i, G, Olsen N, Pang SC,

4    Musk AW.  The additional risk of malignant

5    mesothelioma in former workers and residents of

6    Wittenoom, W-i-t-t-e-n-o-o-m, with benign pleural

7    disease or asbestosis in the journal of Occupational

8    and Environmental Medicine, 2005, volume 62, pages

9    665 to 669.

10             Are you familiar with that article?

11        A.    Again, I'm not sure.  I read Dr. Reid's

12   work.  They've written extensively about Australia

13   and particularly that region of Australia.

14             In all likelihood, I've seen the

15   article, but, again, it was published 17 years ago,

16   so I don't have specific recollection of the contents

17   of that article as I sit here right now.

18        Q.    Back to 421, a few more questions about

19   this article.  Dr. Carbone's article, 421, says

20   proportionally --

21        A.    Sorry, where are you?

22        Q.    The middle of the page?

23        A.    Thank you.

24        Q.    "Proportionally, MPeM is observed in

25   carriers of germline mutations more often than

1                    Jacqueline Moline, M.D.

2      pleural mesothelioma, especially among patients who

3      do not report asbestos exposure."

4                    Do you agree with that statement?

5           A.       Again, it's a very general statement.  I

6      don't have an opinion specifically.  I think it's a

7      small number of folks that have had -- again, I

8      don't -- you can show me the references -- I don't

9      know if I've read them or recall them -- with respect

10     to where the proportions of germline mutations might

11     be and which germline mutations they're speaking

12     about.

13          Q.       This article also states, quote, a

14     history of previous abdominal surgeries is common in

15     these patients, supporting the theory that chronic

16     inflammation, caused by asbestos, by other fibers, or

17     after previous surgeries, promotes the malignant

18     growth of mesothelial cells.

19                   Do you agree with that statement?

20                   MR. KRAMER:  Objection, vague and

21     overbroad.

22          A.       Again, this is a review article.

23     They're referencing reference number two that's

24     talking about that.  There isn't a large body of

25     literature that I'm familiar with with respect to the

Page 224

```
 1                    Jacqueline Moline, M.D.
 2     idea of prior abdominal surgeries promoting
 3     mesothelial growth or promoting malignant
 4     mesothelioma.
 5                    I don't know what they're referencing in
 6     number two.  They're referencing the same articles
 7     they talked about before, but I don't know what
 8     reference number two is, and a review article is just
 9     basically summarizing other people's work.
10          Q.    Have you published anything on the
11     percentage of peritoneal mesotheliomas that you
12     believe to be related to asbestos exposure?
13          A.    I have not specifically published any
14     papers on peritoneal mesothelioma.
15          Q.    What literature do you rely upon for
16     your opinion that Mr. Gref's peritoneal mesothelioma
17     is related to or was caused by asbestos exposure?
18          A.    I think we can look at literature dating
19     back to some of the Selikoff where there's peritoneal
20     mesotheliomas related to asbestos exposure and
21     insulators.  There's Creighton, there's Welch,
22     there's Rodelsperger.  I think some of the Chinese
23     studies like Jiang where they talk about peritoneal
24     mesotheliomas in workers.  I think I've talked about
25     this several times in the past.
```

1                    Jacqueline Moline, M.D.

2          Q.      Do you in your report in this case, I

3    believe we already marked it, in your report in this

4    case, do you identify the authorities that you rely

5    upon for your opinion that Mr. Gref's peritoneal

6    mesothelioma was caused by asbestos exposure?

7          A.      I don't understand what you're asking

8    me.

9          Q.      You were giving us some references and

10   it just occurred to me that I should cross-reference

11   the report, your report in this case marked as

12   Exhibit 3 to see where in your report we would look

13   to find what reference you rely upon for your opinion

14   that Mr. Gref's peritoneal mesothelioma was caused by

15   asbestos exposure.

16               MR. KRAMER:  Objection to form.

17         A.      I don't believe in the report I

18   specifically have a section about peritoneal

19   mesothelioma.  I think it's -- there's no specific

20   section that I've written specifically about

21   peritoneal mesothelioma.

22         Q.      You said generally the literature that

23   you would rely upon for an opinion that Mr. Gref's

24   mesothelioma, peritoneal mesothelioma was caused by

25   asbestos, you mentioned Dr. Selikoff.

1              Jacqueline Moline, M.D.

2              Dr. Selikoff studied professional

3     insulators, right, who used thermal insulation as

4     part of their job?

5          A.    Right, I said that.

6          Q.    So those were people that had heavy

7     occupational exposures to asbestos, right?

8          A.    Correct.

9              MR. KRAMER:  Objection to form.

10         Q.    You mentioned Dr. Creighton.  Did

11    Dr. Creighton do original research of a particular

12    population relating to peritoneal mesothelioma?

13             MR. KRAMER:  Objection to form.

14         A.    Did he do an original, what do you mean

15    by original?

16         Q.    Well, you mentioned earlier a review

17    article versus original research.  Did Dr. Creighton

18    do original research that he reported on relating to

19    peritoneal mesothelioma and asbestos exposure?

20             MR. KRAMER:  Form and mischaracterizes.

21         A.    My recollection is it was a -- I don't

22    recall if it was a case control or it was a paper,

23    but the topic of it was definitely related to

24    mesothelioma.

25         Q.    Was it related to peritoneal

1                    Jacqueline Moline, M.D.

2    mesothelioma and the circumstances under which it can

3    be linked to asbestos exposure?

4         A.    It was specifically related to

5    peritoneal mesothelioma and it was specifically

6    related to individuals who had asbestos exposure.

7         Q.    Do you cite Dr. Creighton's article in

8    your report in this case?

9         A.    I don't believe so.  I would have to go

10   through the report again to see.

11        Q.    Do you have your report there with you

12   on the computer or just a hard copy?  How do you have

13   your report?

14        A.    I have a hard copy of it.

15        Q.    Is it searchable?  Do you have it

16   available in a searchable format?

17        A.    I'm on a screen with you now, so I

18   either go off the screen or --

19        Q.    That's okay.

20             MR. KRAMER:  If it helps, Counsel, on

21   page 12 of the reference list, number 223 is an

22   article by Creighton, I believe it's the one we're

23   talking about if that's where you want to go to.

24             MR. THACKSTON:  I appreciate that.  Let

25   me get the witness to answer the question first.

1              Jacqueline Moline, M.D.

2      A.      I'm sorry, I can't hear anything you're

3   saying, Mr. Thackston.  You need to turn the volume

4   up.

5      Q.      I said to Mr. Kramer that I appreciated

6   his offer, but I would prefer the witness answer the

7   question.  I will check my microphone.

8              Dr. Moline, are you able to point me to

9   anywhere in your report where you cite Dr. Creighton?

10     A.      No.

11     Q.      You also mentioned Welch, who is Welch?

12     A.      Dr. Laura Welch.

13     Q.      Has Dr. Laura Welch published any

14   original research on peritoneal mesothelioma and the

15   circumstances under which it can be attributed to

16   asbestos exposure?

17             MR. KRAMER:  Objection to form.

18     A.      She's published a number of articles.

19   The article I was thinking about was looking at

20   individuals, college graduates with peritoneal

21   mesothelioma, looking at the characteristics of them.

22   I don't believe -- I think it would be considered

23   original research rather than a review article.

24     Q.      Do you cite that Welch article in your

25   report?

Page 229

1                    Jacqueline Moline, M.D.

2          A.      I don't believe so.

3          Q.      Is there a section of your report that

4    relates to your opinion that you believe Mr. Gref's

5    peritoneal mesothelioma was caused by asbestos?

6          A.      There's a section in general where I go

7    through questions relating to whether Mr. Gref's

8    mesothelioma was caused by his exposure.  It's on

9    page 21.  It does not specifically separate

10   peritoneal versus pleura.

11         Q.      You referred us to page 21.  There is a

12   heading, we are displaying that in the deposition now

13   on the screen, there's a heading that says, quote,

14   Applying an Accepted Method for Evaluating Disease

15   Causation in an Individual, end of quote.

16              Is that the right spot in your report

17   that we should look for your opinions on causation

18   between Mr. Gref's peritoneal mesothelioma and

19   asbestos exposure?

20         A.      That's part of it, yes.  There's also

21   other areas starting on more general comments on

22   asbestos contaminated talc and disease starting on

23   page 18 that continues through page 21, and then the

24   opinions related to Mr. Gref continue on page 22.

25         Q.      Let's go back to page 21.  Under page 21

1              Jacqueline Moline, M.D.

2    under the Applying an Accepted Method for Evaluating

3    the Disease Causation in an Individual, you say that,

4    quote, in deciding whether Mr. Gref's mesothelioma

5    was caused by his exposure to asbestos, I applied the

6    methodology that was described by Welch, et al. in

7    her paper Asbestos Exposure Causes Mesothelioma, but

8    Not This Asbestos Exposure: An Amicus Brief to the

9    Michigan Supreme Court, published in 2007 in the

10   International Journal of Occupational and

11   Environmental Health, end of quote.

12              Did I read that correctly?

13        A.    Yes.

14        Q.    So, you're relying on an article that

15   was originally a brief, a legal brief filed in a

16   case, right?

17        A.    No, it was converted into a journal

18   article.  It was not the actual Amicus Brief.

19   Excerpts from the Amicus Brief might have been

20   included in the article, but it was converted into a

21   medical journal article.  It was not a court document

22   Amicus Brief, it was a medical article.

23        Q.    I'm just reading what your report says.

24   It says --

25        A.    That's the title of the paper, but the

Page 231

```
 1                  Jacqueline Moline, M.D.
 2   article that I'm referencing came in the medical
 3   literature, it was not from the actual legal
 4   document.
 5        Q.    It looks like it was something that was
 6   submitted first as an Amicus Brief to the Michigan
 7   Supreme Court and then published in the International
 8   Journal of Occupational and Environmental Health,
 9   true?
10              MR. KRAMER:  Objection to form.
11        A.    That's my understanding.
12              MR. KRAMER:  Calls for speculation.
13        A.    You'll have to ask Dr. Welch this
14   question, she's the one who published it.
15        Q.    Was the International Journal of
16   Occupational and Environmental Health the journal
17   that was owned by Dr. David Egilman at that time?
18              MR. KRAMER:  Objection to form, calls
19   for speculation.
20        A.    I'm sorry.  Did you ask if it was owned
21   by him?
22        Q.    Yes.
23              MR. KRAMER:  Same objections.
24        A.    My understanding is it was owned by
25   Taylor & Francis, which is a publishing house.  I
```

1              Jacqueline Moline, M.D.

2    don't think he had an ownership stake in it, but I

3    don't know.

4         Q.     Has he ever had an ownership stake?  You

5    know who Dr. David Egilman is, right?

6              MR. KRAMER:  Objection to the prior

7    question.

8         A.     I know who Dr. Egilman is, yes.

9         Q.     Has he ever had an ownership interest in

10   the International Journal of Occupational and

11   Environmental Health?

12             MR. KRAMER:  Form, lacks foundation,

13   calls for speculation.

14        A.     I have no idea.

15        Q.     Has he ever been an editor of that

16   journal?

17        A.     I believe at one point he was an editor

18   of that journal.

19        Q.     Has he ever been a peer reviewer for

20   that journal?

21        A.     I don't know.  The peer review process

22   is actually supposed to be anonymous so that you

23   don't know who the peers are, and I don't know, I

24   haven't looked at the journal to see the list of

25   reviewers over the years.  I couldn't tell you.

Page 233

1              Jacqueline Moline, M.D.

2      Q.     Do you know whether the journal ever

3   published a statement that says the editor has the

4   right to be the sole peer reviewer of an article?

5              MR. KRAMER:  Objection, lacks

6   foundation, calls for speculation.

7      A.     I am not familiar with that particular

8   statement.  I'm not familiar with it.

9      Q.     You state that you're borrowing -- let

10  me just quote it.  Quote, this method mirrors the

11  Hill criteria, but is specific for asbestos (see also

12  Lemen).  Similar methodology for assessing causation

13  for individuals exposed to asbestos who developed

14  asbestos-related diseases was also outlined by

15  Freeman.  In this paper, Dr. Welch identifies four

16  questions that should be examined in the causation of

17  disease in an individual.

18              Did I generally get that right?

19      A.     Generally.

20      Q.     Who is Freeman?  It says outlined by

21  Freeman, but it doesn't say anything about where or

22  who.

23      A.     Freeman is on my reference list.  It's

24  an article by Freeman.  I think it's either 2012 or

25  something along those lines.

Page 234

1                  Jacqueline Moline, M.D.

2        Q.      Who is Freeman?

3        A.      Freeman is a physician who wrote an

4    article about causation methodology.

5        Q.      Do you know what's the full name?

6        A.      I believe it's Michael Freeman.

7        Q.      This says that Dr. Welch identifies four

8    questions that should be examined:  "One, was the

9    individual exposed to a toxic agent?  Two, does the

10   agent cause the disease present in the individual?

11   Three, was the individual exposed to this substance

12   at a level where the disease has occurred in other

13   settings?  Four, have other competing explanations

14   for the disease been excluded?", right?

15       A.      Correct.

16       Q.      For your analysis under this rubric, did

17   you separate peritoneal mesothelioma or did you

18   consider peritoneal and pleural mesothelioma

19   together?

20       A.      The rubric is used on each individual

21   case, so it's not a rubric, there's no separate

22   rubric for pericardial, tunica vaginalis, pleural or

23   peritoneal, which are the four areas in which

24   mesothelioma can arise.  It's a general methodology

25   that does not discriminate between source or location

Page 235

1              Jacqueline Moline, M.D.

2   of tumor.

3        Q.     For number two, quote, does the agent

4   cause the disease present in the individual, end of

5   quote, you did not apply that to the disease

6   peritoneal mesothelioma, correct?

7              MR. KRAMER:  Objection,

8   mischaracterizes.

9        A.     In my opinion I can apply that disease.

10  Peritoneal mesothelioma has been associated with

11  asbestos exposure, so that's the opinion that I have

12  stated multiple, multiple times, and I continue to

13  have that opinion so, yes, I can say that.

14             MR. THACKSTON:  Object to the

15  responsiveness.

16       A.     I don't know what's unresponsive of me

17  giving an answer to your question.

18             MR. KRAMER:  It's okay, Dr. Moline.

19  Let's wait for the next question.

20             THE WITNESS:  Okay.

21       Q.     Let me read a statement from page 421.

22  For question number two, there is ample literature

23  that asbestos causes mesothelioma and no dispute in

24  the medical literature, end of quote.

25             That statement, first of all, did I read

Page 236

1                    Jacqueline Moline, M.D.

2    that correctly?

3        A.    Yes.

4        Q.    That statement is general as to all

5    types of mesothelioma, it's not specific to

6    peritoneal mesothelioma, correct?

7                MR. KRAMER:  Form, compound.

8        A.    It's a general statement.

9        Q.    With respect to question number two in

10   the protocol that you followed, the term, quote,

11   agent, in this case, did you use that term to mean

12   the particular products of the individual defendants

13   or did you mean asbestos generally?

14               MR. KRAMER:  Objection to form.

15       A.    I didn't pick the word agent.  I don't

16   think I would use that word if I were developing

17   these questions because I think agent is a very vague

18   phrase, but I was thinking about it in terms of the

19   overall exposure, it was not a particular product per

20   se, it was what is the overall exposure that the

21   individual has.

22       Q.    Well, by agent, the way you applied that

23   term in your report and for your opinions, you were

24   not considering the agent to be cosmetic talc, right?

25               MR. KRAMER:  Form.

1              Jacqueline Moline, M.D.

2        A.    I don't know how you are getting to that

3    conclusion from what I have just said.  I was

4    speaking in this to does the agent in this case, it

5    was asbestos, the source of asbestos was cosmetic

6    talc, so that's where I was going.

7        Q.    So, you're answering the question in the

8    first sentence following the numbered sentences, you

9    say, quote, for question number two there's ample

10   literature that asbestos causes mesothelioma and no

11   dispute in the medical literature, right?

12             MR. KRAMER:  Objection to form.

13       A.    I'm sorry, repeat your question, I

14   didn't hear it, or repeat your statement.  I just

15   didn't hear what you said.

16       Q.    Let me just ask you generally.  You got

17   the list of what you say are the four questions that

18   should be examined and the causation of the disease,

19   right?

20       A.    I'm using an accepted methodology that's

21   been published by Dr. Welch, yes.

22       Q.    You list four questions and then you

23   answer question number two, right, where you say,

24   this is the first full sentence after the list of

25   four begins with, quote, for question number two,

1                    Jacqueline Moline, M.D.

2    right?

3                    MR. KRAMER:  Objection form.

4         A.    Yes.

5         Q.    It says, "there is ample literature that

6    asbestos causes mesothelioma and no dispute in the

7    medical literature," right?

8         A.    That's what it says, yes.

9         Q.    Would you agree with me that you could

10   have in this case made question number two, does

11   cosmetic talc cause the disease peritoneal

12   mesothelioma, right?

13                   MR. KRAMER:  Objection to form.

14        A.    That's not how I view it, that's not how

15   I used it.  I'm not going to change my methodology

16   just to suit you.

17                   MR. THACKSTON:  Object to the

18   responsiveness.

19        Q.    Well, the individual in this case

20   suffers from peritoneal mesothelioma, right?

21        A.    The individual in this case suffers from

22   mesothelioma, yes.

23        Q.    Of the subtype peritoneal, right?

24        A.    It's not the subtype, it's the location.

25   A subtype would be epithelial.  If you want to use

1              Jacqueline Moline, M.D.
2    the nomenclature, use the correct nomenclature.
3    Peritoneal is location.  Subtype is inferring the
4    pathological subtype.
5         Q.    Let me do -- use layperson's term
6    because I'm a layperson presumably and so will the
7    jury be.
8              You would agree with me that -- you
9    agreed with me earlier that the peritoneal area, the
10   stomach area is different than the lung area, right?
11             MR. KRAMER:  Objection to form.
12        A.    I would not define it as stomach.
13   Stomach is in the upper part of the abdomen.  I would
14   describe it as the abdominal cavity.  Stomach is even
15   more vernacular and maybe someone might refer to it
16   as the stomach, but even a layperson understands
17   usually the term abdomen.
18        Q.    Abdominal cavity is further away from
19   the nose than the pleural cavity or the chest cavity,
20   right?
21             MR. KRAMER:  Objection, relevance.
22        A.    Yes.
23        Q.    You have not evaluated specifically
24   whether there's literature that supports the idea
25   that cosmetic talc even if adulterated with trace

1                    Jacqueline Moline, M.D.

2    levels of asbestos has been linked to peritoneal

3    mesothelioma, have you?

4                    MR. KRAMER:  Objection to form.

5         A.    There is not a lot of literature related

6    to that in general.  There are certainly cases where

7    it has been described in individuals with exposure to

8    cosmetic talc that have developed peritoneal

9    mesotheliomas in the literature.

10        Q.    So, you're saying that the only

11   literature you're aware of relating to cosmetic talc

12   and peritoneal mesothelioma are case reports of

13   someone who had mesothelioma, peritoneal mesothelioma

14   and also used cosmetic talc, right?

15                   MR. KRAMER:  Objection, misstates.

16        A.    I'm sorry, I didn't hear the second

17   half.  You're fading out.

18        Q.    The only literature that you're aware of

19   relating to peritoneal mesothelioma and cosmetic talc

20   are case reports of people who have been diagnosed

21   with peritoneal mesothelioma who also used cosmetic

22   talc, right?

23        A.    I think that I'm referring to case

24   series as well as case reports.  I'm also referring

25   to -- I believe in other cases where they've looked

1                   Jacqueline Moline, M.D.

2    at tissue and found in cases where mesothelioma has

3    been present, they've looked at lung fiber burden and

4    found characteristic findings of -- well, they found

5    asbestos fibers that are characteristically found in

6    talcum powder, so they found the same type of fibers

7    that are not seen typically in commercial talcum

8    powder -- in commercial asbestos, but are seen in

9    talcum powder.

10          Q.      In looking at your paragraph related to

11   question number two, the cite that I see, the last

12   sentence says -- it's also related to number three --

13   quote, as described above and recently referenced by

14   the Center for Disease Control -- there was no cite

15   for that, right, referenced by the Center for Disease

16   Control, you don't have a footnote and you don't have

17   an article, right?

18          MR. KRAMER:  Objection to form.

19          A.      It's on my reference list, but I don't

20   have a specific citation.  It was from the MMWR

21   report.

22          Q.      Your reference list, how many items are

23   on your reference list?

24          A.      Currently there's about 505 or

25   something, but there aren't that many that are from

Page 242

1                    Jacqueline Moline, M.D.

2    the CDC.

3        Q.      Somebody would have to go read it and

4    try to find the Center for Disease Control in one of

5    the 500 items?

6              MR. KRAMER:  Objection to form.

7        A.      The list is not alphabetical, so, yes,

8    they would have to go and find that because I do not

9    give a specific reference.

10       Q.      Do you know whether that -- what's the

11   name of that article?

12       A.      It's Mazurek, I believe, from 2017.

13       Q.      What page is that on your reliance list?

14       A.      I don't have an up-to-date reliance list

15   that I'm looking at, so I don't know what page it's

16   on, but if you look under "M", the letter "M" as in

17   Mary, you can find it, the last name is

18   M-a-z-u-r-e-k.

19       Q.      What's the title of the article?

20       A.      The author should be easier to find than

21   the title.  Malignant mesothelioma mortality - United

22   States, 1999 to 2015, Centers for Disease Control and

23   Prevention:  Morbidity and Mortality Weekly Report,

24   66, volume 8, pages 214 to 218, March 3rd, 2017.

25       Q.      Is there a statement in that article

Page 243

1                    Jacqueline Moline, M.D.

2       about the percentage of peritoneal mesotheliomas that

3       have been linked to asbestos exposure?

4              A.     I don't recall.  That wasn't the purpose

5       of that reference, but I don't recall.

6              Q.     Criteria number three mentions what you

7       call analogous exposure scenarios.

8                    Does that article referenced by the CDC

9       relate to exposure scenarios involving alleged trace

10      contamination of cosmetic talc?

11             A.     The article from the CDC is talking

12      about mesothelioma in individuals and they reference

13      that cosmetic talc may be a cause is my recollection.

14      I don't recall, I don't believe the reference

15      specifically separated it out, the location of the

16      mesothelioma.

17                    We've been going an hour, I would like a

18      stretch break, please.

19             Q.     Sure.

20                    VIDEOGRAPHER:  We'll be going off the

21      record at 11:01 a.m.

22                    (A recess was taken.)

23                    VIDEOGRAPHER:  We're back on the record

24      at 11:11 a.m.  Quick correction to the read in, this

25      is actually volume two of Dr. Moline.

1              Jacqueline Moline, M.D.

2              Go ahead, Counselor.

3      Q.    Dr. Moline, when we took a break we were

4  talking about an article on your reliance list that

5  that's not directly referenced in your report; is

6  that on the screen now, Malignant Mesothelioma

7  Mortality?

8              MR. KRAMER:  Objection to form.

9      Q.    Do you see the article on your screen

10  now?

11     A.    No.

12     Q.    You don't see Malignant Mesothelioma

13  Mortality, United States 1999 to 2015?

14     A.    Now I do.  Before I did not.  There was

15  something else there.

16     Q.    It's coming from my computer.  Is it now

17  zoomed, enlarged so you can read the title?

18     A.    Yes.

19     Q.    We'll make this number 19.

20              (Whereupon, Morbidity and Mortality

21  Weekly Report was received and marked Moline

22  Exhibit 19, for identification, as of this date.)

23     Q.    This is called the Morbidity and

24  Mortality Weekly Report, correct?

25     A.    It's not called that, it is that.

Page 245

1                    Jacqueline Moline, M.D.

2          Q.     Is there any indication that this is a

3    peer-reviewed article?

4          A.     They are peer-reviewed.  I know that

5    because I have published MMWRs and I know they're

6    subject to peer review.

7          Q.     So, this is the article that you were

8    referring to on your report.  I believe it was page

9    21 of your report where we were looking at your

10   discussion of item number two under the Welch test,

11   you said something was referenced by the CDC; is this

12   what you were talking about?

13         A.     I believe it was in response to number

14   three of the Welch criteria that I use, not number

15   two.  This was the article that I was referencing.

16         Q.     This article, did you say that you

17   thought that it specifically mentioned cosmetic talc?

18         A.     It references cosmetic talc.  It

19   references cosmetic talc, it's references a paper

20   about cosmetic talc and talks about it, I believe,

21   later on with respect to -- that may be why it's been

22   -- I don't remember the exact terminology they used.

23         Q.     Down at the bottom here there is a

24   footnote that I'm going to attempt to highlight as I

25   go.  Do you see that?

1               Jacqueline Moline, M.D.

2        A.      Yes.

3        Q.      In that footnote that I highlighted

4   says, quote, asbestos is a term used for certain

5   minerals that have crystalized in a particular

6   macroscopic habit with certain commercially useful

7   properties.  In quotations, quote, asbestiform, end

8   of quote, term applied to minerals with a macroscopic

9   habit similar to that of asbestos, right?

10       A.      That's what it says, yes.

11       Q.      Generally this article does not

12  distinguish between pleural and peritoneal

13  mesothelioma, does it?

14       A.      They differentiate in the table.

15       Q.      In what table?  Which table are you

16  talking about?

17       A.      Table one.

18       Q.      Table one, malignant mesothelioma death

19  and age adjusted rates among decedents aged greater

20  than or equal to 25 years by selected

21  characteristics, right?

22       A.      You didn't read the entire title, but

23  yes.

24       Q.      About halfway down it talks about the

25  anatomic site and it gives you the number of deaths

Page 247

```
 1                  Jacqueline Moline, M.D.
 2    per site and the death rate, right?
 3         A.     Correct.
 4         Q.     It says during this time frame there
 5    were 3,351 pleural mesos and 1,854 of the peritoneum,
 6    right?
 7         A.     Yes, as well as a huge number of
 8    unspecified or other, meaning that the death
 9    certificate just said malignant mesothelioma, it did
10    not specify the site.
11         Q.     Table two is titled, quote, industries
12    and occupations with significantly elevated
13    proportionate mortality ratios, 1,830 malignant
14    mesothelioma decendents aged 25 or greater, 23
15    states, 1999, 2003, 2004 and 2007, right?
16         A.     Yes.
17         Q.     The first industry listed is ship and
18    boat building?
19         A.     Correct.
20         Q.     With 24 deaths and then there's a PMR,
21    is that proportionate mortality ratio?
22         A.     I assume they define it at the bottom of
23    the table, but that's typically what PMR stands for.
24    We can verify it if you scroll down and look at the
25    bottom of the table where they have a little mark and
```

Page 248

1                Jacqueline Moline, M.D.

2    they describe that's what Proportionate Mortality

3    Ratio, yes.

4         Q.    If you scroll down it says, PMR, quote,

5    is defined as observed number of deaths with

6    malignant mesothelioma in a specified

7    industry/occupation, divided by the expected number

8    of deaths with malignant mesothelioma.  The expected

9    number of deaths is the total number of deaths in

10   industry or occupation of interest multiplied by a

11   proportion defined as the number of malignant

12   mesothelioma deaths in all industries or occupations,

13   divided by the total number of deaths in all

14   industries/occupations.  The malignant mesothelioma

15   PMRs were internally adjusted by five-year age

16   groups, gender, and race.  CIs were calculated

17   assuming Poisson distribution of data, right?

18        A.    Right as in did you read that or right

19   is that what it says?  What's right?

20        Q.    Is that what it says?

21        A.    That's what the authors wrote.

22        Q.    This also has on the table two

23   industries and occupations with significantly

24   elevated Proportionate Mortality Ratios, it has both

25   ship and boat building and U.S. Navy, right?

Page 249

1                    Jacqueline Moline, M.D.

2          A.      Correct.

3          Q.      You know Mr. Gref's parents were both in

4    the United States Navy, right?

5          A.      Yes.

6          Q.      You know that when Mr. Gref first went

7    to the doctor and was diagnosed with peritoneal

8    mesothelioma, he told the doctor he felt he might

9    have been exposed to asbestos brought home by his

10   parents who were in the United States Navy, didn't

11   he?

12                 MR. KRAMER:  Objection, mischaracterizes

13   facts not in evidence, calls for speculation.

14         A.      I don't specifically recall those

15   particular notations, but it wouldn't surprise me

16   since his parents were both Navy personnel, although

17   their job tasks as they described were not typically

18   associated with asbestos exposure.

19         Q.      Do you know whether they were stationed

20   at a shipyard?

21         A.      I know they were at one time away for a

22   number of years.  I believe they were at the naval

23   base.  I don't know if it was the shipyard.  I don't

24   specifically recall.  His father was a drug and

25   alcohol counselor, he was not working in the engine

Page 250

1                  Jacqueline Moline, M.D.

2    rooms.

3        Q.    Was he a drug and alcohol counselor at a

4    base where they had a shipyard that manufactured or

5    repaired ships?

6              MR. KRAMER:  Objection to form.

7        A.    I don't know if they manufactured ships

8    there.  It was a shipyard.  I don't know if they

9    repaired ships.  I don't know if it was -- I don't

10   know the exact -- I don't know exactly what happened

11   at the shipyard with respect to manufacturing, if

12   ships are made there or not.

13       Q.    Did you do anything to try to rule in or

14   rule out Mr. Gref's possible exposure to asbestos

15   from his parents' work in the Navy at a base that

16   included a shipyard?

17             MR. KRAMER:  Objection to form, assumes

18   facts.

19       A.    Apart from looking carefully at what the

20   depositions of his parents were and where their jobs

21   were located, no, I did not do individual research on

22   the shipyard in Virginia.

23       Q.    Back to the article that we marked as

24   19, I believe.  One of the statements it makes on

25   page 217, and I highlighted it, quote, moreover,

1          Jacqueline Moline, M.D.

2    family members of workers engaged in activities

3    placing them at risk for asbestos exposures also have

4    the potential for exposure to asbestos, end of quote.

5                    Did I read that correctly?

6          A.    Yes.

7          Q.    Was that statement made in the article?

8                    MR. KRAMER:  Asked and answered.

9          A.    I'm sorry, was the statement that you

10   just read from the article in the article, yes, it

11   was.

12         Q.    Do you agree with that statement?

13                   MR. KRAMER:  Vague and overbroad.

14         A.    Do I agree with the statement that

15   family members of asbestos workers are at increased

16   risk for mesothelioma, yes.

17         Q.    Well, it says, quote, workers engaged in

18   activities placing them at risk for asbestos

19   exposure, end of quote, right?

20         A.    Yes, and it says they have a potential

21   for exposure to asbestos, that is correct, if they're

22   in activities that place them at risk for asbestos

23   exposure.

24         Q.    The next paragraph says that, quote,

25   among the 96.3 percent of deaths in 23 states for

1           Jacqueline Moline, M.D.

2   which industry and occupation were known,

3   shipbuilding and construction industries were major

4   contributors to malignant mesothelioma mortality,

5   right?

6           A.    That's what they state.

7           Q.    Where do you believe there's a reference

8   to a study involving cosmetic talc exposure?

9           A.    I have to see the whole article.  I

10  can't do it with you doing this scrolling up and

11  down, that's giving me a seizure.

12          Q.    Let me ask you a different question

13  then.  Looking at table two, the table above

14  occupation, about halfway down it begins, Occupation,

15  do you see the list of occupations in the article

16  from the CDC?

17          A.    Yes.

18          Q.    These are the occupations that they are

19  reporting the people that were diagnosed with

20  mesothelioma?

21          A.    No, that's not, that is not what the

22  table is showing.

23          Q.    Table two, industries and occupations

24  with significantly elevated Proportionate Mortality

25  Ratios, right?

1            Jacqueline Moline, M.D.

2        A.      Correct, it's telling you people who

3   have died from mesothelioma for which they had

4   occupational on the death certificate.  It does not

5   tell you anything beyond that.

6        Q.      It begins with insulation workers as the

7   first one, right?

8        A.      Yes.

9        Q.      Would you agree with me that an

10  occupation that used talcum powder occupationally was

11  barbers and hairdressers?

12            MR. KRAMER:  Objection, calls for

13  speculation.

14        A.      I'm sorry, can you repeat the question?

15        Q.      Would you agree that the occupation

16  barber or hairdresser are occupations that routinely

17  used cosmetic talc as part of their job?

18        A.      Yes.

19        Q.      The occupation barbers and hairdressers

20  are not listed on this list in table two of

21  Exhibit 19, right?

22        A.      Not in this case table.

23        Q.      You're not aware of any epidemiological

24  study that ever concluded that the occupation of

25  barber or hairdresser are at an increased risk of

Page 254

1                   Jacqueline Moline, M.D.
2       developing mesothelioma, are you?
3             A.    I believe barbers and hairdressers are
4       cosmetologists are included in a category with
5       mesotheliomas in the updated article that was by -- I
6       believe it's the same author that came out I think it
7       was this year where they showed a number of
8       individuals who were barbers or hairdressers with
9       mesotheliomas.  It's been mentioned in an article,
10      McDonald mentioned that he felt in an article that a
11      barber's exposure was the cause of their
12      mesothelioma.
13            Q.    Going back to your report.  Show me
14      where these articles mentioning -- these articles
15      that have concluded -- is it your testimony that
16      these articles have concluded that the occupation of
17      barber, hairdresser or cosmetologist puts the worker
18      at an increased risk of mesothelioma based on --
19      let's just say first, is there any article where they
20      have found an increased incidence of mesothelioma
21      among barbers, hairdressers or cosmetologists?
22                  MR. KRAMER:  Objection to form.
23            A.    Again, the updated Mazurek has an
24      increase -- has a number of folks in the hairdresser,
25      cosmetologist category.  I don't remember the exact

1            Jacqueline Moline, M.D.

2     number of mesotheliomas.  It's not in this article,

3     it's in an updated one, and as I have said before,

4     McDonald talks about it as a cause of mesothelioma in

5     one of the individuals in their cohort, but it is

6     not -- that specific thing is not in this article.

7            Q.    We'll talk about McDonald.  What you

8     just told us about this list of occupations was that

9     in this article, the list of occupations just means

10    that's what the death certificate said that the

11    person was doing at the time of death, right?

12           A.    Correct.

13           Q.    They might have had other jobs?

14                 MR. KRAMER:  Objection, calls for

15    speculation.

16           A.    All I know is what was put on the death

17    certificate at the time of death.

18           Q.    You've specifically been retained in

19    cases where someone had a job of barber or

20    hairdresser but they had other occupational exposure

21    to asbestos other than that job, right?

22                 MR. KRAMER:  Objection to form.

23           A.    Yes.

24           Q.    You have one right now, you are retained

25    as an expert in another case by Mr. Kramer and his

1                    Jacqueline Moline, M.D.

2    law firm, right?

3                    MR. KRAMER:  Objection to form, vague.

4         A.     I'm not going to comment on another

5    case.

6         Q.     Just yes or no, are you retained in

7    another case by this plaintiff lawyer and this firm?

8                    MR. KRAMER:  Just generally?

9         A.     I have been retained by Mr. Kramer's

10   firm in other cases.

11        Q.     In another case in which you're retained

12   and for which you have written a report that you have

13   produced, the gentleman was a barber, but he had also

14   worked as an apprentice pipe fitter, right?

15                   MR. KRAMER:  Objection.  I'm not sure

16   what case you're referring to.

17                   MR. THACKSTON:  The Gref case.

18                   MR. KRAMER:  That is this case.

19        A.     We're talking about the Gref case today

20   and I don't believe it is --

21        Q.     I'm sorry.

22        A.     -- Mr. Kramer's firm.  So, Mr. Kramer

23   has no knowledge of this and I will not be discussing

24   another firm's case.

25        Q.     We're in the Gref case.

1              Jacqueline Moline, M.D.

2        A.    I don't think that's appropriate, but

3    I'm not a lawyer here.  You tell me if that's

4    appropriate or not or maybe Mr. Kramer will tell me

5    if it's appropriate or not, but I'm not commenting on

6    other cases.

7              MR. THACKSTON:  Object to

8    responsiveness.

9        Q.    I'm sorry, you're right.  I'm getting my

10   cases mixed up since I was in a deposition the other

11   day, I think it was yesterday, Daigle.  You are

12   retained as an expert in the Daigle case,

13   D-a-i-g-l-e, pending in New Orleans, right?

14             MR. KRAMER:  I'm going to object as

15   outside the scope of this deposition.  That is not a

16   case for which Dr. Moline is retained by the Simmons

17   firm or with me, and I'm not sure that she can

18   comment on that.

19       Q.    Are you retained as an expert in the

20   Daigle case?

21       A.    Again, I don't feel comfortable

22   commenting on other cases.  I have been retained in

23   other cases by other firms, some of whom have had

24   multiple occupations, including being a barber.

25       Q.    You've been retained in other cases

Page 258

1                    Jacqueline Moline, M.D.

2    where someone has had an occupation, including being

3    a barber, but also had worked in other industrial

4    settings where they have claimed exposure to

5    asbestos, right?

6              MR. KRAMER:  Objection, assumes facts,

7    outside the scope, and asked and answered.

8         A.    I have been retained in cases where

9    individuals have worked in more than one occupation,

10   including being in industry and being in the

11   cosmetology industry.

12        Q.    If someone lists on their death

13   certificate that they were a cosmetologist at the

14   time of death, that does not mean that they didn't

15   have other jobs where they might have been exposed to

16   asbestos, right?

17             MR. KRAMER:  Calls for speculation,

18   vague and ambiguous.

19        A.    That's correct.

20        Q.    The more recent report that you're

21   talking about, Morbidity and Mortality Weekly Report,

22   you're talking about the one from March or May of

23   this year, 2022?

24        A.    I believe it came out in 2022.  I don't

25   recall the month.

1                    Jacqueline Moline, M.D.

2         Q.      You've been asked about that in a

3    deposition before, haven't you?

4         A.      I believe so.

5         Q.      You recall that that one makes a

6    statement about peritoneal mesothelioma and asbestos,

7    don't you?

8         A.      I don't recall.

9              MR. KRAMER:  Objection, vague.

10        A.      I don't recall if I was asked.  I don't

11   recall what I answered.  I don't recall the specific

12   line in the paper.  If you want to show it to me, I'm

13   more than happy to discuss.

14        Q.      Let's go back and look at your report

15   first because in your report you say -- let's go back

16   to the specific reference that you made to CDC,

17   Centers for Disease Control.  I stopped sharing, but

18   I ask that we put back up your report.

19              The statement that we were talking about

20   in your report on page 23, quote, as described above,

21   and recently referenced by the Center for Disease

22   Control, as well as published in the peer-reviewed

23   literature, there are numerous other individuals with

24   exposure to asbestos-containing talc products who

25   have developed malignant mesothelioma, end of quote,

1                    Jacqueline Moline, M.D.

2    right?

3         A.    That's what the line says.  I should

4    take out the word "recent".

5         Q.    Footnote for that, if the article is

6    Andrion, A-n-d-r-i-o-n, article entitled Malignant

7    Peritoneal Mesothelioma in a 17-Year-Old Boy with

8    Evidence of Previous Exposure to Chrysotile and

9    Tremolite Asbestos, Human Pathology, volume 25,

10   number six, June 1994, right?

11        A.    Yes.

12        Q.    That's a case report from 1994, that's

13   not recent; would you agree?

14             MR. KRAMER:  Objection to form.

15        A.    1994 is not what I would consider

16   recent, correct.

17        Q.    The next article you cite is

18   B-u-l-b-u-l-y-a-n.

19        A.    Come on, I want you to pronounce it.

20   Amuse all of us.

21        Q.    Bulbulyan.  I'll be happy to give you

22   some comic relief.

23        A.    I think you did very well.

24        Q.    Cancer Mortality Among Women in the

25   Russian Printing Industry, right?

Page 261

1                    Jacqueline Moline, M.D.

2        A.        Correct.

3        Q.        Is it your testimony that that involves

4    people with alleged only exposure to cosmetic talc?

5        A.        It was talc.  The statement says

6    asbestos-containing talc products.  Talc was used in

7    the printing industry.  The statement does not, as I

8    wrote it, does not have the word "cosmetic" in that

9    line, it says talc products.

10       Q.        Would you agree with me that talc has

11   been used for industrial purposes for lot of things

12   like paper and tires industry?

13       A.        Yes.

14       Q.        You understand that the grades of talc

15   used for industrial applications might be different

16   than the grades used for cosmetic application?

17                 MR. KRAMER:  Objection to form.

18       A.        You would have to describe for me what

19   you mean by grade, but I think there is a demarcation

20   between what's used in industrial and what's used in

21   cosmetic.

22       Q.        Would you know, for example, for Clubman

23   talc, do you know what grade of talc was used to make

24   the Clubman talc?

25       A.        Do I know what grade was used to make

Page 262

1                  Jacqueline Moline, M.D.

2    the what?

3          Q.     Clubman, Clubman talc.

4          A.     I don't know what nomenclature is used.

5    I'm not a talcum powder manufacturer, nor supplier,

6    and I'm not intimately familiar with the nomenclature

7    of the sourcing of these products.

8          Q.     You're not giving the opinion that if a

9    seller of a talc that used pharmaceutical grade

10   talcum powder is the same grade of talcum powder that

11   was used for industrial application like in the

12   Russian printing industry, are you?

13                MR. KRAMER:  Form, assumes facts not in

14   evidence, mischaracterizes.

15         A.     I have no idea what happens in Russia,

16   so I can't comment on the Russian printing industry.

17   My understanding is that what is used in cosmetic

18   talc is a different grade than what it used in

19   industrial talc, but, again, this is not my area of

20   expertise and I'm not an expert on this, I will not

21   be getting into the nitty-gritty, so to speak, of the

22   demarcations between what constitutes industrial

23   versus cosmetic.

24         Q.     I'm referring to your criteria for

25   attributing causation and specifically to what agent

Page 263

1                    Jacqueline Moline, M.D.

2      is involved and what disease.

3                    By agent, I'm looking for the specific

4      type of cosmetic talc and the specific type of

5      alleged contamination with asbestos, if you know,

6      okay?  Do you understand that?

7                    MR. KRAMER:  Objection to form.

8           A.    I don't really understand because, as I

9      said earlier, that's not how I define the term agent,

10     so I'm not going to use your definition of how you

11     define it when it's different from how I defined it.

12          Q.    Do you define the term agent as you have

13     used it in your report to mean asbestos?

14                   MR. KRAMER:  Asked and answered.

15          A.    Yes.

16          Q.    In your report on page 21 where you say,

17     quote, there is ample literature that asbestos causes

18     mesothelioma, end of quote.

19                   Is there any other place in your report

20     that you further define the term asbestos?

21          A.    Yes.

22          Q.    Where is that?

23          A.    Page nine.

24          Q.    In terms of what you're considering the

25     agent in this case, is this on page nine, your

1              Jacqueline Moline, M.D.

2    further definition of asbestos?

3              MR. KRAMER:  Objection to form.

4         A.    You asked if I had a definition of

5    asbestos in my report.  Under asbestos and disease I

6    define where asbestos comes from and that it's been

7    used commercially and I talk about the fiber types.

8              You asked if I had any reference in my

9    report at all about the definition of asbestos and a

10   naturally occurring mineral is the definition of

11   asbestos.

12        Q.    When I was asking you about populations

13   that have been studied, that you believe have been

14   studied for peritoneal mesothelioma, you mentioned

15   Rodelsperger.

16             What population did Rodelsperger study?

17        A.    I was referring to the paper where he's

18   talking about the general community paper.  It's

19   Rodelsperger from -- oh goodness, I believe he's

20   talking about asbestos as risk factors for diffuse

21   malignant mesothelioma.  It's a case control study

22   from 2001.

23        Q.    Rodelsperger doesn't mention anything

24   about cosmetic talc, does he?

25        A.    I don't believe so.

Page 265

1                    Jacqueline Moline, M.D.

2          Q.     Did we agree -- I'm sorry.  On

3    Exhibit 19, the CDC article, we agreed that the CDC

4    article in 2017 did not mention cosmetic talc for

5    hairdressers or barbers or cosmetologists?

6                MR. KRAMER:  Form, asked and answered.

7          A.     Did not have hairdressers and barbers as

8    a job category, that's correct, we did agree,

9    shockingly.

10         Q.     And that article did not mention

11   cosmetic talc as a potential source of asbestos

12   exposure, did it?

13         A.     Again, it references -- they reference

14   the cosmetic talc article in that.  I don't know if

15   there's an actual phrase as well, but they talk about

16   a potential source of asbestos exposure, and I know

17   they reference the Gordon paper.

18         Q.     I see the reference to the Gordon paper.

19   I see the footnote.  I don't see where it's mentioned

20   in this tab.  Do you know where it's mentioned in the

21   tab?

22         A.     If you show it to me, maybe I'll be able

23   to find it.

24                MR. THACKSTON:  Somebody has to quit

25   sharing the screen and then I can share again.

1              Jacqueline Moline, M.D.

2         Q.     Can you see back to the article,

3    Exhibit 19, Morbidity and Mortality Weekly Report

4    from 2017?

5         A.     Okay.

6         Q.     The Gordon article is reference number

7    eight.  In the footnotes, the question was, where was

8    that in the text?  I see on page 217 of that article,

9    footnote eight is after this sentence, quote, in

10   addition, ongoing research is focusing on the

11   potential non-occupational and environmental

12   exposures to asbestos fibers and other EMPs, e.g.,

13   erionite, a naturally occurring fibrous mineral that

14   belongs to the group of minerals called zeolites, and

15   non-mineral elongate particles, e.g., carbon

16   nanotubes to assess exposures and potential health

17   risks (7, 8).

18              That's the statement that refers to the

19   Gordon Fitzgerald paper?

20        A.     Correct.

21        Q.     It doesn't mention cosmetic talc?

22        A.     It doesn't have those words except in

23   the reference.

24        Q.     I'll stop sharing and see if we can go

25   to the 2022 CDC Morbidity and Mortality Weekly

1                    Jacqueline Moline, M.D.

2    Report.

3                    MR. THACKSTON:  Let's make that 20.

4                    (Whereupon, 2022 CDC Morbidity and

5    Mortality Weekly Report was received and marked

6    Moline Exhibit 20, for identification, as of this

7    date.)

8         Q.    This is reference material that you have

9    previously read and relied upon and testified about,

10   right?

11        A.    Can you break that down, please.  You're

12   asking me like four questions.

13        Q.    Is this Exhibit 20 a reference material

14   that -- an article that you have previously

15   referenced?

16        A.    Correct.

17        Q.    You brought this to one of your

18   depositions, didn't you?

19        A.    I'm sorry, I didn't hear what you said.

20        Q.    You brought this to one of your

21   depositions, didn't you?

22                    MR. KRAMER:  Form.

23        A.    I might have.  Can you increase the

24   size, please, if you're going to ask me a question

25   from it.

Page 268

1          Jacqueline Moline, M.D.

2     Q.    Does this make a statement about the

3  percentage of peritoneal mesotheliomas that can be

4  linked to asbestos exposure?

5          MR. KRAMER:  Objection to form.

6     A.    First of all, I'm not seeing the entire

7  page, but it's an update of the numbers from the SEER

8  database and it's giving percentages, if I recall

9  correctly, of the number of deaths associated.  This

10 is looking in women.

11    Q.    It also makes some statements about what

12 the most common exposures to asbestos were, doesn't

13 it?

14         MR. KRAMER:  Objection to form, vague.

15    A.    Most common exposures and most common

16 occupations.  I don't know if -- I don't know -- they

17 don't have occupational histories or environmental

18 histories, they just have jobs, not exposures,

19 they're very different.

20    Q.    It makes a reference to exposure data

21 being available for some of the cases.

22    A.    Show me where it says that.  I don't

23 recall that.

24    Q.    I will scroll back up.  It says on page

25 three, among men an estimated 85 percent of

1              Jacqueline Moline, M.D.

2    mesotheliomas were attributed to work-related

3    asbestos exposure.  Among women, the overall

4    attributable risk was estimated at approximately

5    23 percent.  Although occupational asbestos exposure

6    is most often recognized among men working in ship

7    buildings, construction, manufacturing and other

8    industrial settings where women are less likely to be

9    employed, exposure can also occur in other work

10   settings as a consequence of disturbance of

11   previously installed friable asbestos-containing

12   materials during maintenance or renovation or the

13   resuspension of settled fibers in the air caused by

14   dusting, sweeping or cleaning, right?

15        A.    That's what the authors wrote, correct.

16        Q.    So, there were some discussion about the

17   manner by which people may be -- people who are

18   diagnosed with mesothelioma may be exposed to

19   asbestos, right?

20        A.    There was some discussion as they were

21   referencing this paper.  They did not collect

22   exposure data in this paper.

23        Q.    As of May 2022, the CDC article about

24   mesothelioma does not mention cosmetic talc as a

25   possible source of exposure to asbestos, does it?

1                   Jacqueline Moline, M.D.

2                   MR. KRAMER:  Objection.  Objection to

3      form.

4           A.     Specifically I don't use that -- I don't

5      believe they use that phrase within this paper.

6           Q.     Scroll down, please.  This is the one

7      you were talking about that in the list of

8      occupations that someone held at the time of their

9      death, it included the occupational category of

10     hairdressers, hairstylists and cosmetologists,

11     correct?

12          A.     Correct.

13          Q.     Also included, one of the largest was

14     homemaker, right?

15          A.     Correct.

16          Q.     It also notes that the geographic

17     distribution of the highest mesothelioma death rates

18     among women were in states with the shipyard

19     industry, right?

20          A.     Correct.

21                 MR. KRAMER:  Objection to form.

22          Q.     Now, you mentioned the McDonald article,

23     maybe we don't have to go look at it, the McDonald

24     article made -- did not conclude -- first of all, the

25     McDonald article was relating to disease among

1              Jacqueline Moline, M.D.

2    miners, chrysotile miners in Canada, wasn't it?

3         A.    Correct.

4         Q.    It was not a study about other

5    occupations, it noted that one person had a

6    possible -- had done work as a barber and had

7    possible asbestos exposure in that role, right?

8              MR. KRAMER:  Form.

9         A.    Correct.

10        Q.    And you're familiar with other articles

11   that have suggested that occupational exposure to

12   asbestos in the hairdresser or barber industry can

13   come from hairdryers, weren't you?

14             MR. KRAMER:  Objection to form.

15        A.    Yes.

16        Q.    Doctor, let me ask you about your

17   scheduling preferences.

18        A.    Ask me about my what?

19        Q.    Scheduling preferences for the day.

20   Would you like, is there a point where you would like

21   to take a lunch break and is there a point in which

22   you need to stop for the day?

23             MR. KRAMER:  Well, I'll comment on that

24   because under Rule 30 of the federal rules, just to

25   remind counsel, we are limited to or counsel is

Page 272

1              Jacqueline Moline, M.D.

2    limited to seven hours.  We're now within -- we're

3    less than one hour left of a lot of questioning.  I'm

4    going to have some follow-up, so please be aware of

5    that, but as pertains to a lunch break or any other

6    break, Dr. Moline, you can, of course, answer.

7              THE WITNESS:  Based on my understanding

8    of how much time there's left, I would prefer that we

9    maybe take three or four minutes now just so I can

10   have a comfort break, and then we can continue and

11   then we wrap this up within the allotted time under

12   whatever federal rule it is that gives an allotted

13   amount of time.

14             MR. THACKSTON:  I'm not saying I agree

15   with that.  We can take a five-minute break.

16             VIDEOGRAPHER:  We'll be going off the

17   record at 12:00 p.m.

18             (A recess was taken.)

19             VIDEOGRAPHER:  We are back on the record

20   at 12:08 p.m.  Go ahead, Counselor.

21        Q.    Let's go back to your report.  Doctor, I

22   believe since your report something was produced to

23   us that was called something like an exposure

24   analysis where there was an attempt to assign a

25   number of occasions for which Mr. Gref used certain

Page 273

1                    Jacqueline Moline, M.D.

2    kinds of product.

3                    Are you familiar with that document?

4         A.      Are you referring to the exposure

5    testimony summary that was provided to me by

6    Mr. Kramer's firm that we talked about at the onset

7    of today's deposition that I was asked about at ad

8    nauseam in volume one in this deposition; is that

9    what you're referring to?

10        Q.      No, I'm referring to a document where

11   there was some estimates about the number of products

12   that was used and for how long.

13                   Do you remember that document?

14        A.      I don't know what you're referencing.

15   If you show it to me, I can tell you.  I don't know

16   what you're talking about.

17        Q.      If you attempted to -- have you

18   attempted to estimate the number of -- well, have you

19   done an exposure analysis for each of the defendant

20   products in this case?

21        A.      I have done a dose estimate, dose

22   calculation based on the number of applications, yes.

23   I had referenced that it was possibly mathematically

24   to do, so I went ahead and did it.

25        Q.      That's not something that's in your

1              Jacqueline Moline, M.D.

2    report?

3         A.    No, it is not.

4         Q.    When did you do these calculations?

5         A.    I did these calculations when I saw that

6    this deposition was on my calendar.

7         Q.    When was that?  Was it in the last week?

8         A.    Within the last week or so, yes.

9         Q.    When did you provide them to plaintiff's

10   counsel?

11        A.    I didn't.  I did it in case I was asked

12   questions about it.  I have not provided it to him.

13        Q.    So the plaintiff's counsel don't know

14   what your opinions are about the dose estimates, your

15   math on the dose estimates?

16        A.    No, I was asked questions about it and

17   whether I done it, so I went ahead and did it.

18        Q.    Is there a document?  Did you create a

19   document?

20        A.    I have just some scribbled notes.  It

21   was not a formal thing.  I did it just in case I was

22   asked questions.  It's not a typed document.  It's

23   just some scribbled notes that won't make a lot of

24   sense to anyone but me.

25        Q.    Are you familiar with a document that

Page 275

1                    Jacqueline Moline, M.D.

2     purports to show the low, medium and high estimates

3     for the number of containers Mr. Gref may have used

4     of various products?

5                    MR. KRAMER:  Form.

6          A.    I don't know what document you're

7     talking about, especially when you're talking about

8     purports to show, that's confusing me.

9          Q.    Did you create a document where you

10    estimated the number of containers that Mr. Gref may

11    have used for any particular product?

12         A.    I did not create a document related to

13    the number of containers.

14         Q.    Did someone else create a document that

15    they shared with you relating to the number of

16    containers that Mr. Gref may have used?

17         A.    There was a document, it was part of the

18    exposure testimony summary or the number of bottles,

19    yes.

20         Q.    In your report, do you reference a test

21    that Dr. Longo did on a Clubman container that

22    Mr. Gref claims to have owned?

23         A.    If I recall correctly, I'm not a time

24    traveler, I wrote this report in 2021 and if

25    Dr. Longo tested the container in 2022, I am not

1                    Jacqueline Moline, M.D.

2    clairvoyant and did not know what Dr. Longo's report

3    several months later would find.  It is not

4    referenced in my report because it was done after my

5    report was completed.

6         Q.    When is the first time you saw

7    Dr. Longo's report on the test that he did on the

8    Gref container?

9         A.    I don't know exactly.  At some point I

10    have it with me, it was provided to me with

11    additional documents.  It was provided to me, it

12    looks like it was provided to me on August 9th.  I

13    might have seen it before that, but it was provided

14    to me by Mr. Kramer's firm.  I have a cover letter

15    stating, enclosed I find -- here's one folder

16    containing this, which included the Clubman talc,

17    testing by Dr. Longo for the compiled notebook.

18         Q.    Did you read and consider the Longo

19    report on the Gref container that you received in

20    August?

21         A.    I did and now I'm looking for that

22    report.

23         Q.    We can display the Longo report.  So,

24    it's fair to say you didn't express any opinions in

25    your report about Dr. Longo's testing because it was

Page 277

1              Jacqueline Moline, M.D.
2     done after your report, right?
3          A.    Correct.
4          Q.    And you've not done any type of
5     supplemental report to reflect any impact on your
6     opinions that the Longo tests may have had, right?
7          A.    You're speaking like a New Yorker,
8     Mr. Thackston, that was really fast.  Can you repeat
9     that?
10         Q.    Did you do any supplemental report
11    reflecting any impact that Dr. Longo's document may
12    have had on your opinions?
13         A.    I don't believe I did a supplemental
14    report in this case.
15         Q.    Do you know the vintage of the container
16    that Dr. Longo tested?
17              MR. KRAMER:  Objection to form.
18              MR. THACKSTON:  We'll make that
19    Exhibit 22.  Correct me if I've got the numbers
20    wrong.
21              (Whereupon, photograph of MAS Project
22    M71373, Pinaud Clubman container was received and
23    marked Moline Exhibit 22, for identification, as of
24    this date.)
25         Q.    The photograph on the Longo test report

Page 278

1              Jacqueline Moline, M.D.

2    MAS project M71373 Talcum Powder Analysis for the

3    Brian Gref's Pinaud Clubman Talc Container.

4              Do you see that photograph on the

5    screen?

6         A.    I do.

7         Q.    Do you know the vintage of that

8    container?

9              MR. KRAMER:  Objection to form.

10        A.    No, I do not.

11        Q.    Have you reviewed the testimony of the

12   representative of American International Industries

13   taking in this case, Mr. Loveless?

14        A.    In this particular case, no.

15        Q.    If I told you that Mr. Loveless

16   testified that this particular container design was

17   used in 2019 -- 1999, do you have any reason to

18   disagree with that?

19        A.    I can't comment one way or the other.

20        Q.    Do you know how much talc remained in

21   this container when it was turned over to plaintiff's

22   counsel?

23        A.    I don't know how much was in there.  I

24   know how much Dr. Longo used in his sample.  Since I

25   was not part of the analysis, I don't have any other

Page 279

1                    Jacqueline Moline, M.D.

2    way of knowing apart from what is contained in his

3    report.

4         Q.    Dr. Longo concluded that there were

5    no -- he could find no amphibole asbestos in this

6    container, right?

7                    MR. KRAMER:  Objection to form.

8         A.    He did not detect any in this powder,

9    correct.

10        Q.    What he found that he felt might be

11   asbestos was chrysotile asbestos, right?

12                   MR. KRAMER:  Form.

13        A.    I would disagree with your

14   characterization of what he thought he found.  He

15   found chrysotile asbestos in his opinion and he

16   states the reasons why it is chrysotile.

17        Q.    But haven't you previously testified

18   that you're not a fiber identification expert, you

19   have to defer to their opinions about what they say

20   they found, you can't evaluate it one way or another,

21   fair?

22                   MR. KRAMER:  Objection to form.

23        A.    That is correct.  I was referring to

24   your phrasing of that I did not feel was my

25   recollection of reading this report.

```
 1                    Jacqueline Moline, M.D.
 2          Q.      Let's flip through Dr. Longo's report.
 3   He says that he relies on some work by Dr. Su, S-u;
 4   are you familiar with that?
 5          A.      What page?
 6          Q.      Are you familiar with Dr. Su?
 7          A.      What page?  I know a lot of Dr. Su's.
 8          Q.      Are you independently familiar with the
 9   methods that Dr. Longo says that he followed?
10          A.      No.
11          Q.      Have you reviewed the reports, the
12   report in this case of Dr. Gunter?
13          A.      I have not.
14          Q.      Let me ask you a hypothetical.  If
15   Dr. Longo says that he relied upon the work of Dr. Su
16   and Dr. Su says Dr. Longo is dead wrong; would you
17   believe Dr. Su or Dr. Longo?
18                  MR. KRAMER:  Objection to form, calls
19   for hearsay, elicits an opinion by a witness not in
20   this case, characterization.
21          A.      I can't comment on a hypothetical of a
22   person I don't know compared to a person I do know.
23   I'm not comfortable answering that question just
24   because I don't know one of the people that you're
25   asking me whose opinion I believe more strongly.
```

Page 281

1              Jacqueline Moline, M.D.

2        Q.    I've asked you previously if you knew in

3    the context of microscopes what PLM is and you

4    weren't familiar with that term, were you?

5        A.    PLM, I'm not a microscopist, I'm

6    familiar with the term, but I'm not familiar with the

7    methodology behind it.

8        Q.    You do know what it stands for?

9        A.    I didn't realize this was a quiz on

10   acronyms.  The M is for microscope and I believe it's

11   light and it may be phase light microscope, but I'm

12   not exactly sure.  I'm not a microscopist.

13              If you want to go down the acronym

14   route, I can give you all sorts of medical acronyms

15   you'll never figure out.  Every profession has its

16   acronyms.

17              MR. THACKSTON:  Object to

18   responsiveness.

19       Q.    Is your testimony though that you read

20   and relied upon Dr. Longo's report?

21              MR. KRAMER:  Asked and answered.

22       A.    I read Dr. Longo's report and I relied

23   on his findings, yes.

24       Q.    What color is chrysotile under the PLM?

25              MR. KRAMER:  Objection, lacks foundation

Page 282

```
 1                Jacqueline Moline, M.D.
 2    and outside the scope.
 3         A.     Unfortunately, my copy of the report is
 4    in black and white, so I couldn't tell you what color
 5    it is and I would not comment on the various colors
 6    because I am not an expert in microscopy or in the
 7    spectroscopy colors.
 8         Q.     Dr. Longo -- well, Dr. Longo did not do
 9    any air sampling tests with the container as far as
10    you know, did he?
11         A.     As far as I know, he did not, he did a
12    bulk sample.
13         Q.     You have not attempted to do an estimate
14    of what exposures Mr. Gref may have had from any
15    asbestos contamination of Clubman talc, have you, in
16    terms of a number?
17         A.     I have based on the number of -- based
18    on the number of minutes that it was used on him or
19    he used it, I have a -- and using the dose
20    calculations that I have used in other cases, I have
21    a fiber per cc year number.
22         Q.     What scientific information are you
23    using to opine about what an exposure level would
24    have been when Mr. Gref used -- if he used Clubman
25    talc in the way that he described?
```

Page 283

1              Jacqueline Moline, M.D.

2        A.    I'm using the published literature with

3    respect to the amount of asbestos that becomes

4    airborne from various studies and the average of the

5    various studies that have been published that have

6    used -- that have looked at dosage, the number of

7    minutes of application.

8        Q.    Does your report describe that process?

9    Let me withdraw the question.

10             Does your report identify the air sample

11   study that you are relying upon for any opinion

12   regarding Mr. Gref's exposure to asbestos from using

13   Clubman talc?

14             MR. KRAMER:  Form, mischaracterizes.

15       A.    My report identifies the studies that I

16   used, well, two out of three of them, yes.

17       Q.    What are the three?

18       A.    The Gordon paper, the Stefan paper and

19   the Andersson paper.

20       Q.    If we flip to the end of Dr. Longo's

21   report, would you agree that what he found was what

22   he thought was chrysotile at a level of something

23   like 0.006 percentage?

24             MR. KRAMER:  Speaks for itself.

25       A.    If you're asking me for the number,

Page 284

1                    Jacqueline Moline, M.D.

2    either you show it or you give me time to find it;

3    which do you want?  I'm not going to give you a

4    specific number without confirming it.

5         Q.    I'll rephrase without the specific

6    number.  Would you agree that Dr. Longo's test of the

7    Gref Clubman container concluded that there was trace

8    contamination with chrysotile asbestos?

9                    MR. KRAMER:  Objection to form.

10        A.    It depends.  If an 11-ounce bottle

11   containing 82 million chrysotile fibers is considered

12   trace in terms of human health, that's what

13   Dr. Longo's report says based on his findings.  In

14   terms of percentage of fibers within the bottle, it

15   would be less than one percent, which some people

16   define as trace.

17                    MR. THACKSTON:  Object to

18   responsiveness.

19        Q.    On page 15 of Dr. Longo's report he

20   gives a percentage, he claims that he found an

21   average of 264,000 chrysotile bundles per gram of

22   talcum powder, right?

23        A.    I don't see the word "claim".  He said

24   the average bundle results show an average of

25   264,000.

Page 285

```
1              Jacqueline Moline, M.D.
2         Q.    Would you agree that he's not actually
3    counting 264,000 bundles?
4              MR. KRAMER:  Objection, outside the
5    scope.
6         A.    You have to ask Dr. Longo that question.
7         Q.    You don't know whether he counted one
8    and extrapolated or whether he actually counted
9    264,000?
10             MR. KRAMER:  Assumes facts, outside the
11   scope.
12        A.    That's a question for Dr. Longo on how
13   he came up with that number.
14        Q.    What other -- what tests are you aware
15   of where someone took a product that was alleged to
16   contain less than one percent of chrysotile asbestos
17   in cosmetic talc and determine how much someone would
18   breathe when they used the talc?
19             MR. KRAMER:  Form.
20        A.    The tests I'm aware of have had mixed
21   exposure to different fiber types.  I don't know if
22   they've been chrysotile only.  There's certainly --
23   I'm unaware of any that have looked specifically at
24   the question you have just posed.
25        Q.    You're not aware of any -- the three
```

Page 286

1                    Jacqueline Moline, M.D.

2    studies you talk about, none of them used Clubman

3    talc, did they?

4                    MR. KRAMER:  Form, calls for

5    speculation.

6          A.    They did not.

7          Q.    None of them used, as far as you know

8    none of them used talc from the same Montana mines of

9    the same grade, MicroTalc 1745 that Clubman used,

10   right?

11                   MR. KRAMER:  Same objection.

12         A.    My understanding is that two of the

13   articles used blends that included talc from Montana.

14         Q.    Included talc from other locations too

15   like Italy, right?

16         A.    Correct.

17         Q.    And you believe Italian talc is

18   contaminated with asbestos, right?

19         A.    Yes.

20         Q.    Tell me what article you would rely upon

21   -- each time -- do you have any document where you

22   reflect what your analysis is of what you believe

23   Mr. Gref's exposure would have been to asbestos from

24   his use of Clubman talc?

25         A.    I'm sorry.  What was the question?

Page 287

1              Jacqueline Moline, M.D.

2        Q.      Where would I find -- if you have an

3    opinion on the level of asbestos that Mr. Gref would

4    have inhaled when he used cosmetic talc, Clubman

5    talc, where would I find that?

6        A.      You would find it perhaps in other legal

7    documents where I've included a dose estimate in

8    other cases.

9        Q.      But not for Mr. Gref, right?

10       A.      Not for Mr. Gref.

11       Q.      You would agree with me that before

12   someone can breathe the trace contamination, they

13   would have to inhale the talc, right?

14              MR. KRAMER:  Objection to form.

15       A.      That's presupposing that the talc

16   doesn't just go in and they didn't breathe in the

17   talc, maybe they just breathed in the asbestos and

18   not the talc.  I mean I wasn't there at the time they

19   were using the talc and breathing it in.  They would

20   have to be using a talc that has the asbestos in it

21   in order to breathe it in.

22       Q.      To inhale the asbestos, trace levels of

23   asbestos in the talc, they would first have to inhale

24   the talc, right?

25              MR. KRAMER:  Objection to form.

1              Jacqueline Moline, M.D.

2          A.     They're separate entities within the --

3     they would have to inhale the overall powder that

4     contains both talc and asbestos, yes.

5          Q.     When was the first time that that case

6     report that you mentioned from -- the 1994 case

7     report that you mentioned of the 17-year-old with

8     peritoneal mesothelioma, when was the first time that

9     you learned about that?

10         A.     I have no idea.  It was a long time ago.

11         Q.     Was it before 2003?

12         A.     I don't think I saw it until the late

13    2000s.

14         Q.     You testified about causation and

15    mesothelioma cases hundreds of times without ever

16    mentioning cosmetic talc as a possible cause, didn't

17    you?

18              MR. KRAMER:  Objection to form, vague.

19         A.     I'm asked the questions, I answer the

20    questions that I'm asked in a case, so I testified in

21    many different types of asbestos exposure scenarios,

22    many of which did not have cosmetic talc.

23         Q.     But you testified in one where the

24    plaintiff was a professional barber for 50 years and

25    used cosmetic talc, and in that case you did not give

1                     Jacqueline Moline, M.D.

2        the opinion that cosmetic talc had anything to do

3        with his mesothelioma, right?

4                     MR. KRAMER:  Objection, calls for

5        speculation and mischaracterizes, vague, ambiguous.

6            A.     I think you're referring to a case from

7        2005 or somewhere along those that you've asked me

8        questions about on several occasions and the answer

9        is I did not -- I did not discuss the cosmetic talc

10       use in that instance.

11           Q.     Based on what you knew as a medical

12       doctor and an expert witness on mesothelioma

13       causation in, I believe it was in 2003 when you wrote

14       the report for a professional barber of 50 years, you

15       did not attribute his mesothelioma to cosmetic talc,

16       did you?

17                    MR. KRAMER:  Objection to form.

18           A.     In 2003 I did not.  I did not have

19       information that had subsequently been made available

20       to me.

21           Q.     Well, you had information like all of

22       the public cases, public articles about talc and

23       whether talc really causes disease, didn't you?

24                    MR. KRAMER:  Objection to form.

25           A.     I had the case reports that were

Page 290

1              Jacqueline Moline, M.D.

2    published in the 1990s available to me, but I had --

3    they were available, I don't know if I looked at them

4    at that point.

5         Q.    What article -- going back to your

6    report.  What article would you or scientific

7    literature would you rely upon for a opinion that

8    chrysotile contamination of cosmetic talc has ever

9    been linked to peritoneal mesothelioma?

10             MR. KRAMER:  Form.

11        A.    I don't know if there is a specific

12   article that has that level of specificity.  There

13   certainly are articles that talk about chrysotile

14   asbestos causing mesothelioma.

15             As we stated earlier today, there aren't

16   a lot of articles about the role of cosmetic talc.

17   As the knowledge and information has evolved over the

18   past years in terms of what documents have become

19   available and what testing methodologies are now

20   used, there have been discussions of -- Kanarek talks

21   about chrysotile and peritoneal mesothelioma

22   specifically in an article, I don't remember what

23   year it was.  I don't know if it was 2013 or 2014.

24             I know that chrysotile was discussed in

25   the Creighton article as a cause of peritoneal

Page 291

1                    Jacqueline Moline, M.D.

2     mesothelioma.

3                    I don't know if in the Welch article

4     that I was speaking about earlier with the

5     college-educated individuals with peritoneal

6     mesothelioma that there was a specification.

7                    Certainly other articles talk about

8     chrysotile.  It's been found in the Chinese cohorts

9     of chrysotile only that peritoneal mesothelioma is

10    there.

11                   MR. THACKSTON:  Object to

12    responsiveness.

13         Q.    What article talks about chrysotile

14    asbestos causing peritoneal mesothelioma at the

15    levels that someone might be exposed to chrysotile if

16    it's a contaminate of cosmetic talc?

17                   MR. KRAMER:  Form, asked and answered.

18         A.    You're parsing down into a specific

19    hypothesis or a specific phrase when I'm not sure

20    there exists one in the medical literature.

21                   MR. KRAMER:  Counsel, we have now

22    exceeded the seven-hour mark by my clock.  It's now

23    12:37.  Do you have a last question you want to ask

24    before I begin my follow-up?

25                   MR. THACKSTON:  I have a lot of

1                    Jacqueline Moline, M.D.

2    questions I would like to ask.

3                    MR. KRAMER:  I'm sure you do, but is

4    there one last one you're going to be asking today?

5                    MR. THACKSTON:  No, I'm not going to ask

6    the last question today.  I'm going to ask the Court

7    for more time.  I think any questions you ask,

8    anything that I ask by way of follow-up is not part

9    of the seven hours, and I plan to ask the Court to

10   continue my examination for a lot of reasons.

11                   MR. KRAMER:  Dr. Moline --

12                   MR. THACKSTON:  We can wait until you

13   get a ruling on that and then do yours or you can do

14   yours now and then I'll cross-examine based on what

15   you do, and then we can find out whether I'm going to

16   get additional time for discovery, or as you see fit.

17                   I don't think we're going to agree on

18   the record today about how we're going to resolve the

19   issue about whether we get more time.

20                   MR. KRAMER:  I agree with that.  I think

21   the Court will determine, if you chose to seek leave,

22   whether or not you are successful in that.  I'm going

23   to follow up based on the two days of testimony in

24   the record so for however.

25

Page 293

1                    Jacqueline Moline, M.D.

2    EXAMINATION BY

3    MR. KRAMER:

4         Q.    Dr. Moline, are you okay to continue

5    very briefly?

6         A.    Yes.

7         Q.    You were asked questions on day one

8    regarding your capability of performing a dose

9    estimate or dose calculation as you talked about

10   today.  Do you recall that?

11        A.    Yes.  I mean I recall in general I was

12   asked a number of questions about that, yes.

13        Q.    The methodology that you employed to

14   perform that dose estimate, can you describe it?

15        A.    It's basically looking at an average of

16   the published literature with respect to measurable

17   asbestos, averaging them out into one value for

18   application using a shaker method or a puff method,

19   whatever is applicable, and then looking at the

20   number of instances where a particular product is

21   used and the amount of time that is estimated for how

22   long it took to use that particular product, and then

23   doing simple arithmetic, then comparing it to the

24   published literature with respect to fiber per cc

25   years and using it as a standard and occupational

1                Jacqueline Moline, M.D.

2    year of 2,000 hours to come up with a fiber per cc

3    year number based on the overall exposure, which then

4    allows me to compare to existing literature where

5    levels of exposure that have been associated with

6    mesothelioma or increased risk of mesothelioma occur.

7        Q.    Based on your education, knowledge,

8    research, background and training, is it from a

9    medical perspective necessary to perform this dose

10   estimate in order to conclude that one's exposure to

11   asbestos contributed to that person's

12   asbestos-related disease?

13           MR. THACKSTON:  Object to form, leading.

14       A.    No, it's not necessary to do it, and, in

15   fact, it's an absolute estimate because it's an

16   underrepresentation of the exposure because we're not

17   including things like area measures, which have been

18   shown to have asbestos that is persistent in the air

19   after a particular usage, that isn't included, it

20   doesn't include additional exposure if there's

21   cleanup, whether it's sweeping or toweling or

22   vacuuming up the excess talcum powder in this case.

23           So, it's not a full estimate of the full

24   exposure because no one is wearing a dosimeter when

25   they're applying or cleaning up the talc.

1              Jacqueline Moline, M.D.

2        Q.     The steps that you testified about a

3    couple of moments ago, were you able to utilize those

4    to calculate a conservative dose estimate based on

5    the evidence in this case?

6              MR. THACKSTON:  Objection.

7        A.     Yes.

8        Q.     Can you please provide your results of

9    that dose estimate?

10       A.     I calculated based on Mr. Gref's

11   exposure from 1982 to 2010, I stopped at 2010, that

12   his overall or his cumulative exposure was .22 fiber

13   per cc years.

14       Q.     His cumulative exposure you said was

15   .225 fiber per cc years?

16       A.     It was 0.22 fiber per cc years.

17       Q.     Thank you.  Did you perform any other

18   calculations aside from the cumulative conservative

19   dose estimate?

20       A.     Well, what went into it were the

21   different products that either were used on him or he

22   used over the years.

23       Q.     Are you able to further specify any

24   calculations you performed with regard to those

25   individual products?

1              Jacqueline Moline, M.D.

2       A.     Yes.

3       Q.     Can you please do so.

4       A.     The Clubman was 0.034 fiber per cc

5  years, English Leather was 0.034 fiber per cc years,

6  Mennen was 0.04 fiber per cc years, Old Spice was

7  0.034 fiber per cc years, and Johnson & Johnson and

8  Shower to Shower, which I included together since

9  they use the same talcum powder or they use the same

10  sourcing, was 0.07 fiber per cc years.

11       Q.     Do you have an opinion as to

12  individually whether each of those products

13  substantially contributed to Mr. Gref's mesothelioma?

14       A.     Yes, they all contributed.

15              MR. THACKSTON:  Form.

16       Q.     The numbers that you mentioned, are

17  those supported by numbers evaluating increased risk

18  for disease in the literature that you cited?

19       A.     Yes.

20              MS. LAWLER:  Object to form.

21       Q.     Thanks, Dr. Moline.  I think that's all

22  I have.

23       A.     Okay.

24              MR. KRAMER:  Understanding what

25  Mr. Thackston already stated on the record, I think

1              Jacqueline Moline, M.D.

2    we're done.

3              VIDEOGRAPHER:  Mr. Thackston, are you

4    going to cross?

5              MR. THACKSTON:  Yes, my position will be

6    that I'm entitled to cross not subject to any time

7    limitation, which will basically going back through

8    all the studies that she claims to rely on, et

9    cetera.

10             MR. KRAMER:  Okay.  I look forward to

11   reading that to your motion to lead.

12        A.    Mr. Kozak, you're muted.

13             MS. KOZAK:  Does this work.

14             MR. KRAMER:  Yes.

15        A.    It always did, you just had to unmute.

16   Now you're muted again.

17             MR. KRAMER:  We can't hear you.

18             MS. KOZAK:  Two devices I have.  I have

19   the telephone and I have the iPad.

20             Jim, I have just a couple of questions

21   based on the questions you just asked.

22   EXAMINATION BY

23   MR. KOZAK:

24        Q.    Dr. Moline, can you hear me okay?

25        A.    Yes, but how much time is this going to

Page 298

1               Jacqueline Moline, M.D.

2    be, a couple of questions, a couple of legal

3    questions, a couple of lawyer questions?  Are they

4    real questions or are you going to be here for half

5    an hour because I'm not going to do that?

6          Q.    It's just based on the questions that

7    Mr. Kramer just asked.

8               Dr. Moline, Mr. Kramer just asked you a

9    beginning question that was, would you please

10   describe your methodology.  Do you remember that?

11         A.    Yes.

12         Q.    You provided a list of items.  Do you

13   recall that?

14         A.    Yes.

15               MR. KRAMER:  Form.

16         Q.    Is there a name for that methodology?

17         A.    It's my dose calculation methodology.  I

18   haven't coined it or trademarked it or patented it

19   yet.

20         Q.    Can we find that methodology with those

21   steps anywhere in the scientific literature?

22         A.    I have not submitted a paper with such

23   methodology.

24         Q.    Is there anything in the scientific

25   literature that's anywhere close to the steps that

Page 299

1                Jacqueline Moline, M.D.

2    you just listed?

3               MR. KRAMER:  Objection to form.

4         A.    I don't know.  I haven't looked at it

5    from that standpoint.  I've been asked to perform

6    these dose calculations for a number of cases in

7    certain jurisdictions where it's required, and that's

8    the methodology that I use consistently since I was

9    asked to do those.

10        Q.    I thought your methodology was by

11   following the Welch steps.  Are you saying this

12   methodology that you just listed for Mr. Kramer is

13   different or the same?

14              MR. KRAMER:  Objection,

15   mischaracterizes.

16        A.    They're two different issues, one is

17   talking about causality and one is a methodology to

18   calculate a number based on frequency, time and

19   exposure.

20        Q.    So, the one that you listed for

21   Mr. Kramer is the frequency, time and exposure,

22   that's what you're calling it?

23        A.    No, I'm calling it --

24              MR. KRAMER:  Objection.

25        A.    -- dose estimate.

1                    Jacqueline Moline, M.D.

2          Q.      Is that methodology that you just

3    described, the steps that you described for

4    Mr. Kramer, is that used by anyone that you can

5    identify, either a federal agency, a doctor, a

6    hospital, anybody that you can think of that you can

7    name that also uses those steps to determine what you

8    outlined in terms of the dose, conservative dose that

9    you described?

10         A.      I haven't looked for that.

11                 MR. KRAMER:   Form.

12         A.      I'm sure that there are individuals in

13   cases in Texas where it's required, other doctors,

14   other individuals who have used a similar

15   methodology, but I haven't read other experts'

16   reports to be able to comment on it.

17         Q.      So, there is no one else that you can

18   think of that you can identify for us or for the

19   Court that uses that methodology or those steps that

20   you just outlined?

21                 MR. KRAMER:   Form, misstates,

22   mischaracterizes, asked and answered.

23         A.      I am not familiar with anyone else who

24   is using that methodology.

25         Q.      Is there an error rate for that

1                    Jacqueline Moline, M.D.

2    methodology, like how many times it's wrong or how

3    many times it's right using those steps?

4               MR. KRAMER:  Form, assumes facts.

5         A.    I haven't done a statistical analysis on

6    how many times I didn't put the numbers wrong.  I

7    usually confirm it.

8               You said you had a couple of questions

9    and you've asked me about 15, so are we going to

10   continue this much longer?

11        Q.    Was there an answer to my question?

12              MR. KOZAK:  Can I have the answer read

13   back.

14        A.    I said I have not done --

15              MR. KRAMER:  Chris, she did answer the

16   question.  The record will speak for itself.

17        Q.    Doctor, if the Court is to question or

18   ask how do we know if the steps you just outlined are

19   reliable, how would you answer that?

20              MR. KRAMER:  Objection, calls for a

21   legal conclusion and calls for speculation.  I don't

22   think you have to answer that.  That makes no sense

23   in terms of your opinion and goes beyond the scope.

24        Q.    Doctor, is it your contention that the

25   steps you just outlined have been approved or

Page 302

1                    Jacqueline Moline, M.D.

2    verified by any Court?

3               MR. KRAMER:  Objection, calls for

4    speculation, and form.

5         A.    My understanding is it's been used in --

6    the methodology has been -- the same methodology has

7    been used and accepted in courts in Texas.

8         Q.    Can you tell us the name of any case in

9    a court in Texas where this methodology has been

10   discussed or used?

11        A.    I don't often speak to the courts.  I

12   have not, I have not testified in a courtroom in

13   Texas where I have been asked questions by the Court,

14   but I know I have submitted reports that have been in

15   the Texas jurisdiction where the same dose

16   calculation methodology has been used.

17        Q.    Thank you.

18        A.    It was also, actually, in New York State

19   it was used in a case that was before a judge

20   recently in a case, the same methodology.

21        Q.    Was it the Woods case?

22        A.    Yes.  It did not go to trial, but it was

23   used and presented to the judge.

24        Q.    The Court did not make a ruling,

25   correct?

1                  Jacqueline Moline, M.D.

2         A.      I do not know.

3                 MR. KRAMER:  Objection.

4         A.      You're asking legal questions.

5         Q.      I just want to know just to be clear.

6    Is there any Court that you're aware of that has ever

7    ruled on the methodology that you outline for

8    Mr. Kramer?

9                 MR. KRAMER:  Asked and answered.

10        A.      Again, my understanding is in Texas, but

11   I do not know.  These are legal questions that are

12   beyond my scope as a person who provides information

13   but does not do legal briefings.

14        Q.      Thank you.

15                VIDEOGRAPHER:  This concludes today's

16   testimony given by Dr. Jacqueline Moline.

17                MR. THACKSTON:  Hang on.

18                VIDEOGRAPHER:  Sorry.  Go ahead.  My

19   apologies.

20                MR. THACKSTON:  I obviously have

21   follow-up for questions that you asked.  I thought

22   you were cutting off all questioning, but just like

23   Chris asked, I have follow-up on the opinions you

24   solicited.  I don't think those are subject to a

25   seven-hour limit.

1                    Jacqueline Moline, M.D.

2              MR. KRAMER:  I do considering that she

3    put the parties on notice of the calculations during

4    the course of the three hours we've gone today.

5              If you have five minutes worth of brief

6    follow-up on that, I think that's reasonable; if

7    you're going to go in, as you said before, to an

8    extensive line on every single article that she's

9    mentioned both here and in other cases, I think

10   that's not reasonable, but you can make the decision.

11             MR. THACKSTON:  I'll proceed until you

12   stop me.

13   FURTHER EXAMINATION

14   BY MR. THACKSTON:

15        Q.    Dr. Moline --

16             MR. THACKSTON:  There are others on the

17   phone who may have questions too.

18        Q.    Dr. Moline, you gave for the first time

19   in your direct testimony an opinion that you believe

20   that Mr. Gref's use of Clubman would have resulted in

21   an exposure of 0.034 fibers per cc; is that right?

22        A.    No.

23        Q.    I'm sorry.

24        A.    You didn't give the right units.

25        Q.    What's the number for Clubman?

Page 305

1                    Jacqueline Moline, M.D.

2        A.    It's 0.034 fiber per cc year.  The year

3   is important here because it's how it's calculated.

4        Q.    Are you assuming that when Mr. Gref used

5   Clubman that there was a particular level of fiber

6   inhalation associated with that?

7        A.    It's using an average of 1.49 fibers per

8   cc.

9        Q.    What was the number?

10       A.    1.49 fibers per cc.

11       Q.    That's based on the three studies that

12   you told us about for, Gordon, Fitzgerald, Egilman

13   and Andersson?

14             MR. KRAMER:  Objection.

15       A.    Those aren't the articles -- those

16   aren't the authors that I used.  It's Stefan is the

17   lead author of one of the papers, Gordon is the lead

18   author of the other paper, and Andersson is the

19   third.

20       Q.    And none of those were using a cosmetic

21   talc with trace levels of chrysotile that they allege

22   had chrysotile in the ranges that Dr. Longo says that

23   he found in the Gref sample, right?

24             MR. KRAMER:  Objection to form.

25       A.    My recollection is in the Gordon paper

1           Jacqueline Moline, M.D.

2    there was -- I don't know if they commented on

3    chrysotile.  I don't know if Andersson did.  I think

4    the -- I don't believe the Stefan paper talked about

5    chrysotile.

6           Q.    Using the protocol that they said that

7    they followed in the Gordon, well, in all three of

8    those papers, they would not have counted anything

9    doctor -- would they have counted anything Dr. Longo

10   found in the Gref study as a countable fiber?

11          MR. KRAMER:  Objection, outside the

12   scope, calls for speculation.

13          A.    I don't know how to answer that

14   question.  They were using different methodologies in

15   how they were assessing the asbestos.  They weren't

16   looking for chrysotile specifically.

17          Q.    The Gordon study was done specifically

18   to replicate facts from a litigation case, wasn't it?

19          MR. KRAMER:  Objection.

20          A.    I don't know if it was -- it was to

21   replicate the usage of the powder.  I don't know if

22   it was specific to that case.  It was usage and they

23   did both shaker and puff applications and looked at

24   the differences or looked at the amount of exposure

25   from or the air levels, I'm sorry, related to each

1                Jacqueline Moline, M.D.

2    type of exposure.

3        Q.    Was it with Colgate-Palmolive?  Do you

4    know what the product was that was used in the

5    Gordon/Fitzgerald test?

6        A.    Yes, it was a Colgate-Palmolive product.

7        Q.    Do you know of any study that has

8    concluded that someone that experienced an exposure

9    level of 0.034 fibers per cc of chrysotile contracted

10   peritoneal mesothelioma?

11             MR. KRAMER:  Objection to form.

12       A.    If we look at both Rodelsperger and

13   Jiang where they have levels that range from zero to

14   .15 and Rodelsperger, which was a mixed exposure and

15   Jiang, which was chrysotile only, which was zero

16   to .5 fiber per cc years, they have an increased risk

17   and included both pleural and peritoneal.

18       Q.    Your testimony is that if I were to look

19   at those two studies that I would find a level

20   commensurate with 0.034 fiber per cc years of

21   chrysotile only has been linked to peritoneal

22   mesothelioma?

23       A.    My recollection of the Jiang paper,

24   which is chrysotile only, they had an increased risk

25   of mesothelioma, and my understanding is that it

1              Jacqueline Moline, M.D.

2    included both pleural and peritoneal.  I don't have a

3    recollection of the breakdown between the risk for

4    pleural or peritoneal and don't know if they did that

5    in that particular paper.

6         Q.    Is that paper referenced in your report?

7         A.    I don't know if that specific paper is,

8    but it's on my reference list, which was attached to

9    the report.

10        Q.    There were 500 -- didn't you say there

11   were over 500 articles on your reliance list?

12        A.    Well, I'm giving you the name of the

13   author so you can look at it, it's Jiang, J-i-a-n-g.

14        Q.    Do you know the title?

15        A.    I believe it's Hand-spinning chrysotile

16   exposure and risk of malignant mesothelioma:  A

17   case-control study in Southeastern China.

18        Q.    That's a case involving people that

19   worked in a chrysotile manufacturing facility?

20             MR. KRAMER:  Objection, article speaks

21   for itself.

22        A.    It's from individuals with chrysotile

23   exposure who were working in a factory or a facility

24   that used chrysotile and textiles.

25        Q.    You're talking about somebody using

```
 1                   Jacqueline Moline, M.D.
 2     chrysotile as a raw material to manufacture products,
 3     not somebody who's alleging that it was a trace
 4     contaminate of cosmetic talc, right?
 5                   MR. KRAMER:  Objection to form.
 6          A.    I'm speaking about -- I'm using the
 7     article because it's chrysotile.  The exposure
 8     scenario doesn't matter, but one was using cosmetic
 9     talc and one was exposed in the workplace.
10          Q.    You certainly haven't made any
11     comparison between the kind of chrysotile they were
12     using in China to Clubman versus the kind of trace
13     contamination of Montana talc that Longo claims to
14     find, have you?
15                   MR. KRAMER:  Objection to form.
16          A.    I don't know what you're asking me.  Are
17     you asking me have I compared the fibers themselves
18     to see if they're both chrysotile?
19          Q.    Have you compared what product was used
20     in the Jiang Chinese manufacturing facility versus
21     what Dr. Longo says he found in the Clubman
22     container?
23                   MR. KRAMER:  Assumes facts.
24          A.    If you're asking if I compared
25     microscopic appearance of chrysotile, I have not.
```

1                    Jacqueline Moline, M.D.

2      That's not my area of expertise.  I'm just relaying

3      that it was both chrysotile.

4           Q.    I'm asking you if you considered

5      whether, to use your term from your report, that

6      agent at issue in this case is the same as the agent

7      at issue in the report that you cited, and you made

8      no comparison between whatever kind of chrysotile

9      they were using in China with whatever kind of

10     chrysotile Dr. Longo says he found in Clubman, right?

11               MR. KRAMER:  Assumes facts, asked and

12     answered.

13          A.    I don't understand.

14               MR. KRAMER:  Misstates,

15     mischaracterizes.

16          A.    I'm sorry, Mr. Kramer.  I don't

17     understand what difference you're trying to impune.

18     I'm saying that they're both chrysotile exposures and

19     that's the agent that's at issue.  Whether there's

20     other findings in the ore of amphiboles as well in

21     the Montana ore or not that may also have been found,

22     but with respect to Dr. Longo's report, the agent is

23     chrysotile.

24               MR. THACKSTON:  I'm going to attach as I

25     think it's number 23 the Jiang article.  It's called

Page 311

1              Jacqueline Moline, M.D.

2     2018 Hand-spinning chrysotile exposure and the risk

3     of MM:  A case-control study.

4              (Whereupon, 2018 article by Jiang was

5     received and marked Exhibit 23, for identification,

6     as of this date.)

7          Q.    It's your understanding that they make

8     the statement that there's debate about whether

9     chrysotile is even associated with the causation of

10    mesothelioma?

11             MR. KRAMER:  Objection, the article

12    speaks for itself.

13         A.    I don't have the article in front of me,

14    and I think that the literature is -- among

15    scientific bodies there's not a dispute with respect

16    to chrysotile, among some authors there might be, but

17    among all governmental agencies and the consensus in

18    the larger scientific community, there is no dispute

19    about whether chrysotile causes mesothelioma.

20             Are we done?

21             MR. KRAMER:  The time is 1:04.  We're

22    going to be done.

23             MR. THACKSTON:  I certainly have more

24    questions, but if you're going to terminate the

25    deposition, I can't question myself.

1                 Jacqueline Moline, M.D.

2             MS. LAWLER:  This is Katherine Lawler

3   for Mennen.  I will reserve my right to ask follow-up

4   questions to Mr. Kramer's direct at the appropriate

5   time.

6             MR. RUTKOWSKI:  This is David Rutkowski

7   for Shulton.  I reserve our rights as well.  Thank

8   you.

9             MR. MCCAFFREY:  Also, Kevin McCaffrey.

10  I'll join reserving rights, thanks.

11           MR. KOZAK:  Chris Kozak.  I join in

12  reserving rights.  We also didn't have an opportunity

13  to follow up after Mr. Thackston, we only followed up

14  after Mr. Kramer, so there's that as well.

15           VIDEOGRAPHER:  Anything further?

16           MR. KRAMER:  No, that's it.  This

17  concludes today's testimony given by Dr. Jacqueline

18  Moline.  The total number of media units used was

19  three and will be retained by Veritext.

20           We are going off the record at 1:05 p.m.

21  Eastern Daylight Time.

22           (Time Noted:  1:05 p.m.)

23

24

25

Page 313

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )
                          )    ss:
5    COUNTY OF NEW YORK   )

6

7              I, BRENDA FITZGERALD, a Shorthand

8    Reporter and Notary Public within and for the State

9    of New York, do hereby certify:

10             That, Jacqueline Moline, M.D., the

11   expert witness whose DEPOSITION was held on September

12   23rd, 2022, as hereinbefore set forth, was duly sworn

13   by me, and that this transcript of such Examination

14   is a true and accurate record of the testimony given

15   by such witness.

16             I further certify that I am not related

17   to any of the parties to this action by blood or by

18   marriage, and that I am in no way interested in the

19   outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21   my hand this 5th day of October 2022.

22

23                    *Brenda Fitzgerald*

                      _____

24

                      BRENDA FITZGERALD

25

```
 1              WITNESS CERTIFICATION
 2
 3
 4      I have read the foregoing transcript of
 5    my testimony and find it to be true and
 6    accurate to the best of my knowledge and
 7    belief.
 8
 9

              _____
10              JACQUELINE MOLINE, M.D.
11
12

      Subscribed and sworn to
13
      before me on this _____
14
      day of _____, 2022.
15
16
17    _____
          Notary Public
18
19
20              *      *      *
21
22
23
24
25
```

```
1                    ERRATA SHEET
            Priority-One Court Reporting/Veritext
2                    718-983-1234
      ASSIGNMENT NO. P1-5418333
3     CASE NAME: Gref, Brian v. Asbestos
      DATE OF DEPOSITION: 9/23/2022
4     WITNESS' NAME: Dr. Jaqueline Moline Vol 2
5
      PAGE/LINE(S)/    CHANGE           REASON
6     ____/_____/_____/_____
      ____/_____/_____/_____
7     ____/_____/_____/_____
      ____/_____/_____/_____
8     ____/_____/_____/_____
      ____/_____/_____/_____
9     ____/_____/_____/_____
      ____/_____/_____/_____
10    ____/_____/_____/_____
      ____/_____/_____/_____
11    ____/_____/_____/_____
      ____/_____/_____/_____
12    ____/_____/_____/_____
      ____/_____/_____/_____
13    ____/_____/_____/_____
      ____/_____/_____/_____
14    ____/_____/_____/_____
      ____/_____/_____/_____
15    ____/_____/_____/_____
      ____/_____/_____/_____
16    ____/_____/_____/_____
      ____/_____/_____/_____
17    ____/_____/_____/_____
      ____/_____/_____/_____
18    ____/_____/_____/_____
      ____/_____/_____/_____
19    ____/_____/_____/_____
20              _____
              Dr. Jaqueline Moline Vol 2
21    (Notary not required in California)
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____, 2022.
23
      _____
24       NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```

[& - 297]                                                                    Page 1

**&**

**&**  209:6,11,22
  210:3,4 231:25
  296:7

**0**

**0.006**  283:23
**0.034**  296:4,5,7
  304:21 305:2
  307:9,20
**0.04**  296:6
**0.07**  296:10
**0.22**  295:16
**05589**  206:13
  211:9
**07039**  206:22
**07102**  210:5
**07102-5423**
  209:23

**1**

**1,830**  247:13
**1,854**  247:5
**1.49**  305:7,10
**10016**  209:4
**1010**  209:23
**10174**  209:14
**1037**  209:23
**105**  209:8
**10:05**  206:19
  211:3
**11**  284:10
**112**  209:3
**11:01**  243:21
**11:11**  243:24
**12**  227:21
**120**  211:9
**12:00**  272:17

**12:08**  272:20
**12:37**  291:23
**131**  221:19
**1400**  209:17
**15**  215:13,24
  220:14 284:19
  301:9 307:14
**1600**  209:8
**16th**  209:13
**17**  222:15 260:7
  288:7
**1745**  286:9
**18**  208:11 213:8
  213:17,20
  229:23
**19**  208:12 244:19
  244:22 250:24
  253:21 265:3
  266:3
**193**  217:8,13,17
  217:18 218:20
**194**  217:8,13,17
  218:10,10,21
**195**  221:15,15
**196**  219:23,24
  221:15 222:2
**1960s**  219:23
**1982**  295:11
**1990s**  290:2
**1994**  260:10,12
  260:15 288:6
**1997**  220:10
**1999**  242:22
  244:13 247:15
  278:17
**1:04**  311:21
**1:05**  312:20,22

**1:20**  206:13

**2**

**2**  315:4,20
**2,000**  294:2
**20**  208:13 215:13
  267:3,6,13
**2000s**  288:13
**2001**  264:22
**2003**  247:15
  288:11 289:13
  289:18
**2004**  247:15
**2005**  222:8 289:7
**2007**  221:19
  230:9 247:15
**2010**  295:11,11
**2012**  233:24
**2013**  217:21
  290:23
**2014**  218:15
  290:23
**2015**  242:22
  244:13
**2017**  242:12,24
  265:4 266:4
**2018**  208:16
  311:2,4
**2019**  208:11
  213:18 214:4
  215:2 217:10
  278:17
**2021**  275:24
**2022**  206:19
  208:13 211:4
  258:23,24
  266:25 267:4
  269:23 275:25

**313**:12,21
  314:14 315:22
**21**  208:18 220:10
  229:9,11,23,25
  229:25 245:9
  263:16
**2101**  209:17
**211**  208:5
**21201**  209:9
**213**  208:11
**214**  242:24
**217**  250:25 266:8
**218**  242:24
**22**  208:14 229:24
  277:19,23
  295:12
**223**  227:21
**225**  295:15
**22nd**  210:5
**23**  206:19 208:16
  247:14 251:25
  259:20 269:5
  310:25 311:5
**23rd**  211:4
  313:12
**24**  219:23 220:6
  247:20
**244**  208:12
**25**  246:20 247:14
  260:9
**264,000**  284:21
  284:25 285:3,9
**267**  208:13
**277**  208:15
**290**  206:22
**293**  208:6
**297**  208:7

[3 - allege]                                                                              Page 2

**3**

**3**  225:12
**3,351**  247:5
**30**  221:9 271:24
**304**  208:5
**311**  208:16
**321**  220:10
**336**  220:10
**376**  221:19
**382**  221:20
**3rd**  242:24

**4**

**405**  209:13
**421**  214:17,18,25
   218:25 222:18
   222:19 235:21
**423**  220:5,5
**429**  217:18
**45**  217:21
**46**  218:15
**464**  217:22
**473**  217:22

**5**

**5**  307:16
**50**  288:24 289:14
**500**  242:5 308:10
   308:11
**505**  241:24
**5418333**  206:25
**5th**  313:21

**6**

**604**  218:15
**609**  218:16
**62**  222:8
**64**  217:20

**66**  242:24
**665**  222:9
**669**  222:9
**69**  214:25
**6th**  212:9

**7**

**7**  266:17
**718**  206:23
**718-983-1234**
   315:2
**73**  218:14
**75201-2134**
   209:18

**8**

**8**  242:24 266:17
**82**  284:11
**85**  268:25

**9**

**9/23/2022**  315:3
**9485**  313:23
**96.3**  251:25
**983-1234**  206:23
**9th**  276:12

**a**

**a.m.**  211:3
   243:21,24
**abdomen**  216:25
   239:13,17
**abdominal**
   216:19 223:14
   224:2 239:14,18
**able**  214:21
   228:8 265:22
   295:3,23 300:16
**absolute**  294:15

**acceptance**
   211:16
**accepted**  229:14
   230:2 237:20
   302:7
**accurate**  313:14
   314:6
**acronym**  281:13
**acronyms**
   281:10,14,16
**action**  206:13
   313:17
**activities**  251:2
   251:18,22
**actual**  230:18
   231:3 265:15
**ad**  273:7
**addition**  266:10
**additional**  212:8
   222:4 276:11
   292:16 294:20
**adjusted**  246:19
   248:15
**administer**
   207:9
**adulterated**
   239:25
**afflicts**  217:6
**age**  221:16
   246:19 248:15
**aged**  246:19
   247:14
**agencies**  311:17
**agency**  300:5
**agent**  234:9,10
   235:3 236:11,15
   236:17,22,24
   237:4 262:25

**263**:3,9,12,25
   310:6,6,19,22
**ago**  214:6,14
   218:2,23 220:14
   221:9,23 222:15
   288:10 295:3
**agree**  215:11,14
   216:10,17,18
   219:11 223:4,19
   238:9 239:8
   251:12,14 253:9
   253:15 260:13
   261:10 265:2,8
   272:14 283:21
   284:6 285:2
   287:11 292:17
   292:20
**agreed**  207:4,11
   239:9 265:3
**ahead**  211:25
   244:2 272:20
   273:24 274:17
   303:18
**air**  269:13 282:9
   283:10 294:18
   306:25
**airborne**  283:4
**al**  206:11 221:16
   230:6
**alcohol**  249:25
   250:3
**alexander**
   217:18 218:12
   218:19
**alexander's**
   217:24 218:6,18
**allege**  305:21

[alleged - articles]                                                    Page 3

alleged  243:9
  261:4 263:5
  285:15
alleging  309:3
allotted  272:11
  272:12
allow  213:21
allows  294:4
alphabetical
  242:7
ambiguous
  258:18 289:5
ambrosini  222:3
american  206:10
  209:17 278:12
amicus  230:8,18
  230:19,22 231:6
amount  272:13
  283:3 293:21
  306:24
amounts  219:9
amphibole  279:5
amphiboles
  310:20
ample  219:19
  235:22 237:9
  238:5 263:17
amuse  260:20
analogous  243:7
analyses  219:25
analysis  220:8
  234:16 272:24
  273:19 278:2,25
  286:22 301:5
anatomic  246:25
andersson
  283:19 305:13
  305:18 306:3

andrion  260:6
anonymous
  232:22
answer  213:14
  215:15 216:22
  218:17 227:25
  228:6 235:17
  237:23 272:6
  288:19 289:8
  301:11,12,15,19
  301:22 306:13
answered  251:8
  258:7 259:11
  263:14 265:6
  281:21 291:17
  300:22 303:9
  310:12
answering  237:7
  280:23
anticipated
  217:6
anybody  300:6
ap  217:19
  218:12
apart  250:19
  279:2
apologies  303:19
apologize  214:20
appearance
  309:25
appearances
  211:14
applicable
  293:19
application
  261:16 262:11
  283:7 293:18

applications
  261:15 273:22
  306:23
applied  230:5
  236:22 246:8
apply  235:5,9
applying  229:14
  230:2 294:25
appreciate
  227:24
appreciated
  228:5
apprentice
  256:14
appropriate
  257:2,4,5 312:4
approved  301:25
approximately
  215:13 269:4
area  216:14
  239:9,10,10
  262:19 294:17
  310:2
areas  229:21
  234:23
arithmetic
  293:23
arrangement
  211:17
article  208:11,16
  213:8,13,18,25
  214:18,18
  215:17 216:7,18
  217:2,15,23
  218:2,4,8,8,10
  218:10,16 219:2
  220:11,13,14
  221:14,20,22

222:10,15,17,19
222:19 223:13
223:22 224:8
226:17 227:7,22
228:19,23,24
230:14,18,20,21
230:22 231:2
233:4,24 234:4
241:17 242:11
242:19,25 243:8
243:11 244:4,9
245:3,7,15,16
246:11 250:23
251:7,10,10
252:9,15 254:5,9
254:10,19 255:2
255:6,9 260:5,6
260:17 265:3,4
265:10,14 266:2
266:6,8 267:14
269:23 270:22
270:24,25
286:20 290:5,6
290:12,22,25
291:3,13 304:8
308:20 309:7
310:25 311:4,11
311:13
articles  217:12
218:24 219:19
220:4,13,21
224:6 228:18
254:14,14,16
271:10 286:13
289:22 290:13
290:16 291:7
305:15 308:11

[asbestiform - barber]                                    Page 4

**asbestiform**
246:7
**asbestos** 211:7
213:5 217:4
219:5,8 220:8,18
220:23 221:18
223:3,16 224:12
224:17,20 225:6
225:15,25 226:7
226:19 227:3,6
228:16 229:5,19
229:22 230:5,7,8
233:11,13,14
235:11,23
236:13 237:5,5
237:10 238:6
240:2 241:5,8
243:3 246:4,9
249:9,18 250:14
251:3,4,15,18,21
251:22 255:21
258:5,16 259:6
259:24 260:9
261:6 263:5,13
263:17,20 264:2
264:5,5,6,9,11
264:20 265:11
265:16 266:12
268:4,12 269:3,5
269:11,19,25
271:7,12 279:5
279:11,11,15
282:15 283:3,12
284:8 285:16
286:18,23 287:3
287:17,20,22,23
288:4,21 290:14
291:14 293:17

294:11,12,18
306:15 315:3
**asbestosis** 222:7
**ashdown** 209:19
**aside** 295:18
**asked** 215:18
251:8 258:7
259:2,10 263:14
264:4,8 265:6
273:7 274:11,16
274:22 281:2,21
288:19,20 289:7
291:17 293:7,12
297:21 298:7,8
299:5,9 300:22
301:9 302:13
303:9,21,23
310:11
**asking** 216:22
225:7 264:12
267:12 280:25
283:25 292:4
303:4 309:16,17
309:24 310:4
**assess** 266:16
**assessing** 233:12
306:15
**assign** 272:24
**assignment**
315:2
**associated** 217:4
235:10 249:18
268:9 294:5
305:6 311:9
**assume** 247:22
**assumes** 250:17
258:6 262:13
285:10 301:4

309:23 310:11
**assuming** 216:12
248:17 305:4
**attach** 310:24
**attached** 308:8
**attempt** 245:24
272:24
**attempted**
273:17,18
282:13
**attention** 214:17
**attorneys** 207:5
209:3,7,12,16,22
210:4
**attributable**
269:4
**attribute** 289:15
**attributed**
228:15 269:2
**attributing**
262:25
**august** 276:12
276:20
**australia** 222:12
222:13
**author** 213:12
218:20 221:6,11
242:20 254:6
305:17,18
308:13
**authorities**
225:4
**authorized**
207:8
**authors** 217:10
248:21 269:15
305:16 311:16

**available** 227:16
268:21 289:19
290:2,3,19
**avenue** 206:22
209:3,13
**average** 283:4
284:21,24,24
293:15 305:7
**averaging**
293:17
**aw** 222:4
**aware** 240:11,18
253:23 272:4
285:14,20,25
303:6

**b**

**b** 221:16 222:3
260:18,18
**back** 217:2
218:25 222:18
224:19 229:25
243:23 250:23
254:13 259:14
259:15,18 266:2
268:24 272:19
272:21 290:5
297:7 301:13
**background**
294:8
**ballaine** 210:3
**baltimore** 209:9
**barber** 253:16
253:25 254:17
255:19 256:13
257:24 258:3
271:6,12 288:24
289:14

[barber's - carbone]                                                    Page 5

barber's  254:11
barbers  253:11
   253:19 254:3,8
   254:21 265:5,7
base  249:23
   250:4,15
based  213:2
   254:18 272:7
   273:22 282:17
   282:17 284:13
   289:11 292:14
   292:23 294:3,7
   295:4,10 297:21
   298:6 299:18
   305:11
basically  224:9
   293:15 297:7
basing  217:14
beginning  212:9
   298:9
begins  237:25
   252:14 253:6
belief  314:7
believe  212:10
   212:21 213:25
   221:4,13 224:12
   225:3,17 227:9
   227:22 228:22
   229:2,4 232:17
   234:6 240:25
   242:12 243:14
   245:8,13,20
   249:22 250:24
   252:7 254:3,6
   256:20 258:24
   259:4 264:13,19
   264:25 270:5
   272:22 277:13

280:17,25
281:10 286:17
286:22 289:13
304:19 306:4
308:15
belongs  266:14
benign  222:6
berry  221:15
best  314:6
beyond  253:5
   301:23 303:12
bit  215:5
black  282:4
blends  286:13
blood  313:17
blue  221:18
boat  247:18
   248:25
bob  210:9
   211:11
bodies  311:15
body  220:23
   223:24
bold  215:6
borrowing  233:9
bottle  284:10,14
bottles  275:18
bottom  214:25
   245:23 247:22
   247:25
boulevard
   209:23
boy  260:7
brand  206:10
break  243:18
   244:3 267:11
   271:21 272:5,6
   272:10,15

breakdown
   308:3
breathe  285:18
   287:12,16,21
breathed  287:17
breathing
   287:19
brenda  206:18
   211:10 313:7,24
brian  206:4
   211:7 212:13
   278:3 315:3
brief  230:8,15,15
   230:18,19,22
   231:6 304:5
briefings  303:13
briefly  293:5
brought  249:9
   267:17,20
building  209:13
   247:18 248:25
buildings  269:7
bulbulyan
   260:21
bulk  282:12
bundle  284:24
bundles  284:21
   285:3
burden  219:6,7
   219:13,13,24
   220:8,21 241:3
burke  217:18
   218:12
bypass  219:8

c
c  209:2,14 210:2
   211:20 313:2,2

calculate  295:4
   299:18
calculated
   248:16 295:10
   305:3
calculation
   273:22 293:9
   298:17 302:16
calculations
   274:4,5 282:20
   295:18,24 299:6
   304:3
calendar  274:6
california
   315:21
call  243:7
called  206:17
   244:23,25
   266:14 272:23
   310:25
calling  299:22
   299:23
calls  231:12,18
   232:13 233:6
   249:13 253:12
   255:14 258:17
   280:18 286:4
   289:4 301:20,21
   302:3 306:12
canada  271:2
cancer  213:9
   214:4 260:24
capability  293:8
captioned
   206:17
carbon  266:15
carbone  208:11
   213:8,11,19

217:9 219:2
**carbone's**
222:19
**carefully** 250:19
**carriers** 222:25
**case** 212:7,8
214:15 219:18
225:2,4,11
226:22 227:8
230:16 234:21
236:11 237:4
238:10,19,21
240:12,20,23,24
253:22 255:25
256:5,7,11,16,17
256:18,19,24,25
257:12,16,20
260:12 263:25
264:21 273:20
274:11,21
277:14 278:13
278:14 280:12
280:20 288:5,6
288:20,25 289:6
289:25 294:22
295:5 302:8,19
302:20,21
306:18,22
308:17,18 310:6
311:3 315:3
**cases** 240:6,25
241:2 255:19
256:10 257:6,10
257:22,23,25
258:8 268:21
282:20 287:8
288:15 289:22
299:6 300:13

304:9
**category** 254:4
254:25 265:8
270:9
**causality** 299:17
**causation**
229:15,17 230:3
233:12,16 234:4
237:18 262:25
288:14 289:13
311:9
**cause** 219:9
234:10 235:4
238:11 243:13
254:11 255:4
288:16 290:25
**caused** 213:4
217:7 223:16
224:17 225:6,14
225:24 229:5,8
230:5 269:13
**causes** 230:7
235:23 237:10
238:6 263:17
289:23 311:19
**causing** 290:14
291:14
**cavity** 216:20,21
239:14,18,19,19
**cc** 282:21 293:24
294:2 295:13,15
295:16 296:4,5,6
296:7,10 304:21
305:2,8,10 307:9
307:16,20
**cdc** 208:13 242:2
243:8,11 245:11
252:16 259:16

265:3,3 266:25
267:4 269:23
**cedar** 209:17
**cells** 223:18
**center** 210:5
241:14,15 242:4
259:21
**centers** 242:22
259:17
**certain** 246:4,6
272:25 299:7
**certainly** 217:15
218:3 240:6
285:22 290:13
291:7 309:10
311:23
**certificate** 247:9
253:4 255:10,17
258:13
**certification**
207:6 314:1
**certified** 211:11
**certify** 313:9,16
**cetera** 297:9
**change** 238:15
315:5
**characteristic**
241:4
**characteristica...**
241:5
**characteristics**
215:7 228:21
246:21
**characterization**
279:14 280:20
**charles** 209:8
**check** 228:7

**chest** 216:20,25
221:19 239:19
**china** 308:17
309:12 310:9
**chinese** 224:22
291:8 309:20
**chose** 292:21
**chris** 301:15
303:23 312:11
**christopher**
210:6
**chronic** 223:15
**chrysler** 209:13
**chrysotile** 260:8
271:2 279:11,15
279:16 281:24
283:22 284:8,11
284:21 285:16
285:22 290:8,13
290:21,24 291:8
291:9,13,15
305:21,22 306:3
306:5,16 307:9
307:15,21,24
308:15,19,22,24
309:2,7,11,18,25
310:3,8,10,18,23
311:2,9,16,19
**circumstances**
227:2 228:15
**cis** 248:16
**citation** 241:20
**cite** 227:7 228:9
228:24 241:11
241:14 260:17
**cited** 221:14
296:18 310:7

[civil - contains]                                                    Page 7

civil  206:13
cj  220:7
claim  284:23
claimed  258:4
claims  275:22
   284:20 297:8
   309:13
clairvoyant
   276:2
clark  210:4
cleaning  269:14
   294:25
cleanup  294:21
clear  303:5
clinical  218:14
clinician  220:25
   221:2
clock  291:22
close  298:25
clubman  206:10
   208:15 261:22
   261:24 262:3,3
   275:21 276:16
   277:22 278:3
   282:15,24
   283:13 284:7
   286:2,9,24 287:4
   296:4 304:20,25
   305:5 309:12,21
   310:10
clues  213:9
   214:2
clyde  209:11
cohort  255:5
cohorts  291:8
coined  298:18
colgate  209:7
   307:3,6

collect  269:21
college  228:20
   291:5
color  281:24
   282:4
colors  282:5,7
come  260:19
   271:13 294:2
comes  215:16
   264:6
comfort  272:10
comfortable
   257:21 280:23
comic  260:22
coming  244:16
commencing
   206:19
commensurate
   307:20
comment  214:7
   256:4 257:18
   262:16 271:23
   278:19 280:21
   282:5 300:16
commented
   306:2
commenting
   257:5,22
comments
   229:21
commercial
   241:7,8
commercially
   246:6 264:7
commission
   315:25
common  223:14
   268:12,15,15

community
   264:18 311:18
company  206:11
   206:11 209:7,22
   211:13
compare  294:4
compared
   280:22 309:17
   309:19,24
comparing
   293:23
comparison
   309:11 310:8
competing
   234:13
compiled  276:17
completed  276:5
compound  236:7
computer
   227:12 244:16
conclude  270:24
   294:10
concluded
   253:24 254:15
   254:16 279:4
   284:7 307:8
concludes
   303:15 312:17
conclusion  237:3
   301:21
confirm  301:7
confirming
   284:4
confusing  275:8
conroy  209:2
consensus
   311:17

consequence
   269:10
conservative
   295:4,18 300:8
consider  216:16
   220:16,17
   234:18 260:15
   276:18
considered
   228:22 284:11
   310:4
considering
   236:24 263:24
   304:2
consistently
   299:8
constitutes
   262:22
construction
   252:3 269:7
cont'd  210:2
contain  285:16
contained  279:2
container  208:15
   275:21,25 276:8
   276:19 277:15
   277:22 278:3,8
   278:16,21 279:6
   282:9 284:7
   309:22
containers  275:3
   275:10,13,16
containing
   259:24 261:6
   269:11 276:16
   284:11
contains  288:4

[contaminate - data]                                                      Page 8

**contaminate**
291:16 309:4
**contaminated**
229:22 286:18
**contamination**
243:10 263:5
282:15 284:8
287:12 290:8
309:13
**content** 214:8
**contention**
301:24
**contents** 218:24
222:16
**context** 281:3
**continuation**
212:6
**continue** 229:24
235:12 272:10
292:10 293:4
301:10
**continues** 229:23
**contracted** 307:9
**contrast** 217:3
**contributed**
294:11 296:13
296:14
**contributors**
252:4
**control** 226:22
241:14,16 242:4
242:22 259:17
259:22 264:21
308:17 311:3
**converted**
230:17,20
**copy** 227:12,14
282:3

**corn** 220:7
**correct** 213:6
215:4 217:10
226:8 234:15
235:6 236:6
239:2 244:24
247:3,19 249:2
251:21 253:2
255:12 258:19
260:16 261:2
265:8 266:20
267:16 269:15
270:11,12,15,20
271:3,9 277:3,19
279:9,23 286:16
302:25
**correction**
243:24
**correctly** 230:12
236:2 251:5
268:9 275:23
**correlation**
218:13
**corsi** 210:3
**cosmetic** 236:24
237:5 238:11
239:25 240:8,11
240:14,19,21
243:10,13
245:17,18,19,20
252:8 253:17
261:4,8,16,21
262:17,23 263:4
264:24 265:4,11
265:14 266:21
269:24 285:17
287:4 288:16,22
288:25 289:2,9

289:15 290:8,16
291:16 305:20
309:4,8
**cosmetologist**
254:17,25
258:13
**cosmetologists**
254:4,21 265:5
270:10
**cosmetology**
258:11
**counsel** 208:18
215:15 227:20
271:25,25
274:10,13
278:22 291:21
**counselor**
211:25 244:2
249:25 250:3
272:20
**countable**
306:10
**counted** 285:7,8
306:8,9
**counting** 285:3
**county** 313:5
**couple** 212:12
295:3 297:20
298:2,2,3 301:8
**course** 272:6
304:4
**court** 206:2,21
211:8,10,17,18
230:9,21 231:7
292:6,9,21
300:19 301:17
302:2,9,13,24
303:6 315:1

**courtroom**
302:12
**courts** 302:7,11
**cover** 276:14
**create** 274:18
275:9,12,14
**creighton** 224:21
226:10,11,17
227:22 228:9
290:25
**creighton's**
227:7
**criteria** 233:11
243:6 245:14
262:24
**crocidolite**
221:18
**cross** 225:10
292:14 297:4,6
**crystalized**
246:5
**cumulative**
295:12,14,18
**currently** 241:24
**cutting** 303:22
**cv** 206:13 211:9
**cytoreductive**
217:21

| d |
|---|

**d** 208:2 221:16
257:13 260:6
**daigle** 257:11,12
257:20
**dallas** 209:18
**daniels** 210:4
**data** 248:17
268:20 269:22

[database - disease]                                                                Page 9

database  268:8
date  213:20
  242:14 244:22
  267:7 277:24
  311:6 315:3
dating  224:18
david  209:19,24
  231:17 232:5
  312:6
day  212:22
  214:14 257:11
  271:19,22 293:7
  313:21 314:14
  315:22
daylight  211:3
  312:21
days  212:12
  292:23
dcf  206:13
de  221:16 222:2
dead  280:16
death  246:18
  247:2,8 253:4
  255:10,11,16,17
  258:12,14 270:9
  270:17
deaths  246:25
  247:20 248:5,8,9
  248:9,12,13
  251:25 268:9
debate  311:8
decedents
  246:19
decendents
  247:14
deciding  230:4
decision  304:10

defendant  209:7
  209:12,16,22
  210:4 273:19
defendants
  206:12 236:12
defer  279:19
define  239:12
  247:22 263:9,11
  263:12,20 264:6
  284:16
defined  248:5,11
  263:11
definitely  220:24
  226:23
definition
  216:24 263:10
  264:2,4,9,10
demarcation
  261:19
demarcations
  262:22
depending
  215:24
depends  284:10
deposition  206:6
  206:17,18 207:7
  207:7 211:6
  212:7,9,18
  214:10,16
  229:12 257:10
  257:15 259:3
  273:7,8 274:6
  311:25 313:11
  315:3
depositions
  250:20 267:18
  267:21

describe  239:14
  248:2 261:18
  283:8 293:14
  298:10
described  230:6
  240:7 241:13
  249:17 259:20
  282:25 300:3,3,9
description
  208:10
design  278:16
detect  279:8
determine
  285:17 292:21
  300:7
developed
  233:13 240:8
  259:25
developing
  236:16 254:2
devices  297:18
diagnosed
  240:20 249:7
  252:19 269:18
diagnoses
  215:14
diagnosis  213:10
  214:3
died  253:3
difference
  310:17
differences
  221:17 306:24
different  216:14
  217:16 239:10
  252:12 261:15
  262:18 263:11
  268:19 285:21

288:21 295:21
  299:13,16
  306:14
differentiate
  246:14
difficult  221:25
diffuse  215:11
  216:15 217:19
  218:12 264:20
direct  214:17
  304:19 312:4
directly  244:5
disagree  278:18
  279:13
discovery
  292:16
discriminate
  234:25
discuss  259:13
  289:9
discussed  290:24
  302:10
discussing
  256:23
discussion
  245:10 269:16
  269:20
discussions
  290:20
disease  222:7
  229:14,22 230:3
  233:17 234:10
  234:12,14 235:4
  235:5,9 237:18
  238:11 241:14
  241:15 242:4,22
  259:17,21 263:2
  264:5 270:25

289:23 294:12
296:18
**diseases** 233:14
**display** 276:23
**displaying**
213:24 214:24
229:12
**dispute** 235:23
237:11 238:6
311:15,18
**distinction**
219:20
**distinguish**
246:12
**distribution**
248:17 270:17
**district** 206:2,2
211:8,9
**disturbance**
269:10
**divided** 248:7,13
**docket** 211:9
**doctor** 212:24
213:24 221:3
249:7,8 271:16
272:21 289:12
300:5 301:17,24
306:9
**doctors** 300:13
**document**
230:21 231:4
273:3,10,13
274:18,19,22,25
275:6,9,12,14,17
277:11 286:21
**documents**
276:11 287:7
290:18

**dodson** 220:6,17
220:20
**dodson's** 220:12
**doing** 252:10
255:11 293:23
**dosage** 283:6
**dose** 273:21,21
274:14,15
282:19 287:7
293:8,9,14 294:9
295:4,9,19
298:17 299:6,25
300:8,8 302:15
**dosimeter**
294:24
**dr** 211:6 212:2,6
213:11 217:9,24
218:6,18,19
220:12,16,20
221:7,21 222:11
222:19 225:25
226:2,10,11,17
227:7 228:8,9,12
228:13 231:13
231:17 232:5,8
233:15 234:7
235:18 237:21
243:25 244:3
257:16 272:6
275:21,25 276:2
276:7,17,25
277:11,16
278:24 279:4
280:2,3,6,7,9,12
280:15,15,16,16
280:17,17
281:20,22 282:8
282:8 283:20

284:6,13,19
285:6,12 292:11
293:4 296:21
297:24 298:8
303:16 304:15
304:18 305:22
306:9 309:21
310:10,22
312:17 315:4,20
**drug** 249:24
250:3
**duly** 211:21
313:12
**dusting** 269:14

### e

**e** 208:2 209:2,2
209:24 210:2,2
211:20,20,20
221:16,16,16
222:6 242:18
257:13 313:2,2
**e.g.** 266:12,15
**earlier** 226:16
239:9 263:9
290:15 291:4
**easier** 242:20
**eastern** 211:3
312:21
**editor** 232:15,17
233:3
**educated** 291:5
**education** 294:7
**effect** 207:9
**egilman** 231:17
232:5,8 305:12
**eight** 217:5
266:7,9

**either** 227:18
233:24 284:2
295:21 300:5
**elevated** 247:12
248:24 252:24
**elicits** 280:19
**elongate** 266:15
**employed** 269:9
293:13
**emps** 266:12
**enclosed** 276:15
**engaged** 251:2
251:17
**engine** 249:25
**english** 296:5
**enlarged** 244:17
**entire** 246:22
268:6
**entities** 288:2
**entitled** 260:6
297:6
**environmental**
222:8 230:11
231:8,16 232:11
266:11 268:17
**epidemiological**
253:23
**epithelial** 238:25
**equal** 246:20
**equally** 217:6
**erionite** 266:13
**errata** 315:1
**error** 300:25
**especially** 223:2
275:7
**esq** 209:4,9,14
209:18,19,19,24
210:6

[estimate - feel]                                                    Page 11

| | | | |
|---|---|---|---|
| **estimate** 273:18 | **exceeded** 291:22 | 226:19 227:3,6 | **f** |
| 273:21 282:13 | **excerpts** 230:19 | 228:16 229:8,19 | **f** 313:2 |
| 287:7 293:9,14 | **excess** 294:22 | 230:5,7,8 235:11 | **facility** 308:19 |
| 294:10,15,23 | **excluded** 234:14 | 236:19,20 240:7 | 308:23 309:20 |
| 295:4,9,19 | **exhibit** 208:18 | 243:3,7,9 249:18 | **fact** 216:23 |
| 299:25 | 213:17,20 | 250:14 251:4,19 | 294:15 |
| **estimated** | 225:12 244:22 | 251:21,23 252:8 | **factors** 216:2 |
| 268:25 269:4 | 253:21 265:3 | 254:11 255:20 | 264:20 |
| 275:10 293:21 | 266:3 267:6,13 | 258:4 259:24 | **factory** 308:23 |
| **estimates** 273:11 | 277:19,23 311:5 | 260:8 261:4 | **facts** 249:13 |
| 274:14,15 275:2 | **exhibits** 208:9 | 265:12,16 268:4 | 250:18 258:6 |
| **et** 206:11 221:16 | 208:18 | 268:20 269:3,5,9 | 262:13 285:10 |
| 230:6 297:8 | **existing** 294:4 | 269:22,25 271:7 | 301:4 306:18 |
| **evaluate** 279:20 | **exists** 291:20 | 271:11 272:23 | 309:23 310:11 |
| **evaluated** | **expected** 248:7,8 | 273:4,19 275:18 | **factual** 216:22 |
| 215:25 239:23 | **experienced** | 282:23 283:12 | **fading** 240:17 |
| **evaluating** | 307:8 | 285:21 286:23 | **fair** 276:24 |
| 229:14 230:2 | **expert** 220:17 | 288:21 294:3,5 | 279:21 |
| 296:17 | 255:25 257:12 | 294:10,16,20,24 | **familiar** 213:7 |
| **evidence** 249:13 | 257:19 262:20 | 295:11,12,14 | 213:12 217:23 |
| 260:8 262:14 | 279:18 282:6 | 299:19,21 | 218:5,16 220:11 |
| 295:5 | 289:12 313:11 | 304:21 306:24 | 221:6,8,20 |
| **evolved** 290:17 | **expertise** 262:20 | 307:2,8,14 | 222:10 223:25 |
| **exact** 245:22 | 310:2 | 308:16,23 309:7 | 233:7,8 262:6 |
| 250:10 254:25 | **experts** 300:15 | 311:2 | 271:10 273:3 |
| **exactly** 250:10 | **expires** 315:25 | **exposures** 226:7 | 274:25 280:4,6,8 |
| 276:9 281:12 | **explanations** | 251:3 266:12,16 | 281:4,6,6 300:23 |
| **examination** | 234:13 | 268:12,15,18 | **family** 251:2,15 |
| 206:7,17 208:4 | **exposed** 219:4 | 282:14 310:18 | **far** 282:9,11 |
| 211:23 292:10 | 233:13 234:9,11 | **expound** 216:13 | 286:7 |
| 293:2 297:22 | 249:9 258:15 | **express** 276:24 | **fast** 277:8 |
| 304:13 313:13 | 269:18 291:15 | **extensive** 304:8 | **father** 249:24 |
| **examine** 292:14 | 309:9 | **extensively** | **features** 216:9 |
| **examined** | **exposure** 212:12 | 222:12 | 216:13 |
| 211:22 233:16 | 212:15,20 213:4 | **extrapolated** | **federal** 271:24 |
| 234:8 237:18 | 217:4,5,8 221:18 | 285:8 | 272:12 300:5 |
| **example** 261:22 | 223:3 224:12,17 | | **feel** 216:13 |
| | 224:20 225:6,15 | | 257:21 279:24 |

**felt** 249:8 254:10
  279:10
**fiber** 219:5,13,24
  220:8,20 241:3
  264:7 279:18
  282:21 285:21
  293:24 294:2
  295:12,15,16
  296:4,5,6,7,10
  305:2,5 306:10
  307:16,20
**fibers** 219:8
  223:16 241:5,6
  266:12 269:13
  284:11,14
  304:21 305:7,10
  307:9 309:17
**fibrous** 266:13
**figure** 281:15
**filed** 211:8
  230:15
**filing** 207:6
**filter** 219:8
**find** 225:13
  242:4,8,17,20
  265:23 276:3,15
  279:5 284:2
  287:2,5,6 292:15
  298:20 307:19
  309:14 314:5
**findings** 241:4
  281:23 284:13
  310:20
**firm** 211:13
  256:2,7,10,22
  257:17 273:6
  276:14

**firm's** 256:24
**firms** 257:23
**first** 211:20
  212:14,18,22
  215:11 218:20
  219:11 227:25
  231:6 235:25
  237:8,24 247:17
  249:6 253:7
  254:19 259:15
  268:6 270:24
  276:6 287:23
  288:5,8 304:18
**fit** 292:16
**fitter** 256:14
**fitzgerald**
  206:18 211:10
  266:19 305:12
  307:5 313:7,24
**five** 215:2
  248:15 272:15
  304:5
**flip** 280:2 283:20
**floor** 209:13
  210:5
**focusing** 266:10
**folder** 276:15
**folks** 219:25
  223:7 254:24
**follow** 272:4
  291:24 292:8,23
  303:21,23 304:6
  312:3,13
**followed** 236:10
  280:9 306:7
  312:13
**following** 237:8
  299:11

**follows** 211:22
**footnote** 217:18
  218:10 220:4
  241:16 245:24
  246:3 260:5
  265:19 266:9
**footnotes** 266:7
**force** 207:9
**ford** 210:3
**foregoing** 314:4
**forenoon** 206:19
**form** 207:12
  216:8 217:11
  219:15 220:19
  225:16 226:9,13
  226:20 228:17
  231:10,18
  232:12 236:7,14
  236:25 237:12
  238:3,13 239:11
  240:4 241:18
  242:6 244:8
  250:6,17 254:22
  255:22 256:3
  260:14 261:17
  262:13 263:7
  264:3 265:6
  267:22 268:5,14
  270:3,21 271:8
  271:14 275:5
  277:17 278:9
  279:7,12,22
  280:18 283:14
  284:9 285:19
  286:4 287:14,25
  288:18 289:17
  289:24 290:10
  291:17 294:13

  296:15,20
  298:15 299:3
  300:11,21 301:4
  302:4 305:24
  307:11 309:5,15
**formal** 274:21
**format** 227:16
**former** 222:5
**forth** 313:12
**forward** 297:10
**found** 219:22
  241:2,4,4,5,6
  254:20 279:10
  279:14,15,20
  283:21 284:20
  291:8 305:23
  306:10 309:21
  310:10,21
**foundation**
  232:12 233:6
  281:25
**four** 233:15
  234:7,13,23
  237:17,22,25
  267:12 272:9
**frame** 216:2
  247:4
**francis** 231:25
**freeman** 233:15
  233:20,21,23,24
  234:2,3,6
**frequency**
  299:18,21
**friable** 269:11
**friday** 206:18
  211:4
**front** 311:13

[full - heading]                                                    Page 13

**full** 234:5 237:24
 294:23,23
**further** 207:11
 239:18 263:20
 264:2 295:23
 304:13 312:15
 313:16

**g**

**g** 221:16 222:3
 257:13 308:13
**gamble** 209:22
**gateway** 210:5
**gbd** 206:13
**gender** 248:16
**general** 223:5
 229:6,21 234:24
 236:4,8 240:6
 264:18 293:11
**generally** 225:22
 233:18,19
 236:13 237:16
 246:11 256:8
**generic** 216:11
**gentleman**
 256:13
**geographic**
 270:16
**germline** 222:25
 223:10,11
**getting** 237:2
 257:9 262:21
**give** 242:9
 260:21 281:14
 284:2,3 288:25
 304:24
**given** 303:16
 312:17 313:14

**gives** 246:25
 272:12 284:20
**giving** 225:9
 235:17 252:11
 262:8 268:8
 308:12
**go** 211:25 218:25
 227:9,18,23
 229:6,25 242:3,8
 244:2 245:25
 259:14,15
 266:24 270:23
 272:20,21
 281:13 287:16
 302:22 303:18
 304:7
**goes** 301:23
**going** 211:3
 214:13 216:12
 219:3 237:6
 238:15 243:17
 243:20 245:24
 254:13 256:4
 257:14 263:10
 267:24 272:4,16
 284:3 290:5
 292:4,5,6,15,17
 292:18,22 297:4
 297:7,25 298:4,5
 301:9 304:7
 310:24 311:22
 311:24 312:20
**goldberg** 209:21
**good** 211:2
 212:2,4
**goodness** 264:19
**gordon** 265:17
 265:18 266:6,19

 283:18 305:12
 305:17,25 306:7
 306:17 307:5
**governmental**
 311:17
**gpm** 209:16
**grade** 261:19,23
 261:25 262:9,10
 262:18 286:9
**grades** 261:14
 261:16
**graduates**
 228:20
**gram** 284:21
**greater** 246:19
 247:14
**gref** 206:4 211:7
 212:7,13,25
 229:24 249:6
 256:17,19,25
 272:25 275:3,10
 275:16,22 276:8
 276:19 282:14
 282:24 284:7
 287:3,9,10 305:4
 305:23 306:10
 315:3
**gref's** 224:16
 225:5,14,23
 229:4,7,18 230:4
 249:3 250:14
 278:3 283:12
 286:23 295:10
 296:13 304:20
**greve** 209:19
**gritty** 262:21
**group** 266:14

**groups** 248:16
**growth** 223:18
 224:3
**gunter** 280:12

**h**

**habit** 246:6,9
**hairdresser**
 253:16,25
 254:17,24
 255:20 271:12
**hairdressers**
 253:11,19 254:3
 254:8,21 265:5,7
 270:10
**hairdryers**
 271:13
**hairstylists**
 270:10
**half** 240:17
 298:4
**halfway** 246:24
 252:14
**hammar** 220:7
 221:7,7
**hand** 308:15
 311:2 313:21
**hang** 303:17
**hanly** 209:2
**happened**
 214:14 250:10
**happens** 262:15
**happy** 259:13
 260:21
**hard** 227:12,14
**head** 213:14
**heading** 214:19
 215:6 220:5

[heading - internally]                                                    Page 14

229:12,13
**health** 230:11
  231:8,16 232:11
  266:16 284:12
**hear** 212:2
  221:25 228:2
  237:14,15
  240:16 267:19
  297:17,24
**hearsay** 280:19
**heavy** 226:6
**held** 270:8
  313:11
**helps** 227:20
**hereinbefore**
  313:12
**hereunto** 313:20
**high** 275:2
**higher** 219:5,7
  219:12
**highest** 270:17
**highlight** 245:24
**highlighted**
  246:3 250:25
**hill** 233:11
**histological**
  218:13
**historically**
  219:18
**histories** 268:17
  268:18
**history** 223:14
**home** 249:9
**homemaker**
  270:14
**honestly** 212:17
**hospital** 300:6

**hour** 243:17
  272:3 291:22
  298:5 303:25
**hours** 272:2
  292:9 294:2
  304:4
**house** 231:25
**hr** 217:18 218:12
**huge** 247:7
**human** 260:9
  284:12
**hundreds** 288:15
**hypothesis**
  291:19
**hypothetical**
  280:14,21

**i**

**idea** 224:2
  232:14 239:24
  262:15 288:10
**ident** 208:10
**identification**
  213:20 244:22
  267:6 277:23
  279:18 311:5
**identifies** 233:15
  234:7 283:15
**identify** 225:4
  283:10 300:5,18
**ii** 206:15
**impact** 277:5,11
**important** 305:3
**impune** 310:17
**incidence** 254:20
**include** 294:20
**included** 230:20
  250:16 254:4

270:9,13 276:16
  286:13,14 287:7
  294:19 296:8
  307:17 308:2
**including** 257:24
  258:2,10 294:17
**increase** 254:24
  267:23
**increased** 251:15
  253:25 254:18
  254:20 294:6
  296:17 307:16
  307:24
**independently**
  280:8
**indication** 245:2
**individual**
  229:15 230:3
  233:17 234:9,10
  234:11,20 235:4
  236:12,21
  238:19,21
  250:21 295:25
**individually**
  206:10 296:12
**individuals**
  219:4 227:6
  228:20 233:13
  240:7 243:12
  254:8 255:5
  258:9 259:23
  291:5 300:12,14
  308:22
**industrial** 258:3
  261:11,15,20
  262:11,19,22
  269:8

**industries**
  206:10 209:17
  247:11 248:12
  248:14,23 252:3
  252:23 278:12
**industry** 247:17
  248:7,10 252:2
  258:10,11
  260:25 261:7,12
  262:12,16
  270:19 271:12
**inferring** 239:3
**inflammation**
  223:16
**information**
  282:22 289:19
  289:21 290:17
  303:12
**inhalation** 305:6
**inhale** 287:13,22
  287:23 288:3
**inhaled** 287:4
**installed** 269:11
**instance** 289:10
**instances** 293:20
**insulation** 226:3
  253:6
**insulators**
  219:23 224:21
  226:3
**interest** 206:10
  209:8 232:9
  248:10
**interested**
  313:18
**internally**
  248:15

**international**
206:10 209:17
230:10 231:7,15
232:10 278:12
**interrupting**
214:20
**intimately** 262:6
**involved** 263:2
**involves** 261:3
**involving** 243:9
252:8 308:18
**ipad** 297:19
**issue** 292:19
310:6,7,19
**issues** 220:17
299:16
**italian** 286:17
**italy** 286:15
**item** 245:10
**items** 241:22
242:5 298:12

**j**

**j** 211:20 308:13
**jacqueline** 206:7
208:5 211:6
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1

236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1,16
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1

312:1,17 313:10
314:10
**james** 209:4
212:20
**jaqueline** 315:4
315:20
**jersey** 206:22
209:23 210:5
**jiang** 208:16
224:23 307:13
307:15,23
308:13 309:20
310:25 311:4
**jim** 297:20
**job** 206:25 226:4
249:17 253:17
255:19,21 265:8
**jobs** 250:20
255:13 258:15
268:18
**johnson** 296:7,7
**join** 312:10,11
**jorissen** 210:9
211:11
**joseph** 206:4
211:7
**journal** 213:8
214:3 218:15
220:9 221:19
222:7 230:10,17
230:21 231:8,15
231:16 232:10
232:16,18,20,24
233:2
**judge** 207:10
302:19,23
**july** 212:9

**june** 260:10
**jurisdiction**
302:15
**jurisdictions**
299:7
**jury** 239:7
**jw** 220:7

**k**

**k** 221:16,16
242:18
**kanarek** 290:20
**katherine** 209:9
312:2
**kevin** 209:14
312:9
**kind** 309:11,12
310:8,9
**kinds** 273:2
**klerk** 221:16
222:2
**knew** 281:2
289:11
**know** 212:14,16
213:11,12
216:12,16
217:13,25 218:7
219:20 221:11
221:22 223:9
224:5,7 232:3,5
232:8,21,23,23
233:2 234:5
235:16 237:2
242:10,15 245:4
245:5 249:3,6,19
249:21,23 250:7
250:8,9,10,10
255:16 261:22

[know - line]                                                    Page 16

261:23,25 262:4
263:5 265:14,16
265:20 268:16
268:16 273:14
273:15 274:13
275:6 276:2,9
277:15 278:7,20
278:23,24 280:7
280:22,22,24
281:8 282:10,11
285:7,21 286:7
290:3,11,23,24
291:3 299:4
301:18 302:14
303:2,5,11 306:2
306:3,13,20,21
307:4,7 308:4,7
308:14 309:16
**knowing** 279:2
**knowledge**
  256:23 290:17
  294:7 314:6
**known** 252:2
**kolmar** 209:12
**kozak** 208:7
  210:6 297:12,13
  297:18,23
  301:12 312:11
  312:11
**kramer** 208:6
  209:4 212:19,20
  215:15,20
  217:11 219:15
  220:19 223:20
  225:16 226:9,13
  226:20 227:20
  228:5,17 231:10
  231:12,18,23

232:6,12 233:5
235:7,18 236:7
236:14,25
237:12 238:3,13
239:11,21 240:4
240:15 241:18
242:6 244:8
249:12 250:6,17
251:8,13 253:12
254:22 255:14
255:22,25 256:3
256:8,15,18,22
257:4,14 258:6
258:17 259:9
260:14 261:17
262:13 263:7,14
264:3 265:6
267:22 268:5,14
270:2,21 271:8
271:14,23 275:5
277:17 278:9
279:7,12,22
280:18 281:21
281:25 283:14
283:24 284:9
285:4,10,19
286:4,11 287:14
287:25 288:18
289:4,17,24
290:10 291:17
291:21 292:3,11
292:20 293:3
296:24 297:10
297:14,17 298:7
298:8,15 299:3
299:12,14,21,24
300:4,11,21
301:4,15,20

302:3 303:3,8,9
304:2 305:14,24
306:11,19
307:11 308:20
309:5,15,23
310:11,14,16
311:11,21
312:14,16
**kramer's** 256:9
  256:22 273:6
  276:14 312:4
**kurt** 209:19

---

**l**

**l** 211:20,20
  218:11 221:16
  257:13 260:18
  260:18
**laboratories**
  209:12
**lacks** 232:12
  233:5 281:25
**landman** 210:3
**large** 217:4
  223:24
**larger** 215:6
  311:18
**largest** 270:13
**late** 288:12
**lathrop** 209:16
**laura** 228:12,13
**law** 256:2
**lawler** 209:9
  296:20 312:2,2
**lawyer** 256:7
  257:3 298:3
**layperson** 239:6
  239:16

**layperson's**
  239:5
**lead** 297:11
  305:17,17
**leading** 294:13
**learned** 288:9
**leather** 296:5
**leave** 292:21
**lee** 217:18
  218:11,21
**left** 272:3,8
**legal** 211:11
  230:15 231:3
  287:6 298:2
  301:21 303:4,11
  303:13
**lemen** 233:12
**letter** 242:16
  276:14
**level** 234:12
  282:23 283:22
  287:3 290:12
  305:5 307:9,19
**levels** 240:2
  287:22 291:15
  294:5 305:21
  306:25 307:13
**lexington** 209:13
**light** 281:11,11
**likelihood**
  220:13 222:14
**limit** 303:25
**limitation** 297:7
**limited** 271:25
  272:2
**line** 216:15
  259:12 260:3
  261:9 304:8

[line - m.d.]　　　　　　　　　　　　　　　　　　　　　　　　Page 17

315:5
**lines** 233:25
**linked** 227:3
　240:2 243:3
　268:4 290:9
　307:21
**list** 227:21
　232:24 233:23
　237:17,22,24
　241:19,22,23
　242:7,13,14
　244:4 252:15
　253:20 255:8,9
　270:7 298:12
　308:8,11
**listed** 247:17
　253:20 299:2,12
　299:20
**lists** 258:12
**literature** 223:25
　224:15,18
　225:22 231:3
　235:22,24
　237:10,11 238:5
　238:7 239:24
　240:5,9,11,18
　259:23 263:17
　283:2 290:7
　291:20 293:16
　293:24 294:4
　296:18 298:21
　298:25 311:14
**litigation** 306:18
**little** 215:5
　221:24 247:25
**liu** 218:11,21
**livingston**
　206:22

**llc** 209:2
**llp** 209:6,11,16
　209:21
**located** 250:21
**location** 234:25
　238:24 239:3
　243:15
**locations** 286:14
**long** 273:12
　288:10 293:22
**longer** 301:10
**longo** 275:21,25
　276:17,18,23
　277:6,16,25
　278:24 279:4
　280:9,15,16,17
　282:8,8 285:6,12
　305:22 306:9
　309:13,21
　310:10
**longo's** 276:2,7
　276:25 277:11
　280:2 281:20,22
　283:20 284:6,13
　284:19 310:22
**look** 217:17
　219:21 220:4,5
　224:18 225:12
　229:17 242:16
　247:24 259:14
　270:23 297:10
　307:12,18
　308:13
**looked** 219:17
　220:22 232:24
　240:25 241:3
　283:6 285:23
　290:3 299:4

300:10 306:23
　306:24
**looking** 228:19
　228:21 241:10
　242:15 245:9
　250:19 252:13
　263:3 268:10
　276:21 293:15
　293:19 306:16
**looks** 231:5
　276:12
**lot** 214:13 240:5
　261:11 272:3
　274:23 280:7
　290:16 291:25
　292:10
**loveless** 278:13
　278:15
**low** 275:2
**lunch** 271:21
　272:5
**lung** 219:5,8,13
　219:13 220:2,8
　220:18 239:10
　241:3

| m |
| --- |

**m** 211:20 217:18
　218:11 220:7
　222:3,6 242:16
　242:16,18
　281:10
**m.d.** 206:7 208:5
　212:1 213:1
　214:1 215:1
　216:1 217:1
　218:1 219:1
　220:1 221:1,5

222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1

[m.d. - mesothelioma]   Page 18

298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:10
314:10
**m71373** 208:14
277:22 278:2
**macroscopic**
246:6,8
**madison** 209:3
**maintenance**
269:12
**major** 252:3
**malignant**
215:12 221:17
222:4 223:17
224:3 242:21
244:6,12 246:18
247:9,13 248:6,8
248:11,14 252:4
259:25 260:6
264:21 308:16
**man** 221:9
**manner** 269:17
**manufacture**
309:2
**manufactured**
250:4,7
**manufacturer**
262:5
**manufacturing**
250:11 269:7
308:19 309:20

**march** 242:24
258:22
**mark** 213:16
247:25 291:22
**marked** 213:7,19
225:3,11 244:21
250:23 267:5
277:23 311:5
**marriage** 313:18
**mary** 242:17
**maryland** 209:9
**mas** 208:14
277:21 278:2
**material** 267:8
267:13 309:2
**materials** 212:8
212:11 269:12
**math** 274:15
**mathematically**
273:23
**matter** 206:17
211:7 309:8
313:19
**mazurek** 242:12
254:23
**mccaffrey**
209:14 312:9,9
**mcdonald**
254:10 255:4,7
270:22,23,25
**mclarty** 220:7
**mean** 226:14
236:11,13
258:14 261:19
263:13 287:18
293:11
**meaning** 247:8

**means** 255:9
**measurable**
293:16
**measures** 294:17
**media** 211:5
312:18
**medical** 213:2
221:3 230:21,22
231:2 235:24
237:11 238:7
281:14 289:11
291:20 294:9
**medicine** 222:8
**medium** 275:2
**meeting** 221:10
**members** 251:2
251:15
**men** 217:6
268:25 269:6
**mennen** 209:8
296:6 312:3
**mention** 264:23
265:4,10 266:21
269:24
**mentioned**
225:25 226:10
226:16 228:11
245:17 254:9,10
264:14 265:19
265:20 270:22
288:6,7 296:16
304:9
**mentioning**
254:14 288:16
**mentions** 243:6
**mesos** 247:5
**mesothelial**
223:18 224:3

**mesothelioma**
212:25 213:4,9
214:2 215:7,12
215:13 216:9,19
216:20 217:3,7
217:19 218:12
219:3,4,10,12,14
219:25 220:9
221:17 222:5
223:2 224:4,14
224:16 225:6,14
225:19,21,24,24
226:12,19,24
227:2,5 228:14
228:21 229:5,8
229:18 230:4,7
234:17,18,24
235:6,10,23
236:5,6 237:10
238:6,12,20,22
240:3,12,13,13
240:19,21 241:2
242:21 243:12
243:16 244:6,12
246:13,18 247:9
247:14 248:6,8
248:12,14 249:8
251:16 252:4,20
253:3 254:2,12
254:18,20 255:4
259:6,25 260:7
263:18 264:14
264:21 269:18
269:24 270:17
288:8,15 289:3
289:12,15 290:9
290:14,21 291:2
291:6,9,14 294:6

**[mesothelioma - mortality]**                                              Page 19

294:6 296:13
307:10,22,25
308:16 311:10
311:19
**mesotheliomas**
215:22 216:4
219:6 224:11,20
224:24 240:9
243:2 254:5,9
255:2 268:3
269:2
**met**  221:8
**method**  229:14
230:2 233:10
293:18,18
**methodologies**
290:19 306:14
**methodology**
230:6 233:12
234:4,24 237:20
238:15 281:7
293:13 298:10
298:16,17,20,23
299:8,10,12,17
300:2,15,19,24
301:2 302:6,6,9
302:16,20 303:7
**methods**  280:9
**michael**  234:6
**michele**  208:11
213:18
**michigan**  230:9
231:6
**microphone**
228:7
**microscope**
281:10,11

**microscopes**
281:3
**microscopic**
309:25
**microscopist**
221:5 281:5,12
**microscopy**
282:6
**microtalc**  286:9
**middle**  222:22
**migration**
220:23
**million**  284:11
**mineral**  264:10
266:13,15
**minerals**  246:5,8
266:14
**miners**  271:2,2
**mines**  286:8
**minute**  272:15
**minutes**  272:9
282:18 283:7
304:5
**mirrors**  233:10
**mischaracterizes**
226:20 235:8
249:12 262:14
283:14 289:5
299:15 300:22
310:15
**misstates**  240:15
300:21 310:14
**mixed**  257:10
285:20 307:14
**mm**  311:3
**mmwr**  241:20
**mmwrs**  245:5

**moline**  206:7
208:5,10 211:6
212:1,2,6 213:1
213:19 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1,8
229:1 230:1
231:1 232:1
233:1 234:1
235:1,18 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1,25 244:1,3
244:21 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1,16
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1,6
268:1 269:1
270:1 271:1
272:1,6 273:1
274:1 275:1
276:1 277:1,23
278:1 279:1
280:1 281:1

282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1,11 293:1,4
294:1 295:1
296:1,21 297:1
297:24 298:1,8
299:1 300:1
301:1 302:1
303:1,16 304:1
304:15,18 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1,18 313:10
314:10 315:4,20
**moments**  295:3
**montana**  286:8
286:13 309:13
310:21
**month**  258:25
**months**  214:10
214:14 276:3
**morbidity**
208:12,13
242:23 244:20
244:23 258:21
266:3,25 267:4
**morning**  211:2
212:2,5
**mortality**  208:12
208:13 242:21
242:23 244:7,13
244:20,24
247:13,21 248:2
248:24 252:4,24

[mortality - objection]                                    Page 20

258:21 260:24
266:3,25 267:5
**motion** 297:11
**move** 215:5
**mpem** 215:12
217:3,6 219:2
222:24
**mt** 206:22
**mullins** 209:6
**multiple** 235:12
235:12 257:24
**multiplied**
248:10
**musk** 222:4
**mutations**
222:25 223:10
223:11
**muted** 297:12,16

**n**

**n** 208:2 209:2
210:2 211:20,20
221:16 222:3,3,3
222:6 260:6,6,18
308:13
**name** 211:11
212:4 218:19
221:8,13 234:5
242:11,17
298:16 300:7
302:8 308:12
315:3,4
**nanotubes**
266:16
**naturally** 264:10
266:13
**nauseam** 273:8

**naval** 249:22
**navy** 248:25
249:4,10,16
250:15
**necessary** 294:9
294:14
**need** 220:14
228:3 271:22
**nelson** 209:6
**neslemur** 206:11
**never** 221:8
281:15
**new** 206:2,22
209:4,4,14,14,23
210:5 211:9,21
257:13 277:7
302:18 313:4,5,9
**newark** 209:23
210:5
**nine** 218:2
263:23,25
**nitty** 262:21
**nomenclature**
239:2,2 262:4,6
**non** 266:11,15
**nose** 239:19
**notary** 206:18
211:21 313:8
314:17 315:21
315:24
**notations** 249:15
**notebook** 276:17
**noted** 211:14
271:5 312:22
**notes** 270:16
274:20,23
**notice** 304:3

**number** 211:9
213:8 214:23,23
215:2 217:9
220:6,21 223:7
223:23 224:6,8
227:21 228:18
235:3,22 236:9
237:9,23,25
238:10 241:11
241:12 243:6
244:19 245:10
245:13,14
246:25 247:7
248:5,7,9,9,11
248:13 249:22
254:7,24 255:2
260:10 266:6
268:9 272:25
273:11,18,22
275:3,10,13,15
275:18 282:16
282:17,18,21
283:6,25 284:4,6
285:13 293:12
293:20 294:3
299:6,18 304:25
305:9 310:25
312:18
**numbered** 237:8
**numbers** 215:21
268:7 277:19
296:16,17 301:6
**numerous**
259:23

**o**

**o** 211:20 222:3,6
222:6 260:6

**o'sullivan** 220:7
**oath** 207:9
**object** 235:14
238:17 257:7,14
281:17 284:17
291:11 294:13
296:20
**objection** 215:16
217:11 219:15
220:19 223:20
225:16 226:9,13
228:17 231:10
231:18 232:6
233:5 235:7
236:14 237:12
238:3,13 239:11
239:21 240:4,15
241:18 242:6
244:8 249:12
250:6,17 253:12
254:22 255:14
255:22 256:3,15
258:6 259:9
260:14 261:17
263:7 264:3
268:5,14 270:2,2
270:21 271:14
277:17 278:9
279:7,22 280:18
281:25 284:9
285:4 286:11
287:14,25
288:18 289:4,17
289:24 295:6
299:3,14,24
301:20 302:3
303:3 305:14,24
306:11,19

USCA4 Appeal: 23-1972   Doc: 26-2   Filed: 12/20/2023   Pg: 288 of 376

Case 4:22-mc-00001-AWA-DEM   Document 8-3   Filed 12/08/22   Page 51 of 62 PageID# 915

307:11 308:20
309:5,15 311:11
**objections**
207:12 231:23
**observed** 222:24
248:5
**obtaining** 220:2
220:3
**obviously**
303:20
**occasions** 272:25
289:8
**occupation**
248:7,10 252:2
252:14,14
253:10,15,19,24
254:16 258:2,9
**occupational**
217:7 222:7
226:7 230:10
231:8,16 232:10
253:4 255:20
266:11 268:17
269:5 270:9
271:11 293:25
**occupationally**
253:10
**occupations**
247:12 248:12
248:14,23
252:15,18,23
253:16 255:8,9
257:24 268:16
270:8 271:5
**occur** 216:24
269:9 294:6
**occurred** 225:10
234:12

**occurring**
264:10 266:13
**occurs** 216:19,20
219:4
**october** 215:2
313:21
**offer** 228:6
**officer** 207:8
**oh** 264:19
**okay** 212:3
227:19 235:18
235:20 263:6
266:5 293:4
296:23 297:10
297:24
**old** 260:7 288:7
296:6
**olsen** 222:3
**one's** 294:10
**ongoing** 266:10
**onset** 273:6
**ooo** 207:15
208:19 210:10
**opine** 282:23
**opinion** 212:24
213:3 216:23
217:14 223:6
224:16 225:5,13
225:23 229:4
235:9,11,13
262:8 279:15
280:19,25
283:11 287:3
289:2 290:7
296:11 301:23
304:19
**opinions** 229:17
229:24 236:23

274:14 276:24
277:6,12 279:19
303:23
**opportunity**
312:12
**opposed** 218:20
**oral** 206:6,17
**order** 287:21
294:10
**ore** 310:20,21
**original** 226:11
226:14,15,17,18
228:14,23
**originally**
230:15
**orleans** 257:13
**ounce** 284:10
**outcome** 313:19
**outline** 303:7
**outlined** 233:14
233:20 300:8,20
301:18,25
**outside** 257:15
258:7 282:2
285:4,10 306:11
**overall** 236:19
236:20 269:3
288:3 294:3
295:12
**overbroad**
219:16 223:21
251:13
**owned** 231:17,20
231:24 275:22
**ownership** 232:2
232:4,9

**p**

**p** 209:2,2 210:2
210:2 218:11
**p.c.** 210:3
**p.m.** 272:17,20
312:20,22
**p1-5418333**
315:2
**page** 208:4
214:17,18,22,22
214:23,25 215:5
217:18 218:25
220:5,5 222:22
227:21 229:9,11
229:23,23,24,25
229:25 235:21
242:13,15 245:8
250:25 259:20
263:16,23,25
266:8 268:7,24
280:5,7 284:19
315:5
**pages** 217:22
218:15 221:19
222:8 242:24
**palmolive** 209:7
307:3,6
**pang** 222:3
**paper** 212:17
226:22 230:7,25
233:15 245:19
259:12 261:12
264:17,18
265:17,18
266:19 269:21
269:22 270:5
283:18,18,19
298:22 305:18

305:25 306:4
307:23 308:5,6,7
**papers**  224:14
305:17 306:8
**paragraph**
241:10 251:24
**parameters**
218:14
**parents**  249:3,10
249:16 250:15
250:20
**parsing**  291:18
**part**  226:4
229:20 239:13
253:17 275:17
278:25 292:8
**particles**  266:15
**particular**
214:14,15,15,15
218:4 226:11
233:7 236:12,19
246:5 249:15
275:11 278:14
278:16 293:20
293:22 294:19
305:5 308:5
**particularly**
222:13
**parties**  207:5
211:15 304:3
313:17
**patented**  298:18
**pathological**
217:20 239:4
**pathology**
217:21 218:15
220:10,18
221:12 260:9

**patients**  217:5
218:14 219:11
220:9 223:2,15
**peer**  232:19,21
233:4 245:3,4,6
259:22
**peers**  232:23
**pending**  257:13
**people**  226:6
240:20 252:19
253:2 261:4
269:17,17
280:24 284:15
308:18
**people's**  224:9
**percent**  215:13
215:24 217:5
251:25 268:25
269:5 284:15
285:16
**percentage**
224:11 243:2
268:3 283:23
284:14,20
**percentages**
215:22 216:4
217:16 218:5
268:8
**perform**  293:14
294:9 295:17
299:5
**performed**
295:24
**performing**
293:8
**pericardial**
234:22

**peritoneal**
212:25 213:4
215:7,12,22
216:4,19 219:3,4
219:12,25
224:11,14,16,19
224:23 225:5,14
225:18,21,24
226:12,19,25
227:5 228:14,20
229:5,10,18
234:17,18,23
235:6,10 236:6
238:11,20,23
239:3,9 240:2,8
240:12,13,19,21
243:2 246:12
249:7 259:6
260:7 264:14
268:3 288:8
290:9,21,25
291:5,9,14
307:10,17,21
308:2,4
**peritoneum**
216:25 217:19
218:13 219:9
247:5
**persistent**
294:18
**person**  255:11
271:5 280:22,22
303:12
**person's**  294:11
**personnel**
249:16
**perspective**
294:9

**pertains**  272:5
**ph.d.**  221:5
**pharmaceutical**
262:9
**phase**  281:11
**phone**  304:17
**photograph**
208:14 277:21
277:25 278:4
**phrase**  236:18
265:15 270:5
291:19
**phrasing**  279:24
**physician**  234:3
**pick**  236:15
**picking**  218:19
**pinaud**  206:11
208:15 277:22
278:3
**pipe**  256:14
**place**  251:22
263:19
**places**  215:22
**placing**  251:3,18
**plaintiff**  206:4
209:3 256:7
288:24
**plaintiff's**  274:9
274:13 278:21
**plan**  292:9
**pleasant**  206:22
**please**  211:19
213:21 243:18
267:11,24 270:6
272:4 295:8
296:3 298:9
**pleura**  216:24
229:10

[pleural - put]                                                              Page 23

pleural  216:5,8
  216:20 217:3
  219:6,14 222:6
  223:2 234:18,22
  239:19 246:12
  247:5 307:17
  308:2,4
plm  281:3,5,24
pmr  247:20,23
  248:4
pmrs  248:15
point  228:8
  232:17 271:20
  271:21 276:9
  290:4
pointed  214:11
poisson  248:17
population
  215:25 226:12
  264:16
populations
  264:12
portions  214:11
posed  285:24
position  297:5
possible  250:14
  269:25 271:6,7
  288:16
possibly  219:7
  273:23
potential  251:4
  251:20 265:11
  265:16 266:11
  266:16
powder  241:6,8
  241:9 253:10
  262:5,10,10
  278:2 279:8

284:22 288:3
  294:22 296:9
  306:21
prefer  228:6
  272:8
preferences
  271:17,19
present  210:8
  234:10 235:4
  241:3
presented
  302:23
presumably
  239:6
presupposing
  287:15
prevention
  213:10 214:3
  242:23
previous  223:14
  223:17 260:8
previously  267:9
  267:14 269:11
  279:17 281:2
print  214:21
  215:6
printing  260:25
  261:7 262:12,16
prior  212:22
  224:2 232:6
priority  206:21
  211:13 315:1
probably  215:23
  221:22
proceed  304:11
proceeding
  211:16

process  232:21
  283:8
procter  209:22
produced  212:11
  212:22 256:13
  272:22
product  236:19
  273:2 275:11
  285:15 293:20
  293:22 307:4,6
  309:19
products  236:12
  259:24 261:6,9
  262:7 273:11,20
  275:4 295:21,25
  296:12 309:2
profession
  281:15
professional
  226:2 288:24
  289:14
project  208:14
  277:21 278:2
prolific  213:11
promotes  223:17
promoting  224:2
  224:3
pronounce
  260:19
properties  246:7
proportion
  248:11
proportionally
  222:20,24
proportionate
  247:13,21 248:2
  248:24 252:24

proportions
  223:10
protocol  236:10
  306:6
provide  274:9
  295:8
provided  273:5
  274:12 276:10
  276:11,12,13
  298:12
provides  303:12
public  206:18
  211:21 289:22
  289:22 313:8
  314:17 315:24
published  214:4
  216:3 218:2
  222:15 224:10
  224:13 228:13
  228:18 230:9
  231:7,14 233:3
  237:21 245:5
  259:22 283:2,5
  290:2 293:16,24
publishing
  231:25
puff  293:18
  306:23
pulmonary
  221:12
purely  216:16
purports  275:2,8
purpose  243:4
purposes  261:11
put  212:19
  255:16 259:18
  301:6 304:3

[puts - referenced]                                                      Page 24

**puts**  254:17

**q**

**question**  213:15
227:25 228:7
231:14 232:7
235:17,19,22
236:9 237:7,9,13
237:23,25
238:10 241:11
252:12 253:14
266:7 267:24
280:23 283:9
285:6,12,24
286:25 291:23
292:6 298:9
301:11,16,17
306:14 311:25
**questioning**
212:21 272:3
303:22
**questions**  222:18
229:7 233:16
234:8 236:17
237:17,22
267:12 274:12
274:16,22
288:19,20 289:8
292:2,7 293:7,12
297:20,21 298:2
298:3,3,4,6
301:8 302:13
303:4,11,21
304:17 311:24
312:4
**quick**  243:24
**quit**  265:24

**quiz**  281:9
**quotations**  246:7
**quote**  213:9
216:7,10 217:2,8
218:4 219:10
223:13 229:13
229:15 230:4,11
233:10,10 235:3
235:5,24 236:10
237:9,25 241:13
246:4,7,8 247:11
248:4 250:25
251:4,17,19,24
259:20,25
263:17,18 266:9
**quoted**  215:23

**r**

**r**  209:2 210:2
221:16,16,16
222:3 242:18
260:6 313:2
**race**  248:16
**range**  307:13
**ranges**  305:22
**rarely**  217:3
**rate**  247:2
300:25
**rates**  246:19
270:17
**ratio**  247:21
248:3
**ratios**  247:13
248:24 252:25
**raw**  309:2
**raymond**  209:23
**reach**  219:8

**read**  214:7,21
217:24,25 218:6
218:8,18,21
220:12,13
221:21 222:11
223:9 230:12
235:21,25 242:3
243:24 244:17
246:22 248:18
251:5,10 267:9
276:18 281:19
281:22 300:15
301:12 314:4
**reading**  230:23
279:25 297:11
**real**  298:4
**realize**  281:9
**really**  263:8
277:8 289:23
**reason**  278:17
315:5
**reasonable**
304:6,10
**reasons**  279:16
292:10
**recall**  212:18
214:9,16 215:17
218:21 223:9
226:22 243:4,5
243:14 249:14
249:24 258:25
259:5,8,10,11,11
268:8,23 275:23
293:10,11
298:13
**received**  212:7
212:14,17
213:19 244:21

267:5 276:19
277:22 311:5
**recess**  243:22
272:18
**recognize**  218:20
**recognized**
269:6
**recollection**
218:9,23 220:15
221:10 222:16
226:21 243:13
279:25 305:25
307:23 308:3
**record**  211:3,15
212:20 243:21
243:23 272:17
272:19 292:18
292:24 296:25
301:16 312:20
313:14
**recorded**  211:6
**records**  213:2
**refer**  239:15
**reference**  218:4
219:23 220:6
222:2 223:23
224:8 225:10,13
227:21 233:23
241:19,22,23
242:9 243:5,12
243:14 252:7
259:16 264:8
265:13,17,18
266:6,23 267:8
267:13 268:20
275:20 308:8
**referenced**
241:13,15 243:8

[referenced - respect]                                    Page 25

244:5 245:11
259:21 267:15
273:23 276:4
308:6
**references**
219:21 220:6
221:15 223:8
225:9 245:18,19
245:19 265:13
**referencing**
217:12 219:21
223:23 224:5,6
231:2 245:15
269:21 273:14
**referred**  229:11
**referring**  216:17
240:23,24 245:8
256:16 262:24
264:17 273:4,9
273:10 279:23
289:6
**refers**  266:18
**reflect**  277:5
286:22
**reflecting**  277:11
**refresh**  218:9
220:15
**regard**  295:24
**regarding**
283:12 293:8
**region**  222:13
**reid**  221:15
222:2
**reid's**  221:21
222:11
**relate**  243:9
**related**  219:22
224:12,17,20

226:23,25 227:4
227:6 229:24
233:14 240:5
241:10,12 269:2
275:12 294:12
306:25 313:16
**relates**  229:4
**relating**  220:18
226:12,18 229:7
240:11,19
270:25 275:15
**relaying**  310:2
**relevance**  239:21
**reliable**  301:19
**reliance**  242:13
242:14 244:4
308:11
**relied**  267:9
280:15 281:20
281:22
**relief**  260:22
**relies**  280:3
**rely**  224:15
225:4,13,23
286:20 290:7
297:8
**relying**  215:17
230:14 283:11
**remained**  278:20
**remember**
214:13 245:22
254:25 273:13
290:22 298:10
**remind**  271:25
**remote**  211:5,17
**remotely**  211:18
**renovation**
269:12

**repaired**  250:5,9
**repeat**  237:13,14
253:14 277:8
**rephrase**  284:5
**replicate**  306:18
306:21
**report**  208:12,13
223:3 225:2,3,11
225:11,12,17
227:8,10,11,13
228:9,25 229:3
229:16 230:23
236:23 241:21
242:23 244:5,21
244:24 245:8,9
254:13 256:12
258:20,21
259:14,15,18,20
260:12 263:13
263:16,19 264:5
264:9 266:3
267:2,5 272:21
272:22 274:2
275:20,24 276:2
276:4,5,7,19,22
276:23,25 277:2
277:5,10,14,25
279:3,25 280:2
280:12 281:20
281:22 282:3
283:8,10,15,21
284:13,19 288:6
288:7 289:14
290:6 308:6,9
310:5,7,22
**reported**  217:5
226:18

**reporter**  206:18
211:10,17,19
313:8
**reporting**  206:21
252:19 315:1
**reports**  240:12
240:20,24
280:11 289:25
300:16 302:14
**representative**
278:12
**representing**
211:12
**represents**
215:12
**required**  219:7
299:7 300:13
315:21
**research**  226:11
226:17,18
228:14,23
250:21 266:10
294:8
**researchers**
220:22
**reserve**  312:3,7
**reserved**  207:12
**reserving**  312:10
312:12
**residential**
221:18
**residents**  222:5
**resolve**  292:18
**respect**  214:12
220:20 223:9,25
236:9 245:21
250:11 283:3
293:16,24

[respect - screen]                                                              Page 26

310:22 311:15
**respective** 207:5
**response** 245:13
**responsiveness**
235:15 238:18
257:8 281:18
284:18 291:12
**resulted** 304:20
**results** 284:24
295:8
**resuspension**
269:13
**retained** 208:18
255:18,24 256:6
256:9,11 257:12
257:16,19,22,25
258:8 312:19
**review** 223:22
224:8 226:16
228:23 232:21
245:6
**reviewed** 245:3
245:4 259:22
278:11 280:11
**reviewer** 232:19
233:4
**reviewers**
232:25
**rf** 220:7
**right** 212:4
215:3 222:17
226:3,5,7 229:16
230:16 232:5
233:4,18 234:14
236:24 237:11
237:19,23 238:2
238:7,12,20,23
239:10,20

240:14,22
241:15,17 246:9
246:21 247:2,6
247:15 248:17
248:18,18,19,25
249:4 251:19
252:5,25 253:7
253:21 255:11
255:21,24 256:2
256:14 257:9,13
258:5,16 260:2
260:10,25
267:10 269:14
269:19 270:14
270:19 271:7
277:2,6 279:6,11
284:22 286:10
286:15,18 287:9
287:13,24 289:3
301:3 304:21,24
305:23 309:4
310:10 312:3
**rights** 312:7,10
312:12
**riley** 209:6
**rises** 216:14
**risk** 222:4 251:3
251:16,18,22
253:25 254:18
264:20 269:4
294:6 296:17
307:16,24 308:3
308:16 311:2
**risks** 266:17
**road** 209:17
**robert** 209:18
**rodelsperger**
224:22 264:15

264:16,19,23
307:12,14
**role** 271:7
290:16
**ron** 220:16
**rooms** 250:2
**route** 281:14
**routinely** 253:16
**rubric** 234:16,20
234:21,22
**rule** 250:13,14
271:24 272:12
**ruled** 303:7
**rules** 271:24
**ruling** 292:13
302:24
**running** 215:16
**russia** 262:15
**russian** 260:25
262:12,16
**rutkowski**
209:24 312:6,6

**s**

**s** 209:2,3,7,8,12
209:16,22 210:2
210:4,6 218:11
218:11,11 222:3
280:3 315:5
**sake** 220:3
**sam** 221:7
**sample** 278:24
282:12 283:10
305:23
**sampling** 282:9
**saw** 221:22
274:5 276:6
288:12

**saying** 228:3
240:10 272:14
299:11 310:18
**says** 215:6,10,11
219:2 220:6
222:19 229:13
230:23,24 233:3
233:20 234:7
238:5,8 241:12
246:4,10 247:4
248:4,19,20
251:17,20,24
260:3 261:5,9
268:22,24 280:3
280:9,15,16
284:13 305:22
309:21 310:10
**sc** 222:3
**scarborough**
209:6
**scenario** 309:8
**scenarios** 243:7
243:9 288:21
**scheduling**
271:17,19
**scientific** 213:9
214:2 282:22
290:6 298:21,24
311:15,18
**scope** 257:15
258:7 282:2
285:5,11 301:23
303:12 306:12
**screen** 213:21,24
227:17,18
229:13 244:6,9
265:25 278:5

[scribbled - speaks]                                          Page 27

| | | | |
|---|---|---|---|
| scribbled 274:20 274:23 | sentence 237:8 237:24 241:12 266:9 | shipyard 249:20 249:23 250:4,8 250:11,16,22 270:18 | size 267:24 small 214:21 223:7 |
| scroll 247:24 248:4 268:24 270:6 | sentences 237:8 separate 229:9 234:17,21 288:2 | shockingly 265:9 shorthand 206:18 313:7 | sole 233:4 solicited 303:24 somebody 242:3 265:24 308:25 |
| scrolling 252:10 se 236:20 sealing 207:6 searchable 227:15,16 | separated 243:15 september 206:19 211:4 215:2 313:11 | show 213:13,16 223:8 254:13 259:12 265:22 268:22 273:15 | 309:3 sorry 212:16 222:21 228:2 231:20 237:13 |
| second 240:16 section 225:18 225:20 229:3,6 | series 217:4 240:24 services 206:21 | 275:2,8 284:2,24 showed 254:7 shower 296:8,8 | 240:16 251:9 253:14 256:21 257:9 265:2 |
| see 214:22 215:3 215:8 217:8 218:8 219:21 225:12 227:10 232:24 233:11 241:11 244:9,12 245:25 252:9,15 265:18,19,19 266:2,8,24 278:4 284:23 292:16 309:18 | set 313:12,20 settings 234:13 258:4 269:8,10 settled 269:13 seven 272:2 291:22 292:9 303:25 sex 221:17 shaker 293:18 306:23 | showing 252:22 shown 213:25 214:9 294:18 shows 214:24 shulton 209:22 312:7 signature 313:23 signed 207:8,10 significantly 247:12 248:23 252:24 | 267:19 286:25 303:18 304:23 306:25 310:16 sort 216:11 sorts 281:14 source 234:25 237:5 265:11,16 269:25 sourcing 262:7 296:10 southeastern 308:17 |
| seeing 268:6 seek 292:21 seen 214:5 218:3 222:14 241:7,8 276:13 | share 213:22 265:25 shared 275:15 shares 216:8 sharing 259:17 | similar 233:12 246:9 300:14 similarities 216:8 simmons 209:2 | southern 206:2 211:8 sp 220:7 221:7 speak 221:24 |
| seer 268:7 segalla 209:21 seizure 252:11 selected 246:20 selikoff 224:19 225:25 226:2 seller 262:9 sense 274:24 301:22 | 265:25 266:24 sheet 315:1 ship 247:17 248:25 269:6 shipbuilding 252:3 ships 250:5,7,9 250:12 | 257:16 simple 293:23 single 304:8 sit 222:17 site 246:25 247:2 247:10 six 260:10 | 262:21 301:16 302:11 speaking 223:11 237:4 277:7 291:4 309:6 speaks 283:24 308:20 311:12 |

[specialist - summary]                                                    Page 28

specialist  211:12
specific  217:25
  218:7,23 221:10
  222:16 225:19
  233:11 236:5
  241:20 242:9
  255:6 259:11,16
  263:3,4 284:4,5
  290:11 291:18
  291:19 306:22
  308:7
specifically
  216:6,18 223:6
  224:13 225:18
  225:20 227:4,5
  229:9 239:23
  243:15 245:17
  249:14,24
  255:18 262:25
  270:4 285:23
  290:22 306:16
  306:17
specification
  291:6
specificity
  290:12
specified  248:6
specify  247:10
  295:23
spectroscopy
  282:7
speculation
  231:12,19
  232:13 233:6
  249:13 253:13
  255:15 258:17
  286:5 289:5
  301:21 302:4

306:12
spice  296:6
spinning  308:15
  311:2
spot  229:16
springs  209:17
ss  313:4
staats  218:11
stake  232:2,4
standard  293:25
standpoint  299:5
stands  247:23
  281:8
starting  229:21
  229:22
state  211:21
  233:9 252:6
  302:18 313:4,8
stated  235:12
  290:15 296:25
statement
  215:11 216:10
  216:11 223:4,5
  223:19 233:3,8
  235:21,25 236:4
  236:8 237:14
  242:25 251:7,9
  251:12,14 259:6
  259:19 261:5,7
  266:18 268:2
  311:8
statements
  250:24 268:11
states  206:2
  211:8 216:7
  217:2 223:13
  242:22 244:13
  247:15 249:4,10

251:25 270:18
  279:16
stating  217:14
  276:15
stationed  249:19
statistical  301:5
stefan  283:18
  305:16 306:4
stenographic
  211:15
steps  295:2
  298:21,25
  299:11 300:3,7
  300:19 301:3,18
  301:25
stipulate  211:16
stipulated  207:4
  207:11
stipulations
  207:2
stomach  239:10
  239:12,13,14,16
stop  266:24
  271:22 304:12
stopped  259:17
  295:11
street  209:8
stretch  243:18
strongly  280:25
studied  226:2
  264:13,14
studies  224:23
  283:4,5,15 286:2
  297:8 305:11
  307:19
study  217:20
  252:8 253:24
  264:16,21 271:4

283:11 306:10
  306:17 307:7
  308:17 311:3
su  280:3,6,15,16
  280:17
su's  280:7
subject  212:21
  245:6 297:6
  303:24
submitted  231:6
  298:22 302:14
subscribed
  314:12 315:21
subsequently
  289:19
substance
  234:11
substantially
  296:13
subtype  238:23
  238:24,25 239:3
  239:4
successful
  292:22
successor  206:10
  209:8
suffers  212:25
  238:20,21
sufficient  219:9
suggested
  271:11
suit  238:16
suite  209:8,17,23
summarizing
  224:9
summary  212:13
  212:15,21 273:5
  275:18

[supplemental - thackston]                                    Page 29

supplemental
  277:5,10,13
supplier  262:5
supported
  296:17
supporting
  223:15
supports  239:24
supposed  232:22
supreme  230:9
  231:7
sure  222:2,11
  243:19 256:15
  257:17 281:12
  291:19 292:3
  300:12
surgeries  223:14
  223:17 224:2
surprise  249:15
survival  218:14
swear  211:19
swearing  211:18
sweeping  269:14
  294:21
sworn  207:8,10
  211:21 313:12
  314:12 315:21

t

t  218:11,11
  222:6,6 313:2,2
tab  265:20,21
table  246:14,15
  246:15,17,18
  247:11,23,25
  248:22 252:13
  252:13,22,23
  253:20,22

take  260:4
  271:21 272:9,15
taken  206:18
  243:22 272:18
talc  229:22
  236:24 237:6
  238:11 239:25
  240:8,11,14,19
  240:22 243:10
  243:13 245:17
  245:18,19,20
  252:8 253:17
  259:24 261:4,5,6
  261:6,9,10,14,23
  261:23,24 262:3
  262:9,18,19
  263:4 264:24
  265:4,11,14
  266:21 269:24
  276:16 278:3,20
  282:15,25
  283:13 285:17
  285:18 286:3,8
  286:13,14,17,24
  287:4,5,13,15,17
  287:18,19,20,23
  287:24 288:4,16
  288:22,25 289:2
  289:9,15,22,23
  290:8,16 291:16
  294:25 305:21
  309:4,9,13
talcum  241:6,7,9
  253:10 262:5,10
  262:10 278:2
  284:22 294:22
  296:9

talk  224:23
  255:7 264:7
  265:15 286:2
  290:13 291:7
talked  224:7,24
  273:6 293:9
  306:4
talking  223:24
  227:23 243:11
  244:4 245:12
  246:16 256:19
  258:21,22
  259:19 264:18
  264:20 270:7
  273:16 275:7,7
  299:17 308:25
talks  245:20
  246:24 255:4
  290:20 291:13
tasks  249:17
taylor  231:25
telephone
  297:19
tell  232:25 253:5
  257:3,4 273:15
  282:4 286:20
  302:8
telling  253:2
ten  215:24
term  236:10,11
  236:23 239:5,17
  246:4,8 263:9,12
  263:20 281:4,6
  310:5
terminate
  311:24
terminology
  245:22

terms  215:21
  236:18 263:24
  282:16 284:12
  284:14 290:18
  300:8 301:23
test  245:10
  275:20 276:7
  277:25 284:6
  307:5
tested  275:25
  277:16
testified  211:22
  267:9 278:16
  279:17 288:14
  288:20,23 295:2
  302:12
testimony
  212:13,15
  254:15 261:3
  273:5 275:18
  278:11 281:19
  292:23 303:16
  304:19 307:18
  312:17 313:14
  314:5
testing  276:17
  276:25 290:19
tests  277:6 282:9
  285:14,20
texas  209:18
  300:13 302:7,9
  302:13,15
  303:10
text  266:8
textbook  221:12
textiles  308:24
thackston  208:5
  209:18 211:24

213:21 214:12
215:19 221:23
227:24 228:3
235:14 238:17
256:17 257:7
265:24 267:3
272:14 277:8,18
281:17 284:17
291:11,25 292:5
292:12 294:13
295:6 296:15,25
297:3,5 303:17
303:20 304:11
304:14,16
310:24 311:23
312:13
**thank** 214:23
222:23 295:17
302:17 303:14
312:7
**thanks** 215:20
296:21 312:10
**theory** 223:15
**therapy** 213:10
214:3 217:21
**thermal** 226:3
**thing** 255:6
274:21
**things** 214:13
261:11 294:17
**think** 215:21,24
219:17,18,24
220:21,24 221:4
221:5 223:6
224:18,22,24
225:19 228:22
232:2 233:24
236:16,17

240:23 254:6
257:2,11 260:23
261:19 288:12
289:6 292:7,17
292:20 296:21
296:25 300:6,18
301:22 303:24
304:6,9 306:3
310:25 311:14
**thinking** 228:19
236:18
**third** 305:19
**thought** 245:17
279:14 283:22
299:10 303:21
**three** 214:6
234:11 241:12
243:6 245:14
268:25 272:9
283:16,17
285:25 304:4
305:11 306:7
312:19
**time** 207:13
211:4 214:15
215:25 231:17
247:4 249:21
255:11,17
258:14 270:8
272:8,11,13
275:23 276:6
284:2 286:21
287:18 288:5,8
288:10 292:7,16
292:19 293:21
297:6,25 299:18
299:21 304:18
311:21 312:5,21

312:22
**times** 224:25
235:12 288:15
301:2,3,6
**tires** 261:12
**tissue** 220:2,3,8
241:2
**title** 230:25
242:19,21
244:17 246:22
308:14
**titled** 213:9
214:2 247:11
**today** 211:12
256:19 290:15
292:4,6,18
293:10 304:4
**today's** 273:7
303:15 312:17
**told** 249:8 255:8
278:15 305:12
**top** 213:14
**topic** 226:23
**total** 248:9,13
312:18
**toweling** 294:21
**toxic** 234:9
**trace** 239:25
243:9 284:7,12
284:16 287:12
287:22 305:21
309:3,12
**trademarked**
298:18
**trailing** 221:24
**training** 294:8
**transcript**
206:16 313:13

314:4
**traveler** 275:24
**treated** 217:20
**tremolite** 260:9
**trial** 207:13
302:22
**true** 231:9
313:14 314:5
**try** 242:4 250:13
**trying** 310:17
**tumor** 235:2
**tumors** 217:20
**tunica** 234:22
**turn** 228:3
**turned** 278:21
**two** 223:23
224:6,8 234:9
235:3,22 236:9
237:9,23,25
238:10 241:11
243:25 245:10
245:15 247:11
248:22 252:13
252:23 253:20
283:16 286:12
292:23 297:18
299:16 307:19
**type** 241:6 263:4
263:4 277:4
307:2
**typed** 274:22
**types** 236:5
264:7 285:21
288:21
**typically** 241:7
247:23 249:17

[u - whittaker]                                                          Page 31

**u**

u  211:20 218:11
  242:18 260:18
  260:18 280:3
u.s.  248:25
ultrastructural
  220:9
unaware  285:23
underrepresent...
  294:16
understand
  225:7 261:14
  263:6,8 310:13
  310:17
understanding
  231:11,24
  262:17 272:7
  286:12 296:24
  302:5 303:10
  307:25 311:7
understands
  239:16
unfortunately
  282:3
unique  215:7
  216:9,13,16
unit  211:5
united  206:2
  211:8 242:21
  244:13 249:4,10
units  304:24
  312:18
unmute  297:15
unresponsive
  235:16
unspecified
  247:8

update  268:7
updated  254:5
  254:23 255:3
upper  239:13
usage  294:19
  306:21,22
use  236:11,16
  238:25 239:2,5
  245:14 263:10
  270:4,5 286:24
  289:10 293:22
  296:9,9 299:8
  304:20 310:5
useful  246:6
uses  300:7,19
usually  219:5,12
  239:17 301:7
utilize  295:3

**v**

v  315:3
vacuuming
  294:22
vaginalis  234:22
vague  223:20
  236:17 251:13
  256:3 258:18
  259:9 268:14
  288:18 289:5
vaguely  218:5
value  293:17
varies  215:24
variety  216:2
various  275:4
  282:5 283:4,5
vary  215:21
verified  302:2

verify  247:24
veritext  211:13
  312:19 315:1
vernacular
  239:15
versed  220:25
versus  211:7
  216:5 226:17
  229:10 262:23
  309:12,20
video  211:6,11
  211:17
videoconference
  206:5,16
videographer
  210:9 211:2,25
  213:23 243:20
  243:23 272:16
  272:19 297:3
  303:15,18
  312:15
videotaped
  206:6,17
view  214:24
  238:14
vintage  277:15
  278:7
virginia  250:22
vol  315:4,20
volume  206:15
  212:23 214:25
  217:21 218:15
  220:10 221:19
  222:8 228:3
  242:24 243:25
  260:9 273:8

**w**

w  222:6
wait  235:19
  292:12
waived  207:7
want  215:10
  227:23 238:25
  259:12 260:19
  281:13 284:3
  291:23 303:5
way  214:21
  236:22 278:19
  279:2,20 282:25
  292:8 313:18
we've  243:17
  304:4
wearing  294:24
week  274:7,8
weekly  208:12
  208:13 242:23
  244:21,24
  258:21 266:3,25
  267:5
welch  224:21
  228:11,11,12,13
  228:24 230:6
  231:13 233:15
  234:7 237:21
  245:10,14 291:3
  299:11
went  249:6
  273:24 274:17
  295:20
west  206:22
whereof  313:20
white  282:4
whittaker  210:4

**[withdraw - zoomed]**                                             Page 32

**withdraw**  283:9
**witness**  206:17
    208:4 211:18,19
    227:25 228:6
    235:20 272:7
    280:19 289:12
    313:11,15,20
    314:1 315:4
**wittenoom**  222:6
**women**  217:6
    260:24 268:10
    269:3,8 270:18
**woods**  302:21
**word**  236:15,16
    260:4 261:8
    284:23
**words**  266:22
**work**  217:25
    218:6,18 221:21
    222:12 224:9
    250:15 269:2,9
    271:6 280:3,15
    297:13
**worked**  256:14
    258:3,9 308:19
**worker**  254:17
**workers**  222:5
    224:24 251:2,15
    251:17 253:6
**working**  249:25
    269:6 308:23
**workplace**  309:9
**worth**  304:5
**wrap**  272:11
**written**  220:21
    222:12 225:20
    256:12

**wrong**  277:20
    280:16 301:2,6
**wrote**  217:10,12
    234:3 248:21
    261:8 269:15
    275:24 289:13

|  x  |
| :---: |
| **x**  206:3,13 208:2 |

|  y  |
| :---: |

**y**  221:16 260:18
**year**  248:15
    254:7 258:23
    260:7 282:21
    288:7 290:23
    294:2,3 305:2,2
**years**  214:6
    218:2,22 220:14
    221:9,22 222:15
    232:25 246:20
    249:22 288:24
    289:14 290:18
    293:25 295:13
    295:15,16,22
    296:5,5,6,7,10
    307:16,20
**yesterday**
    257:11
**york**  206:2 209:4
    209:4,14,14
    211:9,22 302:18
    313:4,5,9
**yorker**  277:7

|  z  |
| :---: |

**z**  242:18
**zeolites**  266:14
**zero**  307:13,15

**zoom**  206:5,16
**zoomed**  244:17

# Exhibit

Page 1

```
 1
 2                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 3               CASE NO:  1:20-cv-05589-GBD-DCF
 4    --------------------------------------------------x
      BRIAN JOSEPH GREF,                                )
 5                              Plaintiff               )
                                                        )
 6            -versus-                                  )
                                                        )
 7    AMERICAN INTERNATIONAL INDUSTRIES, individually and  )
      as successor-in-interest for the CLUBMAN BRAND, and  )
 8    To THE NESLEMUR COMPANY and PINAUD COMPANY, et al.,  )
                                Defendants.             )
 9    --------------------------------------------------x
10
11                TRANSCRIPT of the Virtual Videotaped
12    Deposition of the witness, JACQUELINE MOLINE, MD,
13    taken  by Defendant, called for Oral Examination in
14    the above-captioned matter, said deposition being
15    taken pursuant to Federal Rules of Civil Procedure
16    by and before,  ELEANOR SEKULIC, a Notary Public on
17    Wednesday, July 6, 2022, commencing at 11:16 a.m.
18
19
20
21
                    PRIORITY-ONE COURT REPORTING, INC.
22        290 West Mount Pleasant Avenue, Suite 2260
                    Livingston, New Jersey  07039
23                       (718) 983-1234
24
25    Job Number:  5276089
```

Page 138

1               Jacqueline Moline, MD - Direct

2   Q.     Okay.   The rest of it is the title of paper.

3      Is that what I left out?

4              MR. DIMUZIO:   Objection to form.

5   A.     And when it was published and where it was

6      published, but, yes.

7   Q.     Okay.

8      So let's go through the steps real quick, if

9      we can.   The first step is, was the person exposed

10     to a toxin?   And, for you, the toxin would be

11     whatever the carcinogenic agent would be, right?

12   A.     Correct.

13   Q.     And --

14   A.     Or -- no, it doesn't have to be -- it doesn't

15     have to be carcinogen.   It's a toxin.   Someone could

16     develop liver fibrosis if they're exposed to a toxic

17     agent.   So it doesn't say carcinogen anywhere there.

18   Q.     So it doesn't need to be a carcinogen to be

19     here?   Or no?   When we're talking about Mr. Gref and

20     your opinion in this case, does it have to be a

21     carcinogen?

22              MR. DIMUZIO:   Objection.   Form.

23     Vague and ambiguous.

24   A.     Well, in this particular instance I'm talking

25     about asbestos, which is a carcinogen.   But my point

1                    Jacqueline Moline, MD - Direct

2         is, this is a methodology that can be used for

3         non-carcinogenic toxins or toxicants as well.  And

4         it doesn't say was the individual exposed to a

5         carcinogen?  It says were they exposed to a toxic

6         agent?  Not all toxicities are cancers.  That was my

7         point.

8     Q.      Okay.

9     A.      You were inferring something that is not

10        stated in the words on the page.

11    Q.      I just wanted to know if you believe that in

12        order to be a toxin, for purposes of this case, it

13        has to be carcinogenic?

14                    MR. DIMUZIO:  Objection.  Form.

15        Vague and ambiguous.  And asked and answered.

16    A.      For the purpose of this case, we're talking

17        about asbestos in mesothelioma.  Mesothelioma is a

18        cancer.  So, in this particular instance, the toxin

19        has to be carcinogenic but it doesn't imply that

20        this methodology can only be used for a carcinogen.

21    Q.      All right.

22            Step 2, does the toxin cause the disease that

23        the person has?  And then the cancer that the person

24        has in this instance is peritoneal mesothelioma; is

25        that right?

```
                                            Page 140
 1                    Jacqueline Moline, MD - Direct
 2      A.      Correct.
 3      Q.      You indicate that there's no dispute in the
 4         medical literature but you don't cite any particular
 5         medical literature.  Is there any particular medical
 6         literature that you would cite with respect to
 7         peritoneal mesothelioma?
 8      A.      I mean, I talked about Kradin, I talked about
 9         the Welch paper.  I can point you to occupational
10         medicine textbooks by Rohm and others.  And it's
11         widely accepted in the occupational and
12         environmental literature that mesothelioma, both
13         peritoneal and pleura, as well as in CDC documents
14         and -- it's just widely accepted.
15      Q.      All right.
16              Number 3, was the person exposed to the toxin
17         at a level where the injury has occurred in other
18         settings?  And then you mention that there's
19         analogous exposure scenarios, your phrase.  And then
20         you reference Footnote 2 on the bottom of 21.  Let
21         me get to it.  That references a number of different
22         articles and studies.  Do you see that on the bottom
23         of Page 21?
24      A.      Yes.
25      Q.      And that's what you're talking about, those
```

```
 1                 Jacqueline Moline, MD - Direct
 2        references in Footnote 2 that are "analogous
 3        exposure scenarios"?
 4        A.      With respect to talc, yes.
 5        Q.      All right.
 6                So, for any of those listed, and you have
 7        there -- first of all, "recently" -- you say in the
 8        body of Page 21, "As described above and recently
 9        referenced by the Centers For Disease Control, as
10        well as the published -- as well as published in
11        peer reviewed literature."  "Referenced by the
12        Centers for Disease Control," what's that reference
13        to?  Is that the 2017 Mazurek?
14        A.      Yes.
15        Q.      That is, okay.
16                So, and then, in Footnote 2 there you mention
17        '94 Andrion, A-N-D-R-I-O-N, a number of different --
18        the 1992 Bulbulyan, B-U-L-B-U-L-Y-A-N, 2012
19        Finkelstein, 2001 Ghio, G-H-I-O, the 2005 Fujiwara,
20        F-U-J-I-W-A-R-A, 2015 Ilgren, 1988 Lamb, 2017
21        Mirabelli, M-I-R-A-B-E-L-L-I, the 2009 Musti,
22        M-U-S-T-I, 2020 Dr. Moline, and 2020 Emory.  Those
23        you're saying are analogous exposure scenarios,
24        right?
25                          MR. DIMUZIO:  Objection.  Form.
```

```
 1                  Jacqueline Moline, MD - Direct
 2      A.      In the sense that they were mesotheliomas
 3          which arose after exposure to talc.
 4      Q.      Okay.
 5              Which one of those are, if we can just narrow
 6          it down, are peritoneal mesotheliomas?
 7      A.      Well, Andrion says it in the title.  I don't
 8          remember whether Bulbulyan was pleural or
 9          peritoneal.  The pleurodesis was talking about
10          pleural effusions.  Fujiwara is talking about
11          pericardial.  I don't think Ilgren specified.  Lamb,
12          I believe it was a pleural.  Mirabelli, I believe it
13          was a pleural.  Musti, I believe it was a
14          peritoneal, in the paper that I cited, it was both
15          pleural and peritoneal, as was Emory both pleural
16          and peritoneal.
17      Q.      All right.
18              The Andrion was a case report based on a
19          mother's description to the author, right, a single
20          case?
21      A.      Correct.
22      Q.      And we don't have any information as to the
23          type of product he says he used, or the mother says
24          he used?
25      A.      Correct.
```

Page 143

1          Jacqueline Moline, MD - Direct

2     Q.     And there's no specific cumulative dose or

3          product specific dose as to the particular

4          individual in the Andrion study?

5     A.     Correct.

6     Q.     And the same would go for Musti, there's no

7          particular cumulative dose specified or product

8          specific dose or information about a product that we

9          could investigate or look into, right?

10                    MR. DIMUZIO:  Objection.  Form.

11    A.     Not that I'm aware.

12    Q.     And with respect to your case series and Dr.

13         Emory's case series, is there anything that you can

14         provide us with that would allow us to compare

15         either the cumulative doses of those individuals for

16         their lifetime for all sources or any product

17         specific dose for any of those individuals?

18                    MR. DIMUZIO:  Objection.  Form.

19    A.     In would be in the paper I wrote, it just has

20         the number of years of exposure and the different

21         products they used.  In terms of Emory, I don't

22         remember if they specified the products.

23    Q.     I'm sorry.  Were you finished?  I'm sorry.

24    A.     Yes.

25    Q.     But there's no specific data that we can look

Page 144

1                    Jacqueline Moline, MD - Direct

2        at to compare their lifetime cumulative asbestos

3        exposure from all sources of any the individuals

4        that you reported on in your article, right?

5                         MR. DIMUZIO:  Objection.  Form.

6        And asked and answered.

7    A.      There's the number of years that they used

8        talcum powders.  That's it.

9    Q.      That's not what I'm asking.  I'm trying to

10       understand if we know if they are -- if we have

11       information that we can look at to show what else

12       they could have -- I'm sorry -- what actual asbestos

13       exposures they could have had during their lifetime

14       if they had asbestos-related cancers?

15   A.      There's nothing specified in my paper or in

16       Emory's that would allow you to do that.

17   Q.      And there's nothing in either of those two

18       papers that would allow us to compare and contrast

19       what Mr. Gref says or claims he used versus what any

20       of the individuals that are summarized in either of

21       your two articles or reports, right, there's nothing

22       that we can look at to compare exposure claims?

23                       MR. DIMUZIO:  Objection.  Form.

24   A.      You could look at the different -- the years

25       of use, and you could look at the latency, and you

```
 1                    Jacqueline Moline, MD - Direct
 2          could look at the location and the different brands
 3          in my paper.  I can't speak to Emory.
 4      Q.     Well, we can't look at anything that would
 5          estimate or attempt to estimate the alleged product
 6          contents or the dose of any particular individual
 7          and then compare it against Mr. Gref, right?
 8                         MR. DIMUZIO:  Objection.  Form.
 9      A.     That wasn't the purpose of the paper.  I don't
10          know how you would do that.  I don't know how you do
11          that in any paper, actually.
12      Q.     Okay.
13          So step four is whether other explanations for
14          the condition have been excluded.  Why is that step
15          important?
16      A.     Again, because this was a general causation,
17          you look to see if there could be other reasons that
18          someone has the disease.  And because -- they were
19          duplicative or super additive, or there could have
20          been another reason why they had a particular
21          disease in general.  And so, you look at that in the
22          same way that you look at someone with heart
23          disease.  You would say do they have diabetes and
24          hypertension?  They could both contribute.
25      Q.     So, when you asked yourself that question, if
```

1                    Jacqueline Moline, MD - Cross

2       Q.      Well, you mainly read and rely upon Dr.

3         Longo's testing and his reports, correct?

4       A.      No, I wouldn't say that.  I rely on Dr.

5         Compton's reports, as well as others.

6       Q.      I understand.  But you rely on -- you rely on

7         both Dr. Compton and Dr. Longo's reports as

8         presented to you by Plaintiff's counsel, right?

9                         MR. DIMUZIO:  Objection to form.

10        Asked and answered.

11      A.      I have relied on both of their reports, yes.

12      Q.      And if --

13                        MR. DIMUZIO:  Counsel, it's 4:59.

14        I think Dr. Moline has got to go.  We can make some

15        statements about reserving rights and that sort of

16        thing.  But I think it's about time for the depo to

17        end, given her time commitment.

18                        MR. THACKSTON:  Well, let me just

19        ask one last question.

20      Q.      If you assume for me Dr. Compton said he found

21        anthophyllite in those six samples and Dr. Longo

22        says there are no amphiboles in those six samples,

23        who do you rely on?

24                        MR. DIMUZIO:  Objection.  Form.

25        Incomplete hypothetical.  Lack of foundation.

Page 203

                    Jacqueline Moline, MD - Cross

1

2    A.      Again, I'm going to have to look at both of

3           the reports and probably have a discussion with them

4           to figure out why there's a discrepancy.

5    Q.      Okay.

6            Doctor, we certainly hold open the deposition

7           to continue it at another time.  Thank you very much

8           for your time today.

9                       THE VIDEOGRAPHER:  We are off the

10          record at 5 p.m., and this concludes today's

11          testimony given by Dr. Jacqueline Moline.  The total

12          number of media units used is five and will be

13          retained by Priority-One, a Veritext company.

14          Thanks everybody.

15                       (Deposition Adjourned.

16                        Time Noted:  5:00 p.m.)

17

18

19

20

21

22

23

24

25

Page 204

A C K N O W L E D G E M E N T

STATE OF

COUNTY OF

I, the undersigned, hereby certify that
I have read the transcript of my testimony taken
under oath in my deposition; that the transcript is
a true and complete and correct record of my
testimony, and that the answers on the record as
given by me are true and correct.


_____

JACQUELINE MOLINE, MD


Signed and subscribed to and before me
This _____ day of _____, 2022


_____

NOTARY PUBLIC

Page 205

1

2                    C E R T I F I C A T E

3          STATE OF NEW YORK      )

4          COUNTY OF NEW YORK     )

5

6              I, ELEANOR SEKULIC, a Notary Public of the

7      State of New York, do hereby certify that the

8      foregoing deposition of JACQUELINE MOLINE, MD was

9      taken by and before me on July 6, 2022.

10             The said witness was duly sworn before the

11     commencement of her testimony, the said testimony

12     was taken stenographically by myself and then

13     transcribed.  The within transcript is a true record

14     of the said deposition.

15             I am not connected by blood or marriage with

16     any of the said parties, nor interested directly or

17     indirectly in the matter in controversy, nor am I in

18     the employ of any of the Counsel.

19

20     DATED:_____

21

22     _____

23     ELEANOR SEKULIC

24

25

# Exhibit

Page 1

1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
2
                Case No. 1:20-CV-05589-GBD-DCF
3
4    BRIAN JOSEPH GREF,
5          Plaintiff,
     V.
6
     AMERICAN INTERNATIONAL INDUSTRIES,
7    Individually and as successor-in-interest
     for the CLUBMAN BRAND, and to THE
8    NESLEMUR COMPANY and PINAUD COMPANY, et
     al.,
9          Defendants.
10   _____/
11
12
13            REMOTE VIDEOTAPED DEPOSITION OF
14              MURRAY M. FINKELSTEIN, MD PhD
15                   Pages 1 - 199
16
                  Wednesday, June 22, 2022
17                 9:01 a.m. - 3:09 p.m.
18
19
20     REPORTED BY:  Beverly Bourlier James, RPR, CRR, FPR
21
22
23
24
25     Job Number: 5279955

Page 66

1          A.     Yes.

2          Q.     Introduction says that, "Pulmonary

3     deposition, clearance, alteration (leaching and

4     splitting) and translocation of mineral fibers play

5     important roles in determining the sites and severity

6     of disease caused by these fibers.  In this report,

7     we review some of our recent findings on the fate of

8     inhaled chrysotile asbestos in the lungs of rats."

9                Do you recall ever reading that before,

10    Doctor?

11         A.     No.

12         Q.     Let me ask you whether you agree with this

13    conclusion.  It says that, "In our model, inhaled

14    asbestos fibers are deposited largely at first

15    alveolar duct bifurcations, many of which are within

16    a few hundred microns of visceral pleura.  The

17    deposited fibers include many greater than 16 microns

18    in length and less than 1 micron in diameter within

19    the range considered most pathogenic."

20                Do you have any reason to disagree with

21    those conclusions?

22         A.     No.

23         Q.     "These fibers are cleared -- " then it

24    continues, "These fibers are cleared slowly, if at

25    all.  Long chrysotile fibers undergo longitudinal

Page 67

1    splitting in the lung so that their number actually

2    increases over time, possibly increasing their

3    potential for biologic effects.  Even though

4    extensive splitting of chrysotile fibers occurs, we

5    have not observed substantial leaching of the

6    magnesium from chrysotile fibers up to 30 days after

7    deposition.  Translocation of chrysotile from deep

8    parenchymal regions toward the subpleural regions of

9    the lung does not occur in our model.  Extensive

10   translocation, however, may not be necessary for the

11   development of asbestos-related pleural disease."

12           Any reason to disagree with any of those

13   conclusions, Doctor?

14       A.    No.

15       Q.    Do you know the maximum length of a fiber

16   that a lung macrophage can engulf?

17       A.    I do not.

18       Q.    Do you know there are those that studied

19   and published on that?

20       A.    I imagine it's been investigated, yes.

21       Q.    Now, one of the articles you cite is from

22   Dr. Emory and others where they look at lung

23   pathology.  Do you recall that?

24       A.    Yes.

25       Q.    Are you familiar with an article by

Page 68

1    Dr. Moline and Gordon from 2019-2020 purporting to

2    report on 33 cases of people that they said were only

3    exposed to asbestos potentially from cosmetic talc?

4         A.    Yes.

5         Q.    Is there any reason why you don't rely on

6    that article?

7         A.    I do; I rely on it for the results of the

8    tissue analysis.

9         Q.    Is the Moline article cited in your paper?

10        A.    I don't know.  Probably not.

11        Q.    In the -- so, for those two articles, were

12   they -- it's your understanding that -- first of all,

13   Drs. Moline and Emory both have served as experts for

14   Plaintiffs in asbestos and talc litigation?

15        A.    I know only about Dr. Moline and she has,

16   yes.

17        Q.    And she's their expert witness -- do you

18   know Dr. Holstein?

19        A.    I know of Dr. Holstein.

20        Q.    Dr. Moline has been an expert witness

21   basically since she started practicing medicine.  Do

22   you know that?

23             MR. DiMUZIO:  Object to the form.

24             THE WITNESS:  No, I don't.

25

Page 69

1    BY MR. THACKSTON:
2        Q.    And, so, for these articles that you -- did
3    you read Dr. Moline's article in the journal in which
4    it was published?
5        A.    Yes.
6        Q.    Do you know what journal that was?
7        A.    I can look it up.
8              Why don't you make a suggestion and I'll
9    see --
10       Q.    I think it's the Journal of Occupational
11   and Environmental Medicine.
12       A.    Okay.  That sounds plausible.
13       Q.    Okay.  Close enough.
14             You don't have any information about the
15   peer-reviewed process, if any, of that particular
16   article, do you?
17       A.    Of course not; it's confidential.
18       Q.    And would you agree that peer review can be
19   very thorough or it can be very shoddy?
20             MR. DiMUZIO:  Objection, form.
21             THE WITNESS:  That seems like a statement
22         which would be difficult to investigate.
23   BY MR. THACKSTON:
24       Q.    When you read Dr. Moline's article -- first
25   of all, she makes statements -- she makes

Page 194

1      A.      Well, that's what you get when you use

2    SAED.

3      Q.      Okay.  Well, do you know what diffraction

4    patterns are?

5      A.      Yes.

6      Q.      Diffraction patterns don't tell you peaks

7    of elements, do they?

8      A.      No, but the diffraction pattern is

9    composed of peaks of elements.

10      Q.      Do you know what lookup chart they used to

11    see if the diffraction patterns matched the

12    diffraction patterns of certain minerals?

13      A.      I do not.

14      Q.      And do you know whether the lookup charts

15    include all minerals, diffraction patterns for all

16    minerals or just diffraction patterns for certain

17    amphiboles?

18      A.      I don't know.

19            MR. DiMUZIO:  Objection to form.

20            THE WITNESS:  You'd have to Dr. Compton.

21    I don't know.

22    BY MR. THACKSTON:

23      Q.      I think you have said before that you are

24    aware that when you look at the elemental peaks for

25    different substances, that you cannot distinguish

Page 195

1    talc from anthophyllite by looking at their elemental

2    peak; do you recall that?

3        A.    No.

4        Q.    Would you agree that the EDS profile would

5    be the same for talc and anthophyllite?

6        A.    No.

7        Q.    Do you know how it would be different?

8        A.    No.  I don't do that work.

9        Q.    Okay.  So you don't know one way or the

10   other whether they would be the same or different?

11           MR. DiMUZIO:  Objection to form.

12   BY MR. THACKSTON:

13       Q.    Is that a yes?

14       A.    That is correct; I don't do that work.

15           MR. THACKSTON:  Okay.  Well, subject to

16       our exhibits making sense, I think that's all I

17       have, Doctor.  I just would like to be able to get

18       back on the record and make sure that we've got

19       the exhibits all numbered properly, if we don't.

20       So I wouldn't close the record just yet, but we

21       can go off the video record, if that's okay with

22       you.

23           MR. DiMUZIO:  Yeah.  Just again, we're

24       going to reserve read and sign and I guess that's

25       it.

Page 196

1              MR. THACKSTON:  Doctor, nice to meet you.

2      Thank you very much.  I'm glad you enjoyed Chapel

3      Hill; always good to go back.

4              THE WITNESS:  Well, you know, the weather

5      outside today here in Toronto is sort of Chapel

6      Hill-like.

7              THE VIDEOGRAPHER:  The time is 3:09.

8      We're going off the video record.

9              (The deposition was concluded at

10     approximately 3:09 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 197

1         I have read the foregoing transcript of my

2    testimony and find it to be true and accurate to the

3    best of my knowledge and belief.

4

5    _____

     MURRAY M. FINKELSTEIN, MD PhD

6

7

     Sworn to and Subscribed before me this _____ day of

8

     _____, 20_____

9

10

     _____

11      Notary Public

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN  DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES

Case No. 4:22-mc-00001-AWA-DEM

Related Case: S.D.N.Y.: 1:20-cv-5589-GBD

### SUPPLEMENTAL DECLARATION OF DR. THERESA S. EMORY, MD

Dr. Theresa S. Emory, MD hereby declares under penalty of perjury as follows:

1.      I am over the age of eighteen and am competent to make this Declaration. I have personal knowledge of the matters set forth below.

2.      I am an Officer at Peninsula Pathology Associates PC ("Peninsula"), and a board-certified physician in anatomic and clinical pathology. I submit this Supplemental Declaration in support of Peninsula's Motion to Quash the subpoena issued by American International Industries ("AII") in connection with *Gref v. Am. Int'l Indus., et al.*, 1:20-cv-5589 (S.D.N.Y.).

3.      As I previously attested, I co-authored a peer-reviewed article entitled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," which was subsequently published in March 2020 in the American Journal of Industrial Medicine (the "Article"). I subsequently authored a Letter to the Editor of the American Journal of Industrial Medicine which addressed comments on the Article, attached hereto as **Attachment A**.

1

# JA903

4.      I maintain a full-time medical practice at Peninsula, where I serve upwards of 100 patients per day by reviewing pathology material and rendering an opinion as to the causation of the patient's disease. I typically spend approximately ten hours per day, five days per week on patient care. I also serve as the Medical Director of two acute care hospital laboratories at Riverside Walter Reed Hospital and Riverside Doctors Hospital Williamsburg.

5.      In addition to my medical practice, I provide medical-legal consultation services in asbestos-related litigation and medical malpractice cases. These medical-legal consultation services account for less than 10% of my professional duties and comprise a small component of my overall income.

6.      If Peninsula is ordered to search for and produce documents in response to the Subpoena, I would be forced to take significant time away from my medical practice to comply with it. Peninsula does not have any staff or administrative personnel that assist with collecting and reviewing litigation-related documents; I do all of that work on my litigation cases myself. Because Dr. Maddox is a retired Partner and part-time employee, I am the sole Peninsula staff member who would be tasked with responding to and complying with the Subpoena.

7.      While it is difficult for me to even begin to anticipate how many hours would be required to respond to the Subpoena, my best estimate is that it would require me to divert hundreds if not thousands of hours away from patient care and my medical practice. For example, the Subpoena requests "all correspondence with plaintiffs' counsel in any of the 75 cases referenced in" the Article. Subpoena Request No. 1(e). Because the Article studied anonymized human subjects, compliance with this request would require (i) undertaking the painstaking process of identifying the individuals in each of the 75 cases; (ii) working backwards to identify the counsel who represented plaintiff(s) in each of those cases; (iii) searching for any and all correspondence

2

**JA904**

with those counsel; and (iv) determining whether any of those materials are protected from disclosure under court rules, privilege doctrines, protective orders, or other confidentiality requirements.

8.      If I am forced to take significant time away from my medical practice to respond to the Subpoena, Peninsula would likely need to hire a contract pathologist to assist with patient care.

9.      My sole aim in conducting the study and writing and publishing the Article was to educate the public and the medical community. I have devoted my career to patient care. As just one example, I brought a clinic for underserved women to Appalachia to provide free cervical and breast cancer screenings with immediate test results and assistance accessing follow-up tests or treatment at no cost. I would never conduct a study or publish an article for personal gain or for any reason other than enhancing patient care and/or advancing scientific and medical research. And in fact, my co-authors and I chose not to include the names of the cosmetic talc products to which the subjects of the study had been exposed—which often is included in studies like the one we conducted—precisely because we did not want it to be focused on particular products, but rather patient care and treatment more generally.

10.      Because mesothelioma is rare—there are only approximately 3,000 to 4,000 cases in the United States per year—it is difficult to identify a large sample set of mesothelioma cases to study. In my experience in my medical practice, because the vast majority of mesothelioma cases are caused by exposure to asbestos, most patients who are diagnosed with mesothelioma end up pursuing litigation in relation to that diagnosis. Mesothelioma litigation case files therefore are an important source for research into this rare and lethal disease, and typically provide a more robust clinical history—through deposition testimony and interrogatories—than seen in patient files. And it would be virtually impossible to perform scientific research on mesothelioma cases

**JA905**

to research this exceedingly rare and lethal disease, and/or make medical advancements related to its treatment.

11. Based on my experience providing medical-legal consultation services, plaintiffs who file litigation related to their mesothelioma diagnoses typically execute limited HIPAA authorization forms that permit the disclosure and use of their medical records only for the purpose of the specific litigation in which they are a plaintiff. It is my understanding that those HIPAA authorization forms therefore do not affect or waive HIPAA protections outside the confines of that specific litigation.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 8th day of December, 2022 in Newport News, VA.


Dr. Theresa S. Emory, MD
Peninsula Pathology Associates

4

**JA906**

# Attachment A

DOI: 10.1002/ajim.23114

**LETTER TO THE EDITOR**



# Authors' response to "malignant mesothelioma following exposure to cosmetic talc: Association, not causation"

To the Editor,

We appreciate the opportunity to reply to Dr. Geyer's letter.

Geyer has commented on possible "recall-bias" in our paper. We should note that we began with a series of 140 patients which was reduced to 75 when we excluded those where a history of other asbestos exposures were present. In legal cases, experts supporting both the plaintiffs and the defense regularly search for all exposures to asbestos. If, in our series, an odd case or two without such recollection may have been included, then there would still be an abundance of cases to support our findings.

Geyer commented that the methods section "provides no descriptions of analysis of any cosmetic talc products used by any individual included in the study and, thus, the methods give no analytical evidence or data demonstrating that any of their 75 study patients used any cosmetic talcum powder that contained asbestos". By implication, Geyer is suggesting that there is no evidence that asbestos was present in talc or that it caused the mesotheliomas we report. In this regard, Geyer and readers can refer to the recently published article by Steffen et al[1] which details methodology used to determine the presence of asbestos in cosmetic talcum powder. Furthermore, according to Geyer one might surmise that talc alone is capable of producing mesothelioma, although no regulatory agency to our knowledge currently accepts that premise, and it begs imagination to conclude that the 75 mesotheliomas in this series were all "idiopathic," in the face of compelling evidence of asbestos contamination of talc.

We recognize that a case series does not in itself "prove" causation. Indeed, causation is never proved except via the strength of association. The strength of association between the development of mesothelioma and exposure to amphibole asbestos has been established. As no safe threshold has been established for exposures to asbestos and the development of mesothelioma,[2] it is reasonable to suggest that repeated exposures above background to low-levels of asbestos are causal of this disease without the need for a case-controlled epidemiological study. The only role of the latter might be to determine risk prospectively in a large exposed population.

Our study is a case series of patients who developed mesothelioma, and whose only known exposure to asbestos was through cosmetic talc. Case reports and case series can be critical in advancing our knowledge of disease. Wagner's case series of 33 cases of malignant mesothelioma from the mines of South Africa in 1960[3] was generally accepted as convincing evidence that asbestos was the cause of this rare disease. The

present study of 75 cases, together with Moline's 33 reported cases,[4] supports the generally accepted notion that amphibole asbestos is a cause of malignant mesothelioma, due to asbestos contamination of cosmetic talc.

Geyer's comment regarding fiber size is misleading. The 3:1 aspect ratio with supporting microprobe analysis is generally accepted as the morphological definition of an asbestiform fiber by OSHA, the EPA, and other international regulatory agencies.[5-7] The comments concerning the laboratory methods, and the implication that they were not controlled for contamination, has been leveled against many laboratories without convincing evidence.

Geyer also questions whether experts for the defense performed similar or equivalent testing. While we are unaware of other testing performed for these cases, we are aware that certain methods, including scanning electron microscopy, have a low sensitivity for detecting low levels of asbestos contamination. Indeed, in our own study we excluded such evidence in the final reporting of the data.

Although Geyer states that he finds no evidence to support our suggestion "that cosmetic talc may cause malignant mesothelioma", this paper is only one piece of ever-growing evidence, including the conclusion by IARC,[8] that this is the case.

Our series of 75 additional individuals with malignant mesothelioma whose only known exposure was cosmetic talc is further evidence that cosmetic talc should be considered a probable cause of mesothelioma. Due to the lethality of malignant mesothelioma, regulation or removal of talc-based products from the market is warranted in the interest of public safety, as other nontoxic alternatives are available.

### CONFLICTS OF INTEREST

Theresa S. Emory, John C. Maddox, and Richard L. Kradin have testified in asbestos litigation, primarily for plaintiffs.

### DISCLOSURE BY AJIM EDITOR OF RECORD

John D. Meyer declares that he has no conflict of interest in the review and publication decision regarding this article.

### AUTHOR CONTRIBUTIONS

JCM and RLK developed the conception and the design of the work. JCM initiated the acquisition and developed the initial data analysis. TSE reviewed the materials, performed the statistical analysis and was the primary author of the manuscript. RLK revised and gave final approval of the version to be published.

JA908

**2** WILEY         LETTER TO THE EDITOR

## ETHICS APPROVAL AND INFORMED CONSENT

As these cases were selected from medical-legal consultation practice and no identifying information is included, there was no formal institutional consent nor informed consent required.

Theresa S. Emory MD[1]
John C. Maddox MD[1]
Richard L. Kradin MD[2,3]

[1]Peninsula Pathology Associates, Department of Pathology, Riverside Regional Medical Center, Newport News, Virginia

[2]Department of Medicine (Pulmonary/Critical Care), Massachusetts General Hospital, Boston, Massachusetts

[3]Department of Pathology, Massachusetts General Hospital, Boston, Massachusetts

**Correspondence**

Theresa S. Emory, MD, Peninsula Pathology Associates Department of Pathology 500 J Clyde Morris Boulevard, Newport News, VA 23601.
Email: temorymd@gmail.com

## ORCID

*Theresa S. Emory* http://orcid.org/0000-0002-8075-4480
*John C. Maddox* http://orcid.org/0000-0003-1417-0337
*Richard L. Kradin* http://orcid.org/0000-0002-3953-8671

## REFERENCES

1. Steffen JE, Tran T, Yimam M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders- a case series. *JOEM.* 2020;62:e65-e73. https://doi.org/10.1097/JOM.0000000000001800
2. OSHA Safety and Health Topics – asbestos. https://www.osha.gov/SLTC/asbestos/. Accessed April 1, 2020.
3. Wagner JC, Sleggs CA, Marchand P. Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province. *Occup Environ Med.* 1960;17:260-271.
4. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc. *J Occup Environ Med. JOEM.* 2020; 62(1):11-17.
5. U.S. Department of Labor, OSHA. *Report of Evaluation of Cosmetics and Cosmetic Talc for FDA,* Daniel T. Crane. February 23, 2019. https://www.fda.gov/media/122413/download. Accessed April 1, 2020.
6. U.S. Environmental Protection Agency – Region IX, Response to the November 2005 National Stone, Sand & Gravel Association Report Prepared by the R.J. Lee Group, Inc. "Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project". 2006. https://archive.epa.gov/region9/toxic/web/pdf/rjlee-response4-20final.pdf. Accessed April 1, 2020.
7. NIOSH. "Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research" Current Intelligence Bulletin 62. Department of Health and Human Services. Centers for Disease Control and Prevention. National Institute for Occupational Safety and Health. Publication No. 2011-159. 2011. https://www.cdc.gov/niosh/docs/2011-159/pdfs/2011-159.pdf. Accessed April 1, 2020.
8. IARC. Monograph Volume 100C. Asbestos (chrysotile, amosite, crocidolite, tremolite, actinolite, and anthophyllite). 2012. https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100C-11.pdf. Accessed April 1, 2020.

Case 4:22-mc-00001-AWA-DEM    Document 8-7    Filed 12/08/22    Page 1 of 4 PageID# 944

# Exhibit

December 7, 2022

**VIA ECF**
Hon. Valerie Figueredo
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re:    *Gref v. Am. Int'l Indus.*, et al., 20-cv-05589

Dear Judge Figueredo:

      Following the deadline for Plaintiff's opposition to Defendants' Motion to Compel the Continuation of the deposition of Plaintiff's Expert Dr. Moline, two defense experts provided testimony that directly contradicts the Defendants' argument that they are entitled to discover the identities of subjects of the peer-reviewed article Dr. Moline co-authored, entitled "Mesothelioma Associated With the Use of Cosmetic Talc." Given that this article is the primary focus of Defendants' Motion, Plaintiff respectfully requests the Court permit him to supplement his opposition with the pertinent testimony that undermines Defendants' claim.

      On November 23, 2022, Dr. Kenneth A. Mundt, an epidemiologist retained by Defendants American International Industries ("AII"), Whittaker Clark & Daniels, Inc. ("WCD"), and Shulton, Inc. ("Shulton"), testified about the procedures he followed to maintain the confidentiality of human research subjects when working on an epidemiological study regarding occupational exposures to hexavalent chromium, a carcinogenic toxin. *See* Excerpts of Dr. Mundt Dep. Vol II, dated Nov. 23, 2022, attached as **Exhibit 1** at 142:20-143:16 (identifying the draft of the study and confirming Dr. Mundt founded Applied Epidemiology, Inc.), 144:22-145:6 (confirming he was responsible for the draft and its contents), 179:3-181:24 (discussing procedures to maintain confidentiality of subjects); *See* Collaborative Cohort Mortality Study of Five Chromate Production Facilities, 1958-1998 (Draft Protocol, dated Apr. 23, 1999), attached as **Exhibit 2** at 4. A draft of this study included an entire section on the "Protection of Human Subjects." **Exhibit 2** at 4. As confirmed at his deposition, Dr. Mundt followed "standard epidemiological procedures" to protect the confidentiality of the human subjects and "no results [were] presented other than in aggregate form, and no individual identity can be discerned." **Exhibit 2** at 4. Specifically, like Dr. Moline's study, Dr. Mundt completed his study with the permission of an Institutional Review Board that was registered with the federal government and responsible for "protecting human subjects." **Exhibit 1** at 180:12-181:6. Regarding specific rules and procedures, Dr. Mundt referenced "the human protections section of the Health and Human Services. There was extensive protocols, registrations, training that was involved." *Id*. at 181:13-16.

      On December 2, 2022, Dr. Kerry Robin Carder, a pediatric dermatologist retained by Defendant American International Industries ("AII"), testified in connection with her personal experience researching and publishing peer-reviewed literature involving human research subjects

that the identities of such subjects is protected information under HIPAA, as well as other laws and ethical rules.[1]

> QUESTION:   Have you ever revealed the identities of any of the studies of human subjects reported such as in what we're looking at here, Exhibit 5?
>
> [Objection omitted]
>
> ANSWER:      I'm not sure what you mean by revealing identities. Patient identities or --
>
> QUESTION:   Patient identities, that's right.
>
> ANSWER:      No.
>
> QUESTION:   Are there rules governing or protecting the identification of patient identities such as the infants in this article?
>
> [Objection omitted]
>
> ANSWER:      Yes.
>
> […]
>
> QUESTION:   Okay. And does HIPAA govern the protection of their identities?
>
> ANSWER:      HIPAA and there are certain laws in place for those who are doing studies, but these were not studies, these were case reports.
>
> So, yes, you either have to have the permission from the family if you do have, say, an identifiable photograph or – yes.
>
> QUESTION:   Okay. And then going back to my former question, are there any ethical guidelines within the medical profession that would prevent or advise against the identification of any of the patients in those published studies on those case reports?
>
> [Objection omitted]
>
> ANSWER:      There – just like HIPAA guidelines, yes, there are guidelines in place […]
>
> [Objection Omitted]

---

[1] Notably, Dr. Carder provided this testimony despite AII's counsel raising baseless objections and instructing her not to answer Plaintiff's questions. Dr. Carder clearly has personal knowledge and expertise that is relevant to understanding the privileged and confidential nature of human research subjects featured in peer-reviewed medical literature.

QUESTION:  And just so I understand your answer, Dr. Carder, are you referring to something in addition to HIPAA or are you referring specifically to HIPAA?

ANSWER:     HIPAA is part of it, but there are similar guidelines for those who are doing studies.

QUESTION:  And what are those guidelines?

ANSWER:     Just that you protect the patient identity.

*See* Excerpts of Dep. of Dr. Carder, dated Dec. 2, 2022, attached as **Exhibit 3** at 54:22-61:19.

The foregoing testimony, along with the testimony of other defense experts cited in Plaintiff's opposition papers, confirm that, as maintained by Northwell Health and Dr. Moline, the identities of the human research subjects involved in Dr. Moline's 2020 peer-reviewed article are confidential and protected information that is immune from discovery. For this reason and the many others set forth in Plaintiff's opposition, Defendants' Motion to Continue the Deposition of Dr. Moline must be denied in its entirety.

Respectfully submitted,

James M. Kramer

# Exhibit 8

```
1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2
    LLOYD BELL, individually and  ) CASE NO.  1:17CV111
3   As executor of the estate of  )
    BETTY WHITLEY BELL, deceased,  )
4                                  )
              Plaintiffs,          )
5                                  )
    V.                             )
6                                  )
    AMERICAN INTERNATIONAL         )
7   INDUSTRIES, et al.,            )
                                   ) Winston-Salem, North Carolina
8             Defendants.          ) September 25, 2020
    _____ )
9

10       CORRECTED TRANSCRIPT OF THE TELEPHONIC MOTIONS HEARING
                BEFORE THE HONORABLE JOI E. PEAKE
11               UNITED STATES MAGISTRATE JUDGE

12

13  APPEARANCES (By telephone):

14  For the Plaintiffs:        WILLIAM M. GRAHAM, ESQ.
                               WALLACE & GRAHAM, P.A.
15                             525 North Main Street
                               Salisbury, North Carolina 28144
16
                               FRANK J. WATHEN, ESQ.
17                             LEAH C. KAGAN, ESQ.
                               SIMON GREENSTONE PANATIER PC
18                             1201 Elm Street, Suite 3400
                               Dallas, Texas 75270
19

20  For the Defendants:
    AII:                       ROBERT E. THACKSTON, ESQ.
21                             KURT W. GREVE, ESQ.
                               SAMUEL GARCIA, ESQ.
22                             LATHROP GPM LLP
                               2101 Cedar Springs Road, Suite 1400
23                             Dallas, Texas 75201

24

25
```

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 338 of 376

Case 4:22-mc-00001-AWA-DEM   Document 8-8   Filed 12/08/22   Page 3 of 8 PageID# 950
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

1  discovery as to Dr. Moline.  It looks like Plaintiffs' counsel

2  just referred defense counsel to Northwell to obtain that.

3       I think there are very different issues here

4  regarding the other individuals included in the study other

5  than Ms. Bell; and as to Ms. Bell, she's placed all of this at

6  issue by bringing the suit by or on her behalf.  She's

7  presented Dr. Moline as her expert, and Dr. Moline then used

8  her information in a study that then was specifically used and

9  relied on in presenting her opinion as to Ms. Bell.

10      It does not look to me like a HIPAA authorization

11 would be required, but to the extent Northwell had the

12 information and believed it was required, it was not

13 inappropriate for defense counsel to use the authorization that

14 Ms. Bell had agreed to in this case.

15      Again, I think it would be very different if defense

16 counsel had used Ms. Bell's authorization from this case to

17 obtain the release of information in some other case.  There

18 are important confidentiality and privacy issues as to the

19 other individuals in the study, so it would only be appropriate

20 in this case to allow the release of the information as to

21 Ms. Bell.

22      It also seems to me that with respect to the rest of

23 the information requested from Northwell, that could be the

24 subject of party discovery regarding the designated experts;

25 and so it looks to me like we may not need further subpoena

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 339 of 376

Case 4:22-mc-00001-AWA-DEM   Document 8-8   Filed 12/08/22   Page 4 of 8 PageID# 951
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

 1  candor to the jury and the ability for AII to cross-examine

 2  Dr. Moline on these issues, and AII has had that opportunity.

 3  They have, in fact -- Mr. Thackston did, in fact, cross-examine

 4  Dr. Moline at length earlier this year in New Jersey in a

 5  different trial of two consolidated Clubman cases, and that

 6  judge did not allow him to identify or to question whether or

 7  not one of the patients was Mrs. Bell --

 8         **THE COURT:**  Well, of course.  I mean, again,

 9  Ms. Kagan, I completely agree with the judge in that case.  If

10  you were here with one of the other individuals on that report,

11  I would be in complete agreement with you that we are not going

12  to let that person be identified or subject to discussion or

13  side litigation here, but we're here in Ms. Bell's case now.

14  So I think it is different than that New Jersey case.

15         **MS. KAGAN:**  But the only purpose of disclosing

16  Ms. Bell against her consent would be because somehow AII has

17  been deprived of the ability to meaningfully cross-examine, and

18  that's just not true.  They have been able to meaningfully

19  cross-examine things like did Dr. Moline take into account that

20  somebody filed a workers' compensation.  That's an easy

21  cross-examination point without ever having to identify

22  Ms. Bell.

23         And in this actual case here, Mr. Thackston can

24  cross-examine Dr. Moline specifically:  Did you take into

25  account this specific fact, the idea that hairdryers, some

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 340 of 376

Case 4:22-mc-00001-AWA-DEM  Document 8-8  Filed 12/08/22  Page 5 of 8 PageID# 952
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

 1  Amendment protections; but documents produced in discovery are

 2  not subject to common law disclosure or information, and

 3  certainly where there's confidentiality orders or protections

 4  in place and a party can claim something is confidential, then

 5  we go through the process of sealing under 5.4 for information

 6  that's filed on the docket.

 7        Here, when it's related to discovery, we follow the

 8  more general balancing that applies when the First Amendment

 9  doesn't apply, and because we're at the discovery or the

10  preliminary stage, it makes sense to allow those things to be

11  filed for which confidentiality is still claimed.

12        And I do think there are concerns with regard to

13  disclosure of this outside this case.  While I am more

14  comfortable with the idea that Ms. Bell has put all of this at

15  issue in this case, and if she's electing to choose Dr. Moline

16  as her expert, then that potentially becomes at issue here.

17  That's a very different calculation as to other folks who may

18  be subject to this study or the use of Ms. Bell's identity in

19  some other lawsuit.

20        So, as I said, I think the determination will

21  ultimately be up to the district judge when we get to trial in

22  this case, but at this point we're just talking about discovery

23  materials.  There is no right to use discovery materials from

24  one case in another case, particularly where, here, there is

25  some claim of confidentiality that's only being produced

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 341 of 376

Case 4:22-mc-00001-AWA-DEM   Document 8-8   Filed 12/08/22   Page 6 of 8 PageID# 953
17CV111 Bell v. AII – Motions – 9/25/20 **CORRECTED**

1  subject to that claim and subject to a confidentiality

2  protection in place.

3        So I would caution against a notion of using this or

4  being able to use this in some other case, because if that's

5  where we're headed, then I would be more inclined to put a

6  protective order over all of it and not allow it to be used at

7  all.  If we're talking about using it here just in this case

8  because it's important and relevant as to Ms. Bell and the fact

9  that she's put all of this at issue here and selected

10 Dr. Moline as her expert, then I think a limited disclosure and

11 use of that is not outside the bounds of reasonableness and

12 actually is necessary to avoid potential misleading of the fact

13 finder here.

14       So that's where I am, but I interrupted you because I

15 don't want end up too far down a path where you make me

16 second-guess that determination.

17       **MR. THACKSTON:**  Your Honor, I don't have -- I'm not

18 trying to conduct discovery for any other case.  I'm only doing

19 what's relevant to the Bell case.

20       But if the materials we're talking about are -- if it

21 turns that it's Ms. Bell's answers to interrogatories or her

22 deposition transcripts, I just should think there should be

23 some onus on the Plaintiffs to have to -- maybe we agree that

24 everything is treated confidential for 14 days, and if they

25 want that to continue to be confidential, then they have to

**JA919**

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 342 of 376

Case 4:22-mc-00001-AWA-DEM  Document 8-8  Filed 12/08/22  Page 7 of 8 PageID# 954
17CV111 Bell v. AII – Motions – 9/25/20 **CORRECTED**

 1  the other 32 are right.

 2       **THE COURT:**  Okay.  So I think I understand,

 3  Mr. Thackston.  Your argument is now related to the other

 4  individuals.  As to those, I would have a lot more concern

 5  about requiring the identification of those individuals, even

 6  if it is based on litigation study.  That's a whole lot broader

 7  of a request.  And the fact that those individuals may have

 8  consented in their own case does not mean that they've

 9  consented to some broader identification or disclosure.

10       And so I think, along the same lines as what happened

11  up in New Jersey when you tried to get Ms. Bell's

12  identification there, I would have the same sort of concerns if

13  you had to try to get the identification of the other

14  individuals here.  There are important confidentiality and even

15  larger structural concerns with regard to how these

16  publications are presented and constructed and protected, and

17  so I don't see a basis for requiring disclosure, and I don't

18  see any case law that would support that as far as other

19  individuals who may have been included in the study.

20       If we're still talking about Ms. Bell, then I am

21  inclined to limit it just in the sense that it's specific to

22  this case, and it's subject to a confidentiality claim and

23  protection to the extent that it's not disclosed outside of

24  this case, unless or until the district judge makes a

25  determination on that as part of dispositive motions or trial.

USCA4 Appeal: 23-1972    Doc: 26-2    Filed: 12/20/2023    Pg: 343 of 376

Case 4:22-mc-00001-AWA-DEM  Document 8-8  Filed 12/08/22  Page 8 of 8 PageID# 955
17CV111 Bell v. AII – Motions – 9/25/20 **CORRECTED**

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6       I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings produced to the best of

9  my ability from an audio recording of the telephone conference

10 in the above-entitled matter.

11

12       Dated this 30th day of September 2020.

13

14

15           _Briana L. Bell_

16           Briana L. Bell, RPR
             Official Court Reporter

17

18

19

20

21

22

23

24

25

# Exhibit 9

Page 201

```
 1                    SUPERIOR COURT OF NEW JERSEY
                     LAW DIVISION: MIDDLESEX COUNTY
 2                   DOCKET NO. MID-L-006651-16ASL
                            MID-L-007336-16AS
 3                   APPELLATE DOCKET NO._____
 4
 5    DWAYNE JOHNSON,                 ) TRANSCRIPT OF
                    Plaintiff,        ) TRIAL
 6       v.                           )
      AMERICAN INTERNATIONAL,         )
 7    INDUSTRIES, et al.,             )
                    Defendants.       )
 8    _____ )
      MARGARET R. LANGLEY LASHLEY AND )
 9    EDWARD G. LASHLEY,              ) (VOLUME 2 of 2)
                    Plaintiffs,       )
10       v.                           )
      AMERICAN INTERNATIONAL INDUSTRIES, )
11    et al.,                         )
                    Defendants.       )
12    _____ )
13
14              Place:    Middlesex Courthouse
                          56 Paterson Street
15                        New Brunswick, New Jersey  08903
16              Date:     Wednesday, March 11, 2020
                          9:14 a.m.
17                        (Volume 2 of 2)
                          (Pages 201 - 238)
18
19    BEFORE:
20       HON. ANA C. VISCOMI, J.S.C. and JURY
21
22    TRANSCRIPT ORDERED BY:
23       JOSEPH MANDIA, ESQ.
         (Simon Greenstone Panatier)
24       5 Penn Plaza
         Suite 2308
25       New York, New York  10001
```

```
 1          a very not so back-door attempt to get the identities
 2          of the person in the study.  Mr. Thackston tried to do
 3          that at deposition, was shut down.  She was directed to
 4          the legal staff of the hospital.  To my knowledge, he
 5          (inaudible).  So even in old reports in isolation, but
 6          to try to patch them up through the back door is in
 7          violation of the paper.  When she put together written
 8          background information of the paper, this is
 9          (inaudible).
10                  THE COURT:  You had access to the unredacted?
11                  MR. THACKSTON:  Yes.
12                  THE COURT:  So you know the identity of this
13          person?
14                  MR. THACKSTON:  Yes.  It's a case we're
15          involved in.  We're the defendant.
16                  THE COURT:  So how, tell me the purpose of
17          what you're seeking to do now.
18                  MR. THACKSTON:  The purpose, your Honor,
19          is that her testimony is that these are litigation
20          cases so everything she has, I have.  It's all public.
21          I don't want anything that's not public information and
22          I'm not trying to identify, why would I want to
23          identify the person?
24                  THE COURT:  Didn't that question you just
25          asked seek to identify the person?
```

Page 219

1          MR. THACKSTON:  Not the person, but the case.
2      We can call it case B, right?  It's not a matter of --
3          THE COURT:  You mean you want to know whether
4      this is Miss D that she testified about?
5          MR. THACKSTON:  Yes.
6          THE COURT:  Well, then that would be
7      identifying the person to you.
8          MR. THACKSTON:  Exactly.  Well, she should
9      identify the person to me.
10         THE COURT:  Why?
11         MR. THACKSTON:  Well, because she made a
12     representation in the public literature that there's no
13     other exposure to asbestos, right?  Well, I'm in the
14     case and I know that not to be true.  And I'm not
15     trying to malign her about it, but she's -- her
16     protocol didn't involve trying to get any other
17     information and whether there is information from
18     public sources that (inaudible).  I should be entitled
19     to cross-examine her on that.  But otherwise, it's
20     completely (inaudible).  I'm not saying she did
21     anything wrong.  I'm just saying based on your
22     methodology, you didn't know this woman has a sworn
23     complaint saying she was exposed to thermal insulation
24     at her workplace.
25         THE COURT:  Thank you.

Page 220

1              I have no issue with you cross-examining

2        individually with regard to all of the different

3        reports that you have or that she may have referenced

4        in that paper that she co-authored, but seeking to

5        identify is inappropriate and so I'm not going to

6        permit that.

7              MR. THACKSTON:  I'm not going to identify the

8        person at all.

9              THE COURT:  No, but that question would seek

10        to identify to you, and that I'm not going to permit.

11        I don't have any issue with individual questions, but

12        that question I'm not going to allow.

13              MR. THACKSTON:  Well, I'm going to try -- I'm

14        not exactly sure what I'm allowed to do, but I'll try

15        my best to --

16              THE COURT:  Well, hold on.  What I'm saying

17        is I have no issue with you cross-examining with regard

18        to any report that you have, any person that's

19        mentioned by type or case of description in her study,

20        in her published paper or the testimony she gave to

21        congress.

22              But you're asking Dr. Moline to testify as to

23        whether this person is that person that you referred

24        to, that I will not permit because that is seeking the

25        identification of who that person may be to you, and

Page 221

1    that I will not permit.  It's inappropriate.  It's

2    improper.

3              (Sidebar ends.)

4              THE COURT:  So the objection to that question

5    is sustained.

6    BY MR. THACKSTON:

7         Q    Dr. Moline, you gave the example, and I don't

8    want anybody's name, I don't want you to identify

9    anybody, when you wrote your testimony for congress,

10   did you take portions directly from a report for a case

11   you're involved in?

12   A    I don't believe I took anything verbatim.  I may

13   have looked to see an illustrative case and I wouldn't

14   have remembered all the facts of the medical course

15   which I think was described, nor the exposure scenario,

16   so I would have had to refer to something.

17        Q    You would have -- you would have said where

18   the person worked, right, what their job was?

19   A    I would have said the category.  I wouldn't have

20   said what company.

21        Q    I mean, worked for a textile mill, tobacco

22   company; in fact, the example you give here in the

23   testimony, you say "she worked in a textile industry

24   working with polyester and cotton yarns, also worked

25   for tobacco company as a packer."  Right?

Page 222

```
 1       A    Correct.
 2            Q    And you would have written a report for
 3       someone in her case making those kinds of statements,
 4       in your report you would also say what her jobs were,
 5       right?
 6       A    If I had written a report on her, yes.
 7            Q    And you wouldn't know if -- in another
 8       context, outside of the particular lawsuit where they
 9       were discussing the claims and questions were asked,
10       you wouldn't know whether she filed another claim or
11       someone on her behalf filed another claim in another
12       context saying she was exposed to asbestos on her job?
13       You just wouldn't have that information, would you?
14       A    If she had made -- are you saying like a workers'
15       compensation claim?
16            Q    Yes.
17       A    I mean, typically I'm provided with all that kind
18       of information or an individual is asked about that
19       during their deposition, where they're asked if they've
20       ever filed any type of lawsuit or filed a workers'
21       compensation claim.  So I might not have had all the
22       documents, but I would have had some information.
23            Q    Would that be relevant if somebody had a
24       worker's comp claim where they were saying they were
25       exposed to asbestos on-the-job?
```

Page 223

1    A    If they said that they were exposed and they had

2    exposure, sure.

3        Q    So I'd ask you to look at page -- this is

4    from the North Carolina Industrial Commission, and down

5    at the bottom left-hand corner you see NCIC, July 24,

6    2019, 1 of 25 pages.  If you look at page 13 --

7    A    This is not fully redacted.  The name is

8    throughout this document.

9        Q    The name what?

10   A    The name of the individual is on many pages here.

11   It's not fully redacted.

12       Q    Well, it's not going to be seen by anybody

13   other than --

14   A    Okay.

15       Q    -- counsel.

16   A    I see an individual's name here.  I just wanted to

17   bring that to your attention.

18       Q    I guess you can see through it.

19   A    No.  No.  I just turned and I saw someone's name

20   on page 12, so I just was making sure you knew that.  I

21   didn't know who would see it.

22       Q    You're the retained expert in this case.

23   They're the law firm in this case.  The judge isn't

24   going to give it to anybody else --

25   A    Sir, I was just saying the name was there.  I

Page 224

1    wasn't saying anything else.  I just wanted to make

2    sure if it went further, there was someone's name here.

3         Q    I understand.  The fact that there is a

4    lawsuit is public record, right?  I mean, this person's

5    lawsuit is a public record.  And at some point you will

6    give a deposition in that case, as far as you know,

7    right?

8    A    Depends on the state, and it could be, yes.

9         Q    Okay.  And I just want you to look at this

10   and see, you recognize the type of document that it is,

11   North Carolina Industrial Commission, and I just want

12   you to read what the next line says?

13   A    Where am I looking?

14        Q    It says, "Claim by employee."

15   A    Okay.

16        Q    "Representative or dependent."

17   A    Okay.

18        Q    "For benefits for lung disease, including

19   asbestosis, silicosis and byssinosis."

20   A    Okay.

21        Q    "The use of this form is required under the

22   provisions of the Workers' Compensation Act."

23   A    Okay.

24        Q    Right?

25             Employer, and I won't say the name of the

Page 225

```
 1    employer out loud, and it has dates of employment?
 2              MR. PURDY:  Mr. Thackston, can I ask what
 3    page you're on?
 4              MR. THACKSTON:  Page 13.
 5    A    Okay.
 6    Q    And then on the next page it has employment
 7    history and dates, and it says, "If you were exposed to
 8    the listed substances while working for this employer.
 9    Describe in detail the exposures employee was exposed
10    to the hazards of asbestos-containing products while
11    employed by this employer."
12              That's on page 14 of 25 right in the middle
13    of the page.  You see that?
14    A    I don't know where you're pointing to.
15              MR. THACKSTON:  Your Honor, may I publish?
16    A    In the bottom half?
17    Q    Right in the middle.
18              THE COURT:  Yes.  Go right ahead.
19    BY MR. THACKSTON:
20    Q    Right?
21              "Employee was exposed to the hazards of
22    asbestos-containing product while employed by this
23    employer."  Right?
24    A    Yes.
25    Q    So if this is the same person who was your
```

1     example before congress, it appears that they, at

2     least, have made a claim that they were exposed to

3     asbestos in some form other than just in using cosmetic

4     talc personally and as a hairdresser.

5          Would you agree?

6          MR. PURDY:  I'm going to object, your Honor.

7          THE COURT:  Objection sustained.

8     BY MR. THACKSTON:

9     Q    Since you put the article out have you had

10    any conversations with any of the lawyers about whether

11    your conclusions were correct with respect to the

12    alleged exposures by the plaintiffs to cosmetic talc

13    only?

14    A    I haven't had any conversations with that specific

15    question raised to me.

16    Q    And no one has contacted you and said look,

17    if case 6 or case 3 is our case, there's something you

18    ought to know, there's some other allegations; nobody's

19    given you that kind of information?

20    A    No.

21    Q    Let me get straight, why is it that you

22    couldn't -- let me back up.

23          So yesterday when you were on direct

24    examination and you were being asked questions about

25    Italian talc studies, you had various criticisms of the

Page 227

1    studies, right?

2    A    Yes.

3        Q    And one of the criticisms was that it wasn't

4    transparent, that one of the authors had gotten money

5    from Johnson & Johnson or somebody and it wasn't

6    transparent that they had had a role in some input in

7    the study, right?

8    A    Right.  That there was no disclosure that the

9    company had had a role in the development protocol and

10   writing of the paper.

11       Q    And you think that if someone's going to put

12   out an article where they're going to say there are

13   no -- we find no mesothelioma among this group of

14   people, that they ought to make the information

15   available that they're basing that on so other medical

16   professionals or others can critique that, right?

17   A    I said that they should let that information that

18   they were contacted by a company who approved the

19   protocol and was involved in the writing of the paper,

20   they should make the readers aware of that, yes.

21       Q    And so in your situation, this is all

22   information that's been available to all the people

23   involved in the cases, it would be possible for you to

24   have someone redact, even someone that worked for one

25   of the firms, redact any personal information and put

Page 228

1    it out there and say here, here's what I'm basing my

2    conclusion on, I'm going to be transparent, here's a

3    website, here's all the documents, case 1, case 2, case

4    3, I want everybody to know what I'm basing my

5    conclusion on that these people have meso and their

6    only known exposure was to cosmetic talc.

7              You could do that, right?

8    A    Theoretically, yes.

9         Q    And in your deposition you were asked

10   specifically, hey, I think I recognize this case, case

11   whatever, case number 3, the case of so and so.  And

12   you refused to answer that, right?

13   A    I am of the opinion that I am not identifying any

14   of the individuals in my paper by name as following

15   standard medical and research practice.

16        Q    But you would agree, you don't have any

17   contact with these people from the standpoint of a

18   medical practice.  You are not their physician.  You

19   are only consulting in their litigation, right?

20   A    They still have a right to privacy with respect to

21   the medical community and the medical literature at

22   large, and I am respecting that privacy.

23        Q    I understand.

24             But you understand, you would agree that

25   people involved in their case because they represent

1    someone who's been sued already have access to the

2    medical records, they have access to everything you

3    have access to, right, the other people involved in the

4    cases, correct?

5    A    Yes.

6        Q    And you would agree with me, wouldn't you,

7    that either before or after you published the paper,

8    other people who might have knowledge of those cases

9    never had an opportunity for input in whether or not

10   those people had other alleged exposures to asbestos;

11   fair?

12   A    I did not consult with any attorneys in the

13   preparation of this paper.  I based it on the

14   information I had, which was clearly stated in the

15   methods of this paper in terms of how I obtained the

16   data.  I did not have conversations with any other

17   individuals apart from my co-authors who had access to

18   the same data I did.

19       Q    And if somebody writes a letter to the editor

20   and says well, I think I recognize, I can't say for

21   sure because they won't identify the person, but if

22   that's this case, I'll call it B, then there certainly

23   were other sworn allegations of exposure in that case,

24   so the premise that there was no other exposure to

25   asbestos might not be valid; you couldn't really take

Page 238

1                        CERTIFICATION

2

3          I, ANDREA F. NOCKS, C.S.R., License Number

4     30XI00157300, a Certified Court Reporter, in and for the

5     State of New Jersey, do hereby certify the foregoing to

6     be prepared in full compliance with the current

7     Transcript Format for Judicial Proceedings and is a true

8     and accurate non-compressed transcript to the best of my

9     knowledge and ability.

10        *Andrea Nocks CCR CRR*

11    ANDREA F. NOCKS              MARCH 11, 2020

12    CERTIFIED COURT REPORTER

13    MIDDLESEX COUNTY COURTHOUSE

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:22-mc-00001-AWA-DEM   Document 8-10   Filed 12/08/22   Page 1 of 5 PageID# 962

# Exhibit 10

```
 1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
              FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                    CIVIL TRIAL DIVISION

 3                        -  -  -

 4    HOLLY FISHER, EXECUTRIX OF THE:  JULY TERM, 2019
      ESTATE OF SANDRA REICHART,    :
 5                                   :
                 Plaintiff,          :
 6                                   :
              vs.                    :
 7                                   :
      AMERICAN INTERNATIONAL         :
 8    INDUSTRIES, individually and   :
      as successor-in-interest for   :
 9    the CLUBMAN BRAND, and to THE  :
      NESLEMUR COMPANY and PINAUD    :
10    COMPANY, et al.,               :
                                     :
11               Defendants.         :  NO.:   0877

12                        -  -  -

13              Thursday, October 13, 2022
                 Courtroom 675, City Hall
14              Philadelphia, Pennsylvania

15                        -  -  -

16    BEFORE:  THE HONORABLE SIERRA THOMAS STREET, J.

17                        -  -  -

18                     JURY TRIAL
                      P.M. SESSION
19                        -  -  -

20
      REPORTED BY:  Kimberly Wilson, RMR, CRR
21                        -  -  -
22           KIMBERLY A. WILSON, RMR, CRR
                 OFFICIAL COURT REPORTER
23       100 SOUTH BROAD STREET, 2ND FLOOR
                PHILADELPHIA, PA  19110
24        kimberly.wilson@courts.phila.gov
                    (215) 683-8010
25
```

```
 1
     APPEARANCES:
 2

 3        JAMES KRAMER, ESQUIRE,
          DONALD P. BLYDENBURGH, ESQUIRE,
 4        OLIVIA KELLY, ESQUIRE,
          Simmons Hanly Conroy
 5          112 Madison Avenue
            New York, NY  10016-7416
 6        212-784-6279
          jkramer@simmonsfirm.com
 7        okelly@simmonsfirm.com
          dblydenburgh@simmonsfirm.com
 8

 9        Counsel for Plaintiff

10

11        ERIC D. COOK, ESQUIRE,
          Willcox Savage
12          Wells Fargo Center
            440 Monticello Avenue, Suite 2200
13          Norfolk, Virginia  23510
          757-628-5661
14        ecook@wilsav.com

15

          DAVID W. SNYDER, ESQUIRE,
16        McGivney Kluger Clark & Intoccia, P.C.
            1650 Arch Street, Suite 1800
17          Philadelphia, PA  19103
          215-557-1990
18        dsnyder@mkcilaw.us.com

19
          Counsel for Defendant, Whittaker, Clark &
20          Daniels, Inc.

21

22

23

24

25
```

```
 1
     APPEARANCES:   (Cont'd.)
 2

 3         ROBERT E. THACKSTON, ESQUIRE,
           Lathrop GPM
 4           2101 Cedar Springs Road
             Suite 1400
 5           Dallas, TX  75201
           469-983-6023
 6         robert.thackston@lathropgpm.com

 7
           ROY F. VIOLA, JR., ESQUIRE,
 8         Gordon & Rees
             18 Columbia Turnpike
 9           Suite 220
             Florham Park, NJ  07936
10         973-822-1110
           rviola@grsm.com
11

12         Counsel for Defendant, American International
             Industries, successor-in-interest for the
13           Clubman Brand, and to The Neslemur Company
             and Pinaud Company
14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2                      I N D E X

3            P L A I N T I F F ' S    E V I D E N C E

4

5    WITNESS                        DR     CR     RD     RC

6    Dr. Jacqueline Moline, M.D.    --      5     88     99
     Holly Fisher                   106    --     --     --
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Jacqueline Moline, M.D. – Cross

1   BY MR. THACKSTON:
2   Q.   And, in fact, the only denial was that the
3   defendant that she made the claim against denied
4   that they were liable, right?
5   A.   I haven't memorized the entire file that
6   you're speaking about.  I know that there was a
7   dispute whether there was exposure.  And I'm not
8   quite sure at how far it proceeded or if it was
9   withdrawn at a certain point.
10  Q.   Well, no matter how it ended up, it started
11  out with someone saying under oath that they were
12  exposed to asbestos other than cosmetic talc,
13  right?
14                    MR. KRAMER:  Objection.  What are we
15        talking about?
16                    THE COURT:  Overruled.  Counsel, you
17        know exactly what we are talking about.  And
18        you objecting is not going to stop it.
19                    THE WITNESS:  I'm sorry.  Can you
20        repeat the question?
21  BY MR. THACKSTON:
22  Q.   No matter how it turned out, it started out,
23  the Workers' Compensation claim started out with
24  the plaintiff saying under oath that she was
25  exposed to asbestos on the job other than cosmetic

Dr. Jacqueline Moline, M.D. - Cross

1   talc, right?

2   A.   I don't know what -- how the process starts in

3   the state that this individual lived in, if it was

4   just the lawyer making an assertion or whether it

5   was the individual.  I do not have a specific

6   recollection of the rules and regulations since

7   they're state by state.

8   Q.   You have been shown the claim before with the

9   signature by the husband, right?

10  A.   I'm sure you have shown it to me in the past.

11  I don't -- but it's been years.  And the husband is

12  not the individual.  And the individual would have

13  known the exposure more than a husband.

14  Q.   Have you ever done any work for the Graham and

15  Wallace law firm in Salisbury, North Carolina?

16  A.   No.

17  Q.   Weren't you a retained expert in the Bell

18  case?

19  A.   I was an expert in the Bell case, but I was

20  not retained -- I don't recall that I was -- I was

21  not retained by that firm.  I don't know that firm.

22  Q.   Okay.  So after you wrote this article based

23  on these litigation cases, and you testified about

24  these articles on direct examination, and you said

25  there's no epidemiology -- well, let me back up.

Dr. Jacqueline Moline, M.D. - Cross

1   There's no epidemiology suggesting that barbers or
2   hairdressers are at an increased risk for
3   mesothelioma, right?
4   A.   No such study has yet been conducted.  It
5   doesn't mean that it isn't true.  But there has not
6   been a specific study that I have seen that is
7   specifically looking at barbers and hairdressers.
8   Q.   Well, we'll get to that.  Okay.
9        And so you said that my study is significant
10  because I got these 33 people who were only exposed
11  to cosmetic talc and they got meso, right?
12  A.   I said my study was significant because it was
13  pointing to cosmetic talc as a cause of
14  mesothelioma and alerting physicians that they
15  should take a history.  If you read the conclusion,
16  that's the point of this article.
17  Q.   After you testified about your article to
18  juries, if somebody who's cross-examining you wants
19  to make sure that that's right, that in those 33
20  cases there was no other exposure -- alleged
21  exposure to asbestos, you take the position that
22  you won't disclose the names of any of those cases,
23  right?
24  A.   I take that position regardless of what
25  situation I'm in.  I do not disclose the names of

Dr. Jacqueline Moline, M.D. - Cross

1    individuals.  That is standard medical practice.

2    That is standard research practice.  I am not doing

3    anything different from any colleague that I know

4    at any institution.

5              MR. THACKSTON:  Object to

6         responsiveness about what colleagues do.

7              THE COURT:  Overruled.

8    BY MR. THACKSTON:

9    Q.   Well, let's take that a step at a time.  So

10   you're not they're treating physician.  You have no

11   physician-patient relationship with any of the 33,

12   right?

13             MR. KRAMER:  Objection, Judge.  This

14        is now going into questioning regarding

15        whether or not or how she may -- the reason

16        why she's not going to be revealing these

17        individuals.  And when we had this

18        conversation, counsel said he was not --

19             THE COURT:  I agree, he did say

20        that.

21             MR. THACKSTON:  I'm sorry, Your

22        Honor?

23             THE COURT:  You did say that you

24        were limited to the issue that you have

25        already touched.  Sustained.

Dr. Jacqueline Moline, M.D. - Cross

 1    BY MR. THACKSTON:
 2    Q.    The position -- well, Northwell, your
 3    employer, is the one that has the information,
 4    right?
 5                        MR. KRAMER:  Same objection, Judge.
 6                        THE COURT:  What's the purpose of
 7          the question?
 8                        MR. THACKSTON:  I'm sorry, Your
 9          Honor?
10                        THE COURT:  What's the purpose of
11          this question, Counsel?
12                        MR. THACKSTON:  I'm so sorry?
13                        THE COURT:  What is the purpose of
14          this question?
15                        MR. THACKSTON:  Oh.  The purpose of
16          the question is that the information has
17          already been released by Northwell.
18                        THE COURT:  Okay.  Well, why don't
19          you ask that.
20    BY MR. THACKSTON:
21    Q.    Northwell has already produced the records
22    that shows that Mrs. Bell was a member of your
23    study, right?
24    A.    I -- what my organization might have done, I
25    will not discuss.  I will not discuss names of the

Dr. Jacqueline Moline, M.D. - Cross

 1  individuals in my paper.

 2  Q.   And you testified earlier about Workers'

 3  Compensation orders.  Have you read -- you're aware

 4  that there's a 40-page order from a federal court

 5  saying that your position that you can't talk about

 6  those people is wrong, right?

 7               MR. KRAMER:  Objection, Judge.

 8               THE COURT:  Sustained.

 9  BY MR. THACKSTON:

10  Q.   Have you read that opinion yet?

11               MR. KRAMER:  Objection.

12               THE COURT:  Sustained.

13  BY MR. THACKSTON:

14  Q.   All right.  In the denial --

15               MR. THACKSTON:  May I approach, Your

16       Honor?  May I display the denial that she's

17       talking about?

18               MR. KRAMER:  We object, Your Honor.

19               THE COURT:  Denials of?

20               MR. THACKSTON:  The last question.

21               THE COURT:  Can you come over here?

22       I don't know what you're talking about.

23  BY MR. THACKSTON:

24  Q.   The only denial in that Workers' Compensation

25  claim -- I'm going to represent to you that my

Dr. Jacqueline Moline, M.D. - Cross

1    information is the only denial is the defendant

2    saying, "We deny the claim."

3         Are you aware of a judicial order finding that

4    Mrs. Bell's Workers' Compensation claim was

5    unfounded?

6                   MR. KRAMER:  Same objection.

7                   THE COURT:  Overruled.

8                   THE WITNESS:  My understanding was

9              that there was a dispute and then either the

10             case was withdrawn or there was a decision.  I

11             may be misremembering, but I know it did not

12             go any further than that.  That there was a

13             dispute that there was any exposure.  I

14             thought it went and either a judge made that

15             determination or the case was withdrawn at

16             that point.  And no further action was taken.

17             So that's my recollection.  I don't know.

18    BY MR. THACKSTON:

19    Q.   Would you want that shown to the jury, if

20    there is such a thing, would you want that shown to

21    the jury in this case to back you up on that?

22    A.   Which thing?

23    Q.   If there is any such thing as an order finding

24    that Mrs. Bell's Workers' Compensation claim was

25    unfounded, would you want to jury to see that in

Dr. Jacqueline Moline, M.D. – Cross

1   this case?

2   A.   We're not here talking about Mrs. Bell.  We're

3   here talking about Mrs. Reichart.  I would like the

4   jury to hear about Ms. Reichart and not about

5   another case.

6                THE COURT:  Well, since I'm going to

7        decide what the jury hears, objection

8        sustained on that question.  If you have

9        something that you want to approach the

10       witness with, you may approach the witness

11       with.

12               The reason why you're being asked

13       about Ms. Bell was because she's part of your

14       study.  So it's not totally irrelevant.

15               Next question.

16   BY MR. THACKSTON:

17   Q.   And I happen to know something about the Bell

18   case because I was involved in it.  For the other

19   32 cases, you haven't released any identification

20   information on those 32 cases either?

21               MR. KRAMER:  Objection, Your Honor.

22               MR. THACKSTON:  It's the last

23       question.

24               MR. KRAMER:  I still object to it.

25       It could be three questions from the end.

Dr. Jacqueline Moline, M.D. – Cross

1                    THE COURT:  It's asked and answered.

2          I mean, she said she --

3                    MR. THACKSTON:  Okay.

4                    THE COURT:  Sustained, Counsel.

5                    MR. THACKSTON:  Okay.

6     BY MR. THACKSTON:

7     Q.    Now, Doctor, one of the things that your

8     article -- your article says that there were -- was

9     it three hairdressers in your study?

10    A.    Yes.

11    Q.    Okay.  And is this your article that I have on

12    the screen now?

13    A.    I'm sorry, I didn't hear what you said.

14    Q.    Is this your article that I have up on the

15    screen?

16    A.    Yes.

17    Q.    And one of the things you say that's

18    highlighted over here on the right is that, "The

19    high prevalence of unexplained or idiopathic

20    mesothelioma among women necessitates further

21    inquiry into the potential non-occupational

22    exposures such as exposure to asbestos contaminated

23    talcum powder."  Right?

24    A.    Yes.

25    Q.    So you note the -- you note the occupations of

Dr. Jacqueline Moline, M.D. - Cross

1   a few of these people.  One of the parts of the
2   paper deals with what you call fiber burden
3   studies, right?
4   A.    There were six cases that had tissue
5   evaluated.
6   Q.    It says -- your article says, "While fiber
7   burden studies are rarely undertaken in the course
8   of clinical treatment, and they're used primarily
9   for medico-legal purposes, the finding of various
10  fibers in the lung tissues can provide guidance on
11  potential prior asbestos exposure, et cetera"
12  Right?
13  A.    Yes.
14  Q.    Do you know whether there has been any fiber
15  burden analysis done of Mrs. Reichart's tissue?
16  A.    I haven't seen any.
17  Q.    Now, you reference in your papers something
18  called a mesothelioma registry?
19  A.    Can you point me to what you're talking about?
20  Q.    Do you remember mentioning the Italian
21  mesothelioma registry?
22  A.    Yes.
23  Q.    And you say that -- you say, quote, "Typically
24  patients with mesothelioma will be simply asked
25  whether they worked with or around asbestos, rather

47

Dr. Jacqueline Moline, M.D. - Cross

1   than being provided with a listing of potential
2   sources of the types of exposure in which one might
3   encounter asbestos.  Cases of mesothelioma among
4   hairdressers characterized as idiopathic, also
5   underscore the contribution of an incomplete
6   exposure history.  The potential failure to
7   identify use of talcum powder exposure in their
8   work would prevent the linking of occupational
9   exposures to asbestos in their mesothelioma.  In
10  our paper, there were three female hairdressers who
11  regularly used talcum powder in their work."
12  Right?
13  A.    Correct.
14  Q.    But then you say, "It was unclear from any of
15  the histories noted in the medical records that
16  these women were asked if they used talcum powder
17  as part of the haircutting process."  And you say,
18  "In a report from the national mesothelioma
19  registry of Italy" -- now, that's like a listing of
20  all the mesothelioma cases in Italy, right?
21  A.    Yes.
22  Q.    "Staff noted a cluster of mesothelioma due to
23  unknown exposure among a hairdressers, but they
24  examined hairdryer use as a potential exposure."
25  Right?

**JA952**

                Dr. Jacqueline Moline, M.D. - Cross

1  A.   Correct.

2  Q.   Because hairdryers at one time contained

3  asbestos, right?

4  A.   Some of them might have, not all of them.

5  Q.   And they have a fan in them that blows air

6  through them, right?

7  A.   I'm not a hairdryer expert.

8  Q.   You're not aware of whether a hairdryer has a

9  fan in it?

10 A.   I'm not going to comment on the mechanics of a

11 hairdryer.

12 Q.   And so in your article you're saying there's

13 no other possible exposure to asbestos.  But then

14 you mention hairdressers.  And then you cite an

15 article that says, a source of asbestos exposure to

16 hairdressers could be hairdryers.  Right?

17          THE COURT:  Can you put that back

18      up, please?  There's no objection, but you

19      didn't read the complete sentence in there.

20          MR. THACKSTON:  Only examine

21      hairdryer use as a potential exposure.  No

22      discussion of the occupational use of talcum

23      powder.  Footnote 51.

24          THE COURT:  If you're going to read

25      to the jury, read completely every word.

**JA953**

## CERTIFICATE OF SERVICE

This is to certify that I have this December 20, 2023, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all registered counsel.

/s/ *Benjamin L. Hatch*

Benjamin L. Hatch

*Counsel for Appellant American International Industries*