**No. 23-1972**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————

PENINSULA PATHOLOGY ASSOCIATES,

*Petitioner-Appellee*,

v.

AMERICAN INTERNATIONAL INDUSTRIES,

*Respondent-Appellant*.

————————

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 4:22-mc-00001-AWA-DEM
Hon. Arenda L. Wright Allen, U.S. District Court Judge

————————

## JOINT APPENDIX
## VOLUME III OF III: JA954 – JA1377

————————

Benjamin L. Hatch
Sylvia M. Kastens
MCGUIREWOODS, LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
(757) 640-3700
bhatch@mcguirewoods.com

*Counsel for Appellant*

Kathryn M. Ali
ALI & LOCKWOOD LLP
300 New Jersey Avenue NW
Suite 900
Washington, DC 20001
(202) 651-2476
katie.ali@alilockwood.com

*Counsel for Appellee*

December 13, 2023

# TABLE OF CONTENTS

**Page**

## Volume I

Docket Report, *In re Peninsula Pathology Assocs.*,
No. 4:22-mc-00001-AWA-DEM (E.D. Va.) ...................................... JA1

R.2 Exhibits Filed (Nov. 18, 2022)

R.2-1 - Motion to Quash Exhibit 1:
Declaration of David M. Smith, MD .................................... JA6

R.2-2 - Motion to Quash Exhibit 2:
Declaration of Theresa S. Emory, MD .............................. JA24

R.2-3 - Motion to Quash Exhibit 3:
Declaration of John C. Maddox, MD.................................. JA35

R.2-4 - Motion to Quash Exhibit 4:
Declaration of Kathryn M. Ali........................................... JA38

R.4 Exhibits Filed (Dec. 2, 2023)

R.4-1 - Opposition to Motion to Quash Exhibit A:
Excerpts of January 10, 2019 Deposition Transcript of
John Maddox, MD............................................................... JA41

R.4-2 - Opposition to Motion to Quash Exhibit B:
Excerpts of May 13, 2020 Deposition Transcript of John
Maddox, MD ....................................................................... JA50

R.4-3 - Opposition to Motion to Quash Exhibit C:
Various Deposition Transcript Cover Pages of John
Maddox, MD ....................................................................... JA69

R.4-4 - Opposition to Motion to Quash Exhibit D:
Various Deposition Transcript Cover Pages of Theresa
Swain Emory, MD.............................................................. JA88

# TABLE OF CONTENTS

**Page**

R.4-5 - Opposition to Motion to Quash Exhibit E:
Research Article *Malignant Mesothelioma Following
Repeated Exposures to Cosmetic Talc: A Case Series of 75
Patients* .............................................................................. JA98

R.4-6 - Opposition to Motion to Quash Exhibit F:
Research Article *Mesothelioma Associated With the Use
of Cosmetic Talc* ............................................................. JA105

R.4-7 - Opposition to Motion to Quash Exhibit G:
Excerpts of October 6, 2021 Trial Transcript,
*Johnson v. Johnson & Johnson*, No. JCCP
4676/20STCV17335 (Cal. Super. Ct.) ................................ JA116

R.4-8 - Opposition to Motion to Quash Exhibit H:
Expert Report of Jacqueline Moline, MD ......................... JA119

R.4-9 - Opposition to Motion to Quash Exhibit I:
Expert Report of Murray M. Finkelstein, PhD, MD ........ JA206

R.4-10 - Opposition to Motion to Quash Exhibit J:
American Int'l Indus. Opposition to Motion to Modify
Subpoena *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ............................................ JA499

R.4-11 - Opposition to Motion to Quash Exhibit K:
*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL
16571057 (M.D.N.C. Sept. 13, 2022) ................................. JA530

R.4-12 - Opposition to Motion to Quash Exhibit L:
Verified Complaint, *Gref v. Am. Int'l Indus.* (N.Y. July 8,
2020) ................................................................................... JA543

R.4-13 - Opposition to Motion to Quash Exhibit M:
Amended Complaint, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Feb. 2, 2021) ........................... JA554

# TABLE OF CONTENTS

**Page**

## Volume II

R.4-14 - Opposition to Motion to Quash Exhibit N:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. June 10, 2021) ................................ JA589

R.4-15 - Opposition to Motion to Quash Exhibit O:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Oct. 13, 2021) ................................ JA592

R.4-16 - Opposition to Motion to Quash Exhibit P:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Jan. 27, 2022) ................................ JA595

R.4-17 - Opposition to Motion to Quash Exhibit Q:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. May 24, 2022) ................................ JA597

R.4-18 - Opposition to Motion to Quash Exhibit R:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Aug. 1, 2022) ................................ JA599

R.4-19 - Opposition to Motion to Quash Exhibit S:
Scheduling Order, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Sept. 6, 2022) ................................ JA601

R.4-20 - Opposition to Motion to Quash Exhibit T:
Letter Memorandum, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Nov. 7, 2022) ........................... JA603

R.4-21 - Opposition to Motion to Quash Exhibit U:
Third Amended Notice of Videotaped Deposition of Dr.
Gregory Diette, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-
05589-GBD (S.D.N.Y. Nov. 22, 2022) ................................ JA624

# TABLE OF CONTENTS

**Page**

R.4-22 - Opposition to Motion to Quash Exhibit V:
Second Amended Notice of Videotaped Deposition of Dr.
Suprith Badarinath, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Jan. 7, 2022) ............................ JA629

R.4-23 - Opposition to Motion to Quash Exhibit W:
Amended Notice of Videotaped Deposition of Dr. Ehsan
Shirazi, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Jan. 7, 2022) ...................................................... JA634

R.4-24 - Opposition to Motion to Quash Exhibit X:
Plaintiff's Supp. Interrogatory, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y. Jan. 19, 2022) ........... JA639

R.4-25 - Opposition to Motion to Quash Exhibit Y:
Defendant's Response to Plaintiff's Supp. Interrogatory,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Feb. 18, 2022) .................................................... JA648

R.4-26 - Opposition to Motion to Quash Exhibit Z:
Excerpt of Defendant's Supp. Request for Admission,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Apr. 7, 2022) ...................................................... JA657

R.4-27 - Opposition to Motion to Quash Exhibit AA:
Defendant's Second Request for Production, *Gref v. Am.
Int'l Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. May 6,
2022) ................................................................................... JA662

R.4-28 - Opposition to Motion to Quash Exhibit BB:
Plaintiff's Response to Defendant's Supp. Request for
Admission, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. May 9, 2022) ............................................. JA669

iv

# TABLE OF CONTENTS

**Page**

R.4-29 - Opposition to Motion to Quash Exhibit CC:
Plaintiff's Response to Defendant's Second Request for
Production, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. June 6, 2022) ........................................... JA678

R.4-30 - Opposition to Motion to Quash Exhibit DD:
Subpoena to Produce, *Gref v. Am. Int'l Indus.*, No. 1:20-
CV-05589-GBD (S.D.N.Y. Oct. 31, 2022) .......................... JA683

R.4-31 - Opposition to Motion to Quash Exhibit EE:
Excerpts of October 1, 2020 Deposition Transcript of
Theresa Swain Emory, MD, *Bell v. Am. Int'l Indus.* ......... JA688

R.4-32 - Opposition to Motion to Quash Exhibit FF:
Excerpts of August 6, 2015 Deposition Transcript of John
C. Maddox, MD, *Archdeacon v. Ameron Int'l Corp.* ......... JA699

R.8 Exhibits Filed (Dec. 8, 2022)

R.8-1 - Reply in Support of Motion to Quash Exhibit 1:
Plaintiff's Letter Motion to Compel, *Gref v. Am. Int'l
Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y. Nov. 21,
2022) .................................................................................. JA705

R.8-2 – Reply in Support of Motion to Quash Exhibit 2:
Defendant's Response to Plaintiff's Letter Motion to
Compel, *Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-
GBD (S.D.N.Y. Dec. 2, 2022) ........................................... JA731

R.8-3 – Reply in Support of Motion to Quash Exhibit 3:
Excerpts of September 23, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) .................................. JA735

R.8-4 – Reply in Support of Motion to Quash Exhibit 4:
Excerpts of July 6, 2022 Deposition Transcript of
Jacqueline Moline, MD, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y.) .................................. JA878

# TABLE OF CONTENTS

**Page**

R.8-5 – Reply in Support of Motion to Quash Exhibit 5:
Excerpts of June 22, 2022 Deposition Transcript of
Murray M. Finkelstein, MD, PhD, *Gref v. Am. Int'l
Indus.*, No. 1:20-CV-05589-GBD (S.D.N.Y.) ..................... JA892

R.8-6 – Reply in Support of Motion to Quash Exhibit 6:
Supp. Declaration of Theresa S. Emory, MD, *In re
Subpoena for Documents Issued to Peninsula Pathology
Associates* (E.D. Va. Dec. 8, 2022) ..................................... JA902

R.8-7 – Reply in Support of Motion to Quash Exhibit 7:
Plaintiff's Letter Reply in Support of Motion to Compel,
*Gref v. Am. Int'l Indus.*, No. 1:20-CV-05589-GBD
(S.D.N.Y. Dec. 7, 2022) ...................................................... JA910

R.8-8 – Reply in Support of Motion to Quash Exhibit 8:
Excerpts of Corrected September 25, 2020 Motions
Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-
00111 (M.D.N.C.) ............................................................... JA914

R.8-9 – Reply in Support of Motion to Quash Exhibit 9:
Excerpts of March 11, 2020 Trial Transcript, *Johnson v.
Am. Int'l Indus.*, Nos. MID-L-006651-16ASL, MID-L-
007336-16AS (N.J. Super. Ct.) .......................................... JA922

R.8-10 – Reply in Support of Motion to Quash Exhibit 10:
Excerpts of October 13, 2022 Trial Transcript, *Fisher v.
Am. Int'l Indus.*, No. 0877 (Penn. Ct. Common Pleas)..... JA937

## Volume III

R.10 – Transcript of December 16, 2022 Proceedings
(Dec. 22, 2022)................................................................... JA954

R.11 – Order Granting Motion to Quash (Dec. 23, 2022) ............. JA1012

# TABLE OF CONTENTS

**Page**

R.18 Exhibits Filed (Jan. 11, 2023)

R.18-1 - Motion re Objections to Magistrate Judge's Order
Exhibit 1: Excerpts of October 1, 2020 Deposition
Transcript of Theresa Swain Emory, MD, *Bell v. Am.
Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.) ..................... JA1020

R.18-2 - Motion re Objections to Magistrate Judge's Order
Exhibit 2: Excerpts of October 13, 2022 Trial Transcript,
*Fisher v. Am. Int'l Indus.*, No. 0877
(Penn. Ct. Common Pleas)................................................ JA1032

R.18-3 - Motion re Objections to Magistrate Judge's Order
Exhibit 3: Complaint, *In re LTL Mgmt. LLC*, No. 21-
30589 (MBK) (D.N.J. Bankr.)......................................... JA1038

R.18-4 - Motion re Objections to Magistrate Judge's Order
Exhibit 4: Scheduling Order, *Gref v. Am. Int'l Indus.*,
No. 1:20-CV-05589-GBD (S.D.N.Y. Dec. 23, 2022)......... JA1093

R.18-5 - Motion re Objections to Magistrate Judge's Order
Exhibit 5: Order, *Burnett v. Am. Int'l Indus.* (W.D. Ark.
July 26, 2022) ................................................................. JA1097

R.20 Exhibits Filed (Jan. 25, 2023)

R.20-1 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 1: Excerpts of December 16, 2022
Motions Hearing Transcript, *Peninsula Pathology
Assocs. v. Am. Int'l Indus.*, No. 4:22mc1 (E.D. Va.)........ JA1102

R.20-2 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 2: Expert Opinion Letter............ JA1161

R.20-3 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 3: Research Article: *Exposure to
Cosmetic Talc and Mesothelioma* ................................... JA1234

## TABLE OF CONTENTS

**Page**

R.20-4 - Opposition to Motion re Objections to Magistrate
Judge's Order Exhibit 4: Excerpts of October 1, 2020
Deposition Transcript of Theresa Swain Emory, MD, *Bell
v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1248

R.21 Exhibits Filed (Jan. 31, 2023)

R.21-1 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 1: Excerpts of October 1, 2020
Deposition Transcript of Theresa Swain Emory, MD, *Bell
v. Am. Int'l Indus.*, No. 1:17-cv-00111 (M.D.N.C.).......... JA1271

R.21-2 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 2: Notice of Judgment, *Pollock v.
Northrop Grumman Shipbuilding, Inc.*, No. 2010-07791
(La. Civ. Dist. Ct. July 29, 2010).................................... JA1295

R.21-3 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 3: Excerpts of September 25, 2020
Hearing Transcript, *Bell v. Am. Int'l Indus.*, No. 1:17-cv-
00111 (M.D.N.C.) ............................................................. JA1304

R.21-4 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 4: Excerpts of April 12, 2021
Hearing Transcript, JCCP No. 4674 (Cal. Super. Ct.)... JA1314

R.21-5 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 5: Research Article: *Exposure to
Cosmetic Talc and Mesothelioma* ................................... JA1322

R.21-6 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 6: Plaintiff's Motion to Dismiss, *In
re Bell*, I.C. No. 19-732863 (N.C. Indus. Comm'n Dec. 1,
2015) ................................................................................. JA1336

R.21-7 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 7: Denial of Workers'
Compensation Claim........................................................ JA1346

# TABLE OF CONTENTS

**Page**

R.21-8 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 8: Mesothelioma Claim .............. JA1355

R.21-9 - Reply in Support of Motion re Objections to Magistrate
Judge's Order Exhibit 9: Defs.' Response to Motion to
Dismiss, *In re Bell*, I.C. No. 19-732863 (N.C. Indus.
Comm'n Jan. 8, 2020) ...................................................... JA1361

R.24 – Order Affirming Order Granting Motion to Quash
(Aug. 14, 2023) ................................................................ JA1367

R.30 – Notice of Appeal (Sept. 13, 2023) ...................................... JA1371

FRAP 10(e)(2)(A) Supplement[1]

Corrected Exhibit G to Defendant's Opposition to Motion
to Quash (R.4-7): Excerpts of October 6, 2021 Trial
Transcript, *Johnson v. Johnson & Johnson*, No. JCCP
4676/20STCV17335 (Cal. Super. Ct.) .................................. JA1374

---

[1] The parties stipulated to supplementing the record with this corrected exhibit pursuant to FRAP 10(e)(2)(A) as one page was inadvertently omitted from the exhibit below.

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                     NEWPORT NEWS DIVISION


 3


 4  PENINSULA PATHOLOGY ASSOCIATES,    )
                                       )
 5            Petitioner,              )
                                       )
 6  v.                                 )      Civil Action No.:
                                       )           4:22mc1
 7  AMERICAN INTERNATIONAL INDUSTRIES,)
                                       )
 8            Respondent.              )

 9

10           TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

11          (Hearing on Motions to Quash and Sanctions)

12
                              Norfolk, Virginia
13                            December 16, 2022

14

15  BEFORE:   THE HONORABLE DOUGLAS E. MILLER
              United States Magistrate Judge
16

17

18  Appearances: (Via Videoconferencing)

19          ALI & LOCKWOOD
                By: Kathryn Marshall Ali
20                  Elizabeth Catherine Lockwood
                    Counsel for Petitioner
21
            LATHROP GPM, LLP
22              By: Robert E. Thackston
            -- and --
23          WILLCOX & SAVAGE
                By: Eric David Cook
24                  Counsel for Respondent

25
```

2

1                    P R O C E E D I N G S

2

3              (Commenced at 2:41 p.m. as follows:)

4

5              THE COURT:  All right.  I'm sorry, I don't know what's

6    going on with my computer, it's still spinning in the

7    background, but my law clerk, Will Metcalf, is connected, so

8    I'll have him sit next to me and use his computer so we can get

9    started.  I apologize.

10             Ms. Dodge, is everyone else ready?

11             COURTROOM DEPUTY CLERK:  Yes, sir.  Peninsula

12   Pathology Associates v. American International Industries, Case

13   4:22mc1.

14             Are the parties ready to proceed?

15             MR. THACKSTON:  Yes.

16             THE COURT:  All right.  It looks like I have -- is it

17   Ali or a Ali?

18             MS. ALI:  You know, either is fine, Your Honor.  It's

19   the subject of debate in my household.  But I say Ali.

20             THE COURT:  All right.  Ms. Ali, it's nice to have,

21   you, and Ms. Lockwood, you all are here for the movant, I guess,

22   and Mr. Cook and Mr. Thackston for the party who initiated the

23   subpoena.  I'm not sure who's taking the lead on this.  Is it

24   going to be you, Ms. Ali?

25             MS. ALI:  I'm going to start, Your Honor.  Ms.

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA955**

1    Lockwood is better prepared --

2           THE COURT:  Hold on a second.  My computer just

3    decided to work.  Let me see if I can switch.

4           (Pause in the record.)

5           COURTROOM DEPUTY CLERK:  Can you hear us?

6           Apparently not.

7           THE COURT:  Okay.  So the good news is that we haven't

8    had to use Zoom in a long time, so that's why we're apparently

9    unfamiliar with it.  But in any event I'm going to...

10           MR. THACKSTON:  Your Honor, Robert Thackston.  I just

11    wonder if it would save some time if, rather than have the other

12    side try to characterize what they think the subpoena is, if I

13    were to characterize what we intend the subpoena to be, I wonder

14    if that might save the Court some time.

15           THE COURT:  I probably have more questions for you,

16    Mr. Thackston, if you're going to take the lead on this, I'm

17    fine to proceed that way.

18           MR. THACKSTON:  Thank you, Your Honor.

19           THE COURT:  I've read everything that you've submitted

20    and I've looked over -- the matter's obviously very thoroughly

21    briefed.

22           Let me just say before we begin, though, I see a

23    number of people who have weighed in to observe.  Obviously it's

24    a public hearing, anyone's welcome to listen in.  I will just

25    say, however, Paul McManus is an official federal court

4

1  reporter, he's keep the transcript.  He should be the only

2  person who's recording the proceedings.  So no one else should

3  be making any kind of a record or transcript of what's going on.

4          But go ahead, Mr. Thackston.  I'm happy to hear

5  anything else you want to say.

6          MR. THACKSTON:  Thank Your Honor.  And I appreciate

7  your letting me go first, only because I think there's a little

8  bit, there's some misunderstandings about what it is that we're

9  trying to accomplish.

10          I represent a company called A-I-I, which is a family

11  owned management company out in California, and they have been

12  sued in a number of cases in which there have been allegations

13  that cosmetic talc had trace contaminations of asbestos and

14  caused mesothelioma.

15          Now, I don't know about the Court's knowledge about

16  the historical litigation involving asbestos --

17          THE COURT:  We are in the same district as the largest

18  Naval base and the largest Naval shipyard in the world, so we

19  have plenty of familiarity with mesothelioma and asbestos.  And

20  also I've read your entire brief and a good part of the exhibits

21  that were attached to both, so you don't need to give me the

22  whole background.  I do understand what Mr. Gref's issue is and

23  the nature of the claims that you're defending in New York, and

24  so you can just cut to the chase with regard to Dr. Emory's

25  article.  That's really what we're here about.

1          MR. THACKSTON:  Absolutely, Your Honor.  And if I

2   could share a screen to do that, I will put the article up.

3          After decades of litigation involving asbestos that

4   never mentioned anything about cosmetic talc, in the last

5   several years, several individuals who are prolific experts for

6   the plaintiffs in asbestos litigation, namely Gordon and

7   Millette, they published one article; Moline published one

8   article, and Emory published one article.  And they're

9   ground-breaking articles to the extent that they claim that

10  nevermind what we said for the last 30 years, but it's cosmetic

11  talc that's causing mesothelioma.  It's adulterated with trace

12  levels of asbestos.  And we found these series of people that

13  have mesothelioma and they didn't have any asbestos exposure

14  except for cosmetic talc.

15          And the Emory article, the interesting thing about it

16  is the strawman here is can physicians protect confidential

17  information given them by patients.  Absolutely.  Does that have

18  anything to do with this issue before the Court?  Absolutely

19  not.  There's no allegation that the Dr. Emory was a physician

20  to any of these cases that she wrote about.  Instead -- and here

21  is the title if the Court can see the article --

22          THE COURT:  I've read it.  I've read it.  And again,

23  Mr. Thackston, I don't -- I'm happy to hear what you want to

24  say, but I've read it all.  I read the whole article.  It's only

25  seven pages long.  It's very brief.  I've looked at exactly how

1  Dr. Moline is using it and Dr. Finklestein is using it.  So I

2  know exactly what it is you're defending.  I don't need the

3  background.

4          Here's what I want to know:  Dr. Emory is not a

5  witness.  She's not in the case.  She's not here.  Why would

6  this be the case that Dr. Emory or her company would have to

7  respond to this incredibly burdensome subpoena.  I just don't

8  understand why you've picked this case to single out, because I

9  frankly see almost no connection between Dr. Emory's study and

10 the case you're defending in New York, at least with respect to

11 Mr. Gref.

12         MR. THACKSTON:  Well, first of all, Your Honor, in

13 whatever case we issued a subpoena it's going to wind up before

14 Your Honor, right?  Because that's where Dr. Emory  is, and

15 that's where the records are.  So it wouldn't make any

16 difference which case it was.  Every case has an expert that's

17 relied on two things -- really three, Gordon, Moline and Emory,

18 right?  And so whichever case -- we almost got there in an

19 Arkansas case and the plaintiffs took the money the day that Dr.

20 Emory's stuff was due.  The Arkansas court says she will answer

21 these questions.  For all we know, Mr. Gref is one of the

22 subjects, right?

23         THE COURT:  Well, now, I wanted to ask you about that,

24 because it's very clearly spelled out in the study -- and I

25 looked at your own expert -- I mean, the expert's report.

7

1  Dr. Moline says he was diagnosed in 2019, and there are two

2  people who are diagnosed in 2019.  This is in the opposition

3  brief.  And they're both over 70 years old and one of them's a

4  woman.  And so again, she's not willing to tell you names, but I

5  frankly don't see how, based on the very brief summary of that

6  study, you can have a good-faith basis to believe that Mr. Gref

7  was one of her subjects.

8          MR. THACKSTON:  Well, Your Honor, we don't know.  And

9  she --

10          THE COURT:  Why don't you know?  Why don't you know,

11  Mr. Thackston?

12          MR. THACKSTON:  Because -- well, we --

13          THE COURT:  Do you think she's lying to you about the

14  age or the year of diagnosis?

15          MR. THACKSTON:  Oh, no, no, no.  I mean, we don't know

16  about any of the specific people because they've taken the

17  position they can't tell us.

18          She said that she had something like a 100-plus files

19  that she looked at and she decided they did not belong in there,

20  and if Mr. Gref was one that did not belong in there because he

21  was, his parents were both in the Navy and they both worked and

22  lived in Newport News, that would be relevant information.

23          But the point is in the other case that we have with

24  Dr. Moline, the only reason we know that one of the people had

25  alleged occupational exposure to asbestos was a happenstance of

8

1   Dr. Moline happened.  And they're using these offensively.  If

2   you've read the Bell decision.

3              THE COURT:  When you say "they're" using it, who is

4   using it?

5              MR. THACKSTON:  Both Doctor -- both -- well, both

6   plaintiff's expert is using --

7              THE COURT:  This subpoena originated in New York, the

8   Southern District, where you're defending a case that was filed

9   by Mr. Gref.  Now, Mr. Gref has hired -- or his lawyers have

10  hired Dr. Moline and you've deposed Dr. Moline, and Dr. Moline

11  wrote her own study.  And I looked at Dr. Moline's report, I

12  looked at the 200-plus pages report from Dr. Finkelstein, and

13  I -- and you pointed me exactly to where it was, it was very

14  helpful.  It's like this.  It's like this [indicating].  It's

15  almost nothing.  I mean, the pages and pages of talc has

16  asbestos, talc has asbestos, this is the way asbestos can be

17  absorbed, these are all of the things, and oh, by the way, there

18  were two studies which found it happened after exposure to talc.

19  I mean, that's what they say.

20             MR. THACKSTON:  It's, it's the, it's the absolute

21  linchpin of talc litigation.  It is the only thing that --

22             MS. ALI:  May I be heard, Your Honor?

23             THE COURT:  Just a minute.  I'm going to give you an

24  opportunity to weigh in.

25             MR. THACKSTON:  Your Honor, it is the reason that talc

1  litigation exists.  These two articles are the only alleged

2  epidemiological link between cosmetic talc and mesothelioma.

3        So they're in the shipyard.  You have many, many

4  studies that show the occupations that are at risk for

5  mesothelioma:  Shipyard workers, insulators, pipe fitters.

6  Nobody has ever suggested that barbers, for example,

7  cosmetologists who work with talc all the time, are at risk for

8  mesothelioma, even though they work with cosmetic talc all the

9  time.  That was a problem for the plaintiffs because you've got

10  to have general causation, right?  Can cosmetic talc cause

11  mesothelioma, before you get to specific causes, causes in this

12  particular case.  And faced with that lack of epidemiology, the

13  plaintiff's own experts created their own articles using

14  litigation information.  And there's not -- and as just Osteen

15  found in the Middle District of North Carolina, you can't use

16  that affirmatively in these case as an expert in federal court

17  and not disclose your reliance materials.

18        And it's undisputed -- Your Honor, on the burden

19  question, we'll take a list of the cases, right?  There was no

20  offer of anything.  We could start with a list of the cases and

21  then we can come back to the Court and say, well, here's 75

22  cases, we have 20 litigation files, and in those 20 litigation

23  files, these people have bankruptcy trust claims for asbestos

24  exposure, they have Worker's Compensation claims like the Bell

25  case.

10

1    And so we asked the Court to allow us to go to the

2 next step of saying produce the litigation materials, the

3 depositions and the answers to interrogatories, nothing else at

4 this point, and then if those show that there was other

5 exposures then we might ask the Court to let us go to the next

6 step.

7    So we had to ask for all of it first, but we would

8 start with just a list of the cases.  And nobody can claim that

9 the list of the cases is private patient information, because

10 she received that list of cases as an expert for the plaintiff

11 in litigation.

12    THE COURT:  Okay.

13    MR. THACKSTON:  We can start with that, Your Honor.

14    THE COURT:  Okay.

15    MR. THACKSTON:  Mr. Cook has more on the specifics of

16 why these privileges don't apply, but I just wanted to let the

17 Court know --

18    THE COURT:  Before we even get to the privileges I

19 have to determine whether the subpoena itself unduly burdensome.

20 And the question -- if it's unduly burdensome, and

21 that requires -- I mean, frankly, this Fourth Circuit case

22 Jordan which was just decided a couple years ago lays it out for

23 non-parties.  And you have to look at both sides of this

24 equation.  And the biggest problem I have with your motion -- or

25 with your subpoena in this court in resisting the motion to

1  quash it is we have a non-party who is a non-witness who has not

2  been designated, whose only connection to the Gref litigation is

3  the fact that her study -- a study she wrote with two co-authors

4  which has been available for over two years is mentioned in one

5  sentence and one footnote of Dr. Moline's report and a half a

6  page of from Finkelstein's 280-plus pages.  And that means -- I

7  know you say it's the linchpin, but from the record that's here

8  on this motion, it doesn't seem like much of a linchpin.

9        Now, maybe the attorneys are mis-using it, maybe the

10  attorneys are moving it or saying that it says something that it

11  doesn't say, but I don't know how that changes the relevance of

12  the survey that Dr. Emory put together in terms of its relevance

13  to Mr. Gref's case.

14        MR. THACKSTON:  Your Honor, Judge Osteen just wrote a

15  41-page opinion on nothing but this topic, right?

16        THE COURT:  Well, Judge Osteen was presiding over a

17  mesothelioma case, right?  Judge Osteen wasn't dealing with a

18  non-party subpoena in a case that wasn't pending in front of

19  Judge Osteen.

20        MR. THACKSTON:  Well, the argument was -- it started

21  out that way because we -- it was -- Moline and Emory were both

22  in that case and we didn't know that he was presiding over one

23  of the cases because they wouldn't disclose what the cases were.

24        But Emory -- this is not a case where it's Cedar

25  Sinai, had nothing to do with the litigation.  She is a

12

```
 1  litigation witness in dozens of cases.  Maybe not Gref, but
 2  the --
 3              THE COURT:  We're talking about Dr. Emory?
 4              MR. THACKSTON:  And Dr. Emory and Dr. Emory  Maddox
 5  wrote this while serving as litigation consultants for the
 6  plaintiffs.
 7              If we scroll to the last, to the very last page of the
 8  article it says two important things:  One -- do we still have
 9  screen share on this?
10              THE COURT:  It's all right.  I've seen the article.  I
11  have it.  I know exactly what it says.  It says that they --
12              MR. THACKSTON:  Here's why they're not just an
13  innocent third party.  It says that they serve as expert
14  witnesses for plaintiffs this talc litigation, right?  So this
15  was written while they were serving as expert witnesses for use
16  by expert witnesses, and there's no dispute that Dr. Emory used
17  it as an expert witness in talc litigation.
18              She's not in the Gref case at the moment but to say
19  they only mentioned it one time, they -- they mention it as the
20  reason that they should be entitled to go forward in these
21  cases, both the Moline article and the Emory article.
22              And as Judge Osteen said, he unsealed the fact that
23  Bell was one of the plaintiffs because it's not fair to use this
24  affirmatively.  He cited an example of the plaintiff's lawyer
25  arguing in closing look at what Dr. Moline's article says?  It
```

1  says that cosmetic talc causes mesothelioma.

2        The list of cases.  There's nothing -- just start off

3  with what are the 75 cases.  That's one -- I'll show you an

4  example of what Northwell produced in the Gref case -- in the

5  Bell case.  They have a, they had a spreadsheet that has the

6  name of the 33 in the Moline case and they just redacted the

7  others.  They gave us one that showed it was Betty Bell.

8        THE COURT:  The reason they redacted them is because

9  the judge didn't order them disclosed.  The only one the judge

10 ordered disclosed was Bell, which you already knew.

11        MR. THACKSTON:  Well, we didn't know it until they

12 admitted it, Your Honor.  We suspected it, but we didn't know

13 it.  We suspected it because of circumstantial evidence, but we

14 didn't know it until they produced this.

15        And we didn't press the issue about the other 32.

16 They said okay -- the magistrate judge said I'm not inclined to

17 give you the other 32, we said that's fine, we didn't even

18 appeal that, we said just give us Bell.  And when we got Bell,

19 we said -- we won the case on summary judgment, then we went

20 back and said we need to unseal this, and Judge Osteen followed

21 the Fourth Circuit's rules for unsealing and felt there was a

22 compelling public interest in this issue, because this article

23 was being used offensively to support cosmetic talc.  And the

24 defendant's hands were tied because even if all 75 of these

25 cases or 33 in the Moline case, if they were dead wrong, we

1   didn't have any way to ask questions about it.

2           And Judge Osteen said from a public policy standpoint

3   and from a *Daubert* standpoint the defendants are not only

4   entitled but required to try to find out what the underlying in

5   facts are.  So her litigation files are not privileged, it's not

6   a burden to produce their list, and if we need anything more

7   than that, we'll come back to the Court.  So today we would take

8   a list of the 75 cases, period.

9           THE COURT:  Okay.  Ms. Ali, do you want to respond to

10  some of what you heard?

11          MS. ALI:  Yes, Your Honor.  Thanks.

12          I think, you know, you, Your Honor, cut to the heart

13  of the matter here.  The question is, for this court, in

14  connection with this motion that's pending before the court, is

15  the relevance of Dr. Emory's study to the Gref litigation,

16  right?  Rule 45 subpoenas, they're issued out of a particular

17  case, this isn't a -- that's how they work, right?  The

18  relevance question is, is it related to Gref?  And I haven't

19  heard anything today, we haven't seen anything in the briefing.

20  We've also read the Moline report, the Finklestein report, we've

21  read their depositions, which were extensive, where Emory was

22  barely discussed at all.  Whatever my colleagues on the other

23  side think that Emory is relevant to in terms of national

24  litigation, other litigations that they may be involved in,

25  she's just barely relevant, if at all, to the Gref litigation.

1  And that is sort of the start and end point here.

2          In addition to other arguments we've made, obviously

3  we've raised issues with timeliness, and we can talk about the

4  privileges question if Your Honor would like, though I -- you

5  know, as you said, these issues have been extensively briefed

6  and I don't want to go round and round on things that we've put

7  in the briefing.  But the question here is really what is the

8  relevance to Gref as compared to the burden on Peninsula and the

9  burden on Dr. Emory.  There is no basis under Rule 45 to do a

10 broad fishing expedition for something that might be relevant to

11 other litigations going on around the country.  You know, we --

12 obviously that's what's going on here.  There's no answer to the

13 question of what the relevance to Gref is.  You see it from the

14 face of the reports, you see it from the face of the deposition

15 transcripts.  You know, she's cited in a single sentence in the

16 Moline report which cites, I think, 500 other sources.  She's

17 cited in, you know, half-a-page most of which is a table in the

18 Finkelstein report.

19          And so, you know -- and they've made clear what they

20 want this for today in this hearing.  They have made it clear in

21 the briefing on Page 5 of their brief, on Page 23 of their

22 brief, that this is for other cases pending throughout the

23 nation.  But that's not what Rule 45 is for.  That is a total

24 abuse of the subpoena process.  It is a violation of

25 Rule 45(b)(1), a violation of (d)(3).  You know, that's the

1  context here about what's really going on.

2          I do want to correct the record on a couple of things.

3  No. 1, the concept that Dr. Emory's study is the linchpin of

4  talc litigation throughout the country and asbestos litigation

5  and it wouldn't exist without it.  First of all as they have

6  said over and over again in their briefing, the cases in Dr.

7  Emory's studies came from litigation.  All of this talc

8  litigation predated the studies.  They're doing a retrospective

9  study of cases that were already filed.  These articles were

10  published in 2020.  You know, talc litigation has been going on

11  for decades before that.  So it's, I don't -- I'm not a talc

12  litigator, maybe there's something I don't know, but that

13  doesn't track for me.

14          And in Bell, you know, A-I-I has cited Bell as though

15  it is this, you know the --

16          THE COURT:  Bell is Judge Osteen's opinion?

17          MS. ALI:  Yes.  I'm sorry.  It's Judge Osteen's

18  opinion.

19          THE COURT:  I thought that was the case.

20          MS. ALI:  In that case, as Your Honor noted, first of

21  all, it's the only case in the country that we're aware of where

22  a court has allowed disclosure of any study, any subject of any

23  study.  And Bell was extremely -- the Court was extremely

24  careful -- and this is both in the magistrate judge -- the

25  transcript that was held of the hearing held before the

17

1    magistrate judge, and in the case in 2020 which we cited as an

2    exhibit to our brief and also in the court's -- the recently

3    order from a couple of months ago, that the district court's

4    order was very explicit that any disclosure was limited to Ms.

5    Bell herself.  And that was for a few reasons, none of which are

6    present here.

7              No. 1, she had executed a HIPAA waiver for that case,

8    right?  She had said she had executed a HIPAA waiver to release

9    medical records in the context of her own litigation, which that

10   was.  She was dead by the time the study was even conducted.  So

11   the Court, whether wrongly or rightly determined that she wasn't

12   entitled to any human subject protection on account of that.

13             And No. 3, the cat was already out of the bag.

14   Northwell, whether -- again, I wasn't involved in this case, but

15   my understanding is that Dr. Moline's employer sort of

16   inadvertently produced a document that they later tried to claim

17   protection over which had identified Ms. Bell as the subject of

18   the study.

19             So the cat was already out of the bag at that point,

20   and there was sort of no way to right that ship.

21             As to every other one of the studies, the subjects of

22   the Moline study, the court was explicit that it was totally

23   inappropriate to disclose the subjects of that study.

24             And I'll mention as well that Dr. Emory was an expert,

25   a testifying expert in Bell.  Counsel for A-I-I deposed her for

```
 1  24 hours in that case.  They asked her to disclose the subjects
 2  of the study, she refused, and they never pursued it.  And then
 3  they waited, right, until -- and that was while this Gref case
 4  was pending.  And so they didn't pursue it in this case where
 5  she was a testifying expert, and instead they waited until a
 6  year after discovery closed in Gref to serve a third-party
 7  subpoena on Peninsula which has nothing really to do with this
 8  case.
 9          So again, I'm happy to go through the other reasons
10  why we think --
11          THE COURT:  No, I don't need, I don't really need to
12  hear any more.
13          I did want to ask Mr. Thackston with respect to the
14  timing, it looks like from the briefing you were supposed to
15  have another conference with Judge Figueredo in New York.  Did
16  that occur and what was the status?  Did she authorize an
17  additional or extension of the deposition of Dr. Moline?
18          MR. THACKSTON:  It did occur, and interestingly, the
19  judge ruled that she was going to hold in-person hearings in New
20  York on this matter on February 8th with respect to Dr. Moline
21  and Northwell.
22          And no disrespect to Ms. Ali, but I have absolutely no
23  idea where she's getting her information.  Some of what she said
24  is about as wrong as -- we did not take Dr. Moline's deposition
25  in Bell for 24 hours.  She disappeared.  She withdrew.  Judge
```

1   Osteen's order says --

2           MS. ALI:  That was Dr. Moline.  I'm talking about my

3   client, Dr. Emory.  You did -- I can pull up the deposition

4   transcript into the record.

5           THE COURT:  Emory's deposition.

6           MR. THACKSTON:  So Dr. Moline withdrew from the case.

7           Your Honor, I guess what I'm not getting is, because

8   Dr. Emory is there -- and by the way, talc litigation has not

9   been going on for decades.  Talc litigation started after 2014

10  with the Gordon/Millette article.  If the judge is aware of a

11  cosmetic talc cases before 2014...

12          The cases that have been filed many times, the cases

13  have other -- that's the point of our subpoena.  Some of the

14  cases are against asbestos defendants, right?  And if she's

15  counting in her 75 cases ones that are against asbestos

16  defendants, then they're not valid cases to say there was only

17  cosmetic talc.  So...

18          THE COURT:  I'm -- I don't mean to cut you off, but I

19  don't -- I just think that you are overstating what this

20  document says.  I mean, it's seven pages long.  It says cosmetic

21  talc may cause mesothelioma and it has 11 digestion studies.  It

22  draws an analogy between the fibers discovered in those

23  digestion studies and the fibers which have been linked to

24  certain mined talc.  That's what it says.  It doesn't do any

25  more than that.

20

1            Now, maybe lawyers are using it to say more than that,

2   or other experts are using it to say more than that, but the

3   study itself, it has -- a lot of what you're describing as

4   undermining its legitimacy is right there on the face of the

5   document.  She says we work for plaintiffs.  She says we got

6   these studies from existing litigation.  She's not trying to

7   hide the ball.

8            MR. THACKSTON:  But by saying that there was no other

9   exposure when there was --

10           THE COURT:  She says there was no other reported

11  exposure.  That's what she says, that there was no other

12  reported exposure.

13           MR. THACKSTON:  It's not that important.  Mr. Kramer,

14  the plaintiff's counsel on the line, why don't we ask Mr. Kramer

15  whether he will stipulate that none of his experts will mention

16  Dr. Emory's report or article.  I'll bet it's so important that

17  they absolutely have to use it.

18           MS. ALI:  Your Honor, respectfully, that is not the

19  test for relevance.  Whether an expert mentions another study

20  among 492 others is not the test for relevance of the question

21  on a Rule 35 subpoena is a balancing --

22           THE COURT:  I'm not litigating the Gref case.  The

23  Gref case is not being litigated here, nor is any other talc

24  case that's being litigated here.  What's being litigated here

25  is the extent to which this subpoena creates an undue burden,

21

1  and one of the elements the Court has to examine is the extent

2  of the relevance of the material or the moving party's, the

3  subpoena's party's need for it.  And a number of things weigh

4  against you, Mr. Thackston, including the things I've already

5  observed with regard to how little they're mentioned by the

6  actual testifying experts in your case.

7          But also the timeliness -- I mean, frankly the

8  timelinesses is of concern.  I don't think I would absolutely

9  quash the subpoena solely on the basis that it was untimely,

10 given that discovery is ongoing.  But the fact that it was not

11 requested earlier in discovery does speak to its relevance to

12 the Gref litigation.  The fact that the case had been going on

13 for two years, and this deposition -- or this subpoena was only

14 issued to Dr. Emory -- or to Dr. Emory's company in November of

15 2022 speaks to its importance to the case and, in the Court's

16 view, diminishes its importance to the Gref case.  So that

17 weighs against you in terms of its burden that it creates.

18         And it's also -- I find it to be an incredibly

19 burdensome subpoena to respond to.  You've been a little bit

20 dismissive of the statements by Dr. Smith and Dr. Emory

21 regarding the burden of responding to this subpoena, but you

22 have sworn declarations, and they don't appear to me to be

23 incredible given the nature of the material that you're seeking

24 in this case.

25         MR. THACKSTON:  Well, Your Honor given that I've

1   conceded that all we're asking for is a list of cases, I don't

2   think we can get the burden at this point.  It's not burdensome

3   to print out your spreadsheet.

4          And for counsel to on one hand say I know nothing

5   about talc litigation and for the Court -- you know, with all

6   due respect, Your Honor, if you don't know anything about a talc

7   case, how can you say it is not important to a talc case?  I'm

8   telling you that when these experts take the stand they might

9   have 400 pages of fluff, but the two things that they talk about

10  are Dr. Emory's study and Dr. Moline's study, because they're

11  the only two studies in the world that claim to draw any kind of

12  relationship between cosmetic talc exposure and mesothelioma.

13  They say they're the first ones to do it.  And so it doesn't

14  matter that you're talking about 40-year-old stuff, the

15  40-year-old stuff wasn't getting you to the jury or wasn't

16  getting past *Daubert*.  But these two things are getting you past

17  *Daubert*.

18          THE COURT:  So you did just hit on one point that I am

19  interested in exploring with the other side, and that is the

20  nature of the peer review that the article underwent.  Because

21  one of the things that was requested in the subpoena was the

22  peer review process.  And it does -- I mean, as I said to Mr.

23  Thackston, I think a significant problem with the subpoena is

24  that there's a lot of disclosure already in the article that

25  provides the defense lawyers some ability to challenge the

1  strength of it as a research document in terms of the bias

2  that's been disclosed, the litigation nature of the sample size,

3  those things they already have to defend.  But one of things

4  that insulates it from that is the fact that it is

5  peer-reviewed, and I wonder what information's available to Dr.

6  Emory or Dr. Maddox or whoever else was involved regarding the

7  peer-review process that the article underwent.

8         MS. ALI:  So I don't have the information about the

9  peer-review process, because obviously our position here is that

10 the subpoena should be quashed in its entirety.

11        I will say, you know, they have -- A-I-I has deposed

12 Dr. Emory in cases where she is a witness and taken, I assume,

13 her [audio interrupted] everything that she's required to

14 provide as an expert in state and federal cases that this is

15 certainly something they could have probed in those cases,

16 certainly something they can probe with her in the future, as I

17 am certain this will not be the last time that Dr. Emory is

18 involved in one of these cases in which they're also involved in

19 the context of a third-party subpoena, where she is just not

20 relevant.  I'm not saying -- first of all, I didn't say I didn't

21 know anything about talc litigation, I said I'm not a talc

22 litigate other.  But what I am saying here and what I think Your

23 Honor has already sort of, you know, stated, is that the

24 question is whether she's relevant to Gref.  Whether the article

25 is relevant to Gref.  And we don't have that here.  So requiring

1  her to respond to a subpoena, any portion of it, is

2  automatically unduly burdensome in that circumstance.  Where the

3  relevance and the need is very, very low then, you know, it's a

4  balancing test.  That's how it works.  And here, the relevance

5  and the need, for all of the reasons we've said in our

6  briefing -- you know, I know that Mr. Thackston has commented

7  several times on the burden in terms of time and cost, which

8  again, you know, we address in the declarations, but it's not

9  just time and cost.  It is all of the other factors that go into

10 burden, including things about medical ethics, which I won't get

11 into unless Your Honor would like, and this sort of the broader

12 chilling effect that we've briefed, it is, you know, deterring

13 people from conducting studies and publishing articles like

14 this.

15         I don't have specifics on the peer-review process

16 here.  It's also something I presume they could get from the

17 journal about their general peer-review process.

18         THE COURT:  Yeah, I did look at it.  I looked at it,

19 frankly, to see whether it was there, and there is some

20 information there on the journal about the peer-review process,

21 but the identity of the peer reviewers is not available.  At

22 least I couldn't determine how you could identify them.

23         Do you know, Mr. Thackston?  Have you ever attempted

24 or asked Dr. Emory, or aware?  That's the other thing that I am

25 aware of from having been involved in -- I didn't say I knew

25

1  anything about talc litigation because I do not, but I do know

2  something about asbestos litigation, and I know people talk.

3  And there is more information sharing on both sides in asbestos

4  litigation than just about any other kind of litigation there

5  is.  And so I suspect if anyone's asked about this, everyone

6  knows about this.

7          Do you know, Mr. Thackston?

8          MR. THACKSTON:  No, I absolutely do not.

9          MR. COOK:  I can volunteer on that one Your Honor.

10         THE COURT:  Mr. Cook?

11         MR. COOK:  Yeah, Eric Cook from Wilcox Savage for

12  A-I-I.

13         I think we do actually cite some testimony, if I

14  recall offhand it was Dr. Maddox from Peninsula Pathology, and I

15  believe he testified it was less than two weeks, which is an

16  extremely short time period with respect to the peer-review

17  process.  We do not have the identities of any of the peer

18  reviewers though, Your Honor.

19         THE COURT:  Did he not know them?

20         MR. COOK:  No.  I -- well, he didn't know the

21  identities of them, Your Honor.  So whether he had -- you know,

22  whether it was sent to somebody he might know, he didn't know

23  the names to say.

24         THE COURT:  Yeah.

25         MR. COOK:  But if I could also just, if I could

26

```
 1  clarify one point for the Court as well, and that goes to the
 2  burden issue:  We did identify in the opposition to the motion
 3  to quash Dr. Maddox's testimony indicating that there is
 4  existing a key, and I think that's what Mr. Thackston was
 5  alluding, to identifying the names of the individuals and the
 6  case numbers.  So from a burden perspective, Your Honor,
 7  Peninsula Pathology doesn't need to go back and reconstruct all
 8  of this information to pull those litigation files, they can
 9  produce just that key identifying the names of the individuals,
10  and then A-I-I will take that burden on to go to the publicly
11  filed lawsuits, to go to the deposition testimony, to go to the
12  sworn interrogatories, all of which Your Honor does not have --
13  or none of which has any confidentiality expectations.  And
14  that's the test --
15            THE COURT:  Well, right.  In other words, the publicly
16  filed documents don't, but the key certainly does.  That's the
17  problem.  And that's what Jordan -- what Jordan said is burden
18  has multiple components.  One component is just the physical
19  effort of undertaking the project, which Dr. Smith has
20  addressed, and Dr. Emory in their declarations.  But the other
21  is the confidentiality aspects of it.  And Dr. Emory has gone on
22  at great length about the repercussions to her practice if she
23  were to reveal that -- I know you disagree with that, you think
24  that she's not right.  But I mean, she does -- she's articulated
25  them on a number of occasions.
```

1          MS. ALI:  And no court has ever ordered production of

2   the information they're asking nor, right?  There's not one case

3   where a court has ever said just produce the key.  No big deal,

4   just produce the key, right?  That's what we keep hearing.  The

5   key is everything, right?  And no court has ever required

6   production.  The only case that A-I-I has cited is Bell where it

7   was a completely -- first of all it was limited to the named

8   plaintiff in that case who had -- everybody agreed had executed

9   a HIPAA waiver for release of that information in that case.

10  And the court was explicit, as we said in our briefing, none of

11  the other subjects of the study could be disclosed.  The court

12  said it was critical -- this is -- I'm quoting the court right

13  now, "That the other 32 subjects of the study had been

14  redacted."  And that was key to the court's decision to say it's

15  okay to release the information as to Ms. Bell, it is not

16  appropriate to release any of the other information.  Here, of

17  the 75 subjects of the study, all of them were exactly situated

18  the way that the other 32 were in the Bell case.  There's not a

19  single case supporting what A-I-I is seeking to do here.

20          And so the -- as Your Honor correctly noted, burden is

21  not just a matter of time and cost.  We disagree of course for

22  all the reasons we said in our briefing and in the declarations,

23  that this is simply a matter of, you know, printing out a key

24  and turning it over, but that's one component of a much broader

25  and more multifaceted burden inquiry that's required here.

28

```
 1              THE COURT:  Okay.

 2              MR. COOK:  Your Honor, if I may?

 3              THE COURT:  Go ahead, Mr. Cook.

 4              MR. COOK:  Couple quick points on that.

 5         There is a order that actually required Dr. Emory to

 6  respond to the -- with respect to the identity of one of the

 7  individuals.  That's the Burnett case from Arkansas, it's a

 8  federal court.  I can supplement the record with respect to

 9  that, Your Honor.  We received it after our briefing.

10         I'd also note that with respect to the Bell case --

11              THE COURT:  In other words, that ordered her to

12  identify one person who they thought was a plaintiff in that

13  case?

14              MR. COOK:  It did.  And the Court did that as a

15  starting point, Your Honor.  There was some additional

16  requirements with respect to that order.  Ultimately Doctor --

17  the case ultimately went away, but the Court said provide an

18  affidavit on the identity of this individual and then I may

19  order further discovery depending on what that affidavit says

20  one way or the other.

21         I'd also point the Court, with respect to the

22  confidentiality issues that were raised by counsel, back to the

23  Bell order again, Your Honor.  Indicates on Page 35 and 36 of

24  the opinion that in a medical research study, the interest in

25  confidentiality belongs primarily to the study participant not
```

1  the researcher or the sponsoring facility.

2          And then it notes there that the study participant

3  chose to publicly expose the fact of his mesothelioma by filing

4  a complaint.  Every single individual underlying the Emory 2020

5  study filed a lawsuit, publicly filed documents.  The

6  information we're asking for on a key, Your Honor, is

7  essentially the information -- in fact less than the information

8  that would be obtained in a well-pleaded complaint filed in any

9  court across the country.  And if we can go get that

10  information, just the name, we will do the work to find out the

11  underlying allegations of exposure in the case.  Because that's

12  what we need to get to.

13          The article claims that the only exposure is from

14  cosmetic talc.  And this is a crux of this, Your Honor.  Because

15  when we looked at Moline and the one case that was identified

16  there in Bell, the person swore under penalty of perjury they

17  had other exposures that weren't from cosmetic talc.  And we

18  believe that there are individuals in the Emory case theory that

19  had exposures to asbestos that are in no way alleged to have

20  occurred from cosmetic talc.

21          So if we get the names of those individuals we can go

22  back -- we'll do the work.  We'll dig up the lawsuits, we'll

23  give up the discovery transcripts, we'll get the sworn answers

24  to interrogatories that provided the basis of that article, and

25  then we can use that to cross-examine the experts in Gref, Your

30

1  Honor.

2           With respect to their concerns about privilege, that

3  can be solved by a protective order and the Court can limit it,

4  limit this production to the Gref case so we can do that

5  information, we can cross the experts in this case.

6           From a burden perspective, Your Honor, right, it's

7  producing a chart, a chart that's already been prepared, so that

8  we can do the work, and then from that protective order you can

9  put a protective order in place so that we can pull the

10  information, and if we find out there's other exposures then we

11  can come back to the court and address it and not use it outside

12  the context of the Gref case, Your Honor.

13           But a protective order would protect them on that

14  particular issue.

15           THE COURT:  Okay.  I understand your argument.

16           What did you want to say Ms. Ali, anything else?

17           MS. ALI:  Just a response that in Bell -- you know,

18  Mr. Cook is saying that there the court found that because the

19  individual had placed her medical information at issue by filing

20  a lawsuit, that waived confidentiality, waived HIPAA protection,

21  all of that.  Again, that was exclusive to Ms. Bell.  The

22  important thing that we keep sort of talking around here is that

23  every one of the other subjects of the study had also filed a

24  litigation, and the court was very, very careful to say none of

25  those people had put their medical information at issue in that

1  case, right?  It was very, very case-specific.  The court was

2  very careful to limit it.

3          And here, as Your Honor, you know, noted right up at

4  the top, Mr. Gref -- I don't know who the identities of the 75

5  people in the study, of course, but it seems very clear to us,

6  right, we weren't given any information when we drafted our

7  brief about who was in the study, who was not.  Of course we

8  don't have that information.  But it seems very clear from the

9  face of the study and who Mr. Gref is and his age and date of

10 diagnosis, that he is not likely one of those subjects.  And so

11 we don't have the Bell issues here.  There is nobody in this

12 Gref case which is the -- again, the only sort of relevant, the

13 universe we're operating in, we just don't have any of those

14 issues.

15         And for this situation where we're talking about, the

16 set of people we're talking about here, the 75 subjects of Dr.

17 Emory's study, are basically identically situated to the 32

18 other subjects of Dr. Moline's study in Bell where they are not

19 the subject of the litigation.  They're situated identically.

20 And in this context, what Judge Osteen held was that they

21 cannot, their identities cannot be released.

22         MR. THACKSTON:  He did not.  He did not.

23         THE COURT:  Okay.  Well, go ahead.  I'll give you one

24 more opportunity, Mr. Thackston, but then I think I'm ready to

25 rule.

1          MR. THACKSTON:  Your Honor, there is a hearing in the

2    Gref case on February 8th regarding whether Northwell and

3    Dr. Moline will be required to turn these materials over.  Now,

4    the only thing I would ask the Court about -- I'm just kind of

5    astounded that counsel for a third party is trying to talk about

6    what the defendants think is a key relevant study in cosmetic

7    talc cases.  If this weren't a key relevant study, why would we

8    go to all this trouble?  It is -- Dr. Moline testified before

9    that cosmetic talc had nothing to do with mesothelioma.  Dr.

10   Emory -- one of the things I would love to hear at some point --

11          THE COURT:  So you already know that, Mr. Thackston.

12          MR. THACKSTON:  Well --

13          THE COURT:  One of the problems that you -- one of the

14   problems that you have is that you already have a lot of

15   material to work with to attack these studies.  And --

16          MR. THACKSTON:  Judge, that's the opposite of what

17   she's saying now.

18          THE COURT:  Well --

19          MR. THACKSTON:  That's the point.

20          THE COURT:  -- you can certainly point that out when

21   she testifies if it's true.  I'm not saying it's true or it

22   isn't true, but if it's true, you already know it and you can

23   already say it.

24          MR. THACKSTON:  But she's saying it's different now

25   because she's done a study, but she can't tell you who is --

1  none of these people agreed to be in a study, Your Honor.  It's

2  not like these people came and said we want to be a part of your

3  study or even knew that they were theoretically being a start of

4  the study.  She took deposition transcripts that she

5  subjectively reviewed.  But now plaintiff's counsel, as Judge

6  Osteen said, they are using this offensively to say to juries we

7  know cosmetic talc causes mesothelioma.

8            In Mr. Gref's case, we know that his peritoneal

9  mesothelioma, which has nothing to do with asbestos, we know it

10 was caused by cosmetic talc.  His parents say they used men's

11 shaving talc on him when he was an infant, but we know that

12 causes mesothelioma because there are two studies out there,

13 Moline and Emory, that say that cosmetic talc alone causes

14 mesothelioma based on the --

15           THE COURT:  Well, you're saying that's what they're

16 saying, and Mr. Thackston, if that's what they're saying then

17 you should be shredding them with their own expert report,

18 because Dr. Finklestein's report has this much [indicating]

19 about Dr. Emory's study and 200 pages of other stuff.  So it's

20 not just Dr. Emory that he's leaning on.

21           MR. THACKSTON:  He didn't testify about the 200 other

22 pages at trial.

23           THE COURT:  He only just comes in and says Dr. Emory

24 says so, so therefore it's true?

25           MR. THACKSTON:  That's what Judge Osteen said in his

34

 1  record specifically.

 2          THE COURT:  Okay.  Well --

 3          MR. THACKSTON:  This is -- he quotes a plaintiff's

 4  lawyer closing that says Dr. Moline's study shows that cosmetic

 5  talc causes mesothelioma.  That's how important it is.  That's

 6  why it meets the Fourth Circuit's test for unsealing an order.

 7  Because it's important that juries know the truth.

 8          MS. LOCKWOOD:  Your Honor, if I could, before you rule

 9  I just wanted to remind the Court we're willing -- I know you're

10  ready to rule -- requesting sanctions because if the Court

11  decides that the subpoena is unduly burdensome and decides to

12  quash it, Rule 45(d)(1) requires the Court also issue sanctions.

13          THE COURT:  I'm going to give them an opportunity to

14  respond separately to that issue, because I am going to grant

15  the motion to quash.  And the reason is it is a non-party.  And

16  so the non-party -- I mean, just read Jordan.  It's Fourth

17  Circuit law.  It's two years old.  It very clearly says when the

18  subpoena's issued to a non-party, that undue burden analysis is

19  heightened because they're a stranger to the litigation.  Now

20  say they're not a stranger to litigation, but they're as close

21  as a stranger can be to the Gref litigation.

22          Now it may be that Dr. Emory is deeply immersed in

23  talc litigation and you may have the opportunity again to depose

24  her, and if I were sitting in a case, a talc case where Dr.

25  Emory was identified as an expert witness and this was part of

1  her CV and you were deposing her about it because she was

2  offering her own expert testimony, that would be a different

3  situation.  That would be a much different situation.  But

4  that's not this situation.  Dr. Emory's study is minimally cited

5  by the testifying experts, all of whom you have apparently ample

6  access to in New York.  And so that is very minimal relevance to

7  the material that you're seeking.

8           And I would also point out that your hands are not

9  tied in attacking Dr. Emory's conclusions, as you've already

10 pointed out.  You have extensive reason to doubt the credibility

11 of this study because it was drafted based on litigation

12 reports.  You can already argue to the experts on

13 cross-examination that every one of these people was suing a

14 talc company for their mesothelioma because that's the only

15 defendant they would have if their only exposure was as a result

16 of talc.  So you already know that.  You already know they were

17 self-selected, and Dr. Emory disclosed that.  She disclosed her

18 potential bias and Dr. Maddox also is well-known.

19          You've asked for information about how much money they

20 make.  That is routinely asked when these witness testify and it

21 is repeatedly shared, I know, among the asbestos bar:  What the

22 these consultants make and how much they testify.  So that

23 information is readily available from other sources.  You do not

24 need to obtain it by issuing a third-party subpoena.

25          And as you've stated, what you're really after is the

36

1   key.  But that is an incredibly burdensome thing to require Dr.

2   Emory to disclose based on her own declaration.  I understand

3   there may be -- it would be a closer question, certainly, and I

4   don't know how I would rule if Dr. Emory were a testifying

5   witness if I were sitting in Judge Osteen's shoes and examining

6   this question with Dr. Emory as a testifying witness.  But she

7   is not a testifying witness in Gref.

8           And as we observed at the very beginning, based on the

9   disclosed case studies in her report, it is extremely unlikely

10  that Mr. Gref was a participant in this study.  I mean, the

11  report very clearly indicates his diagnosis was that 2019, and

12  at the time he was I think less than 40 years old, the

13  participants in the studdie with those diagnoses are both over

14  70 at the time.  So it's, again, as close as they can come to

15  telling you without disclosing names, they have told you that

16  you're not going to find anything about Mr. Gref in this study.

17  And so there's just very, very minimal relevance to the Gref

18  study in allowing this kind of burdensome disclosure.

19          I understand your client might want it, and I

20  understand why they might want it, and I understand why they

21  might think it's highly relevant to their overall litigation

22  strategy to try and discredit the study.  But with respect to

23  Gref, I don't think it's relevant, and I do think the burden is

24  undue based on my own examination of the subpoena and the

25  information sought and Dr. Emory's declaration regarding the

 1  importance of confidentiality to her work.  And the information

 2  already available in the record are available from other sources

 3  to permit you to attack the strength of the study when other

 4  experts rely on it.  So I am going to grant the motion to quash.

 5          I do want to give you an opportunity, Mr. Thackston or

 6  Mr. Cook, to respond to the request of sanctions, because I do

 7  think your opposition was a little bit thin on that question.

 8  And they were not seeking sanctions under the Court's inherent

 9  authority, they were seeking sanctions under 45(d)(1), which is

10  more akin to failing to respond to a discovery order or the

11  Court's obligation to police discovery when there's a Rules

12  violation.  And that does not require any bad-faith showing.  So

13  I do want to give you an opportunity to respond to their request

14  for sanctions under (d)(1), because I do think it's a different

15  standard than the one you've articulated in your brief.

16          MR. THACKSTON:  Well, Your Honor, I'm sure we both

17  want to comment on that, but for the finding that it's not

18  relevant, it, it, it's absolutely relevant to --

19          THE COURT:  I didn't say it was not relevant, Mr.

20  Thackston.  I said it was minimally relevant.  And there is a

21  difference.  It is minimally relevant in Gref.

22          MR. THACKSTON:  Well, yeah, our belief and what's in a

23  189-page expert report from Dr. Finkelstein -- and by the way I

24  deposed him yesterday in another case, and I asked whether he

25  thought that information provided through litigation was

1   protected by an expert and he said absolutely not.  In fact, he

2   went and compelled it from Dr. Riley at Duke so he could look at

3   the underlying data.  So what they say in their reports versus

4   what they say at trial are two very different things, and that's

5   why we pointed out that Judge Osteen had looked at the

6   significance of these studies -- or Dr. Moline's study in the

7   context of a talc case and cited in his order that plaintiff's

8   counsel relied on that case in his closing to say this is why

9   cosmetic talc causes mesothelioma.

10          In the Gref case, the only thing they're going to have

11  is Dr. Moline and Dr. Emory's studies to tell the jury that

12  peritoneal mesothelioma is caused by cosmetic talc exposure.

13  And so it's the judgment of the people involved and the lawyers

14  involved in the cases are what the experts are really going to

15  rely upon.  When they give you 189 pages, I think is what

16  Dr. Finkelstein's report is, that makes it very difficult to

17  figure out what you're really relying on.  But he's not going to

18  get to testify for five or six days at trial, he's going to

19  testify in and out, and the two things he's going to talk about

20  are Moline and Emory with respect to epidemiology that he says

21  connects cosmetic talc with mesothelioma.  That's all that's out

22  there, Your Honor.  And that's why it's incredibly important to

23  us, and one court in the Fourth Circuit has said it is relevant,

24  and not only relevant but it's the defendant's duty to try to

25  get at the factual basis of these experts' opinion.  And the

1  next case where a subpoena is issued -- oh, and the final thing

2  is, when asked to produce this in the context of expert

3  discovery, the witnesses have taken the position that it belongs

4  to their employer and that you should go get it from their

5  employer.  And then when you go get it from their employer they

6  say, oh, no, it's not here, it's expert discovery, you should go

7  get theirs.  To it's a game of whack-a-mole where it's shame on

8  you if you don't try to discover your cases.  We have done both.

9  At your suggestion we've gone and asked the employer to give us

10  the names of the litigation cases that you relied upon.

11         So Your Honor, it's is sort of dammed if we do, dammed

12  if we don't.  We can't get it from the expert, we can't get it

13  from the hospital, but they're still using it offensively.

14         THE COURT:  Again, Mr. Thackston, if you had Dr. Emory

15  as a witness or Dr. Maddox or Dr. Kradin, whoever the third

16  author was, it might be a different question.  But none of them

17  are involved in the Gref case.  And I agree with Ms. Ali and Ms.

18  Lockwood that the relevance question in evaluating the burden is

19  it's its importance to the parties in the case where the

20  subpoena was issued.  And I think you have ample way to

21  challenge the study given what it appears the way they appear to

22  be using it in the disclosed reports.

23         Now, if they use it different way, you know, that's,

24  you'll have to take that up with the trial judge if they're

25  misrepresenting what the study says.  I frankly don't think the

1  study goes that far.  It says may cause.  It specifically

2  discloses these were all litigation cases.  It specifically says

3  that this is a rare tumor and there's very little to be done and

4  more needs to be done to find out the answer.  And I frankly

5  think it's -- I understand your position that it's litigation

6  driven and maybe it is, but to the extent it is, that's evident

7  on the face of the document.

8          MR. THACKSTON:  Well, I'd like to -- what's not on the

9  face of the document is how much money were they making as

10  expert witnesses when they were just testifying on asbestos

11  cases and all the asbestos bankruptcies took place and

12  everybody's filing trust claims, and now that they've started

13  filing talc cases, how much money is Emory and Moline making,

14  and that's not routinely disclosed.  We fight like crazy to try

15  to get that stuff.

16          THE COURT:  But you can get it.  If they're testifying

17  you can get it.  It's clearly bias information.  And if you had

18  a motion here asking me how much Dr. Emory made and she was your

19  witness you would get it.  No question.  But she's not your

20  witness.  She's not against you in this case.

21          MR. THACKSTON:  That's being actively litigated in

22  many cases and it's not, it's not forthcoming.  It is very, very

23  difficult to get.

24          THE COURT:  All right.  Mr. Cook, do you want to -- I

25  do want to hear from you on the sanction question, Mr. Cook, or

1   Mr. Thackston.

2          MR. COOK:  Yeah.  Just very briefly, Your Honor.

3          First of all, with respect to -- Your Honor's pointed

4   to the article and said we can get everything we want from that.

5   I just want to be clear --

6          THE COURT:  I didn't say you can get everything you

7   want.  I just said there was something there.  There was a lot

8   there already.

9          MR. COOK:  What's not clear from that and something

10  that would be subject to this subpoena request that I don't

11  think has been addressed is whether or not Mr. Gref was an

12  individual that was ultimately excluded from the study because

13  he had other exposures.  That would be highly relevant to the

14  Gref case specifically, Your Honor, and something that the Court

15  could order in order to give us that piece of information at

16  least.

17         THE COURT:  I don't know why -- I'm not sure why that

18  would be relevant and why you couldn't get that from other

19  sources.  I mean, I looked at Request 9 through 18 on your

20  subpoena.  It's all about Mr. Gref.  Well, you've got Mr. Gref

21  and Mr. Gref's lawyers.  You've got all of his exposure.  You

22  can ask him anything you want to ask him, and I'm sure already

23  have.  So you know, you would not need to get that from a

24  third-party subpoena because you've got Mr. Gref.  He can tell

25  you.

1          MR. COOK:  Well, unless it was provided to one of the

2   authors of that study and they have information that wasn't

3   provide to us, Your Honor.

4          THE COURT:  But you could ask him, did you ever hire

5   Dr. Emory as a consultant in the case and he would have to tell

6   you if he did.  You can ask him that.

7          MS. LOCKWOOD:  And Your Honor, Dr. Emory and Dr. Smith

8   and Dr. Maddox have all already indicated that they're not

9   involved in the Gref litigation in any way.  So we already know

10  that.

11         But I think it's telling, Your Honor, when you Your

12  Honor asked for Mr. Cook or Mr. Thackston to respond to our

13  request for sanctions, we still have not heard a response to our

14  request for sanctions.  This is also what happened in the

15  briefing as you noted.  I think their response was also about

16  less than a page to this request.  And you know, as Your Honor

17  noted, Rule 45(d)(1) is different because it's not permissive,

18  it's mandatory.  It's mandatory that the court issue sanctions

19  when a subpoena is unduly burdensome and the issuing party

20  didn't take any reasonable steps to mitigate that burden.

21         And if you look at their briefing, the only issue that

22  they hit in any accurate detail is whether the subpoena imposed

23  an undue burden.  They rest on the same arguments that Your

24  Honor already dismissed, right, in finding that the opinion is

25  unduly burdensome.  So then when you look at whether or not they

1  have taken any reasonable steps to mitigate the burden, it

2  becomes quite clear that sanctions have to be issued here.  We

3  asked for them to withdraw the subpoena.  This is the first

4  we're hearing that they would take a list of the 75 or 140

5  cases.  We've never heard that before.  And --

6         THE COURT:  Although to be honest, if you had, you

7  probably still would be here, right Ms. Lockwood?  I mean,

8  that's the core of the dispute.  If they had told you all we

9  want is the key we would still be arguing this motion, wouldn't

10 we.

11        MS. LOCKWOOD:  I think we would, Your Honor.  But I

12 think it shows that they've really taken no steps at all, and to

13 show up here on the day of the hearing and to spring that on us

14 is quite remarkable when our client has had to already expend

15 significant attorney's fees to litigate this, right?  We filed a

16 motion, they responded, they doubled down.  They filed 700 pages

17 in exhibits in opposition.  Do you think that, you know, was an

18 easy thing for us to reply to?  It took a lot of hours.  And our

19 client is on the hook for that now.  And the case law's clear

20 that, when a subpoena on its face is unduly burdensome, when it

21 never should have been issued in the first place, then literally

22 everything done in response to that is an undue burden or

23 expense that mandates sanctions under Rule 45(d)(1).  We haven't

24 heard anything from the other side that would suggest a

25 different result is appropriate here.

1          THE COURT:  All right.  Do you want to respond to the

2   sanctions issue under 45(d)(1), either Mr. Thackston or

3   Mr. Cook?

4          MR. THACKSTON:  Your Honor --

5          MR. COOK:  Go ahead, Robert.

6          MR. THACKSTON:  Yeah.  I was, it's not true that we --

7   they talked about timeliness, they talked about all the kinds of

8   things in their response that as strange -- I don't think you

9   can have it both ways and say you're a stranger to the case and

10  then you urge a timeliness issue that the trial court has turned

11  down.  If it really was untimely, then the Gref court would have

12  said no, that's outside the scope of the discovery period in

13  this case and I'm not going to allow it.

14          MS. ALI:  Your Honor, could I respond on that?

15  Because that's actually addressed specifically in the hearing

16  that happened on Monday.

17          MR. THACKSTON:  The timeliness question?

18          MS. ALI:  We -- that's just not accurate.

19          On the timeliness question the court said -- what

20  happened is the court said I understand there's also a question

21  about timeliness.  I have the transcript right in front of me.

22  The counsel said there's a motion to quash pending in the

23  Eastern District of Virginia, and the magistrate judge said I'm

24  not going to deal with anything having to do with that subpoena,

25  I'm going to let the district court in Virginia deal with that.

 1  It wasn't addressed, it wasn't rejected.  She said there is

 2  already a motion to -- I understand there's already a motion to

 3  quash, I'm not going to deal with it here.

 4          THE COURT:  In other words she didn't say it was

 5  untimely, she didn't say it was timely, she didn't address it

 6  one way or the other?

 7          MS. ALI:  Correct.  That's exactly right, Your Honor.

 8          MR. THACKSTON:  If you believe that the discovery is

 9  outside the time frame you can ask the trial court to quash a

10  subpoena and not to allow --

11          MS. ALI:  There was no motion pending before the court

12  asking for her to quash the subpoena, issue a protective order,

13  nothing.

14          MR. THACKSTON:  That's, that's --

15          MS. ALI:  That's correct.

16          MR. THACKSTON:  Judge, I didn't interrupt other

17  counsel.

18          THE COURT:  Okay.

19          MR. THACKSTON:  That's exactly my point:  That they

20  didn't go to the trial court because they know that discovery is

21  still open.  We're still dealing with it.

22          THE COURT:  They couldn't go to the trial court.  And

23  I was -- I actually should have asked that question at the very

24  beginning because I maybe could have avoided the whole thing.

25  Nobody asked to have this moved to the trial court.  Nobody --

46

1                MS. ALI:  No, Your Honor.

2                THE COURT:  -- asked under 45(f) to say send this up

3    to New York and let Judge Figueredo sort it out.

4                MS. ALI:  That's correct.

5                MR. THACKSTON:  All the arguments that they had in

6    their motion -- my point is they have all these arguments in

7    their brief about being outside the time limits of the trial

8    court.  Those arguments would be made to the trial court.

9    There's arguments made earlier this week with respect to Moline

10   and Northwell and the hearing was set in February, and the Court

11   said we're going to the to push things down the road, we're

12   going to hold this February 8th in person.  So that's -- those

13   arguments were, were irrelevant.

14               And we did say just tell us who the people are.  And

15   they say we can't tell you who the people are.  And so that

16   doesn't solve any of our problems.  There's nothing we can do

17   other than say when we need a ruling then, because we believe

18   that they're not protected in any way and that we don't believe

19   that imposes any burden whatsoever to just give us the

20   spreadsheet, and to say, well, you don't have releases in those

21   cases, well, that's circular.  We don't know what the cases are.

22   Obviously there are releases in those cases for medical

23   information or there wouldn't be lawsuits, right?  The only

24   question --

25               THE COURT:  Well, I don't know.  Any HIPAA waiver I've

 1  ever seen in litigation is for the litigation only.  It

 2  wouldn't, it wouldn't extend to the nature of any participation

 3  in research or -- I mean, I don't know.  I don't know what the

 4  nature of the relationship between Dr. Emory and Dr. Maddox and

 5  the other doctors and these particular subjects were.  But Dr.

 6  Emory has put in a sworn affidavit that says she has a ethical

 7  duty to protect their confidentiality as research subjects.  And

 8  you know, I don't see any kind of inherent untrustworthiness in

 9  that statement.

10         MR. THACKSTON:  Well, but in the absence of a court

11  order to the contrary --

12         THE COURT:  Right.

13         MR. THACKSTON:  -- we made the same arguments, she

14  would be protected if there were a court order saying no, that

15  doesn't apply to litigation materials, you didn't go get

16  permission from those people, you didn't think you needed to

17  today get their permission to include them in the study because

18  you received their medical information only in the sense that it

19  was in depositions and interrogatory responses, if that's even

20  medical information.

21         In fact, if you look at the face, the reason I was

22  trying to go to the end of it, she said this was based on

23  depositions and interrogatory responses, and counsel's motion to

24  quash in this case doesn't say that.  It changes it and says

25  it's based on records from these people.  Well, a deposition is

 1  not a record, and an answer to a interrogatory is not a record.

 2  I think it's a little contortionist to take a deposition

 3  transcript and call it a medical record and say that it's

 4  entitled to protection and this is burdensome and we need to do

 5  all this stuff we --

 6           THE COURT:  Well, we're getting back to the arguments.

 7           Mr. Cook, did you want to say anything more about the

 8  45(d)(1) argument?

 9           MR. COOK:  Yeah, I don't know there's much more to

10  say, Your Honor.  I do think the subpoena -- I know Your Honor's

11  already ruled on it -- but I do think the subpoena was intended

12  to be tailored to the Gref case.  Your Honor has indicated a

13  number of the requests that were specific to tailor and allow us

14  to cross-examine the experts with respect to that.  So that was

15  certainly the intent when it was propounded and we have

16  proposed, I think, a good-faith solution to reduce any potential

17  burden on Peninsula Pathology that would take minutes for them

18  to produce that list, and we would take on, A-I-I would take on

19  the burden of getting the additional information which --

20           THE COURT:  Was there any discussion of a protective

21  order when you were having that conversation with them?  Was

22  there any discussion --

23           MS. LOCKWOOD:  Your Honor, if I could, which

24  discussion are we referring to here?

25           THE COURT:  I'm assuming there was a meet-and-confer?

```
 1  There was a verbal meet-and-confer before the motion was filed,

 2  or was it --

 3          MS. LOCKWOOD:  We did meet and confer with them.

 4  There was no request -- and I see Mr. Greve has joined on video.

 5  He participated.  There was no request that we disclose the

 6  names of the 75 people and start there.  That just did not

 7  happen.  So if that's what's been suggested, I'm not sure where

 8  it's coming from, Your Honor.

 9          MR. GREVE:  Your Honor, again, Kirk Greve.  It's a

10  pleasure to meet you.

11          THE COURT:  Mr. Greve, who are you?  I don't have your

12  appearance in the case.  Who are you for?

13          MR. GREVE:  Yes, sir.  I'm here with Mr. Thackston and

14  A-I-I.  I was the attorney who participated in the

15  meet-and-confer.  You know, as you indicated there was a

16  conference.  We did visit about this.  And the meet and confer

17  really boiled down to a discussion of the timeliness issue.  We

18  didn't get into any substantive discussion of pare down or what

19  steps could be done next, because counsel all agreed that this

20  was all going to turn on the timeliness issue first.  And then

21  once we resolved the timeliness issue then we could sit there

22  and we could focus on what we could or cannot do.

23          Ultimately there was never any detailed discussion on,

24  you know, producing a chart, because as they explained, this was

25  all something that they viewed as being untimely
```

50

1  fact-witness-driven and something that they weren't going to

2  disclose as a result of that.  So that's what the focus of the

3  meet-and-confer was.

4        And then the spirit of it was there would be some type

5  of follow-up or, you know, additional work where we may be able

6  to get together and understand what certain limits were once we

7  got through the timeliness issue.  Obviously, you know, that's

8  something that we've just recently been dealing with.  So we're

9  on a very expedited time frame, Your Honor.

10       THE COURT:  Okay.

11       MS. LOCKWOOD:  That's a little surprising to me that

12  that was their perspective of the spirit of the meet-and-confer,

13  so I think perhaps there was not a meeting of the minds.

14       On that I should also note, though, Your Honor, on the

15  same day that we filed a motion to quash, out of an abundance of

16  caution we served detailed objections where they could have

17  separately come back to us and tried to negotiate any of this,

18  or make any proposal.  And the fact is they didn't take any

19  steps at all, much less reasonable ones, and under

20  Rule 45(d)(1), that is what is required in order to avoid a

21  court's issuance of sanctions.

22       And everything that we've talked about here relates to

23  undue burden, the Court has already found the subpoena's unduly

24  burdensome.  That is the end of the inquiry.  It doesn't matter

25  if the Court decided it unduly burdensome for Reason A or Reason

 1  B.  What matters is the Court found it unduly burdensome, and so

 2  Rule 45(d)(1) requires that sanctions be issued.

 3          THE COURT:  Well, I disagree with that

 4  characterization of 45(d)(1).  I think it requires that I find

 5  that they failed to take steps, reasonable steps to avoid it

 6  being unduly burdensome.  I think you can take responsible steps

 7  to avoid it being unduly burdensome and still have a court find

 8  that it is unduly burdensome.

 9          But having said that, I do, I do agree with Ms.

10  Lockwood.  I don't find there were reasonable steps in this case

11  and I am going to award sanctions, because what it appears to me

12  is going on is that you are going to take -- you have taken an

13  opportunity where Dr. Emory and Maddox and Kradin, the authors

14  of the study, have very, very little to do with Mr. Gref's case.

15  There is no indication that Mr. Gref was a subject in this

16  study.  There is no identification of any of them as testifying

17  witnesses in the study.  And it seems as though you've taken

18  this opportunity to file a subpoena and ask another judge to

19  weigh in on the same questions that you've already gotten

20  negative answers to from multiple other judges in order to try

21  and pry open the survey.  And there's a very, very tenuous

22  connection to the Gref litigation that I find to be a very thin

23  reed on which to put the practice to the expense of defending

24  the subpoena.

25          So I do find that counsel failed to take reasonable

52

1  steps to avoid the undue burden and I am going to order

2  sanctions.

3          So I'm going to issue a short written order granting

4  the motion to quash.  I'm going to take the motion for sanctions

5  under advisement, request that counsel submit to me a sworn

6  statement of the fees incurred in defending the case.  I will

7  say I'm not -- I don't intend to award all of the fees, because

8  I do think there's some merit in the suggestion that a lot of

9  this was hinged on the timeliness of the subpoena, and that is

10 not the basis of the Court's ruling.  If the only issue were the

11 timeliness, I probably would not find it unreasonably

12 burdensome.  If there were otherwise a narrowly tailored

13 subpoena and there was some significant degree of relevance, I

14 probably would have reached a different conclusion.

15         So I'll permit you to submit a request for fees with

16 appropriate affidavits supporting the fees that you incurred in

17 preparing the motion to quash and responding to the opposition.

18         I'll give you 10 days.  Is that sufficient time to

19 submit that?

20         MS. LOCKWOOD:  Yes, Your Honor.

21         THE COURT:  Or where is that going to put us?  I know

22 people have holidays coming up.

23         What is today, the 16th?  That's actually right at

24 Christmas.

25         This is what I'm going to do:  I'm going to go to

**JA1005**

1   beyond the holidays because I'm hoping you all will get together

2   and work this out and I won't need to rule on this question, and

3   if you do, obviously just submit a statement to that effect.

4          But I'll give you till January 4th to submit that

5   statement and whatever brief you want articulating why those are

6   reasonable fees, and then I'll give you all two weeks to respond

7   to the statement.  That's January 18th.  And then I'll issue a

8   separate short order regarding the fees under 45(d)(1).

9          MR. THACKSTON:  Your Honor, I would ask you, just ask

10  that to the extent the Court's going to grant sanctions based on

11  the Court's statement that we had gotten a negative answer from

12  multiple other judges, I would certainly like to be put on

13  notice of what other judges ever gave us a negative answer.

14  Because this issue has not been before any other judge.  This is

15  the first time this issue's been argued as a discovery issue

16  that I'm aware of.  So if I'm going to get sanctioned --

17         THE COURT:  Well, it's my understanding is that Judge

18  Osteen said that you wanted the disclosure of names in the

19  Moline study and Judge Osteen declined to give you the

20  disclosure of any names other than Bell, which had already been

21  disclosed.

22         MR. THACKSTON:  Your Honor, as a point of negotiation,

23  during that case the magistrate judge indicated that she was

24  willing to order the discovery in the Bell case.  We, we just

25  pursued that and did not pursue the other ones.  That wasn't

1  specifically before Judge Osteen.  The only issue before Judge

2  Osteen was the issue of whether to unseal the pleadings.

3         So I'm sorry, Judge, the other rulings that you were

4  told about was a trial court objection to questions while

5  Dr. Moline was on the stand, and the court said we can't go too

6  far into that while allowing some questions about Mrs. Bell.

7         So I think that's been overstated and misrepresented

8  to the Court.  This has not come up before another judge.  The

9  Court has not been presented with any order where a court has

10  squarely considered as much as this court has considered

11  today -- and I respect the Court's decision -- but I don't think

12  that the Court has a clear understanding of whether any other

13  judge has ever done what you've done today.

14         THE COURT:  Okay.  I understand your argument.

15         MS. ALI:  I just want to correct the record.  This

16  issue was squarely litigated in Bell.  It's in the -- we didn't

17  submit the full transcript of the magistrate judge's hearing in

18  that case because there was already so much paper filed in the

19  court.  This is at Pages 83 and 84 of that transcript from 2020.

20  Mr. Thackston specifically asked for the identities of the other

21  32 subjects in the study.  The magistrate judge said I am not

22  going to allow that.  And it was repeated several times forward.

23  We cited the Fisher case in our briefing.  We cited the Johnson

24  and Lashley.  Whether it was in the context of a trial

25  transcript or a written order doesn't matter.  The issue was

55

1   squarely teed up for the court and it was squarely decided.

2           And we cited, I think it's Exhibit 1 to our reply

3   brief, a letter that was filed on the docket in the Gref case, I

4   think it's Pages 9 to 15 of that letter that walked through in

5   pretty significant detail all of the sort of history of A-I-I's

6   attempts to get this information the human subjects.  This is

7   mostly relating to Dr. Moline, not to Dr. Emory, maybe

8   exclusively to Dr. Moline because it was in the context of

9   briefing that issue where she is, of course, a testifying expert

10  in Gref.  But you know, the issue is the same:  Whether subjects

11  in a study should be revealed.  And in every one of those cases,

12  there are additional cased that we didn't cite and attach to the

13  brief.  I'm thinking Harpster, I know there are others, where

14  the court has said this is not appropriate.  It is not

15  appropriate to issue this information.

16          So I know we're way far -- you know, Your Honor has

17  already ruled --

18          THE COURT:  Right.  I have already ruled.  And I want

19  to be clear about the limitations of my rule.  I am not saying

20  that it would never be appropriate.  And as I've already

21  observed, this is not a case where Dr. Emory is testifying.  If

22  she were testifying, it might be a different question.  But she

23  has very, very little connection to the Gref litigation.  And so

24  when I observed what other judges had done, Mr. Thackston, I was

25  observing it in the context of those judges had cases where the

 1  experts were testifying in front of them.  They were going to be

 2  in front of the jury relying on these studies in front of a

 3  jury.  And that is not this case.  Emory is not going to be in

 4  front of the jury, and neither is Maddox.  And the study may be

 5  there with Dr. Moline, but you have Dr. Moline and you have the

 6  ability to explore the credibility of Dr. Moline's testimony

 7  with a jury and to depose her at length and challenge those

 8  things.

 9          But to use this case and this subpoena in a case where

10  Dr. Emory is just, has this very, very tangential connection to

11  it is what troubles me.  And I don't think there were sufficient

12  efforts to try and avoid the dispute that we've resolved here

13  today.  So I am going to entertain a request under 45(d)(1).

14  I've set the briefing schedule to conclude that.

15          As I said, if you all get together and work it out,

16  let me know.  I don't relish doing that, but I think Ms.

17  Lockwood is right:  The statute is different.  It's not, it's

18  not a sanction because of the Court's inherent power, it is

19  enforcement of discovery rules.  That's what the rules are there

20  for.  And so I am going to enforce 45(d)(1) and impose an

21  appropriate sanction; however, if you all agree to a resolution

22  before the briefing schedule or at any time, communicate that to

23  me and I'll simply dismiss the matter.

24          But I am going to enter a short order today taking

25  that under advisement but granting the motion to quash.  Okay?

57

```
 1   I mean, it probably will be Monday or Tuesday actually, not
 2   today.  But it will go out.  Okay?
 3          MR. THACKSTON:  The Court is granting the motion to
 4   quash, holding the question of whether --
 5          THE COURT:  I'm directing briefing, directing briefing
 6   and submission of attorney's fees to assess an appropriate
 7   sanction under 45(d)(1).
 8          MR. THACKSTON:  Right.  Thank Your Honor.
 9          MS. ALI:  Thank you, Your Honor.
10          THE COURT:  Okay.
11          MS. LOCKWOOD:  Thank you, Your Honor.
12          THE COURT:  All right.  Thank you all.
13          Anything else, Ms. Dodge?
14          COURTROOM DEPUTY CLERK:  No, sir.
15          THE COURT:  All right.  Thank you all.  Court will be
16   in recess.
17          (Whereupon, proceedings concluded at 3:57 p.m.)
18
19
20
21
22
23
24
25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA1010**

58

1                        *CERTIFICATION*

2

3          *I certify that the foregoing is a true, complete and*

4    *correct transcript of the proceedings held in the above-entitled*

5    *matter.*

6

7          _____

8                Paul L. McManus, RMR, FCRR

9                     _____

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA1011**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

PENINSULA PATHOLOGY
ASSOCIATES,

          **Plaintiff,**

v.                                      **Case No. 4:22-mc-1**

AMERICAN INTERNATIONAL
INDUSTRIES,

          **Defendant.**

## ORDER

This matter is before the court on Peninsula Pathology Associates' ("Peninsula") motion to quash a third-party subpoena from American International Industries ("AII"). (ECF No. 1). Peninsula "is a medical practice that has been providing pathology services to physicians throughout Eastern Virginia for more than 50 years." Mem. Supp. Mot. Quash ("Peninsula's Mem.") (ECF No. 2, at 4). AII, a manufacturer of cosmetic products, served Peninsula with the third-party subpoena at issue in connection with Gref v. Am. Int'l Indus., et al., No. 1:20-cv-5589, which is currently being litigated before the United States District Court for the Southern District of New York. Id. at 5–6. In that case, which was filed in July 2020, AII faces allegations from plaintiff Brian Gref that he developed mesothelioma as a result of repeated exposure to asbestos from using cosmetic talc products manufactured by AII and other named defendants. Id.

Peninsula is not involved in the Gref litigation. Id. at 6. However, its employee, Dr. Theresa S. Emory, co-authored an article in February 2020 entitled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients" ("the Article"). Id. at

4–5. The Article, which was also co-authored by Dr. John C. Maddox—another Peninsula employee—and Dr. Richard L. Kradin, analyzes the medical and legal records of 75 individuals with malignant mesothelioma whose only known, reported exposure to asbestos came from cosmetic talcum powder. Id. at 5. In the Article, which was published in March of 2020 in the American Journal of Industrial Medicine, the authors' brief analysis concludes that "cosmetic talc may be a cause of malignant mesothelioma," and that "[l]arge-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc." Peninsula's Mem., Ex. 2 (ECF No. 2-2, at 11).

Mr. Gref's experts, Dr. Jacqueline Moline and Dr. Murray Finkelstein, have each opined that Mr. Gref developed malignant mesothelioma as a result of exposure to cosmetic talc. AII's Opp'n, Ex. H (ECF No. 4-8, at 23); AII's Opp'n, Ex. I (ECF No. 4–9, at 280). Both experts submitted detailed expert reports in support of their opinions. The reports contain detailed summaries of Gref's medical treatment and diagnoses, the extensive medical evidence linking mesothelioma to asbestos exposure, and descriptions of the study of asbestos in talc and cosmetic talc products. AII's Opp'n, Ex. H (ECF No. 4-8, at 4–24); AII's Opp'n, Ex. I (ECF No. 4–9, at 3–280). Both reports also rely on and cite the Article briefly. AII's Opp'n, Ex. H (ECF No. 4-8, at 22 n.2); AII's Opp'n, Ex. I (ECF No. 4–9, at 233).

On November 7, 2022, AII served the third-party subpoena on Peninsula seeking to uncover documents relating to (1) "the Article and underlying study;" (2) "Peninsula and Dr. Emory's billing documents, income, and other financial records;" and (3) "SDNY plaintiff Mr. Gref." Id. at 6–7. Peninsula responded by filing the instant motion to quash on November 18, 2022. (ECF No. 1). Peninsula argues that AII's subpoena should be quashed under Federal Rule of Civil Procedure 45(d), Peninsula's Mem. (ECF No. 2, at 12–17), which states that a court "must

2

USCA4 Appeal: 23-1972   Doc: 26-3   Filed: 12/30/2023   Pg: 70 of 435

quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). AII opposed Peninsula's motion, (ECF No. 4), and Peninsula replied, (ECF No. 8). The court held a hearing on the motion via Zoom on December 16, 2022. For the reasons stated on the record and discussed briefly below, after reviewing the parties' briefs and arguments, the court GRANTS Peninsula's motion to quash.

Federal Rule of Civil Procedure 26(b) limits the scope of civil discovery by requiring that all material sought be both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). When assessing whether these two requirements—relevance and proportionality—have been satisfied in a particular case, courts must consider, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." See id.; Va. Dep't of Corr. v. Jordan, 921 F.3d 180, 189 (4th Cir. 2019). However, "[w]hen discovery is sought from nonparties" in particular, "its scope must be limited even more" beyond this standard Rule 26(b) analysis. Jordan, 921 F.3d at 189. Additional limitation is necessary because nonparties "have 'no dog in [the] fight,'" and therefore "have 'a different set of expectations from the parties themselves." Id. (quoting Cusumano v. Microsoft Corp., 162 F.3d 708, 717 (1st Cir. 1998)). In short, "[n]onparties faced with civil discovery requests deserve special solicitude" and "should not be drawn into the parties' dispute unless the need to include them outweighs the burdens of doing so, considering their nonparty status." Id. at 194.

In light of these concerns, "[a] more demanding variant of the [Rule 26(b)] proportionality analysis . . . applies when determining whether, under Rule 45, a subpoena issued against a nonparty 'subjects a person to undue burden' and must be quashed or modified." Id. at 189 (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)). "As under Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient," but the inquiry

3

is "even more demanding and sensitive . . . than the one governing discovery generally" on account of the subpoena recipient's nonparty status.  Id. (citing In re Mod. Plastics Corp., 890 F.3d 244, 251 (6th Cir. 2018); Citizens Union of N.Y.C. v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017); In re Pub. Offering PLE Antitrust Litig., 427 F.3d 49, 53 (1st Cir. 2005)) (cleaned up).

Several factors are pertinent to this weighing analysis.  When assessing the benefit to the requesting party, courts should consider, among other things:

> the relevance of the information sought [and] the requesting party's need for it.  The information sought must likely (not just theoretically) have marginal benefit in litigating important issues[1]. . . . Courts should also consider what information is available to the requesting party from other sources.  To that end, the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena.

Id. (citations omitted).  Likewise, when assessing the burden to the recipient, courts should consider, among other things, the financial cost of producing the information as well as "other cognizable burdens," such as (1) the impact of production on privacy or confidentiality interests; (2) the interests—including business interests—of the recipient and others who might be affected; and (3) whether the subpoena is overbroad and would require "tailoring" by the nonparty.  Id. at 189–90.

Weighing these factors, I find that the benefits of the subpoenaed material to AII are significantly outweighed by the burdens on Peninsula and Dr. Emory in responding to the

---

[1] "Marginal benefit" simply means that "the information must offer some value over and above what the requesting party already has."  Jordan, 921 F.3d at 189.

4

subpoena.  With respect to the benefit of the information to AII, it's crucial that neither Peninsula nor Dr. Emory are involved in the Gref litigation.  Dr. Emory has not been named as a witness or deposed.  And although Dr. Emory sometimes consults in mesothelioma cases—primarily for plaintiffs—there is no evidence she has consulted with Gref.  Though AII speculated that Gref may have consulted with Peninsula, it made no factual proffer to that effect despite its ready access to discovery from him.[2]  And AII has waited until now, over two years into the Gref litigation, to request that Peninsula produce the information listed in the subpoena.  While Dr. Moline and Dr. Finkelstein do cite the Article in their respective expert reports, they do so minimally—Dr. Moline cites the Article at the end of a string-cite in a single footnote, AII's Opp'n, Ex. H (ECF No. 4-8, at 23), while Dr. Finkelstein's mention of the Article in his 292-page report accounts for a half page, most of which is devoted to reproducing the results of 11 tissue digestion studies appearing in the Article, AII's Opp'n, Ex. I (ECF No. 4–9, at 233).  Additionally, comparing Mr. Gref's age and date of diagnosis to the corresponding data for the participants in the Article's underlying study—which are already disclosed in the text of the piece itself—it is plain that Mr. Gref was not one of Dr. Emory's subjects.  See AII's Opp'n, Ex. E (ECF No. 4-5, at 4–6).  All of this evidence points to the conclusion that the information AII seeks is minimally relevant to their defense in the Gref litigation.

---

[2] At the hearing, AII argued at length that, although Dr. Emory is not an expert in the Gref litigation, the requested information is nonetheless relevant because Dr. Emory's article is a driving "linchpin" of modern talc litigation.  However, the question before the court is not whether the Article is relevant to talc litigation generally, but whether it is relevant to the case at hand—which is Mr. Gref's pending action in the Southern District of New York.  As such, I make no findings about the relevance of Dr. Emory's article to talc litigation generally, whether the subpoena would be proper in a different talc case, or whether the subpoena would be proper if Dr. Emory or one of her co-authors had been named as an expert witness in the Gref litigation.

AII has also failed to explain why it cannot obtain from other sources "comparable information that would also satisfy its needs" for impeachment of Dr. Moline and Dr. Finkelstein at trial. See Jordan, 921 F.3d at 189. The company argues that it requires the identities of Dr. Emory's research subjects to try and prove they had other exposures to asbestos fibers that might undermine the Article's conclusion that their mesothelioma "may" have been caused by exposure to talc. But there is already extensive information on the face of the Article that AII can use to attack the Article's conclusion, and its support for the opinions offered by Gref's experts. For example, Dr. Emory disclosed that she has "testified in asbestos litigation, primarily for plaintiffs," and that her 75 subjects anonymously reported by the Article were derived from "medical-legal consultation." See AII's Opp'n, Ex. E (ECF No. 4-5, at 2, 7). Thus, as AII's counsel has argued, there is ample basis to suggest that the self-selected sample of litigation subjects is poorly reflective of the universe of people exposed to cosmetic talc. In light of these facts, I am persuaded that the additional information sought by subpoena would be minimally beneficial to AII in the Gref litigation.

With respect to the burdens on Peninsula and Dr. Emory, AII has made dozens of document requests intended to encompass any and all records associated with the Article, Peninsula's and Dr. Emory's finances, and Mr. Gref. The overbreadth of these requests, especially given the minimal relevance of the information sought, is apparent on the face of the subpoena. Peninsula's president, Dr. David M. Smith, confirmed in his affidavit that the financial and logistical costs of gathering these documents and/or reasonably tailoring the production would be significant. Mot. Quash, Ex. 1 (ECF No. 1-2, at 3) ("Responding to the Subpoena, which contains many requests concerning the Article, Peninsula's correspondence with various individuals, Peninsula's financial records, and additional materials, would be burdensome and costly, and would divert time and

6

resources from Peninsula's busy medical practice."). And although, at oral argument, AII limited its demand to a list of the names of the participants in the Article's study, Dr. Emory stated in her affidavit that producing documents identifying those individuals would constitute a violation of the medical ethics rules by which she is bound as a board-certified physician. Peninsula's Mem., Ex. 2 (ECF No. 2-2, at 4). In light of these facts, I am persuaded that compliance with AII's subpoena would force Peninsula and Dr. Emory to bear heavy burdens, both financially and professionally. Consequently, I conclude that AII's subpoena imposes an undue burden and therefore must be quashed under Rule 45(d)(3)(A)(iv).

In its brief filed in support of its motion, Peninsula also argues that AII's subpoena warrants sanctions under Rule 45(d)(1). Peninsula's Mem. (ECF No. 2, at 20–23). Rule 45(d)(1) imposes a duty on those issuing subpoenas to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The court "must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Id. (emphasis added). In its briefing, AII did not address the sanctions argument except to argue that Peninsula had not demonstrated "bad faith." AII's Opp'n (ECF No. 4, at 25 n.12). However, while the court must find bad faith when imposing sanctions under its inherent authority, when acting under Rule 45(d)(1), bad faith is not required. See Mount Hope Church v. Bash Back!, 705 F.3d 418, 428 (9th Cir. 2012) ("[B]ad faith is sufficient to invoke Rule 45(c)(1)[3] sanctions. But we have never stated that bad faith is necessary, and we do not do so now. More precisely, bad faith is a sufficient ground for sanction, but it is not a necessary ground if Rule 45(c)(1) is otherwise violated . . . ."); In re Mod. Plastics

---

[3] Formerly, and at the time of the Ninth Circuit's decision in Mount Hope Church, the text of the current Rule 45(d)(1) was found in Rule 45(c)(1).

Corp., 890 F.3d 244, 251 (6th Cir. 2018) (rejecting appellants' argument "that sanctions may not be imposed under Rule 45(d)(1) absent a finding of bad faith" because "neither case [cited by appellants] supports a bad-faith requirement"); Jiangmen Kinwai Furniture Decoration Co. Ltd. v. IHFC Properties, LLC, No. 1:14-CV-689, 2015 WL 12911773, at *1–2 (M.D.N.C. Oct. 27, 2015) (finding that, "[w]hile not necessary to the Court's decision" to award sanctions under Rule 45(d)(1) for an unduly burdensome subpoena, the plaintiff and its attorney had acted in bad faith and could be subjected to sanction under the court's inherent authority). In light of my findings above, I conclude that AII and its attorneys have failed to "take reasonable steps to avoid imposing undue burden or expense" on Peninsula. See id. Consequently, sanctions are warranted under Rule 45(d)(1). The court will take the issue of sanctions under advisement and issue a separate order following requested briefing on the fees incurred matter.

For the foregoing reasons, this court GRANTS Peninsula's motion to quash. Additionally, to aid the court in its determination of the appropriate sanctions under Rule 45(d)(1), the court hereby ORDERS Peninsula to file a sworn statement of its costs and fees by **January 4, 2023**, and ORDERS AII to file its response by **January 18, 2023**.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 23, 2022

8

Exhibit 1

**JA1020**

Theresa Swain Emory, M.D.                    October 1, 2020

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3                   GREENSBORO DIVISION
 4    - - - - - - - - - - - - - - - x
 5    LLOYD BELL, Individually and   :
      as Executor of the Estate of   :
 6    BETTY WHITLEY BELL, Deceased   :
                    Plaintiff        :
 7       vs.                         : Civil Action No.
      AMERICAN INTERNATIONAL         : 1:17-cv-00111
 8    INDUSTRIES, INC., et al.       :
                    Defendants       :
 9    - - - - - - - - - - - - - - - x
      AMERICAN INTERNATIONAL         :
10    INDUSTRIES, INC.               :
                    Third-Party      :
11                  Plaintiff        :
         vs.                         :
12    NESLEMUR COMPANY f/k/a, THE    :
      NESTLE-LEMUR COMPANY           :
13                  Third-Party      :
                    Defendant        :
14    - - - - - - - - - - - - - - - x
15           VIRTUAL VIDEOTAPED DEPOSITION OF
16                THERESA SWAIN EMORY, M.D.
17    DATE:       Thursday, October 1, 2020
18    TIME:       10:21 a.m.
19    LOCATION:   Remote Proceedings
20    REPORTED BY: Denise M. Brunet, RPR
21
22
```

Theresa Swain Emory, M.D.                          October 1, 2020

                                                      Page 2

1                    A P P E A R A N C E S

2

3     On behalf of Plaintiff:

4                      LEAH C. KAGAN, ESQUIRE

5                      Simon Greenstone Panatier, P.C.

6                      1201 Elm Street

7                      Suite 3400

8                      Dallas, Texas   75270

9                      (214) 276-7680

10                     klagan@sgptrial.com

11

12    On behalf of Defendant Colgate-Palmolive Company:

13                     MATTHEW SCHROLL, ESQUIRE

14                     Nelson Mullins Riley &

15                       Scarborough, LLP

16                     2 South Biscayne Boulevard

17                     21st Floor

18                     Miami, Florida  33131

19                     (305) 373-9416

20                     matt.schroll@nelsonmullins.com

21

22      APPEARANCES:  (Continued on Next Page.)

Theresa Swain Emory , M.D.                              October 1, 2020

                                                    Page 3

 1     APPEARANCES CONTINUED:

 2

 3     On behalf of Defendant Whittaker Clark & Daniels,

 4     Inc.:

 5                    TRACY E. TOMLIN, ESQUIRE

 6                    Nelson Mullins Riley &

 7                      Scarborough, LLP

 8                    One Wells Fargo Center

 9                    301 S. College Street

10                    Charlotte, North Carolina  28202

11                    (704) 417-3000

12                    tracy.tomlin@nelsonmullins.com

13

14     On behalf of Defendant American International

15     Industries:

16                    KURT W. GREVE, ESQUIRE

17                    Lathrop BPM, LLP

18                    2101 Cedar Springs Road

19                    Dallas, Texas  75201

20                    (469) 983-6100

21                    kurt.greve@lathropbpm.com

22       APPEARANCES:  (Continued on Next Page.)

Theresa Swain Emory, M.D.                                          October 1, 2020

                                                              Page 4

1    APPEARANCES CONTINUED:

2

3    On behalf of Defendant Cyprus Amax Minerals Co.:

4                   ALVINA OELHAFEN, ESQUIRE

5                   Alston & Bird

6                   555 Fayetteville Street

7                   Raleigh, North Carolina  27601

8                   allie.oelhafen@alston.com

9

10   On behalf of Defendant Neslemur Company f/k/a The

11   Nestle-Lemur Company:

12                  KEVIN McCAFFREY, ESQUIRE

13                  Clyde & Co US LLP

14                  The Chrysler Building

15                  405 Lexington Avenue

16                  New York, New York  10174

17                  (212) 710-3952

18                  kevin.mccaffrey@clydeco.us

19

20   ALSO PRESENT:  Kaitlin Motley

21                    Jeffrey Elam, Videographer

22   (All parties appearing remotely.)

Theresa Swain Emory, M.D.                    October 1, 2020

                                          Page 144

1       insulation, that's not going to put me in the same

2       category with them for sitting here with my

3       microscope making a diagnosis in my office.

4            Q    Okay.  Doctor, I'm going to switch gears.

5       I'm going to mark your article from this year,

6       2020, as the next exhibit.

7                 (Deposition Exhibit Number 15 was marked

8       for identification.)

9       BY MR. SCHROLL:

10           Q    Actually, while we're waiting for that to

11      load, I'll ask you something else.

12                Your article is a case series, correct?

13           A    Correct.

14           Q    And you're familiar with Dr. Moline's

15      article published this year that's also a case

16      series, correct?

17           A    Yes.

18           Q    Are you aware of any epidemiological

19      studies of users of cosmetic talcum powder?

20           A    So what do you mean by epidemiological

21      studies?

22           Q    How about cohort studies?

Theresa Swain Emory, M.D.                        October 1, 2020

Page 145

 1      A      So there's lots in the literature.

 2      Q      Can you give me an example?

 3      A      I mean, there's a lot of studies on talc

 4   and talc users and disease.  It's on my reliance

 5   list.

 6      Q      Okay.  Yeah.  That's my fault.  How

 7   about -- how about this:  Epidemiological studies

 8   of the users of cosmetic talcum powder showing an

 9   increased risk of mesothelioma.

10      A      Well, that's what the whole point of, you

11   know, the series that I put out -- and I'm sure

12   that's part of the reason Dr. Moline put out -- so

13   that the information can get out to the public and

14   the medical community so people know, because we

15   weren't -- it wasn't a commonly discussed topic.

16   And so that's why we -- well, I don't know why she

17   did, but that's why I worked on that series.

18           The same as with the meso- -- the

19   gastrointestinal smooth muscle or stromal tumors

20   that I published in back in the '90s.  When you

21   have a rare disease and you're trying to find out

22   etiology or also exposure -- in this case of

USCA4 Appeal: 23-1972    Doc: 26-3       Filed: 12/20/2023    Pg: 84 of 435

Case 4:22-mc-00001-AWA-DEM   Document 18-1   Filed 01/11/23   Page 8 of 12 PageID# 1120
Theresa Swain Emory, M.D.                    October 1, 2020

Page 146

 1    asbestos -- that's how the literature develops,

 2    that publications come, and sometimes it is case

 3    series and, you know, there are -- with regard to

 4    talc, there are a lot of case reports of people

 5    going back to the '40s on cosmetic talc or --

 6    miners and millers.

 7              I mean, but as far as a big study, or a

 8    series, I would say that that's -- the purpose of

 9    the publication was just to add to the literature

10    something that the public needs to be aware of,

11    and physicians.  Medical and scientific community

12    needs to be aware.

13        Q    Are you familiar with the four studies

14    looking at miners and millers from the Italian

15    talc mines?

16        A    So I'll have to go to my -- which ones

17    are you speaking of and I'll look and see?  What

18    are you talking about, exactly?

19        Q    There's a study by Rubino, et al.  Are

20    you familiar with are that study?

21        A    Yes.

22        Q    I didn't see it on your reliance list.

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 85 of 435

Case 4:22-mc-00001-AWA-DEM   Document 18-1   Filed 01/11/23   Page 9 of 12 PageID# 1121
Theresa Swain Emory, M.D.                          October 1, 2020

Page 175

```
 1        A     I had gone to Dr. Moline's paper.  Sorry,

 2    I'll go back to mine.

 3        Q     Okay.  I'm sorry, page 2 of your article

 4    under the "discussion" heading.

 5        A     Okay.

 6        Q     You note the 75 individuals in this study

 7    and then you note Moline, et al., reported 33

 8    cases.

 9              Have you done anything to determine

10    whether any of Dr. Moline's 33 cases are the same

11    as the cases of your 75 individuals?

12        A     So again, that would be unethical to find

13    out the names or the identities of the human

14    subjects that she had and mine.  But the best that

15    could be done is to only look at the table that

16    was available and -- in an attempt to not have any

17    sort of overlapping.  So that is the best one

18    could do, standing within ethics guidelines and

19    anonymized human subjects.

20        Q     And did you do a comparison based on the

21    available data on the articles to determine

22    whether there was any overlap?
```

Theresa Swain Emory, M.D.                              October 1, 2020

                                                        Page 176

 1        A    Again, that's the only way that anyone

 2   can attempt to separate those, but again, there's

 3   no way -- you know, there were 75 of hers and -- I

 4   mean, of ours and I think 33 for her, and it was

 5   the best that could be done.

 6        Q    And I understand what you're saying is

 7   you can compare the tables of data on both

 8   articles, and I'm asking, did you do that?

 9        A    Yes.

10        Q    And did you determine whether there was

11   any overlap?

12        A    There wouldn't be overlap, to the best of

13   our ability.

14        Q    Okay.  I want you to look at case

15   number 72 of your article in your table number 1.

16        A    Okay.

17        Q    And case number 72, your article reports

18   is a male with year of diagnosis in 2016, age 44,

19   peritoneal-type, correct?

20        A    No.  Pleural.

21        Q    You are correct.  I misread that.  That's

22   why I asked, did I read that correctly?

Theresa Swain Emory , M.D.                    October 1, 2020

Page 178

1    So I think -- I'd caution you because I don't know

2    about the bar in Texas, if that's where you are,

3    but I can tell you the board of medicine in

4    Virginia is not going to tolerate my exposing and

5    de-anonymizing human subjects.

6         Q     Okay.  And in table 2 --

7               MR. SCHROLL:  Move to strike.

8    BY MR. SCHROLL:

9         Q     And in table 2 of Dr. Moline's article,

10   the bottom of page 15, it says case number 6, and

11   it finds asbestos type, anthophyllite and

12   tremolite.  Do you see where I'm referring to?

13        A     No.

14        Q     Page 15, table 2.

15        A     Not doing this, no.  I don't know what

16   you're trying to do.  If you're trying to

17   de-anonymize these patients -- I'm only going to

18   talk about my paper.  I'm not comparing my paper

19   to Dr. Moline's as we sit here today.

20        Q     Do any of the 75 cases in your case

21   article have -- had incidents of pleural plaques?

22        A     What's reported in our paper is what's

Case 4:22-mc-00001-AWA-DEM  Document 18-1  Filed 01/11/23  Page 12 of 12 PageID# 1124
Theresa Swain Emory, M.D.        October 1, 2020
USCA4 Appeal: 23-1972  Doc: 26-3  Filed: 12/20/2023  Pg: 88 of 435

Page 254

1       CERTIFICATE OF NOTARY PUBLIC

2       I, Denise M. Brunet, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears

5    in the foregoing deposition was sworn by me; that

6    the testimony of said witness was taken by me

7    stenographically and thereafter reduced to print

8    by means of computer-assisted transcription by me

9    to the best of my ability; that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to this litigation and have no

12   interest, financial or otherwise, in the outcome

13   of this matter.

14
_____

16   Denise M. Brunet

17   Notary Public in and for

18   The District of Columbia

19

20   My Commission Expires:

21   December 14, 2022

22

Exhibit 2

```
 1              IN THE COURT OF COMMON PLEAS

 2           FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

 3                     CIVIL DIVISION

 4                       - - -

 5  HOLLY FISHER, EXECUTRIX   : JULY TERM 2019
    ESTATE OF SANDRA REICHART : NO. 19070087
 6                            :

 7          vs.               :

 8                            :

    AMERICAN INTERNATIONAL    :
 9  INDUSTRIES, individually  :
    and as successor-in-interest:
10  for the CLUBMAN BRAND, and :
    the NESLEMUR COMPANY and   :
11  PINAUD COMPANY, et al      :

12                       - - -

13              Thursday, October 13, 2022
                Courtroom 675, City Hall
14              Philadelphia, Pennsylvania

15                       - - -

16                 MORNING SESSION

17                       - - -

18

19  B E F O R E:

20         THE HONORABLE SIERRA THOMAS-STREET, J.

21                       - - -

22

23  Reported by:  Stephanie Goffredo, RPR
                    Official Court Reporter
24

25
```

**JA1033**

```
 1   A P P E A R A N C E S:

 2

 3   SIMMONS HANLY CONROY
     JAMES KRAMER, ESQUIRE
 4   DONALD P. BLYDENBURGH, ESQUIRE
     OLIVIA KELLY, ESQUIRE
 5   ATTORNEY FOR PLAINTIFFS

 6

     LATHROP GPM
 7   ROBERT E. THACKSTON, ESQUIRE
     ATTORNEY FOR DEFENDANT AII
 8

 9   MCGIVNEY KLUGER CLARK & INTOCCIA, P.C.
     DAVID W. SNYDER, ESQUIRE
10   ATTORNEY FOR

11

12   WILLCOX SAVAGE
     ERIC D. COOK, ESQUIRE
13   ATTORNEY FOR WHITTAKER AND CLARK

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA1034**

Fisher vs. American International Industries, et al

1   known exposure they had.

2       Q    I want to discuss some articles with you,

3   Dr. Moline.

4            MR. KRAMER:  I'd like to mark for

5            identification P-304, P-330, and P-334?

6            May I approach?

7            MR. THACKSTON:  What is the --

8            MR. KRAMER:  Medical literature.  I can

9       read the title.

10           P-304, Malignant Peritoneal Mesothelioma

11           in a 17-year-old boy with evidence of previous

12           exposure to chrysotile and tremolite asbestos.

13           P-330, Mesothelioma Associated with the

14      Use of Cosmetic talc.

15           P-334, Malignant Mesothelioma Following

16      Repeated Exposures to Cosmetic Talc a Case

17      series of 75 patients.

18           THE COURT:  Yes.  You may proceed.

19           MR. KRAMER:  Thank you.

20  BY MR. KRAMER:

21      Q    Dr. Moline, turning first to P-304, do you

22  recognize that article?

23      A    Yes.

24      Q    Can you tell us what significance, if any,

25  this has related to the opinions you're going to be

**JA1035**

Fisher vs. American International Industries, et al

1    you don't know where someone might be getting a

2    disease from.

3            In this particular paper we also were

4    showing that individuals who had mesothelioma, we

5    were unable to find any other source of asbestos

6    exposure that could lead to their mesothelioma, so

7    we highlighted that aspect of it.  That cosmetic

8    talc was the common theme in all of those cases.

9        Q    Then P-334, malignant mesothelioma

10   following repeated exposure to cosmetic talc, a case

11   series of 75 patients, do you rely upon this article

12   in forming during opinions?

13       A    Yes.  It's another case series.  It's a

14   larger case series than the one that I published,

15   and it's individuals similarly with a history of

16   exposure to cosmetic talc who developed

17   mesothelioma.

18       Q    Are you familiar with the CDC?

19       A    Yes.

20       Q    I guess we all are at this point.  You

21   mentioned before that you attempt to keep up on the

22   medical literature related to asbestos and disease;

23   did I get that right?

24       A    Yes.

25       Q    Does the CDC publish information in the

**JA1036**

```
1                  C E R T I F I C A T E
2          I hereby certify that the proceedings and
3     evidence noted are contained fully and
4     accurately in the stenographic notes taken by
5     me on the proceedings of the above matter, and
6     that this is a correct transcript of the same.
7
8
9
10
11          -------------
12          Stephanie Goffredo, RPR
            Official Court Reporter
13
14
15          (The foregoing certification of this
16     transcript does not apply to any reproduction
17     of the same by any means, unless under the
18     direct control and/or supervision of the
19     certifying reporter.)
20
21
22
23
24
25
```

**JA1037**

Exhibit 3

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
Allison M. Brown, Esq.
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3222
Facsimile: (917) 777-3222
Email: Allison.Brown@skadden.com

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>        Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br>        Plaintiff,<br>v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br>        Defendant. | Adv. Proc. No. 22-_____ (MBK) |

**COMPLAINT**

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PARTIES ...................................................................................................................... 3

JURISDICTION ........................................................................................................... 5

FACTS ......................................................................................................................... 5

I.      Dr. Moline: Plaintiffs' Paid Expert Witness ......................................................... 5

II.     Dr. Moline Has Repeatedly Published Disparaging Statements About Johnson's
        Baby Powder and Shower to Shower in Multiple Forums ................................... 7

        A.      Dr. Moline Published an "Influential" and "Groundbreaking" Talc Article ......... 7

        B.      Dr. Moline Repeatedly Republished Her False and Disparaging
                Statements .................................................................................................. 10

III.    Dr. Moline Knew Her Statements Were False or Recklessly Ignored Available
        Information Demonstrating Their Falsity When Made ...................................... 18

        A.      Dr. Moline's Intimate Knowledge of the True Asbestos Exposures of the
                33 Individuals Referenced in the Article ............................................... 19

        B.      The Record Now Shows that Individuals in the Article Claimed Exposures
                to Asbestos from Sources Other than Talc .......................................... 20

IV.     Dr. Moline and Plaintiffs' Counsel Concealed the Falsity of Her Statements ................. 36

V.      Dr. Moline Was Motivated by Fame and Fortune ............................................. 37

VI.     Dr. Moline's Statements Perpetuated a Decades-Long Fraud in Asbestos
        Litigation ......................................................................................................... 39

VII.    LTL Was Gravely Harmed by Dr. Moline's False Statements .......................... 42

CAUSES OF ACTION ............................................................................................... 43

        Count I: Injurious Falsehood / Product Disparagement ................................. 43

        Count II: Fraud .............................................................................................. 47

        Count III: Violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a) ................... 49

PRAYER FOR RELIEF ............................................................................................ 50

i

## INTRODUCTION

1.     This is an action to recover for the knowing and repeated disparagement of Johnson's Baby Powder and Shower to Shower by Dr. Jacqueline Moline.

2.     In 2019, Dr. Moline published an article claiming that 33 individuals who used talc powder and developed the asbestos-related cancer mesothelioma had no other potential exposures to asbestos—pointing the finger squarely at talc products such as Johnson's Baby Powder. *See* **Exhibit A**, Moline, et. al., *Mesothelioma Associated With the Use of Cosmetic Talc* (2019) (the "Moline Article" or the "Article").

3.     Dr. Moline knew that claim was false when she made it, and that individuals she referenced in her Article had admitted to—and indeed had made claims seeking compensation for—exposure to other sources of asbestos, or recklessly disregarded substantial evidence to the contrary. Dr. Moline nonetheless reiterated her false claims to the media, in scientific literature, at public conferences, and to Congress, judges and juries. The misrepresentation has even infected this Court's proceedings, where it has been cited in filings, including one as recently as yesterday.

4.     Dr. Moline engaged in this widespread deception—not for any laudable public purpose—but for her own personal aggrandizement and gain. She received accolades, speaking opportunities, and acclaim for her self-proclaimed novel and disruptive study. And her disparaging statements provided a foundation for the mass tort asbestos plaintiffs' bar's baseless claims against LTL, and they richly compensated her with millions of dollars of fees to act as their "expert" and mouthpiece.

5.     Dr. Moline's deception was recently laid bare by a federal judge in the District Court for the Middle District of North Carolina who rejected the efforts of certain plaintiffs' law firms for whom Dr. Moline works to keep the evidence of her deceit under seal. *See* **Exhibit B**,

1

*Bell v. Am. Int'l Indus. et al.*, No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022), ECF No. 398 at 4,

17, 22 (the "*Bell* Opinion"). The *Bell* Opinion excoriated Dr. Moline because of her

"concealment" of information about occupational asbestos exposures of Betty Bell—a plaintiff

in cosmetic talc litigation who was also confirmed to be one of the individuals included in Dr.

Moline's article. *Id.* at 16-18, 20. The court found that the inclusion of an individual with

asbestos exposures apart from allegedly contaminated talc had "direct bearing on the study's

credibility" as it contradicted the entire foundation of the Article. The Court also expressed grave

concern about the "groundbreaking nature" and "widespread influence" of the Moline Article

"on the cosmetic talc litigation nationwide" given that this critical information had been shielded

from public disclosure until the *Bell* Opinion was issued. *Id.*

      6.     As Dr. Moline intended, her disparaging statements have caused LTL significant

and ongoing commercial, reputational, and financial harm. In fact, when LTL's predecessor

announced that it would stop selling talc-based Johnson's Baby Powder in North America, it

cited "declining" demand "due in large part to changes in consumer habits" that were "fueled by

misinformation around the safety of the product and a constant barrage of litigation advertising."

The Moline Article is a central element of that misinformation.

      7.     With her malfeasance now unveiled, Dr. Moline should be held accountable for

the egregious harm she has caused to LTL, and should be required to retract her Article and issue

corrective disclosures. Further, the deliberate nature of Dr. Moline's conduct demands a stringent

award designed to deter such conduct, which has become a hallmark of the mass tort plaintiffs'

bar's business model.

      8.     Indeed, this most recent revelation concerning Dr. Moline's deceit is only further

affirmation of a long-running and troubling trend of doctors leveraging their credentials to

2

**JA1042**

fabricate false narratives and support "junk science" to bolster the mass tort plaintiffs' bar's claims.[2] These purported experts contrive baseless opinions, which plaintiffs' lawyers then use to confuse juries, secure extreme verdicts, and in turn pay these same experts. And all the while, the firms and experts fight to conceal their duplicity behind protective orders and fight disclosure of key facts that would illuminate this deceit.

9.    This cycle must end. The false narratives contrived by purported experts like Dr. Moline cause harm to the manufacturers whose products they target—and to those who are suffering from harm wrongly attributed to such products. Rather than addressing the actual cause of their harm, these individuals are led astray by contrived claims amplified by the law firms that purport to represent their interests. This is a grave wrong that must be righted.

## PARTIES

10.    LTL is a North Carolina limited liability company with its principal place of business in New Jersey.

11.    LTL was created through a corporate restructuring (the "2021 Corporate Restructuring") of the former Johnson & Johnson Consumer Inc. ("Old JJCI") that was completed on October 12, 2021. As a result of the 2021 Corporate Restructuring, Old JJCI ceased to exist and LTL and Johnson & Johnson Consumer Inc., a New Jersey company ("New

---

[2] As just one example, earlier this month, the Southern District of Florida dismissed thousands of product liability claims advanced against pharmaceutical manufacturers, detailing the unfounded, unreliable and unscientific opinions that had been submitted by a roster of plaintiffs' experts—including Dr. Anne McTiernan, who also partnered with Dr. Moline to fabricate a false narrative regarding the very talc products at issue here. *In re Zantac (Ranitidine)*, MDL No. 2924, Doc. No. 6120 (S.D. Fla. Dec. 6, 2022). The long history of manipulating science in asbestos litigation, and now talc litigation, is laid out in more detail in Section VI below. Sadly, the Moline Article is just the latest iteration that has come to light, but its impact—particularly as to LTL—has been substantial.

3

JJCI"), were formed. Old JJCI manufactured and sold Johnson's Baby Powder and Shower to Shower.

12.    As part of the 2021 Corporate Restructuring, LTL was allocated and became solely responsible for certain liabilities of Old JJCI, including liabilities arising from all claims (the "Talc Claims") relating in any way to injury or damage sustained or incurred in the exposure to talc or talc-containing products (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws). LTL also was allocated and received certain assets of Old JJCI. Consequently, LTL received all causes of action and privileges that relate to the assets and liabilities allocated to LTL in the Corporate Restructuring, including the claims asserted herein.[3]

13.    On October 14, 2021, LTL commenced a Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina. The bankruptcy case was transferred to this District on November 16, 2021. LTL continues to be in possession of its property and is managing its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.    Defendant Dr. Jacqueline Miriam Moline is an Occupational Medicine specialist and Professor of Occupational Medicine, Epidemiology and Prevention and Internal Medicine, and the Chairperson of the Department of Occupational Medicine, Epidemiology and Prevention at the Donald & Barbara Zucker School of Medicine at Hofstra/Northwell, as well as Director of the Northwell Health Queens World Trade Center Health Program, and Director of the New

---

[3] In discussing events prior to the 2021 Corporate Restructuring concerning talcum powder products, Talc Claims, and talc litigation, "LTL" includes Old JJCI, LTL's immediate corporate predecessor.

4

**JA1044**

York State funded Occupational and Environmental Medicine of Long Island Clinical Center.

Upon information and belief, Dr. Moline is a citizen of New York.

15.     Dr. Moline has been disclosed as a plaintiff's expert in over 200 cosmetic

talc/mesothelioma cases against LTL. She has provided deposition testimony in 46

talc/mesothelioma cases against LTL, as well as trial testimony in 16 of those cases.

## JURISDICTION

16.     This Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §§ 157, 1331, 1332 and 1334. The parties are citizens of different States and the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over Plaintiffs' claims

under the Lanham Act. Pursuant to 28 U.S.C. §§ 157 and 1334, this Court has jurisdiction of the

claims asserted herein because they relate to LTL's bankruptcy proceeding.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

18.     Venue is further predicated upon 28 U.S.C. § 1391, which provides for proper

venue in any district in which a substantial part of the events giving rise to the claim occurred.

## FACTS

**I.      Dr. Moline: Plaintiffs' Paid Expert Witness**

19.     Dr. Moline has made a career and small fortune testifying on behalf of the mass

tort asbestos plaintiffs' bar. She has been testifying as a paid expert in asbestos litigation for over

20 years, always on behalf of plaintiffs. For playing that role, she is paid between approximately

$250,000 and $300,000 per year (about 40% of her total income) and, in aggregate, has received

over $3 million.

20.     In recent years, Dr. Moline's testimony mainly was in mesothelioma cases against

LTL (and other manufacturers of talc powder products)—having been disclosed as a plaintiff's

5

expert in over 200 cases, provided deposition testimony in 46 cases, and testified in 16 separate trials against LTL.

    21.     Even before the recent controversy concerning the Article, Dr. Moline's reliability has faced heavy criticism. Notably, multiple appellate courts have excluded her opinions or found them insufficient to establish that, as she posited, the asbestos in the talc products at issue caused mesothelioma.[4]

    22.     In *Lanzo*—a cosmetic talc case against LTL—the New Jersey Appellate Division "concluded that the trial court erred by allowing … Moline to provide expert testimony that non-asbestiform minerals can cause mesothelioma." *Lanzo v. Cyprus Amax Mins. Co.*, 467 N.J. Super. 476, 513 (N.J. App. Div. 2021).

    23.     In *Olson*—another cosmetic talc case against LTL—the New York Appellate Division reversed judgment entered in plaintiffs' favor, concluding that Dr. Moline, as plaintiff's medical causation expert, failed "to establish sufficient exposure to a substance to cause the claimed adverse health effect." *Matter of New York City Asbestos Litig. (Olson)*, 207 A.D.3d 415, 416 (N.Y. 1st Dep't 2022).

    24.     In *Nemeth*—a cosmetic talc case against another company—the New York Court of Appeals again concluded that Dr. Moline's opinion was insufficient to establish causation. The Court stated: "[T]he studies or scientific literature cited or relied upon by Dr. Moline" did

---

[4] Dr. Moline's opinions on the cause of mesothelioma also were rejected in cases involving other products. In *Juni*, Dr. Moline testified that asbestos allegedly in Ford Motor Company's friction products caused the plaintiff's mesothelioma. The New York Appellate Division found her opinion "insufficient" to, in fact, establish causation: "The evidence presented by plaintiff here was insufficient because it failed to establish that the decedent's mesothelioma was a result of his exposure to a sufficient quantity of asbestos in friction products sold or distributed by defendant Ford Motor Company." *In re New York City Asbestos Litig. (Juni)*, 148 A.D.3d 233, 236-37, 239 (N.Y. App. Div. 1st Dep't 2017). The New York Court of Appeals affirmed. *Matter of N.Y.C. Asbestos Litig. (Juni)*, 32 N.Y.3d 1116, 1122 (2018).

not "provide the necessary support for her conclusion as to proximate causation." *Nemeth v.*

*Brenntag N. Am.*, 38 N.Y.3d 336, 345 (2022).

25.     These appellate courts' determinations of the unscientific and unreliable nature of

the testimony Dr. Moline has offered time and again in various courts against LTL and others

affirms Dr. Moline's proclivity to make knowingly false and disparaging statements published

outside of court to the scientific community and general public.

## II.     Dr. Moline Has Repeatedly Published Disparaging Statements About Johnson's Baby Powder and Shower to Shower in Multiple Forums

### A.     Dr. Moline Published an "Influential" and "Groundbreaking" Talc Article

26.     Starting in October 2019, Dr. Moline repeatedly and widely published disparaging

statements regarding talc powder products, including, in particular, Johnson's Baby Powder and

Shower to Shower.

27.     Specifically, Dr. Moline repeatedly asserted that she had conducted the ***first***

***comprehensive*** case study review of individuals whose ***sole exposure to asbestos*** was talc, and

determined that the asbestos contamination in those talc products had caused their mesothelioma.

28.     Dr. Moline concocted this "study"—along with another prominent plaintiffs'

expert witness in asbestos and talc cases (Ronald E. Gordon, Ph.D.)—after courts began

routinely excluding Dr. Moline's testimony regarding causation in other litigation cases, as

discussed further below.

29.     That scheme culminated in Dr. Moline and her co-authors' publication of an

article in the widely read Journal of Occupational and Environmental Medicine entitled

*Mesothelioma Associated With the Use of Cosmetic Talc*. Ex. A, Moline Article. The Article

became available online on October 10, 2019.

7

**JA1047**

30. As lead author, Dr. Moline asserted that the Article presented "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users." Ex. A, Moline Article at 14.

31. Dr. Moline "present[s] 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products." Ex. A, Moline Article at 11.

32. These 33 individuals are all plaintiffs in litigation where Dr. Moline serves as an expert witness on behalf of plaintiffs' counsel. Ex. A, Moline Article at 11.

33. The Article identifies Johnson's Baby Powder and Shower to Shower as the talc powders most commonly used by the individuals.[5]

34. Dr. Moline also buttressed the Article by citing to 2017 statistics from the website Statista. Ex. A, Moline Article at 11 n. 26. Statista's 2017 statistics show that Johnson's Baby Powder was the most commonly used brand of talc, accounting for approximately 52% of users. That website also shows that Shower to Shower was the second most popular brand, accounting for approximately 17% of users (for a total of just under 70%).

35. In the Article, Dr. Moline also relies on litigation testing that specifically names "Johnson & Johnson Baby Powder" and "Shower to Shower." Ex. A, Moline Article at 14 n. 35.[6]

---

[5] The Article asserts that the 33 individuals used 22 different brands of talc. Ex. A, Moline Article at 11, 15. Each brand is identified by a letter A through V. The Article contains "Appendix 3" for "type of talcum powder used," and provides a publicly available link to the Appendix: http://links.lww.com/JOM/A651. Ex. A, Moline Article at 12. The Appendix is a key identifying which brand corresponds to each letter. It identifies Johnson's Baby Powder as "D" and Shower to Shower as "I." Ex. A, Moline Article at App'x 3. Of the 33 cases, 19 (over half) used Johnson's Baby Powder (brand "D"). Ex. A, Moline Article at 15. Johnson's Baby Powder was used by more individuals in the Article than any other brand. Ex. A, Moline Article at 15.

[6] This testing was conducted by Dr. William Longo, another professional plaintiffs' expert witness and a central figure in talc litigation. Dr. Longo suffers from a similar flaw to Dr. Moline, having falsely testified under oath at least 10 times—including in litigation against LTL—that before he was retained in talc cases, his laboratory had never tested cosmetic talc for

8

36. Notably, however, Dr. Moline *did not disclose* the names of the 33 individuals

featured in the Article and has actively *attempted to conceal* the individuals' identities (as

discussed further below).

37. The Article states multiple times that the subjects of the Article had *no other*

*exposure to asbestos* apart from alleged exposure to asbestos from talcum powder:

- "Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder." Ex. A, Moline Article at 11.

- "Results: Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases." Ex. A, Moline Article at 11.

- "For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." Ex. A, Moline Article at 11.

- "The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." Ex. A, Moline Article at 14.

- "Like Wagner, we present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder." Ex. A, Moline Article at 14.

38. Since publishing the Article, Dr. Moline has doubled down on this proposition,

testifying that a potential alternative asbestos exposure would have excluded that individual from

the Article's case series.

---

the presence of asbestos. In reality, he had tested cosmetic talc and not found any asbestos, calling the idea of asbestos contamination an "an urban legend." That all changed when Dr. Longo was hired as a plaintiffs' expert in talc litigation. Suddenly, Dr. Longo began to find "trace" asbestos in virtually every sample of talc that he tested. His new tactic: *Call it asbestos even if it's not*. At this point, Dr. Longo will even call talc "asbestos" by using an unpublished and self-invented method of detection. Other scientists, including another plaintiff-side expert, have said that what Dr. Longo is calling "chrysotile asbestos" is really nothing more than talc. But juries, judges, and the American public are told time and again that Dr. Longo has found asbestos in talc, including in Johnson's Baby Powder.

9

39.      Indeed, as a North Carolina federal court recently explained, the premise that all 33 cases did not have other potential exposures to asbestos apart from talcum powder was the "principal factual underpinning of the article." Ex. B, *Bell* Opinion at 22.

40.      Yet, facts have now come to light making clear that the statement that none of the 33 individuals had any other exposure to asbestos is simply not true, as described more fully in Part III below.

### B.      Dr. Moline Repeatedly Republished Her False and Disparaging Statements

41.      Dr. Moline has repeated the false premise of the Article time and time again, in myriad settings and with large and varied audiences.

#### 1.      Time Magazine Article

42.      Shortly after the Moline Article became available online, *Time* magazine published a story about the Article on October 15, 2019. **Exhibit C**, A New Study Suggests Tainted Talcum Powder Can Cause a Rare Cancer. Here's How That Could Play Out in the Courtroom (Oct. 15, 2019).[7]

43.      Dr. Moline is quoted in the story saying: "This is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'"

44.      She also said: "Everything points to cosmetic talc being the cause" of the Article's subjects' mesothelioma.

---

[7] https://time.com/5692129/talcum-powder-mesothelioma/.

10

**JA1050**

### 2.    Romper.com Article

45.    Dr. Moline similarly gave an interview for an article on Romper.com which was published on October 16, 2019. **Exhibit D**, Contaminated Baby Powders May Be Linked To Rare Cancer, New Study Suggests (Oct. 16, 2019).[8]

46.    The subject of the Romper piece was the Moline Article: "In a case study of 33 patients, researchers found strong evidence that exposure to asbestos-contaminated talcum powder, such as that's often used in baby powders, can result in malignant mesothelioma."

47.    That article quotes Dr. Moline:

- "All the folks in the study used cosmetic talc, usually for decades, and they all had mesothelioma with no other asbestos source."

- "We couldn't find any other source [of exposure] apart from the cosmetic talc."

### 3.    Asbestos.com Article

48.    Dr. Moline's *Time* magazine quotes were reproduced in an October 18, 2019 article on Asbestos.com, *Case Study Shows Asbestos in Talc Causes Mesothelioma.*

49.    The Asbestos.com article emphasizes that: "'Everything points to cosmetic talc being the cause,' co-author Dr. Jacqueline Moline told Time Magazine. 'This is the first time that anyone has said, 'Let me look at all these cases, put it together and identify the ones where [talc] is the sole exposure.''" **Exhibit E**, Povtak T, Case Study Shows Asbestos in Talc Causes Mesothelioma (Jan. 5, 2021).[9]

50.    Asbestos.com is sponsored by plaintiffs' law firms concentrating in asbestos litigation.

---

[8] https://www.romper.com/p/contaminated-baby-powders-may-be-linked-to-rare-form-of-cancer-study-suggests-19221063.

[9] https://www.asbestos.com/news/2019/10/18/talc-mesothelioma-case-study.

11

**JA1051**

### 4.    Congressional Subcommittee Testimony

51.    On December 10, 2019, Dr. Moline testified before a House Subcommittee on talc and talc litigation.

52.    The day before, CNBC, Reuters, and Yahoo! Finance all covered the upcoming hearing.

53.    In her written testimony, Dr. Moline stated: "[M]y colleagues and I reported on 33 individuals with no other identifiable source of exposure apart from cosmetic talc." **Exhibit F**, Written Testimony of Jacqueline Moline at 2.[10]

54.    She also repeated in her oral testimony: "This talc exposure was their only exposure to asbestos." **Exhibit G**, Hearing Transcript at 8 (Dec. 10, 2019).[11]

55.    In her testimony, she discussed "Ms. D" (*i.e.* Ms. Bell discussed at length in Part III.B below). Dr. Moline testified that Ms. D "had worked in various industries, including textile and tobacco, and had no exposure to asbestos" there. *Id.* at 9.

56.    The witnesses who testified and the Representatives speaking throughout the session referred many times to Johnson & Johnson brand talcum powder products.

57.    Indeed, the subcommittee's chairman began the hearing discussing the allegations of asbestos in "Johnson & Johnson's talc-based baby powder." *Id.* at 2.

58.    And in his opening statement, he displayed images of Johnson's Baby Powder:

---

[10] https://www.congress.gov/116/meeting/house/110311/witnesses/HHRG-116-GO05-Wstate-MolineJ-20191210.pdf.

[11] https://docs.house.gov/meetings/GO/GO05/20191210/110311/HHRG-116-GO05-Transcript-20191210.pdf.

12

**JA1052**



59.     The congressional hearing was broadcast on C-SPAN, which also posted the hearing on YouTube.

60.     The relevant Congressional Committee put out a press release listing among the "takeaways" from the hearing that "Dr. Jacqueline Moline testified that individuals who have *only* been exposed to asbestos through the use of talc-based Johnson & Johnson Baby Powder have developed mesothelioma."[12]

61.     The websites mesothelioma.com and mesothelioma.net—which are sponsored by plaintiffs' law firms specializing in asbestos litigation—published articles covering the hearing.[13] One story stated that "Dr. Moline "offered insights from 33 mesothelioma patients who were

---

[12] https://oversight.house.gov/news/press-releases/oversight-subcommittee-held-second-hearing-on-the-public-health-risks-of.

[13] https://www.mesothelioma.com/blog/congressional-hearing-examines-asbestos-detection-in-talc; https://mesothelioma.net/mesothelioma-news/congressional-hearings-regarding-asbestos-in-talc-features-mesothelioma-victims-testimony/.

13

exposed to asbestos from talcum powder" and that "talcum powder was the only instance of asbestos exposure among all 33 patients in the study."

### 5.    2020 ADAO "Conversation"

62.    On May 13, 2020, Dr. Moline participated in an Asbestos Disease Awareness Organization event by Zoom called *ADAO Conversation with Dr. Jacqueline Moline & Robert Sussman Discuss Asbestos, Talc, Prevention, and Policy.*[14]

63.    During that event, she said of the Article: "What we found in these individuals is that these 33 did not have any other known source of asbestos exposure that we could discern from the information that we were provided."

64.    She also said: "[R]eally the whole point of our paper" was "to say that mesothelioma can occur in individuals whose sole exposure is to cosmetic talc."

### 6.    Statement on EPA's Risk Evaluation of Asbestos

65.    On March 30, 2020, the EPA invited public input on its draft risk assessment of asbestos.

66.    Dr. Moline submitted a comment, which was posted on the EPA's website on May 31, 2020. **Exhibit H**, Toxic Substances Control Act (TSCA) Science Advisory Committee on Chemicals Review of Risk Evaluation for Asbestos, Comment submitted by Jacqueline Moline (May 31, 2020).[15]

67.    In her statement, she wrote: "[M]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

---

[14] https://www.youtube.com/watch?v=PUiFlYuajjQ.

[15] https://www.regulations.gov/docket/EPA-HQ-OPPT-2019-0501/comments?filter=moline.

14

68.    Dr. Moline's statement was also made available on the Asbestos Disease Awareness Organization's website.[16]

### 7.    2022 ADAO Asbestos Awareness and Prevention Conference

69.    On September 17, 2022, Dr. Moline gave a presentation at the *2022 ADAO Asbestos Awareness and Prevention Conference*.[17] That presentation was just four days *after* the federal district court in *Bell* (discussed in Section III) issued its opinion identifying alternative asbestos exposures beyond allegedly contaminated talc for one of the individuals in the Article.

70.    She spoke during Session II: Medical Advancements: Diagnosing and Treating Mesothelioma and Other Asbestos-Related Diseases.

71.    During her presentation, she spoke extensively about the Article.

72.    Although the *Bell* Court had just identified alternative asbestos exposures for Ms. Bell (aka Ms. D from her congressional testimony), and castigated Dr. Moline for stating otherwise in her Article, Dr. Moline made no reference to that alternative asbestos exposure. Instead, Dr. Moline reiterated once again that, with respect to the individuals referenced in her Article, that "[w]e were unaware of any other asbestos exposure apart from talc."

73.    She also presented a slide regarding her Article stating: "Talcum powder as the only asbestos exposure":

---

[16] https://www.asbestosdiseaseawareness.org/wp-content/uploads/2020/05/ EPA-Statement.pdf.

[17] https://www.youtube.com/watch?v=sqWAzNM9SCA&t=20s.

15

**JA1055**



#### 8.    Dr. Moline Northwell Health Web Bio

74.    Dr. Moline has a web bio on Northwell Health's website. **Exhibit I**, Jacqueline

Moline, MD, MSc, Feinstein Institutes for Medical Research Northwell Health.[18]

75.    Even after the central premise of the Article was exposed as false by the *Bell*

Court, her web bio *to this day* reads: "Dr. Moline published the first case series, identifying

cosmetic talc as the asbestos source leading in mesothelioma in 33 individuals."

#### 9.    Dr. Moline and Other Plaintiffs' Experts Cite the Article in Court

76.    In addition to publicly and widely disseminating her false statements, Dr. Moline

(and other plaintiffs' experts) have routinely referenced the Article in numerous cosmetic talc

trials across the country. Ex. B, *Bell* Opinion at 17-18.

---

[18] https://feinstein.northwell.edu/institutes-researchers/our-researchers/jacqueline-moline-md-msc.

16

77.    After the online publication of the Article, Dr. Moline was disclosed in 58 other cosmetic talc/mesothelioma cases against LTL alone, where she began to routinely rely on the Article as the centerpiece of her testimony.

78.    In September 2021, a California state court ruled over LTL's objection that "Plaintiffs' experts can rely on the Article and state that they relied on it."

79.    Dr. Moline then testified for the first time at an LTL talc trial (*Shawn Johnson*) about the Article.

80.    That testimony included a statement that she "picked people [for the Article] who didn't have any other exposure other than cosmetic talc" to "the best of [her] knowledge."

81.    But during cross examination, Dr. Moline refused to identify any of the subjects of the Article: "I will not disclose the name of the individuals in the paper."

82.    Compounding this prejudice, another plaintiff's experts (Dr. Allan Smith) testified that the Moline Article as a "main source of information that [he is] aware of today" and that he relies upon to testify that talcum powder causes mesothelioma.

83.    Shortly thereafter, in another LTL talc trial (*Prudencio*), another California court permitted plaintiffs' experts to rely on the Moline Article and give a summary of it "consistent with the established rules of expert reliance."

84.    And these two LTL trials were not the only cases where an expert has relied on the Moline Article. As the North Carolina federal court explained: "other expert witnesses have begun relying on the article for the basis of their opinions." Ex. B, *Bell* Opinion at 17-18.

85.    In 63 other cases against LTL, a combined 20 other plaintiffs' experts relied on the Moline Article in either their deposition or court disclosures: Drs. Brody, Castleman, Cohen,

17

**JA1057**

Compton, Dodson, Egilman, Emory, Finkelstein, Gordon, Haber, Horn, Kanarek, Kradin, Longo, Maddox, Madigan, Radecki, Rigler, Verschraegen, and Zhang.

86.     Even here, in the LTL bankruptcy, the Article already has made an appearance. More specifically, when Mr. Satterley moved for relief from the preliminary injunction enforcing the bankruptcy stay on litigation, he submitted an expert affidavit which relied on the Moline Article. And as recently as December 15, 2022, Mr. Satterley submitted an update to this Court with an expert report from a different expert witness that also relied upon and cited to the Moline article.

### III.    Dr. Moline Knew Her Statements Were False or Recklessly Ignored Available Information Demonstrating Their Falsity When Made

87.     When Dr. Moline published her statements in the public domain, to the scientific community, and in various courts across the country, she knew that the premise of her position—that she conducted a study of 33 mesothelioma patients whose sole exposure to asbestos was through talc powder—was false or recklessly ignored available information demonstrating its falsity.

88.     The truth is that Dr. Moline was intimately familiar with the case histories of the 33 individuals referenced in the Article from her role as a plaintiffs' expert in the underlying tort cases in which those individuals had asserted claims against LTL and others.

89.     In other words, Dr. Moline knew full well that Ms. Bell, which the Article counts amongst the 33 individuals and whom she referenced repeatedly in various public statements inside and outside litigation, as well as others, had admitted to and claimed compensation for exposure to asbestos from other sources, or recklessly disregarded substantial evidence of alternative exposure.

18

A.    Dr. Moline's Intimate Knowledge of the True Asbestos Exposures of the 33
      Individuals Referenced in the Article

90.    To truly understand Dr. Moline's familiarity with the 33 individuals covered in
the Article, one must start with the very first cosmetic talc/mesothelioma case to go to trial
involving Johnson's Baby Powder—a case called *Herford*, in which Dr. Moline was one of
plaintiffs' key experts.

91.    During the *Herford* trial, Dr. Moline testified: "There are about 41 cases of
individuals that I've reviewed records of [or] have in some cases had the opportunity to
evaluate." Earlier, she had acknowledged in her deposition that all 41 of those cases involved
people who came to her through litigation—in other words, each of them were plaintiffs in
mesothelioma cases.

92.    Dr. Moline was examined at trial about her record review and evaluation of the 41
cases. When asked "And would those evaluations include learning about their occupational and
environmental history of exposures," Dr. Moline responded: "Yes."

93.    On the Northwell website, Dr. Moline is quoted as saying that it is "important to
take a comprehensive exposure history when evaluating patients presenting with cancers like
mesothelioma."[19]

94.    Notably, the *Herford* court precluded Dr. Moline from testifying about her
conclusions regarding the 41 individuals because she had evaluated them in "medicolegal
matters" not in the "clinical context."

_____

[19] https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

19

**JA1059**

95.     For the same reason, other courts thereafter repeatedly barred Dr. Moline from offering testimony on her litigation case review of these various plaintiffs.[20] And so, for a period, Dr. Moline was stymied.

96.     But Dr. Moline ultimately pivoted. To circumvent these piling and adverse rulings, Dr. Moline published the Article to add a veneer of credibility to the other plaintiffs she wanted to testify about, and her claim that their sole source of asbestos exposure was talcum powder.

97.     That veneer has been dispelled by recently uncovered evidence disclosed in the *Bell* decision that demonstrates, unequivocally, that Ms. Bell's exposure to asbestos reaches well beyond exposure to talc, as Dr. Moline knew full well.

**B.      The Record Now Shows that Individuals in the Article Claimed Exposures to Asbestos from Sources Other than Talc**

98.     In September 2022, the *Bell* court unveiled the "concerning" contradiction between (1) Dr. Moline's representations that her study was confined to individuals whose sole exposure to asbestos was talc, and (2) the evidence that she knew they had other exposures. Further scrutiny of the record indicates that this concerning contradiction extends beyond the individual who was the plaintiff in the *Bell* case.

**1.      Case #9**

99.     The falsity of the Moline Article was most recently revealed in the context of the *Bell* case.

---

[20] *Fong et al. v. Johnson & Johnson*, *et al.*, No. BC675449 (Super. Ct. Ca., L.A. Cnty.); *Hayes v. Colgate-Palmolive Co., et al.*, No. 16-CI-003503 (Jefferson Cir. Ct., Ky.); *Olson et al. v. Brenntag North America, Inc., et al.*, No. 190328/2017 (Supr. Ct. N.Y., N.Y. Cnty.); *Pipes v. Johnson & Johnson, et al.*, No. CJ-2017-3487 (Dist. Ct., Okla. Cnty., Okla.); *Lanzo v. Cyprus Amax Minerals Co.*, et al., No. MID-7385-16 AS (Super. Ct. N.J., Middlesex Cnty.); *Weirick v. Brenntag N. Am., Inc.*, No. BC656425 (Super. Ct. Ca., L.A. Cnty.).

20

100.    There, another talc defendant, American International Industries ("AII"), was able
to uncover critical evidence regarding Case #9 from the Moline Article: Betty Whitley Bell
(a.k.a. "Ms. D").

101.    Ms. Bell worked most of her career as a hairdresser. She alleged using "Clubman"
brand talc powder for over thirty years, beginning in the 1970s. She was diagnosed with
mesothelioma in July 2015. Ex. B, *Bell* Opinion at 2.

102.    Ms. Bell filed workers' compensation claims with the North Carolina Industrial
Commission in September 2015, asserting, under criminal penalty for false statements, that she
was exposed to asbestos during prior employment with two textile employers—Hoechst
Celanese Corporation and Pillowtex Corporation. Ms. Bell's worker's compensation claims were
eventually dismissed without prejudice. Ex. B, *Bell* Opinion at 2.

103.    Ms. Bell filed a lawsuit[21] in February 2017, arguing that exposure to asbestos in
Clubman talc powder—not from her prior employment with textile manufacturers—caused her
mesothelioma: *Bell v. Am. Int'l Indus.*, No. 17-cv-111 (M.D.N.C.).[22]

104.    Ms. Bell's workers' compensation claims were discussed at her deposition and
included on Dr. Moline's list of materials reviewed in her 2016 expert report in Ms. Bell's case.
That means Dr. Moline *knew or recklessly ignored available information* at the time she wrote
and published the Article. Indeed, the Article itself states: "Data gathered for all 33 patients were

---

[21] Ms. Bell passed away in June 2017. The executor of her estate, Lloyd Bell, was substituted as
Plaintiff in this action after Ms. Bell passed.

[22] Attempting to hide or ignore asbestos trust claims is nothing new in cosmetic talc litigation. In
one matter with LTL, the plaintiffs' law firm Weitz & Luxenberg (a firm that has retained Dr.
Moline 30 times in cosmetic talc cases against LTL) failed to turn over asbestos trust claims that
they prepared themselves and were legally obligated to provide.

21

**JA1061**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 119 of 435

Case 4:22-cv-08991-MKA-DEM1  Document 40 of 116/22  Filed 04/11/22 16/2a ge 23:0f155 Page ID#: 1155
Document    Page 24 of 54

gathered from each individual's medical records and sworn testimony (deposition transcripts) of individuals." Ex. A, Moline Article at 11.

105.    Because the facts of Ms. Bell's case paralleled the description of Ms. D in Dr. Moline's congressional testimony, defendant AII—who had purchased the Clubman brand in the late 1980s—suspected that Ms. Bell was one of the 33 anonymous individuals included in the Article. Ex. B, *Bell* Opinion at 4.

106.    In a deposition for a different mesothelioma case, AII asked Dr. Moline for specific information about the 33 individuals from the Article. As she did in the LTL cases, Dr. Moline declined to answer, claiming confidentiality concerns. Ex. B, *Bell* Opinion at 4.

107.    Instead, the plaintiff's counsel advised AII that if it was determined to continue seeking information regarding the 33 individuals, it would have to subpoena Northwell Health (Dr. Moline's employer). When AII did so, plaintiff's counsel moved to quash the subpoena. Ex. B, *Bell* Opinion at 4-5.

108.    But AII persisted. And after AII provided Northwell with a HIPAA authorization form signed by the plaintiff, Northwell produced a single five-page document. The document is a spreadsheet containing information on each of the 33 individuals studied in the Article. Importantly, the entire document is redacted except for the row headings and the column listing Ms. Bell's information, which identified her as Case #9. Ex. B, *Bell* Opinion at 5:

22



109.    Upon learning that this document had been disclosed, plaintiff's counsel filed an emergency motion for a protective order to preclude any inquiry into the identities of these individuals. The motion also sought the destruction of all copies of the Northwell document and requested that the document not be disseminated in Ms. Bell's case or any other forum. Ex. B, *Bell* Opinion at 5.

110.    The plaintiff's counsel also reported AII's counsel to the Department of Health & Human Services for supposedly violating Ms. Bell's HIPAA rights. Counsel "requested" that Northwell claw back the document, threatened to also report Northwell's *counsel* to HHS if he did not, and stated that she was "considering reporting [his] violation to the New York bar as this is a staggering breach."

23

**JA1063**

Please provide all correspondence with counsel for AII and a copy of the HIPAA.

I have reported Mr. ██████ to HHS for violating Ms. Bell's HIPAA rights. I again renew my request that you immediately claw back this production or I will have no choice but to report you as well.

We will be filing a motion for a protective order and sanctions against Mr. ██████ in the Bell matter. I am also considering reporting your violation to the New York bar as this is a staggering breach. You had no right to produce any information regarding my client based on the misuse of a HIPAA authorization provided to you not by my client and without any notice to my client while a motion to quash was pending. I am just flabbergasted by your reckless conduct.

111.    The plaintiff's counsel later conceded in court that *none* of the information in the document Northwell provided to AII is HIPAA protected and therefore no HIPAA-protected information was at risk of disclosure. Ex. B, *Bell* Opinion at 36. AII had in any event provided Northwell with a HIPAA authorization form signed by the plaintiff. Ex. B, *Bell* Opinion at 5.

112.    In ruling on the plaintiff's motion for a protective order, the magistrate judge held that the Northwell document could be used in Ms. Bell's case, but that it, and the information therein confirming Ms. Bell was one of the 33 individuals the Article studied, was "confidential and limited solely to this case." The magistrate judge explicitly stated that this limited protective order could potentially be reconsidered as the case progressed. Ex. B, *Bell* Opinion at 6.

113.    In response, Northwell filed a Motion to Intervene and Extend Protective Order and sought to prevent defense counsel from questioning Dr. Moline about any link between Ms. Bell and the Article. Ex. B, *Bell* Opinion at 6.

114.    Before Northwell's motion was adjudicated, the plaintiff essentially withdrew Dr. Moline as an expert by not offering her deposition by the court-ordered deadline. Accordingly, in February 2021, the magistrate judge denied Northwell's intervention motion as procedurally moot and untimely, as well as substantively meritless. Ex. B, *Bell* Opinion at 6.

24

**JA1064**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 122 of 435

Case 1:22-cv-00081-MKA-DBM1    Document 1    Filed: 02/16/22    Filed: 04/11/22/36/Page 23 of 55 Page ID #: 1158
                    Document    Page 27 of 54

115.    A few months later, AII filed a motion requesting that the court vacate the
magistrate judge's protective order so that the information that it had learned could be used in
defending other cases. Ex. B, *Bell* Opinion at 6-8.

116.    The *Bell* court did in fact vacate the earlier protective order—allowing the
Northwell document to be used in other cases—and unsealed numerous items on the docket. Ex.
B, *Bell* Opinion at 36-40.

117.    The court took great lengths to explain why the revelations uncovered in *Bell*
should be made publicly available. The court began by observing the impact of the revelations on
the Article's credibility: "Ms. Bell's employment history, as well as her belief that she may have
been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's
finding that each of the '33 cases ... had no known exposure to asbestos other than prolonged use
of talcum powder.'" Ex. B, *Bell* Opinion at 16.[23]

118.    It went on: "The fact is that at least one study participant reported to a state
agency that she did have another known asbestos exposure, at least one known to the study
participant. Given the groundbreaking nature of the article and its express premise that all
individuals studied had no known alternative asbestos exposures, the fact that one of the
individuals claimed otherwise has direct bearing on the study's credibility. This court expressed
concern about this seeming contradiction before and does so again." Ex. B, *Bell* Opinion at 17.

---

[23] It's telling that one of the co-authors of the Moline Article is pathologist Dr. Ronald Gordon,
an individual who has served as a plaintiff's expert witness in asbestos and cosmetic talc
litigation. Dr. Gordon was arrested in the early 1990s for conspiracy to commit bank fraud and
money laundering, and he admitted to committing those crimes in the course of testifying as a
cooperating witness against a co-defendant. Yet Dr. Gordon repeatedly provided false testimony
concerning this incident, including falsely testifying that he had never been arrested; never
falsified a document; and that he had only ever testified in court as an expert witness.

25

**JA1065**

USCA4 Appeal: 23-1972    Doc: 26-3      Filed: 12/20/2023      Pg: 123 of 435

Case 4:22-cv-00801-MWA-DEM1   Document   Filed 10/16/22   Filed 04/11/23 6/Page 22 of 155  Page ID #1159
Document    Page 28 of 54

119.    The court stated its "concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide." Ex. B, *Bell* Opinion at 17.

120.    The court pointed to the fact that "Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial" and that "plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos." Ex. B, *Bell* Opinion at 17.

121.    Part of the court's concern included that "other expert witnesses have begun relying on the article for the basis of their opinions." And the court even noted that "[w]hen entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller [i.e., LTL] specifically discussed the article's integral role in supporting the plaintiffs' claims." Ex. B, *Bell* Opinion at 18.

122.    The court concluded: "In this case, a principal factual underpinning of the article is that in all thirty-three cases studied 'no identified source apart from the talcum powder' was identified. The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the factual underpinning of no known exposure to asbestos other than talcum powder." Ex. B, *Bell* Opinion at 22.

123.    Lest there be any doubt about the brazenness of Dr. Moline's knowing or reckless disregard for the truth, at a public conference on September 17, 2022— *just four days after* the *Bell* court issued its decision confirming Ms. Bell's claims for compensation from other sources of asbestos exposure and Dr. Moline's knowledge of the same—Dr. Moline *again* asserted that, with respect to the cases in her Article, she was "unaware of any asbestos exposure apart from talc."

26

**JA1066**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 124 of 435

Case 4:22-cv-00093-MWA-DEM1 Document 62 Filed 11/16/22 Filed 04/11/2236/Page 32 of 55 Page ID#1160
                              Document    Page 29 of 54

124.   In other words, even now and despite the *Bell* order, Dr. Moline refuses to acknowledge that the foundational premise of the Article has been proven false.

125.   What's more, although Ms. Bell's example was recently uncovered after extensive discovery efforts in North Carolina federal court, she is not the only individual in the Article with other asbestos exposures. The record demonstrates that additional individuals in the Article had alternative sources of asbestos exposures beyond alleged contamination in talc.

126.   What LTL and others have now found is that (1) there are several cases in the Article that can be matched back to specific litigation plaintiffs with documented alternative asbestos exposures, and (2) these alternative asbestos exposures were known to Dr. Moline, but not disclosed in her Article.

127.   Below are four additional examples where it appears that alternative sources of exposure were present and known to Dr. Moline at the time the Article was written:

### 2.   Case #6

128.   The falsity of the Moline Article is also evident given the information uncovered in the *Lanzo* case.

129.   In 2016, Stephen Lanzo brought a claim against LTL alleging that he was exposed to asbestos through use of Johnson's Baby Powder.

130.   Dr. Moline served as an expert witness in Mr. Lanzo's case against LTL—she served an expert report, sat for deposition, and testified at trial.

131.   During the course of that case, alternative sources of asbestos exposure beyond alleged contamination in talc were identified. Additionally, evidence of the presence of commercial asbestos—not a type of "asbestos" allegedly present in Johnson's Baby Powder—was found in plaintiff's tissue.

132.   Despite this, Dr. Moline included Mr. Lanzo in her Article as Case #6:

27

|                                   | Mr. Lanzo | Case #6 |
|-----------------------------------|-----------|---------|
| **Gender**                        | Male | Male |
| **Year of Diagnosis**             | 2016 | 2016 |
| **Age At Diagnosis**              | 43 | 43 |
| **Mesothelioma Site**             | Pleural | Pleural |
| **Talcum Powder Brand**           | Johnson's Baby Powder | D (Johnson's Baby Powder) |
| **Estimated Years Of Use**        | 40 | 40 |
| **Occupation**                    | Finance | Finance |
| **Other Details**                 | **Moline Expert Report at 5, 14**<br><br>"developed chest pain after playing hockey in 2012"<br><br>"Mr. Lanzo recalled using the talcum powder in the bathroom or his room, and that there would be powder on the floor."<br><br>"He applied the talcum powder to his torso, groin, legs and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." | **Moline Article at 13-14**<br><br>"developed chest pain after playing hockey in 2012"<br><br>"Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor."<br><br>"He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." |

133.    As further background, Dr. Moline states in her Article that "crocidolite" asbestos fibers "are encountered in cases of industrial and occupational exposure, *not cosmetic talcum powder*." Ex. A, Moline Article at 14 (emphasis added).

134.    Dr. Moline knowingly made false statements or recklessly ignored available information demonstrating their falsity when she stated in her Article that crocidolite asbestos was not found in the tissue of Case #6.

28

**JA1068**

135.    Specifically, she states that "tissue samples from six patients were analyzed"
(including Case #6) and that "[a]mosite and *crocidolite*, asbestos fibers . . . *were not found* in
any of these cases." Ex. A, Moline Article at 14 (emphasis added).

136.    But in fact, crocidolite asbestos was found in the tissue of that Case #6—Mr.
Lanzo.

137.    In the *Lanzo* case, *Plaintiff's expert* Mr. Lee Poye analyzed Mr. Lanzo's tissue
and found crocidolite asbestos:



138.    Defense expert, Dr. Matthew Sanchez, also found crocidolite in Mr. Lanzo's

tissue:



139.    The statement in the Moline Article that no crocidolite was found in the tissue for

Case #6 is false.[24]

140.    Dr. Moline also stated in her Article that the exposure data she obtained included

"known abatement of asbestos while the patient was in school, home renovations that might have

---

[24] Ignoring or concealing tissue analyses is also not a new tactic. In one case against LTL,
plaintiffs' law firm Kazan, McClain, Satterley & Greenwood (another firm that has retained Dr.
Moline as an expert witness in cases against LTL) hid its expert's tissue analysis because he
found no asbestos. The firm never produced the expert's voluminous analysis even though it was
required to be disclosed under both the relevant California rules of evidence and a case-specific
deposition notice. And while the expert testified under oath that he did not know whether he ever
tested the specific plaintiff's tissue, emails later leave no question that he did and knew that he
did at the time of the false testimony.

JA1070

used asbestos containing materials, and any other potential sources of asbestos exposure." Ex. A, Moline Article at 11.

141. But she testified at Mr. Lanzo's trial in 2018 (before her Article was published) that 60 linear feet of exposed asbestos pipe was removed from Mr. Lanzo's basement. She had reviewed the asbestos record of abatement.

142. Dr. Moline also testified that she understood that the basement was a family room with a TV and couches, and that Mr. Lanzo spent time in the basement.

143. Case #6 is one of the cases Dr. Moline discusses in detail in her Article. Yet she does not mention the asbestos pipe in the basement as a potential source of exposure. She instead says that other potential exposures to asbestos were considered, with no identified source apart from the talcum powder.

144. Mr. Lanzo also had potential exposures from his schools.

145. In his elementary school, damage to the asbestos pipe insulation was found in multiple locations, including hallways, classrooms, the lunchroom, and the boys' locker room.

146. In the school he attended from grades 1-4, the school district found what amounted to 64 bags of friable asbestos-containing material which would have been present while he attended (and removed after he left).

147. In the school he attended for grade 5, large amounts of friable asbestos were found and removed from the boys' bathroom and classrooms in the years after his attendance.

148. In his middle school, abatement records show that asbestos-containing material was removed from classrooms after Mr. Lanzo was a student at the school. At one point, 67 bags of friable waste was removed from the school. All this asbestos would have been present when Mr. Lanzo was there.

31

149.   In his high school, hundreds of bags of friable asbestos were removed. The school

district removed 200 square-feet of friable asbestos from the ground-floor lobby from 1989-

1992—meaning some of the asbestos was removed during Mr. Lanzo's junior and senior year.

150.   Dr. Moline stated in her article that she considered "known abatement of asbestos

while the patient was in school." Ex. A, Moline Article at 11. But she did not mention any of the

abatement in Mr. Lanzo's schools in her Article.

### 3.   Case #17

151.   Plaintiff Helen Kohr filed a claim against other cosmetic talc defendants alleging

that she was exposed to asbestos in their products.

152.   Dr. Moline appeared as an expert in Ms. Kohr's case.

153.   Upon information and belief, Case #17 is a likely match for Ms. Kohr:

|                              | Ms. Kohr                                             | Case #17                                             |
| ---------------------------- | ---------------------------------------------------- | ---------------------------------------------------- |
| **Gender**                   | Female                                               | Female                                               |
| **Year of Diagnosis**        | 2015                                                 | 2015                                                 |
| **Age At Diagnosis**         | 80                                                   | 81                                                   |
| **Mesothelioma Site**        | Pleural Epithelial                                   | Pleural Epithelial                                   |
| **Talcum Powder Brand**      | Cashmere Bouquet, Coty Airspun, Helena Rubinstein    | Cashmere Bouquet, Coty Airspun, Helena Rubinstein    |
| **Estimated Years Of Use**   | 40                                                   | 40                                                   |
| **Occupation**               | Office Worker                                        | Office Worker                                        |

154.   Dr. Moline's *own expert report* in Ms. Kohr's case from *2017* (well before her

Article was published) stated that Ms. Kohr was exposed to asbestos-containing cigarettes

known as Kent cigarettes.

155.   Dr. Moline's report stated: "Ms. Kohr was *exposed to asbestos from Kent*

*Micronite cigarettes*, which she smoked from 1952-1956 when crocidolite asbestos was used in

the filters" (emphasis added).

32

Powder and in more recent fiber release studies of samples of these products. The bulk
analysis and fiber release studies done recently by Fitzgerald and others from ore taken
from the same source mines as those used in the manufacture of the Cashmere Bouquet
and Coty products showed significant amounts of chrysotile, anthophyllite, and tremolite
asbestos. Ms. Kohr was exposed to asbestos from Kent Micronite cigarettes, which she
smoked from 1952-1956 when crocidolite asbestos was used in the filters. Studies have
shown that each filter contained 10 milligrams of crocidolite asbestos and that millions of
fibers of asbestos were released into the lungs during smoking. Dr. Steven Compton has
personally evaluated Kent Micronite cigarettes and noted crocidolite asbestos fibers
present in the Micronite filter. Longo et al tested Kent cigarettes (Cancer Research 1995)
and noted crocidolite fibers in both the filters and in the cigarette smoke itself.

156.    She even stated the Kent cigarettes were a cause of the plaintiff's mesothelioma:

a.    "Her exposures to asbestos-contaminated face powder and asbestos-

contaminated body powder *and to Kent cigarettes* were the cause of her mesothelioma"

(emphasis added).

b.    "Ms. Kohr had malignant mesothelioma of the pleura as a result of her

*exposure to asbestos from Kent cigarettes* and cosmetic talc" (emphasis added).

157.    But, in her Article, Dr. Moline represented that Case #17 had no exposures to

asbestos other than talcum powder. If Case #17 is Ms. Kohr, Dr. Moline's statement that there

were no other asbestos exposures for Case #17 is knowingly false.[25]

    **4.    Case #3**

158.    Plaintiff Doris Jackson filed a claim against other cosmetic talc defendants

alleging that she was exposed to asbestos in their products.

159.    Dr. Moline appeared as an expert in Ms. Jackson's case.

---

[25] Although this particular case did not involve claims against LTL, it serves as a stark example
of Dr. Moline's willingness to make statements regarding the lack of exposures that she knew
were false.

160.    Upon information and belief, Case #3 is a likely match for Doris Jackson.

| | Ms. Jackson | Case #3 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 84 | 84 |
| Mesothelioma Site | Pleural Biphasic | Pleural Biphasic |
| Talcum Powder Brand | Cashmere Bouquet | Cashmere Bouquet |
| Estimated Years Of Use | 70 | 70 |
| Occupation | Elementary School Teacher | Elementary School Teacher |
| Tissue Digestion | Yes | Yes |
| Asbestos Type in Digestion | Tremolite | Tremolite |
| Site Found | Lung, Lymph Node | Lung, Lymph Node |
| Concentration | 0; 9,409 | 0; 9,409 |
| Other Details | **Moline Expert Report at 3-4**<br><br>"developed shortness of breath with exertion in September 2014, along with a cough and chest tightness. . ."<br><br>"a chest x-ray showed a very large left pleural effusion." | **Moline Article at 12**<br><br>"In September 2014, Case 3 . . . developed shortness of breath, a cough, and chest tightness."<br><br>"A chest x-ray in November 2014 showed a large left pleural effusion" |

161.    A medical record history form from Ms. Jackson's examination with Dr. Robert

Cameron included a handwritten statement that she had been exposed to "[c]eiling pipes with

degrading insulation" during her more than 30-year career as a public school teacher.

162.    Dr. Moline noted the evidence of alternative exposure in her expert report for the

*Jackson* case:

Dr. Robert Cameron, a thoracic surgeon, saw Ms. Jackson on February 4, 2015. In her intake form, she noted that she was exposed for over thirty years to ceiling pipes with degrading insulation while working as a teacher in the DC Public Schools. An MRI of the

34

**JA1074**

163.      But, in her Article, Dr. Moline represented that Case #3 had no exposures to

asbestos other than talcum powder. If Case #3 is Ms. Jackson, Dr. Moline's statement that there

were no other asbestos exposures for Case #3 at least recklessly disregards available information.

###### 5.      Case #4

164.      Plaintiff Valerie Jo Dalis filed a claim against other cosmetic talc defendants

alleging that she was exposed to asbestos in their products.

165.      Dr. Moline appeared as an expert in Ms. Dalis's case.

166.      Upon information and belief, Case #4 is a likely match for Ms. Dalis.

| | Ms. Dalis | Case #4 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 66 | 66 |
| Mesothelioma Site | Peritoneal Epithelial | Peritoneal Epithelial |
| Talcum Powder Brand | Cashmere Bouquet, Mennen | Cashmere Bouquet, Mennen |
| Estimated Years Of Use | 30 | 30 |
| Occupation | Hairdresser | Hairdresser |
| Tissue Digestion | Yes | Yes |
| Asbestos Type in Digestion | Chrysotile | Chrysotile |
| Site Found | Peritoneum | Peritoneum |
| Concentration | 920 | 920 |
| Other Comments | **Moline Expert Report at 10**<br><br>"Ms. Dalis had additional exposure to talcum powder when working as a licensed cosmetologist"<br><br>"She shook the powder onto the necks and wiped the powder off with a brush or blow dryer."<br><br>"She described wearing gloves on a regular basis to apply color, and she had to blow the powder into the gloves." | **Moline Article at 13**<br><br>"Case 4 had additional exposure to talcum powder in the 1960s while working as a licensed cosmetologist"<br><br>"She shook the talcum powder onto the client's neck, and would wipe off the excess with a brush or blow dryer."<br><br>She also used talcum powder inside the gloves that she donned prior to applying hair color." |

35

**JA1075**

167.    Before Ms. Dalis filed her complaint against another cosmetic talc defendant, she submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from the Manville Personal Injury Settlement Trust.

168.    The Moline Article states: "Talcum powder exposure histories were reviewed based on sworn testimony by patients and in some cases, family members with first-hand knowledge of the use of talcum powder, such as parents who recalled using talcum powder while diapering the patient." Ex. A, Moline Article at 12.

169.    The bankruptcy submissions were discussed at Ms. Dalis's deposition and her husband's deposition.

170.    But again, in her Article, Dr. Moline represented that Case #4 had no exposures to asbestos other than talcum powder. If Case #4 is Ms. Dalis, Dr. Moline's statement that there were no other asbestos exposures for Case #4 is false.

## IV.    Dr. Moline and Plaintiffs' Counsel Concealed the Falsity of Her Statements

171.    During the time Dr. Moline has been repeating this falsehood that none of the individuals in her Article had alternative exposures to asbestos, she, her employer, and plaintiffs' counsel resisted efforts by others to obtain information about her cases which would uncover the Article's false premise.

172.    On 10 separate occasions, Dr. Moline refused to testify at her deposition in cases against LTL regarding the identities of the individuals in her Article. For example:

- **November 2019:** "I will not comment on any further cases that might or might not be included in the paper."

- **February 2020:** "I will not name names in this deposition. That is correct."

- **June 2020:** "I am not willing to discuss any names of any of the individuals in the paper of any of the 33."

36

**JA1076**

- **January 2021:** "I decline to disclose the identi[t]ies or facts apart from what is described in the paper, and my feelings on this have not changed or my position on that has not changed."

173.    In one instance, Dr. Moline bizarrely testified at her deposition that she could not identify "Ms. D" from her congressional testimony (i.e., Ms. Bell) because Ms. D was "based on an amalgam of different folks."

174.    But when asked, "So is Ms. D one person?" Dr. Moline responded, "In essence, yes."

175.    She then refused to identify Ms. D: "Ms. D does have a real name. I will not disclose it because it was from one of the individuals in my paper."

176.    She would not even answer the basic question: "Were there any documents that you saw that alleged exposure to asbestos other than from talc?"

177.    She then refused to answer any questions regarding Ms. Bell's case.

178.    A defendant moved to compel Dr. Moline's testimony identifying the individuals in her article. Dr. Moline, her employer (Northwell Health), and the plaintiff all opposed the motion.

179.    As noted, Ms. Bell's example was only recently uncovered after extensive discovery efforts in North Carolina federal court.

**V.    Dr. Moline Was Motivated by Fame and Fortune**

180.    Dr. Moline disparaged Johnson's Baby Powder and Shower to Shower for her own professional aggrandizement and financial gain.

181.    The Article in part represented an attempt to gain publicity and enhance her own stature within the scientific community.

182.    In the Article, Dr. Moline attempts to explicitly align herself with one of the two most preeminent scientists in the asbestos space: Dr. J. Christopher Wagner. As the Article

37

**JA1077**

describes, Dr. Wagner published a famous and groundbreaking article in 1960 concerning 33

mesothelioma cases, which was the first epidemiology study linking asbestos exposure with the

development of mesothelioma. Ex. A, Moline Article at 11. Not coincidentally, Dr. Moline chose

33 cases for *her study*, and was quick to make the connection: "Like Wagner, we present 33

cases. . . ." Ex. A, Moline Article at 11.

183.    Dr. Moline also tirelessly promoted herself by using the Article, discussing it

publicly at speaking engagements, before Congress, and to the media, as discussed above.

184.    Her employer, Northwell Health, also used the Article to promote Dr. Moline. It

ran a prominent story concerning the Article on its website, saying: "For the first time,

Jacqueline Moline, MD, MSc, professor in the Institute of Health Innovations and Outcomes

Research at The Feinstein Institutes for Medical Research, and her colleagues have identified

household talcum powder contaminated with asbestos as the root cause of malignant

mesothelioma in 33 long-term users, as published in the Journal of Occupational and

Environmental Medicine."[26]

185.    The web story repeated the false premise of the Article: "The patients had no

other known exposure to asbestos, and in the six detailed, the tissue analysis revealed the

presence of asbestos commonly found in talc and not that found in other commercial products,

such as automobile brakes or home insulation materials. It was determined that the 27 other

individuals in the study were also linked to contaminated talcum powder, as they had no

additional exposure to asbestos."

---

[26] https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

38

186.    Beyond just the recognition the Article brough Dr. Moline, the asbestos plaintiffs'
bar pays Dr. Moline hundreds of thousands of dollars a year to serve as an expert witness to help
them win jury verdicts. This litigation work represents nearly half her income.

187.    Those verdicts then help fund plaintiffs' law firms, who typically receive a large
percentage of the verdict amount (often in the millions of dollars). That money is then used, in
part, to hire Dr. Moline for the next case.

188.    To keep this cycle in motion and the money flowing, Dr. Moline has every
incentive to try to help the plaintiffs' bar as much as possible, both by trying to sway public
opinion and by manufacturing support for what she is saying in court.

189.    To be clear, Dr. Moline did not publish the Article or make the challenged public
statements to advance academic or scientific discourse. Nor did she do so with the intent to
advance the interests of any particular talc plaintiff. Rather, Dr. Moline acted to further her own
interest, gain fame, and gain fortune for herself.

190.    By helping the plaintiffs' lawyers, she ultimately was helping herself.

**VI.    Dr. Moline's Statements Perpetuated a Decades-Long Fraud in Asbestos Litigation**

191.    The circumstances surrounding the Moline Article, including her knowing or
reckless misrepresentations and subsequent efforts to conceal pertinent facts, may at first blush
appear difficult to believe. But, sadly, Dr. Moline's actions fit a pattern of fraud both in the
cosmetic talc litigation specifically and asbestos litigation writ-large.

192.    One of the most egregious problems—central to the asbestos plaintiffs' bar's
business model—is submitting claims against multiple defendants, without disclosing to each
successive defendant the prior assertions predicated on alternative uses. Then the sheer volume
of claims is used to coerce portfolio settlements that don't reflect the merits of each individual
claim.

39

**JA1079**

193.     The *Garlock* proceedings are a famous example of fraud by hiding alternative

exposures.

194.     A North Carolina bankruptcy court found evidence of "wide-ranging, systematic,

and well-concealed fraud designed to suppress evidence and inflate settlement values for

mesothelioma claims." *Garlock Sealing Techs., LLC v. Shein*, No. 3:13-cv-137, 2015 WL

5155362, at *2 (W.D.N.C. Sept. 2, 2015) (citing *In re Garlock Sealing Techs.*, LLC, 504 B.R.

71, 85 (Bankr. W.D.N.C. 2014)).

195.     More specifically, the *Garlock* court found that evidence of exposure to large,

now-bankrupt asbestos manufacturing companies "disappeared" as a result of "the effort by

some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and

to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining

recoveries" in the tort system. *In re: Garlock*, 504 B.R. at 84. The court found that these

"demonstrable misrepresentation(s)" were "sufficiently widespread" in the asbestos tort system

"to have a significant impact" on settlement practices and results. *Id.* at 85.

196.     Notably, the day before the bankruptcy court issued that holding, Garlock sued

five plaintiffs' firms for the litigation conduct discussed by the court under the Racketeer

Influenced and Corrupt Organizations Act, better known as RICO.[27] Upon information and

belief, those lawsuits were instrumental in and resolved in connection with the final plan of

reorganization in the *Garlock* case.

---

[27] *See Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett, P.C.*, No. 3:14-cv-116 (W.D.N.C.); *Garlock Sealing Techs., LLC v. Belluck & Fox, LLP*, No. 3:14-cv-118 (W.D.N.C.); *Garlock Sealing Techs., LLC v. Waters & Kraus.*, No. 3:14-cv-130 (W.D.N.C.) (Stanley-Iola, LLP also named a defendant); and *Garlock Sealing Techs., LLC v. Shein Law Center, Ltd.*, No. 3:14-cv-137 (W.D.N.C.).

40

197.　One of the firms sued was Simon Greenstone Panatier Bartlett, P.C, a firm that has paid Dr. Moline to testify 20 times in one three-year span. And it is the very same firm that sought to keep her data sealed and hidden in the *Bell* matter.

198.　Since *Garlock*, other recent bankruptcy proceedings have uncovered further examples of fraud.

199.　**Bestwall Bankruptcy**. In a particularly damning twist, it appears that Dr. Moline is not the only plaintiff-expert-turned-author whose litigation-influencing misstatements are coming to light in bankruptcy courts right now. The North Carolina debtor Bestwall is faced with a conundrum much like the Moline Article, which it is presently conducting discovery on while the asbestos plaintiffs' bar fights tooth and nail to keep relevant information hidden.[28] Similar to Dr. Moline, Plaintiffs' expert James Dahlgren published a 2012 article claiming to identify three cases of mesothelioma in which the only known exposure to asbestos was from joint compound manufactured by Old Georgia Pacific (predecessor to Bestwall). Although the company settled all three of the cases covered in the article, it now has uncovered that these individuals submitted claims to various asbestos trusts claiming exposure to other sources of asbestos after the cases were settled.

200.　**Imerys Bankruptcy**. Fraud has even been uncovered in a recent cosmetic talc bankruptcy filed by the talc supplier for Johnson's Baby Powder. In the Imerys bankruptcy pending in New Jersey, one plaintiffs' lawyer recently was forced to concede under oath that he took a list of individuals diagnosed with ovarian cancer or mesothelioma and asserted claims against the debtor without even assessing whether the claimant ever used Johnson's Baby

---

[28] *In re Bestwall LLC*, No. 17-BK-31795 (LTB) (W.D.N.C. Bankr.).

41

Powder. What's more, in some instances, the claimant previously alleged and recovered on a
theory that his/her disease was exclusively attributable to another company's products.

## VII.   LTL Was Gravely Harmed by Dr. Moline's False Statements

201.    Dr. Moline's disparagement of Johnson's Baby Powder and Shower to Shower
talc products for her own aggrandizement harmed LTL.

202.    As discussed above, Dr. Moline repeated her false statement multiple times over
the years, ensuring they would reach the public, particularly through the press such as *Time*
Magazine.

203.    Her Article became available online on October 10, 2019. In October 2019, the
call center handling the Consumer business of Johnson & Johnson saw a significant increase in
contacts.

204.    The sales volume and profits from Johnson's Baby Powder declined in 2019 and
again in 2020. And an ever-increasing percentage of Johnson's Baby Powder sales was the corn
starch-based version compared to the talc-based version. Dr. Moline's statements and the
resulting publicity were a substantial cause of this sales decline.

205.    LTL announced in May 2020 its discontinuation of talc-based Johnson's Baby
Powder in the United States and Canada. As the press release at the time explained: "Demand for
talc-based Johnson's Baby Powder in North America ha[d] been declining due in large part to
changes in consumer habits and fueled by misinformation around the safety of the product and a
constant barrage of litigation advertising." The Moline Article is a central element of that
misinformation.

206.    LTL also incurred substantial costs as a direct result of Dr. Moline's false
statements. Among other costs, LTL spent millions of dollars in fees paid to attorneys, expert
witnesses, and other professionals to investigate, respond to, defend against, and otherwise

42

counteract Dr. Moline's false statements. That included deposing Dr. Moline multiple times regarding her Article.

207.    Indeed, Dr. Moline's false statements have forced LTL to file this lawsuit to correct the record.

## CAUSES OF ACTION

### Count I: Injurious Falsehood / Product Disparagement

208.    LTL hereby incorporates each preceding paragraph as though fully set forth herein.

209.    Dr. Moline has made statements that contain false and untrue assertions of fact, including the false statements referenced above, which include, but are not limited to (emphasis added):

　　　　a.    Multiple factual assertions in the Article, including:

　　　　　　i.    "Talcum powder usage *was the only source of asbestos for all 33 cases*."

　　　　　　ii.    "*For all 33 cases*, other potential exposures to asbestos were considered, with *no identified source apart from the talcum powder*."

　　　　　　iii.    "[W]e present 33 cases, predominantly of women, who had *no known exposure to asbestos* other than prolonged use of talcum powder."

　　　　　　iv.    "Amosite and crocidolite, asbestos fibers … *were not found in any*" of the six subjects whose tissue samples were tested.

　　　　b.    Dr. Moline's statement to *Time* Magazine, published on October 15, 2019, that "[t]his is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where *[talc] is the sole exposure*.'"

43

**JA1083**

  c. Dr. Moline's statements to Romper.com, published on October 16, 2019, that "[a]ll the folks in the study used cosmetic talc, usually for decades, and they *all had mesothelioma with no other asbestos source*" and "[w]e couldn't find *any other source* apart from the cosmetic talc."

  d. Dr. Moline's statement in her written Congressional testimony that "my colleagues and I reported on 33 individuals with *no other identifiable source of exposure* apart from cosmetic talc," and her assertion that "Ms. D" had "no known exposure to asbestos" in her work in the textile industry.

  e. Dr. Moline's statement in her oral Congressional testimony that she and her colleagues "reported on 33 individuals *whose only source of asbestos exposure was cosmetic talc*."

  f. Dr. Moline's statement at a May 13, 2020, event organized by the Asbestos Disease Awareness Organization that "[w]hat we found in these individuals is that *these 33 did not have any other known source of asbestos exposure* that we could discern from the information that we were provided."

  g. Dr. Moline's comment to EPA, posted on its website on June 1, 2020, that "[m]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

  h. Dr. Moline's statement, in discussing the article at a September 17, 2022, *ADAO Asbestos Awareness and Prevention Conference*, that "[w]e were unaware of any asbestos exposure apart from talc." A slide describing the Article falsely stated: "Talcum powder as the only asbestos exposure."

**JA1084**

USCA4 Appeal: 23-1972     Doc: 26-3      Filed: 12/20/2023      Pg: 142 of 435

Case 4:22-cv-00001-MMA-DEM Document 1 Filed 11/16/22 Filed 01/12/36/22 Page 42 of 55 Page ID# 1178
Document     Page 47 of 54

210.    Dr. Moline published the false statements alleged herein to others, including through electronic and hard-copy publication of the Article, written and oral testimony to Congress, at least one national magazine, and multiple conferences. Dr. Moline's false statements were read and otherwise received by the public at large, consumers and manufacturers of cosmetic talc products, Congressional and government officials, scientists, and attorneys and expert witnesses involved in talcum powder litigation, among others.

211.    Dr. Moline's false, influential, and groundbreaking Article has been republished by numerous sources, including multiple plaintiffs' firms and advocacy groups soliciting talc-related personal injury claims relied upon by plaintiffs' multiple expert witnesses in talc litigation; and considered by judges and juries throughout the country adjudicating cosmetic talc claims.

212.    Dr. Moline intended and/or reasonably anticipated that the publication of her false statements would disparage the safety of the Johnson's Baby Powder and Shower to Shower products and harm LTL's interests. Dr. Moline's false statements did disparage the safety of those products.

213.    Dr. Moline acted with actual malice because her false statements were made with the knowledge that they were false and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, Dr. Moline has repeatedly sought to conceal evidence betraying the falsity of her statements and demonstrating that her statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity. Dr. Moline's acts of concealment include statements reaffirming the false statements in the Article and refusing to disclose the identity of the 33 subjects of the Article or answer questions about the information she reviewed prior to the Article's publication.

45

**JA1085**

214.    Dr. Moline acted without any privilege, authorization, or immunity in making her false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying her Article.

215.    Dr. Moline's false statements were made of and concerning LTL's products. Dr. Moline's false statements impugned the safety of all cosmetic talc products, including Johnson's Baby Powder and Shower to Shower. Johnson's Baby Powder and Shower to Shower products were well-recognized, the leading brands among a discrete and limited number of cosmetic talc products in the market. The Article identifies Johnson's Baby Powder (product "D") and Shower to Shower (product "I") as two of the 22 brands of cosmetic talc allegedly used by the Article's 33 subjects. According to the Article, 19 of the 33 subjects allegedly used Johnson's Baby Powder—more than any other brand.

216.    Dr. Moline's false statements were published contemporaneously with statements referring to Johnson's Baby Powder, including through Congressional testimony, advocacy events, plaintiff attorney websites, and various media outlets. For example, the subcommittee chairman began the hearing featuring Dr. Moline's Congressional testimony by referencing allegations of asbestos in "Johnson and Johnson's talc-based baby powder" and by displaying images of Johnson's Baby Powder.

217.    Anyone reading, hearing, or otherwise receiving Dr. Moline's false statements would have associated those statements with the Johnson's Baby Powder and Shower to Shower products. Indeed, on repeated occasions, Johnson & Johnson and LTL were asked to comment on Dr. Moline's Article and false statements, thereby demonstrating that readers of the statements in fact associated them with LTL's products.

46

**JA1086**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 144 of 435

Case 4:22-cv-08991-MKA-DEM1 Document 6 Filed 12/16/22 Filed 04/12/36/Page 50 of 155 Page ID #1180
Document    Page 49 of 54

218.    After the online publication of the Article, Dr. Moline has been disclosed in 58
cosmetic talc/mesothelioma cases against LTL. Dr. Moline routinely relies on her Article in
these cases. Moreover, in 63 cosmetic talc/mesothelioma cases against LTL, a combined 20 other
plaintiff experts have relied on the Article in either their deposition or court disclosures.

219.    As a direct and proximate cause of Dr. Moline's false statements, LTL has
suffered, and continues to suffer, actual and special damages, including, without limitation, lost
profits on the sale of Johnson's Baby Powder and Shower to Shower caused by the widespread
dissemination of the Article; increased fees to defend (including substantial fees paid to
attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against
Dr. Moline's assertions) and resolve Talc Claims; and other expenses incurred to counteract and
prevent Dr. Moline's false statements from causing further harm (including the costs of this
litigation).

220.    Dr. Moline knew or reasonably should have anticipated that her false statements
and subsequent acts of concealment would cause the aforementioned actual and special damages
to LTL.

**Count II: Fraud**

221.    LTL hereby incorporates each preceding paragraph as though fully set forth
herein.

222.    As alleged herein, Dr. Moline has made statements that contain false and untrue
assertions of fact.

223.    Dr. Moline's false statements were made with the knowledge that they were false
and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, Dr.
Moline has repeatedly sought to conceal evidence undermining the falsity of her statements and

47

demonstrating the statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity.

224. Dr. Moline acted without any privilege, authorization, or immunity when she published her false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying her Article.

225. Dr. Moline made the false statements alleged herein intending that they be relied upon by others, including by the public at large, consumers and manufacturers of cosmetic talc products, Congressional and government officials, scientists, and attorneys and expert witnesses involved in talcum powder litigation, all of whom did reasonably and justifiably rely on Dr. Moline's false statements.

226. Dr. Moline omitted from her publications of and references to the Article that her statements regarding the lack of alternative exposures were false and that she knew they were false. In view of her affirmative representations, Dr. Moline had a duty to fully disclose such facts. She instead actively concealed and thwarted LTL's efforts to discover the truth. As a result, LTL did not know and could not have known of Dr. Moline's fraud until the *Bell* Opinion recently laid bare her knowledge and collaboration to conceal the falsity. LTL therefore made its business decisions and defense of Talc Claims, including but not limited to LTL's investigation of claims, approaches to settling such claims, retention of experts, and trial strategies—in reasonable and justifiable reliance on her fraudulent partial disclosures.

227. As a direct and proximate cause of Dr. Moline's false statements, LTL has suffered, and continues to suffer, actual and special damages, including, without limitation, lost profits on the sale of Johnson's Baby Powder caused by the widespread dissemination of the

48

Article; increased fees to defend (including substantial fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against Dr. Moline's assertions) and resolve Talc Claims; and other expenses incurred to counteract and prevent Dr. Moline's false statements from causing further harm (including the costs of this litigation).

### Count III: Violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a)

228.    LTL hereby incorporates each preceding paragraph as though fully set forth herein.

229.    In connection with Johnson's Baby Powder and Shower to Shower and the services of Dr. Moline, both of which are offered in interstate commerce, Dr. Moline has made material false and misleading descriptions or representations of fact, as set forth above. The statements disparage and misrepresent the nature, characteristics, and qualities of Johnson's Baby Powder and Shower to Shower.

230.    In connection with Johnson's Baby Powder and Shower to Shower and the services of Dr. Moline, both of which are offered in interstate commerce, Dr. Moline has made material false and misleading omissions of fact, as set forth above, under circumstances where she had a duty to speak. The omissions disparage and misrepresent the nature, characteristics, and qualities of Johnson's Baby Powder and Shower to Shower.

231.    Dr. Moline's statements and omissions are literally false, expressly and/or by necessary implication. In the alternative, Dr. Moline's statements have actually deceived, or have the tendency to deceive, a substantial portion of the intended audience.

232.    Dr. Moline's statements and omissions concerned matters that are material to purchasing decisions and to other commercial decisions, including but not limited to the safety of Johnson's Baby Powder and Shower to Shower.

49

**JA1089**

233.    Dr. Moline's statements and omissions were made in commercial advertising, and therefore violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Dr. Moline made the statements and omissions with a commercial motive: namely, to promote services as a testifying expert witness by making those services more desirable, gaining additional clients, and reaping additional compensation. Dr. Moline's statements and omissions were widely circulated to the public nationwide as part of an organized effort to target a class or category of customers or potential customers.

234.    Although *mens rea* is not required to establish a Lanham Act violation, Dr. Moline made these statements and omissions knowingly and willfully. In the alternative, Dr. Moline made them with willful blindness and/or reckless disregard as to their truth or falsity.

235.    As a direct and proximate result of the deception caused by Dr. Moline's statements and omissions, LTL has suffered, and will continue to suffer, loss of sales and customers, irreparable harm to its commercial reputation and goodwill, and other compensable damages. In addition, Dr. Moline's statements and omissions resulted in the unjust enrichment of Dr. Moline and/or her collaborators at LTL's expense.

### PRAYER FOR RELIEF

WHEREFORE, LTL respectfully requests judgment or relief against Dr. Moline as follows:

1)    Awarding special, compensatory, and punitive money damages to LTL against Dr. Moline for injurious falsehood and product infringement;

2)    Awarding money damages (including punitive damages) to LTL against Dr. Moline for fraud;

3)    Awarding money damages to LTL against Dr. Moline for her violations of the Lanham Act;

50

**JA1090**

4)    Enjoining Dr. Moline from continuing to make false statements of the type

alleged herein;

5)    Enjoining Dr. Moline to answer questions regarding her Article that she has to

date refused to answer;

6)    Enjoining Dr. Moline to retract and/or issue a correction of her Article;

7)    Enjoining Dr. Moline to produce unsealed records identifying the individuals in

the Article;

8)    Awarding LTL the costs of this action, including attorneys' fees, together with

pre- and post-judgment interest; and

9)    Awarding LTL such other relief as the Court deems just and proper.

Dated: December 16, 2022            Respectfully submitted,

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Lyndon M. Tretter, Esq. (pro hac vice)
Joseph F. Pacelli, Esq. (pro hac vice)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
ltretter@wmd-law.com
jpacelli@wmd-law.com

51

**JA1091**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 149 of 435

Case 1:22-cv-00081-MN-A-DEM1    Document 1    Filed 01/16/22    Filed 04/11/22/36/Page 22 of 55 Page ID#1185
Document    Page 54 of 54

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**

Allison M. Brown (044992012)
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3222
Facsimile: (917) 777-3222
Allison.Brown@skadden.com

*ATTORNEYS FOR DEBTOR*

**JA1092**

# Exhibit 4

SO ORDERED

VALERIE FIGUEREDO
United States Magistrate Judge
Dated: 12-23-2022

Plaintiff's letter motion at ECF No. 296 is **DENIED**. The parties are directed to meet and confer about scheduling the deposition of Dr. Feingold, and the completion of Dr. Longo's deposition, for dates in January 2023. Once the parties have scheduled a date for Dr. Longo's deposition, the parties are directed to schedule subsequent depositions of Drs. Segrave, Gunter, and Poye in February 2023. The deposition of Dr. Dietie can proceed on March 3, 2023. The parties are directed to submit a joint letter updating the Court on the status of the expert deposition schedule by no later than **Friday, January 13, 2023**. The Clerk of Court is directed to terminate the motion at ECF No. 296.

**VIA ECF**
Hon. Valerie Figueredo
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1660
New York, NY 10007

Re:      *Gref v. Am. Int'l Indus.*, et al., 20-cv-05589

Dear Judge Figueredo:

Pursuant to Your Honor's Rules of Practice § II(c)(2), Plaintiff Brian Gref writes to respectfully request your immediate intervention regarding a discovery dispute, which, if left unaddressed, will cause Plaintiff irreparable prejudice.

As Your Honor is aware, Mr. Gref is living with mesothelioma, a rapidly-progressing terminal illness. It is his expressed intent to live long enough to see the claims asserted against the Defendants in this case be resolved by a jury trial. Despite these exigencies, Defendants have, for the last five months, taken the legally unsupported position that they will not produce their experts for deposition until the depositions of Plaintiff's experts are completed. Notwithstanding the baselessness of this position, Plaintiff has attempted to accommodate Defendants by promptly making available his experts for deposition so that this case can proceed to trial. *See e.g.* Email dated Aug. 17, 2022, attached as **Exhibit 1** (objecting to Defendants' position as to the order of depositions and requesting a date for Dr. Carder as her testimony would not be affected by depositions of Plaintiff's remaining experts). However, at this juncture, it is has become clear that Plaintiff's efforts are to no avail. As demonstrated by the details of the illustrative exchanges set forth below, which represent dozens of communications between the parties over the last six months, Defendants are more intent on holding this case hostage than they are resolving discovery issues with Plaintiff in good faith.

As per the previous scheduling order, expert depositions began in this case in the Summer of 2022. With as little rescheduling as possible, depositions of Plaintiff's experts were completed on June 15, 2022 (Dr. Brody, cell biology), June 29, 2022 (Dr. Compton, microscopy and mineralogy), June 22, 2022 (Dr. Finkelstein, epidemiology), June 21, 2022, Sept. 9, 2022, and Sept. 19, 2022 (Dr. Krekeler, geology, mineralogy, and microscopy), June 8, 2022 (Dr. Kucsma, economics), Sept. 19, 2022 and Nov. 16, 2022 (Dr. Longo, mineralogy, microscopy, and material science), June 27, 2022 (Dr. Markowitz, state-of-the-art), July 6, 2022 and Sept. 23, 2022 (Dr. Moline, occupational and environmental medicine), and July 8, 2022 (Dr. Zhang, pathology and occupational medicine). As it stands, although Defendants have a request pending before the Court to continue the deposition of Dr. Moline for an unspecified length of time (regarding a number of subjects that Plaintiff has explained are patently improper) and the parties are negotiating a limited continuance of Dr. Longo's deposition, Plaintiff's experts have all been deposed in accordance with Rule 30 of the Federal Rules of Practice and Defendants are fully on notice of their opinions.

**JA1094**

Since late July 2022, Plaintiff has been attempting to schedule depositions of Defendants' 19 experts as promptly as possible. In nearly every instance, Plaintiff's requests went unanswered and required multiple follow-ups with defense counsel. *See* Email dated Aug. 10, 2022, attached as **Exhibit 2** (Plaintiff requesting dates for Defendant American International Industries' ("AII") expert dermatologist, Dr. Cardner, and other experts); Email dated Aug. 19, 2022, attached as **Exhibit 3** (Plaintiff followed up for dates of Defendants' experts).

As of August 29, 2022, AII and Defendant Shulton, Inc. ("Shulton") still had not provided dates for five of their experts: Mr. Segrave, Dr. Mundt, Dr. Mossman, Mr. Adams, and Mr. Poye. *See* Email dated Aug. 29, 2022, attached as **Exhibit 4**.

As of October 14, 2022, depositions for Mr. Segrave, Dr. Carder, Dr. Gunter, and Dr. Diette were still *not* scheduled. *See* Email dated Oct. 14, 2022, attached as **Exhibit 5**. Plaintiff followed-up again for dates of these depositions on October 24, 2022, as well as dates to conclude the depositions of Dr. Attanoos and Dr. Mundt. *See* Email dated Oct. 24, 2022, attached as **Exhibit 6**.

On November 3, 2022, Plaintiff wrote to all counsel of record regarding Defendants' repeated failure to provide deposition dates for more than half-a-dozen of their respective experts, including Dr. Attanoos (for completion), Dr. Carder, Dr. Diette, Dr. Feingold, Dr. Mundt (for completion), and Mr. Segrave. *See* Letter to ACR dated Nov. 3, 2022, attached as **Exhibit 7**.

On November 10, 2022, AII advised Dr. Carder was available for a deposition on November 18, 2022, and offered Dr. Feingold, a medical causation expert, for only 2 hours on November 17, 2022. *See* Email dated Nov. 10, 2022, attached as **Exhibit 8**.

On November 16, 28, and December 6, 2022, Plaintiff made additional follow-up requests for deposition dates for Mr. Segrave, Dr. Gunter, Dr. Diette, and the completion of Dr. Feingold's deposition. *See* Email dated Nov. 16, 2022, attached as **Exhibit 9**; Email dated Nov. 28, 2022, attached as **Exhibit 10**; Email dated Dec. 6, 2022, attached as **Exhibit 11**.

As of this writing, after months of requesting to take their depositions (or complete their depositions), Plaintiff is still awaiting a date for Mr. Segrave, Dr. Gunter, Dr. Diette, and Dr. Feingold.

Equally problematic, once Defendants have scheduled depositions of their experts, they routinely unilaterally cancel the depositions within days of the date, sometimes without any explanation, claiming that a new date will be provided but often failing to follow through. *See e.g.* Email dated Oct. 4, 2022, attached as **Exhibit 12** (unilaterally adjourning Dr. Gunter's deposition on Oct. 7); Email dated Dec. 16, 2022, attached as **Exhibit 13** (Plaintiff's response to Colgate unilaterally adjourning Dr. Diette's deposition on Dec. 16, 2022). For example, just last week, notwithstanding that Plaintiff's medical causation expert, Dr. Jacqueline Moline, was deposed for about 7.5 hours and Defendant Colgate-Palmolive Company ("Colgate"), as successor-in-interest to The Mennen Company, has indicated it has a very limited basis on which to further question Dr. Moline, Colgate pulled the deposition of its medical causation expert, Dr. Diette, a week before it was scheduled to take place on December 22, 2022, claiming that Dr. Diette cannot be deposed before Dr. Moline's deposition is completed.

In addition to being contrary to the Federal Rules of Practice and governing case law, the unilateral withdrawal of Dr. Diette's long-awaited deposition has caused irreparable prejudice to Plaintiff, as Colgate has advised that he is not available again until March 3, 2023. Indeed, making Dr. Diette (or any other expert) unavailable to Plaintiff until long after expert discovery should have concluded places Plaintiff in the untenable position of either (i) agreeing to further delay the setting of a trial date and risk Mr. Gref passing before a jury is seated, or (ii) forgoing discovery of defense expert opinions in advance of trial.

In Plaintiff's good faith efforts to resolve matters without court intervention, numerous meet-and-confers surrounding Plaintiff's repeated follow-up for deposition dates of Defendants' experts have taken place. Most recently, on Thursday, December 8, 2022, the issue of Dr. Feingold's outstanding deposition was raised during an approximately 30-minute meet and confer with all Defendants. There, Defendants yet again indicated, without any authority, that they would remain steadfast in their position that their experts would not need to be deposed until all depositions of Plaintiff's experts are completed. This borders on frivolous. Neither Your Honor's Individual Practices nor the Local Rules of the Southern District of New York provide that a party can delay its expert witness depositions until after its adversary's expert witnesses depositions have first been completed. Further, none of the scheduling orders entered in this case suggest, let alone state, that Plaintiff's expert depositions must be completed before Defendants' can be scheduled. This is unsurprising, given that "[t]he federal courts do not provide either party with priority on depositions." *Fernandez v. Calvary Mennonite Church*, 1996 WL 197711, *1 (S.D.N.Y Apr. 23, 1996); *see also Rodal v. Massachusetts Mut. Life Ins. Co.*, 2020 WL 3448278, *1 (E.D.N.Y. Apr. 23, 2020) ("[t]here is no priority of depositions in the federal system."). Instead, depositions should proceed in the order in which they were noticed. *See Alheid v. Target Corp.*, 2017 WL 4174929 (S.D.N.Y. Aug. 29, 2017) (holding that "[t]o the extent defendants suggest that they are entitled to take plaintiff's deposition before plaintiff deposes defendants, defendants' objection is frivolous" because "there is no priority of depositions in federal practice."). Simply stated, Defendants' excuse for not proceeding with expert discovery should be characterized for exactly what it is: nothing more than a baseless tactic to needlessly delay resolution of this case.

In light of the foregoing, Plaintiff respectfully requests that the Court direct Defendants to provide by December 23, 2022, deposition dates falling no later than January 31, 2023 for all defense experts whose depositions have not yet been completed or, in the alternative, that the Court schedule a Local Rule 37.2 conference to address the issues raised in Plaintiff's letter. Plaintiff's counsel stands ready should the Court have any questions.

Respectfully submitted,

James M. Kramer

**JA1096**

Exhibit 5

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

WILLIAM BURNETT, As Special Administrator
Of the Estate of SARAH BURNETT, Deceased                                    PLAINTIFF

v.                                        CIVIL NO. 20-3046 – TLB

AMERICAN INTERNATIONAL INDUSTRIES, et al.                          DEFENDANTS

**ORDER**

Before the Court for consideration are Defendants' Motions to Compel Reliance Materials and Records Subpoenas (ECF Nos. 188 & 190). The Court conducted a hearing on these Motions on July 25, 2022, during which all parties appeared and participated by and through counsel. Since yesterday's hearing, counsel for all parties have accepted the Court's invitation to provide additional materials which may be instructive, amounting – in total – to more than 1,000 pages. While the Court pauses to consider these additional materials, it finds and directs as follows:

1.      Dr. Theresa S. Emory, an author of *Malignant mesothelioma following repeated exposures to cosmetic talc:  A case series of 75 patients*, published in the American Journal of Industrial Medicine on March 6, 2020, has been identified as an expert witness for Plaintiff and has submitted an expert report (ECF No. 202-2).  It is well-settled that the Federal Rules of Civil Procedure and governing law permit litigants the opportunity to explore opposing expert witness' qualifications, opinions, factual and other foundations for opinions, and credibility – to include the expert's biases.  To that end, Defendants ask the Court to compel Plaintiff to provide information specifically identified in Exhibit K (ECF No. 188-15) which Defendants posit should have been

1

**JA1098**

included in Dr. Emory's Reliance Materials (ECF No. 202-4).   Plaintiff objects to the Motion without particularly dissecting the component parts of Exhibit K.  While much of Exhibit K relates to the factual underpinnings for Dr. Emory's study/article (understandably drawing a majority of the parties' arguments), it also seeks information routinely sought from experts such as qualifications, billing records, foundations for Dr. Emory's factual assumptions, and identification of information provided by the counsel who retained and compensated the expert.  Exhibit K further seeks information related to a study/article written by Dr. Jacqueline M. Moline (*Mesothelioma Associated with the Use of Cosmetic Talc*, published in the Journal of Occupational and Environmental Medicine, January 2020) who is not an expert in this matter due to Plaintiff's failure to timely identify her but upon whose work Dr. Emory apparently relies, in part, in reaching her disclosed opinions.

2. **The Court directs counsel to specifically confer regarding Exhibit K and to advise the Court, in writing and not later than August 12, 2022, of any areas of agreed production by Plaintiff.  It is the Court's expectation that counsel can reach agreements on many of Exhibit K's requests, save and except for the materials underpinning the Dr. Emory and Dr. Moline studies/articles, which form the central dispute herein.**

3.     The parties should know that this Court, as courts previously tackling this issue, is particularly concerned by Plaintiff's argument that Dr. Emory's study – based substantially on litigation documents (depositions, interrogatory responses) which are not privileged – cannot be subjected to scrutiny but must remain anonymized due to medical research methodology concerns. The Court observes from reading her article, Dr. Emory acknowledges her own conflict of interest in the subject(s) of her study.  Defendants say, based on personal knowledge of their own cosmetic talc litigation history, that Dr. Emory likely served as an expert witness in a yet undetermined

number of the matters Dr. Emory included in her study. Defendants urge the Court to allow discovery so as not to permit advocacy of a legal theory to masquerade as science. Defendants further say they are entitled to discover both the process and facts relied upon (or disregarded) when Dr. Emory "ruled out" other asbestos exposures to the participants included in her study. On this matter, the Court finds Dr. Emory's article opaque. Paramount of its concerns here is that the undersigned cannot be assured that Mrs. Burnett – for whom Dr. Emory seeks to offer a causation opinion – is not included in Dr. Emory's study (or, for that matter, Dr. Moline's). Such circularity could not be permitted to proceed unchallenged. Balanced against these concerns and this litigation's quest for truth are legitimate concerns related to privacy/confidentiality, society's need for participation in research studies, and scientific research anonymity which have been identified, briefed, and arduously articulated by Plaintiff.

Should the Court compel Plaintiff to disclose information underpinning Dr. Emory's study, the Court believes a protective order would be necessitated to govern disclosures. **For this reason, the Court directs counsel for Defendants to draft a proposed protective order which would address the privacy concerns raised by Plaintiff's opposition pleadings and to provide the draft to Plaintiff's counsel and to the Court by August 12th. At a minimum, the draft order should identify a process or method for protecting from further disclosure the (a) identify of any participant in Dr. Emory's study, and (b) any medical evidence related to that participant. Plaintiff will have until August 19th to propose modifications of the protective order. By that date, the Court will have considered the parties' voluminous supplemental materials and be ready to rule on the Motions.**

4.      Defendants seek this Court's approval of Exhibits L and M (ECF Nos. 188-16, 188-17), Subpoenas Duces Tecum to Northwell Health and Dr. Moline, respectively. As noted

**JA1100**

herein, Dr. Moline is neither a party nor an expert in this matter, and Northwell Health is not yet a party to this litigation.  Although prudent of Defendants to notify the Court of this interrelated discovery issue, it is not the practice of the Court to offer guidance or blessing to the proposed employment of discovery tools. Federal law provides guidance on issuing subpoenas outside the jurisdiction and affording opportunity in the remote venues (in this instance, New York and Virginia) for challenging them.  From the materials provided, it appears both Dr. Moline and Northwell Health are well-versed in the requests being contemplated and their opportunity to object/intervene.  More does not need to be said with respect to Exhibits L and M.

IT IS SO ORDERED this 26th day of July 2022.


*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

**JA1101**

# Exhibit 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    NEWPORT NEWS DIVISION

 3

 4  PENINSULA PATHOLOGY ASSOCIATES,   )
                                      )
 5            Petitioner,             )
                                      )
 6  v.                                )       Civil Action No.:
                                      )          4:22mc1
 7  AMERICAN INTERNATIONAL INDUSTRIES,)
                                      )
 8            Respondent.             )

 9

10            TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

11        (Hearing on Motions to Quash and Sanctions)

12
                              Norfolk, Virginia
13                            December 16, 2022

14

15  BEFORE:   THE HONORABLE DOUGLAS E. MILLER
              United States Magistrate Judge
16

17

18  Appearances: (Via Videoconferencing)

19        ALI & LOCKWOOD
              By: Kathryn Marshall Ali
20                Elizabeth Catherine Lockwood
                  Counsel for Petitioner
21
          LATHROP GPM, LLP
22            By: Robert E. Thackston
          -- and --
23        WILLCOX & SAVAGE
              By: Eric David Cook
24                Counsel for Respondent

25
```

**JA1103**

2

```
 1                   P R O C E E D I N G S

 2

 3            (Commenced at 2:41 p.m. as follows:)

 4

 5            THE COURT:  All right.  I'm sorry, I don't know what's

 6   going on with my computer, it's still spinning in the

 7   background, but my law clerk, Will Metcalf, is connected, so

 8   I'll have him sit next to me and use his computer so we can get

 9   started.  I apologize.

10            Ms. Dodge, is everyone else ready?

11            COURTROOM DEPUTY CLERK:  Yes, sir.  Peninsula

12   Pathology Associates v. American International Industries, Case

13   4:22mc1.

14            Are the parties ready to proceed?

15            MR. THACKSTON:  Yes.

16            THE COURT:  All right.  It looks like I have -- is it

17   Ali or a Ali?

18            MS. ALI:  You know, either is fine, Your Honor.  It's

19   the subject of debate in my household.  But I say Ali.

20            THE COURT:  All right.  Ms. Ali, it's nice to have,

21   you, and Ms. Lockwood, you all are here for the movant, I guess,

22   and Mr. Cook and Mr. Thackston for the party who initiated the

23   subpoena.  I'm not sure who's taking the lead on this.  Is it

24   going to be you, Ms. Ali?

25            MS. ALI:  I'm going to start, Your Honor.  Ms.
```

**JA1104**

```
 1  Lockwood is better prepared --

 2          THE COURT:  Hold on a second.  My computer just

 3  decided to work.  Let me see if I can switch.

 4          (Pause in the record.)

 5          COURTROOM DEPUTY CLERK:  Can you hear us?

 6          Apparently not.

 7          THE COURT:  Okay.  So the good news is that we haven't

 8  had to use Zoom in a long time, so that's why we're apparently

 9  unfamiliar with it.  But in any event I'm going to...

10          MR. THACKSTON:  Your Honor, Robert Thackston.  I just

11  wonder if it would save some time if, rather than have the other

12  side try to characterize what they think the subpoena is, if I

13  were to characterize what we intend the subpoena to be, I wonder

14  if that might save the Court some time.

15          THE COURT:  I probably have more questions for you,

16  Mr. Thackston, if you're going to take the lead on this, I'm

17  fine to proceed that way.

18          MR. THACKSTON:  Thank you, Your Honor.

19          THE COURT:  I've read everything that you've submitted

20  and I've looked over -- the matter's obviously very thoroughly

21  briefed.

22          Let me just say before we begin, though, I see a

23  number of people who have weighed in to observe.  Obviously it's

24  a public hearing, anyone's welcome to listen in.  I will just

25  say, however, Paul McManus is an official federal court
```

4

```
 1  reporter, he's keep the transcript.  He should be the only

 2  person who's recording the proceedings.  So no one else should

 3  be making any kind of a record or transcript of what's going on.

 4          But go ahead, Mr. Thackston.  I'm happy to hear

 5  anything else you want to say.

 6          MR. THACKSTON:  Thank Your Honor.  And I appreciate

 7  your letting me go first, only because I think there's a little

 8  bit, there's some misunderstandings about what it is that we're

 9  trying to accomplish.

10          I represent a company called A-I-I, which is a family

11  owned management company out in California, and they have been

12  sued in a number of cases in which there have been allegations

13  that cosmetic talc had trace contaminations of asbestos and

14  caused mesothelioma.

15          Now, I don't know about the Court's knowledge about

16  the historical litigation involving asbestos --

17          THE COURT:  We are in the same district as the largest

18  Naval base and the largest Naval shipyard in the world, so we

19  have plenty of familiarity with mesothelioma and asbestos.  And

20  also I've read your entire brief and a good part of the exhibits

21  that were attached to both, so you don't need to give me the

22  whole background.  I do understand what Mr. Gref's issue is and

23  the nature of the claims that you're defending in New York, and

24  so you can just cut to the chase with regard to Dr. Emory's

25  article.  That's really what we're here about.
```

1          MR. THACKSTON:  Absolutely, Your Honor.  And if I

2    could share a screen to do that, I will put the article up.

3          After decades of litigation involving asbestos that

4    never mentioned anything about cosmetic talc, in the last

5    several years, several individuals who are prolific experts for

6    the plaintiffs in asbestos litigation, namely Gordon and

7    Millette, they published one article; Moline published one

8    article, and Emory published one article.  And they're

9    ground-breaking articles to the extent that they claim that

10   nevermind what we said for the last 30 years, but it's cosmetic

11   talc that's causing mesothelioma.  It's adulterated with trace

12   levels of asbestos.  And we found these series of people that

13   have mesothelioma and they didn't have any asbestos exposure

14   except for cosmetic talc.

15         And the Emory article, the interesting thing about it

16   is the strawman here is can physicians protect confidential

17   information given them by patients.  Absolutely.  Does that have

18   anything to do with this issue before the Court?  Absolutely

19   not.  There's no allegation that the Dr. Emory was a physician

20   to any of these cases that she wrote about.  Instead -- and here

21   is the title if the Court can see the article --

22         THE COURT:  I've read it.  I've read it.  And again,

23   Mr. Thackston, I don't -- I'm happy to hear what you want to

24   say, but I've read it all.  I read the whole article.  It's only

25   seven pages long.  It's very brief.  I've looked at exactly how

1   Dr. Moline is using it and Dr. Finklestein is using it.  So I

2   know exactly what it is you're defending.  I don't need the

3   background.

4          Here's what I want to know:  Dr. Emory is not a

5   witness.  She's not in the case.  She's not here.  Why would

6   this be the case that Dr. Emory or her company would have to

7   respond to this incredibly burdensome subpoena.  I just don't

8   understand why you've picked this case to single out, because I

9   frankly see almost no connection between Dr. Emory's study and

10  the case you're defending in New York, at least with respect to

11  Mr. Gref.

12         MR. THACKSTON:  Well, first of all, Your Honor, in

13  whatever case we issued a subpoena it's going to wind up before

14  Your Honor, right?  Because that's where Dr. Emory  is, and

15  that's where the records are.  So it wouldn't make any

16  difference which case it was.  Every case has an expert that's

17  relied on two things -- really three, Gordon, Moline and Emory,

18  right?  And so whichever case -- we almost got there in an

19  Arkansas case and the plaintiffs took the money the day that Dr.

20  Emory's stuff was due.  The Arkansas court says she will answer

21  these questions.  For all we know, Mr. Gref is one of the

22  subjects, right?

23         THE COURT:  Well, now, I wanted to ask you about that,

24  because it's very clearly spelled out in the study -- and I

25  looked at your own expert -- I mean, the expert's report.

7

1   Dr. Moline says he was diagnosed in 2019, and there are two

2   people who are diagnosed in 2019.  This is in the opposition

3   brief.  And they're both over 70 years old and one of them's a

4   woman.  And so again, she's not willing to tell you names, but I

5   frankly don't see how, based on the very brief summary of that

6   study, you can have a good-faith basis to believe that Mr. Gref

7   was one of her subjects.

8            MR. THACKSTON:  Well, Your Honor, we don't know.  And

9   she --

10           THE COURT:  Why don't you know?  Why don't you know,

11  Mr. Thackston?

12           MR. THACKSTON:  Because -- well, we --

13           THE COURT:  Do you think she's lying to you about the

14  age or the year of diagnosis?

15           MR. THACKSTON:  Oh, no, no, no.  I mean, we don't know

16  about any of the specific people because they've taken the

17  position they can't tell us.

18           She said that she had something like a 100-plus files

19  that she looked at and she decided they did not belong in there,

20  and if Mr. Gref was one that did not belong in there because he

21  was, his parents were both in the Navy and they both worked and

22  lived in Newport News, that would be relevant information.

23           But the point is in the other case that we have with

24  Dr. Moline, the only reason we know that one of the people had

25  alleged occupational exposure to asbestos was a happenstance of

1  Dr. Moline happened.  And they're using these offensively.  If

2  you've read the Bell decision.

3          THE COURT:  When you say "they're" using it, who is

4  using it?

5          MR. THACKSTON:  Both Doctor -- both -- well, both

6  plaintiff's expert is using --

7          THE COURT:  This subpoena originated in New York, the

8  Southern District, where you're defending a case that was filed

9  by Mr. Gref.  Now, Mr. Gref has hired -- or his lawyers have

10 hired Dr. Moline and you've deposed Dr. Moline, and Dr. Moline

11 wrote her own study.  And I looked at Dr. Moline's report, I

12 looked at the 200-plus pages report from Dr. Finkelstein, and

13 I -- and you pointed me exactly to where it was, it was very

14 helpful.  It's like this.  It's like this [indicating].  It's

15 almost nothing.  I mean, the pages and pages of talc has

16 asbestos, talc has asbestos, this is the way asbestos can be

17 absorbed, these are all of the things, and oh, by the way, there

18 were two studies which found it happened after exposure to talc.

19 I mean, that's what they say.

20         MR. THACKSTON:  It's, it's the, it's the absolute

21 linchpin of talc litigation.  It is the only thing that --

22         MS. ALI:  May I be heard, Your Honor?

23         THE COURT:  Just a minute.  I'm going to give you an

24 opportunity to weigh in.

25         MR. THACKSTON:  Your Honor, it is the reason that talc

1  litigation exists.  These two articles are the only alleged

2  epidemiological link between cosmetic talc and mesothelioma.

3        So they're in the shipyard.  You have many, many

4  studies that show the occupations that are at risk for

5  mesothelioma:  Shipyard workers, insulators, pipe fitters.

6  Nobody has ever suggested that barbers, for example,

7  cosmetologists who work with talc all the time, are at risk for

8  mesothelioma, even though they work with cosmetic talc all the

9  time.  That was a problem for the plaintiffs because you've got

10 to have general causation, right?  Can cosmetic talc cause

11 mesothelioma, before you get to specific causes, causes in this

12 particular case.  And faced with that lack of epidemiology, the

13 plaintiff's own experts created their own articles using

14 litigation information.  And there's not -- and as just Osteen

15 found in the Middle District of North Carolina, you can't use

16 that affirmatively in these case as an expert in federal court

17 and not disclose your reliance materials.

18        And it's undisputed -- Your Honor, on the burden

19 question, we'll take a list of the cases, right?  There was no

20 offer of anything.  We could start with a list of the cases and

21 then we can come back to the Court and say, well, here's 75

22 cases, we have 20 litigation files, and in those 20 litigation

23 files, these people have bankruptcy trust claims for asbestos

24 exposure, they have Worker's Compensation claims like the Bell

25 case.

1          And so we asked the Court to allow us to go to the

2     next step of saying produce the litigation materials, the

3     depositions and the answers to interrogatories, nothing else at

4     this point, and then if those show that there was other

5     exposures then we might ask the Court to let us go to the next

6     step.

7          So we had to ask for all of it first, but we would

8     start with just a list of the cases.  And nobody can claim that

9     the list of the cases is private patient information, because

10    she received that list of cases as an expert for the plaintiff

11    in litigation.

12         THE COURT:  Okay.

13         MR. THACKSTON:  We can start with that, Your Honor.

14         THE COURT:  Okay.

15         MR. THACKSTON:  Mr. Cook has more on the specifics of

16    why these privileges don't apply, but I just wanted to let the

17    Court know --

18         THE COURT:  Before we even get to the privileges I

19    have to determine whether the subpoena itself unduly burdensome.

20    And the question -- if it's unduly burdensome, and

21    that requires -- I mean, frankly, this Fourth Circuit case

22    Jordan which was just decided a couple years ago lays it out for

23    non-parties.  And you have to look at both sides of this

24    equation.  And the biggest problem I have with your motion -- or

25    with your subpoena in this court in resisting the motion to

1   quash it is we have a non-party who is a non-witness who has not

2   been designated, whose only connection to the Gref litigation is

3   the fact that her study -- a study she wrote with two co-authors

4   which has been available for over two years is mentioned in one

5   sentence and one footnote of Dr. Moline's report and a half a

6   page of from Finkelstein's 280-plus pages.  And that means -- I

7   know you say it's the linchpin, but from the record that's here

8   on this motion, it doesn't seem like much of a linchpin.

9           Now, maybe the attorneys are mis-using it, maybe the

10  attorneys are moving it or saying that it says something that it

11  doesn't say, but I don't know how that changes the relevance of

12  the survey that Dr. Emory put together in terms of its relevance

13  to Mr. Gref's case.

14          MR. THACKSTON:  Your Honor, Judge Osteen just wrote a

15  41-page opinion on nothing but this topic, right?

16          THE COURT:  Well, Judge Osteen was presiding over a

17  mesothelioma case, right?  Judge Osteen wasn't dealing with a

18  non-party subpoena in a case that wasn't pending in front of

19  Judge Osteen.

20          MR. THACKSTON:  Well, the argument was -- it started

21  out that way because we -- it was -- Moline and Emory were both

22  in that case and we didn't know that he was presiding over one

23  of the cases because they wouldn't disclose what the cases were.

24          But Emory -- this is not a case where it's Cedar

25  Sinai, had nothing to do with the litigation.  She is a

```
1   litigation witness in dozens of cases.  Maybe not Gref, but
2   the --
3              THE COURT:  We're talking about Dr. Emory?
4              MR. THACKSTON:  And Dr. Emory and Dr. Emory  Maddox
5   wrote this while serving as litigation consultants for the
6   plaintiffs.
7              If we scroll to the last, to the very last page of the
8   article it says two important things:  One -- do we still have
9   screen share on this?
10             THE COURT:  It's all right.  I've seen the article.  I
11  have it.  I know exactly what it says.  It says that they --
12             MR. THACKSTON:  Here's why they're not just an
13  innocent third party.  It says that they serve as expert
14  witnesses for plaintiffs this talc litigation, right?  So this
15  was written while they were serving as expert witnesses for use
16  by expert witnesses, and there's no dispute that Dr. Emory used
17  it as an expert witness in talc litigation.
18             She's not in the Gref case at the moment but to say
19  they only mentioned it one time, they -- they mention it as the
20  reason that they should be entitled to go forward in these
21  cases, both the Moline article and the Emory article.
22             And as Judge Osteen said, he unsealed the fact that
23  Bell was one of the plaintiffs because it's not fair to use this
24  affirmatively.  He cited an example of the plaintiff's lawyer
25  arguing in closing look at what Dr. Moline's article says?  It
```

13

1   says that cosmetic talc causes mesothelioma.

2            The list of cases.  There's nothing -- just start off

3   with what are the 75 cases.  That's one -- I'll show you an

4   example of what Northwell produced in the Gref case -- in the

5   Bell case.  They have a, they had a spreadsheet that has the

6   name of the 33 in the Moline case and they just redacted the

7   others.  They gave us one that showed it was Betty Bell.

8            THE COURT:  The reason they redacted them is because

9   the judge didn't order them disclosed.  The only one the judge

10  ordered disclosed was Bell, which you already knew.

11           MR. THACKSTON:  Well, we didn't know it until they

12  admitted it, Your Honor.  We suspected it, but we didn't know

13  it.  We suspected it because of circumstantial evidence, but we

14  didn't know it until they produced this.

15           And we didn't press the issue about the other 32.

16  They said okay -- the magistrate judge said I'm not inclined to

17  give you the other 32, we said that's fine, we didn't even

18  appeal that, we said just give us Bell.  And when we got Bell,

19  we said -- we won the case on summary judgment, then we went

20  back and said we need to unseal this, and Judge Osteen followed

21  the Fourth Circuit's rules for unsealing and felt there was a

22  compelling public interest in this issue, because this article

23  was being used offensively to support cosmetic talc.  And the

24  defendant's hands were tied because even if all 75 of these

25  cases or 33 in the Moline case, if they were dead wrong, we

1    didn't have any way to ask questions about it.

2            And Judge Osteen said from a public policy standpoint

3    and from a *Daubert* standpoint the defendants are not only

4    entitled but required to try to find out what the underlying in

5    facts are.  So her litigation files are not privileged, it's not

6    a burden to produce their list, and if we need anything more

7    than that, we'll come back to the Court.  So today we would take

8    a list of the 75 cases, period.

9            THE COURT:  Okay.  Ms. Ali, do you want to respond to

10    some of what you heard?

11            MS. ALI:  Yes, Your Honor.  Thanks.

12            I think, you know, you, Your Honor, cut to the heart

13    of the matter here.  The question is, for this court, in

14    connection with this motion that's pending before the court, is

15    the relevance of Dr. Emory's study to the Gref litigation,

16    right?  Rule 45 subpoenas, they're issued out of a particular

17    case, this isn't a -- that's how they work, right?  The

18    relevance question is, is it related to Gref?  And I haven't

19    heard anything today, we haven't seen anything in the briefing.

20    We've also read the Moline report, the Finklestein report, we've

21    read their depositions, which were extensive, where Emory was

22    barely discussed at all.  Whatever my colleagues on the other

23    side think that Emory is relevant to in terms of national

24    litigation, other litigations that they may be involved in,

25    she's just barely relevant, if at all, to the Gref litigation.

1   And that is sort of the start and end point here.

2           In addition to other arguments we've made, obviously

3   we've raised issues with timeliness, and we can talk about the

4   privileges question if Your Honor would like, though I -- you

5   know, as you said, these issues have been extensively briefed

6   and I don't want to go round and round on things that we've put

7   in the briefing.  But the question here is really what is the

8   relevance to Gref as compared to the burden on Peninsula and the

9   burden on Dr. Emory.  There is no basis under Rule 45 to do a

10  broad fishing expedition for something that might be relevant to

11  other litigations going on around the country.  You know, we --

12  obviously that's what's going on here.  There's no answer to the

13  question of what the relevance to Gref is.  You see it from the

14  face of the reports, you see it from the face of the deposition

15  transcripts.  You know, she's cited in a single sentence in the

16  Moline report which cites, I think, 500 other sources.  She's

17  cited in, you know, half-a-page most of which is a table in the

18  Finkelstein report.

19          And so, you know -- and they've made clear what they

20  want this for today in this hearing.  They have made it clear in

21  the briefing on Page 5 of their brief, on Page 23 of their

22  brief, that this is for other cases pending throughout the

23  nation.  But that's not what Rule 45 is for.  That is a total

24  abuse of the subpoena process.  It is a violation of

25  Rule 45(b)(1), a violation of (d)(3).  You know, that's the

1    context here about what's really going on.

2           I do want to correct the record on a couple of things.

3    No. 1, the concept that Dr. Emory's study is the linchpin of

4    talc litigation throughout the country and asbestos litigation

5    and it wouldn't exist without it.  First of all as they have

6    said over and over again in their briefing, the cases in Dr.

7    Emory's studies came from litigation.  All of this talc

8    litigation predated the studies.  They're doing a retrospective

9    study of cases that were already filed.  These articles were

10   published in 2020.  You know, talc litigation has been going on

11   for decades before that.  So it's, I don't -- I'm not a talc

12   litigator, maybe there's something I don't know, but that

13   doesn't track for me.

14          And in Bell, you know, A-I-I has cited Bell as though

15   it is this, you know the --

16          THE COURT:  Bell is Judge Osteen's opinion?

17          MS. ALI:  Yes.  I'm sorry.  It's Judge Osteen's

18   opinion.

19          THE COURT:  I thought that was the case.

20          MS. ALI:  In that case, as Your Honor noted, first of

21   all, it's the only case in the country that we're aware of where

22   a court has allowed disclosure of any study, any subject of any

23   study.  And Bell was extremely -- the Court was extremely

24   careful -- and this is both in the magistrate judge -- the

25   transcript that was held of the hearing held before the

1   magistrate judge, and in the case in 2020 which we cited as an

2   exhibit to our brief and also in the court's -- the recently

3   order from a couple of months ago, that the district court's

4   order was very explicit that any disclosure was limited to Ms.

5   Bell herself.  And that was for a few reasons, none of which are

6   present here.

7           No. 1, she had executed a HIPAA waiver for that case,

8   right?  She had said she had executed a HIPAA waiver to release

9   medical records in the context of her own litigation, which that

10  was.  She was dead by the time the study was even conducted.  So

11  the Court, whether wrongly or rightly determined that she wasn't

12  entitled to any human subject protection on account of that.

13          And No. 3, the cat was already out of the bag.

14  Northwell, whether -- again, I wasn't involved in this case, but

15  my understanding is that Dr. Moline's employer sort of

16  inadvertently produced a document that they later tried to claim

17  protection over which had identified Ms. Bell as the subject of

18  the study.

19          So the cat was already out of the bag at that point,

20  and there was sort of no way to right that ship.

21          As to every other one of the studies, the subjects of

22  the Moline study, the court was explicit that it was totally

23  inappropriate to disclose the subjects of that study.

24          And I'll mention as well that Dr. Emory was an expert,

25  a testifying expert in Bell.  Counsel for A-I-I deposed her for

18

1  24 hours in that case.  They asked her to disclose the subjects

2  of the study, she refused, and they never pursued it.  And then

3  they waited, right, until -- and that was while this Gref case

4  was pending.  And so they didn't pursue it in this case where

5  she was a testifying expert, and instead they waited until a

6  year after discovery closed in Gref to serve a third-party

7  subpoena on Peninsula which has nothing really to do with this

8  case.

9          So again, I'm happy to go through the other reasons

10  why we think --

11          THE COURT:  No, I don't need, I don't really need to

12  hear any more.

13          I did want to ask Mr. Thackston with respect to the

14  timing, it looks like from the briefing you were supposed to

15  have another conference with Judge Figueredo in New York.  Did

16  that occur and what was the status?  Did she authorize an

17  additional or extension of the deposition of Dr. Moline?

18          MR. THACKSTON:  It did occur, and interestingly, the

19  judge ruled that she was going to hold in-person hearings in New

20  York on this matter on February 8th with respect to Dr. Moline

21  and Northwell.

22          And no disrespect to Ms. Ali, but I have absolutely no

23  idea where she's getting her information.  Some of what she said

24  is about as wrong as -- we did not take Dr. Moline's deposition

25  in Bell for 24 hours.  She disappeared.  She withdrew.  Judge

1  Osteen's order says --

2          MS. ALI:  That was Dr. Moline.  I'm talking about my

3  client, Dr. Emory.  You did -- I can pull up the deposition

4  transcript into the record.

5          THE COURT:  Emory's deposition.

6          MR. THACKSTON:  So Dr. Moline withdrew from the case.

7          Your Honor, I guess what I'm not getting is, because

8  Dr. Emory is there -- and by the way, talc litigation has not

9  been going on for decades.  Talc litigation started after 2014

10 with the Gordon/Millette article.  If the judge is aware of a

11 cosmetic talc cases before 2014...

12         The cases that have been filed many times, the cases

13 have other -- that's the point of our subpoena.  Some of the

14 cases are against asbestos defendants, right?  And if she's

15 counting in her 75 cases ones that are against asbestos

16 defendants, then they're not valid cases to say there was only

17 cosmetic talc.  So...

18         THE COURT:  I'm -- I don't mean to cut you off, but I

19 don't -- I just think that you are overstating what this

20 document says.  I mean, it's seven pages long.  It says cosmetic

21 talc may cause mesothelioma and it has 11 digestion studies.  It

22 draws an analogy between the fibers discovered in those

23 digestion studies and the fibers which have been linked to

24 certain mined talc.  That's what it says.  It doesn't do any

25 more than that.

1          Now, maybe lawyers are using it to say more than that,

2    or other experts are using it to say more than that, but the

3    study itself, it has -- a lot of what you're describing as

4    undermining its legitimacy is right there on the face of the

5    document.  She says we work for plaintiffs.  She says we got

6    these studies from existing litigation.  She's not trying to

7    hide the ball.

8          MR. THACKSTON:  But by saying that there was no other

9    exposure when there was --

10          THE COURT:  She says there was no other reported

11    exposure.  That's what she says, that there was no other

12    reported exposure.

13          MR. THACKSTON:  It's not that important.  Mr. Kramer,

14    the plaintiff's counsel on the line, why don't we ask Mr. Kramer

15    whether he will stipulate that none of his experts will mention

16    Dr. Emory's report or article.  I'll bet it's so important that

17    they absolutely have to use it.

18          MS. ALI:  Your Honor, respectfully, that is not the

19    test for relevance.  Whether an expert mentions another study

20    among 492 others is not the test for relevance of the question

21    on a Rule 35 subpoena is a balancing --

22          THE COURT:  I'm not litigating the Gref case.  The

23    Gref case is not being litigated here, nor is any other talc

24    case that's being litigated here.  What's being litigated here

25    is the extent to which this subpoena creates an undue burden,

```
 1  and one of the elements the Court has to examine is the extent

 2  of the relevance of the material or the moving party's, the

 3  subpoena's party's need for it.  And a number of things weigh

 4  against you, Mr. Thackston, including the things I've already

 5  observed with regard to how little they're mentioned by the

 6  actual testifying experts in your case.

 7            But also the timeliness -- I mean, frankly the

 8  timelinesses is of concern.  I don't think I would absolutely

 9  quash the subpoena solely on the basis that it was untimely,

10  given that discovery is ongoing.  But the fact that it was not

11  requested earlier in discovery does speak to its relevance to

12  the Gref litigation.  The fact that the case had been going on

13  for two years, and this deposition -- or this subpoena was only

14  issued to Dr. Emory -- or to Dr. Emory's company in November of

15  2022 speaks to its importance to the case and, in the Court's

16  view, diminishes its importance to the Gref case.  So that

17  weighs against you in terms of its burden that it creates.

18            And it's also -- I find it to be an incredibly

19  burdensome subpoena to respond to.  You've been a little bit

20  dismissive of the statements by Dr. Smith and Dr. Emory

21  regarding the burden of responding to this subpoena, but you

22  have sworn declarations, and they don't appear to me to be

23  incredible given the nature of the material that you're seeking

24  in this case.

25            MR. THACKSTON:  Well, Your Honor given that I've
```

1  conceded that all we're asking for is a list of cases, I don't

2  think we can get the burden at this point.  It's not burdensome

3  to print out your spreadsheet.

4         And for counsel to on one hand say I know nothing

5  about talc litigation and for the Court -- you know, with all

6  due respect, Your Honor, if you don't know anything about a talc

7  case, how can you say it is not important to a talc case?  I'm

8  telling you that when these experts take the stand they might

9  have 400 pages of fluff, but the two things that they talk about

10  are Dr. Emory's study and Dr. Moline's study, because they're

11  the only two studies in the world that claim to draw any kind of

12  relationship between cosmetic talc exposure and mesothelioma.

13  They say they're the first ones to do it.  And so it doesn't

14  matter that you're talking about 40-year-old stuff, the

15  40-year-old stuff wasn't getting you to the jury or wasn't

16  getting past *Daubert*.  But these two things are getting you past

17  *Daubert*.

18         THE COURT:  So you did just hit on one point that I am

19  interested in exploring with the other side, and that is the

20  nature of the peer review that the article underwent.  Because

21  one of the things that was requested in the subpoena was the

22  peer review process.  And it does -- I mean, as I said to Mr.

23  Thackston, I think a significant problem with the subpoena is

24  that there's a lot of disclosure already in the article that

25  provides the defense lawyers some ability to challenge the

```
1   strength of it as a research document in terms of the bias

2   that's been disclosed, the litigation nature of the sample size,

3   those things they already have to defend.  But one of things

4   that insulates it from that is the fact that it is

5   peer-reviewed, and I wonder what information's available to Dr.

6   Emory or Dr. Maddox or whoever else was involved regarding the

7   peer-review process that the article underwent.

8             MS. ALI:  So I don't have the information about the

9   peer-review process, because obviously our position here is that

10  the subpoena should be quashed in its entirety.

11            I will say, you know, they have -- A-I-I has deposed

12  Dr. Emory in cases where she is a witness and taken, I assume,

13  her [audio interrupted] everything that she's required to

14  provide as an expert in state and federal cases that this is

15  certainly something they could have probed in those cases,

16  certainly something they can probe with her in the future, as I

17  am certain this will not be the last time that Dr. Emory is

18  involved in one of these cases in which they're also involved in

19  the context of a third-party subpoena, where she is just not

20  relevant.  I'm not saying -- first of all, I didn't say I didn't

21  know anything about talc litigation, I said I'm not a talc

22  litigate other.  But what I am saying here and what I think Your

23  Honor has already sort of, you know, stated, is that the

24  question is whether she's relevant to Gref.  Whether the article

25  is relevant to Gref.  And we don't have that here.  So requiring
```

1   her to respond to a subpoena, any portion of it, is

2   automatically unduly burdensome in that circumstance.  Where the

3   relevance and the need is very, very low then, you know, it's a

4   balancing test.  That's how it works.  And here, the relevance

5   and the need, for all of the reasons we've said in our

6   briefing -- you know, I know that Mr. Thackston has commented

7   several times on the burden in terms of time and cost, which

8   again, you know, we address in the declarations, but it's not

9   just time and cost.  It is all of the other factors that go into

10  burden, including things about medical ethics, which I won't get

11  into unless Your Honor would like, and this sort of the broader

12  chilling effect that we've briefed, it is, you know, deterring

13  people from conducting studies and publishing articles like

14  this.

15          I don't have specifics on the peer-review process

16  here.  It's also something I presume they could get from the

17  journal about their general peer-review process.

18          THE COURT:  Yeah, I did look at it.  I looked at it,

19  frankly, to see whether it was there, and there is some

20  information there on the journal about the peer-review process,

21  but the identity of the peer reviewers is not available.  At

22  least I couldn't determine how you could identify them.

23          Do you know, Mr. Thackston?  Have you ever attempted

24  or asked Dr. Emory, or aware?  That's the other thing that I am

25  aware of from having been involved in -- I didn't say I knew

```
1   anything about talc litigation because I do not, but I do know

2   something about asbestos litigation, and I know people talk.

3   And there is more information sharing on both sides in asbestos

4   litigation than just about any other kind of litigation there

5   is.  And so I suspect if anyone's asked about this, everyone

6   knows about this.

7              Do you know, Mr. Thackston?

8              MR. THACKSTON:  No, I absolutely do not.

9              MR. COOK:  I can volunteer on that one Your Honor.

10             THE COURT:  Mr. Cook?

11             MR. COOK:  Yeah, Eric Cook from Wilcox Savage for

12  A-I-I.

13             I think we do actually cite some testimony, if I

14  recall offhand it was Dr. Maddox from Peninsula Pathology, and I

15  believe he testified it was less than two weeks, which is an

16  extremely short time period with respect to the peer-review

17  process.  We do not have the identities of any of the peer

18  reviewers though, Your Honor.

19             THE COURT:  Did he not know them?

20             MR. COOK:  No.  I -- well, he didn't know the

21  identities of them, Your Honor.  So whether he had -- you know,

22  whether it was sent to somebody he might know, he didn't know

23  the names to say.

24             THE COURT:  Yeah.

25             MR. COOK:  But if I could also just, if I could
```

1   clarify one point for the Court as well, and that goes to the

2   burden issue:  We did identify in the opposition to the motion

3   to quash Dr. Maddox's testimony indicating that there is

4   existing a key, and I think that's what Mr. Thackston was

5   alluding, to identifying the names of the individuals and the

6   case numbers.  So from a burden perspective, Your Honor,

7   Peninsula Pathology doesn't need to go back and reconstruct all

8   of this information to pull those litigation files, they can

9   produce just that key identifying the names of the individuals,

10  and then A-I-I will take that burden on to go to the publicly

11  filed lawsuits, to go to the deposition testimony, to go to the

12  sworn interrogatories, all of which Your Honor does not have --

13  or none of which has any confidentiality expectations.  And

14  that's the test --

15          THE COURT:  Well, right.  In other words, the publicly

16  filed documents don't, but the key certainly does.  That's the

17  problem.  And that's what Jordan -- what Jordan said is burden

18  has multiple components.  One component is just the physical

19  effort of undertaking the project, which Dr. Smith has

20  addressed, and Dr. Emory in their declarations.  But the other

21  is the confidentiality aspects of it.  And Dr. Emory has gone on

22  at great length about the repercussions to her practice if she

23  were to reveal that -- I know you disagree with that, you think

24  that she's not right.  But I mean, she does -- she's articulated

25  them on a number of occasions.

 1          MS. ALI:  And no court has ever ordered production of
 2   the information they're asking nor, right?  There's not one case
 3   where a court has ever said just produce the key.  No big deal,
 4   just produce the key, right?  That's what we keep hearing.  The
 5   key is everything, right?  And no court has ever required
 6   production.  The only case that A-I-I has cited is Bell where it
 7   was a completely -- first of all it was limited to the named
 8   plaintiff in that case who had -- everybody agreed had executed
 9   a HIPAA waiver for release of that information in that case.
10   And the court was explicit, as we said in our briefing, none of
11   the other subjects of the study could be disclosed.  The court
12   said it was critical -- this is -- I'm quoting the court right
13   now, "That the other 32 subjects of the study had been
14   redacted."  And that was key to the court's decision to say it's
15   okay to release the information as to Ms. Bell, it is not
16   appropriate to release any of the other information.  Here, of
17   the 75 subjects of the study, all of them were exactly situated
18   the way that the other 32 were in the Bell case.  There's not a
19   single case supporting what A-I-I is seeking to do here.
20          And so the -- as Your Honor correctly noted, burden is
21   not just a matter of time and cost.  We disagree of course for
22   all the reasons we said in our briefing and in the declarations,
23   that this is simply a matter of, you know, printing out a key
24   and turning it over, but that's one component of a much broader
25   and more multifaceted burden inquiry that's required here.

28

```
 1              THE COURT:  Okay.

 2              MR. COOK:  Your Honor, if I may?

 3              THE COURT:  Go ahead, Mr. Cook.

 4              MR. COOK:  Couple quick points on that.

 5         There is a order that actually required Dr. Emory to

 6  respond to the -- with respect to the identity of one of the

 7  individuals.  That's the Burnett case from Arkansas, it's a

 8  federal court.  I can supplement the record with respect to

 9  that, Your Honor.  We received it after our briefing.

10         I'd also note that with respect to the Bell case --

11              THE COURT:  In other words, that ordered her to

12  identify one person who they thought was a plaintiff in that

13  case?

14              MR. COOK:  It did.  And the Court did that as a

15  starting point, Your Honor.  There was some additional

16  requirements with respect to that order.  Ultimately Doctor --

17  the case ultimately went away, but the Court said provide an

18  affidavit on the identity of this individual and then I may

19  order further discovery depending on what that affidavit says

20  one way or the other.

21         I'd also point the Court, with respect to the

22  confidentiality issues that were raised by counsel, back to the

23  Bell order again, Your Honor.  Indicates on Page 35 and 36 of

24  the opinion that in a medical research study, the interest in

25  confidentiality belongs primarily to the study participant not
```

**JA1130**

1  the researcher or the sponsoring facility.

2          And then it notes there that the study participant

3  chose to publicly expose the fact of his mesothelioma by filing

4  a complaint.  Every single individual underlying the Emory 2020

5  study filed a lawsuit, publicly filed documents.  The

6  information we're asking for on a key, Your Honor, is

7  essentially the information -- in fact less than the information

8  that would be obtained in a well-pleaded complaint filed in any

9  court across the country.  And if we can go get that

10 information, just the name, we will do the work to find out the

11 underlying allegations of exposure in the case.  Because that's

12 what we need to get to.

13         The article claims that the only exposure is from

14 cosmetic talc.  And this is a crux of this, Your Honor.  Because

15 when we looked at Moline and the one case that was identified

16 there in Bell, the person swore under penalty of perjury they

17 had other exposures that weren't from cosmetic talc.  And we

18 believe that there are individuals in the Emory case theory that

19 had exposures to asbestos that are in no way alleged to have

20 occurred from cosmetic talc.

21         So if we get the names of those individuals we can go

22 back -- we'll do the work.  We'll dig up the lawsuits, we'll

23 give up the discovery transcripts, we'll get the sworn answers

24 to interrogatories that provided the basis of that article, and

25 then we can use that to cross-examine the experts in Gref, Your

30

1   Honor.

2          With respect to their concerns about privilege, that

3   can be solved by a protective order and the Court can limit it,

4   limit this production to the Gref case so we can do that

5   information, we can cross the experts in this case.

6          From a burden perspective, Your Honor, right, it's

7   producing a chart, a chart that's already been prepared, so that

8   we can do the work, and then from that protective order you can

9   put a protective order in place so that we can pull the

10  information, and if we find out there's other exposures then we

11  can come back to the court and address it and not use it outside

12  the context of the Gref case, Your Honor.

13         But a protective order would protect them on that

14  particular issue.

15         THE COURT:  Okay.  I understand your argument.

16         What did you want to say Ms. Ali, anything else?

17         MS. ALI:  Just a response that in Bell -- you know,

18  Mr. Cook is saying that there the court found that because the

19  individual had placed her medical information at issue by filing

20  a lawsuit, that waived confidentiality, waived HIPAA protection,

21  all of that.  Again, that was exclusive to Ms. Bell.  The

22  important thing that we keep sort of talking around here is that

23  every one of the other subjects of the study had also filed a

24  litigation, and the court was very, very careful to say none of

25  those people had put their medical information at issue in that

1  case, right?  It was very, very case-specific.  The court was

2  very careful to limit it.

3          And here, as Your Honor, you know, noted right up at

4  the top, Mr. Gref -- I don't know who the identities of the 75

5  people in the study, of course, but it seems very clear to us,

6  right, we weren't given any information when we drafted our

7  brief about who was in the study, who was not.  Of course we

8  don't have that information.  But it seems very clear from the

9  face of the study and who Mr. Gref is and his age and date of

10 diagnosis, that he is not likely one of those subjects.  And so

11 we don't have the Bell issues here.  There is nobody in this

12 Gref case which is the -- again, the only sort of relevant, the

13 universe we're operating in, we just don't have any of those

14 issues.

15         And for this situation where we're talking about, the

16 set of people we're talking about here, the 75 subjects of Dr.

17 Emory's study, are basically identically situated to the 32

18 other subjects of Dr. Moline's study in Bell where they are not

19 the subject of the litigation.  They're situated identically.

20 And in this context, what Judge Osteen held was that they

21 cannot, their identities cannot be released.

22         MR. THACKSTON:  He did not.  He did not.

23         THE COURT:  Okay.  Well, go ahead.  I'll give you one

24 more opportunity, Mr. Thackston, but then I think I'm ready to

25 rule.

1          MR. THACKSTON:  Your Honor, there is a hearing in the

2   Gref case on February 8th regarding whether Northwell and

3   Dr. Moline will be required to turn these materials over.  Now,

4   the only thing I would ask the Court about -- I'm just kind of

5   astounded that counsel for a third party is trying to talk about

6   what the defendants think is a key relevant study in cosmetic

7   talc cases.  If this weren't a key relevant study, why would we

8   go to all this trouble?  It is -- Dr. Moline testified before

9   that cosmetic talc had nothing to do with mesothelioma.  Dr.

10  Emory -- one of the things I would love to hear at some point --

11         THE COURT:  So you already know that, Mr. Thackston.

12         MR. THACKSTON:  Well --

13         THE COURT:  One of the problems that you -- one of the

14  problems that you have is that you already have a lot of

15  material to work with to attack these studies.  And --

16         MR. THACKSTON:  Judge, that's the opposite of what

17  she's saying now.

18         THE COURT:  Well --

19         MR. THACKSTON:  That's the point.

20         THE COURT:  -- you can certainly point that out when

21  she testifies if it's true.  I'm not saying it's true or it

22  isn't true, but if it's true, you already know it and you can

23  already say it.

24         MR. THACKSTON:  But she's saying it's different now

25  because she's done a study, but she can't tell you who is --

1   none of these people agreed to be in a study, Your Honor.  It's

2   not like these people came and said we want to be a part of your

3   study or even knew that they were theoretically being a start of

4   the study.  She took deposition transcripts that she

5   subjectively reviewed.  But now plaintiff's counsel, as Judge

6   Osteen said, they are using this offensively to say to juries we

7   know cosmetic talc causes mesothelioma.

8           In Mr. Gref's case, we know that his peritoneal

9   mesothelioma, which has nothing to do with asbestos, we know it

10  was caused by cosmetic talc.  His parents say they used men's

11  shaving talc on him when he was an infant, but we know that

12  causes mesothelioma because there are two studies out there,

13  Moline and Emory, that say that cosmetic talc alone causes

14  mesothelioma based on the --

15          THE COURT:  Well, you're saying that's what they're

16  saying, and Mr. Thackston, if that's what they're saying then

17  you should be shredding them with their own expert report,

18  because Dr. Finklestein's report has this much [indicating]

19  about Dr. Emory's study and 200 pages of other stuff.  So it's

20  not just Dr. Emory that he's leaning on.

21          MR. THACKSTON:  He didn't testify about the 200 other

22  pages at trial.

23          THE COURT:  He only just comes in and says Dr. Emory

24  says so, so therefore it's true?

25          MR. THACKSTON:  That's what Judge Osteen said in his

 1  record specifically.

 2          THE COURT:  Okay.  Well --

 3          MR. THACKSTON:  This is -- he quotes a plaintiff's

 4  lawyer closing that says Dr. Moline's study shows that cosmetic

 5  talc causes mesothelioma.  That's how important it is.  That's

 6  why it meets the Fourth Circuit's test for unsealing an order.

 7  Because it's important that juries know the truth.

 8          MS. LOCKWOOD:  Your Honor, if I could, before you rule

 9  I just wanted to remind the Court we're willing -- I know you're

10  ready to rule -- requesting sanctions because if the Court

11  decides that the subpoena is unduly burdensome and decides to

12  quash it, Rule 45(d)(1) requires the Court also issue sanctions.

13          THE COURT:  I'm going to give them an opportunity to

14  respond separately to that issue, because I am going to grant

15  the motion to quash.  And the reason is it is a non-party.  And

16  so the non-party -- I mean, just read Jordan.  It's Fourth

17  Circuit law.  It's two years old.  It very clearly says when the

18  subpoena's issued to a non-party, that undue burden analysis is

19  heightened because they're a stranger to the litigation.  Now

20  say they're not a stranger to litigation, but they're as close

21  as a stranger can be to the Gref litigation.

22          Now it may be that Dr. Emory is deeply immersed in

23  talc litigation and you may have the opportunity again to depose

24  her, and if I were sitting in a case, a talc case where Dr.

25  Emory was identified as an expert witness and this was part of

1  her CV and you were deposing her about it because she was

2  offering her own expert testimony, that would be a different

3  situation.  That would be a much different situation.  But

4  that's not this situation.  Dr. Emory's study is minimally cited

5  by the testifying experts, all of whom you have apparently ample

6  access to in New York.  And so that is very minimal relevance to

7  the material that you're seeking.

8          And I would also point out that your hands are not

9  tied in attacking Dr. Emory's conclusions, as you've already

10  pointed out.  You have extensive reason to doubt the credibility

11  of this study because it was drafted based on litigation

12  reports.  You can already argue to the experts on

13  cross-examination that every one of these people was suing a

14  talc company for their mesothelioma because that's the only

15  defendant they would have if their only exposure was as a result

16  of talc.  So you already know that.  You already know they were

17  self-selected, and Dr. Emory disclosed that.  She disclosed her

18  potential bias and Dr. Maddox also is well-known.

19          You've asked for information about how much money they

20  make.  That is routinely asked when these witness testify and it

21  is repeatedly shared, I know, among the asbestos bar:  What the

22  these consultants make and how much they testify.  So that

23  information is readily available from other sources.  You do not

24  need to obtain it by issuing a third-party subpoena.

25          And as you've stated, what you're really after is the

1  key.  But that is an incredibly burdensome thing to require Dr.

2  Emory to disclose based on her own declaration.  I understand

3  there may be -- it would be a closer question, certainly, and I

4  don't know how I would rule if Dr. Emory were a testifying

5  witness if I were sitting in Judge Osteen's shoes and examining

6  this question with Dr. Emory as a testifying witness.  But she

7  is not a testifying witness in Gref.

8         And as we observed at the very beginning, based on the

9  disclosed case studies in her report, it is extremely unlikely

10  that Mr. Gref was a participant in this study.  I mean, the

11  report very clearly indicates his diagnosis was that 2019, and

12  at the time he was I think less than 40 years old, the

13  participants in the studdie with those diagnoses are both over

14  70 at the time.  So it's, again, as close as they can come to

15  telling you without disclosing names, they have told you that

16  you're not going to find anything about Mr. Gref in this study.

17  And so there's just very, very minimal relevance to the Gref

18  study in allowing this kind of burdensome disclosure.

19         I understand your client might want it, and I

20  understand why they might want it, and I understand why they

21  might think it's highly relevant to their overall litigation

22  strategy to try and discredit the study.  But with respect to

23  Gref, I don't think it's relevant, and I do think the burden is

24  undue based on my own examination of the subpoena and the

25  information sought and Dr. Emory's declaration regarding the

1   importance of confidentiality to her work.  And the information

2   already available in the record are available from other sources

3   to permit you to attack the strength of the study when other

4   experts rely on it.  So I am going to grant the motion to quash.

5           I do want to give you an opportunity, Mr. Thackston or

6   Mr. Cook, to respond to the request of sanctions, because I do

7   think your opposition was a little bit thin on that question.

8   And they were not seeking sanctions under the Court's inherent

9   authority, they were seeking sanctions under 45(d)(1), which is

10  more akin to failing to respond to a discovery order or the

11  Court's obligation to police discovery when there's a Rules

12  violation.  And that does not require any bad-faith showing.  So

13  I do want to give you an opportunity to respond to their request

14  for sanctions under (d)(1), because I do think it's a different

15  standard than the one you've articulated in your brief.

16          MR. THACKSTON:  Well, Your Honor, I'm sure we both

17  want to comment on that, but for the finding that it's not

18  relevant, it, it, it's absolutely relevant to --

19          THE COURT:  I didn't say it was not relevant, Mr.

20  Thackston.  I said it was minimally relevant.  And there is a

21  difference.  It is minimally relevant in Gref.

22          MR. THACKSTON:  Well, yeah, our belief and what's in a

23  189-page expert report from Dr. Finkelstein -- and by the way I

24  deposed him yesterday in another case, and I asked whether he

25  thought that information provided through litigation was

```
 1   protected by an expert and he said absolutely not.  In fact, he
 2   went and compelled it from Dr. Riley at Duke so he could look at
 3   the underlying data.  So what they say in their reports versus
 4   what they say at trial are two very different things, and that's
 5   why we pointed out that Judge Osteen had looked at the
 6   significance of these studies -- or Dr. Moline's study in the
 7   context of a talc case and cited in his order that plaintiff's
 8   counsel relied on that case in his closing to say this is why
 9   cosmetic talc causes mesothelioma.
10           In the Gref case, the only thing they're going to have
11   is Dr. Moline and Dr. Emory's studies to tell the jury that
12   peritoneal mesothelioma is caused by cosmetic talc exposure.
13   And so it's the judgment of the people involved and the lawyers
14   involved in the cases are what the experts are really going to
15   rely upon.  When they give you 189 pages, I think is what
16   Dr. Finkelstein's report is, that makes it very difficult to
17   figure out what you're really relying on.  But he's not going to
18   get to testify for five or six days at trial, he's going to
19   testify in and out, and the two things he's going to talk about
20   are Moline and Emory with respect to epidemiology that he says
21   connects cosmetic talc with mesothelioma.  That's all that's out
22   there, Your Honor.  And that's why it's incredibly important to
23   us, and one court in the Fourth Circuit has said it is relevant,
24   and not only relevant but it's the defendant's duty to try to
25   get at the factual basis of these experts' opinion.  And the
```

 1  next case where a subpoena is issued -- oh, and the final thing

 2  is, when asked to produce this in the context of expert

 3  discovery, the witnesses have taken the position that it belongs

 4  to their employer and that you should go get it from their

 5  employer.  And then when you go get it from their employer they

 6  say, oh, no, it's not here, it's expert discovery, you should go

 7  get theirs.  To it's a game of whack-a-mole where it's shame on

 8  you if you don't try to discover your cases.  We have done both.

 9  At your suggestion we've gone and asked the employer to give us

10  the names of the litigation cases that you relied upon.

11          So Your Honor, it's is sort of dammed if we do, dammed

12  if we don't.  We can't get it from the expert, we can't get it

13  from the hospital, but they're still using it offensively.

14          THE COURT:  Again, Mr. Thackston, if you had Dr. Emory

15  as a witness or Dr. Maddox or Dr. Kradin, whoever the third

16  author was, it might be a different question.  But none of them

17  are involved in the Gref case.  And I agree with Ms. Ali and Ms.

18  Lockwood that the relevance question in evaluating the burden is

19  it's its importance to the parties in the case where the

20  subpoena was issued.  And I think you have ample way to

21  challenge the study given what it appears the way they appear to

22  be using it in the disclosed reports.

23          Now, if they use it different way, you know, that's,

24  you'll have to take that up with the trial judge if they're

25  misrepresenting what the study says.  I frankly don't think the

1  study goes that far.  It says may cause.  It specifically

2  discloses these were all litigation cases.  It specifically says

3  that this is a rare tumor and there's very little to be done and

4  more needs to be done to find out the answer.  And I frankly

5  think it's -- I understand your position that it's litigation

6  driven and maybe it is, but to the extent it is, that's evident

7  on the face of the document.

8            MR. THACKSTON:  Well, I'd like to -- what's not on the

9  face of the document is how much money were they making as

10  expert witnesses when they were just testifying on asbestos

11  cases and all the asbestos bankruptcies took place and

12  everybody's filing trust claims, and now that they've started

13  filing talc cases, how much money is Emory and Moline making,

14  and that's not routinely disclosed.  We fight like crazy to try

15  to get that stuff.

16            THE COURT:  But you can get it.  If they're testifying

17  you can get it.  It's clearly bias information.  And if you had

18  a motion here asking me how much Dr. Emory made and she was your

19  witness you would get it.  No question.  But she's not your

20  witness.  She's not against you in this case.

21            MR. THACKSTON:  That's being actively litigated in

22  many cases and it's not, it's not forthcoming.  It is very, very

23  difficult to get.

24            THE COURT:  All right.  Mr. Cook, do you want to -- I

25  do want to hear from you on the sanction question, Mr. Cook, or

1   Mr. Thackston.

2          MR. COOK:  Yeah.  Just very briefly, Your Honor.

3          First of all, with respect to -- Your Honor's pointed

4   to the article and said we can get everything we want from that.

5   I just want to be clear --

6          THE COURT:  I didn't say you can get everything you

7   want.  I just said there was something there.  There was a lot

8   there already.

9          MR. COOK:  What's not clear from that and something

10  that would be subject to this subpoena request that I don't

11  think has been addressed is whether or not Mr. Gref was an

12  individual that was ultimately excluded from the study because

13  he had other exposures.  That would be highly relevant to the

14  Gref case specifically, Your Honor, and something that the Court

15  could order in order to give us that piece of information at

16  least.

17         THE COURT:  I don't know why -- I'm not sure why that

18  would be relevant and why you couldn't get that from other

19  sources.  I mean, I looked at Request 9 through 18 on your

20  subpoena.  It's all about Mr. Gref.  Well, you've got Mr. Gref

21  and Mr. Gref's lawyers.  You've got all of his exposure.  You

22  can ask him anything you want to ask him, and I'm sure already

23  have.  So you know, you would not need to get that from a

24  third-party subpoena because you've got Mr. Gref.  He can tell

25  you.

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA1143**

1          MR. COOK:  Well, unless it was provided to one of the

2   authors of that study and they have information that wasn't

3   provide to us, Your Honor.

4          THE COURT:  But you could ask him, did you ever hire

5   Dr. Emory as a consultant in the case and he would have to tell

6   you if he did.  You can ask him that.

7          MS. LOCKWOOD:  And Your Honor, Dr. Emory and Dr. Smith

8   and Dr. Maddox have all already indicated that they're not

9   involved in the Gref litigation in any way.  So we already know

10  that.

11         But I think it's telling, Your Honor, when you Your

12  Honor asked for Mr. Cook or Mr. Thackston to respond to our

13  request for sanctions, we still have not heard a response to our

14  request for sanctions.  This is also what happened in the

15  briefing as you noted.  I think their response was also about

16  less than a page to this request.  And you know, as Your Honor

17  noted, Rule 45(d)(1) is different because it's not permissive,

18  it's mandatory.  It's mandatory that the court issue sanctions

19  when a subpoena is unduly burdensome and the issuing party

20  didn't take any reasonable steps to mitigate that burden.

21         And if you look at their briefing, the only issue that

22  they hit in any accurate detail is whether the subpoena imposed

23  an undue burden.  They rest on the same arguments that Your

24  Honor already dismissed, right, in finding that the opinion is

25  unduly burdensome.  So then when you look at whether or not they

 1  have taken any reasonable steps to mitigate the burden, it

 2  becomes quite clear that sanctions have to be issued here.  We

 3  asked for them to withdraw the subpoena.  This is the first

 4  we're hearing that they would take a list of the 75 or 140

 5  cases.  We've never heard that before.  And --

 6          THE COURT:  Although to be honest, if you had, you

 7  probably still would be here, right Ms. Lockwood?  I mean,

 8  that's the core of the dispute.  If they had told you all we

 9  want is the key we would still be arguing this motion, wouldn't

10  we.

11          MS. LOCKWOOD:  I think we would, Your Honor.  But I

12  think it shows that they've really taken no steps at all, and to

13  show up here on the day of the hearing and to spring that on us

14  is quite remarkable when our client has had to already expend

15  significant attorney's fees to litigate this, right?  We filed a

16  motion, they responded, they doubled down.  They filed 700 pages

17  in exhibits in opposition.  Do you think that, you know, was an

18  easy thing for us to reply to?  It took a lot of hours.  And our

19  client is on the hook for that now.  And the case law's clear

20  that, when a subpoena on its face is unduly burdensome, when it

21  never should have been issued in the first place, then literally

22  everything done in response to that is an undue burden or

23  expense that mandates sanctions under Rule 45(d)(1).  We haven't

24  heard anything from the other side that would suggest a

25  different result is appropriate here.

 1            THE COURT:  All right.  Do you want to respond to the

 2    sanctions issue under 45(d)(1), either Mr. Thackston or

 3    Mr. Cook?

 4            MR. THACKSTON:  Your Honor --

 5            MR. COOK:  Go ahead, Robert.

 6            MR. THACKSTON:  Yeah.  I was, it's not true that we --

 7    they talked about timeliness, they talked about all the kinds of

 8    things in their response that as strange -- I don't think you

 9    can have it both ways and say you're a stranger to the case and

10    then you urge a timeliness issue that the trial court has turned

11    down.  If it really was untimely, then the Gref court would have

12    said no, that's outside the scope of the discovery period in

13    this case and I'm not going to allow it.

14            MS. ALI:  Your Honor, could I respond on that?

15    Because that's actually addressed specifically in the hearing

16    that happened on Monday.

17            MR. THACKSTON:  The timeliness question?

18            MS. ALI:  We -- that's just not accurate.

19            On the timeliness question the court said -- what

20    happened is the court said I understand there's also a question

21    about timeliness.  I have the transcript right in front of me.

22    The counsel said there's a motion to quash pending in the

23    Eastern District of Virginia, and the magistrate judge said I'm

24    not going to deal with anything having to do with that subpoena,

25    I'm going to let the district court in Virginia deal with that.

1   It wasn't addressed, it wasn't rejected.  She said there is

2   already a motion to -- I understand there's already a motion to

3   quash, I'm not going to deal with it here.

4          THE COURT:  In other words she didn't say it was

5   untimely, she didn't say it was timely, she didn't address it

6   one way or the other?

7          MS. ALI:  Correct.  That's exactly right, Your Honor.

8          MR. THACKSTON:  If you believe that the discovery is

9   outside the time frame you can ask the trial court to quash a

10  subpoena and not to allow --

11         MS. ALI:  There was no motion pending before the court

12  asking for her to quash the subpoena, issue a protective order,

13  nothing.

14         MR. THACKSTON:  That's, that's --

15         MS. ALI:  That's correct.

16         MR. THACKSTON:  Judge, I didn't interrupt other

17  counsel.

18         THE COURT:  Okay.

19         MR. THACKSTON:  That's exactly my point:  That they

20  didn't go to the trial court because they know that discovery is

21  still open.  We're still dealing with it.

22         THE COURT:  They couldn't go to the trial court.  And

23  I was -- I actually should have asked that question at the very

24  beginning because I maybe could have avoided the whole thing.

25  Nobody asked to have this moved to the trial court.  Nobody --

1              MS. ALI:  No, Your Honor.

2              THE COURT:  -- asked under 45(f) to say send this up

3    to New York and let Judge Figueredo sort it out.

4              MS. ALI:  That's correct.

5              MR. THACKSTON:  All the arguments that they had in

6    their motion -- my point is they have all these arguments in

7    their brief about being outside the time limits of the trial

8    court.  Those arguments would be made to the trial court.

9    There's arguments made earlier this week with respect to Moline

10   and Northwell and the hearing was set in February, and the Court

11   said we're going to the to push things down the road, we're

12   going to hold this February 8th in person.  So that's -- those

13   arguments were, were irrelevant.

14             And we did say just tell us who the people are.  And

15   they say we can't tell you who the people are.  And so that

16   doesn't solve any of our problems.  There's nothing we can do

17   other than say when we need a ruling then, because we believe

18   that they're not protected in any way and that we don't believe

19   that imposes any burden whatsoever to just give us the

20   spreadsheet, and to say, well, you don't have releases in those

21   cases, well, that's circular.  We don't know what the cases are.

22   Obviously there are releases in those cases for medical

23   information or there wouldn't be lawsuits, right?  The only

24   question --

25             THE COURT:  Well, I don't know.  Any HIPAA waiver I've

1    ever seen in litigation is for the litigation only.  It

2    wouldn't, it wouldn't extend to the nature of any participation

3    in research or -- I mean, I don't know.  I don't know what the

4    nature of the relationship between Dr. Emory and Dr. Maddox and

5    the other doctors and these particular subjects were.  But Dr.

6    Emory has put in a sworn affidavit that says she has a ethical

7    duty to protect their confidentiality as research subjects.  And

8    you know, I don't see any kind of inherent untrustworthiness in

9    that statement.

10           MR. THACKSTON:  Well, but in the absence of a court

11   order to the contrary --

12           THE COURT:  Right.

13           MR. THACKSTON:  -- we made the same arguments, she

14   would be protected if there were a court order saying no, that

15   doesn't apply to litigation materials, you didn't go get

16   permission from those people, you didn't think you needed to

17   today get their permission to include them in the study because

18   you received their medical information only in the sense that it

19   was in depositions and interrogatory responses, if that's even

20   medical information.

21           In fact, if you look at the face, the reason I was

22   trying to go to the end of it, she said this was based on

23   depositions and interrogatory responses, and counsel's motion to

24   quash in this case doesn't say that.  It changes it and says

25   it's based on records from these people.  Well, a deposition is

48

1  not a record, and an answer to a interrogatory is not a record.

2  I think it's a little contortionist to take a deposition

3  transcript and call it a medical record and say that it's

4  entitled to protection and this is burdensome and we need to do

5  all this stuff we --

6          THE COURT:  Well, we're getting back to the arguments.

7          Mr. Cook, did you want to say anything more about the

8  45(d)(1) argument?

9          MR. COOK:  Yeah, I don't know there's much more to

10  say, Your Honor.  I do think the subpoena -- I know Your Honor's

11  already ruled on it -- but I do think the subpoena was intended

12  to be tailored to the Gref case.  Your Honor has indicated a

13  number of the requests that were specific to tailor and allow us

14  to cross-examine the experts with respect to that.  So that was

15  certainly the intent when it was propounded and we have

16  proposed, I think, a good-faith solution to reduce any potential

17  burden on Peninsula Pathology that would take minutes for them

18  to produce that list, and we would take on, A-I-I would take on

19  the burden of getting the additional information which --

20          THE COURT:  Was there any discussion of a protective

21  order when you were having that conversation with them?  Was

22  there any discussion --

23          MS. LOCKWOOD:  Your Honor, if I could, which

24  discussion are we referring to here?

25          THE COURT:  I'm assuming there was a meet-and-confer?

**JA1150**

1  There was a verbal meet-and-confer before the motion was filed,

2  or was it --

3          MS. LOCKWOOD:  We did meet and confer with them.

4  There was no request -- and I see Mr. Greve has joined on video.

5  He participated.  There was no request that we disclose the

6  names of the 75 people and start there.  That just did not

7  happen.  So if that's what's been suggested, I'm not sure where

8  it's coming from, Your Honor.

9          MR. GREVE:  Your Honor, again, Kirk Greve.  It's a

10  pleasure to meet you.

11          THE COURT:  Mr. Greve, who are you?  I don't have your

12  appearance in the case.  Who are you for?

13          MR. GREVE:  Yes, sir.  I'm here with Mr. Thackston and

14  A-I-I.  I was the attorney who participated in the

15  meet-and-confer.  You know, as you indicated there was a

16  conference.  We did visit about this.  And the meet and confer

17  really boiled down to a discussion of the timeliness issue.  We

18  didn't get into any substantive discussion of pare down or what

19  steps could be done next, because counsel all agreed that this

20  was all going to turn on the timeliness issue first.  And then

21  once we resolved the timeliness issue then we could sit there

22  and we could focus on what we could or cannot do.

23          Ultimately there was never any detailed discussion on,

24  you know, producing a chart, because as they explained, this was

25  all something that they viewed as being untimely

 1   fact-witness-driven and something that they weren't going to

 2   disclose as a result of that.  So that's what the focus of the

 3   meet-and-confer was.

 4          And then the spirit of it was there would be some type

 5   of follow-up or, you know, additional work where we may be able

 6   to get together and understand what certain limits were once we

 7   got through the timeliness issue.  Obviously, you know, that's

 8   something that we've just recently been dealing with.  So we're

 9   on a very expedited time frame, Your Honor.

10          THE COURT:  Okay.

11          MS. LOCKWOOD:  That's a little surprising to me that

12   that was their perspective of the spirit of the meet-and-confer,

13   so I think perhaps there was not a meeting of the minds.

14          On that I should also note, though, Your Honor, on the

15   same day that we filed a motion to quash, out of an abundance of

16   caution we served detailed objections where they could have

17   separately come back to us and tried to negotiate any of this,

18   or make any proposal.  And the fact is they didn't take any

19   steps at all, much less reasonable ones, and under

20   Rule 45(d)(1), that is what is required in order to avoid a

21   court's issuance of sanctions.

22          And everything that we've talked about here relates to

23   undue burden, the Court has already found the subpoena's unduly

24   burdensome.  That is the end of the inquiry.  It doesn't matter

25   if the Court decided it unduly burdensome for Reason A or Reason

 1  B.  What matters is the Court found it unduly burdensome, and so

 2  Rule 45(d)(1) requires that sanctions be issued.

 3          THE COURT:  Well, I disagree with that

 4  characterization of 45(d)(1).  I think it requires that I find

 5  that they failed to take steps, reasonable steps to avoid it

 6  being unduly burdensome.  I think you can take responsible steps

 7  to avoid it being unduly burdensome and still have a court find

 8  that it is unduly burdensome.

 9          But having said that, I do, I do agree with Ms.

10  Lockwood.  I don't find there were reasonable steps in this case

11  and I am going to award sanctions, because what it appears to me

12  is going on is that you are going to take -- you have taken an

13  opportunity where Dr. Emory and Maddox and Kradin, the authors

14  of the study, have very, very little to do with Mr. Gref's case.

15  There is no indication that Mr. Gref was a subject in this

16  study.  There is no identification of any of them as testifying

17  witnesses in the study.  And it seems as though you've taken

18  this opportunity to file a subpoena and ask another judge to

19  weigh in on the same questions that you've already gotten

20  negative answers to from multiple other judges in order to try

21  and pry open the survey.  And there's a very, very tenuous

22  connection to the Gref litigation that I find to be a very thin

23  reed on which to put the practice to the expense of defending

24  the subpoena.

25          So I do find that counsel failed to take reasonable

```
 1   steps to avoid the undue burden and I am going to order

 2   sanctions.

 3            So I'm going to issue a short written order granting

 4   the motion to quash.  I'm going to take the motion for sanctions

 5   under advisement, request that counsel submit to me a sworn

 6   statement of the fees incurred in defending the case.  I will

 7   say I'm not -- I don't intend to award all of the fees, because

 8   I do think there's some merit in the suggestion that a lot of

 9   this was hinged on the timeliness of the subpoena, and that is

10   not the basis of the Court's ruling.  If the only issue were the

11   timeliness, I probably would not find it unreasonably

12   burdensome.  If there were otherwise a narrowly tailored

13   subpoena and there was some significant degree of relevance, I

14   probably would have reached a different conclusion.

15            So I'll permit you to submit a request for fees with

16   appropriate affidavits supporting the fees that you incurred in

17   preparing the motion to quash and responding to the opposition.

18            I'll give you 10 days.  Is that sufficient time to

19   submit that?

20            MS. LOCKWOOD:  Yes, Your Honor.

21            THE COURT:  Or where is that going to put us?  I know

22   people have holidays coming up.

23            What is today, the 16th?  That's actually right at

24   Christmas.

25            This is what I'm going to do:  I'm going to go to
```

1  beyond the holidays because I'm hoping you all will get together

2  and work this out and I won't need to rule on this question, and

3  if you do, obviously just submit a statement to that effect.

4          But I'll give you till January 4th to submit that

5  statement and whatever brief you want articulating why those are

6  reasonable fees, and then I'll give you all two weeks to respond

7  to the statement.  That's January 18th.  And then I'll issue a

8  separate short order regarding the fees under 45(d)(1).

9          MR. THACKSTON:  Your Honor, I would ask you, just ask

10 that to the extent the Court's going to grant sanctions based on

11 the Court's statement that we had gotten a negative answer from

12 multiple other judges, I would certainly like to be put on

13 notice of what other judges ever gave us a negative answer.

14 Because this issue has not been before any other judge.  This is

15 the first time this issue's been argued as a discovery issue

16 that I'm aware of.  So if I'm going to get sanctioned --

17         THE COURT:  Well, it's my understanding is that Judge

18 Osteen said that you wanted the disclosure of names in the

19 Moline study and Judge Osteen declined to give you the

20 disclosure of any names other than Bell, which had already been

21 disclosed.

22         MR. THACKSTON:  Your Honor, as a point of negotiation,

23 during that case the magistrate judge indicated that she was

24 willing to order the discovery in the Bell case.  We, we just

25 pursued that and did not pursue the other ones.  That wasn't

1   specifically before Judge Osteen.  The only issue before Judge

2   Osteen was the issue of whether to unseal the pleadings.

3          So I'm sorry, Judge, the other rulings that you were

4   told about was a trial court objection to questions while

5   Dr. Moline was on the stand, and the court said we can't go too

6   far into that while allowing some questions about Mrs. Bell.

7          So I think that's been overstated and misrepresented

8   to the Court.  This has not come up before another judge.  The

9   Court has not been presented with any order where a court has

10  squarely considered as much as this court has considered

11  today -- and I respect the Court's decision -- but I don't think

12  that the Court has a clear understanding of whether any other

13  judge has ever done what you've done today.

14          THE COURT:  Okay.  I understand your argument.

15          MS. ALI:  I just want to correct the record.  This

16  issue was squarely litigated in Bell.  It's in the -- we didn't

17  submit the full transcript of the magistrate judge's hearing in

18  that case because there was already so much paper filed in the

19  court.  This is at Pages 83 and 84 of that transcript from 2020.

20  Mr. Thackston specifically asked for the identities of the other

21  32 subjects in the study.  The magistrate judge said I am not

22  going to allow that.  And it was repeated several times forward.

23  We cited the Fisher case in our briefing.  We cited the Johnson

24  and Lashley.  Whether it was in the context of a trial

25  transcript or a written order doesn't matter.  The issue was

1   squarely teed up for the court and it was squarely decided.

2          And we cited, I think it's Exhibit 1 to our reply

3   brief, a letter that was filed on the docket in the Gref case, I

4   think it's Pages 9 to 15 of that letter that walked through in

5   pretty significant detail all of the sort of history of A-I-I's

6   attempts to get this information the human subjects.  This is

7   mostly relating to Dr. Moline, not to Dr. Emory, maybe

8   exclusively to Dr. Moline because it was in the context of

9   briefing that issue where she is, of course, a testifying expert

10  in Gref.  But you know, the issue is the same:  Whether subjects

11  in a study should be revealed.  And in every one of those cases,

12  there are additional cased that we didn't cite and attach to the

13  brief.  I'm thinking Harpster, I know there are others, where

14  the court has said this is not appropriate.  It is not

15  appropriate to issue this information.

16          So I know we're way far -- you know, Your Honor has

17  already ruled --

18          THE COURT:  Right.  I have already ruled.  And I want

19  to be clear about the limitations of my rule.  I am not saying

20  that it would never be appropriate.  And as I've already

21  observed, this is not a case where Dr. Emory is testifying.  If

22  she were testifying, it might be a different question.  But she

23  has very, very little connection to the Gref litigation.  And so

24  when I observed what other judges had done, Mr. Thackston, I was

25  observing it in the context of those judges had cases where the

 1  experts were testifying in front of them.  They were going to be

 2  in front of the jury relying on these studies in front of a

 3  jury.  And that is not this case.  Emory is not going to be in

 4  front of the jury, and neither is Maddox.  And the study may be

 5  there with Dr. Moline, but you have Dr. Moline and you have the

 6  ability to explore the credibility of Dr. Moline's testimony

 7  with a jury and to depose her at length and challenge those

 8  things.

 9          But to use this case and this subpoena in a case where

10  Dr. Emory is just, has this very, very tangential connection to

11  it is what troubles me.  And I don't think there were sufficient

12  efforts to try and avoid the dispute that we've resolved here

13  today.  So I am going to entertain a request under 45(d)(1).

14  I've set the briefing schedule to conclude that.

15          As I said, if you all get together and work it out,

16  let me know.  I don't relish doing that, but I think Ms.

17  Lockwood is right:  The statute is different.  It's not, it's

18  not a sanction because of the Court's inherent power, it is

19  enforcement of discovery rules.  That's what the rules are there

20  for.  And so I am going to enforce 45(d)(1) and impose an

21  appropriate sanction; however, if you all agree to a resolution

22  before the briefing schedule or at any time, communicate that to

23  me and I'll simply dismiss the matter.

24          But I am going to enter a short order today taking

25  that under advisement but granting the motion to quash.  Okay?

```
 1   I mean, it probably will be Monday or Tuesday actually, not

 2   today.  But it will go out.  Okay?

 3           MR. THACKSTON:  The Court is granting the motion to

 4   quash, holding the question of whether --

 5           THE COURT:  I'm directing briefing, directing briefing

 6   and submission of attorney's fees to assess an appropriate

 7   sanction under 45(d)(1).

 8           MR. THACKSTON:  Right.  Thank Your Honor.

 9           MS. ALI:  Thank you, Your Honor.

10           THE COURT:  Okay.

11           MS. LOCKWOOD:  Thank you, Your Honor.

12           THE COURT:  All right.  Thank you all.

13           Anything else, Ms. Dodge?

14           COURTROOM DEPUTY CLERK:  No, sir.

15           THE COURT:  All right.  Thank you all.  Court will be

16   in recess.

17           (Whereupon, proceedings concluded at 3:57 p.m.)

18

19

20

21

22

23

24

25
```

58

1                          *CERTIFICATION*

2

3          *I certify that the foregoing is a true, complete and*

4    *correct transcript of the proceedings held in the above-entitled*

5    *matter.*

6    **Paul L.**          Digitally signed by Paul L. McManus,
                          OCR
7    **McManus, OCR**     DN: cn=Paul L. McManus, OCR, c=VA,
                          email=pmcmanusocr@gmail.com
                          Date: 2022.12.22 15:29:01 -05'00'

8              Paul L. McManus, RMR, FCRR

9                  _____

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA1160**

# Exhibit 2



now



May 12, 2022

Ms. Janelle Winters, Esq.
Landman Corsi Ballaine & Ford, P.C.
One Gateway Center, 4th Floor
Newark, NJ   07102

Ms. Julia Gowin, Esq.
Lathrop Gage LLP
1888 Century Park East, Suite 1000
Los Angeles, CA   90067-1623

Mr. Clint Hagaman, Esq.
Cosmich Simmons & Brown, PLLC
100 East RiverCenter Boulevard, Suite 480
Covington, KY   41011

Copley Square
607 Boylston Street
Suite 301
Boston, MA 02116
USA

**Phone: +1 857 444 9639**

www.cardnochemrisk.com
www.cardno.com
www.stantec.com

**Re: Brian J. Gref, Plaintiff, v. American International Industries, et al. (regarding Whittaker, Clark & Daniels, Inc., American International Industries, and Shulton, Inc.)**

Dear Ms. Winters, Ms. Gowin and Mr. Hagaman:

Thank you for requesting my epidemiological assessment of the above-referenced matter. It is my understanding that Plaintiffs allege that Brian Gref developed malignant peritoneal mesothelioma as a result of his personal use and his parents' use on him of various talcum powder products. These allegedly include products manufactured by Shulton Inc. and The Proctor & Gamble Company, and possibly containing cosmetic or pharmaceutical grade talc distributed by Whittaker, Clark & Daniels, Inc. or American International Industries.

The following report provides summaries of my credentials and basic epidemiological concepts and methods, as well as overviews of the peer-reviewed published literature on the causes of malignant mesothelioma and the possible relationship with talc and talcum powder. Based on my review and synthesis of the epidemiological evidence and my review of the case materials provided by Defense Counsel – combined with my experience of over 30 years as an epidemiologist – I offer several expert opinions which I hold to a reasonable degree of scientific and epidemiological certainty.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Kenneth A. Mundt, PhD, FACE
Senior Principal Health Scientist

**JA1162**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**Summary of conclusions and expert opinions**[1]

1. Epidemiological concepts and standard methods have been established for decades. Their proper use provides invaluable scientific analyses and perspectives in the process of evaluating and integrating evidence for purposes of determining preventable causes of human disease. Causal relationships identified from weight-of-evidence evaluations of the body of published epidemiological literature may be quantified in terms of exposure-disease relationships, i.e., risk assessment. Therefore, epidemiology serves as a primary basis for determining population risk and disease causation and by extension informs individual disease risk.

2. Malignant mesothelioma is a cancer arising from the layer of cells lining body cavities and organs, known as the mesothelium. Epidemiological studies clearly and consistently demonstrate that substantial occupational or environmental exposure to respirable amphibole asbestos fibers significantly increases the risk of pleural and to a lesser extent peritoneal malignant mesothelioma; however, as such exposure scenarios over time become rarer, increasingly lower proportions of diagnosed mesotheliomas validly can be attributed to asbestos exposure. Further, higher quality epidemiological studies demonstrate low or no risk (i.e., risks similar to background rates) of mesothelioma among those with the lowest exposures to amphibole asbestos. Based on the materials provided, I found no documentation that Mr. Gref sustained substantial exposure to amphibole asbestos from any source that would have placed him at increased risk of malignant peritoneal mesothelioma.

3. Other preventable risk factors for malignant pleural - and presumably peritoneal- mesothelioma include exposure to fibrous erionite or fibrous fluoro-edenite, therapeutic ionizing radiation, medical diagnostic procedures using injected thorium dioxide and possibly some infectious agents or chronic serosal inflammatory conditions. Nevertheless, there is no indication in the record that Mr. Gref had any of these risk factors.

4. A substantial and growing proportion of mesothelioma cases diagnosed in men in the US today is unrelated to amphibole asbestos exposure or other recognized risk factors. These mesothelioma cases are considered idiopathic, literally meaning "of unknown cause", and align with the role of unrepaired gene replication errors, but also may include undocumented or unrecognized causal factor(s) such as undiagnosed genetic susceptibility and unwitting exposure to substantial quantities of amphibole asbestos. Accordingly, and finding no clear evidence in the record that Mr. Gref ever had been exposed to substantial amounts of amphibole asbestos as well as his young age at diagnosis, I conclude to a reasonable degree of epidemiological certainty that Mr. Gref's malignant peritoneal mesothelioma is idiopathic.

5. Numerous epidemiological studies of groups including workers highly exposed to talc have been published and these were comprehensively identified and critically reviewed.

   a. A substantial body of published, peer-reviewed epidemiological studies of cohorts of talc miners and millers highly exposed to mineral talc dusts – with all accessory minerals and

---

[1] I provide here a summary of the conclusions and expert opinions I have formulated following my review of case materials and relevant scientific literature as presented in detail below. These conclusions and opinions – which I hold to a reasonable degree of scientific and epidemiological probability – are repeated at the end of the report.

**JA1163**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

      contaminants – does not demonstrate that such exposures cause malignant
      mesothelioma.

    b.  Studies following patients receiving pleurodesis treatments involving injections of talc
       directly into the pleural space do not demonstrate increased risk of mesothelioma.

    c.  Epidemiological cancer registry linkage studies also consistently demonstrate no
       increased risk of malignant pleural and peritoneal mesothelioma among hairdressers and
       barbers – who may be occupationally exposed regularly to talcum powder products.

    d.  There are no peer-reviewed published epidemiological studies specifically evaluating
       consumer use of talcum powders and risk of malignant mesothelioma.

Critical review and synthesis of the body of epidemiological studies directly addressing human
health risks associated with exposure to talc, with all accessory and contaminant minerals
present (even assuming trace levels of asbestos) do not scientifically substantiate – and therefore
refute – the claim that exposure to talc, or the use of talcum powder products containing such
talc, causes malignant mesothelioma.

6.  The allegations that Mr. Gref's and his parent's use of talcum powder products on him as a child
    somehow caused or contributed to causing his malignant peritoneal mesothelioma cannot be
    substantiated epidemiologically, i.e., based on human scientific evidence. Therefore, I conclude
    to a reasonable degree of scientific certainty that Mr. Gref's and his family member's alleged use
    of talcum powder products manufactured by Shulton Inc. or The Proctor & Gamble Company and
    possibly containing cosmetic or pharmaceutical grade talc distributed by Whittaker, Clark &
    Daniels, Inc. or American International Industries did not cause or contribute to his malignant
    peritoneal mesothelioma. Absent Mr. Gref's use of these products, even assuming they may have
    contained trace amounts of asbestos, his risk of malignant peritoneal mesothelioma would have
    been unchanged.

**Credentials**

7.  I hold a PhD in Epidemiology from the Department of Epidemiology, School of Public Health,
    University of North Carolina; a Master of Science (MS) in Epidemiology from the Department of
    Biostatistics and Epidemiology, School of Public Health, University of Massachusetts; a Master of
    Arts (MA) from the Department of English, University of Virginia; and a Bachelor of Arts (AB) from
    Dartmouth College.

8.  I have worked full-time as an epidemiologist for 35 years, first as a university professor and
    subsequently as a consultant. From September 1989 through June 1999, I served on the
    Graduate Faculty of the Department of Biostatistics and Epidemiology of the School of Public
    Health and Health Sciences (SPHHS), University of Massachusetts. In 1999 I joined Applied
    Epidemiology, Inc. (AEI) – a company I founded in 1991 – and in November 2003, AEI merged
    with ENVIRON International Corporation (ENVIRON). In 2015, ENVIRON merged with Ramboll,
    where I served as Health Sciences Global Practice Network Leader until July 2018. I joined Cardno
    ChemRisk in September 2018 as a Senior Principal Health Scientist. In 2021 I was named
    ChemRisk Fellow.

**JA1164**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

9. Since 2004 I have served as Adjunct Professor in the Department of Biostatistics and
Epidemiology at the University of Massachusetts and Charter Member of the Dean's Advisory
Board. I was appointed Associate Director for Institutional Engagement of the University's Global
Health Institute in 2018. I was appointed Adjunct Professor in the Department of Environmental
Health Sciences as well as Adjunct Professor in the Department of Epidemiology/Biostatistics,
Arnold School of Public Health and Health Sciences, University of South Carolina at Columbia, in
2016 and in 2018, respectively. I also serve on the Boards of the American University of the
Caribbean, Les Cayes, Haiti, and two US 501(c)(3) non-profit organizations.

10. I am a Fellow in the American College of Epidemiology (FACE) and member of the American
College of Epidemiology Ethics Committee. In July 2016, I was appointed Secretary General of
MEDICHEM, the international scientific association for occupational and environmental medicine
and health in the production and use of chemicals. I currently serve as Advisory Editor for three
peer-reviewed scientific journals: International Archives of Occupational and Environmental
Health; Archives of Industrial Hygiene and Toxicology; and Journal of Public Health and
Emergency. I am a member of the Executive Committee of the Dose-Response Society, which
publishes the journal, Dose-Response. I regularly peer review papers submitted to these and
numerous other medical and health professional journals.

11. My scientific research and professional evaluations focus on identifying and quantifying human
health risks related to occupational, environmental and consumer product exposures, typically
leading to publication in peer-reviewed health and medical journals. This work typically involves
critical review and synthesis of epidemiological findings and integrating this with evidence from
exposure science, animal toxicology, and biological mechanisms of disease to improve scientific
understanding the complex relationships between these exposure and risk of various diseases. I
have provided epidemiological and human health risk evaluations to corporations, trade
associations, governmental entities (including the US DoD and US EPA), institutions for statutory
accident insurance and prevention (e.g., German Berufsgenossenschaften), inter-governmental
organizations (e.g., the World Bank) and law firms. I have testified before legislative and
regulatory bodies (including OSHA and US Congress) on human health risk matters.

12. My curriculum vitae, included as Attachment A, provides a more detailed summary of my
professional activities, as well as a complete list of my publications. A listing of my prior
testimony in the last four years is included as Attachment B. My firm's rate sheet is included as
Attachment C, and my time is billed at $475 per hour.

**Principles of epidemiological methods and perspectives**

13. Epidemiology is the basic science of public health practice. Epidemiology uses measures such as
the incidence, prevalence and distribution of diseases in populations, and compares these across
otherwise comparable groups with different exposure and risk factor profiles to identify and
evaluate factors that may be related to disease risk. Methods are employed to identify and
interpret statistical correlations or "associations" between various exposures or other risk factors
for disease and disease occurrence or "risk." Epidemiological methods have been standardized
for many years and are well described in numerous classical textbooks such as Hennekens and
Buring (1987), Checkoway, et al. (2004) and Rothman (1986). Understanding and interpreting
epidemiological study findings in light of all the conceptual, methodological and interpretational
challenges constitute the "art" of epidemiology.

3

## JA1165

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

14. Epidemiological methods are broadly applied in understanding health and disease in populations, but also inform risks at the individual level. For example, clinical epidemiological trials and post-marketing epidemiological studies are used to determine the efficacy and side effects of new pharmaceutical agents.  Physicians use this information to decide whether a drug is likely to benefit specific patients sufficiently to outweigh any risk of dangerous side effects. However, the actual outcome – beneficial or dangerous side effects – for a specific patient is not known in advance, as the epidemiological evaluations are conducted on groups of individuals and not that patient. Similarly, and by extension, the relationships observed in epidemiological studies provide information on the probabilities of disease in groups that can inform professional decisions regarding similarly situated individuals.

15. There are two basic observational approaches used in epidemiology to evaluate possible associations between risk factors and disease: cohort studies, in which disease rates are compared between groups of exposed persons and groups of unexposed persons; and case-control studies, in which exposure history among individuals with disease ("cases") is compared with exposure history among individuals without the disease ("controls"). Each approach has specific strengths and weaknesses. For example, cohort studies can directly observe rates of disease, and because cohort studies can characterize exposure before disease occurs, recall bias (the tendency of people diagnosed with a disease to recall exposures different or more thoroughly than those not similarly diagnosed) is avoided. However, the number of exposures or risk factors that can be considered is often limited, and the time and costs required may be prohibitive. On the other hand, case-control studies often can be conducted quickly and consider simultaneously numerous exposures or risk factors; however, information on historical exposures obtained from participants in case-control studies is subject to recall bias, and these studies cannot directly determine rates of disease in the study groups or the underlying population. Furthermore, underlying differences between the cases and controls or the differential participation of exposed cases or other selection bias may generate associations that do not validly reflect causal relationships.

16. Relative risk is estimated and interpreted differently for cohort and case-control studies but is generally considered an indicator of the strength of association or correlation between the exposure or risk factor and the disease outcome of interest. It is estimated in cohort studies as the ratio of the rate of disease (i.e., risk) among the exposed and the rate of disease among the unexposed. In cohort studies, this measure of relative risk may be reported simply as the "relative risk" among exposed participants compared to unexposed participants, or it may be reported as a standardized incidence ratio, standardized mortality ratio, or standardized rate ratio. Relative risk is estimated in case-control studies as the ratio of exposure odds (the "odds ratio") among cases compared with controls. Larger relative risk (or odds ratio) may indicate a strong statistical correlation but does not itself indicate whether this reflects a true causal association or some other statistical correlation arising from methodological error ("bias") or simply random error ("chance"). Most relative risks are small (i.e., less than two) and more likely to reflect the effects of bias, confounding or chance (see below).

17. Observational studies that utilize aggregate or population-level data as the unit of analysis rather than individual-level data often are called "ecological" studies. These studies most commonly are used to describe disease incidence or prevalence, particularly when the disease of interest is rare. Ecological studies also may be useful in generating hypotheses, but they are limited in their ability to account for confounding factors and often require the use of proxy measures of

4

**JA1166**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

exposure and outcome. Further, because individual exposures and risk factors are unknown, their results cannot directly address individual-level associations between a specific exposure and health outcome. Inaccurately interpreting the results of an ecological study that reports an aggregate-level association between and exposure and outcome as evidence of an individual-level association is referred to as "ecological fallacy."

18. Case reports and case series are descriptive presentations that usually characterize exposure and disease in a single case or several individuals. They are not epidemiological studies because they lack a valid comparison group and therefore rates of disease in exposed and unexposed groups (or frequency of exposure in diseased and non-diseased groups) cannot be compared to derive an estimate of relative risk. Cases typically represent unusual or novel observations in an undefined source group or population and results therefore cannot be generalized, i.e., validly applied to other individuals or circumstances. Thus, case reports and case series may be useful in generating hypotheses that can be tested using appropriate epidemiological study designs but are of little use in assessing causality.

19. When diseases and/or exposures are classified imprecisely or erroneously, misclassification occurs, which can result in biases that distort the apparent association between exposure and the disease outcome of interest. For true causal agents, misclassification often results in overestimating risk at low exposures and the underestimating risks at higher exposures. Bias also arises from any number of other sources, e.g., selective participation of certain subsets of individuals can lead to selection bias, survival bias, volunteer bias, etc. and low response rates or systematic errors in measured data can lead to information bias, recall bias, social acceptability bias, etc. Additionally, the mixing of possible effects of other strong risk factors for the same disease with the exposure(s) of interest leads to confounding bias, and interaction (i.e., non-independence of the effects of a risk factor). Confounding bias leads to inaccurate measurement of the association between the primary exposure of interest and the outcome, either diminishing or inflating the estimated effect.

20. Results of occupational studies comparing workers to a general population may be viewed by some as unreliable due to a so-called "healthy worker effect." Differences between workers and the general population can and do arise due to the selective hiring and retention of healthy or fit workers and is seen primarily for cardiovascular diseases when disease patterns for these workers are compared with those of the general population. For cancer outcomes, however, such an effect is expected to be minimal or non-existent, except, e.g., for lung (or other smoking-related) cancers in occupations where smoking is more prevalent than in the general population. Most cancers occur at older ages and any future cancer risk would not influence workers' likelihood of being hired:

> Many investigators have argued that the HWE is of little or no consequence in interpreting data on cancer mortality. The reason for this is that it is unlikely that factors predicting eventual cancer deaths would be presented at 20 years of age, when many people become employed, which may not be true for factors that predict other causes of death. In other words, most cancers are not associated with a prolonged period of ill-health that would affect employability for a long time before death occurred (Li and Sung, 1999).

5

# JA1167

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Furthermore, in higher-quality occupational cohort studies, workers meeting a minimal employment criterion (such as one year) are followed until the end of the study or death – whichever occurs first – regardless of occupational status.

21. Disease induction and latent periods are epidemiological concepts that are important for properly evaluating the timing of relevant exposure. The "induction period" for a disease refers to the interval between an individual's first exposure, or the first occurrence of physiological damage, and the onset of a disease process. The "latent period" is the interval between the physiological onset of disease and its detection due to overt symptoms or medical diagnosis. The induction and latent periods are not observable or measurable but are estimated as the time from first known exposure to the date of diagnosis, i.e., the maximum possible induction and latency. In the case of chronic diseases, and especially solid tumor cancers, the induction and latent periods can span decades. If the induction or latent periods are not properly accounted for in the design of an epidemiological study, then the measured or estimated exposures will be biased and may be irrelevant to disease risk, no matter how accurately measured.

22. Interpretation of epidemiological evidence also must consider the role random error or chance plays in statistical analyses. Epidemiologists evaluate the probability that an observed result may be due to chance alone by applying tests of statistical significance and the necessary assumption that the results are not products of systematic error or bias. Statistically significant results do not imply or indicate causation and, by definition, some proportion (typically 5%) of statistically significant results is expected to arise simply due to chance.

23. Establishing causation generally requires the systematic critical review and synthesis of the epidemiological, toxicological and disease mechanistic evidence, combined with a quality-based, weight-of-evidence integration across these lines of inquiry. The International Agency for Research on Cancer (IARC) uses this approach for classifying carcinogens (IARC 2006) as do US government agencies such as the Office of Health Assessment and Translation (OHAT) – part of the National Toxicology Program of the National Institute for Environmental Health Sciences – and the Integrated Risk Information System (IRIS) of the US Environmental Protection Agency (NTP 2019; EPA 2018). A quality-based weight-of-evidence approach assigns greater weight to high-quality studies than to weaker or clearly biased studies, which may be given much less weight or excluded. Key to the synthesis of epidemiological evidence is consideration of the strength and consistency of epidemiological evidence across high-quality studies performed using different methods and diverse populations. Results from any single observational study, no matter how compelling, are insufficient to demonstrate a causal association.

24. Where individual exposures can be quantified accurately and validly associated with disease risk, epidemiological evidence also can help determine the shape of the exposure- or dose-response relationship and can be used to derive estimates of disease risk at various levels of exposure. Such quantitative risk assessments or risk evaluations often provide the basis for setting risk-based exposure limits for exposure in the workplace and the environment, and in establishing the safety of consumer products and ultimately preventing disease. With better understanding of dose-response relationships and underlying disease mechanisms, the linear-no-threshold (LNT) assumption of dose-response is increasingly replaced with more accurate and refined characterizations (Rhomberg et al. 2011; Bogen 2016; Bevan and Harrison 2017).

**JA1168**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**The epidemiology of cancers**

25. Cancers include many diseases with common characteristics including irreversible or unrepaired genetic damage and uncontrolled division of the abnormal cells. Cancers originate in many different cells, tissues and organs, and can metastasize, or spread to other cells, tissues, and organs (ACS, 2021). Cancer sites with the highest rates in the United States include female breast, lung and bronchus, prostate, colon and rectum, melanoma of the skin, bladder, non-Hodgkin lymphoma, kidney and renal pelvis, uterus and leukemias (ACS, 2021).

26. For many known carcinogens, the dose-response relationship is not linear and may be described more accurately in terms of a threshold, biphasic or other exposure-risk function. For example, cadmium and cadmium compounds, nickel compounds, crystalline silica and formaldehyde all are genotoxic carcinogens associated with exposure thresholds (Bevan and Harrison, 2017). Where dose-response data are lacking for low exposure ranges where risks may be absent or too small to be detected, the conservative LNT assumption often is invoked as the default (and simplest) model. This is fueled by a persistent belief in the LNT and at its extreme the notion that "a single molecule" or "a single fiber" can trigger the carcinogenic process. However, the LNT model often masks or mischaracterizes true dose-response relationships, especially epidemiologically where risks observed at high exposure levels are extrapolated to lower exposures where increased risks have not been observed. Therefore, the lack of an observed threshold effect from exposure to any carcinogen may arise simply from the inappropriate application of the LNT risk model. The appearance of increased risk at very low levels of exposure to a cancer hazard also arises due to exposure misclassification.

27. Asbestoses appear to be among the carcinogens that demonstrate exposure thresholds. IARC (2012) notes "substantial controversies" regarding quantification of the risks between asbestos exposure and lung cancers including "whether there is a risk at low levels of exposure (i.e., environmental exposure)." Cox and colleagues developed a physiologically based pharmacokinetic (PBPK) model combined with an inflammation-driven two-stage clonal expansion model of carcinogenesis to describe asbestos exposure thresholds for mesothelioma and lung cancer. The threshold model aligned with the observed activation thresholds of NLRP3 inflammasomes, which in sufficient concentrations cause chronic inflammation. The authors emphasized that "low concentrations of asbestos do not trigger chronic inflammation and resulting increases in cancer risk observed at higher exposure concentrations" (Cox, 2019, p. 12). Although evidence of exposure thresholds for asbestos exposure and mesothelioma and lung cancer is mounting, the available data do not allow accurate or precise quantification of these thresholds.

28. There is a common but erroneous belief that cancers primarily are caused by chemical exposures, whether in the workplace, in the environment or from consumer products, regardless of the actual exposure levels. However, occupational and environmental exposure to chemical carcinogens has been estimated to cause or contribute to causing only a small proportion of all cancers (Doll and Peto 1981). Accordingly, a substantial proportion of human cancers arises due to other causes, especially the lifetime accumulation of random mutations in normally dividing stem cells (Moolgavkar et al. 2017). Advances in molecular biology have elucidated the fundamental influence of acquired genetic and epigenetic changes on cancer risk (Tomasetti and Vogelstein 2015; Tomasetti et al. 2017). More specifically, evaluations of biological mechanisms underlying cancers suggest that "only a third of the variation in cancer risk among tissues is

7

**JA1169**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

attributable to environmental factors or inherited predispositions" (Tomasetti and Vogelstein 2015), and the remaining two thirds result from random errors occurring during normal stem cell divisions. The authors concluded:

> [T]hese studies provide a well-defined, molecular explanation for the large and apparently unpreventable component of cancer risk that has long puzzled epidemiologists. It is, of course, possible that virtually all mutations in all cancers are due to environmental factors, most of which have simply not yet been discovered. However, such a possibility seems inconsistent with the exhaustively documented fact that about three mutations occur every time a normal cell divides and that normal stem cells often divide throughout life (Tomasetti et al. 2017).

29. While many site-specific cancers are relatively rare, all cancer sites combined represent the second most common cause of the death in the United States (ACS, 2021). According to the American Cancer Society, approximately one in three people in the United States will develop some form of cancer in their lifetime (ACS, 2019a). This is not surprising as aging dramatically increases the risk of most cancers, consistent with increasing rates and accumulation of spontaneous genetic changes with age (Laconi et al. 2020). Specifically, most cancers have very similar temporal incidence dynamics and despite their cell origins, demonstrate "approximately the same fractional increases in incidence with age" attributed to the changing cellular environment of aging somatic cells (Rozhok and DeGregori 2019). DNA methylation is one of the key mechanisms underlying the association between cancer and aging (Dugue et al. 2020; Takeshima and Ushijima 2019). A prospective cancer epidemiology study reported that cancer risk overall increased 4-9% for every 5-year "age acceleration" in methylation (Dugue et al., 2020). Thus, the independent role of aging cells (and the accumulation of genetic damage and epigenetic alterations) contributing to increased cancer rates aligns with the epidemiological observation that the risk of most cancers increases with age, independently from potential environmental causes or risk factors.

30. Furthermore, nearly all cancers have multifactorial etiologies, meaning that many different causes and risk factors combine to contribute to the disease process (ACS, 2019a). These factors include inherited genetic traits; effectiveness of clearance or metabolism of toxins and pathogens (including the impact of co-morbidities); natural (e.g., immunological) defense mechanisms; exposures to sufficient quantities of physical, chemical or biological hazards (or combinations); numerous behavioral, physical and mental stressors; and unrepaired spontaneous genetic replication errors that accumulate with age. For most cancers, determining epidemiologically whether any of these factors are true causal factors, co-causal factors or surrogates for causal factors remains difficult if not impossible.

31. Diseases of unknown origin or cause are considered idiopathic. Lexico defines "idiopathic" as "[r]elating to or denoting any disease or condition which arises spontaneously or for which the cause is unknown."[2] Accordingly, idiopathic cancers may arise spontaneously or due to some unrecognized or unknown causal factor. Among individuals with a specific cancer, some proportion (depending on the prevalence of the exposure) will have historical exposures to

---

[2] https://www.lexico.com/en/definition/idiopathic "Lexico.com is a new collaboration between Dictionary.com and Oxford University Press (OUP) to help users worldwide with everyday language challenges."

**JA1170**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

cancer hazards that occurred independently of the disease and played no role in its development (i.e., coincidental exposures), and some proportion will have none. Greenland (2014) wrote "people who have the exposure can develop the disease from a mechanism that does not include the exposure" and presented the following example: "a smoker may develop lung cancer through some mechanism that does not involve smoking (e.g., one involving asbestos or radiation exposure, with no contribution from smoking). For such lung-cancer cases, their smoking was incidental; it did not contribute to the cancer causation" (Greenland 2014). This concept helps explain, for example, that as smoking prevalence in the US has declined over several decades, rates of small and squamous cell lung cancers (i.e., the cancer types most strongly associated with smoking) also have dropped. In contrast, rates of lung adenocarcinoma (the major lung cancer type least strongly associated with smoking) have remained stable in men and have increased in women (Meza, et al. 2015). Temporal trends in lung cancer mortality among smokers and non-smokers indicate that "age-adjusted mortality for lung cancer in never smokers is increasing among males and females despite decreasing mortality rates for lung cancer overall since 1997" (Hosgood et al. 2020). This might reflect improved diagnostic acuity leading to the identification and treatment of more cancers that may be idiopathic, or at least acknowledged to be unrelated to smoking. A recent genetic epidemiological study of 232 lung cancer cases in never smokers revealed distinct mutational signatures arising from natural or endogenous processes, further illustrating how the accumulation of mutations leads to cancer development (Zhang et al. 2021). A similar pattern is becoming increasingly clear for mesotheliomas, where diagnostic acuity and accuracy have improved detection and where greater proportions of diagnosed cases have no significant amphibole asbestos exposure.

**Review approach**

32. I have reviewed the epidemiological literature on the risk factors and causes of malignant mesothelioma, including malignant mesothelioma of the pleura and peritoneum.

33. Occupational epidemiological studies of workers exposed to asbestos and mesothelioma risk were reviewed to determine the exposure conditions associated with increased risk of mesothelioma. To cover the wide range of potential occupational exposure scenarios, studies in the primary asbestos industries, i.e., mining or milling of raw asbestos or manufacturing asbestos-containing materials, as well as secondary asbestos industries, i.e., thermal insulators, shipbuilders and other trades using or manipulating asbestos-containing products were identified and reviewed. Historically, industrial talc and asbestos have been used in some of the same industries or for some of the same purposes, e.g., stiffening rubber products (IARC 2010). Consequently, studies of workers in settings where talc and asbestos have been used concurrently (e.g., rubber and ceramics industries) are not useful for differentiating the risks individually associated with asbestos or talc and were not reviewed.

34. I also have evaluated the peer-reviewed, published epidemiological literature specifically on mesothelioma risk among talc miners and millers highly exposed to mineral talc as well as other occupational groups likely exposed intermittently or to lesser quantities of talcum powders containing cosmetic-grade talc (i.e., hairdressers and barbers).

35. My comprehensive evaluation of the published epidemiological literature on talc exposure and risk of mesothelioma required the identification and screening of published primary research studies as well as reviews of the scientific literature. Searches of the published primary research

JA1171

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

studies were performed using PubMed, a search engine provided by the US Library of Medicine (NLM) that allows free access to the NLM database of indexed citations and abstracts for medical literature published since about 1966. The following search terms were included in various combinations: "epidemiology," "mesothelioma," "pleural," "peritoneal," "cancer," "pleurodesis," "talc," "talcum," "hairdresser," "barber," "occupation," and "exposure assessment." Abstracts were screened for relevance, and full versions of relevant publications obtained and reviewed.

36. I have utilized standard and widely accepted methods for critically reviewing and synthesizing the scientific literature, and formulated my scientific opinions and conclusions based on this assessment. In addition to the relevant peer-reviewed, published epidemiological literature, I draw upon my education, training and professional experience to formulate my professional opinions and conclusions, which I hold to a reasonable degree of scientific and epidemiological certainty.

**Review of the epidemiological literature on exposure to asbestos and risk of malignant mesothelioma**

**A. Overview of the characteristics and toxicity of asbestos fibers**

37. "Asbestos" or "asbestiform minerals" are common terms for several naturally occurring mineral silicates from the serpentine and amphibole groups specifically in the crystalline fiber, i.e., "asbestiform" habit. These same silicate minerals can also occur in a non-fibrous or "non-asbestiform" habit, including elongate cleavage fragments, which are not asbestos (IARC 2012). The table below, adapted from Lippmann (2014) summarizes the mineral names, differentiating constituents and primary geographical sources.

| Commercial fiber name | Mineral name | Mineral group | Major cations within the silicates |
|---|---|---|---|
| Chrysotile | Chrysotile | Serpentine | Mg, Fe |
| Crocidolite | Riebeckite | Amphibole | Na, Mg, Fe |
| Anthophyllite | Anthophyllite | Amphibole | Mg, Fe |
| Amosite | Grunerite | Amphibole | Fe, Mg, Mn |
| Actinolite | Actinolite | Amphibole | Ca, Fe, Mg |
| Tremolite | Tremolite | Amphibole | Ca, Mg, Fe |
| | Winchite | Amphibole | Ca, Mg, Fe |
| | Richterite | Amphibole | Ca, Mg, Fe |

Chrysotile, actinolite, anthophyllite and tremolite are generally encountered as asbestiform minerals, and are grayish white.
Actinolite *asbestos* is found as a contaminant of amosite from South Africa.
Amosite is the asbestiform version of grunerite, and is brown.
Anthophyllite *asbestos* was mined and commercially used in Finland.
Crocidolite is the asbestiform version of Riebeckite, and is blue.
Tremolite *asbestos* is exploited commercially in Korea, and is a contaminant in some chrysotile ores and in vermiculite mined in Libby, Montana.
Winchite and Richterite are the major asbestiform contaminants of vermiculite ore mined in Libby, Montana.

38. Asbestos fibers in general display excellent tensile strength; flexibility; and resistance to thermal, chemical and biological degradation, which made them popular for many applications including

10

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

fire protection and energy conservation (ATSDR 2001; Virta 2002; Virta 2005; NIOSH 2011; IARC 2012).

39. Because of its widespread historical use and natural occurrence, human exposure to asbestos is ubiquitous. Asbestos fibers in air come from natural sources such as the erosion of rock or soils containing asbestos and from the disturbance of manufactured products containing asbestos. According to the US Agency for Toxic Substances and Disease Registry (ATSDR), "Low levels of asbestos that present little, if any, risk to your health can be detected in almost any air sample. For example, 10 fibers are typically present in a cubic meter (fibers/m$^3$) of outdoor air in rural areas. (A cubic meter is about the amount of air that you breathe in 1 hour). . . Typical levels found in cities are about 10-fold higher" (ATSDR 2001). However, risk of mesothelioma among women appears not to differ across rural-urban gradients, suggesting that these levels are too low to influence risk (Glynn et al. 2018). Analyses of SEER data for malignant pleural mesothelioma indicate that "female urban and female rural incidence rates remained relatively constant from 1973 to 2012." The authors note that the 10-fold differences in ambient air concentrations of asbestos around the country are too small to influence the observed risk of mesothelioma (Glynn et al. 2018).

40. Chrysotile is the only member of the serpentine group, and the one used historically in the greatest quantity in the US. Inhaled chrysotile fibers readily break down as they are susceptible to dissolution whether engulfed by macrophages via the process called phagocytosis or degraded externally (Churg and Wright 1994; Bernstein and Hoskins 2006; Craighead and Gibbs 2008; Bernstein et al. 2013). Chrysotile fibers detected in tissue samples likely reflect recent exposures (Churg and Wright 1994; Bernstein and Hoskins 2006; Craighead and Gibbs 2008; Bernstein et al. 2013).

41. The amphibole group of minerals consists of crocidolite ("blue asbestos" or riebeckite asbestos), amosite ("brown asbestos" or grunerite asbestos), tremolite, anthophyllite and actinolite (Virta 2002; Bernstein et al. 2003). Predominately crocidolite and amosite asbestos have been mined commercially, but sometimes the other types of asbestos are present as contaminants of other extracted minerals (Virta 2002; Roggli and Oury 2004). Unlike serpentine fibers, which are softer and curly, amphibole asbestos fibers are rigid and rod or needle-shaped (ATSDR 2001; Virta 2002; Virta 2005; NIOSH 2011; IARC 2012; Bernstein et al. 2013).

**B. Overview of the epidemiology of malignant mesothelioma**

42. Malignant mesothelioma is a form of cancer arising from the layer of cells lining body cavities and organs, known as the mesothelium (ACS, 2019b). There are three main cell variations: epithelioid (accounting for more than 50%), sarcomatoid (about 10% to 20%) and mixed (or biphasic) (about 20-30%), and each cell variation has subtypes (ACS, 2019b; Carbone et al. 2019). Mesothelioma mainly occurs in the pleura (about 75%) (International Classification of Diseases, 10th Revision (ICD-10): C45.0), i.e., originating from cells surrounding the lungs, followed by the peritoneum (ICD-10: C45.1), originating from the abdominal lining (ACS, 2019b). As with many cancers, mesothelioma can spread to adjacent tissues or metastasize to more remote locations. Other primary or metastatic cancers at any of these sites can resemble mesothelioma and mistakenly be diagnosed as primary mesothelioma:

11

**JA1173**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

> When the diagnosis of mesothelioma is based on histologic features alone, primary mesothelioma may resemble various primary or metastatic cancers that have directly invaded the serosal membranes. Some of these metastatic malignancies, particularly carcinomas and sarcomas of the pleura, pericardium and peritoneum, may undergo desmoplastic reaction in the pleura, thereby mimicking mesothelioma, rather than the primary tumor (Kerger et al. 2014)

It should be noted that prior to the implementation of the 10th revision to the International Classification of Diseases (ICD-10) in 1999, deaths due to malignant mesothelioma may have been misdiagnosed or misclassified. Thus, historical epidemiological studies generally relied on the broader categories of "pleural cancers" (of which mesothelioma is the largest member) or "peritoneal cancers." These broader categories often included metastatic cancers, and possibly benign conditions, of unknown origin (Fordyce et al. 2019).

43. Synthesis of the body of epidemiological studies demonstrates that substantial exposure to commercial amphibole asbestos (i.e., crocidolite and amosite) is the most important and preventable cause of malignant pleural mesothelioma, and to a lesser extent, peritoneal mesothelioma. The greatest risks have been reported among groups highly exposed several decades prior to disease development (Rake et al 2009, Hilliard et al. 2003, Sluis-Cremer et al. 1992, Berry et al. 2012, Luberto et al. 2019). Increased risk of mesothelioma also has been associated with substantial environmental exposure to asbestos including naturally occurring asbestos, neighborhood exposure to mining operations, household exposure to family members contaminated occupationally with asbestos, and other domestic sources (Newhouse and Thompson 1965; Magnani et al. 2001; Marchevsky et al. 2006; Metintas et al. 2008; Pintos et al. 2009; Mirabelli et al. 2010; Liu et al. 2017; Noonan 2017).

44. In recent years in the US, the annual incidence of malignant mesothelioma for all sites combined, but predominantly pleural mesothelioma, is approximately one per 100,000 (Henley et al. 2013; Howlader et al. 2020). Given the overall rate of all cancers in the US of 442.4 per 100,000 for 2013-2017, mesothelioma represents only 0.2% of all cancers (Howlader et al. 2020). Peritoneal mesothelioma is much rarer and has an estimated age-adjusted rate of one per 1,000,000 (Moolgavkar et al. 2009). Proportionately, peritoneal mesothelioma occurs more frequently in women (22.8% of mesothelioma) than in men (6.4% of mesothelioma) (Price and Ware 2009). Rarer sites, accounting for less than 1% of all mesotheliomas, include the pericardium (lining of the heart) (ICD-10: C45.2) and the tunica vaginalis (lining of the testicles) (ICD 10: C45.7, Mesothelioma of other sites) (Mezei et al. 2017).

45. Based on the US National Cancer Institute's Surveillance, Epidemiology, and End Results Program (SEER) data, time trends reveal that between 1973-2013 the rate of malignant pleural mesothelioma in men initially increased before beginning to decrease in the mid-1990s, likely reflecting reduced use of amphibole asbestos and improved workplace exposure controls in the preceding decades (Moolgavkar et al. 2017). Trends in the age-adjusted incidence rates of malignant pleural mesothelioma in women during 1973-2013 remained remarkably stable, likely reflecting the lower probability of occupational exposure to amphibole asbestos compared to men (Moolgavkar et al. 2009; Moolgavkar et al. 2017). These results are consistent with results for mesothelioma (all locations combined) reported by the US National Cancer Institute, showing a clear rise and decline among men in contrast with stable rates in women (see Figure reproduced below from Howlader et al. (2020)).

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Figure 17.1



## Mesothelioma
### SEER Incidence, 1975-2017
### All Races, By Sex

Source: SEER 9 areas. Rates are age-adjusted to the 2000 US Std Population (19 age groups - Census P25-1103).
Regression lines are calculated using the Joinpoint Regression Program Version 4.8, April 2020,
National Cancer Institute.

46. The rates of peritoneal mesothelioma (all types) in both men and women in the US have
remained relatively stable over the years 1973-2013 (Moolgavkar et al. 2017). As Moolgavkar
(2009) noted specifically for peritoneal mesothelioma for men and women, "this observation
suggests that asbestos exposure was responsible for only a minor fraction of peritoneal
mesotheliomas in SEER over the period 1973–2005." The same was observed in updated analyses
(Moolgavkar et al. 2017). Further, Hemminki and Li (2003) reported similar age-specific rates of
malignant peritoneal mesothelioma among women and men in Sweden from 1961-1998,
consistent with the trends reported by Moolgavkar et al. (2009). In Norway, age-standardized
incidence rates for peritoneal mesothelioma were consistently below 0.08 per 100,000 from
2000 to 2019, leading the authors to conclude that "the association with asbestos exposure is
less clear, and the stable and very low incidence rate substantiates this notion" (Brustugun et al.
2021).

**C.   Overview of asbestos and other known risk factors for malignant mesothelioma**

47. Occupational studies of asbestos exposure and malignant pleural and peritoneal mesothelioma
risk demonstrate positive exposure-response relationships, with substantially elevated risks

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

reported among those exposed at higher levels of amphibole asbestos and low or no risk observed among those with the lowest exposures (Albin et al., 1990; Bang et al., 2006; Finkelstein, 1984; Hilliard et al., 2003; Pukkala et al., 2009; Rake et al., 2009; Rolland et al., 2010; Sluis-Cremer et al., 1992; Talcott et al., 1989; Till et al., 2018; Petersen 2020). This is illustrated by a study of about 114,000 US veterans, including US Navy personnel, with followup for mortality through 2010 (Till et al. 2018). Historically, asbestos exposure among some maritime – including US Navy – personnel may have been very high given the large quantities of asbestos-containing insulation, primarily amosite, applied throughout seagoing vessels (Rushworth 2005; Williams et al. 2007). Till et al. (2018) reported that US Navy job categories with the highest potential for amphibole asbestos exposure (e.g., machinist's mates, boiler technicians, water tender, pipe fitters, and fireman) had increased risk of mesothelioma mortality whereas occupations with low or medium potential exposure to amphibole asbestos (e.g., Boatswain's Mate and Seamen) had risks of mesothelioma similar to background rates (see table 2 from the study reproduced below) (Till et al. 2018).

**Table 2.** Standardized mortality ratio of mesothelioma by selected ratings and potential for asbestos exposure among 63,815 enlisted naval personnel (sailors).

| Asbestos potential and rating | No. of sailors[a] | Observed | Expected | SMR | 95% CI |
|---|---|---|---|---|---|
| **High Potential** | | | | | |
| Boiler technician | 1002 | 8 | 0.72 | 11.1 | 4.78–21.9 |
| Pipe fitter | 283 | 3 | 0.23 | 13.0 | 2.62–38.1 |
| Machinist's mate | 3809 | 29 | 3.2 | 9.18 | 6.15–13.2 |
| Water tender | 845 | 2 | 0.65 | 3.06 | 0.34–11.1 |
| Fireman | 7302 | 30 | 6.2 | 4.85 | 3.27–6.92 |
| Total | 12,880 | 69 | 10.7 | 6.47 | 5.03–8.19 |
| **Low/Medium Potential** | | | | | |
| Boatswain's mate | 2938 | 2 | 2.40 | 0.83 | 0.09–3.01 |
| Hull technician | 2 | 0 | <.01 | n/a | n/a |
| Seaman | 21,144 | 25 | 17.7 | 1.42 | 0.92–2.09 |
| Total | 23,936 | 27 | 19.9 | 1.35 | 0.89–1.97 |
| Any Potential (Low to High) | 36,639 | 96 | 30.5 | 3.15 | 2.55–3.85 |
| No to minimal potential | 27,176 | 30 | 23.4 | 1.28 | 0.87–1.83 |

[a]Six hundred and eighty-two naval personnel have more than one rating.

48. The increased risk of malignant mesothelioma within a single occupation or industry among workers historically exposed to substantial amounts of amphibole asbestos is further illustrated in a systematic review and meta-analysis regarding the risk of various cancers among petroleum refinery workers in which a statistically significantly increased risk of mesothelioma based on 18 studies (meta-RR=2.36, 95% CI: 1.78-3.13). The relative risk estimate was very high for refinery maintenance workers (meta-RR=4.03, 95% CI: 3.33-4.88) likely reflecting more frequent exposure to asbestos insulation among these workers as "asbestos was commonly used as an insulating material in refineries" (Schnatter et al., 2018, p. 3337-3338).

49. The risk of peritoneal mesothelioma is associated with much higher asbestos exposure, on average, than pleural mesothelioma (Coggon et al. 1995; Hilliard et al. 2003). For example, Finkelstein (1984) reported that the mean cumulative asbestos exposure for eleven pleural mesothelioma cases was 42 f/ml-years, whereas for eight peritoneal mesothelioma cases it was 161 f/ml-years, all of whom had been exposed to crocidolite. Peritoneal mesothelioma cases have been observed in occupational and environmental settings involving large cohorts with substantial to very heavy amphibole asbestos exposure (i.e., laggers and other insulation

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

workers) (Newhouse and Thompson 1965; McDonald and McDonald 1980; Coggon et al. 1995; Hodgson and Darnton 2000; Boffetta et al. 2007). Apart from those heavily exposed to amphibole asbestos, peritoneal mesothelioma rarely is associated with prior asbestos exposure (Lee et al. 2013; Liu et al. 2014; Carbone et al. 2019). In a large pathological study, 92% of individuals diagnosed with peritoneal mesothelioma did not report any prior asbestos exposure (Lee et al. 2013). Moreover, peritoneal mesothelioma affects men and women equally, suggesting that gender differences in occupational asbestos exposure have no apparent effect on peritoneal mesothelioma rates (Liu et al. 2014; Carbone et al. 2019). Boffetta (2007) corroborated the weaker association between amphibole asbestos exposure and risk of peritoneal mesothelioma relative to pleural mesothelioma.

50. In contrast to results of occupational cohort studies that demonstrate low or no increased risk of malignant mesothelioma at low levels of exposure, a few population-based and hospital-based case-control studies report higher prevalence of post-hoc self-reported low-level occupational exposure to asbestos among cases than among controls (Iwatsubo et al., 1998; Rodelsperger et al., 2001; Lacourt et al., 2014). However, in addition to the problem of not identifying the specific asbestos fiber type, methodological challenges have been noted, especially including information bias and consequentially, exposure misclassification which are common limitations to population-based case-control studies (Siemiatycki and Boffetta, 1998). Some population-based cohort studies also suffer from similar limitations. For example, 58,279 men aged 55 to 69 enrolled in the Netherlands Cohort Study were followed for various diseases including mesothelioma. "Asbestos" exposure was estimated using two different job-exposure matrices (JEMs) based on self-reported occupational histories (Offermans et al. 2014). JEMs often are constructed where homogeneous exposure groups and time periods are defined and estimates (preferably based on industrial monitoring data) are derived for each job-time combination. Applying one of the JEMs, Offermans et al. (2014) reported a statistically significantly elevated risk for mesothelioma in a low exposure category (HR=2.69; 95% CI: 1.60-4.53, median 0.2 fibers/year/mL; based on 20 cases) but not when using the other JEM (HR= 0.71; 95% CI: 0.32-1.56; mean 4 fiber unit-years; 7 cases). This study highlights the large impact of exposure misclassification inherent to studies relying on historical recall, self-reporting and ecological exposure ascertainment methods.

51. Time since initial exposure to significant concentrations of respirable amphibole asbestos, as a surrogate for the period of induction and latency (combined), also is a strong predictor of mesothelioma risk (McDonald et al. 1983; Talcott et al. 1989; McDonald et al. 1997). The highest risk of mesothelioma occurs, on average, 40-50 years after first known substantial exposure to amphibole asbestos, and a majority of asbestos-related cases occur between 30 and 60 years from initial significant exposure (Seidman and Selikoff 1990; McDonald et al. 1997; Bianchi et al. 2001; Hilliard et al. 2003; Clements et al. 2007; Marinaccio et al. 2007; Kishimoto et al. 2010; Tse et al. 2010; Berry et al. 2012; Reid et al. 2013; Reid et al. 2014). However, the interplay of factors such as frequency and intensity of exposure and fiber type contribute to a highly variable latency period for mesothelioma across study populations, with the shortest average latency (i.e., around 20 to 30 years) observed in a few occupational settings with likely very high exposure to amphibole asbestos, with a more typical and longer latency among those with moderate to high exposure (Bianchi et al. 1997). A cohort following children exposed to environmental asbestos from a cement plant using amphibole asbestos reported that the median age at mesothelioma diagnosis was 60.9 years and that 97% of the cases developed mesothelioma more than 30 years after completing the seventh grade (Dalsgarrd et al. 2019).

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

52. Epidemiological evidence addressing risks of mesothelioma associated with other types of amphibole asbestos is sparse. Two reports identified four cases of mesothelioma among miners extracting anthophyllite in Finland (Karjalainen et al. 1994; Meurman et al. 1994). Wylie et al. (2020) estimated that the modeled mesotheliogenic potency of asbestiform anthophyllite is similar to that of amosite and tremolite, but lower than that of crocidolite.

53. Epidemiological studies of all primary asbestos industries, i.e., those producing and directly using amphibole asbestos fibers, have reported increased mortality from pleural and peritoneal mesothelioma. Increased risks of malignant mesothelioma have been reported among employees in asbestos mining and milling (de Klerk et al. 1989; Piolatto et al. 1990; Sluis-Cremer et al. 1992; Berry et al. 2012; Reid et al. 2014), asbestos cement manufacturing (Thomas et al. 1982; Finkelstein 1984; Alies-Patin and Valleron 1985; Ohlson and Hogstedt 1985; Gardner et al. 1986; Hughes et al. 1987; Raffn et al. 1989; Albin et al. 1990; Neuberger and Kundi 1990; Ulvestad et al. 2002; Magnani et al. 2008; Menegozzo et al. 2011; Luberto et al. 2019), asbestos textile manufacturing (McDonald et al. 1982; McDonald et al. 1983; Peto et al. 1985; Dement et al. 1994; Pira et al. 2005), manufacturing of friction and insulation materials (McDonald et al. 1984; Enterline et al. 1987; Newhouse and Sullivan 1989) and filter manufacturing and assembly (McDonald et al., 1978; Jones et al., 1980; Talcott et al., 1989).

54. Workers in secondary asbestos industries, i.e., those working with or handling asbestos-containing products also have been studied epidemiologically. High risks of mesothelioma have been reported especially where workers manipulated materials containing amphibole asbestos and generated high concentrations of respirable amphibole asbestos fiber. Some of the largest risks have been demonstrated among workers employed in shipyards during and in the decades following World War II, where large quantities of thermal insulation containing amosite were used (Rusiecki et al. 2018; Roelofs et al. 2013; Puntoni et al. 2001). Other occupations where mesothelioma risks were high include thermal insulators, steamfitters and pipefitters, and construction workers where job tasks involved manipulating thermal insulation containing amosite. Cutting asbestos block, removing or manipulating friable thermal insulation, applying or working in the vicinity of spray-on asbestos insulation operations, and mixing dry asbestos cement are examples of activities likely to generate significant concentrations of respirable amphibole asbestos fibers (Jarvholm and Sanden 1998; Roggli and Sanders 2000; Koskinen et al. 2003; Jarvholm 2006; Williams et al. 2007; Bianchi and Bianchi 2009; Merlo et al. 2018).

55. Mesothelioma in groups without clear or known occupational asbestos exposure can result from substantial environmental exposure to asbestos (Newhouse and Thompson 1965; Magnani et al. 2001; Marchevsky et al. 2006; Metintas et al. 2008; Pintos et al. 2009; Mirabelli et al. 2010; Liu et al. 2017; Noonan 2017) or other unidentified sources of amphibole asbestos exposure, especially in areas where large quantities of amphibole asbestos historically were extracted, processed or discarded (Musk et al. 2017). Environmental exposure results from asbestos released from industrial operations (e.g., asbestos mines and mills, asbestos cement or other product manufacturing), weathering of natural soil deposits or outcroppings, or the erosion of asbestos-containing building materials (ATSDR 2001). A meta-analysis by Xu et al. (2018) reported ten-fold increased summary relative risk estimates (SRRE) for mesothelioma associated with neighborhood and domestic exposure to amphibole asbestos.

56. Although critical review and synthesis of the body of epidemiological literature confirms that substantial exposure to respirable amphibole asbestos causes mesothelioma, the findings for

16

**JA1178**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

chrysotile asbestos exposure are much less conclusive (Poland and Duffin 2019; Yano 2018; Yarborough 2006). For example, the differences in mesothelioma risk by asbestos fiber type are illustrated by McCormack et al. (2012) who evaluated the proportional distribution of mesothelioma deaths among total deaths based on 55 cohort studies finding that the proportion of mesothelioma in the pure or predominantly chrysotile category was 0.27% compared with 9.84% for crocidolite. On the other hand, one case-control study from Southeastern China reported an association between malignant mesothelioma and hand-spinning raw chrysotile fiber (Jiang et al. 2018).

57. Several reviews have been published on chrysotile asbestos exposure and mesothelioma risk. Five of these reviews assert that chrysotile is a cause of mesothelioma (Smith and Wright 1996; Stayner et al. 1996; Nicholson 2001; Li et al. 2004; Kanarek 2011); however, it is not clear that any of these systematically identified and excluded studies where mixed fiber exposures were likely, or where prior exposure to amphibole asbestos reasonably could be ruled out. Four additional reviews attempted to address the relationship between exposure to amphibole-free chrysotile and mesothelioma risk and reported that chrysotile exposure alone appears not to contribute to the risk of mesothelioma (Yarborough 2006; Yarborough 2007; White et al. 2008; Bernstein et al. 2013). Evaluation and synthesis of the evidence from the individual epidemiological studies included in these reviews and those published afterwards (McDonald et al. 1984; Gardner et al. 1986; Piolatto et al. 1990; Dement et al. 1994; Smailyte et al. 2004; Hein et al. 2007; White et al. 2008; Pira et al. 2009; Sichletidis et al. 2009; Du et al. 2012; Lin et al. 2012; Wang et al. 2012; Pierce et al. 2016; Pira et al. 2017c; Jiang et al. 2018; Loomis et al. 2019; Ferrante et al. 2020; Wong et al. 2020), indicate no clear or consistent relationship with mesothelioma. Additionally, epidemiological reviews and meta-analyses indicate no significantly increased risk of mesothelioma among mechanics working with chrysotile-containing friction products (Garabrant et al. 2016; Poland and Duffin, 2019; Thomsen et al. 2021). Overall, the body of epidemiological evidence does not demonstrate that moderate or low-level exposure to chrysotile causes malignant mesothelioma.

58. Mechanisms underlying malignant mesothelioma caused by asbestos have been elucidated and appear to involve genetic factors as well as chronic inflammation due to fiber morphology and persistence in pleural and peritoneal mesothelial tissues (Donaldson et al. 2013; Fishbein et al. 2020; Gaudino et al. 2020). Amphibole asbestos fibers are insoluble, do not readily break down and are much less likely to be eliminated by phagocytosis; therefore, these fibers tend to accumulate and may be identified in lung tissue samples many years after exposure occurred (Gilham et al. 2016). Because of their rigidity and extreme thinness, amphibole asbestos fibers are capable of translocating from the lungs to sites including the pleura where they can persist for decades and induce chronic inflammation increasing the risk of malignant mesothelioma (ATSDR 2001; Craighead and Gibbs 2008). Epidemiological and toxicological evidence confirms that mesothelioma risk depends on the type of asbestos fiber to which individuals have been exposed. Relative risks for both pleural and peritoneal mesothelioma are many times greater among those exposed to amphibole asbestos than those exposed only to chrysotile or mixtures (Hodgson and Darnton 2000; Berman and Crump 2008a; Berman and Crump 2008b; Hodgson and Darnton 2010; McCormack et al. 2012; Lippmann 2014).

59. Corroborative evidence comes from laboratory studies where bio-persistent fibers thinner than about ▪▪▪▪ ▪▪▪▪▪▪▪▪▪▪▪▪▪ about ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪ ▪ ▪▪▪▪▪▪ ▪▪▪ nm 2014) ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪ ▪ ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪ ▪▪▪ ▪▪▪▪▪▪▪ ▪ ▪▪▪▪▪▪ ▪▪▪ by phagocytes; ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

17

**JA1179**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

the phagocytes repeatedly attach to the fibers and rupture, releasing their acidic content and inducing inflammation of the surrounding tissue. This has been termed "frustrated phagocytosis." It is this chronic inflammatory process that is believed to lead to fibrosis and to carcinogenic transformations in the pleural mesothelium, including malignant mesothelioma (Jaurand and Fleury-Feith 2005; Donaldson et al. 2006; Donaldson et al. 2010; Schinwald et al. 2012; Barlow et al. 2017; Gaudino et al. 2020).

60. Integration of the epidemiological evidence with evaluations based on coherent information on fiber morphology, toxicology and pathology leads to the conclusions that 1) moderate to substantial exposure to amphibole asbestos increases the risk of malignant mesothelioma, but that negligible exposure does not; and 2) even moderate exposure to chrysotile asbestos does not increase the risk of malignant mesothelioma. This contrast underscores the importance of differentiating asbestos type as well as magnitude and timing of exposure in evaluating associated malignant mesothelioma risk.

61. Other possible risk factors for malignant pleural mesothelioma include exposure to the following:

    a. Erionite, a fibrous zeolite mineral, with a similar physical resemblance to crocidolite and occurs naturally in the western US (Carbone et al. 2012; Jasani and Gibbs 2012; Van Gosen et al. 2013; Ortega-Guerrero et al. 2015; Saracci 2015; Attanoos et al. 2018; Beaucham et al. 2018; Berry et al. 2022);

    b. Other amphibole minerals that form crystalline fibers such as fibrous fluoro-edenite (Comba et al. 2003; Ballan et al. 2014; Bruno et al. 2014; IARC 2017; Attanoos et al. 2018; Wylie et al. 2020), fibrous winchite and fibrous richterite (possible components of "Libby amphibole") (Sullivan 2007; NIOSH 2011; Dunning et al. 2012; Wylie et al. 2020);

    c. Therapeutic ionizing radiation (Hassan and Alexander 2005; Tward et al. 2006; Hodgson et al. 2007; Teta et al. 2007; Brown et al. 2007; Craighead and Gibbs 2008; De Bruin et al. 2009; Goodman et al. 2009; Carbone et al. 2012; Jasani and Gibbs 2012; Farioli et al. 2013; Gibb et al. 2013; Farioli et al. 2016; Chang et al. 2017; Moolgavkar et al. 2017; Attanoos et al. 2018);

    d. Thorotrast, an injected radioactive contrast medium containing thorium dioxide and used in X-ray diagnostics in the US until the 1950s (Goodman et al. 2009; Jasani and Gibbs 2012);

    e. Infectious agents possibly including Simian virus 40 (SV40) that contaminated polio vaccines produced between 1955 and 1963 (Carbone et al. 2020a; Jasani and Gibbs 2012; Thanh et al. 2016; Attanoos et al. 2018) and *Yersinia enterocolitica* exposure from handling raw meats (Saebo et al. 1993); and

    f. Some chronic serosal inflammatory conditions (e.g., empyema or possibly related to ventriculoperitoneal shunt) and infectious diseases (e.g., tuberculosis) have been suggested as contributing to mesothelioma, consistent with the biological observation that cancer frequently arises at sites of chronic inflammation and injury (Fishbein et al. 2020; Attanoos et al. 2018; Simonsen et al. 2014; Carbone et al. 2012).

**JA1180**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Combined, and even if true etiologic agents, these other risk factors explain a relatively small proportion of total mesothelioma cases (Attanoos et al. 2018). The risk factors for malignant peritoneal mesothelioma (other than amphibole asbestos) appear to be similar to those for malignant pleural mesothelioma, e.g., increased risk of peritoneal mesothelioma has been reported among individuals exposed to erionite and Thorotrast, and to a lesser extent, SV40 (Boffetta et al. 2007). Note that the extensive body of epidemiological literature exploring all possible causes of malignant mesothelioma does not demonstrate (or suggest) that exposure to cosmetic talc or talcum powder products increases the risk of malignant mesothelioma.

**Overview of the epidemiology of malignant mesothelioma not associated with amphibole asbestos or other known causal agents**

62. Mesothelioma in groups without clear or known occupational or environmental asbestos exposure – and absent the other likely causes – is considered idiopathic (Attanoos et al. 2018). Because women historically were less likely to be occupationally exposed to amphibole asbestos, the proportion of pleural mesotheliomas unrelated to asbestos is substantially higher among women than among men and may exceed 90% (McDonald and McDonald 1980; Price and Ware 2009). Depending on the methods and definitions used to identify historical asbestos exposure, malignant pleural mesothelioma without identifiable amphibole asbestos exposure has been estimated to account for 13%–45% (see Table below) of cases in men (McDonald and McDonald 1980; Spirtas et al. 1994; Teschke et al. 1997; Agudo et al. 2000; Gorini et al. 2002; Gennaro et al. 2005; Goldberg et al. 2006; Price and Ware 2009; Rake et al. 2009; Aguilar-Madrid et al. 2010; Marinaccio et al. 2012; Lacourt et al. 2014; Kraynie et al. 2016; Mensi et al. 2016).

**Table: Proportion of Malignant Pleural Mesothelioma Cases with No Identifiable Asbestos Exposure among Men (modified from Attanoos et al. 2018)**

| Reference | Source of Cases | Time Period | Proportion Unexposed |
|---|---|---|---|
| McDonald & McDonald (1980) | Population based case-control study, Canada and US | Canada (1960-1972); US (1972) | 44.9% |
| Spirtas et al. (1994) | US Cancer Registries, Veterans Administration Hospital | 1975-1980 | 42%* |
| Teschke et al. (1997) | Population based case-control study, British Columbia, Canada | 1990-1992 | 41% |
| Agudo et al. (2000) | Population based case-control study, Spain | 1993-1996 | 38% ** |
| Gorini et al. (2002) | Tuscany, Italy Registry | 1988-2000 | 15% |
| Gennaro et al. (2005) | Liguria, Italy Registry | 1996-2002 | 15% |
| Goldberg et al. (2006) | French National Mesothelioma Surveillance Program | 1999-2001 | 16.8% |
| Price and Ware (2009) | US SEER Registries | 1973-2005 SEER data used to project proportion of asbestos-related mesothelioma cases in 2008. | 27.3-29.2% |

**JA1181**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

| Rake et al. (2009) | UK Cancer Registry and physician records | Cases born since 1925; interviewed between 2001-2006. | 14% |
|---|---|---|---|
| Aguilar-Madrid et al. (2010) | Population based case- control study, Mexico | 2004-2006 | 19.4% |
| Marinaccio et al. (2012) | Italian Registry | 1993-2004 | 14% |
| Lacourt et al. (2014) | Population based case-control study, France | 1998-2002 | 13% |
| Kraynie et al. (2016) | Fiber analysis, US 546 mesothelioma cases | 1997-2013 | 14% |
| Mensi et al. (2016) | Lombardy, Italy Registry | 2000-2012 | 22.8% |

* Results presented for peritoneal mesothelioma.
** Includes small number of female mesothelioma cases.

63. The proportion of individuals diagnosed with mesothelioma and with reported asbestos exposure depends directly on the accuracy of the exposure ascertainment and estimation methods employed. Self-reporting of historical asbestos exposure is often inaccurate, and susceptible to recall and reporting biases. When exposure assessment is based on individual-level workplace measurement or expert assessment, focuses on amphibole asbestos, considers confidence or probability of exposure, and considered within proper latency windows, the proportion of mesothelioma cases attributable to asbestos exposure will be reduced and approach a more valid estimate. In other words, the weaker or less specific the definition of asbestos exposure (such as self-reported "ever" versus "never"), the greater the proportion of cases will be that have coincidental or assumed exposure. For example, Spirtas et al. (1994) applied a more accurate definition for asbestos exposure and found that only 48.3% of pleural mesothelioma cases in men had an exposure history including at least one job with a National Occupational Hazard Survey = 25), only one (4%) was determined to have been exposed to asbestos based on probability of exposure (Spirtas et al. 1994). In contrast, where the prevalence of substantial exposure to amphibole asbestos is documented to be higher, the relative proportion of mesotheliomas unrelated to asbestos will be smaller. The proportion of cases in which asbestos actually caused or contributed to the cancer occurrence is likely lower than indicated by these estimates, as there is a tendency to assume that any reported or presumed past asbestos exposure might have caused the cancer rather than being coincidental or nonexistent (Spirtas et al. 1994). The proportion of idiopathic mesothelioma cases in a given population increases as the prevalence of exposure to substantial quantities of amphibole asbestos and the cases caused by such exposures decline.

64. Additional but indirect evidence of malignant mesothelioma occurring absent asbestos exposure is found in studies reporting mesothelioma risks (i.e., standardized incidence ratios) for a range of different occupations and industries with no known use or handling of asbestos, such as secretaries, teachers or mail carriers (Pukkala et al. 2009; Rolland et al. 2010; Roelofs et al. 2013; Plato et al. 2016). However, most of these studies are based on current, most recent or usual occupation, and occupational categories reporting statistically significant excesses may miss important occupational exposures from prior jobs commonly held decades earlier, such as working in the engine rooms of vessels while serving in the US Navy. In contrast, many occupations also have been identified for which statistically significant deficits of malignant

20

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

mesothelioma were reported, i.e., suggesting a protective effect. For example, Pukkala et al. (2009) specifically reported results for "Religious workers etc": among men, 51 newly diagnosed mesothelioma cases were identified with 96 expected (based on general population rates) resulting in a statistically significant decreased relative risk estimate (SIR=0.53, 95% CI 0.40-0.70). Men employed as "Hairdressers" (and potentially exposed to talc) similarly were reported to have a statistically significant <u>deficit</u> of malignant mesothelioma incidence (SIR=0.29, 95% CI 0.08-0.75).[3]

65. As with many cancers, genetic mutations appear to play a role in mesothelioma risk. Gene mutations are changes to DNA that can lead to a wide variety of downstream cellular responses, such as the deactivation of genes that control cell replication (ACS 2014). Typically, cells must accumulate many mutations before becoming cancerous (ACS 2014). For mesothelioma, both germline (inherited) and somatic mutations, independent of environmental exposures, can contribute to increasing disease risk (Carbone et al. 2019; Laitman et al. 2021).

66. Some heritable genetic mutations can predispose individuals to increased mesothelioma risk, including mutations of BAP1 and other genes that regulate DNA repair, such as MLH1, MLH3, TP53, and BRCA2. Overall, at least 12% of mesotheliomas occur in carriers of genetic mutations (Neri et al. 2008; Carbone et al. 2012; Carbone et al. 2019). Of these, mutation of the BAP1 gene is the most common, leading to BAP1 tumor predisposition syndrome (Testa et al. 2011; Carbone et al. 2020b). Germ-line mutations in BAP1 also are associated with basal cell carcinomas, breast carcinomas, cholangiocarcinomas, kidney (specifically renal cell) cancers, skin melanomas, uveal melanomas and various brain tumors (Carbone et al. 2019; Carbone et al. 2020b).

   a. One study reported on 57 families with 174 individuals carrying a germline BAP1 mutation (Rai et al. 2016). All but one of the families had members with one or more of the primary cancers (uveal melanoma, malignant mesothelioma, cutaneous melanoma, renal cell carcinoma) implicated in BAP-1 cancer predisposition syndrome, and 22% of the 174 individuals were diagnosed with malignant mesothelioma. Among individuals diagnosed with mesothelioma 36% were diagnosed with at least one additional primary cancer.

   b. Among 198 study participants with mesothelioma, 23 (12%) were identified as having a germline mutation (two occurred in one individual), and BAP1 was the most common, accounting for six (25%) of the 24 identified genetic mutations (Panou et al. 2018). The authors noted that "[a] significant proportion of patients with MM [malignant mesothelioma] carry germline mutations in cancer susceptibility genes, especially those with peritoneal MM, minimal asbestos exposure, young age and a second cancer diagnosis." Histologically, individuals with familial *BAP1*-related malignant mesothelioma typically show epithelioid morphology (Pagliuca et al. 2021).

   c. A family history of cancer, including mesothelioma, kidney and urinary bladder cancers, substantially increases the risk of developing mesothelioma (Ji et al. 2016). Risk of familial mesothelioma was substantially increased when either a parent (SIR = 3.88, 95% CI: 1.01-10.04) or a sibling (SIR = 12.37, 95% CI: 5.89-22.84) was diagnosed with mesothelioma. Individuals with a sibling who was diagnosed with kidney (SIR = 2.13, 95%

---

[3] This study is discussed further below.

**JA1183**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

        CI: 1.16-3.59) and bladder cancer (SIR = 2.09, 95% CI: 1.32-3.14) also had increased risk of mesothelioma (Ji et al. 2016).

67. Consistent with the etiology of many cancers, malignant mesothelioma also arises due to the accrual of unrepaired spontaneous (i.e., non-heritable) mutations of somatic BAP1 and DNA repair genes. Laitman et al. 2021 conducted one of the largest studies of the spectrum of tumors that harbor somatic BAP1 gene mutations, reporting that almost half (45.24%) of the 575 mesothelioma cases had inactivating BAP1 genomic alterations. The high frequency of pathogenic BAP1 mutations was seen in both pleural (44.27%) and peritoneal (48.32%) mesothelioma cases. Deletions in somatic BAP1 genes accounted for approximately 14% of all the BAP1 mutations observed among the mesothelioma cases (Laitman et al. 2021). In addition to mesothelioma, spontaneous BAP1 mutations are associated with uveal melanoma and clear cell kidney cancer. Individuals with these mutations do not have a germline BAP1 gene mutation and are less likely to have a family history of mesothelioma, uveal melanoma or clear cell kidney cancer (Carbone et al. 2019; Genetics Home Reference 2020). For mesothelioma occurring in men, Tomasetti et al. 2017 estimated that 31% of driver gene mutations leading to cancer were due to replication errors (i.e., not attributable to heredity or environmental factors) versus 68.5% for environmental factors and 0.5% for hereditary factors (see Fig. 3 and Table S6). Based on this estimate, almost one-third of malignant mesothelioma cases among men likely results from chance mutations.

68. Mesothelioma occurs at all ages, but is extremely rare in young people (i.e., < 40 years of age). Mesothelioma (of all sites) among young people accounted for approximately only 2% of mesothelioma patients in the SEER database from 1990 to 2010 (Thomas et al. 2015). A few descriptive epidemiological assessments compared the distribution of clinical and etiologic factors across younger and older mesothelioma patients to identify potential differences. These studies report a lower male to female ratio, comparable frequencies of pleural and peritoneal mesothelioma, and significantly less asbestos exposure among younger patients (Thomas et al. 2015; Vivero et al. 2018). Risk factors for mesothelioma occurring at young ages have not been well characterized, but some reports suggested that therapeutic radiation, familial history of breast cancer, germline mutations in DNA repair genes, and genetic rearrangements may increase risk of malignant mesothelioma among young people (Thomas et al. 2015; Desmeules et al. 2017; Vivero et al. 2018; Hung et al. 2018, Panou et al. 2018). The differences observed in the biology of malignant mesothelioma between younger and older age groups may reflect disparate etiologic drivers, i.e., different constellations of causes and a lesser role, if any, of asbestos (Vivero et al. 2018). These differences, combined with the latency estimates for asbestos-related malignant mesothelioma, indicate that the probability that malignant mesothelioma among those under age 40 can be attributed to asbestos exposure is very low.

69. Malignant mesothelioma (primarily pleural) caused by substantial exposure to amphibole asbestos represents the largest group of preventable mesotheliomas, as the other known environmental risk factors collectively explain only a small percentage of total mesothelioma cases (Attanoos et al. 2018). As the number of individuals in the US historically exposed to substantial amphibole exposure such as the occupational groups identified above declines, mesothelioma rates also have declined among men, and remain consistently flat among women. Consequently, a substantial proportion of the remaining mesotheliomas (and a large majority of peritoneal mesotheliomas) remains idiopathic. Furthermore, malignant mesothelioma diagnosed among young people is unlikely related to asbestos exposure (Thomas et al. 2015; Vivero et al.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

2018). It is possible that nearly all malignant mesothelioma cases eventually will be unrelated to asbestos (Price and Ware 2009). Therefore, the implication that asbestos exposure causes nearly all malignant mesotheliomas (e.g., Moline et al. 2020) is unsupported by the epidemiological evidence.

**Review of the epidemiological literature on talc and mesothelioma risk**

70. Talc (hydrated magnesium silicate) is neither an amphibole mineral nor a form of asbestos. IARC Monograph 93 (IARC 2010, p. 277) states: "Talc particles are normally plate-like. When viewed under the microscope in bulk samples or on air filters, they may appear to be fibres and have been identified as such. Talc may also form as true mineral fibres that are asbestiform; asbestiform describes the pattern of growth of a mineral that is referred to as a 'habit'." IARC (2010) further states: "asbestiform talc must not be confused with talc that contains asbestos" (IARC 2010, p. 406). Depending upon the geological conditions under which it is formed, talc may co-exist with other accessory minerals such as serpentine, quartz and amphibole (non-asbestiform tremolite and anthophyllite) (Van Gosen et al. 2004; IARC 2010). Pharmaceutical talc consists of a minimum of 99% talc whereas cosmetic talc consists of a minimum of 90% talc. The balance may include associated accessory minerals such as calcite, chlorite, dolomite, kaolin and magnesite that may be present in various shapes and sizes after milling, but not any detectable asbestiform minerals (Cosmetic Ingredient Review Expert Panel 2013). Industrial talc may contain a greater proportion of accessory minerals.

71. Some cosmetic talc as well as finished talcum powders have been reported to contain trace levels of asbestiform minerals or structures resembling asbestos; however, much controversy surrounds the methods used to correctly identify and quantify asbestos fibers (Cosmetic Ingredient Review Expert Panel 2013). As asbestos is ubiquitous, asbestos fibers can be detected almost everywhere – even in the cleanest air in remote rural areas (Agency for Toxic Substances and Disease Registry (ATSDR) 2001). Asbestos fibers in air can arise from the disturbance of manufactured products such as insulation and cement and from naturally occurring asbestos sources (ATSDR 2001). As with most any product analyzed for the presence of asbestos, contamination may occur at any point following production, including in the laboratory performing the analysis. Therefore, the mere identification of asbestos fibers in air, water and consumer products is neither unexpected nor necessarily constitutes a human health hazard.

72. No epidemiological study was  dentified that specifically evaluated personal cosmetic talcum powder use and risk of mesothelioma. Three recent case series reported lung fiber burdens of select individuals with mesothelioma in the context of medico-legal consultation (Moline et al. 2020; Emory et al. 2020; Roggli et al. 2020). These case series may help formulate hypotheses but are not epidemiological studies and are subject to numerous biases that proper epidemiological study design aims to prevent. The primary limitations include not knowing the size or characteristics of the population that gave rise to the cases, and most importantly the lack of an appropriate comparison group. Case series therefore cannot address disease risk, isolate or quantify risks associated with any specific factor, or establish the causal relationship between a hypothesized risk factor (e.g., talcum powder use) and the risk of disease (e.g., mesothelioma). That a case series draws on individuals involved in litigation due to an exposure likely increases the chances cases have such exposure, regardless of whether it played any role in the disease. Therefore, these case series and case reports are of no causal inferential value.

# JA1185

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

73. Hairdressers and barbers represent occupational groups with periodic but possibly frequent use of cosmetic talc products. Two studies using occupational classification codes reported results for mesothelioma among hairdressers and barbers (Pukkala et al. 2009; Plato et al. 2016). As part of the Nordic Occupational Cancer (NOCCA) study, Pukkala et al. (2009) evaluated 6,017 mesothelioma cases in men and 1,548 in women identified from national cancer registries in Denmark, Finland, Iceland, Norway and Sweden. They reported mesothelioma deficits both in men (standardized incidence ratio (SIR) = 0.29; 95% CI: 0.08-0.75) and women (SIR = 0.42; 95% CI: 0.09-1.23) employed as hairdressers (including barbers, beauticians and others). In contrast, and as expected, occupations with likely amphibole asbestos exposure – such as plumbers and seamen – had statistically significant excesses of mesothelioma cases. Plato et al. (2016) extended follow up through 2009 for the Swedish NOCCA cohort members, which continued to demonstrate no excess risk of pleural or peritoneal mesothelioma among the 18,912 women and 7,056 men classified as hairdressers and beauticians. These large studies provide no indication that even regular professional use of cosmetic talc might be associated with any increased risk of mesothelioma, as rates of mesothelioma lower than those of the general unexposed population were reported.[4] Further, PMR estimates obtained from the National Occupational Mortality Surveillance (NOMS) system for barbers, hairdressers and cosmetologists in the US fail to demonstrate any excess of mesothelioma deaths (NIOSH 2019).

74. A few studies have followed patients for many years after receiving talc pleurodesis – a medical procedure in which talc is directly injected into the pleural space to prevent pleural effusion (accumulation of fluid) or pneumothorax (collapsed lung) in patients with other medical conditions including lung cancer and mesothelioma. Although the number of patients followed in these studies was small and the total follow-up time limited, no cases of mesothelioma were reported (Chappell et al. 1979; Lange et al. 1988; Viskum et al. 1989; Györik 2007).

75. Workers engaged in talc mining and processing historically had the greatest occupational exposure to talc and all accessory minerals (Marsh and Ierardi 2020). For example, respirable dust counts obtained for such operations routinely exceeded 1000 million particles per cubic foot (mppcf) (i.e., over one billion particles per cubic foot) prior to 1955 and the implementation of some dust control measures such as wet drilling (Rubino et al. 1976; Kleinfeld et al. 1967). In contrast, the estimated dust exposure concentration per application of cosmetic talcum powder was nearly 6,000 times lower (median 0.1752 mppcf), highlighting the vast range of talc concentrations across exposure scenarios and the especially high concentrations historically encountered by talc miners and millers (Hildick-Smith 1976).

76. Several epidemiological studies have been published on talc mining and milling workers in locations including New York State (Kleinfeld et al. 1967; Kleinfeld et al. 1974; Dement et al. 1980; Stille and Tabershaw 1982; Lamm et al. 1988; Brown et al. 1990; Honda et al. 2002), Italy (Rubino et al. 1976; Rubino et al. 1979; Coggiola et al. 2003; Pira et al. 2017a; Ciocan et al. 2021), Norway (Wergeland et al. 1990; Wergeland et al. 2017), France and Austria (Wild et al. 2002), and Vermont (Selevan and Dement 1979; Selevan et al. 1979; Fordyce et al. 2019). One additional study of cancer mortality among workers employed in the production of silica, fire-bricks, gold mining and talc mining and milling in Russia did not mention mesothelioma, presumably because

---

[4] It is not appropriate to interpret these statistically significant deficits as indicating a *protective effect* of talc exposure, just as the reporting of a few statistically significant positive associations would not validly constitute a *causal effect*.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

no mesothelioma deaths were observed (Katsnelson and Mokronosova 1979). This study is not addressed further. Each of the other studies of talc workers was reviewed and summarized briefly below.

77.  Epidemiological studies of talc miners and millers in upstate New York span several decades. Commercial talc from this region primarily was used for industrial purposes and is reported to contain a variety of accessory minerals including tremolite, anthophyllite, carbonate and a small amount of crystalline silica. Kleinfeld and coworkers published two studies on New York talc miners and millers, largely in response to earlier reports of fibrogenic pneumoconiosis (possibly talcosis) among several miners (Kleinfeld et al. 1967; Kleinfeld et al. 1974). Kleinfeld et al. (1967) was the first study to address cancer in association with occupational exposure to fibrous talc dust. The authors reported a greater than three-fold increase in expected mortality from cancers of the lung and pleura. Nine of the ten malignancies in this group were lung carcinomas, and one was a pleural fibrosarcoma. Confounding factors including smoking and previous employment histories were not considered. One peritoneal mesothelioma was reported in both publications (the same individual who died in the late 1950s) and analyses including this case in the category of "gastric cancers" found no excess risk overall or by specific age categories. A three-fold excess of mortality due to nonmalignant respiratory disease was reported, however, reflecting the extraordinarily high concentrations of dust present in the workplace; prior to 1948, median exposures ranged from 61 to 1,196 mppcf. Most job categories after 1948, when more effective controls were introduced including wet-drilling methods, had median exposures between 13 and 63 mppcf (Kleinfeld et al. 1974).

78.  Stille and Tabershaw (1982) and Lamm et al. (1988) examined another group of New York talc miners, the latter reporting one mesothelioma (site not specified) in an electrician hired at the plant only 15 years before his death. Brown et al. (1990) studied the same plant, but in their NIOSH Health Hazard Evaluation Report mentioned no mesotheliomas. Honda et al. (2002) extended follow-up of this cohort through 1989 and examined mortality in subgroups based on work area, years since hire, years worked and estimated cumulative exposure to respirable dusts. Two deaths from mesothelioma were reported; however, on the death certificates used to identify underlying cause of death, New York State nosologists officially coded one of these as "benign neoplasm of the respiratory system" and the other as "malignant neoplasm of bronchus and lung, unspecified" despite specific mention of mesothelioma elsewhere on the certificate. Methodologically, it is questionable whether it was appropriate for these to be analyzed as mesothelioma deaths without performing the same level of scrutiny on all of the death certificates used to determine the reference rates. Furthermore, neither case clearly appears to be related to employment at the talc plant. Despite a relatively high cumulative talc exposure, one of these workers died only 15 years after being hired at the plant (possibly the electrician reported by Lamm et al. (1988)) suggesting there was likely not adequate time to allow for the induction of mesothelioma since the individual first began working at the talc plant. The other possible mesothelioma case was in an employee who "worked only briefly at the facility as a draftsman during mill construction in 1948–49. His job would have entailed minimal exposure to talc dust" (Honda et al. 2002). Statistically significant excesses of nonmalignant respiratory diseases were reported, however, again reflecting the extremely high mineral dust exposures in this industry.

79.  A study of miners and millers employed at a talc mine reportedly not containing asbestiform minerals in the Gouverneur Talc District of upstate New York reported one mesothelioma death.

JA1187

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

The employee diagnosed with mesothelioma was hired at the mine 16 years prior to his death, indicating too short a latency to be related to his talc mining exposures (Dement et al. 1980). It was reported that this individual worked for 11 years in construction prior to being employed by the mine.

80. In sum, epidemiological studies of New York talc workers have not demonstrated a clear or consistent excess risk of mesothelioma, despite ample evidence of very high exposures to talc and all accessory minerals. None of the few cases of mesothelioma identified (and assuming the two reported in Honda et al. (2002) were indeed mesotheliomas) is convincingly associated with employment in the talc mining and milling facilities. Several studies appear to have been on the same population and may have repeatedly reported on the same case(s), giving an impression of more cases than actually had occurred in this population. Some debate regarding the identification of additional mesothelioma cases among these miners and millers has surfaced; however, the epidemiological studies have not been updated systematically, precluding formal evaluation (Finkelstein 2012; Nolan et al., 2013).

81. Several studies of talc miners and millers have been conducted in regions where the talc deposits are considered pure, i.e., without significant contamination by fibrous minerals and free of asbestos. These regions include the following: Montana, Texas and North Carolina (Gamble et al. 1982); Vermont (Selevan and Dement 1979; Selevan et al. 1979; Fordyce et al. 2019); Italy (Rubino et al. 1976; Rubino et al. 1979; Coggiola et al. 2003; Pira et al. 2017a; Ciocan et al. 2021); Norway (Wergeland et al. 1990; Wergeland et al. 2017); and France and Austria (Wild et al. 2002). Talc from these mines is of a higher grade, and is used in cosmetic and pharmaceutical applications (Rubino et al. 1976). Hildick-Smith reported that cosmetic talc "contains more than 90% mineral talc, is free of detectable asbestos, and contaminated by only limited amounts of other minerals" (Hildick-Smith 1976). Specifications were introduced in the US in 1976 requiring that cosmetic talc must not contain detectable, fibrous asbestiform fibers (Fiume, et al. 2015).

82. Although very small and not intended to evaluate mesothelioma incidence or mortality, Gamble et al. (1982) performed a cross-sectional study of 299 talc miners and millers from Montana, Texas, and North Carolina, with a focus on respiratory symptoms, lung function, and chest X-rays. This is the only known epidemiological study on this group of talc workers and sheds some light on possible exposures. Dust samples collected at each location were examined using PCM and TEM. PCM detected no fibers, but TEM detected tremolite and antigorite fibers in the Texas talc only, but the authors did not describe them as asbestiform. No significant increases in symptoms or pneumoconiosis or significant reductions in lung function were found, although bilateral pleural thickening was observed in some workers (Gamble et al. 1982).

83. A study jointly conducted by investigators from the US National Institute for Occupational Safety and Health (NIOSH) and Occupational Safety and Health Administration (OSHA) followed men employed for a minimum of one year as miners and millers (not mutually exclusive) in the Vermont talc industry between January 1, 1940 and December 31, 1969 (Selevan and Dement 1979; Selevan et al. 1979). These workers were invited to participate in a chest x-ray screening program by the Vermont Department of Health as part of an annual survey of workers in dusty trades, results of which produced no indication of exposure to asbestos or crystalline silica (Selevan et al. 1979). The authors noted, "The talc in one of the closed mines is reported to have had "cobblestones" of serpentine rock which were highly tremolitic. In the mining of this talc, these "cobblestones" were avoided and/or discarded [during extraction]. Therefore, miners may

26

**JA1188**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

have been exposed to tremolite, but it is unlikely that the millers from this company were."
(Selevan et al. 1979). The authors do not describe the tremolite as asbestiform. Nonmalignant
respiratory disease mortality was observed in excess among the millers, but not the miners,
reflecting the greater exposure to talc among the millers. No mesothelioma cases were reported.

84. Rossner et al. (2020) evaluated historical respirable dust exposures in the Vermont talc mines
and mills. Included in the assessment were approximately 700 respirable dust samples (as a proxy
for talc exposures) collected at seven site locations over a 30 year time period (from the late
1970s to the early 2000s). Sampling data were extracted from two sources: mining company
records including original sampling data sheets, and Mine Safety and Health Administration
(MSHA) records from historical inspections. The arithmetic mean (AM) of respirable dust
concentrations collected across all seven sites during MSHA inspections from 1978 to 1980 (n =
26) was 2.23 mg/m$^3$, 2.29 mg/m$^3$ from 1981 to 1989, and 0.69 mg/m$^3$ from 1990 to 1998. Dust
concentrations were generally higher in the milling areas than in the mining operations. Several
mining and milling jobs categories, however, had estimated average respirable dust
concentrations that exceeded the OSHA PEL (3 mg/m$^3$) and ACGIH TLV (2 mg/m$^3$). These findings
are consistent with evaluations from other talc mines (e.g., Val Chisone) where very high
historical dust concentrations were documented (Rubino et al. 1976).

85. Fordyce et al. expanded the Vermont cohort inclusion period from 1930 to 1983, increasing the
cohort by 35 workers, and extended follow up through 2012 (Fordyce et al. 2019; Fordyce et al.
2020). No mesothelioma deaths were identified using the original study methods. Further
examination of additional information reported on death certificates, however, led to the
identification of one mesothelioma death. The authors concluded there was "no evidence of
increased risk of respiratory cancer." In contrast, a statistically significant increase of
nonmalignant respiratory disease mortality was reported – primarily due to emphysema,
bronchitis and other nonmalignant respiratory diseases (which may include pneumoconiosis)
(Fordyce et al. 2019).

86. A study of talc miners and millers (Wergeland et al. 1990) conducted by the Norwegian
Directorate of Labour Inspection and the Cancer Registry of Norway was designed to determine if
excess cancer risk from respiratory diseases could be demonstrated after exposure to high purity
Norwegian talc. Norwegian talc reportedly contains only trace amounts of quartz, tremolite and
anthophyllite, and very low fiber (unspecified) content has been confirmed by electron
microscopy. Workers first employed in 1944 (mine) or 1935 (mill) were followed for cancer
incidence and cause-specific mortality. No mesothelioma cases or deaths were identified, and no
excess of nonmalignant respiratory disease was observed, however one death certificate
identified "talcosis" (a nonmalignant disease or pneumoconiosis caused by breathing dusts
containing high concentrations of talc) and two death certificates noted "silicosis" (a
nonmalignant disease caused by breathing dusts containing high concentrations of crystalline
silica) as contributory causes of death (Wergeland et al. 1990). In an update of this cohort that
extended follow up through 2011, no cases of mesothelioma were identified, and a statistically
significant deficit of nonmalignant respiratory diseases other than pneumoconiosis was observed
(Wergeland et al. 2017).

87. Wild et al. (2002) conducted parallel cohort studies among talc miners and millers in France and
Austria, coupled with nested case-control analyses of non-malignant and malignant respiratory
diseases. Included were all men who had worked continuously for at least one year in any of

**JA1189**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

several companies producing talc. The French cohort consisted of those employed since January 1, 1945 and followed through 1994. The Austrian cohort consisted of the workers employed beginning January 1, 1972 and followed through 1995. In neither cohort was any mesothelioma case identified; however, a significant excess of pneumoconiosis associated with talc exposure was reported (Wild et al. 2002).

88. The longest studied cohort of talc miners and millers is that of the Val Chisone region of Italy, considered to have one of the largest and purest talc deposits extracted. Workers first hired at the Val Chisone facilities since 1930 have been followed continuously over many years (Rubino et al. 1976; Rubino et al. 1979; Coggiola et al. 2003; Pira et al. 2017a). Rubino (1976) followed from 1948 through June 30, 1974 workers who were hired between 1921 and 1950 and worked for at one year at the mines and mills. They reported no mesotheliomas among the workers, whereas two mesothelioma deaths were identified in the unexposed control population – a community roughly 50 miles away from the mines. Investigation of these two cases revealed no history of asbestos exposure. As seen in most studies, non-malignant respiratory disease mortality was elevated among these workers, reflecting very high dust concentrations (i.e., typically between 100 and 800 mppcf – with some measurements well exceeding one billion particles per cubic foot), especially in the mining operations prior to 1955. Concentrations associated with milling, and with mining after 1955 generally had been reduced to below 50 mppcf (Rubino et al. 1976). Rubino et al. (1979) re-analyzed these study data comparing the mortality experience of the miners and millers with that of the general Italian population. This analysis also reported a deficit (i.e., fewer observed than would be expected based on general population rates) of mesothelioma deaths based on zero cases among the talc workers (Rubino et al. 1979) but confirmed the clear excess of nonmalignant respiratory diseases among the miners.

89. Pira et al. (2017a) reported statistically significant overall mortality, largely driven by excess mortality due to non-malignant respiratory disease (primarily pneumoconiosis and specifically silicosis among the miners), cirrhosis of the liver, and digestive tract disease (Pira et al. 2017). The authors concluded: "The data of our cohort confirm, with a follow-up extended to a maximum of 66 years, our previous observation that occupational exposure to Val Chisone talc is not associated with an increased risk of mesothelioma. In the new study, we observed no deaths from mesothelioma, and could exclude a two-fold excess risk" (Pira, et al. 2017b).

90. In the latest update of this cohort, Ciocan et al. (2021) further extended follow-up through 2020. A total of 1,749 men contributed 64,349 person-years of observation and 76.7% of the cohort was deceased at the end of follow-up. Among all men employed at least one month in the mine or mill between 1946 and 1995 and followed through the end of 2020 no death from pleural cancer or peritoneal mesothelioma was identified (including among those censored at age 85). Consistent with previous analyses, large and statistically significant excess deaths from pneumoconiosis and especially silicosis continued to be observed, especially among miners (SMR = 12.75, 95% CI: 9.8-16.3). It was concluded that "[t]his uniquely long-term follow up confirms the results of previous analyses, namely the lack of association between exposure to talc with no detectable level of asbestos and lung cancer and mesothelioma" (Ciocan et al. 2021).

91. In sum, no excess risk of malignant mesothelioma has been reported in any of the available epidemiological studies of workers heavily exposed to talc (reflected in significant excesses of non-malignant respiratory diseases including talcosis). Though each individual study was small, the collective number of workers followed and cumulative person-years observed were

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

substantial, workers were clearly and highly exposed and the cohorts were followed for many decades.

92. Ierardi et al. (2022) updated the pooled analyses by Marsh et al. (2019) and Finley et al. (2017) by incorporating new information from the Vermont, Italian and Norwegian cohorts. Based on 130,154 cumulative person-years of follow-up across the five cohorts, it was estimated that about 4.14 cases (mid-value estimate) of mesothelioma would have been expected based on local general population rates (Ierardi et al. 2022). They determined that the pooled cohorts had 59% and 78% power to detect a 2.5-fold or greater and a 3.0-fold or greater increased risk of mesothelioma, respectively. Given the additional extended follow-up of the Italian study (i.e., Ciocan et al. 2021) and the impromptu examination of cause of death of censored workers – all without identifying any mesothelioma deaths, further increases effective statistical power. Nevertheless, to date only one mesothelioma death has been identified to date across these five cohorts, suggesting the observed deficit of mesothelioma cases among talc miners and millers persists.

93. Using the most recent data from the cosmetic talc miners and millers cohort studies and the asbestos-exposed occupational groups identified by McCormack et al. (2012), I calculated proportionate mortality percentages (PMPs) for mesothelioma by predominant asbestos fiber-type exposure group and for talc miners and millers. Additionally, for comparative purposes, I included PMPs for mesothelioma among men and women in the United States general population. PMPs are represented as mesothelioma deaths per 1,000 deaths due to all combined causes (see Table below). Overall, the proportion of deaths due to mesothelioma among cohorts of talc miners and millers is much lower than the mesothelioma burden among asbestos-exposed occupational groups and is indistinguishable from that of women in the US general population, a group with essentially no substantial exposure to amphibole asbestos. The mesothelioma PMP for cosmetic talc miners and millers (0.04%) includes the single mesothelioma death identified in the latest Vermont cohort (Fordyce et al. 2019). That single mesothelioma death was identified by examining all notations on the death certificates of deceased cohort members; however, the same procedure was not performed on any portion of the comparison population so it is not known what the expected number would have been (Fordyce et al. 2019). Therefore, including this mesothelioma in the calculation of proportionate mortality is conservative, as technically the proportion based on standard methods would be zero, and even further below the proportion observed among women in the US general population.

JA1191

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*



94. In stark contrast with the body of published epidemiological evidence to date on the causal link between substantial exposure to amphibole asbestos and the risk of malignant mesothelioma, the epidemiological evidence to date on occupational groups exposed to substantial levels of talc uniformly demonstrates no increased risk of malignant mesothelioma. The very high exposures to talc sustained by talc miners includes the overburden minerals encountered in accessing and extracting the talc and for millers includes all accessory minerals that are pulverized with the talc and incorporated into talcum powder and other cosmetic products. The lack of any excess – and in fact a moderate observed deficit – of mesothelioma deaths across studies of talc miners and millers contradicts the hypothesis and medical claims that exposure to finished (processed) talc or consumer products containing finished pharmaceutical or cosmetic grade talc causes malignant pleural or peritoneal mesothelioma.

**JA1192**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**Brief case background**

95. Mr. Brian Gref was born on July 25, 1982 (B. Gref Vol. I: p. 11). He began to experience abdominal pain in 2016 or 2017 and was diagnosed with torsion of the omentum (B. Gref Vol. I: pp. 193-195). Six months after surgery for the omentum torsion, Mr. Gref developed abdominal distension, recurrent abdominal pain and ascites (B. Gref Vol. I: pp. 199-200). A CT guided biopsy was collected on November 25, 2019, and subsequently he was diagnosed with malignant peritoneal mesothelioma, epithelioid type. He was 37 years old at the time of diagnosis (Mayo Clinic Pathology: p. 2; B. Gref Vol. I: pp. 212-213). Mr. Gref reported no personal or family history of cancer (Cancer Specialists of North Florida: p. 5; B. Gref Vol. I: pp. 28, 34).

96. Mr. Gref started working in approximately 1997 or 1998, but did not allege being occupationally exposed to asbestos in any of his jobs including bank manager, assistant store manager, security guard, military medic, lube tech and gas station attendant (B. Gref Vol. I: pp. 130, 141, 146).

97. Mr. Gref also did not allege any domestic or environmental exposures to asbestos. Mr. Gref's parents worked in various roles in the U.S. Navy. Mr. Gref's mother served at Guantanamo Bay from 1982 to 1985, at a fleet training center from 1985 to 1989, and aboard the USS Yosemite from 1989 to 1992 (K. Nappi Vol. I: pp. 30-35). Mr. Gref's father served in the US Navy primarily as an equal opportunity specialist (B. Gref Vol. I: pp. 41, 232; R. Gref: pp. 40-45).

98. Mr. Gref did allege being exposed to asbestos from his family's use of cosmetic talcum powder products on him as a child as well as his personal application of talcum powders from approximately 1982 to 2019 (B. Gref Vol. I: pp. 47, 64).

   a) Mr. Gref testified that his parents applied talcum powder to him as an infant after baths (B. Gref Vol. I: pp. 46-47, 52). He recalled the following talcum powder products brands being present in the family home: Clubman, Old Spice, English Leather, Johnson's Baby Powder, Shower to Shower, and Mennen (B. Gref Vol. I: p. 47).

   b) Mr. Gref's mother testified that she used Clubman, Mennen, Shower to Shower, Old Spice, and English Leather brand talcum powders on him as an infant after diaper changes and baths (K. Nappi Vol. I: pp. 55-57) and as part of his personal hygiene routine until he was eight years old (approximately in 1990) (K. Nappi Vol. I: p. 101).

   c) Mr. Gref reported that he personally apply talcum powder products daily beginning in 1991 and estimated that he applied powder once per week by the age of twelve (B. Gref Vol. I: pp. 59-60, 64-65). He recalled that he "pretty equally" used Johnson's Baby Powder, Clubman, Mennen, English Leather, Shower to Shower and Old Spice talcum powders after baths (B. Gref Vol. I: pp. 47, 64-66). . He continued to use talcum powder products until 2019 (B. Gref Vol. I: p. 120).

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**Summary of conclusions and expert opinions**

99. Epidemiological concepts and standard methods have been established for decades. Their proper use provides invaluable scientific analyses and perspectives in the process of evaluating and integrating evidence for purposes of determining preventable causes of human disease. Causal relationships identified from weight-of-evidence evaluations of the body of published epidemiological literature may be quantified in terms of exposure-disease relationships, i.e., risk assessment. Therefore, epidemiology serves as a primary basis for determining population risk and disease causation and by extension informs individual disease risk.

100. Malignant mesothelioma is a cancer arising from the layer of cells lining body cavities and organs, known as the mesothelium. Epidemiological studies clearly and consistently demonstrate that substantial occupational or environmental exposure to respirable amphibole asbestos fibers significantly increases the risk of pleural and to a lesser extent peritoneal malignant mesothelioma; however, as such exposure scenarios over time become rarer, increasingly lower proportions of diagnosed mesotheliomas validly can be attributed to asbestos exposure. Further, higher quality epidemiological studies demonstrate low or no risk (i.e., risks similar to background rates) of mesothelioma among those with the lowest exposures to amphibole asbestos. Based on the materials provided, I found no documentation that Mr. Gref sustained substantial exposure to amphibole asbestos from any source that would have placed him at increased risk of malignant peritoneal mesothelioma.

101. Other preventable risk factors for malignant pleural - and presumably peritoneal- mesothelioma include exposure to fibrous erionite or fibrous fluoro-edenite, therapeutic ionizing radiation, medical diagnostic procedures using injected thorium dioxide and possibly some infectious agents or chronic serosal inflammatory conditions. Nevertheless, there is no indication in the record that Mr. Gref had any of these risk factors.

102. A substantial and growing proportion of mesothelioma cases diagnosed in men in the US today is unrelated to amphibole asbestos exposure or other recognized risk factors. These mesothelioma cases are considered idiopathic, literally meaning "of unknown cause", and align with the role of unrepaired gene replication errors, but also may include undocumented or unrecognized causal factor(s) such as undiagnosed genetic susceptibility and unwitting exposure to substantial quantities of amphibole asbestos. Accordingly, and finding no clear evidence in the record that Mr. Gref ever had been exposed to substantial amounts of amphibole asbestos as well as his young age at diagnosis, I conclude to a reasonable degree of epidemiological certainty that Mr. Gref's malignant peritoneal mesothelioma is idiopathic.

103. Numerous epidemiological studies of groups including workers highly exposed to talc have been published and these were comprehensively identified and critically reviewed.

    a. A substantial body of published, peer-reviewed epidemiological studies of cohorts of talc miners and millers highly exposed to mineral talc dusts – with all accessory minerals and contaminants – does not demonstrate that such exposures cause malignant mesothelioma.

    b. Studies following patients receiving pleurodesis treatments involving injections of talc directly into the pleural space do not demonstrate increased risk of mesothelioma.

JA1194

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

    c.  Epidemiological cancer registry linkage studies also consistently demonstrate no increased risk of malignant pleural and peritoneal mesothelioma among hairdressers and barbers – who may be occupationally exposed regularly to talcum powder products.

    d.  There are no peer-reviewed published epidemiological studies specifically evaluating consumer use of talcum powders and risk of malignant mesothelioma.

Critical review and synthesis of the body of epidemiological studies directly addressing human health risks associated with exposure to talc, with all accessory and contaminant minerals present (even assuming trace levels of asbestos) do not scientifically substantiate – and therefore refute – the claim that exposure to talc, or the use of talcum powder products containing such talc, causes malignant mesothelioma.

104. The allegations that Mr. Gref's and his parent's use of talcum powder products on him as a child somehow caused or contributed to causing his malignant peritoneal mesothelioma cannot be substantiated epidemiologically, i.e., based on human scientific evidence. Therefore, I conclude to a reasonable degree of scientific certainty that Mr. Gref's and his family member's alleged use of talcum powder products manufactured by Shulton Inc. or The Proctor & Gamble Company and possibly containing cosmetic or pharmaceutical grade talc distributed by Whittaker, Clark & Daniels, Inc. or American International Industries did not cause or contribute to his malignant peritoneal mesothelioma. Absent Mr. Gref's use of these products, even assuming they may have contained trace amounts of asbestos, his risk of malignant peritoneal mesothelioma would have been unchanged.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**Materials received from Defense Counsel**

*Cited in background*

1. Videoconference and Telephonic Deposition of Brian Gref Volume I (dated May 13, 2021)
2. Videotaped Virtual Deposition of Karen Nappi Volume I (dated June 16, 2021)
3. Videoconference and Telephonic Deposition of Roger Gref (dated June 23, 2021)
4. Various Medical Records (various dates)

*Not cited in background*

1. Videoconference and Telephonic Deposition of Brian Gref Volume II (dated May 14, 2021)
2. Videotaped Virtual Deposition of Karen Nappi Volume II (dated June 17, 2021)
3. Various Clubman talc container photos (no date provided)
4. Videoconference and Telephonic Deposition of Tabetha Ulgage (dated August 18, 2021)
5. Videotaped Videoconference of Carrie Gref (dated September 14, 2021)
6. Videotaped Virtual Deposition of Hannah Madison McKinlay (dated September 16, 2021)
7. Videoconference and Telephonic Deposition of Jeneane Bennett (dated July 21, 2021)
8. Expert Report of David Y. Zhang, MD, PhD, MPH (dated July 19, 2021)
9. Declaration of David Y. Zhang, MD, PhD, MPH, FCAP (dated September 1, 2021)
10. Expert Report of Murray Finkelstein, PhD, MD (dated September 7, 2021)
11. Expert Report of Jacqueline Moline, MD, MSc, FACP, FACOEM (dated October 28, 2021)
12. Military Records of Brian Gref (Part 1 of 2) (various dates)
13. Military Records of Brian Gref (Part 2 of 2) (various dates)
14. National Personnel Records of Brian Gref (various dates)
15. Department of Veteran Affairs Records of Brian Gref (various dates)
16. Additional Department of Veteran Affairs Records of Brian Gref (various dates)
17. Karen Nappi National Personnel Records – Produced in response to a subpoena (various dates)
18. Roger Gref National Personnel Records – Produced in response to a subpoena (various dates)
19. Brian Gref's Answers to the Interrogatories (dated April 7, 2021)
    a. Brian Gref's Answers Request for Production of Documents (dated April 7, 2021)
    b. Chart A – Jobsite-Specific Exposure History (dated April 6, 2021)
    c. Various Medical Records (various dates)
20. Plaintiff's Answers to Patriarch Partners, LLC's First Set of Interrogatories (dated July 2, 2021)
21. Plaintiff's Initial Fact Sheet (dated July 8, 2020)
22. Plaintiff's Letter Regarding Responses and Objections to Deposition Demands (dated May 7, 2021)
23. Affidavit of Tabetha Smith Ulgade (dated July 13, 2021)
24. Whittaker, Clark & Daniels, Inc.'s Responses to Plaintiff's Interrogatories and Requests for Production (dated August 26, 2021)
25. Tabetha Ulgade Documents in Response to Plaintiff's Subpoena (various dates)
26. Carrie Gref Documents in Response to Plaintiff's Subpoena (various dates)
27. Plaintiff's Answers to Whittaker, Clark & Daniels, Inc.'s First Set of Interrogatories (dated August 5, 2021)
28. Plaintiff's Answers to Whittaker, Clark & Daniels, Inc.'s First Set of Requests for Production (dated August 5, 2021)

JA1196

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

29. Plaintiff's Responses to Defendant American International Industries' First Set of Interrogatories Directed to Plaintiff (dated July 26, 2021)

30. Plaintiff's Responses to Defendant American International Industries' First Request for Production of Documents (dated July 26, 2021)

31. Plaintiff's Responses to the Proctor & Gamble Company and Shulton, Inc.'s First Set of Interrogatories (dated August 5, 2021)

32. Plaintiff's Responses to the Proctor & Gamble Company and Shulton, Inc.'s First Set of Requests for Production (dated August 5, 2021)

33. Plaintiff's Responses to Colgate-Palmolive Company's First Set of Interrogatories (dated August 5, 2021)
   a. Exhibit A – Plaintiff's Financial Records (various dates)

34. Plaintiff's Responses to Colgate-Palmolive Company's First Set of Requests for Production (dated August 5, 2021)

35. Plaintiff's Responses to Kolmar Laboratories, Inc.'s First Set of Interrogatories (dated August 5, 2021)

36. Plaintiff's Responses to Kolmar Laboratories, Inc.'s First Set of Requests for Production (dated August 5, 2021)

37. Remote Videotaped Deposition of Charles Loveless (dated November 17, 2021)

38. Errata Sheet of Charles Loveless (no date provided)

39. Videotaped Virtual Deposition of Suprith Badarinath, MD (dated January 11, 2022)

40. Videotaped Virtual Deposition of Dennis St. George (dated November 23, 2021)
   a. Various Exhibits (various dates)

41. Videotaped Virtual Deposition Upon Oral Examination of Paul Joseph Vincenti (dated September 24, 2021)

42. Videotaped Remote Deposition of William Ward (dated October 19, 2021)

43. Videotaped Virtual Deposition of Zvi Ryzman (dated August 12, 2021)
   a. Various Exhibits (various dates)

44. Military Records (various dates)

45. Declaration of David Y. Zhang, MD, PhD, MPH, FCAP (dated September 1, 2021)
   a. Various Exhibits (various dates)

46. Declaration of Murray M. Finkelstein, PhD, MD (dated March 29, 2022)
   a. Various Exhibits (various dates)

47. Expert Report of Arnold R. Brody, PhD (dated June 12, 2020)
   a. Various Exhibits (various dates)

48. Declaration of Steven Patrick Compton, PhD (dated March 30, 2022)
   a. Various Exhibits (various dates)

49. Declaration of Dr. Mark P. S. Krekeler (dated March 17, 2022)
   a. Various Exhibits (various dates)

50. Expert Report of Kristin K. Kucsma, MA, and Kenneth T. Betz, MBA, MA (dated March 31, 2022)

51. Declaration of William Edward Longo, PhD (dated March 31, 2022)

52. Various Exhibits of William Edward Longo, PhD (various dates)

53. Declaration of David Rosner, PhD (dated March 20, 2022)
   a. Various Exhibits (various dates)

54. Declaration of Gerald E. Markowitz, PhD (dated March 23, 2022)
   a. Various Exhibits (various dates)

55. Expert Report of Alan Segrave, PG (dated April 29, 2022)

JA1197

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

**References**

ATSDR (Agency for Toxic Substances and Disease Registry). Toxicological Profile for Asbestos. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry; 2001.

Agudo A, Gonzalez CA, et al. Occupation and risk of malignant pleural mesothelioma: A case-control study in Spain. Am J Ind Med 2000; 37:159-68.

Aguilar-Madrid G, Robles-Perez E, et al. Case-control study of pleural mesothelioma in workers with social security in Mexico. Am J Ind Med 2010; 53:241-51.

Albin M, Jakobsson K, et al. Mortality and cancer morbidity in cohorts of asbestos cement workers and referents. Br J Ind Med 1990; 47:602-10.

Alies-Patin AM, Valleron AJ. Mortality of workers in a French asbestos cement factory 1940-82. Br J Ind Med 1985; 42:219-25.

Alpert N, van Gerwen M, Taioli E. Epidemiology of mesothelioma in the 21(st) century in Europe and the United States, 40 years after restricted/banned asbestos use. Trans Lung Cancer Res 2020; 9:S28-S38.

American Cancer Society. Genes and Cancer. Atlanta, GA: American Cancer Society (ACS); 2014.

American Cancer Society (ACS 2019a). Cancer Treatment & Survivorship Facts & Figures 2019-2021. Last Revised: January 13, 2020. Atlanta, GA: American Cancer Society (ACS); 2019.

American Cancer Society (ACS 2019b). About Malignant Mesothelioma. Last Medical Review: Nov. 16, 2018. Last Revised: May 28, 2019. Atlanta, GA: American Cancer Society (ACS); 2019.

American Cancer Society. Cancer Facts & Figures. Atlanta, GA: American Cancer Society (ACS); 2021.

Attanoos RL, Churg A, et al. Malignant mesothelioma and its non-asbestos causes. Arch Pathol Lab Med 2018; 142:753-60.

Ballan G, Del Brocco A, et al. Mode of action of fibrous amphiboles: The case of Biancavilla (Sicily, Italy). Ann Ist Super Sanit 2014; 50:133-8.

Bang KM, Pinheiro GA, et al. Malignant mesothelioma mortality in the United States, 1999-2001. Int J Occup Environ Health 2006; 12:9-15.

Barlow CA, Grespin M, Best EA. Asbestos fiber length and its relation to disease risk. Inhal Toxicol 2018; 29:541-54.

Berman DW, Crump KS. A meta-analysis of asbestos-related cancer risk that addresses fiber size and mineral type. Crit Rev Toxicol 2008a; 38 Suppl 1:49-73.

Berman DW, Crump KS. Update of potency factors for asbestos-related lung cancer and mesothelioma. Crit Rev Toxicol 2008b; 38 Suppl 1:1-47.

Bernstein D, Dunnigan J, et al. Health risk of chrysotile revisited. Crit Rev Toxicol 2013; 43:154-83.

Bernstein DM, Hoskins JA. The health effects of chrysotile: Current perspective based upon recent data. Regulatory Toxicology and Pharmacology 2006; 45:252-64.

Bernstein DM, Rogers R, Smith P. The biopersistence of Canadian chrysotile asbestos following inhalation. Inhal Toxicol 2003; 15:1247-74.

Berry G, Reid A, et al. Malignant mesotheliomas in former miners and millers of crocidolite at Wittenoom (Western Australia) after more than 50 years follow-up. Br J Cancer 2012; 106:1016-20.

Berry TA, Belluso E, et al. Asbestos and Other Hazardous Fibrous Minerals: Potential Exposure Pathways and Associated Health Risks. Int J Environ Res Public Health 2022: 19(7), 4031.

Beaucham C, King B, et al. Assessing occupational erionite and respirable crystalline silica exposure among outdoor workers in Wyoming, South Dakota, and Montana. J Occup Env Hyg 2018; 15:455-65.

JA1198

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Bevan RJ, Harrison PTC. Threshold and non-threshold chemical carcinogens: A survey of the present regulatory landscape. Reg Tox Pharm 2017; 88:291-302.

Bianchi C, Bianchi T. Malignant pleural mesothelioma in Italy. Indian J Occup Environ Med 2009; 13:80-3.

Bianchi C, Brollo A, et al. Asbestos exposure in malignant mesothelioma of the pleura: a survey of 557 cases. Ind Health 2001; 39:161-7.

Bianchi C, Giarelli L, et al. Latency periods in asbestos-related mesothelioma of the pleura. Eur J Cancer Prev 1997; 6:162-6.

Boffetta P. Health effects of asbestos exposure in humans: a quantitative assessment. Med Lav 1998; 89:471-80.

Boffetta P. Epidemiology of peritoneal mesothelioma: A review. Ann Oncol 2007; 18:985-90.

Bogen KT. Linear-no-threshold default assumptions for noncancer and nongenotoxic cancer risks: A mathematical and biological critique. Risk Anal 2016; 36:589-604.

Brown DP, Sanderson WT, Fine LJ. Health Hazard Evaluation Report: HETA 90-390-2065 -- R.T. Vanderbilt Company, Gouverneur, New York. Sept., 1990. Washington, D.C.: National Institute for Occupational Safety and Health (NIOSH); 1990.

Bruno C, Tumino R, et al. Incidence of pleural mesothelioma in a community exposed to fibres with fluoro-edenitic composition in Biancavilla (Sicily, Italy). Ann Ist Super Sanit 2014; 50:111-8.

Brustugun OT, Nilssen Y, Eide IJZ. Epidemiology and outcome of peritoneal and pleural mesothelioma subtypes in Norway. A 20 year nation-wide study. Acta Oncol 2021:1-7.

Carbone M, Gazdar A, Butel JS. SV40 and human mesothelioma. Trans Lung Cancer Res 2020a; 9:S47-S59.

Carbone M, Harbour JW, et al. Biological mechanisms and clinical significance of BAP1 mutations in human cancer. Cancer Discov 2020b; 10:1103-20.

Carbone M, Adusumilli PS, et al. Mesothelioma: Scientific clues for prevention, diagnosis, and therapy. CA Cancer J Clin 2019; 69:402-29.

Carbone M, Ly BH, et al. Malignant mesothelioma: facts, myths, and hypotheses. J Cell Physiol 2012; 227:44-58.

Carbone M, Pass HI, et al. New developments about the association of SV40 with human mesothelioma. Oncogene 2003; 22:5173-80.

Chang ET, Lau EC, et al. Therapeutic radiation for lymphoma and risk of second primary malignant mesothelioma. Cancer Causes Cntrl 2017; 28:971-9.

Chappell AG, Johnson A, et al. A survey of the long-term effects of talc and kaolin pleurodesis. Research Committee of the British Thoracic Association and the Medical Research Council Pneumoconiosis Unit. British Journal of Diseases of the Chest 1979; 73:285-8.

Checkoway H, Pearce N, Kriebel D. Research Methods in Occupational Epidemiology. Monographs in Epidemiology and Biostatistics: 34. Second ed. New York: Oxford University Press; 2004.

Churg A, Wright JL. Persistence of natural mineral fibers in human lungs: an overview. Environ Health Perspect 1994; 102 Suppl 5:229-33.

Ciocan C, Pira E, et al. Mortality in the cohort of talc miners and millers from Val Chisone, Northern Italy: 74 years of follow-up. Environ Res 2021; 203:111865.

Clements M, Berry G, et al. Projected mesothelioma incidence in men in New South Wales. Occup Env Med 2007; 64:747-52.

Coggiola M, Bosio D, et al. An update of a mortality study of talc miners and millers in Italy. Am J Ind Med 2003; 44:63-9.

Comba P, Gianfagna A, Paoletti L. Pleural mesothelioma cases in Biancavilla are related to a new fluoro-edenite fibrous amphibole. Arch Environ Health 2003; 58:229-32.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

CIREP (Cosmetic Ingredient Review Expert Panel). Safety Assessment of Talc as Used in Cosmetics. Final Report. April 12, 2013. Washington, D.C. : Cosmetic Ingredient Review 2013.

Cox LA. Dose-response modeling of NLRP3 inflammasome-mediated diseases: asbestos, lung cancer, and malignant mesothelioma as examples. Crit Rev Tox 2019; 49:614-35.

Craighead JE. Epidemiology of mesothelioma and historical background. Recent Results Cancer Res 2011; 189:13-25.

Craighead JE, Gibbs AR. Asbestos and Its Diseases. New York: Oxford University Press; 2008.

De Bruin ML, Burgers JA, et al. Malignant mesothelioma after radiation treatment for Hodgkin lymphoma. Blood. 2009; 113(16):3679-81.

De Klerk NH, Armstrong BK, et al. Cancer mortality in relation to measures of occupational exposure to crocidolite at Wittenoom Gorge in Western Australia. Br J Ind Med 1989; 46:529-36.

Dement JM, Brown DP, Okun A. Follow-up study of chrysotile asbestos textile workers: cohort mortality and case-control analyses. Am J Ind Med 1994; 26:431-47.

Dement JM, Zumwalde RD, et al. Occupational Exposure to Talc Containing Asbestos: Morbidity, Mortality, and Environmental Studies of Miners and Millers. I. Environmental Study II. Cross Sectional Morbidity Study III. Retrospective Cohort Study of Mortality. DHEW (NIOSH) Publication No. 80-115. February 1980. Washington, D.C.: U.S. Dept. of Health, Education, and Welfare, Public Health Service, Center for Disease Control, National Institute for Occupational Safety and Health; 1980.

Desmeules P, Joubert P, et al. A Subset of Malignant Mesotheliomas in Young Adults Are Associated With Recurrent EWSR1/FUS-ATF1 Fusions. Am J Surg Pathol 2017; 41:980-8.

Doll R, Peto R. The causes of cancer: quantitative estimates of avoidable risks of cancer in the United States today. J Natl Cancer Inst. 1981; 66(6):1191-308.

Donaldson K, Aitken R, et al. Carbon nanotubes: A review of their properties in relation to pulmonary toxicology and workplace safety. Tox Sci 2006; 92:5-22.

Donaldson K, Murphy FA, et al. Asbestos, carbon nanotubes and the pleural mesothelium: a review of the hypothesis regarding the role of long fibre retention in the parietal pleura, inflammation and mesothelioma. Part Fibre Toxicol 2010; 7:5.

Donaldson K, Poland CA, et al. Pulmonary toxicity of carbon nanotubes and asbestos - Similarities and differences. Adv Drug Deliv Rev 2013; 65:2078-86.

Du L, Wang X, et al. Analysis of mortality in chrysotile asbestos miners in China. J Huazhong Univ Sci Technolog Med Sci 2012; 32:135-40.

Dugue PA, Bassett JK, et al. Biological Aging Measures Based on Blood DNA Methylation and Risk of Cancer: A Prospective Study. JNCI Cancer Spectr 2021; 5: 109.

Dunning KK, Adjei S, et al. Mesothelioma Associated With Commercial Use of Vermiculite Containing Libby Amphibole. J Occup Environ Med 2012.

Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients. Am J Ind Med 2020; 63:484-9.

Enterline PE, Hartley J, Henderson V. Asbestos and cancer: a cohort followed up to death. Br J Ind Med 1987; 44:396-401.

EPA. Application of Systematic Review in TSCA Risk Evaluations. EPA Doc. No.: 740-P1-8001. May, 2018. Washington, D.C.: Environmental Protection Agency (EPA)-Office of Chemical Safety and Pollution Prevention; 2018.

Farioli A, Ottone M, et al. Radiation-induced mesothelioma among long-term solid cancer survivors: a longitudinal analysis of SEER database. Cancer Med 2016; 5:950-9.

Farioli A, Violante FS, et al. Risk of mesothelioma following external beam radiotherapy for prostate cancer: a cohort analysis of SEER database. Cancer Causes Control 2013; 24:1535-45.

**JA1200**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Ferrante D, Mirabelli D, et al. Mortality and mesothelioma incidence among chrysotile asbestos miners in Balangero, Italy: A cohort study. Am J Ind Med 2020; 63:135-45.

Finkelstein MM. Mortality among employees of an Ontario asbestos-cement factory. Am Rev Respir Dis 1984; 129:754-61.

Finkelstein MM. Re: Brent L. Finley, Stacey M. Benson & Gary M. Marsh (2017): Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology, Inhalation Toxicology, DOI: 10.1080/08958378.2017.1336187. Inhalation Toxicology 2017; 29:387-8.

Finley BL, Benson SM, Marsh GM. Cosmetic talc as a risk factor for pleural mesothelioma: A weight of evidence evaluation of the epidemiology. Inhalation Toxicology 2017; 229:179-85.

Finley BL, Benson SM, Marsh GM. Response to letters regarding "Cosmetic talc as a risk factor for pleural mesothelioma: A weight of evidence evaluation of the epidemiology". Inhal Tox 2018; 30:1-4.

Fishbein, A, Hammonck,BD, Panigrahy,D. Carcinogenesis: Failure of resolution of inflammation. Pharmacology & Therapeutics 2020; 1-36.

Fiume MM, Boyer I, et al. Safety Assessment of Talc as Used in Cosmetics. Int J Toxicol 2015; 34:66S-129S.

Fordyce TA, Leonhard MJ, et al. A 37-year update on mortality patterns in an expanded cohort of Vermont talc miners and millers. J Occup Env Med 2019; 61:916-23.

Fordyce TA, Leonhard MJ, et al. Letter to the Editor: Egilman et. al.'s misrepresentation of the Fordyce et al. (2019) Vermont talc miners and millers cohort study update. J Occup Env Med 2020; 62:e19-e21.

Gamble J, Greife A, Hancock J. An Epidemiological-Industrial Hygiene Study of Talc Workers. Ann Occup Hyg 1982; 26:841-59.

Gardner MJ, Winter PD, et al. Follow up study of workers manufacturing chrysotile asbestos cement products. British Journal of Industrial Medicine 1986; 43:726-32.

Gaudino G, Xue J, Yang H. How asbestos and other fibers cause mesothelioma. Trans Lung Cancer Res 2020; 9:S39-S46.

Gennaro V, Ugolini D, et al. Incidence of pleural mesothelioma in Liguria Region, Italy (1996-2002). Eur J Cancer 2005; 41:2709-14.

Gibb H, Fulcher K, et al. Analyses of radiation and mesothelioma in the US Transuranium and Uranium Registries. Am J Pub Health 2013; 103:710-6.

Gilham C, Rake C, et al. Pleural mesothelioma and lung cancer risks in relation to occupational history and asbestos lung burden. Occupational and Environmental Medicine 2016; 73:290-9.

Glynn ME, Keeton KA, et al. Ambient asbestos fiber concentrations and long-term trends in pleural mesothelioma incidence between urban and rural areas in the United States (1973-2012). Risk Analysis 2018; 38:454-71.

Gogou E, Hatzoglou C, et al. Mesothelioma mortality rates in Greece for the period 2005–2015 is increased compared to previous decades. Medicina 2019; 55(8): 419.

Goldberg M, Imbernon E, et al. The French National Mesothelioma Surveillance Program. Occup Environ Med 2006; 63:390-5.

Goodman JE, Nascarella MA, Valberg PA. Ionizing radiation: a risk factor for mesothelioma. Cancer Causes Control 2009; 20:1237-54.

Gorini G, Silvestri S, et al. [Tuscany mesothelioma registry (1988-2000): evaluation of asbestos exposure]. Med Lav 2002; 93:507-18.

Greenland S. Attributable Fraction and Probability of Causation. Republished in Wiley StatsRef: Statistics Reference Online. 2014. (originally published online in 2008 in Encyclopedia of Quantitative Risk Analysis and Assessment).

**JA1201**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Gyorik S, Erni S, et al. Long-term follow-up of thoracoscopic talc pleurodesis for primary spontaneous pneumothorax. Eur Resp J 2007; 29:757-60.

Hassan R, Alexander R. Nonpleural mesotheliomas: mesothelioma of the peritoneum, tunica vaginalis, and pericardium. Hematol Oncol Clin NA 2005; 19:1067-87, vi.

Hein MJ, Stayner LT, et al. Follow-up study of chrysotile textile workers: Cohort mortality and exposure-response. Occup Environ Med 2007; 64:616-25.

Hemminki K, Li X. Time trends and occupational risk factors for peritoneal mesothelioma in Sweden. J Occup Environ Med 2003; 45:451-5.

Henley SJ, Larson TC, et al. Mesothelioma incidence in 50 states and the District of Columbia, United States, 2003-2008. Int J Occup Env Health 2013; 19:1-10.

Hennekens CH, Buring JE, Mayrent SL. Statistical association and cause-effect relationships. In: Hennekens CH, Buring JE, Mayrent SL, eds. Epidemiology in medicine. 1st ed. Boston: Little Brown; 1987:30-53.

Hildick-Smith GY. The biology of talc. Br J Ind Med 1976; 33:217-29.

Hilliard AK, Lovett JK, McGavin CR. The rise and fall in incidence of malignant mesothelioma from a British Naval Dockyard, 1979-1999. Occ Med 2003; 53:209-12.

Hodgson DC, Gilbert ES, et al. Long-term solid cancer risk among 5-year survivors of Hodgkin's lymphoma. J Clin Oncol 2007; 25:1489-97.

Hodgson JT, Darnton A. The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure. Annals of Occupational Hygiene 2000; 44:565-601.

Hodgson JT, Darnton A. Mesothelioma risk from chrysotile. Occup Env Med 2010; 67:432.

Honda Y, Beall C, et al. Mortality among workers at a talc and mining facility. Ann Occup Hyg 2002; 46:575-85.

Hosgood HD, Cosgrove C, et al. Lung cancer mortality among smokers and never-smokers in the United States. Epidemiol 2020; 31:e24-e5.

Howlader N, Noone AM, et al. Tables 17.1- 17.13 and Figure 17.1 (Mesothelioma) from: SEER Cancer Statistics Review (CSR) 1975-2017, Based on Nov., 2019 SEER Data Submission and Posted to the SEER Website April, 2020. Retrieved June 26, 2020 from: https://seer.cancer.gov/csr/1975_2017/browse_csr.php. Bethesda, MD: U.S. Dept. of Health and and Human Services, National Institutes of Health, National Cancer Institute (NCI); 2020.

Hughes JM, Weill H, Hammad YY. Mortality of workers employed in two asbestos cement manufacturing plants. Br J Ind Med 1987; 44:161-74.

Hung YP, Dong F, et al. Identification of ALK Rearrangements in Malignant Peritoneal Mesothelioma. JAMA Oncol 2018; 4:235-8.

IARC. Preamble to the IARC Monographs: B. Scientific Review and Evaluation. January 23, 2006. Retrieved  from: https://monographs.iarc.fr/preamble-to-the-iarc-monographs-amended-january-2006/preamble-to-the-iarc%20-monographs-13/. Lyon: WHO (World Health Organization 2006.

IARC. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 93: Carbon Black, Titanium Dioxide, and Talc. Lyon, France: International Agency for Research on Cancer; 2010.

IARC. Volume 100: A Review of Carcinogens. Part C: Arsenic, Metals, Fibres, and Dusts. Lyon, France: World Health Organization, International Agency for Research on Cancer; 2012.

IARC. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 111: Some Nanomaterials and Some Fibres. Retrieved from: https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Some-Nanomaterials-And-Some-Fibres-2017. Lyon: IARC Press-WHO; 2017.

JA1202

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

IARC. IARC Monographs on the Identification of Carcinogenic Hazards to Humans: Preamble. Amended
    Jan., 2019. Retrieved Oct. 27, 2020 from: https://monographs.iarc.fr/wp-
    content/uploads/2019/07/Preamble-2019.pdf. Lyon: World Health Organization (WHO)-
    International Agency for Research on Cancer (IARC); 2019.

Ierardi AM, Marsh GM. Absence of mesothelioma risk maintained in an expanded international cohort
    of cosmetic talc miners and millers. Inhal Tox 2020; 32:257-64.

Iwatsubo Y, Pairon JC, et al. Pleural mesothelioma: dose-response relation at low levels of asbestos
    exposure in a French population-based case-control study. Am J Epidemiol 1998; 148:133-42.

Jarvholm B. Carcinogens in the construction industry. Ann NY Acad Sci 2006; 1076:421-8.

Jarvholm B, Sanden A. Lung cancer and mesothelioma in the pleura and peritoneum among Swedish
    insulation workers. Occup Environ Med 1998; 55:766-70.

Jasani B, Gibbs A. Mesothelioma not associated with asbestos exposure. Arch Pathol Lab Med 2012;
    136:262-7.

Jaurand MC, Fleury-Feith J. Pathogenesis of malignant pleural mesothelioma. Respirology 2005; 10:2-8.

Ji J, Sundquist J, Sundquist K. Incidence and familial risk of pleural mesothelioma in Sweden: a national
    cohort study. Eur Respir J 2016; 48:873-9.

Jiang Z, Chen T, et al. Hand-spinning chrysotile exposure and risk of malignant mesothelioma: A case-
    control study in Southeastern China. Int J Cancer 2018; 142:514-23.

Jones JSP, Smith PG, et al. The Consequences of Exposure to Asbestos Dust in a Wartime Gas-Mask
    Factory. In: Wagner JC, ed. Biological Effects of Mineral Fibres Volume 2, IARC Scientific
    Publication No 30. Lyon, France: International Agency for Research on Cancer; 1980:637-53.

Kanarek MS. Mesothelioma from chrysotile asbestos: update. Ann Epidemiol 2011; 21:688-97.

Katsnelson BA, Mokronosova KA. Non-fibrous mineral dusts and malignant tumors: An epidemiological
    study of mortality. J Occup Med 1979; 21:15-20.

Kerger BD, James RC, Galbraith DA. Tumors that mimic asbestos-related mesothelioma: Time to consider
    a genetics-based tumor registry? Front Genet 2014; 5:151.

Kishimoto T, Gemba K, et al. Clinical study on mesothelioma in Japan: Relevance to occupationa
    asbestos exposure. Am J Ind Med 2010; 53:1081-7.

Kleinfeld M, Messite J, et al. Mortality among talc miners and millers in New York State. Arch Environ
    Health 1967; 14:663-7.

Kleinfeld M, Messite J, Zaki MH. Mortality experiences among talc workers: A follow-up study. Occup
    Med 1974; 16:345-9.

Koskinen K, Pukkala E, et al. Incidence of cancer among the participants of the Finnish Asbestos
    Screening Campaign. Scand J Work Env Health 2003; 29:64-70.

Kraynie A, de Ridder GG, et al. Malignant mesothelioma not related to asbestos exposure: Analytical
    scanning electron microscopic analysis of 83 cases and comparison with 442 asbestos-related
    cases. Ultrastruct Path 2016; 40:142-6.

Laconi E, Marongiu F, DeGregori J. Cancer as a disease of old age: Changing mutational and
    microenvironmental landscapes. Br J Cancer 2020; 122:943-52.

Lacourt A, Gramond C, et al. Occupational and non-occupational attributable risk of asbestos exposure
    for malignant pleural mesothelioma. Thorax 2014; 69:532-9.

Lacourt A, Leveque E, et al. Dose-time-response association between occupational asbestos exposure
    and pleural mesothelioma. Occup Env Med 2017; 74:691-7.

Laitman Y, Newberg J, et al. The spectrum of tumors harboring BAP1 gene alterations. Cancer Genet
    2021; 256-257:31-5.

Lamm SH, Levine MS, et al. Analysis of excessive lung cancer risk in short-term employees. Am J
    Epidemiol 1988; 127:1202-9.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Lange P, Mortensen J, Groth S. Lung function 22-35 years after treatment of idiopathic spontaneous pneumothorax with talc poudrage or simple drainage. Thorax 1988; 43:559-61.

Lee M, Alexander HR, Burke A. Diffuse mesothelioma of the peritoneum: a pathological study of 64 tumours treated with cytoreductive therapy. Pathol 2013; 45:464-73.

Li C, Sung F. A review of the healthy worker effect in occupational epidemiology. Occup Med 1999: 49: 225-229.

Li L, Sun TD, et al. Cohort studies on cancer mortality among workers exposed only to chrysotile asbestos: a meta-analysis. Biomed Environ Sci 2004; 17:459-68.

Lin S, Wang X, et al. Cause-specific mortality in relation to chrysotile-asbestos exposure in a Chinese cohort. J Thorac Oncol 2012; 7:1109-14.

Lippmann M. Toxicological and epidemiological studies on effects of airborne fibers: Coherence and public [corrected] health implications. Crit Rev Toxicol2014; 44:643-95.

Liu B, van Gerwen M, et al. Epidemiology of environmental exposure and malignant mesothelioma. J Thorac Oncol 2017; 12:1031-45.

Liu S, Staats P, et al. Diffuse mesothelioma of the peritoneum: Correlation between histological and clinical parameters and survival in 73 patients. Pathol 2014; 46:604-9.

Loomis D, Richardson DB, Elliott L. Quantitative relationships of exposure to chrysotile asbestos and mesothelioma mortality. Am J Ind Med 2019; 62:471-7.

Luberto F, Ferrante D, et al. Cumulative asbestos exposure and mortality from asbestos related diseases in a pooled analysis of 21 asbestos cement cohorts in Italy. Env Health 2019; 18:71.

Magnani C, Dalmasso P, et al. Increased risk of malignant mesothelioma of the pleura after residential or domestic exposure to asbestos: A case-control study in Casale Monferrato, Italy. Environ Health Perspect 2001; 109:915-9.

Magnani C, Ferrante D, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med 2008; 65:164-70.

Marchevsky AM, Harber P, et al. Mesothelioma in patients with nonoccupational asbestos exposure. An evidence-based approach to causation assessment. Ann Diagn Pathol 2006; 10:241-50.

Marinaccio A, Binazzi A, et al. Analysis of latency time and its determinants in asbestos related malignant mesothelioma cases of the Italian register. Eur J Cancer 2007; 43:2722-8.

Marinaccio A, Binazzi A, et al. Pleural malignant mesothelioma epidemic: incidence, modalities of asbestos exposure and occupations involved from the Italian National Register. Int J Cancer 2012;130: 2146-54.

Marinaccio A, Binazzi A, et al. Malignant mesothelioma due to non-occupational asbestos exposure from the Italian national surveillance system (ReNaM): Epidemiology and public health issues. Occup Environ Med 2015; 72:648-55.

Marsh GM, Ierardi AM, et al. Occupational exposures to cosmetic talc and risk of mesothelioma: An updated pooled cohort and statistical power analysis with consideration of latency period. Inhal Tox 2019; 31:213-23.

Marsh GM, Ierardi AM. Confidence interval function analysis to evaluate the risk of mesothelioma among an expanded international cohort of cosmetic talc miners and millers. Reg Tox Pharm 2020; 115:104696.

Mazurek, JM, Syamlal G, et al. Malignant mesothelioma mortality-United States, 1999-2015. MMWR 2017; 66: 8-214.

McCormack V, Peto J, et al. Estimating the asbestos-related lung cancer burden from mesothelioma mortality. Br J Cancer 2012; 106:575-84.

McDonald AD, Case BW, et al. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. Ann Occup Hyg 1997; 41:707-19.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

McDonald AD, Fry JS, et al. Dust exposure and mortality in an American chrysotile textile plant. Br J Ind Med 1983; 40:361-7.

McDonald AD, Fry JS, et al. Dust exposure and mortality in an American factory using chrysotile, amosite, and crocidolite in mainly textile manufacture. Br J Ind Med 1982; 39:368-74.

McDonald AD, Fry JS, et al. Dust exposure and mortality in an American chrysotile asbestos friction products plant. Br J Ind Med 1984; 41:151-7.

McDonald AD, McDonald JC. Malignant mesothelioma in North America. Cancer 1980; 46:1650-6.

McDonald JC, Gibbs GW, et al. Mortality after long exposure to cummingtonite-grunerite. Am Rev Resp Dis 1978; 118:271-7.

Menegozzo S, Comba P, et al. Mortality study in an asbestos cement factory in Naples, Italy. Ann Ist Super Sanita 2011; 47:296-304.

Mensi C, De Matteis S, et al. Incidence of mesothelioma in Lombardy, Italy: Exposure to asbestos, time patterns and future projections. Occup Env Med 2016; 73:607-13.

Merlo DF, Bruzzone M, et al. Mortality among workers exposed to asbestos at the shipyard of Genoa, Italy: a 55 years follow-up. Environ Health 2018; 17:94.

Metintas M, Metintas S, et al. Epidemiology of pleural mesothelioma in a population with non-occupational asbestos exposure. Respirology 2008; 13:117-21.

Meurman LO, Pukkala E, Hakama M. Incidence of cancer among anthophyllite asbestos miners in Finland. Occup Environ Med 1994; 51:421-5.

Meza R, Meernik C, et al. Lung cancer incidence trends by gender, race and histology in the United States, 1973-2010. PLoS One 2015; 10:e0121323.

Mezei G, Chang ET, et al. Epidemiology of mesothelioma of the pericardium and tunica vaginalis testis. Annals Epidemiol 2017; 27:348-59.

Mirabelli D. Letter on: "Cosmetic talc as a risk factor for pleural mesothelioma: A weight of evidence evaluation of the epidemiology". Inhal Toxicol 2017; 29:341-.

Mirabelli D, Cavone D, et al. Non-occupational exposure to asbestos and malignant mesothelioma in the Italian National Registry of Mesotheliomas. Occup Environ Med 2010; 67:792-4.

Moline J, Bevilacqua K, et al. Mesothelioma associated with the use of cosmetic talc. J Occup Env Med 2020; 62:11-7.

Moolgavkar SH, Chang ET, et al. Epidemiology of mesothelioma. In: Testa JR, ed. Asbestos and Mesothelioma Current Cancer Research. Cham, Switzerland: Springer; 2017:43-72.

Moolgavkar SH, Meza R, Turim J. Pleural and peritoneal mesotheliomas in SEER: Age effects and temporal trends, 1973-2005. Cancer Causes and Control 2009; 20:935-44.

Mujahed T, Tazelaar HD, et al. Malignant Peritoneal Mesothelioma Arising in Young Adults With Long-standing Indwelling Intra-abdominal Shunt Catheters. Am J Surg Pathol 2021; 45:255-62.

Musk B, Gordon L, et al. Risk factors for malignant mesothelioma in people with no known exposure to asbestos. Am J Ind Med 2017; 60:432-6.

NCI. General Information About Malignant Mesotheliomaa. Retrieved Dec. 12, 2018 from: https://www.cancer.gov/types/mesothelioma. Bethesda, MD: National Cancer Institute (NCI) 2015.

NTP. Handbook for Conducting a Literature-Based Health Assessment Using OHAT Approach for Systematic Review and Evidence Integration. March 4, 2019. Research Triangle Park, NC Office of Health Assessment and Translation (OHAT), Division of the National Toxicology Program, National Institute of Environmental Health Sciences; 2019.

Neri M, Ugolini D, et al. Genetic susceptibility to malignant pleural mesothelioma and other asbestos-associated diseases. Mutat Res 2008; 659:126-36.

**JA1205**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Neuberger M, Kundi M. Individual asbestos exposure: smoking and mortality--a cohort study in the asbestos cement industry. Br J Ind Med 1990; 47:615-20.

Newhouse ML, Thompson H. Mesothelioma of pleura and peritoneum following exposure to asbestos in the London area. Br J Ind Med 1965; 22:261-9.

Newhouse ML, Sullivan KR. A mortality study of workers manufacturing friction materials: 1941-86. Br J Ind Med 1989; 46:176-9.

Nicholson WJ. The carcinogenicity of chrysotile asbestos - A review. Ind Health 2001; 39:57-64.

NIOSH. National Occupational Mortality Surveillance (NOMS). U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, Division of Field Studies and Engineering, Health Informatics Branch (2019). Accessed 1/7/22.

NIOSH. Current Intelligence Bulletin 62: Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research. DHHS No. 2011-159. March, 2011. Cincinnati, OH: Department of Health and Human Services, Centers for Disease and Prevention, National Institute for Occupational Safety and Health (NIOSH) 2011.

Noonan CW. Environmental asbestos exposure and risk of mesothelioma. Ann Trans Med 2017; 5:234.

Ohlson CG, Hogstedt C. Lung cancer among asbestos cement workers. A Swedish cohort study and a review. Br J Ind Med 1985; 42:397-402.

Ortega-Guerrero MA, Carrasco-Nunez G, et al. High incidence of lung cancer and malignant mesothelioma linked to erionite fibre exposure in a rural community in Central Mexico. Occup Env Med 2015; 72:216-8.

Pagliuca F, Zito Marino F, et al. Inherited predisposition to malignant mesothelioma: germline BAP1 mutations and beyond. Eur Rev Med Pharmacol Sci 2021; 25:4236-46.

Panou V, Gadiraju M, et al. Frequency of germline mutations in cancer susceptibility genes in malignant mesothelioma. J Clin Oncol 2018; 36:2863-71.

Petersen K, Pukkala E, et al. Cancer incidence among seafarers and fishermen in the Nordic countries. Scand J Work Env Health 2020; 46:461-8.

Peto J, Doll R, et al. Relationship of mortality to measures of environmental asbestos pollution in an asbestos textile factory. Ann Occup Hyg 1985; 29:305-55.

Pierce JS, McKinley MA, et al. An evaluation of reported no-effect chrysotile asbestos exposures for lung cancer and mesothelioma. Crit Rev Toxicol 2008; 38:191-214.

Pierce JS, Ruestow PS, Finley BL. An updated evaluation of reported no-observed adverse effect levels for chrysotile asbestos for lung cancer and mesothelioma. Crit Rev Toxicol 2016; 46:561-86.

Pintos J, Parent ME, et al. Risk of mesothelioma and occupational exposure to asbestos and man-made vitreous fibers: evidence from two case-control studies in Montreal, Canada. J Occup Environ Med 2009; 51:1177-84.

Piolatto G, Negri E, et al. An update of cancer mortality among chrysotile asbestos miners in Balangero, northern Italy. Br J Ind Med 1990; 47:810-4.

Pira E, Coggiola M, et al. Mortality of talc miners and millers from Val Chisone, Northern Italy: An updated cohort study. Occup Environ Med 2017a; 59:659-64.

Pira E, Coggiola M, et al. Response to Letter to the Editor On the Mortality of Talc Miners and Millers From Val Chisone, Northern Italy. Occup Environ Med 2017b; 59:e195.

Pira E, Romano C, et al. Mortality from cancer and other causes among Italian chrysotile asbestos miners. Occup Environ Med 2017c; 74:558-63.

Pira E, Pelucchi C, et al. Mortality from cancer and other causes in the Balangero cohort of chrysotile asbestos miners. Occup Environ Med 2009; 66:805-9.

**JA1206**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Pira E, Pelucchi C, et al. Cancer mortality in a cohort of asbestos textile workers. Br J Cancer 2005; 92:580-6.

Plato N, Martinsen JI, et al. Occupation and mesothelioma in Sweden: updated incidence in men and women in the 27 years after the asbestos ban. Epidemiol Health 2016; 38:e2016039.

Poland CA, Duffin R. The toxicology of chrysotile-containing brake debris: implications for mesothelioma. Crit Rev Toxicol 2019; 49: 11-35.

Price B, Ware A. Time trend of mesothelioma incidence in the United States and projection of future cases: an update based on SEER data for 1973 through 2005. Crit Rev Toxicol 2009; 39:576-88.

Pukkala E, Martinsen JI, et al. Occupation and cancer - follow-up of 15 million people in five Nordic countries. Acta Oncol 2009; 48:646-790.

Puntoni R, Merlo F, et al. A historical cohort mortality study among shipyard workers in Genoa, Italy. Am J Ind Med 2001; 40:363-70.

Raffn E, Lynge E, et al. Incidence of cancer and mortality among employees in the asbestos cement industry in Denmark. Br J Ind Med 1989; 46:90-6.

Rai K, Pilarski R, et al. Comprehensive review of BAP1 tumor predisposition syndrome with report of two new cases. Clin Genet 2016; 89:285-94.

Rake C, Gilham C, et al. Occupational, domestic and environmental mesothelioma risks in the British population: a case-control study. Br J Cancer 2009; 100:1175-83.

Reid A, Franklin P, et al. Are children more vulnerable to mesothelioma than adults? A comparison of mesothelioma risk among children and adults exposed non-occupationally to blue asbestos at Wittenoom. Occup Environ Med 2018;75: 898-903.

Reid A, de Klerk NH, et al. Mesothelioma risk after 40 years since first exposure to asbestos: A pooled analysis. Thorax 2014; 69:843-50.

Reid A, Franklin P, et al. All-cause mortality and cancer incidence among adults exposed to blue asbestos during childhood. Am J Ind Med 2013; 56:133-45.

Rhomberg LR, Goodman JE, et al. Linear low-dose extrapolation for noncancer heath effects is the exception, not the rule. Crit Rev Tox 2011; 41:1-19.

Rodelsperger K, Jockel KH, et al. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study. Am J Ind Med 2001; 39:262-75.

Roelofs CR, Kernan GJ, et al. Mesothelioma and employment in Massachusetts: Analysis of cancer registry data 1988-2003. Am J Ind Med 2013; 56:985-92.

Roggli VL, Carney JM, et al. Talc and mesothelioma: mineral fiber analysis of 65 cases with clinicopathological correlation. Ultrastruct Pathol 2020:1-8.

Roggli V, Oury TD. Pathology of Asbestos Associated Diseases. Second ed. New York, NY: Springer-Verlag New York, Inc.; 2004.

Roggli VL, Sanders LL. Asbestos content of lung tissue and carcinoma of the lung: a clinicopathologic correlation and mineral fiber analysis of 234 cases. Ann Occup Hyg 2000; 44:109-17.

Rolland P, Gramond C, et al. Occupations and industries in France at high risk for pleural mesothelioma: A population-based case-control study (1998-2002). Am J Ind Med 2010; 53:1207-19.

Rossner A, Williams PRD, et al. Analysis of historical worker exposures to respirable dust from talc mining and milling operations in Vermont. Ann Work Exp Health 2020.

Rothman KJ. Modern Epidemiology. Boston: Little Brown & Co.; 1986.

Rozhok A, DeGregori J. A generalized theory of age-dependent carcinogenesis. eLife 2019;8.

Rubino GF, Scansetti G, Piolatto G. Mortality and morbidity among talc miners and millers in Italy. In: Lemen R, Dement JM, eds. Dusts and Disease: Proceedings of the Conference on Occupational

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Exposures to Fibrous and Particulate Dust and Their Extension into the Environment. Park Forest South, IL: Pathotox Publishers; 1979:357-63.

Rubino GF, Scansetti G, et al. Mortality study of talc miners and millers. J Occup Med 1976; 18:186-93.

Rusiecki J, Stewart P, et al. Mortality among Coast Guard Shipyard workers: A retrospective cohort study of specific exposures. Arch Env Occup Health 2018; 73:4-18.

Saebo A, Elgjo K, Lassen J. Could development of malignant mesothelioma be induced by Yersinia enterocolitica infection? Med Hypoth 1993; 40:275-7.

Sakellariou K, Malamou-Mitsi V, et al. Malignant pleural mesothelioma from nonoccupational asbestos exposure in Metsovo (north-west Greece): slow end of an epidemic? European Respiratory Journal 1996; 9: 1206-10.

Saracci R. Erionite and cancer in a Mexican village. Occup Environ Med 2015; 72:163-4.

Schinwald A, Murphy FA, et al. The threshold length for fiber-induced acute pleural inflammation: shedding light on the early events in asbestos-induced mesothelioma. Toxicol Sci 2012; 128:461-70.

Schnatter AR, Chen M, et al. Systematic review and meta-analysis of selected cancers in petroleum refinery workers. J Occup Env Med 2018; 60(7):e329-e342.

Schnatter AR, Wojcik NC, and Jorgensen G. Mortality update of a cohort of Canadian petroleum workers. J Occup Env Med 2019; 61(3):225-238.

Seidman H, Selikoff IJ. Decline in death rates among asbestos insulation workers 1967-1986 associated with diminution of work exposure to asbestos. Ann N Y Acad Sci 1990; 609:300-17; discussion 17-8.

Selevan SG, Dement JM. Mortality patterns among miners and millers of non-asbestiform talc: Preliminary report. Dusts and Disease: Proceedings of the Conference on Occupational Exposures to Fibrous and Particulate Dust and Their Extension into the Environment. R. Lemen and J. M. Dement. Park Forest South, IL, Pathotox Publishers 1979; 379-388.

Selevan SG, Dement JM, et al. Mortality patterns among miners and millers of non-asbestiform talc: preliminary report. J Environ Pathol Toxicol 1979; 2:273-84.

Sichletidis L, Chloros D, et al. Mortality from occupational exposure to relatively pure chrysotile: a 39-year study. Respiration 2009; 78:63-8.

Siemiatycki J, Boffetta P. Invited commentary: Is it possible to investigate the quantitative relation between asbestos and mesothelioma in a community-based study? Am J Epidemiol 1998; 148:143-7.

Simonsen DF, Farkas DK, et al. Tuberculosis and risk of cancer: a Danish nationwide cohort study. Int J Tuberc Lung Dis 2014; 18:1211-9.

Sluis-Cremer GK, Liddell FD, et al. The mortality of amphibole miners in South Africa, 1946-80. Br J Ind Med 1992; 49:566-75.

Smailyte G, Kurtinaitis J, Andersen A. Mortality and cancer incidence among Lithuanian cement producing workers. Occup Env Med 2004; 61:529-34.

Smith AH, Wright CC. Chrysotile asbestos is the main cause of pleural mesothelioma. Am J Ind Med 1996; 30:252-66.

Spirtas R, Heineman EF, et al. Malignant mesothelioma: Attributable risk of asbestos exposure. Occup Environ Med 1994; 51:804-11.

Stayner LT, Dankovic DA, Lemen RA. Occupational exposure to chrysotile asbestos and cancer risk: a review of the amphibole hypothesis. Am J Public Health 1996; 86:179-86.

Stille WT, Tabershaw IR. The mortality experience of upstate New York talc workers. J Occup Med 1982; 24:480-4.

JA1208

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Sullivan PA. Vermiculite, respiratory disease, and asbestos exposure in Libby, Montana: update of a cohort mortality study. Environ Health Perspect 2007; 115:579-85.

Takeshima H, Ushijima T. Accumulation of genetic and epigenetic alterations in normal cells and cancer risk. NPJ Precis Oncol 2019;3:7.

Talcott JA, Thurber WA, et al. Asbestos-associated diseases in a cohort of cigarette-filter workers. N Engl J Med 1989; 321:1220-3.

Teschke K, Morgan MS, et al. Mesothelioma surveillance to locate sources of exposure to asbestos. Can J Public Health 1997; 88:163-8.

Testa JR, Cheung M, et al. Germline BAP1 mutations predispose to malignant mesothelioma. Nat Genet 2011; 43:1022-5.

Teta MJ, Lau E, et al. Therapeutic radiation for lymphoma: risk of malignant mesothelioma. Cancer 2007; 109:1432-8.

Teta MJ, Mink PJ, et al. US mesothelioma patterns 1973-2002: indicators of change and insights into background rates. Eur J Cancer Prev 2008; 17:525-34.

Thanh TD, Tho NV, et al. Simian virus 40 may be associated with developing malignant pleural mesothelioma. Oncol Lett 2016; 11:2051-6.

Thomas HF, Benjamin IT, et al. Further follow-up study of workers from an asbestos cement factory. Br J Ind Med 1982; 39:273-6.

Thomas A, Chen Y, et al. Distinctive clinical characteristics of malignant mesothelioma in young patients. Oncotarget 2015; 6:16766-73.

Thomsen RW, Riis AH, et al. Risk of asbestosis, mesothelioma, other lung disease or death among motor vehicle mechanics: a 45-year Danish cohort study. Thorax 2021.

Till JE, Beck HL, et al. Asbestos exposure and mesothelioma mortality among atomic veterans. Int J Radiat Biol 2018:1-15.

Tomasetti C, Li L, Vogelstein B. Stem cell divisions, somatic mutations, cancer etiology, and cancer prevention. Science 2017; 355:1330-4.

Tomasetti C, Vogelstein B. Cancer etiology. Variation in cancer risk among tissues can be explained by the number of stem cell divisions. Science 2015; 347:78-81.

Tse LA, Yu IT, et al. Are current or future mesothelioma epidemics in Hong Kong the tragic legacy of uncontrolled use of asbestos in the past? Environ Health Perspect 2010; 118:382-6.

Tward JD, Wendland MM, et al. The risk of secondary malignancies over 30 years after the treatment of non-Hodgkin lymphoma. Cancer 2006; 107:108-15.

Ulvestad B, Kjaerheim K, et al. Cancer incidence among workers in the asbestos-cement producing industry in Norway. Scand J Work Environ Health 2002; 28:411-7.

Van Gosen BS, Lowers H, A., et al. Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Content. Berlin: Springer; 2004.

Van Gosen BS, Blitz TA, et al. Geologic occurrences of erionite in the United States: an emerging national public health concern for respiratory disease. Environ Geochem Health 2013; 35:419-30.

Virta RL. Asbestos: Geology, mineralogy, mining, and uses. Open-File Report 02-149. October 2002. Reston, VA: US Department of the Interior, US Geological Survey; 2002.

Virta RL. Mineral Commodity Profiles: Asbestos. USGS Circular 1255-KK. Washington, D.C.: U.S. Department of the Interior, U.S. Geological Survey; 2005.

Viskum K, Lange P, Mortensen J. Long term sequelae after talc pleurodesis for spontaneous pneumothorax. Pneumologie 1989; 43:105-6.

Vivero M, Bueno R, Chirieac LR. Clinicopathologic and genetic characteristics of young patients with pleural diffuse malignant mesothelioma. Mod Pathol 2018; 31:122-31.

# JA1209

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Wang XR, Yu ITS, et al. Cancer mortality among Chinese chrysotile asbestos textile workers. Lung Cancer 2012; 75:151-5.

Wergeland E, Aage Andersen, Anders Berheim. Morbidity and mortality in talc-exposed workers. Am J Ind Med 1990; 17:505-13.

Wergeland E, Gjertsen F, et al. Cause-specific mortality and cancer morbidity in 390 male workers exposed to high purity talc, a six-decade follow-up. Am J Ind Med 2017; 60:821-30.

White N, Nelson G, Murray J. South African experience with asbestos related environmental mesothelioma: is asbestos fiber type important? Regul Toxicol Pharmacol 2008; 52:S92-6.

Wild P, Leodolter K, et al. A cohort mortality and nested case-control study of French and Austrian talc workers. J Occup Environ Med 2002; 59:98-105.

Williams PR, Phelka AD, Paustenbach DJ. A review of historical exposures to asbestos among skilled craftsmen (1940-2006). J Toxicol Environ Health 2007; 10:319-77.

Wong J, Rice, C, et al. Mesothelioma risk among those exposed to chrysotile asbestos only and mixtures that include amphibole: a case-control study in the US, 1975-1980. Occup Environ Med 2020.

Wright, JD, St. Clair, CM, Deutsch, I… Herzog, TJ. Pelvic radiotherapy and the risk of secondary leukemia and multiple myeloma. Cancer 2010; 2486-2492.

Wylie AG, Korchevskiy A, et al. Modeling mesothelioma risk factors from amphibole fiber dimensionality: mineralogical and epidemiological perspective. J Appl Tox 2020; 40:515-24.

Yano E. Adverse health effects of asbestos: solving mysteries regarding asbestos carcinogenicity based on follow-up survey of a Chinese factory. Environ Health Prev Med 2018; 23:35.

Yarborough CM. Chrysotile as a cause of mesothelioma: An assessment based on epidemiology. Crit Rev Toxicol 2006; 36:165-87.

Yarborough CM. The risk of mesothelioma from exposure to chrysotile asbestos. Curr Opin Pulm Med 2007; 13:334-8.

Zhang T, Joubert P, et al. Genomic and evolutionary classification of lung cancer in never smokers. Nat Genet 2021; 53(9):1348-1359.

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

# Attachment A – Curriculum Vitae



**Professional History**

**Senior Principal Health Scientist, Cardno ChemRisk (2018-Current)**

*Cardno ChemRisk*

Nominated ChemRisk Fellow, December 2021.

Appointed by US Environmental Protection Agency (US EPA) Administrator to US EPA's Science Advisory Board (SAB) and Chair, US EPA's Chemical Assessment Advisory Committee (CAAC) (2021). (2021). Congress established the SAB in 1978 to provide scientific advice to the EPA Administrator.

**Principal and Health Sciences Global Network Leader (2003-2018)**

*Ramboll US Corporation (formerly ENVIRON International Corporation)*

Developed and lead Ramboll US's (formerly ENVIRON International Corporation's) Health Sciences Global Practice; directed the Applied Epidemiology Practice Area.

**President and Founder (1991-2003)**

*Applied Epidemiology, Inc.*

Formed consultancy focused on applying epidemiological concepts and methods to diverse occupational and environmental health challenges.

**Associate Professor, Department of Family Medicine and Community Health (1997-2002)**

*University of Massachusetts Medical School, Worcester*

Adjunct faculty member of and advisor to the Occupational Medicine Residency Program. Collaborated in conducting clinical trial on carpal tunnel release surgery. Taught epidemiology component of Masters in Public Health (MPH) Program.

**Associate Professor of Epidemiology, School of Public Health and Health Sciences (1989-1999)**

*University of Massachusetts at Amherst*

Taught at the graduate university level in epidemiological concepts and methods in the Department of Biostatistics and Epidemiology. Developed and directed the Occupational Epidemiology Unit. Mentored dozens of students at the doctoral and masters level.

**Professional Honors/Awards**

> Appointed Senior Principal in Cardno's Technical Excellence Program (2020).Kammer Merit in Authorship Award, American College of Occupational and Environmental Medicine, 2017
> Award for Significant Contributions to the field of Public Health, University of Massachusetts School of Public Health, 2011
> Teaching Excellence Award, University of Massachusetts School of Public Health, 1995
> Delta Omega Award for Dissertation Research, University of North Carolina at Chapel Hill, 1990

**JA1213**



| **Membership in Professional Societies** | > Fellow, American College of Epidemiology (FACE) |
| | > Delta Omega – Public Health Honorary Society |
| | > International Commission on Occupational Health |
| | > MEDICHEM |
| | > Sigma Xi - The Scientific Research Honor Society |
| | > Society for Risk Analysis |

**Membership in Professional Societies**

> Fellow, American College of Epidemiology (FACE)
> Delta Omega – Public Health Honorary Society
> International Commission on Occupational Health
> MEDICHEM
> Sigma Xi - The Scientific Research Honor Society
> Society for Risk Analysis

**Other Professional Activities**

> Secretary General, MEDICHEM, 2015-2020
> Secretary, ICOH Scientific Committee on Occupational Health and Safety in the Chemical Industry 2016-2019
> Associate Director for Institutional Engagement, Institute for Global Health, University of Massachusetts, 2018-present
> Officer and Member of the Board, Alliance for Global Health Innovation (a 501(c)(3) charitable organization), Atlanta, GA., 2018-present
> Member of the Board, American University of the Caribbean, Les Cayes, Haiti, 2019-present
> Member, Dean's Advisory Board, University of Massachusetts School of Public Health and Health Sciences, 2002-present
> Editorial Service
>   – Member, Editorial Board, Journal of Public Health and Emergency, 2019-present
>   – Advisory Editor, Archives of Industrial Hygiene and Toxicology, 2013-present
>   – Member Executive/Steering Committee, International Hormesis Society, 2005-preset
>   – Advisory Editor, International Archives of Occupational and Environmental Health, 2002-present
>   – Associate Editor, Dose-Response, 2001-2012

> Member, Ethics Committee, American College of Epidemiology, 2016-2019
> Invited Observer, Proceedings of IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volumes 93, 98 and 100f, International Agency for Research on Cancer (IARC), 2006-2009
> Scientific Consultant, Science Review Board, FIFRA Scientific Advisory Panel, United States Environmental Protection Agency (EPA), 2002-2004
> Epidemiology Consultant and Scientific Advisor, Health Services Department, The World Bank, 1993-2004
> Member of the Board of Directors and Haiti Program Director, Opportunities for Communities, Inc., a 501(c)(3) educational organization, 2008-present
> Peer Reviewer in Epidemiology, Agency for the Toxic Substances and Disease Registry, 1993-2005

JA1214



**Peer Reviewer**

> Annals of Epidemiology
> Archives of Industrial Hygiene and Toxicology
> BMC Cancer
> Cancers
> Critical Reviews in Toxicology
> Dose-Response
> International Archives of Occupational and Environmental Health
> Occupational and Environmental Medicine
> Regulatory Toxicology and Pharmacology

**Academic Appointments**

> Adjunct Professor of Epidemiology, University of South Carolina, 2018-present
> Adjunct Professor of Environmental Health, University of South Carolina, 2016-present
> Adjunct Professor of Epidemiology, University of Massachusetts, 2005-present
> Adjunct Professor of Epidemiology, University of North Carolina, 2007-2019
> Adjunct Associate Professor, Department of International Health, School of Nursing and Health Studies, Georgetown University, 2002-2007
> Consulting Faculty, United States Navy, Department of Undersea Medicine, Naval Submarine Base, New London, CT, 1999
> Visiting Professor, Abteilung für Sozialmedizin und Epidemiologie, Ruhr-Universität Germany 1991-1994
> Epidemiology Short Course Instructor: Norway, Germany, Slovakia, Thailand, Italy, Switzerland and USA

**Publications**

**Publications in Peer-Reviewed Medical and Health Journals**

> Haase LM, Birk T, Bachand AM, Mundt KA. A Health Surveillance Study of Workers employed at a Copper Smelter - Effects of Long-Term Exposure to Copper on Lung Function using Spirometric Data. J Occup Environ Med. 2021 Aug 1;63(8):e480-e489.
> Mundt KA, Dell L, Boffetta P, Beckett E, Lynch H, Desai V, Lin C-K, Thompson W. The importance of evaluating specific myeloid malignancies in epidemiological studies of environmental carcinogens. BMC Cancer. 2021 Mar 6;21(1):227.
> Dell LD, Gallagher AE, Yost LJ, Mundt KA. Integration of Evidence on Community Cancer Risks from Elongate Mineral Particles in Silver Bay, Minnesota. Risk Anal. 2021 Sep;41(9):1674-1692.
> Lauer DJ, Mundt KA, Thompson WJ, Best EA. Letter to the Editor: Largely Unchanged Annual Incidence and Overall Survival of Pleural Mesothelioma in the USA. World J Surg. 2020 Dec;44(12):4279-4280.
> Sax SN, Gentry PR, Van Landingham C, Clewell HJ, Mundt KA. Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen. Risk Anal; 2020;40(2):294-318.

JA1215



> Andersen ME, Gentry PR, Swenberg JA, Mundt KA, White KW, Thompson C, Bus H, Sherman JH, Greim H, Bolt H, Marsh GM, Checkoway H, Coggon D, Clewell, HJ III. Considerations for refining the risk assessment process for formaldehyde: Results from an interdisciplinary workshop. Advance online publication, May 3, 2019. Regul Toxicol Pharmacol 2019;106:210-223.

> Catalani SF, Donato F, Madeo E,Apostoli P, De Palma G, Pira E, Mundt KA, Boffetta P. Occupational exposure to formaldehyde and risk of non hodgkin lymphoma: a meta-analysis. BMC Cancer 2019;19(1):1245.

> Checkoway H, Lees PSJ, Dell LD, Gentry PR, Mundt KA. Peak Exposures in Epidemiologic Studies and Cancer Risks: Considerations for Regulatory Risk Assessment. Advance online publication March 29, 2019. Risk Anal 2019;39(7):1441-1464.

> Vincent MJ, Kozal JS, Thompson WJ, Maier A, Dotson GS, Best EA, Mundt KA. Ethylene Oxide: Cancer Evidence Integration and Dose-Response Implications. Dose Response 2019;17(4): 1559325819888317.

> Boffetta P, Mundt KA, Thompson WJ. The epidemiologic evidence for elongate mineral particle (EMP)-related human cancer risk. Toxicol Appl Pharmacol 2018;361:100-106.

> Mundt KA, Gentry PR, Dell LD, Rodricks JV, Boffetta P. Six years after the NRC Review of EPA's Draft IRIS Toxicological Review of Formaldehyde: Regulatory implications of new science in evaluating formaldehyde leukemogenicity. Regulatory Toxicology and Pharmacology 2018 (Feb);92:472-490.

> Mundt KA, Gallagher AE, Dell LD, Natelson EA, Boffetta P, Gentry PR. Response to Dr. Bernard D. Goldstein's Letter to the Editor. Critical Reviews in Toxicology 2018 (May);48(5):341-343.

> Mundt KA, Dell LD, Crawford L, Sax SN, Boffetta P. Cancer Risk Associated with Exposure to Bitumen and Bitumen Fumes: An Updated Systematic Review and Meta-Analysis. Journal of Occupational and Environmental Medicine 2018 (Jan 60);(1):e6-e54.

> Mundt KA, Gallagher AE, Dell LD, Natelson N, Boffetta P, Gentry PR. Formaldehyde, Hematotoxicity, and Chromosomal Changes – Letter to the Editor. Cancer Epidemiology, Biomarkers & Prevention 2018 (Jan 27);(1):119.

> Berge W, Mundt KA, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: A meta-analysis. European Journal of Cancer Prevention 2018 (May);27(3):248-257.

> Mundt KA, Gallagher AE, Dell LD, Natelson EA, Boffetta P, Gentry PR. Does occupational exposure to formaldehyde cause hematotoxicity and leukemia-specific chromosome changes in cultured myeloid progenitor cells? Critical Reviews in Toxicology 2017;47(7): 592-602.

> Mundt KA, Dell LD, Crawford L, Gallagher AE. Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013. Occupational and Environmental Medicine 2017;74(10):709-716.

> Dell LD, Gallagher AE, Crawford L, Jones RM, Mundt KA. Author's response to Dr. Morfeld "Controlling the false Discovery Rate in Many SMR Analyses". Journal of Occupational and Environmental Medicine 2016;58(1):e-23.

JA1216



> Van Landingham C, Mundt KA, Allen BC, Gentry PR. The need for transparency and reproducibility in documenting values for regulatory decision making and evaluating causality: The example of formaldehyde. Regulatory Toxicology and Pharmacology 2016;81:12-521.

> Morfeld P, Mundt KA, Dell LD, Sorahan T, McCunney RJ. Meta-Analysis of Cardiac Mortality in Three Cohorts of Carbon Black Production Workers. International Journal of Environmental Research and Public Health 2016;13(3), 302.

> Mundt KA, Boffetta P. Extended follow-up of lung cancer and non-malignant respiratory disease mortality among California diatomaceous earth workers. Occupational and Environmental Medicine 2016;73(1):71-72.

> Dell LD, Gallagher AE, Crawford L, Jones RM, Mundt KA. Cohort Study of Carbon Black Exposure and Risk of Malignant and Nonmalignant Respiratory Disease Mortality in the US Carbon Black Industry. Journal of Occupational and Environmental Medicine 2015;57(9):984-997.

> Checkoway H, Dell LD, Boffetta P, Gallagher AE, Crawford L, Lees PSJ, Mundt KA. Formaldehyde exposure and mortality risks from acute myeloid leukemia and other lymphohematopoietic malignancies in the US National Cancer Institute Cohort Study of Workers in Formaldehyde Industries.  Journal of Occupational and Environmental Medicine 2015;57(7):785-794.

> McCunney RJ, Morfeld P, Colby WD, Mundt KA. Wind Turbines and Health: An examination of a proposed case definition. Noise & Health 2015;17(77):175-181.

> Morfeld P, Mundt KA, Taeger D, Guldner K, Steinig O, Miller BG. Response to: An Attempt to Estimate an Exposure Threshold Is Not a Scientific Exercise-Example of Silicosis From Exposure to Quartz Dust. Journal of Occupational & Environmental Medicine 2014 Oct;56(10):105.

> Morfeld P, Mundt KA, Taeger D, Guldner K, Steinig O, Miller BG.Response to Letter to the Editor:  Author response to the letter from Dr. Möhner: Threshold value estimation for respirable quartz dust exposure and silicosis.  Journal of Occupational & Environmental Medicine 2014 Feb;56(2):123-5.

> McCunney RJ, Mundt KA, Colby WD, Dobie R, Kaliski K, Blais M.Wind Turbines and Health. A Critical Review of the Scientific Literature.  Journal of Occupational & Environmental Medicine 2014 Nov;56(11)e108-30.

> Morfeld P, Mundt KA, Taeger D, Guldner K, Steinig O, Miller BG. Response to: Healthy-Worker Effect Led to an Overestimation of the Concentration Threshold Value for Respirable Quartz. Journal of Occupational and Environmental Medicine. 2014 Oct;56(10):106-7.

> Checkoway H, Boffetta P, Mundt DJ, Mundt KA. Response letter to the Editor RE: Formaldehyde and leukemia: missing evidence! Cancer Causes Control. 2013 Jan;24(1):205. Epub 2012 Nov 29.

> Morfeld P, Mundt KA, Taeger D, Guldner K, Steinig O, Miller BG. Threshold value estimation for respirable quartz dust exposure and silicosis incidence among workers in the German porcelain industry. Journal of Occupational and Environmental Medicine 2013 Nov;55(9):1027-1034.

> Checkoway H, Boffetta P, Mundt DJ, Mundt KA. Critical review and synthesis of the epidemiologic evidence on formaldehyde exposure and risk of leukemia and

JA1217



other lymphohematopoietic malignancies. Cancer Causes Control 2012; 23(11):1747-1766. E-pub 2012 Sept 5.

> Mundt KA, Birk T, Parsons W, Borsch-Galetke E, Siegmund K, Heavner K, Guldner K. Respirable crystalline silica exposure-response evaluation of silicosis morbidity and lung cancer mortality in the German porcelain industry cohort.  Journal of Occupational & Environmental Medicine, 2011;53(3):282-289. Erratum in 2012 Oct;54(10):1309.

> Boffetta P, Mundt KA, Adami H-O, Cole P, Mandel J. TCDD and cancer: A critical review of epidemiologic studies. Critical Reviews in Toxicology 2011 Aug;41(7):622-36. Epub 2011 Jul 1.

> Schulte PA, Mundt DJ, Nasterlack M, Mulloy KB, Mundt KA. Exposure Registries: overview and utility for nanomaterial workers.  Journal of Occupational and Environmental Medicine 2011 Jun;53(6 Suppl): S42-7.

> Bachand A, Mundt KA, Mundt DJ, Montgomery R.  Epidemiological studies of formaldehyde exposure and risk of leukemia and nasopharyngeal cancer: A Meta-Analysis.  Critical Reviews in Toxicology, 2010;40(2):85-100.

> Bachand A, Mundt KA, Mundt DJ, Carlton LE. Meta-analyses of occupational exposure as a painter and lung and bladder cancer morbidity and mortality 1950-2008.  Critical Reviews in Toxicology, 2010;40(2):101-125.

> Birk T, Guldner K, Mundt KA, Dahmann D, Adams RC, Parsons W. Quantitative crystalline silica exposure assessment for an historical cohort epidemiological study in the German porcelain industry. Journal of Occupational & Environmental Hygiene 2010;7(9):516-528.

> Birk T, Mundt KA, Guldner K, Parsons W, Luippold R. Mortality in the German porcelain industry 1985-2005: First results of an epidemiological cohort study. Journal of Occupational and Environmental Medicine 2009;51(3):373-385.

> Schulte PA, Trout D, Zumwalde R, Kuempel E, Geraci C, Castranova V, Mundt DJ, Mundt KA, Halperin WE. Options for occupational health surveillance of workers potentially exposed to engineered nanoparticles: State of the science. Journal of Occupational and Environmental Medicine 2008;50 (5):517-526.

> Mundt DJ, Mundt KA, Luippold RS, Schmidt MD, Farr CH. Clinical epidemiological study of employees exposed to surfactant blend containing perfluorononanoic acid (PFNA).  Occupational and Environmental Medicine 2007;64(9):589-94. Epub 2007 Apr 4.

> Mundt KA. Cancer risk in the semiconductor industry: responding to the call for action. Occupational and Environmental Medicine 2007;64(1):5-6.

> Mundt DJ, van Wijngaarden E, Mundt KA. An assessment of the possible extent of confounding in epidemiological studies of lung cancer risk among roofers. Journal of Occupational and Environmental Hygiene. 2007;4(S1):163-174.

> Birk T, Mundt KA, Dell LD, Luippold RS, Miksche L, Steinmann-Steiner-Haldenstaett W, Mundt DJ. Lung cancer mortality in the German chromate industry, 1958-1998. Journal of Occupational and Environmental Medicine 2006;48(4):426-433.

> Dell LD, Mundt KA, Luippold RS, Nunes AP, Cohen L, Burch MT, Heidenreich MJ, Bachand AM. A cohort mortality study of employees in the United States carbon black industry. Journal of Occupational and Environmental Medicine 2006;48(12):1219-29.

JA1218



> Mundt KA. An examination of the Environmental Protection Agency risk assessment principles and practices: a brief commentary on section 4.1.3 of the EPA March 2004 Staff Paper. Human and Experimental Toxicology 2006;25(1):19-21.

> Boffetta P, Mundt KA, Dell LD. Response to Swaen & Duijts on the epidemiologic evidence for the carcinogenicity of vinyl chloride monomer. Scandinavian Journal of work, Environment and Health 2005:31(3):236.

> Luippold RS, Mundt KA, Dell LD, Birk T. Low-level hexavalent chromium exposure and rate of mortality among US chromate production employees. Journal of Occupational and Environmental Medicine 2005;47(4):381-385.

> Mundt KA. Statistical challenges in evaluating dose-response using epidemiological data. Dose-Response (formally Nonlinearity in Biology, Toxicology and Medicine) 2005;3:453-455.

> Mundt KA, Luippold R, Dell, L, Birk T. Hexavalent chromium study's conclusions unjustified. Letters to the Editor. Journal of Occupational and Environmental Medicine 2005;47(10):981.

> van Wijngaarden E, Mundt KA, Luippold RS. Evaluation of the exposure-response relationship of lung cancer mortality and occupational exposure to hexavalent chromium based on published epidemiological data. Nonlinearity in Biology, Toxicology and Medicine, 2004; 2(1):27-34.

> Crump C, Crump K, Hack E, Luippold R, Mundt K, Liebig E, Panko J, Paustenbach D, Proctor D. Dose-response and risk assessment of airborne hexavalent chromium and lung cancer mortality. Risk Analysis 2003;23(6):1147-1163.

> Lewis R, Rempala G, Dell LD, Mundt KA. Vinyl chloride and liver and brain cancer at a polymer production plant in Louisville, Kentucky. Journal of Occupational and Environmental Medicine 2003;45(5):533-537.

> Luippold RS, Mundt KA, Austin RP, Liebig E, Panko J, Crump C, Crump K, Proctor D. Lung cancer mortality among chromate production workers. Occupational and Environmental Medicine 2003;60:451-457.

> Mundt KA, Birk T, Burch MT. Critical review of the epidemiological literature on occupational exposure to perchloroethylene and cancer. International Archives of Occupational and Environmental Health 2003;76:473-491.

> Boffetta P, Matisane L, Mundt KA, Dell LD. Meta-analysis of studies of occupational exposure to vinyl chloride in relation to cancer mortality. Scandinavian Journal for Work, Environment and Health 2003;29(3):220-229.

> Mundt KA, Bigelow C, van Wijngaarden E. Apportionment of disease in individuals. Letter to the Editor. Journal of Clinical Epidemiology 2003;56:290-91.

> Proctor DM, Panko JP, Liebig EW, Scott PK, Mundt KA, Buczynski MA, Barnhart RJ, Harris MA, Morgan RJ, Pausentenbach DJ. Workplace airborne hexavalent chromium concentrations for the Painesville, Ohio chromate production plant (1943-1971). Applied Occupational and Environmental Hygiene Journal 2003;18(6):430-449.

> Mundt DJ, Dell LD, Luippold RS, Sulsky SI, Skillings A, Gross R, Cox KI, Mundt KA. Cause-specific mortality among Kelly Air Force Base civilian employees,

JA1219



1981-2001. Journal of Occupational and Environmental Medicine 2002;44(11):989-996.

> Sulsky SI, Mundt KA, Bigelow C, Amoroso PJ. Risk factors for occupational knee-related disability among enlisted women in the US Army. Occupational and Environmental Medicine 2002;59:601-607.

> Sulsky SI, Hooven FH, Burch MT, Mundt KA. Critical review of the epidemiological literature on the potential cardiovascular effects of occupational carbon disulfide exposure. International Archives of Occupational and Environmental Health 2002;75:365-80.

> Dimberg LA, Striker J, Nordanlycke-Yoo C, Nagy L, Mundt KA, Sulsky SI. Mental health insurance claims among spouses of frequent business travelers. Occupational and Environmental Medicine 2002;59:175-181.

> Dimberg LA, Mundt KA, Sulsky SI, Liese BH. Deep venous thrombosis associated with corporate air travel. Journal of Travel Medicine 2001;8(3):127-132.

> Mundt KA and May S. Epidemiological assessment of hormesis in studies with low-level exposure. Human & Ecological Risk Assessment 2001;7(4):795-809.

> Goldstein RB, Bigelow C, McCusker J, Lewis BF, Mundt KA, Powers SI. Antisocial behavioral syndromes and return to drug use following residential relapse prevention/health education treatment. American Journal of Drug & Alcohol Abuse 2001;27(3):453-482.

> Sulsky SI, Mundt KA, Bigelow C, Amoroso PJ. Case-control study of discharge from the US Army for disabling occupational knee injury: The role of gender, race/ethnicity, and age. American Journal of Preventive Medicine 2000;18(3S):103-111.

> Kerr MA, Nasca PC, Mundt KA, Michalek AM, Baptiste MS, Mahoney MS. Parental occupational exposures and risk of neuroblastoma: A case-control study (2000United States). Cancer, Causes & Control 2000;11:635-643.

> Demure B, Mundt KA, Bigelow C, Luippold RS, Ali D, Liese B. Video display terminal workstation improvement program: II. Ergonomic intervention and reduction of musculoskeletal discomfort. Journal of Occupational and Environmental Medicine 2000;42:792-797.

> Mundt KA, Dell LD, Austin RP, Luippold RS, Noess R, Bigelow C. Historical cohort study of 10,109 men in the North American vinyl chloride industry, 1942-1972: Update of cancer mortality to 31 December 1995. Occupational and Environmental Medicine 2000;57:774-781.

> Demure B, Luippold RS, Bigelow C, Ali D, Mundt KA, Liese B. Video display terminal workstation improvement program: I. Baseline associations between musculoskeletal discomfort and ergonomic features of workstations. Journal of Occupational and Environmental Medicine 2000;42:783-791.

> Dell LD, Mundt KA, McDonald M, Tritschler JP, Mundt D. Critical review of the epidemiology literature on the potential cancer risks of methylene chloride. International Archives of Occupational and Environmental Health 1999;72:429-442.

> Mundt KA, Weiland SK, Bucher AM, Straif K, Werner B, Chambless L, Keil U. An occupational cohort mortality study of women in the German rubber industry:

**JA1220**



1976 to 1991. Journal of Occupational and Environmental Medicine 1999;41:807-812.

> Striker J, Luippold RS, Nagy RN, Liese B, Bigelow C, Mundt KA. Risk factors for psychological stress among international business travelers. Occupational and Environmental Medicine 1999;56:245-252.

> Pransky G, Benjamin K, Himmelstein J, Mundt KA, Morgan W, Feuerstein M, Koyamatsu K, Hill-Fotouhi C. Work-related upper-extremity disorders: Prospective evaluation of clinical and functional outcomes. Journal of Occupational and Environmental Medicine 1999;41:884-892.

> Straif K, Weiland SK, Werner B, Chambless L, Mundt KA, Keil U. Workplace risk factors for cancer in the German rubber industry. Part 2: Mortality from non-respiratory cancers. Occupational and Environmental Medicine 1998;55:325-332.

> Stanek EJ, Calabrese EJ, Mundt KA, Pekow P, Yeatts KB. Prevalence of soil mouthing/ingestion among healthy children aged 1 to 6. Journal of Soil Contamination, 1998;7(2):227-242.

> Mundt KA, Dell LD. RE: Cancer mortality in workers exposed to phenoxy herbicides, chlorophenols, and dioxins, and expanded and updated international cohort study (letter to the Editor). American Journal of Epidemiology 1998;147(11):1094-1095.

> Mundt KA, Tritschler JP, Dell LD. Validity of epidemiological data in risk assessment applications. Human and Ecological Risk Assessment 1998; 4(3):675-683.

> Goldstein RB, Powers SI, McCusker J, Lewis BF, Bigelow C, Mundt KA. Antisocial behavioral syndromes among residential drug abuse treatment clients. Drug and Alcohol Dependence 1998;49:201-216 (Erratum 1999;53:171-187).

> Weiland SK, Straif K, Chambless L, Werner B, Mundt KA, Bucher A, Birk T, Keil U. Workplace risk factors for cancer in the German rubber industry. Part 1: Mortality from respiratory cancers. Occupational and Environmental Medicine 1998;55:317-324.

> Liese B, Mundt KA, Dell LD, Nagy L, Demure B. Medical insurance claims associated with international business travel. Occupational and Environmental Medicine, 1997;54:499-503.

> Weiland SK, Mundt KA, Straif K, Keil U. Cancer mortality among workers in the German rubber industry (correspondence). Occupational and Environmental Medicine, 1997;54:216.

> Goldstein RB, Powers SI, McCusker J, Mundt KA, Lewis BF, Bigelow C. Gender differences in manifestations of antisocial personality disorder among residential drug abuse treatment clients. Drug and Alcohol Dependence, 1996;41:35-45.

> Assman SF, Hosmer DW, Lemeshow S, Mundt KA. Confidence intervals for measures of interaction. Epidemiology 1996; 7:286-290.

> Weiland SK, Mundt KA, Keil U, Kraemer B, Birk T, et al. Cancer mortality among workers in the German rubber industry: 1981-1991. Occupational and Environmental Medicine, 1996;53:289-298.

JA1221



> Goldstein RB, Powers SI, McCusker J, Lewis BF, Mundt KA, Bigelow C. Lack of remorse in antisocial personality disorder among drug abusers in residential treatment. Journal of Personality Disorders, 1996;10(4):321-334.

> Birk T, Weiland S, Schumann J, Person M, Mundt KA, Keil U. Historische kohortenstudie in der deutschen kautschukindustri: Zielsetzung, ztudiensdesign und erhebungsverfahren (Historical cohort study in the German rubber industry: goals, study design and data collection). Sozial Präventivmed 1995;40:135-145.

> Mundt KA, Dell LD. Neuropsychologic effects of environmental dioxins and furans? Occupational and Environmental Medicine Report 1994;8(5):41-44.

> Gehlbach SG and Mundt KA. Evaluating worksite health programs. Journal of Ambulatory Care Management 1994;17(2):82-91.

> Pastides H, Austin R, Lemeshow S, Klar J, and Mundt, KA. A retrospective-cohort study of occupational exposure to hexavalent chromium. American Journal of Industrial Medicine 1994;25:663-675.

> Mundt KA. Epidemiologic surveillance: A management tool for occupational health. Journal of Ambulatory Care Management 1994;17(2):19-27.

> Pastides H, Austin R, Mundt KA, Ramsey F, Feger N. Transforming industrial hygiene data for use in epidemiologic studies: A case study of hexavalent chromium. Journal of Occupational Medicine and Toxicology 1994;3(1):57-71.

> Weiland SK, Mundt, KA, Rückmann A and Keil U. Self-reported wheezing and allergic rhinitis in children and traffic density on street of residence. Annals of Epidemiology 1994;4:243-247.

> Mundt KA. Letter to the Editor: RE: "Exposure to residential electric and magnetic fields and risk of childhood leukemia" and "Case-control study of childhood cancer and exposure to 60-HZ magnetic fields.", American Journal of Epidemiology 1992:135(9);1070-1075.

> Pastides H, Miller JR, Mundt KA, Klar J, Adams RF, Olendorf T.  A characterization of occupational static magnetic field exposures at a diaphragm-cell and a mercury-cell chlor-alkali facility. Applied Occupational and Environmental Hygiene 1992;7:42-48.

> Mundt KA, Chambless LE, Burnham CB and Heiss G. Measuring ankle systolic blood pressure:  Validation of the Dinamap 1846 SX. Angiology, 1992:43(7);555-566.

> Mundt KA and Polk BF. Predictive value of a single diagnostic test: a belated correction (letter). New England Journal of Medicine 1979;300(15):859.

> Mundt KA and Polk BF. Identification of site of urinary-tract infections by antibody-coated bacteria assay. Lancet 1979;2:1172-5.

### Other Publications

> Birk T, Begemann P, Turnbull D, Mundt KA. Derivation of an Exposure-Risk Relationship (ERB) or alternatively an Occupational Exposure Limit (AGW) for Selenium and its Compounds. Published by Deutsche Gesetzliche Unfallversicherung (DGUV). (IFA Report 5/2014e, December 2014: 65 pages; ISBN:978-86423-132-2)

> Birk T, Burch MT, Mundt KA. Quality based critical review (QBCR) of the epidemiological literature on silica, silicosis, tobacco smoking and lung cancer.

JA1222



Published by Hauptverband der gewerblichen Berufsgenossenschaften (BIA-Report, February 2003).

> Sulsky S, Mundt KA, Bigelow C, Amoroso PJ, Fisher D. Knee-related injuries and disabilities in the US Army, 1980-1997. US Army Research Institute of Environmental Medicine (Technical Report no. T00-24, September 2000: 143 pages).

> Williams RE, Amoroso PJ, Mundt KA, Bigelow C. Physical tasks of military occupational specialties as risk factors for knee-related disability discharge. US Army Research Institute of Environmental Medicine (Technical Report no.T00-9, February 2000: 66 pages).

> Mundt KA, Birk T, Burch MT, McDonald M, Bigelow C, Dieckmann W. Tetrachlorethen und Krebs. Kritische Überprüfung und Synthese der Epidemiologischen Literatur. (Tetrachlorethylene and Cancer. Critical analysis and synthesis of the epidemiological literature.), Published by Hauptverband der gewerblichen Berufsgenossenschaften (BIA-Report no. 3, May 2000: 222 pages; ISBN:3-88383-572-2)

> Patnaik P, Amoroso PJ, Mundt KA, Bigelow C. Disabling knee injury in the United States Army: Classification of injury for etiologic research. US Army Research Institute of Environmental Medicine (Technical Report no. T01-1, October 2000: 48 pages).

> Mundt KA. Evaluating the quality of epidemiological research: The obvious, the necessary and the elusive. In: The Proceedings of the Sixth International Symposium of the International Section for Research. Epidemiology and Occupational Risks, April 22-24, 1998. Published by the ISSA Section for Research, 1999; pages 185-188, ISBN 3-900608-33-4.

> Bloemen L, Jackson JR, Kightlinger M, Mundt KA, Pastides H.  A new proposal for a code of good epidemiological practice. In: The Proceedings of the Sixth International Symposium of the International Section for Research. Epidemiology and Occupational Risks, April 22-24, 1998. Published by the ISSA Section for Research, 1999; pages 106-110, ISBN 3-900608-33-4.

> Pastides H, Mundt KA. Epidemiological Surveillance. Chapter 5 in DiNardi SR (editor) The Occupational Environment - Its Evaluation and Control. Virginia: American Industrial Hygiene Association, 1997 (pp 99-102).

> Mundt KA, Shy CM.  Interaction: An epidemiological perspective for risk assessment. Chapter 19 in: Fan and Chang (editors) Toxicology and Risk Assessment. New York: Marcel Dekker, Inc. 1996 (pp 329-351).

> Demure B, Liese B, Lissanu L, Mathur D, Mundt KA, Nagy L, Striker J. Staff Health: A Report. The World Bank, Washington, D.C.

> Mundt KA. Workplace-based surveillance as a strategy for policy development and disease prevention. In: Proceedings of the 3rd Annual Symposium on Environmental and Occupational Health during Societal Transition in Central and Eastern Europe. Policies, Programs, and Public Participation: Environmental and Occupational Health in the Emerging Market Economies and Democracies of Central and Eastern Europe, June 26 - July 1, 1992. Published by Management Sciences for Health, Boston, pages 193-197.

JA1223

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Attachment B – Prior Testimony List (last 4 years)

<u>LITIGATION TESTIMONY</u>

In the previous four years, Dr. Kenneth A. Mundt has provided the following deposition, hearing and trial testimony presented by topical area:

<u>Asbestos</u>

*David McKneely vs. Nokia of America Corporation as successor-in-interest to Western Electric Company, et al.* 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana. Case No. C-713174. Deposition: April 19, 2022. *(disease: lung cancer; alleged exposure: occupational asbestos exposure)*

*Duff Stanley, Individually and as the Representative of the Estate of Barbara Light, deceased; Brian Edward Light; and Michelle Light vs. Chanel, Inc., Macy's Inc. and Revlon Consumer Products Corp.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/20STCV42059. Deposition: March 25, 2022. *(disease: peritoneal and pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Julie Peterson, as Special Administrator of the Estate of Margie A. Foster v. Revlon, Inc. and Whittaker, Clark & Daniels, Inc., et al.* Circuit Court of Cook County, Illinois. Case No. 18-L-003411. Deposition: February 17, 2022. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Jose Martinez vs. The Boeing Company, et al.* Superior Court of the State of California for the County of Alameda. Case No. RG21104635. Deposition: February 7, 2022. *(disease: pleural mesothelioma; alleged exposure: asbestos from being near aircraft mechanical work)*

*Lynne L. Roy vs. Chanel, Inc., Whittaker, Clark & Daniels, Inc., et al.* Civil District Court for the Parish of Orleans, State of Louisiana. Case No. 2020-02718, Section 16, Division "A." Deposition: January 27, 2022. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Dr. Robert O. Wilson and Faith Wilson v. Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No. RG21092931 Deposition: January 3, 2022. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Myriam Kerr and Robert Kerr v. Revlon, Inc. and Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/21STCV22475. Deposition: December 30, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Maria Gomez v. Revlon, Inc. and Whittaker, Clark & Daniels, Inc., et al.* United States District Court for the Southern District of Florida, Ft. Lauderdale Division. Case No. 0:21-cv-60594-CIV-MARTINEZ-SNOW. Deposition: December 13, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Michelle Roedel, Individually and as Successor-in-Interest to the Estate of Doreen Myers, Deceased, and Steven Myers, v. Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/BC720136. Trial: December 7, 2021. Deposition: September 3, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

JA1225

<u>LITIGATION TESTIMONY</u>

*Nedelka Vanklive v. Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No. RG20062734. Trial: November 29, 2021. Deposition: June 17, 2021. *(diseases: pleural mesothelioma, ovarian cancer, fallopian tube cancer; alleged exposure: contaminated cosmetic talc)*

*Mae K. Moore v. Chanel, Inc., Lucky Stores, Inc., Revlon, Inc., and Whittaker, Clark & Daniels, Inc.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/21STCV05513. Deposition: November 17, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Edward Richards and Linda Richards v. John Crane, Inc.* Superior Court of the State of California for the County of Alameda. Case No. RG21088294. Deposition: October 15, 2021. *(disease: pleural mesothelioma; alleged exposure: occupational asbestos from gaskets and packing)*

*John Hurley, Special Administrator of the Estate of Leanne Hurley, v. Chanel, Inc., Revlon, Inc., Whittaker, Clark & Daniels, Inc.* Circuit Court of Cook County, Illinois. Case No. 2020 L 004159. Deposition: October 8, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Rosemary Dobson, Individually and as Personal Representative of the Estate of Eric Dobson, v. Chanel, Inc., Whittaker, Clark & Daniels, Inc.* Court of Common Please, Cuyahoga County, Ohio. Case No. CV-19-910745. Deposition: October 8, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Marla Hamilton, Marcus Hamilton, and Jackson Hamilton v. Chanel, Inc., Macy's Inc., Whittaker, Clark & Daniels, Inc., et al.* Circuit Court of the 13th Judicial Circuit, Hillsborough County, Florida. Case No. 19-CA-009136. Deposition: September 17, 2021. *(disease: peritoneal mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Stephanie Salcedo, Individually and as Administrator of the Estate of Theresa M. Garcia, Deceased, v. Whittaker, Clark & Daniels, Inc., Revlon, Inc. et al.* Circuit Court of Cook County, Illinois. Case No. 2020 L 004505. Deposition: August 23, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Frank George Petas, Individually and as Personal Representative of the Estate of Victoria Petas, deceased, et al. v. Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/BC701655. Deposition: August 16, 2021. *(disease: peritoneal mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Steven M. Sexton and Patricia A. Sexton v. YBJD, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No.: RG20074721. Deposition: May 3, 2021. *(disease: pleural mesothelioma; alleged exposure: joint compound)*

*Connie Dietrich v. The Boeing Company, et al.* Superior Court of the State of California for the County of Los Angeles. Case No. JCCP4674/18STCV00436. Deposition: April 23, 2021. *(disease: pleural mesothelioma; alleged exposure: asbestos from husband's aircraft mechanical work)*

*Todd Lopez as Personal Representative of the Estate of Jack Trout, et al. v. Cameron International Corporation, formerly known as Cooper Cameron Corporation, Cooper-Bessemer Corporation, and*

# JA1226

<u>LITIGATION TESTIMONY</u>

*Cooper Industries, et al.* Case No. D-101-CV-2019-00046. Deposition: April 20, 2021. *(disease: pleural mesothelioma; alleged exposure: occupational asbestos from engines and compressors)*

*Vernon Eggers, Individually and as the Personal Representative of the Estate of Barbara Eggers, Deceased, v. Coty, Inc. and Whittaker, Clark & Daniels, Inc.* District Court in and for Oklahoma County, State of Oklahoma. Case No. CJ-2018-4739. Deposition: April 16, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Christina Prudencio v. Vi-Jon, Inc., Longs Drugs Stores California, LLC, Perrigo Company of Tennessee, et al.* Superior Court of the State of California for the County of Alameda. Case No. RG20061303. Deposition: April 14, 2021. *(disease: peritoneal mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Willie McNeal, Jr. v. Whittaker, Clark & Daniels, Inc. and Shulton Company, et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC698965. Trial: April 8, 2021. Deposition: July 31, 2020. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Dalal Metwally v. Whittaker, Clark & Daniels, Inc. and Revlon, Inc.* Superior Court of the State of California for the County of San Francisco. Case No. CGC-19-276780. Deposition: March 24, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Wendi J. Hirshberg and Richard Hirshberg v. Elizabeth Arden, Inc. and Whittaker, Clark & Daniels, Inc.* Superior Court of the State of Washington for King County. Case No. 20-2-05603-1 SEA. Deposition: February 23, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Robert Runne and Catherine Runne v. Cyprus Mines and Whittaker, Clark & Daniels, Inc.* Superior Court of the State of California for the County of Alameda. Case No. RG20061377. Deposition: February 8, 2021. *(disease: pleural mesothelioma; alleged exposure: industrial talc)*

*Lloyd Bell, Individually and as Executor of the Estate of Betty Whitley Bell, Deceased, v. American International Industries and Whittaker, Clark & Daniels, Inc.* USDC for the Middle District of North Carolina Greensboro Division. File No.: 1:17-cv-00111. Deposition: February 2, 2021. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Donald G. West and Bertha Nadine West v. T.W. Smith Company.* Superior Court of the State of California for the County of Alameda. Case No. RG20061848. Deposition: November 25, 2020. *(disease: mesothelioma; alleged exposure: occupational exposure to asbestos from contracting work*)

*Michael Lefton, et al. v. The Shulton Company and Whittaker, Clark & Daniels, Inc.* In the Court of Common Pleas, Cuyahoga County, Ohio. Case No. CV-19-910745. Deposition: November 16, 2020. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Curt O. Sawmiller, Individually and as Personal Representative of the Estate of Paul Sawmiller, v. Danly Machine Corp., et al.* In the Court of Common Pleas, Cuyahoga County, Ohio. Case No. CV-18-902897. Deposition: October 2, 2020. *(disease: pleural mesothelioma; alleged exposure: presses in automotive manufacturing)*

JA1227

<u>LITIGATION TESTIMONY</u>

*Arthur Rosengren v. The Boeing Company, North American Aviation, Douglas Air, and McDonnell Air, et al.* United States District Court, Central District of California. Case No. 2:19-CV-09064-SVW-E. Deposition: September 28, 2020. *(disease: pleural mesothelioma; alleged exposure: aircraft mechanical work)*

*Gary Parsons, et al. v. Danly Machine Corp., et al.* In the Circuit Court of Common Pleas, Cuyahoga County, Ohio. Case No. CV-18-897821. Deposition: September 11, 2020. *(disease: peritoneal mesothelioma; alleged exposure: presses in automotive manufacturing)*

*William A. Clark and Stephanie I. Clark v. Deere & Company, et al.* Superior Court of Washington for King County. Case No. 19-2-26061-1 SEA. Deposition: July 24, 2020. *(disease: pleural mesothelioma; alleged exposure: asbestos from farm equipment)*

*Linda Zimmerman v. Chanel, Inc., et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC720153. Deposition: March 3, 2020. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Joyce DuQuette, Individually and As Personal Representative of the Heirs and Estate of Thomas Joseph DuQuette v. Whittaker, Clark & Daniels, Inc.* In the Circuit Court of Cook county, Illinois. Case No. 16 L 5625. Deposition: February 28, 2020. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Adam Breakell v. Whittaker, Clark & Daniels, Inc.* Superior Court, J.D. Fairfield at Bridgeport, State of Connecticut. Case No. FBT-CV-17-6066689S. Deposition: January 28, 2020. *(disease: peritoneal mesothelioma; alleged exposure: industrial talc)*

*Margaret Rose Langley Lashley and Edward Lashley v. American International Industries, et al.* Superior Court of New Jersey, Middlesex County. Docket No. MID-L-7336-16 AS. *Dwayne Johnson v. American International Industries, et al.* Superior Court of New Jersey, Middlesex County. Docket No. MID-L-06651-16 AS. Joint Deposition: Oct. 29, 2019. (*diseases: peritoneal and pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Lubertha McLeod v. Nokia of America Corporation as successor-in-interest to Western Electric Company, et al.* Civil District Court for the Parish of Orleans, State of Louisiana. Division J-15. Case No. 2018-5352. Deposition: October 9, 2019. *(disease: pleural mesothelioma; alleged exposure: occupational exposure to asbestos from telecommunications work)*

*Robert Skelton, individually and as successor in interest to Wanda Skelton, deceased, Gary Skelton, and Jerry Skelton v. S. Martinelli & Company, et al.* Superior Court of the State of California for the County of Alameda. Case No. RG17868697. Deposition: September 27, 2019. (*disease: pleural mesothelioma; alleged exposure: asbestos from husband's work clothing)*

*Kevin F. Chabaud v. Ameron International Corporation, et al.* 23rd Judicial District Court for the Parish of St. James, State of Louisiana. No. 37286 Div. A. Deposition: September 24, 2019. *(disease: idiopathic pulmonary fibrosis; alleged exposure: occupational exposure to asbestos)*

*George Crudge and Shara Crudge v. American International Industries, et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC685901. Deposition: May 30, 2019. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

<u>LITIGATION TESTIMONY</u>

*Candace Carmichael v. Soco West, Inc., sued individually and as successor-in-interest to, parent, alter ego and equitable trustee of Western Chemical & Manufacturing Co. and A.J. Lynch & Co., et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC711670. Deposition: May 24, 2019. (*disease: peritoneal mesothelioma; alleged exposure: asbestos from father's work clothing*)

*Larry Boynton, individually and on behalf of the heirs of Barbara Boynton, v. Kennecott Utah Copper LLC, et al.* Third Judicial District Court in and for Salt Lake County, State of Utah. Case No. 160902693. Deposition: May 21, 2019. (*disease: pleural mesothelioma; alleged exposure: asbestos from husband's work clothing*)

*Jody E. Ratcliff v. Brenntag, Inc. and Whittaker, Clark & Daniels, Inc.* United States District Court for the Middle District of North Carolina. Case No. 1-17-CV-00174. Deposition: May 6, 2019. (*disease: peritoneal mesothelioma; alleged exposure: contaminated cosmetic talc*)

*Ervan Groves and Jo Ann Groves vs. D.W. Nicholson, et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC696433. Deposition: January 29, 2019. Trial: April 10, 2019. (*disease: pleural mesothelioma; alleged exposure: occupational exposure to asbestos from contracting work*)

*Patricia Schmitz vs. Whittaker, Clark & Daniels, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No. RG18923615. Deposition: April 1, 2019. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc*)

*Daniel W. Strajna vs. SoCo West, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No. RG18898464. Deposition: March 15, 2019. (*disease: pleural mesothelioma; alleged exposure: occupational exposure to asbestos from emberizing fireplace materials*)

*Ann Ripley and Philip Ripley vs. Chanel, Inc., and Whittaker, Clark & Daniels, et al.* Superior Court of New Jersey Law Division-Middlesex County. Docket No. MID-L-00562-18AS. Deposition: February 27, 2019. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc*)

*Mark Rininger, Executor for the Estates of Joanne Rininger and Dean Rininger vs. Chanel, Inc., et al.* In the Court of Common Please, Summit County, Ohio. Case No. 2014 11 5256. Deposition: January 28, 2019. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc*)

*Carolyn Walquist and Howard Walquist vs. Deere & Company, et al.* Circuit Court, Twentieth Judicial Circuit, St. Clair County, Illinois. Case No. 17-L-81. Deposition: January 23, 2019. (*disease: pleural mesothelioma; alleged exposure: asbestos from husband's work clothing*)

*James Forgie, Jr., Individually and as Personal Representative of the Estate of Patricia Forgie, decedent, and Anna Forgie, and Julia Forgie vs. Bristol Myers Squibb Company, Revlon, Inc. et al.* Superior Court of the State of California for the County of Santa Barbara. Case No. 17CV01032. Deposition: January 11, 2019. (*disease: peritoneal mesothelioma; alleged exposure: contaminated cosmetic talc*)

JA1229

<u>LITIGATION TESTIMONY</u>

*William Shampanore, Jr. and Mary Shampanore v. Harris Corporation, et al.* Superior Court of the State of California for the County of Los Angeles. Case No. BC 630446. JCCP Case No. 4674. Deposition: November 15, 2018. *(disease: pleural mesothelioma; alleged exposure: asbestos from typesetting equipment)*

*Anna Marie Tucker v. Chanel, Inc., et al.* In the Circuit Court of the State of Oregon for the County of Multnomah. Case No. 17CV13605. Trial: September 11-12, 2018. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

*Carla Allen v. Bristol-Myers Squibb Company, Revlon, Inc., Yves Saint Laurent America, Inc., et al.* Superior Court of the State of California, for the County of Humboldt. Case No. DR180132. Deposition: September 7, 2018. (*disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc*)

*Carolyn Weirick and Elvira Graciela Escudero Lora v. Chanel, Inc., et al.* Superior Court for the State of California for the County of Los Angeles. Case No. BC 656425. JCCP No. 4674. Deposition: May 14, 2018. *(disease: pleural mesothelioma; alleged exposure: contaminated cosmetic talc)*

<u>Chemicals</u>

*Gary Melloway v. The Savogran Company, W.M. Barr & Company, Inc., et al.* Superior Court of the State of California for the County of Alameda. Case No. RG19045434. Deposition: August 19, 2021. *(disease: acute myeloid leukemia; alleged exposure: benzene)*

Oral comments before the Illinois State Senate Executive Committee on November 13, 2019 regarding House Bill 3888 (Environmental Protection Act – Ethylene Oxide Phase Out). Representation: Vantage Specialty Chemicals, Inc. and Illinois Manufacturers Association. (*diseases: breast cancer and lymphatic cancers; exposure: ethylene oxide*)

*In the Matter of the Complaint of Maersk Tankers as, as Owner and Operator of the MIT Carla Maersk for Exoneration from or Limitation of Liability (Regarding CONTI 168. Sehifffahrts-GMBH & Co. Bulker KG MS "CONTI PERIDOT," Bremer Bereederungsgesellschaft MBH & Co. KG).* United States District Court for the Southern District of Texas, Galveston Division. C.A. No. 3:15-CV-00106 (Admiralty). Deposition: June 11, 2019. (*disease: various acute and chronic effects; exposure: methyl tert-butyl ether*)

*Clayton Leo Thompson v. Kinder Morgan Altamont, LLC, et al.* United States District Court, District of Utah, Central Division. Case No. 2:15-cv-00623-JNP-BCW. Evidentiary Hearing: September 27, 2018. (*disease: chronic myeloid leukemia; exposure: benzene*)

<u>Wind Turbines</u>

*In the Matter of the Application of FIRELANDS WIND, LLC for a Certificate of Environmental Compatibility and Public Need for a Wind-Powered Electric Generating Facility in Huron and Erie Counties, Ohio.* Before the Ohio Power Siting Board. Case No. 18-1607-EL-BGN. Written Testimony: September 11, 2020. Hearing: October 9, 2020. (*disease: various health complaints; alleged exposure: wind turbine noise emissions*)

JA1230

<u>LITIGATION TESTIMONY</u>

*In the Matter of the Application of REPUBLIC WIND, LLC for a Certificate of Environmental Compatibility and Public Need for a Wind-Powered Electric Generating Facility in Seneca and Sandusky Counties, Ohio.* Before the Ohio Power Siting Board. Case No. 17-2295-EL-BGN. Written Testimony: October 21, 2019. Hearing: November 5, 2019. (*disease: various health complaints; alleged exposure: wind turbine noise emissions*)

<u>Other:</u>

*In re: Guadalupe Olivera.* Before the Board of Industrial Insurance Appeals, State of Washington. Claim No. SG21191. Docket No. 21 13955. Deposition: April 8, 2022. *(disease: COVID-19; employer: Tyson Foods)*

*Regional Municipality of Halton, et al. (Applicants) and Canadian National Railway Company and Ministry of the Attorney General (Ontario) (Respondents).* Ontario Superior Court of Justice. Court File No. CV-18-592382. Cross-examination: April 4, 2022. (*health outcome: sleep disturbance; exposure: intermodal terminal night-time noise)*

*John J. "Gus" Hoefling and Margaret Hoefling v. U.S. Smokeless Tobacco Company and Pinkerton Tobacco Company.* United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:19-cv-03847-JD. Deposition: March 29, 2021. *(disease: tonsillar cancer; alleged exposure: smokeless tobacco)*

*Scott D. McClurg, et al. v. Cotter Corporation and Mallinckrodt LLC.* United States District Court, Eastern District of Missouri, Eastern Division. Lead Case No. 4:12CV00361 AGF. Deposition: August 12, 2020. *(disease: various cancers; alleged exposure: environmental exposure to radionuclides in Coldwater Creek area)*

*Don Strong, et al. v. Republic Services, Inc., Bridgeton Landfill, LLC, et al.* Circuit Court of St. Louis County, State of Missouri. Case No. 17SL-CC01632-01. Deposition: December 9, 2019. *(disease: various cancers; alleged exposure: radiation leakage from landfill)*

*Roger Shinnerl v. Ascension Health, Inc., et al.* Circuit Court of the County of Vanderburgh in the State of Indiana. Cause No. 82C01-1702-CT-000865. Deposition: July 18, 2019. *(disease: thyroid cancer; alleged exposure: radiation from medical equipment)*

Last updated: April 25, 2022

**JA1231**

Expert Report of Kenneth A. Mundt, PhD, FACE
*Gref vs WCD, AII, and Shulton*

Attachment C – Cardno Chemrisk Rate Sheet



**2021 Rate Sheet - Mundt**

| itle | | Hourly Rate |
|------|---|------------|
| Senior Managing Principal | $ | 575 - 600 |
| Managing Principal | $ | 500 - 565 |
| Senior Principal* | $ | 450 - 500 |
| Principal | $ | 400 - 450 |
| Principal Science Advisor | $ | 375 - 400 |
| Senior Managing | $ | 350 |
| Senior Consultant | $ | 325 |
| Managing | $ | 280 |
| Senior Supervising | $ | 270 |
| Supervising | $ | 255 |
| Senior | $ | 245 |
| Health Scientist I - II | $ | 215 - 225 |
| Senior Associate I - II | $ | 175 - 190 |
| Associate I - II | $ | 150 - 165 |
| Assistant I - II | $ | 130 - 145 |
| Research Associate I - II | $ | 100 - 120 |
| Administrative | $ | 75 |

**Other Direct Costs**

| | | |
|------|---|------------|
| Direct Project Expense** | $ | 8/hour |
| Subcontractor Markup | | 20% |
| Expense Markup | | 20% |

*Dr. Mundt's rate is $475 per hour.

**Expenses associated with the allocation of internal administrative costs
such as telephone, fax, copy jobs less than 100 pages, postage,
administrative support, etc. that are too small to track and allocate individually.

ote  **Outstanding balances over    days are subject to    APR.**

**JA1233**

# Exhibit

Moline *et al.*
*Journal of Occupational Medicine and Toxicology*      *(2023) 18:1*
https://doi.org/10.1186/s12995-023-00367-5

Journal of Occupational
Medicine and Toxicology

**RESEARCH**                                                           **Open Access**

# Exposure to cosmetic talc and mesothelioma



Jacqueline Moline[1,2][*], Kesha Patel[1] and Arthur L. Frank[3]

## Abstract

**Aim** Mesothelioma is associated with asbestos exposure. In this case series, we present 166 cases of individuals who had substantial asbestos exposure to cosmetic talc products as well as some who had potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma.

**Methods** Data were gathered for all subjects referred to an occupational and environmental medicine specialist as part of medicolegal review. Years of total cosmetic talcum powder usage was noted as well as the latency from the onset of talcum powder use to the mesothelioma diagnosis. Alternate asbestos exposure in addition to the exposure from cosmetic talc was categorized as none, possible, likely, and definite.

**Results** In 122 cases, the only known exposure to asbestos was from cosmetic talc. For 44 cases, potential or documented alternate exposures in addition to the cosmetic talc were described.

**Conclusion** Cumulative exposure to asbestos leads to mesothelioma; for individuals with mixed exposures to asbestos, all exposures should be considered. Use of cosmetic talc is often overlooked as a source of asbestos exposure. All individuals with mesothelioma should have a comprehensive history of asbestos exposure, including cosmetic talc exposure.

**Keywords** Malignant mesothelioma, Cumulative asbestos exposure, Cosmetic talcum powder

## Introduction

Mesothelioma, described as a sentinel tumor, is intimately associated with asbestos exposure. Asbestos has been used for decades in thousands of products, both in occupational and non-occupational settings, historically accounting for the bulk of mesothelioma cases. Non-occupational exposures can be environmental in nature, from effluents from mines and factories, from para-occupational exposures such as "shade-tree mechanics" using friction products, and from home renovations [1]. Household exposures affecting family members, known as "take-home" exposure has been well described in the literature [2–5]. An underappreciated source of exposure is the use of cosmetic talc products. The International Agency for Research on Cancer (IARC) [6] states that asbestos contaminated talc is carcinogenic and should be treated as if one were dealing with asbestos. Asbestos levels in talcum powder are significantly above background ambient asbestos exposure levels [7–9]. Talc application simulation studies have been published [7, 8] where exposures to talcum powder were 1.9 f/cc and 2.57 f/cc, respectively. According to the Gramond et al. [10] categorization of intensity, asbestos exposure at these levels would be considered to be high (> 1–10 f/ml).

Historically, asbestos exposures at work have been linked to multiple products. The overall risk for asbestos related disease, including mesothelioma, is related to cumulative exposure. As agencies such as NIOSH, OSHA, the EPA, and others have recognized, there is no known safe exposure to asbestos. Low doses of exposure to asbestos contribute to mesothelioma [11].

*Correspondence:
Jacqueline Moline
jmoline@northwell.edu
[1] Department of Occupational Medicine, Epidemiology and Prevention, Northwell Health, Great Neck, NY 11021, USA
[2] Donald and Barbara Zucker School of Medicine at Hofstra/Northwell, Hempstead, NY 11549, USA
[3] Dornsife School of Public Health of Drexel University, Philadelphia, PA 19104, USA



© The Author(s) 2023. **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

JA1235

Both time from first exposure (latency) and total exposure (cumulative dose) to asbestos must be taken into account when evaluating risk. With multiple repeated incidences of exposure, all those above background level should be thought of as "'substantial." When considering the elevated risk of mesothelioma in sheet metal workers [12, 13], Zoloth and Michaels considered the multiple bystander exposures to different products, not simply one construction material. This case series presents 166 cases of individuals who had a minimum of five years and a mean of 40.8 years of exposure to asbestos through cosmetic talc products, some with possible other exposures, but all developed mesothelioma.

### Methods

Data were gathered for all subjects referred to an occupational and environmental medicine specialist, JM, as part of medicolegal review. All cases were reviewed personally by an occupational medicine specialist with experience evaluating asbestos exposure in thousands of individuals. The individual's medical records were reviewed and mesothelioma diagnoses were based on pathological reports that were performed as part of their diagnostic evaluation. Exposure data was obtained by sworn testimony of the mesothelioma patients in all cases, and/or from family members who had direct knowledge of the individual's use of cosmetic talc and, if present, other sources of asbestos exposure. Use of talc was recorded as being diapered or powdered as a child; diapering or powdering children or others; applying talcum powder to oneself after bathing, or other personal applications of talc. Years of total cosmetic talcum powder usage was noted as well as the latency from the onset of talcum powder use to the mesothelioma diagnosis. Age was presented within a 10 year window to maintain confidentiality. Data reviewed included family occupational histories (parents or anyone cohabitating with the individual), hobbies, residence, living with or laundering clothes of an asbestos exposed worker, if indicated, home renovations that could have exposed the individual to asbestos containing construction materials, residence close to a facility with environmental contamination, or other potential asbestos exposures. In those individuals with potential asbestos exposure in addition to the cosmetic talc, categorization of these exposures was done by two occupational physicians, JM and ALF. Alternate asbestos exposure in addition to the exposure from cosmetic talc was categorized as none, possible, likely, and definite following the descriptions by Gramond et al. [10]. Non-occupational exposure to asbestos was characterized as paraoccupational (living with an asbestos worker or

cleaning clothes), do-it-yourself home repair, domestic (handling asbestos material or living in the presence of asbestos material susceptible to damage at home), or environmental (living near and asbestos processing plant). This study was conducted with approval from the Human Research Protection Program at Northwell Health Feinstein Institute for Medical Research (#21–0897-OTH).

### Results

We identified 166 individuals with exposure to cosmetic talc who were diagnosed with a malignant mesothelioma between 2014 and 2021. None of these individuals were previously included in publications by the authors [14]. A summary of the case findings is found in Table 1. Overall, the average age of diagnosis was 63.3 (age range 26–94) years of age. The majority of cases were epithelioid mesothelioma (75.3%). The average length of exposure to cosmetic talc was 40.8 years (range 5–76 years of use), and the average latency period from the onset of talcum powder use to the development of mesothelioma was 52.4 (20–83 years). We identified 122 individuals with asbestos exposure solely through use of cosmetic talc. Exposure to talcum powder could have been for personal use, in an occupational setting (for example, a nurse applying talcum powder to a patient), or applying talcum powder to others such as children. For 122 individuals, they either used cosmetic talc while diapering children or recalled applying talc to others (such as their children). Overall, 80.6% of women and 52.4% of men used talcum powder for diapering or applying talc to others. For 44 individuals, potential alternate asbestos exposure in addition to cosmetic talc was reported. Table 1 presents the 44 cases with alternate exposure ranked by possible, likely, and definite asbestos exposure. Twenty-two women (17.8%) and fifteen men (35.7%) had likely or definite alternate exposure to asbestos in addition to their talcum powder usage. [Details of the exposure history of all 166 individuals with cosmetic talc exposure is presented in Table 2, including a description of the alternate exposure.] Table 1 also shows the site of the tumor by gender. Of the 166 cases, 109 were pleural, 52 were peritoneal, 4 were discovered in both the pleura and peritoneum and the original site could not be determined. One case of pericardial mesothelioma was noted out of the 166 cases, which reflects the rarity of this site for mesothelioma. The percentages of peritoneal mesothelioma were similar for women (29.8%) and men (35.7%). The high proportion of peritoneal mesothelioma tumors relative to pleural tumors, consistent with prior case series of patients with malignant mesothelioma after cosmetic talc use [14, 15], is unusual and deserves further investigation.

**JA1236**

Moline *et al. Journal of Occupational Medicine and Toxicology*      (2023) 18:1

**Table 1** Characteristics of 166 mesothelioma cases with cosmetic talc usage

| | | Total (*N* = 166) | Female (*n* = 124) | Male (*n* = 42) |
|---|---|---|---|---|
| **Average Age (range)** | | 63.3 (26 – 94) | 64.3 (26 – 94) | 60.9 (28 – 83) |
| **Years of Talc Use*** (range) | | 40.8 (5 – 76) | 40.4 (6 – 76) | 42.0 (5 – 74) |
| **Talc Latency in Years (range)** | | 52.4 (20 – 83) | 53.3 (20 – 83) | 49.9 (28 – 74) |
| **Diapering or Applying Talc to Others**** | | 122 (73.5%) | 100 (80.6%) | 22 (52.4%) |
| **Talc Use Only** | | 122 (73.5%) | 97 (78.2%) | 25 (59.5%) |
| **Talc Use and Alternate Exposure** | | 44 (26.5%) | 27 (21.8%) | 17 (40.5%) |
| **Certainty of Alternate Exposure (*n* = 44) (26.5%)** | Possible | 7 (4.2%) | 5 (4.0%) | 2 (4.8%) |
| | Likely | 17 (10.2%) | 14 (11.3%) | 3 (7.1%) |
| | Definite | 20 (12.0%) | 8 (6.5%) | 12 (28.6%) |
| **Tumor Location** | Pleura | 109 (65.7%) | 83 (66.9%) | 26 (61.9%) |
| | Peritoneum | 52 (31.3%) | 37 (29.8%) | 15 (35.7%) |
| | Both Pleura & Peritoneum | 4 (2.4%) | 3 (2.4%) | 1 (2.4%) |
| | Pericardium | 1 (0.6%) | 1 (0.8%) | 0 |
| **Tumor Subtype** | Biphasic | 24 (14.5%) | 18 (14.5%) | 6 (14.3%) |
| | Epithelial | 125 (75.3%) | 92 (74.2%) | 33 (78.6%) |
| | Sarcomatoid | 16 (9.6%) | 13 (10.5%) | 3 (7.1%) |
| | Not specified | 1 (0.6%) | 1 (0.8%) | 0 |

* Years of Talc Use: includes years of being diapered or powdered with talc as a child; years of diapering or powdering children or others with talc; and years applying talcum powder to oneself after bathing or other personal use

** Diapering or Applying Talc: restricted to diapering or powdering children with talc or applying talcum powder to others, including occupational use

## Discussion

This paper presents 166 individuals with malignant mesothelioma and asbestos exposure through documented use of cosmetic talcum powder. For 122 of 166, their only known exposure to asbestos was their use of cosmetic talcum powder. Without the recognition of asbestos exposure through cosmetic talcum powder, 73.5% of the cases might well have been considered "idiopathic." Similarly, for those 26.5% of cases with additional asbestos exposure along with the talc, those alternate exposures would have been mistakenly considered as the sole, and sufficient, cause of the mesothelioma. Historically, the attributable risk of asbestos for mesothelioma in women ranged from around 20–50%. However as Baur et al. point out, misclassification or inadequate exposure ascertainment has led to this low attributable risk for women compared to men. [16]. Data from occupationally exposed cohorts that included men and women actually show that compared to similarly exposed men, women had higher mortality rates from mesothelioma [17–20]. Lacourt found that at low-level cumulative asbestos exposure ((0 – 0.1 f-cc/year) women were more likely to develop mesothelioma than men [21]. Magnani (2008) found the SMR for mesothelioma was higher for women than for men among workers at an asbestos cement plant [22]. Frank et al. (2009) found mesothelioma rates in the Qingdao region of China were correlated with a higher proportion of women employed in asbestos manufacturing industries.

[23] In some instances authors limited the characterization of asbestos exposure in women to certain industries, such as shipbuilding during wartime [24], thus neglecting other potential sources and decreasing the attributable risk. Conversely, when non-occupational exposures were included for women, even with low-intensity domestic exposure considered, the attributable risk increased from 40% to 64.8% [21].

Given that all types of asbestos can cause mesothelioma [6], it is important to consider every source of exposure to asbestos in an individual. Talcum powder has been contaminated with both chrysotile and amphibole asbestos (predominately anthophyllite and tremolite) [8, 25, 26]. Recently, Wong et al. (2021) found significantly elevated risks of mesothelioma among individuals with only chrysotile exposure and for mixed fiber exposure. [27]. Chrysotile alone (OR = 3.8) and in combination with tremolite/anthophyllite asbestos (OR = 3.9) were associated with similar increases in risk of mesothelioma. These three fiber types are most commonly found in cosmetic talc, and given that different ore sources were used in manufacturing over time, it is likely that many formulations and uses of talcum powder involved mixed fiber type exposure. There is no scientific basis to state that one type of exposure was the sole cause of the mesothelioma in a mixed exposure scenario. For example, rates of mesothelioma have been evaluated based on either job type or locale (e.g., construction, shipping) rather than

JA1237

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1

**Table 2** Description of 166 mesothelioma cases

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Pleura | Epithelial | Cosmetics factory | 41 | 36 | Yes | None | |
| 31–40 | F | Peritoneal | Biphasic | Marketing | 39 | 12 | No | None | |
| 91–100 | F | Pleura | Epithelial | Clerical worker | 69 | 57 | Yes | Definite | Smoked Kent cigarettes in 1950s |
| 51–60 | M | Pleura | Biphasic | Warehouse supervisor | 54 | 22 | No | Definite | Home renovations as child |
| 21–30 | M | Peritoneal | Epithelial | Aircraft technician | 28 | 5 | No | None | |
| 41–50 | F | Pleura | Biphasic | Marketing | 47 | 47 | Yes | Definite | Automotive friction exposure |
| 41–50 | F | Peritoneal | Epithelial | Operator technician | 37 | 36 | Yes | Likely | Parents worked in chemical plant/with automotive friction materials; no work clothes laundered at home |
| 61–70 | F | Peritoneal, pleura | Epithelial | Hairdresser | 65 | 57 | Yes | Definite | Household exposures laundering clothes (automotive friction materials) |
| 41–50 | F | Pleura | Epithelial | Industrial engineer | 45 | 10 | Yes | None | |
| 71–80 | M | Pleura | Biphasic | Firefighter, painter | 59 | 59 | No | Definite | Occupational exposures to industrial talc, firefighting |
| 51–60 | F | Peritoneal | Epithelial | Dental assistant, secretary, logging business | 58 | 57 | Yes | Definite | Automotive friction product exposure |
| 51–60 | F | Peritoneal, pleura | Epithelial | Nurse | 50 | 20 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 60 | 61 | No | None | |
| 61–70 | M | Peritoneal | Epithelial | Software engineer | 53 | 53 | No | Likely | Construction work as teenager; family member machinist |
| 61–70 | F | Pleura | Epithelial | Secretary | 61 | 20 | Yes | None | |
| 61–70 | M | Pleura | Epithelial | Law professor | 46 | 45 | No | None | |
| 21–30 | F | Peritoneal | Biphasic | Customer service manager | 26 | 12 | No | None | |
| 51–60 | F | Pleura | Epithelial | Dental assistant, sales | 50 | 17 | Yes | Likely | Dental tape used in office |
| 21–30 | F | Pleura | Epithelial | Programmer | 29 | 17 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Clerical worker | 54 | 48 | No | None | |
| 71–80 | F | Pleura | Biphasic | Dental assistant, receptionist | 64 | 34 | Yes | Possible | Possible household exposure from parental occupations |
| 61–70 | F | Pleura | Epithelial | Systems analyst | 62 | 61 | Yes | None | |

Moline *et al. Journal of Occupational Medicine and Toxicology*      (2023) 18:1

Page 5 of 13

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use* | Diapering/ Applying Talc to Others** | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Peritoneal | Epithelial | Clerical worker | 59 | 31 | Yes | Likely | Asbestos shingle exposure as child |
| 71–80 | F | Peritoneal | Epithelial | Teacher's aide, customer service | 46 | 46 | No | None | |
| 51–60 | M | Pleura | Epithelial | Baked goods manufacturer | 55 | 49 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Housekeeping, packaging | 51 | 23 | No | None | |
| 41–50 | M | Peritoneal | Epithelial | Lawyer | 46 | 23 | Yes | None | |
| 51–60 | M | Pleura | Sarcomatoid | IT | 30 | 30 | Yes | None | |
| 61–70 | F | Peritoneal | Epithelial | Bookkeeper | 62 | 15 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Engineer | 71 | 20 | No | Definite | Home renovations, automotive friction products, cement in molds |
| 41–50 | F | Pleura | Epithelial | Restaurant | 46 | 12 | No | None | |
| 81–90 | F | Pleura | Epithelial | Not provided | 62 | 62 | Yes | Likely | Household exposures laundering clothes (automotive friction materials) |
| 81–90 | F | Pleura | Epithelial | LPN | 67 | 18 | Yes | Likely | Household exposures laundering clothes (automotive friction materials) |
| 31–40 | F | Peritoneal | Epithelial | Nanny, teacher | 26 | 7 | Yes | Definite | Home renovations |
| 61–70 | M | Peritoneal | Epithelial | Packaging, machine operator, welding | 48 | 48 | Yes | Definite | Cut transite and cement pipes; automotive friction exposure ("shade tree") |
| 71–80 | F | Peritoneal | Biphasic | Clerical worker | 61 | 39 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Lawyer | 54 | 18 | No | None | |
| 41–50 | F | Pleura | Sarcomatoid | Research | 44 | 45 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Variety of jobs | 50 | 48 | Yes | Definite | Home renovation |
| 41–50 | M | Peritoneal | Epithelial | Farrier, mechanic, general labor | 41 | 35 | Yes | Definite | Occupational exposure |
| 81–90 | M | Pleura | Epithelial | Barber | 50 | 36 | Yes | Likely | Boiler work in rail yards |
| 71–80 | M | Pleura | Biphasic | Bus driver, factory worker | 47 | 47 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Physician | 20 | 12 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Cashier, sales, clerical worker, wire assembler | 53 | 53 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Laborer | 41 | 50 | Yes | Likely | Home renovations, family member worked with clay |

**JA1239**

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 61–70 | M | Pleura | Epithelial | Accountant | 69 | 69 | Yes | Definite | Home renovations during 1970s |
| 81–90 | F | Pleura | Biphasic | Bookkeeping, rehab counseling | 83 | 32 | Yes | None | |
| 71–80 | F | Pleura | Sarcomatoid | Office manager | 75 | 75 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Merchandising manager | 31 | 18 | Yes | None | |
| 41–50 | F | Pleura, peritoneal | Epithelial | Teacher | 46 | 22 | Yes | None | |
| 51–60 | M | Pleura | Epithelial | Automechanic, pipefitter | 31 | 44 | Yes | Definite | Occupational and take home exposure (shipyard) |
| 51–60 | F | Peritoneal | Epithelial | Clerical worker | 40 | 38 | Yes | None | |
| 41–50 | F | Pericardium | Sarcomatoid | Medical center | 50 | 31 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Mechanic, parts manager | 61 | 50 | No | Definite | Occupational naval exposure to asbestos, automotive friction material handling |
| 71–80 | F | Pleura | Epithelial | Secretary, cosmetics, cashier | 50 | 25 | No | Definite | Household exposures laundering clothes (automotive friction materials) |
| 61–70 | F | Pleura | Sarcomatoid | Catering | 45 | 40 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Cleaner, personal assistant | 52 | 50 | Yes | None | |
| 51–60 | M | Pleura | Epithelial | Meat inspector | 41 | 26 | No | None | |
| 71–80 | F | Pleura | Epithelial | Office manager | 65 | 55 | Yes | Possible | Household exposure from husband (drilling wells, pipes) |
| 71–80 | F | Pleura | Epithelial | Clerical worker | 60 | 59 | Yes | Possible | Family member worked at service station (no details on work) |
| 71–80 | M | Pleura | Sarcomatoid | Accountant | 47 | 39 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Sales, business | 60 | 16 | No | None | |
| 81–90 | M | Peritoneal | Epithelial | Accountant | 68 | 56 | No | None | |
| 51–60 | F | Pleura | Epithelial | Social worker | 40 | 6 | No | None | |
| 71–80 | F | Pleura | Epithelial | Hairdresser | 60 | 49 | Yes | None | |
| 41–50 | M | Pleura, peritoneal | Epithelial | Warehouse worker | 47 | 8 | No | Definite | Automotive filler exposure |
| 51–60 | F | Pleura | Epithelial | Retail, bankteller, work at school | 56 | 56 | Yes | None | |
| 61–70 | F | Pleura | Biphasic | Bakery | 64 | 49 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Hospitality | 61 | 58 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Cashier | 57 | 56 | Yes | None | |
| 81–90 | F | Peritoneal | Epithelial | Teacher | 40 | 50 | Yes | Possible | Abatement done at work |

**JA1240**

USCA4 Appeal: 23-1972     Doc: 26-3     Filed: 12/20/2023     Pg: 298 of 435

Case 4:22-mc-00001-AWA-DEM    Document 20-3    Filed 01/25/23    Page 8 of 14 PageID# 1386

Moline *et al. Journal of Occupational Medicine and Toxicology*     (2023) 18:1                               Page 7 of 13

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 81–90 | F | Pleura | Epithelial | Physical therapy assistant | 64 | 62 | Yes | None | |
| 31–40 | M | Peritoneal | Epithelial | IT | 35 | 25 | No | None | |
| 51–60 | F | Pleura | Epithelial | Housekeeper | 42 | 34 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Teacher | 54 | 50 | Yes | Likely | Home renovations |
| 61–70 | M | Pleura | Epithelial | Accounting | 63 | 63 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Tractor driver, race track | 62 | 60 | No | Likely | Oil drilling |
| 71–80 | F | Pleura | Epithelial | Research | 62 | 42 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Agriculture consultant | 53 | 53 | Yes | None | |
| 31–40 | F | Peritoneal | Epithelial | Clerical worker | 39 | 27 | Yes | None | |
| 41–50 | F | Pleura | Biphasic | Clerical worker | 49 | 49 | No | Likely | Ceramics use |
| 71–80 | M | Pleura | Epithelial | Communications system/ office | 47 | 49 | Yes | None | |
| 81–90 | F | Pleura | Not specified | Nurse | 76 | 70 | Yes | Likely | Family member worked in shipyard |
| 71–80 | F | Peritoneal | Epithelial | Meat wrapper | 56 | 47 | Yes | None | |
| 71–80 | M | Pleura | Biphasic | Advertising | 62 | 62 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Teacher, hospital administration | 70 | 70 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Chef | 37 | 36 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Case manager | 53 | 52 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Finance and marketing | 42 | 34 | No | None | |
| 51–60 | M | Pleura | Epithelial | Painter, carpet installer | 38 | 38 | Yes | Definite | Automotive friction product use |
| 81–90 | F | Pleura | Epithelial | Secretary | 63 | 45 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Nursing | 69 | 40 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 46 | 22 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Industrial engineer | 48 | 53 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Librarian | 55 | 44 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Clerical worker, hostess | 53 | 15 | No | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 67 | 55 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Clerical worker | 64 | 20 | Yes | None | |
| 71–80 | F | Peritoneal | Sarcomatoid | Secretary, medical billing | 47 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Communications and real estate | 69 | 69 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Home health | 42 | 24 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Clerical worker, hostess | 53 | 15 | Yes | None | |
| 71–80 | F | Pleura | Biphasic | Therapy aid | 67 | 67 | Yes | None | |
| 61–70 | M | Pleura | Biphasic | Restaurant, lead technician | 50 | 47 | Yes | None | |
| 61–70 | F | Pleura | Sarcomatoid | Teacher | 51 | 43 | Yes | None | |

Moline *et al. Journal of Occupational Medicine and Toxicology*        (2023) 18:1

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Pleura | Epithelial | Sales | 44 | 16 | Yes | None | |
| 41–50 | F | Pleura | Epithelial | Chicken farming, medical assistant | 48 | 48 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Physician | 40 | 17 | No | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 69 | 64 | No | None | |
| 61–70 | F | Pleura | Epithelial | Assembly line worker | 51 | 52 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | X-ray technician | 40 | 40 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Factory worker, housekeeper | 33 | 14 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Clerical worker | 38 | 29 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Clerical worker | 54 | 27 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Variety of jobs | 76 | 76 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Receptionist, dental assistant | 45 | 35 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Midwife | 55 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Seamstress | 63 | 56 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Accounting | 65 | 65 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Nurse | 57 | 57 | Yes | None | |
| 71–80 | M | Peritoneal | Epithelial | Sales, truck driver | 45 | 32 | No | Definite | Automotive friction products use |
| 51–60 | M | Pleura | Epithelial | Lawyer | 48 | 48 | Yes | None | |
| 51–60 | F | Pleura | Sarcomatoid | Customer service | 56 | 27 | Yes | None | |
| 81–90 | F | Pleura | Sarcomatoid | Teacher | 53 | 47 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Not provided | 67 | 48 | No | Definite | Smoked Kent cigarettes in 1950s |
| 31–40 | F | Peritoneal | Biphasic | Banking | 39 | 19 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Logger, run loader | 74 | 74 | Yes | Possible | Automotive friction product use and home renovations |
| 71–80 | F | Peritoneal | Epithelial | Hairdresser | 50 | 50 | Yes | Likely | Hairdryers present in salon |
| 31–40 | F | Pleura | Sarcomatoid | Certified Nursing Assistant and phlebotomist | 39 | 24 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Seamstress | 62 | 52 | Yes | None | |
| 31–40 | F | Peritoneal | Epithelial | Variety of jobs | 27 | 20 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Laborer | 51 | 51 | Yes | None | |
| 41–50 | M | Peritoneal | Biphasic | Casino worker | 47 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Nurse | 69 | 18 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Accountant, comptroller | 70 | 30 | Yes | Possible | Home renovations |
| 61–70 | F | Pleura | Sarcomatoid | Clerical worker | 60 | 27 | No | None | |
| 61–70 | F | Pleura | Biphasic | Secretary, cleaner | 52 | 52 | Yes | Likely | Home renovations in 1970s |

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 300 of 435

Case 4:22-mc-00001-AWA-DEM    Document 20-3    Filed 01/25/23    Page 10 of 14 PageID# 1388

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1    Page 9 of 13

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 61–70 | F | Pleura | Sarcomatoid | Office cleaner, food prep | 64 | 64 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Insurance agent | 58 | 57 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Cook, cleaner, concierge | 54 | 44 | Yes | None | |
| 31–40 | M | Peritoneal | Epithelial | Lab technician | 36 | 36 | No | None | |
| 91–100 | F | Pleura | Epithelial | Variety of jobs | 60 | 60 | No | None | |
| 51–60 | F | Pleura | Epithelial | Real estate broker | 36 | 35 | Yes | None | |
| 41–50 | F | Pleura | Biphasic | PhD in astronomy, dance teacher | 37 | 37 | No | None | |
| 71–80 | F | Pleura | Epithelial | Switchboard operator, HR | 64 | 50 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 50 | 46 | Yes | Likely | Ceramics work for 4–5 years |
| 41–50 | F | Peritoneal | Epithelial | Lawyer | 44 | 20 | No | None | |
| 71–80 | F | Pleura | Epithelial | Quality control | 67 | 67 | Yes | None | |
| 51–60 | F | Pleura | Sarcomatoid | Counselor | 55 | 54 | No | None | |
| 71–80 | F | Pleura | Biphasic | Certified nursing assistant, ranch work | 62 | 35 | Yes | Likely | Vermiculite exposure |
| 71–80 | M | Peritoneal | Epithelial | Physician | 67 | 67 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Nurse Practitioner | 44 | 34 | Yes | None | |
| 31–40 | M | Pleura | Epithelial | Not provided | 29 | 30 | No | None | |
| 61–70 | F | Pleura | Epithelial | Banking | 60 | 50 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 56 | 45 | Yes | None | |
| 71–80 | F | Pleura | Sarcomatoid | Hairdresser | 61 | 25 | Yes | None | |
| 71–80 | M | Pleura | Sarcomatoid | Mechanic | 60 | 48 | No | Definite | Occupational exposure and home renovations |
| 61–70 | M | Peritoneal | Epithelial | Worked at special education preschool | 57 | 50 | No | None | |
| 71–80 | F | Peritoneal | Biphasic | Teacher | 65 | 46 | Yes | None | |
| 71–80 | F | Pleura | Biphasic | Teacher | 71 | 59 | Yes | Possible | Family member was Linotype operator |
| 81–90 | F | Pleura | Epithelial | Cashier, waitress | 60 | 58 | Yes | None | |
| 31–40 | F | Pleura | Epithelial | Administrator | 28 | 7 | No | None | |
| 71–80 | F | Peritoneal | Epithelial | Teacher | 50 | 51 | Yes | Likely | Household exposure to laundry (automotive friction materials) |
| 31–40 | M | Pleura | Epithelial | Homeland Security | 33 | 33 | No | None | |
| 61–70 | M | Pleura | Epithelial | Trucking company | 55 | 56 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Office worker | 62 | 45 | Yes | None | |

[*] Years of Talc Use: includes years of being diapered or powdered with talc as a child; years of diapering or powdering children or others with talc; and years applying talcum powder to oneself after bathing or other personal use

[**] Diapering or Applying Talc: restricted to diapering or powdering children with talc or applying talcum powder to others, including occupational use

**JA1243**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 301 of 435

Case 4:22-mc-00001-AWA-DEM    Document 20-3    Filed 01/25/23    Page 11 of 14 PageID# 1389

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1    Page 10 of 13

on each specific task or exposure within the job category. Furthermore, mesothelioma is a disease that occurs following a long latency period. It is important to consider whether the latency period for all exposures, whether due to asbestos in talcum powder, or through occupational or para-occupational exposures meets the minimum latency period.

Subgroups of individuals not traditionally known to be exposed to asbestos have been identified, such as teachers. In this case series, 12 teachers (7.2% of cases) were diagnosed with mesothelioma. Anderson et al. identified 12 school teachers with mesothelioma in Wisconsin (6 male, 6 female). [28]. Nine cases had no known exposure to asbestos, although several worked in school buildings with asbestos containing building materials (ACBM) present, but the condition of the ACBR while the teachers were present in the school was unknown. No history of talcum powder use was elicited. Marianaccio et al. identified mesotheliomas in 11 female teachers in Italy. [29]. Mazurek et al. evaluated mesothelioma deaths in women in the United States from 1999–2020 using death certificate data. [30]. Mesothelioma was noted in 32 female elementary and middle school teachers. No information on exposure to asbestos or specific tasks at work or a comprehensive exposure history was available; no history of talcum powder use was elicited, as the study was based solely on death certificates. Tomasallo et al. found increased mortality among school teachers in Wisconsin, USA. [31]. They noted that para-occupational or take home exposure could be responsible for the increased risk. Again, no history of asbestos exposure through talcum powder usage was ascertained. It might be possible that exposure to ACBM played some role in these mesotheliomas, however, the notable history of exposure to asbestos-containing talcum powders among teachers in this case series, highlights the importance of assessing this source of exposure in future studies of mesothelioma in teachers and other predominantly female professions.

Mazurek et al. found seven cases of mesothelioma among female hairdressers. [30]. Our series identified five hairdressers/barbers with documented occupational exposure to asbestos containing talcum powder. Moline et al. found three hairdressers who used cosmetic talc as part of their occupation, [14] and Emory et al. [15] found 4 hairdressers out of 75 patients. Pavlisko et al. identified a hairdresser in their study of mesothelioma in women, but classified the case in the non-occupational/paraoccupational exposure category. [32] McDonald attributed the finding of tremolite in the lung tissue of a chrysotile worker to his prior occupational exposure to talc as a barber [33]. Rodelsberger recognized talc as a source of asbestos exposure and identified hairdressers and barbers as asbestos-exposed industries [34]. The examples

of these two occupational subgroups, teachers with personal use of cosmetic talc, and hairdressers with occupational use of cosmetic talc, show the importance of obtaining a thorough history and determining all potential sources of asbestos exposure.

This case series describes mesotheliomas in end-users of cosmetic talcum powder, thus using no personal protective equipment or dust suppression activities, unlike some cohorts with occupational exposures [35]. Prior mortality studies of talc miners and millers in Italy (and other countries) have not identified mesotheliomas in their populations, although two cases of peritoneal cancer were identified by Pira et al. [36]. The Rubino, Coggiola and Pira et al. studies used mortality data collected prior to an ICD mesothelioma code, which could impact proper classification of mesothelioma. [35–37]. The studies had a relatively small sample size, which given the rarity of mesothelioma, even among highly exposed individuals, would have led to insufficient statistical power [38]. Fordyce studied Vermont talc miners and found two mesotheliomas in the small cohort of 427 miners; Vermont talc has been used in cosmetic talcum powder [39].

Fiber burden studies were done in some individuals from the two prior case series of mesothelioma among individuals with cosmetic talcum powder use. Moline et al. reported on tissue fiber analysis in six of 33 individuals. Asbestos fibers, of the types found in cosmetic talc, were found in all six samples. Emory et al. found anthophyllite asbestos in all 9 individuals for whom tissue fiber analysis was done. Tremolite was found in six of the cases in addition to the anthophyllite. Hull et al. [40] looked at New York State talc miners and found anthophyllite, tremolite/actinolite, chrysotile and talc in their lungs. There were over a dozen cases of mesothelioma identified in these talc miners. Our case series did not include data on tissue sampling, which is not typically done for clinical purposes; rather we relied on patient history. For occupational exposures to asbestos, fiber analysis is not required to ascertain a history of exposure, rather the history of exposure to asbestos is sufficient [41]. This should be no different for environmental exposures, such as asbestos exposure in cosmetic talcum powder, or even para-occupational exposures.

Pleural mesothelioma is more common than peritoneal mesothelioma [42], with estimates of pleural mesothelioma occurring approximately 80–90% of the time compared to peritoneal mesothelioma. The presenting location for the tumor, either pleural or peritoneal, was similar in all three recent case series. In Moline et al., 11 of 33 patients had peritoneal mesothelioma and in Emory et al., 23 of 75 cases were peritoneal mesothelioma. In this larger case series, the proportion of peritoneal mesotheliomas was 31.3%. The proportion of men

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 302 of 435

Case 4:22-mc-00001-AWA-DEM    Document 20-3    Filed 01/25/23    Page 12 of 14 PageID# 1390

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1    Page 11 of 13

in each of the three case series was similar. In Emory et al., 15% of the cases were men, compared with 18% of the cases in Moline et al. In the current case series, among 122 cases with talc-only exposure, 20.5% were men, slightly above the proportion in two previous case series. This might reflect growing awareness among men that talcum powder use could explain their mesothelioma, particularly when no other identifiable source of asbestos was identified. Few individuals in this case series underwent testing for the tumor suppressor gene, BAP-1, which is associated with an increased risk for mesothelioma when associated with asbestos exposure, [43] including greater susceptibility at low doses of asbestos such as exposures from cosmetic talcum powder use. Interestingly, there was a greater frequency of peritoneal mesothelioma cases in those with the BAP-1 mutation and asbestos exposure [44].

Several authors have written about the importance of the cumulative dose, which has been related to several asbestos-caused diseases, both non-malignant and non-malignant. Luberto et al. discussed the "increased mortality risk due to asbestos exposure for malignant neoplasm of pleura, peritoneum, lung and ovary, as well as asbestosis, all increasing with cumulative exposure." [19] Henderson et al. commented on the use of the cumulative exposure model in the Helsinki Criteria. [45] Iwastsubo and colleagues, citing only low exposures leading to disease noted that "excess of mesothelioma was observed for levels of cumulative exposure." [46] Ferrante and her colleagues [47] found that the "risk of pleural malignant mesothelioma increased with cumulative asbestos exposure and also in analyses limited to subjects non-occupationally exposed," comparable to the current case series. Albin et al. [48] even noted that "colorectal cancer displayed a clear relation with cumulative dose," as one would reasonably expect with asbestos-related diseases.

This case series may reflect the potential sources of bias that impact all studies that use cases in which litigation is occurring. However, because mesothelioma is a rare disease and full environmental histories are rarely obtained or documented, it would be impossible to amass so many cases with one type of exposure using standard sources such as hospital or cancer registry records. Furthermore, most patients (and their clinicians) are unaware of the presence of asbestos in talcum powder, leading them to report no known asbestos exposure. The data related to years of exposure to cosmetic talcum powder was obtained and typically described in great detail during sworn testimony. For nearly one-quarter of the individuals in this series, additional exposures to asbestos were reported along with the cosmetic talcum powder. When available,

information regarding talcum powder usage was corroborated by sworn testimony of family members. Typically, the questioning of individuals about alternate exposures to asbestos as part of litigation is fairly comprehensive, but it is possible that there were additional, unknown sources. This presents a challenge for any study of asbestos exposure and, in particular, mesothelioma, given the long latency period from the onset of exposure to the development of disease.

## Conclusion

For individuals with exposure to asbestos through cosmetic talc usage and additional alternate sources, all exposures contribute to the development of mesothelioma. Published case reports and case series have identified over 100 individuals whose sole exposure to asbestos was through cosmetic talcum powder usage [14, 15, 49]. Thus, is it critical to obtain a history of all potential exposures to asbestos. In this case series, 122 cases would have had no source of asbestos identified if a history of asbestos-containing cosmetic talc had not been elicited. The other 44 would have likely been misclassified as having only alternate exposures. It is indisputable that asbestos causes mesothelioma, therefore, it is critical to elicit all potential sources of asbestos exposure so that we can better understand, and prevent, future cases of this deadly cancer.

### Acknowledgements
Not applicable.

### Authors' contributions
Jacqueline Moline conceived of the manuscript, and was involved in the acquisition of data, analysis and writing of the manuscript. Kesha Patel was involved in data presentation and analysis. Arthur L. Frank was involved in writing and evaluation of alternative exposures. The author(s) read and approved the final manuscript.

### Funding
No funds or external assistance were obtained by any outside source in the development, writing, analysis or conclusions of this manuscript.

### Availability of data and materials
The datasets generated and/or analyzed during the current study are not publicly available. Individuals of cases will not be provided to protect the confidentiality of the cases presented in the study. Efforts to minimized identification, such as describing age in a range were employed.

## Declarations

### Ethics approval and consent to participate
The project received approval from the Institutional Review Board and we received a waiver of consent to include the participants in the study. (IRB #: 21–0897).

### Consent for publication
Not applicable.

### Competing interests
Authors Jacqueline Moline and Arthur L. Frank have served as expert witnesses in asbestos litigation, including talc litigation for plaintiffs.

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 303 of 435

Case 4:22-mc-00001-AWA-DEM    Document 20-3    Filed 01/25/23    Page 13 of 14 PageID# 1391

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1    Page 12 of 13

Received: 4 October 2022  Accepted: 4 January 2023
Published online: 18 January 2023

## References

1. Olsen NJ, Franklin PJ, Reid A, et al. Increasing incidence of malignant mesothelioma after exposure to asbestos during home maintenance and renovation. Med J Aust. 2011;195(5):271–4. https://doi.org/10.5694/mja11.10125.
2. Bourdès V, Boffetta P, Pisani P. Environmental exposure to asbestos and risk of pleural mesothelioma: review and meta-analysis. Eur J Epidemiol. 2000;16(5):411–7. https://doi.org/10.1023/a:1007691003600.
3. Epler GR, Fitz Gerald MX, Gaensler EA, Carrington CB. Asbestos-related disease from household exposure. Respiration. 1980;39(4):229–40. https://doi.org/10.1159/000194221.
4. Miller A. Mesothelioma in asbestos-exposed workers: 32 United States cases since 1990. Am J Ind Med. 2005;47(5):458–62. https://doi.org/10.1002/ajim.20167.
5. Schneider J, Straif K, Woitowitz HJ. Pleural mesothelioma and household asbestos exposure. Rev Environ Health. 1996;11(1–2):65–70. https://doi.org/10.1515/REVEH.1996.11.1-2.65.
6. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans, International Agency for Research on Cancer, World Health Organization, eds. *Carbon Black, Titanium Dioxide, and Talc*. International Agency for Research on Cancer ; Distributed by WHO Press; 2010.
7. Steffen JE, Tran T, Yimam M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders—a case series. J Occup Environ Med. 2020;62(2):e65–77. https://doi.org/10.1097/JOM.0000000000001800.
8. Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health. 2014;20(4):318–32. https://doi.org/10.1179/2049396714Y.0000000081.
9. U.S. Public Health Service USD of H& HS. Public Health Statement Asbestos CAS#: 1332–21–4. *Atlanta Agency Toxic Subst Dis Regist*. Published online September 2001.
10. Gramond C, Rolland P, Lacourt A, et al. Choice of rating method for assessing occupational asbestos exposure: Study for compensation purposes in France. Am J Ind Med. 2012;55(5):440–9. https://doi.org/10.1002/ajim.22008.
11. Tossavainen A. Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution. Scand J Work Environ Health. 1997;4:311–6. https://doi.org/10.5271/sjweh.226.
12. Michaels D, Zoloth S. Asbestos disease in sheet metal workers: Proportional mortality update. Am J Ind Med. 1988;13(6):731–4. https://doi.org/10.1002/ajim.4700130612.
13. Zoloth S, Michaels D. Asbestos disease in sheet metal workers: the results of a proportional mortality analysis. Am J Ind Med. 1985;7(4):315–21. https://doi.org/10.1002/ajim.4700070407.
14. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc. J Occup Environ Med. 2020;62(1):11–7. https://doi.org/10.1097/JOM.0000000000001723.
15. Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: a case series of 75 patients. Am J Ind Med. 2020;63(6):484–9. https://doi.org/10.1002/ajim.23106.
16. Baur X, Frank AL, Soskolne CL, Oliver LC, Magnani C. Malignant mesothelioma: ongoing controversies about its etiology in females. Am J Ind Med. 2021;64(7):543–50. https://doi.org/10.1002/ajim.23257.
17. Newhouse ML, Berry G, Wagner JC, Turok ME. A study of the mortality of female asbestos workers. Br J Ind Med. 1972;29(2):134–41. https://doi.org/10.1136/oem.29.2.134.
18. Berry G. Mortality from all cancers of asbestos factory workers in east London 1933–80. Occup Environ Med. 2000;57(11):782–5. https://doi.org/10.1136/oem.57.11.782.
19. Luberto F, Ferrante D, Silvestri S, et al. Cumulative asbestos exposure and mortality from asbestos related diseases in a pooled analysis of 21 asbestos cement cohorts in Italy. Environ Health. 2019;18(1):71. https://doi.org/10.1186/s12940-019-0510-6.
20. Pira E, Pelucchi C, Buffoni L, et al. Cancer mortality in a cohort of asbestos textile workers. Br J Cancer. 2005;92(3):580–6. https://doi.org/10.1038/sj.bjc.6602240.
21. Lacourt A, Gramond C, Rolland P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. Thorax. 2014;69(6):532–9. https://doi.org/10.1136/thoraxjnl-2013-203744.
22. Magnani C, Ferrante D, Barone-Adesi F, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med. 2008;65(3):164–70. https://doi.org/10.1136/oem.2007.032847.
23. Frank AL, Zengchang P, Huaqiang Z, Yun Z. Mesothelioma in Qingdao, PRC (2000–2007). J Phys Conf Ser. 2009;151:012007.
24. Price B. Mesothelioma trends in the United States: an update based on surveillance, epidemiology, and end results program data for 1973 through 2003. Am J Epidemiol. 2004;159(2):107–12. https://doi.org/10.1093/aje/kwh025.
25. Bird T, Steffen JE, Tran TH, Egilman DS. A review of the talc industry's influence on federal regulation and scientific standards for asbestos in talc. NEW Solut J Environ Occup Health Policy. 2021;31(2):152–69. https://doi.org/10.1177/1048291121996645.
26. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. Am Ind Hyg Assoc J. 1968;29(4):350–4. https://doi.org/10.1080/00028896809343015.
27. Wong JYY, Rice C, Blair A, Silverman DT. Mesothelioma risk among those exposed to chrysotile asbestos only and mixtures that include amphibole: a case–control study in the USA, 1975–1980. Occup Environ Med. 2021;78(3):199–202. https://doi.org/10.1136/oemed-2020-106665.
28. Anderson HA, Hanrahan LP, Schirmer J, Higgins D, Sarow P. Mesothelioma among employees with likely contact with in-place asbestos-containing building materials. Ann N Y Acad Sci. 1991;643:550–72. https://doi.org/10.1111/j.1749-6632.1991.tb24506.x.
29. Marinaccio A, Corfiati M, Binazzi A, et al. The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Environ Med. 2018;75(4):254–62. https://doi.org/10.1136/oemed-2016-104119.
30. Mazurek JM, Blackley DJ, Weissman DN. Malignant mesothelioma mortality in women — United States, 1999–2020. MMWR Morb Mortal Wkly Rep. 2022;71(19):645–9. https://doi.org/10.15585/mmwr.mm7119a1.
31. Tomasallo CD, Christensen KY, Raymond M, Creswell PD, Anderson HA, Meiman JG. An occupational legacy: malignant mesothelioma incidence and mortality in wisconsin. J Occup Environ Med. 2018;60(12):1143–9. https://doi.org/10.1097/JOM.0000000000001461.
32. Pavlisko EN, Liu B, Green C, Sporn TA, Roggli VL. Malignant diffuse mesothelioma in women: a study of 354 cases. Am J Surg Pathol. 2020;44(3):293–304. https://doi.org/10.1097/PAS.0000000000001418.
33. Mcdonald A, Case B, Churg A, et al. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. Ann Occup Hyg. 1997;41(6):707–19. https://doi.org/10.1016/S0003-4878(97)00020-3.
34. Rödelsperger K, Jöckel KH, Pohlabeln H, Romer W, Woitowitz HJ. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study. Am J Ind Med. 2001;39(3):262–75. https://doi.org/10.1002/1097-0274(200103)39:3%3c262::AID-AJIM1014%3e3.0.CO;2-R.
35. Coggiola M, Bosio D, Pira E, et al. An update of a mortality study of talc miners and millers in Italy. Am J Ind Med. 2003;44(1):63–9. https://doi.org/10.1002/ajim.10240.
36. Pira E, Coggiola M, Ciocan C, et al. Mortality of talc miners and millers from Val Chisone, Northern Italy: an updated cohort study. J Occup Environ Med. 2017;59(7):659–64. https://doi.org/10.1097/JOM.0000000000000992.
37. Rubino G, Scansetti G, Piolatto G, Romano C. Mortality study of talc miners and millers. J Occup Med. 1976;18(3):187–93.
38. Finkelstein MM. Re: mortality of talc miners and millers from Val Chisone, Northern Italy. J Occup Environ Med. 2017;59(10):e194.
39. Fordyce TA, Mowat FS, Leonhard MJ, Moolgavkar SH. Letter to the Editor: misrepresentation by Egilman et al. of the Fordyce et al. (2019) vermont talc miners and millers cohort study update. J Occup Environ Med. 2020;62(1):e19–e21. doi:https://doi.org/10.1097/JOM.0000000000001784
40. Hull MJ, Abraham J, Case B. Mesothelioma among workers in asbestiform fiber-bearing talc mines in New York State. Ann Occup Hyg.

Moline *et al. Journal of Occupational Medicine and Toxicology*    *(2023) 18:1*    Page 13 of 13

2002;46(Supplement 1):132–5. https://doi.org/10.1093/annhyg/46.suppl_1.132.

41. Wolff H, Vehmas T, Oksa P, Rantanen J, Vainio H. Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution 2014: recommendations. Scand J Work Environ Health. 2015;41(1):5–15. https://doi.org/10.5271/sjweh.3462.

42. Kim J, Bhagwandin S, Labow DM. Malignant peritoneal mesothelioma: a review. Ann Transl Med. 2017;5(11):236–236. https://doi.org/10.21037/atm.2017.03.96.

43. Xu J, Kadariya Y, Cheung M, et al. Germline mutation of *Bap1* Accelerates development of asbestos-induced malignant mesothelioma. Cancer Res. 2014;74(16):4388–97. https://doi.org/10.1158/0008-5472.CAN-14-1328.

44. Ohar JA, Cheung M, Talarchek J, et al. Germline BAP1 mutational landscape of asbestos-exposed malignant mesothelioma patients with family history of cancer. Cancer Res. 2016;76(2):206–15. https://doi.org/10.1158/0008-5472.CAN-15-0295.

45. Henderson DW, Rödelsperger K, Woitowitz HJ, Leigh J. After Helsinki: a multidisciplinary review of the relationship between asbestos exposure and lung cancer, with emphasis on studies published during 1997–2004. Pathology (Phila). 2004;36(6):517–50. https://doi.org/10.1080/00313020400010955.

46. Iwatsubo Y, Pairon JC, Boutin C, et al. Pleural mesothelioma: dose-response relation at low levels of asbestos exposure in a French population-based case-control study. Am J Epidemiol. 1998;148(2):133–42. https://doi.org/10.1093/oxfordjournals.aje.a009616.

47. Ferrante D, Mirabelli D, Tunesi S, Terracini B, Magnani C. Pleural mesothelioma and occupational and non-occupational asbestos exposure: a case-control study with quantitative risk assessment. Occup Environ Med. 2016;73(3):147–53. https://doi.org/10.1136/oemed-2015-102803.

48. Albin M, Jakobsson K, Attewell R, Johansson L, Welinder H. Mortality and cancer morbidity in cohorts of asbestos cement workers and referents. Occup Environ Med. 1990;47(9):602–10. https://doi.org/10.1136/oem.47.9.602.

49. Andrion A, Bosia S, Paoletti L, et al. Malignant peritoneal mesothelioma in a 17-year-old boy with evidence of previous exposure to chrysotile and tremolite asbestos. Hum Pathol. 1994;25(6):617–22. https://doi.org/10.1016/0046-8177(94)90230-5.

**Publisher's Note**

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Ready to submit your research?  Choose BMC and benefit from:

- fast, convenient online submission
- thorough peer review by experienced researchers in your field
- rapid publication on acceptance
- support for research data, including large and complex data types
- gold Open Access which fosters wider collaboration and increased citations
- maximum visibility for your research: over 100M website views per year

At BMC, research is always in progress.

Learn more biomedcentral.com/submissions



# Exhibit 4



Deposition of:

**Theresa Swain Emory , M.D.**

*October 1, 2020*

In the Matter of:

**Bell, Lloyd et al v. American International Industries et al**

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Theresa Swain Emory , M.D.                                    October 1, 2020

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3                  GREENSBORO DIVISION

4     - - - - - - - - - - - - - - - x

5    LLOYD BELL, Individually and    :

     as Executor of the Estate of    :

6    BETTY WHITLEY BELL, Deceased     :

                  Plaintiff          :

7       vs.                          :  Civil Action No.

     AMERICAN INTERNATIONAL          :  1:17-cv-00111

8    INDUSTRIES, INC., et al.        :

                  Defendants         :

9     - - - - - - - - - - - - - - - x

     AMERICAN INTERNATIONAL          :

10   INDUSTRIES, INC.                :

                  Third-Party        :

11                Plaintiff          :

        vs.                          :

12   NESLEMUR COMPANY f/k/a, THE     :

     NESTLE-LEMUR COMPANY            :

13                Third-Party        :

                  Defendant          :

14    - - - - - - - - - - - - - - - x

15         VIRTUAL VIDEOTAPED DEPOSITION OF

16              THERESA SWAIN EMORY, M.D.

17   DATE:        Thursday, October 1, 2020

18   TIME:        10:21 a.m.

19   LOCATION:    Remote Proceedings

20   REPORTED BY: Denise M. Brunet, RPR

21

22

Theresa Swain Emory , M.D.                    October 1, 2020

Page 2

```
 1                A P P E A R A N C E S

 2


 3    On behalf of Plaintiff:

 4               LEAH C. KAGAN, ESQUIRE

 5               Simon Greenstone Panatier, P.C.

 6               1201 Elm Street

 7               Suite 3400

 8               Dallas, Texas  75270

 9               (214) 276-7680

10               klagan@sgptrial.com

11


12    On behalf of Defendant Colgate-Palmolive Company:

13               MATTHEW SCHROLL, ESQUIRE

14               Nelson Mullins Riley &

15                 Scarborough, LLP

16               2 South Biscayne Boulevard

17               21st Floor

18               Miami, Florida  33131

19               (305) 373-9416

20               matt.schroll@nelsonmullins.com

21


22     APPEARANCES:  (Continued on Next Page.)
```

                                                    Page 3

1    APPEARANCES CONTINUED:

2

3    On behalf of Defendant Whittaker Clark & Daniels,

4    Inc.:

5                    TRACY E. TOMLIN, ESQUIRE

6                    Nelson Mullins Riley &

7                      Scarborough, LLP

8                    One Wells Fargo Center

9                    301 S. College Street

10                   Charlotte, North Carolina  28202

11                   (704) 417-3000

12                   tracy.tomlin@nelsonmullins.com

13

14   On behalf of Defendant American International

15   Industries:

16                   KURT W. GREVE, ESQUIRE

17                   Lathrop BPM, LLP

18                   2101 Cedar Springs Road

19                   Dallas, Texas  75201

20                   (469) 983-6100

21                   kurt.greve@lathropbpm.com

22    APPEARANCES:  (Continued on Next Page.)

```
                                                    Page 4

 1    APPEARANCES CONTINUED:

 2

 3    On behalf of Defendant Cyprus Amax Minerals Co.:

 4                     ALVINA OELHAFEN, ESQUIRE

 5                     Alston & Bird

 6                     555 Fayetteville Street

 7                     Raleigh, North Carolina  27601

 8                     allie.oelhafen@alston.com

 9

10    On behalf of Defendant Neslemur Company f/k/a The

11    Nestle-Lemur Company:

12                     KEVIN McCAFFREY, ESQUIRE

13                     Clyde & Co US LLP

14                     The Chrysler Building

15                     405 Lexington Avenue

16                     New York, New York  10174

17                     (212) 710-3952

18                     kevin.mccaffrey@clydeco.us

19

20    ALSO PRESENT:  Kaitlin Motley

21                     Jeffrey Elam, Videographer

22    (All parties appearing remotely.)
```

Theresa Swain Emory , M.D.                          October 1, 2020

Page 5

1                           C O N T E N T S

2        EXAMINATION BY:                            PAGE

3        Counsel for Colgate-Palmolive              8

4        Counsel for Whittaker Clark & Daniels      195

5

6        DEPOSITION EXHIBITS:                       MARKED

7        Exhibit 1    Notice of deposition          7

8        Exhibit 2    Emory curriculum vitae        7

9        Exhibit 3    Emory report                  26

10       Exhibit 4    Prior testimony list          38

11       Exhibit 5    PPA Invoice dated 12/19/19     47

12       Exhibit 6    PPA Invoice dated 2/4/20       49

13       Exhibit 7    PPA Invoice dated 6/29/20      50

14       Exhibit 8    Surgical pathology report     58

15       Exhibit 9    CT report                     68

16       Exhibit 10   Reliance materials            82

17       Exhibit 11   Revised prior testimony list  110

18       Exhibit 12   Printout from FDA website     118

19       Exhibit 13   Claim for benefits to North Carolina

20                    Industrial Commission         124

21       Exhibit 14   Longo expert report for Vinson  136

22       (Exhibits continued on the next page.)

Page 166

```
 1   BY MR. SCHROLL:

 2        Q    Okay.  The data that is contained here in

 3   the article would have been accessed by you,

 4   Dr. Maddox and Dr. Kradin, correct?

 5        A    The authors of the paper are myself,

 6   Dr. Maddox and Dr. Kradin.

 7        Q    Did you have any clerical staff or any

 8   assistance that also had access to this data in

 9   preparation of this paper?

10        A    Not that I'm aware of.

11        Q    So the only three people who would have

12   had access to the underlying data would be

13   yourself, Dr. Maddox and Dr. Kradin, correct?

14        A    As far as I know.  With regard to writing

15   of the paper, with the paper.  Obviously, you

16   know, we got the material and people must have

17   information.  But as far as writing this paper, we

18   did not have clerical assistance to write the

19   paper.

20        Q    And you served as a legal expert in some

21   number of these cases; is that correct?

22             MS. KAGAN:  Objection.  Foundation.
```

Theresa Swain Emory , M.D.                              October 1, 2020

Page 167

```
 1              THE WITNESS:  I've never -- I don't know

 2     where you see that written in the paper.

 3     BY MR. SCHROLL:

 4        Q    I'm asking if you did.

 5        A    It's not in the paper, so there's nothing

 6     to say about that.  I'm not going to de-anonymize

 7     these people.  And you can try however you want,

 8     but I think that the bar -- your state bar

 9     probably would have a question about trying to

10     de-anonymize human subjects that were in medical

11     research.

12              MR. SCHROLL:  Move to strike.

13     BY MR. SCHROLL:

14        Q    Doctor, I understand you're not going to

15     tell me.  I just need you to tell me that you're

16     not going to tell me for purposes of the record

17     and the questions and answers will go much faster.

18        A    I don't care how long it takes, but I'm

19     not telling you any more than what's in the paper.

20              MR. GREVE:  I need the restroom real

21     quick.

22              MR. SCHROLL:  Okay.  Let's go off the
```

Theresa Swain Emory , M.D.                          October 1, 2020

Page 168

```
1    record.

2              THE VIDEOGRAPHER:  We are going off the

3    record.  The time is 3:03 p.m.

4              (Whereupon, a short recess was taken.)

5              THE VIDEOGRAPHER:  We are back on the

6    record.  The time is 3:10 p.m.

7    BY MR. SCHROLL:

8        Q    Okay.  Doctor, on page 2 of your article,

9    under methods, it says, "Exposures were identified

10   through sworn deposition testimonies and answers

11   to sworn interrogatories provided from subjects,

12   parents and spouses."

13             Did your review of these cases also

14   include expert reports from the litigation of

15   these cases?

16       A    I think that what it says here in the

17   methods is what we have reported.

18             I just want to make one thing clear.  I

19   know you're not asking me a question, but just so

20   it's clear, since you need to get it all on the

21   record, that revealing anonymized human subjects

22   would jeopardize my medical license.  And I am
```

Theresa Swain Emory , M.D.                    October 1, 2020

 1    unwilling for someone to try to de-anonymize these

 2    human subjects and put me in jeopardy.  And quite

 3    frankly, if that happens, I think that -- I would

 4    think that that might be a problem for whoever is

 5    trying to force this.

 6          You know, just like you can't reveal a

 7    patient that comes to the emergency room or a rape

 8    victim or whatever, when they're anonymized,

 9    they're anonymized.  And these are anonymized

10    patients.  Not patients.  Human subjects.

11          But when it is a patient, or even someone

12    that comes to me from a social service issue and

13    says, I'm being beaten by my spouse, you cannot

14    reveal these things.

15          And again, that could jeopardize my

16    medical license.  And I just want that to be

17    perfectly clear, that revealing human subjects

18    that have been anonymized is a very unethical and

19    inappropriate exercise.

20          MR. SCHROLL:  Okay.  Move to strike.

21    BY MR. SCHROLL:

22      Q    At the -- page 6 of your article, at the

Page 174

1    cuminganite -- and I'm -- poor court reporter, I'm

2    sorry -- and Sanchez reported cuminganite, which

3    is also amosite, in his J&J Vermont talc.  So it's

4    the same mineral, but the trade name is amosite.

5        Q    Okay.  The next exhibit, Exhibit 16, is

6    the case series by Dr. Moline and Dr. Gordon from

7    this year.

8            (Deposition Exhibit Number 16 was marked

9    for identification.)

10           THE WITNESS:  Okay.

11   BY MR. SCHROLL:

12       Q    One moment, please.

13       A    I have it up.

14       Q    Okay.  Doctor, I think in your report,

15   you said that, with your case series and

16   Dr. Moline's case series, that that shows well

17   over 100 incidents of cosmetic talcum powder

18   causing mesothelioma in the literature; is that

19   correct?

20       A    Where are you looking?

21       Q    In your article -- I'm sorry, page 12.

22   Hold on.

Theresa Swain Emory , M.D.                    October 1, 2020

Page 175

1        A    I had gone to Dr. Moline's paper.  Sorry,

2    I'll go back to mine.

3        Q    Okay.  I'm sorry, page 2 of your article

4    under the "discussion" heading.

5        A    Okay.

6        Q    You note the 75 individuals in this study

7    and then you note Moline, et al., reported 33

8    cases.

9             Have you done anything to determine

10   whether any of Dr. Moline's 33 cases are the same

11   as the cases of your 75 individuals?

12       A    So again, that would be unethical to find

13   out the names or the identities of the human

14   subjects that she had and mine.  But the best that

15   could be done is to only look at the table that

16   was available and -- in an attempt to not have any

17   sort of overlapping.  So that is the best one

18   could do, standing within ethics guidelines and

19   anonymized human subjects.

20       Q    And did you do a comparison based on the

21   available data on the articles to determine

22   whether there was any overlap?

Theresa Swain Emory , M.D.                    October 1, 2020

Page 176

1          A     Again, that's the only way that anyone

2     can attempt to separate those, but again, there's

3     no way -- you know, there were 75 of hers and -- I

4     mean, of ours and I think 33 for her, and it was

5     the best that could be done.

6          Q     And I understand what you're saying is

7     you can compare the tables of data on both

8     articles, and I'm asking, did you do that?

9          A     Yes.

10         Q     And did you determine whether there was

11    any overlap?

12         A     There wouldn't be overlap, to the best of

13    our ability.

14         Q     Okay.  I want you to look at case

15    number 72 of your article in your table number 1.

16         A     Okay.

17         Q     And case number 72, your article reports

18    is a male with year of diagnosis in 2016, age 44,

19    peritoneal-type, correct?

20         A     No.  Pleural.

21         Q     You are correct.  I misread that.  That's

22    why I asked, did I read that correctly?

Page 177

1          It is a 72-year-old male, year of

2     diagnosis 2016, age 44, pleural mesothelioma,

3     correct?

4          A    That's what it says.

5          Q    Okay.  And if you look at Dr. Moline's

6     article, in table number 1, that reports a male,

7     2016 year of diagnosis, age 43, pleural

8     mesothelioma, correct?

9          A    What number?

10         Q    Case number 6 in table 1 of Dr. Moline's

11    article.

12         A    Yes.  And that's a different -- the

13    person was 44 in mine.

14         Q    Okay.

15         A    Again, if you're trying to de-anonymize

16    these, I warn you that's it's a perilous thing to

17    try to do for no apparent reason except for the

18    fact that it could cause you, and me maybe, to

19    lose our licenses.

20         These are human --

21         Q    Okay.

22         A    -- subjects that are in medical research.

Theresa Swain Emory , M.D.                    October 1, 2020

1    So I think -- I'd caution you because I don't know

2    about the bar in Texas, if that's where you are,

3    but I can tell you the board of medicine in

4    Virginia is not going to tolerate my exposing and

5    de-anonymizing human subjects.

6        Q    Okay.  And in table 2 --

7            MR. SCHROLL:  Move to strike.

8    BY MR. SCHROLL:

9        Q    And in table 2 of Dr. Moline's article,

10   the bottom of page 15, it says case number 6, and

11   it finds asbestos type, anthophyllite and

12   tremolite.  Do you see where I'm referring to?

13       A    No.

14       Q    Page 15, table 2.

15       A    Not doing this, no.  I don't know what

16   you're trying to do.  If you're trying to

17   de-anonymize these patients -- I'm only going to

18   talk about my paper.  I'm not comparing my paper

19   to Dr. Moline's as we sit here today.

20       Q    Do any of the 75 cases in your case

21   article have -- had incidents of pleural plaques?

22       A    What's reported in our paper is what's

 1    reported in our paper.

 2        Q    Okay.  So the answer is you will not tell

 3    me that, correct?

 4        A    The data that's put into the paper is the

 5    data that I will discuss.  I will not discuss

 6    anything else.  You're trying to de-anonymize

 7    human subjects.

 8        Q    Okay.  Is Betty Bell one of the 75 cases

 9    in your article?

10            MS. KAGAN:  I'm going to object and

11    instruct Dr. Emory not to answer.  If she is going

12    to de-anonymize Betty Bell, that would violate

13    Betty Bell's confidentiality.  And I'm objecting

14    on behalf of Betty Bell and not on behalf of

15    Dr. Emory.

16            MR. SCHROLL:  Okay.  That's fine.

17    BY MR. SCHROLL:

18        Q    Dr. Emory, are you going to tell me the

19    answer to that question?

20        A    I will not de-anonymize anybody.  So I'm

21    not telling you anything about any name of anyone.

22        Q    And Dr. Moline is also an expert in this

 1    case, correct?

 2        A    I think so.

 3        Q    Okay.  Would you tell the brand of talcum

 4    powder that any of the individuals used to

 5    Dr. Moline?

 6        A    I think I've made it very clear that I

 7    won't tell any additional information with regard

 8    to these 75 human subjects than what was published

 9    in the peer-reviewed literature.

10        Q    Okay.  Hold on.  I'm trying to load the

11    next exhibit.  Okay.  Let's pull up Exhibit 17.

12            (Deposition Exhibit Number 17 was marked

13    for identification.)

14    BY MR. SCHROLL:

15        Q    Let me know when you can view it.

16            Are you able to see it, Doctor?

17        A    Yes.

18        Q    And this is an e-mail exchange that you

19    had with Dr. David Egilman, correct?

20        A    Yes.

21        Q    And he's asking you a question about case

22    number 75, correct?

Page 181

1      A    Yes.

2      Q    And you reply to him and you give

3   information about case number 75, correct?

4      A    Number 75 -- yes.

5      Q    Okay.  And you tell Dr. Egilman that she

6   used one product, Cashmere Bouquet, correct?

7      A    Yes.

8      Q    Okay.  And you would not tell me today

9   the brand of talcum powder used by any of these 75

10  individuals in your case series, correct?

11     A    That's correct.

12     Q    And why is it that you're able to tell

13  Dr. Egilman the brand of talcum powder?

14     A    Because he wasn't trying to de-anonymize

15  anyone.  He asked a question for his medical

16  research, I'm sure, but there was no attempt of

17  de-anonymizing anyone, which is what you're here

18  to do today.  So information between people with

19  regard to de-anonymization can occur, but that's

20  not something that somebody is trying to do.

21     Q    How do you know he's not trying to

22  de-anonymize anyone?

Theresa Swain Emory , M.D.                    October 1, 2020

Page 254

1          CERTIFICATE OF NOTARY PUBLIC

2              I, Denise M. Brunet, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears

5    in the foregoing deposition was sworn by me; that

6    the testimony of said witness was taken by me

7    stenographically and thereafter reduced to print

8    by means of computer-assisted transcription by me

9    to the best of my ability; that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to this litigation and have no

12   interest, financial or otherwise, in the outcome

13   of this matter.

14

15                      _____

16                      Denise M. Brunet

17                      Notary Public in and for

18                      The District of Columbia

19

20   My Commission Expires:

21   December 14, 2022

22

JA1267

Page 255

1    Leah Kagan, Esquire

2    lkagan@sgptrial.com

3                      October 5, 2020

4    RE:  Bell, Lloyd Et Al v. American International

                     Industries Et Al

5      10/1/2020, Theresa Swain Emory, M.D. (#4275487)

6      The above-referenced transcript is available for

7    review.

8      Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 256

1    Bell, Lloyd Et Al v. American International Industries Et Al

2    Theresa Swain Emory, M.D. (#4275487)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Theresa Swain Emory, M.D.              Date

25

Theresa Swain Emory , M.D.                    October 1, 2020

Page 257

1    Bell, Lloyd Et Al v. American International Industries Et Al

2    Theresa Swain Emory, M.D. (#4275487)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Theresa Swain Emory, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Theresa Swain Emory, M.D.            Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

# Exhibit 1

Theresa Swain Emory , M.D.                                    October 1, 2020

                                                            Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3                    GREENSBORO DIVISION

4      - - - - - - - - - - - - - - x

5    LLOYD BELL, Individually and   :

     as Executor of the Estate of   :

6    BETTY WHITLEY BELL, Deceased   :

                 Plaintiff          :

7        vs.                        : Civil Action No.

     AMERICAN INTERNATIONAL         : 1:17-cv-00111

8    INDUSTRIES, INC., et al.       :

                 Defendants         :

9      - - - - - - - - - - - - - - x

     AMERICAN INTERNATIONAL         :

10   INDUSTRIES, INC.               :

                 Third-Party        :

11               Plaintiff          :

         vs.                        :

12   NESLEMUR COMPANY f/k/a, THE    :

     NESTLE-LEMUR COMPANY           :

13               Third-Party        :

                 Defendant          :

14     - - - - - - - - - - - - - - x

15           VIRTUAL VIDEOTAPED DEPOSITION OF

16               THERESA SWAIN EMORY, M.D.

17   DATE:        Thursday, October 1, 2020

18   TIME:        10:21 a.m.

19   LOCATION:    Remote Proceedings

20   REPORTED BY: Denise M. Brunet, RPR

21

22

Page 2

1            A P P E A R A N C E S

2

3    On behalf of Plaintiff:

4                 LEAH C. KAGAN, ESQUIRE

5                 Simon Greenstone Panatier, P.C.

6                 1201 Elm Street

7                 Suite 3400

8                 Dallas, Texas  75270

9                 (214) 276-7680

10                klagan@sgptrial.com

11

12   On behalf of Defendant Colgate-Palmolive Company:

13                MATTHEW SCHROLL, ESQUIRE

14                Nelson Mullins Riley &

15                  Scarborough, LLP

16                2 South Biscayne Boulevard

17                21st Floor

18                Miami, Florida  33131

19                (305) 373-9416

20                matt.schroll@nelsonmullins.com

21

22    APPEARANCES:  (Continued on Next Page.)

                                        Page 3

1    APPEARANCES CONTINUED:

2

3    On behalf of Defendant Whittaker Clark & Daniels,

4    Inc.:

5                    TRACY E. TOMLIN, ESQUIRE

6                    Nelson Mullins Riley &

7                       Scarborough, LLP

8                    One Wells Fargo Center

9                    301 S. College Street

10                   Charlotte, North Carolina  28202

11                   (704) 417-3000

12                   tracy.tomlin@nelsonmullins.com

13

14   On behalf of Defendant American International

15   Industries:

16                   KURT W. GREVE, ESQUIRE

17                   Lathrop BPM, LLP

18                   2101 Cedar Springs Road

19                   Dallas, Texas  75201

20                   (469) 983-6100

21                   kurt.greve@lathropbpm.com

22      APPEARANCES:  (Continued on Next Page.)

                                                    Page 4

1     APPEARANCES CONTINUED:

2

3     On behalf of Defendant Cyprus Amax Minerals Co.:

4                     ALVINA OELHAFEN, ESQUIRE

5                     Alston & Bird

6                     555 Fayetteville Street

7                     Raleigh, North Carolina  27601

8                     allie.oelhafen@alston.com

9

10    On behalf of Defendant Neslemur Company f/k/a The

11    Nestle-Lemur Company:

12                    KEVIN McCAFFREY, ESQUIRE

13                    Clyde & Co US LLP

14                    The Chrysler Building

15                    405 Lexington Avenue

16                    New York, New York  10174

17                    (212) 710-3952

18                    kevin.mccaffrey@clydeco.us

19

20    ALSO PRESENT:  Kaitlin Motley

21                      Jeffrey Elam, Videographer

22    (All parties appearing remotely.)

Theresa Swain Emory , M.D.                    October 1, 2020

Page 5

1                      C O N T E N T S

2     EXAMINATION BY:                            PAGE

3     Counsel for Colgate-Palmolive              8

4     Counsel for Whittaker Clark & Daniels     195

5

6     DEPOSITION EXHIBITS:                      MARKED

7     Exhibit 1    Notice of deposition           7

8     Exhibit 2    Emory curriculum vitae         7

9     Exhibit 3    Emory report                   26

10    Exhibit 4    Prior testimony list          38

11    Exhibit 5    PPA Invoice dated 12/19/19     47

12    Exhibit 6    PPA Invoice dated 2/4/20       49

13    Exhibit 7    PPA Invoice dated 6/29/20      50

14    Exhibit 8    Surgical pathology report     58

15    Exhibit 9    CT report                     68

16    Exhibit 10   Reliance materials            82

17    Exhibit 11   Revised prior testimony list  110

18    Exhibit 12   Printout from FDA website     118

19    Exhibit 13   Claim for benefits to North Carolina

20                 Industrial Commission         124

21    Exhibit 14   Longo expert report for Vinson 136

22    (Exhibits continued on the next page.)

Theresa Swain Emory , M.D.                              October 1, 2020

Page 6

```
  1    DEPOSITION EXHIBITS:                          MARKED

  2    Exhibit 15  Article - Malignant mesothelioma

  3                following repeated exposures to

  4                cosmetic talc:  A case series of 75

  5                patients                              144

  6    Exhibit 16  Article - Mesothelioma associated with

  7                the use of cosmetic talc               174

  8    Exhibit 17  E-mail chain starting with e-mail from

  9                Emory to Egilman dated 3/18/20         180

 10

 11         (Exhibits attached to the transcript.)

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22
```

Page 7

```
 1              P R O C E E D I N G S

 2              (Deposition Exhibit Numbers 1 and 2 were

 3      premarked for identification.)

 4              THE VIDEOGRAPHER:  Good morning.  We are

 5      going on the record at 10:21 a.m. on October 1st,

 6      2020.  Please note that audio and video recording

 7      will continue to take place unless all parties

 8      agree to go off the record.

 9              This is the video-recorded deposition of

10      Theresa Swain Emory, M.D., taken by counsel for

11      defense in the matter of Lloyd Bell, individually

12      and as executor of the estate of Betty Whitley

13      Bell, deceased, versus American International

14      Industries, Incorporated, et al., versus Neslemur

15      Company, f/k/a the Nestle-Lemur Company,

16      third-party defendant, filed in the United States

17      [sic] Court for the Middle District of North

18      Carolina, Greensboro Division, case number

19      1:17-CV-00111-WO-JEP.

20              This is a remote proceeding virtual Zoom.

21      My name is Jeffrey Elam from the firm Veritext

22      Legal Solutions and I am the videographer.  The
```

Theresa Swain Emory , M.D.                    October 1, 2020

Page 8

```
 1    court reporter is Denise Brunet from the firm

 2    Veritext Legal Solutions.  I am not related to any

 3    party in this action nor am I financially

 4    interested in the outcome.  Counsel and all

 5    present is noted on the stenographer record.

 6            Will the court reporter please swear in

 7    the witness.

 8    WHEREUPON,

 9            THERESA SWAIN EMORY, M.D.,

10    called as a witness, and having been remotely

11    sworn by the notary public, was examined and

12    testified as follows:

13            THE VIDEOGRAPHER:  Thank you.  We may

14    proceed.

15            EXAMINATION BY COUNSEL FOR

16            DEFENDANT COLGATE-PALMOLIVE

17    BY MR. SCHROLL:

18       Q    Good morning, Dr. Emory.

19       A    Good morning.

20       Q    Can you hear me okay?

21       A    Yes, and I can't see you.  I was hoping

22    whoever I was speaking with I would be able to
```

Page 9

```
 1    see.
 2              MR. SCHROLL:  Can other people see me?
 3              THE REPORTER:  Yes.
 4              MS. KAGAN:  Dr. Emory, Matt is the one in
 5    the blue shirt.
 6              THE WITNESS:  Okay.  I do see him.
 7    BY MR. SCHROLL:
 8       Q    Okay.  My name is Matthew Schroll.  I
 9    represent Colgate-Palmolive Company, defendant in
10    this case.  Can you please state your full name.
11       A    Theresa Swain Emory, M.D.
12       Q    Okay.  And where are you physically
13    located today?
14       A    I am at 500 J. Clyde Morris Boulevard,
15    Newport News, Virginia.
16       Q    And you understand that this is a
17    deposition that we're conducting by video
18    conference due to the global pandemic, right?
19       A    Yes.
20       Q    And you've been deposed before?
21       A    Yes.
22       Q    And you understand that this is just like
```

Theresa Swain Emory , M.D.                    October 1, 2020

1    one issue.  The other one is there's no basis for

2    anyone in a particular litigation to be asking for

3    information that is anonymized and doesn't claim

4    any particular product or anything here.  So there

5    is no basis for it and, no, I won't.

6        Q    Okay.  And will you tell me the

7    identities of the individual law firms that

8    referred the 75 cases?

9        A    The paper does not implicate or talk

10   about any law firm, any specific product.  And the

11   human subjects have been anonymized.  So I will

12   not do any more than what is in this paper.  This

13   paper stands as this paper.  And it was peer

14   reviewed.  And it is -- that's all the information

15   I will provide is what's published in the

16   literature.

17       Q    And I understand that, Doctor.  It sounds

18   like, again, the answer is no.  So I'll accept

19   that.  But I just need to have an answer on the

20   record.

21            So when it comes to the identities of the

22   law firms that referred these 75 cases, will you

Theresa Swain Emory , M.D.                    October 1, 2020

Page 159

```
 1    tell me those law firm names for the individual 75

 2    cases, yes or no?

 3        A    No.

 4            MS. KAGAN:  Asked and answered.

 5            THE REPORTER:  I'm sorry?

 6            MS. KAGAN:  The objection was asked and

 7    answered.

 8            THE WITNESS:  I answered the question.

 9    BY MR. SCHROLL:

10        Q    Would you reveal any information about

11    the manner on how the individual 75 used the

12    talcum powder products?

13        A    The paper stands for itself.  So no

14    additional information will be provided.

15        Q    Will you tell me the age that any of the

16    75 individuals first started using talcum powder

17    products?

18        A    I will not add anything that's in the --

19    that isn't in the paper.  And you can look for

20    yourself the estimated years of use and estimated

21    years of latency and you can look at the age and

22    you could figure that out.
```

Theresa Swain Emory , M.D.                    October 1, 2020

1    Q    And you've looked at the case series by

2    Dr. Moline and Gordon, correct?

3    A    Correct.

4    Q    And in their case series, they provide

5    the brand of talcum powder products used by the

6    individuals.  Do you consider that to be

7    unethical?

8    A    I don't consider that to be unethical.

9    What people decide to show in their medical human

10   subject research is up to them.  Our paper stands

11   for itself.  I have no opinion about how someone

12   else might do their revelations in their papers.

13   But again, theirs were anonymized as well.

14          It's the human subject anonymization

15   that -- it's egregious, in my opinion, for someone

16   to try to expose human subjects which -- it's just

17   unheard of.

18          I have done research, like I said before,

19   on human subjects in the past, and it's appalling

20   to me, quite frankly, especially in a situation

21   where you have no -- nothing that would even have

22   anything to do at all with this case.  There's

Theresa Swain Emory , M.D.                    October 1, 2020

Page 161

```
 1    nothing here pointing to your litigation.  And

 2    this wasn't written for litigation.  This was

 3    written to educate the public and the medical

 4    community.

 5              MR. SCHROLL:  I'll move to strike the

 6    non-responsive portion.

 7    BY MR. SCHROLL:

 8         Q    Is it your position that telling me the

 9    brand of talcum powder used by any of these 75

10    people is a HIPAA violation?

11         A    I don't understand the question.  Telling

12    you anything about what?

13         Q    For example, case number 1, if I wanted

14    to know what brand of talcum powder case number 1

15    used, would you consider that illegal to tell me?

16         A    No.  I never said that.  What you're

17    going to get is what is on this paper.  And that's

18    the information that's available.

19         Q    Okay.  And is that just to me or to

20    anybody?

21         A    The paper stands for itself and that is

22    the only information that is available.
```

1    So I think -- I'd caution you because I don't know

2    about the bar in Texas, if that's where you are,

3    but I can tell you the board of medicine in

4    Virginia is not going to tolerate my exposing and

5    de-anonymizing human subjects.

6        Q    Okay.  And in table 2 --

7             MR. SCHROLL:  Move to strike.

8    BY MR. SCHROLL:

9        Q    And in table 2 of Dr. Moline's article,

10   the bottom of page 15, it says case number 6, and

11   it finds asbestos type, anthophyllite and

12   tremolite.  Do you see where I'm referring to?

13       A    No.

14       Q    Page 15, table 2.

15       A    Not doing this, no.  I don't know what

16   you're trying to do.  If you're trying to

17   de-anonymize these patients -- I'm only going to

18   talk about my paper.  I'm not comparing my paper

19   to Dr. Moline's as we sit here today.

20       Q    Do any of the 75 cases in your case

21   article have -- had incidents of pleural plaques?

22       A    What's reported in our paper is what's

Theresa Swain Emory , M.D.                    October 1, 2020

Page 179

1     reported in our paper.

2          Q    Okay.  So the answer is you will not tell

3     me that, correct?

4          A    The data that's put into the paper is the

5     data that I will discuss.  I will not discuss

6     anything else.  You're trying to de-anonymize

7     human subjects.

8          Q    Okay.  Is Betty Bell one of the 75 cases

9     in your article?

10              MS. KAGAN:  I'm going to object and

11     instruct Dr. Emory not to answer.  If she is going

12     to de-anonymize Betty Bell, that would violate

13     Betty Bell's confidentiality.  And I'm objecting

14     on behalf of Betty Bell and not on behalf of

15     Dr. Emory.

16              MR. SCHROLL:  Okay.  That's fine.

17     BY MR. SCHROLL:

18          Q    Dr. Emory, are you going to tell me the

19     answer to that question?

20          A    I will not de-anonymize anybody.  So I'm

21     not telling you anything about any name of anyone.

22          Q    And Dr. Moline is also an expert in this

Page 180

1    case, correct?

2        A    I think so.

3        Q    Okay.  Would you tell the brand of talcum

4    powder that any of the individuals used to

5    Dr. Moline?

6        A    I think I've made it very clear that I

7    won't tell any additional information with regard

8    to these 75 human subjects than what was published

9    in the peer-reviewed literature.

10       Q    Okay.  Hold on.  I'm trying to load the

11   next exhibit.  Okay.  Let's pull up Exhibit 17.

12           (Deposition Exhibit Number 17 was marked

13   for identification.)

14   BY MR. SCHROLL:

15       Q    Let me know when you can view it.

16           Are you able to see it, Doctor?

17       A    Yes.

18       Q    And this is an e-mail exchange that you

19   had with Dr. David Egilman, correct?

20       A    Yes.

21       Q    And he's asking you a question about case

22   number 75, correct?

Theresa Swain Emory , M.D.                    October 1, 2020

 1      A    Yes.

 2      Q    And you reply to him and you give

 3   information about case number 75, correct?

 4      A    Number 75 -- yes.

 5      Q    Okay.  And you tell Dr. Egilman that she

 6   used one product, Cashmere Bouquet, correct?

 7      A    Yes.

 8      Q    Okay.  And you would not tell me today

 9   the brand of talcum powder used by any of these 75

10   individuals in your case series, correct?

11      A    That's correct.

12      Q    And why is it that you're able to tell

13   Dr. Egilman the brand of talcum powder?

14      A    Because he wasn't trying to de-anonymize

15   anyone.  He asked a question for his medical

16   research, I'm sure, but there was no attempt of

17   de-anonymizing anyone, which is what you're here

18   to do today.  So information between people with

19   regard to de-anonymization can occur, but that's

20   not something that somebody is trying to do.

21      Q    How do you know he's not trying to

22   de-anonymize anyone?

Theresa Swain Emory , M.D.                    October 1, 2020

Page 254

1              CERTIFICATE OF NOTARY PUBLIC

2              I, Denise M. Brunet, the officer before

3       whom the foregoing deposition was taken, do hereby

4       certify that the witness whose testimony appears

5       in the foregoing deposition was sworn by me; that

6       the testimony of said witness was taken by me

7       stenographically and thereafter reduced to print

8       by means of computer-assisted transcription by me

9       to the best of my ability; that I am neither

10      counsel for, related to, nor employed by any of

11      the parties to this litigation and have no

12      interest, financial or otherwise, in the outcome

13      of this matter.

14

                          _____

15

16                        Denise M. Brunet

17                        Notary Public in and for

18                        The District of Columbia

19

20      My Commission Expires:

21      December 14, 2022

22

Page 255

1    Leah Kagan, Esquire

2    lkagan@sgptrial.com

3                        October 5, 2020

4    RE:  Bell, Lloyd Et Al v. American International

                    Industries Et Al

5        10/1/2020, Theresa Swain Emory, M.D. (#4275487)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19      If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 256

1    Bell, Lloyd Et Al v. American International Industries Et Al

2    Theresa Swain Emory, M.D. (#4275487)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Theresa Swain Emory, M.D.                Date

25

JA1291

Page 257

1    Bell, Lloyd Et Al v. American International Industries Et Al

2    Theresa Swain Emory, M.D. (#4275487)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Theresa Swain Emory, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Theresa Swain Emory, M.D.           Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25



# NAC

Triet Tran <triet@egilman.com>

---

## FW: a question on case 75

**David Egilman** <degilman@egilman.com>                                    Wed, Mar 18, 2020 at 1:49 PM
To: triet tran <triet@egilman.com>

**From:** Theresa Emory [mailto:temorymd@gmail.com]
**Sent:** Wednesday, March 18, 2020 1:49 PM
**To:** David Egilman
**Subject:** Re: a question on case 75

Yes only inhalation. She used one product (Cashmere Bouquet) with a powder puff applicator from around age 9- no report of perineum use..

On Tue, Mar 17, 2020 at 12:57 PM David Egilman <degilman@egilman.com> wrote:

Was case 75 an inhalation exposure only? If so this is clean evidence that inhaled talc/asbestos travels to the ovary.

Thanks



"Statistics are human beings with the tears wiped away."

- Irving J. Selikoff, M.D.

BROWN

David Egilman MD MPH

Clinical Professor of Family Medicine

Alpert School of Medicine Brown University

President GHETS

https://mail.google.com/mail/u/1?ik=60d08c9c85&view=pt&search=all&permmsgid=msg-f%3A1661525072472710876&dsqt=1&simpl=msg...

**EXHIBIT**
**0017**

**JA1293**

8 North Main Street

Attleboro Massachusetts 02703

508-472-2809

**JA1294**

# Exhibit 2

**Civil District Court for the Parish of Orleans**
**STATE OF LOUISIANA**

No.   2010 - 07791                                              Section:   15 - A

DAMOND, BEATRICE POLLOCK   ET AL
versus
NORTHROP GRUMMAN SHIPBUILDING, INC.   ET AL

Date Case Filed:   7/29/2010

NOTICE OF SIGNING OF JUDGMENT

TO:

Gerolyn P Roussel Esq            01134
1714 Cannes Drive
Laplace          LA 70068-2407

Christopher T Grace III Esq            26901
Suite 900
3421 N Causeway Blvd
Metairie          LA 70002-3760

Lawrence G Pugh III Esq            17351
1100 Poydras Street
Suite 3200
New Orleans          LA 70163-1132

In accordance with Article 1913 C.C.P., you are hereby notified that Judgment
in the above entitled and numbered cause was signed on     May 6 , 2013
New Orleans, Louisiana.
May 6 , 2013

MINUTE CLERK

**JA1296**

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2010-7791             DIVISION "A"                    SEC: "15"

BEATRICE POLLOCK DAMOND and LESLIE DEAN SAM

versus

NORTHROP GRUMMAN SHIPBUILDING, INC. (formerly AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.) and KASS BROS., INC.

FILED:_____           _____
                                                          DEPUTY CLERK

## JUDGMENT

This matter came for hearing on April 22, 2013, on Kass Bros., Inc.'s Motion to Quash Records Deposition/for Protective Order regarding certain items subpoenaed from Dr. Victor Roggli. Also, at that time, plaintiffs made an oral motion to continue the trial currently scheduled for May 6, 2013.

Present:     Gerolyn P. Roussel (#01134) and Jonathan B. Clement (#30444), counsel for plaintiffs, Beatrice Damond and Leslie Sam;

             Christopher T. Grace, III (# 26901), counsel for defendant, Huntington Ingalls Incorporated;

             Lawrence G. Pugh, III (#173510) and H. Philip Radecker, Jr. (#17102), counsel for defendant, Kass Bros., Inc.

After considering the pleadings, evidence, exhibits, argument of counsel, the law,

**IT IS ORDERED, ADJUDGED AND DECREED** that the motion is **DENIED** as to the database and the underlying information and data used to prepare the database as outlined in the subpoena regarding Tables 11-7 and Table 11-8 in Chapter 11, Analysis of Tissue Mineral Fiber Content in "Pathology of Asbestos-Associated Diseases," Second Edition (Roggli, Oury & Sporn, Editors), and the motion is **GRANTED** as to the database and underlying data for Table 11-3.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the motion to continue trial is **GRANTED**. All parties are to appear on May 6, 2013, at 8:30 a.m. to select a new trial date.

Judgment read, rendered and signed this _____6th_____ day of _____May_____, 2013.

_____
JUDGE TIFFANY G. CHASE

A TRUE COPY

_____
DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

- 1 -

**JA1297**

**RULE 9.5 CERTIFICATE**

I HEREBY CERTIFY that on April 22, 2013, a copy of the proposed judgment was circulated via facsimile to H. Philip Radecker, Jr. and Lawrence Pugh, counsel for Kass Brothers, Inc., and to Brian C. Bossier, Edwin A. Ellinghausen, III, and Christopher Grace, counsel for Huntington Ingalls Incorporated. Mr. Radecker requested certain changes, which were made. Counsel for Huntington Ingalls Incorporated did not object to the proposed judgment nor did they request any changes. The requisite time for review has passed. Accordingly, the judgment is being submitted for consideration.

GEROLYN P. ROUSSEL

- 2 -

**JA1298**

# Analysis of Tissue Mineral Fiber Content

# 11

Victor L. Roggli and Anupama Sharma

## 11.1 Introduction

The development of techniques for assaying the mineral fiber content of tissues has provided the opportunity to correlate the occurrence of various fiber-related diseases with the cumulative fiber burdens in the target organ. Exposure to mineral fibers generally occurs through the inhalation of airborne fibers, and thus the respiratory tract is the site of most asbestos-related diseases. Consequently, most studies of tissue fiber burdens have concentrated on the analysis of lung parenchyma [1]. It is the purpose of this chapter to review the various techniques which have been developed for the analysis of tissue fiber burdens, noting the advantages and limitations of each. The morphologic, crystallographic, and chemical features of the various types of asbestos are reviewed in Chap. 1 and the structure and nature of asbestos bodies in Chap. 3. In addition, the relationship between tissue asbestos burden and the various asbestos-associated diseases (see Chaps. 4, 5, 6, and 7) and the various categories of occupational and environmental exposures (see Chap. 2) will also be explored in the present chapter. Finally, the overall contribution of the various types of asbestos and non-asbestos mineral fibers to the total mineral fiber burden will be discussed in relationship to the biological activity and pathogenicity of the various fiber types.

## 11.2 Historical Background

During the past several decades, there has been considerable interest in the correlation of dusts in the workplace environment with lung diseases resulting from the inhalation of these dusts (i.e., the pneumoconioses). Analysis of lung dust burdens required considerable cooperation between the basic physical sciences and the biological and medical sciences [2]. The distinctive behavior of fibrous materials as compared to other particulates has required many pointed studies as to inhalability, deposition, and subsequent disposal or accumulation of airborne fibers (see Chap. 10). The techniques employed were generally bulk analytical techniques such as x-ray diffraction, chemical analysis, or polarizing microscopy, which were adequate in most circumstances because of the well-defined source of the dust in the workplace and the relatively large amounts of dust recoverable from the lungs of patients dying with pneumoconiosis. However, analysis of dust content from individuals exposed to asbestos posed a number of difficulties for the traditional bulk analytical approaches. First, the

V.L. Roggli, MD (✉)
Department of Pathology,
Duke University Medical Center,
200 Trent Drive – Room #255 M DUMC 3712,
Durham, NC 27710, USA
e-mail: roggl002@mc.duke.edu

A. Sharma, MD
Pathology Department, VA Medical Center,
University Drive C, Pittsburgh, PA 15240, USA

JA1299

**Table 11.6** Asbestos content of lung tissue in reported series of patients with mesothelioma

| Source | No. of cases | Method[a] | Asbestos bodies/ gram dried lung | Uncoated fibers/ gram dried lung |
|---|---|---|---|---|
| Whitwell et al. [15] | 100 | PCLM | – | 0.75 (0–70) |
| Gylseth et al. [73] | 15 | SEM | – | 11 (2–490) |
| Mowe et al. [74] | 14 | SEM | – | 2.4 (0.4–37) |
| Dodson et al. [75] | 55 | TEM[b] | 9.56 (0.06–1,250) | 0.70 (0.022–69.0) |
| Churg and Vedal [56] | 83 | TEM | – | 0.92 |
| Churg et al. [76] | 15 | TEM | – | 214 (SD±9) |
| Gaudichet et al. [77] | 20 | TEM[b] | 3.2 (0.04–450) | 18 |
| Warnock [78] | 27 | TEM[b] | 18.5 (1.9–3,800) | 4.9 (0.57–137) |
| Dodson et al. [79] | 43 | TEM[b] | 1.5 (0–1,060) | 0.38 (0.017–539) |

Values reported are the median counts for thousands ($10^3$) of asbestos bodies or millions ($10^6$) of uncoated fibers/gram of dried lung tissue, with ranges indicated in parentheses. The studies by Churg and Vedal [56], Churg et al. [76], and Gaudichet et al. [77] provided the mean value for total fibers/gram of dried lung. Geometric standard deviation is given in parentheses for the study by Churg et al. [76]

[a]*PCLM* phase-contrast light microscopy, *SEM* scanning electron microscopy, *TEM* transmission electron microscopy
[b]In these four studies, asbestos bodies were counted by conventional light microscopy

**Table 11.7** Asbestos content of lung tissue in 524 cases of mesothelioma

| | N | AB/g (LM) | N | AF/g (SEM) |
|---|---|---|---|---|
| *Pleural mesothelioma* | | | | |
| Asbestosis | 29 | 17,700 (2,160–1,600,000) | 30 | 131,000 (31,500–11,900,000) |
| PPP | 170 | 960 (2.2–74,500) | 164 | 13,800 (370–1,710,000) |
| Other | 284 | 100 (0.8–174,000) | 278 | 5,200 (340–1,420,000) |
| *Peritoneal mesothelioma* | | | | |
| Asbestosis | 7 | 159,000 (23,000–207,000) | 7 | 505,000 (247,000–1,010,000) |
| PPP | 11 | 490 (14.4–140,000) | 11 | 30,600 (263–1,160,000) |
| Other | 17 | 4 (1.0–684,000) | 17 | 1,090 (<490–1,960,000) |

Asbestos bodies/gram of wet lung tissue as determined by light microscopy (LM) and total asbestos fibers 5 μm or greater in length/gram of wet lung tissue as determined by scanning electron microscopy (SEM). Values reported as median with range in parentheses
*PPP* parietal pleural plaques, *other* cases with neither asbestosis nor plaques (or uninformative cases with regard to plaques or asbestosis)

laboratory is summarized in Table 11.7. The median asbestos body count for mesothelioma cases that also had asbestosis is much higher than cases that had parietal pleural plaques without asbestosis, which in turn is higher than cases that had neither plaques nor asbestosis. In addition, the median asbestos body count for asbestosis cases is much higher for patients with peritoneal as compared to pleural mesotheliomas, but less for patients with pleural plaques alone or for patients with neither plaques nor asbestosis (or uninformative cases). A similar trend is observed for total asbestos fibers as measured by SEM, with the exception of a higher asbestos fiber count for peritoneal mesothelioma patients with pleu-

ral plaques compared to pleural mesothelioma patients with plaques (Table 11.7). These findings are consistent with the observation that, on average, greater exposure to asbestos is necessary for the development of peritoneal mesothelioma than is needed to develop pleural mesothelioma [81]. The asbestos body counts and fiber levels in the author's laboratory are reported per gram of wet lung and can be compared with those of other investigators by multiplying by a factor of 10 in order to convert to counts per gram of dried lung.

The asbestos body content was within our normal range of 0–20 AB/g in 124 cases or 24 % of the total. In 41 of these 124 cases, the fiber content was found to be elevated by SEM [82]. Hence,

V.L. Roggli and A. Sharma

**Table 11.8** Exposure categories in 94 % of 1,445 cases with malignant mesothelioma

| Industry | Occupation | Nonoccupational exposure |
|---|---|---|
| Shipbuilding | Pipefitter/welder | Household contact |
| US Navy/merchant marine | Boiler worker | |
| Construction | Maintenance | |
| Insulation | Machinist | |
| Oil and chemical | Electrician | |
| Power plant | Sheet metal worker | |
| Railroad | | |
| Automotive | | |
| Steel/metal | | |
| Asbestos manufacture | | |
| Paper mill | | |
| Ceramics/glass | | |

Modified from Ref. [88]

diameter [91, 92]. The biopersistence of relatively long amphibole fibers in lung tissues is the likely reason for the greater potency of amosite and crocidolite fibers in the production of mesothelioma as compared to chrysotile. The latter tends to fragment into shorter fibers and has a much shorter half-life within the lung [56, 76].

It should be noted that most of the studies of fiber burdens in mesothelioma patients have examined lung parenchyma. It is reasonable to assume that fibers actually reaching the pleura are the ones responsible for pleural disease, and the dimensions and types of fibers accumulating in the pleura are of interest in this regard. Sebastien et al. [31] reported that in individuals exposed to mixtures of fibers, short chrysotile fibers (<5 μm) tended to accumulate in the pleura, whereas longer amphibole fibers accumulated in the lung parenchyma. Suzuki and Yuen [93] and Suzuki et al. [94] also reported primarily short chrysotile fibers in the pleura and in mesothelial tissues. Churg et al. [92], on the other hand, found no difference in the length, diameter, or type of fibers isolated from peripheral versus central lung parenchyma in Canadian chrysotile workers. Dodson et al. [95] found long commercial amphibole fibers in samples of pleural plaque from asbestos workers, and Gibbs et al. [96] also identified similar fibers in pleural samples of patients with diffuse visceral pleural thickening. Boutin et al. [97] found a preferential concentration of long commercial amphibole fibers in black spots on the parietal pleura. Dodson et al. [98] recovered

long commercial amphibole fibers from samples of peritoneum and mesentery. Clearly, fibers of the type and size known to be associated with the greatest risk of mesothelioma do in fact migrate to pleural and peritoneal tissues. The identification of short chrysotile fibers in these tissues is of questionable relevance, since there is no convincing data that these fibers are pathogenic (see Chap. 10). Analysis of pleural tissues should not be substituted for lung tissue analyses for purposes of determination of causation, since the goal of such analyses is to determine if an individual has a cumulative fiber content different from that of a reference population. This can best be determined by analysis of lung tissue samples. Analysis of tumor tissue is uninformative since values expected for metastatic tumor to the pleura or peritoneum in patients with malignancies not known to be asbestos-related have not been reported.

In summary, patients with mesothelioma who do not also have asbestosis have on average smaller pulmonary asbestos burdens than do patients with asbestosis. This observation is consistent with epidemiologic evidence that mesothelioma can occur in individuals with brief, low-level, or indirect exposures to asbestos [1]. In over half of the patients with mesothelioma in the authors' series, asbestos bodies can be detected in histologic sections with careful scrutiny, and in more than 75 %, tissue digestion studies show an elevated tissue asbestos body content (Fig. 11.7). The distribution of asbestos

# AFFIDAVIT

**STATE OF NORTH CAROLINA**

**COUNTY OF DURHAM**

Victor L. Roggli, M.D., a person of the full age of majority, represents that:

1. I am a medical doctor with a specialty in pathology and I am currently a professor in the Department of Pathology at the Duke University Medical Center;

2. I have been recognized as a knowledgeable expert regarding asbestos related diseases and have testified in over 275 trials on the subject;

3. I have been retained by both plaintiff and defense attorneys in litigation regarding asbestos related diseases;

4. I am co-author of Chapter 11, "Analysis of Tissue Mineral Fiber Content" in *Pathology of Asbestos-Associated Disease*, Second Edition (Roggli, Oury and Sporn, editors);

5. Tables 11-3, 11-7, and 11-8 contained in the aforementioned Chapter 11 are the subject of seven separate requests for "things, documents and categories of documents to be produced" at a records deposition served on me with a subpoena;

6. I have been asked to produce (1) all reports of any cases which appear in the aforementioned tables, (2) the background research material and raw data resulting in the aforementioned tables, (3) the back-up information concerning fiber burden analysis for any of the cases reported in the aforementioned tables, (4) the paper files which include the back-up information concerning the disease processes for any of the cases reported in the aforementioned tables, (5) all documents and/or material from which the disease history was obtained for any of the cases reported in the aforementioned tables, (6) all documents and/or material from which the exposure history was obtained for any of the cases reported in the aforementioned tables, and (7) all documents and/or material from which the fiber burden analysis information was obtained for any and all cases reported in the aforementioned tables;

7. The three tables at issue are concerned with just under 1900 individual cases;

8. It is my estimate that it would take at least several months of work to even gather the information requested;

**JA1302**

9.   Additionally, the Health Insurance Portability and Accountability Act of 1996

("HIPAA") would require me to redact any information which would identify individual

patients. This would add yet more time to the process requested;

10.   In order to respond to the subpoena I would have to stop all other work at the

university and for other clients. This would be without question an undue burden on me

and my staff;

11.   Victor L. Roggli has read this affidavit and verifies that all information herein is

true and correct to the best of his knowledge.

VICTOR L. ROGGLI, M.D.

Sworn to and Subscribed
Before Me, this 29ᵗ Day
of March, 2013

Notary Public (# No # )

My commission expires
7-6-2014

# Exhibit 3

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
   LLOYD BELL, individually and  ) CASE NO.  1:17CV111
 3 As executor of the estate of  )
   BETTY WHITLEY BELL, deceased,  )
 4                               )
          Plaintiffs,            )
 5                               )
   V.                            )
 6                               )
   AMERICAN INTERNATIONAL        )
 7 INDUSTRIES, et al.,           )
                                 ) Winston-Salem, North Carolina
 8      Defendants.              ) September 25, 2020
   _____
 9

10     CORRECTED TRANSCRIPT OF THE TELEPHONIC MOTIONS HEARING
            BEFORE THE HONORABLE JOI E. PEAKE
11             UNITED STATES MAGISTRATE JUDGE

12

13 APPEARANCES (By telephone):

14 For the Plaintiffs:       WILLIAM M. GRAHAM, ESQ.
                             WALLACE & GRAHAM, P.A.
15                           525 North Main Street
                             Salisbury, North Carolina 28144
16
                             FRANK J. WATHEN, ESQ.
17                           LEAH C. KAGAN, ESQ.
                             SIMON GREENSTONE PANATIER PC
18                           1201 Elm Street, Suite 3400
                             Dallas, Texas 75270
19

20 For the Defendants:
   AII:                      ROBERT E. THACKSTON, ESQ.
21                           KURT W. GREVE, ESQ.
                             SAMUEL GARCIA, ESQ.
22                           LATHROP GPM LLP
                             2101 Cedar Springs Road, Suite 1400
23                           Dallas, Texas 75201

24

25
```

**JA1305**

```
 1   APPEARANCES Continued (By telephone ):

 2   For the Defendants:
     Brenntag North America:  TRACY E. TOMLIN, ESQ.
 3   Whittaker Clark          BENJAMIN S. CHESSON, ESQ.
                              NELSON MULLINS RILEY & SCARBOROUGH LLP
 4                            301 South College Street, Suite 2300
                              Charlotte, North Carolina 28202
 5

 6   Colgate-Palmolive:       MATTHEW R. SCHROLL, ESQ.
                              NELSON MULLINS RILEY & SCARBOROUGH LLP
 7                            2 South Biscayne Boulevard, 21st Floor
                              Miami, Florida 33131
 8
     Cyprus Amax:             TIMOTHY PECK, ESQ.
 9                            FOX ROTHSCHILD LLP
                              P.O. Box 21927
10                            Greensboro, North Carolina 27420

11   Neslemur Co.:            JOE CARRUTHERS, ESQ.
                              WALL BABCOCK, LLP
12                            1076 West Fourth Street
                              Winston-Salem,  North Carolina 27101
13

14   Transcriber:            BRIANA L. BELL, RPR
                              United States Court Reporter
15                            P.O. Box 20991
                              Winston-Salem, North Carolina 27120
16

17

18

19

20

21

22

23

24

25
```

**JA1306**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 364 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-3   Filed 01/31/23   Page 4 of 10 PageID# 1444
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

1   from using this information in a subsequent trial.

2           So, for example, that *Johnson-Lashley* trial had to be

3   suspended, and it was ultimately mistried because of the

4   pandemic, and jurors could not remain sworn as jurors

5   indefinitely.

6           So at some point we will be able to come back and try

7   the *Johnson-Lashley* case in New Jersey, and Mr. Thackston

8   certainly, I'm confident, will attempt to use this information

9   in that trial, and that judge has already ruled that's not

10  appropriate, but there's nothing stopping him if the record

11  isn't sealed.  If this hearing, this portion of our transcript

12  is not sealed for discovery purposes and the records and

13  filings are not sealed, then nothing stops any other defendant

14  or AII from continuing to disclose Mrs. Bell's identity outside

15  of her case.

16          **THE COURT:**  I think that's fair, and I would want to

17  make sure that we are keeping that limited to this case and

18  confidential and under seal.  And then to the extent it may

19  have to be revisited ultimately at trial, then that's something

20  that the district judge can consider further, to the extent

21  that needs to be done; but, certainly, at this point I would

22  not expect or intend these sort of preliminary or

23  discovery-related determinations -- to make that then public

24  for use in other cases.

25          Anything else, Ms. Kagan, before I go to

**JA1307**

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 365 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-3   Filed 01/31/23   Page 5 of 10 PageID# 1445
17CV111 Bell v. AII – Motions – 9/25/20 **CORRECTED**

 1          Again, I've indicated I've got concerns about that,

 2  but I will let you present whatever you may want to present, if

 3  it's separate for Colgate, so that you can brief that and I can

 4  consider whatever you may want to present there.

 5          **MR. SCHROLL:**  Thank you, Your Honor.

 6          **THE COURT:**  All right.  Mr. Peck, anything for

 7  Cyprus?

 8          **MR. PECK:**  No, Your Honor.  Based on the position of

 9  Cyprus in this case, we don't have anything to add on this

10  dispute.

11          **THE COURT:**  Okay.  Mr. Tomlin, for Whittaker Clark &

12  Daniels?

13          **MR. TOMLIN:**  Nothing further, Your Honor.

14          **THE COURT:**  All right.  So let me come back around.

15  There's still the last matter of Colgate's motions and

16  scheduling that I would like to take up and that we need to do

17  quickly.  So I don't want to do any more extended discussion on

18  this, but, Ms. Kagan, just with respect to the present motions,

19  anything else that you needed to be heard on?

20          **MS. KAGAN:**  No, Your Honor.

21          **THE COURT:**  And, Mr. Thackston, anything else?

22          **MR. THACKSTON:**  No, Your Honor.

23          **THE COURT:**  All right.  So as to those, what I'm

24  going to do will be as to the motion to quash, No. 168, I am

25  going to grant that as (audio glitch) as to any remaining

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 366 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-3   Filed 01/31/23   Page 6 of 10 PageID# 1446
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

1  requests -- we're getting some feedback again.

2         So we're getting a lot of feedback, folks.  We think

3  it may be from one of the parties.  It's making it difficult to

4  make a recording.

5         All right.  Now, we're back.  So I don't know who it

6  was that may have just joined or muted, but whatever that may

7  have been, it prevents us from getting a good recording.  So

8  hopefully we've got that now.

9         All right.  So as to the motion to quash, No. 168,

10 that would be granted as to any remaining requests, without

11 prejudice to making appropriate requests as part of the expert

12 discovery process, as we've discussed.  As part of that, as

13 I've initially indicated, I did not find any bad faith or

14 unreasonable conduct with respect to that and the particular

15 circumstances that were presented here; but for any remaining

16 requests, the parties will address those as part of expert

17 discovery rather than by subpoena to Northwell.  So that will

18 be the -- 168 would be granted to any remaining requests.

19         As to the motion for protective order, which is

20 No. 179, I will deny the request that all documents identifying

21 Ms. Bell as a subject be destroyed, but I will allow Plaintiff

22 to designate that information as confidential and limited

23 solely to this case, and the motion for a protective order

24 would be granted to that extent.

25         Again, that is just as to a claim for confidentiality

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 367 of 435

Case 4:22-mc-00001-AWA-DEM  Document 21-3  Filed 01/31/23  Page 7 of 10 PageID# 1447
17CV111 Bell v. AII — Motions — 9/25/20 **CORRECTED**

 1  during discovery, which means that any filing of that

 2  information would need to be accompanied by a motion to seal

 3  pursuant to Local Rule 5.4.  However, the Court is not making

 4  any ultimate determination as to whether that information

 5  should be sealed if it is presented and considered as part of

 6  dispositive motions or at trial since that would be subject to

 7  different standards that would apply.

 8          In that respect, the motions to seal, No. 180 and

 9  No. 200, will be granted with respect to the present filings

10  related to discovery disputes, as those are not subject to

11  First Amendment protections that would apply to filings on

12  dispositive motions and at trial.  Again, whether those should

13  remain under seal ultimately would be a matter for the trial

14  judge in this case, and so those things would need to be filed

15  with a motion to seal consistent with Rule 5.4 until that issue

16  is ultimately determined by the trial judge.

17          With respect to the motion for a protective order as

18  to discovery or inquiry into the identity of other human study

19  subjects, that will be granted with respect to Plaintiffs'

20  Motion 179 as to AII and the subpoena to Northwell, and I will

21  find that based on the discussion that would be of a different

22  determination than Ms. Bell, who, as I've discussed, I would

23  find in a different situation to the extent that she has put

24  the matter at issue and then retained Dr. Moline as the expert

25  in the case, and that was part of our extensive earlier

**JA1310**

 1   discussion.  I won't repeat all of that here, but I will also

 2   note that to the extent Colgate has indicated some requests to

 3   be able to address and brief that, I will consider that, and I

 4   will allow the parties to fully brief that before I make any

 5   determination on the request that Colgate may raise.

 6          So as to the present motion for a protective order,

 7   it would be essentially granted, except that denied with

 8   respect to the documents identifying Ms. Bell as the subject,

 9   and those can be included as part of the discovery in this

10   case, but that information is confidential and limited solely

11   to this case, and that is specifically as to her identity as

12   one of the 33 subjects.  If there is any reason to revisit that

13   further and as well if there is any reason to address a further

14   motion that may be filed, including by Colgate, then those are

15   matters that the Court can take up once they are briefed and

16   presented.

17          So I think that takes care of, again, 168, 179, 180,

18   and 200.  For the clerk, 168 would be granted as to any

19   remaining requests without prejudice to making requests as part

20   of expert discovery.  179 will be denied in part and granted in

21   part, as set out during the hearing.  And motions to seal, 180

22   and 200, will be granted with respect to the discovery

23   disputes.

24          And, Ms. Kemp, I will indicate specifically to you,

25   as to 179, just note it's denied in part and granted in part on

**JA1311**

USCA4 Appeal: 23-1972   Doc: 26-3   Filed: 12/20/2023   Pg: 369 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-3   Filed 01/31/23   Page 9 of 10 PageID# 1449
17CV111 Bell v. AII - Motions - 9/25/20 **CORRECTED**

1   the docket entry as further set out in the hearing, because

2   parts of that may be subject to claims of confidentiality, and

3   we'll let the parties address that once the transcript is

4   ordered and docketed.  So we can just -- the docket entry can

5   just show granted in part and denied in part, and the details

6   will be as set out in the transcript.

7           All right.  The last piece we have is the scheduling

8   and Colgate-Palmolive's motion -- we're getting the feedback

9   again.

10          **COURTROOM DEPUTY CLERK:**  Judge Peake, I'm not sure

11  what's going on with the line.  I never had these difficulties

12  before.  Usually, it's clear.

13          **THE COURT:**  I'm concerned about the ability to make a

14  transcript because the level of interference that we're getting

15  is increasing.  If we still have this conference line, what we

16  could do is take a five-minute break, and then see if we come

17  back and get a cleaner line.  It does seem to come and go, so

18  it's possible we're getting feedback from -- see, it's clear

19  again.  It's possible we're getting feedback from other folks

20  on the line.

21          **COURTROOM DEPUTY CLERK:**  Maybe we can take a recess,

22  Your Honor, and try to call back in.  Maybe that would help.

23          **THE COURT:**  Why don't we do that.  Let's take a

24  five-minute recess.  Everybody disconnect and then call back

25  in, and we'll see -- and I'll ask our IT folks to come down and

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 370 of 435

```
 1   UNITED STATES DISTRICT COURT

 2   MIDDLE DISTRICT OF NORTH CAROLINA

 3   CERTIFICATE OF REPORTER

 4

 5

 6           I,  Briana L. Bell, Official United States Court

 7   Reporter, certify that the foregoing transcript is a true and

 8   correct transcript of the proceedings produced to the best of

 9   my ability from an audio recording of the telephone conference

10   in the above-entitled matter.

11

12           Dated this 30th day of September 2020.

13

14

15

16           Briana L. Bell, RPR
             Official Court Reporter

17

18

19

20

21

22

23

24

25
```

**JA1313**

# Exhibit 4

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

DEPARTMENT SSC 4         HON. STEPHEN M. MALONEY, JUDGE
COORDINATED PROCEEDING              )
SPECIAL TITLE (RULE 3.550)          )JCCP NO. 4674
                                    )
LAOSD ASBESTOS CASES                )
_____)
                                    )
WILLIE McNEAL, Jr.,                 )
                                    )
                    PLAINTIFF,      )
                                    )
vs.                                 )NO. BC698965
                                    )
AUTOZONE, INC., ET AL.,             )
                                    )
                    DEFENDANTS.     )
_____)

**Certified Transcript**

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MONDAY, APRIL 12, 2021

APPEARANCES:
FOR PLAINTIFF:
            SIMON GREENSTONE PANATIER, PC
            BY:  STUART PURDY, ESQ.
                 TYSON GAMBLE, ESQ.
            3780 KILROY AIRPORT WAY, SUITE 540
            LONG BEACH, CALIFORNIA  90806
            562-590-3400
            SPURDY@SGPTRIAL.COM
            TGAMBLE@SGPTRIAL.COM

 (APPEARANCES CONTINUED
NEXT PAGE)

PAGES 3601 TO 3776-3900
REPORTED BY:           LORA J. JOHNSON, CSR 10119
                       RPR, CRR, RMR, CCRR #202
                       OFFICIAL REPORTER PRO TEMPORE

**JA1315**

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

```
 1    APPEARANCES:  (CONTINUED)

 2       FOR DEFENDANT WHITTAKER, CLARK & DANIELS:

 3                 BERKES CRANE ROBINSON & SEAL LLP
                   BY:  ROBERT H. BERKES, ESQ.
 4                 515 SOUTH FIGUEROA STREET, SUITE 1500
                   LOS ANGELES, CALIFORNIA  90071
 5                 213-955-1150
                   RBERKES@BCRSLAW.COM
 6
                   MCGIVNEY, KLUGER, CLARK & INTOCCIA, P.C.
 7                 BY:  ROBERT L. BAUM, ESQ.
                   18 COLUMBIA TURNPIKE
 8                 FLORHAM PARK, NJ 07932
                   973-822-1110
 9                 RBAUM@MKCILAW.US.COM

10    ALSO PRESENT:

11                 CHASE WARE, TECHNICAL ASSISTANT
12                 JOE REPKING, TECHNICAL ASSISTANT
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

JA1316

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

```
 1                  M A S T E R   I N D E X
 2                     APRIL 12, 2021
 3
 4
 5           CHRONOLOGICAL INDEX OF WITNESSES
 6
                          NONE
 7
 8
 9
10
11              INDEX OF EXHIBITS
12
                          NONE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

Page 3636

```
 1                 10:11 a.m.)
 2          THE COURT:  We will now hear the closing
 3   argument of Mr. Purdy on behalf of the plaintiff.
 4          MR. PURDY:  Thank you, your Honor.
 5
 6                 CLOSING ARGUMENT
 7   BY MR. PURDY:
 8          Well, good morning, everyone.
 9          THE PANEL:  Good morning.
10          MR. PURDY:  You will be the first jury in
11   Los Angeles County to deliberate and deliver a verdict.
12   We made it.  And it's -- it's pretty amazing to think
13   about where we are as a society and where we are here
14   in this courtroom, if you think about it.
15          I imagine when you were summoned for jury
16   service, I imagine some, if not all of you, went, No
17   way, we're not really going to have a civil trial.
18   There's no way we can pull this off.  Do you really
19   have to show up.
20          I'm sure you talked to friends and family and
21   said, Are they really going to have a civil trial?  To
22   be a jury?  What are the chances?
23          Well, here we are.  The chances are that we
24   could do it, and we did it, and you did it.
25          I cannot commend the court staff enough, the
26   judge, his Honorable, the security, all of those things
27   had to go right.  But what we had to have, we had to
28   have a jury, and you showed up for that call of duty.
```

**JA1318**

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

Page 3639

```
 1   trials.  This lower standard, this preponderance of the
 2   evidence.  And I don't say that to diminish the case,
 3   this "more likely than not" standard.  We think we've
 4   proved many things beyond the shadow of a doubt.  But
 5   that's what the law states, and you swore to follow
 6   that law, to listen to the evidence.
 7           We asked each of you, are you -- 12, and with
 8   two alternates, that's 14 jurors who will follow the
 9   law.  Will you uphold the law?  And you said yes.  You
10   all committed to that, to both sides.  You made that
11   commitment and then you took an oath.
12           And I'm going to show you some of the things
13   to point to when a juror says, Well, I'm not sure if
14   Whittaker, Clark & Daniels sold talc in the '70s.
15   Well, then we can point to you Mr. Dippold's testimony.
16           Or I'm not sure they understood.  Do you think
17   they really understood and appreciated the detection
18   limits in using more sensitive microscopes?  And you
19   should point them to deposition testimony of
20   Mr. St. George.
21           Or was there really tremolite, the mineral
22   tremolite in their talc?  And we can point you to two
23   things:  Mr. Segrave, their own testing expert, or
24   Mr. Longo -- Dr. Longo.  Or some of the documents, the
25   North Carolina, the Fullam document, or the Lewin
26   report, or their own testing.
27           Gosh, does cosmetic talc really cause
28   mesothelioma?  Well, Dr. Moline, she published a paper
```

**JA1319**

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

Page 3640

```
 1    on this.  Dr. Emory, she published a paper on this.
 2    Dr. Moline testified to Congress on this issue.  Those
 3    are some of the things that we need to give you and
 4    show you in the evidence, if those questions come up.
 5              So how do we do this?  How do we arrive at a
 6    verdict?
 7              And the instructions that the Court gave walk
 8    you through how we do that.  And so there's -- there's
 9    really four ways that we're going to show you that we
10    proved that Whittaker, Clark & Daniels is responsible.
11    There's four different ways.  But what's important to
12    note is that any one of them is enough.  So if you find
13    them responsible for any one thing, if you say they are
14    negligent and their negligence was a factor in causing
15    Mr. McNeal's mesothelioma, that's enough to get to
16    damages.  Okay?
17              You do not need all four, you don't need two
18    of four.  We think we've proved all four.  And really
19    it's -- if we break them down, if Number 1 is
20    negligence, that's really going to be -- when we talk
21    about this negligence claim, that's really what the
22    company did, what they did and didn't do.  What they
23    failed to do.  How they acted unreasonably.  Did they
24    select the right tests?  Did they communicate what they
25    were finding?
26              And then numbers 2, 3, and 4 are more -- with
27    the exception of number 4 there -- I'll call product
28    liability claims, strict liability.  If the product
```

TRIAL DAY 16, on APRIL 12, 2021
WILLIE McNEAL, JR. vs. AUTOZONE, INC., et al.

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                 FOR THE COUNTY OF LOS ANGELES
 3    DEPARTMENT SSC 4        HON. STEPHEN M. MALONEY, JUDGE
 4    COORDINATED PROCEEDING          )
      SPECIAL TITLE (RULE 3.550)      )JCCP NO. 4674
 5                                    )
      LAOSD ASBESTOS CASES            )
 6    _____  )
                                      )
 7    WILLIE McNEAL, Jr.,             )
                                      )
 8                      PLAINTIFF,    )
                                      )
 9    vs.                             )NO. BC698965
                                      )
10    AUTOZONE, INC., ET AL.,         )REPORTER'S
                                      )CERTIFICATE
11                      DEFENDANTS.   )
      _____  )
12
13
14            I, LORA J. JOHNSON, CSR NO. 10119, Official
15    Reporter of the Superior Court of the State of
16    California, for the County of Los Angeles, do hereby
17    certify that a verbatim record of the proceedings was
18    taken by me in stenographic shorthand and thereafter
19    transcribed into typewritten form under my direction
20    and supervision; and that the foregoing pages comprise
21    a full, true, and correct transcript of the proceedings
22    held in the matter of the above-entitled cause on
23    April 12, 2021.
24
25                              _____
26                              Lora J. Johnson, CSR 10119
                                RPR, CRR, RMR, CCRR #202
27                              Official Reporter Pro Tempore
28
```

JA1321

# Exhibit 5

Moline et al.
*Journal of Occupational Medicine and Toxicology*    (2023) 18:1
https://doi.org/10.1186/s12995-023-00367-5

Journal of Occupational
Medicine and Toxicology

**RESEARCH**                                                                    **Open Access**

# Exposure to cosmetic talc and mesothelioma 

Jacqueline Moline[1,2*], Kesha Patel[1] and Arthur L. Frank[3]

## Abstract

**Aim**  Mesothelioma is associated with asbestos exposure. In this case series, we present 166 cases of individuals who had substantial asbestos exposure to cosmetic talc products as well as some who had potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma.

**Methods**  Data were gathered for all subjects referred to an occupational and environmental medicine specialist as part of medicolegal review. Years of total cosmetic talcum powder usage was noted as well as the latency from the onset of talcum powder use to the mesothelioma diagnosis. Alternate asbestos exposure in addition to the exposure from cosmetic talc was categorized as none, possible, likely, and definite.

**Results**  In 122 cases, the only known exposure to asbestos was from cosmetic talc. For 44 cases, potential or documented alternate exposures in addition to the cosmetic talc were described.

**Conclusion**  Cumulative exposure to asbestos leads to mesothelioma; for individuals with mixed exposures to asbestos, all exposures should be considered. Use of cosmetic talc is often overlooked as a source of asbestos exposure. All individuals with mesothelioma should have a comprehensive history of asbestos exposure, including cosmetic talc exposure.

**Keywords**  Malignant mesothelioma, Cumulative asbestos exposure, Cosmetic talcum powder

## Introduction

Mesothelioma, described as a sentinel tumor, is intimately associated with asbestos exposure. Asbestos has been used for decades in thousands of products, both in occupational and non-occupational settings, historically accounting for the bulk of mesothelioma cases. Non-occupational exposures can be environmental in nature, from effluents from mines and factories, from para-occupational exposures such as "shade-tree mechanics" using friction products, and from home renovations [1]. Household exposures affecting family members, known as "take-home" exposure has been well described in the literature [2–5]. An underappreciated source of exposure is the use of cosmetic talc products. The International Agency for Research on Cancer (IARC) [6] states that asbestos contaminated talc is carcinogenic and should be treated as if one were dealing with asbestos. Asbestos levels in talcum powder are significantly above background ambient asbestos exposure levels [7–9]. Talc application simulation studies have been published [7, 8] where exposures to talcum powder were 1.9 f/cc and 2.57 f/cc, respectively. According to the Gramond et al. [10] categorization of intensity, asbestos exposure at these levels would be considered to be high (>1–10 f/ml).

Historically, asbestos exposures at work have been linked to multiple products. The overall risk for asbestos related disease, including mesothelioma, is related to cumulative exposure. As agencies such as NIOSH, OSHA, the EPA, and others have recognized, there is no known safe exposure to asbestos. Low doses of exposure to asbestos contribute to mesothelioma [11].

*Correspondence:
Jacqueline Moline
jmoline@northwell.edu
[1] Department of Occupational Medicine, Epidemiology and Prevention, Northwell Health, Great Neck, NY 11021, USA
[2] Donald and Barbara Zucker School of Medicine at Hofstra/Northwell, Hempstead, NY 11549, USA
[3] Dornsife School of Public Health of Drexel University, Philadelphia, PA 19104, USA

 © The Author(s) 2023. **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativeco mmons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1

Both time from first exposure (latency) and total exposure (cumulative dose) to asbestos must be taken into account when evaluating risk. With multiple repeated incidences of exposure, all those above background level should be thought of as "'substantial." When considering the elevated risk of mesothelioma in sheet metal workers [12, 13], Zoloth and Michaels considered the multiple bystander exposures to different products, not simply one construction material. This case series presents 166 cases of individuals who had a minimum of five years and a mean of 40.8 years of exposure to asbestos through cosmetic talc products, some with possible other exposures, but all developed mesothelioma.

## Methods

Data were gathered for all subjects referred to an occupational and environmental medicine specialist, JM, as part of medicolegal review. All cases were reviewed personally by an occupational medicine specialist with experience evaluating asbestos exposure in thousands of individuals. The individual's medical records were reviewed and mesothelioma diagnoses were based on pathological reports that were performed as part of their diagnostic evaluation. Exposure data was obtained by sworn testimony of the mesothelioma patients in all cases, and/or from family members who had direct knowledge of the individual's use of cosmetic talc and, if present, other sources of asbestos exposure. Use of talc was recorded as being diapered or powdered as a child; diapering or powdering children or others; applying talcum powder to oneself after bathing, or other personal applications of talc. Years of total cosmetic talcum powder usage was noted as well as the latency from the onset of talcum powder use to the mesothelioma diagnosis. Age was presented within a 10 year window to maintain confidentiality. Data reviewed included family occupational histories (parents or anyone cohabitating with the individual), hobbies, residence, living with or laundering clothes of an asbestos exposed worker, if indicated, home renovations that could have exposed the individual to asbestos containing construction materials, residence close to a facility with environmental contamination, or other potential asbestos exposures. In those individuals with potential asbestos exposure in addition to the cosmetic talc, categorization of these exposures was done by two occupational physicians, JM and ALF. Alternate asbestos exposure in addition to the exposure from cosmetic talc was categorized as none, possible, likely, and definite following the descriptions by Gramond et al. [10]. Non-occupational exposure to asbestos was characterized as paraoccupational (living with an asbestos worker or

cleaning clothes), do-it-yourself home repair, domestic (handling asbestos material or living in the presence of asbestos material susceptible to damage at home), or environmental (living near and asbestos processing plant). This study was conducted with approval from the Human Research Protection Program at Northwell Health Feinstein Institute for Medical Research (#21–0897-OTH).

## Results

We identified 166 individuals with exposure to cosmetic talc who were diagnosed with a malignant mesothelioma between 2014 and 2021. None of these individuals were previously included in publications by the authors [14]. A summary of the case findings is found in Table 1. Overall, the average age of diagnosis was 63.3 (age range 26–94) years of age. The majority of cases were epithelioid mesothelioma (75.3%). The average length of exposure to cosmetic talc was 40.8 years (range 5–76 years of use), and the average latency period from the onset of talcum powder use to the development of mesothelioma was 52.4 (20–83 years). We identified 122 individuals with asbestos exposure solely through use of cosmetic talc. Exposure to talcum powder could have been for personal use, in an occupational setting (for example, a nurse applying talcum powder to a patient), or applying talcum powder to others such as children. For 122 individuals, they either used cosmetic talc while diapering children or recalled applying talc to others (such as their children). Overall, 80.6% of women and 52.4% of men used talcum powder for diapering or applying talc to others. For 44 individuals, potential alternate asbestos exposure in addition to cosmetic talc was reported. Table 1 presents the 44 cases with alternate exposure ranked by possible, likely, and definite asbestos exposure. Twenty-two women (17.8%) and fifteen men (35.7%) had likely or definite alternate exposure to asbestos in addition to their talcum powder usage. [Details of the exposure history of all 166 individuals with cosmetic talc exposure is presented in Table 2, including a description of the alternate exposure.] Table 1 also shows the site of the tumor by gender. Of the 166 cases, 109 were pleural, 52 were peritoneal, 4 were discovered in both the pleura and peritoneum and the original site could not be determined. One case of pericardial mesothelioma was noted out of the 166 cases, which reflects the rarity of this site for mesothelioma. The percentages of peritoneal mesothelioma were similar for women (29.8%) and men (35.7%). The high proportion of peritoneal mesothelioma tumors relative to pleural tumors, consistent with prior case series of patients with malignant mesothelioma after cosmetic talc use [14, 15], is unusual and deserves further investigation.

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1      Page 3 of 13

**Table 1** Characteristics of 166 mesothelioma cases with cosmetic talc usage

| | | Total (*N* = 166) | Female (*n* = 124) | Male (*n* = 42) |
|---|---|---|---|---|
| **Average Age (range)** | | 63.3 (26 – 94) | 64.3 (26 – 94) | 60.9 (28 – 83) |
| **Years of Talc Use** * **(range)** | | 40.8 (5 – 76) | 40.4 (6 – 76) | 42.0 (5 – 74) |
| **Talc Latency in Years (range)** | | 52.4 (20 – 83) | 53.3 (20 – 83) | 49.9 (28 – 74) |
| **Diapering or Applying Talc to Others** ** | | 122 (73.5%) | 100 (80.6%) | 22 (52.4%) |
| **Talc Use Only** | | 122 (73.5%) | 97 (78.2%) | 25 (59.5%) |
| **Talc Use and Alternate Exposure** | | 44 (26.5%) | 27 (21.8%) | 17 (40.5%) |
| **Certainty of Alternate Exposure (*n* = 44) (26.5%)** | Possible | 7 (4.2%) | 5 (4.0%) | 2 (4.8%) |
| | Likely | 17 (10.2%) | 14 (11.3%) | 3 (7.1%) |
| | Definite | 20 (12.0%) | 8 (6.5%) | 12 (28.6%) |
| **Tumor Location** | Pleura | 109 (65.7%) | 83 (66.9%) | 26 (61.9%) |
| | Peritoneum | 52 (31.3%) | 37 (29.8%) | 15 (35.7%) |
| | Both Pleura & Peritoneum | 4 (2.4%) | 3 (2.4%) | 1 (2.4%) |
| | Pericardium | 1 (0.6%) | 1 (0.8%) | 0 |
| **Tumor Subtype** | Biphasic | 24 (14.5%) | 18 (14.5%) | 6 (14.3%) |
| | Epithelial | 125 (75.3%) | 92 (74.2%) | 33 (78.6%) |
| | Sarcomatoid | 16 (9.6%) | 13 (10.5%) | 3 (7.1%) |
| | Not specified | 1 (0.6%) | 1 (0.8%) | 0 |

* Years of Talc Use: includes years of being diapered or powdered with talc as a child; years of diapering or powdering children or others with talc; and years applying talcum powder to oneself after bathing or other personal use

** Diapering or Applying Talc: restricted to diapering or powdering children with talc or applying talcum powder to others, including occupational use

## Discussion

This paper presents 166 individuals with malignant mesothelioma and asbestos exposure through documented use of cosmetic talcum powder. For 122 of 166, their only known exposure to asbestos was their use of cosmetic talcum powder. Without the recognition of asbestos exposure through cosmetic talcum powder, 73.5% of the cases might well have been considered as "idiopathic." Similarly, for those 26.5% of cases with additional asbestos exposure along with the talc, those alternate exposures would have been mistakenly considered as the sole, and sufficient, cause of the mesothelioma. Historically, the attributable risk of asbestos for mesothelioma in women ranged from around 20–50%. However as Baur et al. point out, misclassification or inadequate exposure ascertainment has led to this low attributable risk for women compared to men [16]. Data from occupationally exposed cohorts that included men and women actually show that compared to similarly exposed men, women had higher mortality rates from mesothelioma [17–20]. Lacourt found that at low-level cumulative asbestos exposure ((0 – 0.1 f-cc/year) women were more likely to develop mesothelioma than men [21]. Magnani (2008) found the SMR for mesothelioma was higher for women than for men among workers at an asbestos cement plant [22]. Frank et al. (2009) found mesothelioma rates in the Qingdao region of China were correlated with a higher proportion of women employed in asbestos manufacturing industries.

[23] In some instances authors limited the characterization of asbestos exposure in women to certain industries, such as shipbuilding during wartime [24], thus neglecting other potential sources and decreasing the attributable risk. Conversely, when non-occupational exposures were included for women, even with low-intensity domestic exposure considered, the attributable risk increased from 40% to 64.8% [21].

Given that all types of asbestos can cause mesothelioma [6], it is important to consider every source of exposure to asbestos in an individual. Talcum powder has been contaminated with both chrysotile and amphibole asbestos (predominately anthophyllite and tremolite) [8, 25, 26]. Recently, Wong et al. (2021) found significantly elevated risks of mesothelioma among individuals with only chrysotile exposure and for mixed fiber exposure. [27]. Chrysotile alone (OR = 3.8) and in combination with tremolite/anthophyllite asbestos (OR = 3.9) were associated with similar increases in risk of mesothelioma. These three fiber types are most commonly found in cosmetic talc, and given that different ore sources were used in manufacturing over time, it is likely that many formulations and uses of talcum powder involved mixed fiber type exposure. There is no scientific basis to state that one type of exposure was the sole cause of the mesothelioma in a mixed exposure scenario. For example, rates of mesothelioma have been evaluated based on either job type or locale (e.g., construction, shipping) rather than

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1

**Table 2** Description of 166 mesothelioma cases

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Pleura | Epithelial | Cosmetics factory | 41 | 36 | Yes | None | |
| 31–40 | F | Peritoneal | Biphasic | Marketing | 39 | 12 | No | None | |
| 91–100 | F | Pleura | Epithelial | Clerical worker | 69 | 57 | Yes | Definite | Smoked Kent cigarettes in 1950s |
| 51–60 | M | Pleura | Biphasic | Warehouse supervisor | 54 | 22 | No | Definite | Home renovations as child |
| 21–30 | M | Peritoneal | Epithelial | Aircraft technician | 28 | 5 | No | None | |
| 41–50 | F | Pleura | Biphasic | Marketing | 47 | 47 | Yes | Definite | Automotive friction exposure |
| 41–50 | F | Peritoneal | Epithelial | Operator technician | 37 | 36 | Yes | Likely | Parents worked in chemical plant/with automotive friction materials; no work clothes laundered at home |
| 61–70 | F | Peritoneal, pleura | Epithelial | Hairdresser | 65 | 57 | Yes | Definite | Household exposures laundering clothes (automotive friction materials) |
| 41–50 | F | Pleura | Epithelial | Industrial engineer | 45 | 10 | Yes | None | |
| 71–80 | M | Pleura | Biphasic | Firefighter, painter | 59 | 59 | No | Definite | Occupational exposures to industrial talc, firefighting |
| 51–60 | F | Peritoneal | Epithelial | Dental assistant, secretary, logging business | 58 | 57 | Yes | Definite | Automotive friction product exposure |
| 51–60 | F | Peritoneal, pleura | Epithelial | Nurse | 50 | 20 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 60 | 61 | No | None | |
| 61–70 | M | Peritoneal | Epithelial | Software engineer | 53 | 53 | No | Likely | Construction work as teenager; family member machinist |
| 61–70 | F | Pleura | Epithelial | Secretary | 61 | 20 | Yes | None | |
| 61–70 | M | Pleura | Epithelial | Law professor | 46 | 45 | No | None | |
| 21–30 | F | Peritoneal | Biphasic | Customer service manager | 26 | 12 | No | None | |
| 51–60 | F | Pleura | Epithelial | Dental assistant, sales | 50 | 17 | Yes | Likely | Dental tape used in office |
| 21–30 | F | Pleura | Epithelial | Programmer | 29 | 17 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Clerical worker | 54 | 48 | No | None | |
| 71–80 | F | Pleura | Biphasic | Dental assistant, receptionist | 64 | 34 | Yes | Possible | Possible household exposure from parental occupations |
| 61–70 | F | Pleura | Epithelial | Systems analyst | 62 | 61 | Yes | None | |

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Peritoneal | Epithelial | Clerical worker | 59 | 31 | Yes | Likely | Asbestos shingle exposure as child |
| 71–80 | F | Peritoneal | Epithelial | Teacher's aide, customer service | 46 | 46 | No | None | |
| 51–60 | M | Pleura | Epithelial | Baked goods manufacturer | 55 | 49 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Housekeeping, packaging | 51 | 23 | No | None | |
| 41–50 | M | Peritoneal | Epithelial | Lawyer | 46 | 23 | Yes | None | |
| 51–60 | M | Pleura | Sarcomatoid | IT | 30 | 30 | Yes | None | |
| 61–70 | F | Peritoneal | Epithelial | Bookkeeper | 62 | 15 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Engineer | 71 | 20 | No | Definite | Home renovations, automotive friction products, cement in molds |
| 41–50 | F | Pleura | Epithelial | Restaurant | 46 | 12 | No | None | |
| 81–90 | F | Pleura | Epithelial | Not provided | 62 | 62 | Yes | Likely | Household exposures laundering clothes (automotive friction materials) |
| 81–90 | F | Pleura | Epithelial | LPN | 67 | 18 | Yes | Likely | Household exposures laundering clothes (automotive friction materials) |
| 31–40 | F | Peritoneal | Epithelial | Nanny, teacher | 26 | 7 | Yes | Definite | Home renovations |
| 61–70 | M | Peritoneal | Epithelial | Packaging, machine operator, welding | 48 | 48 | Yes | Definite | Cut transite and cement pipes; automotive friction exposure ("shade tree") |
| 71–80 | F | Peritoneal | Biphasic | Clerical worker | 61 | 39 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Lawyer | 54 | 18 | No | None | |
| 41–50 | F | Pleura | Sarcomatoid | Research | 44 | 45 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Variety of jobs | 50 | 48 | Yes | Definite | Home renovation |
| 41–50 | M | Peritoneal | Epithelial | Farrier, mechanic, general labor | 41 | 35 | Yes | Definite | Occupational exposure |
| 81–90 | M | Pleura | Epithelial | Barber | 50 | 36 | Yes | Likely | Boiler work in rail yards |
| 71–80 | M | Pleura | Biphasic | Bus driver, factory worker | 47 | 47 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Physician | 20 | 12 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Cashier, sales, clerical worker, wire assembler | 53 | 53 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Laborer | 41 | 50 | Yes | Likely | Home renovations, family member worked with clay |

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 61–70 | M | Pleura | Epithelial | Accountant | 69 | 69 | Yes | Definite | Home renovations during 1970s |
| 81–90 | F | Pleura | Biphasic | Bookkeeping, rehab counseling | 83 | 32 | Yes | None | |
| 71–80 | F | Pleura | Sarcomatoid | Office manager | 75 | 75 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Merchandising manager | 31 | 18 | Yes | None | |
| 41–50 | F | Pleura, peritoneal | Epithelial | Teacher | 46 | 22 | Yes | None | |
| 51–60 | M | Pleura | Epithelial | Automechanic, pipefitter | 31 | 44 | Yes | Definite | Occupational and take home exposure (shipyard) |
| 51–60 | F | Peritoneal | Epithelial | Clerical worker | 40 | 38 | Yes | None | |
| 41–50 | F | Pericardium | Sarcomatoid | Medical center | 50 | 31 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Mechanic, parts manager | 61 | 50 | No | Definite | Occupational naval exposure to asbestos, automotive friction material handling |
| 71–80 | F | Pleura | Epithelial | Secretary, cosmetics, cashier | 50 | 25 | No | Definite | Household exposures laundering clothes (automotive friction materials) |
| 61–70 | F | Pleura | Sarcomatoid | Catering | 45 | 40 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Cleaner, personal assistant | 52 | 50 | Yes | None | |
| 51–60 | M | Pleura | Epithelial | Meat inspector | 41 | 26 | No | None | |
| 71–80 | F | Pleura | Epithelial | Office manager | 65 | 55 | Yes | Possible | Household exposure from husband (drilling wells, pipes) |
| 71–80 | F | Pleura | Epithelial | Clerical worker | 60 | 59 | Yes | Possible | Family member worked at service station (no details on work) |
| 71–80 | M | Pleura | Sarcomatoid | Accountant | 47 | 39 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Sales, business | 60 | 16 | No | None | |
| 81–90 | M | Peritoneal | Epithelial | Accountant | 68 | 56 | No | None | |
| 51–60 | F | Pleura | Epithelial | Social worker | 40 | 6 | No | None | |
| 71–80 | F | Pleura | Epithelial | Hairdresser | 60 | 49 | Yes | None | |
| 41–50 | M | Pleura, peritoneal | Epithelial | Warehouse worker | 47 | 8 | No | Definite | Automotive filler exposure |
| 51–60 | F | Pleura | Epithelial | Retail, banktteller, work at school | 56 | 56 | Yes | None | |
| 61–70 | F | Pleura | Biphasic | Bakery | 64 | 49 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Hospitality | 61 | 58 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Cashier | 57 | 56 | Yes | None | |
| 81–90 | F | Peritoneal | Epithelial | Teacher | 40 | 50 | Yes | Possible | Abatement done at work |

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1    Page 7 of 13

**Table 2** (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use* | Diapering/ Applying Talc to Others** | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 81–90 | F | Pleura | Epithelial | Physical therapy assistant | 64 | 62 | Yes | None | |
| 31–40 | M | Peritoneal | Epithelial | IT | 35 | 25 | No | None | |
| 51–60 | F | Pleura | Epithelial | Housekeeper | 42 | 34 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Teacher | 54 | 50 | Yes | Likely | Home renovations |
| 61–70 | M | Pleura | Epithelial | Accounting | 63 | 63 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Tractor driver, race track | 62 | 60 | No | Likely | Oil drilling |
| 71–80 | F | Pleura | Epithelial | Research | 62 | 42 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Agriculture consultant | 53 | 53 | Yes | None | |
| 31–40 | F | Peritoneal | Epithelial | Clerical worker | 39 | 27 | Yes | None | |
| 41–50 | F | Pleura | Biphasic | Clerical worker | 49 | 49 | No | Likely | Ceramics use |
| 71–80 | M | Pleura | Epithelial | Communications system/ office | 47 | 49 | Yes | None | |
| 81–90 | F | Pleura | Not specified | Nurse | 76 | 70 | Yes | Likely | Family member worked in shipyard |
| 71–80 | F | Peritoneal | Epithelial | Meat wrapper | 56 | 47 | Yes | None | |
| 71–80 | M | Pleura | Biphasic | Advertising | 62 | 62 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Teacher, hospital administration | 70 | 70 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Chef | 37 | 36 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Case manager | 53 | 52 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Finance and marketing | 42 | 34 | No | None | |
| 51–60 | M | Pleura | Epithelial | Painter, carpet installer | 38 | 38 | Yes | Definite | Automotive friction product use |
| 81–90 | F | Pleura | Epithelial | Secretary | 63 | 45 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Nursing | 69 | 40 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 46 | 22 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Industrial engineer | 48 | 53 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Librarian | 55 | 44 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Clerical worker, hostess | 53 | 15 | No | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 67 | 55 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Clerical worker | 64 | 20 | Yes | None | |
| 71–80 | F | Peritoneal | Sarcomatoid | Secretary, medical billing | 47 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Communications and real estate | 69 | 69 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Home health | 42 | 24 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Clerical worker, hostess | 53 | 15 | Yes | None | |
| 71–80 | F | Pleura | Biphasic | Therapy aid | 67 | 67 | Yes | None | |
| 61–70 | M | Pleura | Biphasic | Restaurant, lead technician | 50 | 47 | Yes | None | |
| 61–70 | F | Pleura | Sarcomatoid | Teacher | 51 | 43 | Yes | None | |

**JA1329**

USCA4 Appeal: 23-1972      Doc: 26-3      Filed: 12/20/2023      Pg: 387 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-5   Filed 01/31/23   Page 9 of 14 PageID# 1467

**Table 2**  (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 51–60 | F | Pleura | Epithelial | Sales | 44 | 16 | Yes | None | |
| 41–50 | F | Pleura | Epithelial | Chicken farming, medical assistant | 48 | 48 | Yes | None | |
| 41–50 | M | Peritoneal | Epithelial | Physician | 40 | 17 | No | None | |
| 71–80 | F | Pleura | Epithelial | Secretary | 69 | 64 | No | None | |
| 61–70 | F | Pleura | Epithelial | Assembly line worker | 51 | 52 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | X-ray technician | 40 | 40 | Yes | None | |
| 51–60 | F | Pleura | Biphasic | Factory worker, housekeeper | 33 | 14 | Yes | None | |
| 51–60 | F | Pleura | Epithelial | Clerical worker | 38 | 29 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Clerical worker | 54 | 27 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Variety of jobs | 76 | 76 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Receptionist, dental assistant | 45 | 35 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Midwife | 55 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Seamstress | 63 | 56 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Accounting | 65 | 65 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Nurse | 57 | 57 | Yes | None | |
| 71–80 | M | Peritoneal | Epithelial | Sales, truck driver | 45 | 32 | No | Definite | Automotive friction products use |
| 51–60 | M | Pleura | Epithelial | Lawyer | 48 | 48 | Yes | None | |
| 51–60 | F | Pleura | Sarcomatoid | Customer service | 56 | 27 | Yes | None | |
| 81–90 | F | Pleura | Sarcomatoid | Teacher | 53 | 47 | Yes | None | |
| 71–80 | F | Peritoneal | Epithelial | Not provided | 67 | 48 | No | Definite | Smoked Kent cigarettes in 1950s |
| 31–40 | F | Peritoneal | Biphasic | Banking | 39 | 19 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Logger, run loader | 74 | 74 | Yes | Possible | Automotive friction product use and home renovations |
| 71–80 | F | Peritoneal | Epithelial | Hairdresser | 50 | 50 | Yes | Likely | Hairdryers present in salon |
| 31–40 | F | Pleura | Sarcomatoid | Certified Nursing Assistant and phlebotomist | 39 | 24 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Seamstress | 62 | 52 | Yes | None | |
| 31–40 | F | Peritoneal | Epithelial | Variety of jobs | 27 | 20 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Laborer | 51 | 51 | Yes | None | |
| 41–50 | M | Peritoneal | Biphasic | Casino worker | 47 | 47 | Yes | None | |
| 81–90 | F | Pleura | Epithelial | Nurse | 69 | 18 | Yes | None | |
| 71–80 | M | Pleura | Epithelial | Accountant, comptroller | 70 | 30 | Yes | Possible | Home renovations |
| 61–70 | F | Pleura | Sarcomatoid | Clerical worker | 60 | 27 | No | None | |
| 61–70 | F | Pleura | Biphasic | Secretary, cleaner | 52 | 52 | Yes | Likely | Home renovations in 1970s |

Moline *et al. Journal of Occupational Medicine and Toxicology*      (2023) 18:1      Page 9 of 13

**Table 2**  (continued)

| Age at Diagnosis | Sex | Tumor Location | Tumor Subtype | Occupation(s) | Talc Latency (years) | Years of Talc Use[*] | Diapering/ Applying Talc to Others[**] | Certainty of Alternate Exposure | Type of Alternate Exposure |
|---|---|---|---|---|---|---|---|---|---|
| 61–70 | F | Pleura | Sarcomatoid | Office cleaner, food prep | 64 | 64 | Yes | None | |
| 61–70 | F | Pleura | Epithelial | Insurance agent | 58 | 57 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Cook, cleaner, concierge | 54 | 44 | Yes | None | |
| 31–40 | M | Peritoneal | Epithelial | Lab technician | 36 | 36 | No | None | |
| 91–100 | F | Pleura | Epithelial | Variety of jobs | 60 | 60 | No | None | |
| 51–60 | F | Pleura | Epithelial | Real estate broker | 36 | 35 | Yes | None | |
| 41–50 | F | Pleura | Biphasic | PhD in astronomy, dance teacher | 37 | 37 | No | None | |
| 71–80 | F | Pleura | Epithelial | Switchboard operator, HR | 64 | 50 | No | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 50 | 46 | Yes | Likely | Ceramics work for 4–5 years |
| 41–50 | F | Peritoneal | Epithelial | Lawyer | 44 | 20 | No | None | |
| 71–80 | F | Pleura | Epithelial | Quality control | 67 | 67 | Yes | None | |
| 51–60 | F | Pleura | Sarcomatoid | Counselor | 55 | 54 | No | None | |
| 71–80 | F | Pleura | Biphasic | Certified nursing assistant, ranch work | 62 | 35 | Yes | Likely | Vermiculite exposure |
| 71–80 | M | Peritoneal | Epithelial | Physician | 67 | 67 | Yes | None | |
| 41–50 | F | Peritoneal | Epithelial | Nurse Practitioner | 44 | 34 | Yes | None | |
| 31–40 | M | Pleura | Epithelial | Not provided | 29 | 30 | No | None | |
| 61–70 | F | Pleura | Epithelial | Banking | 60 | 50 | Yes | None | |
| 51–60 | F | Peritoneal | Epithelial | Nurse | 56 | 45 | Yes | None | |
| 71–80 | F | Pleura | Sarcomatoid | Hairdresser | 61 | 25 | Yes | None | |
| 71–80 | M | Pleura | Sarcomatoid | Mechanic | 60 | 48 | No | Definite | Occupational exposure and home renovations |
| 61–70 | M | Peritoneal | Epithelial | Worked at special education preschool | 57 | 50 | No | None | |
| 71–80 | F | Peritoneal | Biphasic | Teacher | 65 | 46 | Yes | None | |
| 71–80 | F | Pleura | Biphasic | Teacher | 71 | 59 | Yes | Possible | Family member was Linotype operator |
| 81–90 | F | Pleura | Epithelial | Cashier, waitress | 60 | 58 | Yes | None | |
| 31–40 | F | Pleura | Epithelial | Administrator | 28 | 7 | No | None | |
| 71–80 | F | Peritoneal | Epithelial | Teacher | 50 | 51 | Yes | Likely | Household exposure to laundry (automotive friction materials) |
| 31–40 | M | Pleura | Epithelial | Homeland Security | 33 | 33 | No | None | |
| 61–70 | M | Pleura | Epithelial | Trucking company | 55 | 56 | Yes | None | |
| 71–80 | F | Pleura | Epithelial | Office worker | 62 | 45 | Yes | None | |

[*] Years of Talc Use: includes years of being diapered or powdered with talc as a child; years of diapering or powdering children or others with talc; and years applying talcum powder to oneself after bathing or other personal use

[**] Diapering or Applying Talc: restricted to diapering or powdering children with talc or applying talcum powder to others, including occupational use

Moline *et al. Journal of Occupational Medicine and Toxicology*    (2023) 18:1

on each specific task or exposure within the job category. Furthermore, mesothelioma is a disease that occurs following a long latency period. It is important to consider whether the latency period for all exposures, whether due to asbestos in talcum powder, or through occupational or para-occupational exposures meets the minimum latency period.

Subgroups of individuals not traditionally known to be exposed to asbestos have been identified, such as teachers. In this case series, 12 teachers (7.2% of cases) were diagnosed with mesothelioma. Anderson et al. identified 12 school teachers with mesothelioma in Wisconsin (6 male, 6 female). [28]. Nine cases had no known exposure to asbestos, although several worked in school buildings with asbestos containing building materials (ACBM) present, but the condition of the ACBR while the teachers were present in the school was unknown. No history of talcum powder use was elicited. Marianaccio et al. identified mesotheliomas in 11 female teachers in Italy. [29]. Mazurek et al. evaluated mesothelioma deaths in women in the United States from 1999–2020 using death certificate data. [30]. Mesothelioma was noted in 32 female elementary and middle school teachers. No information on exposure to asbestos or specific tasks at work or a comprehensive exposure history was available; no history of talcum powder use was elicited, as the study was based solely on death certificates. Tomasallo et al. found increased mortality among school teachers in Wisconsin, USA. [31]. They noted that para-occupational or take home exposure could be responsible for the increased risk. Again, no history of asbestos exposure through talcum powder usage was ascertained. It might be possible that exposure to ACBM played some role in these mesotheliomas, however, the notable history of exposure to asbestos-containing talcum powders among teachers in this case series, highlights the importance of assessing this source of exposure in future studies of mesothelioma in teachers and other predominantly female professions.

Mazurek et al. found seven cases of mesothelioma among female hairdressers. [30]. Our series identified five hairdressers/barbers with documented occupational exposure to asbestos containing talcum powder. Moline et al. found three hairdressers who used cosmetic talc as part of their occupation, [14] and Emory et al. [15] found 4 hairdressers out of 75 patients. Pavlisko et al. identified a hairdresser in their study of mesothelioma in women, but classified the case in the non-occupational/paraoccupational exposure category. [32] McDonald attributed the finding of tremolite in the lung tissue of a chrysotile worker to his prior occupational exposure to talc as a barber [33]. Rodelsberger recognized talc as a source of asbestos exposure and identified hairdressers and barbers as asbestos-exposed industries [34]. The examples

of these two occupational subgroups, teachers with personal use of cosmetic talc, and hairdressers with occupational use of cosmetic talc, show the importance of obtaining a thorough history and determining all potential sources of asbestos exposure.

This case series describes mesotheliomas in end-users of cosmetic talcum powder, thus using no personal protective equipment or dust suppression activities, unlike some cohorts with occupational exposures [35]. Prior mortality studies of talc miners and millers in Italy (and other countries) have not identified mesotheliomas in their populations, although two cases of peritoneal cancer were identified by Pira et al. [36]. The Rubino, Coggiola and Pira et al. studies used mortality data collected prior to an ICD mesothelioma code, which could impact proper classification of mesothelioma. [35–37]. The studies had a relatively small sample size, which given the rarity of mesothelioma, even among highly exposed individuals, would have led to insufficient statistical power [38]. Fordyce studied Vermont talc miners and found two mesotheliomas in the small cohort of 427 miners; Vermont talc has been used in cosmetic talcum powder [39].

Fiber burden studies were done in some individuals from the two prior case series of mesothelioma among individuals with cosmetic talcum powder use. Moline et al. reported on tissue fiber analysis in six of 33 individuals. Asbestos fibers, of the types found in cosmetic talc, were found in all six samples. Emory et al. found anthophyllite asbestos in all 9 individuals for whom tissue fiber analysis was done. Tremolite was found in six of the cases in addition to the anthophyllite. Hull et al. [40] looked at New York State talc miners and found anthophyllite, tremolite/actinolite, chrysotile and talc in their lungs. There were over a dozen cases of mesothelioma identified in these talc miners. Our case series did not include data on tissue sampling, which is not typically done for clinical purposes; rather we relied on patient history. For occupational exposures to asbestos, fiber analysis is not required to ascertain a history of exposure, rather the history of exposure to asbestos is sufficient [41]. This should be no different for environmental exposures, such as asbestos exposure in cosmetic talcum powder, or even para-occupational exposures.

Pleural mesothelioma is more common than peritoneal mesothelioma [42], with estimates of pleural mesothelioma occurring approximately 80–90% of the time compared to peritoneal mesothelioma. The presenting location for the tumor, either pleural or peritoneal, was similar in all three recent case series. In Moline et al., 11 of 33 patients had peritoneal mesothelioma and in Emory et al., 23 of 75 cases were peritoneal mesothelioma. In this larger case series, the proportion of peritoneal mesotheliomas was 31.3%. The proportion of men

**JA1332**

USCA4 Appeal: 23-1972     Doc: 26-3     Filed: 12/20/2023     Pg: 390 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-5   Filed 01/31/23   Page 12 of 14 PageID# 1470

Moline *et al. Journal of Occupational Medicine and Toxicology*     *(2023) 18:1*     Page 11 of 13

in each of the three case series was similar. In Emory et al., 15% of the cases were men, compared with 18% of the cases in Moline et al. In the current case series, among 122 cases with talc-only exposure, 20.5% were men, slightly above the proportion in two previous case series. This might reflect growing awareness among men that talcum powder use could explain their mesothelioma, particularly when no other identifiable source of asbestos exposure was identified. Few individuals in this case series underwent testing for the tumor suppressor gene, BAP-1, which is associated with an increased risk for mesothelioma when associated with asbestos exposure, [43] including greater susceptibility at low doses of asbestos such as exposures from cosmetic talcum powder use. Interestingly, there was a greater frequency of peritoneal mesothelioma cases in those with the BAP-1 mutation and asbestos exposure [44].

Several authors have written about the importance of the cumulative dose, which has been related to several asbestos-caused diseases, both non-malignant and non-malignant. Luberto et al. discussed the "increased mortality risk due to asbestos exposure for malignant neoplasm of pleura, peritoneum, lung and ovary, as well as asbestosis, all increasing with cumulative exposure." [19] Henderson et al. commented on the use of the cumulative exposure model in the Helsinki Criteria. [45] Iwastsubo and colleagues, citing only low exposures leading to disease noted that "excess of mesothelioma was observed for levels of cumulative exposure." [46] Ferrante and her colleagues [47] found that the "risk of pleural malignant mesothelioma increased with cumulative asbestos exposure and also in analyses limited to subjects non-occupationally exposed," comparable to the current case series. Albin et al. [48] even noted that "colorectal cancer displayed a clear relation with cumulative dose," as one would reasonably expect with asbestos-related diseases.

This case series may reflect the potential sources of bias that impact all studies that use cases in which litigation is occurring. However, because mesothelioma is a rare disease and full environmental histories are rarely obtained or documented, it would be impossible to amass so many cases with one type of exposure using standard sources such as hospital or cancer registry records. Furthermore, most patients (and their clinicians) are unaware of the presence of asbestos in talcum powder, leading them to report no known asbestos exposure. The data related to years of exposure to cosmetic talcum powder was obtained and typically described in great detail during sworn testimony. For nearly one-quarter of the individuals in this series, additional exposures to asbestos were reported along with the cosmetic talcum powder. When available,

information regarding talcum powder usage was corroborated by sworn testimony of family members. Typically, the questioning of individuals about alternate exposures to asbestos as part of litigation is fairly comprehensive, but it is possible that there were additional, unknown sources. This presents a challenge for any study of asbestos exposure and, in particular, mesothelioma, given the long latency period from the onset of exposure to the development of disease.

## Conclusion

For individuals with exposure to asbestos through cosmetic talc usage and additional alternate sources, all exposures contribute to the development of mesothelioma. Published case reports and case series have identified over 100 individuals whose sole exposure to asbestos was through cosmetic talcum powder usage [14, 15, 49]. Thus, is it critical to obtain a history of all potential exposures to asbestos. In this case series, 122 cases would have had no source of asbestos identified if a history of asbestos-containing cosmetic talc had not been elicited. The other 44 would have likely been misclassified as having only alternate exposures. It is indisputable that asbestos causes mesothelioma, therefore, it is critical to elicit all potential sources of asbestos exposure so that we can better understand, and prevent, future cases of this deadly cancer.

### Acknowledgements
Not applicable.

### Authors' contributions
Jacqueline Moline conceived of the manuscript, and was involved in the acquisition of data, analysis and writing of the manuscript. Kesha Patel was involved in data presentation and analysis. Arthur L. Frank was involved in writing and evaluation of alternative exposures. The author(s) read and approved the final manuscript.

### Funding
No funds or external assistance were obtained by any outside source in the development, writing, analysis or conclusions of this manuscript.

### Availability of data and materials
The datasets generated and/or analyzed during the current study are not publicly available. Individuals of details of cases will not be provided to protect the confidentiality of the cases presented in the study. Efforts to minimized identification, such as describing age in a range were employed.

## Declarations

### Ethics approval and consent to participate
The project received approval from the Institutional Review Board and we received a waiver of consent to include the participants in the study. (IRB #: 21–0897).

### Consent for publication
Not applicable.

### Competing interests
Authors Jacqueline Moline and Arthur L. Frank have served as expert witnesses in asbestos litigation, including talc litigation for plaintiffs.

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 391 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-5   Filed 01/31/23   Page 13 of 14 PageID# 1471

Moline *et al. Journal of Occupational Medicine and Toxicology*    *(2023) 18:1*    Page 12 of 13

Received: 4 October 2022  Accepted: 4 January 2023
Published online: 18 January 2023

## References

1. Olsen NJ, Franklin PJ, Reid A, et al. Increasing incidence of malignant mesothelioma after exposure to asbestos during home maintenance and renovation. Med J Aust. 2011;195(5):271–4. https://doi.org/10.5694/mja11.10125.
2. Bourdès V, Boffetta P, Pisani P. Environmental exposure to asbestos and risk of pleural mesothelioma: review and meta-analysis. Eur J Epidemiol. 2000;16(5):411–7. https://doi.org/10.1023/a:1007691003600.
3. Epler GR, Fitz Gerald MX, Gaensler EA, Carrington CB. Asbestos-related disease from household exposure. Respiration. 1980;39(4):229–40. https://doi.org/10.1159/000194221.
4. Miller A. Mesothelioma in household asbestos-exposed workers: 32 United States cases since 1990. Am J Ind Med. 2005;47(5):458–62. https://doi.org/10.1002/ajim.20167.
5. Schneider J, Straif K, Woitowitz HJ. Pleural mesothelioma and household asbestos exposure. Rev Environ Health. 1996;11(1–2):65–70. https://doi.org/10.1515/REVEH.1996.11.1-2.65.
6. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans, International Agency for Research on Cancer, World Health Organization, eds. *Carbon Black, Titanium Dioxide, and Talc*. International Agency for Research on Cancer ; Distributed by WHO Press; 2010.
7. Steffen JE, Tran T, Yimam M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders—a case series. J Occup Environ Med. 2020;62(2):e65–77. https://doi.org/10.1097/JOM.0000000000001800.
8. Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health. 2014;20(4):318–32. https://doi.org/10.1179/2049396714Y.0000000081.
9. U.S. Public Health Service USD of H& HS. Public Health Statement Asbestos CAS#: 1332–21–4. *Atlanta Agency Toxic Subst Dis Regist*. Published online September 2001.
10. Gramond C, Rolland P, Lacourt A, et al. Choice of rating method for assessing occupational asbestos exposure: Study for compensation purposes in France. Am J Ind Med. 2012;55(5):440–9. https://doi.org/10.1002/ajim.22008.
11. Tossavainen A. Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution. Scand J Work Environ Health. 1997;4:311–6. https://doi.org/10.5271/sjweh.226.
12. Michaels D, Zoloth S. Asbestos disease in sheet metal workers: Proportional mortality update. Am J Ind Med. 1988;13(6):731–4. https://doi.org/10.1002/ajim.4700130612.
13. Zoloth S, Michaels D. Asbestos disease in sheet metal workers: the results of a proportional mortality analysis. Am J Ind Med. 1985;7(4):315–21. https://doi.org/10.1002/ajim.4700070407.
14. Moline J, Bevilacqua K, Alexandri M, Gordon RE. Mesothelioma associated with the use of cosmetic talc. J Occup Environ Med. 2020;62(1):11–7. https://doi.org/10.1097/JOM.0000000000001723.
15. Emory TS, Maddox JC, Kradin RL. Malignant mesothelioma following repeated exposures to cosmetic talc: a case series of 75 patients. Am J Ind Med. 2020;63(6):484–9. https://doi.org/10.1002/ajim.23106.
16. Baur X, Frank AL, Soskolne CL, Oliver LC, Magnani C. Malignant mesothelioma: ongoing controversies about its etiology in females. Am J Ind Med. 2021;64(7):543–50. https://doi.org/10.1002/ajim.23257.
17. Newhouse ML, Berry G, Wagner JC, Turok ME. A study of the mortality of female asbestos workers. Br J Ind Med. 1972;29(2):134–41. https://doi.org/10.1136/oem.29.2.134.
18. Berry G. Mortality from all cancers of asbestos factory workers in east London 1933–80. Occup Environ Med. 2000;57(11):782–5. https://doi.org/10.1136/oem.57.11.782.
19. Luberto F, Ferrante D, Silvestri S, et al. Cumulative asbestos exposure and mortality from asbestos related diseases in a pooled analysis of 21 asbestos cement cohorts in Italy. Environ Health. 2019;18(1):71. https://doi.org/10.1186/s12940-019-0510-6.

20. Pira E, Pelucchi C, Buffoni L, et al. Cancer mortality in a cohort of asbestos textile workers. Br J Cancer. 2005;92(3):580–6. https://doi.org/10.1038/sj.bjc.6602240.
21. Lacourt A, Gramond C, Rolland P, et al. Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma. Thorax. 2014;69(6):532–9. https://doi.org/10.1136/thoraxjnl-2013-203744.
22. Magnani C, Ferrante D, Barone-Adesi F, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med. 2008;65(3):164–70. https://doi.org/10.1136/oem.2007.032847.
23. Frank AL, Zengchang P, Huaqiang Z, Yun Z. Mesothelioma in Qingdao, PRC (2000–2007). J Phys Conf Ser. 2009;151:012007.
24. Price B. Mesothelioma trends in the United States: an update based on surveillance, epidemiology, and end results program data for 1973 through 2003. Am J Epidemiol. 2004;159(2):107–12. https://doi.org/10.1093/aje/kwh025.
25. Bird T, Steffen JE, Tran TH, Egilman DS. A review of the talc industry's influence on federal regulation and scientific standards for asbestos in talc. NEW Solut J Environ Occup Health Policy. 2021;31(2):152–69. https://doi.org/10.1177/1048291121996645.
26. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. Am Ind Hyg Assoc J. 1968;29(4):350–4. https://doi.org/10.1080/00028896809343015.
27. Wong JYY, Rice C, Blair A, Silverman DT. Mesothelioma risk among those exposed to chrysotile asbestos only and mixtures that include amphibole: a case–control study in the USA, 1975–1980. Occup Environ Med. 2021;78(3):199–202. https://doi.org/10.1136/oemed-2020-106665.
28. Anderson HA, Hanrahan LP, Schirmer J, Higgins D, Sarow P. Mesothelioma among employees with likely contact with in-place asbestos-containing building materials. Ann N Y Acad Sci. 1991;643:550–72. https://doi.org/10.1111/j.1749-6632.1991.tb24506.x.
29. Marinaccio A, Corfiati M, Binazzi A, et al. The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure. Occup Environ Med. 2018;75(4):254–62. https://doi.org/10.1136/oemed-2016-104119.
30. Mazurek JM, Blackley DJ, Weissman DN. Malignant mesothelioma mortality in women — United States, 1999–2020. MMWR Morb Mortal Wkly Rep. 2022;71(19):645–9. https://doi.org/10.15585/mmwr.mm7119a1.
31. Tomasallo CD, Christensen KY, Raymond M, Creswell PD, Anderson HA, Meiman JG. An occupational legacy: malignant mesothelioma incidence and mortality in wisconsin. J Occup Environ Med. 2018;60(12):1143–9. https://doi.org/10.1097/JOM.0000000000001461.
32. Pavlisko EN, Liu B, Green C, Sporn TA, Roggli VL. Malignant diffuse mesothelioma in women: a study of 354 cases. Am J Surg Pathol. 2020;44(3):293–304. https://doi.org/10.1097/PAS.0000000000001418.
33. Mcdonald A, Case B, Churg A, et al. Mesothelioma in Quebec chrysotile miners and millers: epidemiology and aetiology. Ann Occup Hyg. 1997;41(6):707–19. https://doi.org/10.1016/S0003-4878(97)00020-3.
34. Rödelsperger K, Jöckel KH, Pohlabeln H, Romer W, Woitowitz HJ. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study. Am J Ind Med. 2001;39(3):262–75. https://doi.org/10.1002/1097-0274(200103)39:3%3c262::AID-AJIM1014%3e3.0.CO;2-R.
35. Coggiola M, Bosio D, Pira E, et al. An update of a mortality study of talc miners and millers in Italy. Am J Ind Med. 2003;44(1):63–9. https://doi.org/10.1002/ajim.10240.
36. Pira E, Coggiola M, Ciocan C, et al. Mortality of talc miners and millers from Val Chisone, Northern Italy: an updated cohort study. J Occup Environ Med. 2017;59(7):659–64. https://doi.org/10.1097/JOM.0000000000000992.
37. Rubino G, Scansetti G, Piolatto G, Romano C. Mortality study of talc miners and millers. J Occup Med. 1976;18(3):187–93.
38. Finkelstein MM. Re: mortality of talc miners and millers from Val Chisone, Northern Italy. J Occup Environ Med. 2017;59(10):e94.
39. Fordyce TA, Mowat FS, Leonhard MJ, Moolgavkar SH. Letter to the Editor: misrepresentation by Egilman et al. of the Fordyce et al. (2019) vermont talc miners and millers cohort study update. J Occup Environ Med. 2020;62(1):e19–e21. doi:https://doi.org/10.1097/JOM.0000000000001784
40. Hull MJ, Abraham J, Case B. Mesothelioma among workers in asbestiform fiber-bearing talc mines in New York State. Ann Occup Hyg.

USCA4 Appeal: 23-1972    Doc: 26-3    Filed: 12/20/2023    Pg: 392 of 435

Case 4:22-mc-00001-AWA-DEM   Document 21-5   Filed 01/31/23   Page 14 of 14 PageID# 1472

Moline *et al. Journal of Occupational Medicine and Toxicology*    *(2023) 18:1*                                                    Page 13 of 13

2002;46(Supplement 1):132–5. https://doi.org/10.1093/annhyg/46.
suppl_1.132.

41. Wolff H, Vehmas T, Oksa P, Rantanen J, Vainio H. Asbestos, asbestosis, and
cancer, the Helsinki criteria for diagnosis and attribution 2014: recom-
mendations. Scand J Work Environ Health. 2015;41(1):5–15. https://doi.
org/10.5271/sjweh.3462.

42. Kim J, Bhagwandin S, Labow DM. Malignant peritoneal mesothelioma:
a review. Ann Transl Med. 2017;5(11):236–236. https://doi.org/10.21037/
atm.2017.03.96.

43. Xu J, Kadariya Y, Cheung M, et al. Germline mutation of *Bap1* Accelerates
development of asbestos-induced malignant mesothelioma. Cancer Res.
2014;74(16):4388–97. https://doi.org/10.1158/0008-5472.CAN-14-1328.

44. Ohar JA, Cheung M, Talarchek J, et al. Germline BAP1 mutational land-
scape of asbestos-exposed malignant mesothelioma patients with family
history of cancer. Cancer Res. 2016;76(2):206–15. https://doi.org/10.1158/
0008-5472.CAN-15-0295.

45. Henderson DW, Rödelsperger K, Woitowitz HJ, Leigh J. After Helsinki: a
multidisciplinary review of the relationship between asbestos exposure
and lung cancer, with emphasis on studies published during 1997–2004.
Pathology (Phila). 2004;36(6):517–50. https://doi.org/10.1080/0031302040
0010955.

46. Iwatsubo Y, Pairon JC, Boutin C, et al. Pleural mesothelioma: dose-
response relation at low levels of asbestos exposure in a French popu-
lation-based case-control study. Am J Epidemiol. 1998;148(2):133–42.
https://doi.org/10.1093/oxfordjournals.aje.a009616.

47. Ferrante D, Mirabelli D, Tunesi S, Terracini B, Magnani C. Pleural meso-
thelioma and occupational and non-occupational asbestos exposure: a
case-control study with quantitative risk assessment. Occup Environ Med.
2016;73(3):147–53. https://doi.org/10.1136/oemed-2015-102803.

48. Albin M, Jakobsson K, Attewell R, Johansson L, Welinder H. Mortality and
cancer morbidity in cohorts of asbestos cement workers and referents.
Occup Environ Med. 1990;47(9):602–10. https://doi.org/10.1136/oem.
47.9.602.

49. Andrion A, Bosia S, Paoletti L, et al. Malignant peritoneal mesothelioma in
a 17-year-old boy with evidence of previous exposure to chrysotile and
tremolite asbestos. Hum Pathol. 1994;25(6):617–22. https://doi.org/10.
1016/0046-8177(94)90230-5.

## Publisher's Note

Springer Nature remains neutral with regard to jurisdictional claims in pub-
lished maps and institutional affiliations.

Ready to submit your research? Choose BMC and benefit from:

• fast, convenient online submission

• thorough peer review by experienced researchers in your field

• rapid publication on acceptance

• support for research data, including large and complex data types

• gold Open Access which fosters wider collaboration and increased citations

• maximum visibility for your research: over 100M website views per year

At BMC, research is always in progress.

Learn more biomedcentral.com/submissions



# Exhibit 6

# EXHIBIT 2

## NORTH CAROLINA INDUSTRIAL COMMISSION

**I. C. No. 15-755738, BETTY WHITLEY BELL, Employee-Plaintiff v. HOECHST CELANESE CORPORATION AND PILLOWTEX CORPORATION, f/k/a FIELDCREST CANNON f/k/a CANNON MILLS, Employer-Defendants and ESIS AND NORTH CAROLINA SELF INSURANCE SECURITY ASSOCIATION, Carrier-Defendants.**

### PLAINTIFF'S MOTION TO DISMISS

NOW COMES PLAINTIFF, by and through undersigned counsel, and hereby moves the Industrial Commission for an order dismissing her claim for mesothelioma.

1.    Form 18B was filed on September 4, 2015 against the above captioned employers.

2.    Plaintiff does not wish to continue her workers' compensation case.

Accordingly, pursuant to Rule 616 of the Rules of the Industrial Commission, Plaintiff wishes to dismiss her case against Hoechst Celanese Corporation and Pillowtex Corporation f/k/a Fieldcrest Cannon f/k/a Cannon Mills without prejudice from this claim.

This ___ day of December, 2015.

Edward L. Pauley
NCSB No.: 27060
Attorney for Plaintiff
Wallace and Graham, P.A.
525 N. Main Street
Salisbury, NC 28144
mdoby@wallacegraham.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel and/or parties of record by delivering a copy via email on this ___1st___ day of December, 2015, addressed as follows:

        Erin Fleming Taylor
        Cranfill Sumner & Hartzog
        eft@cshlaw.com

        Ashish Sharda
        The Stuart Law Firm
        asharda@stuartlawfirm.com

        Edward L. Pauley
        Wallace and Graham, P.A.
        epauley@wallacegraham.com
        704/633-9434

2

# EXHIBIT 6

## NORTH CAROLINA INDUSTRIAL COMMISSION

**I. C. No. 19-732863, LLOYD CLIFFORD BELL, Spouse and Sole Dependent of BETTY WHITLEY BELL, Deceased-Employee, v. HOECHST CELANESE CORPORATION AND PILLOWTEX CORPORATION, f/k/a FIELDCREST CANNON f/k/a CANNON MILLS, Employer-Defendants and ESIS AND NORTH CAROLINA SELF INSURANCE SECURITY ASSOCIATION, Carrier-Defendants.**

### PLAINTIFF'S MOTION TO DISMISS

NOW COMES PLAINTIFF, by and through undersigned counsel, and hereby moves the Industrial Commission for an order dismissing Pillowtex Corporation, f/k/a Fieldcrest Cannon, f/ka/ Cannon Mills and the North Carolina Self Insurance Security Association.

1.    Form 18B for a death claim was filed on April 25, 2019 against the above captioned employers.

2.    Plaintiff wishes to dismiss Pillowtex Corporation, f/k/a Fieldcrest Cannon, f/ka/ Cannon Mills and the North Carolina Self Insurance Security Association from this case.

Accordingly, pursuant to Rule 616 of the Rules of the Industrial Commission, Plaintiff wishes to dismiss Pillowtex Corporation f/k/a Fieldcrest Cannon f/k/a Cannon Mills without prejudice from this claim.  This dismissal does not apply to Hoechst Celanese Corporation.

This **16th** day of December, 2019.

Edward L. Pauley
NCSB No.: 27060
Attorney for Plaintiff
Wallace and Graham, P.A.
525 N. Main Street
Salisbury, NC  28144
mdoby@wallacegraham.com

Bell WC Death Benefits Claim040

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel and/or parties of record by delivering a copy via email on this **16th** day of December, 2019, addressed as follows:

>   Jerri J. Simmons
>   Cranfill Sumner & Hartzog
>   jsimmons@cshlaw.com
>
>
>   Stephen Dimmick
>   The Stuart Law Firm
>   sdimmick@stuartlawfirm.com

Edward L. Pauley
Wallace and Graham, P.A.
epauley@wallacegraham.com
704/633-9434

2

Bell WC Death Benefits Claim041

**JA1342**

# EXHIBIT 10

JA1343

## NORTH CAROLINA INDUSTRIAL COMMISSION

**I. C. No. 19-732863, LLOYD CLIFFORD BELL, Spouse and Sole Dependent of BETTY WHITLEY BELL, Deceased-Employee, Plaintiff v. HOECHST CELANESE CORPORATION, Employer-Defendant and ESIS, Claim Administrator.**

### PLAINTIFF'S MOTION TO DISMISS

NOW COMES PLAINTIFF, by and through undersigned counsel, pursuant to **11 NCAC 23A .0616(a)** and hereby moves the Industrial Commission for an order of voluntary dismissal of this claim.

1.    Form 18B for a death claim was filed on April 25, 2019 against the above captioned employers.

2.    Plaintiff wishes to voluntarily dismiss his claim without prejudice.

This 16th day of September, 2020.

Edward L. Pauley
NCSB No.: 27060
Attorney for Plaintiff
Wallace and Graham, P.A.
525 N. Main Street
Salisbury, NC 28144
epauley@wallacegraham.com

**JA1344**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel and/or parties of record by delivering a copy via email on this _____ day of September, 2020, addressed as follows:

    Jerri J. Simmons c/o Jake Stewart
    Cranfill Sumner & Hartzog
    jstewart@cshlaw.com

    _____
    Edward L. Pauley
    Wallace and Graham, P.A.
    epauley@wallacegraham.com
    704/633-9434

2

# Exhibit 7

# EXHIBIT 1

**North Carolina Industrial Commission**

IC File # 15-755738

# *DENIAL OF WORKERS' COMPENSATION CLAIM*
# *(G.S. §97-18(c) AND G.S. §97-18(d))*

Emp. Code #

Carrier Code # 999-098

Carrier File # 140030.99

**The Use Of This Form Is Required Under The Provisions of The Workers' Compensation Act**   Employer FEIN

| Betty Whitley Bell | | | | Fieldcrest Cannon, Inc./Pillowtex Corporation | | | |
|---|---|---|---|---|---|---|---|
| Employee's Name | | | | Employer's Name | | | Telephone Number |
| 6252 Irish Potato Road | | | | Insolvent Self-Insured Employer | | ( ) - | |
| Address | | | | Employer's Address | | City | State   Zip |
| Rockwell | | NC | 28138 | North Carolina Self-Insurance Security Association c/o Stuart Law Firm, PLLC | | | |
| City | | State | Zip | Insurance Carrier | | Policy Number | |
| ( ) - | | | | 1033 Wade Avenue, Suite 202 | | Raleigh | NC   27605 |
| Home Telephone | | Work Telephone | | Carrier's Address | | City | State   Zip |
| -2176 | ☐ M ☐ F | 1949 | | (919) 787- 6050 | | (919 787-9988 | |
| Social Security Number | Sex | Date of Birth | | Carrier's Telephone Number | | Fax Number | |
| Date of Injury:  12/31/92 | | | | | | | |

## TO EMPLOYEE (TO DEPENDENT(S) OR NEXT OF KIN IN CASE OF DEATH):

This is to inform you that the claim for the

☐ injury on _____ , or
☐ occupational disease as of  7/20/15 _____ , or
☐ death on _____

is **DENIED** for the following reasons:

Please see attached.

_____      Attorney for NCSISA      10/22/2015
SIGNATURE EMPLOYER OR CARRIER/ADMINISTRATOR                          TITLE                          DATE

Employer/Insurance Carrier must provide a detailed statement of the grounds for denying compensability of the claim or liability for the claim where payments have previously been made without prejudice under N.C. Gen. Stat. § 97-18(d). Failure to specify a particular ground may preclude  asserting certain defenses at a later date pursuant to N.C. Gen. Stat. § 97-18(f).

Employee: If you disagree with this denial, you are entitled to request a hearing by submitting a Form 33. If you need assistance you may contact the Industrial Commission at the address below or telephone the Industrial Commission at (800) 688-8349.

Employer: A copy of this form shall be sent to the employee and employee's attorney of record, if any, and all known health care providers which have submitted bills to the employer/carrier. The original of this form shall be sent to the Industrial Commission at the address below.

MAIL TO:   **NCIC - CLAIMS SECTION**
**4335 MAIL SERVICE CENTER**
FORM 61                                    **RALEIGH, NC 27699-4335**
10/2006                                     **TELEPHONE: (919) 807-2502**
PAGE 1 OF 1          **FORM 61**     **HELPLINE: (800) 688-8349**
**WEBSITE: HTTP://WWW.IC.NC.GOV/**

Betty Whitley Bell v. Fieldcrest Cannon, Inc./Pillowtex Corp.
I.C. File No. 15-755738

Form 61 Attachment

The North Carolina Self-Insurance Security Association (hereinafter "Security Association") DENIES this claim for the following reasons:

The Security Association is statutorily obligated to pay the "covered claims" of its member self-insurers that are left unpaid as a result of the member's insolvency. N.C. Gen. Stat. § 97-133(a)(4) (2003). A "covered claim" is "an unpaid claim against an insolvent self-insurer that relates to an injury that occurs *while the self-insurer is a member of the Association*..." N.C. Gen. Stat. § 97-130(4). The Security Association is required by law to deny payment of all claims that are not "covered claims." N.C. Gen. Stat. § 97-133(a)(7). Employer was a member self-insurer of the Association from October 1, 1986 to December 19, 1997.

Investigation of this claim is incomplete and the Security Association is unable to ascertain from the information presently available that Employee has a compensable occupational disease or is disabled from a compensable occupational disease.

The Security Association denies that Employee had the requisite exposure to asbestos and/or asbestos-containing materials such as to have caused any occupational disease and denies that Employee has any disability related to her alleged exposure to asbestos and/or asbestos-containing materials.

The Security Association denies that Employee developed mesothelioma as a result of alleged exposure to asbestos and/or asbestos-containing materials while employed by Employer and/or while Employer was a member self-insurer of the Security Association.

This claim may be barred by N.C. Gen. Stat. § 97-57. The Security Association denies that Employee was last injuriously exposed to asbestos and/or asbestos-containing materials during her employment with Employer and/or that Employee sustained any last injurious exposure that would give rise to a "covered claim" for the Security Association.

This claim may also be barred by the applicable statute of limitations, pursuant to N.C. Gen. Stat. § 97-58 and/or N.C. Gen. Stat. § 97-22.

The Security Association reserves the right to assert additional defenses of which it may become aware as the investigation of this claim continues.

JA1349

# EXHIBIT 4

JA1350

North Carolina Industrial Commission

# *DENIAL OF WORKERS' COMPENSATION CLAIM*
## *(G.S. § 97-18(c) AND G.S. § 97-18(d))*

IC File # 19-732863

Emp. Code # _____

Carrier Code # 999-098

Carrier File # _____

The Use of This Form is Required Under the Provisions of the Workers' Compensation Act     Employer FEIN _____

| Betty Whitley Bell | | | | Pillowtex Corp./Fieldcrest Cannon, Inc. | | | |
|---|---|---|---|---|---|---|---|
| Employee's Name | | | | Employer's Name | | | (   )   - |
| 6252 Irish Potato Road | | | | Insolvent Self-Insured Employer | | | Telephone Number |
| Address | | | | Employer's Address | City | State | Zip |
| Rockwell | | NC | 28138 | North Carolina Self-Insurance Security Association | | | |
| City | | State | Zip | Insurance Carrier | | Policy Number | |
| (704)239 ,0798 | | (   )   - | | c/o Stuart Law Firm, PLLC, 1033 Wade Avenue, Suite 202, Raleigh, NC 27605 | | | |
| Home Telephone | | Work Telephone | | Carrier's Address | City | State | Zip |
| XXX-XX- 2176 | ☐ M ☒ F | ▓▓ 1949 | | (919)787 ,5050 | (919,787 ,9988 | | |
| Last 4 Digits of SSN | Sex | Date of Birth | | Carrier's Telephone Number | Fax Number | | |
| Date of Injury: | | | | | | | |

## TO EMPLOYEE (TO DEPENDENT(S) OR NEXT OF KIN IN CASE OF DEATH):

This is to inform you that the claim for the ☐ injury on _____, or
☐ occupational disease as of _____, or
☒ death on 6-3-17

is **DENIED** for the following reasons:

See attached.

| | Attorney | 7   17   2019 |
|---|---|---|
| SIGNATURE EMPLOYER OR CARRIER/ADMINISTRATOR | TITLE | DATE |

Employer/Insurance Carrier must provide a detailed statement of the grounds for denying compensability of the claim or liability for the claim where payments have previously been made without prejudice under N.C. Gen. Stat. § 97-18(d). Failure to specify a particular ground may preclude  asserting certain defenses at a later date pursuant to N.C. Gen. Stat. § 97-18(f).

Employee: If you disagree with this denial, you are entitled to request a hearing by submitting a Form 33. If you need assistance you may contact the Industrial Commission at the address below or telephone the Industrial Commission at (800) 688-8349.

Employer: A copy of this form shall be sent to the employee and employee's attorney of record, if any, and all known health care providers which have submitted bills to the employer/carrier. The original of this form shall be sent to the Industrial Commission at the address below.

FORM 61
02/2017
PAGE 1 OF 1

# FORM 61

*FILE VIA ELECTRONIC DOCUMENT FILING PORTAL*
*HTTP://WWW.IC.NC.GOV/DOCFILING.HTML*

*CONTACT INFORMATION:*
*NCIC-CLAIMS ADMINISTRATION*
*TELEPHONE: (919) 807-2502*
*HELPLINE: (800) 688-8349*
*WEBSITE: HTTP://WWW.IC.NC.GOV*

Bell WC Death Benefits Claim026

Betty Whitley Bell v. Fieldcrest Cannon, Inc./Pillowtex Corp. et al.
I.C. File No. 19-732863

### Form 61 Attachment

The North Carolina Self-Insurance Security Association (hereinafter "Security Association") DENIES this claim for the following reasons:

The Security Association is statutorily obligated to pay the "covered claims" of its member self-insurers that are left unpaid as a result of the member's insolvency. N.C. Gen. Stat. § 97-133(a)(4) (2003). A "covered claim" is "an unpaid claim against an insolvent self-insurer that relates to an injury that occurs *while the self-insurer is a member of the Association...*" N.C. Gen. Stat. § 97-130(4). The Security Association is required by law to deny payment of all claims that are not "covered claims." N.C. Gen. Stat. § 97-133(a)(7). Employer was a member self-insurer of the Association from October 1, 1986 to December 19, 1997.

Investigation of this claim is incomplete and the Security Association is unable to ascertain from the information presently available that Employee had a compensable occupational disease or was disabled from a compensable occupational disease.

The Security Association denies that Employee had the requisite exposure to asbestos and/or asbestos-containing materials such as to have caused any occupational disease and/or death and denies that Employee had any disability related to his alleged exposure to asbestos and/or asbestos-containing materials.

This claim may be barred by N.C. Gen. Stat. § 97-57. The Security Association denies that Employee was last injuriously exposed to asbestos and/or asbestos-containing materials during his employment with Employer-Defendant and/or that Employee sustained any last injurious exposure that would give rise to a "covered claim" for the Security Association.

This claim may also be barred by the applicable statute of limitations, pursuant to N.C. Gen. Stat. § 97-58 and/or N.C. Gen. Stat. § 97-22.

The Security Association reserves the right to assert additional defenses of which it may become aware as the investigation of this claim continues.

Bell WC Death Benefits Claim027

JA1352

# EXHIBIT 5

**JA1353**

**North Carolina Industrial Commission**

IC File # 19-732863

# DENIAL OF WORKERS' COMPENSATION CLAIM
## (G.S. §97-18 (c) AND G.S. §97-18 (d))

Emp. Code #_____

Carrier Code #_____

Carrier File #7A555409288752

The Use Of This Form Is Required Under The Provisions of The Workers' Compensation Act

Employer FEIN_____

| | | | |
|---|---|---|---|
| Betty Whitley Bell (dec) | | Hoechst Celanese | |
| Employee's Name | | Employer's Name | Telephone Number |
| 6252 Irish Potato Road | | | |
| Address | | Employer's Address | City     State     Zip |
| Rockwell, NC 28138 | | ESIS | |
| City     State     Zip | | Insurance Carrier | Policy Number |
| 704-239-0798 | | PO Box 6560 Scranton, PA | |
| Home Telephone | Work Telephone | Carrier's Address | City     State     Zip |
| xxx-xx-2176     F | ▮/1949 | 804-346-3628 | 800-884-7975 |
| Social Security Number     Sex | Date of Birth | Carrier's Telephone Number | Fax Number |
| Date of Injury:     06/03/2017 (death) | | | |

## TO EMPLOYEE (TO DEPENDENTS(S) OR NEXT OF KIN IN CASE OF DEATH):

This is to inform you that the claim for the   ☐ injury _____, or
                                               ☐ occupational disease as _____, or
                                               ☒ death 06/03/2017 _____

Is **DENIED** for the following reasons:

Defendants deny that Employee's death was the result of a compensable occupational disease for lack of sufficient information and belief. The claim may be barred under N.C.G.S. 97-22, 97-24, 97-38, and 97-58 and/or any other applicable statutes/case law. Defendants reserve all other rights under the N.C. Workers' Compensation Act, including but not limited to the right to assert any credits or liens. Defendants reserve all other potential defenses pending further investigation and discovery.

_signature_

SIGNATURE EMPLOYER OR CARRIER/ADMINISTRATOR                    Attorney for Defendants                    7/23/2019

                                                               TITLE                                       DATE

Employer/Insurance Carrier must provide a detailed statement of the grounds for denying compensability of the claim or liability for the claim where payments have previously been made without prejudice under N.C. Gen. Stat. § 97-18(d). Failure to specify a particular ground may preclude asserting certain defenses at a later date pursuant to N.C. Gen. Stat. § 97-18(f).

Employee: If you disagree with this denial, you are entitled to request a hearing by submitting a Form 33. If you need assistance you may contact the Industrial Commission at the address below or telephone the Industrial Commission at (800) 688-8349.

Employer: A copy of this form shall be sent to the employee and employee's attorney of record, if any, and all known health care providers which have submitted bills to the employer/carrier. The original of this form shall be sent to the Industrial Commission at the address below.

MAIL TO:   NCIC – CLAIMS SECTION
           4335 MAIL SERVICE CENTER
FORM 61                                        **FORM 61**          RALEIGH, NC 27699-4335
10/2006                                                             TELEPHONE: (919) 807-2502
PAGE 1 OF 1                                                         OMBUDSMAN: (800) 688-8349

4851-9586-4477, v. 1

Bell WC Death Benefits Claim037

# Exhibit 8

# EXHIBIT A

15-755738
IC File #

North Carolina Industrial Commission          **MESOTHELIOMA**

## CLAIM BY EMPLOYEE, REPRESENTATIVE, OR DEPENDENT

Emp. Code # 08392370

## FOR BENEFITS FOR LUNG DISEASE

Carrier Code # 999-098

*INCLUDING ASBESTOSIS, SILICOSIS, AND BYSSINOSIS (G.S. 97-53)*

Employer FEIN

The Use Of This Form Is Required Under The Provisions Of The Workers' The Compensation Act

| Betty Whitley Bell | | | | Female | | /1949 |
|---|---|---|---|---|---|---|
| Employee's Name | | | Social Security Number | | Sex | Date of Birth |
| Address | | | If Employee is deceased, list Personal Representative | | | |
| Rockwell | NC | 28138 | Lloyd Bell | | | |
| City | State | Zip | Spouse's Name | | | |
| 704-239-0798 | | | William M. Graham, NC State Bar No.: 17972 | | | |
| Employee's Home Telephone | Work Telephone | | Name of Attorney if represented | | | |

### PRINT OR TYPE ALL ANSWERS

Notice is hereby given, as required by law, that the above-named employee sustained an occupational disease caused by
exposure to: cotton dust; silica ☐ asbestos ☒; or other substance ☐ and, if known, state substance:
Date of diagnosis:   7-20-15       By:  Dr.  Duke University Medical Center   Attach diagnosing medical records.

### Employer-Defendants
Attach additional pages if necessary

| | | | | 1967 to 1968 and |
|---|---|---|---|---|
| Employer Name:  Hoechst Celanese Corporation | Telephone: | Dates of Employment | 1970 to 1972 |
| Address:  Salisbury, NC | | Location of Job(s)  Salisbury, NC | |
| EC# 00906690  999-005 | State   Zip | | |

City

| Pillowtex   Corporation   f/k/a |
|---|
| Fieldcrest   Cannon,   Inc.   f/k/a |
| Employer Name:   Cannon Mills | Telephone: | Dates of Employment   1972 to 1992 |
| Address:   Salisbury, NC | | Location of Job(s)   Salisbury, NC Plant #16 |
| City | State   Zip   999-098 | |

Fieldcrest Cannon Inc EC# 21502270
Cannon Mills EC# 21501720  999-098
**IT IS REQUIRED THAT BOTH PAGES OF THIS FORM BE COMPLETED IN ORDER TO PROCESS THIS CLAIM**
Pillowtex  EC# 08392370  999-098
MAIL TO:

FORM 18B
2/01
PAGE 1 OF 4

**FORM 18B**

**NCIC – CLAIMS SECTION**
**4335 MAIL SERVICE CENTER**
**RALEIGH, North Carolina 27699-4335**
**MAIN TELEPHONE: (919) 807-2500**
**OMBUDSMAN: (800) 688-8349**

Received

SEP 08 2015

NC Industrial Commission

**BELL WC 00008**

Employment History, Beginning With Most Recent Employment (Attach additional pages if necessary)

| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
|---|---|---|---|
| Home Care | 1/2015 | Nursing care | Assisted elderly lady |
| | 8/2015 | | |
| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
| Philip Morris USA Inc. | 1996 | Tobacco manufacturer | Packing machine operator / Production Tech III. |
| | 2009 | | |
| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
| Food Lion, LLC | 1974; 1992 | Grocery store | Expense payable clerk |
| | 1996 | | |
| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
| Pillowtex Corporation f/k/a Fieldcrest Cannon, Inc. f/ka Cannon Mills | 1972 | Textiles | Weaver, spinner, shipping/receiving, yard crew, office, cloth room, nonsalary foreman. |
| | 1992 | | |

If you were exposed to the listed substance(s) while working for this employer, describe in detail the exposures:

Plaintiff was exposed to the hazards of asbestos-containing products while employed by this employer. Plaintiff will describe said exposure in detail in discovery with this defendant.

| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
|---|---|---|---|
| Wal-Mart | 1972 | Department store | Appliances, shipping, office, automotive dept. |
| | 1974 | | |

If you were exposed to the listed substance(s) while working for this employer, describe in detail the exposures:

| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
|---|---|---|---|
| Doctor's office | 1970 | Doctor's office | Medical assistant |
| | 1972 | | |
| Employer | From/To: | Employer's Type of Business | Employee's Job Title |
| Fiber Industries Inc. a/k/a Hoechst Celanese Corporation | 1967 to 1968; 1970 | Polyester textiles | Beaming, draw twist |
| | 1972 | | |

If you were exposed to the listed substance(s) while working for this employer, describe in detail the exposures:

Plaintiff was exposed to the hazards of asbestos-containing products while employed by this employer. Plaintiff will describe said exposure in detail in discovery with this defendant.

FORM 18B
5/02
PAGE 2 OF 4

**FORM 18B**

*NCIC – CLAIMS SECTION*
*4335 MAIL SERVICE CENTER*
*RALEIGH, NC 27699-4335*
*MAIN TELEPHONE: (919) 807-2500*
*OMBUDSMAN: (800) 688-8349*

Received
SEP 08 2015
NC Industrial Commission

BELL WC 00009

List the names and addresses of all family physicians, treating physicians and hospitals that have provided medical services or treatment to you over a 20 year period prior to the filing of this claim.

| Year | Name | Address (City) | Purpose for which treated (if known) |
|------|------|----------------|--------------------------------------|
| | Duke University Medical Center | Durham, NC | mesothelioma |
| | Carolinas Medical Center - NE | Concord, NC | mesothelioma |
| | Levine Cancer Institute/Dr. Thomas Steffens | Concord, NC | mesothelioma |
| | Dr. Brian McCollough/Cabarrus Family Practice | Concord, NC | Family physician |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

MAIL TO:

FORM 18B
5/02
PAGE 3 OF 4

**FORM 18B**

*NCIC – CLAIMS SECTION*
*4335 MAIL SERVICE CENTER*
*RALEIGH, NC 27699-4335*
*MAIN TELEPHONE: (919) 807-2500*
*OMBUDSMAN: (800) 688-8349*

**BELL WC 00010**

I hereby authorize the above named medical sources to disclose medical records (including images such as x-rays, CT scans, MRIs, sonograms, etc) regarding my treatment, hospitalization, and/or outpatient care for any condition during the period(s) identified above to all parties (including insurance companies) or State agencies that may review my application for compensation. I also hereby authorize that a photocopy of this authorization be accepted with the same authority as this original. The information disclosed will be used in connection with my claim for benefits under the Workers' Compensation Act.

I understand this authorization will automatically expire when my application for benefits is finally decided.

| | (704) 633-5244 |
|---|---|
| Signature of (Check One) ☐ Employee, ☐ Attorney, ☐ Representative, or ☐ Dependent | Telephone Number |

Salisbury, North Carolina 28144

Address                                                City          State          Zip                Date Completed

Employee should return original of this form to the Industrial Commission, furnish his/her employer with one signed copy, and retain a copy.

**MAIL TO:**

FORM 18B
5/02
PAGE 4 OF 4

**FORM 18B**

*NCIC – CLAIMS SECTION*
*4335 MAIL SERVICE CENTER*
*RALEIGH, NC 27699-4335*
*MAIN TELEPHONE: (919) 807-2500*
*OMBUDSMAN: (800) 688-8349*

**BELL WC 00011**

# Exhibit 9

# EXHIBIT 7

## NORTH CAROLINA INDUSTRIAL COMMISSION

**I. C. No. 19-732863, LLOYD CLIFFORD BELL, Spouse and Sole Dependent of BETTY WHITLEY BELL, Deceased-Employee, v. HOECHST CELANESE CORPORATION AND PILLOWTEX CORPORATION, f/k/a FIELDCREST CANNON f/k/a CANNON MILLS, Employer-Defendants and ESIS AND NORTH CAROLINA SELF INSURANCE SECURITY ASSOCIATION, Carrier-Defendants.**

### DEFENDANTS' RESPONSE TO MOTION TO DISMISS

NOW COME Defendants, Hoechst Celanese Corporation and ESIS/Amour Risk, by and through counsel and pursuant to Rule 609 of the Workers' Compensation Rules of the North Carolina Industrial Commission in response to Plaintiff's Motion to Dismiss. In support of their response, Defendants show unto the Commission the following:

1.     On or about April 25, 2019, Plaintiff's attorney filed a Form 18B *Claim by Employee, Representative, or Dependent for Benefits for Lung Disease*, alleging the decedent died as a result of his work-related exposure to asbestos. (***Please see attached Exhibit 1***).

2.     On the Form 18B, Plaintiff named two Defendant-Employers. It was alleged the decedent had exposure to asbestos containing materials with Hoechst Celanese from 1967 to 1968 and from 1972-1973. It was also alleged the decedent had exposure to asbestos-containing materials with Pillowtex Corporation f/k/a Fieldcrest Cannon, Inc. f/k/a Cannon Mills from 1969 and from 1976 – 1995. It was noted the decedent worked for Pillowtex Corporation at the Salisbury Plant. (***Please see attached Exhibit 1 and 2***).

3.     Plaintiff provides no insight as to why he is now arbitrarily dismissing Pillowtex Corporation and the N.C. Self-Insurance Security Association from this claim, when the decedent alleged asbestos exposure with this employer after his employment ended with Hoechst Celanese. Pillowtex has the potential to be the last injurious employer in this claim. The decedent treated with Dr. Thomas D'Amico on 7/7/15. At that time, she was given a lung examination and she discussed her history of possible exposures. It was noted she was never a smoker, but she worked for Phillip Morris Tobacco for 12 years and had a significant second hand smoke exposure history. She also worked in a cotton mill and in the fiber industry for many years starting in the 1960's. Upon information and belief, the cotton mill work referred to is her work at Pillowtex, since she did work there for many years after her time with Hoechst Celanese. (***Please see attached Exhibit 3***).

4.     Further, there is case law where other employees have filed occupational claims alleging asbestos exposure against Pillowtex Corporation f/k/a Fieldcrest Cannon, Inc. f/k/a Cannon Mills. In *Ketchie v. Fieldcrest Cannon, Inc.,* 243 N.C. App. 324, 777 S.E.2d 129 (2015), it was noted there were *15* other similar employees who alleged asbestos exposure while working at this company. In *Mullinax v. Fieldcrest Cannon, Inc.,* 100 N.C.App. 248, 395 S.E.2d 160 (1990), the parties agreed to resolve an occupational disease claim involving asbestos exposure, but then one of the parties later tried to back out of the agreement. But, still this is an example of a case that involved potential asbestos exposure.

4818-3507-9856, v. 2

Bell WC Death Benefits Claim057

5.    Pursuant to N.C.G.S. §97-57, when compensation is payable for an occupational disease, "the employer in whose employment the employee was last injuriously exposed to the hazards of such disease, and the insurance carrier, if any, which was on the risk when the employee was so last exposed under such employer, shall be liable."

6.    The Decedent performed work at Pillowtex Corporation f/k/a Fieldcrest Cannon, Inc. f/k/a Cannon Mills from 1969 and from 1976 – 1995.  If the decedent was exposed to asbestos at all with Fieldcrest, her last injurious exposure could have occurred at any point during her employment at Pillowtex Corporation.

7.    These Defendants contend Pillowtex Corporation is a necessary party and cannot be dismissed form the claim. The determination of when and where Plaintiff was last injuriously exposed to asbestos must be determined only after a full evidentiary hearing and requires both lay and expert testimony.

WHEREFORE, based upon the aforementioned, Defendants respectfully request that the Commission enter an Order denying Plaintiff's Motion to Dismiss Pillowtex Corporation from this matter without prejudice.

This the ___8___ day of January, 2020.

CRANFILL SUMNER & HARTZOG LLP

BY: _____
JERRI J. SIMMONS
State Bar No. 41594
Attorneys for Defendants
Post Office Box 30787
Charlotte, North Carolina 28230
Telephone:  (704) 332-8300

4818-3507-9856, v. 2

Bell WC Death Benefits Claim058

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the attached DEFENDANTS' RESPONSE TO MOTION TO DISMISS on all of the parties to this cause by:

_____  Hand delivering a copy hereof to the attorney for each said party addressed as follows:

_____  Depositing a copy hereof, postage prepaid, in the United States Mail, addressed to the attorney for each said party as follows:

_____  Depositing a copy hereof with a nationally recognized overnight courier service, for overnight delivery, addressed to the attorney for each said party as follows:

_____  Telecopying a copy hereof to the attorney for each said party as follows:

__X__  Electronically transmitting a copy hereof to the attorney for each said party as follows:

Edward Pauley
Wallace and Graham, PA
epauley@wallacegraham.com

Stephen Dimmick
Via email: sdimmick@stuartlawfirm.com

This the _____ day of January, 2020.

_____
CRANFILL SUMNER & HARTZOG LLP

4818-3507-9856, v. 2

Bell WC Death Benefits Claim059

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the attached DEFENDANTS' RESPONSE TO MOTION TO DISMISS on all of the parties to this cause by:

_____ Hand delivering a copy hereof to the attorney for each said party addressed as follows:

_____ Depositing a copy hereof, postage prepaid, in the United States Mail, addressed to the attorney for each said party as follows:

_____ Depositing a copy hereof with a nationally recognized overnight courier service, for overnight delivery, addressed to the attorney for each said party as follows:

_____ Telecopying a copy hereof to the attorney for each said party as follows:

__X__ Electronically transmitting a copy hereof to the attorney for each said party as follows:

Edward Pauley
Wallace and Graham, PA
epauley@wallacegraham.com

Stephen Dimmick
Via email: sdimmick@stuartlawfirm.com

This the ____ day of January, 2020.

_____
CRANFILL SUMNER & HARTZOG LLP

4818-3507-9856, v. 2

Bell WC Death Benefits Claim060

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES

Case No. 4:22mc1

## ORDER

Pending before the Court are a Motion to Quash (ECF No. 1) filed by Peninsula Pathology Associates ("PPA"), Magistrate Judge Douglas E. Miller's Order granting the Motion to Quash (ECF No. 11) (the "Order"), and Objections to the Magistrate Judge's Order (ECF No. 17) (the "Objections") filed by American International Industries ("AII"). In addition, AII filed a memorandum in support of its Objections, PPA filed a response, and AII filed a reply. Mem. Supp., ECF No. 18; Resp., ECF No. 20; Reply, ECF No. 21.

AII objects to the Magistrate Judge's Order pursuant to Federal Rule of Civil Procedure 72(a), Local Civil Rule 72, and 28 U.S.C. § 636(b)(1). Mem. Supp. at 1, ECF No. 18. AII argues that the Order is "clearly erroneous and contrary to law" and should therefore be set aside and/or modified by this Court. *See id.* at 3–5; *see also* Fed. R. Civ. P. 72(a) (stating "clearly erroneous or . . . contrary to law" standard). For the reasons set forth below, however, the Court finds that the Order is neither clearly erroneous nor contrary to law. Therefore, the Objections (ECF No. 17) will be **OVER-RULED**, and the Order (ECF No. 11) will be **AFFIRMED**.

JA1367

The parties are familiar with the relevant facts, and these are also set out in the Order, along with the law applicable to the Motion to Quash. *See* Order at 1–4, ECF No. 11; *see also* Tr., Dec. 16, 2022 Hr'g ("Tr."), ECF No. 10. The Court therefore pretermits a detailed factual background for purposes of resolving the Objections.

As noted, AII objects to the Order under Rule 72(a), which directs the Court to "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). A finding is "clearly erroneous" only "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Bate Land & Timber LLC*, 877 F.3d 188, 198 (4th Cir. 2017) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The clearly erroneous "standard is a demanding one." *Id.*; *accord U.S. S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 243–44 (4th Cir. 2009) (describing necessary level of error as "egregious"). A ruling is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *United Mktg. Sols., Inc. v. Fowler*, No. 1:09cv1392, 2011 WL 837112, at *2 (E.D. Va. Mar. 2, 2011). In addition, a magistrate judge's rulings on discovery matters in particular are entitled to "great deference." *Malibu Media, LLC v. John Does 1–23*, 878 F. Supp. 2d 628, 629 (E.D. Va. 2012) (quoting *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 470 (E.D. Va. 2010)).

Here, AII makes no argument that the Magistrate Judge's ruling was "contrary to law." Rather, it argues that two aspects of the Order were clearly erroneous: the conclusion that the subpoenaed materials were only "minimally relevant" to AII's

defense in the *Gref* litigation, Order at 5, ECF No. 11, and the conclusion that AII's subpoena imposed an "undue burden" on PPA, *id.* at 7. *See* Mem. Supp. at 11, 15, ECF No. 18.

The Court has reviewed the briefing on the Motion to Quash, the associated exhibits, the hearing transcript, and the Order, along with the briefing on the Objections and the associated exhibits, and has carefully considered the arguments made by AII in its Objections. Upon doing so, the Court is not left with a "definite and firm conviction that a mistake has been committed." *In re Bate Land & Timber LLC*, 877 F.3d at 198.

First, the Magistrate Judge's conclusion regarding the minimal relevance of the information sought by AII to the *Gref* litigation was based on a reasonable view of the evidence, including his views that neither PPA nor Dr. Emory are involved in the *Gref* litigation and that AII has significant alternative bases to satisfy its needs for impeachment material in that litigation. *See* Order at 5–6, ECF No. 11. The Court is satisfied on the entire evidence that no clear error occurred with regard to this determination.

Second, with regard to the undue burden placed on PPA, AII relies heavily on its narrowed offer at the hearing to request only the names of the participants in the Article and underlying study at issue in the subpoena. *See* Mem. Supp. at 15–17, ECF No. 18; Reply at 14–16, ECF No. 21. But even considering this narrowed request, the Court finds no clear error. The Magistrate Judge's conclusion with regard to undue burden was based on a reasonable view of the evidence, including his concern for the

JA1369

medical ethical concerns implicated by the requested disclosure. *See* Order at 7, ECF No. 11; *see also* Resp. at 17–20, ECF No. 20. Moreover, the Magistrate Judge was ultimately required to *balance* the undue burden on PPA against the benefits of the requested discovery to AII. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). Therefore, the Magistrate Judge's finding that the benefit to AII was "minimal[]"—which, as noted above, is not clearly erroneous—mitigates the level of undue burden necessary to tip the balance in favor of PPA, particularly in the context of a third-party subpoena. *See id.* (balancing test is "even more demanding and sensitive" when subpoena recipient is a nonparty). In light of the entire evidence, both with respect to the undue-burden analysis and the overall balancing analysis, the Court has no conviction, let alone a "definite and firm conviction," that the Magistrate Judge committed any error.[1]

For the forgoing reasons, AII's Objections (ECF No. 17) are **OVERRULED**, and the Magistrate Judge's Order (ECF No. 11) is **AFFIRMED**. The Clerk is **REQUESTED** to provide a copy of this Order to all counsel of record and Magistrate Judge Douglas E. Miller.

**IT IS SO ORDERED.**

_____
/s/
Arenda L. Wright Allen
United States District Judge

August 14, 2023
Norfolk, Virginia

---

[1] AII also at some level appears to object to the Magistrate Judge's conclusion that as-yet-undetermined sanctions are warranted under Rule 45(d)(1). *See* Mem. Supp. at 5, ECF No. 18; Reply at 19, ECF No. 21; *see also* Order at 7–8, ECF No. 11. To the extent that AII raises such an objection to the conclusion that sanctions are warranted, the Court finds no clear error, and the objection is overruled.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| IN RE SUBPOENA FOR DOCUMENTS ISSUED TO PENINSULA PATHOLOGY ASSOCIATES, | Case No. 4:22-mc-00001<br><br>Related Case: S.D.N.Y.: 1:20-CV-05589-GBD |

## AMERICAN INTERNATIONAL INDUSTRIES' NOTICE OF APPEAL

American International Industries appeals to the United States Court of Appeals for the Fourth Circuit from the Order entered August 14, 2023 (ECF No. 24), wherein the District Court affirmed the Magistrate Judge's Order (ECF No. 11) granting Peninsula Pathology Associates' motion to quash American International Industries' third-party subpoena to Peninsula Pathology Associates issued in *Gref v. American International Industries, et al.*, 1:20-cv-5589 (S.D.N.Y.).

Dated: September 13, 2023

Respectfully submitted,

**AMERICAN INTERNATIONAL INDUSTRIES**
*By Counsel*

*/s/ Sylvia Macon Kastens*
Benjamin L. Hatch (VSB No. 70116)
Sylvia Macon Kastens (VSB No. 92375)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3700
Facsimile: (757) 640-3701
E-mail: bhatch@mcguirewoods.com
skastens@mcguirewoods.com

Eric D. Cook (VSB No. 68054)
WILLCOX SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23150
Telephone: (757) 628-5500
Facsimile: (757) 628-5566

E-Mail:  ecook@wilsav.com

Robert E. Thackston (VSB No. 27385)
LATHROP GPM LLP
2101 Cedar Springs Road, Suite 1400
Dallas, TX 75201-2134
Telephone:  (469) 983-6100
E-Mail:  robert.thackston@lathropgpm.com

*Counsel for American International Industries*

**JA1372**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 13th day of September, 2023, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

*/s/ Sylvia Macon Kastens*

**JA1373**

# Corrected Exhibit G
## to Opposition to Motion to Quash (R.4-7):

Excerpts of October 6, 2021 Trial Transcript, *Johnson v. Johnson & Johnson*, No. JCCP 4676/20STCV17335 (Cal. Super. Ct.)

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              FOR THE COUNTY OF LOS ANGELES
 3    DEPARTMENT 4         HON. STEPHEN M. MOLONEY, JUDGE
 4
    COORDINATED PROCEEDING SPECIAL TITLE  )
 5  (RULE 3.550)                          )
                                          )
 6  LAOSD ASBESTOS CASES                  )
    _____)
 7                                        )
                                          )CASE NO.:
 8  SHAWN JOHNSON, AN INDIVIDUAL; HOLLY   )
    JOHNSON, AN INDIVIDUAL,               )JCCP 4674/20STCV17335
 9                                        )
                                          )
10            PLAINTIFFS,                 )
                                          )
11     VS.                                )
                                          )
12  JOHNSON & JOHNSON; JOHNSON & JOHNSON  )
    CONSUMER INC., A SUBSIDIARY OF        )
13  JOHNSON & JOHNSON; ALBERTSONS         )
    COMPANIES, INC., INDIVIDUALLY AND AS  )
14  SUCCESSOR IN INTEREST TO SAV-ON DRUG  )
    STORES, INC.; COSTCO WHOLESALE        )
15  CORPORATION; RALPHS GROCERY COMPANY;  )
    THRIFTY PAYLESS, INC., DBA RITE AID   )
16  PHARMACY; WALMART, INC. AND DOES 1    )
    THROUGH 400, INCLUSIVE,               )
17                                        )
              DEFENDANTS.                 )
18  _____)
19
20         REPORTER'S TRANSCRIPT OF PROCEEDINGS
21            WEDNESDAY, OCTOBER 6, 2021
22                    DAY 36
23            (PAGES 10801 TO 11014)
24
25     (APPEARANCES ON NEXT PAGE)
26
27
    REPORTED BY:  DAYNA HESTER, C.S.R. 9970
28         OFFICIAL REPORTER PRO TEMPORE
```

10865

1          GRASPING AT STRAWS, THROWING ANYTHING ON THE

2     WALL, SEEING WHAT STICKS, HOPING SOMETHING STICKS,

3     HOPING ONE OF YOU WILL BITE AT THIS FAKE, FABRICATED

4     NON-SCIENTIFIC DEFENSE.

5          DON'T DO IT, LADIES AND GENTLEMEN.

6          YOU HEARD DR. MOLINE EXPLAIN THE CONCEPT OF

7     INDIVIDUAL SUSCEPTIBILITY TO YOU.  SOMETHING ABOUT OUR

8     INTERNAL MAKEUP MAKES US MORE SUSCEPTIBLE TO CERTAIN

9     TOXINS.

10         SOMETHING INTERNALLY TO MR. JOHNSON HAS MADE

11    HIM MORE SUSCEPTIBLE THAN THE REST OF THE WORLD TO THE

12    ASBESTOS IN JOHNSON'S BABY POWDER.

13         AND JUST BECAUSE HE IS MORE SUSCEPTIBLE,

14    DOESN'T MEAN HE DOESN'T WIN THIS CASE.

15         JOHNSON & JOHNSON, WHEN THEY SELL THIS

16    PRODUCT, THEY HAVE TO MAKE IT SAFE FOR EVERYONE.  AND

17    THAT'S -- THAT'S WHY YOU GET THIS CHARGE, LADIES AND

18    GENTLEMEN.  THAT'S WHY THIS WAS READ TO YOU.

19         I ASKED DR. MOLINE.  REMEMBER, DR. MOLINE HAD

20    A FOUR-STEP PROCESS THAT SHE UTILIZED IN ASSESSING

21    WHETHER MR. JOHNSON'S EXPOSURES TO ASBESTOS FROM

22    JOHNSON'S BABY POWDER CAUSED HIS DISEASE.  AND SHE

23    TALKED ABOUT THE FOUR STEPS THAT SHE WENT THROUGH.

24         AND SHE ARRIVED AT HER CONCLUSION, WHICH WAS

25    BASED UPON SCIENCE, PEER-REVIEWED PUBLICATIONS, HER OWN

26    WRITINGS, HER OWN CASE SERIES.

27         REMEMBER THE MOLINE CASE SERIES, THE EMORY

28    CASE SERIES.  OVER A HUNDRED PEOPLE EXPOSED TO COSMETIC

10866

1    TALC GETTING MESOTHELIOMA.

2            HOW MANY PEOPLE HAVE TO DIE OF MESOTHELIOMA

3    BEFORE THIS COMPANY WILL SAY, "OKAY.  ENOUGH'S ENOUGH.

4    WE ADMIT IT WE DID IT"?

5            THE CRAZY THING IN OUR SOCIETY, EVEN IF YOU'RE

6    GUILTY, YOU CAN COME INTO COURT AND REQUIRE THE OTHER

7    SIDE TO PROVE IT.

8            THAT'S WHAT JOHNSON & JOHNSON DID.  THEY CAME

9    INTO THIS COURTROOM KNOWING THAT THEY WERE LIABLE,

10   KNOWING THAT THEY WERE GUILTY, AND THEY SAID, "HEY,

11   PLAINTIFF PROVE IT."

12           AND THAT'S WHAT WE'VE DONE OVER THE LAST

13   36 DAYS.  AND I KNOW IT'S BEEN EXHAUSTING.  IT'S BEEN

14   EXHAUSTING FOR ME AND MY TEAM.

15           I KNOW AT TIMES IT'S BEEN FRUSTRATING FOR YOU

16   AS JURORS.  I KNOW IT'S BEEN HARD TO GET HERE EVERY

17   DAY.  I KNOW SOMETIMES IT'S HARD TO PAY ATTENTION.

18           BUT IT'S THAT IMPORTANT.

19           THE LAST 36 DAYS, WE SAID TO THEM, "ALL RIGHT.

20   YOU WANT US TO PROVE IT?  THAT'S EXACTLY WHAT WE'RE

21   GOING TO DO."

22           AND THAT'S EXACTLY WHAT WE DID, LADIES AND

23   GENTLEMEN.

24           AND DR. MOLINE TELLS YOU HIS EXPOSURES FROM

25   1964 TO 1978.  THOSE EXPOSURES ALONE CAUSED HIS

26   DISEASE, INCREASED HIS RISK OF MESOTHELIOMA.

27           SHE TELLS YOU, "ALL RIGHT.  IF YOU JUST LOOK

28   AT 1985 THROUGH 2019, THAT EXPOSURE PERIOD ALONE

## CERTIFICATE OF SERVICE

This is to certify that I have this December 20, 2023, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all registered counsel.

*/S/ Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Appellant American International Industries*