**No. 23-1972**

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

PENINSULA PATHOLOGY ASSOCIATES,

*Petitioner-Appellee,*

v.

AMERICAN INTERNATIONAL INDUSTRIES,

*Respondent-Appellant.*

———————————

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 4:22-mc-00001-AWA-DEM
Hon. Arenda L. Wright Allen, U.S. District Court Judge

———————————

## REPLY BRIEF FOR APPELLANT

———————————

Robert E. Thackston
NELSON MULLINS RILEY
& SCARBOROUGH LLP
3333 Lee Parkway
Suite 740
Dallas, TX 75219
(469) 983-6100
robert.thackston@
nelsonmullins.com

Benjamin L. Hatch
Sylvia Macon Kastens
MCGUIREWOODS, LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
(757) 640-3700
bhatch@mcguirewoods.com

*Counsel for Appellant American International Industries*

March 4, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 4

I.     PPA's Status As A "Non-Party" Does Not Meaningfully Change The Analysis Here. ........................................... 6

II.    The List Of Case Names Is Highly Relevant To *Gref*. .................. 8

       A.     That asbestos causes mesothelioma is beside the point. ................................................................... 11

       B.     PPA's proposed ways for A-I-I to defend itself without the data A-I-I seeks would be ineffective. ............... 13

       C.     There is little reason to depose Dr. Moline and Dr. Finkelstein on a topic about which they have no knowledge. ............................................................ 15

       D.     Any "peer review" did not confirm accuracy of underlying case facts and is irrelevant. ...................... 16

       E.     The timing of A-I-I's subpoena has no bearing on its relevance. ........................................................... 17

       F.     The caselaw supports permitting discovery here. ............ 18

III.   The Subpoena Imposes No Burden On PPA. ................................ 20

       A.     No confidentiality interests are implicated. ................... 21

       B.     The speculative risk of "chilling" research is no basis to quash the subpoena. ............................................. 25

       C.     The proper remedy to address any confidentiality concerns is a protective order. ................................... 28

IV.    This Court Should Reject PPA's Proposed Alternative Grounds For Affirmance. ................................................... 30

       A.     A-I-I is not seeking privileged or protected information. ........................................................... 30

       B.     The subpoena was timely. ......................................... 31

CONCLUSION ............................................................................. 33

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Bell v. Am. Int'l Indus.*,
   627 F. Supp. 3d 520 (M.D.N.C. 2022) ...................................... 17, 18, 25

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab.*
   *Litig.*,
   249 F.R.D. 8 (D. Mass. 2008) ............................................................ 19

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
   2013 WL 12170639 (D.N.J. Apr. 3, 2013) .......................................... 24

*Briggs v. Cnty. of Maricopa*,
   2021 WL 1192819 (D. Ariz. Mar. 30, 2021) ...................................... 30

*Buchanan v. Am. Motors Corp.*,
   697 F.2d 151 (6th Cir. 1983) ........................................................ 18, 19

*Cook v. Howard*,
   484 F. App'x 805 (4th Cir. 2012) ...................................................... 29

*DatCard Sys., Inc. v. PacsGear, Inc.*,
   2011 WL 2491515 (D. Minn. Apr. 25, 2011) ........................................ 7

*Deitchman v. E.R. Squibb & Sons, Inc.*,
   740 F.2d 556 (7th Cir. 1984) ........................................................ 19, 29

*Doe v. American Red Cross Blood Services*,
   125 F.R.D. 646, 647, 650, 652-53 (D.S.C. 1989) ................................ 24

*Farnsworth v. Procter & Gamble Co.*,
   758 F.2d 1545 (11th Cir. 1985) .......................................................... 23

*In re Fosamax Prod. Liab. Litig.*,
   2009 WL 2395899 (S.D.N.Y. Aug. 4, 2009) ........................................ 26

*In re: Johnson & Johnson Talcum Powder Prods.*,
   No. 16-md-2738, ECF 29138 (D.N.J. Feb. 29, 2024) ...................... 9, 10

*Kellington v. Bayer Healthcare Pharms., Inc.*,
　2016 WL 5349801 (W.D. Va. Sept. 23, 2016)....................................19

*Kohari v. Jessie*,
　2014 WL 1338558 (S.D. W. Va. Apr. 3, 2014)....................................30

*Laird v. Tatum*,
　408 U.S. 1 (1972)................................................................25

*Lampshire v. Procter & Gamble Co.*,
　94 F.R.D. 58 (N.D. Ga. 1982).....................................................24

*Lanzo v. Cyprus Amax Mins. Co.*,
　2016 WL 11188365 (N.J. Super. Ct. Dec. 22, 2016)..........................22

*Lanzo v. Cyprus Amax Mins. Co.*,
　467 N.J. Super. 476 (App. Div. 2021)..........................................22

*LTL Mgm't LLC v. Emory*,
　No. 23-cv-03649, ECF 1 (D.N.J. July 7, 2023)................................16

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
　2017 WL 1493671 (D. Minn. Apr. 26, 2017).....................................19

*Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*,
　71 F.R.D. 388 (N.D. Cal. 1976)..................................................24

*In re Subpoena to PayPal Holdings, Inc.*,
　2020 WL 3073221 (N.D. Cal. June 10, 2020)......................................7

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
　813 F.2d 1207 (Fed. Cir. 1987)...................................................7

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
　295 F.R.D. 517 (N.D. Fla. 2013)..................................................7

*United States v. Ellis*,
　121 F.3d 908 (4th Cir. 1997).....................................................21

*United States v. Parris*,
　639 F. App'x 923 (4th Cir. 2016)..................................................3

*United States v. Smith,*
   640 F.3d 580 (4th Cir. 2011) ............................................................. 21

*Va. Dep't of Corr. v. Jordan,*
   921 F.3d 180 (4th Cir. 2019) ..................................................... 6, 10, 29

*Wright v. Jeep Corp.,*
   547 F. Supp. 871 (E.D. Mich. 1982) ............................................. 28, 29

## Court Rule

Fed. R. Civ. P. 45 ............................................................... *passim*

## Other

David W. Schnare, *Academic Research Transparency and the
   Importance of Being Earnest*, 49 J.L. & Educ. 1, 5 (2020) ................. 16

John Bohannon, *Science, Who's Afraid of Peer Review*
   (Oct. 4, 2013) ...................................................................... 16

9 Moore's Federal Practice - Civil § 45.51 ............................................... 30

## INTRODUCTION

The decision of the court below rests on multiple clearly erroneous bases, any one of which would warrant reversal.

On relevance, the magistrate judge admitted that he "d[id]n't understand" why A-I-I sought this discovery in *Gref* and said that he perceived "almost no connection between Dr. Emory's study and [*Gref*]." JA959. But the *Johnson* closing argument makes clear that there is not just a "connection" between the Article and *Gref*, but that the Article is critical to the case.

PPA has no response whatsoever to a plaintiffs' counsel stating: "Remember the Moline case series, the Emory case series. Over a hundred people exposed to cosmetic talc getting mesothelioma. *How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'?*" JA1376-1377 (emphasis added). Gref's counsel could attempt to do the same here. PPA does not so much as mention that closing argument in its brief.

It did not matter at that trial that Dr. Emory, Dr. Maddox, and Dr. Kradin did not personally testify. Nor did it matter the amount of space the Article took up in any expert report. Plaintiffs' *counsel* could still use

the Article to dramatic effect, which Gref's counsel can do at trial for the same reasons.

And the Article is highly relevant for far more reasons than just that closing. PPA does not dispute that there are "no studies of the epidemiology of mesothelioma among cosmetic talc users," as Gref's own expert admits. JA445. The Article is critical because it attempts to fill that gap. The Article also supports Gref's contention—hotly disputed in the case—that cosmetic talc is contaminated with asbestos. According to the Article, supposedly the only explanation for the individuals' mesotheliomas is the *presence of asbestos in talc.*

The magistrate judge describing the Article as "minimally relevant" in the face of its plain relevance and the very real ways it has been exploited at closing argument in the past is clearly erroneous and warrants reversal.

On burden, the magistrate judge's conclusion that "compliance with AII's subpoena would force Peninsula and Dr. Emory to bear *heavy burdens*" is also clearly erroneous and serves as an independent basis to reverse. *See* JA1018 (emphasis added). Aside from the financial and logistical costs of complying with the subpoena before it was narrowed—

2

which the district court did not adopt and PPA does not defend—the magistrate judge relied on only one burden: supposed "medical ethics rules." But PPA has not cited a *single* medical ethics rule to support that conclusion or any other authority demonstrating that any such medical ethics rule exists. In fact, PPA admits that "the physician-patient evidentiary privilege is not at issue in this case." RB44.[1] And PPA does not argue that HIPAA applies. Relying on non-existent "medical ethics rules" is clearly erroneous and another basis for reversal.

Finally, reversal is appropriate if the "appellate court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Parris*, 639 F. App'x 923, 927 (4th Cir. 2016). Having misjudged both the relevance and the burden, this Court should also reverse because the magistrate judge clearly erred in balancing the factors.

---

[1] PPA's response brief will be cited: RB__. A-I-I-'s opening brief will be cited: OB__. The underlying *Gref* docket (S.D.N.Y. 20-cv-5589) will be cited *Gref* ECF __.

## ARGUMENT

A-I-I proposed a hypothetical in its opening brief where an expert makes false claims at trial about 75 other unrelated plaintiffs, explaining that the discoverability of those plaintiffs' identities should not change simply because the plaintiffs were laundered through the veneer of an "article." OB28. PPA's response is a non sequitur—claiming that A-I-I contends "that every time an expert relies on another academic's article, a party should get discovery into that third party's underlying data, even if they have nothing to do with the case." RB34. That is neither responsive to the hypothetical nor a remotely reasonable characterization of A-I-I's arguments.

The Emory Article is uniquely situated. Its authors are experts in cosmetic-talc litigation and knew they would be subject to discovery about their Article. The Article is critical to Gref's case. There is a dearth of epidemiology showing that cosmetic talc users are at increased risk of mesothelioma. The Article purports to support Gref's theory that cosmetic talc contains asbestos. And the Article can be exploited in closing argument in ways that have actually occurred in actual cases.

The Article's subjects are plaintiffs in litigation, who have no expectation of privacy regarding their medical conditions. Rather, each plaintiff-subject had every expectation that their medical condition would be discussed publicly. And A-I-I has sought only the smallest amount of non-private information: the names of the cases used in the Article.

A-I-I has also demonstrated it has good reason to believe the fundamental premise of the Article is false. This is no "fishing expedition." *See* RB34. PPA's argument that A-I-I's plaintiff matches are "unsubstantiated" holds no water here where the question is simply whether A-I-I is entitled to basic discovery for the purpose of substantiating its arguments. *See* RB30.

This Article is unlike simply every paper an expert relies on, and its unique nature also makes this case unlike those cited by PPA. *See* RB33-34. Permitting discovery into this singular Article that was published as a litigation tactic does not create a "slippery slope" to discovery into every single study any expert ever relies on.

This Court should reverse the decision below and permit A-I-I's requested discovery.

I.    **PPA's Status As A "Non-Party" Does Not Meaningfully Change The Analysis Here.**

PPA only pays lip service to its argument that its status as a non-party makes any significant difference in how this Court should conduct its analysis. RB19-21. PPA does not dispute that the standard for non-parties simply means that "courts look closely at the pertinent factors." OB25. PPA also agrees that—as the party seeking to block discovery—it bears the burden to show why the subpoena should be quashed. RB19-21.

Rather, PPA disagrees only that any "special weight" given to non-parties is diminished here because (1) PPA is not a stranger to cosmetic talc litigation and (2) courts should be more hesitant to deem information irrelevant when the underlying case is not before them. Both factors point in favor of discovery here.

*First,* the rationale in *Jordan* for courts having more sensitivity toward non-parties is based on the *expectations* of those parties to become connected to the litigation. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). PPA plucks out one phrase in *Jordan* referring to the "parties' dispute." RB20. But *Jordan* had no occasion to address subpoena recipients with a connection to the litigation more broadly

6

because it involved a subpoena to a true stranger to the dispute: the *Virginia* Department of Corrections in a case involving *Mississippi's* execution practices. *Id.* at 185.

Here, PPA is enmeshed in talc litigation, as is the Article. The Article's authors are experts in cosmetic-talc litigation. Its subjects are plaintiffs in cosmetic-talc litigation. Its purpose is to aid cosmetic-talc litigation, and it has succeeded in doing so. PPA has every expectation that it will be heavily involved in discovery in cosmetic-talc litigation like *Gref*. PPA's proposed rule that these considerations do not factor into the analysis *at all* does not make sense.

*Second,* PPA downplays the Federal Circuit's statements that a district court should be "especially hesitant" to deem evidence irrelevant when it is supervising discovery for a case pending in another district. *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211-12 (Fed. Cir. 1987). PPA's protests that the case is too old, out-of-circuit, and based on an older version of Rule 45 are meritless. RB21 n.3.

Courts across the country continue to rely on *Truswal* for this very concept.[2] Contrary to PPA's argument, Rule 45's amendments have no bearing on the commonsense principle that an outside court reviewing a subpoena may not be as familiar with the facts of the underlying case. PPA never explains how the amendments change the analysis.

Whatever minimal weight non-parties generally may receive should not apply here, or at least to a lesser extent.

## II.    The List Of Case Names Is Highly Relevant To *Gref*.

PPA's arguments on relevance only underscore the errors of the court below. PPA highlights that the magistrate judge stated: "I just *don't understand* why you've picked this case to single out, because I frankly see *almost no connection* between Dr. Emory's study and [*Gref*]." JA959 (emphasis added); RB22-23. That lack of understanding is precisely the problem.

The relevance is plain from how the study has been used at other trials. PPA does not respond *whatsoever* to how plaintiffs' lawyers have

---

[2] *See, e.g.*, *In re Subpoena to PayPal Holdings, Inc.*, 2020 WL 3073221, at *2 (N.D. Cal. June 10, 2020); *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 295 F.R.D. 517, 521 (N.D. Fla. 2013); *DatCard Sys., Inc. v. PacsGear, Inc.*, 2011 WL 2491515, at *2 (D. Minn. Apr. 25, 2011).

used the Emory Article in a closing argument: "*How many people have to die of mesothelioma before this company will say, 'Okay. Enough's enough. We admit it we did it'?*" JA1376-1377 (emphasis added). Dr. Emory, Dr. Maddox, and Dr. Kradin did not testify at that trial, yet plaintiffs still emphasized the Article in closing arguments. The same could occur in *Gref*.

This serves as a stark example for why the number of words devoted to discussing a paper in an expert report is no indication of its importance at trial. An expert need only cite a paper to discuss it at trial. And once part of the trial, Gref's *counsel* can then emphasize the Article as much as they want—not just in closing argument, but also on direct examination of Gref's experts and cross examination of A-I-I's. Indeed, Dr. Moline testified about the Article as recently as a February 2024 cosmetic talc trial against A-I-I in New York.

A recent order in the federal Johnson & Johnson cosmetic talc/ovarian cancer MDL recognizes both the significance of this discovery and why it is warranted. Special Master Order No. 19, *In re: Johnson & Johnson Talcum Powder Prods.*, No. 16-md-2738, ECF 29138 (D.N.J. Feb. 29, 2024). The defendant sought the identities of the

individuals included in Dr. Moline's similar papers. *Id.* at 1. The Special Master explained that "Moline's articles are directly relevant" to an issue "at the heart of the case"—whether "J&J's talc contains asbestos." *Id.* at 6. He ruled that "[i]f the articles are relied upon by plaintiffs, the articles should be fair game for discovery" because "defendants in cosmetic talc cases deserve a fair opportunity to explore the weight to be assigned Dr. Moline's facts and conclusions." *Id.* at 6, 7. That is precisely the situation here with respect to the Emory Article.[3]

The Article easily satisfies the undemanding standard for relevance in *Jordan*, a case PPA repeatedly cites. Relevant evidence must provide only a "marginal benefit in litigating important issues," in that "the information must offer some value over and above what the requesting party already has." *Jordan*, 921 F.3d at 189. It is fundamentally unfair to permit Gref's counsel to argue that other mesothelioma cases involved

---

[3] The special master denied the discovery only because "J&J ha[d] not shown that plaintiffs' experts rely on Moline's articles to support their expert opinions" and because "Plaintiffs expressly assured J&J and the SM at oral argument that they w[ould] not use or seek to introduce Moline's articles at trial." *Id.* at 7-8. That is not the situation here where Gref's experts *do* rely on the Emory Article and Gref has *not* agreed to not raise the Article at trial.

no non-talc exposures and then shield the identity of those cases so A-I-I cannot test those assertions.

None of PPA's numerous attempts to justify this unreasonable result hold water.

## A. That asbestos causes mesothelioma is beside the point.

PPA repeatedly claims that the Article is not important because it has already been established that *asbestos* causes mesothelioma. This skewed framing serves as the foundation of PPA's argument, which PPA considered important enough to weave throughout its entire brief. *See* RB2 ("[A]sbestos, regardless of the product that it is contained in, causes mesothelioma."); *id.* at 7 ("[A]sbestos, regardless of the product in which it is contained, is capable of causing mesothelioma."); *id.* ("[A]sbestos fibers of any type or size can cause mesothelioma"); *id.* at 23 ("asbestos causes mesothelioma."); *id.* at 27 ("asbestos causes mesothelioma"); *id.* at 28 ("all forms of asbestos cause cancer."); *id.* at 28 (same).

PPA's framing is false by its own words. PPA itself stated the "goal of the Article" was to discuss "a potential cause of malignant mesothelioma that, at that time, had not been widely reported or recognized: *cosmetic talc*." RB4 (emphasis added). The Article itself

concludes that "[m]esotheliomas can develop following exposure *to cosmetic talcum powder*"—not asbestos. JA99 (emphasis added); *see also* JA104 (similar). Even the Article's *title* is "Malignant mesothelioma following repeated exposures to *cosmetic talc*." JA99 (emphasis added).

The Article makes no attempt to add to the scientific knowledge that asbestos causes mesothelioma. The whole point of the Article is to argue that alleged asbestos in talc was the only explanation for 75 individuals' mesothelioma. That information came from lawsuits. Yet now PPA wants to block discovery to identify those lawsuits to prevent any investigation into whether those exposure claims were true.

Additionally, as the special master in the Johnson & Johnson ovarian cancer MDL recognized, the Article supports Gref's theory that asbestos is present in the talc. That is why the Special Master found the Articles are relevant to an issue at the "heart of the case" even in cases where plaintiffs did not develop mesothelioma but rather ovarian cancer. If a product as widely used as cosmetic talc actually contained asbestos, one would expect to see high rates of mesothelioma among end users of cosmetic talc, like barbers. Yet there are no epidemiological studies that identify barbers (or any other group of cosmetic talc end users) at an

increased risk of mesothelioma. JA1186. Likewise, studies of *miners and millers* of cosmetic talc—who would have the highest exposures—show no increased risk of mesothelioma. JA1192; *see also* JA1186. If cosmetic talc contained asbestos, then mesothelioma would not be a rare disease given the number of people who have used it regularly their entire lives.

The Emory Article attempts to fill that scientific gap for plaintiffs by alleging a relation between cosmetic talc end users and mesothelioma that no other study (other than Dr. Moline's) finds. The Article is therefore critical to Gref's case. While PPA tells this court the Article is irrelevant, Gref has never committed not to mentioning it at trial.

## B. PPA's proposed ways for A-I-I to defend itself without the data A-I-I seeks would be ineffective.

The magistrate judge concluded, "[t]here is already extensive information on the face of the Article that A-I-I can use to attack the Article's conclusion." JA1017. PPA's attempts to support that rationale fall flat. RB25. The primary argument PPA proposes for the defense to make at trial is that the Article's authors are plaintiff-side litigation experts. *Id.* But the fact that the authors may have some bias pales in comparison to the argument that the *Article's premise is false*.

13

The same is true of PPA's technical and not-particularly-jury-friendly argument that because the Article is a "case series" it does not have the "proper epidemiological study design aims" to provide "causal inferential value." RB32. That scientifically focused argument, while perhaps available, does little to remove the sting of the Article's powerful and easily understood point: that asbestos in cosmetic talc supposedly *must* be the cause of mesothelioma because it is the only explanation for the 75 individuals' mesothelioma. *PPA* certainly believes the Article provides "causal inferential value"—the Article itself claims to show that "cosmetic talc may be a *cause* of malignant mesothelioma." JA104 (emphasis added).

Finally, PPA talks out of both sides of its mouth when it argues that "A-I-I can also cross examine the *Gref* experts about their supposed case matches." RB25. PPA itself previews Gref's response, contending that "several of the supposed case matches contain data differences, and thus are not even plausible matches." RB30. But PPA cannot argue that A-I-I is able to cross-examine Gref's experts regarding its case matches while simultaneously arguing those matches are incorrect. The entire purpose of the discovery is to ascertain those and other matches.

It will be difficult-to-impossible to prove these matches to a jury without knowing who the plaintiff-subjects are. That is even *more* problematic in a case like *Gref* where Dr. Emory is not an expert. Dr. Moline and Dr. Finkelstein do not know who the individuals in the Emory Article are and so are in no position to agree whether a case match is accurate. In fact, they are likely to fight the concept that the cases are matches just as PPA does in its own brief.

## C. There is little reason to depose Dr. Moline and Dr. Finkelstein on a topic about which they have no knowledge.

It is of no moment that Dr. Moline and Dr. Finkelstein were not questioned significantly about the Emory Article at their *Gref* depositions, as PPA contends. RB7-8. Opposing counsels need not reveal all of their questions in a deposition. The amount of deposition questioning is no concession as to the importance of any topic that may be raised at trial. And questioning Gref's experts about the most critical issue regarding the Article—the truth of the non-talc asbestos exposures—would have been futile. As mentioned above, those experts have no knowledge about the underlying cases on which the Article is

supposedly based. They can hide behind the claim that the Article was peer reviewed.

### D. Any "peer review" did not confirm accuracy of underlying case facts and is irrelevant.

PPA also claims the Article was peer reviewed and that A-I-I has not "provided any good reason to supersede that quality control process." RB29-30. While certainly a paper that is not even peer reviewed should raise major red flags about its reliability, any peer review is not a panacea ensuring accuracy.[4] Never was that truer than in this case.

The journal where Dr. Kradin is an editor accepted the Article for publication a mere *11 days* after it was received. JA99 ("Received: 24 February 2020" and "Accepted: 6 March 2020"). Dr. Maddox himself recognized that represented a "pretty quick" turnaround time. JA60. It is implausible that any peer reviewers could thoroughly evaluate 75 full litigation files including transcripts and medical records in that time in

---

[4] Peer review does not "necessarily correlate with reliability." David W. Schnare, *Academic Research Transparency and the Importance of Being Earnest*, 49 J.L. & Educ. 1, 5 (2020). As one example, a *Science* reporter was able to get more than 150 peer-review journals to accept scientific papers with experiments "so hopelessly flawed that the results [are] meaningless." John Bohannon, *Science*, *Who's Afraid of Peer Review* (Oct. 4, 2013), https://www.science.org/doi/10.1126/science.2013.342 .6154.342_60.

16

a search for non-talc exposures. In fact, there is reason to believe the peer reviewers were never given access to the underlying data in the first place, especially since the authors claim they are duty-bound to never disclose it. *See also* Complaint ¶ 113, *LTL Mgm't LLC v. Emory*, No. 23-cv-03649, ECF 1 (D.N.J. July 7, 2023) (asserting that the peer reviewers did not have access to the data).

There was no "quality control" process that A-I-I attempts to supersede. And even if one existed, that would not be a basis to block discovery. It has no bearing on whether the information sought is relevant or represents an undue burden.

### E. The timing of A-I-I's subpoena has no bearing on its relevance.

PPA is also wrong to contend the timing of the subpoena indicates the Article is not relevant. As discussed below, the subpoena was served in the middle of fact and expert discovery. *See infra* § IV.B. So, the timing of the subpoena during ongoing discovery does not hint at a lack of relevance.

Additionally, the *Bell* opinion, in unsealing information that identified Ms. Bell as a subject of Dr. Moline's paper, gave A-I-I the good faith basis to believe the Emory Article also included cases with

17

alternative exposure to asbestos unrelated to talc. Dr. Moline's paper claimed all 33 cases of mesothelioma had only exposure to cosmetic talc. Yet A-I-I discovered that Ms. Bell, one of those 33 cases, had also filed a workers compensation claim swearing to occupational asbestos exposure in a textile mill.[5]

The *Bell* Court specifically acknowledged, "AII seeks to vacate the protective order so the Northwell Document can be used in other litigation." *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 529 (M.D.N.C. 2022). The Middle District of North Carolina issued the *Bell* opinion in September 2022. A-I-I issued its subpoena to PPA the next month. JA10.

**F.    The caselaw supports permitting discovery here.**

PPA has not marshalled a single case that supports quashing the subpoena here. The cases PPA cites are not remotely like the circumstances surrounding the Emory Article: a narrow request for just a list of non-confidential case names used by experts in the broader litigation for non-confidential material where there is good reason to

---

[5] Contrary to PPA's contentions (at RB31 n.5), Ms. Bell's workers' compensation claims were "not adjudicated on the merits." *Bell*, 627 F. Supp. 3d at 531.

believe the premise of the Article is false—and where the Article has been emphasized in closing arguments in similar cases. *See* RB33-34.

*Buchanan* involved a request for a deposition and documents which would require the third party "to spend many days testifying and disclosing all of the raw data, including thousands of documents, accumulated over the course of a long and detailed research study." *Buchanan v. Am. Motors Corp.*, 697 F.2d 151, 152 (6th Cir. 1983). *In re NHL* similarly involved requests that would take "13 years worth of time" to gather to produce. *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2017 WL 1493671, at *4 (D. Minn. Apr. 26, 2017). And in *In re Bextra*, the medical journal actually *produced* "general communications between their editors and the authors of articles" after negotiations with the defendant. *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 249 F.R.D. 8, 11 (D. Mass. 2008).

The cases A-I-I cited are much more analogous, and PPA failed to convincingly distinguish them. *See* RB35-36. PPA hangs its hat on the thin reed that the subpoenaed information in *Kellington* was written by an expert who *previously* was involved in the litigation, rather than an expert who was currently involved in *other cases* in the litigation. RB35

(citing *Kellington v. Bayer Healthcare Pharms., Inc.*, 2016 WL 5349801 (W.D. Va. Sept. 23, 2016)). And both here and in *Deitchmann*, the paper at issue was "of enormous significance" to the case. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 558 (7th Cir. 1984).

## III.   The Subpoena Imposes No Burden On PPA.

The magistrate judge and district court identified only a single supposed "burden" on PPA: so-called "medical ethical concerns." JA1369-1370; *see also* JA1018 ("medical ethics rules"). But PPA still has not provided *any authority* whatsoever to support this concept—relying only on Dr. Emory's conclusory statement.

To try to circumvent this clear error, PPA in a footnote distorts the magistrate judge's ruling. PPA claims the magistrate judge considered "several factors." RB38 n.10 (quoting JA1015). But PPA quotes the part of the opinion where the magistrate judge laid out the factors "courts *should* consider" in the abstract. JA1015 (emphasis added). When actually analyzing what supposed "burdens" exist, the magistrate judge and the district court relied exclusively on non-existent "medical ethics."[6]

---

[6] The magistrate judge also discussed burdens associated with the original subpoena, though recognized that A-I-I had since "limited its demand to a list of the names." JA1018. The district court did not rely on

Trying to salvage this flawed reasoning, PPA now pivots to arguing the subpoena should be quashed because of alleged concerns regarding confidentiality and chilling academic research. Neither represents a legitimate burden here. Moreover, these new arguments not relied on by the district court or magistrate judge do not merit the deference of a "clear error" standard of review. *United States v. Smith*, 640 F.3d 580, 596 (4th Cir. 2011) ("As the district court made no findings on this point, our review must be de novo."); *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997) ("[W]e review a District Court's factual findings for clear error; if, as here, no findings exist, our review is plenary.").

## A.    No confidentiality interests are implicated.

PPA does not meaningfully grapple with the fact that the subpoena involves unique circumstances where the medical conditions of all the Article's subjects have already been made public. As the American Tort Reform Association's amicus brief explains (at 8-9), it is a common legal principle that a person loses any expectation of privacy when disclosing information to a third party. Here, the information wasn't merely sent to

---

the burdens associated with the original, unnarrowed subpoena. JA1367-1370. Nor does PPA before this Court.

one other person, but made public. Because all the subjects of the Article were litigants, they did not have any expectation of *privacy*, but rather every expectation that their medical conditions would be discussed in the very public setting of trial.

Take Stephen Lanzo for example, who appears to be Case #72 in the Article. OB13-15. Stephen Lanzo filed a public complaint stating: "Stephen Lanzo, III, contracted mesothelioma." Complaint ¶ 3, *Lanzo v. Cyprus Amax Mins. Co.*, 2016 WL 11188365 (N.J. Super. Ct. Dec. 22, 2016). He had a public trial discussing his mesothelioma which is currently available online for anyone to watch.[7] The verdict in his favor was reversed in a public appellate opinion, discussing his mesothelioma. *Lanzo v. Cyprus Amax Mins. Co.*, 467 N.J. Super. 476, 487 (App. Div. 2021).

In fact, the first hit of a simple Google search for "Stephen Lanzo" is a page on his plaintiffs' firm's website promoting their (since-reversed) trial victory and stating that Mr. Lanzo has mesothelioma.[8] Mr. Lanzo

---

[7]  https://cvn.com/proceedings/lanzo-v-cyprus-amex-minerals-co-et-al-trial-2017-11-20.

[8] https://www.kazanlaw.com/verdicts/117000000-mesothelioma-verdict-for-lifelong-user-of-johnson-johnson-baby-powder/.

cannot possibly have any expectation of privacy in the fact that he has mesothelioma. Nor could any of the other subjects who are similarly situated, having made their mesothelioma public by filing public lawsuits where they expected their mesotheliomas would be publicly litigated.

PPA even admits that "the physician-patient evidentiary privilege is not at issue in this case." RB44. And it makes no argument that HIPAA applies. Instead, it claims its assertion of "confidentiality is based on the widely-recognized confidentiality of human research subject identities." *Id.* But simply calling something "widely-recognized" does not make it so. PPA has cited no medical authority for this supposed principle in these circumstances. Nor has it cited any other authority that a medical condition should maintain some form of confidentiality in the circumstances here where the subjects' medical conditions have already been made public.

PPA again relies on cases involving circumstances that are dissimilar to the issue before this Court. *See* RB42-43. In *Farnsworth*, the information sought was "of a highly personal nature" including "sexual practices, contraceptive methods, pregnancy histories, menstrual activity, tampon usage, and douching habits." *Farnsworth v. Procter &*

23

*Gamble Co.*, 758 F.2d 1545, 1546 (11th Cir. 1985). Those study participants, unlike Dr. Emory's, were not all plaintiffs who already publicly revealed the medical information at issue. Moreover, unlike this case, there was no evidence in *Farnsworth* that the underlying facts reported in the study were false. *Lampshire* was an earlier ruling involving the same study and suffers from the same flaws. *Lampshire v. Procter & Gamble Co.*, 94 F.R.D. 58, 60 (N.D. Ga. 1982).

*Doe v. American Red Cross Blood Services* did not involve a study at all, but a request to identify "the HIV positive donor whose blood was transfused into Jane Doe during an operation." 125 F.R.D. 646, 647, 650, 652-53 (D.S.C. 1989). That HIV status was not previously made public, and the court there emphasized the unique stigma surrounding HIV in that era. The court described the donor as "suffering from a disease that is widely thought of as the modern day equivalent of leprosy." *Id.* at 652.

Finally, in *Braintree* the relevant documents were *produced*, and the only question was whether information would be filed under seal—a completely different inquiry. *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 2013 WL 12170639, at *1 (D.N.J. Apr. 3, 2013). As discussed below, A-I-I agreed in a similar vein to obtain the identities of the subjects of the

24

Article under seal to maintain their confidentiality. Moreover, the individuals in *Braintree* "expressly agreed to participate in the studies on the condition that their medical data remain confidential." *Id.*; *see also Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*, 71 F.R.D. 388, 389 (N.D. Cal. 1976) (employees agree to participate in interview "[u]nder a pledge of confidentiality"). Here, by contrast, there is no dispute that the authors of the Emory Article did not seek their subjects' consent at any time. JA104; *see also* RB39 (acknowledging as much).[9]

## B.   The speculative risk of "chilling" research is no basis to quash the subpoena.

PPA is also wrong to contend the subpoena is burdensome on the ground that complying with it "threatens to chill scientific research." RB39. That argument turns less on the alleged confidentiality of the information but almost entirely on the authors' status as "researchers."

---

[9] PPA also quotes from a mid-trial ruling regarding Dr. Moline's paper in *Johnson/Lashley v. American International Industries* where the court did not have the benefit of full briefing and argument. RB43. Critically, that trial occurred in 2020 shortly after Dr. Moline's original article first became available—well before the *Bell* ruling and other new information came to light revealing that the premise of Dr. Moline's 2020 Article is not true. *Supra* 17-18.

In the First Amendment context, asserting that a law would "chill" speech requires concrete evidence. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). PPA should not be able to block a subpoena by simply *asserting* without any evidence that complying with the subpoena would "chill" research. PPA never so much as explains *how* or *why* obtaining this list of names will impact their research at all. It would not, for many reasons.

As discussed above, the Article was written by litigation experts about litigation plaintiffs for litigation purposes. Even before the Article was published, everyone would have expected litigants to probe into the assertions that these individuals had no non-talc exposure to asbestos.

PPA relies on *In re Fosamax*, which found the subpoena would "handicap [the National Academy of Sciences'] ability to recruit participants" and diminish the "candor" of study participants. *In re Fosamax Prod. Liab. Litig.*, 2009 WL 2395899, at *5 (S.D.N.Y. Aug. 4, 2009). But here, the subjects of the Article did not even know they would be in the study, so there are no recruitment concerns. JA104. And the subpoena does not threaten anyone's candor to researchers as the

information came from sworn deposition testimony and interrogatory responses. JA100. The plaintiffs who are the subjects of the Article already had every incentive to be candid to avoid committing perjury and to maintain their credibility.

It is therefore irrelevant that "physicians and academics rely on the promise of confidentiality to conduct their research" in other contexts. RB40. That was not the case here. PPA claims without evidence that the "methodology used in the Article is typical." RB39. But even if true, that would not negate the fact that the Article's approach eliminates the "chill" concerns about participation and candor.

Finally, the idea that the subpoena would chill researchers' "ability and willingness to research rare and lethal diseases like mesothelioma and assist medical advancements related to its treatment" is a complete misdirection. Dr. Emory and the Article's other authors were not researching *treatments* for cancer. If anything, they were trying to support litigation. Actual researchers of treatments for rare and lethal diseases have nothing to fear. And PPA's point on this front turns on the supposed chill stemming from being "subjected to burdensome subpoenas." RB40. That is a circular argument. The entire inquiry is to

27

decide *whether* the subpoenas are burdensome. PPA cannot argue the reason subpoenas represent an undue burden is because they are "burdensome subpoenas."

Because the authors served as experts in the litigation cases the Article's subjects were drawn from, the authors were intimately familiar with the facts surrounding the plaintiff-subjects' non-talc asbestos exposures. That the Article claims these exposures do not exist means the Article is either intentionally false or that the authors published it with reckless disregard for its truth or falsity. At bottom, PPA's argument is that the Article's authors can make false statements about plaintiffs in litigation to support the litigation position of cosmetic talc plaintiffs like Mr. Gref, but they should be shielded from discovery merely because the statements occurred in an "article." That is not the law, nor should it be.

**C.    The proper remedy to address any confidentiality concerns is a protective order.**

It is a vast oversimplification for PPA to claim that "[w]hen, as here, a subpoena is unduly burdensome, there is only one available course: the court '*must quash*' the subpoena." RB44 (emphasis added). Multiple courts recognize that, when a subpoena presents an undue burden, "[t]he

solution is not to cover-up the information or its data base because disclosure is too burdensome but to use the tools available to lessen the burden and to permit the information to become available." *Wright v. Jeep Corp.*, 547 F. Supp. 871, 877 (E.D. Mich. 1982). Indeed, "a district court abuses its discretion when—as in this case—it fails to recognize or consider the range of options available to it before ruling on a motion to quash." *Cook v. Howard*, 484 F. App'x 805, 827 (4th Cir. 2012) (Diaz, J., dissenting in part and concurring in part).

It is well-established that a protective order is the preferred solution to confidentiality concerns. *Jordan*, 921 F.3d at 192-93 ("And disclosure subject to a confidentiality order, if feasible, is generally preferable to an outright denial of discovery."); *see also, e.g.*, *Deitchman*, 740 F.2d at 564 (concluding that the failure to issue a protective order was "an abuse of discretion."). The court below abused its discretion by failing to consider or address whether a protective order would have alleviated the supposed "burden."

29

**IV.  This Court Should Reject PPA's Proposed Alternative Grounds For Affirmance.**

**A.  A-I-I is not seeking privileged or protected information.**

This Court should reject PPA's two-sentence argument that the subpoena seeks "privileged or other protected matter" under Fed. R. Civ. P. 45(d)(3)(A)(iii). RB46. Putting aside that the information sought is not even confidential for the reasons discussed above, the provision PPA relies on is inapplicable as a matter of law.

The subpoena does not seek "privileged" material. As mentioned above, PPA itself admits "the physician-patient evidentiary privilege is not at issue in this case." RB44.

Nor does the subpoena seek "other protected matter." That provision "refers to testimony or production that, although not privileged, is nevertheless protected from compelled disclosure, such as attorney work product or trial preparation materials." 9 Moore's Federal Practice – Civil § 45.51. "[H]ealth care records are not the type of 'other protected' materials intended by" Rule 45(d)(3)(A)(iii). *Kohari v. Jessie*, 2014 WL 1338558, at *3 (S.D. W. Va. Apr. 3, 2014); *see also Briggs v. Cnty. of Maricopa*, 2021 WL 1192819, at *5 n.5 (D. Ariz. Mar. 30, 2021) (similar).

That interpretation makes sense. The rule PPA invokes describes categories of documents where the court "*must* quash or modify the subpoena." Fed. R. Civ. P. 45(d)(3)(A) (emphasis added). If PPA were correct that "confidentiality" is sufficient, a court would be *required* to quash or modify a subpoena merely because two private parties entered into an agreement to keep material confidential. Rule 45(d)(3)(A)(iii) does not apply here.

## B.   The subpoena was timely.

PPA argues that "[s]ubpoena was issued after the close of discovery in *Gref*, and therefore was untimely." RB46. That is wrong. Even the magistrate judge explained at the hearing that he would not "quash the subpoena solely on the basis that it was untimely *given that discovery is ongoing*." JA974 (emphasis added). On September 6, 2022, the *Gref* court adjourned the pretrial conference "until discovery is completed in the case" and requested the parties notify it once complete. JA602. The subpoena was served the next month in October 2022. As recently as August 2023, the parties submitted a status report discussing ongoing discovery. *Gref* ECF 390. As of today, the parties still have not notified the court that discovery is complete.

31

PPA also argues the subpoena should be quashed because it was not "issued during the *fact discovery period*." RB46 (emphasis added). This argument—asserted without any support—is wrong twice over. First, even taking PPA's argument at face value, fact discovery *was* still ongoing. Despite PPA's claim that fact discovery closed on November 2021, it continued throughout 2022 with no timeliness objections lodged by either party:

- **1/11/2022:** Dr. Badarinath (treating physician) deposition notice. JA629-633.

- **1/12/2022**: Dr. Shirazi (treating physician) amended deposition notice. JA634-638.

- **1/19/2022:** Plaintiff's Supplemental Interrogatory. JA639-646.

- **2/18/2022:** A-I-I's Response to Supplemental Interrogatory. JA648-655.

- **4/7/2022**: A-I-I's Supplemental Requests for Admissions. JA657-661.

- **5/6/2022:** A-I-I's Second Request for Production of Documents. JA662-668.

- **5/9/2022:** Plaintiff's Responses to A-I-I's Supplemental Requests for Admissions. JA669-676.

- **6/6/2022:** Plaintiff's Responses to A-I-I's Second Request for Production of Documents. JA678-682.

- **10/31/2022:** Subpoena to Navy Personnel Command. JA683-687.

A-I-I issued its subpoena to PPA on October 27, 2022. Fact discovery was still ongoing at the time of the subpoena.

Second, the subpoena is relevant to *expert* discovery, which was also still ongoing, as it concerns expert reliance material. While PPA tries to claim that expert discovery closed in July 2022, it acknowledges that "the deadline to complete *expert depositions* was extended several times." RB46. Multiple depositions, such as Dr. Diette's, had not occurred at the time of the subpoena. JA625. Dr. Moline's deposition had not yet even been completed when the subpoena was issued. JA604. In May 2023, Gref agreed to allow A-I-I to depose Dr. Moline again. *Gref* ECF 347. And as PPA itself notes, Dr. Moline has since attempted to supplement her expert report in *September 2023*. RB15.

As even the magistrate judge found, the subpoena was timely.

## CONCLUSION

This Court should reverse the decision of the court below and require the production of the list of the individuals in the Emory Article.

Respectfully submitted,

*/s/Benjamin L. Hatch*

| | |
|---|---|
| Robert E. Thackston | Benjamin L. Hatch |
| NELSON MULLINS RILEY | Sylvia Macon Kastens |
| & SCARBOROUGH LLP | MCGUIREWOODS, LLP |
| 3333 Lee Parkway | 9000 World Trade Center |
| Suite 740 | 101 West Main Street |
| Dallas, TX 75219 | Norfolk, VA 23510 |
| (469) 983-6100 | (757) 640-3700 |
| robert.thackston@ | bhatch@mcguirewoods.com |
| nelsonmullins.com | skastens@mcguirewoods.com |

*Counsel for Appellant American International Industries*

March 4, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 6487 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 365 ProPlus.

Date: March 4, 2024

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Appellant American*
*International Industries*

## CERTIFICATE OF SERVICE

This is to certify that I have this March 4, 2024, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all registered counsel.

/s/ Benjamin L. Hatch

Benjamin L. Hatch

*Counsel for Appellant American International Industries*